# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA )  |  |
| ) |  |
| v. ) | CRIM. NO. 3:13-CR-226(RNC) |
| ) |  |
| DANIEL E. CARPENTER, et al. ) |  |
| ) | JUNE 6, 2014 |
| Defendants ) |  |
| ) |  |

## DEFENDANT CARPENTER'S BRIEF IN SUPPORT OF THE EMERGENCY MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR LACK OF FEDERAL JURISDICTION/VENUE AND SUFFICIENCY OF ALLEGATIONS RE: TITLE 18 CRIMES

### PRELIMINARY STATEMENT

In December, 2013, a grand jury returned an indictment against both Daniel

Carpenter and Wayne Bursey, accusing them of violating 18 U.S.C. §1349 (conspiracy to

commit mail and wire fraud); 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1341 (mail

fraud); 18 U.S.C. §2 (aiding and abetting). On May 14, 2014, the grand jury returned a

superseding indictment adding on 23 additional counts, including Conspiracy to Commit

Money Laundering under 18 U.S.C. §1956(h); Illegal Monetary Transactions under 18

U.S.C. §1957; Money Laundering under 18 U.S.C. §1956(a)(1)(A)(i); and Aiding and

Abetting under 18 U.S.C. §2. The Superseding Indictment (the "Indictment"), however,

as it relates to Mr. Carpenter, fails to allege facts sufficient to constitute a **federal**

offense. Accordingly, the allegations of the Indictment are insufficient to invoke the

jurisdiction of this Court, as they fail to satisfy the legal requirement that they state facts

1

sufficient to make out a violation of the federal mail and wire fraud statutes or the money-laundering statutes. Therefore, for the reasons which follow, the Indictment should be dismissed in its entirety.

This Indictment arose out of an ongoing investigation involving several individuals, including J. Edward Waesche, IV, an insurance broker licensed to sell life insurance in numerous states, including Connecticut. Mr. Waesche worked with such carriers as Lincoln National Corporation, the Phoenix Companies, and Penn Mutual Insurance Company for many years. As a duly licensed agent, he was expected to operate fairly, honestly, and truthfully with these and other insurance companies. They relied upon his honesty. Part of his job was to obtain information from various applicants for insurance and to complete applications for insurance, knowing that others would rightfully rely upon his representations as truthful and complete.

In the instant matter, Mr. Carpenter, as well as co-defendant Wayne Bursey, also relied upon Mr. Waesche to be honest, fair, and truthful. Beginning in 2006, Mr. Waesche and others engaged in a scheme to defraud not only the defendants but the Charter Oak Trust (hereinafter the "Charter Oak Trust" or the "Trust"), an employee welfare benefit plan and trust, by providing false information to them in order to induce the Charter Oak Trust to allow Mr. Waesche's clients to participate in an employee welfare benefit plan under the Charter Oak Trust program. Part of said scheme was to submit to the Charter Oak Trust false insurance applications that, among other things, contained several false statements and sometimes misrepresented the financial status of the proposed insureds to justify the issuance of large face amount, high end universal life

2

insurance policies. By filing such applications, Mr. Waesche defrauded not only the respective carriers but also the Charter Oak Trust and Mr. Carpenter's company, which funded most of the policies through a funding arrangement with the Trust. Mr. Waesche did so to obtain for himself alone substantial commission payments from the carriers, paid for by premiums from the Charter Oak Trust, which would result from his falsely inducing the Charter Oak Trust to allow these proposed insureds to participate in the employee welfare benefit trust funded by Mr. Carpenter's company. Mr. Waesche knew that, in order for these premiums to be paid by the Charter Oak Trust, the proposed insureds were required to meet certain financial wealth criteria. Mr. Waesche, now an admitted felon, caused false financial statements and false reports to be submitted to both the Charter Oak Trust and Mr. Carpenter's company, as well as the to the respective carriers, knowing that the Trustee (Mr. Bursey) and others, including Mr. Carpenter, would rely upon the misrepresentations made by Mr. Waesche and other brokers.

As a result of Mr. Waesche's fraudulent activities, businesses associated with Mr. Carpenter funded policies in the Charter Oak Trust in which they would never have invested had Mr. Carpenter known the truth. Certain hedge funds, such as Ridgewood Capital, also relied upon false documents generated by Mr. Waesche to become financially involved with the Charter Oak Trust and Mr. Carpenter's company. They were apparently duped by Mr. Waesche's false statements as well.

The claim in the instant Indictment is that at some point Mr. Carpenter and Wayne Bursey, Trustee of the Charter Oak Trust, conspired with Mr. Waesche to falsely induce various named carriers to issue various universal life policies to the Charter Oak Trust,

3

the owner and beneficiary of the policies, for the benefit of the various insureds. The Indictment does not, however, allege that Mr. Carpenter ever met any of the insureds, Nor does it allege that Mr. Carpenter filled out, prepared or submitted any of the questionable insurance applications which are the subject of the Indictment. Mr. Carpenter denies any knowledge that Mr. Waesche prepared and submitted false financial statements so that he, Mr. Waesche, could obtain commissions funded by the premium payments of the Charter Oak Trust, so clearly Mr. Carpenter cannot be part of any scheme to defraud anyone.

The government further claims that Mr. Carpenter conspired with others to submit misleading applications concerning the source of funding of such policies; Mr. Carpenter denies the same. There is no allegation that Mr. Carpenter submitted the applications, only the claim that Mr. Carpenter would make money if the various carriers issued the policies. In fact, it is indisputable (and even the government recognizes the fact) that Mr. Carpenter lost millions of dollars, in significant part because of Mr. Waesche's admitted criminal conduct in submitting false financial information. The alleged insurance carrier "victims" made millions of dollars in premiums on the life insurance policies, and Mr. Waesche made a lot of money in commissions, but Mr. Carpenter lost millions of dollars through his various companies, which did nothing more than provide funding for the Charter Oak Trust to purchase the policies.

The Indictment, if carefully read, fails, for the reasons which follow, to state a legitimate mail and wire fraud case against Mr. Carpenter, and therefore the money laundering allegations are wholly inadequate as they are erroneously based on both a

4

legal fiction and a legal impossibility. Additionally, as to most of the counts in the Indictment, the allegations reveal that Connecticut is not the proper venue for this prosecution, and that the prosecution is time-barred for virtually all of the counts, even assuming they could withstand the jurisdictional scrutiny below.

## I. The Indictment Must Be Dismissed For Lack of Federal Jurisdiction

Before it can do anything else, a federal court must determine that it has subject matter jurisdiction to hear a case. Federal courts are courts of limited jurisdiction, and not all frauds rise to the level of conduct falling within the federal mail and wire fraud statutes or involve the United States of America in such a way that would invoke federal jurisdiction. The federal courts have consistently held to the principle that once jurisdiction is challenged, the District Court has **no authority to do anything** but to take action on the motion to determine whether or not it has jurisdiction to proceed. As the Supreme Court held in The State of Rhode Island v. The State of Massachusetts, 37 U.S. 657 (1838), once the question of jurisdiction is raised "it must be *considered* and *decided* before the court can move one step further" (emphasis added) Id. at 719. "Jurisdiction **cannot be assumed** by a district court nor conferred by agreement of parties, but it is incumbent upon [the US Attorney] to allege in clear terms, the necessary facts showing jurisdiction which must be proved by convincing evidence." Harris v. American Legion, 162 F. Supp. 700 (1958), see also McNutt v. General Motors Acceptance, 298 U.S. 178 (1936).

Mr. Carpenter respectfully submits that this Court does not have jurisdiction because the federal mail and wire fraud statutes do not purport to reach **all frauds**, but

only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." Kann v. United States, 323 U.S. 88 (1944) (emphasis added). See also United States v. Maze, 414 U.S. 395 (1974). In this case, the government's indictment not only fails to address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment involves an email, letter, or wire allegedly involving Mr. Carpenter that came **after** the application for insurance complained about. If the alleged fraud was falsely filling out and submitting via the mails an allegedly fraudulent insurance application, then all of these counts in the Indictment relate to acts occurring after the fraud had come to its full fruition. In all of these cases, the allegedly fraudulent insurance application had been sent to the insurance carrier and the policy had been approved before Mr. Carpenter even knew about the insurance policy. Therefore, the insurance policies had already been issued based on the allegedly false information provided by the Insured or by the Agent (such as Mr. Waesche) that signed the application. Mr. Carpenter's name is nowhere to be found on any of the Charter Oak Trust applications, nor did he fill out, sign or submit any life insurance application mentioned in the Indictment, or any application dealing with COT for that matter. Similarly, if the mail and wire fraud counts are dismissed for lack of jurisdiction, then the money laundering counts are doomed as well because the "money laundering" is based on the alleged "specified unlawful activity" of mail and wire fraud. Ergo, if there is no fraud, there can be no "specified unlawful activity" based on the non-fraudulent activity, and there can be no "knowledge" of "specified unlawful activity" that does not exist.

6

In <u>Maze</u>, the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question [of] whether [the] mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." <u>Maze,</u> 414 U.S. at 399, 402. Here, as in <u>Maze</u>, the success of the alleged insurance application scheme clearly did not depend in any way on the use of mails or wires by Mr. Carpenter or his company, as the alleged uses of the mails and wires all occurred **after** the alleged fraud was **complete**, and the insurance policies had already been approved and issued based on the allegedly false information.

Even assuming that some answers on the insurance applications were incorrect, virtually all those insurance applications were all submitted between 2006 and 2008, and thus the alleged scheme had already come to fruition when the insurance carriers approved the underwriting and issued the policies. All of the counts of the Indictment concerning Mr. Carpenter list mailings and wires that have nothing at all to do with the allegedly fraudulent filling out and submission of allegedly false insurance applications to the carriers. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). <u>Maze,</u> supra at 405; see also <u>United States v. Tackett,</u> 646 F.2d 1240, 1244 (8th Cir. 1981) ("The statute does not reach all mailings resulting from a fraudulent scheme, but only those which are in **furtherance** of the scheme.") (emphasis added). The word "furtherance" in this case means that the mailings and wires must be in some way connected to the fraud. If the fraud was submitting an allegedly false insurance

application, those mailings and wires are not listed here, they were not done in the district of Connecticut, and certainly not done by Mr. Carpenter. Accordingly, the federal mail and wire fraud statutes have not been properly invoked in this case, and this Court lacks jurisdiction to proceed any further with this case. The Indictment should be dismissed forthwith as a matter of law.

## II. The Indictment Must Be Dismissed Because It Fails To Properly Allege All Of The Elements Of Mail and Wire Fraud

An indictment that fails to allege each and every material element of a crime is defective on its face and must be dismissed as a matter of law. United States v. Kurtz, 2008 WL 1820903 (W.D.N.Y. April 21, 2008). Specifically, the Indictment must be dismissed because (1) it fails to allege that the insurance carriers as "victims" were deprived of any "property" within the meaning of the mail and wire fraud statutes; (2) it fails to allege that Mr. Carpenter had the *mens rea* or "specific intent" to defraud the carriers of any property; and (3) it alleges no mailing or wiring that was actually in the furtherance of the scheme to defraud or that was a necessary part of the fraud, as required by the Supreme Court in Parr v. United States, 363 U.S. 370 (1960), Maze, supra, and Kann, supra. For these reasons, as written, the Indictment is fatally defective and insufficient on its face. It must be dismissed.

In order to state a mail and/or wire fraud offense, the government must plead sufficient facts that allege that the defendant (1) used either mail or wire communications in the foreseeable furtherance, (2) of a scheme to defraud, (3) involving a material deception, (4) with the specific intent to deprive another of, (5) property. *See* report to

8

Congress on the elements of mail and wire fraud by the Congressional Research Service, CRS Report R41931, Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law, by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these material elements with sufficient facts renders an indictment facially invalid. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." United States v. Russell, 369 U.S. 749, 764 (1962).

The "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004), cert. denied, 544 U.S. 1017 (2005) (quotation marks, citation, and brackets omitted). Because the mail fraud and the wire fraud statutes use the same relevant language, they are analyzed the same way. United States v. Schwartz, 924 F.2d 410, 416 (2d Cir.1991). In the context of mail fraud and wire fraud, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" McNally v. United States, 483 U.S. 350, 358 (1987), quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924). Although the Indictment need not show that the intended victim of the fraud was actually harmed, it must show that the defendant **contemplated doing actual harm** to the insurance carriers. He must have intended to do something more than merely deceiving the victim. See United States v. Regent Office Supply Co., 421 F.2d 1174, 1180-81 (2d Cir.1970).

9

As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck. Id. at 1182. The Charter Oak Trust, the owner of the policies in question, paid tens of millions of dollars in premium to the carriers involved. Any fraud in this case was committed **against** Mr. Carpenter and his company Grist Mill Capital, LLC, which provided the funding for the insurance policies, as well as the Charter Oak Trust, by the duly licensed brokers, who were approved by the so-called "victim" carriers and who filled out and submitted the insurance applications at issue in this case. Had Mr. Carpenter or the Charter Oak Trust or others known that some of the insureds and insurance agents, certified by the carriers, themselves, conspired to mislead the Charter Oak Trust and Mr. Carpenter and others, then the Charter Oak Trust and others would not have allowed them to participate in the employee welfare benefit trust offered by the Charter Oak Trust.

Even if the government's alleged story of the fraud made sense, which it clearly does not, there would be **zero** value to Mr. Carpenter or anyone else to be the owner of fraudulently secured policies, because as fraudulent contracts they could be "voided" or "rescinded" at any time up to six years after issuance. They would have zero value – no bids – in the life settlement secondary market, assuming *arguendo* that there was still such a market after the financial collapse in 2008 of Lehmann Brothers, Bear Sterns, and AIG (the big three of the Life Settlement Market). In the Indictment, the government paints the "STOLI" (Stranger Originated Life Insurance) market as a totally legal and legitimate, but somewhat "gray" offshoot, of the viatical and life settlement secondary

markets for life insurance policies, and all three markets collapsed in 2008 due to the Great Recession. And, unlike the stock market that hit its low in March 2009 and has since recovered, there appears to be no surviving firms in the life settlement business. That is why, when Ridgewood foreclosed on Grist Mill Capital and took all of the policies, they ended up selling the policies at an amount far less than the premiums paid. If the policies were obtained by fraud, there would have been "no-bids" or "zero" bids. Contrary to the government's specious arguments, there would be no value to any life insurance policy procured by fraud.

Furthermore, it is well established that a mere breach of contract does not constitute fraud nor does every mailing or wire that is part of an actual fraud rise to the level of federal mail and wire fraud. Not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud. Nor does a breach of contract in itself constitute a scheme to defraud. See, e.g., United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("The [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract"); McEvoy Travel Bureau, Inc.v. Heritage Travel, Inc., 904 F.2d 786, 791-92 (1st Cir. 1990).

Moreover, it is not enough to show that the insurance carriers might have been "deceived" into doing a deal that they might not normally do – in this case issue an alleged STOLI policy. Even assuming *arguendo* the truth of the government's STOLI allegations, deceiving an insurance carrier into issuing an insurance contract does not create mail or wire fraud:

11

> As in Starr, the indictment here does not allege…that there was a
> "discrepancy between benefits reasonably anticipated" and actual benefits
> received. And as in Regent Office, it fails to allege that [the defendant]
> misrepresented "the nature of the bargain." **Instead, the indictment states
> only that [the defendant's] misrepresentation induced [the insurance
> carrier] to enter into a transaction it would otherwise have avoided.
> Because it does not assert that [the defendant's] misrepresentation had
> "relevance to the object of the contract," we do not think it is legally
> sufficient** (emphasis added).

United States v. Shellef, 507 F.3d 82, 109 (2d Cir. 2007).

The Court established this major flaw in the colloquy between the Court and the

AUSA Novick, where the government admitted they had not indicted the insureds who

allegedly filled out the false applications, or even the brokers who submitted the alleged

false applications to the carriers. Instead, they indicted Mr. Carpenter, who never met or

talked to the straw Insureds or brokers, and whose name is nowhere to be found on the

allegedly false applications. Mr. Carpenter also did not review or sign any of the life

insurance applications. Despite this fact, Mr. Carpenter's life, career, and reputation have

been destroyed by numerous defamatory press releases. As Supreme Court Justice

Kennedy noted, just being indicted by the government is a life-changing experience,

because in the time period between indictment and trial, the accused may suffer ruinous

consequences to his reputation, his employment, and his future business opportunities

from which he may never recover, even if he is later acquitted. See Gentile v. Nevada,

501 U.S. 1030 (1991). For this reason, Mr. Carpenter respectfully moves this Court to

immediately dismiss this facially defective Indictment.

The government's futile attempt to solve this obvious problem by replicating the

inapposite allegations in the indictment in United States v. Binday, 908 F.Supp 2d 485

(SDNY 2012), is equally unavailing. Unlike the instant matter, not only did Binday, the

broker, solicit the "straw-insureds" in his case, he **filled out** and **signed** the allegedly

fraudulent insurance applications and sent them to the insurance carrier in order to be

paid the "high commissions," this is similar to Mr. Waesche in this case. Even in the

Binday indictment, the government did not claim that STOLI policies are illegal, and

they are not. Nor does the government claim that STOLI policies are not as profitable as

regular universal life insurance policies. The reason for this is obvious, in that whether

policies are STOLI policies which are premium-financed policies or ones that are self-

financed, the insurance carrier takes the same risk and makes the same profits if the

insured does not die. Therefore, none of these allegations go to the **materiality** of the

risk or to the elements of the bargain. This is exactly why the district court in United

States v. Kurtz, 2008 WL 1820903 (W.D.N.Y. April 21, 2008), dismissed the indictment

against a scientist accused of mail and wire fraud for allegedly stealing biological

materials and selling them:

> "Our cases have drawn a fine line between schemes that do no more than
> cause their victims to **enter into transactions they would otherwise
> avoid**-which do not violate the mail or wire fraud statutes-and schemes that
> depend for their completion on a misrepresentation of an essential element
> of the bargain-which do violate the mail and wire fraud statutes.
>
> In United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir.1970),
> the defendants sold stationery, id. at 1176. The defendants' scheme
> consisted of directing their sales personnel to misrepresent their identities to
> prospective customers so that the customers would be willing to entertain
> their offers. See id. (noting, as an example, that the sales personnel
> fraudulently claimed that they had been referred by a friend of the customer
> or an officer of the customer's firm). We concluded that no conviction
> under the mail fraud statute could stand where the misrepresentation was

"not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." *See* id. at 1179.

United States v. Starr, 816 F.2d 94 (2d Cir.1987), is similar. The defendants there collected bulk mailings from their customers and then sent them through the post office. *See* id. at 95-96. At the post office, however, they hid high-rate mail in low-rate mail packages, and paid the low-rate price for the entire shipments. Id. at 96. The defendants nonetheless charged their customers as if the mailings were high-rate, and produced and mailed false invoices to show that the high-rate price had in fact been paid. Id. We decided that "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." Id. at 100. Because "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," we concluded that such a charge can not apply to situations where the alleged victims "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." Id. at 98-99 (internal quotation marks and citation omitted); *cf.* id. at 102 (Newman, J., concurring) ("An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed. **However, the indictment for defrauding the customers has led to a conviction that must be reversed.**")

Shellef, 507 F.3d at 107-109 (emphasis added).

Mr. Carpenter respectfully asks this Court to replace the word "customers" with the word "carriers" and to immediately dismiss the facially defective Indictment against Mr. Carpenter, as there is nothing that the government can say or do or argue that can save this facially and fatally defective indictment. Mr. Carpenter requests that the Court follow the Second Circuit's analysis in Shellef, where the Second Circuit concluded:

As in Starr, the indictment here does not allege, pursuant to the government's "no-sale" theory, that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received. And as in Regent Office, it fails to allege that [the defendant] misrepresented "the nature of the bargain." Instead, the indictment states only that [the defendant's] misrepresentation induced [the manufacturer] to enter into a transaction it would otherwise have avoided. Because it does not assert that

> [the defendant's] misrepresentation had "relevance to the object of the contract," we do not think it is legally sufficient.

Shellef, 507 F.3d at 109 (citations omitted).

Kurtz, 2008 WL at *4-*6.

Just as in Kurtz, the Indictment here is constitutionally infirm and is defective on its face because it fails to sufficiently allege the "specific intent" to defraud the insurance carriers out of their property or money, through the use of mailings and wires in furtherance of the scheme to defraud. As discussed below, the government's "scheme to defraud" theory is not just specious, but legally invalid. For the purposes of the Court's analysis, suffice it to say the Indictment is deficient on its face for not only not properly alleging all five elements of mail and wire fraud, but for not even attempting to explain how paying premiums to an insurance carrier somehow "defrauds" the insurance carrier of its money or its property. The government sought to produce a Binday look-a-like indictment, but Mr. Carpenter did not fill out any applications, sign any applications, submit any applications, or recruit any "straw-insureds" as Mr. Binday was alleged to have done in his case.

Moreover, the big difference between this Indictment and the Binday indictment is that in this case, all of the policies were issued to a welfare benefit plan known as the Charter Oak Trust, which eradicates the government's entire theme of the alleged fraud, because it is black-letter law that the Charter Oak Trust had an immediate and automatic insurable interest at all times in the policies, and therefore they could not possibly be STOLI policies, where the owner of the policy lacks an "insurable" interest. Thus, it was

impossible to have any fraud committed by Mr. Carpenter against the carriers based on the facts alleged in the Indictment, and for that reason it must be dismissed immediately as a matter of law.

This also explains why no "Money-Laundering" charge can stand here as there is no "specified unlawful activity" in this case as detailed below, because the proceeds at issue in this case came from a legitimate insurance claim, the payment of a legitimate death benefit to a trust, or the payment of a settlement in a lawsuit. There was no illegal activity being "concealed" or "promoted" here, and to claim that Mr. Carpenter "knowingly" did anything illegal in the insurance application process is inconsistent with both the law and the undisputed facts.

## III. The Indictment Must be Dismissed because it Fails to Assert the Necessary Facts to State an Offense under the Mail and Wire Fraud Statutes

The Indictment as it relates to Mr. Carpenter is also constitutionally deficient because it contains no description beyond the conclusory allegations referencing the statute allegedly violated. As such, the Indictment in its current state deprives Mr. Carpenter of constitutionally fair notice of the charges against him, and for that reason alone should be dismissed. See Fleisher v. United States, 302 U.S. 218 (1937), for the proposition, "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie, the defendant's commission of that crime." United States v. Superior Growers Supply, Inc., 982 F.2d 173, 177 (6th Cir.1992). See also United States v. Polychron, 841 F.2d 833 (8th Cir.), cert. denied, 488 U.S. 851 (1988). A bill of particulars cannot cure a legal deficiency in

16

the Indictment; rather, the proper result is dismissal of the indictment.  See, e.g., United States v. Russell, 369 U.S. 749, 770 (1962)("But it is a settled rule that a bill of particulars cannot save an invalid indictment"). See also United States v. Norris, 281 U.S. 619, 622 (1930).

The Supreme Court has cautioned:

> Undoubtedly the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged.

Hamling v. United States, 418 U.S. 87, 117 (1974).  See also United States v. Novak, 443 F.3d 150, 159 (2d Cir. 2006) (holding that, absent intent to harm or actual harm, deception alone does not constitute fraud); United States v. Starr, 816 F.2d 94, 98-99 (2d Cir. 1987) (holding that because the scheme was **designed to satisfy** [the carriers], rather than harm the [carriers], the deception did not constitute fraud); United States v. Regent Office Supply Co., 421 F.2d 1174, 1181 (2d Cir. 1970) (rejecting government's theory that merely inducing the customers "to part with their money because of the false representations...amounted to fraud").

In the instant matter the Indictment fails to assert facts against Mr. Carpenter which in law constitute an offense; which, if proven, would establish a prima facie case of a federal offense.  The Indictment alleges that Mr. Carpenter caused money to be loaned to Charter Oak Trust for funding certain life insurance policies, which is not illegal.  There is no allegation in the Indictment that Mr. Carpenter induced or instructed any applicant to fill out an insurance application falsely; he did not.  There is no

allegation that Mr. Carpenter filled out any insurance application on behalf of an insured; he did not. Even if Mr. Carpenter knew that some third party was submitting false applications to carriers (he did not know), Mr. Carpenter, unlike Mr. Waesche, had no legal duty to the carriers. Mr. Carpenter is not licensed as an agent with any of the carriers in this case.

In sum, there is no allegation that Mr. Carpenter owed any "honest services" to the carriers or duty to the carriers; he did not. Mr. Carpenter only agreed to loan or caused to be loaned money to the Charter Oak Trust, all to his loss. In sum, as the Indictment relates to Mr. Carpenter, it fails to state a viable claim of mail or wire fraud.

## IV.    The Indictment Against Carpenter Must Be Dismissed Because It Fails To Allege Any Money Or Property Actually Lost By The Carriers

The mail fraud statute renders criminal the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises." 18 U.S.C. § 1341. Although this formulation might be read disjunctively to provide that obtention of money or property need not be involved in the case of a "scheme or artifice to defraud," the Supreme Court reviewed the history of the mail fraud statute in McNally v. United States, 483 U.S. 350, 356-59 (1987), and rejected this interpretation. Id. at 359-60. Accordingly, as the Court stated in McNally and reiterated in Carpenter v. United States, 484 U.S. 19 (1987), §1341 "is 'limited in scope to the protection of property rights.'" Carpenter, 484 U.S. at 25 (quoting McNally, 483 U.S. at 360). Nowhere does the Indictment allege that Mr.

Carpenter "intended" to hurt the carriers or steal money from the carriers. Nor could the government make such an absurd claim.

In accordance with McNally and Carpenter, "[t]he essential elements of a mail fraud violation are (1) a scheme to defraud, (2) **money or property [as the object of the scheme]**, and (3) use of the mails to further the scheme." United States v. Wallach, 935 F.2d 445, 461 (2d Cir. 1991) (emphasis added). An in depth analysis by the Second Circuit of why this Indictment does not properly invoke the necessary element of the mail and wire fraud statutes because the allegations did not involve the "obtention of **money and property**" by fraud within the meaning of § 1341 can be found in United States v. Miller, 997 F.2d 1010, 1012 (1993).

United States v. Cleveland, 531 U.S. 12 (2000), showed that there must be real property or money that is the object of the fraud, and not intangibles like "licenses." To deprive victims of **real property or money** by fraud, trickery, or chicanery is the only way to invoke federal court jurisdiction through the mail and wire fraud statutes:

> "Since we hold below that the scheme to fraudulently obtain ATC-IATA approval of the Norton-Heritage arrangement was not a scheme to defraud anyone of money or property, the mailings and wirings alleged in connection with the alleged illegal payments would not constitute mail and wire fraud under McNally, even if they could be construed as being in furtherance of that scheme. We note, moreover, that the mere fact that these mailings and wirings occurred as a result of the scheme to fraudulently obtain ATC-IATA approval does not mean they could be construed as being in furtherance of that scheme. See, e.g., United States v. Maze, 414 U.S. 395, 405 (1973)."

McEvoy, 904 F.2d at 792 n.10.

In the instant matter, there is no claim that any of the insurance carriers referred to in the Indictment actually lost any money. To the contrary, the carriers made tens of millions in premium collections and suffered no actual loss. The carriers, in sum, were not deprived of property. Nor was it the intent of Mr. Carpenter to deprive the carriers of money or property. The Indictment is filled with speculation and specious theories about possible loss by the carriers through other "STOLI" policies, but there is no specific claim of actual loss of money or property, or allegations that Mr. Carpenter intended any of the carriers to suffer any loss, which is the *sine qua non* of fraud; he did not. The Indictment, as it relates to Mr. Carpenter must be dismissed.

## V.    The Indictment Must Be Dismissed Because The Mailings and Wires Had Nothing to Do With the Scheme and Were After the Scheme Had Come to Fruition

Illustrative of this point is a recent decision by New York Judge Jed Rakoff, sitting by designation in the Ninth Circuit, where the defendant defrauded his own company through phony billing and caused the payments for the fake bills sent to a woman friend, who bought him an expensive watch that she then sent to him. The gift of the watch had nothing to do with the fraud, yet it was that mailing, after the fraud was accomplished (the money was in her hands already from the fake billing), on which the government relied. The Ninth Circuit reversed the defendant's mail fraud conviction, concluding that the success of the alleged scheme did not depend in any way on the use of the mails. United States v. Phillips, 704 F.3d 754, 763 (9th Cir. 2012).

In the present case, the government has largely copied – almost verbatim – the description of Stranger Owned Life Insurance (STOLI) from the indictment in United

20

States v. Binday, 908 F. Supp. 2d 485 (SDNY 2012), in which the mailings charged were the commission checks sent to the alleged fraudsters. Here, by contrast, the Charter Oak Trust paid the carriers, but the charged mails and wires conduct relative to Mr. Carpenter took place well after the completion of the alleged fraud, which was the submission of alleged false information in applications that resulted in the issuance of insurance policies. The only apparent fraud in this case was caused by the "Binday"-type agent/brokers (e.g., Mr. Waesche), who allegedly conspired with the insureds to lie on insurance applications and then lie during their Personal History Interviews. It is undisputed, and the government's own indictment demonstrates, that Mr. Carpenter did not fill out, sign, or submit any of the applications at issue in this case. In every one of these listed cases, the policy was already approved by the carrier before Mr. Carpenter arranged for the funding arrangement with his outside funds. Financing life insurance premiums as a lender (e.g. the "banker") is not a crime, and selling life insurance policies is not a crime, not even if they happen to be STOLI policies (which may explain why no one from the hedge funds involved – Ridgewood, Caldwell, or Plainfield – was indicted as well). In sum, the factual allegations contained in the Indictment as opposed to the "conclusions" or "speculation" contained in the Indictment, do not support valid claims of mail or wire fraud against Mr. Carpenter; hence, the Indictment should be dismissed as a matter of law.

## VI.    The Conspiracy Count Must Be Dismissed as a Matter of Law

If there is no Mail & Wire Fraud crime, it is legally impossible to have a conspiracy to commit mail and wire fraud under Section 1349. The Indictment's

conspiracy count must be dismissed because it does not allege sufficient facts of who, what, when, where, and why to show that Mr. Carpenter **willfully** joined a conspiracy to **willfully** violate the law. The only acts that count as an overt act of the conspiracy would be filling out the allegedly false or fraudulent applications, most of which were done before June of 2008 and all of which were done by people other than Mr. Carpenter. The Indictment does not even allege what the actual conspiracy was and who was part of the conspiracy, as is required by law. See, e.g., the Supreme Court's decision in Russell v. United States, 369 U.S. 749 (1962).

The conspiracy count must also be dismissed because it fails to allege any "**knowledge**" on the part of the alleged conspirators (whoever "they" are, since the identity of the alleged "co-conspirators" is not even mentioned) that they were even **willfully** participating in an illegal conspiracy. One of the elements which has been considered **indispensable** to an indictment for a conspiracy is **knowledge**; e.g., knowledge that justice was or will be administered or the law broken. In Pettibone v. United States, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their conviction, stated:

> It seems clear that an indictment against a person for...endeavoring to influence or impede a witness or officer in a court of the United States in the discharge of his duty, must charge a knowledge or notice, on the part of the accused....Unless that fact exists, the statutory offense cannot be committed...and without such knowledge or notice, the evil intent is lacking.

Id. at 206-207.

This requirement of a direct and explicit allegation in an indictment was reiterated by the United States Court of Appeals for the Fourth Circuit in <u>Asgill v. United States</u>, 60 F.2d 780 (4th Cir. 1932), in which the court held that merely alleging the means intended to be used cannot be taken inferentially to support a conspiracy indictment, unless the essential elements of unlawful agreement and purpose have been fully and clearly stated. The court further stated: "When the charge is laid, however, the terms of the agreement must be set forth therein and until this is done evidence of the conduct of the parties cannot be held to be competent or responsive to the then alleged agreement." <u>Id.</u> at 785. In <u>Direct Sales Co. v. United States</u>, 319 U.S. 703 (1943), the Supreme Court affirmed the position it had taken in the <u>Pettibone</u> case fifty years prior and stated:

> Without the knowledge, the intent cannot exist....Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal....This, because charges of conspiracy are not to be made out by piling inference on inference, thus fashioning...a dragnet to draw in all substantive crimes.

<u>Id.</u> at 711.

In <u>Ingram v. United States</u>, 360 U.S. 672 (1959), the Supreme Court again considered the intent element in a conspiracy indictment and after, quoting with approval its holding in the <u>Direct Sales Co.</u> case, stated: "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." <u>Id.</u> Perhaps the most eloquent plea for the limitation of prosecutions for criminal conspiracy was written by Justice Jackson in his concurring opinion in <u>Krulewitch v. United States</u>, 336 U.S. 440 (1949), in which he stated:

> The modern crime of conspiracy is so vague that it almost defies description. Despite certain elementary and essential elements, it also,

chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid.

Id. at 446-447.

>Most other countries have devised what they consider more discriminating principles upon which to prosecute criminal gangs, secret associations and subversive syndicates.

Id. at 453.

>However, even when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought whenever it is sought to extend the doctrine to meet the exigencies of a particular case.

Id. at 449.

As the Supreme Court teaches us in Morissette v. United States, 342 U.S. 246 (1952), for there to be a crime, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." Id. at 251-52. Therefore, since the Indictment is devoid of any "evil acts" actually done by Mr. Carpenter and any "evil mind" is pure conjecture on the part of the government, the Indictment should be dismissed in its entirety because it fails to adequately describe the "concurrence" between "an evil meaning" mind and an evil act. Because of the specific lack of any reference to anyone having **knowledge** of a conspiracy involving the Charter Oak Trust, the conspiracy count clearly must be dismissed.

Only if and when said applications were approved by the respective carriers after they themselves carried out their own in-depth due diligence and underwriting process, and only after the respective carriers' own approved licensed broker confirmed the suitability of the targeted insured, did Mr. Carpenter get involved (like a banker) in providing money to the Charter Oak Trust to fund the policies. At no time did Mr. Carpenter represent to the respective carriers the nature of any premium financing that form the basis of the Indictment. Hence, as to Mr. Carpenter, as a matter of law the Conspiracy Count must be dismissed.

## VII. The Aiding and Abetting Allegations Must Be Dismissed because There is No Crime Alleged in the Indictment.

The Indictment in this case was apparently patched together as a hodgepodge of normal business actions following the submission of insurance applications with allegedly false statements in them made by the broker or by the insured (but not by Mr. Carpenter), **without** each of the counts being considered in relation to the applicable legal elements. Perhaps the best example of that is that the government has used its "stand-by" charge of aiding and abetting to charges for which it cannot legally apply. Counts 1-33 each allege a substantive offense, but has also included the standard throw-away reference to 18 U.S.C. §2. In this case, that section cannot apply as a matter of law. It certainly cannot apply to Mr. Carpenter if the government wants to allege that Mr. Carpenter is the "criminal mastermind" behind the alleged Charter Oak Trust conspiracy.

While it is theoretically possible for two or more people to conspire to commit mail and/or wire fraud, that is not what is charged here. Instead, the Indictment alleges

that Mr. Carpenter committed the substantive offenses, somehow, as an alleged "Svengali of STOLI" as if STOLI was somehow *per se* evil. If Mr. Carpenter is found not guilty of the substantive offense, the offense was not committed by anyone and there would be no other person for Mr. Carpenter to have aided and abetted in committing a substantive offense. Consequently, the aiding and abetting counts cannot stand. See, e.g., California v. Roy, 519 U.S. 2, 3 (1996) (reversing aiding and abetting conviction because jury was not told it must find the defendant intended to aid another in committing the crime); Standefer v. United States, 447 U.S. 10, 19 (1980) (aiding and abetting requires defendant to aid another in committing an offense); Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (aiding and abetting is "a rule of criminal responsibility for acts which one assists another in performing").

Furthermore, if there is no crime properly alleged in the Indictment, there can be no "aiding and abetting" of that crime. Moreover, the government has failed to state which party is the **principal** of the crime, and which party is the aider and abetter, which also requires dismissal of the Count because it is unknown whether the Grand Jury indicted Mr. Carpenter as a principal or as an aider and abetter, and it is clear that one cannot be tried for both. This discrepancy perhaps could be cured by a bill of particulars, but it is black-letter law that a faulty and facially defective indictment cannot be saved by any bill of particulars. See, e.g., the Supreme Court's ruling in United States v. Russell, 369 U.S. 749, 770 (1962): "But it is a settled rule that a bill of particulars cannot save an invalid indictment. See United States v. Norris, 281 U.S. 619, 622; 4 Anderson, Wharton's Criminal Law and Procedures 1870."

Since the alleged fraud is filling out and submitting allegedly fraudulent insurance applications, the Indictment must be dismissed as to Mr. Carpenter because he never helped or assisted any of the supposed "Straw-Insureds" in filling out an insurance application, let alone submitting it to a carrier. In fact, **Mr. Carpenter is not licensed with any of the carriers,** so he would not be able to sign as an agent on the case in any event and his submitting of the application would have resulted in it being returned and declared a nullity. Therefore, Mr. Carpenter could not have acted as a principal or as an "aider" on filling out the applications. But, even if he did, there would be no crime here as Mr. Carpenter's company's goal was to pay the premiums to fund the policies, not **harm** the insurance carriers by **taking their money** or property by chicanery and deceit. Mr. Carpenter's company **paid premiums** to the insurance carriers. That is not a crime. No carrier ever accused Mr. Carpenter or his company of any fraudulent activity, and Mr. Carpenter never filled out, signed, nor submitted **any** of the allegedly fraudulent insurance applications listed in the Indictment. Nor does the Indictment state that Mr. Carpenter did anything regarding the applications themselves, so he did not "aid and abet" anyone. Therefore, as to Mr. Carpenter, the aiding and abetting allegations must be dismissed as a matter of law.

## VIII. The Indictment Must Be Dismissed as Connecticut is Not the Proper Venue for These Counts

Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed. Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article

III, and the Sixth Amendment. United States v. Cabrales, 524 U.S. 1, 5 (1998); see also United States v. Anderson, 328 U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). In a criminal case, "venue must be narrowly construed." United States v. Jefferson, 674 F.3d 332, 365 (4th Cir. 2012). "Venue…is an element…which must be proved…by a preponderance of the evidence." United States v. Miller, 111 F.3d 747, 749-50 (10th Cir. 1997).

An example of the strength of those protections is manifested in the principle that, when an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989). The Indictment, however, lists Straw Insureds and outside brokers from as far away as Texas and California. Specifically, Counts 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 26 of the Indictment concern non-resident, non-Connecticut insureds, that Mr. Carpenter never met with nor talked to, nor helped in any way to fill out their allegedly false insurance applications. Not only is this a fact, the Indictment does not allege anything different, but Mr. Carpenter is the indicted person here; not the people that filled out the applications, signed the applications, or submitted the allegedly false applications to the insurance carriers. In fact, only two of the alleged Straw Insureds are from Connecticut, and there is nothing alleged in the Indictment that says Mr. Carpenter had anything to do with the applications of these two Straw Insureds.

To the contrary, already convicted insurance agent, Joseph Edward Waesche, (United States v. Waesche IV, 3:13CR224(RNC)), who confessed to conspiring with

various insurance applicants and brokers all across the country to submit false applications to various carriers, and a subject of this Indictment, met with these unindicted applicants and/or others on their behalf out of state, including New York. Waesche has admitted to defrauding the carriers, but more importantly, he committed an outright fraud on the Charter Oak Trust as well as Mr. Carpenter's company, Grist Mill Capital, LLC. Nowhere in the Indictment does the government allege the facts sufficient to show **any** criminal activity by Mr. Carpenter anywhere, as opposed to Waesche who has already confessed to a pattern of fraud. Nowhere in the Indictment does the government allege the necessary "core of criminality" that occurred in the District of Connecticut. Instead, the Indictment goes on for more than 40-50 pages talking about the activity of other people, including the unindicted Straw Insureds.

The Straw Insureds lived in other states, as did their agents and brokers that submitted the allegedly false insurance applications. The carriers, such as Lincoln and Penn Mutual, conducted their business out of state as well, wherever their agents did business. There is an insufficient nexus for said counts to be prosecuted in Connecticut, and the government must prove Venue with a preponderance of the evidence, which is impossible in this case just based on the conclusory allegations made by the government in the Indictment. Hence, all of these specific counts should be dismissed for lack of proper venue, and especially as to Mr. Carpenter the Indictment must be dismissed in its entirety because he had nothing to do with these applications. See United States v. Auernheimer, Crim. No. 11-cr-470 (SDW) (3d Cir. April 11, 2014).

As explained in the Third Circuit's recent decision in Auernheimer, these constitutional protections as to venue manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. Mr. Carpenter did nothing wrong, illegal, or criminal in the District of Connecticut, and yet the people who **did** fill out, sign, and submit the allegedly false insurance applications for the Straw Insureds in other states remain unindicted, and that means even as part of a conspiracy, the District of Connecticut is not only the wrong jurisdiction for this case, but also the wrong venue.

"Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." United States v. Tzolov, 642 F.3d 214, 218 (2d Cir. 2011)(referencing United States v. Rodriguez-Moreno, 526 U.S. 275, 280 (1999)). "[T]he site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." Anderson, at 703.

> "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." Svoboda, 347 F.3d at 482-83. "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." Id."

United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004).

See also United States v. Brennan, 183 F.3d 139, 147 (2d Cir. 1999) (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs").

The Second Circuit has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. United States v. Reed, 773 F.2d 447, 481 (2d Cir. 1985); see also Beech-Nut, supra.

"[T]he constitutional underpinning and importance of proper venue dictate that waiver of objections to venue should not be readily inferred." United States v. Price, 447 F.2d 23, 27 (2d Cir. 1971). That being the case, the Second Circuit has found a waiver of the right to challenge venue in a criminal trial only under extraordinary circumstances. One such circumstance is "when the indictment or statements by the prosecutor clearly reveal [a venue] defect but the defendant fails to object." Id.; see *also* United States v. Khan, 821 F.2d 90, 93 (2d Cir. 1987) (finding waiver in light of a clear defect in venue apparent on the fact of the indictment); United States v. Levasseur, 816 F.2d 37, 45 (2d Cir. 1987) (agreeing with the district court that defendant had waived his right to contest venue at the close of evidence where "the indictment gave clear notice of venue defects."). These cases establish a clear rule concerning the timeliness of a defendant's objection to venue in a criminal action. When the defect in venue is apparent on the face of the indictment, a defendant waives the right to contest the issue if he or she fails to object prior to trial. Therefore, Mr. Carpenter respectfully requests this Court to immediately dismiss this Indictment for an obvious failure to establish proper venue in the Indictment.

In United States v. Bezmalinovic, 962 F. Supp. 435 (S.D.N.Y. 1997), the court dismissed a bank fraud charge for lack of venue. The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New York ("E.D.N.Y."), submitted the application to MHT in the E.D.N.Y., more commonly known as Brooklyn, received proceeds via checks drawn on an account in the E.D.N.Y., and then deposited those checks into his account in the E.D.N.Y.

The government argued that venue was proper in the S.D.N.Y. because, after the checks were deposited into a Chemical Bank account in the E.D.N.Y., the checks were sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account. However, the court in Bezmalinovic did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the S.D.N.Y. The court further noted that the "only acts alleged to have occurred in the [S.D.N.Y.] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." Id. at 437. In addition, the court stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." Id. The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" with the S.D.N.Y. sufficient for venue to be constitutionally permissible. Id. at 441.

Moreover, in United States v. Novak, 443 F.3d 150 (2d Cir. 2006), the defendant challenged jurisdiction in the Eastern District of New York when the evidence showed (and the government agreed) that the alleged offenses took place in the Southern District of New York; just one subway stop away. In this case, the Indictment clearly shows that the alleged frauds were committed outside of Connecticut, and therefore Connecticut is not the proper venue for these charges to be brought, so the Indictment should be dismissed in its entirety for lack of proper venue.

## IX. ALL OF THE INDICTMENT'S MONEY LAUNDERING COUNTS MUST BE DISMISSED AS A MATTER OF LAW

A criminal defendant is entitled to an indictment that sets forth the essential elements of the charge against him. See, e.g., United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002). Rule 7(c)(1) provides that "[t]he indictment…must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). A count is insufficient for lack of specificity if a defendant can show that "the indictment, liberally construed, was not 'sufficient to identify the offense which [he] conspired to commit.'" LaSpina, 399 F.3d at 177-78.

To sustain the substantive money laundering charges, the government must establish that Mr. Carpenter (1) **knowing** that the property involved in a financial transaction represented the **proceeds** of some form of **unlawful activity**, (2) conducted or attempted to conduct a financial transaction, (3) which in fact involved the **proceeds** of **specified unlawful activity**, (4) either with (a) **the intent to promote** the carrying on of **specified unlawful activity** or (b) the **knowledge** that the transaction was designed at

33

least in part to **conceal** or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. See 18 U.S.C. § 1956(a); United States v. Gotti, 459 F.3d 296, 334 (2d Cir.2006).

In order to establish that a defendant committed a "money laundering" offense or conspired to launder money in violation of 18 U.S.C. §1956(h) or §1957, the government must show that the defendant agreed to: (1) conduct a financial transaction; (2) involving the **proceeds** of some **Specified Unlawful Activity (SUA)**; (3) **knowing** that the property involved in the transaction represented the **proceeds** of some form of **unlawful** activity; and (4) **knowing** that the financial transaction was designed in whole or in part to **conceal** or **disguise** the nature, source, location, ownership, or control of those **proceeds**. United States v. Hassan, 578 F.3d 108, 127-28 (2d Cir. 2008).

The Second Circuit as well as several other circuits, has distinguished between the underlying crime that produces tainted proceeds and any subsequent financial transaction intended to launder those illegal proceeds. United States v. McCarthy, 271 F.3d 387, 395 (2d Cir. 2001). Absent this distinction, any crime involving a financial transaction could simultaneously constitute money laundering.

From the above-described cases, one can derive that the essence of a "money-laundering" allegation in any indictment to survive a dismissal challenge must clearly allege and state the "core of criminality" that a defendant is charged with. There are four indispensable elements of the money-laundering statutes, all of which must be specifically and clearly alleged for an indictment to be deemed sufficient to survive a dismissal challenge:

34

1. Proceeds from an underlying Specified Unlawful Activity (SUA);

2. Actual knowledge that the proceeds are from some SUA;

3. Actual use of the proceeds from the SUA;

4. Actual knowledge and intent to use the proceeds of the SUA in order to **conceal** the true nature of the proceeds or to **promote** the illegal SUA in some manner.

Far from stating a valid "money-laundering" complaint, the Indictment is just a rendition of "money moving" between valid entities for well-documented and legitimate purposes. In fact, the government claims in Paragraph 133 that "the defendants used the **death benefit funds** to pay for, among other things,…insurance premiums, and a home in Rhode Island." This statement is surplusage that would be struck from any indictment because it fails to state **any** type of criminal offense, much less "money laundering".

The gist of the government's "non-crime" is that Straw Insured-13 ("SI-13") signed up for an insurance policy with Lincoln in December of 2006. (Ind. P. 123). Despite the Court telling the government not to add any more Straw Insureds, the government felt it was necessary to add this case in order to help the lawyers representing the bogus charity, Universitas, LLC in its civil lawsuit against the Charter Oak Trust in New York. From Paragraphs 123-133, the only thing Mr. Carpenter is accused of is signing the funding agreement. Nowhere is it alleged that Mr. Carpenter had anything to do with the recruitment of SI-13, a resident of Florida (wrong venue again), in 2006 – (well outside any statute of limitations for any crime) - or the filling out, signing, or submission of any application for SI-13.

As discussed above, even if someone did submit a false insurance application, it was **not** Mr. Carpenter, and the reason why Mr. Carpenter knows that the application probably was not fraudulent is because of the year-long investigation of SI-13's insurance application and death claim caused by his death inside the life insurance contestability period. See Ind. P. 130. This is important for two reasons for the Court's ultimate dismissal of this entire Indictment. First, if someone lies on an insurance policy and then dies during the contestability period, the insurance claim and payment of the death benefit can be challenged by the carrier. Lying on an insurance application is not a crime, even though it may be a breach of contract.

Second, if the insurance carrier discovers that an application is a total fraud, as has happened in several famous STOLI lawsuits, the carrier has up to six years to order the contract rescinded for fraud. In the state of Connecticut, an insurance carrier arguing for rescission due to fraud must refund all premiums paid to the owner of the policy before the policy can be rescinded. All circuits recognize that a breach of contract does not rise to the level of criminal fraud. See, e.g., Regent Office and Kurtz, supra. Therefore, there is no SUA even suggested here, much less properly alleged.

This is critical because Paragraph 131 is fatal to the entire Indictment, and especially the "money-laundering" counts that follow Counts 35-57. Paragraph 131 acknowledges that Bursey, on behalf of the Charter Oak Trust, sued Lincoln for the death benefit under the two insurance policies, and 10 days later Lincoln paid both policies' death benefits of over $30 million. This is after an exhaustive year-long investigation. Big insurance carriers do not pay out "fraudulent" death claims from "fraudulent"

applications, especially if they think STOLI is involved. Nonetheless, Lincoln paid the claim, when many other big insurance carriers were being sued by state and federal regulators for failure to pay legitimate claims, much less "disputed" claims like this one.

This simple fact requires that the entire Indictment be dismissed for failure to invoke this Court's jurisdiction as well as for failure to state a criminal offense. The $30 million was paid either as a legitimate death claim or as settlement of the Bursey lawsuit in Paragraph 131. Even assuming *arguendo* that SI-13's life insurance application was totally fraudulent, that does not make Lincoln's payment of $30 million to the Charter Oak Trust the "proceeds" of some unlawful **SUA** as required by all of the money-laundering statutes. Moreover, if SI-13's application was not fraudulent, then there is a good chance that none of the applications are fraudulent. Even if they were fraudulent, we know that lying on an insurance application does not rise to the level of mail and wire fraud. But, assuming that were the case, Mr. Carpenter did not fill out, sign, or submit any of those applications, and nowhere in the Indictment does it say that Mr. Carpenter even met with these Straw Insureds to induce them to lie on their insurance applications, if in fact they did. Without that detail describing the "core of criminality," all of the Counts of the Indictment are defective on their face and must be dismissed.

Moreover, it will be a **legal** and a **factual** impossibility for the government to prove that Mr. Carpenter had **knowledge** that the proceeds were from a SUA. Even the Indictment refers to the $30 million as "death benefit funds" to pay for "insurance premiums" as well as the "home" in Rhode Island. Also in Paragraph 133 is the statement: "The **death benefit funds** were passed through various bank accounts

37

controlled by Carpenter and other working for or with the defendants." Without specific knowledge of an SUA, without real SUA proceeds, and without knowledge and intent to conceal the nature of the SUA or to promote the SUA, all of the Indictment's Counts must be dismissed. Because, without knowledge, specific intent, and proceeds from an SUA, a "money-laundering" indictment just becomes a chronicle of bank statements and "money moving," which is not a crime anywhere. See, Hassan, supra. See, also, United States v. Faulkenberry, 614 F.3d 573 (6th Cir. 2010).

## CONCLUSION

For the above reasons, Mr. Carpenter moves this honorable Court to immediately dismiss the Indictment.

Defendant, Daniel Carpenter

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel  860.522.3343
Fax 860.522.2490
Fed. Bar  Ct00009
rbrown@bpslawyers.com

## CERTIFICATION

This is to certify that on January ____, 2014, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Patrick Egan, Esq.
Fox Rothschild, LLP
2000 Market Street
Philadelphia, PA 19103

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009