UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIM. NO. 3:13-CR-226(RNC) |
| ) | |
| DANIEL E. CARPENTER, et al. ) | |
| ) | AUGUST 1, 2014 |
| Defendants ) | |
| ) | |

**BRIEF IN SUPPORT OF
DEFENDANT CARPENTER'S MOTION TO DISMISS
EACH COUNT AS PROSECUTION IS BARRED BY
MCCARRAN-FERGUSON ACT 15 U.S.C., SECTIONS 1011-1015**

The defendant was initially indicted on December 12, 2013, on 33 counts of violating various Title 18 Sections, including 1341 (Mail Fraud); 1343 (Wire Fraud); and 1349 (Conspiracy to Commit Mail and Wire Fraud). However, on May 14, 2014, the Grand Jury returned a Superseding Indictment charging the defendant with 57 counts, including 24 additional counts of 18 U.S.C., 1957 (Illegal Monetary Transactions, 18 U.S.C., Section 1956 (a)(1)(A)(i) Money Laundering) and 18 U.S.C., Section 2 (Aiding and Abetting). The defendant has pleaded not guilty to all counts and the matter is scheduled for trial in late winter of 2015.

According to the Superseding Indictment, admitted felon, co-defendant Edward Waesche along with other alleged non-indicted corrupt licensed life insurance agents conspired with alleged corrupt non-indicted individuals, known as "Straw Insureds" to

1

prepare fraudulent life insurance applications to be submitted to various life insurance carriers to procure life insurance policies, typically with a face amount between two million dollars and twenty million dollars. The typical straw insured was at least 70 years of age.

The unindicted licensed insurance agents allegedly worked with the Straw Insureds in creating applications for life insurance policies that the Government claims contained false and misleading information. The objective, according to the indictment, was to deceive the carriers into issuing life insurance policies; this was done without any knowledge by Daniel Carpenter, who never met, talked to or communicated with the so-called Straw Insureds or the unindicted agents. (Mr. Carpenter did at times interact with Mr. Waesche, but was totally unaware that the people Mr. Waesche found and sold policies to submitted false financial information or applications to secure insurance; Mr. Carpenter never saw or handled the applications before they were submitted to the carriers.)

The life insurance policies would be owned by a 419 Welfare Benefit Trust Plan known as Charter Oak Trust. Mr. Carpenter provided commercial loans to Charter Oak Trust; said Trust, as owner of the policies in question used money it borrowed from Mr. Carpenter's financial entity to help pay the premium on these policies. The loans were secured by the life insurance policies themselves; again, not an unusual commercial practice.

The Government is claiming that somehow Mr. Carpenter conspired with Wayne Bursey of Charter Oak Trust and the insurance agents and the insureds to defraud the

carriers into issuing life policies they might not otherwise issue; later it is claimed that Mr. Carpenter and others took the insurance proceeds from the life policy on Straw Insured #13, who died in 2008, and unlawfully used the funds; that is, it is claimed by the Government in the Superseding Indictment that Mr. Carpenter <u>knew</u> the proceeds in question, roughly 30 million dollars, were the product of criminal activity, yet secretly laundered the proceeds or otherwise engaged in illegal monetary transactions or knowingly aided and abetted the use of said illicit insurance proceeds.

A close examination of the Superseding Indictment, however, fails to allege facts (as opposed to unsupported conclusions) to support these bold allegations. As previously discussed, there are no allegations that Daniel Carpenter even talked to the so-called Straw Insureds while they were answering the questions in the application. There are no allegations that Daniel Carpenter talked to or communicated with the corrupt agents, who were making huge commissions by aiding and abetting the alleged corrupt insureds in filling out and submitting the alleged fraudulent applications to the respective carriers through Charter Oak Trust, who foolishly trusted the corrupt <u>licensed</u> agents; these agents purportedly had been vetted by the respective licensing carriers. The agents clearly were involved in the submission of the policies to the carriers. Mr. Carpenter had <u>no duty</u>, unlike the agents, to the carrier to ensure accuracy in the applications.

Mr. Carpenter worked with other financial entities, including hedge funds, to loan money to Charter Oak Trust. After the policies were issued, Mr. Carpenter did submit paperwork to various entities to complete the <u>lawful</u> financial transactions done every business day in the insurance industry. It is not uncommon or illegal to use banks and

3

other financial institutions to finance policies. It is <u>NOT</u> the job or duty (at least until now) to ensure that the underlying insurance application was properly or accurately filled out; indeed as in the instant matter, the financial institution did not review the respective insurance application. Mr. Carpenter was only concerned with making proper and secured financial loans, including to Charter Oak Trust. These activities in Connecticut and throughout the United States are not crimes. Mr. Carpenter had <u>no</u> <u>duty</u> and had <u>no</u> <u>dealings</u> with the so-called insurance carriers that collected millions of dollars in premiums at the ultimate expense of Mr. Carpenter and others.

The McCarran-Ferguson Act (Act) <u>15 U.S.C.S. Section 1011, et seq.</u> states: Congress declares that the continued regulation and taxation by the several states of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several states. The Act goes on to state: (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several states which relate to the regulation or taxation of such business. (b) <u>No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business the business of insurance unless such Act specifically relates to the business of insurance. 15 U.S.C.S. Section 1012.</u> (Emphasis added.) None of the laws cited in the Superseding Indictment, including Mail and Wire Fraud, relate specifically to the business of insurance and are therefore subject to the constraints of the McCarran-Ferguson Act.

4

The Supreme Court has left no doubt that the Act contemplates state control over the connection between insurer and insured through the conduit of the insurance policy. In SEC v. National Securities, Inc., 393 U.S. 453, 460 (1969), Mr. Justice Marshall said:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement-these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was-it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

Connecticut state law is very clear. The insurance carrier has two years from the date of issuance of the policy to discover and contest any alleged misstatements or omissions in the policy in order to void or rescind the policy. Under Connecticut law, to rescind the policy even in the case of blatant fraud, the carrier must repay all premiums received and then bring an action to rescind the policy. If the individual does not die and the policy is not contested during that two year contestability period, then the policy becomes incontestable under Connecticut state law.

A case directly on point, where the mail and wire fraud indictment was dismissed under the Act, is United States v. O'Brien, 501 F. Supp. 140 (E.D.P.A. Oct. 21, 1980). The Court in O'Brien first looked at the applications in all of the counts, and dismissed the counts where the insurance applications were filled out more than five years before the indictment, as is the case here. Mr. Carpenter will be filing a separate motion to dismiss all of the mail and wire fraud counts for the same reason.

5

The O'Brien court correctly surmised that, while acts taken at a later date might be "proof" of a scheme to defraud, those acts all older than five years could not possibly be "the basis of a prosecution." *See*, O'Brien, 501 F. Supp. at 143 (*citing* 18 U.S.C. Section 3281). The court then turned to the key element of non-disclosure in connection with the alleged fraud, i.e., the defendants had signed up for disability policies with multiple carriers and did not disclose the other coverage with other carriers – a far greater sin than the allegations in this case of "premium financing" versus more traditional funding methods for an insurance policy:

> Turning now to the non-disclosure in connection with the claims, the inescapable question is whether defendants' conduct comprised a scheme for obtaining money by means of false or fraudulent pretenses. I think it did not as a matter of law for two reasons, lack of materiality and legal impossibility.

O'Brien, 501 F. Supp. at 143.

As to materiality, there can be no fraud where the Charter Oak Trust paid the exact same premiums for the exact same risk. There are **no** allegations in either indictment that "smokers" got away with "non-smoker" rates or that someone did not disclose they flew small planes for a living, had HIV or heart disease or even high blood pressure, nor are there any allegations that **anyone** lied about their weight, which invariably happens on the applications of many people. The only allegations are that some people and some brokers falsified their financial information, but they were not indicted, and that none of the applications disclosed that the Charter Oak Trust received its funds to pay all of the premiums from Grist Mill Capital. Mr. Carpenter would like to suggest not only is this not a crime, it is not even a fraud that could withstand a challenge for dismissal under

6

Rule 9(b) for failure to plead fraud with particularity under the Federal Rules of Civil Procedure, much less a challenge under Bell Atlantic v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). For this reason alone, the Indictment should be dismissed.

The lies by the insureds as to their wealth could have been discovered with a $15 credit check, which every carrier supposedly does. The carrier was responsible for the insurance risk underwriting, not Mr. Carpenter. Because there is no alleged fraud as to the insurance risks affecting longevity of the insured, just as construction workers and physicians pay different rates for disability coverage, the superseding indictment fails to state any offense or crime that should be in any court. But since it involves the intimate relationship between the Insurer and the Insured, this prosecution is clearly blocked by the Act.

Moreover, this prosecution is also barred by the doctrine of impossibility. As the court said in O'Brien:

> When the companies chose to write insurance in [Connecticut], they chose concomitantly to be bound by the provisions of its laws. Having so chosen with knowledge of the law that bound them to pay the full amount of the claim and having rejected the option to prorate, there was at least an implicit promise to pay that full amount even though there was other undisclosed insurance. The failure to disclose was not material, and hence was legally insignificant.
>
> There is a second defect in the claims forms mailing charges, legal impossibility. The essence of the charge is a scheme to defraud and to obtain money by false or fraudulent pretenses. To "[d]efraud is to deprive of some right, interest or property by deceit." United States v. Godwin, 566 F.2d 975, 976 (5th Cir. 1978). The defendants may have thought that they were obtaining money by deceit, but they were not. One cannot defraud another into paying money which that other person is obligated by law to pay. The insurance companies had no "right, interest or

7

property" in the monies due defendants and they were deprived of nothing by deceit; rather, they were compelled to pay by operation of law.

O'Brien, 501 F. Supp. at 143.

In United States v. Berrigan, 482 F.2d 171 (3d Cir. 1973), Judge Aldisert said, at page 188:

> Legal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime. Thus, legal impossibility would apply to those circumstances where (1) the motive, desire and expectation is to perform an act in violation of the law; (2) there is intention to perform a physical act; (3) there is a performance of the intended physical act; and (4) the consequence resulting from the intended act does not amount to a crime.

The court in O'Brien went on to say, which is certainly applicable to this case in Connecticut:

> Perhaps both the immateriality of the non-disclosures and the legal impossibility of defendants' acts being criminal is best illuminated by a question: what would the insurers have paid had disclosure been made? The answer: exactly the same amounts. In short, there could have been no scheme to defraud the insurers of monies they were obligated to pay in any event. The crime which defendants may have intended to commit was legally impossible.

O'Brien, 501 F. Supp. at 143.

Connecticut has adopted a comprehensive and detailed insurance law code. Title 38a (Chapter 397, et seq.) of the Connecticut General Statutes, which specifically deals with regulating the sale of insurance in Connecticut. Chapter 204, 38a-815, et seq. specifically deals with unfair insurance practices. A review of Title 38a fails to find any law that prohibits a private financial entity from engaging in loaning funds to an owner (Charter Oak Trust) of a life insurance policy. Nothing in Title 38a prohibits a lender of commercial funds from securing a lien on the proceeds of any life insurance policy.

8

There is no state law that requires financial lenders of money to entities that own life insurance policies to owe a duty to the respective carrier to ensure that the original insurance applications contained true information. Mr. Carpenter had no affirmative duty to ensure any life policy application was properly filled out by the insured, the agent, even the owner, or that it was accurate or complete. Yet, under the Government's interpretation of the various statutes involving the crimes charged in the Superseding Indictment, the Government is making crimes involving indirect financing of life insurance policies a crime in Connecticut where none exists.

In other words, the Government is imposing a duty on Mr. Carpenter to ensure that any life policy purchased by a third party (Charter Oak Trust) that his business entity funds, irrespective of personal knowledge, must be free of fraud; this would be true even if the applicant and others secretively and unknown to Mr. Carpenter, submitted false information to the respective carrier. The Government in the manner in which they use the Mail and Wire Fraud Statutes 18 U.S.C. Section 1341, 1343, et seq. are invalidating, impairing or superseding the insurance laws of Connecticut by making a perfectly legal act, loaning money to an entity to use to fund life insurance policies, an illegal act.

To show a scheme to defraud, the Government must present proof that the defendant possesses a fraudulent intent. United States v. Starr, 816 F.2d 94, 98 (2nd Cir. 1987). In other words, the Government must show that Mr. Carpenter contemplated doing actual harm; that is, something more than merely deceiving the victim (the carriers). See U.S. v. Regent Office Supply Co., 421 F.2d 1174, 1180-81 (2nd Cir. 1970); U.S. v. Michael Binday, 900 F.Supp. 2d. 485 (SDNY 2012). (In Binday the difference is

9

that it was the crooked brokers (owners) and insureds, not any financial institution, that were prosecuted; a different factual situation. The financial institutions that loaned the money like Mr. Carpenter were not prosecuted.) In the instant matter unlike Binday, Mr. Carpenter is not even alleged to have filled out any bogus life insurance applications, much less submit them. Unlike Mr. Binday, Mr. Carpenter did not commit a crime.

The Supreme Court has made it clear that federal law should not frustrate any declared state policy or interfere with a state's administrative regime; if so, the McCarran-Ferguson Act precludes its application. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 101-103, 103 S. Ct. 2890; 77 L. Ed. 2d, 490 (1983). In other words, Congress' intent is to cede the field of insurance regulation to the States, serving only instances in which Congress expressly orders otherwise. Humana v. Forsyth, 525 U.S. 299, 309; 199 S. Ct. 710; 142 L.Ed. 2d 753 (1999). In the instant matter, Mr. Carpenter's actions of providing secured funds to Charter Oak Trust and causing the funds loaned to be secured by the life policies in question are not crimes under state law in Connecticut, or any other state in the Union. However, the Government, in the manner in which they want the Court to interpret the several criminal statutes cited in the Superseding Indictment, is preempting state law by making the aforementioned legal conduct by Mr. Carpenter illegal, thereby frustrating state policy; thereby interfering with state insurance laws; and thereby weakening and impairing Connecticut State Law, Title 38a, including Connecticut's Unfair Insurance Practices Act, Chapter 704 – See Section 38a-815 C.G.S., et seq.

10

Accordingly, for all the aforementioned reasons in the instant matter 15 U.S.C., Section 1011, et seq., the McCarran-Ferguson Act precludes the prosecution of Mr. Carpenter and therefore, it is moved that all counts in the Superseding Indictment be dismissed.

Defendant, Daniel Carpenter

By /s/ Richard R. Brown
Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009
rbrown@bpslawyers.com

# CERTIFICATION

This is to certify that on August 1, 2014, a copy of the foregoing Brief was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Patrick Egan, Esq.
Fox Rothschild, LLP
2000 Market Street
Philadelphia, PA 19103

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009