UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA                    CRIMINAL NO. 3:13CR226 (RNC)

v.

DANIEL CARPENTER                            September 15, 2014



GOVERNMENT'S OMNIBUS MEMORANDUM IN RESPONSE TO DEFENDANT
CARPENTER'S VARIOUS MOTIONS TO DISMISS THE SUPERSEDING INDICTMENT

## TABLE OF CONTENTS

I.      Relevant Background ................................................................................................ 1

II.     Standard of Review On A Motion To Dismiss An Indictment............................. 9

III.    Carpenter's Challenges to the Superseding Indictment's Sufficiency, Venue, and
        Jurisdiction Should Be Denied (Response to Docs. 56 and 63) ....................... 10

        A.      The Superseding Indictment Sufficiently Pleads Wire Fraud and Mail Fraud
                (Defendant's Arguments Nos. 1-5)........................................................... 11

                1.      Relevant Law ................................................................................ 11

                2.      The Superseding Indictment Charges Mail and Wire Fraud in a
                        Clear, Concise, and Sufficient Manner ..................................... 13

                3.      The Defendant's Attacks on the Substantive Mail and Wire Fraud
                        Counts are Unavailing................................................................. 17

        B.      The Indictment Sufficiently Pleads A Violation of 18 U.S.C. § 1349
                (Defendant's Argument No. 6). ................................................................ 25

        C.      Carpenter Is Properly Charged Under Multiple Theories of Liability
                (Defendant's Argument No. 7) ................................................................. 28

        D.      The Charges Are Appropriately Venued In Connecticut
                (Defendant's Argument No. 8) ................................................................. 30

        E.      The Superseding Indictment Sufficiently Pleads Money Laundering
                and Illegal Monetary Transactions (Defendant's Argument No. 9) .......... 35

IV.     The Superseding Indictment Was Timely (Response to Docs. 64 and 65) ...... 38

        A.      Relevant Law .......................................................................................... 39

        B.      Each Count In The Superseding Indictment Is Timely On Its Face ......... 41

        C.      Carpenter's Arguments Misstate the Law and Improperly Recast the Facts ....... 43

V.      The Motion To Dismiss Based On The McCarran-Ferguson Act Should Be Denied
        (Response to Docs. 66 and 67) ......................................................................... 47

        A.      Relevant Law .......................................................................................... 47

        B.      The McCarran-Ferguson Act does not bar the prosecution of this case. ....... 50

VI.     Defendant's Motion to Dismiss For Failure to State A Crime Is Nothing
        More than a Restatement of His Earlier Arguments (Response to Docs. 68 and 69)....... 56

VII.    Conclusion ....................................................................................................... 57

# TABLE OF AUTHORITIES

## Cases

*Cleveland v. United States,*
   521 U.S. 12 (2000) ............................................................................................ 24

*Costello v. United States,*
   350 U.S. 359 (1956) ....................................................................... 10, 19, 25, 28

*Hamling v. United States,*
   418 U.S. 87 (1974) ............................................................................................ 9

*Humana, Inc. v. Forsyth,*
   525 U.S. 299 (1999) ................................................................................... passim

*McBoyle v. United States,*
   283 U.S. 25 (1931) ........................................................................................... 56

*Neder v. United States,*
   527 U.S. 1 (1999) ....................................................................................... 11, 16

*Pereira v. United States,*
   347 U.S. 1 (1954) ............................................................................................. 13

*PHL Variable Ins. Co. v. Charter Oak Trust,*
   No. HHDCV106012621S, 2012 WL 2044416 (Conn. Super. Ct. May 4, 2012) ................... 55

*Pinkerton v. United States,*
   328 U.S. 640 (1946) ......................................................................................... 28

*Schmuck v. United States,*
   489 U.S. 705 (1989) ............................................................................. 12, 13, 19

*SEC v. National Securities, Inc.,*
   393 U.S. 453 (1969) ......................................................................................... 53

*Shaw v. Delta Air Lines, Inc.,*
   463 U.S. 85 (1983) ........................................................................................... 53

*Smith v. United States,*
   133 S. Ct. 714 (2013) ....................................................................................... 40

*United States v. Albers,*
   No. 08 Cr. 819 (NG)(RML), 2011 WL 1225548 (S.D.N.Y. March 31, 2011) ................... 26

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) ......................................................................... passim

*United States v. Altman,*
   48 F.3d 96 (2d Cir. 1996) .................................................................................. 13

*United States v. Amico,*
   486 F.3d 764 (2d Cir. 2007) .............................................................................. 13

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)........................................................................ 11, 14, 31

*United States v. Ayeki*,
   289 F. Supp. 2d 183 (D. Conn. 2003) ......................................................... 31, 33

*United States v. Bahel,*,
   62 F.3d 610 (2d Cir. 2011) ..................................................................... 13, 25, 28

*United States v. Baldeo*,
   No. 13 Cr. 125 (PAC), 2013 WL 5477373 (S.D.N.Y. October 2, 2013).......... 30, 31

*United States v. Bartee*,
   301 Fed. Appx. 46 (2d Cir. 2008) ...................................................................... 26

*United States v. Bellomo*,
   263 F. Supp. 2d 561 (E.D.N.Y. 2003) ............................................................ 30, 31

*United States v. Ben Zvi*,
   168 F.3d 49 (2d Cir. 1999)................................................................................ 42

*United States v. Bergrin*,
   650 F.3d 257 (3d Cir. 2011)............................................................................... 10

*United States v. Beridze*,
   415 Fed. Appx. 320 (2d Cir. 2011) .................................................................... 26

*United States v. Bezmalinovic*,
   962 F. Supp. 435 (S.D.N.Y. 1997) ................................................................... 33

*United States v. Binday*,
   908 F. Supp. 2d 485 (S.D.N.Y. December 10, 2012) ........................... 21, 23, 46, 55

*United States v. Blumeyer*,
   114 F.3d 758 (8th Cir. 1997) ............................................................................ 49

*United States v. Bryant,*,
   998 F.3d 21 (1st Cir. 1993)............................................................................... 44

*United States v. Cavin*,
   39 F.3d 1299 (5th Cir. 1994) ............................................................................ 49

*United States v. Cianchetti*,
   315 F.2d 584 (2d Cir. 1963).............................................................................. 40

*United States v. Cooper*,
   132 F.3d 1400 (11th Cir. 1998) ......................................................................... 50

*United States v. Desposito*,
   704 F.3d 221 (2d Cir. 2013).............................................................................. 56

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992).................................................................... 39, 42, 46

*United States v. Eppolito*,
   543 F.3d 25 (2d Cir. 2008)..................................................................... 39, 42, 43

*United States v. Ferguson*,
    653 F.3d 61 (2d Cir. 2011)..................................................................... 28, 29

*United States v. Goldberg*,
    756 F.2d 949 (2d Cir. 1985)........................................................ 10, 19, 23, 45

*United States v. Grady*,
    544 F.2d 598 (2d Cir. 1976)................................................................. 40, 43

*United States v. Grimm*,
    788 F.3d 498 (2d Cir. 2013)......................................................................... 46

*United States v. Gross*,
    416 F.2d 1205 (8th Cir. 1969) ....................................................... 39, 42, 46

*United States v. Henderson*,
    No. 08-29-C, 2010 WL 5018234 (M.D. La. Dec. 3, 2010) ...................... 50

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008)......................................................................... 37

*United States v. Irvin*,
    682 F.3d 1254 (10th Cir. 2012) ................................................................. 12

*United States v. Isola*,
    548 Fed. Appx. 723 (2d Cir. 2013)....................................................... 12, 38

*United States v. Italiano*,
    894 F.2d 1280 (11th Cir. 1990) ................................................................. 44

*United States v. Kazarian*,
    No. 10 Cr. 895(PGG), 2012 WL 1810214 (S.D.N.Y. May 18, 2012)............... 26, 46

*United States v. Kim*,
    246 F.3d 186 (2d Cir. 2001)................................................................. 31, 33

*United States v. King*,
    No. 98-CR-91A(F), 2000 WL 362026 (W.D.N.Y. March 24, 2000) ......................... 39, 42, 46

*United States v. Krenning*,
    93 F.3d 1257 (5th Cir. 1996) ..................................................................... 49

*United States v. Kurtz*,
    No. 04 Cr. 155A (RJA), 2008 WL 1820903 (W.D.N.Y. April 21, 2008) ................... 21

*United States v. LaSpina*,
    299 F. 3d 165 (2d Cir. 2002).......................................................... 9, 23, 27

*United States v. Magleby*,
    420 F.3d 1136 (10th Cir.2005) ................................................................. 34

*United States v. Marion*,
    404 U.S. 307 (1971)..................................................................................... 43

*United States v. Maze*,
    414 U.S. 395 (1974)..................................................................................... 19

*United States v. Metter*,
  860 F. Supp. 2d 205 (E.D.N.Y. 2012) ............................................. 30, 31

*United States v. Novac*,
  443 F.3d 150 (2d Cir. 2006).............................................................. 33

*United States v. O'Brien*,
  501 F. Supp. 140 (E.D. Pa. 1980) ............................................... 53, 54

*United States v. Pacheco*,
  912 F.2d 297 (9th Cir. 1990) ....................................................... 41, 44

*United States v. Perez*,
  575 F.3d 164 (2d Cir. 2009).................................. 10, 13, 27, 29

*United States v. Peterson*,
  896 F. Supp. 2d 305 (S.D.N.Y. 2012)........................................ 49, 55

*United States v. Philips*,
  704 F.3d 754 (9th Cir. 2012) ......................................................... 24

*United States v. Pierce*,
  224 F.3d 158 (2d Cir. 2000)....................................................... 11, 14

*United States v. Pimental*,
  199 F.R.D. 28 (D. Mass. 2001) ...................................................... 50

*United States v. Potamitis*,
  739 F.2d 784 (2d Cir. 1984)........................................................... 30

*United States. v. Pugh*,
  151 F.3d 799 (8th Cir. 1998) ......................................................... 48

*United States v. Ramirez*,
  420 F.3d 134 (2d Cir. 2005)........................................................... 31

*United States v. Ratcliff*,
  245 F.3d 1246 (11th Cir. 2001) ..................................................... 44

*United States v. Redcorn*,
  528 F.3d 727 (10th Cir. 2008) .................................................. 48, 55

*United States v. Reed*,
  773 F.2d 477 (2d Cir. 1985)........................................................... 30

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970)......................................................... 21

*United States v. Reifler*,
  446 F.3d 65 (2d Cir. 2006)................................................. 11, 20, 24

*United States v. Resendiz-Ponce*,
  549 U.S. 102 (2007)........................................................................ 9

*United States v. Riley*,
  78 F.3d 367 (8th Cir. 1996) ........................................................... 49

*United States v. Ross*,
   77 F.3d 1525 (7th Cir. 1996) ......................................................................... 41, 44

*United States v. Rossomando*,
   144 F.3d 197 (2d Cir. 1998)......................................................................... 12, 22

*United States v. Rowland*,
   No. 3:14cr79, 2014 WL 3341690 (D. Conn. Jul. 8, 2014) ................................ passim

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008)................................................................................ 30

*United States v. Rutkoske*,
   506 F.3d 170 (2d Cir. 2007)........................................................................... 40, 41

*United States v. Salinas*,
   373 F.3d 161 (1st Cir. 2004) ............................................................................... 33

*United States v. Schwartz*,
   924 F.2d 410 (2d Cir. 1991)........................................................................... 12, 22

*United States v. Shabani*,
   513 U.S. 10 (1994)............................................................................................. 56

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007)............................................................................. 20, 21

*United States v. Slevin*,
   106 F.3d 1086 (2d Cir. 1996).......................................................................... passim

*United States v. Spero*,
   331 F.3d 57 (2d Cir. 2003)............................................................................. passim

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992)................................................................................. 9

*United States v. Stewart*,
   955 F. Supp. 385 (E.D. Pa. 1997) .................................................................. 48, 53

*United States v. Strain*,
   396 F.3d 689 (5th Cir. 2005) .............................................................................. 33

*United States v. Stroh*,
   No. 3:96CR139(AHN), 2000 WL 1833397 (D. Conn. Nov. 3, 2000) .................... 40

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003)................................................................................ 30

*United States v. Sylvanus*,
   192 F.2d 96 (7th Cir. 1951) ................................................................................ 49

*United States v. Szur, No. S5*,
   No. S5 97 Cr. 108 (JGK), 1998 WL 132942 (S.D.N.Y. March 20, 1998) .............. 31

*United States v. Tzolov*,
   642 F.3d 314 (2d Cir. 2011)................................................................................ 33

*United States v. Velastegui*,
    199 F.3d 590 (2d Cir. 1999)........................................................................ 10, 38, 56

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991).......................................................................... passim

*United States v. Walsh*,
    194 F.3d 37 (2d Cir. 1999)....................................................................................... 9

*United States v. Whitfield*,
    543 U.S. 209 (2005)........................................................................................ 36, 46

## **Statutes**

15 U.S.C. § 1012(b) ............................................................................................. 47, 50

18 U.S.C. § 2 ......................................................................................................... 28, 45

18 U.S.C. § 371 ........................................................................................................... 26

18 U.S.C. § 1341 .................................................................................................. passim

18 U.S.C. § 1343 .................................................................................................. passim

18 U.S.C. § 1349 .................................................................................................. passim

18 U.S.C. § 1956 .................................................................................................. passim

18 U.S.C. § 1957 .................................................................................................. passim

18 U.S.C. § 3232 ........................................................................................................ 30

18 U.S.C. § 3237(a) .................................................................................................... 30

18 U.S.C. § 3282 ........................................................................................................ 39

The Government files this memorandum in opposition to defendant Daniel Carpenter's various motions to dismiss the Superseding Indictment based upon (1) lack of jurisdiction, venue, and sufficiency of allegations (Docs. 56, 63); (2) violation of the statute of limitations (Docs. 64 and 65); (3) the McCarran-Ferguson Act (Docs. 66, 67); and (4) the Superseding Indictment's failure to "state a crime" (Docs. 68 and 69).    As is discussed more fully below, the defendant's arguments misstate and misapply the applicable law and seek to litigate facts now that are within the province of the trial jury.   The Superseding Indictment is a clear, concise, and sufficient description of the charges against the defendant, with proper venue and unaffected by the McCarran-Ferguson Act.   As such, Carpenter's motions should be denied in all respects.

## I.   <u>Relevant Background</u>

On December 12, 2013, a federal grand jury sitting in Hartford, Connecticut returned a 33-count indictment charging defendant-movant Carpenter ("Carpenter") and co-defendant Wayne Bursey ("Bursey") (collectively "the defendants") with Wire Fraud, in violation of 18 U.S.C. § 1343; Mail Fraud, in violation of 18 U.S.C. § 1341; and Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349.   Both defendants were arraigned on January 17, 2014, and were released on secured bonds.   Carpenter has since been incarcerated on a previous conviction from the District of Massachusetts.   *See United States v. Daniel Carpenter*, No. 1:04CR10029 (GAO) (D. Mass. March 4, 2014).   On May 14, 2014, the same federal grand jury returned a superseding indictment.   The Superseding Indictment included the original 33 counts of mail and wire fraud and conspiracy, and then added an additional 24 counts of money laundering, illegal monetary transactions, and conspiracy to commit money laundering.

The Superseding Indictment charges the defendants with participating in a scheme to defraud certain "Life Insurance Providers," or "Providers," through materially false and fraudulent representations to those Providers in connection with the purchase of universal life insurance

1

policies within the "Plan and Trust."   Superseding Indictment ("Ind.") ¶ 25.[1]   The Plan and Trust purported to be a multiple employer welfare benefit plan that provided death benefits to employees of adopting employers through the purchase of insurance policies.   Ind. ¶ 23.   Bursey signed the declaration of trust as president of the "Plan Sponsor," which also acted as trustee of the Trust. Ind. ¶ 22.   The Plan Sponsor, along with other "Subject Entities" housed at offices in Simsbury and Stamford, Connecticut, was controlled by Carpenter.   Ind. ¶¶ 2, 22.

Although the Plan purported to be a bona fide welfare benefit plan, the Superseding Indictment alleges that in practice it was run by the defendants as a means to procure life insurance policies on the lives of elderly strangers and then to resell those policies after two years, all without the knowledge or acquiescence of the Life Insurance Providers that issued the policies.   Ind. ¶¶ 30, 34, 36.   The Superseding Indictment explains that such "Stranger Originated Life Insurance," or "STOLI," harmed the Providers by "caus[ing] a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received" by issuing policies.   Ind. ¶ 15. Specifically, the Superseding Indictment articulates five distinct ways in which the Providers were harmed, including the earlier payout of death benefits, less premium income from the policies than anticipated, mispriced policies because of undermined actuarial assumptions, decreased cash flow, and larger-than-warranted commissions.   Ind. ¶ 16.   As such, the Providers attempted to ferret out and deny STOLI policies by asking certain questions on applications, including regarding third-party payment of premiums and the intent to sell the policies.   Ind. ¶ 15.

Carpenter's scheme involved several basic steps.   First, insurance agents working for or on behalf of the Subject Entities recruited elderly "Straw Insureds" to participate in the Plan, often with the promise of free insurance for two years, after which the Straw Insured may receive a share

---

[1] The defendant refers to the "Plan and Trust" as the "Charter Oak Trust."   The "Plan and Trust" and the "Charter Oak Trust" are synonymous.

of the proceeds from a sale of the policy.   Ind. ¶ 26.   A "paper company" was often set up for the Straw Insured to allow them to participate in the Plan and Trust, often without the knowledge, approval, and/or consent of the Straw Insured.   Ind. ¶ 27.   The agent would then fill out a life insurance application that had several misrepresentations, including denying the third-party funding of premiums, denying discussions regarding the possibility of a policy sale, and falsely claiming that the policy was being purchased for "estate planning" purposes.   Ind. ¶ 28.   The applications also often included inflated financial information and denials of the performance of life expectancy reports.   Ind. ¶ 28. The Superseding Indictment alleges that these fraudulent applications were "submitted and caused to be submitted" to the Life Insurance Providers by Carpenter, Bursey, and others known and unknown.   Ind. ¶ 38.

Despite these representations to the contrary, the Superseding Indictment alleges that in truth no Straw Insured ever paid a premium into the Trust; rather, the premiums were funded by loans.   Ind. ¶ 30.   These loans came from the Funding Entities, and in particular from Funding Entity 1 – of which Carpenter represented himself as "Chairman of Managing Member."   Ind. ¶ 30.   Funding Entity 1, in turn, often borrowed money for the insurance premiums from an entity referred to as the "Outside Funder."   Ind. ¶ 30.   These loan arrangements were memorialized in certain documents that were never disclosed to the Providers.   Ind. ¶¶ 32-34.   The loan agreements did not obligate the Straw Insured to pay anything for the policies on their lives; rather, upon "maturation, disposition, or termination" of the policies, Funding Entity 1 would be paid back for its loan of premiums, along with other fees.   Ind. ¶ 33.   According to the Superseding Indictment, those fees resulted in an effective interest rate of as much as 100% of the loaned premiums.   Ind. ¶ 35. The Superseding Indictment explains that the misrepresentations by Carpenter and his co-conspirators "created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies…and the actual benefits that the Providers

received in doing so."    Ind. ¶ 37.

The Superseding Indictment further alleges that Carpenter, Bursey, and others, having devised the scheme to defraud the insurance companies, used the mails and interstate wires for the purpose of executing that scheme.    Ind. ¶¶ 41, 42.    Although the scheme involved a total of eighty-four fraudulently-originated policies on seventy-six Straw Insureds, the Superseding Indictment further specifies twelve Straw Insureds regarding whom thirty-two substantive counts of mail and wire fraud are alleged. Ind. ¶¶ 38, 43-119.   For each substantive count of mail and wire fraud, the Superseding Indictment provides brief background on the relevant Straw Insured – including details about funding documents that were signed by Carpenter and misrepresentations on applications that were signed by Bursey – and then tracks the statutory language for either 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud).

For example, Counts 1-4 of the Superseding Indictment provide background on Straw Insured 1's ("SI-1") participation in the Plan, including funding documents signed by Carpenter and several misrepresentations on an application for life insurance on SI-1's life signed by Bursey, Ind. ¶¶ 44-48, and then track the statutory language for wire fraud in ¶ 49, with the time and location of each individual wire transmission.   These counts alleged that "for the purpose of executing…the aforesaid scheme and artifice to defraud…defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted" certain interstate wires. Those wires consisted of an e-mail with a fraudulent application sent from the Subject Entities in Connecticut to Penn Mutual in Pennsylvania (Count One); two wire transfers of money from Connecticut to banks in others states to fund premium payments for the policy on SI-1's life (Counts Two and Three); and an email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a wire transfer to pay a premium

(Count Four).   Ind. ¶ 49.   Similarly by way of example, Count Five of the Superseding Indictment provides background on Straw Insured 2's ("SI-2") participation in the Plan, Ind. ¶¶ 51-53, and then tracks the statutory language for mail fraud in ¶ 54, again providing the date and time of the mailing. In this case, the Indictment alleged that "for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same" a request from Carpenter for the Outside Funder to disburse money for the purpose of "funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-2's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Penn Mutual." Ind. ¶ 54.

As suggested in part by these examples, the nature of the individual executions of the scheme that are charged in the Superseding Indictment include the mailing, faxing, or emailing of fraudulent applications from the defendants' offices in Simsbury to insurance company offices in other states; wire transfers of funds by Carpenter from a Funding Entity to the Trust in order to fund the payment of premiums; wire transfers of funds by Bursey from the Trust to insurance companies to pay insurance premiums; emails from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware to request the processing of wire transfer requests from Trust to the appropriate insurance company; and the mailing (by private commercial carrier) of "Funding Memorand[a] and Disbursement Request[s]," authorizing the transfer of funds from the Outside Funding Entity to Funding Entity 1 to fund the payment of a premium according to the above-referenced loan.  *See* Ind. ¶¶ 43-119.   The earliest charged wire or

5

mailing is in Count Six, which alleges a mailing on August 29, 2008.

In Count 33, the Superseding Indictment charges a violation of 18 U.S.C. § 1349, Conspiracy to Commit Mail and Wire Fraud.   This count first incorporates both the introductory allegations of Paragraphs 1-42, as well as the substantive allegations in Paragraphs 43-119.   It then, as with the substantive counts, recites the statutory language, alleging that from 2006 through 2013, Carpenter, Bursey and others "did combine, conspire, confederate, and agree together and with each other to commit mail and wire fraud as described in this Indictment…that is, to devise and execute a scheme to defraud the Life Insurance Providers by means of false and fraudulent pretenses, representations, and promises, and to execute that scheme by means of use of private interstate and commercial carriers and interstate wire communications."   Ind. ¶ 121.

The Superseding Indictment then levies twenty-four counts of money laundering, illegal monetary transactions, and conspiracy – all related to the death benefits paid on two policies issued on the life of Straw Insured 13 ("SI-13").   In brief, the Superseding Indictment alleges that two policies were taken on SI-13's life based upon misrepresentations regarding third-party financing of and intent to sell the policies; that SI-13 died within the two-year contestability period; that Lincoln paid $30 million to the Trust; and that the defendants, knowing that the death benefits were proceeds of specified unlawful activity (i.e., the aforementioned wire and mail fraud), engaged in transactions with those funds – in some instances to promote other specified unlawful activity and in some instances to conceal the origin of the funds.   *See* Ind. ¶¶ 123-142.

The Superseding Indictment further specifies that the defendants used the mails and interstate wires in furtherance of the scheme as it related to SI-13.   Specifically, the defendants caused two Funding Memoranda and Disbursement Requests to be sent on December 21, 2007 via Federal Express, in order to disburse money from the Outside Funding Entity to Funding Entity 1

6

to fund premiums for the policies on SI-13's life.   Ind. ¶ 128.   Following SI-13's death, the Subject Entities e-mailed "death claim" forms that included representations by Bursey that "falsely failed to acknowledge that the policies on SI-13's life had been collaterally assigned to Funding Entity 1."   Ind. ¶ 129.   Although Lincoln engaged in an investigation prior to paying the death benefits, the Superseding Indictment alleges that the defendants never told Lincoln that the policies on SI-13's life had been funded or had been taken with the intent to resell them.   Ind. ¶ 130.   Bursey, on behalf of the Trust, instead sent communications to Lincoln demanding payment from Lincoln so that the trust could pay a claim to SI-13's beneficiary (the "SI-13 charity").   Ind. ¶ 130.   Bursey followed those communications by suing Lincoln, which then paid the more than $30 million in death benefits to the Trust.   Ind. ¶ 131.

The counts of money laundering and illegal monetary transactions concern the disposition of those death benefits by the defendants to several destinations – none of them being the SI-13 charity.   Ind. ¶ 133.   They are divided into four sets of counts: a multi-object conspiracy charge (Count 34); substantive counts of illegal monetary transactions related to large transfers between defendant-controlled accounts (Counts 35-39); substantive counts of illegal monetary transactions related to the purchase of a home in Rhode Island (Counts 40-47); and substantive counts of money laundering concerning the use of death benefit money to promote the carrying on of the fraud, either through repayment of the Outside Funder or the payment of additional Plan and Trust insurance premiums (Counts 48-57).

As with the wire and mail fraud counts, the money laundering counts include some necessary background and then track the statutory language for the particular charge.   The conspiracy alleges that from May 21, 2009 through the present, Carpenter, Bursey, and others "did knowingly combine, conspire, and agree with each other and with other persons…to commit

offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957…."  Ind. ¶ 135.   The count then goes on to specify three objects of the conspiracy, again tracking the statutory language of each subsection of either 18 U.S.C.§§ 1956(a)(1)(A)(i) (promotion of an Specified Unlawful Activity, or "SUA"), 1956(a)(1)(B)(i) (concealment); and 1957 (illegal monetary transactions).  Ind. ¶135.

Similarly, both sets of illegal monetary transaction counts plead their respective offenses by following the language of 18 U.S.C. § 1957.  For example, Count 35 – the earliest count of money laundering or illegal monetary transactions – charges that on May 21, 2009, Carpenter and Bursey knowingly engaged, and aided and abetted others to engage, in a monetary transaction "by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud…and wire fraud," namely a transfer by Bursey of SI-13 death benefit money from a Trust account to an account of Funding Entity 1.   Ind. ¶ 137.

Lastly, the substantive counts of money laundering also follow the language of 18 U.S.C. § 1956(a)(1)(A)(i).   For example, Count 48 charges that on May 22, 2009, Bursey and Carpenter conducted and aided and caused others to conduct a financial transaction affecting interstate or foreign commerce "which involved the proceeds of a specified unlawful activity, that is mail fraud…and wire fraud…, specifically the SI-13 fraud, with the intent to promote the carrying on of specified unlawful activity, to wit: mail fraud in…and wire fraud…, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity," specifically a transfer by Carpenter of SI-13 death benefit funds from Funding Entity 1 to Funding Entity 3 "for the purpose of, among other things, funding premiums to be paid on other Trust-owned insurance policies."

Ind. ¶142.  Each of the transactions referenced in the money laundering and illegal monetary transaction counts take place through financial institutions, specifically using bank accounts on which either Carpenter or Bursey is one of few signatories.   Ind. ¶ 134.

## II.  Standard of Review On A Motion To Dismiss An Indictment

Rule 7(c) of the Federal Rules of Criminal Procedure requires only that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."   Under this standard, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). Moreover, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F. 3d 165, 177 (2d Cir. 2002) (internal quotes omitted).

Thus, an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776 (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)); *see also United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (the Second Circuit has "consistently upheld indictments that do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime") (internal quotation marks omitted). So long as the indictment meets these two requirements, it cannot be dismissed merely because the government has not alleged additional facts.   *United States v. Rowland*, No. 3:14cr79, 2014 WL 3341690 at *8 (D. Conn. Jul. 8, 2014) (Arterton, J.) (citing *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)); *see also LaSpina*, 299 F.3d at 177 (2d Cir. 2002) ("in an indictment for conspiring to commit an offense in which the conspiracy is the gist of the crime it is not necessary to allege with

technical precision all the elements essential to the commission of the offense which is the object of the conspiracy").

Indeed, in assessing the validity of an indictment, "the facts alleged by the Government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). Conversely, "contrary assertions of fact by the defendant will not be considered."  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial…the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) (quoting *Alfonso*, 143 F.3d at 776-77).

"Only if 'a charging document fails to state an offense [because] the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation' is dismissal of an indictment appropriate."  *Rowland*, 2014 WL 3341690 at *6 n.3 (quoting *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011)).  Otherwise, a facially valid indictment "is enough to call for trial of the charge on the merits."  *Costello v. United States,* 350 U.S. 359, 363 (1956) (citations and footnote omitted).

## III.    Carpenter's Challenges to the Superseding Indictment's Sufficiency, Venue, and Jurisdiction Should Be Denied (Response to Docs. 56 and 63)

In his first motion to dismiss the indictment, Carpenter advances several overlapping arguments that in large part represent improper and specious factual disputes, made inappropriately at this stage of the litigation.  Carpenter's first through fifth points challenge particular aspects of the indictment's pleading of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; the sixth point challenges the wire and mail fraud conspiracy count, 18 U.S.C. § 1349; the seventh point challenges the use of aiding and abetting language in the superseding indictment; the eighth point challenges venue; and the ninth point attacks the money laundering

counts.   As is described below, each of these attacks is frivolous and Carpenter's motion should be denied.

### A.   The Superseding Indictment Sufficiently Pleads Wire Fraud and Mail Fraud (Defendant's Arguments Nos. 1-5)

#### 1.   Relevant Law

The elements of mail and wire fraud, codified at 18 U.S.C. §§ 1341 and 1343, respectively, are essentially identical: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."   *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). To establish a scheme to defraud, "the government must prove (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (internal citations omitted).   However, though proof of fraudulent intent is an essential component of a "scheme to defraud," "the government is not required to show that the intended victim was actually defrauded. The government need only show that the defendant[] contemplated some actual harm or injury." *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991); *see also United States* v. *Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) (noting that "the scheme need not have resulted in actual injury to the scheme's victims").

Moreover, while the Government must prove that the misrepresentations were material, it need not show that the victim *actually relied* on the statement.   *Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.") (citations omitted).   Rather, "[i]n general, a false statement is material if it has a *natural tendency* to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 16 (emphasis added; citation, alteration, and quotation

marks omitted).   "This definition, in referring to natural tendencies and capabilities, establishes materiality in the bank fraud context as an objective quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision."   *United States v. Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012).   Indeed, a victim's negligence in relying on a misrepresentation is irrelevant – the test is an objective one, concerned only with how a reasonable victim would have behaved.   *United States v. Isola*, 548 Fed. Appx. 723, 724-25 (2d Cir. 2013) (summary order).

The requirement that the scheme have as its object the obtaining of money or property has similarly been interpreted broadly.   For example, the "'right to control' how corporate assets were spent . . . has been recognized as a property interest that is protected by the mail fraud statute." *Wallach*, 935 F.2d at 462; *see also United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (noting that "the concrete harm contemplated by the defendant is to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions"). So, too, has a harm that is essential to the bargain but not definably pecuniary. *See United States v. Schwartz*, 924 F.2d 410, 421 (2d Cir. 1991) (finding that "defendants' conduct deprived [victim] of the right to define the terms for the sale of its property in that way, and cost it, as well, good will").

As to the third element – the use of the mails or wires "in furtherance" of the fraudulent scheme – the mailing or wire "need not be an essential element of the scheme. It is sufficient for the [mailing or wire communication] to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotation marks omitted).   Indeed, "'[i]nnocent' mailings – ones that contain no false information – may supply the mailing element."   *Id*. at 715.   Moreover, there is "no requirement that the

mailings precede the fraud.  Where the frauds are not isolated or unrelated swindles, postfraud mailings of invoices, checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised, or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant." *United States v. Slevin*, 106 F.3d 1086, 1089-90 (2d Cir. 1996) (citations omitted).

Nor is it necessary for the defendant to participate personally in the wire transmission or mailing, "as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme."  *United States v. Bahel*, 62 F.3d 610, 641-42 (2d Cir. 2011); *see also United States v. Amico*, 486 F.3d 764, 781 (2d Cir. 2007) (applying the "reasonably foreseeable" standard in the context of a mailing).   Thus, it is sufficient if the Government establishes "that the defendant caused the mailing, i.e., 'acted with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen, even though not actually intended." *United States v. Altman*, 48 F.3d 96, 102-03 (2d Cir. 1996) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)).   "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud."  *Schmuck*, 489 U.S. at 715.

2.   The Superseding Indictment Charges Mail and Wire Fraud in a Clear, Concise, and Sufficient Manner

As an initial matter, the Superseding Indictment here sufficiently pleads the "elements of the offense charged," fairly informs Carpenter "of the charge against which he must defend," and enables "him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Alfonso*, 143 F.3d at 776.   It does not, and need not, detail all the information that the Government will present at trial to prove each element, nor rule out potential defenses.  *See, e.g.*, *Perez*, 575

F.3d at 166-67; *Rowland*, 2014 WL 3341690 at *6.   Each of the substantive charges "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776.   For example, Count 1 of the indictment states that (1) Carpenter acted "for the purpose of executing the aforesaid scheme and artifice to defraud;" (2) that he caused the use of a particular interstate wire – namely an email by employee of the Subject Entities containing a fraudulent insurance application – on a specified date and at a specified place; and (3) that he did so "knowingly."   Ind. ¶ 49.   Those allegations track precisely the elements of the offense.   *See Autuori*, 212 F.3d at 115.   Each additional substantive count similarly tracks the statutory language and the elements of mail and wire fraud.

Moreover, the Superseding Indictment is expansive in its explanation of the scheme to defraud, alleging both the existence of the scheme and the materiality of the misrepresentations, and then alleging Carpenter's knowing execution of that scheme by causing the use of the mails and interstate wires.   *See Pierce*, 224 F.3d at 165 (2d Cir. 2000).   In brief, the Superseding Indictment charges Carpenter and his co-conspirators with directly engaging in a scheme to defraud the Life Insurance Providers through materially false and fraudulent representations to those Providers in connection with the purchase of universal life insurance policies within the "Plan and Trust," entities that purported to be an employee welfare benefit plan but were in truth a vehicle for the defendant and his co-conspirators to obtain insurance policies on the lives of third parties without the knowledge approval of the Providers.   *See* Ind. ¶ 25.   The Superseding Indictment further alleges that the defendant controlled the Subject Entities, among which were the Plan Sponsor, the entity responsible for the establishment and operation of the Plan and Trust. Ind. ¶¶ 2, 22.   Coupled with the statutory allegations related to each specific substantive count, the allegations in Paragraphs 2, 22, and 25 are *by themselves* sufficient to meet the Superseding

14

Indictment's pleading obligations.  *See, e.g., Rowland*,  2014 WL 3341690 at *8 ("Although Defendant is correct that the Superseding Indictment does not specifically allege how Mr. Rowland caused a false filing with the FEC, it need not do so.").

Nonetheless, although the Superseding Indictment is not required to specify details of how the offense was committed, in this case it sets out in some detail the nature of the scheme and the materiality of the misrepresentations made by Carpenter and his co-conspirators.  The scheme involved several basic steps.  First, insurance agents working for or on behalf of the Subject Entities – again, entities controlled by Carpenter – recruited elderly "Straw Insureds" to participate in the Plan and Trust, often with the promise of free insurance for two years, after which the Straw Insured may receive a share of the proceeds from a sale of the policy.  Ind. ¶ 26.  A "paper company" was often set up for the Straw Insured to allow them to participate in the Plan and Trust. Ind. ¶ 27.  The agent would then fill out a life insurance application that had several misrepresentations, including denying the third-party funding of premiums, denying discussions regarding the possibility of a policy sale, and falsely claiming that the policy was being purchased for "estate planning" purposes.  Ind. ¶ 28. The Superseding Indictment alleges that these fraudulent applications were "submitted and caused to be submitted" to the Life Insurance Providers by Carpenter, Bursey, and others.  Ind. ¶ 38.

Despite Carpenter and his co-conspirators' misrepresentations, the Superseding Indictment alleges that in truth no Straw Insured ever paid a premium into the Plan and Trust; rather, the premiums were funded by loans.  Ind. ¶ 30.  These loans came from the Funding Entities, and in particular from Funding Entity 1 – of which Carpenter represented himself as "Chairman of Managing Member."  Ind. ¶ 30.  Funding Entity 1, in turn, often borrowed money for the insurance premiums from an entity referred to as the "Outside Funder."  Ind. ¶ 30.  These loan

arrangements were memorialized in certain documents that were never disclosed to the Providers. Ind. ¶¶ 32-34.   The loan agreements did not obligate the Straw Insured to pay anything for the policies on their lives; rather, upon "maturation, disposition, or termination" of the policies, Funding Entity 1 would be paid back for its loan of premiums, along with other fees.   Ind. ¶ 33. According to the Superseding Indictment, those fees resulted in an effective interest rate of as much as 100% of the loaned premiums.   Ind. ¶ 35.   Finally, the Superseding Indictment alleges that Carpenter, Bursey, and others, having devised the scheme to defraud the insurance companies, used *and caused to be used* the mails and interstate wires for the purpose of executing that scheme. Ind. ¶¶ 41, 42.   The individual substantive counts then explain how the scheme was executed as to each of Straw Insured-1 through Straw Insured-13.

The Superseding Indictment also explained at length why the misrepresentations made in the insurance applications were material.   Critically, the Superseding Indictment states that the Life Insurance Providers took great pains to prevent the origination of life insurance policies by investors on the lives of the third parties with the intent to sell or retain ownership over those policies.   Ind. ¶ 12.   The Superseding Indictment described several red flags that would indicate that a policy was STOLI – among them the intent to sell at the origination of the policy and the funding of premiums through non-recourse loans – and application questions that were used by the Providers to ferret out violators.   Ind. ¶¶ 12-15.   Finally, the Superseding Indictment explained several distinct ways in which misrepresentations related to STOLI concerns would affect the Providers' considerations in deciding whether to issue a policy.   Ind. ¶ 16.   Taking those concerns as true, it is patently obvious that misrepresentations designed to circumvent those concerns would have a "natural tendency to influence, or [be] capable of influencing," the Providers.   *Neder*, 527 U.S. at 16.

3.    The Defendant's Attacks on the Substantive Mail and Wire Fraud Counts
       are Unavailing

In the face of an indictment that pleads wire and mail fraud with greater-than-necessary specificity, Carpenter makes several claims that misstate the law, incorrectly interpret the Superseding Indictment, and improperly attempt to rely on facts other than those set out in the Superseding Indictment.

a)    The Indictment Pleads Sufficiently that the Charged Executions of
       the Fraud Scheme Were In Furtherance of the Scheme.

First, Carpenter inaptly claims that the executions of the scheme, i.e., the individual wires and mailings, all occurred after the completion of the fraud.  Doc. 63 at 5-8.[2]  This is both incorrect and premature.  This Circuit has made clear that "there is no requirement that the mailings precede the fraud," provided that the post-fraud mailings "further the scheme."  *Slevin*, 106 F.3d at 1089-90.  Here, the executions of the scheme fall into two general categories – the transmissions of false insurance applications and the transmissions of money (or emails or mailings directing money transfers) to fund loans for or pay insurance premiums.   The former are patently part of the scheme even under Carpenter's misguided theory, a fact which he conveniently ignores here.  *See* Doc. 63 at 7 ("the mails and wires *all* occurred after the fraud was complete and the insurance policies had already been approved and issued") (emphasis added).  Indeed, Carpenter concedes as much in one of his myriad other memoranda.  *See* Doc. 65 at 8 ("[T]he scheme alleged in the Superseding Indictment was that, by trick or scheme, the defendants provided alleged fraudulent information to induce the respective carriers to issue a universal life insurance policy…that was the fraud.   Once the Government could prove the same, a violation occurs.").   In other words, even under Carpenter's logic any of the charged mailings or wires that

---

[2] Given the various motions and memoranda filed by the defendant, some of which have similar titles, reference will be to document number rather than to document title.

transmitted the insurance applications to procure the insurance policies necessarily occurred before the scheme was completed.

The latter, the transfer of funds to pay premiums, are likewise critical to the success of the scheme, which is no way was complete after the origination of the policies.  First, a principal objective of Carpenter's scheme was to use misrepresentations to obtain from the Providers insurance policies that could be resold on the life settlement market after the two-year contestability period passed.  Ind. ¶ 30.  That objective would obviously be defeated if the premiums were not paid and the policies simply lapsed and became worthless.  In that way, the scheme to defraud was not complete until the policies were sold or otherwise disposed of and the payment of premiums "help[ed] to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant," *Slevin*, 106 F.3d at 1090, here between Carpenter, his co-conspirators, and the Providers.

Second, the payment of premiums by third party funding entities was not innocent and indefinite conduct, but the very thing that the scheme deliberately hid from the Providers.  *See* Ind. ¶¶ 30-35.  Indeed, the scheme did not contemplate indefinite premium payments by the policy owner, as the Providers were led to believe, but only those sufficient to maintain the existence of the policy until it could be sold after the two-year contestability period, as evidenced in part by the 27-month term of the Outside Funder's loan to Funding Entity 1.  *See* Ind. ¶ 31.

Third, the harm to the Providers – the discrepancy between what they reasonably anticipated to receive from issuing the policies and what they actually received – only came to fruition with the payment of premiums. *See* Ind. ¶ 37.  It was only then the Providers allowed insurance coverage at a price and with commissions that did not accurately reflect the concerns they would otherwise have had if in possession of accurate information.  *See* Ind. ¶ 16.  Fourth,

the Indictment alleges a continuing scheme over many different Straw Insureds; the mass cessation of premiums on some policies would surely have prevented the origination of others within the same scheme and with the same Providers.   *See Slevin*, 106 F.3d at 1090,

Finally, as matter of pleading, the Superseding Indictment clearly alleges that each mailing or wire was in furtherance of the scheme.   To the extent that Carpenter argues otherwise, that is a matter for the jury at trial after presentation of all of the evidence.   *See Costello*, 350 U.S. at 363 (a facially valid indictment "is enough to call for trial of the charge on the merits.").

Nor does Carpenter's reliance on *United States v. Maze*, 414 U.S. 395, 399 (1974) augur for a different result.   There, the Court simply found that a credit card company's mailings to a victim notifying him of the defendant's improper use of his credit card were not sufficiently related to the scheme to support a charge of mail fraud.   The sole objective of the defendant's scheme – obtaining hotel rooms – had already been completed, and the notification letters only made it more likely that the defendant would be apprehended, i.e., they were not in furtherance of the scheme. *Id*. at 403.   Here, the use of the mails and wires was a critical step in obtaining and maintaining insurance policies that were the central object of the conspiracy.   *See Schmuck*, 489 U.S. at 710-11 ("It is sufficient for the [mailing or wire communication] to be incident to an essential part of the scheme or a step in [the] plot.").[3]

> b)   The Superseding Indictment Sufficiently Pleads Deprivation of
> Property and Intent.

Next, Carpenter attempts to import his own view of the facts into a specious and repetitive attack on certain elements of the crimes of wire and mail fraud.   Doc. 63 at 8-16.   Specifically, Carpenter claims that the Superseding Indictment fails to plead that the Providers were deprived of

---

[3] The defendant also makes various assertions regarding his factual innocence, e.g., his lack of awareness of the fraudulent applications, that are interspersed throughout his memorandum.   The Government will not respond to all of them individually, but in general the Court should ignore them as irrelevant to the adjudication of this motion to dismiss.   *See Goldberg*, 756 F.2d at 950 ("contrary assertions of fact by the defendant will not be considered.").

property, that Carpenter intended that they be so deprived, or that the mailings or wires were in furtherance of the scheme. The latter argument is simply a restatement in different terms of Carpenter's first point, which was discussed above.

With regard to the former elements, the Superseding Indictment pleads sufficiently that the "defendant[] contemplated some actual harm or injury," *Wallach*, 935 F.2d at 461, namely the issuance of insurance policies based on material misrepresentations so that Carpenter and his co-conspirators could resell the policies on the life settlement market. Moreover, the Superseding Indictment pleads in detail why such deception harms the Providers, and thus are material. *See* Ind. ¶ 16. That the failing market for life settlements got in the way of Carpenter's expected profit, *see* Doc. 63 at 10-11, is – even if true – irrelevant to what Carpenter contemplated at the time of the scheme. *See Reifler*, 446 F.3d at 96 ("the scheme need not have resulted in actual injury to the scheme's victims"). Moreover, Carpenter's contention is based not upon the facts in the Superseding Indictment, but on his own views that he apparently expects the Court to accept without support.

Carpenter inaptly seeks to shoehorn this case into the mold of *United States* v. *Shellef*, 507 F.3d 82, 109 (2d Cir. 2007), which held that an indictment charging a bare "no-sale" theory of wire fraud was insufficient as a matter of law. The *Shellef* indictment alleged that the defendants, who purchased and then resold certain controlled chemicals, made false representations to their suppliers about what they intended to do with the chemicals they were buying. *Id*. at 107. It further alleged that the suppliers would not have sold the chemicals to the defendants absent the misrepresentations. *Id*. at 109. The indictment did not, however, allege "that there was a 'discrepancy between the benefits reasonably anticipated' and actual benefits received" by the suppliers as a result of these misrepresentations. *Id*. (citation omitted). Given this pleading defect, the Second Circuit vacated the defendants' wire fraud convictions, reasoning that the jury could have improperly convicted based on a

20

bare determination that the defendants had misrepresented a fact that had no "'relevance to the object of the contract.'" Id. at 108 (citation omitted); *see also United States v. Kurtz*, No. 04 Cr. 155A (RJA), 2008 WL 1820903, at *6 (W.D.N.Y. Apr. 21, 2008) (dismissing indictment where it alleged a "no-sale" theory but failed to allege that the misrepresentation charged was "an essential element of the bargain or that the defendant's scheme depended on a misrepresentation regarding the transfer restriction"); *cf. United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) (holding that the mail and wire fraud statutes "require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful").

By contrast, the Superseding Indictment here specifically includes the sorts of allegations that the *Shellef* court found lacking in that case. It alleges that the defendants' misrepresentations "created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies…and the actual benefits that the Providers received in doing so," Ind. ¶ 37, and spells out five different ways in which the lies that the defendants told, caused to be told, and schemed to tell mattered to the Providers' bottom line, Ind. ¶ 16.   *See United States v. Binday*, 908 F. Supp. 2d 485, 491 (S.D.N.Y. December 10, 2012) (finding that similar language satisfied the flaws in the *Shellef* indictment).   Carpenter may not agree with the Superseding Indictment's assertions, *see* Doc. 63 at 13, but that is for a trial jury; accepting the Superseding Indictment's allegations as true, it clearly pleads that Carpenter specifically contemplated a loss to the Providers.

Likewise, Carpenter's bald assertion that a welfare benefit plan can *ipso facto* circumvent anti-STOLI precautions is irrelevant and a baseless factual assertion divorced from the Superseding Indictment's allegations.   *See* Doc. 63 at 14.   This is a fraud case – Carpenter is not charged with STOLI *per se*, but with lying to insurance companies to circumvent their rules.   The Superseding Indictment's explanation of STOLI simply provides the background necessary to assess materiality and harm to the Providers.

21

Finally, although the Superseding Indictment is clear in alleging that Carpenter's scheme contemplated pecuniary harm to the Providers, it need not show even that. Rather, at a minimum, Carpenter's plan to deprive the Providers of information in making decisions about whether to issue particular insurance policies is itself a cognizable depravation that affects a company's "right to control how corporate assets were spent." *Wallach*, 935 F.2d at 462; *see also Rossomando*, 144 F.3d at 201 n.5. Indeed, Carpenter's conduct deprived the Providers "of the right to define the terms for the sale of its property." *Schwartz*, 924 F.2d at 421. Put differently, Carpenter may argue that there is no change in value between STOLI and legitimately-originated policies, but the Providers are not required to rely on one convicted felon's opinion. Rather, they may make their own decision in full view of the facts. Carpenter's lies deprived them of the ability to do that.

c)      The Indictment Sufficiently Pleads Carpenter's Involvement.

The Court need not linger long on Carpenter's oft-repeated claim that the Superseding Indictment fails to allege sufficient facts regarding what he personally did in furtherance of the scheme. Doc. 63 at 16-18. As discussed at length above, the Superseding Indictment specifically alleges that Carpenter engaged in a scheme to defraud the Providers and that in furtherance of that scheme he used and caused to be used the mails and interstate wires. In so doing, the Superseding Indictment "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776. The Superseding Indictment need allege no more facts than that. *See, e.g.*, *Rowland*, 2014 WL 3341690 at *8 ("Although Defendant is correct that the Superseding Indictment does not specifically allege how Mr. Rowland caused a false filing with the FEC, it need not do so.").

That said, the Superseding Indictment does allege that Carpenter (1) controlled the Subject Entities, among which was the Plan Sponsor, Ind. ¶¶ 2, 22; (2) controlled the entities that funded the policies in the Plan and Trust, Ind. ¶¶ 2, 30; (3) signed documents regarding the funding

agreements between the Funding Entities, the Outside Funder, and the Trust, Ind. ¶¶ 48, 53, 59, et. al.; (4) signed requests for disbursement of loaned funds to pay premiums, Ind. ¶¶ 54, 60, 82, et. al.; (5) initiated wires from funding entities to the Trust to pay premiums on insurance policies, Ind. ¶¶ 49, 66, 71, et. al.; (6) misrepresented to the Providers that the Plan and Trust was a bona fide multiple employer welfare benefit trust, Ind. ¶ 36; and (7) submitted and caused to be submitted numerous false and fraudulent life insurance applications, Ind. ¶ 38.   To the extent that Carpenter claims that he was nonetheless an unknowing dupe in a scheme run by people underneath him, he is free to argue that to a trial jury; at this stage, Carpenter's knowing participation is both alleged explicitly and "implied by the specific allegations made."  *LaSpina*, 299 F. 3d at 177 (internal quotes omitted).   Moreover, his claims of factual innocence are again nothing more than "contrary assertions of fact" that have no place in a motion to dismiss. *Goldberg*, 756 F.2d at 950.   Finally, Carpenter's claim that he owed no fiduciary duty to the Providers is irrelevant – he is not charged with violating a fiduciary obligation, but with a scheme to defraud.

> d)   The Superseding Indictment Need Not Allege Actual Loss of Property.

Carpenter's next claim, that the Superseding Indictment fails because it does not allege actual loss to the Providers, is repetitive of his second claim and again misstates the law.   As discussed above, the Superseding Indictment pleads sufficiently that the misrepresentations by Carpenter and his co-conspirators "created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies…and the actual benefits that the Providers received in doing so," Ind. ¶ 37, and alleged five ways in which the Providers were specifically harmed, Ind. ¶ 16.   *See Binday*, 908 F. Supp. 2d at 491 (finding similar indictment language sufficient to plead contemplated harm to insurance providers).   The law is clear that so long as the scheme

23

"contemplated some actual harm or injury," *Wallach*, 935 F.2d at 461, "the scheme need not have resulted in actual injury to the scheme's victims," *Reifler*, 446 F.3d at 96.

Nor is the object of the Carpenter's fraud like the video poker licenses held not to be property in *Cleveland v. United States*, 521 U.S. 12, 26-27 (2000). There, the Court held that because the license was not "property" in the hands of the victim – the state regulators – it could not be property for purposes of the mail fraud statute. *Id.* In contrast, Carpenter's scheme contemplated the deprivation from the Providers – the victims – of money, property in the form of insurance contracts, and the Providers' "right to control how corporate assets were spent." *Wallach*, 935 F.2d at 462. Each of these is cognizable under the mail and wire fraud statutes.

> e)   The Mailings and Interstate Wires Were In Furtherance of Carpenter's Scheme.

Carpenter's next argument is simply a repetition of his first – that his use of the mails and wires took place after the completion of the scheme. Here, Carpenter misapplies a Ninth Circuit case, which stood for the uncontroversial proposition that a mailing involving the disposition of fraud proceeds was not in furtherance of the criminal scheme. *United States v. Philips*, 704 F.3d 754, 763 (9th Cir. 2012). That is patently not the case here, where the executions of the scheme involve either the transmission of the fraudulent insurance applications or the funding of premiums on the fraudulently obtained policies. In either case, the wires and mails did not deal in proceeds of the fraud, but rather with the two essential ingredients for its continued success, that is, false representations and money to pay premiums. As discussed above, the scheme required the continued funding of premiums so that the policies would remain in force until they could be sold or otherwise disposed of and because this was a continuing crime that involved more than eighty insurance policies. *Slevin*, 106 F.3d at 1089-90 ("there is no requirement that the mailings precede the fraud," provided that the post-fraud mailings "further the scheme.").

Moreover, should Carpenter wish to argue otherwise, he may do so at trial; the Superseding Indictment is sufficient in its pleading.   *See Costello*, 350 U.S. at 363.   Indeed, the structure of the Indictment further buttresses this argument – to the extent that Carpenter is charged with utilizing proceeds of the offense, he is charged with money laundering.

Similarly, Carpenter's repetitive argument that the scheme was the responsibility of the insureds and the insurance agents and that he merely funded the policies is again a defense that he may raise at trial but not as grounds for dismissal.   Simply because Carpenter insulated himself by conspiring with insurance agents to fill out applications does not mean he may now conveniently hide behind those agents in denying responsibility. If anything, this very issue explains why the law requires factual disputes to be determined by a jury at trial and not by way of motion.   *Alfonso*, 143 F.3d at 776-77.   It is enough that the Superseding Indictment pleads that Carpenter engaged in the scheme, submitted and caused the submission of fraudulent insurance applications, and used or caused the use of the mails and interstate wires in furtherance of that scheme.   *See*, *Bahel*, 62 F.3d at 641-42 (Government need not prove use of wires or mails by the defendant "as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme.").

**B.     The Indictment Sufficiently Pleads A Violation of 18 U.S.C. § 1349 (Defendant's Argument No. 6).**

Carpenter's next argument incorrectly attacks the Superseding Indictment's pleading of 18 U.S.C. § 1349, conspiracy to commit mail and wire fraud.   Carpenter again misstates the pleading requirement of the Superseding Indictment by claiming that it fails to "allege sufficient facts of who, what, when, where, and why to show that Mr. Carpenter willfully joined a conspiracy to willfully violate the law."   Doc. 63 at 21-22.   In truth, the Superseding Indictment does indeed allege all of the necessary elements of the statute, including willfulness, and adds facts regarding

Carpenter's participation that – although unnecessary – give some details of Carpenter's role in the offense.

18 U.S.C. § 1349 supplements the wire and mail fraud statutes with a statutory conspiracy and attempt provision.   It states: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."   Unlike the general conspiracy law, found at 18 U.S.C. § 371, 18 U.S.C. § 1349 does not include an "overt act" requirement.   *See*, *e.g.*, *United States v. Kazarian*, No. 10 Cr. 895(PGG), 2012 WL 1810214 at *24, n12 (S.D.N.Y. May 18, 2012) ("Unlike Section 371, Section 1349 contains no overt act requirement, and courts have rejected the argument that such a requirement should be read into the statute."); *United States v. Albers*, No. 08-CR-819 (NG)(RML), 2011 WL 1225548 at *1 (S.D.N.Y. March 31, 2011) (same); *United States v. Beridze*, 415 Fed. Appx. 320, 325-26 (2d Cir. 2011) (not mentioning the overt act as a requisite element for a 1349 conspiracy); *United States v. Bartee*, 301 Fed. Appx. 46, 50 (2d Cir. 2008) (same).   Thus, the elements of a § 1349 conspiracy are (1) two or more people entered the unlawful agreement in the indictment; and (2) the defendant knowingly and wilfully became a member of the conspiracy.   *See* 1-19 Leonard B. Sand et al., Modern Federal Jury Instructions – Criminal ("Sand") ¶ 19.03 (2014) (adapted for § 1349); 11th Circuit Pattern Jury Instruction, Instruction 54.

Here, the allegations in Count 33 of the Superseding Indictment sufficiently "track the language of the statute," *Alfonso*, 143 F.3d at 776 (citations omitted), by alleging that Carpenter, Bursey, and others willfully and knowingly conspired to commit mail and wire fraud as described in the Superseding Indictment, that is, "to devise and execute a scheme to defraud the Life Insurance Providers by means of false and fraudulent…representations…and to execute that

scheme by means of private commercial carriers and interstate wire communications."   Ind. ¶
121.   In tracking the statute, this language "fairly informs [the] defendant of the charge against
which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future
prosecutions for the same offense.'"   *Alfonso*, 143 F.3d at 776.   As discussed at length above, the
Superseding Indictment need allege no further detail about the manner of the commission of the
crime.   *See, e.g.*, *See LaSpina*, 299 F.3d at 177. ("in an indictment for conspiring to commit an
offense in which the conspiracy is the gist of the crime it is not necessary to allege with technical
precision all the elements essential to the commission of the offense which is the object of the
conspiracy"); *Rowland*, 2014 WL 3341690 at *8.   Indeed, in *La Spina*, 299 F.3d at 178, the court
found sufficient a § 1956(h) conspiracy charge where it "tracked the statutory language of §
1957(a) by identifying the object of the conspiracy as 'engaging and attempting to engage in
monetary transactions in criminally derived property that was of a value greater than $10,000 and
that was derived from specified unlawful activity[.]'"   Moreover, the description of the "specified
unlawful activity" from which the property was derived as "interstate transportation of property
obtained by fraud and wire fraud" was likewise deemed sufficient to put the defendant on notice of
the charge he would be required to defend.   *Id.*

Of course, the Superseding Indictment here does provide some description of Carpenter's
participation – most notably his control of the Subject Entities and Plan Sponsor, involvement in
the funding of policies, and wilful causing of various wires and mailings in furtherance of the
scheme – although certainly not a "full proffer of the evidence [the Government] intends to present
at trial."   *Perez*, 575 F.3d at 166.   Carpenter's claim that he was a mere "banker" in this scheme,
unknowing of its illegality, *see* Doc. 63 at 25, is nothing more than an attack on the "sufficiency of
the evidence" that the Court should decline to decide as a pretrial motion to dismiss.   *Perez*, 575

27

F.3d at 166.   Moreover, the Government has no quarrel with Carpenter's argument that it must prove willfulness; however, the pleadings here are "enough to call for trial of the charge on the merits."   *Costello*, 350 U.S. at 363.

### C.   Carpenter Is Properly Charged Under Multiple Theories of Liability (Defendant's Argument No. 7)

Carpenter's next challenge – to the Superseding Indictment's pleading of aiding and abetting liability – appears to have been written without reference to either the law or the Superseding Indictment.   In addition to liability as a principal, a defendant may be charged under other theories as well – aiding and abetting the offense (18 U.S.C. § 2(a)), wilfully causing the offense (18 U.S.C. § 2(b)), and conspiratorial liability for substantive offenses (so-called *Pinkerton* liability). *See Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946) (ruling that liability for reasonably foreseeable acts within the scope and in furtherance of a conspiracy is attributable to all conspirators).   In wire and mail fraud in particular, a defendant need not have actually undertaken the mail or wire, "as long as it is reasonably foreseeable that the charged transmission would occur in the execution of the scheme."   *Bahel*, 62 F.3d at 641-42.   A defendant may be charged under all four theories of liability for the same conduct and, in fact, there is no requirement that the jury be unanimous as to which theory of liability drove their determination.   *See United States v. Ferguson*, 653 F.3d 61, 79-80 (2d Cir. 2011) ("Just as there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict, neither must it agree on alternative mental states.") (internal citations omitted).

Here, the Superseding Indictment properly charges Carpenter both as a principal as well as through accessorial theories of liability.   For example, Counts 1-4 of the Superseding Indictment charge that "defendants CARPENTER and BURSEY, and others working for and on behalf of the

Subject Entities, did knowing cause to be transmitted, and aided and abetted others to cause to be transmitted" certain interstate wires.  Ind. ¶ 49.  That paragraph, which is substantially the same as the other substantive counts, charges Carpenter as a principal, an aider and abettor, and for knowingly causing the offense.  This is clearly permitted by the law, as would be the Government's request (should it make one) to allow the jury to be instructed on *Pinkerton* liability. *See Ferguson*, 653 F.3d at 79-80.

Carpenter's arguments to the contrary are yet again based on his rewriting of the Superseding Indictment to suit his arguments and a misstatement of the law.   At base, Carpenter contends that the Superseding Indictment charges him as a so-called "Svengali of STOLI," Doc. 63 at 26 (quotations in original), and therefore the Superseding Indictment must rise or fall by considering only liability as a principal. First, Carpenter's quotations marks are misleading – the Superseding Indictment makes no such allegation.  Rather, the Superseding Indictment is a dispassionate recitation of a set of allegations that plead sufficiently several charges against Carpenter and Bursey as both principals and accessories.   As discussed above, Carpenter is not charged with STOLI, but with fraud against the Providers.   Second, Carpenter's contention that "it is unknown whether the Grand Jury indicted Mr. Carpenter as a principal or as an aider and abetter (sic)," Doc. 63 at 26, is directly contrary to the established law of this Circuit, which does not require such specificity either in an indictment or from a trial jury.   *See Ferguson*, 653 F.3d at 79-80.   Finally, Carpenter repeats the same factual demurrers as above, namely that he did not participate in the scheme, or aid others in doing so, and that he only funded the policies.   These contentions are not attacks on the law of aiding and abetting, but yet more attacks on the sufficiency of the evidence that will apparently form the basis of his defense at trial.   *See Perez*, 575 F.3d at 166-67.

29

### D.      The Charges Are Appropriately Venued In Connecticut (Defendant's Argument No. 8)

Carpenter's next argument, for dismissal on the basis of improper venue, again misstates the law and ignores the express allegations in the Superseding Indictment.

18 U.S.C. § 3232 provides that venue lies in the district "in which [the] offense [was] committed." "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Rather, when the acts constituting a criminal offense take place in several districts, prosecution is proper in any district in which some part of the offense conduct occurred. *See United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984). Indeed, 18 U.S.C. § 3237(a) expressly provides that "any offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." In addition, the Second Circuit has held that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)).

Moreover, in the context of a pre-trial motion to dismiss for improper venue, "[a]n indictment alleging on its face that the crimes occurred in the venue where the case is brought is sufficient to withstand a motion to dismiss." *United States v. Baldeo*, No. 13 Cr. 125 (PAC), 2013 WL 5477373, at *5 (S.D.N.Y. Oct. 2, 2013); *see also, e.g., United States v. Metter*, 860 F. Supp. 2d 205, 207 (E.D.N.Y. 2012) (rejecting defendant's pretrial challenge to venue as "frivolous" because the indictment "states that the conduct at issue occurred 'within the Eastern District of New York and elsewhere'"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) (same);

*United States v. Ayeki*, 289 F. Supp. 2d 183, 188 (D. Conn. 2003) (holding that "it is premature to decide the issue of venue" in a pre-trial motion to dismiss where the indictment alleged that the offense occurred "in the District of Connecticut and elsewhere"); *United States v. Szur*, No. S5 97 Cr. 108 (JGK), 1998 WL 132942 at *9 (S.D.N.Y. Mar. 20, 1998) (holding that allegation in indictment that the offense occurred "in the Southern District of New York and elsewhere," was sufficient to resist a motion to dismiss for improper venue). "Whether such acts alleged in the Indictment in fact occurred in the [alleged district] is appropriately left for trial[.]"  *Szur*, 1998 WL 132942 at *9.

Here, each count of the Superseding Indictment expressly alleges that the charged offense took place "in the District of Connecticut and elsewhere."  This alone warrants a denial of the defendant's motion to dismiss for improper venue. *See Baldeo*, 2013 WL 5477373, at *5; *Metter*, 860 F. Supp. 2d at 207; *Bellomo*, 263 F. Supp. 2d at 579; *Ayeki*, 289 F. Supp. 2d at 188; *Szur*, 1998 WL 132942, at *9.  Similarly, the Superseding Indictment alleges that each of the mailings and wires – which are essential elements of the crime, *see United Autuori*, 212 F.3d at 115 – were sent or initiated *from Connecticut* by Carpenter, Bursey, or other employees of the Subject Entities. *See*, e.g., Ind. ¶ 49 (charging in Count One an "email from an employee of the Subject Entities in Connecticut," in Count Two a wire initiated from Connecticut, etc.).  Again, this is sufficient by itself to allege venue.  *See United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) (holding that in for mail fraud prosecutions, venue is proper where "the defendant 'places,' 'deposits,' 'causes to be deposited,' 'takes,' or 'receives' mail, or 'knowingly causes' mail 'to be delivered.'"); *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (finding that venue for wire fraud is where offense was begun, continued, or completed and affirming district court's conclusion that "the act of causing a wire to be transmitted in furtherance of a fraud is criminalized by the statute.").

The Superseding Indictment here also alleges other facts to support venue in the District of Connecticut for each count of the Superseding Indictment.   The Superseding Indictment alleges that the Subject Entities, including the Plan Sponsor, operated principally in Connecticut; that Carpenter controlled the Subject Entities and maintained his principal place of business in Connecticut; and that Bursey worked for and on behalf of the Subject Entities, was the President of the Plan Sponsor, and maintained his principal place of business in Connecticut.   Ind. ¶¶ 1-3, 22. Likewise, the Superseding Indictment also alleges that Carpenter, who maintained his principal place of business in Connecticut, knowingly caused the mailings and wires to be made and aided and abetted others to do the same.

Confronted with an indictment that alleges proper venue in all counts, Carpenter attempts to export one of his sufficiency claims into an attack on venue.   He again argues that the mail fraud and wire fraud counts that concern premium payments are not properly venued in Connecticut because they were not in furtherance of the scheme.   This is not a venue argument – if the defendant's argument were true, it would lead to dismissal on sufficiency, not venue, grounds.   At any rate, the use of the mails and wires to make premium payments were indeed in furtherance of the scheme for several reasons discussed above, including because the premium payments were critical and essential to keeping the policies in force so that they could be sold at a later date, which was a prime objective of the fraud.

Carpenter also argues that the Straw Insureds and agents who filled out the insurance applications (aside from Joseph Edward Waesche IV, who worked in Connecticut) resided in other states, and therefore venue is not proper in Connecticut.   However, the mailings and wires, which are essential elements of the crime and were done in furtherance of the scheme, took place in Connecticut.   It is patently irrelevant where the insureds, agents, or anyone else lived.

Carpenter relies incorrectly on several cases in which the court dismissed for improper venue.   Two of those cases involved dismissals *after trial*, did not concern pleading requirements, and thus are not instructive here.   *See United States v. Novac*, 443 F.3d 150 (2d Cir. 2006); *United States v. Strain*, 396 F.3d 689, 697 (5th Cir. 2005).   *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997) is likewise unhelpful – it held simply that venue could not rely on ministerial acts not intended or foreseen by the defendant.   Here, the mailing and wiring of the insurance applications and premiums were essential acts done in furtherance of the scheme to defraud, not acts incidental to the offense. These were not unforeseen or unintended; the Superseding Indictment expressly alleges that the defendant and others "knowingly and intentionally" caused the mailings and wires.   Nor can the defendant, who has his business in Connecticut and who sent wires and mails from Connecticut, claim surprise that he should be charged here.   Finally, *United States v. Salinas*, 373 F.3d 161 (1st Cir. 2004) is irrelevant– that passport fraud is not a continuing crime does not affect the settled law that wire and mail fraud continue through the completion of each execution.   *See Kim*, 246 F.3d at 191.

With respect to the mail and wire fraud conspiracy, the Superseding Indictment sufficiently pleads venue by alleging that the offense occurred "in the District of Connecticut and elsewhere." Ind. ¶ 121; *see United States v. Ayeki*, 289 F. Supp. 2d 183, 188.   Should Carpenter contest venue at trial, the Government would then be entitled to prove it by showing that "an overt act in furtherance of the conspiracy was committed" in Connecticut.   *United States v. Tzolov*, 642 F.3d 314, 319-20 (2d Cir. 2011) (internal citations omitted).   "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy."   *Id.* at 320.   Although 18 U.S.C. § 1349 is not an overt-act

conspiracy, and so the Superseding Indictment does not enumerate them as such, the Superseding Indictment alleges numerous acts taking place in Connecticut in furtherance of the object and purpose of the conspiracy, including each of the mailings and wires alleged in Counts 1-32.   All of those acts, and any others not alleged in the Superseding Indictment, would be employed to prove venue at trial. *See*, *e.g.*, *United States v. Magleby*, 420 F.3d 1136, 1145 (10th Cir.2005) (noting that "venue is proper wherever acts in furtherance of the conspiracy occur, regardless of whether an overt act must be proved" as a requisite element of the conspiracy offense).

Finally, although Carpenter does not specifically argue that the money laundering and illegal monetary transaction counts are improperly venued in Connecticut, the Government addresses them here because Carpenter moves to dismiss the Superseding Indictment in its entirely for improper venue.   The money laundering statute provides that for offenses arising under 18 U.S.C. § 1957 (illegal monetary transactions) or 18 U.S.C. § 1956 (money laundering), venue is proper in "any district in which the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1)(A). The statute further provides that, "[f]or purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place." 18 U.S.C. § 1956(i)(3).   Under the statute, the term "conducts" includes "initiating, concluding, or participating in initiating, or concluding a transaction."   18 U.S.C. § 1956(c)(2).   In addition, for conspiracy to commit money laundering, venue is proper in the district where venue would lie for the completed money laundering offense or in any other district where an act in furtherance of conspiracy took place.   18 U.S.C. § 1956(i)(2).

Here, in each of the money laundering and illegal monetary transaction counts charged in

the Superseding Indictment, the transaction is alleged to have taken place in the "District of Connecticut and elsewhere," and is alleged to have been initiated or originated by Carpenter, Bursey, or a Subject Entity.   Thus, the allegations in the Superseding Indictment sufficiently allege Connecticut venue for the counts of money laundering, illegal monetary transactions, and conspiracy to commit money laundering.

### E.   The Superseding Indictment Sufficiently Pleads Money Laundering and Illegal Monetary Transactions (Defendant's Argument No. 9)

Finally, Carpenter's attacks on the sufficiency of the money laundering counts are baseless and rely on more unsubstantiated factual contentions outside of the four corners of the Superseding Indictment. Doc. 63 at 37-42.   Carpenter seems to restate the "elements" of the money laundering statutes three times, each time with a different formulation, and without distinguishing between violations of 18 U.S.C. §§ 1956 and 1957.

There are several different theories upon which a prosecution for money laundering or illegal monetary transactions may be premised.   Here, two particular subsections are charged, in addition to conspiracy.   18 U.S.C. § 1956(a)(1)(A)(i) provides that: "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity…with the intent to promote the carrying on of specified unlawful activity [commits a crime]."   18 U.S.C. § 1957 provides, in relevant part that "whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity [and does so] in the United States [commits a crime]." [4]   Violations of the mail and wire fraud statutes

---

[4] The Superseding Indictment also adds an additional subsection as an object of the conspiracy.  18 U.S.C. § 1956(a)(1)(B)(i) imposes punishment on anyone who, "knowing that the property involved in a financial transaction represents the proceeds  of some form of unlawful activity, conducts or attempts to conduct such a financial

are recognized as "specified unlawful activities."   *See* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B).

These different sections have distinct elements.   18 U.S.C. § 1956(a)(1)(A)(i) requires the Government to show that (1) "the defendant conducted a financial transaction involving property constituting the proceeds of specified unlawful activity;" (2) "the defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity;" and (3) "the defendant acted with the intent to promote the carrying on of specified unlawful activity." 3-50A Sand ¶ 50A.01.   For a violation of § 1957, the Government must show that (1) "the defendant engaged in a monetary transaction in or affecting interstate commerce;" (2) "the monetary transaction involved criminally derived property of a value greater than $10,000;" (3) "that the property was derived from specified unlawful activity;" (4) "the defendant acted knowingly that is, with knowledge that the transaction involved proceeds of a criminal offense;" and (5) "the transaction took place in the United States."   3-50A Sand ¶ 50A.06.   Finally, a § 1956(h) conspiracy requires the Government to prove that (1) two or more people entered the unlawful agreement in the indictment; and (2) the defendant knowingly and wilfully became a member of the conspiracy.   *See* 1-19 Sand ¶ 19.03 (adapted for § 1956(h)); *United States v. Whitfield*, 543 U.S. 209, 219 (2005) (no overt act requirement for money laundering conspiracy).

Here, the Superseding Indictment tracks the appropriate elements and statutory language in alleging the money laundering and illegal monetary transaction offenses.   Ind. ¶¶ 136-51.   These counts principally concern Carpenter's disposition of the proceeds of the insurance policies fraudulently obtained on the life of SI-13, who died shortly after the issuance of his policy.   Ind. ¶¶ 123-133.   The money laundering counts are divided into four sets: a multi-object conspiracy charge (Count 34); substantive counts of illegal monetary transactions related to large transfers

---

transaction which in fact involves the proceeds of specified unlawful activity[,] knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

between defendant-controlled accounts (Counts 35-39); substantive counts of illegal monetary transactions related to the purchase of a home in Rhode Island (Counts 40-47); and substantive counts of money laundering concerning the use of death benefit money to promote the carrying on of the fraud, either through repayment of the Outside Funder or the payment of additional Plan and Trust insurance premiums (Counts 48-57).   Each of those counts tracks verbatim the appropriate statutory language.   *See* Ind. ¶¶ 135, 137, 139, and 142.   As in the wire and mail fraud counts, Carpenter is permissibly charged as a principal, an aider and abettor, and for wilfully causing the violation.   *See United States v. Huezo*, 546 F.3d 174, 179-80 (2d Cir. 2008) (sustaining aiding and abetting in the money laundering context).

Carpenter inaptly complains that the Superseding Indictment is just "a rendition of money moving between valid entities for well-documented and legitimate entities," and claims that the Superseding Indictment's allegations that the he used death benefit funds to pay for a house in Rhode Island and other insurance premiums is "surplusage."   Doc. 63 at 39.   Instead, this is the very essence of money laundering and illegal monetary transactions.   For the former, the allegations show that Carpenter transacted in the proceeds of a specified unlawful activity ("SUA") (the death benefit proceeds from the wire and mail fraud scheme as it related to SI-13) to promote the carrying on of an SUA (the continued funding of premiums as part of the wire and mail fraud scheme).   *See* 18 U.S.C. § 1956(a)(1)(A)(i).   For the latter, it shows that Carpenter engaged in a monetary transaction in criminally derived proceeds (again, from the ill-gotten death benefit proceeds) in an amount greater than $10,000.   *See* 18 U.S.C. § 1957.   Carpenter's denial of the Superseding Indictment's allegations that he was aware of the specified unlawful activity is sufficient to earn him a trial, but does not warrant a pre-trial dismissal.

Again faced with a facially sufficient indictment, Carpenter diverts his argument outside

the factual allegations and back into baseless factual assertions and claims of innocence that define

his brief.   In a familiar theme, Carpenter again protests that there is insufficient description of the

facts underlying the allegations against him.   So long as the Superseding Indictment "track[s] the

language of the statute" and gives the approximate time and place of the offense, this is not a basis

for a motion to dismiss.  *See Alfonso*, 143 F.3d at 776; *Rowland*, 2014 WL 3341690 at *8.

Moreover, Carpenter's factual claims are themselves specious.   Carpenter argues that "Paragraph

131 is fatal to the entire Indictment" in that it alleges that Lincoln paid the death benefit after "an

exhaustive year-long investigation," and that "big insurance carriers" do not pay on fraudulent

applications.   Doc. 63 at 30.   In addition to being Carpenter's opinion, it is directly contrary to

the Superseding Indictment, whose factual allegations must be "accepted as true."  *Velastegui*,

199 F.3d at 592 n.2.   The Superseding Indictment clearly alleges that Carpenter and his

co-conspirators withheld the information from Lincoln that would have permitted Lincoln to know

that the applications were fraudulent.   Ind. ¶¶ 123-131.   Even after SI-13's death, co-conspirator

Bursey continued to send misleading correspondence to Lincoln.   Ind. ¶ 129 (fax denying that

policy had been collaterally assigned).   Moreover, negligence by the victim is not a defense to

fraud.  *See Isola*, 548 Fed. Appx. at 724-25.

## IV.   The Superseding Indictment Was Timely (Response to Docs. 64 and 65)

Although couched as a claim that the Superseding Indictment violates the statute of

limitations, Documents 64 and 65 are in truth nothing more than a tedious 62-page restatement of

several of Carpenter's sufficiency arguments.   Principally, Carpenter repeats his argument that

the scheme was completed prior to the wires and mailings that related to the payment of premiums

for the insurance policies, and thus claims that the statute of limitation should run from the date the

insurance application was submitted.   Where the count charges the submission of an application

that lies within the limitations period, Carpenter switches course and instead claims that he has no

criminal liability because he did not sign the application.   This is patently *not* a statute of limitations argument but yet another factual denial that does not belong in a motion to dismiss. These claims are then repeated over and over again in Carpenter's motion and memorandum, punctuated at times with other misleading factual claims and misstatement of the law.   In fact, each of the counts alleged in the Superseding Indictment are timely on their face, and any claim to the contrary must wait until trial.   Therefore Carpenter's motion should be dismissed.

### A.        Relevant Law

 "Except as otherwise expressly provided by law," an indictment for violating 18 U.S.C. §§ 1341, 1343, 1349, 1956, and 1957 must be "found…within five years after such offense shall have been committed."   18 U.S.C. § 3282.   "The statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that the defendant's actions concerning the scheme to defraud occurred before the statutory period."   *United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992).   The same logic applies to wire fraud as well.   *See United States v. Gross*, 416 F.2d 1205, 1210 (8th Cir. 1969); *see also United States v. King*, No. 98-CR-91A(F), 2000 WL 362026 at *16 (W.D.N.Y. March 24, 2000) ("In mail and wire fraud cases, the period of limitations commences to run from the date of the charged mailing or the alleged use of a domestic or international wire.").   For non-overt-act conspiracies such as 18 U.S.C. §§ 1349 and 1956(h), so long as the "conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn."   *United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003).   The defendant bears the burden to prove to the trier of fact that the conspiracy terminated or he withdrew prior to the statute of limitations.   *See United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) ("Where the government has presented sufficient evidence to show a conspiracy that has continuing purposes

or goals, the burden is on the defendant to prove that the conspiracy was terminated or that he took affirmative steps to withdraw."); *Spero*, 331 F.3d at 60-61 (once the government has shown that a conspiracy existed and that defendant was a member of it, the burden falls upon the defendant to prove that the conspiracy was terminated); *United States v. Stroh*, No. 3:96CR139(AHN), 2000 WL 1833397 at *4 (D. Conn. Nov. 3, 2000) (Nevas, J.) ("Because the facts relating to Stroh's affirmative defenses of withdrawal and statute of limitations are inevitably bound up with the evidence pertaining to the conspiracy itself, those issues can not be decided as a matter of law after a short fact-finding hearing.").

While a pre-trial motion to dismiss on statute of limitations grounds is permissible, an indictment survives attack where it charges offenses within the limitations period. *See United States v. Cianchetti*, 315 F.2d 584, 589 (2d Cir. 1963) ("By charging an overt act within the five-year period of limitations made applicable to this conspiracy by 18 U.S.C. § 3282, the indictment was not subject to attack upon its face."). Similarly, a defendant may place the statute of limitations in issue at trial, which obligates the Government to prove to a jury only that "the conspiracy continued past the statute-of-limitations period." *Smith v. United States*, 133 S. Ct. 714, 721 (2013).

The bringing of an indictment tolls the statute of limitations "as to the charges contained in that indictment." *United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976). To permit charges in a superseding indictment to retain the limitations period of the original indictment, "the original indictment must be validly pending, and the super[s]ceding indictment must not materially broaden or substantially amend the charges." *United States v. Rutkoske*, 506 F.3d 170, 175 (2d Cir. 2007). The statute of limitations that applies to a superseding indictment is count-specific; "where the counts of an original indictment are simply duplicated verbatim into a superseding

indictment, the statute of limitations on those counts is tolled, even if additional counts that are subject to no limitations objections are added. This is because when charges from an original indictment are duplicated in a superseding indictment the defendant cannot claim he lacked notice of those charges." *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990); *see also United States v. Ross*, 77 F.3d 1525, 1537 (7th Cir. 1996) ("When the third superseding indictment was returned…twenty of the indictment's thirty-five counts were still within the five-year limitation period. Regardless of any relation back, these charges clearly were not time barred.").

**B.     Each Count In The Superseding Indictment Is Timely On Its Face**

Here, every count of the Superseding Indictment was timely brought.   Counts 1-33 of the Superseding Indictment are identical in every respect to Counts 1-33 in the original Indictment. *See Pacheco*, 912 F.2d at 305.   In fact, other than one introductory sentence,[5] the allegations are drawn verbatim from the original Indictment, and thus the limitations period applicable to the original indictment would apply to Counts 1-33.   *See Rutkoske*, 506 F.3d at 175.   The original Indictment was returned on December 12, 2013.   Doc. 1.   Thus ordinarily Counts 1-33 must allege conduct that occurred on or after December 12, 2008.   However, as he correctly acknowledged in his motion, Carpenter waived the statute of limitations from August 9, 2013 to December 11, 2013.   *See* Doc. 64 at 5.   Consequently, Counts 1-33 must allege acts that occurred on or after August 9, 2008.

Each of Counts 1-32, the substantive allegations of wire and mail fraud, charge interstate wires or mailings that took place on or after August 9, 2008, and thus were timely brought. The earliest charged transmission is in Count Six, which alleges that on August 29, 2008, Carpenter

---

[5] The sole alteration to Paragraphs 1-121 is the addition of a sentence in Paragraph 6 that "Lincoln was a recipient of funds from the United States Government's Troubled Asset Relief Program, the bailout program created in 2008 in response to the financial crisis."   This sentence, provided for background purposes, did not broaden or amend the substance of the charges in the original indictment, did not broaden or change any aspect the scheme to defraud or the conspiracy, and did not broaden or change the way the Carpenter was alleged in the original indictment to have participated in the scheme or conspiracy.

caused, and aided others to cause, the mailing of a Funding Memorandum and Disbursement Request for the purpose of funding the Outside Funder's loan to Funding Entity 1 for payment of a premium on a policy on SI-3's life.   Ind. ¶ 60.   All of the other mailings and interstate wires take place after that.   Since the statute period runs from the date of the mailing or wire, each of Counts 1-32 is timely.   *See Eisen*, 974 F.2d at 263; *Gross*, 416 F.2d at 1210; *King*, 2000 WL 362026 at *16.   Similarly, the non-overt-act conspiracy alleged in Count 33 was timely filed because (1) it "contemplates a continuity of purpose and a continued performance of acts," *Spero*, 331 F.3d at 60; and (2) it ran "from in or about 2006 through in or about 2013," Ind. ¶ 121, well beyond the August 9, 2008, limitations cut-off.   Carpenter is free to attempt to prove at trial that the conspiracy was terminated or that he withdrew before the limitations period, but that would be his burden at trial and not on a motion to dismiss.   *See Eppolito*, 543 F.3d 25 at 49.

Conversely, the money laundering charges added by the Superseding Indictment in Counts 34-57 may not relate back sufficiently to the original Indictment to gain the benefit of the earlier limitations period.   *United States v. Ben Zvi*, 168 F.3d 49, 55 (2d Cir. 1999) (new money laundering counts did not relate back to wire fraud for statute of limitations purposes).   In that case, the Court should apply the date of the Superseding Indictment to the limitations analysis for the money laundering counts.   The Superseding Indictment was returned on May 14, 2014.   Doc. 53.   Thus ordinarily Counts 34-57 must allege conduct that occurred on or after May 14, 2009. However, because Carpenter waived the statute of limitations for 124 days (between August 9 and December 11, 2013), in fact Counts 34-57 must allege conduct that occurred on or after January 10, 2009.

Judged by the January 10, 2009 date, Counts 34-57 are timely.   First, the substantive money laundering and illegal monetary transaction charges contained in Counts 35-57 all charge

monetary or financial transactions that occurred well after the limitations cut-off. Indeed, the earliest of those charged transactions is in Count 35, which charges that on or about May 21, 2009, Carpenter knowingly engaged in and aided, abetted, and caused a monetary transaction in criminally derived property – specifically proceeds of the SI-13 death benefit – of more than $10,000. Ind. ¶ 35. All of the other financial and monetary transactions charged in the Superseding Indictment took place after Count 35, with the latest being on October 28, 2009. Thus all of the substantive counts of money laundering are timely.

Likewise, as with the wire and mail fraud conspiracy, the non-overt-act money laundering conspiracy alleged in Count 34 was timely filed because (1) it "contemplates a continuity of purpose and a continued performance of acts," *Spero*, 331 F.3d at 60, i.e., using the SI-13 death benefit proceeds "to pay for, among other things, various trust-related insurance premiums, other insurance premiums, and a home in Rhode Island," Ind. ¶ 133; and (2) it ran "from in or about May 21, 2009 through the present," Ind. ¶ 135, well beyond the January 10, 2009, limitations cut-off. Again, it would be Carpenter's burden to prove at trial either termination or withdrawal prior to the limitations period. *See Eppolito*, 543 F.3d 25 at 49.

### C.  Carpenter's Arguments Misstate the Law and Improperly Recast the Facts

Despite the obvious timeliness of the Superseding Indictment, Carpenter makes several unavailing arguments in a repetitive and wearisome review of every count in the Superseding Indictment.[6] As an initial matter, Carpenter mistakenly claims that all counts of the Superseding Indictment should bear its later statute of limitations date. Doc. 65 at 3. As discussed above, the statute of limitations is count-specific. *See Grady*, 544 F.2d at 601 (The bringing of an indictment

---

[6] In his motion, the defendant makes a frivolous claim under the Sixth Amendment's Speedy Trial guarantee. *See* Doc. 64 at 6. It is long-settled that neither the Speedy Trial Act nor the Sixth Amendment's guarantee is implicated until a defendant is charged. *See United States v. Marion*, 404 U.S. 307, 320 (1971).

tolls the statute of limitations "as to the charges contained in that indictment."). So long as the charges in the original Indictment are imported verbatim into the Superseding Indictment, those charges' statutes of limitation are tolled at the filing of the original indictment, regardless of any new charges. *See Pacheco*, 912 F.2d at 305; *Ross*, 77 F.3d at 1537. Carpenter's unexplained reliance on *United States v. Bryant*, 998 F.3d 21, 24 (1st Cir. 1993) and *United States v. Ratcliff*, 245 F.3d 1246 (11th Cir. 2001) is misplaced. Doc. 65. at 3, 17. Those cases simply do not hold – as Carpenter seemingly implies – that the verbatim adoption of unaltered charges into a superseding indictment that also contains new counts necessarily applies a new limitations period to the original charges. Rather, both cases consider only whether facts added to a conspiracy count in a superseding indictment "materially broaden[ed] []or substantially amend[ed]" those counts such that the original limitations date would no longer apply. *Bryant*, 998 F.3d at 25; *see also Ratcliff*, 245 F.3d at 1253-54. Indeed, "[n]otice to the defendant is the central policy underlying the statutes of limitation. If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him. That is, he knows that he will be called to account for certain activities and should prepare a defense." *Pacheco*, 912 F.2d at 305 (quoting *United States v. Italiano*, 894 F.2d 1280, 1283 (11th Cir. 1990)). Here the Superseding Indictment adopted verbatim the first 33 counts of the Indictment; Carpenter cannot now claim lack of notice of those charges from the original filing date.

Similarly, Carpenter's often repeated argument that the money laundering counts' incorporation by reference of the allegations in Counts 1-33 expands those original counts is unsupported by the language of the Superseding Indictment, case law, or logic. *See*, *e.g.*, Doc. 65 at 17. If those original wire and mail fraud counts had done the reverse and added references to

the new counts in the Superseding Indictment, perhaps Carpenter could argue that the original

counts were duly expanded.   However, that is not the case here – the incorporation flows only one

way.  The Superseding Indictment adopts verbatim the original 33 counts; thus those original

charges of the Indictment properly receive the earlier limitations period.

Carpenter also speciously claims that the Superseding Indictment introduced the concept

of "Aiding and Abetting."   Doc. 65 at 21.   In truth, the original Indictment clearly charged

Carpenter in every substantive count as a principal and aider and abettor, and made specific

reference to 18 U.S.C. § 2.   *See* Doc. 1.   Carpenter's claim is simply false.

The remainder of Carpenter's arguments are simply variations of fact-dependent claims

made throughout his various motions that the mailings and interstate wires were not in furtherance

of the crime.   Carpenter's arguments can be broken into two categories – that the offense ended at

the submission of the application and that he did not sign or fill out the false applications.   The

latter argument is simply a denial of guilt, notwithstanding the Superseding Indictment's clear

allegations otherwise, and therefore should be ignored by this Court.   *See Goldberg*, 756 F.2d at

950 ("contrary assertions of fact by the defendant will not be considered.").   As such, the

Government declines to answer every contrary factual assertion made by Carpenter prior to trial.

In the former, Carpenter repeats his earlier contention that premium payments took place

after the completion of the scheme.   *See*, *e.g.*, Doc. 65 at 10.   First, just as this was not a venue

argument, it is also not properly a statute of limitations argument.   Carpenter conflates "overt

acts" with substantive counts of wire and mail fraud and money laundering.   *See*, *e.g.*, Doc. 65 at

12 ("the subsequent alleged misconduct cited in the respective counts…cannot and do not

represent 'overt' acts.   They cannot save the respective counts from the effects of 18 U.S.C.,

Section 3282").   The counts to which Carpenter refers represent individual substantive executions

of the mail and wire fraud scheme; those charges' limitations periods begin on the date of the mailing or wire. *See Eisen*, 974 F.2d at 263; *Gross*, 416 F.2d at 1210; *King*, 2000 WL 362026 at *16.   To the extent that Carpenter believes that those executions were not properly alleged to be in furtherance of the scheme, he may – and indeed he has – move to dismiss.

Similarly, Carpenter's argument does not apply to either conspiracy count.   *United States v. Grimm*, 788 F.3d 498, 501 (2d Cir. 2013), on which Carpenter relies, considers only the timeliness of an overt-act conspiracy, which requires the Government to "establish that a conspirator knowingly committed at least one overt act in furtherance" within the limitations period.   Here, the Superseding Indictment charges conspiracies that do not require overt acts. *United States v. Kazarian*, 2012 WL 1810214 at *24, n12 (no overt act required in 18 U.S.C. § 1349); *Whitfield*, 543 U.S. at 219 (same for § 1956(h)).   Absent an overt-act requirement, so long as the "conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *Spero*, 331 F.3d at 60.   Carpenter would be free to attempt to prove termination at trial; he may not do so now.   *Id.* at 60-61.

Finally, even on its facts, *Grimm* does not support Carpenter's argument.   In *Grimm*, 788 F.3d at 499, the defendants fraudulently obtained guaranteed investment contracts for General Electric at below-regulation interest rates.   The court held that indefinite payments on those contracts at depressed rates, each of which represented a profit to GE (who would otherwise pay more interest), could not serve as overt acts in furtherance of the scheme because they were "lengthy, indefinite, ordinary, typically noncriminal and unilateral." *Id.* at 503.   Here, the exact opposite is true – the premium payments were necessary to effectuate the goal of the scheme, that

is, to sell or take over insurance policies on the lives of third parties; the insurance policies would have lapsed and been worthless without the payment of premiums; the premium payments were not indefinite, but contemplated to end as soon as Carpenter and his co-conspirators could sell the policies; the payments were not unilateral, but involved the coordinated effort of several co-conspirators and funding entities; and the third-party funding of payments was not "typically noncriminal," but rather the very thing that Carpenter's misrepresentations intended to hide.

## V. The Motion To Dismiss Based On The McCarran-Ferguson Act Should Be Denied (Response to Docs. 66 and 67)

Carpenter has also filed a Motion to Dismiss Each Count as Prosecution is Barred by McCarran-Ferguson Act 15 U.S.C., Sections 1011-1015.  *See* Docs. 66, 67.  Carpenter incorrectly argues that the Government's criminal prosecution violates the McCarran-Ferguson Act because it invalidates, impairs, and supersedes Connecticut state insurance law.  For the reasons set forth below, the Carpenter's motion should be denied.

### A.    Relevant Law

The McCarran-Ferguson Act, which provides that state law shall generally govern the business of insurance, states in relevant part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

The Supreme Court has clarified that the McCarran-Ferguson Act does not entirely "cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise." *Humana, Inc. v. Forsyth*, 525 U.S. 299, 308 (1999) (rejecting a McCarran-Ferguson challenge to a private RICO action against an insurer to recover treble damages for corrupt insurance practices, even though state law provided a parallel remedy).  The

Court held that the Act does not preclude the application of a federal statute "[w]hen federal law does not *directly conflict* with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime." *Id*. at 309 (emphasis added).   A direct conflict exists when it is impossible for a party to comply with both state and federal law.   *Id*. (stating there was no "direct conflict" where the parties could comply with both federal and state law).   The Court further held that "when a federal law is applied in aid or enhancement of state regulation and does not disturb any declared state policy or disturb the States' administrative regime, the McCarran-Ferguson Act does not bar federal action." *Id*. at 303.

Thus, federal courts have repeatedly held, both before and after *Humana, Inc.*, that the McCarran-Ferguson Act does not bar federal criminal prosecutions, including under the federal mail and wire fraud statutes, simply because the fraud involves the business of insurance.[7]  *See, e.g.*, *United States v. Redcorn*, 528 F.3d 727, 737 (10th Cir. 2008) (holding that federal prosecution for health care fraud, mail fraud, and wire fraud, was not barred by McCarran-Ferguson Act and stating "we are skeptical that a federal criminal statute would ever be preempted by McCarran–Ferguson unless it were to forbid something affirmatively required by state insurance law"); *United States v. Stewart*, 955 F. Supp. 385, 391 (E.D. Pa. 1997) (denying motion to dismiss indictment charging defendant with violations of RICO, mail fraud, and wire fraud because the McCarran–Ferguson Act, "does not shield a person accused of criminal conduct in violation of the laws of the United States.") *aff'd* 185 F.3d 112, 119 n.3 (3d Cir. 1999) ("we reject without discussion [defendant's] arguments that . . . the McCarran–Ferguson Act [] barred the prosecution."); *United States. v. Pugh*, 151 F.3d 799, 800 (8th Cir. 1998) (holding that the defendant's convictions for mail and wire fraud, interstate and foreign transportation of money

---

[7]  Defendant cites one case where a district court, before the Supreme Court's decision in *Humana Inc.*, vacated a mail fraud conviction based on the McCarran-Ferguson Act.   The Government addresses that case below.

obtained by fraud, and money laundering were not barred because "criminal exploitation of an insurance company does not trigger the preemptive provisions of McCarran-Ferguson."); *United States v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997) (denying McCarran-Ferguson challenge by defendant convicted of mail and wire fraud in connection with insurance scheme and stating "the criminal prosecution of an insurance company officer for fraud does not invalidate, impair, or supersede any law enacted by the state"); *United States v. Riley*, 78 F.3d 367, 372 n.5 (8th Cir. 1996) (stating that notwithstanding the McCarran-Ferguson Act, "[o]bviously, the federal government may prosecute mail and wire fraud committed upon state insurance regulators, and other criminal exploitation of an insurance company."); *United States v. Krenning*, 93 F.3d 1257, 1268 n.16 (5th Cir. 1996) (upholding defendants' convictions for mail fraud and conspiracy and stating the preemption provision of the McCarran-Ferguson Act does not apply to a fraud prosecution because there is no conflict with state insurance regulation); *United States v. Cavin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (denying McCarran-Ferguson challenge by defendant convicted of mail and wire fraud, bank fraud, and money laundering because the government's "interest in the [bank, mail, and wire] fraud prosecution is completely compatible with the state's regulatory interests"); *United States v. Sylvanus*, 192 F.2d 96, 108 (7th Cir. 1951) (upholding a conviction for mail fraud and conspiracy to commit mail fraud and stating that "[T]he McCarran Act does not immunize an insurance company whose operations are subject to state regulation from prosecution for violation of the mail fraud statute" and "that it was not the intent of the Congress, by its passage of the McCarran Act, [to] surrender control of the use of the mails or to cease to authorize the federal courts to determine whether the mails have been utilized in attempted execution of a scheme to defraud."); *United States v. Peterson*, 896 F. Supp. 2d 305, 320 (S.D.N.Y. 2012) (holding that wire fraud prosecution of insurance company executive for illegally engaging in

insurance business was not precluded by the McCarran–Ferguson Act); *United States v. Henderson*, Crim. No. 08-29-C, 2010 WL 5018234, *3 (M.D. La. Dec. 3, 2010) (denying defendant's motion to dismiss mail fraud count because "[t]he mail fraud statute is based on Congress' power to regulate the use of the mails, a power which it had no intention of surrendering when it passed McCarran–Ferguson." (citing *Cavin* and *Sylvanus*)); *United States v. Pimental*, 199 F.R.D. 28, 38 (D. Mass. 2001) (denying motion to dismiss and stating that McCarran-Ferguson Act claims by defendants, who were charged with conspiracy and mail fraud for making false representations to their insurers about their employees' work and salaries in order to reduce their insurance premiums, were "futile" because "federal mail fraud prosecutions are not barred by the McCarran-Ferguson Act."); *see also United States v. Cooper*, 132 F.3d 1400, 1404 (11th Cir. 1998) (declining to address the merits of the defendant's McCarran-Ferguson argument because he did not raise it below, but suggesting, based on *Blumeyer*, *Cavin*, and *Sylvanus*, that McCarran–Ferguson Act does not preempt federal prosecution for mail fraud).

### B. The McCarran-Ferguson Act does not bar the prosecution of this case.

The federal criminal prosecution of Carpenter is not barred by the McCarran-Ferguson Act because the prosecution does not invalidate, impair, or supersede any law enacted by the State of Connecticut in relation to the business of insurance. *See* 15 U.S.C. § 1012(b).   Under the Supreme Court's decision in *Humana, Inc.*, 525 U.S. at 309, the test is whether the federal criminal prosecution directly conflicts with state regulation, frustrates any declared state policy, or interferes with a state's administrative regime.   Here it does not.

Carpenter is charged with participating in a scheme to defraud the Life Insurance Providers through materially false and fraudulent representations to those Providers in connection with the purchase of universal life insurance policies within the Plan and Trust.   The Superseding Indictment alleges that Carpenter and others "submitted and *caused* to be submitted numerous

false and fraudulent life insurance applications during the course of the scheme and artifice to defraud." Superseding Indictment ¶ 38 (emphasis added). The Superseding Indictment also charges Carpenter with conspiracy and aiding and abetting others to do the same.

The federal criminal prosecution of this scheme is not in conflict with Connecticut's state law. Quite the opposite, Connecticut state law also criminalizes this very same conduct. Connecticut General Statute ("C.G.S.") § 53a-215, titled "Insurance Fraud," makes it a felony for a person to present or cause to be presented to an insurance company an insurance application that contains materially false, incomplete, or misleading information. The statute also makes it a felony for a person to conspire with, or aid or abet, another person to do the same. That is precisely what the Superseding Indictment alleges Carpenter did here.

Similarly, Connecticut's insurance laws prohibit a person from presenting or causing to be presented to an insurance producer false material information concerning the entry into any practice or plan that involves STOLI or from engaging in or committing or permitting its employees or agents to engage in, among other things, any scheme or artifice to defraud in the business of life settlements or in violation of state insurable interest laws. *See* C.G.S. § 38a-465j. The statute also prohibits a person for aiding and abetting or conspiring to do the same. *Id.* Again, that is what the Superseding Indictment alleges Carpenter did here. The statute provides that a person who commits such acts is guilty of committing insurance fraud under section C.G.S. § 53a-215, discussed above. *See* C.G.S. § 38a-465l(a). Significantly, the statute provides that "Nothing in this part shall be construed to: (1) Preempt the authority or relieve the duty of other law enforcement or regulatory agencies to investigate, examine and prosecute suspected violations of law[.]" C.G.S. § 38a-465j(h).

Thus, the federal criminal statutes here are not in conflict with state law, but rather are

being applied to complement and enhance state law.   As such, the motion to dismiss should be denied.   *See Humana, Inc.*, 525 U.S. at 303 ("when a federal law is applied in aid or enhancement of state regulation and does not disturb any declared state policy or disturb the States' administrative regime, the McCarran-Ferguson Act does not bar federal action.").

In his motion, Carpenter argues that the Government violates the McCarran-Ferguson Act because it is prosecuting him for engaging in the business of loaning money to individuals or entities for the purpose of financing insurance policies, which he claims is permissible under Connecticut state law.   Carpenter, however, mischaracterizes the Government's allegations against him.   The Government is not prosecuting Carpenter simply for making loans.   Rather, the allegations against him are that he participated in a scheme to defraud the Life Insurance Providers, of which loans were but one component.

It is true that standing alone, providing loans to finance insurance premiums is permissible under state insurance regulations.   Carpenter claims that by prosecuting him for loaning money to finance insurance premiums, the Government is imposing a duty on him and on any other lending institution to ensure that insurance applications filled out by a third party are correctly filled out *See* Doc. 67 at 9.   The Government's prosecution here does no such thing, as Carpenter was not an arm's length lender who might otherwise claim ignorance of the origination of the relevant insurance policies.   Rather, the Superseding Indictment alleges that the loans were part of a scheme to defraud the Providers – a scheme that Carpenter devised and participated in.   Likewise, Carpenter was in control of the Subject Entities, which includes the Plan Sponsor, *see* Ind. ¶¶ 2, 22, and he caused the false insurance applications to be submitted, he aided and abetted others to submit the false insurance applications, and he conspired to do the same.   Such conduct constitutes insurance fraud and is criminal under Connecticut state law.   *See* C.G.S. §§ 38a-465j,

38a-465l, 53a-215.

Moreover, none of the cases cited by Carpenter support his position that the McCarran-Ferguson Act bars this prosecution.   Indeed, in two of the cases he cites, the Supreme Court actually rejected the McCarran-Ferguson challenge.   *See Humana, Inc.*, 525 U.S. at 311 (rejecting a McCarran-Ferguson challenge to a private RICO action against an insurer); *SEC v. National Securities, Inc.*, 393 U.S. 453, 463 (1969) (upholding, in face of a McCarran-Ferguson Act challenge, the SEC's authority to unwind an insurance company merger that the Arizona Director of Insurance had approved because there was no "direct conflict" and "Arizona has not commanded something which the Federal Government seeks to prohibit.").[8]

The only case cited by Carpenter in which a court actually held that criminal prosecution for mail fraud was precluded by the McCarran-Ferguson Act is *United States v. O'Brien*, 501 F. Supp. 140 (E.D. Pa. 1980).   *See* Doc. 67 at 5.   However, that case does not help Carpenter for several reasons.   First, *O'Brien*, which is a 1980 district court case from the Eastern District of Pennsylvania, predated the Supreme Court's 1999 decision in *Humana, Inc.*   Second, even before *Humana, Inc.*, it appears *O'Brien* was no longer good law.   In fact, in a more recent district court case from the Eastern District of Pennsylvania, the court denied a motion to dismiss an indictment charging the defendant with violations of RICO, mail fraud, and wire fraud because the McCarran–Ferguson Act "does not shield a person accused of criminal conduct in violation of the laws of the United States."   *United States v. Stewart*, 955 F. Supp. 385, 391 (E.D. Pa. 1997).   On appeal, the Third Circuit rejected without discussion the defendant's argument that the McCarran-Ferguson Act barred the prosecution, finding the argument "to be clearly without merit." *United States v. Stewart*, 185 F.3d 112, 119 n.3 (3d Cir. 1999) ("we reject without

---

[8] The third Supreme Court case he cites, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), has nothing to do with the McCarran-Ferguson Act.   The issue in that case whether federal ERISA law preempted the New York Human Rights Law.

discussion [defendant's] arguments that . . . the McCarran–Ferguson Act [] barred the prosecution.").

Finally, *O'Brien* is easily distinguishable from this case.  There, the defendants were charged with mail fraud related to submitting applications and claims for health and accident insurance that failed to disclose they already had other health and accident insurance when they submitted the applications and claims to the insurance provider.  *O'Brien*, 501 F. Supp. at 141.  In granting a motion for acquittal, the court relied on Pennsylvania state law to find the fraud to be immaterial and legally impossible.  *Id.* at 144.   The court pointed to Pennsylvania state insurance law, which provided that misstatements as to other insurance are not grounds for cancellation.  *Id.* at 142.   Rather, the insurer's sole remedy was to prorate their liability with the other insurance carriers, provided a proration liability clause is included in the written policy itself, or to pay the entire claim if the policy contains no such clause.  *Id.* Since the policies at issue did not have a proration clause, the Providers had an obligation to pay the entire claim, regardless of the omission on the applications.  *Id.* at 143.   Thus, the court held that the failure to disclose was not material.  *Id.* The court also dismissed on legal impossibility grounds, stating that it is impossible to defraud another to pay money which that other person is obligated by law to pay.  *Id.*  Significantly, the Government in *O'Brien* did not present any evidence that the insurance company suffered harm in any other way except for paying out the claim that it was obligated under the law to pay.  *Id.* at 144.

In this case, unlike *O'Brien*, the court is faced with a pre-trial motion to dismiss, and therefore must accept the allegations as true.   Carpenter claims that *O'Brien* is applicable because the insureds would have paid the same premiums absent the fraud and therefore the false statements were not material and the fraud was a legal impossibility.   However, not only does the

Superseding Indictment here allege that the false and fraudulent misstatements are material, it alleges several ways the insurance companies would suffer economic harm as a result of the fraud. It expressly alleges that the defendants' misrepresentations "created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies…and the actual benefits that the Providers received in doing so," Ind. ¶ 37, and then spells out five different ways in which the false representations that the defendant made and caused to be made affected the Providers' bottom lines, Ind. ¶ 16.  Substantially similar allegations survived a motion to dismiss in *Binday*, 908 F. Supp. 2d at 491.[9]  Thus, contrary to the defendant's argument, *O'Brien* does not counsel a dismissal here.

In sum, the federal criminal statutes here are not in conflict with state law.  This criminal prosecution does not create an inability for the defendant to comply with both state and federal law.  *See Humana, Inc.*, 525 U.S. at 309 (stating there was no "direct conflict" where the parties could comply with both federal and state law); *Redcorn*, 528 F.3d at 737 (10th Cir. 2008) ("we are skeptical that a federal criminal statute would ever be preempted by McCarran-Ferguson unless it were to forbid something affirmatively required by state insurance law").  Indeed, the Government here is prosecuting Carpenter for conduct that is already criminal under Connecticut state law.  As such, the motion to dismiss should be denied.  *See Humana, Inc.*, 525 U.S. at 303 ("when a federal law is applied in aid or enhancement of state regulation and does not disturb any declared state policy or disturb the States' administrative regime, the McCarran-Ferguson Act does not bar federal action."); *Peterson*, 896 F. Supp. 2d at 319 (finding no violation of

---

[9]  To the extent the defendant suggests that because the two-year contestability period has lapsed and therefore the insurance companies are obligated to pay the death benefit, it is possible the insurance companies still would be able to rescind the policies and refuse to pay any death benefits on the grounds that policies obtained in violation of insurable interest laws are void and unenforceable.  *See PHL Variable Ins. Co. v. Charter Oak Trust*, No. HHDCV106012621S, 2012 WL 2044416 (Conn. Super. Ct. May 4, 2012) (denying Charter Oak Trust's Motion for Summary Judgment and holding that the COT insurance policies might be unenforceable and void *ab initio* if they lacked an insurable interest at inception, as alleged in the complaint, and as such would not be subject to the two-year contestability period).

McCarran-Ferguson Act because wire fraud prosecution did not conflict with state policy or regime but rather enhanced the state's interest in prohibiting insurance fraud).

**VI.**   **Defendant's Motion to Dismiss For Failure to State A Crime Is Nothing More than a Restatement of His Earlier Arguments (Response to Docs. 68 and 69)**

Finally, the defendant has advanced one final motion – for failure to "state a crime" – that is yet another restatement of his earlier motions to dismiss the indictment for failing to plead the elements of the crimes charged.  Specifically, the defendant again claims that the Superseding ndictment fails to allege deprivation of property from the Providers, specific intent to defraud the Providers, and that the mailings or wires were in furtherance of the scheme.  Doc. 69 at 5.  The Government will not restate its earlier answers to these identical claims.

Carpenter adds a claim here, with no support, that the wire and mail fraud statutes are impermissibly vague.  It is long settled that "due process provides a criminal defendant with the right to 'fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed.'"  *United States v. Desposito*, 704 F.3d 221, 229 (2d Cir. 2013) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.)).  "If the statutory language alone provides clear notice that certain conduct is illegal, Due Process is satisfied and the government may prosecute such activity without waiting for every conceivable challenge to a law's validity."  *Desposito*, 704 F.3d at 230 (concluding that the application of 18 U.S.C. § 844(h)(1) was plain from the face of the statute).  Indeed, fair warning is implicated only "when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."  *Velastegui*, 199 F.3d at 593 (quoting *United States v. Shabani,* 513 U.S. 10, 17 (1994)).

There is nothing impermissibly vague in the wire or mail fraud statutes, particularly as applied to this case, where the defendant is charged with engaging in a scheme to mislead the Providers into issuing life insurance policies by hiding, among other things, that third parties

would fund premiums. Carpenter's seemingly rhetorical question – "how would the lay person know that making a premium payment would become a federal crime" – does not implicate notice. Rather, his question can be answered rather simply: they would not unless they were, like Carpenter, engaged in a scheme to defraud the Life Insurance Providers out of money and property by means of those premium payments.

**VII.**   <u>**Conclusion**</u>

For the reasons stated herein, the Government respectfully requests that Daniel Carpenter's various motions to dismiss the Superseding Indictment (Docs. 56, 63-69) be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *David E. Novick*
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510

/s/ *Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 15, 2014, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *David E. Novick*

_____
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY