|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:13CR226(RNC) |
| | ) | |
| DANIEL E. CARPENTER | ) | |
| | ) | OCTOBER 10, 2014 |

## DEFENDANT CARPENTER'S REPLY BRIEF
## TO GOVERNMENT'S OMNIBUS MEMORANDUM

### PRELIMINARY STATEMENT

In the government's omnibus opposition brief (Gov. Br.) to Mr. Carpenter's various motions to dismiss the Superseding Indictment in this case (Indictment), there are several cases that the government mentions that actually support Mr. Carpenter's motions to dismiss, and actually undermine the Government's own case.

For example, the government cites in its brief *United States v. Pierce*, 224 F.3d 158 (2d Cir. 2000) for the elements necessary to allege a scheme to defraud. The Pierces' convictions in that case were vacated and the indictment against them was dismissed, despite other parties pleading guilty to the "crime" alleged in the Pierces' indictment, because the government failed to allege in their indictment an actual property right that the Pierces deprived the Canadian government of, just as in this case the government has failed to allege any money or property that Mr. Carpenter's alleged scheme has deprived

any insurance carrier of. This is a fatal flaw to the government's entire case. See *Pierce*

at 165, where the Second Circuit quotes from three different Supreme Court cases:

*McNally v. United States*, 482 U.S. 350, 358 (1987); *Hammerschmidt v. United States*,

265 U.S. 182, 188 (1924); and *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987) for

the notion that there must be some type of money or property right that someone is using

trickery, deceit, or chicanery to deprive someone of their lawful property rights. The

Second Circuit also cites its own case: *United States v. Trapilo*, 130 F.3d 547, 551 (2d

Cir. 1997) ("The wire fraud statute is limited in scope to the protection of money or

property rights.") It is undisputed in this case that Mr. Carpenter's only alleged crime is

to have had his company provide funding to COT to <u>pay</u> over $100,000,000 in

unrecovered premiums to the various carriers in this case. The Indictment is devoid of

<u>any</u> allegation accusing Mr. Carpenter of taking <u>any</u> money or property from the

respective carriers. Moreover, the Second Circuit in *Pierce* also states that:

> *A scheme to deceive, however dishonest the methods employed, is not*
> *a scheme to defraud in the absence of a property right for the scheme*
> *to interfere with. See Carpenter v. United States, 484 U.S. 19, 27-28*

*Pierce,* supra, at 166 (emphasis added).

The Second Circuit then goes on to cite to *United States v. Starr*, 18 F.2d 94, 98

(2d Cir. 1987) that a "plan to engage in deceit is not, without more, a scheme to defraud

under the mail fraud statute" and that contemplated harm to the victim is required. In this

case, there is no way that paying tens of millions of dollars to life insurance carriers on

2

policies that their own underwriters took to underwrite after examining the risk of each insured based on the rates calculated by their own actuaries can be considered "harm" or a "scheme to defraud" the carriers. There is no allegation in the Indictment that anyone lied about a so-called Straw Insured's health (i.e. someone with lung cancer claiming to be a preferred risk non-smoker). The only claim as to Mr. Carpenter, who was not in a position of trust with the providers, is that he did not disclose that his company provided the funding to the Charter Oak Trust to fund the policies. And the government knows that it is black-letter law that a failure to disclose without a duty to disclose, does not give rise to a claim of mail or wire fraud. *See Sanchez v. Triple-S Management, Corp.*, 492 F.3d 1 (1st Cir. 2007); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998); *United States v. Altman*, 48 F.3d 96 (2d Cir. 1995).

Therefore, because the Indictment is devoid of any claim that Mr. Carpenter intended to "trick" or "harm" or "deprive" any of the carriers of any money or property by use of something more than "deceit," the Indictment must be dismissed as to Mr. Carpenter on all counts. Additionally, as described in *Pierce*, once there was no mail or wire fraud, there could not be any money laundering counts as there was no Specified Unlawful Activity (SUA) with which to point to as is required by all of the Money Laundering Counts. In this case, because it is undisputed that the funds from the so-called Straw Insured's death were paid as either the settlement of a lawsuit (See Gov. Br at 7) or the payment of a legitimate death claim after a year-long investigation (See Gov.

3

Br. at 8 Indictment 131), there can be no Money Laundering Counts or Unlawful Monetary Transactions sustained because there is no <u>actual</u> SUA proceeds and without <u>actual</u> SUA proceeds, it would be impossible for Mr. Carpenter to have knowledge that the proceeds were the fruits of some illegal activity. See *United States v. LeSpina*, 299 F.3d 165, 177 (2d Cir. 2002).

The government also cites another case *United States v. Ayeki*, 289 F.Supp. 2d 183, 188 (D. Conn. 2003) (Gov. Br. at 33) for the remarkable, if not wholly unsupportable, idea that the government can claim venue anywhere and the defendant must go to trial on what the government says and wait until after the trial is over to challenge the government's proof of venue as part of a sufficiency motion under Rule 29. Not only is this a gross misstatement of the law and the Constitutional rights of a defendant, it would also be a tremendous waste of scarce judicial resources. But, in *Ayeki,* the defendant also brought a motion to dismiss the indictment based on egregious prosecutorial misconduct due to an unlawful search and seizure. The District Court ruled that a motion to dismiss the indictment would only be appropriate if the government action rose to the Supreme Court level of conduct that "shocked the conscience." Unfortunately, Ayeki did not allege that the search and seizure were outside the scope of the warrant. In this case the two "raids" on Mr. Carpenter's office in 2010 and 2011 rise to and surpass the "shock the conscience" level found in *Rochin v. California*, 342 U.S. 165 (1952). Mr. Carpenter has submitted not one but two comprehensive motions

showing that the government conduct during both raids far exceeded anything allowed by the search warrants – neither of which had the required affidavit attached to prevent the search and seizure from becoming the overly broad and non-particularized general warrant that the Founding Fathers abhorred. Based on the Court's decision in *Ayeki*, this Court should dismiss the Indictment for egregious misconduct that clearly "shocks the conscience" by any standard. While defendant, Daniel Carpenter, stands by his original respective arguments as to why the Superseding Indictment should be dismissed, he would be remiss if he failed to point out some of the discrepancies he has with government's interpretation of the law.

## STANDARD OF REVIEW RE: MOTION TO DISMISS

While, of course, Mr. Carpenter agrees that Rule 7(c) of the Federal Rules of Criminal Procedure deals with the standard for a Court to review an Indictment for legal sufficiency, Mr. Carpenter disputes the government's assertion that it "... need do little more than to track the language of the statute charges and state the time and place in proximate terms of the alleged crime." Gov. Br. at 9.

The government, though, chooses to ignore the standing law of *Russell v. United States*, 369 U.S. 749 (1962), which clearly requires "that an Indictment must do more than simply repeat the language of the criminal statute." *Id.* at 764. It is black letter law that an indictment must not only parrot the statutes it seeks to enforce, but also allege facts showing that the essential elements of the relevant offenses were committed. *See,*

5

*e.g., United States. v. Berlin*, 472 F.2d 1002, 1008 (2d Cir. 1973) ("[A]n indictment that fails to allege all the elements of the offense required by the statute will not be saved by simply citing the statutory section.").

"A crime is made up of acts and intent, and these must be set forth in the indictment with reasonable particularity of time, places, and circumstances." *United States v. Cruikshank*, 92 U.S. 542, 558 (1876); *see also Russell*, 369 U.S. at 765 ("An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him . . . is defective, although it may follow the language of the statute.") (internal citation omitted). The present Superseding Indictment provides precious few facts upon which Mr. Carpenter or this Court could determine whether the averments describe a criminal act. Here, as in *Russell*, the nature of the government's apparent theory of criminality under the statutes demands greater particularity to satisfy the mandatory criteria of providing adequate notice of the charges, distinguishing between criminal conduct and wholly innocent conduct, and providing protection against double jeopardy.

None of the cases cited in the government's brief cast any doubt on the standard articulated in *Russell*. To the contrary, both *Hamling v. United States*, 418 U.S. 87 (1974), and *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007), acknowledge and reaffirm *Russell*. In fact, in *Resendiz-Ponce*, the Supreme Court re-affirmed its prior rule that, although some offenses may be indicted by simply parroting the language of the

6

statute, "**there are crimes that must be charged with greater specificity**" 549 U.S. at 109 (emphasis added), especially in cases such as this in which the Indictment contains insufficient facts to indicate whether any conviction would arise out of the theory of guilt presented to the Grand Jury. In fact, in quoting Fed. R. Crim. P. Rule 7(c), the government leaves out the fact that the protections afforded by the Constitution are further QUALIFIED through Rule 7(c)(1) of the Federal Rules of Criminal Procedure, which requires that an indictment include "**a plain, concise, and definite written statement of the *essential facts constituting the offense charged*.**" Fed. R. Crim. P. 7(c)(1) (emphasis added).

## A. WIRE/MAIL FRAUD

Mr. Carpenter disputes the government's assertion that the Superseding Indictment sufficiently pleads the elements of the offenses charged as to fairly informed Mr. Carpenter of the charges against which he must defend. While the allegations claim that Mr. Carpenter "controlled the subject entities, including Charter Oak Trust (see p. 14 of Gov. Br.), they fail to show that Mr. Carpenter had actual knowledge:

1. That the insurance agents, including the only prosecuted insurance agent, Edward Waesche, prepared or assisted in preparing false insurance applications, which listed on most occasions, false financial information or the alleged purpose of procuring insurance, e.g. "estate planning".

2. That the so-called Straw Insureds, none of which the government, unbelievably, chose to seek indictment and prosecution, agreed to conspire with the aforementioned licensed and authorized insurance agents to provide the various respective insurance companies, the providers, with false and misleading information. Indeed, there are no factual allegations in the Superseding Indictment that Mr. Carpenter knew any of the prospective insureds or saw any of the applications for seeking life insurance. The reason there were no such factual allegations was because, in fact, Mr. Carpenter never saw or had input into the individual applications submitted.

3. That any of the applications contained false/misleading information about the nature of the funding for payment of the premiums. It is to be noted that even the government admits that Mr. Carpenter is not charged with violating any fiduciary obligation to any of the providers. In other words, there are no factual allegations that Mr. Carpenter, himself, submitted any false or misleading documents to any provider; primarily, because he did not do so.

What the government fails to acknowledge is that concerning Counts 1-33 of the Superseding Indictment, all of the alleged Mail/Wire Fraud cases were complete once the alleged object of the respective crimes was committed; the unlawful obtaining of the so-called STOLI life policies. In other words, the objective of the use of the mails or the wires was to submit materially misleading/false life insurance application to cause the providers to issue the so-called desired policies. The alleged crime was completed when

the applications were dropped in the mail box or sent in a false materially misleading email to the providers with the intent to have the providers issue the various life insurance policies. This is no different than when someone robs a federally insured bank; what the individual intends to do with stolen money may be interesting but irrelevant to the issue of whether a crime, bank-robbery, had been committed.

What the government is trying to do on all the substantive counts of Wire/Mail Fraud is to extend the time to fall within the lawful time period for prosecution and avoid the constraints of 18 U.S.C. Section 3282 (to be discussed later in this brief). The second purpose of trying to extend the already completed Mail and Wire Fraud crimes of Counts 1-33, is to drag Mr. Carpenter into a scheme where he did not belong. Quite frankly, it did not matter if, as happen in the instant matter, the various agents, including Mr. Waesche, along with the unindicted so-called Straw Insureds, used COT as their vehicle to commit their obvious crimes (lying about their finances and lying about why they wanted life insurance "estate planning"). There are insufficient facts alleged (as opposed to unsubstantiated conclusions), that Mr. Carpenter knew about their respective financial circumstances or purposes for obtaining life insurance or that the insureds lied about how the premiums were to be paid. ALL the so-called Straw Insureds represented to the carriers that they were well-off financially. The carriers made little effort, like a $25.00 credit report, to verify the so-called materially important financial statement

This case is far different than the likes of *United States v. Binday*, 908 F. Supp. 2d 485 (S.D.N.Y. 2012) cited four times by the government, pp 21, 23, 46 and 55, where the defendants themselves had prepared the false insurance forms and personally submitted false and misleading information to the providers; there are no such allegations listed here because Mr. Carpenter did not participate directly or indirectly with the various insureds; he never met them. Aside from Mr. Waesche, he never met the other unindicted crooked licensed agents or any of the so-called Straw Insureds. Nor does the Indictment say otherwise. With Mr. Waesche, he had no knowledge that Mr. Waesche was committing all the crimes he admitted to and no doubt more.

## VENUE

All agree that 18 U.S.C., Section 3232 provides that venue lies in the district where the offense was committed. See Gov. Br., p30. Further, the government claims that an indictment alleging on its face facts that the crime occurred in the venue where the case is brought is sufficient to withstand a motion to dismiss. What the government fails to do in its brief, where it cites over 100 cases, is to cite the one that matters, *United States v. Cabrales*, 524 U.S. 1 (1998); also see *United States v. Brennan*, 183 F. 3d 139 (2d Cir. 1999). In *Cabrales*, the court noted that venue is proper only where the crime was committed. The *locus delicti*, must be determined from the nature of the crime alleged and the location of the act or acts constituting it. *Cabrales, supra*, at 6-7. Indeed, venue is proper only where the acts constituting the offense, the crimes "essential conduct

elements" took place. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999). Finally, it is to be noted that venue must be proper with respect to each count. *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). This means, with all due respect, the Court must examine the location of where each wrongful act occurred by each corrupt insurance agent and each corrupt so-called Straw Insured: New York, Texas, Arizona, etc.

The Second Circuit has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see also Beech-Nut Nutrition Corp.*, 871 F.2d at 1188. The independent determination of venue must be done in every case for each count, and venue must be proper for each count, or the Indictment must be dismissed. In *United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005), *cert. denied*, 546 U.S. 1113 (2006), the petitioners, Vitug and Ramirez, were indicted in the Southern District of New York for making false statements concerning mail fraud, wire fraud, and conspiracy. At the close of the government's case and at the close of all the evidence, Vitug moved for a judgment of acquittal on several counts for improper venue. The district court denied the motion, evidently relying on *Cabrales* and *Rodriguez-Moreno,* in holding the evidence "clearly demonstrates that essential elements of the conduct constituting the charged offenses

11

occurred in the Southern District of New York." *Ramirez*, 420 F.3d at 138. The jury subsequently convicted both defendants on all counts. After analyzing *Cabrales* and *Rodriguez-Moreno*, the Second Circuit reversed Vitug's convictions on several wire fraud and mail fraud counts for improper venue.

In declining the government's invitation to improperly expand the Constitutional limits on venue, the Second Circuit, after parsing the "essential conduct element" analysis of *Cabrales* and *Rodriguez-Moreno*, held: "While a scheme to defraud is certainly one of three essential elements of mail fraud, it is not an essential conduct element." *Ramirez*, 420 F.3d at 144 (emphasis in original). Consequently, "we conclude that 'having devised or intending to devise a scheme or artifice to defraud,' while it is an essential element, it is not an essential conduct element for purposes of establishing venue." *Id.* at 145 (emphasis in original). Otherwise, the Second Circuit warned, "a defendant who devised a scheme to defraud while driving across the country could be prosecuted in virtually any venue through which he passed." *Id.* The Second Circuit also rejected the government's invitation "to extend the reasoning of *Rodriguez-Moreno* to our case," based on the critical difference between the mail fraud statute and the charged offense in *Rodriguez-Moreno*. *Id.* As a result, the Second Circuit reversed Vitug's conviction on the mail fraud count for improper venue because the mailing at issue was sent from New Jersey to Vermont, and the preliminary mailing to the DOL in Manhattan "was a separate event that occurred prior to the charged offense and in preparation for it." *Id.* at 146.

In *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997), the court dismissed a bank fraud charge for lack of venue. Very similar to Carpenter's case, the government there argued that venue was proper in the SDNY because, after the checks were deposited into a Chemical Bank account in the EDNY, the checks were sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan. Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account. However, the court in *Bezmalinovic* did not agree with the government's determination of venue and held that the <u>ministerial</u> processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the SDNY. The court further noted that the "only acts alleged to have occurred in the [SDNY] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment, just like the ministerial acts of paying premiums on a policy in Mr. Carpenter's case, did not constitute "substantial contacts" within the SDNY sufficient for venue to be constitutionally permissible. *Id.* at 441.

In the instant matter, there are no <u>factual</u> allegations (as opposed to unsupported conclusions) that any of Mr. Carpenter's acts constituted <u>essential</u> <u>conduct</u> to any of the Mail/Wire Fraud Counts, where the crime was complete on the mailing or emailing of the

alleged false/materially misleading life insurance applications. Even the government cannot dispute that most every application was prepared in Texas or Arizona or New York or some other state (not Connecticut), where most of the insureds live or where the agents prepared the alleged false applications. While it is true that apparently co-defendant Wayne Bursey had to conduct the ministerial act of signing off on the policies on behalf of COT in Connecticut, such conduct did not amount to "essential conduct" for the purposes of establishing venue, as is mandated in the aforementioned cases cited. The carriers that received the applications were not in Connecticut. The so-called Straw Insured did not reside in Connecticut. Virtually all the corrupt insurance agents that helped the so-called Straw Insureds did not live in Connecticut; only COT and Mr. Carpenter's company.

As it relates specifically to venue and Mr. Carpenter, it must be remembered each fact alleged was in and of itself a legal act; that is, the funding of an insurance premium is not illegal. Protecting a loan by generating mortgage papers by a provider of funds is not only not illegal, but an act repeated thousands of times each day in the United States. As the government has conceded, Mr. Carpenter had no fiduciary duty to any of the providers or the insureds, none. So where are the factual allegations that at the time the substantive crimes were being committed, the mailing of the false application, Mr. Carpenter knew that the applications were false? Indeed, it can easily be stated that the frauds being committed, if any, upon the providers were the same frauds also being

14

committed on Mr. Carpenter and his business. Mr. Carpenter advanced millions upon millions of dollars to COT with the belief that the insureds had sufficient net worth to be suitable candidates for life insurance. He had a right, just like the providers, to rely upon the truthfulness of the licensed insurance agents to only deal with suitable and honest insureds. Consequently, as a result of that reliance, his business has suffered losses in the millions.

In sum, under both the rulings of the Supreme Court as well as those of the Second Circuit, proper venue as to each count is not appropriate in Connecticut as it relates to the prosecution of Daniel Carpenter in that:

1. The defendant Carpenter's acts in Connecticut were on their face lawful. e.g. advancing money and securing the debt.

2. The elements and nature of the crime were such that the alleged material misrepresentation were made out of state by third parties (the agents and the insureds) where they provided alleged misinformation about net worth, purpose of policy (estate planning), and nature of financing. Mr. Carpenter did none of those things, as he did not participate in recruiting the insureds, employing the agents or filling out or mailing the applications.

3. The effect of the alleged illicit conduct presumably occurred in the state of the providers, none of which were in Connecticut.

4. The clear suitability for fact finding would be the state where the providers are located and where the preparing of the allegedly false applications occurred; not Connecticut.

Hence, since the government has failed to meet the criteria as it relates to each and every count, those counts for which proper venue has not been established (which we believe would be all of them) should be dismissed.

## STATUTE OF LIMITATIONS

The government in order to avoid the clearly stated limits of 18 U.S.C., Section 3282 of prosecution within five (5) years of wrongful criminal acts, makes every effort to enlarge the crime periods by claiming events after the crime has been completed somehow still constitute the crime, itself, particularly as it relates to the various Mail and Wire Fraud counts. The government attempts to dismiss the obvious arguments that when others prepared and mailed or wired the applications, that is when the clock of five years starts; not some later date when Mr. Carpenter advances some funds to COT, who, not Carpenter, pays some premium. As earlier stated, as much as the government wants the Court to buy into the argument that in all the substantive counts, Mr. Carpenter's action triggers a new five year period, that logic is false and must fail. Furthermore, the original indictment was clearly broadened to include the Money Laundering counts, which thereby eliminates the tolling of the superseding indictment to the time of the original indictment. *See, United States v. Grady*, 544 F.2d 598, 602 (2d Cir. 1976).

The simple test is whether upon the mailing of an application containing false material facts could permit the perpetrator to be prosecuted for Mail or Wire Fraud; the answer, of course, is yes. It matters not whether for their own self-serving reasons, the target continues to pay the premiums; it does not constitute a new crime. Paying literally millions upon millions of dollars in premiums to the "victims" hardly constitutes a criminal act. We don't need to wait for a bank robber to take his ill-gotten loot and buy a BMW to prosecute him.

The government alleges that *United States v. Grimm*, 738 F. 3d 498, 501 (2d Cir. 2013) (Gov. Br. p46) is not relevant; however, they ignore the fundamental concept that when the crime is <u>completed</u>, the clock starts. *Grimm,* which was recently affirmed *en banc* by the Second Circuit, also does away with and invalidates the government's "payment theory" that it used in several bid-rigging cases to extend the statute of limitations. That theory no longer holds water in the Second Circuit, nor does the government mention that in their brief. *See, United States v. Grimm,* 763 F.3d 221 (2d Cir. 2014). Claiming *ex post facto* that somehow subsequent paying of premiums extends the crime and enlarges the period to commence prosecution is not consistent with the substantive crimes. Concerning the conspiracy charges, again, the question asks, when is the crime complete? The government claims that somehow the conspiracy continued until the policies are sold to third parties. First, as even the government concedes, STOLI life policies are <u>not</u> illegal; (see Gov. Br. p21), thousands of such policies exists. Rather,

according to the government what ties in Carpenter to those counts where the five year period has otherwise lapsed as it relates to the mailing of the alleged false applications, is the claim that the prosecution is saved by the subsequent conduct, especially in the conspiracy counts that Carpenter caused money to be transferred to COT to pay subsequent premium payments. See Gov. Br. p45.

The court need only to look at the government's brief, itself, to see that the government contradicts itself. The government notes the following:

> **"This is a fraud case – Carpenter is not charged with STOLI per se (whatever that means), but with lying to insurance companies to circumvent their rules."** (emphasis added.) See Gov. Br. p21.

The government then goes on to note:

> **"That scheme was to deprive the providers of information in making decisions about whether to issue particular insurance policies."** See Gov. Br. p22.

So there it is in the government's own brief. **The crime is not what happens to the policies after they are issued. The crime is lying to the carriers to prevent them from making an informed decision about whether, for their own internal reasons, to issue such a policy out of concerns for STOLI.**

Therefore, all the claims by the government that somehow subsequent premium payments are in "furtherance" of the crime are nonsense and inconsistent with their own position. The crime is complete when through alleged deceit the carriers are "tricked" into issuing a valid policy. At that time the crimes are over and the conspiracy is

complete; thus, the clock, even on the alleged conspiracies, runs from the mailings/wires or at least by when the sought after life policies are issued. For these reasons any activities after that are irrelevant for figuring out statute of limitations for subsequent prosecutions.

The government in its attempt to circumvent the constraints of 18 U.S.C. Section 3282 on limitation of actions notes that because it is prosecuting under 18 U.S.C. Section 1349, instead of 18 U.S.C. Section 371, which does not require an "overt act", that it somehow insulates itself in the conspiracy counts. What the government fails to acknowledge, which is the fact that even with the allegations contained in the Conspiracy counts, as well as the Aiding and Abetting counts, is that the crimes alleged in counts 1-33 are complete when the mailings or emails occur; hence, irrespective of any "overt act", the crimes are complete. As earlier stated in the original brief, subsequent lawful acts such as paying premiums do not extend the five year prosecution rule beyond the completion of the crime, itself.

## THE CONSPIRACY COUNTS FAIL TO ARTICULATE A CRIME, RE: CARPENTER

The government alleges that Mr. Carpenter and others had an agreement to defraud the "victim" carriers in order to achieve their alleged "scheme." This allegation is baseless in its entirety as it is nowhere alleged that Mr. Carpenter had any contact with the "known and unknown" individuals referenced in Count 33 (which statement itself is

19

disingenuous as the government raided the offices of the unindicted brokers in conjunction with the raids against the Simsbury and Stamford offices in 2011, and has interviewed all of the unindicted so-called Straw Insureds), so the government knows full well that Mr. Carpenter never talked to any of the insureds or agents, and therefore could not have had or been in any form of agreement with these parties. Certainly paying premiums on policies – an act that costs money rather than earns it – does not show the requisite "intent" alleged by the government. The Second Circuit in *United States v. Gallishaw*, 428 F.2d 760 (2d Cir. 1970), quotes the Supreme Court opinion in *Ingram v. United States*, 360 U.S. 672 (1959), where it stated that: "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." 360 U.S. at 678.

In Gallishaw's case, just because he provided a gun to Carballo did not mean that he was part of the conspiracy to rob the bank. In this case, just because Mr. Carpenter's company provided the funding for the Trust does not mean there was any criminal intent much less an "agreement" or a criminal "conspiracy" to defraud anyone. Other than the government's speculative conjecture, there are no facts pleaded in the Indictment that suggests Mr. Carpenter had any intent, much less the required *scienter* or *mens rea* necessary for a crime to defraud anyone, much less carriers in the insurance community in which he had spent his entire working life, and people that he viewed as contractual vendors, if not friends and partners. If there was a scheme here, it was against the Trust

20

and Mr. Carpenter's company by the Straw Insureds and the brokers that resulted in over $100 million in revenues to the carriers and losses to Mr. Carpenter's company of over $74 Million in the payment of premiums. The government knows these numbers and these facts and they do not make for a very compelling "conspiracy" or even a "scheme to defraud" on the part of Mr. Carpenter or anyone associated with him or his company.

### The Lack of An Agreement Means There is No Conspiracy Here

A conspiracy is an "agreement among the conspirators." *United States v. Falcone*, 311 U.S. 205, 210 (1940). A "meeting of minds" is required. *Krulewitch v. United States*, 336 U.S. 440, 448 (1949) (Jackson, J., concurring). "[U]nless at least two people commit [the act of agreeing], no one does. When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone." *See Sears v. United States*, 343 F.2d 139 (5th Cir. 1965) (no conspiracy with government informant who secretly intends to frustrate the conspiracy); *Delaney v. State*, 164 Tenn. 432, 51 S.W.2d 485 (1932) (no conspiracy with person who feigns agreement). The law of conspiracy requires agreement as to the "object" of the conspiracy. This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the "essential nature of the plan" must be shown. *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). It is never alleged that Mr. Carpenter engaged in a "meeting of minds" with any of the unindicted brokers or Straw

Insureds, and therefore the alleged agreement to, or knowledge of an agreement to defraud does not exist.

In *Gallishaw*, the defendant was convicted after a trial judge charged the jury that he could be convicted of conspiracy to rob a bank if he had rented a machine gun to another individual "with the knowledge `that there was a conspiracy to do something wrong and to use the gun to violate the law.'" *Id.* at 762. The Second Circuit reversed, saying that "at the very least" the government was required to show "that he knew that a bank was to be robbed." *Id.* at 763. They explained that the defendant "had to know what kind of criminal conduct was in fact contemplated." *Id.* at 763 n. 1; cf. *United States v. Calabro*, 467 F.2d 973, 982 (2d Cir. 1972) (supplier of false identification must have known that it would be used in a transaction involving forged bonds in order to be guilty as an aider and abettor; generalized suspicion of illegal use would not suffice). Thus, it is clear that a general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan.

"Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938). A conspirator's liability for substantive crimes committed by his co-conspirators depends on whether the crimes were committed "in furtherance of the unlawful agreement or conspiracy." *Pinkerton v. United States*, 328 U.S. 640, 645 (1946). The question of whether single or multiple conspiracies have been pled or proved depends on

22

the nature of the agreement. *United States v. Dardi,* 330 F.2d 316, 327 (2d Cir.). Because overt acts are acts "to effect the *object* of the conspiracy," 18 U.S.C. § 371 (emphasis added), they are defined by reference to the conspiratorial agreement. *United States v. Bayer,* 331 U.S. 532, 542 (1947). In addition, when questions arise concerning matters such as venue, *Hyde v. United States,* 225 U.S. 347 (1912), or the statute of limitations, *Grunewald v. United States,* 353 U.S. 391, 396-97 (1957), which depend on the formation of the agreement or the occurrence of overt acts, it becomes "crucial," *id.* at 397, to determine the scope of the conspiratorial agreement. *See Bridges v. United States,* 346 U.S. 209, 224 (1953) (statute of limitations). In the instant matter there is no question but that the so-called Straw Insureds conspired with the agents as stated. However, no material facts are alleged to support a claim that Mr. Carpenter conspired with these people, who got together and lied to the carriers and lied indirectly to Mr. Carpenter (and COT).

When the government proceeds under the conspiracy-to-defraud clause, in cases that could as easily have been brought under the "offense" clause, the courts must be alert to subtle "attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." 353 U.S. at 404. The terms "conspiracy" and "defraud," when used together, have a "peculiar susceptibility to a kind of tactical manipulation which shields from view very real infringements on basic values of our criminal law." *United States v. Rosenblatt,* 554 F.2d 36, 40 (2d Cir. 1977).

23

In *Rosenblatt*, the government claimed that the "possible abuse [of the conspiracy-to-defraud clause] need not concern the Court in the context of this case." The Second Circuit believed that the invitation to hide behind "the context of this case" was tempting, but after considering the result that would follow under the "offense" clause of the statute, this Court concluded that the temptation must be resisted. *Krulewitch,* 336 U.S. at 457.

The Second Circuit rejected the argument that the phrase "conspiracy to defraud the United States" is sufficient, without more, to define the "central" nature of the conspiratorial plan. The scope of the phrase "conspiracy to commit any offense against the United States" is extremely broad, for there are many statutes creating offenses against the United States. It is clear, however, that the "offense" clause does not do away with the requirement that there must be agreement as to the same offense. Similarly, the phrase "conspiracy to defraud the United States" is "broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Haas v. Henkel,* 216 U.S. 462, 479 (1910). Nevertheless, this breadth, like the breadth of the "offense" clause, merely relates to the types of criminal conduct that may be prosecuted. It does not eliminate the requirement that there must be an agreement as to the same type of conduct. Both clauses of the conspiracy statute use broad, generic terms which are insufficient, standing alone, to define the "essential nature" of a given conspiratorial plan.

> It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, "includes generic terms, it is

not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.

*United States v. Cruikshank,* 92 U.S. (2 Otto) 542, 558 (1875).

The Second Circuit likewise rejected the notion that *Dennis* authorizes the government to elect between the "offense" and conspiracy-to-defraud clauses, in cases where they overlap, in such a way as to produce the most favorable result. In *Dennis,* the Court made it clear that it was not abrogating the requirement that "the allegation as to conspiracy to defraud . . . properly [reflect] the essence of the alleged offense." 384 U.S. at 863; *see United States v. Klein,* 247 F.2d 908, 918 (2d Cir. 1957). *See also Cruikshank, supra,* 92 U.S. (2 Otto) at 557-58; The Second Circuit held that when the government proceeds under the conspiracy-to-defraud clause it must plead and prove an agreement with respect to the essential nature of the alleged fraud. Thus, just as the particular offense must be specified under the "offense" branch, *Williamson v. United States,* 207 U.S. 425, 447 (1908), the fraudulent scheme must be completely alleged in its entirety and proved under the conspiracy-to-defraud clause. In *Rosenblatt,* the government neither pled nor proved an agreement on the essential nature of the fraud. Accordingly, Rosenblatt's conviction was reversed, and was ordered to be dismissed. In this case, as the government has failed to properly plead any facts sufficiently alleging any conspiracy by anyone, the conspiracy counts should be dismissed at this stage of the proceeding. In the instant matter to the Superseding Indictment did not plead any fact sufficiently

alleging a conspiracy between Mr. Carpenter and any of the unindicted co-conspirators. The reason the government could not do so is because none of the insureds dealt with Mr. Carpenter; none of the agents dealt with Mr. Carpenter when they filled out the applications. Accordingly, the various conspiracy counts, irrespective of any "overt acts", must fail.

## THERE IS NO CRIME HERE; NOR DID MR. CARPENTER AID AND/OR ABET ANYONE ELSE'S CRIME

Aiding and abetting requires something more than "conspiring" to commit a crime or thinking about committing a crime. Even knowing that a crime is being committed and being present at the scene of a crime generally does not constitute aiding and abetting. See for example, *Nye & Nisson v United States*, 336 U.S. 613 (1949), where the Supreme Court quoted Judge Learned Hand's definition of aiding and abetting in *United States v Peoni*, 100 F.2d 401, 402 (2d Cir. 1938):

> "In order to aid and abet another to commit a crime, it is necessary that a defendant in some way associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seeks by his own action to make it succeed."

*Nye & Nissen*, at 619.

Similarly in the Second Circuit's decision in *United States v Garguilo*, 310 F.2d 249 (2d Cir. 1962), the Second Circuit found that the defendant Macchia was not an aider and abetter despite being at the print shop at the time when Garguilo and Villari were engaged in counterfeiting ten dollar bills. Just because Macchia was Gargilo's

companion did not make him a criminal despite the fact that he had knowledge that a crime was being committed and he was present while the crime was being committed.

Here, in this case, there is nothing more than the government's baseless speculation that a crime was committed allegedly by the brokers and so-called Straw Insureds giving false information to the carriers on their life insurance applications. There is no allegation in the indictment that Mr. Carpenter had anything to do with filling out the applications or submitting them to the carriers. Not only did Mr. Carpenter not have any knowledge that the applications were in fact false, he was not present at the scene when the allegedly false applications were filled out and submitted. Nor does the indictment claim otherwise.

Therefore, Mr. Carpenter lacks both the KNOWLEDGE that a crime was being committed and being present at the SCENE of the crime which both the Supreme Court in *Nye & Nissen* and the Second Circuit in *Peoni* and *Garguilo* say is NOT ENOUGH to support a claim of "aiding and abetting" someone in the commission of a crime. Since Mr. Carpenter is not, in fact, an officer, owner, or controlling party of the sponsor of the Trust as the Indictment erroneously claims, and since he had no actual knowledge that the so-called Straw Insureds and their brokers were allegedly committing a fraud, if they were committing a fraud, then it was against Mr. Carpenter and his company and against the Trust and certainly Mr. Carpenter would not aid and abet THEM to defraud Mr. Carpenter's own company and the Trust. There are absolutely no facts alleged in the

indictment that support a scheme to defraud the carriers by Mr. Carpenter, and because Mr. Carpenter would not aid and abet a fraudulent scheme to defraud himself, the Aiding and Abetting counts must be dismissed along with the conspiracy counts.

## THE GOVERNMENT'S ARGUMENTS RE: MONEY LAUNDERING AND ILLEGAL MONETARY TRANSACTIONS ARE WITHOUT MERIT

The government in its brief (see pp35 *et seq.*, Gov. Br.) essentially argues that somehow Mr. Carpenter knew that the proceeds from two life insurance policies of Sash Spencer, who was insured in the welfare benefit trust plan and who died within two years of the life policies being issued, were the fruits of unlawful activity. The government claims that somehow Mr. Carpenter knew this very wealthy man and billion dollar hedge fund manager, was somehow involved in a scheme with the insurance agent to defraud his carrier. There were no allegations that Mr. Carpenter prepared, reviewed or submitted any application on behalf of Mr. Spencer. There was no claim that Mr. Carpenter was in any position of trust with Mr. Spencer. In fact, there were no facts pled that Mr. Carpenter even knew Mr. Spencer. Rather, again, the claim is that Mr. Carpenter loaned COT money and secured the loans by taking a lien on the disbursement of any insurance proceeds. Funding of insurance policies is a perfectly lawful activity.

In order to have a Money Laundering claim, there had to be funds that were derived from criminal activity and more importantly, Mr. Carpenter had to know said funds were unlawfully obtained. Further, as all agree, 18 U.S.C., Section

1956(a)(1)(A)(i) requires that Mr. Carpenter was involved in a financial transaction where he actually knew the proceeds were derived from a specified unlawful activity, SUA.

In the instant matter, the undisputed facts are that Lincoln, the provider of these two policies, was involved in litigation with COT over the legality of the policies and notwithstanding the same, ultimately Lincoln agreed to pay the proceeds from the two disputed policies to COT; these are the same funds that somehow Mr. Carpenter was supposed to know were illegal! There is no factual dispute that according to the Superseding Indictment the questioned funds were only distributed after the provider willfully and knowingly transferred $30,000,000 to COT. In order to claim Money Laundering and Illegal Monetary Transactions, the government is compelled to go back all the way to 2006 and 2007, where it claims that the insurance agent and Mr. Spencer were conspiring to commit crimes by participating in a multiple employer welfare benefit plan. (Note: one cannot say "Straw Insured" because all agree Mr. Spencer was worth millions of dollars and had good reason to own the two policies in question and had the ability to purchase the policies from COT, as he had a right to do under the terms of the policies. Also, he desired to give the proceeds to a charity; hardly the tell-tale signs of a corrupt individual that presumably Mr. Carpenter was supposed to know about.) See para. 123, et seq. of Superseding Indictment.

All Counts from Count 34 through Count 57 concern the above named individual and how from May 21, 2009, through July 1, 2009, there were a series of monetary transfers. However, there is little, outside of bold unsubstantiated conclusions, to demonstrate that in May 2009, forward for a period of about 40 days that Mr. Carpenter knew any of the proceeds from the two life insurance policies involved originated from the fruits of criminal activities. Even the government waited several years before they determined that notwithstanding who Mr. Spencer was, what his assets were, and what he wanted to do with the life insurance policy, that back in 2006 some specified unlawful activity occurred involving the late Mr. Spencer. Yet their claim is that Mr. Carpenter actually knew the proceeds were unlawfully obtained by COT, who had borrowed funds from Grist Mill Capital and Ridgewood; yet, they offered no <u>factual</u> allegations to support the same.

The fact is that all these Counts (34-57) must be dismissed because of the failure of the Superseding Indictment to properly allege that Mr. Carpenter, from the facts claimed, committed any crime.

Wherefore, for any and all of the aforementioned reasons the law mandates a dismissal of each and every count against Mr. Carpenter.

## THE MCCARRAN FERGUSON ACT

The McCarran Ferguson Act ("MFA" or the "Act") was created by Congress in reaction to *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), a

criminal antitrust case that upset the traditional regulation of the insurance business by the individual States. *See e.g. Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183, 19 L. Ed. 357 (1869). Mr. Carpenter's initial brief cites a case directly on point to the issues raised here: *United States v. O'Brien*, 501 F. Supp. 140 (E.D.P.A. Oct. 21, 1980), where an individual was indicted on Mail & Wire fraud charges based on allegedly false information put on insurance applications that were filled out more than five years prior to the indictment.

In *O'Brien*, the claim was that he did not disclose to the carriers on the applications that he was applying for insurance with more than one carrier, while in this case Mr. Carpenter is accused of failing to disclose to providers that his company was providing the funding for the policies purchased by the COT. It is difficult to imagine a criminal case more directly matched than *O'Brien*, and the allegations in this case, including the problems with applications filled out long before the statute of limits period. Also once again, unlike in O'Brien's case, Mr. Carpenter had nothing to do with filling out or submitting the allegedly false applications. But, the government would have this Court believe that the MFA has been effectively repealed or overruled by the Supreme Court's decision in *Humana v Forsyth*, 525 U.S. 299 (1999), which is a civil RICO case and not a criminal case. Similarly, the government would have this Court believe that *O'Brien* has been over-ruled by *United States v. Stewart*, 955 F.Supp. 385 (E.D.P.A. 1997), which was a typical corporate fraud case that could have just as easily

been the fraudulent take-over of Summit Bank or Summit Corp as it was Summit insurance company taken over by a fraudulent wheeler-dealer.

Just as *Humana* involved a Civil RICO lawsuit against a Nevada insurance company that was over-charging and failing to reimburse its clients for the money it was receiving in discounts from hospitals and other medical providers, *Stewart* involved a rogue investor and con-artist that fraudulently did a leveraged buy-out of an insurance company, that could just as easily have been a bank or any other company. So while *Stewart* and *Humana* might argue that the MFA may stop federal authorities from prosecuting them or suing them, there is no question that both Stewart and Humana were doing something wrong that had nothing to do with the actual "business of insurance," which is what the MFA deals with. Thus, both *Humana* and *Stewart* are inapposite to the situation here. Conversely, *O'Brien* is directly on point, and as the Supreme Court described the business of insurance that is covered by the MFA:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement-these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was-it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

*SEC v. National Securities, Inc.*, 393 U.S. 453, 460 (1969).

The MFA is meant to preserve the regulation of the insurance business to the states, not the corporate fraud business as the government suggests. In fact, the government's brief even cites to several Connecticut statutes that regulate the very conduct that the Indictment seeks to criminalize. This is the spirit, if not the very essence, of the sort of thing that the MFA was passed by Congress to prevent. Moreover, the government is trying to criminalize the necessary payment of insurance premiums in the ordinary course of business. If insurance premiums are not paid, then the policy will lapse with no value. Whether the Trust "borrowed" the money from Mr. Carpenter's company or entered into a "collateralized" Split-Dollar arrangement is of no consequence, because the COT was the owner, beneficiary, and premium payer for all of the policies at all times so the government claim that there was a "misrepresentation" on the applications as to who was paying the premiums is just incorrect.

The COT also prohibited the purchase and sale of the policy by anyone but the insured, and every insured has the right to name a trust, or any entity, as the beneficiary of an insurance policy on his or her life. Since the government offers no allegations as to why the COT is not a bona fide welfare benefit plan, under both Connecticut and Delaware law, a trust always has an insurable interest in the life of a plan participant or a beneficiary or a family member. There is nothing either illegal or unusual about the COT Trust arrangement, and it is clearly governed by the insurance laws and regulations of the various states where the applications were signed and submitted. In fact, each carrier

must get state insurance commissioner approval for each type of application it uses in each state that it does business in, because there is no such thing as a "federal" insurance application.

The relationship between the insured, the insurance agent, the carrier, and the owner of an insurance policy constitutes the very essence of the "insurance business," which the MFA requires to be regulated by the individual states. As Justice Marshall referred to it: "The relationship between the insurer and the insured....." is the business regulatory environment the MFA was designed to protect from federal intervention. *Id.* at 460

Finally, the government reply brief tries to abrogate the MFA, or water down its preclusive and pre-emptive effects in this case by pointing to cases that contain fraudulent business practices that merely happen to involve insurance companies. But, the folly of the argument in their reply brief can be easily exposed by a simple example. If one of the former traders at the now infamous SAC Capital were to argue that the government could not touch them because of the MFA for illegal insider trading merely because they had bought stock in MetLife or Prudential rather than the drug companies or the tech companies they actually traded in, they would be laughed out of court because trading in Prudential stock does not involve the state regulation of the relationship between the insured and the insurer, which is really what the business of insurance is all about. But, that is exactly what the government is trying to do in this case by ridiculing

Mr. Carpenter's valid arguments in an attempt to obfuscate the reality that this case boils down to some so-called Straw Insureds and brokers that Mr. Carpenter never met or talked to filling out and submitting some allegedly false insurance applications and sending them in.

If that is a crime, then Mr. Carpenter had nothing to do with it, but more importantly, it is the very essence of the business of insurance for which the MFA was created in order to preserve for the States to regulate and govern. Not all frauds give rise to federal statutes, and especially in the case of Mail & Wire fraud, if all five elements are not satisfied, then the criminal conduct belongs to the state to prosecute or regulate. See e.g. *Kann v. United States*, 323 U.S. 88 (1944) "**... one element of the offense defined by statute, namely that the mailing must be for the purpose of executing the fraud, is lacking in the present case**".

In this case in particular, because it involves the "business of insurance," federal involvement is precluded, pre-empted, and prohibited by the MFA. So, therefore, in addition to all of the other reasons that Mr. Carpenter has presented in his various briefs for dismissing all of the counts of the Indictment, the Indictment must be dismissed in its entirety just as was done in *O'Brien* as it is pre-empted by the MFA.

## CONCLUSION

For the above reasons, all of the counts in the Superseding Indictment must be dismissed as a matter of law.

Defendant, Daniel Carpenter

By_____

      Richard R. Brown, Esq.
      Brown Paindiris & Scott, LLP
      100 Pearl Street, 2nd Floor
      Hartford, CT 06103
      Tel 860.522.3343
      Fax 860.522.2490
      Fed. Bar Ct00009
      rbrown@bpslawyers.com

## CERTIFICATION

This is to certify that on October _10_, 2014, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Patrick Egan, Esq.
Fox Rothschild, LLP
2000 Market Street
Philadelphia, PA 19103

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2rd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009