UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO. 3:13CR226 (RNC)

                          v.

DANIEL CARPENTER

        and

WAYNE BURSEY                                November 5, 2014

GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTIONS TO
SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT

# TABLE OF CONTENTS

I.   Relevant Background ........................................................................................ 1

    A.   The 2010 Search ........................................................................................ 2

        1.   Initial Warrant ................................................................................ 2

        2.   Execution of the IRS Search Warrant .......................................... 9

        3.   Privilege Claim and Filter Team Orders ...................................... 9

    B.   The 2011 Search ...................................................................................... 10

        1.   Initial Warrants ............................................................................ 10

        2.   Execution of the May 25 and 26 Search Warrants ..................... 16

        3.   Targets' Delay Over Privilege Claims ........................................ 18

II.  The Defendant Has Not Proven Standing to Contest Either Search ................................ 20

    A.   Relevant Law ........................................................................................... 20

    B.   Analysis ................................................................................................... 23

III. Both Searches Were Based Upon More than Adequate Probable Cause, and the Defendant Has Failed to Allege Facts Sufficient to Permit a Hearing ........................... 25

    A.   Relevant Law ........................................................................................... 25

        1.   Probable Cause Standard .............................................................. 25

        2.   Standard for a *Franks* Hearing ................................................... 26

    B.   Analysis ................................................................................................... 28

        1.   2011 Search ................................................................................... 28

        2.   2010 Search ................................................................................... 30

IV.  The 2010 and 2011 Search Warrants Were Sufficiently Particularized and Were Not Overbroad ................................................................................................ 39

    A.   Relevant Law ........................................................................................... 39

    B.   Analysis ................................................................................................... 43

        1.   2011 Search ................................................................................... 43

        2.   2010 Search ................................................................................... 54

V.   Law Enforcement Acted in Good Faith Reliance On A Valid Warrant ......................... 62

    A.   Relevant Law ........................................................................................... 62

    B.   Analysis ................................................................................................... 64

VI.  The DOL Properly Searched and Seized Materials That Had Been Previously Seized by the IRS and Neither the DOL nor the IRS Have Held Computer Evidence for an Unreasonable Period of Time ............................................................................... 67

    A.   Relevant Law ........................................................................................... 67

  B.   Analysis.................................................................................................... 69

VII. The Defendant's Due Process Claim Is Misplaced and Unavailing ................................. 72

VIII. Conclusion ............................................................................................................ 75

**TABLE OF AUTHORITIES**

Cases

*Andresen v. Maryland,*
    427 U.S. 463 (1976)..........................................................................................41, 43

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1988)..........................................................................................72, 73

*Crowe v. Smith,*
    151 F.3d 217 (5th Cir. 1998) ....................................................................................73

*Franks v. Delaware,*
    438 U.S. 154 (1978)................................................................................26, 27, 39

*Herring v. United States,*
    555 U.S. 135 (2009) ...................................................................................................62

*Illinois v. Gates,*
    462 U.S. 213 (1983)..................................................................................... passim

*Katz v. United States,*
    389 U.S. 347, (1967)................................................................................................. 20

*Malapanis v. Regan,*
    335 F.Supp.2d 285 (D. Conn. 2004)........................................................................73

*Massachusetts v. Sheppard,*
    468 U.S. 981 (1984)...........................................................................................62, 63

*Matthews v. Eldrige,*
    424 U.S. 319 (1976)....................................................................................................73

*Natale v. Town of Ridgefield,*
    170 F.3d 258 (2d Cir. 1999)......................................................................................72

*National City Trading Corp. v. United States,*
    635 F.2d 1020 (2d Cir. 1980).........................................................................42, 43, 54

*Rakas v. Illinois,*
    439 U.S. 128 (1978)....................................................................................................20

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991).................................................................................26, 30

*Smith v. Hald Hallow Hills Cent. Sch. Dist.,,*
    298 F.3d 169 (2d Cir. 2002)......................................................................................72

*Smolicz v. Borough/Town of Naugatuck,*
    No. 3:04CV855(WWE), 2006 WL 2085291 (D. Conn. 2006) ..............................73

*Sporer v. UAL Corp.,*
    No. C 08-02835 JSW, 2009 WL 2761329 (N.D. Cal. Aug. 27, 2009) ...............22, 25

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001)............................................................................. 37

*United States Postal Service v. CEC Services*,
869 F.2d 184 (2d Cir. 1989).................................................................... passim

*United States v. Abboud*,
438 F.3d 554 (6th Cir. 2006) ......................................................................... 43

*United States v. Abrams*,
615 F.2d 541 (1st Cir. 1980)........................................................................... 52

*United States v. Angevine*,
281 F.3d 1130 (10th Cir. 2002) ..................................................................... 22

*United States v. Blumberg*,
No. 3:97-CR-119 (EBB), 1998 WL 136174 (D. Conn. Mar. 11, 1998) ........................... 40, 47

*United States v. Bowen*,
689 F. Supp. 2d 675 (S.D.N.Y. 2010)..................................................... passim

*United States v. Brewer*,
588 F.3d 1165 (8th Cir. 2009) ....................................................................... 69

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980)........................................................................... 42

*United States v. Britt*,
508 F.2d 1052 (5th Cir. 1975) ....................................................................... 21

*United States v. Buck*,
813 F.2d 588 (2d Cir. 1987)........................................................................... 41

*United States v. Burke*,
718 F. Supp. 1130 (S.D.N.Y. 1989)........................................................ passim

*United States v. Busby*,
No. CR 11-00188 SBA, 2011 WL 6303367 (N.D. Cal. Dec. 16, 2011)................................ 22

*United States v. Burns*,
No. 07 CR 556, 2008 WL 4542990 (N.D. Ill. Apr. 29, 2008)................................ 69

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000)........................................................................... 28

*United States v. Center Art Galleries,*,
875 F.2d 747 (9th Cir. 1989) .................................................................. 51, 61

*United States v. Chuang*,
897 F.2d 646 (2d Cir. 1990)............................................................. 20, 21, 24

*United States v. Cohan*,
628 F. Supp. 2d 355 (S.D.N.Y. 2009)............................................... 40, 42, 48

*United States v. Costin*,
No. 3:05CR38(JCH), 2006 WL 2522377 (D. Conn. July 31, 2006) ...................... 21

*United States v. Dale*,
  991 F.2d 819 (D.C. Cir. 1993) .................................................. 39

*United States v. D'Amico*,
  734 F.Supp.2d 321 (S.D.N.Y. 2010) ............................. 54, 56, 61

*United States v. Diaz*,
  841 F.2d 1 (1st Cir. 1988) ......................................................... 40

*United States v. Dinero Express, Inc.*,
  No. 99 Cr. 975 (SWK),2000 WL 254012 (S.D.N.Y. Mar. 6, 2000) ................. passim

*United States v. Dupree*,
  781 F. Supp. 2d 115 (E.D.N.Y. 2011) ...................................... 39

*United States v. Falso*,
  544 F.3d 110 (2d Cir. 2008) .............................. 27, 38, 63, 64

*United States v. Gagnon,*,
  337 F.3d 230 (2d Cir. 2004) ..................................................... 26

*United States v. Galpin*,
  720 F.3d 436 (2d Cir. 2013) ..................................................... 52

*United States v. Ganias*,
  755 F.3d 125 (2d Cir. 2014) .................................... 68, 70, 71

*United States v. Gorrell*,
  360 F.Supp.2d 48 (D.D.C. 2004) ............................................. 69

*United States v. Gotti*,
  771 F. Supp. 535 (E.D.N.Y. 1991) .......................................... 27

*United States v. Gregoire*,
  638 F.3d 962 (8th Cir. 2011) .................................................... 68

*United States v. Grunewald*,
  987 F.2d 531 (8th Cir. 1993) .................................................... 73

*United States v. Hamilton*,
  538 F.3d 162 (2d Cir. 2008) ..................................................... 20

*United States v. Hargus*,
  128 F.3d 1358 (10th Cir. 1997) ............................................... 67

*United States v. Hassoun*,
  No. 04-60001-CR-Cooke/Brown, 2007 WL 141151 (S.D. Fla. Jan. 17, 2007) ...................... 22

*United States v. Hernandez*,
  No. 09 CR 625 (HB), 2010 WL 26544 (S.D.N.Y. January 6, 2010) ................ passim

*United States v. Hershenow*,
  680 F.2d 847 (1st Cir. 1982) .................................................... 40

*United States v. Kordel,*,
  391 U.S. 1 (1970) ..................................................................... 73

*United States v. Kow*,
  58 F.3d 423 (9th Circ. 1995) ............................................................ 51, 60

*United States v. LaChance*,
  788 F.2d 856 (2d Cir. 1986) .............................................................. 49, 60

*United States v. Lafayette Academy*,
  610 F.2d 1 (1st Cir. 1979) ...................................................................... 52

*United States v. Leary*,
  846 F.2d 592 (10th Cir. 1988) ................................................................ 51

*United States v. Leon*,
  468 U.S. 897 ...................................................................... 62, 63, 64

*United States v. Liu*,
  No. 12 Cr. 934 (RA), 2014 WL 101672   (S.D.N.Y. Jan. 10, 2014) ...................................... 64

*United States v. Markey*,
  131 F. Supp. 2d 316 (D. Conn. 2001) .................................................. 63, 65

*United States v. Martin*,
  157 F.3d 46 (2d Cir. 1998) .................................................................... 26

*United States v. Martin*,
  426 F.3d 68 (2d Cir. 2005) ................................................................ 27, 38

*United States v. Maxwell*,
  920 F.2d 1028 (DC Cir. 1990) ............................................................ 51, 61

*United States v. Nagle*,
  No. 1:09-cr-384-01, 2010 WL 3516859 (M.D. Pa. Sept. 1, 2010) .......................................... 21

*United States v. Navarro*,
  767 F. Supp. 544 (S.D.N.Y. 1991) ...................................................... 27, 39

*United States v. Offices Known as 50 State Distributing Co.*,
  708 F.2d 1371 (9th Cir. 1983) ................................................................ 42

*United States v. Orozco–Prada*,
  732 F.2d 1076 (2d Cir. 1984) ................................................................ 27

*United States v. Padilla*,
  508 U.S. 77 (1993) .............................................................................. 21

*United States v. Regan*,
  706 F. Supp. 1102 (S.D.N.Y. 1989) .............................................. passim

*United States v. Riley*,
  906 F.2d 841 (2d Cir. 1990) .................................................................. 41

*United States v. Roche*,
  614 F.2d 6 (1st Cir. 1980) .............................................................. 52, 61

*United States v. Rollack*,
  90 F.Supp.2d 263 (S.D.N.Y. 1999) ........................................................ 27

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993).............................................................. 39

*United States v. Rosa*,
    626 F.3d 56 (2d Cir. 2010)................................................. 52, 53, 63

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)............................................... 26, 28, 30

*United States v. Saleh*,
    No. 10 CR 623 (KTD), 2011 WL 1210207 (S.D.N.Y. Mar. 24, 2011) ................... 21

*United States v. Santarelli*,
    778 F.2d 609 (11th Cir. 1985) ...................................................... 68

*United States v. Schandl*,
    947 F.2d 462 (11th Cir. 1991) ...................................................... 68

*United States v. Simons*,
    206 F.3d 392 (4th Cir. 2000) ....................................................... 22

*United States v. Sorcher*,
    No. 05 Cr. 799, 2007 WL 1160099 (S.D.N.Y. Apr. 18, 2007)................... 23

*United States v. Souffront*,
    338 F.3d 809 (7th Cir. 2003) ................................................... 27, 38

*United States v. Sugar*,
    606 F. Supp. 1134 (S.D.N.Y. 1985)................................................ 41

*United States v. Syphers*,
    426 F.3d 461 (1st Cir. 2005) ....................................................... 68

*United States v. Teyibo*,
    877 F. Supp. 846 (S.D.N.Y. 1995) ................................................. 73

*United States v. Tranquilo*,
    606 F. Supp. 2d 370 (S.D.N.Y. 2009)...................................... 21, 22, 23

*United States v. Triumph Capital*,
    211 F.R.D. 31 (D. Conn. 2002)............................................ 20, 21, 69

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984)........................................................ 41

*United States v. Zanche*,
    541 F. Supp. 207 (W.D.N.Y. 1982) ................................................ 41

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005)......................................................... 72

*Wasson v. Sonoma County Junior Coll.*,
    4 F. Supp. 2d 893 (N.D. Cal. 1997) ................................................ 22

Statutes

26 U.S.C. § 7206(2) ................................................................................... 36

29 U.S.C. § 1002(1) ................................................................................... 12

IRC § 419 ................................................................................... 3, 13, 54, 55

IRC § 6112 ................................................................................................... 4

Rules

F.R.E. 502(e) .............................................................................................. 19

Fed. R. Crim. P. 41 ............................................................................... 51, 68

The Government files this memorandum in opposition to defendant Daniel Carpenter and defendant Wayne Bursey's motions to suppress evidence seized on May 26, 2011 by the United States Department of Labor ("DOL") pursuant to a federal search warrant (Docs. 72, 80, and 81) and defendant Carpenter's motion to suppress evidence seized on April 20, 2010 by the Internal Revenue Service-Criminal Investigations ("IRS-CI") pursuant to a federal search warrant (Docs. 82 and 83). The defendants' motions should be denied. The contested evidence was seized pursuant to valid search warrants issued upon probable cause and with sufficient particularity. Similarly, the warrants were executed in good faith and in accordance with their respective terms and within the boundaries set by the Fourth Amendment.

## I.  <u>Relevant Background</u>

The defendants stand charged by a Superseding Indictment with mail and wire fraud, money laundering, and conspiracy to commit those offenses. The charges stem from an investigation led by Connecticut-based DOL agents and the United States Attorney's Office for the District of Connecticut into the Charter Oak Trust and related entities. In connection with that investigation, DOL agents obtained search warrants for several locations on or about May 25, 2011. Among the locations searched was 100 Grist Mill Road in Simsbury, Connecticut, from which several entities and individuals connected to the Charter Oak Trust operated. Prior to that search, DOL agents in Connecticut learned that IRS-CI agents in Wisconsin had previously searched the same location in April 2010, but related to a different alleged scheme than the one being investigated by the DOL in Connecticut. In the course of the IRS-CI search, certain material was seized that was believed to relate to the Charter Oak Trust, and several computers were imaged. As a result, in addition to performing its own search of the premises in May 2011, the DOL also obtained warrants to search some of the IRS-seized documents (that had not already been returned to the targets) and the computer images seized by the IRS, for certain specified

material related to the Charter Oak Trust and related individuals and entities. While Bursey challenges only the 2011 warrant, Carpenter challenges both the 2010 and 2011 warrants. Although Carpenter wishes to challenge the 2010 search more broadly, the Court should limit its inquiry to the facts necessary to adjudicate the admissibility of evidence in this case. A fuller explanation of the facts follows.

### A. The 2010 Search

#### 1. Initial Warrant

On April 16, 2010, the IRS-CI obtained a search warrant from the Honorable Thomas P. Smith, United States Magistrate Judge, for an investigation being run out of Wisconsin (the "IRS Warrant" or the "2010 Warrant"). *See* Doc. 83-1. The investigation focused on the promotion and administration of abusive 419 welfare benefit plans by entities and individuals located at 100 Grist Mill Road in Simsbury, Connecticut ("100 GMR"). Judge Smith signed the warrant based upon a 57-page affidavit by Special Agent Shaun Schrader of the IRS-CI (the "Schrader Affidavit"). *See* Doc. 83-2. The warrant authorized the search of the office of Nova Benefits Plans LLC ("Nova"), also known as Benistar, located at 100 GMR, for certain specified documents and records maintained by and/or on behalf of Nova; Benistar; Benefit Plan Advisors; Benistar 419 Advantage Plan; Benistar 419 Plan & Trust; Nova Sickness, Accident, Disability & Indemnity Trust ("SADI"); US Benefits Group, Inc.; Nova Long Term Care Trust; Nova Life One Plan & Trust; Grist Mill Trust; and any other trusts, businesses or entities that promote, administer, or utilize 419 plans for the time period 2004 to the present. *See* IRS Warrant and Attachment B to IRS Warrant. The warrant also authorized the search of computers, electronic devices, and related storage media for the specified categories of material. *Id*.

The Schrader Affidavit begins with a brief synopsis of the investigation, explaining how Nova and its related entities and individuals are conspiring to impede the lawful function of the

IRS and are aiding and assisting in the preparation of false income tax returns by promoting and administering abusive 419 welfare benefit plans, and alleges that evidence of those offenses would be found on the premises and media to be searched. Schrader Affidavit ("SA") ¶¶ 3-9. The investigation, which involved the use of a cooperating witness (the "CW") and undercover agents ("UCAs"), revealed that through the abusive 419 plans, employers could contribute money, which is a deductible business expense, to the plan on behalf of a covered employee. *Id.* ¶¶ 5-7. Then the individual employees were able to violate the Internal Revenue Code ("IRC") by claiming minor injuries as instances of permanent disablement and disfigurement, allowing them to receive the money contributed to the plan by the employer substantially tax-free. *Id.* The affidavit also alleges that the actions of Nova and its employees resulted in the provision of false and misleading documents to the IRS. *Id.* Documents overstated the employee's tax basis when he/she terminated the plan and cashed out the policy, consequently understating the individual's tax liability. *Id.* In addition, a Nova employee coached a client to backdate documents, allowing the client to claim deductions for a year in which no contribution was made. *Id.*

The Schrader Affidavit next provides a general background on 419 welfare benefit plans. *Id.* ¶¶ 11-16. The affidavit states that a 419 welfare benefit plan is an arrangement under which an employer provides welfare benefits to employees, such as life, disability and severance insurance. *Id.* ¶ 11. Generally, an employer's contribution to the plan is deductible, but only if it qualifies as an ordinary and necessary business expense of the employer and only to the extent allowable under IRC 419 and 419A, which imposes strict limits on the tax-deductible amounts. *Id.* ¶ 12. However, if the employer participates in a "10 or more employer plan," the IRS allows the employer to deduct an unlimited contribution amount. *Id.* ¶ 12. The covered employees, who are the beneficiaries of the plan, can receive a distribution from the plan, usually tax-free, if they

file a valid claim, such as for severe illness, disability, disfigurement, or death. *Id*. ¶ 14. The affidavit explains that some 419 plans, known as "abusive 419 tax shelters," operate to distribute disguised dividends or deferred compensation in circumvention of IRC rules and regulations. *Id*. ¶ 15. The affidavit also explains that 419 transactions are "listed transactions" meaning they are subject to the IRC § 6112 disclosure requirements. *Id*. ¶ 16.

The Schrader Affidavit then provides a more detailed account of the investigation. *Id*. ¶¶ 17-59. Specifically, the affidavit describes (i) information provided by the CW, (ii) the agent's review of documents provided by the CW, (iii) a monitored phone conversation that took place on October 29, 2009, involving representatives of Nova and its related entities, the CW, and UCAs, and (iv) monitored face-to-face meetings that took place on January 12, 2010, at 100 GMR involving representatives of Nova and its related entities, the CW, and UCAs. *Id*.

The CW is an independent insurance broker in Wisconsin who sold 419 plans through Nova and its predecessor since 2002. *Id.* ¶ 18. The CW indicated that the business/employer enrolls in the 419 plan with the plan administrator, Nova, and pays an enrollment fee. *Id*. ¶ 19. The business contributes to a trust, such as SADI, which is administered by Nova. *Id.* Nova keeps 5% of the contribution as its administration fee, and the business can deduct the contribution on its tax return. *Id*. The trust then purchases an annuity or life insurance policy from an insurance company. The trust owns the policy and the employee is the plan beneficiary. *Id*.

According to the CW, Nova allows the beneficiaries to abuse the 419 plans in two ways. *Id*. ¶ 20. First, Nova approves virtually any claim, no matter how frivolous. *Id.* Second, when the employer terminates the plan, Nova allows the beneficiary to buy out the plan for 10% of the policy's cash value. *Id*. Nova reports nothing regarding the ownership change, causing the insurance company to issue a Form 1099 to the beneficiary if the cash out amount is greater than

the original purchase cost (the basis), or no Form 1099 at all if the cash amount is less than the basis. *Id*. In truth, the beneficiary should have zero basis in the policy since the business, not the beneficiary, made the contribution. *Id*. Due to the incorrect basis, the Form 1099 shows the beneficiary owes little or no taxes, and he/she is able to receive the full cash value of the policy tax-free for a fee of 10%. *Id*. According to the CW, Nova knows that the 1099s do not reflect the correct basis of the beneficiary. *Id*. In essence, a business is allowed to take a deduction in addition to allowing an individual to extract tax-free money from the business. *Id*.

The CW provided information about 14 employers whom s/he assisted in setting up Nova and/or Benistar 419 plans, with some employers utilizing more than one 419 plan. *Id*. ¶ 21. The employers' contributions to the plans totaled over $8 million. *Id*. The only employees covered under the plans were company principals or relatives of the principals, and the plans were sold as purported disability plans with the ability to get money out tax-free. *Id*. ¶¶ 21-22. Nine of the plans the CW set up, totaling $ 4 million, had been cashed out by the beneficiaries, and disability claims totaling $1 million had been approved. *Id*. ¶ 22.

SA Schrader reviewed tax return information for the 419 plans set up by the CW that were terminated and cashed out. *Id*. ¶ 23. Six of the businesses' contributions and deductions created a loss for the business by reducing ordinary income below zero. *Id*. Further, after the employee buyout, in only one instance was the proper basis used by the beneficiary on their personal tax return. *Id*. In the remaining cases, little or no income was reported because the business's original cost basis was used, and the individual was able to evade the payment of taxes from cashing out the policy. *Id*.

The CW provided information showing that Nova and Benistar set up and administered various 419 plans, including Benistar 419 Plan and Trust, Benistar 419 Advantage Plan, SADI,

Nova Long Term Care Trust, Nova Life One Plan & Trust, and Grist Mill Trust. *Id.* ¶ 24. The CW also indicated that the 419 plans may not qualify as a "10 or more employer plan," which allows the employer to deduct the full amount of the contribution without limitation, because Nova accounts for each employer and policy separately, instead of pooling all the contributions and accounting for them as one plan. *Id.* ¶ 25.

Next, SA Schrader describes some of the monitored conversations from the October 29 call and the January 12 meetings involving the UCAs, the CW, and representatives from Nova and its related entities. *Id.* ¶¶ 26-49. The affidavit breaks down and organizes portions of each of the conversations as they related to different ways in which the 419 plans are abused: (i) the filing and approval of claims, (ii) plan terminations and buy-outs, and (iii) backdating of documents. *Id.*

With respect to the filing and approval of claims, the affidavit provides excerpts from the October 29 conversation between ██████████ who works for Nova and its related entities, the CW, and two undercover agents, UCA1 and UCA2. *Id.* ¶¶ 26-32. UCA1 played the role of a business owner who was interested in investing in a Nova 419 plan, and UCA2 played the role of UCA1's financial advisor. *Id.* In the conversation, ██████ described how Nova encourages participants to file claims because they have a very loose definition for disability benefits and have approved claims for minor and inconsequential injuries, that the trustee of the board that approves the claims is Wayne Bursey, and that they have never denied a claim except once. *Id.*

The affidavit then provides excerpts from the January 12 face-to-face meetings between ██████ ██████████ who also worked for Nova and its related entities, Wayne Bursey, the CW, UCA2 and UCA3, who played the role of UCA2's business partner. *Id.* ¶¶ 26, 33-38. ██████ and ██████ both described how virtually any disability or disfigurement claim would be approved by the board, without much scrutiny, because Nova has control over the board. *Id.* ¶¶

33-34.  They both also described that Nova has never denied a claim, except once, where the claim form was filled out incorrectly and had to be resubmitted.  *Id*. ¶ 35.  Later, Bursey stated that it is "very unlikely" that a claim would be denied and that a small scar is sufficient to make a claim.  *Id*. ¶ 36.  At the same meeting, ████ guaranteed that any claim submitted will be approved as a disability.  *Id*. ¶ 37.

The affidavit then provides excerpts regarding plan terminations and buy-outs.  *Id*. ¶¶ 39-46.  The conversations detailed how Nova counsels its client to take advantage of misleading Form 1099s that are issued by insurance companies when the policies are cashed out.  *Id*.  With respect to annuity plans, ████ described how the cost basis in the policy remains the same because the insurance company has no way to monitor the transaction and know the correct basis.  *Id*.  In one of the face-to-face conversations, ████ discussed, in the presence of ████ the challenge they face in trying to make the plan look legitimate to the IRS.  *Id*. ¶ 42.  With respect to life insurance plans, ████ described how beneficiaries can borrow money to buy out the plan, that the loan is created in a way to impede the IRS, and that the beneficiary can receive the money from the policy tax-free.  *Id*. ¶¶ 43-46.

The affidavit next describes conversations regarding the backdating of documents in which ████ instructs UCAs 1, 2, and 3 to backdate enrollment documents for a SADI 419 plan to September 30, 2009, so they could fund the plan and take a deduction in 2009 even though UCA1's business year already ended on September 30. *Id*. ¶¶ 47-49.  The affidavit also describes how ████ did in fact accept the backdated enrollment documents and enrollment fee and stated they would process it.  *Id*.

After discussing these monitored conversations, the affidavit explains that the IRS describes 419 transactions as listed transactions that must be reported to the IRS on Form 8886, but

that Nova does not require participants to file the form. *Id.* ¶ 50. The affidavit explains that due to Forms 8886 not being filed, the IRS is unaware of Nova's 419 plan participants and therefore cannot monitor how the plans are being used. *Id.*

The Schrader Affidavit next describes the relationship between the various entities at 100 GMR. *Id.* ¶ 51-58. ███████ indicated that Benistar is a third-party administrator focused on 419 welfare benefit plans and other services. *Id.* ¶ 51. The Benistar 419 Plan was started in 1997. *Id.* In 2003, Nova Benefit Plans and Benefit Plan Advisors were established, and each company had their own selection of 419 plans. ███████ said they had a "nice run" of a few hundred million dollars with the Nova Benefit Plans and Grist Mill Trust until the end of 2007. *Id.* At that point, US Benefits Group was created and bought out Benefit Plan Advisors. *Id.* It was created to be a sales and marketing arm for all the companies involved and bring them under one umbrella. *Id.* ███████ described how employees wear multiple hats, that Nova was basically the same as Benistar, and that the employees at Nova were the same employees that worked for Benistar. *Id.* ¶¶ 51-52.

The affidavit states that tax return information obtained from an IRS database shows 100 GMR as the address on file for Nova Benefit Plans, Benistar, Benefit Plan Advisors, and US Benefits Group. *Id.* ¶ 53. The affidavit further explains that in October 2009, the CW received a Nova brochure and SADI enrollment documents in an envelope with a return address of Benefit Plan Advisors at 100 GMR, with instructions to mail the completed application, with a check, to SADI, Nova Benefits Plans LLC, at 100 GMR. *Id.* ¶ 54. On February 9, 2010, ███████ sent UCA2 an email with enrollment documents for Nova's Long Term Care Trust. *Id.* ¶ 58.

Lastly, the Schrader Affidavit explains that in the affiant's training and experience, it is necessary for businesses to maintain adequate books and records of accounts to determine income

and expenses, and that such records include ledgers, journals, receipts, invoices, bank and investment account statements, tax returns, and payroll records. *Id.* ¶ 59. The affidavit also includes a protocol for seizing and searching computer and electronic evidence. *Id.* ¶¶ 63-69.

### 2.    Execution of the IRS Search Warrant

The warrant was executed at 100 GMR on April 20, 2010. In addition to copies of the warrant itself, executing agents were provided with a "search warrant plan" that included an extensive summary of the investigation. *See* Exhibit 1 (Excerpt from Search Warrant Plan). That summary contained a statement of objectives for the plan, which included securing evidence of abusive 419 plans. *Id.* The summary explained how 419 plans worked and discussed information from the CW regarding the abusive nature of the 419 plans, including the approval of frivolous claims and the termination of plans, which allowed "business owners and individuals to underpay their taxes." *Id.* The plan identified the "known businesses and trusts," but also noted that "the above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans." *Id.*

Agents seized 322 boxes of documents along with 13 images of computers located at 100 GMR. *See* Declaration of IRS-CI Special Agent Patrick J. Debbink ("Debbink Decl.") ¶ 1 (Exhibit 2). The material taken was a small fraction of the total on site. *See* Exhibit 3 (sample entry and exit photos).

### 3.    Privilege Claim and Filter Team Orders

Following the IRS search, privilege and Rule 41(g) litigation ensued, both in Connecticut and in Wisconsin. *See* Debbink Decl. ¶¶ 4-16. Among other things, several individuals and entities – including Bursey and Carpenter – issued blanket claims of privilege over the seized material. Debbink Decl. ¶ 4. In connection with that litigation, United States District Judge Lynn Adelman of the Eastern District of Wisconsin issued three orders regarding the operation of

a filter team to review the seized material for privilege, on March 11, March 22, and August 5, 2011. *See* Debbink Decl. ¶ 7; *In Re Grand Jury Proceedings*, No. 10-MC-049 (E.D. Wisc.) (Adelman, J.) (three orders attached as Exhibit 4). The parties settled the Rule 41(g) litigation – which did not involve the defendants – when the Government agreed to return the hard copy documents after a reasonable opportunity to copy them. Debbink Decl. ¶ 6. Boxes with relevant documents were returned to Halloran and Sage, counsel for Benistar Admin Services Inc. ("BASI"), an umbrella company for the 100 GMR entities, while boxes with no responsive documents were sent directly to the targets. Debbink Decl. ¶ 9.

As relevant to these proceedings, as of the time of the May 26, 2011 execution of various DOL warrants, the targets (including Carpenter and Bursey) had not provided privilege logs related to either Electronically Stored Information ("ESI") or hard copy material, there was no resolution as to the privilege claims by the targets, and thus the prosecution team had not yet begun to search the material seized in April 2010. Debbink Decl. ¶ 10. Indeed, the first privilege log was not produced until June 22, 2011, Debbink Decl. ¶ 12, and the targets were still preventing the investigative team from searching non-privileged material as of September 27, 2011, Debbink Aff. ¶ 16. Moreover, as of May 26, 2011, there were some boxes of seized material that had already been returned to BASI's counsel, Halloran and Sage, while others remained at the IRS in Wisconsin. Debbink Aff. ¶ 11.

**B.    The 2011 Search**

1.    Initial Warrants

On May 25, 2011, before the Wisconsin prosecution team examined any documents or computer files pursuant to Judge Adelman's filter orders, the DOL sought search warrants for an unrelated investigation being run out of Connecticut (the "DOL Warrants"). The DOL investigation focused on a separate scheme utilizing the Charter Oak Trust, Charter Oak Trust

2009, and the Charter Oak Trust Welfare Benefit Plan (collectively the "COT"), along with certain other entities and individuals located at 100 GMR and 300 First Stamford Place in Stamford, Connecticut ("300 FSP"). The DOL warrants did not seek records related to all 419 plans, but only as to the specific entities and individuals related to the operation of the COT.

The Honorable Joan G. Margolis, United States Magistrate Judge, signed fifteen search warrants based upon a common 60-page affidavit by DOL Special Agent Lynn Allen (the "Allen Affidavit"). *See* Exhibit 5.[1] The warrants authorized the search of (1) 300 FSP, which includes the sales and marketing business offices of BASI and other associated businesses; (2) 100 GMR, which includes the main business offices of BASI, Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, LLC, Avon Capital, LLC, Nova Group, Inc., TPG Group, Inc., and other associated businesses; and (3) forensic images of 13 computer drives and media that were previously seized pursuant to the IRS warrant. The warrant authorized a search for specific categories of documents, for the period 2006 to the present, related to Carpenter, Bursey, ███████ ███████ ███████ ███████ ███████ ███████, ███████ ███████ ███████ Grist Mill Capital, LLC ("GMC"), Grist Mill Holdings, LLC, Benefit Plan Advisors, LLC, TPG Group, Inc., Caroline Financial Group, Nova Group Inc., Avon Capital, LLC ("Avon"), and the COT. *See* DOL Warrant, Attachment D (Exhibit 6).[2]

The Allen Affidavit sets out in detail a complex financial scheme by certain "targets," including Carpenter and Bursey, to commit violations of wire fraud, mail fraud, and insurance fraud, and alleged that evidence of those schemes would be found on the premises and media to be searched. AA ¶¶ 4, 6. After an introduction, the affidavit begins by identifying certain

---

[1] Carpenter attaches only SA Allen's affidavit in support of a follow-up warrant from May 26, 2011, rather than the 60-page affidavit underlying the search that he is contesting. We assume this was merely an oversight.
[2] Here, again, Carpenter attached the warrant for 100 GMR but not Attachment D; he inserts Attachment D in a separate exhibit. *See* Docs. 81-1, 81-3. In an abundance of caution, we have included the two together here.

individuals, entities, and locations that would be relevant to the narrative of the scheme. AA ¶¶ 8-24. First, the affidavit identifies BASI as an "administrator of health and welfare benefit plans" and names certain related entities as the "subject companies" for purposes of the requested warrants. AA ¶ 8. Notably, the warrants do not request to search for documents of BASI generally, but only the specified subject companies. *See* DOL Warrant, Attachment D.

The Charter Oak Trust is introduced next, with – in alternate versions of a trust declaration – either GMC (by ████ or Nova Group, Inc. (by Bursey) as Plan Sponsor and Administrator. AA ¶ 10-11. This background section also explains the ownership of GMC to be comprised of Grist Mill Holdings, Caroline Financial Group, and ████ AA ¶ 14. Avon Capital is owned 100% by Grist Mill Capital. AA ¶ 14. The affidavit then describes the connection of these entities to 100 GMR. AA ¶¶ 13,14, 20.

Next, the Allen Affidavit provides background on welfare benefit plans and so-called "stranger originated life insurance," or "STOLI." AA ¶¶ 25-33. A welfare benefit plan is "any plan, fund, or program...established by an employer...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, disability [or] death...benefits." AA ¶ 26 (quoting 29 U.S.C. § 1002(1)). STOLI is defined as insurance policies "procured with the sole intent to have third party investors purchase the policies." AA ¶ 31. STOLI policies are illegal in some cases, and typically not issued by insurance companies. AA ¶ 31. The affidavit explains how schemes mislead insurance companies into issuing such STOLI policies, often by means of misrepresentations in the origination of the policies. AA ¶ 32. Then, following the two-year "contestability period," after which it is more difficult to challenge fraud in the policy origination, the STOLI policies are sold to investors. AA ¶ 33.

The Allen Affidavit then explains the scheme under investigation. AA ¶¶ 34-47. In

brief, the affidavit alleges that the targets – including Carpenter and Bursey – were operating a STOLI scheme whereby they or their associates solicit individuals to purchase life insurance through the COT; submit materially false insurance applications on the insureds' behalf; compensate the insureds by financial incentive; and sell the policies following the contestability period.   AA ¶ 34.   The targets also arranged to set up businesses purely for the purpose of insureds joining the COT.   AA ¶ 35.

The COT was established in October 2006 as an employee welfare benefit plan, sponsored and administered by either GMC or Nova Group, Inc.   AA ¶¶ 36-37.   A legal opinion letter described the COT as an employee welfare benefit fund under IRC § 419(e), sponsored by Nova Group, Inc., in which employers must contribute to the fund to cover the costs of benefits to employees.   AA ¶38.   Moreover, SA Allen located numerous COT "Adoption Agreements" at a bank used by GMC; those adoption agreements also stated that the employers would be contributing to the "plan administrator," i.e., Nova or GMC.   AA ¶ 39.   Similarly, the COT life insurance applications indicated that they were being sought for "legacy or estate planning" and that the premium payments were not financed by a third party.   AA ¶40.

Despite these representations to the contrary, the affidavit explains that the premiums for the policies in the COT were funded by a $35 million line of credit procured by Avon and GMC from Ridgewood Finance, Inc. ("Ridgewood").   AA ¶¶ 41, 42.   ████████ signed the agreement for the line of credit on behalf of Avon and GMC on November 22, 2006, and then signed an amended agreement on February 12, 2007.   AA ¶¶ 42, 43.   Commitment letters for individual advances on the line of credit indicated a 27-month term, and were signed by Carpenter on behalf of GMC.   AA ¶ 44.   The funding arrangement was also reflected in a Disclosure, Acknowledgement & Certification ("DAC") Agreement between the insured, the insurance agent,

and GMC; SA Allen was unaware of any DAC Agreements being provided to insurance companies. AA ¶ 45. Bank records showed that GMC used either Ridgewood money, its own money, or money from entities associated with GMC and COT to fund COT premium payments. AA ¶ 46.

Of the 80 COT insurance policies that Agent Allen reviewed, all involved misrepresentations to the insurers that the policies were not being financed through third parties; all involved insureds of 70 years old or over; no employers paid any premiums; seventeen adopting employers were formed one year prior to policy origination; and there was evidence that nearly half of the policies older than two years had their ownership transferred. AA ¶ 47.

The affidavit next provides illustrative detail of 6 of the 80 COT policies reviewed by SA Allen, specifically the policies of ████████████ (AA ¶¶ 49-56); ████████████ (AA ¶¶ 57-65; ████████████ (AA ¶¶ 66-71); ████████████ (AA ¶¶ 72-79); ████████████ (AA ¶¶ 80-92); and ██████ (AA ¶¶ 93-102). Each of those cases involved misrepresentations as described previously – insurance applications and/or other electronic or mailed communications to insurance companies that falsely denied third party funding of premiums, all of which were signed by Bursey and, in some cases by ████████████ or ████ as insurance agent. AA ¶¶ 49-51, 57-60, 66-68, 72-76, 80-83, 87-90, 93-94, 96-98. Despite these representations, all of these cases were funded by third parties. That information included – depending on the case – DAC agreements documenting a funding arrangement, authorized by Carpenter, between GMC and COT (AA ¶¶ 54, 63, 91, 100); commitment letters showing that GMC was getting its funding from Ridgewood to pay premiums on the insurance policies (AA ¶ 55, 64); intricate sets of bank transfers showing that premiums were coming from Ridgewood, GMC, and/or a GMC-related entity, and not the adopting employers (AA ¶¶56, 65, 71, 92, 102); and an interview of ████

connected to a civil suit in which she acknowledged she participated in the COT for a financial incentive, did not fund the premiums herself, and that the financial documents submitted for her were vastly inflated (AA ¶¶ 77-79). Several of the cases involved businesses that did not appear to be legitimate employers at the time of the supposed COT adoption. AA ¶¶ 52-53 (████████ 61-62 (████████ 70 (████████ 84 (████████

SA Allen then indicated that she was still in the process of gathering commission data for the millions of dollars received by ████████ ████████ ████████ TPG Group, and others as a result of the COT. AA ¶¶ 103-104.

Approximately half of the post-contestability COT policies had already been transferred to new owners. AA ¶ 105. Among those transferred were six COT policies sold – and five other policies under discussions to be sold – to a life settlement fund called Life Insurance Fund Elite ("LIFE"), which is managed by ISM Advisors, an investment management company. AA ¶¶ 106. ████████ from 300 FSP, negotiated the sale of the COT policies from Avon, along with numerous other policies, with ████████ purporting to be the principal of Avon and "president" of Benistar. AA ¶¶106, 109. ████████ did not explain how Avon owned the COT policies. AA ¶ 108. Still other policies were transferred to other entities, including the Avalon I Trust and M&T Bank, with Bursey and ████████ listed on the ownership change forms. AA ¶ 110-112.

The next section of the affidavit details the types of documents that people and businesses maintain, including financial records and computer records, and discusses how "the flow of funds into and out of a company or sole proprietorship can be tracked by tracing the paper trail that is created by entities into the business records and bank accounts and by documents received or prepared in connection with each transaction." AA ¶¶ 113-14. Business also maintain records of communications in both hard copy and electronic format. AA ¶ 115. The affidavit specifically

referenced the items in Attachment D to the warrant. SA ¶ 113. Based on SA Allen's investigation, she believed that records relevant to the investigation of the targets for insurance fraud, mail fraud, and wire fraud would be found at 300 FSP and 100 GMR. AA ¶ 116.

SA Allen also discussed her reason for believing that computer records would be located at the premises (AA ¶¶ 118-126) and how those computer records would be searched (AA ¶¶ 127-130). All of the targets and others at the subject companies used e-mail to communicate with one another and with other businesses in furtherance of the fraud scheme. AA ¶ 119. SA Allen provided specific examples of emails by the targets, other employees of the subject companies, Ridgewood, and other outside entities, all related to the fraud scheme. AA ¶¶ 120-26. SA Allen then explained the complexities of forensic computer review, and the necessity in many cases of imaging computers for off-site review. AA ¶¶ 127-130.

Finally, SA Allen suggested a proposal for screening media for privileged material. AA ¶¶ 131-38. In doing so, SA Allen provided the Court with background on the earlier IRS search, including the targets' prior privilege claims and the nature of the Judge Adelman filter orders. AA ¶¶ 133-34. Ultimately, the affidavit asked to search 100 GMR, 300 FSP, the Stamford offices of Caldwell Funding Corporation (successor to Ridgewood), and the various computer images seized from 100 GMR in April 2010, for the items listed in Attachment D. AA ¶¶ 140-44.

2.      Execution of the May 25 and 26 Search Warrants

On May 26, 2011, DOL-OIG executed the physical searches of 100 GMR and 300 FSP (collectively, the "subject offices").[3] The warrant for 300 FSP was executed initially by eight DOL-OIG agents, and the warrant for 100 GMR was executed initially by seven DOL-OIG agents. Prior to commencing the searches, executing agents gathered for intelligence briefings for each search site. At those briefings, agents who were directly familiar with the search warrant,

_____
[3] The imaging of the forensic images taken in the IRS search occurred within a few days of May 26, 2011.

affidavit, and the investigation provided a summary of the alleged criminal conduct that was discussed in the affidavit. All executing agents were provided with copies of Attachment D, and copies of the affidavit were made available. The agents also received copies of an Operational Plan (the "DOL Ops Plan") that provided additional information for the warrant execution. *See* Exhibit 7.[4] Among other things, the DOL Ops Plan listed the statutes under investigation, two paragraphs related to the case background (identifying the COT), and directed that agents should "search and seize evidence in accordance with [DOL policies] and the SW and its accompanying affidavit." During the searches, SA Allen was present at 300 FSP and two other DOL agents intimately familiar with the investigation were on site at 100 GMR to direct the execution of the warrants.

Once at the premises, the agents identified the occupants of the subject offices, and then permitted everyone to leave. In fact, some occupants (including Carpenter) insisted on remaining inside one of the search locations, and arrangements were made to accommodate those requests. Following initial entry, an additional seven unarmed investigators from DOL's Employee Benefits Security Administration assisted in the search of 100 GMR. They were not present during the initial entry.

During the course of the warrants' executions, agents identified insurance applications inside the subject offices, interspersed within responsive material, for policies not issued by insurers. Although agents believed that these applications were covered by the original warrants, SA Allen nonetheless sought and received additional warrants from Judge Margolis on May 26, 2011, to expand the scope of the original warrants accordingly. *See* Exhibit 8 (Affidavit and Warrant for 100 GMR from May 26, 2011).

---

[4] Attached are pages from the DOL Ops Plan for 100 GMR. Certain information has been redacted and certain pages left out that do not bear on the Government's arguments here. The full document is available at the Court's request.

Simultaneous to the execution of the search warrants on May 26, 2011, agents served on Halloran a subpoena for COT-related documents that had been seized from 100 GMR in the IRS search, but had been returned to the custody of Halloran as counsel for BASI pursuant to the second Judge Adelman filter order. As to the COT-related material in boxes that had not yet been returned to Halloran, Judge Adelman issued a search warrant in the Eastern District of Wisconsin, based upon an affidavit and warrant substantially similar to the Allen Affidavit and warrant, allowing the DOL to seize copies of those materials

In total, 86 boxes of documentary evidence were seized during the search of 100 GMR (41 boxes), 300 FSP (42 boxes), and the IRS-seized material still in Wisconsin (3 boxes). The material taken was a miniscule fraction of the total number of documents present at the subject offices. Attached to this memorandum as Exhibit 9 are examples of "entry and exit" pictures of some locations within 100 GMR, including Carpenter's and Bursey's workspaces and various storage areas.[5] According to DOL inventory sheets, agents found nothing responsive in many of the areas searched and did not seize anything from those areas. *See* Exhibit 10.[6]

In addition to the 13 drives comprising the IRS seized media from 2010, an additional 34 images were made of computer drives from the searches of the subject offices, 12 from 100 GMR and 22 from 300 FSP. The computers that were imaged at 100 GMR were a fraction of the total number of computers on-site. No computers had to be removed from 100 GMR during the search, and the few computers that were removed for processing from 300 FSP were mostly returned by June 3, 2011, and all were returned by June 21, 2011.

3.      Targets' Delay Over Privilege Claims

Immediately following the execution of the warrants for the subject offices and the service

---

[5] There are many other photos from the 48,000 square foot facility available for the Court's review if necessary.
[6] The defendant attached to his memorandum the inventories for the rooms from which material was seized, and appears to have left out the myriad rooms from which nothing was taken. *See* Docs. 81-4, 81-5.

of the Halloran subpoena, counsel for the targets identified in the warrant – including defendants Carpenter and Bursey – issued blanket claims of privilege over all materials seized. The targets resisted the use of a filter team to resolve privilege claims, which essentially prevented the accessing of any of the ESI seized for many months. Ultimately, Judge Mark R. Kravitz, who oversaw the grand jury in which the investigation was then proceeding, ordered the use of a filter team over the targets' objections to permit the review of ESI. *See In Re: Grand Jury Proceedings*, 3:11MC210(MRK) (Dec. 27, 2011) (the "Kravitz Filter Order") (Exhibit 11). The targets were also directed to provide the hard copy documents over which they claimed privilege to Judge Kravitz for review.

The ensuing events are well documented in various filings in connection with the filter team as well as Carpenter's unsuccessful motions to unseal the search warrant affidavit. *See In Re: Grand Jury Proceedings*, 3:12CR882(JCH). In short, once potentially privileged ESI was provided to the targets pursuant to the Kravitz Filter Order, they (including Carpenter and Bursey) did not comply with that order. Rather, Carpenter – joined by BASI – filed a motion in May 2013 to avoid the requirement of a privilege log altogether and to revisit Judge Kravitz's order. Chief United States District Judge Janet C. Hall denied that motion and ordered the targets to comply with Judge Kravitz's order. *See* Exhibit 12 (June 26, 2013 transcript of sealed hearing). A short time later, after producing some privilege logs in accordance with the Kravitz Filter Order, the targets agreed with the Government on the terms of a no-waiver agreement under F.R.E. 502(e), which was incorporated into an order by Judge Hall on August 22, 2013. *See* Exhibit 13. The 502 Agreement superseded the Kravitz Filter Order and permitted the Government access to search the seized ESI without privilege limitation, and without waiving the targets' potential claims of privilege should any be indicted.

A grand jury returned an indictment against Carpenter and Bursey on December 12, 2013. The Government continues to prioritize and process the seized media pursuant to the 502 Agreement and the search warrants. Given the volume of information to be searched, the process is likely to continue for some time.

## II. The Defendant Has Not Proven Standing to Contest Either Search

### A. Relevant Law

"A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 361, (1967) (Harlan, J., concurring); *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990)). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130 n.1 (1978). Accordingly, in a motion to suppress evidence a defendant must demonstrate a legitimate expectation of privacy in the area that was searched. *Id.*

"A corporate officer or employee in certain circumstances may assert a reasonable expectation of privacy in his corporate office, and may have standing with respect to searches of corporate premises and records." *Chuang*, 897 F.2d at 649. That standing of a corporate officer or manager is not, however, automatic. Indeed, "shareholders of a corporation do not have standing merely because they are shareholders, nor can they vicariously assert the corporation's Fourth Amendment rights. They must establish some personal expectation of privacy in the corporate records at issue." *United States v. Triumph Capital*, 211 F.R.D. 31, 54 (D. Conn. 2002).

"The question of whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched." *Chuang*, 897 F.2d at 649. "He must demonstrate a sufficient 'nexus between the area searched and [his own] work space.'" *Id.* (citing *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir. 1975)).

As a result, the exercise of standing is specific to each defendant and to the particular area searched. Indeed, courts have repeatedly limited an employee's expectation of privacy, if any, to his or her own workspaces and computers. *See Chuang*, 897 F.2d at 650 (bank officer had no expectation of privacy in another officer's workspace, despite the defendant's ownership interest and operational control over the bank); *United States v. Costin*, No. 3:05CR38(JCH), 2006 WL 2522377, at *4-*6 (D. Conn. July 31, 2006) (expectation of privacy limited to a supervisor's area and defendant's office, and did not include other parts of office or data on computers outside his office); *Triumph Capital*, 211 F.R.D. at 54 (corporate officer has no standing in computer assigned to and controlled by another individual); *United States v. Tranquilo*, 606 F. Supp. 2d 370, 378 (S.D.N.Y. 2009) ("the record evidence does not reveal whether Mr. Tranquillo regularly occupied or worked in the particular room in which the computers were kept."); *United States v. Saleh*, No. 10 CR 623 (KTD), 2011 WL 1210207, at *5 (S.D.N.Y. Mar. 24, 2011) ("[Defendant employee] has not claimed any ownership interest in the premises nor stated any facts indicating his exclusive use and control over the area searched."); *United States v. Nagle*, No. 1:09-cr-384-01, 2010 WL 3516859, at *7 (M.D. Pa. Sept. 1, 2010) (no expectation of privacy for defendant CEO either in other employees' computers or in company computer servers). Moreover, the law is clear that a defendant may not exercise standing to contest a search of a co-conspirator's office. *See United States v. Padilla*, 508 U.S. 77, 82 (1993) (standing requirement to challenge constitutionality of

search or seizure is not subject to "coconspirator exception") (citation omitted).

Even where a defendant may otherwise have an expectation of privacy in a computer or workspace, that expectation may nonetheless be unreasonable in certain circumstances. An employee's expectation of privacy in files stored on a work-issued computer is not objectively reasonable where the employer notifies employees that their computer files are subject to monitoring and/or are otherwise without an expectation of privacy. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (employee's belief that his computer files were private was not objectively reasonable because the employer's policy reserved right to monitor); *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002) (same); *Wasson v. Sonoma County Junior Coll.*, 4 F. Supp. 2d 893, 905-906 (N.D. Cal. 1997) (same); *United States v. Busby*, No. CR 11-00188 SBA, 2011 WL 6303367, at *5-*6 (N.D. Cal. Dec. 16, 2011) (no objective expectation of privacy in computer, even where employee set own password, because employer policy states employee has no expectation of privacy); *Sporer v. UAL Corp.*, No. C 08-02835 JSW, 2009 WL 2761329, at *5 (N.D. Cal. Aug. 27, 2009) (expectation of privacy unreasonable where company e-mail subject to monitoring and employees were warned that they had no expectation of privacy). Such a policy vitiates an employee's expectation of privacy even where that policy allows some personal e-mail use. *See United States v. Hassoun*, No. 04-60001-CR-Cooke/Brown, 2007 WL 141151, at *1-*2 (S.D. Fla. Jan. 17, 2007) (company permitted personal use, but policy made clear that all use would be monitored).

A defendant's burden to prove standing cannot be met by unsupported assertions of counsel. Rather, at a minimum the defendant must come forward with a sworn affidavit by someone with direct knowledge of the facts underlying the defendant's expectation of privacy. *Tranquilo*, 606 F. Supp. 2d at 378 ("As a preliminary matter, Mr. Tranquillo has not put forth the

foregoing facts--or, indeed, *any* facts relevant and probative of his privacy interest in the two A & D Carting computers--in a sworn affidavit."); *United States v. Sorcher*, No. 05 Cr. 799, 2007 WL 1160099, at *8 (S.D.N.Y. Apr. 18, 2007) ("Indeed, the record contains no affidavits from defendants asserting their possessory or proprietary interest in the documents."). In assessing standing to suppress, a defendant's factual contentions, including his denials of allegations in the search warrant affidavit, may be considered against him. *See Tranquilo*, 606 F. Supp.2d at 378, 378 n.4 (considering defendant's denials of management or ownership alleged in affidavit).

**B.     Analysis**

The defendants' motions are bereft of any allegations – let alone those supported by a sworn affidavit or other admissible evidence – that would carry either's burden to prove standing to seek suppression of evidence. *See Tranquilo*, 606 F. Supp. 2d at 378 (requiring facts in support of standing to be in a sworn affidavit by someone with direct knowledge).

In his motion to suppress the fruits of the 2010 IRS warrant, Carpenter makes only passing reference to standing and offers no support for the idea that he personally had a reasonable expectation of privacy in any of the places searched or property seized. Indeed, his supporting memorandum makes only conclusory allegations that "he had both subjectively and objectively reasonable expectations of privacy in his offices and work areas," and that "he also had a reasonable expectation of privacy from government intrusion into his desktop and laptop computers." Doc. 83 at 17. In fact, Carpenter essentially denies control over the subject offices, claiming that he "stepped down from all Benistar-related entities in January of 2004, and was never an officer or signatory for Nova or its affiliates." Doc. 83 at 4. The Court may consider the defendant's denial of control against him in the context of standing. *See Tranquilo*, 606 F. Supp.2d at 378, 378 n.4. Carpenter also claims that the Government seized "personal records belonging to Mr. Carpenter, which were clearly outside the scope of the warrant." Doc. 82 at 2.

Yet he does not say from where within the office complex they were recovered, or why he would have a reasonable expectation of privacy therein.

Carpenter's motion to suppress the 2011 DOL warrant is even more sparing in its allegations of standing. Carpenter again fails to present any admissible evidence that would meet his burden to prove standing as to any particular area searched. First, Carpenter's motion describes the areas searched to include, at 300 FSP, the offices of BASI, and at 100 GMR, the "home" of BASI, COT, GMC, Avon, Nova Group Inc., and "other associated businesses." Doc. 80 at 1-2. He does not allege his personal relationship with any of those businesses, or any "nexus between the area searched and [his own] work space." *Chuang*, 897 F.2d at 649 (citations omitted). Again, it is not enough for Carpenter simply to allege that his personal records were among the material seized, *see* Doc. 80 at 2, without asserting an expectation of privacy in the area from which those records were seized.

Similarly, defendant Bursey offers no support for a reasonable expectation of privacy in the areas searched. Indeed, his memorandum simply adopts Carpenter's memorandum and repeats almost verbatim Carpenter's characterization of the search. *See* Doc. 72 at 5. As with Carpenter, Busey describes the search as one of various business premises and does not specify where within the premises, if anywhere, Bursey had an objectively reasonable expectation of privacy. *See Id*. Likewise, Bursey complains of the seizure of his "personal financial, tax and insurance records," but does not articulate from where those items were seized, and whether Bursey had a reasonable expectation of privacy in those areas.

Even if either of these defendants was to offer admissible evidence of a subjective expectation of privacy, he would nonetheless have to show that that expectation of privacy was objectively reasonable. Here, it is not clear that either would have an expectation of privacy in the

computer records that make up a significant majority of the records at issue. First, to the extent that an e-mail of Carpenter or Bursey was recovered from another individual's e-mail box, there would be no personal expectation of privacy under any theory. More importantly, Carpenter and Bursey must prove that they had an objectively reasonable expectation of privacy in their work e-mail boxes, *see Sporer*, 2009 WL 2761329 at *5 (expectation of privacy unreasonable where company e-mail subject to monitoring and employees were warned that they had no expectation of privacy), in light of an apparent 100 GMR policy that specifically warns employees that "while these tools are provided for the performance of job duties and limited personal use, there should be no expectation of privacy." *See* Exhibit 14.[7]

## III. Both Searches Were Based Upon More than Adequate Probable Cause, and the Defendant Has Failed to Allege Facts Sufficient to Permit a Hearing

### A. Relevant Law

#### 1. Probable Cause Standard

The Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause, however, is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted). "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. "In assessing the proof

---

[7] The exhibit contains two documents – a Benistar "Information Security and Computer Use Policy," and an e-mail from a Benistar computer technician to ▮▮▮▮▮▮ ▮▮▮▮▮▮ referencing a "computer policy agreement" that "everyone else" signed. The policy is not attached to the e-mail directly, but was located elsewhere in the ESI.

of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). "Courts do not isolate each factor of suspicion but instead look to the totality of the circumstances." *United States v. Gagnon*, 337 F.3d 230, 236 (2d Cir. 2004) (citing *Gates*, 462 U.S. at 230-31).

A court reviewing the issuance of a search warrant "accord[s] 'great deference' to a judge's determination that probable cause exists[] and . . . resolve[s] any doubt about the existence of probable cause in favor of upholding the warrant." *Salameh*, 152 F.3d at 113; *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998). The court's "duty is 'simply to ensure that the magistrate had a substantial basis for . . . conclud[ing]' that probable cause existed." *Salameh*, 152 F.3d at 113 (quoting *Gates*, 462 U.S. at 238-39). "[T]he resolution of doubtful cases . . . should be largely determined by the preference to be accorded to warrants." *Martin*, 157 F.3d at 52 (internal quotation marks omitted). "A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner." *Id.* (internal quotation marks omitted). As a result, a defendant "who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

## 2. Standard for a *Franks* Hearing

"There is ... a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Despite that presumption, a defendant may challenge the validity of a search warrant if he makes a "substantial preliminary showing" that the supporting affidavit contains deliberately or recklessly false or misleading information. *Id.* at 164-72. The standard for entitlement to a *Franks* hearing is high, and requires a "substantial preliminary showing that: (1) the warrant affidavit contains a false statement or material omissions that makes the affidavit misleading; (2) the false statement or material omission was the result of

the affiant's deliberate falsehood or reckless disregard for the truth; and (3) the false statement or material omission was integral or necessary to the judge's probable cause finding." *United States v. Martin*, 426 F.3d 68, 73–74 (2d Cir. 2005).

The alleged falsehood must have come from the affiant, not a non-governmental informant. *See Franks*, 438 U.S. at 171 ("[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant"); *United States v. Rollack*, 90 F.Supp.2d 263, 270 (S.D.N.Y. 1999) ("A *Franks* challenge goes to the veracity of the affiant, not the affiant's sources of information."). "Absent a showing that the affiant himself knowingly included false statements in the affidavit, there is a basis neither for a hearing, nor for suppression itself." *United States v. Navarro*, 767 F. Supp. 544, 546 (S.D.N.Y. 1991) ("Probable cause is not defeated because an informant may have erred or lied so long as the affiant accurately represented what was told to him"). Moreover, it is not enough to simply allege the affiant acted deliberately. "A defendant seeking a *Franks* hearing must offer direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had obvious reasons for omitting or falsifying facts." *See United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003).

In addition, in order to avoid "fishing expeditions into affidavits that are otherwise presumed truthful," unsupported conclusory allegations are insufficient. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008). Rather, a defendant must point out specific deliberate falsehoods supported by "affidavits or sworn or otherwise reliable statements of witnesses." *Id*. (quoting *Franks*, 438 U.S. at 171); *see also United States v. Orozco–Prada*, 732 F.2d 1076, 1089 (2d Cir. 1984) (affirming denial of *Franks* hearing on grounds that defendant "made no offer of proof and did not submit a sworn or otherwise reliable statement of a witness."); *United States v. Gotti*, 771 F. Supp. 535, 539 (E.D.N.Y. 1991) (same).

Even where a defendant has come forward with some competent evidence of such deliberate falsehoods, a court must still ask "whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation marks omitted). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *Salameh*, 152 F.3d at 113.

**B.     Analysis**

Both the 2011 and 2010 search warrants were based upon detailed affidavits setting forth probable cause to search 100 GMR and/or 300 FSP for evidence of the offenses specified in the warrants. The defendants' argument that the affidavits lacked probable cause or were otherwise based on material misstatements or omissions are baseless and should be rejected.

1.     <u>2011 Search</u>

The May 2011 search of 100 GMR by DOL agents was based on more than adequate probable cause. The Allen Affidavit, which was submitted in support of the application for the warrant, provides evidence of a complex financial scheme by certain targets, including Carpenter and Bursey, to commit violations of wire fraud, mail fraud, and insurance fraud, utilizing the COT and COT 2009.

As discussed in the factual recitation above, the affidavit demonstrates that the targets operated a STOLI scheme in which they solicited older individuals to purchase life insurance through the COT; submitted materially false insurance applications to insurance companies on the insureds' behalf in order to obtain the policies; compensated the insureds by financial incentive; and then sold the policies following the two-year contestability period. AA ¶ 34.

SA Allen reviewed 80 COT insurance policies and applications, and she provides

extensive detail in the affidavit on six of those policies. AA ¶¶ 47-102. Based on her review, she observed that for each of the 80 policies, the insurance application and/or other correspondence to the insurance companies, all of which were signed by Bursey, falsely denied that the premiums were being funded by a third party. AA ¶¶ 47-51, 57-68, 72-76, 80-83, 87-90, 93-94, 96-98. In actuality, the affidavit provided information that the COT policies were funded by a $35 million line of credit procured from Ridgewood or with its own money or that of a related entity. AA ¶¶ 41-46. Similarly, many of the COT life insurance applications falsely indicated that they were being sought for "legacy or estate planning." AA ¶ 40. No employers ever paid any premiums and several of the policies involved businesses that did not appear to be legitimate employers at the time of the supposed COT adoption. AA ¶ 47. There was also evidence that nearly half of the policies older than two years were sold or had their ownership transferred. AA ¶¶ 47, 110-12.

The information above was more than sufficient to establish probable cause to search 100 GMR and 300 FSP for evidence of the STOLI scheme. *See Gates*, 462 U.S. at 238 (probable cause is "a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place").

Nonetheless, the defendants argue without support that the May 2011 search lacked probable cause. Doc. 72 at 5; Doc. 81 at 15. In the opening paragraphs of Carpenter's memorandum, which Bursey incorporates by reference, Carpenter states that he "will demonstrate [the search and seizure] was premised upon a search warrant that omitted significant material and exculpatory information, all in a reckless disregard for the truth." Doc. 81 at 4. Significantly, however, nowhere in his 37-page memo does he specify what material or information was omitted. He does not point to a single statement that he claims is false or incorrect. Nor does he explain why he believes that SA Allen acted in reckless disregard for the truth. He simply states that the

warrant was devoid of probable cause.

As such, the defendants fail to raise any doubts about the validity of the statements in the affidavit, and they come nowhere close to satisfying their heavy burden to challenge Judge Margolis's determination that probable cause existed to issue the warrant. *See Rivera,* 928 F.2d at 602 (a defendant "who argues that a warrant was issued on less than probable cause faces a heavy burden"); *Salameh*, 152 F.3d at 113 (a court reviewing the issuance of a search warrant "accord[s] 'great deference' to a judge's determination that probable cause exists[] and . . . resolve[s] any doubt about the existence of probable cause in favor of upholding the warrant"). Accordingly, no *Franks* hearing is necessary and the Court should summarily reject the defendants' argument that the 2011 warrant was devoid of probable cause.

### 2.    2010 Search

As with the 2011 search, Carpenter argues that the affidavit in support of the April 2010 IRS search lacked probable cause. He also contends that the affidavit contained material misstatements and omissions, and he asks the Court to conduct a *Franks* hearing. Tellingly, Bursey has not filed a motion to suppress the 2010 search warrant. As explained below, Carpenter's arguments are without merit and his request for a *Franks* hearing should be denied.

#### a)    The Schrader Affidavit provided probable cause for the search.

The April 2010 search by IRS-CID agents was based on more than enough information to establish probable cause to search 100 GMR. The Schrader Affidavit, which was provided in support of the search warrant application, explains how Nova and its associated entities and individuals were conspiring to impede the lawful function of the IRS and were aiding and assisting in the preparation of false income tax returns through the promotion and administration of abusive 419 welfare benefit plans. SA ¶¶ 3-9. The affidavit provides detailed information obtained from multiple sources, including (i) a cooperating witness and undercover agents, (ii) an agent's review

of tax return information for some participants in the 419 plans, and (iii) monitored telephone calls and face-to-face conversations with representatives of Nova and its entities.   SA ¶¶ 17-59.

As discussed above, the affidavit demonstrates that Nova's 419 plans allow an employer to contribute money to purchase a disability and/or life insurance plan on behalf of an employee and, as a result, lower the employer's taxable income by taking a tax deduction for the contribution. SA ¶¶ 5-7, 12, 19.   The employer contributes the money to a trust administered by Nova, and the trust then purchases an annuity disability plan or life insurance policy from an insurance company. SA ¶ 19.   The trust owns the policy and the covered employee is the plan beneficiary.   SA ¶ 19. With a disability plan, the beneficiary can then obtain the money contributed to the plan, without paying taxes, by claiming minor injuries as instances of permanent disablement and disfigurement. SA ¶¶ 5-7, 20.   Nova approves virtually any disability claim, no matter how frivolous, so that the employee can get money back tax-free.   SA ¶¶ 20, 26-32, 33-36, 37.

In addition, Nova allows the beneficiary to buy out the plan for 10% of the policy's cash value, but Nova does not provide the insurance company with any information about the ownership change.   SA ¶ 20.   Consequently, when the beneficiary then cashes out the policy, he receives a Form 1099 showing little or no income, or he receives no Form 1099 at all, because the insurance company issues the form based on the employer's cost basis, which is the amount the employer contributed, instead of the beneficiary's basis, which should be zero.   SA ¶¶ 5-7, 20. As a result, the beneficiary is able to cash out the policy almost tax-free.   SA ¶ 20.

Agent Schrader provided information indicating that Nova knew the Form 1099s reflected an incorrect basis.   SA ¶¶ 20, 31-46.   Indeed, ███████ counseled agents to take advantage of misleading Form 1099s that are issued by insurance companies when the policies are cashed out because the insurance company has no way to monitor the transaction and know the correct basis.

SA ¶¶ 39-46.   With respect to life insurance plans, ████ described how beneficiaries can borrow money to buy out the plan, that the loan is created in a way to impede the IRS, and that the beneficiary can receive the money from the policy tax-free.   SA ¶¶ 43-46.

The CW explained that the only employees that were covered under the plans s/he helped set up were company principals or their relatives, and the plans were sold as a way to get money out of the company tax-free.   SA ¶¶ 20-21.   In essence, a business is allowed to take a deduction for its contribution and the individual is allowed to get money out of the business without paying taxes.   SA ¶ 20.   The CW also indicated that the 419 plans may not even qualify as a "10 or more employer plan," which allows the employer to deduct the full amount of the contribution without limitation, because Nova accounts for each employer and policy separately, instead of pooling all the contributions and accounting for them as one plan.   SA ¶ 25.

Agent Schrader corroborated the CW with tax return information for nine plans s/he set up, totalling $4 million in contributions, where the employer terminated the plan and the beneficiary then bought and cashed out the policy.   SA ¶¶ 22-23.   In six cases, the employer was able to take a deduction that took its ordinary income below zero for tax purposes.   SA ¶ 23.   In every case except one, the beneficiary had reported little or no income from cashing out the policy because the employer's original cost basis was used, instead of the zero cost basis that should have been used, allowing the beneficiary to evade the payment of taxes.   SA ¶ 23.

The 419 plans were used to impede the IRS and assist in the filing of false tax returns in other ways.   For instance, ████ instructed the undercover agents to backdate enrollment documents for a 419 plan, so they could fund the plan and take a deduction in a prior year.   SA ¶¶ 5-7, 47-49.   ████ did in fact accept the backdated enrollment documents and enrollment fee. SA ¶¶ 47-49.   The affidavit further explains that 419 programs are subject to disclosure

requirements and should be reported to the IRS on Form 8886, but that Nova does not require the form to be filed.   SA ¶¶ 16, 50.   As a result, the IRS is unaware of the 419 plans' participants and cannot monitor if the plans are being used in an abusive manner.   SA ¶ 50.

In addition to Nova, the affidavit also provides probable cause to believe other entities at 100 GMR were involved in the alleged offenses.   SA ¶¶ 18, 24, 51-58.   The CW stated s/he was engaged in selling 419 plans through Nova and its predecessor since 2002.   SA ¶ 18.   The CW provided information showing that Nova and Benistar set up and administered trusts for their various 419 plans, including the Benistar 419 Plan & Trust, Benistar 419 Advantage Plan, SADI, Nova Long Term Care Trust, Nova Life One Plan & Trust, and Grist Mill Trust.   SA ¶ 24.   The CW said s/he set up plans with SADI and that some employers utilized more than one 419 plan. SA ¶ 21.   In addition, shortly after the face-to-face meetings in which ███████ describes how the plans can be used to obtain money tax-free, ███████ sent UCA2 an email with enrollment documents for Nova's Long Term Care Trust.   SA ¶ 58.

The affidavit indicates that Benistar is a third party administrator focused on 419 welfare benefit plans and other services.   SA ¶ 51.   In 2003, Nova Benefit Plans and Benefit Plan Advisors were established, and each company had their own selection of 419 plans.   SA ¶ 51.   ███████ indicated they had a "nice run" of a few hundred million dollars with the Nova Benefit Plans and Grist Mill Trust until the end of 2007.   SA ¶ 51.   At that point, US Benefits Group was created and bought out Benefit Plan Advisors.   SA ¶ 51.   Thus, it stands to reason that US Benefits would have records and information about Benefit Plan Advisors.   According to ███████ US Benefits was created to be a sales and marketing arm for all the companies involved and bring them under one umbrella.   SA ¶ 51.   ███████ also described how employees wear multiple hats, that Nova was basically the same as Benistar, and that the employees at Nova were

33

the same employees that worked for Benistar.  SA ¶ 51.  The affidavit states that tax return information obtained from an IRS database shows 100 GMR as the address on file for Nova, Benistar, Benefit Plan Advisors, and US Benefits Group.  SA ¶ 53.

In short, the affidavit was more than sufficient to reach a "practical common sense decision" that there was a "fair probability" that evidence of the alleged offenses would be found at 100 GMR.  *See Gates*, 462 U.S. at 238.  Notably, the search warrant did not authorize the search and seizure of records related to every entity or business located at 100 GMR, but only for certain specified documents and records maintained by and/or on behalf of entities involved in the 419 plans.  *See* Attachment B to IRS Warrant.

> b)  The defendant's attacks on probable cause are unavailing.

Notwithstanding the detailed information that was provided in the Schrader Affidavit, Carpenter claims that the affidavit lacks any factual foundation to support probable cause.  Doc. 83 at 13-27.  His claims are without merit.

For instance, Carpenter argues that the CW only recounted one instance where Nova approved a disability claim for a small scar as the result of a wart removal and that is not enough to establish a conspiracy to wrongfully approve minor claims.  Doc. 83 at 18.  Carpenter mischaracterizes the CW's statements.  The CW provided information on 14 employers showing clients had disability claims approved that totaled $1 million. SA ¶ 21.  As the affidavit makes clear, the CW was merely providing one "example" of a frivolous injury for the agent when s/he discussed the scar from the wart removal. SA ¶ 20.

Carpenter also argues that the affidavit improperly attributes the approval of illegitimate claims to Nova based on the statements of a single Nova employee, ▓▓▓▓▓▓ Doc. 83 at 14, 16, 19.  What Carpenter ignores, however, are the statements by two other Nova representatives, ▓▓▓▓▓▓ and Bursey, that corroborate ▓▓▓▓▓▓ statements.  As discussed above, ▓▓▓▓▓▓

34

and Bursey were present during the conversation with the undercover agents about the claims approval process.   SA ¶¶ 33-38.   ▮▮▮▮ confirmed that virtually any disability or disfigurement claim would be approved without much scrutiny.   SA ¶ 33.   He also confirmed that Nova has only ever denied one claim.   SA ¶ 35.   Bursey himself stated that it is "very unlikely" that a claim would be denied and that a small scar is sufficient to make a claim.   SA ¶ 36.   These statements were also consistent with the CW's statements.   SA ¶ 20.

Carpenter further claims that the affidavit is "rife" with examples of ▮▮▮▮ indicating that disability benefits must be legitimate and accompanied by a doctor's note. Doc. 83 at 19-20. In fact, ▮▮▮▮ statements are universally consistent with the CW's characterization of Nova's "very loose definition" for what constitutes a legitimate disability or disfigurement.   SA ¶ 30. According to ▮▮▮▮ "To the extent you can't use any of your bodily functions for any period of time" that would be a legitimate claim.   Indeed, ▮▮▮▮ described that when he markets the plans at seminars around the country, he tells people "the best way for you to benefit from the plan is to find a way to get disabled. . . . I am a healthy guy, you know, and I have no issues whatsoever, healthy.   But I have been in two minor surgeries in the last – in the last two years that left me with some scarring.   That would be enough to claim on the plan."   SA ¶ 32.   In a meeting where ▮▮▮▮ and Bursey were present, ▮▮▮▮ even guarantees that any claim submitted will be approved as a disability so that a client can get his money back tax-free.   SA ¶ 37.

Carpenter also argues that the affidavit fails to establish probable cause to believe that Nova or its principals were in a conspiracy to impede the IRS because the government has not established that the purpose or object of the conspiracy was to impede the IRS.   Doc. 83 at 20-23. According to Carpenter, mere collateral effects that have the effect of impeding the IRS do not suffice.   *Id.*   Yet the affidavit is clear that the primary purpose of Nova's 419 plans was to

provide a way for individuals to evade the payment of taxes. The 419 plans at issue were marketed, promoted, and administered to allow employees, primarily the company's principals and their relatives, to take money out of the company without paying taxes, and allow the company to get a deduction to lower its taxes at the same time. Thus, the affidavit provides probable cause to believe that Nova and its representatives were involved in a conspiracy to impede the IRS.

Carpenter further argues there is no evidence that Nova or any of its principals misrepresented any facts directly to the IRS. Doc. 83 at 21-22. Carpenter contends that if third parties, i.e. the plan beneficiaries, submit false information to the IRS either through a questionable disability or overstating the basis in an insurance policy that is cashed out, that does not rise to a conspiracy that includes Nova or its principals. *Id*. In a conspiracy, however, it is not necessary that Nova or its principals make the misrepresentation directly to the IRS. All that is required is that one member of the conspiracy commit an overt act in furtherance of the conspiracy. Here, the conspiracy includes Nova and its related entities and individuals, the brokers that sold the plans, and the employers and beneficiaries that participated in the plans. Even if Nova did not misrepresent facts directly to the IRS, there are plenty of overt acts in furtherance of the conspiracy, including the submission by employers and beneficiaries of false income tax returns. In addition, the affidavit not only alleges conspiracy to impede the IRS, it also alleges that Nova and its related entities and individuals "aided and assisted" the filing of false tax returns, in violation of 26 U.S.C. § 7206(2). SA ¶¶ 3, 70. Thus, whether Nova directly misrepresented facts to the IRS is irrelevant.

Carpenter next contends that there is no evidence that ▮▮▮▮▮ counseled any client to underreport or underpay their tax liabilities. Doc. 83 at 22. To the contrary, there are express conversations where ▮▮▮▮▮ encouraged the agents to take advantage of misleading Form 1099s

because the insurance company has no way to monitor the transaction and know the correct basis. SA ¶¶ 31-46. Further, he coached two undercover agents into submitting backdated documents so they could get a tax deduction in a prior year. SA ¶¶ 47-49.

Finally, Carpenter claims that even if ████████ statement were true, there are no facts to establish that Nova shared the conspiracy's objectives or that any of his statements were endorsed by the organization or even known to the organization or its principals. Doc. 83 at 22-23. As a general matter, an organizational entity such as Nova "can only act through its employees and agents." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (citation omitted). ████████ is a high level salesman in the company who went around the country promoting these plans. Moreover, ████████ and Bursey were present and contributed to the conversations and had firsthand knowledge of ████████ statements. This was more than sufficient for the magistrate to find probable cause that Nova itself was involved. However, even if ████████ was conspiring with others outside of Nova to abuse the 419 plans without Nova's approval, there would still be probable cause to search 100 GMR and seize the specified records for evidence that ████████ used the 419 plans to commit the alleged crimes.

c)      The defendants are not entitled to a *Franks* hearing.

Carpenter is not entitled to a *Franks* hearing based on his unsworn and unsubstantiated claims that the Schrader Affidavit contains material misstatements and omissions. Doc. 83 at 14-16. Carpenter incorrectly contends that the affidavit relies almost exclusively on the statements of a single employee, ████████ Doc. 83 at 14. As shown above, the affidavit relies not only on ████████ statements, but also on statements from a cooperating witness, statements by two other Nova employees, ████████ and Bursey, and information gathered by the agent's own review of tax return information for some of Nova's 419 plan participants.

Moreover, Carpenter has utterly failed to make the threshold "substantial" showing

37

necessary to conduct a *Franks* hearing. *See Martin*, 426 F.3d at 73–74. First, Carpenter's list of purported misstatements and omissions is offered in the form of an unattributed, unsworn exhibit to his memorandum, leaving the Court with no way to assess the personal knowledge and veracity of its author. Doc. 83-4. On this basis alone, a *Franks* hearing should be denied. *See Falso*, 544 F.3d at 125 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished[.]")

Even if Carpenter prepared the exhibit, it is not clearly reliable. Carpenter has repeatedly asserted that he was not an officer or employee of Nova, that he was not an officer any of Nova's affiliates, and that his company merely owned the building at 100 GMR which he claims housed his personal private office. Doc. 83-4 at 14-15. Carpenter thus would have no personal knowledge about the misstatements and omissions listed in the exhibit, which are predominately about Nova's operations and the claims it processed.

Second, Carpenter does not provide any evidence that SA Schrader acted "deliberately." *See Martin*, 426 F.3d at 73–74 (defendant must make a "substantial preliminary showing" that "the false statement or material omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth"); *Souffront*, 338 F.3d at 822 (requiring "direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had obvious reasons for omitting or falsifying facts"). Carpenter does not identify, let alone offer any proof, that SA Schrader knew any of the statements in Doc. 83-4 were false in any way, or that he recklessly disregarded their truthfulness. In fact, given that several of ▮▮▮▮▮▮ statements were consistent with statements made by the CW, ▮▮▮▮▮▮ and/or Bursey, there was no reason for SA Schrader to doubt their veracity. Carpenter's unsupported challenges to the truthfulness of ▮▮▮▮▮▮ statements do not warrant a *Franks* hearing. As discussed, the alleged deliberate falsehood must come from the

affiant, not a non-governmental informant. *Franks*, 438 U.S. at 171; *Navarro*, 767 F. Supp. at 546. Similarly, the defendants do not explain how or why the SA Schrader should have known about any alleged omissions. *See United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993) (rejecting the defendant's argument that probable cause "require[s] an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence") (citations omitted). Accordingly, the defendants' request for a *Franks* hearing should be denied.

**IV.    The 2010 and 2011 Search Warrants Were Sufficiently Particularized and Were Not Overbroad**

**A.    Relevant Law**

Particularity and overbreadth are distinct – though interrelated – issues. Overbreadth refers to "whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause." *United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. January 6, 2010). Put differently, "the issue is whether there exists probable cause to support the breadth of the search that was authorized." *United States v. Dinero Express, Inc.*, No. 99 Cr. 975 (SWK), 2000 WL 254012, at *9 (S.D.N.Y. Mar. 6, 2000) (quotations omitted); *see also United States v. Dupree*, 781 F. Supp. 2d 115, 154 (E.D.N.Y. 2011). As discussed above, determination of probable cause is a "practical, common-sense decision whether, given all of the circumstances set forth in the affidavit…there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 239. Such determinations by an issuing magistrate are entitled to "great deference," *id*., and "doubts should be resolved in favor of upholding the warrant," *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993).

Where a warrant identifies categories of documents to be seized, the Government need

only show that those categories are "reasonably related to the alleged criminal activity and their seizure justified by the affidavit." *Hernandez*, 2010 WL 26544 at *8. Moreover, just because supposedly "innocent" records may be called for by a warrant does not render that warrant invalid, especially where the records are relevant to the context of a complicated fraud. *United States v. Cohan*, 628 F. Supp. 2d 355, 364 (S.D.N.Y. 2009) (finding warrant not overbroad that called for seizure of fraudulent and non-fraudulent patient files, where the non-fraudulent would provide additional circumstantial evidence of the scheme); *see United States v. Diaz*, 841 F.2d 1, 3-4 (1st Cir. 1988) ("We recognize . . . that there is insufficient [evidence in the affidavit] to implicate any USDA inspector other than Matos. [However], it seems obvious that mere partial knowledge of what was purchased (e.g., only [records pertaining to] lots inspected by Matos) would be insufficient to show [the fraud]."); *United States v. Blumberg*, No. 3:97-CR-119 (EBB), 1998 WL 136174, at *7 (D. Conn. Mar. 11, 1998) ("[L]egitimate business records are also material to a reconstruction of the methodology and extent of such a complex scheme."); *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("[M]aterial evidence of criminal activity is not necessarily limited just to evidence describing the criminal activity, particularly in complex tax fraud cases. In order to reconstruct defendants' true financial and tax picture, evidence regarding legal as well as illegal transactions may be necessary."); *United States v. Hershenow*, 680 F.2d 847, 853 (1st Cir. 1982) (warrant authorizing search and seizure of doctor's records depicting both legal and illegal practices held permissible "in order to get a complete picture of a patient's case").

Particularity, on the other hand, asks "whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *Hernandez*, 2010 WL 26544 at *7 The particularity requirement of the Fourth Amendment

"guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976).

While a warrant must reasonably channel the discretion of those charged with executing it, *see*, *e.g.*, *Riley*, 906 F.2d at 844; *United States v. Young*, 745 F.2d 733, 759-760 (2d Cir. 1984), courts have never required precise specification of every item to be seized, *see*, *e.g.*, *United States v. Burke*, 718 F. Supp. 1130, 1143 (S.D.N.Y. 1989) (noting that the Second Circuit has approved of "warrants with quite broad language"); *Dinero Express*, 2000 WL 254012 at *8 ("the Fourth Amendment does not require that every item or document to be seized be specifically identified within the warrant"). Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.2d at 844-45.

The fact that a warrant calls "for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity." *United States v. Sugar*, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985). "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to uncover, and have insured that all those facts were included in the warrant." *United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987). This is true especially in fraud cases, where "business records are often incapable of being itemized one by one, particularly when their existence, but not their precise names or quantity, is all that is known." *United States v. Zanche*, 541 F. Supp. 207, 210 (W.D.N.Y. 1982).

Indeed the Second Circuit, like most others, has approached particularity and overbreadth differently in complex fraud cases, holding that where "there was probable cause to believe that [a] business was permeated with fraud . . . the agents could properly seize all of the business records." *National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980); *accord United States Postal Service v. CEC Services*, 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements"). "In order to fall within the 'all records' exception, it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'" *Burke*, 718 F. Supp. at 1139-40 (quoting *United States v. Offices Known as 50 State Distributing Co.*, 708 F.2d 1371, 1372-75 (9th Cir. 1983)) (quoting *United States v. Brien*, 617 F.2d 299, 308 (1st Cir. 1980)).

In truth, the all records "exception" is less an exception than "a recognition that a warrant – no matter how broad – is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based." *United States v. Bowen*, 689 F. Supp. 2d 675, 683 n.6 (S.D.N.Y. 2010) (citations omitted). Nowhere is this more evident than in fraud cases, where "[t]he degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated." *Regan*, 706 F. Supp. at 1113; *see also Coban*, 628 F. Supp. 2d at 362 ("It also bears noting that here, as in *Andresen*, the charged offense is a "complex . . . scheme whose existence could be proved only by piecing together many bits of evidence," not a straightforward crime such as drug possession where the types of evidence that will be relevant

are few and obvious) (quoting *Andresen*, 427 U.S. at 482 n.10); *United States v. Abboud*, 438

F.3d 554, 575 (6th Cir. 2006) ("In a business fraud case, the authorization to search for general

business records is not overbroad.").

**B.      Analysis**

Here, the affidavits underlying both warrants demonstrated probable cause to support the

requested search parameters set forth in the warrants, and those parameters were sufficiently

particular under the circumstances of each case.   The defendant conveniently ignores significant

and meaningful restrictions on the types of material permitted to be seized under each warrant, and

cite to cases that disapprove warrants under markedly different circumstances than here.

1.      2011 Search

a)      The warrant was not overbroad

The 2011 search was supported by an affidavit that set forth probable cause to show that

the COT was "permeated by fraud." *National City Trading Corp.* 635 F.2d at 1026.   The affidavit

– indeed, this entire prosecution – is premised on the notion that the COT was a scheme by several

enumerated targets, including Carpenter and Bursey, to operate a STOLI scheme whereby they (or

their associates) solicit individuals to purchase life insurance through the COT; submit materially

false insurance applications on the insureds' behalf; compensate the insureds by financial

incentive; and sell the policies following the contestability period.   AA ¶ 34.   The pervasiveness

of the fraud, moreover, is supported by more than conclusory assertions.   In fact, SA Allen states

that she reviewed 80 insurance policies in the COT, and that *all 80* were fraudulent, in that they all

involved misrepresentations to the insurers that the policies were not being financed through third

parties.   AA ¶ 47.   Moreover, SA Allen found that nearly half of the policies older than two years

already had their ownership transferred – remarkable given that the COT only began in October

2006.   AA ¶ 47.   The affidavit provided specific information regarding the sale of several of

those policies.   AA ¶¶ 105-112.   Far more than just the "tip of the iceberg," the evidence in the affidavit leaves little doubt of the extent of the alleged fraud.   *See Burke*, 718 F. Supp. at 1140 (noting that evidence of the extent of the fraud "could consist of a large number of fraudulent transactions or of documentation -- in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation -- that the entire operation is a scam").

Given the pervasiveness of fraud within the COT, the categories of items to be seized were appropriately tailored to reflect the probable cause to seize records related to the COT.   This was not a warrant that simply permitted the seizure of all records at 100 GMR, 300 FSP, or on any of the seized computer images.   Rather, the breadth of the warrant is limited in three distinct ways – by specific entities and people, by time period, and by categories of documents.   *See* Attachment D.   Moreover, these limitations are collective, i.e., a document must fall within the temporal restriction, must relate to a specified individual or entity, *and* must fall within one of the enumerated categories of documents in order to be covered by the warrant.

First, the temporal scope is straightforward – it limits the seizure of documents from 2006 to the present.   This is appropriate given that the COT was initiated in 2006, and the Allen Affidavit alleged that it was continuously in operation through the time of the warrant.

Second, the affidavit sets out in detail how each of the individuals and entities relate to the COT and its fraud scheme.   With regard to the target individuals, the affidavit explicitly alleges that they are the operators of the scheme.   AA ¶ 34.   More specifically:

- Carpenter was authorized to request advances under the Ridgewood loan to GMC, AA ¶ 15; he signed commitment letters with Ridgewood on behalf of GMC, in order to fund the COT policies, AA ¶ 44; and he accepted DAC agreements on behalf of GMC memorializing the loan between the COT and GMC in order to fund individual COT policies, AA ¶¶ 54, 63, 91, 100.

- ▮▮▮▮▮ signed one of the versions of the COT Trust Declaration as Manager of GMC, AA ¶ 10; he has a small capital interest in GMC, AA ¶ 13; he signed the credit agreement with Ridgewood on behalf of GMC and Avon, and was authorized to request advances, AA ¶¶ 15, 41; he signed a Line of Credit Grid Promissory Note with Ridgewood as Manager of GMC and Member/Manager of Avon, AA ¶ 42; he signed an Amended and Restated Line of Credit Grid Promissory Note as Manager of Grist Mill Capital, LLC, and Avon Capital, LLC, AA ¶ 43; his name was on policies and documents as a principal of Avon in connection with the policy sales to ISM, AA ¶ 109; he communicated with others via e-mail regarding the fraud scheme, AA ¶¶ 119, 120; and he was a primary contact with Ridgewood in connection with policy funding, AA ¶ 120.

- ▮▮▮▮▮ was authorized to request advances under the Ridgewood loan to GMC, AA ¶ 15; he met with an individual at 300 FSP in order to show insurance policies owned by the COT, AA ¶ 22; he received commissions on COT policies under TPG Group, AA ¶ 103; he represented himself as a principal of Avon in order to negotiate the sale to ISM of several insurance policies, including several COT policies, AA ¶¶ 106-109; and he was the contact on change of ownership forms for other COT policies that were transferred to the Avalon I Trust, AA ¶ 110-11.

- ▮▮▮▮▮ was listed as insurance agent on COT-related premium notices that were sent to 300 FSP and its predecessor office in Stamford, AA ¶¶ 16, 18; he signed several COT insurance applications and forms bearing misrepresentations regarding the funding of insurance policies, AA ¶¶ 49, 51, 57, 58, 72, 73; he sent misleading e-mails to insurance company representatives related to COT policies, AA ¶¶ 50, 76; he wrote misleading memoranda to insurance companies concerning prospective COT insureds, AA ¶¶ 59, 74; he signed DAC agreements acknowledging the funding arrangement between GMC and COT, AA ¶ 54, 63; he received millions of dollars in commissions from COT policies, both in his own name and through TPG Group, AA ¶ 103; and he used e-mail to communicate with others regarding the fraud, AA ¶¶ 119, 121-26.

- Bursey signed a version of the COT Declaration of Trust, as well as the Declaration for COT 2009, as President of Nova Group, the Plan Sponsor and Administrator, AA ¶¶ 11, 12; he signed the Secretary's Certificate on the Ridgewood credit agreement as a manager of GMC and Avon, and was one of the parties permitted to request an advance under the credit facility, AA ¶ 15; he signed numerous COT insurance applications and other forms bearing false information that were sent to insurance companies, AA ¶¶ 49, 51, 58, 66, 72, 87, 97; he signed change of ownership forms for policies within the COT that were disposed of following contestability, AA ¶¶ 110-12; and he communicated with others regarding the COT through e-mail,   AA ¶ 119.

- ▮▮▮▮▮ signed and/or was listed as insurance agent on several COT insurance

applications and other forms that included misrepresentations, AA ¶¶ 67, 68, 88, 98; and he received millions in commissions in his own name or with ▮▮▮ and ▮▮▮▮, AA ¶ 103-104.

- ▮▮▮▮▮▮▮ were associated with COT applications and insureds that came through ▮▮▮ & Company. ▮▮▮ signed and/or was listed as insurance agent on several fraudulent COT insurance applications through "▮▮▮ & Company," AA ¶¶ 66-68, 80-81, 87-88, 93-94, 97-98; he signed DAC agreements memorializing loans between COT and GMC, AA ¶¶ 91, 100; and he received $1.6 million in commissions on the 16 COT policies he sold, AA ¶ 104. ▮▮▮ sent and/or faxed applications and other reports or communications on behalf of ▮▮▮ & Company. AA ¶¶ 80, 90, 93. ▮▮▮▮, operating from ▮▮▮ address, assisted in the registration of businesses for people who wanted to participate in the COT, AA ¶¶ 70, 84; and he signed off on a financial statement for a COT applicant under ▮▮▮ AA ¶ 90.

Similarly, the affidavit clearly sets out in detail how each of the subject entities related to the COT. Each of the entities is related to Benistar Amin. Services Inc., an administrator of health and welfare benefit plans. AA ¶ 8. However, the warrant does not ask to search for records related to BASI. Rather, it specifies the COT and other BASI-related entities that are connected to the COT. With regard to those other entities:

- Nova Group was listed as Plan Sponsor and Administrator on versions of the COT and COT 2009 Declarations of Trust, AA ¶¶ 11, 12, 37, 86; it is listed as Plan Sponsor in a legal opinion letter from September 2009, AA ¶ 38; and it was used to transmit at least one fraudulent COT application to an insurance company, AA ¶ 101.

- GMC, was listed as Plan Sponsor and Administrator on one version of the COT Declaration, AA ¶¶ 10, 37; it owned 100% of Avon Capital, AA ¶14; GMC (and Avon) took a $35 million line of credit from Ridgewood in order to fund GMC's loans to COT to pay insurance premiums, AA ¶¶ 15, 41-43; it had a bank account at Christiana Bank & Trust Company ("Christiana"), and numerous COT Adoption Agreements were submitted to Christiana for the employers of the insureds, AA ¶ 39; it agreed, through Carpenter, to commitment letters whereby Ridgewood made loans against the line of credit to GMC to then loan to COT for insurance premiums, AA ¶¶ 44, 55, 64; it agreed, through Carpenter, to DAC agreements memorializing a funding agreement under which GMC funded the payment of premiums by COT, AA ¶ 45; based on bank records, it in fact sent money to COT to pay insurance premiums, either with money it borrowed from Ridgewood, its own assets, or assets of one of the other BASI-related entities, such as Avon, AA ¶ 46, 56, 65,

71, 92, 102; and it was represented in e-mails by other targets and subjects related to the funding of COT premiums by Ridgewood, AA ¶ 120.

- Grist Mill Holdings LLC owned 98% of GMC, with the remainder owned by ▮▮▮▮ and Caroline Financial Group.

- Avon was owned 100% by GMC, AA ¶ 14; Avon, together with GMC, entered into the $35 million credit agreement with Ridgewood that funded premiums in the COT, AA ¶¶ 15, 41-43; GMC funded certain COT premiums with money taken from an Avon bank account, AA ¶ 71; and ▮▮▮▮ sold a number of policies to ISM Advisors, including COT policies, while representing himself as a principal of Avon and that Avon owned the policies for sale, including the COT policies, AA ¶¶ 106-109;

- Benefit Plan Advisors was a BASI entity used to submit COT cases from 100 GMR to insurance companies. AA ¶¶ 66, 86, 96.

- TPG Group was a BASI entity used to receive commissions on COT policies. AA ¶ 103.

Finally, when limited by the time period, individuals, and entities discussed above, the categories of documents to be seized are appropriately tailored to the probable cause provided by the warrant. More specifically:

- Paragraphs a through d and j through l permit seizure of financial related documents for the period from 2006 to the present for the targets and the subject entities, specifically books and records (paragraph a), tax and other IRS or U.S. Treasury forms (b and c), financial statements (d), bank records (j), loan records (k), and billing records (l). Given the financial nature of the scheme, it is eminently reasonable to look for and seize documents that will evidence the movement of money through and by the various entities and individuals. *See Blumberg*, 1998 WL 136174, at *7 ("[L]egitimate business records are also material to a reconstruction of the methodology and extent of such a complex scheme."); *Regan*, 706 F. Supp. at 1113 ("In order to reconstruct defendants' true financial and tax picture, evidence regarding legal as well as illegal transactions may be necessary."). With regard to the entities involved, the affidavit shows an intricate web of ownership, e.g., Grist Mill Holdings and Caroline Financial own GMC, which in turn owns Avon. This is made even more complex by an overlay of financial dealings, e.g., Avon, which is owned by GMC, entered into the Ridgewood line of credit with GMC, but then also independently provided money to GMC for payment of other premiums. Notably, this set of financial categories of documents does not request all records – though it likely could, in light of the intricacy of these dealings – but only financial records for the years of

47

the operation of the COT. Similarly, the personal financial records are equally appropriate under the circumstances. As Carpenter is the "managing member" of GMC, Bursey is the President of Nova Group and thus sponsor of the COT, and various others receive millions of dollars in commissions from working with the COT, it is highly relevant to understand the financial picture of each individual for the years in question. To the extent that an individual's tax return may also show income from non-COT sources, it does not vitiate the relevancy of the document itself. Indeed, just because supposedly "innocent" records may be called for by a warrant does not render that warrant invalid. *See Cohan*, 628 F. Supp. 2d at 364. Again, these categories do not – as the defendant seemingly suggests – authorize the seizure of all records for all entities.

- Paragraphs e-h, m, and n are broader in the types of documents permitted to be seized, but much narrower in subject matter. Indeed, these categories are limited to documents related to COT, including employer payments (e), insurance policy records (f), correspondence regarding the COT (h), and the relationship between the COT and the named individuals and entities (m and n). Given that the COT was pervaded by fraud, it was perfectly reasonable for the Magistrate to permit a broader seizure of COT documents. *CEC Services*, 869 F.2d at 187 ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements"). Similarly, the seizure of Ridgewood related documents (paragraph g) was reasonable given that Ridgewood was an outside funder of the COT, and thus its dealings with the subject individuals and entities are highly relevant to the fraud scheme.

- Paragraph i, which calls for the seizure of documents related to the transfer of ownership of insurance policies for the period 2006 through the present, related to the subject entities and targets, is also reasonable. Whereas other insurance-related categories narrowed their focus to COT only, the evidence in the affidavit regarding policy sales showed that such a limitation would be inappropriate. Indeed, the evidence of the sale of COT policies shows that they were intermingled with other policies as they were being offered for sale by ▮▮▮▮▮ and that the purchaser did not receive information about how the COT policies came to be owned by Avon. In light of that, it was reasonable to authorize a broader category of documents, while still restricting it by the time period and entities that were otherwise related to COT. Even to the extent that some of the transferred policies may not be fraudulent, those records would help "[make] the fraudulence of *other* records clear." *Cohan*, 628 F. Supp. 2d at 364.

- Paragraphs n and o merely seek evidence of ownership of the computer systems and use of the Internet in a case where there is much evidence that the targets and entities communicated and stored documents electronically. Neither paragraph provides authority to seize anything substantive.

- Similarly, paragraph q does not itself authorize the seizure of any substantive categories of documents, but rather gives effect to Rule 41's provision permitting off-site review.

b) The warrant was sufficiently particular

In light of the breath of the probable cause here, the warrant "was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." Hernandez, 2010 WL 26544 at *7. As discussed at length above, the warrant was limited by three critical parameters – date range, specific individuals and entities, and categories of documents of varying breadth. These categories clearly met the "standard for constitutional particularity," i.e., that the warrant was "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." Regan, 706 F. Supp. at 1110 (quoting United States v. LaChance, 788 F.2d 856, 874 (2d Cir. 1986)).

That the warrant authorizes a search for several categories of documents, some broader than others, is not itself evidence of lack of particularity. See Dinero Express, 2000 WL 254012, *8 ("The validity of a warrant is not affected by the fact that a vast amount of material falls within its scope."). Rather, because the affidavit contained probable cause that the COT was permeated by fraud, and the breadth of the warrant tracked reasonably the information provided by the affidavit, the warrant is legitimate precisely because "its scope [did] not exceed the probable cause upon which it is based." Bowen, 689 F. Supp. 2d at 683 n.6.

c) The defendant's arguments to the contrary misread the affidavit and misapply the law

The defendants' motions and memorandum[8] misconstrue the scope of the warrant, ignore the breadth of the probable cause in the affidavit, cite to a laundry list of distinguishable cases, and

---

[8] Bursey filed a motion to suppress the fruits of the 2011 warrant and then incorporated by reference Carpenter's memorandum. Doc. 72. As the Bursey motion makes no arguments outside of those made by Carpenter, the Government will refer primarily to Carpenter's filings.

are devoid of any actual analysis applying the law to the facts. First, likely recognizing that the warrant is highly particularized on its face, Carpenter attacks its particularity and breadth by attempting to misconstrue and misstate its terms. Specifically, he attempts to mischaracterize Attachment D as broader than it actually is by repeatedly ignoring – or even denying – the restrictions placed on the scope of the warrant by its first paragraph, which limits the material to be seized by time frame and designated individuals and entities. *See* Doc. 81 at 15-16 (fails to reference limiting paragraph and claims categories by themselves authorize seizure of "virtually every document on the premises"); 18-19 (claims paragraph o permitted seizure of materials "without any limitation as to time period or subject matter"); 22 (claiming paragraph a was overbroad, again failing to reference the limiting paragraph).

Carpenter similarly misstates the breadth of the warrant's individual categories. For example, his claim that paragraph h authorizes the seizure of "virtually every email message ever generated by any employee" is belied by the restriction, on its own terms, to emails related to the COT and to the specified time frame. *See* Doc. 81 at 19. Likewise, he wholly misquotes paragraph o – he claims that it authorizes the seizure of "all appointment books, diaries, calendars, message logs, and other documents used to record schedules, meetings, conversations or other events," and claims that it does so "*without any limitation as to time period or subject matter*." Doc. 81 at 19 (Carpenter's emphasis). In truth, paragraph o authorizes the seizure of "records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries and reference materials," and is again limited by time frame, entities, and individuals.

His attack on paragraph q, which he claims authorizes the seizure of all computer evidence without limitation, is even more specious. *See* Doc. 81 at 23. Again, rather than acknowledge

the significant restrictions in the first part of paragraph q, he moves directly to subsection (i).   In fact, paragraph q provides no independent basis for the search, and instead facilitates the search of electronic media for the evidence discussed in the rest of the attachment: "In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review…."   Indeed, this section simply gives effect to Rule 41's authorization for off-site review of electronic media, without the time restrictions placed on the execution. *See* Fed. R. Crim. P. 41(e)(2)(B).

Given Carpenter's mischaracterization of the warrant, it is not surprising that he also fails to analyze in any meaningful way the probable cause underlying its scope.   Indeed, although the defendant makes conclusory allegations regarding probable cause, *see* Doc. 81 at 21, he never actually tells this Court why there is no probable cause to support the breadth of the designated categories, nor why the cases he lists are at all comparable to the facts here.   In fact, the defendant cites a mix of particularity and overbreadth cases – he appears to conflate the two – all of which are eminently distinguishable.   *See*, *e.g.*, *United States v. Kow*, 58 F.3d 423, 427-28 (9th Circ. 1995) (declined to apply "permeated with fraud" doctrine where affidavit focused on violence against employee, not the business fraud); *United States v. Maxwell*, 920 F.2d 1028, 1033 (DC Cir. 1990) (not enough probable cause in a three-page affidavit to support an all records seizure, but finds good faith); *United States v. Center Art Galleries*, 875 F.2d 747, 750 (9th Cir. 1989) (search of all art gallery records overbroad where affidavit only implicated forged Dali paintings); *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988) (cannot extrapolate from one transaction to broad illegal export scheme).

The defendant also cites to three 30-year-old First Circuit cases that – aside from being distinguishable on their facts – pre-date the development of fraud-specific particularity and

overbreadth cases. *See United States v. Abrams*, 615 F.2d 541, 545 (1st Cir. 1980), *United States v. Lafayette Academy*, 610 F.2d 1, 3 (1st Cir. 1979); *United States v. Roche*, 614 F.2d 6 (1st Cir. 1980). As the concurrences in two of those cases acknowledge, the advent of document-intensive fraud cases would likely change courts' approaches to particularity. *See Abrams*, 615 F.2d at 549 (Campbell, J., concurring) (Noting that "[t]he law is still largely unformed in this difficult area" and citing "the development of the Xerox machine, the growth of white-collar fraud, and the accompanying explosion of paper" as well as the Supreme Court's then-recent decision in *Andresen*); *Lafayette Academy*, 610 F.2d at 7 (Kunzig, J., concurring) ("In this era of expending white collar fraud, it may be that future court decisions will tend toward narrower interpretations of Fourth Amendment protections in this type of situation. I would hope so."). Indeed, this ground shift was just beginning in this circuit at that time, with *National City Trading Corp* in 1980, and was not truly formed until *C.E.C. Services* in 1989.

As the defendant offers no substantive attack on the probable cause underlying the breadth of the warrant, he is left with a meaningless particularity challenge. *See Bowen*, 689 F. Supp. 2d at 683 n.6 ("a warrant – no matter how broad – is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based"). Indeed, since there is clearly probable cause to seize each of the categories of material, the only remaining question is whether those categories were "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *Regan*, 706 F. Supp. at 1110 (quoting *LaChance*, 788 F.2d at 874. They clearly are.

The defendants' attempt to invoke this circuit's recent decisions in *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013), and *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), is misplaced and again based on a mischaracterization of the warrant here. In *Galpin*, 720 F.3d at

447, the court found insufficiently particular a warrant that, in a case where the probable cause was limited to a sex offender internet registration offense, authorized a non-specific search of electronic devices for that offense as well as "evidence of NYS Penal Law and Federal Statutes," and provided no other restriction on the executing agent. Similarly, in *Rosa*, 626 F.3d at 58, the court found insufficiently particular a warrant that – in a case that involved specific allegations of sex offenses, child pornography, and firearms offenses – permitted a search for evidence of any criminal offense, again with no other direction to the executing agent as to what he or she would seize. Although the defendant would have this Court believe that the warrant here is similarly vague, that is simply not the case. *See* Doc. 81 at 5 (claiming "almost all of the computers were either seized or copied, all to be searched in their entirety – *without any limit* – at the distraction of law enforcement agents and without any particularization…"). Rather, the Government's seizure or imaging of a portion of the computers from 100 GMR or 300 FSP was squarely within the well-established guidelines for off-site review permitted by Rule 41. The defendant's hyperbole aside, the agents here are directed in that review by much more than the unfettered discretion allowed by the warrants in *Rosa* and *Galpin*. As discussed at length above, the categories are highly particularized and directed the executing agents not just to particular categories of documents, but further directed them to seize those categories only related to a particular time frame, entities, and individuals.

Moreover, *Galpin* and *Rosa* are further distinguishable in that they are outside of the line of fraud-related cases that treat particularity more broadly where there is probable cause to believe that an enterprise is permeated by fraud. *See C.E.C. Services, Inc.*, 869 F.2d at 185. In such cases, courts have found sufficiently particular categories of documents related to the particular enterprise, regardless of whether the warrant specifically references the crime under

investigation.  *See C.E.C. Services, Inc.*, 869 F.2d at 185 (approving a warrant that had no reference to the crime charged, but called for the seizure of broad categories of records related to a particular enterprise); *United States v. D'Amico*, 734 F.Supp.2d 321, 364 (S.D.N.Y. 2010) (approving a fraud-related warrant without reference to crime, and observing that "there is no constitutional requirement that a warrant must specify the crime for which a search is being conducted"); *Dinero Express*, 2000 WL 254012 at *8 (approving warrant for several categories of records, with no reference to crime, and noting "the Court is confident that an agent can rationally understand and implement these terms") (quotations omitted).  Indeed, the terms of the warrant here are clear; any rational agent could – and in fact did – follow them.

        2.    <u>2010 Search</u>

        a)    The warrant was not overbroad.

Like the 2011 search, the 2010 search was also supported by an affidavit that set forth probable cause to show that the Nova-related 419 plans were "permeated by fraud." *National City Trading Corp.* 635 F.2d at 1026.   As is discussed at length in the previous section, the Schrader Affidavit provided evidence that Nova Benefit Plan Advisors, Benistar, and Benefit Plan Advisors – among other entities – existed to promote and administer a series of abusive IRC § 419 plans, i.e., plans designed to circumvent IRS rules and regulations.  SA ¶ 6.   Those plans were specifically designed and operated to defraud the IRS in three ways – by allowing an employer a tax deduction from plan contributions, but permitting employees to gain access to that money, tax-free, through frivolous injury claims; by allowing the beneficiary to cash-out of a plan without paying the appropriate taxes; and encouraging participants to backdate enrollment documents in order to take undeserved deductions in a prior year.  SA ¶ 5.   The affidavit makes clear that these aspects of the scheme were not simply ancillary benefits, but the essence of the sales pitch made by ▮▮▮▮▮▮ *see*, *e.g.*, SA ¶ 31 ("now again, it is in our best interest to pay out claims because it

makes us look more like a legitimate welfare benefit plan"), and by the CW to his clients, SA ¶ 22 ("the CW sold the 419 plans to his clients as purported disability plans with the ability to get money out tax free"). Since the beneficiaries were typically the employers' principals or their relatives, it is clear that the 419 plans were nothing more than illegitimate ways for those principals to extract money from their businesses tax-free. SA ¶ 22. Moreover, even the 419 aspect of these plans may be fraudulent, as the manner in which the employers are accounted for is contrary to the requirements of the IRC. SA ¶25.

Nor is the probable cause in the affidavit limited to one specific 419 plan. Rather, the evidence in the affidavit was that these plans were promoted generically. *See*, *e.g.*, SA ¶ 21 ("some of [the CW's client] employers utilized more than one 419 plan"); SA ¶ 24 ("the CW provided information that Nova and Benistar set up and administered various trusts for their plans"); SA ¶ 27 ("in essence what we do here are welfare benefit plans that are basically established under Code Section 419 and 419(a)"). The CW identified several specific plans, but acknowledged that this was not necessarily the entire universe. SA ¶ 24.

The information in the affidavit was not based upon a single transaction or event, but upon information and records of numerous transactions and undercover communications with people inside Nova. *See Burke*, 718 F. Supp. at 1140 (evidence of the extent of the fraud "could consist of a large number of fraudulent transactions or of documentation -- in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation -- that the entire operation is a scam"). The CW provided information on 14 clients whom s/he assisted in setting up Nova/Benistar 419 plans, in some cases more than one per employer. SA ¶ 21. SA Schrader examined the tax records for the CW's clients and found that in all but one of the 14 cases "due to the improper [cost] basis, the individuals were able to evade the payment of taxes

on the money they received from cashing out their policies." SA ¶ 23. In explaining to the UCAs and the CW how to avoid paying taxes at termination, ███████ said, "we've done thousands of these, basis is the same." SA ¶ 45. Similarly, ███████ told the UCAs that between Grist Mill Trust and Nova Benefit Plans, they had a "few million dollar run." SA ¶51.

Moreover, the fraud was not propagated by one isolated employee, but by a high-level salesman (███████ in the presence and/or with the assistance of Bursey – the trustee and administrator – and other Nova employees. SA ¶¶ 26, 29, 37. For example, in a meeting where ███████ and Bursey were present, ███████ guaranteed that any claim submitted will be approved as a disability so that a client can get his money back tax-free. SA ¶ 37. Moreover, Nova and its related entities were able to hide their malfeasance by failing to file required IRS forms. *See* SA ¶ 50.

In sum, this was a complex tax avoidance scheme, run across multiple trusts and promoting entities, where the central objective of the trusts was a fraud. In such a case, it is wholly appropriate to seize broad sets of records of the relevant enterprises. *See C.E.C. Services*, 869 F.2d at 185 (approving warrant calling for seizure of, among other things, "business, personnel, and financial records of the entities named herein"); *D'Amico*, 734 F. Supp. 2d at 358 (approving warrant authorizing the seizure of, among other things, "all documents related to American Blast, Ltd.," and "computers, computer storage, and files…").

That said, this was far from a general warrant in that it carefully limited its scope to "the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6. Indeed, as with the 2011 warrant, the 2010 warrant does *not* ask for all records present at 100 GMR or 300 FSP. Rather, the breadth of the warrant is limited in three distinct ways – it must be maintained by or on behalf of an entity or trust that "promote[s], administer[s], or utilize[s] 419 plans," it must be

within the time period 2004 to 2010, and it must fall within one of several enumerated categories of documents. *See* Attachment B. Moreover, these limitations are collective; i.e., a document must fall within the temporal restriction, must come from a specified entity, and must fall within one of the enumerated categories of documents in order to be covered by the warrant.

First, the temporal restriction on the material – 2004 and forward – was reasonable and supported by the affidavit. In fact, it likely restricted the warrant further than was necessary according to the probable cause. Indeed, the affidavit made clear that Benistar began in 1994, started the Benistar 419 Plan in 1997, and Nova Benefit Plans and Benefit Plan Advisors came into being with their own 419 plans around 2003. SA ¶ 51. Thus the period 2004 to the present was well within the timeframe of the fraud.

Second, there was clearly probable cause to believe that the various entities and trusts in the introductory paragraph of Attachment B were involved in the operation of 419 plans. Specifically:

- Nova Benefit Plans, LLC ("Nova"), Benistar, Benefit Plan Advisors, and US Benefits Group are all entities that operated out of 100 GMR and that were responsible for the operation of the various fraudulent 419 plans. Benistar was the original 419-promoting company at 100 GMR that was founded in 1994, and went out of business in 2005 as the IRS began to apply pressure because of the plans it was selling. SA ¶¶ 51, 52. Nova was created in its place, with the same employees and business. SA ¶ 52. Nova and Benefit Plan Advisors each had their own selection of 419 plans. SA ¶51. In response to new regulations in 2007, US Benefits Group was created to buy out Benefit Plan Advisors and "to be a sales and marketing arm for all the companies involved and bring all of the companies under one umbrella." SA ¶ 51. Employees work interchangeably with the various 419 companies. SA ¶ 51 ("We used to walk into a meeting and, you know, depending upon who we are, give you a Benefit Plan card or a NOVA card or a US Benefits card or, I literally have eight cards ... "). In sum, it was eminently reasonable to find probable cause that all of these entities were primarily involved in the promotion of 419 plans.

- Benistar 419 Advantage Plan, Benistar 419 Plan & Trust; NOVA Sickness, Accident, Disability, and Indemnity Trust ("SADI"), NOVA Long Term Care Trust,

NOVA Life One Plan & Trust, and Grist Mill Trust are all 419 plans and trusts identified in the affidavit as being run by the various 419-promoting entities at 100 GMR.   SA ¶ 24.

•       The warrant also authorizes seizure related to "and any other trusts, businesses or entities that promote, administer, or utilize 419 plans."   Although the CW was able to articulate the names of some of the 419 plans, the affidavit made clear that this list was not exclusive.   Moreover, as described above, the scheme related to the operation of 419 plans in general from 100 GMR.   Thus it was reasonable at that point of the investigation to presume the possibility of additional 419 plans other than those that the CW could specifically name.   *See Buck*, 813, F.2d at 590 ("Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to uncover, and have insured that all those facts were included in the warrant.").

Finally, when limited by the time period, individuals, and entities discussed above, the categories of documents to be seized are appropriately tailored to the probable cause provided by the warrant.   More specifically:

•       Paragraphs 1 and 2 relate specifically to clients and participants of the 419 plans, including client files, enrollment documents, termination documents, claim documents, and correspondence (1), and the investment of funds from clients (2).   These records are at the core of the scheme, and are directly relevant to showing whether particular clients evaded taxes and to what degree.

•       Paragraphs 3, 4, 6, and 7 relate to the operation of the trusts and promoting entities, as opposed to the clients – trust documents and financial records (3), bookkeeping and financial records (4), income and expense records (6), and corporate records (7).   In that the 419 plans are promoted as abusive tax shelters, these records will show how the trusts and promoting entities are set up, how they make money, and how money from clients is utilized.

•       Paragraph 5 authorized the seizure of client loan records.   [redacted] described to UCA 2 how Nova utilizes loans from insurance policies in 419 plans in order to allow the participant to get access to the value of the policy without paying taxes.   SA ¶ 43.

•       Paragraph 8 authorized the seizure of legal opinions regarding 419 plans.   The existence and use of such legal opinions was evidenced in the affidavit, which notes that "they were routinely included in promotional literature."   SA ¶ 18 n.1.

- Paragraph 9 and 10 authorized seizures related to promotion of 419 plans, including promotional materials (9) and communications with brokers and middlemen (10). Indeed, much of the affidavit discusses the way in which the 419 plans are promoted as abusive tax shelters.

- Paragraph 11 calls for the seizure of communications, including e-mail, between employees, clients, insurance companies, brokers, and related parties. The affidavit makes clear that e-mail and other forms of communication were commonly used in furtherance of the scheme. *See*, *e.g.*, SA ¶¶ 41 (referencing e-mail from ▇▇▇▇ to CW), 58 (referencing e-mails between ▇▇▇▇ CW, and UCA2).

- Paragraph 12 called for appointment records for the various 419 entities. As the affidavit makes clear that the essence of the scheme was to sell 419 plans to prospective clients, appointment records are highly probative of, among other things, which employees met with which brokers or clients, when, and how often.

- Paragraph 13 calls for seizure of IRS publications, which are relevant to showing the knowledge, and willful avoidance, of the IRS rules.

- Paragraphs 14, 15, and 16 relate to electronic media. Paragraph 15 authorizes the seizure of computer devices (but not data or information) maintained by the various entities, but provides no independent basis to search those devices. Paragraph 14 then authorizes the search of data from the seized devices for material described in paragraphs 1-13. Finally, paragraph 16 authorizes the seizure of programs or instruction manuals, but also does not provide any substantive basis for a search. ▇▇▇▇ in providing a tour to the UCAs of 100 GMR, pointed out numerous computer workstations and a server room. SA ¶ 57.

### b) The warrant was sufficiently particular

As with the 2011 warrant, the 2010 warrant authorized the seizure of an extensive list of material that was clearly articulated and limited according to the affidavit's probable cause related to the operation of 419 plans from 100 GMR. The resulting list of categories "was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *Hernandez*, 2010 WL 26544 at *7. These categories clearly met the "standard for constitutional particularity," i.e., that the warrant was "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *Regan*, 706 F.

Supp. at 1110 (quoting *LaChance*, 788 F.2d at 874). Again, "[t]he validity of a warrant is not affected by the fact that a vast amount of material falls within its scope." *Dinero Express*, 2000 WL 254012 at *8. Rather, because the affidavit contained probable cause that the Nova/Benistar 419 plans were permeated by fraud, and the breadth of the warrant tracked reasonably the information provided by the affidavit, the warrant is legitimate precisely because "its scope [did] not exceed the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6.

c)      Carpenter's arguments to the contrary are unavailing

Carpenter again raises several arguments substantially similar to those he makes against the 2011 warrant. Doc. 83 at 8-11, 24-25. These arguments again misconstrue the scope of the warrant and misstate the law. First, Carpenter again inexplicably pretends that the initial paragraph of Attachment B – limiting the warrant to 419-related entities and to a particular time period – simply doesn't exist. Indeed, he repeatedly falsely claims that Attachment B "imposes no temporal limitations whatsoever." Doc. 83 at 10. Later, he incorrectly claims that Paragraph 11 allows the seizure of every e-mail by any employee "regardless of subject matter or date." Doc. 83 at 24. Similarly, he alleges that Paragraph 12 allows the seizure of appointment books, diaries, etc. "*without any limitation as to time or subject matter*" Doc. 83 at 24 (emphasis in original). In truth, of course, the warrant limits both of these categories, along with all of the other categories, to a time frame and a set of entities for which there is direct support in the affidavit. In the same vein, the defendant misleadingly claims that paragraph 15 authorizes the agents unfettered discretion to search. Doc. 83 at 13. In fact, paragraph 15 is limited to the seizure of devices, but contains no authorization to search; rather, the search of electronic devices is cabined by paragraph 14, which in turn limits it to enumerated categories 1-13.

Next, the defendant relies on the same set of cases as he cites in his motion to suppress the 2011 warrant, and again fails to explain how they dictate suppression here. Unlike *Kow*, 58 F.3d

at 427-28, the affidavit here focused on the same subject as the scope of the warrant; unlike *Maxwell*, 920 F.2d at 1033, this was not a three-page affidavit in support of an all records seizure; unlike *Center Art Galleries*, 875 F.2d at 750, this was not a request to seize material of the scheme for which there was probable cause; and unlike *Roche*, 614 F.2d at 7, this case did not pre-date the development of a fraud-specific particularity body of cases in this circuit. This circuit makes clear that "[w]hen the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *C.E.C. Services*, 869 F.2d at187. The evidence in SA Schrader's 57-page affidavit was indeed more than enough to show probable cause that the alleged conduct was, at the very least, "sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg." *Burke*, 718 F. Supp. at 1139-40 (quotations omitted).

Likewise, the defendant's claim that the warrant should have been further been limited to evidence of a *Klein* conspiracy also belies the established law in this circuit. As was argued in the prior section, there is no such requirement in the constitution or in the law of this circuit, especially in cases of complex fraud. *See CEC Services, Inc.*, 869 F.2d at 185 (approving a warrant that had no reference to the crime charged, but called for the seizure of broad categories of records related to a particular enterprise); *D'Amico*, 734 F.Supp.2d at 364 (approving a fraud-related warrant without reference to crime, and observing that "there is no constitutional requirement that a warrant must specify the crime for which a search is being conducted"); *Dinero Express*, 2000 WL 254012 at *8 (approving warrant for several categories of records, with no reference to crime, and noting "the Court is confident that an agent can rationally understand and implement these terms")(quotations omitted). Rather, the constitution requires only that the warrant be "sufficiently

specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *Regan*, 706 F. Supp. at 1110. That is clearly true here.

Finally, Carpenter makes the specious claim that the warrant lacked particularity as to the place to be searched because it failed to distinguish between the various businesses operating out of 100 GMR. *See* Soc. 83 at 11-12. In fact, the affidavit makes clear that these businesses were essentially interchangeable, and that the employees of one were the employees of another. SA ¶ 51. When the UCAs entered 100 GMR to meet with ████████ they observed on the wall a sign for Benistar, but were told by a receptionist that it was Nova's offices. SA ¶57. ████████ explained that "they" occupied only half of the premises, and that the other half was "still available." SA ¶ 57. Thus it was reasonable for SA Schrader, based on the information available to him, to describe the premises as Nova or Benistar's offices, notwithstanding the other entities that operated there. Moreover, the warrant left little doubt as to the search location being the premises located at 100 Grist Mill Road, which is one "single office building."

## V.     Law Enforcement Acted in Good Faith Reliance On A Valid Warrant

### A.     Relevant Law

Even where a search warrant is deemed overbroad or insufficiently particular, a court nonetheless must determine whether the "good faith" exception applies. *See United States v. Leon*, 468 U.S. 897 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (applying exception to particularity requirement). "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). In certain circumstances, however, "the conduct at issue [is] not so objectively culpable as to require exclusion." *Id.* at 146. Where "[an] officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable," a reviewing court's subsequent

determination that the warrant was constitutionally infirm will not trigger the exclusionary rule. *Leon*, 468 U.S. at 922; *see also Sheppard*, 468 U.S. at 989-90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested."). Accordingly, the exception protects from suppression a search and seizure made in good faith reliance by government agents based on a search warrant in all but four situations: "(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient...that reliance upon it is unreasonable." *Falso*, 544 F.3d at 125 (citations omitted).

In undertaking a good faith analysis with respect to particularity and overbreadth, a court may look to factors outside the warrant, including any unincorporated supporting documents such as an affidavit or application, to make an "assessment of the officers' conduct in a particular case." *See Rosa*, 626 F.3d at 63. In *Rosa*, the court found that despite the warrant's overbreadth – it authorized a search for evidence of any crime, without further particularity – the executing investigator knew and acted in accordance with the limits of the search contemplated in the affidavit. *Id*. In that regard, the executing agents' familiarity with the supporting documents, instructions regarding the scope of the search, and the scope of the actual search is relevant. *See Id*.; *United States v. Markey*, 131 F. Supp. 2d 316, 326 (D. Conn. 2001) (upholding warrant, but finding good faith would have applied in part because "the agents were instructed that there was to be a limited search related to Marquis International, and they took care to follow those instructions" and because the evidence custodian reviewed the supporting affidavit). Similarly, the complexity of the investigation may be considered in assessing whether an agent reasonably

relied on a warrant. For example, "an agent would reasonably expect to seize a broad swath of e-mails in a case involving a multi-year, complex fraud scheme in which e-mail communications allegedly played a key role," and thus would expect a broadly worded warrant. *Bowen*, 689 F. Supp. 2d at 684; *see also United States v. Liu*, No. 12 Cr. 934 (RA), 2014 WL 101672 at *8-*9 (S.D.N.Y. Jan. 10, 2014) (same).

B.     Analysis

Here, even if the Court were to find the warrants defective in some way, the "good faith" exception would apply. The first three of the *Falso* factors clearly do not apply here – there is no evidence presented by the defendants that either agent "knowingly misled" the issuing judge, that the issuing judge "wholly abandoned his or her judicial role," or that the "application is so lacking in indicia of probable cause as to render reliance upon it unreasonable." *See Falso*, 544 F.3d at 125. Even considering Carpenter's attacks on the probable cause in the 2010 affidavit, it certainly contained sufficient facts in its 57 pages such that a "reasonably well-trained officer" would not have known that "the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S at 922 n.23.

Thus the only remaining inquiry is "whether the warrant is so facially deficient...that reliance upon it is unreasonable." *Falso*, 544 F.3d at 125. Here, the complexity of the schemes in each of the affidavits would lead a reasonable officer to expect similarly broad categories of records to be included in a warrant. *See Bowen*, 689 F. Supp. 2d at 684; *Hernandez*, 2010 WL 26544 at 12 ("although the search warrant included fairly broad categories…it is by no means "so facially deficient" as to render reliance unreasonable. Given the nature of a complex tax fraud case like this one, a government agent would likely expect to find fairly broad categories of tax-related documents to be seized."). Thus even without a hearing on the issue, and relying simply on the sworn affidavits of SA Schrader and SA Allen, the Court can easily conclude that the agents relied

in good faith on the face of the warrants.

Even were the Court inclined to conduct a good faith hearing, the Government would show that in both warrants the executing agents understood and directed their searches at material related to the matters under investigation. *See Markey*, 131 F. Supp. 2d at 326 (D. Conn. 2001) ("the agents were instructed that there was to be a limited search related to Marquis International, and they took care to follow those instructions"). First, the evidence would show that each of the executing agents was provided with a sufficient summary of the nature of the investigation so as to undertake a properly limited seizure of evidence. In the 2010 search, each agent was provided with an extensive operations plan that included a 2 ½ page summary of the investigation, as well as a copy of Attachment B. Those agents also met with SA Schrader and others involved in the investigation prior to the search to discuss the investigation, and there were agents at the search site familiar with the facts in the affidavit – including SA Schrader – available to direct the seizures. In the 2011 search, executing agents were also provided with an operations plan that contained a shorter explanation of the criminal investigation. Moreover, the agents met prior to the searches with either SA Allen directly (300 FSP search) or with SA Allen's supervisor (100 GMR), who had read and was well-familiar with the affidavit. At these intelligence briefings SA Allen and her supervisor explained the investigation and made available copies of the affidavit for agents to read. They were also on site to guide the searches at they unfolded. Perhaps the most obvious example of the search agents' caution was their decision, after coming across numerous insurance applications related to the COT, to seek an additional warrant to seize those applications. This was clear evidence of the agents' intention to follow carefully the precise guidance of the warrant, and not to seize – as Carpenter claims – anything they wanted.

Moreover, the facts surrounding the execution of each warrant indicate that neither set of

executing agents viewed these as general warrants. Indeed, despite the hallways and offices full of records that were encountered at 100 GMR, the IRS seized a mere 322 boxes and the DOL seized only 41. Such carefully circumscribed searches certainly call into question Carpenter's dramatic allegations that in 2010 "the agents, with little guidance from the search warrant…essentially ransacked the offices and seized virtually everything there," Doc. 83 at 2, and then in 2011 "the agents, with little guidance from the search warrant…essentially ransacked the offices and seized anything they wanted," Doc. 81 at 2. Available for the Court's review are the "entry and exit" photos from 100 GMR for both searches, showing that such a small portion of the records on-site were taken that in most areas – including in Carpenter's office – there appear to be no differences between when the agents entered and when they exited.[9]

Finally, the good faith of the agents executing the off-site searches of the computer images is even more straightforward.[10] The agents that have executed the computer searches on the DOL-seized media, including DOL's copies of the IRS images, have been SA Allen and others directly participating in this investigation, all of whom are intimately familiar with the investigation and the affidavit. Thus they are easily able to cabin their searches within the parameters of the investigation. Indeed, their good faith was evidenced when they came upon COT-related documents from prior to 2006 during their search of the non-privileged material. Rather than simply seize those documents as being in plain view, SA Allen again sought a warrant from Judge Margolis expanding the scope of the search accordingly. *See* Exhibit 15 (SA Allen

---

[9] Carpenter also falsely claims that the DOL seized his personal cell phones and laptops and his personal homeowner's policy. *See* Doc. 81 at 3. In truth the DOL seized no cell phones and are unaware of a "personal" laptop seized in the search. Moreover, the home insurance policy to which Carpenter refers is not his homeowners policy at all, but an "amended declaration" related to an insurance policy for a home in Rhode Island that is owned by an entity called "Moonstone Partners," and that – as was later alleged in the Indictment – was purchased with ill-gotten gains of the COT scheme.

[10] We note here that Carpenter falsely claims that DOL agents took images of every computer on site, and that the IRS took "dozens" of computer images. *See* Doc. 81 at 3, Doc. 83 at 1. In fact, the IRS imaged only 13 computers or drives at 100 GMR, and the DOL imaged 12 computers or drives at 100 GMR and 22 at 300 FSP.

Affidavit from January 31, 2012).

**VI.** **The DOL Properly Searched and Seized Materials That Had Been Previously Seized by the IRS and Neither the DOL nor the IRS Have Held Computer Evidence for an Unreasonable Period of Time**

The Government did not violate the defendants' Fourth Amendment rights when it seized copies of computers and other paper documents from the IRS, which had previously seized the materials from 100 GMR in April 2010. The defendants argue that by the time the DOL seized the materials in 2011, the IRS had violated their rights by unreasonably retaining the materials for approximately 13 months[11] without returning them, and therefore, the use of such materials should be suppressed in this case. *See* Docs. 81 at 29-32 and 83 at 28-31.[12] As explained below, given the extensive litigation that took place in Wisconsin over privilege issues related to the seized materials, which precluded the prosecution team from even reviewing the seized materials for responsive materials, the 13-month period that the IRS retained the materials was reasonable. Similarly, Carpenter argues that DOL has unreasonably retained the computer images it seized in May 2011 from 100 GMR, 300FSP, and the IRS for over 3 years. *See* Doc. 81 at 25. As explained below, any delay other than what one would expect in a complicated document case was primarily due to Carpenter's own failure to expeditiously assert and resolve claims of privilege.

**A.** **Relevant Law**

Courts have long held that where the volume of material to be reviewed and seized is extraordinarily large or other practical considerations would render onsite review difficult, it is reasonable for government agents to seize the materials for later offsite review. *See United States*

---

[11] Carpenter argues that the IRS has unreasonably held on to the seized computer evidence for over 4 years. The only issue before the Court is whether the IRS unreasonably held the documents for 13 months, which is the point in time the DOL seized copies it for use in this case. To the extent that the IRS still retains those materials in their possession, that should be the subject of a motion to suppress in Wisconsin if and when Carpenter is charged there.

[12] Carpenter raises this argument both in the motion to suppress evidence seized by the Department of Labor in May 2011 (*see* Doc. No. 81 at 29-32) and in the motion to suppress evidence seized by the IRS in April 2010 (*see* Dkt. No. 83 at 28-31).

*v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997) (upholding seizure of an entire file cabinet when such seizure was motivated by the impracticability of onsite sorting); *United States v. Santarelli*, 778 F.2d 609, 616 (11th Cir. 1985) (where onsite examination of paper documents would have taken several days, agents acted reasonably in seizing documents for offsite review); *United States v. Schandl*, 947 F.2d 462, 465-66 (11th Cir. 1991) (had agents searched each document on site, the time required would have "substantially increase[d] . . . thereby aggravating the intrusiveness of the search" (internal quotation omitted)).

With respect to electronic stored information, Rule 41 expressly provides that computers, hard drives, and other electronic storage media can be seized or copied in their entirety for later offsite review, without the time limit set on the warrant's execution. *See* Fed. R. Crim. P. 41(e)(2)(B). The Advisory Committee notes acknowledges the impracticality of searching large amounts of information at a search location, and contemplates "a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Indeed, the Second Circuit has recognized that "[i]n light of the significant burdens on-site review would place on both the individual and the Government, the creation of mirror images for offsite review is constitutionally permissible in most instances[.]" *United States v. Ganias*, 755 F.3d 125, 135 (2d Cir. 2014).

Consistent with the practicalities of reviewing voluminous computer data, courts have recognized that computer searches are not subject to strict time limits. Rather, recognizing that law enforcement needs flexibility to search and review voluminous computer data, courts have upheld long periods of time for offsite review as "reasonable." *See, e.g., United States v. Gregoire*, 638 F.3d 962, 968 (8th Cir. 2011) (one-year delay between seizure of computer and search of computer did not violate Fourth Amendment rights of defendant); *United States v.*

*Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) (one year court-issued extension to search computer because of investigation backlog was reasonable); *United States v. Brewer*, 588 F.3d 1165, 1172-73 (8th Cir. 2009) (upholding delay of several months in searching computers);*United States v. Gorrell*, 360 F.Supp.2d 48, 55 n. 5 (D.D.C. 2004) (finding suppression not required for 10–month delay in processing data recovered from computers); *Triumph Capital*, 211 F.R.D. at 66 (finding eight month delay was reasonable and noting that "computer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary document search"); *United States v. Burns*, No. 07 CR 556, 2008 WL 4542990, at *8-*9 (N.D. Ill. Apr. 29, 2008) (upholding 10-month delay in searching computer data was reasonable).

## B.     Analysis

Here, the IRS's continued retention of computers and documents for the 13 months between the April 2010 search and the May 2011 search was reasonable under the circumstances. Following the IRS search, privilege and Rule 41(g) litigation ensued, both in Connecticut and in Wisconsin.   *See* Debbink Decl. ¶¶ 4-16.   Among other things, several individuals and entities – including Bursey and Carpenter – issued blanket claims of privilege over the seized material. Debbink Decl. ¶ 4.   In connection with that litigation, United States District Judge Lynn Adelman of the Eastern District of Wisconsin issued three orders regarding the operation of a filter team to review the seized material for privilege, on March 11, March 22, and August 5, 2011.   *See* Debbink Decl. ¶ 7; Exhibit 4 (Judge Adelman orders).   The parties also settled the Rule 41(g) litigation – which did not involve the defendants – when the Government agreed to return the hard copy documents after a reasonable opportunity to copy them.   Debbink Decl. ¶ 6.   Under the second filter order, boxes with relevant documents were returned to Halloran, counsel for BASI, while boxes with no responsive documents were sent directly to the targets.   Debbink Decl. ¶ 9.

By the time the DOL sought its warrant in May 2011 to search the previously seized IRS

69

media (in Connecticut) and the remaining boxes (in Wisconsin), the targets – including Carpenter and Bursey – had not provided privilege logs related to either ESI or hard copy material, there was no resolution as to any privilege claims by the targets, and thus the prosecution team had not yet begun to search the material seized in April 2010. Debbink Decl. ¶ 10. Indeed, the first privilege log was not produced until June 22, 2011, Debbink Decl. ¶ 12, and the targets were still preventing the investigative team from searching non-privileged material as of September 27, 2011, Debbink Aff. ¶ 16. Moreover, as of May 26, 2011, there were some boxes of seized material that had already been returned to BASI's counsel, Halloran and Sage, while others remained at the IRS in Wisconsin.[13] Debbink Aff. ¶ 11.

The defendants here wholly ignore this factual record in their motions. Instead, they accuse the IRS of improperly holding onto the materials indefinitely "on the off-chance the information would become relevant to a subsequent criminal investigation." Dkt. No. 81 at 30; Dkt. No. 83 at 28. The defendants' accusations are utterly baseless. As the record aptly demonstrates, there was no impropriety on the part of the IRS. At the time the DOL executed the warrant in 2011, the IRS was not holding on to the materials in bad faith on the off-chance the information could be used in a subsequent investigation. Rather, the reason that the IRS had retained all of the material for a year was because their own delay in asserting privilege claims had precluded the IRS search from proceeding with its duly authorized search.

Accordingly, the defendant's reliance on the Second Circuit's recent decision in *Ganias*, is unavailing. In *Ganias*, 755 F.3d at 138, the government had executed a search warrant in November 2003 at the offices of an accountant. The warrant permitted the government to obtain

---

[13] The boxes that were transferred to Halloran were not the subject of the search warrant. The search warrant only sought the 13 computers and hard drives and the few boxes of paper documents in the custody of the IRS. The boxes in the possession of Halloran were obtained by grand jury subpoena, and therefore are not the subject of the defendants' suppression motion.

records of two of the accountant's corporate clients.  *Id.*   The agents made forensic images of the accountant's computers to review offsite. *Id.*   By December 2004, the government had searched the computers and segregated out documents that were responsive to the warrant, but did not purge the non-responsive files.  *Id.*   Later, the Government suspected that the accountant was personally involved in criminal activity. In April 2006, two and a half years after seizing the accountant's computers and making mirror images of them, the government obtained a second warrant to search the mirror images of the computers, which it had retained, for defendant's personal financial records.  *Id.* at 130.   The court held the government violated the defendant's Fourth Amendment rights by retaining the unresponsive personal financial records after they already completed their original search and separated out unresponsive records.  *Id.* at 137-38.

Here, unlike in *Ganias*, the IRS and Wisconsin prosecutors had not yet begun – let alone completed – their search of the seized material, and thus certainly could not have segregated out the non-responsive material.   In fact, they were prohibited by court order from doing so until the targets' privilege claims were resolved.   Under these circumstances, the IRS's retention of the materials prior to the DOL search was reasonable.[14]   Accordingly, the DOL's search and seizure of materials that had been previously seized by the IRS was proper.

Likewise, the government's continued retention of the computer images that the DOL seized in May 2011 is reasonable.   Following the DOL's seizure of such materials, the defendants asserted blanket privilege claims over the materials, precluding the Government from reviewing the materials for responsiveness until the privilege issues were resolved.   Indeed, the defendants resisted compliance with a filter order at every turn, until Judge Hall ordered them in 2013 to comply.   Combined with the normal and reasonable delays expected in examining a large volume

---

[14] The Government also believes the IRS's continued retention of the ESI following the DOL searches was reasonable; however, that is a question for another day and in another venue.

of computer data, the defendants' own delay makes the DOL's retention of the seized images eminently reasonable.

## VII.     The Defendant's Due Process Claim Is Misplaced and Unavailing

Carpenter claims that the Government's conduct in connection with both the 2010 and 2011 searches violated his rights under the Due Process Clause of the Constitution.   Doc. 80 at 3; Doc. 81 at 25-29; Doc. 82 at 3; Doc. 83 at 31-32.   Bursey incorporates Carpenter's argument with respect to the 2011 search.   Doc. 72 at 3.   The defendants' claims are without merit and should be dismissed.

To assert a valid due process violation, the defendant must allege governmental conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."   *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1988).   The Second Circuit has counseled that there must be "malicious and sadistic abuses of power by government officials intended to oppress or to cause injury and designed for no legitimate government purpose." *Id*. at 94 (internal citations omitted); *see Smith v. Hald Hallow Hills Cent. Sch. Dist.*, 298 F.3d 169, 173 (2d Cir. 2002) (substantive due process claim requires conduct so "brutal" and "offensive to human dignity" as to shock the conscience); *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority").

Applying this standard here, the Government's conduct did not violate the defendants' due process rights.   As discussed, the government agents conducted the searches pursuant to court authorized warrants, based on probable cause, and they acted in good faith.   Moreover, the defendants have failed to offer a scintilla of evidence that the agents acted maliciously, with the intent to oppress or cause injury, or without a legitimate government purpose.   To the contrary,

they were investigating violations of federal criminal law. Under these circumstances, the defendants' due process claims should be denied. *See Malapanis v. Regan*, 335 F.Supp.2d 285 (D. Conn. 2004) (failure to return seized property after learning that false information was relied on in the search warrant application did not amount to due process violation); *Smolicz v. Borough/Town of Naugatuck*, No. 3:04CV855(WWE), 2006 WL 2085291, at *7 (D. Conn. 2006) (finding the search warrant valid, which therefore, precluded a finding of "egregious" or "outrageous" infringement of due process right).

Significantly, none of the cases cited by the defendants deal with search warrants, and in every case except one, the court found no due process violation. *See County of Sacramento*, 523 U.S. at 833 (deputy sheriff did not violate individual's substantive due process right to life after individual died following a high-speed pursuit); *Matthews v. Eldrige*, 424 U.S. 319 (1976) (no evidentiary hearing was required prior to termination of Social Security disability payments); *United States v. Kordel*, 391 U.S. 1 (1970) (finding no violation of defendant's fifth-amendment right against self-incrimination where government used defendant's statements from government's civil investigation proceedings to obtain leads for use in criminal case against the defendant); *Betts v. Brady*, 316 U.S.455 (1942) (finding no deprivation of right to counsel); *Crowe v. Smith*, 151 F.3d 217 (5th Cir. 1998) (district court violated defendants' right to due process by imposing criminal fines and sanctions via civil process); *United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993) (IRS did not violate defendant's due process rights by using information obtained in civil audit in a criminal investigation);[15] *United States v. Teyibo*, 877 F. Supp. 846 (S.D.N.Y. 1995) (defendant's due process rights not violated when he provided documents and statements to

---

[15] In Carpenter's memorandum of law to suppress evidence obtained from the 2011 DOL warrant, he incorrectly quotes *Grunewald* as stating "the **DOL** may not develop a criminal investigation under the auspices of a civil audit[.]". Doc. 81 at 29 (incorrectly quoting *Grunewald*, 987 F.2d at 534) (emphasis added). In actuality, the *Grunewald* decision states "the **IRS** may not develop a criminal investigation under the auspices of a civil audit[.]" The *Grunewald* case had nothing to do with the DOL.

SEC in a civil proceeding, which were later used against him in a parallel criminal action).

With respect to the 2011 search, the defendants also suggest that the government violated the defendants' due process rights by conducting parallel proceedings. Doc. 81 at 28-29. The defendants cite three cases, *Kordel*, *Grunewald*, *Teyibo*, discussed above, where the courts found no due process violation when the government used evidence obtained from a civil investigation in a later criminal investigation. The Government fails to see how those cases are relevant because the government is not aware of any parallel civil investigation by the DOL in connection with the COT STOLI scheme before or after commencing the criminal investigation.

To the extent the defendants contend that the IRS criminal investigation out of Wisconsin and the DOL criminal investigation in Connecticut are parallel proceedings, the government notes they involve different investigations by different agencies that are being prosecuted by different U.S. Attorney's Offices for different and unrelated crimes. Moreover, the IRS did not turn over information from its case to the DOL on its own; the DOL seized it from the IRS pursuant to a court authorized search warrant. Essentially, the defendants argue that the government cannot investigate and prosecute a defendant for committing two separate and unrelated crimes. Under the defendants' logic, if the government searches a defendant's home for narcotics, and later learns that he committed a bank robbery and evidence of the robbery is at his home, the government would be precluded from going back to search the home for the second offense. The Constitution does not command such an absurd result. The Due Process Clause does not immunize a defendant from being investigated for multiple crimes. Accordingly, the defendants' due process argument should be denied.

## VIII.  Conclusion

For the reasons stated herein, the Government respectfully requests that Carpenter and Bursey's motions to suppress evidence seized on May 26, 2011 by the DOL pursuant to a federal search warrant (Docs. 72, 80, and 81) and Carpenter's motion to suppress evidence seized on April 20, 2010 by the IRS-CI pursuant to a federal search warrant (Docs. 82 and 83), be denied in full.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *David E. Novick*
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510

/s/ *Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 5, 2014, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ *David E. Novick*
_____
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY