UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – x
                              :
UNITED STATES OF AMERICA      :   No.  3:13CR226(RNC)
                              :
          vs.                 :
                              :
DANIEL CARPENTER, ET AL,      :
                              :   HARTFORD, CONNECTICUT
              Defendants.     :   DECEMBER 4, 2014
                              :
– – – – – – – – – – – – – – – x



MOTIONS HEARING


    BEFORE:

          HON. ROBERT N. CHATIGNY, U.S.D.J.









                         Darlene A. Warner, RDR–CRR
                         Official Court Reporter

1
   APPEARANCES:

2

3
      FOR THE GOVERNMENT:

4
          U.S. ATTORNEY'S OFFICE-NH
          157 Church Street

5
          P.O. Box 1824; 23rd Floor
          New Haven, Connecticut 06510.

6
          BY:  DAVID E. NOVICK, AUSA
             NEERAJ PATEL, AUSA

7
      FOR DAVID CARPENTER:

8
          BROWN, PAINDIRIS & SCOTT

9
          100 Pearl Street, 2nd Floor
          Hartford, Connecticut 06103

10
          BY:  RICHARD R. BROWN, ESQ.
             CODY N. GUARNIERI, ESQ.

11

12
      FOR WAYNE BURSEY:

13
          FOX ROTHSCHILD LLP
          2000 Market Street, 20th Floor

14
          Philadelphia, Pennsylvania 19103
          BY:  PATRICK J. EGAN, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1              10:00 A.M.

2

3          THE COURT:  Good morning.  Would you please

4    state your appearances for the record.

5          MR. BROWN:  For the government, David Novick and

6    Neeraj Patel.  Also present at counsel table is Special

7    Agent Lynn Allen from the Department of Labor, and Senior

8    Investigator, Mary Goreham from the Department of Labor.

9    Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. BROWN:  Good morning, Your Honor, Attorney

12    Richard Brown representing Mr. Carpenter.

13          MR. GUARNIERI:  Good morning, Your Honor,

14    Attorney Cody Guarnieri, also representing Mr. Carpenter.

15          MR. BROWN:  Good morning, Your Honor, Patrick

16    Egan, Fox Rothschild on behalf of Mr. Bursey.

17          THE COURT:  Good morning.  We scheduled this

18    case for a hearing on the pending motions.  There are

19    quite a few motions that have been filed.  By my count we

20    have five motions to dismiss, two motions to suppress, two

21    discovery motions, and the parties' briefs are substantial

22    spanning many hundreds of pages.

23          Mr. Novick, do you have any suggestions as to

24    how we should proceed to address this?

25          MR. NOVICK:  Your Honor, I would suggest we

1    discuss them in sort of tranches.

2           We can discuss the motions to dismiss, I guess,

3    because those were filed first.  I suggest since it's the

4    defendant's motion, if he wants to be heard on them, he'd

5    be given the opportunity to do so and the government would

6    respond.  And I would include both the motion to

7    dismiss -- motions, plural, to dismiss on all the various

8    grounds and have the government respond to them in an

9    omnibus fashion.

10          But we would be -- I think I would suggest,

11   given the fact that there are various overlapping issues

12   within each of the motions to dismiss, that they be

13   discussed by the defense first in totality and then we can

14   respond to them.  And then discuss the motions to suppress

15   as well in the same fashion.  And then at the end discuss

16   the discovery motions.

17          That would be my suggestion, Your Honor.

18          THE COURT:  All right.  Is that agreeable to

19   you?

20          MR. BROWN:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. BROWN:  Your Honor, I agree in the sense

23   that it doesn't make any sense to do every one

24   piecemeal-wise, that there's certain areas that we could

25   group together and discuss them as a whole, and of course

1       the Court may have specific questions, but that would seem

2       to be the logical way.

3               I would also point out that while I'm prepared

4       to discuss any motion, or co-counsel, to discuss the

5       motions, I don't see the point, subject to the Court's

6       thoughts, of rehashing everything that's contained in the

7       briefs themselves.

8               As the Court pointed out, both parties, all the

9       parties I should say, filed very in depth arguments citing

10      numerous cases.  Obviously there's material differences in

11      the perspective of the law as it relates to the government

12      and the defendants; but while I'm happy to go through each

13      page and whatnot, I think the way I would like to -- since

14      they're my motions and co-counsel motions and presumably

15      we have the burden and therefore we should commence the

16      arguments.  I think it would be beneficial to the Court if

17      I could at least go through the facts of the case as we

18      see it and where I see some major issues that I see the

19      Court needing to resolve.

20              Again, we both cite the law, sometimes the same

21      cases, sometimes different cases, but we put different

22      spins on it.  But I think it would be helpful to the Court

23      at least if I make an effort to try to articulate, give a

24      background of the case, and try to articulate as I see it

25      some major differences.  Because there are some findings

1    that if the Court makes in my favor or favor of the

2    defendants, things are going to go one way.  On the other

3    hand, if the Court believes that the arguments I present

4    aren't justified through the law, then I see the Court

5    going a different way.

6         And I think it's more helpful this morning as

7    opposed to regurgitating everything, although I've got it

8    here, to simply try to give the situation from our

9    perspective, and of course the government will have the

10   opportunity to respond.

11        THE COURT:  All right, thank you.

12        Mr. Egan, do you wish to comment?

13        MR. EGAN:  No, Your Honor, I'm agreeable to that

14   procedure.

15        THE COURT:  Okay, thank you.  Given the volume

16   of paper that has been submitted, it would be most helpful

17   to me if each side could try to identify in a very concise

18   way the core points that the party wants me to consider,

19   and while I appreciate that Mr. Carpenter and Mr. Bursey

20   have their own view of the facts, the issues that are

21   presented to me, at least in connection with the motions

22   to dismiss, require me to assume the truth of the

23   allegations in the indictment.

24        So I'm not looking for help with regard to the

25   defendants' view of the facts, what I'm looking for is a

1    concise summary of the core points that each side would

2    want me to bear in mind in dealing with the many arguments

3    that have been made in the papers.

4        Mr. Brown?

5        MR. BROWN:  Your Honor, before we proceed, I'd

6    like to just note for the record that my client is not

7    present today.  My client is presently incarcerated in a

8    federal prison in Pennsylvania on an unrelated federal

9    conviction and that I did indicate that I would and I in

10   fact did file a waiver of his presence that he signed and

11   forwarded to me, I forwarded it to the Court, wherein I

12   had explained to him that he has an opportunity to be

13   here.

14       The government had indicated to me they were

15   prepared to transport him from Pennsylvania to Connecticut

16   for the purposes of today's proceedings, but

17   notwithstanding the same, my client decided for reasons

18   stated in the motion to excuse himself subject to the

19   permission of the Court which was granted.

20       I don't know if counsel would want to comment

21   about his client, Your Honor.

22       MR. EGAN:  Yes, Your Honor.  And as Your Honor

23   is aware, we filed a motion with regard to Mr. Bursey's

24   health condition which we might want to discuss with the

25   Court towards the end of the hearing as well, the ongoing

1    situation with regard to Mr. Bursey, but he has waived his

2    presence, and due to his ongoing health issues is not

3    present today voluntarily.

4              THE COURT:  All right.

5              Mr. Egan, I'll defer to you when it will be best

6    to address that, but it seems to me that maybe that's

7    something I should take up at the beginning.

8              MR. EGAN:  Well, Your Honor, as you're aware

9    from the motion that we filed, Mr. Bursey has been

10   diagnosed with very significant and severe late stage,

11   stage four, cancer.

12             At the time that this initial diagnosis took

13   place, I was advised by his oncologist that it was very

14   difficult to tell what the outcome of his situation would

15   be, that some individuals in that position had, you know,

16   much longer life expectancies than others, and he really

17   couldn't tell at that point.

18             I did discuss this with the government at the

19   time and provided them with the medical records, one of

20   the sets of medical records that was appended to the

21   motion that I filed.

22             At that point strategically I thought the best

23   thing would be to wait and see how it developed before we

24   addressed it with the Court, and Mr. Bursey was able to

25   appear for the arraignment on a superseding indictment,

1    although he did walk with the assistance of a walker at

2    that point.

3           Since then, Mr. Bursey has had more significant

4    health issues.  He took a fall.  He broke a leg.  He is

5    presently taking a very aggressive and -- I wouldn't call

6    it experimental because I don't know enough about the

7    science -- but it's apparently a chemotherapy pill that

8    his particular practitioner believes has some hope of

9    giving him some significant relief, and he's on a course

10   of three months of taking that, and yesterday was the

11   beginning of the third month.

12          At the end of the third month, they're going to

13   do a scan of his brain and some other areas of his body to

14   determine whether there's been any significant change in

15   his status.  But the pill itself is very much interfering

16   with his ability to function in a lot of ways.  And he's

17   also, unfortunately, in severe pain and needs to take a

18   number of pain medications in order to alleviate the pain.

19          So while he is capable of making decisions and

20   communicating with me in a very good fashion for about two

21   hours a day, that's about it.  He's basically good for

22   about two hours a day at the most.  And he's confined to a

23   wheelchair.

24          My personal sort of plan was, wait until the end

25   of these procedures, that would be January, then I would

1    get another report from the doctor, and then I was going

2    to, based upon that report, potentially obviously address

3    the issue if the government wants more, but potentially

4    file a motion with the Court, if Mr. Bursey's condition

5    continues to deteriorate, to file a motion with the Court

6    because I don't know that he will be able to participate

7    in the trial in March.  But I really -- my sense is that's

8    going to end up being the case, but I really don't know

9    now.  And so that was the way I had intended to proceed.

10        I did yesterday receive the motion that was

11    filed by Mr. Carpenter's lawyer.  I did not -- because I

12    was on the road, I got the government's response late last

13    night but didn't have a chance to review it, and I know

14    that may impact this issue as well.

15        But as it stands, my plan was to address this

16    issue with the Court sometime in January when I have a

17    better sense of what his prognosis is and when we're a

18    little closer to the date so we know whether he's going to

19    still be in this condition or whether he will have been

20    improved at all.

21        THE COURT:  Thank you.

22        Any comment on Mr. Bursey's situation?

23        MR. NOVICK:  No, Your Honor.  As Mr. Egan

24    correctly pointed out, he and I have spoken about this,

25    about the situation that occurred, or that I became aware

1    of after the indictment.  And we will take the information

2    that Mr. Egan provides to us when it's available and

3    discuss it with Mr. Egan, discuss it with the Court, as to

4    what the correct way to proceed will be.

5         And obviously we did have conversations about

6    Mr. Brown's motion to continue, and I understand that that

7    will be something that plays into that equation.  We can

8    discuss that at the Court's convenience.  Whether the

9    Court wants to discuss it now or at the end of the

10   proceeding is fine with me.

11        THE COURT:  All right, thank you.

12        All right, let's turn then to the motions to

13   dismiss, please.

14        Mr. Brown?

15        MR. BROWN:  Your Honor, if I may, the crux of

16   these motions as I see it on the motions to dismiss really

17   have to do with whether or not, from the indictments and

18   the superseding indictment, whether or not the government

19   has in fact set out a series of allegations that in the

20   eyes of the Court would constitute the relative crimes

21   that were charged in this case, that we started out with

22   an indictment back in December of last year with mail

23   fraud, wire fraud and conspiracy -- and this is somewhat

24   relevant to some of the motions I'm going to address this

25   morning -- on the motion to dismiss, and subsequently

1    filed a superseding indictment on or about I believe

2    May 14, somewhere in that ballpark, of this year, wherein

3    a couple things happened, Your Honor.

4           Number one, they added on additional different

5    charges.  Specifically, if I recall, aiding and abetting,

6    illegal monetary transactions, and laundering of certain

7    funds.

8           Actually what they did was, contrary to what the

9    Court I think had originally requested, we went from 12

10   alleged straw insureds to more than 12.  The Court had

11   asked the government to refrain from expanding but the

12   government for its own reasons made that decision to do so

13   and subsequently came down with the superseding

14   indictment.

15          The reason that that's important, Your Honor, is

16   because in this superseding indictment, and I'll look for

17   the pages, but there were four different paragraphs,

18   paragraphs 122, 136, 138 and 140, that what they did in

19   general, Your Honor, was to tie the new charges back to

20   the old charges.  Meaning that as a defendant or defense

21   attorney, the defendant now is going to be held

22   accountable for certain transactions that occurred

23   originally cited in the original indictment with certain

24   dates that in May would be more than five years earlier,

25   tying them into the new superseding indictment, new

1    charges, for example, just take by way of example the

2    money laundering charges.

3            And what that means now is, not only is the

4    defendant has to defend against charges of wire fraud by

5    way of example in the original indictment or mail fraud,

6    but in the defense of those charges now needs to concern

7    himself with the issues involving money laundering and to

8    what degree that may have played a role in any of the

9    first I think it's 33 counts, Your Honor.

10           And the reason that's important is what while I

11   understand federal law, a superseding indictment doesn't

12   necessarily start the clock running anew, but it isn't an

13   absolute rule.  And the real rule is really whether or not

14   there is a change, at least the way I perceive it, between

15   the old indictment and the new indictment, that puts the

16   defendant for the first time on notice that he's going to

17   be held accountable for certain alleged criminal activity.

18   And a lot, if not most of the original actions concerned

19   itself with insurance policies or conduct surrounding life

20   insurance policies that was going back to 2006, 2007,

21   2008.

22           And I don't think it's any accident that the

23   original indictment came out when it did because of

24   concerns the government had about the statute of

25   limitations expiring, and of course this Court is well

1    aware of the rule that statute of limitations is to be

2    strictly construed in favor of the defendant and against

3    the government, that unless the Congress has specifically

4    enlarged the period of time, that it's a period of five

5    years.

6         So it may have been that some of the counts

7    originally of the first set of counts, Your Honor, may

8    have fallen within the ambit of five years.  And I think

9    in my brief I articulate which ones those might be and

10   which ones aren't, which requires a different argument

11   I'll present in a moment.  But the real question is, as I

12   see it, Your Honor, whether or not that new superseding

13   indictment changes the -- materially changes the

14   allegations by adding on additional claims of wrongdoing

15   that weren't there before, and it's our position that

16   indeed it does.

17        The government obviously is arguing to the

18   contrary.  Well, it's really the same words but it really

19   isn't, because the question the Court simply has to ask

20   itself is:  If the government's position is true, then why

21   was there any need or why was there any intent to add on

22   paragraphs 122, 136, 138 and 140?  What it wanted to do

23   was to hold the defendant accountable for more misconduct

24   as it related to the original counts in the superseding

25   indictment.

1           So what the superseding indictment could have

2    done, and I submit should have done if it was -- if they

3    were acting within the framework of the law in respecting

4    the statute of limitations -- is to restate the first

5    counts verbatim and then without those four paragraphs,

6    without putting the defendant now on notice for the first

7    time that he's going to be held accountable for aiding and

8    abetting, laundering and -- money laundering and

9    questionable monetary transactions, using the illegal

10   funds, and tying them into the first 24 counts.  They

11   could have done that, and I see that in that case the 24

12   counts would not have been affected by the superseding

13   indictment as it relates to the statute of limitations.

14   But they intentionally told us for the first time, in

15   addition to everything else, you're going to be held

16   accountable for the new charges, the new three listed

17   crimes.

18           So it's our position, Your Honor, on that alone,

19   that it changes everything and that the clock needs to be

20   reset.  And so we need to relate back five years from the

21   May -- I believe it was May 14, 2014.  And so anything

22   within the ambit of that time period is fair game for the

23   government, anything prior to that needs to be dismissed.

24           There's a second part of that, Your Honor, which

25   I think is important, and I want to highlight which really

```
 1    is a common thread through many of the motions.  The

 2    question is a fundamental one.  When was the crime

 3    complete?

 4              The general allegations, as the Court knows --

 5    excuse me for a second.

 6              The allegations are, Your Honor, that, as this

 7    Court knows, that there was a series of insurance life

 8    policies that were written with various insurance

 9    companies named or referred to at least in the various

10    indictments, and there seem to be two parts to that.  The

11    first part was the actual locating these what the

12    government or others have referred to as so-called straw

13    insureds, by the way, as opposed to straw owners.  Lot of

14    times they're the same, but in this particular case

15    they're referred to as straw insureds.

16              And by that, I take it to mean that these people

17    in a sense were being used for some sort of criminal

18    enterprise, as it were, and that the government would want

19    the Court or the jury, depending on the time period, to

20    believe that Mr. Carpenter and I suppose Mr. Bursey, but

21    I'm only speaking as to Mr. Carpenter, was somehow

22    involved in that process.  And I think it's important

23    because there's a line that needs to be drawn between what

24    it's alleged really that Mr. Carpenter did or what their

25    allegations say they did.  And what in fact a careful look
```

1    at the indictments would in fact reveal.  Or quite

2    frankly, what the Court will find -- and I think I tried

3    to point that out ironically in some of the government's

4    responses as to what they now claim Mr. Carpenter did.

5         And I really think it's important because the

6    real question is -- in focusing on Mr. Carpenter -- is

7    whether or not he was somehow involved in criminal

8    activity within the last five years from when the

9    indictments were issued, or the superseding indictments,

10   or not.

11        And the conduct that the Court needs to concern

12   itself with in the first phase, which is the acquiring of

13   the insurance policy, it is the position of Mr. Carpenter

14   that as relates to the various crimes of wire fraud and

15   mail fraud and conspiracy to commit the same, that --

16   first of all, we're not satisfied a crime has in fact

17   occurred -- but whatever happened, it did not involve

18   Mr. Carpenter.

19        The various policies were issued, according to

20   the indictment, after various individuals signed on the

21   dotted line saying that they would want these policies.

22   These are the people.  And I might as well point this out:

23   None of these people I believe, except for perhaps one,

24   lived in Connecticut.  These are all people that lived in

25   districts outside the District of Connecticut, that

1    apparently various agents of which, aside from

2    Mr. Waesche -- I don't believe my client ever met or any

3    allegations that they ever met or anything along those

4    lines -- signed up these particular so-called straw

5    insureds for life insurance policies.

6           All of these people apparently were older than

7    70 years of age, all of these people sought policies I

8    believe $2 million or higher.  One gentleman, that is

9    straw number 13, policies were up around $30 million.  And

10   it appears from the allegations that these applications

11   for insurance required some sort of financial statement

12   that have would, I presume, justify policies in excess of

13   $2 million or more.  And the allegations are that these

14   were prepared by the agents and that the agents worked

15   with the prospective insureds to generate false financial

16   statements signed by the insureds, signed by the agents.

17          In addition to that, I don't know if it's clear

18   or not, but in addition to that, these agents were

19   required to file with the carriers verification, meaning

20   the carriers were counting on these agents to confirm the

21   assets.

22          So it appears from the allegations that the

23   agents -- and there's no allegation that these agents were

24   employed by Mr. Carpenter.  There's no allegations that

25   have Mr. Carpenter knew the insureds.  These agents, as a

1    matter of -- the Court can take this into consideration, I

2    guess, as a matter of various licensing and insurance

3    laws, these agents are licensed by the carriers, meaning

4    that the carriers themselves presumably engaged in due

5    diligence before they issue a license that permits them to

6    sell their policies.

7            There's no allegations that Mr. Carpenter paid

8    any of these agents to do anything.  There's no

9    allegations that these agents received any money from

10   Mr. Carpenter to engage in the procuring of these

11   policies.

12           And the reasons there's no allegations is

13   because there was no money conveyed by Mr. Carpenter to

14   any of these agents.  The reality as to why they indicated

15   or failed to indicate in the indictment that there was any

16   monies paid by Mr. Carpenter -- there's some general

17   stuff -- but by Mr. Carpenter to the insureds, the reason

18   there isn't anything is because the fact of the matter is

19   I don't believe the government has any evidence that

20   Mr. Carpenter paid anyone, either the insureds or the

21   agents, to do anything.

22           There are allegations that certain commissions

23   were paid.  Quite frankly it appeared to me very lucrative

24   commissions paid.  But there's no allegations that

25   Mr. Carpenter paid those commissions.  The allegations are

1    that ultimately the carriers paid the commissions that

2    they had set up on their own for whatever particular

3    reasons.

4            And ultimately, Your Honor, during the period of

5    2006, 2008, these applications were forwarded and it

6    appears, and the Court will take this for the purposes of

7    this motion, that these applications contained false and

8    misleading financial information.

9            Also presumably the Court will take into

10   consideration that as part of the application process that

11   it appears that these various carriers included certain

12   inquiries as to the nature of the financing of these

13   particular policies.  And accepting for purposes only of

14   this motion, that that's true, and accepting for the

15   purposes of this motion that those applications were

16   presented inaccurate misleading information, there is no

17   allegation that Mr. Carpenter told the agent or discussed

18   with the agent or urged the agent or had any communication

19   with the agent prior to the submission of those

20   applications to engage in corrupt conduct by encouraging

21   them to file false or misleading applications.

22           There is no question that Mr. Carpenter had a

23   right to rely upon the carriers to insure that the people

24   that they licensed to sell their product were honest and

25   not corrupt type of people.  There isn't any question,

1    Your Honor, that as a result of the submission of these

2    applications, that these policies were issued.  And so

3    here's the question:

4            The question, Your Honor, is whether or not the

5    filing and the use of the mails or the use of the wires to

6    provide the carriers with the necessary information --

7    which we'll assume for the sake of this discussion was

8    false, misleading and material -- constituted a crime.  In

9    other words, Your Honor, I think another way of looking at

10   it is, assume for sake of discussion that the carriers

11   issued their policies and the next day one of the straw

12   buyers went to the U.S. Attorney's Office and said, you

13   know, what?  I -- my conscience is bothering me.  I worked

14   with this agent.  We filed false applications, and as a

15   result of that, I'm now insured for $2 million or

16   $5 million.  I feel bad about it, but I did it, I'm here

17   to throw myself on the mercy of the Court.

18           The question becomes whether the U.S. Attorney's

19   Office indict all these people and prosecute all these

20   people.  And the obvious answer is yes.  Why?  Because the

21   crime had been committed.  The object of the conspiracy

22   had become complete.  The purpose of providing this

23   misinformation was to obtain an insurance policy.  And

24   that was complete.

25           There can be no dispute, at least in my mind

1      from a legal point of view, that wire fraud or mail fraud

2      or conspiracy to commit the same had been completed.  The

3      object of the conspiracy, the purpose of the conduct had

4      been satisfied, because now there was a real policy, a

5      contract, between the insureds, the owner of the policy

6      which was Charter Oak Trust, and the carriers.  Where's

7      Mr. Carpenter?

8              The carriers owed no obligation to

9      Mr. Carpenter.  Mr. Carpenter, through all of this, owed

10     no obligation or duty to the carriers.  Unlike the agents

11     that had the duty of honest services because they had been

12     licensed by these carriers and the carriers had a right to

13     rely upon these agents, Your Honor --

14             THE COURT:  Mr. Brown, is the crux of it, your

15     interpretation of the indictment, more accurately the

16     superseding indictment, to exclude Mr. Carpenter from any

17     of the activities that you just outlined?

18             In other words, are you saying that properly

19     construed, the superseding indictment fails to allege that

20     Mr. Carpenter had anything to do with all of the things

21     you just outlined?

22             MR. BROWN:  Yes.  And what's important is that

23     the government recognized -- so they tried to cover this

24     up because they -- I don't want to use that word -- tried

25     to construct an indictment to get around that problem.  So

1    the problem being statute of limitations, that kind of

2    thing, which obviously would void this prosecution.

3            So what they did was to claim, okay, okay, we're

4    not going to push that part of it.  But, you know, these

5    policies were going to subsequently be -- they have to be

6    financed, premiums have to be paid.  And so Charter Oak

7    Trust enters into an agreement with Mr. Carpenter or

8    Mr. Carpenter's companies to provide funding.

9    Mr. Carpenter's companies as alleged either on their own

10   or with other funders, Ridgewood and there's others,

11   entered into agreements with these people to get money and

12   then provide those funds to Charter Oak.

13           So the relationship isn't with the insurance

14   carriers, it's not with the insureds, it's with Charter

15   Oak Trust.  And so the question is whether or not these

16   activities, accepting as true or accurate as outlined in

17   the indictment, is enough to tie him in to a crime that's

18   already been committed.

19           They would like to say, well, really the crime

20   hasn't been committed yet because if that's true then

21   Mr. Carpenter's not involved.  So this crime sort of drags

22   out.  And the way it drags out is that because

23   Mr. Carpenter signed some papers to secure the loans so

24   that the various policies, Your Honor, as I understand it

25   were used by Charter Oak Trust to secure loans -- which is

1    done of course every day, every day -- and everything that

2    Mr. Carpenter did -- everything alleged in the indictment

3    in and of itself is not illegal.

4          It's not as if for example with drug cases he

5    had provided the drugs or done something along those

6    lines.  All he did was provide funding to policies that

7    have been issued.  Obviously he's not going to provide

8    funds to policies that were yet to be issued.  So that the

9    agreement, the purported tricking of the insurance

10   company, was certainly done, had to be done, before any

11   financing would take place because no one's going to

12   finance a policy that has yet to be issued.

13         So did the carriers know that there was

14   third-party funding for the purposes of the indictment in

15   today's hearing, apparently the answer is no.

16         Interesting, but where's the relationship

17   between the carriers and Mr. Carpenter?  If it wasn't

18   Mr. Carpenter that provided the funding, then who?  Let's

19   assume Bank of America provided it.  Are we going to

20   indict Bank of America because they decided to come into

21   some contract with Charter Oak Trust?

22         You see, the key thing, Your Honor, quite

23   frankly, if I may, between this case and the typical cases

24   involving these so-called STOLI type of contracts -- the

25   typical case, and it's in the briefs, are cases in which

1    the person that gets indicted typically is the agent.  The

2    agent is the one that induces the 70, 75 year old

3    person -- by the way I do resent the use of the word

4    "elder" with 70 year old people, but that's a personal

5    matter since I'm almost there.  But people 70 and older

6    typically is the agent.  And then the agent gets the

7    policy and submits the policy, funds the policy and then

8    two years later wants to sell it.  And those are the

9    people that get indicted.  We don't typically, at least

10   from my review of the various case laws -- I can't say

11   there's none -- start going after other people.

12          And then in this whole thing, which is

13   interesting, Your Honor, is the aiding and abetting

14   charge.  I find that quite interesting.

15          Why I find that interesting, Your Honor, is that

16   throughout the indictment it appears that the allegation

17   that somehow or other Mr. Carpenter is somehow or other a

18   mastermind or something, even though there's no

19   allegations that he caused the agents, that he

20   specifically caused the agents to engage in fraudulent

21   activity or that he personally instructed the insured or

22   met the insured, knew the insureds or even knew the

23   agents.  There is no allegation.  And the reason is, again

24   except for Mr. Waesche, I have no evidence or any

25   information that in fact he have knew these people.

1          So the question becomes, is he the principal or

2     is he some guy on the sidelines helping out?  Aiding and

3     abetting in some fashion?  Which is it?

4          Well, apparently the government doesn't know.

5     Because in one hand they characterize him as the

6     mastermind, the principal person.  On the other hand, they

7     said his conduct rose to that of aiding and abetting.

8     Aiding and abetting who?  Where in the indictment does it

9     indicate who the principal is that Mr. Carpenter aided or

10    abetted?

11         THE COURT:  Mr. Brown, I'm going to ask you to

12    pause there, please, and I'm going to ask Mr. Novick to

13    respond to what you have said so far.

14         Mr. Novick, before you proceed, let me ask Mr.

15    Egan if there's anything he wants to interject.

16         MR. EGAN:  No, Your Honor, because Mr. Brown

17    hasn't reached the issue that I raised.

18         THE COURT:  Okay, thank you.

19         MR. NOVICK:  Your Honor, I'm going to attempt to

20    do what the Court asked first thing, which is, I think I

21    can boil down virtually all of the defendants' arguments

22    in his motions to dismiss into a couple of points.

23         The first point is that virtually --

24    notwithstanding the defendants' arguments here this

25    morning or Mr. Brown's arguments here this morning --

1    nowhere does he accept the allegations in the indictment

2    as true.  Because if he accepted the allegations in the

3    indictment as true, he would see that in fact the

4    indictment as a matter of pleading is more than

5    sufficient.  It is more than the typical indictment that

6    might come before the Court in terms of the allegations in

7    each and every substantive count, in each and every count,

8    saying that Mr. Carpenter and Mr. Bursey, together with

9    other co-conspirators, caused these either wires to take

10   place, these money wires, these emails, these applications

11   to be submitted.  Just based on that, this indictment is

12   sufficient.

13        The better part of this morning has been spent

14   saying that, you know, what?  Mr. Carpenter only did this

15   stuff.  In other words, he only did the funding part of

16   this, and funding things is not illegal because if Bank of

17   America can do it, then I can do it too.  Well, if Bank of

18   America caused applications to be submitted with false

19   information in them or caused wires to pay for these

20   policies knowing that they were fraudulent policies, then

21   we would indict them too.  But that's not the case here.

22        And so, Your Honor, to say that Mr. Carpenter

23   had nothing to do with this is an inherently factual

24   argument.  To say that all he did was fund this -- Your

25   Honor, I am chomping at the bit here.  We'll be more than

1    happy at trial to present the Court with memos, emails,

2    showing that this was Mr. Carpenter's idea from the very

3    beginning; that Mr. Carpenter was involved at this at the

4    formative stages, at the interacting with brokers.  But

5    that's not what we're here to do.  All we're here to do is

6    to discuss:  Does the indictment allege properly?

7              And so I do take a little bit of exception to

8    Mr. Brown suggesting that not only doesn't the indictment

9    allege these things but it can't allege them because

10   they're not true.  I don't want the Court to be left with

11   the wrong impression here.  The government looks forward

12   to the opportunity to proving the defendants' guilt in

13   this matter, but that's not what's at issue here.

14             THE COURT:  Okay.  The emails and documents that

15   you have just mentioned have been produced?

16             MR. NOVICK:  Yes, Your Honor.

17             And I credit what Mr. Brown said in his motion

18   to continue, which is that there's a lot of material.

19   Now, granted, these are all principally in the computers

20   on servers -- or a lot of them I should say -- that were a

21   part of these productions.  Granted a lot of these were in

22   the production that was given last January. But it's a lot

23   of material, the government spent a lot of time going

24   through these documents.  And so, I don't know, perhaps

25   Mr. Brown hasn't seen those particular documents yet.

1            Although I will say that we have met with

2    counsel for both defendants, as we often do, to provide

3    them with a snapshot of the government's case -- I believe

4    this was in advance of indictment here -- to give them the

5    highlights, to show them some of the memos, to show them

6    these memos that say essentially, here's what the Charter

7    Oak Trust is, here's what you all should be doing, this is

8    why this is such a great program.  All of these things

9    have been highlighted for the defendant in an effort for

10   them, frankly, to see the strength of the government's

11   case, as we often do.

12            So yes, Your Honor, we've highlighted some.

13   Others -- they're all in these productions that we've

14   given, and if they aren't, then they'll be produced

15   shortly.  But the lion's share of discovery that the

16   government's in possession of now has been turned over.

17            The other undercurrent of the defendants'

18   motions, which I heard both in his filed motions as well

19   as this morning, is this idea that I think misconstrues

20   both the scheme and the allegations in the indictments,

21   and that is that the scheme was somehow complete at the

22   filing of these insurance applications.

23            Anybody who has an insurance policy knows that

24   the contract with the insurance company requires many

25   things from all parties.  Requires not just a submission

1    of the applications in order to get the value of the

2    insurance policy.  Requires not just a submission of the

3    application.  Requires also the paying for the policy.

4    And in fact in this case, the paying for the policy is

5    what really triggers the potential loss to the insurance

6    companies.  This whole scheme was directed at being able

7    to illicitly or illegally get these insurance policies by

8    lying to the insurance companies about what the true

9    purpose of procuring them in the first place was, getting

10   the policies, keeping them in force until the time they

11   can be disposed of.

12         And the indictment talks about all that.  The

13   indictment sets that out in spades, in fact why this would

14   cause loss to the various insurance carriers.  And all

15   those litany of reasons why this is an economic harm to

16   the insurance carriers all require the payment of the

17   premiums.  I mean, that's what the loss is here.

18         And to the extent that a scheme to defraud

19   contemplates, as the defendant -- you know, Mr. Egan

20   suggested we haven't gotten to what the crux of his

21   argument was -- but again looking at the economic benefit

22   or the economic harm to the insurance carriers, none of

23   that really triggers until we talk about the payment of

24   the premiums.

25         The cases that Mr. Brown cites in his brief with

1    regard to this issue as to the idea that the scheme would

2    somehow have been completed at the time of the submission

3    of the insurance policies, that goes to a question of

4    whether this was engaging in, you know, was using or

5    transacting in the proceeds of the crime.  So in other

6    words, after the defendants did what they were going to

7    do, they got money out of this, and then they used that

8    money to do something else.  They used that money to buy

9    property.  They used that money to buy other insurance

10   policies that were unrelated.

11           This isn't that.  I mean, this is money being

12   spent by the co-conspirators.  This is money being spent

13   by the co-conspirators to actually carry out the purpose

14   of the object of the conspiracy.

15           I don't think that this is a controversial

16   concept, Your Honor.  And in fact I think the way the

17   indictment is pled shows this in spades.  Because in the

18   superseding indictment it does charge certain counts

19   having to do with the proceeds of the offense.  But it

20   charges those as money laundering, and appropriately so.

21   It does not charge those transactions, the transactions in

22   the straw insured 13 benefit -- death benefit as wire

23   fraud, nor could it.  Because it's proceeds of the crime.

24   It charges those as money laundering, as dealing in the

25   proceeds of crime.

1        And I think, again, that just further shows in

2   relief why the superseding indictment is pled

3   sufficiently, is pled correctly.

4        THE COURT:  To further respond to Mr. Brown's

5   presentation, can you enlighten us as to the government's

6   theory regarding Mr. Carpenter's culpability?  What was

7   his involvement in the activity?  When did it commence and

8   how long did it continue?

9        MR. NOVICK:  Certainly, Your Honor.

10       Mr. Carpenter's, as a -- is the Court asking in

11  terms of allegations or in terms of the fact in general?

12       THE COURT:  In terms of allegations.

13       MR. NOVICK:  In terms of allegations it alleges

14  a number of things.  It alleges that he controlled and/or

15  owned the subject entities, one of which was the plan

16  sponsor in this case which ran the entire Charter Oak

17  Trust.  Off the bat, that shows Mr. Carpenter's

18  involvement in this.  It alleges that he was intimately

19  involved and signed off on the funding of these policies.

20       Now Mr. Carpenter wants to allege that that is

21  somehow innocent conduct.  Well, it may be wire fraud is

22  often a series of pieces of things that might be innocent

23  otherwise but put together and taken in context and with

24  the correct criminal intent is in fact part of the

25  conspiracy, it's part of the scheme here.

1           And again, Your Honor, to go back to what I say

2    at the beginning, as a matter of pleading, the indictment

3    alleges that the defendant Carpenter caused these wires to

4    take place.  It alleges that he participated in this

5    conspiracy with the other individuals.

6           THE COURT:  What was in it for him?

7           MR. NOVICK:  Your Honor, these are his

8    companies, he controlled the planned sponsor, they get

9    premiums, and also to dispose of these policies -- the

10   whole point of this exercise was they get money back at

11   the end.  They get not just -- and I believe the

12   indictment -- the superseding indictment sets out exactly

13   what was contemplated -- but they get both the premiums

14   back, they gent then various fees, which in some cases

15   results in a hundred percent interest on the money that's

16   being loaned out in the first place.

17          So there's a ton of money contemplated to be

18   gained from doing this, and that is the essence of this

19   scheme here, Your Honor.

20          Again it causes all the harms set forth in the

21   indictment.  But in terms of gain, it comes to fruition

22   really when these policies are sold or disposed of in some

23   way and then they get a ton of money back.

24          They also get money through the commissions.

25   And the allegations that, you know, Mr. Carpenter didn't

1   share in that are also belied by the indictment, where one

2   of the subject entities, the TPG Group, participates in

3   receiving money through the -- participates in receiving

4   money that was paid out in commissions on these policies.

5            One other thing, Your Honor, that -- and again,

6   I think that those are really the two driving forces

7   behind the defendants' motion -- and if you relate them

8   back to statute of limitations, venue, all of these things

9   falsely I think improperly assume the completion of the

10  indictment -- completion of the scheme at a particular

11  time, which is just belied by what the indictment says.

12           I'll note that the defendant does -- or

13  Mr. Brown spent a fair bit of time this morning talking

14  about the relation back concept and the statute of

15  limitations as regards to superseding indictment.  I

16  addressed this I think sufficiently in my brief.

17           I would just -- Mr. Brown says that what we

18  should have done was to repeat verbatim the first however

19  many counts.  We did repeat verbatim, except for one

20  sentence that I called to the Court's attention in my

21  brief, that had nothing to do with the charges, repeat

22  verbatim Counts One through Thirty-three.  And then at the

23  end of page 48, it begins anew from there with the money

24  laundering counts.

25           And he -- Mr. Brown cites various paragraphs

1    that somehow make it -- somehow make the superseding

2    indictment improper.  Those paragraphs aren't incorporated

3    in Counts one through Thirty-three.  This is all new

4    allegations beginning on page 48.

5            And what I argued in my brief and what I would

6    reiterate here is that these are -- that the statute of

7    limitations is count specific.  So yes, we believe that

8    Counts One through Thirty-three, they're verbatim from the

9    original superseding indictment.  I suppose we could

10   charge a separate indictment, which would have seemed to

11   be an inefficient use of the Court's time.

12           The case law is clear that the original statute

13   of limitations is given to Counts one through

14   Thirty-three, the new statute of limitations based on the

15   date of the new indictments of the superseding indictment,

16   applies to the new counts.

17           We're not contending, nor could we, that somehow

18   Counts Thirty-four through the end would get the original

19   statute of limitations.  We're not making that allegation

20   nor need we.  And I think we've explained that

21   sufficiently.

22           One more clarification, because it's an

23   inaccuracy in Mr. Brown's original brief and again another

24   one here, is he makes the allegation that the superseding

25   indictment is the first time aiding and abetting are

1    alleged.  Aiding and abetting was alleged in the original

2    indictment.  It's alleged in the new indictment.  It's in

3    the superseding indictment.  Again, those paragraphs were

4    cut and pasted from the original indictment into the

5    superseding indictment.

6         And so I think the relation back concept doesn't

7    apply here.  You just have two separate statutes of

8    limitations and all of the counts are within the statute

9    of limitation.

10        Your Honor I think I've set out what I believe

11   to be the crux of the issue and why we don't have a

12   problem here and why I don't believe this is a

13   controversial position that we're taking.

14        I will make one point.  The defendant says that

15   the Court told us to limit ourselves to the 12 straw

16   insureds in the indictment at the time of the conference,

17   and I do remember the conference almost a year ago.  I

18   don't know that that was the Court's point.  I think the

19   Court was discussing what a trial would look like in the

20   matter.  And as I recall there was some discussion about

21   this other big death benefit that was lurking out there,

22   and I recall making some comment to the point of it seems

23   like the defendant is inviting us to indict him for this

24   other conduct that was not yet a part of the indictment.

25   And that's what we did, and that's the essence of the

1    superseding indictment with adding in his disposition with

2    use of the proceeds from that large death benefit.  That

3    was part.

4         So I don't think we've gone beyond what the

5    Court contemplated us doing.  And certainly obviously

6    we're entitled to supersede as the facts see, you know,

7    lead us towards.  But again, I don't think we did anything

8    other than what the facts dictate and anything in

9    controverting what the Court had directed.

10        Just one moment, please, Your Honor?

11        THE COURT:  Yes.

12             (Pause)

13        MR. NOVICK:  Nothing else, Your Honor.  Thank

14   you.

15        THE COURT:  All right.  Mr. Brown, I'll give you

16   an opportunity to reply briefly, and then I'll call on Mr.

17   Egan to make whatever comments he would like to make.

18        MR. BROWN:  Yes, Your Honor, a couple of things.

19        Number one, and I'll just take paragraph 122 as

20   representative of the other paragraphs I cited earlier,

21   that on Count Thirty-four, which starts out "conspiracy to

22   commit money laundering" that we all agree was not in the

23   original indictment, "the allegations in paragraph 1

24   through 119 of this indictment are incorporated herein by

25   reference."  To me that means that for the first time my

1    client, Mr. Carpenter's, put on notice that as it relates

2    to the first 33 counts, that he now needs to concern

3    himself with new and different charges; that I can't --

4    you can't, when you're defending a case, you can't look at

5    everything in isolation; that the wire fraud, the mail

6    fraud, the conspiracies related, now has an aspect of it

7    as of in this particular case, money laundering or illegal

8    monetary transactions.  And so those are the points I

9    would make on that.

10         Second thing I would make, Your Honor, is quite

11    frankly what counsel has indicated is exactly where I'm

12    going on this, which is that as the way I see it is the

13    question is whether or not the crime is complete for

14    purposes of prosecution when in fact the -- as a result of

15    the earlier activity the policies issued.  Because the

16    object of the conspiracy or the object of the wire fraud

17    or the object of the mail fraud clearly is to obtain the

18    policies.  Now, what you do with the policies is

19    interesting, but that doesn't mean the crime is not

20    complete.

21         Example might be:  Dick Brown decides to go rob

22    the Last National Bank because I want to buy a new

23    Corvette and so I go in and I rob the bank and I come out

24    with the money and I get arrested and my defense is,

25    listen, I intended to take that money and buy a new

1    Corvette, so I haven't completed the crime yet, so I don't

2    think you have jurisdiction.  Whether or not they sold the

3    policies, didn't sell the policies, what they were going

4    to do with the fruits of the illegal activity doesn't mean

5    that the crime hasn't been completed yet.

6            And so the reason the government's arguing as

7    hard as it is, I submit, is simply because when you get

8    into the statute of limitations -- I won't go to the whole

9    thing -- it's in my brief, without that theory being

10   accepted by the Court, then I respectfully submit the

11   Court has no choice but to dismiss those counts wherein

12   the criminal conduct did not happen within the previous

13   five years.

14           And if I could, Your Honor, just one other

15   aspect, if I could indulge the Court with?  Because this

16   is where I was leading before the Court stopped me.  And I

17   haven't addressed it yet because it's really two blocks.

18   We got the original charges and then we have the new

19   charges.

20           The new charges are a little bit different than

21   the other ones.  The new charges concerned an incident

22   where a particular individual straw buyer, 13 or 14,

23   unlike all the other matters, procured the policy in the

24   2006, 2008 time period, and before the two years was up,

25   he passed and it resulted in policies of $10 million and

1    $20 million ultimately becoming available.

2            What's important about that, however, because we

3    have to get into whether or not it's alleged that

4    Mr. Carpenter had the criminal intend, the criminal

5    knowledge as related to the money laundering with

6    specified unlawful activities and those kinds of things

7    and was that properly pleaded, and of course our position

8    is it isn't and their position is it was.

9            And I would only want to point out, Your Honor,

10   that in this particular activity the Court certainly can

11   take notice of the allegations, which is simply that at

12   some point the insurance carrier, in this case Lincoln I

13   recall, paid the policy, and somehow or other my client is

14   supposed to know that even though they took a year, I

15   think according to the allegations, to do so, and even

16   though my client again without going through the whole

17   thing, wasn't involved in the -- you know, he didn't

18   submit the policy application or anything else -- but

19   somehow or other he's supposed to know that this is now

20   the fruits of some sort of criminal activity even though

21   certainly he had a right to rely upon the activities of

22   due diligence of the carrier itself.  And there was some

23   litigation that was going on and ultimately the company

24   decided to pay the money.

25            And those subsequent counts all concern the

1    activity of my client, vis-a-vis the money that was paid

2    by the carriers to the Charter Oak Trust that owned the

3    two policies.

4           And I'm only submitting, Your Honor, that when

5    the Court reviews that aspect of it, it's our claim that

6    even accepting the allegations at face value, it's

7    insufficient because there's no basis, no foundation

8    articulated in the indictment as to how it is that our

9    client, my client, could have known that those were the

10   fruits of some sort of illegal, illicit transaction from

11   when the carrier itself paid.

12          So there is that dividing line, Your Honor, and

13   how the Court determines whether or not the crime has been

14   completed plays a role I think in all 50 counts.

15   Certainly I can leave the issues involving venue, which

16   counsel didn't address, I'm sure he would if the Court

17   asks, is this really the right jurisdiction when

18   everything essentially -- other than the mailing from COT

19   apparently to the carriers occurred outside the alleged

20   fraudulent activity, as to whether or not this is the

21   proper forum.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Mr. Egan?

25          MR. EGAN:  Thank you, Your Honor.

1            Your Honor, I also filed a motion to dismiss.

2    Your Honor, I just want to elaborate on the points that

3    were made in the brief.  I'm sure Your Honor has fully

4    reviewed the brief so I don't want to rehash everything

5    that's in there.

6            I do not take any position obviously on

7    Mr. Brown's arguments with regard to Mr. Carpenter's role

8    in the case and what he did or didn't do.  It's not my

9    business or my issue.  But I do take some issue with

10   something he said in his argument, and that was that we

11   should assume that these are material misrepresentations

12   because that -- we should not assume that these are

13   material misrepresentations and in fact that is the crux

14   of the argument with the motion to dismiss that we filed

15   on behalf of Mr. Bursey.

16           And essentially, Your Honor, what is at question

17   here is what is the actual bargain and what is the

18   actual -- what is material and important to the bargain

19   between these individuals who purchased these policies and

20   the insurance companies.  And the question is whether the

21   misrepresentations, which of course because they're

22   alleged in the indictment we must assume are accurate for

23   the purposes of this argument, but whether those

24   misrepresentations go to the basis of the bargain or are

25   they merely collateral to the bargain.  And we would argue

1    to Your Honor that they are merely collateral to the

2    bargain.

3            And the reason is that the insurance companies

4    in this instance have a contract with these various

5    individuals.  That contract allows those individuals to

6    sell their insurance policy after a two year period.  If

7    the insurance companies did not want to allow those

8    individuals to sell those policies after that two year

9    period lapsed, those insurance companies could not allow

10   that to be part of that contract.

11           There are statements in the various applications

12   about what you intend to do with the policy.  There are

13   statements in the applications that talk about is there

14   third-party financing of the policy.  But there is nothing

15   to indicate to the prospective purchaser or to my client

16   or to anyone else, that if you say a different answer to

17   those questions, you will not receive the policy, you will

18   not be able to sell the policy or that anything else

19   changes.

20           And in addition, these are insurance policies

21   where the premiums that are being paid are extremely high.

22   So it's not like the insurance companies are, you know,

23   not getting paid a sufficient amount of money or a correct

24   amount of money for this policy.  And indeed the

25   government's allegations that they're not receiving the

1     appropriate amount of money for it are entirely

2     speculative.  And you need look no further than the

3     indictment.

4          The purported damages that are listed in the

5     indictment are receiving lower premium rates or having to

6     pay out a higher death benefit because applicants falsely

7     represent themselves as higher net worth than they

8     actually were is entirely speculative.  Third-party payers

9     are less likely to pay premium in excess amounts than

10    insured payers.  Not that they will.  Third-party payers

11    are less likely to allow policy lapses than insured

12    payers.  Third-party payers are more likely to submit late

13    payments.  No evidence that they got late payments in this

14    case, no evidence that policies that would have lapsed

15    didn't lapse, or no allegation of any of these facts.

16         And the last is the higher the warranted payment

17    of commissions to agents.  The fact of the matter is, the

18    agents are, as Mr. Brown stated, the insurance company's

19    agents.  The insurance company regulates the agents, they

20    license the agents, and kick them out if they want to.

21    And quite frankly, it is well-known in this industry that

22    agents sold these types of policies.  And oftentimes when

23    the agent was involved with the individuals, they were

24    actually knowledgeable of what was going on.  They are the

25    insurance company's representatives, not Mr. Bursey.

1    Mr. Bursey is merely a trustee for the trust who is

2    administering this program and administering this policy.

3            So for the government to allege that he engaged

4    in a scheme to make material misrepresentations to an

5    insurance company when the insurance company's agents

6    themselves were in some instances I believe aware of the

7    facts or certainly the entire insurance industry was aware

8    of this practice and these policies, is I think

9    insufficient to carry the government's burden.

10           In addition, the some of these insurance

11   companies actually did better on these policies than they

12   otherwise would have, because what they ended up doing is:

13   They would take the policies, collect the premiums and

14   before the two years was up, they'd pull the plug on them.

15   They'd basically come back and say, this is a third-party

16   beneficiary, we're voiding this contract.  By the way, you

17   paid us all this money, we get to keep it -- and there's a

18   lot of civil litigation going on around the country about

19   this -- we get to keep all these premiums we made and you

20   don't get the benefit of what you paid for, your life

21   insurance policy.

22           And a cynic might suggest, because I don't trust

23   Bank of America more than I trust anybody else or any

24   other insurance company, that the insurance companies were

25   aware of this the entire time and were more than happy to

1    collect these premiums knowing they weren't going to have

2    to pay out on the policies.

3           So they're going in with their eyes open, the

4    misrepresentations are not material to the bargain and the

5    case law, and it's cited in both our brief and the

6    government's brief, United States versus Regent Office

7    Supply, and United States versus Shellef, basically talk

8    about this.  It's where two parties come to an agreement

9    and one party does a little better off on the agreement

10   but it doesn't otherwise harm the other party or those

11   harms are speculative or they're not going to the basis of

12   the bargain, then that is not a material

13   misrepresentation.

14          So the crux of the argument is, Your Honor,

15   these are not materially misrepresentations, the

16   government has not sufficiently pled the case and

17   therefore this Court should dismiss the indictment as it

18   pertains to Mr. Bursey.

19          Now, I've also argued that if the mail fraud and

20   wire fraud falls, then the money laundering must fall as

21   well, because the specified unlawful activity on which the

22   money laundering is based is that very act which we are

23   arguing here is not material.

24          THE COURT:  So although the superseding

25   indictment alleges that the defendants undertook to

1     deceive the carriers with regard to the nature of these

2     policies, superseding indictment fails to allege an

3     offense for the reasons you've stated.

4               MR. EGAN:  Yes, Your Honor, there's no material

5     misrepresentation because it doesn't go to the crux of the

6     bargain, it's a collateral and it doesn't go to the basis

7     of the bargain.  And there can be collateral

8     misrepresentations, but if the basis of the bargain is the

9     same -- and this is the case law from Shellef and Regent,

10    if the basis of the bargain is the same, then it's

11    collateral and it does not rise to the level of mail

12    fraud.  And that's Second Circuit law.

13              THE COURT:  In that context, Mr. Egan, please

14    state the essence of the bargain.

15              MR. EGAN:  The essence of the bargain is that

16    the individuals are purchasing a life insurance policy,

17    they're paying a premium for that life insurance policy

18    and that life insurance policy will pay on them if they

19    die.

20              One of the clauses in that life insurance

21    policy, and none of the ones that were issued said this

22    was not true, is that those individuals are able to sell

23    that insurance policy after the contestability period

24    passes.  And under Connecticut law it's legal to sell

25    those insurance policies after the contestability period

1    passes.

2           The government's allegation is that because the

3    applications ask questions about whether there's a

4    third-party beneficiary or whether you might be intending

5    to sell this down the road, therefore when those questions

6    were not answered accurately, that is a fraud.  Our point

7    is that that doesn't change the actual contract, it

8    doesn't change the actual bargain.  All it does is add a

9    collateral misrepresentation which wouldn't rise to a

10   level sufficient enough to make out a crime.

11           THE COURT:  Thank you.

12           MR. EGAN:  Thank you, Your Honor.

13           THE COURT:  Mr. Novick?

14           MR. NOVICK:  Yes, Your Honor?

15           THE COURT:  Let's start with the argument that

16   there was no harm done.

17           MR. NOVICK:  Certainly, Your Honor.

18           Your Honor, I'd love to think that when I

19   purchase life insurance to protect my family, that the

20   insurance company prices that because they care about me

21   and, you know, want to do right by my kids, but that's

22   simply not the case.  They price their policies out and

23   they price them out -- if this were a widget, some

24   product, they would price it out based on how much it cost

25   to make the thing, shipping it out and making a profit.

1    Insurance companies have to do something else.  They have

2    to calculate how much money they expect to make from the

3    policy.  They have to calculate the fact that they're a

4    going business, they need to stay in business because they

5    do provide a necessary service for our economy.  So they

6    need to price out how much money do they think they're

7    going to make in based upon how long they think you're

8    going to live, based upon how long they think you're going

9    to hold the policy, whether the policy is going to lapse.

10   In other words, are they going to actually end up having

11   to pay out that benefit.

12          Now, we may say, well, that's unfair because the

13   insurance company should assume they're going to pay out

14   that death benefit at the end of the day, but that's not

15   true.  If you think about it, assuming a certain lapse

16   rate allows them:  A, to make more money for their

17   stockholders and, B, allows them to price differently

18   everybody else's insurances.

19          So all of these things the insurance companies

20   factor in to how they're going to price their policies.

21   We my not like it, we may say they shouldn't take that

22   into account, but the reality is they do.  And the reality

23   is that they ask these questions on the applications so

24   that they can price their policies.

25          Now, if we want to say that they're asking

1    superfluous questions on the applications, in other words

2    this question is there but they don't really care about

3    it:  A, that doesn't make any sense and, B, that's a fine

4    argument the defendant can make at trial.  As a matter of

5    pleading, the indictment pleads in spades exactly what the

6    Shellef court said was missing in that case.  Exactly why

7    this -- these lies go to the basis of the bargain.

8    Exactly why there would be an economic harm to the

9    insurance company were they to issue these policies based

10   upon these specific misrepresentations.  And that's all we

11   really need to do.

12          It's what the Court upheld in Binday, and in

13   fact, this alleges additional information regarding

14   commissions and other aspects of this than was in Binday.

15   But nonetheless, the same approach was undertaken and that

16   approach was directly in response to the Court's decision

17   in Shellef, the Second Circuit's decision in Shellef.

18          And as to the other cases that the defendant

19   cites, Mr. Egan cites, again I've responded to that in my

20   brief, I don't need to rehash all of that here, but in

21   essence what those cases dealt with were really what we

22   call a no sell theory of wire fraud.  So there's

23   misrepresentations made but they didn't really affect

24   the -- and they would have affected necessarily the

25   decision made by the individual, but they didn't really

1    go, they didn't really cause any harm, they didn't really

2    go to the basis of the bargains.  Here this goes to the

3    essence of the bargain, it goes to the information the

4    company had.

5              THE COURT:  At a trial you would offer testimony

6    by people from the carriers?

7              MR. NOVICK:  Absolutely, Your Honor.

8              THE COURT:  And how do you propose to deal with

9    the argument that they were in fact aware of what was

10   going on and happy to line their pockets?

11             MR. NOVICK:  Sure, Your Honor.  And I anticipate

12   the defendant making those arguments.  I anticipate filing

13   a motion in limine just as the government did in the

14   Southern District in the Binday case to preclude some of

15   those arguments as being extraneous to this case here.

16   Because I think what Your Honor will see, as in this case

17   here, is that each and every one of the underwriting files

18   for the insurance policies was remarkable in the sense

19   that:  Number one, all of the policies have these lies on

20   them; in none of these underwriting files were any of

21   these funding documents provided.

22             You'll hear testimony from some of the internal

23   sales agents for the insurance companies who had no idea

24   that these were being funded in the manner they were.

25   They simply thought that these were, you know, typical 419

1    plans made with payments from the employer for the benefit

2    of the employee.  No idea that there was a $35 million

3    line of credit to pay for all these.

4             And in fact, to go to what Mr. Brown said

5    earlier, even when the death benefit of straw insured

6    number 13 was being investigated, they continued to tell

7    these lies in response to questions asked by the insurance

8    company.

9             In fact, Mr. Egan's client himself sent in

10   paperwork which denied the existence of a collateral

11   assignment of this policy when in fact knowing full well

12   the whole essence of this was, and in fact there was in

13   existence, a collateral assignment of this policy.

14   Because they knew that this would cause the insurance

15   company not to pay out the policy.

16            Now, there's civil litigation, I believe it's

17   called the Fenwick litigation out in California regarding

18   some practices by Phoenix prior to the time of these

19   insurance policies citing the testimony of one particular

20   agent or one particular employee of Phoenix who said that

21   he was directed to do this by his employer and he got

22   bonuses based upon that.  It was in contradiction to other

23   testimony in that litigation regarding practices within

24   Phoenix.

25            But again, here most of these policies or all

1    these policies are after the conduct in that case, involve

2    several other insurance companies, and involving, Your

3    Honor will see -- and I can pull out emails now, to show

4    Your Honor why we'll prove that not only were these

5    material misrepresentations, but the defendants knew they

6    were material misrepresentations.

7            In fact, Your Honor, if I may just have one.

8    moment?

9                    (Pause)

10           MR. NOVICK:  In one email in 2009, Mr. Carpenter

11   writes to one of his agents who worked with Lincoln

12   carrier.  He says -- the agent had asked for guidance on

13   how to check "no" to some of these questions, and they

14   engaged in a back and forth over this.  And it ended with

15   "Remember, if you check 'yes' they will expect you to say

16   the name of an approved finance program like Credit

17   Suisse.  Problem is, they haven't approved any program so

18   they killed the application."  Seems to me materiality

19   right there, Your Honor.

20           So I think we'll be able to prove that.  And

21   that's how we'll prove it.  We'll prove it through both

22   the statements of the defendants, prove it through the

23   testimony of the insurance companies.  And we invite that.

24           But as far as a matter of pleading, we've pled

25   exactly what I think the insurance companies were going to

1      say.  We pled exactly what I think the defendants were

2      contemplating as to why the warrants issued.  They might

3      not like that fact.  They may say, you know what, in '04

4      and '05, the insurance companies would have issued these

5      policies.  And that may be the case.  It maybe took the

6      insurance companies awhile to figure out this hurt their

7      funding, and they came up with all these policies that the

8      Court will hear about to stop this from happening.

9            And they communicated that to the brokers, they

10     communicated that to the people they worked with, they

11     communicated that to people who work with the defendants

12     and for the defendants.  And that was discussed.  There

13     are emails going back and forth among all of the

14     co-conspirators saying look, you know, here's the latest

15     policy from Lincoln, here's the latest policy from Phoenix

16     on this issue.

17           So again Your Honor, I invite that as a trial

18     issue.  For a matter of pleading, I don't think there's an

19     issue here.

20           THE COURT:  Thank you.

21           Mr. Egan, any reply?

22           MR. EGAN:  Yes, Your Honor, I think that's

23     changing the focus of what really should be considered by

24     the Court.  And what should be considered by the Court is

25     that the policies allowed for sale, every policy allowed

1     for a sale of the policy, and therefore if they didn't

2     want a sale of the policy, they could have kept that out

3     of the contract, and therefore they were not induced to

4     enter into the contract by the misrepresentations, and

5     therefore the misrepresentations are not material.

6              THE COURT:  Okay.  We'll take a break, and when

7     we come back, we'll turn to the motions to suppress.

8              MR. EGAN:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10              (Whereupon, a recess followed).

11              THE COURT:  Turning to the motions to suppress,

12    Mr. Brown?

13              MR. BROWN:  Your Honor, again, as I indicated

14    earlier, I won't test the Court's patience by rehashing

15    virtually everything that's contained in the various

16    briefs that were provided, but I'm sure the Court wants to

17    deal with certain issues, presumably starting with the

18    issue of standing to contest the search.

19              The government has in its brief suggested to the

20    Court that Mr. Carpenter is without standing to challenge

21    the searches in question.  And in particular there really

22    are two searches.

23              There was one that was done, Your Honor, in 2010

24    in an unrelated matter by the IRS, presumably IRS CID,

25    that in April I believe of 2010 went onto the same

1    premises in Simsbury as did the Department of Labor in

2    2011, in May of 2011, and conducted a search wherein they

3    seized a certain number of hard drives, I believe it was

4    13, and over 200 some odd boxes of materials.  And that

5    from 2010 to 2011 they either possessed or controlled

6    those documents and items seized.

7            And then there was the search in May of 2011 at

8    the same premises as well as down in Stamford,

9    Connecticut, wherein numerous agents, there's a debate

10   over the number, but I won't get into that today, that

11   went into the two premises, Your Honor, and seized a

12   number of hard drives where they downloaded the

13   information.  And then they didn't physically take the

14   hard drives, as I understand it, but if they did, they

15   shortly thereafter returned them.  But rather drained

16   those hard drives of information as well as secured

17   numerous documents.

18           And they did so in both cases, Your Honor, as a

19   result of search warrants having been issued by various

20   magistrates of this court.

21           And in both situations, Mr. Carpenter had his

22   own office on the premises.  And I find this issue of

23   standing somewhat ironic, because as recently as today

24   we've heard counsel representing the government claim

25   Mr. Carpenter's responsible for everything.  Mr. Carpenter

1    controls everything.  And there's no dispute where Mr.

2    Carpenter's offices were, 100 Grist Mill Road in Simsbury.

3            So I think the government's going to be quite

4    hard-pressed at this point to have its cake and eat it

5    too, as it were, by on one hand claiming that

6    Mr. Carpenter's role was a very material one and

7    Mr. Carpenter's role was such that the various entities in

8    question were somehow or other controlled by him.

9            There's no dispute that Mr. Carpenter's office,

10   which is his own office, was located at Grist Mill Road.

11   There could be no dispute that -- in fact on the day of

12   the search, Your Honor, he was actually present, and I

13   think the government may have put that in its brief

14   somewhere -- was present during the course of the search.

15   The search was all inclusive.  They went from one end of

16   the building to the other.  There were many agents there.

17   They spent several hours going through everything.  They

18   seized items such as personal, ironically, insurance

19   policies that had nothing to do with their investigation

20   and other such items.

21           So it's the position of the defendant, Your

22   Honor, that the Fourth Amendment is here to protect

23   people, not places, and that indeed in this case our

24   motions are directed to protecting the Fourth Amendment

25   rights of my client, Your Honor, to be free from

1    unjustified searches by the government, or to be protected

2    against searches that may extend, be very broad and beyond

3    the scope of a warrant, to protect searches where there is

4    in fact a defective warrant.

5           So while I understand the government raising

6    this point because, why not, I suggest that in this case

7    it's a tad frivolous, and that we ask the Court to allow

8    Mr. Carpenter to have his day in court by having these

9    warrants and the government scrutinized to ensure that

10   they acted within the framework of the law itself.

11          On the warrants, Your Honor, on the warrants

12   themselves --

13          THE COURT:  Before you turn to the warrants,

14   Mr. Brown, excuse me.

15          Is Mr. Carpenter obliged to submit an affidavit

16   stating that he had a reasonable expectation of privacy in

17   the premises and providing some basic facts to support his

18   claim?

19          MR. BROWN:  Well, Your Honor, that's a good

20   question, Your Honor.

21          The issues we had today, Your Honor, was whether

22   or not this was really going to be any kind of evidentiary

23   hearing.  And I took this to mean that the decision was

24   made simply that both parties, as we're doing really,

25   would engage in oral arguments.

1            I can't represent as an officer of the Court

2   that if the Court felt it appropriate that such an

3   affidavit be filed, I can represent that I would have that

4   affidavit in ten days.  It's just more of a mechanical one

5   of getting him to sign it.

6            But I can represent and make this proffer, Your

7   Honor, that he would attest to the fact that, as stated

8   and undisputed, he was on the premises that day; and there

9   is no dispute either that those are his business premises;

10  that he has his own office there, he wasn't a guest, he

11  wasn't happened to be there when the agents came in kind

12  of thing; and that if anything, the warrant seems to

13  support the claim that they believe that various documents

14  of which they earlier claim my client would have had

15  control or possession, meaning financial documents and

16  whatnot, that is represented by the government to be

17  critical in their case, are clearly associated with

18  Mr. Carpenter.

19            But certainly, Your Honor, if the Court feels, I

20  would just ask the Court to indulge the fact that I could

21  have such an affidavit that would attest to what I'm

22  representing filed with the Court in a very timely

23  fashion, Your Honor.

24            THE COURT:  Thank you.

25            MR. BROWN:  And if I may proceed, Your Honor?

1    And then the Court can perhaps later on decide the

2    appropriateness of any such affidavit.

3            THE COURT:  Thank you.

4            MR. BROWN:  But that would be the proffer that

5    my client would be willing to sign under oath as to his

6    activities at the facility.

7            Quite frankly, as stated in one of my briefs,

8    Your Honor, I didn't include the whole thing that my

9    client had given to me, but the bottom line is he spends

10   more hours in that facility than he spends at home.  And

11   that would include sleeping time, I guess.

12           Your Honor, for the purposes of moving this

13   hearing along, Your Honor, I would -- my argument as it

14   relates to the affidavits are similar in both, and so I

15   will address both at the same time, meaning both the 2010

16   and 2011 search warrants.

17           The reason, Your Honor, that the original search

18   in 2010 is important and needs to be reviewed by this

19   Court is that the Internal Revenue Service, as it stated,

20   did seize a number of documents or other evidence in their

21   search.  And in 2011, the Department of Labor determined

22   in May that there very well might be some information

23   contained in the documents seized by the IRS 13 months

24   earlier that would have been of assistance to them in

25   their investigation of the instant matter, and as a result

1    of that, they did in fact procure a warrant really just

2    simply reciting the same facts and information contained

3    in the search warrant of the 100 Grist Mill Lane property

4    and the Stamford properties, Your Honor.

5           And so our position is that if in fact the

6    Internal Revenue Service's warrant was defective, that it

7    would be contrary to law to allow the fruits of that

8    seized property to be seized by the government yet again

9    for another investigation.

10          The basic theme, Your Honor, is that if you

11   review the affidavits, you couldn't have come across a

12   more broad, expansive list of items that the warrant

13   ostensibly allowed to be searched.  And if you review each

14   warrant, you'll note contrary to the typical warrant it

15   doesn't cite a crime that's being investigated.  The

16   information that we have, we weren't there, but the

17   information we have is that the warrant -- the arrest

18   warrant affidavit itself was not attached to the warrant.

19          And our position is, Your Honor, that the law

20   enforcement people that went onto the premises, from the

21   affidavit or from the warrant rather itself, were not

22   provided with specific enough guidance to avoid what

23   really ultimately turned out to be a general search.

24          And this is all complicated, Your Honor, because

25   here we are in the 21st century, and the dilemma that

1    courts have of course in determining whether or not law

2    enforcement people exceeded their bounds really are tied

3    up in computers.  Because really what the protocol seems

4    to be now is that contrary to the, shall we say good old

5    days, and contrary to the initial response of the Fourth

6    Amendment, that indeed draining a computer of all its

7    information on the hard drive, there's no discrimination,

8    literally everything is taken, and then later on in the

9    convenience of their own offices they review all the

10   documents and I guess theoretically supposed to put aside

11   those that aren't in their minds within the confines of

12   the four sides of the warrant, and then permitted to

13   review or seize or keep the rest.  And presumably this is

14   supposed to be done in a reasonable time period, and

15   ultimately any items that are seized beyond the scope of

16   the warrant are supposed to have been returned.

17            In the 2010 case, as indicated, 13 months went

18   by where the government was controlling certain items that

19   had been seized, even though that by that time 13 months

20   later no indictment had come down against anyone connected

21   with that seizure, as far as I'm aware.  And indeed here

22   we are 2014, four and a half years later, nothing has come

23   down.

24            It appears that what happened was that the

25   government in its infinite wisdom ultimately, instead of

1     returning the property to its owner in this case the

2     various businesses and/or my client, chose instead to turn

3     a lot of the items over to counsel for Mr. Carpenter or

4     the companies.  And one would think, well, isn't that good

5     enough?  But there's cases in there, and I think I cited

6     cased, Your Honor, for the proposition that until such

7     items have been returned to their lawful owner, then they

8     don't have the enjoyment of control over those properties

9     meaning those properties can only be accessed with

10    permission of the government set up under terms of the

11    government.

12              So the person who owns that property doesn't

13    have control.  And I cite a case, Your Honor, for the

14    proposition that that's not good enough when property

15    taken that shouldn't have been taken or taken and should

16    have been returned because a reason period of time

17    standard has passed, our position is that it's not present

18    in our particular case.

19              In other words, 13 months -- by 13 months, said

20    property that was beyond the scope of the warrant in 2010

21    should have been returned.  Or even if it was within the

22    scope of the warrant, if it wasn't being used to

23    facilitate its intended purpose any longer, should have

24    been returned.

25              And so that's one aspect of the case.

1        And then the 2011 warrant by the Department of

2   Labor, Your Honor, which sought the property, and in more

3   particular, sought to go onto the premises and seize

4   virtually everything on the premises, it's our position is

5   overly broad.  There was no -- there was really nothing in

6   the place they couldn't have seized.  Now, they didn't

7   seize everything in the place, and I'm not claiming that

8   they would.  But there was no guidance.  And warrants that

9   don't provide guidance -- and I cite the cases -- are

10  obviously overbroad.

11       And a part of what the Court may look at in

12  determining how broad it is and whether or not there's

13  proper guidance is whether or not there's cited on the

14  arrest warrant itself a particular crime.  And the reason

15  of course why that's important is if you're looking for

16  stolen TVs, you don't need to go into someone's medicine

17  cabinet.  So that with the nature of the crime should

18  direct in part law enforcement in terms of what areas of a

19  business or home it may go into.

20       Now, there's case law, Your Honor, that states

21  that perhaps commercial businesses are not necessarily

22  entitled to the same strict standard as going into

23  somebody's home, but it doesn't mean that the businesses

24  or the individuals in the businesses aren't entitled to

25  the protection of the Fourth Amendment.  And so even

1    though you might give a little bit more leeway because

2    it's commercial as opposed to a personal residence,

3    nevertheless, they still are entitled to the same

4    protection and the same scrutiny in terms of whether or

5    not relatively speaking the warrants are overbroad.

6         Now -- so we're just simply asking the Court,

7    Your Honor, to review the warrants.  I've already put in

8    the briefs and the reply briefs our feelings about the

9    legality of those warrants.  I need not go into that

10   further.

11        But I do also want to bring up one other point,

12   Your Honor, because the government went into it, and that

13   is, well, assuming that the warrants are in fact

14   defective, what should the Court do?  And the government's

15   position is that in this case the exclusionary rule under

16   Leon, or whatever, shouldn't be such that the items seized

17   should be excluded from the possibility of use at a trial.

18   And the claim is that the agents went in in good faith and

19   operated in good faith.  I think that's typically the

20   test.  Or whether or not there were things in there that

21   were misleading to the magistrate.  Those kinds of tests.

22   And again I brief all that, Your Honor.

23        But -- and I put in my brief, Your Honor, a

24   series of statements that are put in the affidavit that we

25   believe are not factually correct.  And while any one of

1    those particular claims may be in and of itself not

2    monumental or material, it is the sum total of all of

3    those statements, remembering that the government has been

4    investigating Mr. Carpenter for a period of time and there

5    was nothing that required them to do this overnight, that

6    I think any magistrate is entitled to presume that the

7    government was very careful in any fact represented to the

8    Court in attempting to induce the Court to allow them to

9    go on to somebody's business premises and search to their

10    heart's content for whatever is claimed in the search

11    warrant.  Scope of search.  And I list a series, Your

12    Honor.  And it's our position that if you combine all of

13    those misrepresentations, that it adds up to a situation

14    where the magistrate is misled as to the facts that would

15    support the affidavit and justify the search.

16         So our claim in part, Your Honor, is -- and I

17    cite three different areas out of four, I don't accuse the

18    magistrate of any improprieties, and only one needs to be

19    proven -- as to why it is that the exclusionary rule

20    should be applicable and that in fact, with all due

21    respect, that there was not good faith in this matter,

22    that the agents should have known.  Simply, by the way,

23    the most fundamental things.  Look at the warrant and what

24    are we looking for?  What crime is there?  Tell us what

25    crime there is.

1         And the final point, Your Honor, is that if you

2    look at the warrant as relates to Mr. Carpenter, because

3    of course when you're talking about Mr. Carpenter's right

4    under the Fourth Amendment, we need to see whether or not

5    the warrant justified searching Mr. Carpenter's items that

6    were in fact seized or Mr. Carpenter's emails that were

7    seized.  Not just is there justification to go in there

8    for other reasons.  I think each person that's the target

9    of a search, as Mr. Carpenter was, is entitled to the

10   benefit of the Court looking at the warrant in the context

11   of this individual.

12         And if you look at the warrant by way of the

13   2011, you'll see that the only thing that I could find in

14   there is some allegations about that he was involved in

15   certain financing of certain items.  I don't see in there

16   as it relates to Mr. Carpenter that they were talking

17   about fraudulent emails by the way of example.

18         And so if there isn't probable cause to search

19   that particular area, even though there might be probable

20   cause in the warrant to search other areas, I only ask

21   this Court, Your Honor, to scrutinize the warrant to see

22   if the areas searched involving Mr. Carpenter, the papers

23   taken concerning Mr. Carpenter, that there's a

24   justification and a warrant that would permit and allow

25   the agents to do so.

1          So other than that, Your Honor, I spent a lot of

2    time on the briefs, I don't think I need to repeat them

3    any further.

4          Thank you.

5          THE COURT:  Thank you.

6          Any comments, Mr. Egan?

7          MR. EGAN:  No, Your Honor.

8          THE COURT:  All right, thank you.

9          Mr. Novick?

10         MR. NOVICK:  Your Honor, again if I can boil

11   down what I think the issues here are:

12         The first is I would say as to standing -- and I

13   think this actually also pervades the motion with regard

14   to certainly the challenge to the veracity of the search

15   warrant or the sufficiency of the search warrants in some

16   respect.  And I guess I look to what Mr. Brown said

17   earlier, which is that he was looking for the Court to

18   tell him what the Court was looking for it.

19         It's not the Court's burden to do that.  It's

20   the defendant's burden to make a motion if he wants to

21   make a motion, if he wants to make a motion to suppress,

22   and if he wants to challenge the allegations underlying

23   the affidavits, if he wants to assert standing on behalf

24   of an officer in the corporation that was searched, it's

25   his burden, he needs to come forward -- the case law is

1    abundantly -- clear with evidence.  Now, whether that's in

2    the form of an affidavit signed by his client, whether

3    it's in the form of an affidavit signed by somebody else

4    with direct knowledge.  He needs to come forward with an

5    affidavit to support that.

6          And what does that grant him?  Well, that gets

7    him to a Frank's hearing in some respects, or at least

8    gets us to a hearing where we could challenge the veracity

9    of whoever came forward to suggest that the agent was

10   somehow mistaken or intentionally lied I guess in this

11   case in the affidavit.

12         He hasn't done that, and I don't think it's fair

13   to the government, frankly, to say, well, let's see how

14   this goes first, let's see if the Court's going to accept

15   my allegations first or say that there's an issue, and

16   then I'll go about trying to gather facts to support this.

17         And I don't think this can be solved simply by

18   taking what's in the brief and having Mr. Carpenter sign

19   it, certainly with regard to standing.  And actually also

20   with regard to the Frank's issue.

21         With regard to standing, all the defendant is

22   saying is essentially that -- and the government says

23   the same thing -- that he controlled some of the companies

24   that were on site there.  Mr. Carpenter has spent his life

25   or certainly his professional life, creating companies,

1    and he wants to hide behind those companies in many

2    respects, and he's doing that here.  He's saying, look, I

3    didn't have anything to do with Charter Oak Trust, with

4    Nova, whoever else, I dealt with these companies but not

5    with these companies.  He can't have it both ways.

6           He wants to hide behind these companies.  He

7    wants to say these offices are the offices of these

8    companies.  Fine, come forward and tell us how it is that

9    you have an expectation of privacy in a particular

10   location that was searched in this office.  Come forward

11   and tell us.  You have an office there and you say that

12   things were seized from a particular place within that

13   office.  Come forward and tell us.  He hasn't.  He knows

14   what was taken.  He has the ability to do that.

15          And one of the frustrating things about this

16   motion is its lack of specificity.  There were a number of

17   things taken.  The inventories, he attached some of them,

18   we attached all of them at least with regard to 100 Grist

19   Mill Road with regard to a different point, but the Court

20   can see there were things taken from a number of different

21   places.

22          I did a quick count before we came to Court this

23   morning, Your Honor.  Just looking at 100 Grist Mill Road

24   in the Department of Labor search in 2011, among those I

25   believe 40 boxes or so, boxes that were taken in that

1    search, there were three boxes of material that were taken

2    from Daniel Carpenter's office and one box of material

3    from Mr. Bursey's office.

4         So come forward and tell us why.  Who had access

5    to that office?  Was it locked?  Did you keep -- was it

6    business files primarily that were in there?  What was the

7    status of that office?  Did other people come into that

8    office periodically?  Was there a corporate policy that

9    said that these documents are not yours?

10         Mr. Brown has repeated both in these motions as

11   well as in the motions he filed pre-indictment with regard

12   to the search warrant -- and again we've been litigating a

13   lot of these facts, Your Honor, for a couple of years

14   now -- says that we seized his personal insurance policy.

15   And as I've repeated to the Court in our response and

16   repeated to Judge Hall when we were litigating this

17   pre-indictment, the insurance policy that was seized was a

18   policy for a house in Rhode Island which was purchased

19   with the proceeds of the crime and charged in the

20   indictment.  So again, come forward and tell us, what

21   place?

22         Mr. Brown is right that the Fourth Amendment

23   protects people, but it protects people's rights in

24   particular places.  It's not just a question of, you know,

25   Mr. Carpenter is aggrieved because this had to do with him

1    in some way, shape or form.  He needs to assert where the

2    material was taken from and why he had an expectation of

3    privacy in that location.

4            And that goes to his last point as well, which

5    is, it doesn't matter whether the indictment -- excuse

6    me -- whether the search warrant affidavit says anything

7    at all about Mr. Carpenter.  It does, but it doesn't

8    matter.  It certainly asserts enough information, enough

9    evidence to say that they should be able to search the

10   entirety of that office.  Because even assuming the

11   defendants facts as true and that Mr. Carpenter only

12   participated in the funding aspects of this plan,

13   certainly the funding of the Charter Oak Trust policies is

14   evidence of the crime that the government alleges was

15   committed here and that the court and the magistrate found

16   probable cause to support.

17           So that's certainly enough to go into his

18   offices and take those documents and then let's argue

19   later on, as we're doing today, about whether that

20   constitutes and we'll argue at trial as to whether that

21   constitutes at least in part his participation in the

22   crime.  So that's the first.

23           Your Honor, I don't think the standing issue is

24   frivolous, and I don't think he can simply sit back and

25   say I'll produce additional evidence as to standing in

1    this context later on.  He didn't meet his burden.  He had

2    the burden, he hasn't brought anything forward to the

3    Court to meet that burden.  So the motion should be denied

4    purely based on that ground.

5              Pushing forward to --

6              THE COURT:  What then?  Suppose I agree with

7    you?  What then?  Would he be prevented from seeking to

8    file a new motion, one that was adequately supported?

9              MR. NOVICK:  Your Honor, it's a fair point.  I

10   think that what I'm about to suggest is that the Court can

11   certainly make note of the fact -- I think the Court

12   ultimately doesn't need to do that.  Because I think the

13   Court can deny the motion on all the other bases and not

14   necessarily revisit standing.

15             But yes, Your Honor, I think it would be up to

16   the Court to decide at that point whether the Court ought

17   to permit the defendant -- even though the case law is

18   clear, even though his burden, his obligation is clear --

19   I guess it would be at the discretion of the Court.

20             The government would argue this is essentially

21   giving the defendant extended bites at the apple here to

22   make these claims.  But, you know, I would leave it to the

23   Court's discretion as to whether that was equitable and in

24   terms of trying to achieve finality in this case or

25   whether it made sense to let him then make another motion

1    in that context.

2         On the one hand, I think the answer is no, it's

3    unfair to the government.  We've responded to this.  We

4    spent, as Your Honor can see, a great deal of effort in

5    trying to respond to these motions, trying to unpack a lot

6    of different issues.  Although we believe it's legally

7    straightforward, it's very factually complex.  There's

8    multiple search warrants, multiple motions, long search

9    warrant affidavits to try to unpack for the Court.

10        But notwithstanding all of that, you know, I

11   leave it to the Court's discretion as to what the Court

12   feels is equitable.

13        But even putting that aside, the second

14   overarching -- you know, I also mentioned the fact that

15   the defendant hasn't come forward with any affidavits

16   supporting his allegations with regard to the deficiencies

17   in the search warrants as well, and it's akin to the same

18   thing, but again I think it's even a greater problem here

19   because he's casting aspersion on the statements, in

20   particular Special Agent Schrader in the initial motion,

21   although I see that in his reply brief filed very

22   recently, he now for the first time attacked certain

23   things Special Agent Allen had said.  But again, these are

24   unsupported allegations made without anything that the

25   government can challenge, any reason for the Court to even

1    order a Frank's hearing at that point.

2           And I would argue that even if -- let's say Your

3    Honor was -- let's say that as Your Honor suggested we, or

4    as counsel suggested, we simply had an affidavit  that

5    signed off on these allegations there.  What then?  None

6    of that actually says that the agents knew or should have

7    known of any of these falsehoods that he alleges were in

8    the affidavit.  And I think black letter law at that

9    point, Your Honor, is that does not undermine the search

10   warrant affidavit itself.  Nothing he's alleging says why

11   the agent should have known it.

12          And so I think even if Your Honor was to let him

13   do that, it still would fail.  He still would not be able

14   to perfect an attack on the veracity of the underlying

15   search warrant affidavits.

16          Which brings me to the other overarching issue

17   here that he raises, the defendant raises in his motion

18   and then I guess in a little bit of a different way in his

19   reply brief, and that is the issue of particularity and

20   overbreadth.  And I say both of those, I think the courts

21   have struggled with trying to figure out how those two

22   things interact with one another, particularly in the

23   context of business crimes.

24          The decisions in Galpin and Rosa, in George,

25   deal with completely different factual scenarios than the

1    facts here.  Those dealt with warrants where the warrants

2    essentially permitted a search for evidence of any crime

3    on its face.  Go in, take these computers, look for

4    evidence of any crime.

5           Government does not quarrel with that being

6    insufficient both as a matter of particularity because

7    there's no guidance to the executing officer, but really

8    as a matter of overbreadth.  It just didn't comport with

9    the evidence that was in the affidavit.  But that's not

10   what's going on here.

11          This comes out of -- and this is no different I

12   would argue, Your Honor, than a myriad of other search

13   warrants that come before the Court in the context of

14   white collar cases where coming from National City Trading

15   Company, coming from CEC Services, an entire line of

16   business record cases, which -- and I think in the context

17   of it -- and I think the Damico case from the southern

18   district really captured it well -- there's no benefit,

19   it's form over function to say that the only -- that the

20   fatal flaw in a particular warrant is that it doesn't

21   mention the name of the crime.  Because I challenge the

22   Court to articulate why it would have been helpful for an

23   executing agent here to have known the crime at issue was

24   wire fraud.

25          The reality is, and as I think one of the other

1    district court cases makes clear, that in the context of

2    business records exceptions, it's not really an exception

3    but more an articulation of the idea that so long as the

4    breadth of the warrant is supported by the probable cause

5    in the affidavit, then particularity is sufficient so long

6    as the particularity matches the breadth of the warrant.

7    And that is in spades what's going on here.

8            And as I pointed out in extensive fashion in the

9    brief, that's what the warrant did.  The affidavit did.

10   The affidavit set out exactly why each of these categories

11   of documents would provide probable cause as to why each

12   of these categories of documents, limited by the date

13   range, limited by the entities or individuals, depending

14   on whether you're looking at 2010 or 2011, and gave the

15   agents guidance more so than certainly if they had gotten,

16   just go look for evidence of wire fraud, go look for

17   evidence of an insurance fraud scheme.  Particularly when

18   you're talking about scenarios -- we may debate the number

19   of agents, but there certainly were more than a couple of

20   agents there -- particularly when you're talking about

21   giving guidance to agents about what you can and can't

22   take.  You're not, practically speaking, going to have an

23   agent going in there looking at a piece of paper and

24   saying, does this piece of paper provide evidence of wire

25   fraud?

1            And why can't you do that?  Because in reality,

2     how is that agent going to know?  You know, in wire fraud

3     cases, the innocent mailings can oftentimes be the

4     executions of a fraud scheme such that the fraud may be

5     elsewhere, fraud may be in the application.  The wire may

6     be the evidence of it.  But how is an agent sitting there

7     right then and there who doesn't necessarily have the same

8     level of familiarity as the case agents do, going to make

9     a determination?  Again it's form over substance.

10           So as long as -- and I would argue, it's more

11    protective of a property owner's rights to carefully

12    articulate what the government is able to seize, to

13    carefully articulate the types of documents, the

14    categories of documents, that the government was able to

15    seize.  This was far from a general search, Your Honor.

16    It was not treated as a general search by the agents

17    executing it.  And we provided some pictures to Your Honor

18    in the brief to see the number, the vast number of

19    documents, that are in this place and the vast number of

20    rooms that weren't even touched.

21           By way of example:  There are health plans that

22    are administered at 100 Grist Mill Road.  My understanding

23    is the agents went to these rooms, saw that it was health

24    plans, looked quickly around, made sure that that was

25    accurate and then moved on.  They were not treating this

1    as a general records search, go take everything in the

2    business.  They were treating it as a record search for

3    these particular entities for these particular categories

4    of documents.

5           And in again in view of the fact that the

6    touchstone of the Fourth Amendment is reasonableness,

7    acting exactly as they should, acting in a careful,

8    conscientious way to seize just those documents that were

9    called for in the warrant, and looking at it -- or excuse

10   me -- to the extent that the warrant provided them with

11   great particularity, exactly what they were supposed to

12   seize.  In particular, I mean, nowhere is a better example

13   than Mr. Carpenter's office.  Provided pictures of the

14   vast numbers of documents in Mr. Carpenter's office, and

15   they took three boxes out of there.  And I don't know that

16   the IRS search took more than that.  They took more boxes

17   overall, but there's certainly no evidence they took more

18   than that.  And we provided some pictures from

19   Mr. Carpenter's office from that search as well.

20          So, Your Honor, again, I think that the --

21   looking at the issue of particularity, the defendant is

22   sort of missing the point.  The point is that this is a

23   different type of case from Galpin, from Rosa, from

24   George, and that the agents acted or that the warrant was

25   more than particularized, more than sufficiently

1    particularized and the agents acted appropriately given

2    the particularity of that.

3              The last thing I'll address myself to is the

4    good faith issue.  Good faith I think, Your Honor, will

5    come later if in fact the Court does find that the -- that

6    there was a problem with the warrant.  However, I think

7    you could probably rule on good faith now as an

8    alternative basis to uphold the warrant, just given the

9    fact that this was the type of warrant -- looking at the

10   Rosa case, Judge Walker's decision in Rosa -- that this

11   was a type of warrant that a reasonable agent should have

12   been able to rely on, and certainly in this case acted in

13   the way -- in a way that reflects their reliance on that.

14   In other words, all of the documents that the government

15   submitted to the Court showing that the search -- that the

16   people executing the search were well aware of, had access

17   to the information about the search, about what the scheme

18   was.  And in fact when they came upon documents that they

19   thought were potentially outside the scope, probably not

20   but potentially, they went and got another warrant, and

21   they acted in a way we would have wanted them to, in a way

22   that reflects their reasonableness.

23             Your Honor, I do note that the defendant

24   mentioned just -- I know I said that was going to be my

25   final point -- but the defendant did mention at the outset

1     talking about the fact that the government held onto I

2     think it was the IRS search documents for 13 months.  You

3     know, again, as I said before, this is a somewhat

4     factually complex set of circumstances that I think the

5     government has set out in detail in its brief.  And I

6     think again, without rehashing everything that's in there,

7     what it tells the Court is that the concerns that were

8     expressed by the Second Circuit in Ganias simply don't

9     exist here.

10              This wasn't a circumstance where the government

11    was holding onto something beyond what was reasonable.

12    And in reality, they were holding onto these documents

13    because the defendants had made a myriad of motions,

14    because the defendants had made blanket privilege claims,

15    and they were refusing to consent to the use of a taint

16    team.  There was litigation going on.  In fact, the

17    defendants didn't even give the government in Wisconsin

18    the ability to look at any documents at all, even the

19    non-privilege documents, until well after the Department

20    of Labor executed a search warrant in May.

21              So at the time, and again that 13-month period,

22    all that really mattered for the purposes of the Ganias

23    issues here, it was completely reasonable for the

24    government to have possession of it and therefore

25    completely reasonable for this government, the Connecticut

1    U.S. Attorney's Office and the Department of Labor, to

2    search that material as they did.  And again that only

3    really applies here to the computers that were searched

4    because -- and a few of the documents that were still

5    being held in Wisconsin.  The documents that were held at

6    Halloran & Sage were there based on an agreement that the

7    defendants came to, a settlement the defendants came to

8    with the government in Wisconsin which we weren't a party

9    to but was made pursuant to litigation in front of Judge

10   Covello as a means to settle their Rule 41 claims.

11           So to suggest that this was somehow our scheme

12   to be able to maintain control of these documents I think

13   is just belied by that procedural history of what went on

14   here.

15           THE COURT:  All right.

16           Mr. Novick, let me ask you to turn your

17   attention finally to the pending discovery motions.

18           MR. NOVICK:  Certainly, Your Honor.

19           THE COURT:  Where does discovery stand and what

20   do you think the Court should do with regard to these

21   motions?

22           MR. NOVICK:  So let me comment where discovery

23   stands first.

24           You know, we have in agreement with counsel, and

25   as I think there was a motion or at least some information

1    to the Court very early on, that we would proceed on a

2    rolling basis, that it made sense for the government to

3    take the expense because we have the facilities down south

4    to scan things and to do forensics and all these things

5    that would be very expensive for the defense to do.

6            So what we have done is we have sent everything

7    to South Carolina where our facility is, they've scanned

8    everything on sort of a rolling basis, put it into

9    searchable databases.

10           On the forensic side we have been proceeding as

11   quickly as possible.  Again, the defendants could have

12   done their own forensics but the government has agreed

13   that it made sense for the government to do forensics and

14   provide the results to the defendants.

15           We provided a vast amount of discovery in

16   January of this year within the I think 30 days after

17   arraignment, which included a number of the computers

18   which included all of the paper documents sent to South

19   Carolina.  There have been dribs and drabs of that as time

20   has gone on, and we've provided extensive indices to all

21   of this material for the benefit of the defendants as time

22   has gone on.

23           I know there have been some technical glitches

24   along the way in the defendants loading those databases

25   onto their system they're using at Halloran & Sage.  My

1   understanding is our technology specialist has spent a lot

2   of time on the phone with them making sure they have the

3   right software to make sure they can do what they have to

4   do.

5           I don't think there's any fault on either side.

6   These are things that just happen.  I think given the

7   amount of data that was there and given the programs or

8   the -- whatever differences there are in the programs that

9   were being used.

10          So the most recent production, Your Honor,

11  included the forensics from the server at 100 Grist Mill

12  Road that was taken during the 2011 search.  We have also

13  given them a number of forensics from past production from

14  other computers, from the server at the funding

15  corporation, the Ridgewood server.

16          There are other computers that remain to be

17  done.  The government believes it has two in process right

18  now that absent some other unforeseen circumstance and in

19  the event of trying again to move this case to some sense

20  of finality, we believe will be the last of the computers

21  that we're going to look at.  And that is the server from

22  300 First Stamford Place seized in the 2011 search and a

23  server or computer that was seized from a search of a

24  Texas agent down in Houston.  Those are in process.

25          I spoke yesterday or the day before to the

1       forensic agents for each of those computers, and they're

2       moving in due course.  I've designated for them sub drives

3       that I think are the relevant ones rather than having them

4       process the entirety of the drive, picking out the folders

5       that go to the people that have some relevance to the case

6       and trying again to cabin what we're looking for.  And

7       we'll provide those in due course.

8               I hope we'll be able to get at least some raw

9       data from them by the end of this year and then hopefully

10      make productions in January from those.  Those are not

11      nearly as large as the server that was just turned over to

12      the defendants, the 100 Grist Mill Road server.

13              As far as other discovery, we've provided

14      90 percent of the prospective witnesses.  I don't expect

15      anywhere near the number of witnesses we've provided to

16      them to actually testify.  But in the spirit of

17      cooperative discovery and not having to litigate these

18      issues, we've provided them with all of these statements.

19      We've not provided maybe 10 percent of those statements

20      for various reasons, some of which are we don't know who

21      are our witnesses are going to be and are working

22      feverishly to figure that out.  We'll make those decisions

23      as we go forward.

24              There are a couple of grand jury testimony

25      transcripts from the case, and I've told counsel that it's

```
1    my practice -- and I don't think there's reason in this

2    case to deviate from that -- to turn those over two weeks

3    in advance.  It's not that much stuff.  It's the testimony

4    of the case agent and testimony of the cooperating

5    witness, and that's the extent of it.

6            And in reality, there is a number of memoranda

7    of interview related to the cooperator that the defendants

8    already have.  So to the extent that they want the

9    substance of that material, they have it.

10           So I don't think there's any basis.  I would say

11   we're moving with all due speed.  I don't think there's

12   any basis to do anything other than what we're doing.

13   We'll continue to try to, you know, respond to what the

14   defendants are asking for.

15           We have, I will say -- and we put most of this

16   in our response to the defense motions -- we have

17   preserved the rough notes of the agents who did the

18   interviews of the witnesses consistent with the CES case.

19   We've turned over the agent notes of defendant Carpenter's

20   statements which I think is required under CES.  Our

21   reading of CES is such that the notes of the agents

22   regarding the other witnesses are potentially Jencks

23   material but not necessarily so.  The defendants will

24   have, if they don't already have, the actual reports from

25   those.
```

1           And to the extent we're going to call any of

2     those witnesses -- let me say this, I think that under

3     CES, should Special Agent Allen or anybody else testify

4     and part of the cross-examination or direct examination is

5     on the subject matter of an interview where they have

6     notes, I think then certainly under CES there would be

7     grounds to have to turn over the agent rough notes.  In

8     the event that that doesn't happen, I don't think CES

9     requires it.  However, in an abundance again of trying to

10    avoid needless litigation, I think the government will do

11    an evaluation of its case and figure out are these

12    witnesses we're going to call, and we'll turn over the

13    appropriate notes if they're Jencks material at the

14    appropriate time.  I don't think that's right now.

15           I will also say that as always our obligation is

16    to make sure we are turning over Giglio and Brady

17    material, and to the extent there are notes that are

18    somehow consistent with the reports, we understand our

19    obligation to do that.  And frankly that's probably more

20    than anything augers for us turning the notes over in an

21    abundance of caution.  I don't think there's anything the

22    government is trying to hide in this case at all.

23           The counsel can correct me if I'm wrong, but I

24    don't think there are any other discovery issues here.

25           Or if the Court wants me to address anything

1    else?

2              THE COURT:  Looking at the motions, it seems

3    that with regard to the defendants' requests you have

4    produced or have agreed to produce everything with the

5    exception of documents in the possession of the carriers

6    with regard to loss?

7              MR. NOVICK:  We have produced -- we've

8    subpoenaed, and this goes back a couple of years, Your

9    Honor -- subpoenaed documents from the insurance carriers

10   having to do with the, you know, each of the insureds,

11   each of the straw insureds.  We have gone back where we

12   thought that there was something that was not provided or

13   asked further questions to make sure we have all

14   documents.

15             I just got off the phone yesterday with a

16   representative from Lincoln in response to my request to

17   go back and look for anything they might have missed with

18   regard to emails with Mr. Carpenter and Mr. Bursey.

19   They're going to produce a couple hundred more documents

20   to us, which he said frankly they don't appear to be

21   communications with Mr. Carpenter or Mr. Bursey, but they

22   seem to be perhaps relevant to the case.  So I said, out

23   of an abundance of caution, just produce them.  And we'll

24   turn them over with the next production that we're going

25   to send out.

1        With regard to -- just give me one moment, Your

2   Honor?

3             (Pause)

4        MR. NOVICK:  Your Honor, as to the loss issue, I

5   mean, we've asked for the entirety of their files.  I

6   don't know that the insurance companies keep profit and

7   loss statements for the insureds themselves, nor do I

8   think it's actually relevant here.  I mean, what's

9   relevant here is that the defendants at the time

10  contemplated that there would be loss based on the

11  procedures undertaken.  How things shook out in the, you

12  know, ultimate sense doesn't seem to me to be relevant.

13       I mean, this is something that was litigated in

14  the Southern District where they attempted to get

15  Rule 17(c) subpoenas for the underwriting procedures for

16  the, sort of, how they priced their policies, and I think

17  judge -- the judge in that case essentially said, no, you

18  know, it's enough for the insurance carrier to come and

19  say that they would have not issued these policies and it

20  would have harmed them in these ways, and you don't get to

21  know -- because these are the trade secrets of these

22  insurance companies.

23       So, A, I don't think that they keep those

24  records.  We certainly can ask them.  But more

25  importantly, I don't think that they are relevant to what

1    happened here.

2            That's all, Your Honor.

3            THE COURT:  All right, thank you.

4            Mr. Brown, any comments on --

5            MR. BROWN:  Briefly, Your Honor.

6            I'm at somewhat of a disadvantage on the 17(c)

7    motion, Your Honor for the following reasons as counsel

8    has articulated, stuff keeps coming in and coming in, and

9    to be honest with you, I don't know what we got, you know,

10   in total.

11           And it would seem to me -- because I have filed

12   a motion, Your Honor, to enlarge the period of time for

13   the commencement of trial -- I don't know if the Court has

14   had a chance to see that or not, I just filed it a couple

15   of days ago.  And the reason for that is really what was

16   articulated by counsel is that they haven't even finished

17   giving us everything that they may have and we can't make

18   a determination until we get that as to whether or not

19   it's useful, not useful and whatnot.

20           And I will say the government has been all along

21   providing us with information.  I have no reason to

22   believe they're stalling or anything like that.  It's a

23   lot of stuff, a lot of stuff for them to go through, and

24   certainly they've got much more people at their disposal

25   than Mr. Carpenter does.

1          So my point is this, that if the -- and I am

2    asking in my motion, Your Honor, for an enlargement of

3    time from I think it's March 5 or 10, I forget which,

4    until September 10.  I'm not asking for a long time.  It's

5    only relatively speaking a few months, because we're as

6    anxious as anyone else to get started.  But I don't think

7    I can do my job effectively until I've had a reasonable

8    opportunity to review these materials to see if they will

9    be of assistance to us.

10          The reason I bring this up, Your Honor, and

11   perhaps it's premature at this point until I have a chance

12   to see what the government actually provides to us as to

13   the necessity of the subpoenas or not.  And I would

14   suggest that if that's the case without prejudice, is that

15   we let that ride for a period of time, Your Honor, until

16   I've had a chance to digest everything.

17          MR. NOVICK:  Your Honor, if I may just, one, I'd

18   like to clarify something, just for the record.

19          The insurance company files, with maybe a small

20   exception here and there, were turned over in that

21   January production.  Those were documents that we had,

22   that we had scanned pre-indictment and turned over within

23   that 13-day period post arraignment.

24          So the underwriting filings from the straw

25   insureds, not just the 12 or 15 named in the indictment,

1    but all 76 insureds, 84 policies, were turned over to the

2    defense in that initial discovery production.

3           Now, I concede that that's a lot of material and

4    I think that the defense over estimates the number of

5    bodies that the government has to review these documents,

6    but that's neither here nor there.  They're basically

7    sitting here, Your Honor.  But I just want to clarify for

8    the Court that these aren't things that the government was

9    withholding or that the defendant hasn't had a reasonable

10   time to look at in advance of filing their 17(c) subpoena.

11          That having been said, I don't have an objection

12   to the defendant renewing, if there is going to be a

13   motion to continue granted, I don't have any objection to

14   the defendant renewing his 17(c) motion or tabling it for

15   now pending his ability to go back and see if he's got the

16   stuff that he wanted.

17          And in fact, if there are some set of material

18   that he wants that I think is reasonable and could be

19   asked for from the insurance companies that isn't covered

20   under the subpoenas, he can call us and ask us and we can

21   decide whether the government would be agreeable to

22   seeking that and try to get to the end of this issue

23   without having to involve the Court.

24          But ultimately I don't object to tabling that

25   issue for now if that's what the defendant wants to do.

1              THE COURT:  Mr. Egan?

2              MR. EGAN:  Yes, Your Honor, I don't have any

3      issue with tabling the 17(c) argument or determination.

4      However, I don't think that the way it's being framed

5      should be dispositive.  Because quite frankly the

6      government has issued a subpoena that the government

7      issued and the government has asked for documents that the

8      government has asked for.  The subpoena that we intend to

9      issue if the Court were to so grant us leave to do so

10     would be for a different -- in my view potentially

11     encompass different documents which are relevant and are

12     admissible in our view.  And I can argue that at the

13     appropriate time.

14             I don't think -- actually in my experience, it's

15     a little unusual for the government to take the position

16     it's taking.  It's been my experience the government

17     doesn't take a position on this.  That if the insurance

18     company wishes to move to quash the subpoena, I've had

19     several arguments about that, and it's always United

20     States v. Nixon, and whether they're admissible,

21     et cetera.

22             But in this instance, the government seems to be

23     doing the insurance company's bidding to that extent.  And

24     I'm not even sure what -- standing is probably not the

25     right word, but I don't know why actually the government's

1    even taking that up.

2          Or regardless, I don't think the government's

3    willingness to give us whatever they get out of the

4    insurance company is dispositive of the issue of whether

5    the 17(c) subpoena should issue.

6          Moreover, we should obviously determine that

7    quickly.  Because if the Court were to grant the motion,

8    then I can assure you the insurance companies will be in

9    there with their lawyers filing a motion to quash, and

10   that will take time as well.

11         So I just wanted to point those things out.

12         THE COURT:  From your standpoint, what is the

13   dispute with regard to discovery?  What is it that you

14   would seek that the government would not want to provide?

15         MR. EGAN:  The crux of this case, in my view, is

16   whether or not it was material to these insurance

17   companies the representations that were made in these

18   applications.  We do not know whether we have all the

19   documents of those insurance companies which go to their

20   determination of that issue.  We know we have what the

21   government has and we've reviewed what the government has.

22   But I don't know what else might be at those insurance

23   companies might be a discussion of whether this really

24   mattered to them or not, or whether there was somebody

25   there aware of it and didn't care about it, which I

1    believe is relevant and admissible at trial, and therefore

2    we should be entitled to it.

3                THE COURT:  And you think the way the government

4    phrased its requests did not necessarily encompass what

5    you claim you need?

6                MR. EGAN:  Yes, Your Honor.

7                THE COURT:  Have you talked about that?

8                MR. NOVICK:  No.  I've read their motions, Your

9    Honor.  I don't know that we've discussed it in great

10   detail.  I think we've discussed it in, you know, the same

11   generalities that I think we're really discussing it now.

12               Your Honor, what -- if I could unpack what

13   Mr. Egan is saying, you know, there's two issues:

14               One is production of documents related to the

15   insurance company's underwriting of particular straw

16   insureds.  And I think we've turned that over.  That's

17   what we've asked for.  Why would we not have asked for

18   that?  And it's certainly in the subpoena that we've send

19   sent.  I don't quarrel with Mr. Egan.  I've said to him

20   and Mr. Brown in the past that if they're looking for

21   discussions in those underwriting files that have to do

22   with, oh, here's the funding documents and we knew what

23   this was all along, they're going to be sorely

24   disappointed.  If what we're talking about is generalized

25   discussions internal to the insurance companies about

1    this, I think that's far afield.  I think that's a fishing

2    expedition, and I would object to that.

3          And Mr. Egan may have different experience

4    elsewhere but, you know, certainly the government has from

5    time to time taken a position that a Rule 17(c) subpoena

6    is improper for the various reasons that we've articulated

7    in our motion response.  And there are a number of cases

8    on this issue.

9          And, frankly, to force the insurance company to

10   go back and reproduce everything that they've already

11   produced, such that now there is discovery from the

12   insurance company that came from the government, there is

13   the same discovery that comes through the defendant, I

14   think is a waste of both the government and defense

15   resources and court resources in having to sort all of

16   this out.

17         If when Mr. Brown and Mr. Egan go through the

18   documents that they have and say, you know what, we are

19   missing X, Y and Z, then I think there is a discussion

20   that can be had there.  But just a general blanket

21   insurance company turn over anything you've ever said

22   about life insurance, originated life insurance, funding

23   of life insurance policies, whether it's connected to this

24   case or not, is just a, it's an irrelevant fishing

25   expedition, and that's why we would object to it.

1             I'm happy to shelf it now.  We can a debate it

2     later on.  I agree we shouldn't wait too long because at

3     some point the insurance companies probably will want to

4     weigh in depending on the nature of the 17(c) subpoenas.

5             And I know at least in the Southern District in

6     a similar case, and I know we cite to that from time to

7     time, they did weigh in on those issues and filed motions

8     to quash.

9             THE COURT:  Okay.  Well, I think that this has

10    been helpful.  I would urge you to please continue the

11    conversation, if possible today while it's in the

12    forefront of everybody's consciousness.

13            I would simply note that to the extent what

14    Mr. Egan has in mind is similar to what was at issue in

15    the Binday case, I think that the Court's footnote 2 in

16    that case bears on the question.  So I would ask you to

17    take a look at that as you further your discussion today.

18            I'm happy to give you a copy of the opinion so

19    you can look at it right now.

20            MR. EGAN:  Thank you, Your Honor.

21            MR. NOVICK:  Thank you, Your Honor.

22            THE COURT:  All right?

23            MR. BROWN:  Your Honor, if I may before we

24    adjourn?  I would note we didn't cover the

25    McCarran-Ferguson Act.  I would ask the Court take that on

1       the papers.

2               THE COURT:  Okay.

3               MR. NOVICK:  Your Honor, just ask as to the

4       motion to continue, so we know how to proceed.  We've

5       responded mostly just to correct the record, make the

6       Court understand what I've just explained in terms of our

7       trying to adhere to our discovery obligations.  But we

8       don't have an objection ultimately, because obviously I

9       want the defendant to be able to prepare for trial

10      sufficiently.

11              We have a couple of concerns.  I suppose the

12      most pressing one is the whole nature of this crime as

13      Your Honor is aware is that the straw insureds are old.

14      I'm not going to use the "elderly" description but, you

15      know, we have in anticipation of this hearing, and so we

16      could have this discussion, gone back and called each of

17      the insureds just to take a sense of their health.  I

18      think there are some not of like completely failed health,

19      but would have a difficult time, certainly as time goes

20      on, traveling here.

21              So my only point would be, Your Honor, if the

22      Court's inclined to grant the continuance -- and again we

23      don't object to that -- that the Court be aware and that I

24      presume the defendant won't object to Rule 15 depositions

25      if it's necessary in certain cases, especially with

1    witnesses who would be coming from California, Arizona,

2    et cetera.  I realize it's a great expense to the

3    government.  I don't see any way around it if there's

4    going to be a motion to continue in particular if people

5    have said to us that they would find it very difficult, if

6    not impossible, to travel this distance.

7              THE COURT:  So if I were to grant the

8    defendant's motion, you would want to arrange for such

9    depositions to take place in the near term?

10             MR. NOVICK:  I may, Your Honor.  I think,

11   personally speaking, I'm getting ready for another trial

12   in front of this Court and after that's done in January, I

13   would suggest that probably sometime in the spring at the

14   convenience of the parties -- and again going back to each

15   of the insureds and finding out what each of their

16   statuses are -- make a motion to the Court that would ask

17   for the certain depositions of straw insureds and I would

18   suspect it would be Texas and maybe California.

19             THE COURT:  All right.

20             MR. NOVICK:  And we would have to do that

21   probably well in advance, especially if Mr. Carpenter

22   wanted to be present, because he would have to be moved

23   through the U.S. prison system.  He may waive his

24   appearances, but I don't know, but all of these things

25   take time.  So I would hope that, and that's why I'm

1    asking here, that the defendant, given that he's asking

2    for the Court's indulgence to be able to look at these

3    additional documents notwithstanding what we pointed out

4    with regard to his access to these documents up until now,

5    that they not object to Rule 15 depositions where they are

6    reasonable and make sense in the context of these

7    witnesses' health.

8              MR. BROWN:  Your Honor, I think I could do that.

9              MR. EGAN:  There would be no objection here,

10   Your Honor.

11             THE COURT:  Mr. Egan, what is Mr. Bursey's

12   position with regard to the motion for a continuance of

13   the trial?

14             MR. EGAN:  We don't object, Your Honor.

15             MR. NOVICK:  In terms of timing, Your Honor, I

16   guess we can talk to the courtroom deputy with regard to a

17   specific date.  The government has issues with the

18   September date requested by the --

19             MR. BROWN:  I don't have specific dates.  It was

20   after that date.

21             MR. NOVICK:  To avoid the Jewish holidays and

22   the Labor Day holiday, I would suggest that we do it in

23   October.  But I can -- we can take that up with the

24   courtroom deputy.

25             THE COURT:  Okay.  Well, I don't need to keep

1    you in suspense with regard to that motion.  Having read

2    the motion, I think the writing is on the wall.  It has to

3    be granted, and I don't mean to say that grudgingly.  But

4    my concern is that the arguments that are advanced in

5    support of the motion, which I think are more than

6    sufficient to support the motion, can be advanced again

7    and there needs to be some finality to this process.

8            Any time you have a case where counsel are able

9    to talk about the millions of documents that they need to

10   scrutinize, you could postpone the trial date for a

11   decade.  My concern is that I don't think that's in

12   anybody's interest.

13           MR. BROWN:  We have no -- for the record, Your

14   Honor, we have no interest in delaying this case one day

15   longer than necessary and that we'll be prepared to go to

16   trial in October.

17           MR. NOVICK:  And, Your Honor, that's why we're

18   trying to put some end to the forensic portion of this,

19   and we hope to do that in the early portion of the year,

20   so that there's more than ample time for Mr. Brown to be,

21   and Mr. Egan, to be ready.

22           THE COURT:  Well, I'll grant that motion to

23   extend the trial date and I'll assume that the new date

24   will be in the fall, perhaps in October.  I do that on the

25   understanding that if Rule 15 depositions are to be done,

1    they'll be done without objection and on the understanding

2    that there will be no further requests unless something

3    truly unforeseeable should crop up.

4              Thank you for your presentations and for the

5    briefs, and I'll get back to you on the other matters.

6              MR. BROWN:  Thank you, Your Honor.

7              MR. EGAN:  Thank you, Your Honor.

8              MR. NOVICK:  Thank you, Your Honor.

9              THE COURT:  I will rely on you to talk about

10   discovery pursuant to our discussion today.

11                  (Proceedings adjourned at 1:12 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3                     In Re: U.S. vs. CARPENTER

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7     Reporter for the United States District Court for the

8     District of Connecticut, do hereby certify that the

9     foregoing pages are a true and accurate transcription of

10    my shorthand notes taken in the aforementioned matter to

11    the best of my skill and ability.

12

13

14

15
                      /s/_____
16
                        DARLENE A. WARNER, RDR-CRR
17                       Official Court Reporter
                         450 Main Street, Room #223
18                       Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25