UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.  3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | January 29, 2016 |

**GOVERNMENT'S TRIAL MEMORANDUM AND MOTIONS *IN LIMINE***

# <u>TABLE OF CONTENTS</u>

I.   BACKGROUND ........................................................................................................ 1

   A.   The Scheme ................................................................................................. 1

   B.   Anticipated Evidence ................................................................................. 6

II.   MOTIONS *IN LIMINE* ........................................................................................ 12

   A.   Motion to preclude evidence and argument that the Providers acted negligently in the face of misrepresentations by defendant and co-conspirators. ................................................. 12

   B.   Motion to preclude evidence and argument about the Providers' failure to take legal action over policies revealed to be STOLI, or to settle any of the litigation they initiated. ..... 15

   C.   Motion to preclude evidence and argument suggesting that the Providers did not care about STOLI because they allowed sale of policies on the secondary life settlement market. 18

   D.   Motion to preclude evidence and argument that Carpenter's false representations did not cause actual economic harm. .......................................................................................... 20

   E.   Motion to preclude the defendant from offering his own out-of-court statements. ....... 24

   F.   Motion to permit the Government to cross-examine the defendant about his prior federal convictions for mail and wire fraud in the event he testifies at trial. ....................................... 25

   G.   Motion to require advance notice of privilege claims and advice-of-counsel defense. . 28

   H.   Motion to preclude evidence and argument related to selective prosecution. .............. 32

III.   CONCLUSION ...................................................................................................... 35

i

The Government submits this memorandum to outline its theory of the case, highlight its anticipated evidence, and identify issues that may arise at the trial.[1]

## I.   <u>BACKGROUND</u>

### A.   The Scheme

The extensive briefing and 63-page Superseding Indictment in this case provide a detailed background on the allegations underlying the Government's case. Consistent with the Superseding Indictment, the Government intends to prove at trial that defendant Daniel Carpenter ("Carpenter") led a scheme to defraud certain "Life Insurance Providers," or "Providers," through materially false and fraudulent representations to those Providers in connection with the purchase of universal life insurance policies within the Charter Oak Trust.[2] The Charter Oak Trust was purported to be a multiple employer welfare benefit plan that provided death benefits to employees of adopting employers through the purchase of insurance policies.  Co-Defendant Wayne Bursey ("Bursey") signed the declaration of trust as president of Nova Group, Inc., the plan sponsor, which also acted as trustee of the Trust.  Nova Group, Charter Oak Trust, and myriad other "Subject Entities" housed at offices in Simsbury (at 100 Grist Mill Road) and Stamford, Connecticut (at 2187 Atlantic Avenue and, later, 300 First Stamford Place), were controlled by Carpenter.

Although the Charter Oak Trust purported to be a bona fide welfare benefit plan, the evidence will show that in practice the defendant ran the plan as a means to procure life insurance policies on the lives of elderly strangers and then to resell those policies after two

---

[1] The Government reserves its right to raise additional issues or file additional motions *in limine* as appropriate.  For instance, yesterday, for the first time in the more than two years this case has been pending, Carpenter provided the name of a purported expert he may call at trial.   The government has received no information about the opinions he intends to offer. The Government may file a motion *in limine* to preclude this expert testimony.

[2] The Indictment anonymized the Charter Oak Trust as the "Plan and Trust."

years, all without the knowledge or acquiescence of the Life Insurance Providers that issued the policies. The evidence will show that such "Stranger Originated Life Insurance" ("STOLI") harmed the Providers by causing a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received by issuing policies. To this end, the Government will present evidence of five distinct ways in which the Providers were harmed: (1) the earlier payout of death benefits; (2) less premium income from the policies than anticipated; (3) mispriced policies because of undermined actuarial assumptions; (4) decreased cash flow; and (5) larger than warranted commissions. The evidence will also show that the Providers attempted to identify STOLI policies, which they in turn would deny, by asking certain questions on applications, including questions regarding third-party payment of premiums and the intent to sell the policies.

Carpenter's scheme involved several basic steps. First, insurance agents working for or on behalf of Carpenter's entities recruited elderly "Straw Insureds" to participate in the Charter Oak Trust, often with the promise of free insurance for two years, after which the Straw Insured might receive a share of the proceeds from a sale of the policy. A "paper company" was often set up for the Straw Insured to allow him or her to participate in the Charter Oak Trust, often without the knowledge, approval, and/or consent of the Straw Insured. The agent would then fill out a life insurance application that had several misrepresentations, including denying the third-party funding of premiums, denying discussions regarding the possibility of a policy sale, and falsely claiming that the policy was being purchased for "estate planning" purposes. The fraudulent applications also often included inflated financial information and denials of the performance of life expectancy reports. The evidence will show that Carpenter caused these fraudulent applications to be submitted to the Life Insurance Providers through different employees of his entities.

2

Despite these representations to the contrary, the evidence will show that in truth no Straw Insured ever paid a premium into the Trust; rather, the premiums were funded by loans to the Charter Oak Trust.  These loans principally came from Grist Mill Capital (known in the Indictment as "Funding Entity 1"), of which Carpenter represented himself as "Chairman of Managing Member," and in some cases from Avon Capital, another of Carpenter's entities.[3] Grist Mill Capital and Avon Capital, in turn, borrowed money for many of the insurance premiums from an entity know as Ridgewood Finance, which was a premium financing arm of Caldwell Funding Corporation, a company engaged in the life settlement business.  Caldwell was controlled by a Greenwich-based hedge fund. These loan arrangements were memorialized in certain documents that were never disclosed to the Providers. The loan agreements did not obligate the Straw Insured to pay anything for the policies on their lives; rather, upon "maturation, disposition, or termination" of the policies, Grist Mill Capital would be paid back for its loan of premiums, along with other fees. Those fees resulted in an effective interest rate of as much as 100% of the loaned premiums.  The evidence will show that the misrepresentations by Carpenter and his co-conspirators deprived the Providers of economically valuable information that bore on their decision making.

The evidence will show that Carpenter, Bursey, and others, having devised the scheme to defraud the insurance companies, used the mails and interstate wires for the purpose of executing that scheme.  Although the charged scheme and conspiracy involved 84 fraudulently-originated policies on 76 Straw Insureds, the Government focused the Superseding Indictment on twelve Straw Insureds, as alleged in 32 substantive counts of mail and wire fraud, and an additional three straw insureds as they relate to the money laundering and illegal monetary transaction

---

[3] "Nova" was named as an inversion of "Avon."

3

counts.  The fraud charges contained in the Superseding Indictment include the mailing, faxing, or emailing of fraudulent applications from the defendant's offices in Simsbury to insurance company offices in other states; wire transfers of funds by Carpenter from Grist Mill Capital or Avon Capital to the Charter Oak Trust in order to fund the payment of premiums; wire transfers of funds by Bursey from the Charter Oak Trust to insurance companies to pay insurance premiums; emails from an employee of Carpenter's entities in Connecticut to the Christiana Bank (acting as "Insurance Trustee")[4] in Delaware to request the processing of wire transfer requests from the Trust to the appropriate insurance company; and the mailing (by Federal Express) of "Funding Memorand[a] and Disbursement Request[s]," authorizing the transfer of funds from Ridgewood to Grist Mill Capital to fund the payment of a premium according to the above-referenced loan.  The earliest charged wire or mailing is in Count Six, which alleges a mailing on August 29, 2008.

In Count 33, the Superseding Indictment charges a violation of 18 U.S.C. § 1349, Conspiracy to Commit Mail and Wire Fraud, which charges Carpenter with engaging in the above-described mail and wire fraud scheme, along with others, involving the entirety of the Charter Oak Trust.

The Superseding Indictment then charges twenty-four counts of money laundering, illegal monetary transactions, and conspiracy—all related to the death benefits paid on two policies issued on the life of Sash Spencer (known in the Indictment as Straw Insured 13, or SI-13). In brief, the evidence will show that two policies were taken on Spencer's life based upon misrepresentations regarding third-party financing of and intent to sell the policies; that Spencer

---

[4] The evidence will show that Christiana Bank, as the so-called insurance trustee, was employed to maintain documentation of all money advanced under the credit facility from Ridgewood to Grist Mill Capital and Avon Capital, and to execute wire transfers of money when directed to by those parties, assuming all preconditions of the facility were met.

died within the two-year contestability period; that Lincoln paid $30 million to the Charter Oak Trust; and that Carpenter, knowing that the death benefits were proceeds of specified unlawful activity (*i.e.*, the aforementioned wire and mail fraud), engaged in transactions with those funds—in some instances to promote other specified unlawful activity, that is, to fund additional premiums, and in some instances to conceal the origin of the funds.

To prove the underlying specified unlawful activity, the Government will show the use of the mails and interstate wires in furtherance of the scheme as it related to Spencer. Specifically, Carpenter caused two Funding Memoranda and Disbursement Requests to be sent on December 26, 2007 via Federal Express, in order to disburse money from Ridgewood to Grist Mill Capital to fund premiums for the policies on Spencer's life. Following Spencer's death, Carpenter's companies e-mailed "death claim" forms that included representations by Bursey that falsely failed to acknowledge that the policies on Spencer's life had been collaterally assigned to Grist Mill Capital. Although Lincoln engaged in an investigation prior to paying the death benefits, Carpenter never told Lincoln that the policies on Spencer's life had been funded by a third party or had been taken with the intent to resell them. Bursey, on behalf of the Trust, instead sent communications to Lincoln demanding payment from Lincoln so that the trust could pay a claim to Spencer's beneficiary, a charity. Bursey followed those communications by suing Lincoln, which then paid more than $30 million in death benefits to the Charter Oak Trust.

Counts 34-57, which charge money laundering and illegal monetary transactions, concern the disposition of Spencer's death benefits by Carpenter to several destinations—none of them being the Spencer charity. These counts are divided into four groups: a multi-object conspiracy charge (Count 34); substantive counts of illegal monetary transactions related to large transfers between defendant-controlled accounts (Counts 35-39); substantive counts of illegal monetary

5

transactions related to the defendant's purchase of a home in Rhode Island (Counts 40-47); and substantive counts of money laundering concerning the use of death benefit money to promote the carrying on of the fraud, either through repayment of the Outside Funder or the payment of additional Plan and Trust insurance premiums (Counts 48-57). Each of the transactions referenced in the money laundering and illegal monetary transaction counts take place through financial institutions, specifically using bank accounts on which either Carpenter or Bursey is one of few signatories.

### B.   Anticipated Evidence

To prove the scheme, the Government's evidence will consist of witness testimony and extensive documentary evidence. The following is submitted as an aid to the Court and opposing counsel and is meant to be a broad overview of the Government's proof that should not limit the Government's proof at trial.

### 1.   Witness Testimony[5]

The witness testimony can be divided into several categories, as follows:

a.   *Straw Insureds*: The Government will call several straw insureds, who will testify to the sales pitch they received from their respective insurance agents. While these accounts vary, they all include common themes: an offer of insurance for two years, no responsibility for paying premiums at all, and the possibility of a financial benefit, typically through a share in the proceeds from a sale of the policy.[6] Although there were

---

[5] The Government is attempting to streamline its case to allow for fewer than the 15-20 days suggested previously, although to a large extent the Government's current estimate of time is based upon the length of cross-examinations the defendant employed during the Rule 15 Depositions.

[6] There are slight variations on this theme—Teresa Martinez received a promise of a cash payment, and Luella Paulsrud could not remember what she was told regarding the source of her financial benefit.

6

fifteen straw insureds singled out in the indictment, the Government may not call all of those witnesses (beyond not calling the two who have passed away), and may call others who were not singled out, depending on the availability of witnesses and the nature of the evidence offered and questions posed by the defendant. Similarly, the Government may call a small number of witnesses who were closely associated with the straw insureds and may have understood better the nature of the insured's participation.

b.      *"Inside" Insurance Agents*: At least two insurance agents associated with Carpenter's entities will testify about their interactions with prospective insureds and/or with retail (outside) brokers who were recruiting "clients" into the Charter Oak Trust. These witnesses will also testify about their conversations with Carpenter (in person, over the phone, and through e-mail) regarding the purpose and operation of the Charter Oak Trust.

c.      *Staff*: The Government will call a small number of current or former staff members (other than the above-referenced agents) from 100 Grist Mill Road, who will testify as to the purpose and operation of the Charter Oak Trust.

d.      *Insurance Company Witnesses*: The Government will call witnesses from at least three of the Providers to establish that misrepresentations related to STOLI deprived the Providers of economically valuable information that bears on their decision-making—the so-called "economic harm" principle.  In addition, the Government will call witnesses who dealt with Carpenter and/or other employees of his entities to explain that they were unaware of the true nature of the Charter Oak Trust.

e.      *Other Witnesses*: The Government will also call a former Ridgewood executive to explain the set-up of the credit facility; a former employee of Christiana

Bank to explain the process by which the premiums were funded; a former executive of a life settlement fund who attempted to purchase several Charter Oak policies; and records custodians from the various insurance companies and other businesses.

      f.    *Law Enforcement Agent*: The Government will call at least one law enforcement agent principally to introduce exhibits not introduced through other witnesses, and to introduce summary exhibits.

      2.    <u>Documentary Evidence</u>

In addition to the witness testimony, a large part of the Government's case will come from the hundreds of pages of documentary evidence recovered through subpoena and search warrants. These documents consist of, among other things, the following categories:

      a.    *Correspondence*: The Government searched hundreds of thousands of e-mails in the execution of search warrants at 100 Grist Mill Road and 300 First Stamford Place, and recovered many that were directly relevant to the case against Carpenter. Those e-mails include evidence of Carpenter's control over the Charter Oak Trust and the fraud scheme; his knowledge of the intent to finance and sell the policies within the Charter Oak Trust; his knowledge of the nature of the misrepresentations being made to Providers; and his knowledge of and participation in efforts to sell Charter Oak policies.

      b.    *Insurance Applications*: The Government's evidence will also include relevant portions of insurance company applications, including the sections that have the relevant misrepresentations concerning the use of third-party funding/financing, the intent to sell the policies, the purpose of the insurance policies, and the use of life expectancy valuations.

8

c.    *Charter Oak Documents*: The Government will present as evidence all of the so-called Charter Oak Documents for each of the policies taken. These documents, often known as the "ABC" documents, include an informal inquiry, which consists of a medical questionnaire, an insurance needs analysis questionnaire, and HIPAA waivers; an enrollment kit, which consists of paperwork for the insured's employer to "adopt" the Charter Oak Trust; and a "Disclosure and Certification Agreement," or "DAC."  The DAC acknowledges a funding agreement between the Charter Oak Trust and Grist Mill Capital whereby Grist Mill Capital would agree to pay the premiums for the purchase of an insurance policy on the insured's life. Among other things, the DAC states that an insured had no intent to sell the policy—although no insured will testify that he read or understood the document. The DAC recited the fees that would be taken upon the "maturation, disposition, or termination" of the policy, and amount to 20% of premiums advanced, 2-10% of the face value, and a small administrative fee. In most cases, those amounts came to an effective interest rate of 100% over two years, preventing any insured from being economically incentivized to repay the advance and take over the policy. Neither the DAC nor the funding arrangement was disclosed to the providers.

d.    *Loan Documents*: In cases where Ridgewood financed the premiums, there will also be documentation of the arrangement between Charter Oak Trust and Grist Mill Capital. These documents include a "Funding Obligation Agreement and Power of Attorney" and a "Collateral Assignment Agreement," which granted Grist Mill Capital a lien on any policy it funded through the Charter Oak Trust. In addition to these documents, the Government will introduce copies of the loan documents between Ridgewood and Grist Mill Capital and Avon Capital, which include a $35 million line of

9

credit and which provided Ridgewood with a security interest in Charter Oak Trust policies. None of these documents were disclosed to the Providers.

e.     *Funding Documents*: Again, where Ridgewood funded the premiums, the Government will introduce documentation of individual advances for the payment of premiums. These documents include "Commitment Letters," where Ridgewood committed to fund a particular life insurance policy and set out the terms of the 27-month loan to Grist Mill Capital. The Commitment Letter typically included an insurance illustration, which showed the minimum amount of premiums necessary to keep the policy in force, and differed from the illustration that was sent to the life insurance company, which typically showed a level premium. These documents also include Funding Memoranda and Disbursement Requests from Carpenter, requesting that Ridgewood and Christiana actually send the money for the premiums.

f.     *Life Expectancy Valuations*: The Government will introduce reports of third party life expectancy valuations for the straw insureds that were ordered by agents and/or Carpenter's companies both at the time of origination of each policy and at the two-year anniversary.[7]

g.     *Bank Records*: The Government will introduce bank records showing the movement of money both in support of the substantive wire fraud counts as well as the money laundering and illegal monetary transaction counts.

---

[7] Regarding all insureds, the Government will provide the insurance applications, Charter Oak documents, loan and funding documents (where applicable), and some of the life expectancy valuations, summarized by a series of charts. Regarding Straw Insureds 1-15, the Government will also introduce a small number of additional documents related to the policies, including the wires or mailings that are the subject of the Superseding Indictment.

h.      *Other Documents*: The Government will also introduce myriad other business records, including evidence of the attempt to sell several of the Charter Oak policies, proof of the mailing of certain of the Funding Memoranda that underlie the substantive mail fraud counts, and records maintained by the various straw insureds.

i.      *Summary Exhibits*: The Government will offer several summary exhibits related to the Charter Oak Trust policies, the substantive counts, the alleged misrepresentations, and the movement of money in the money laundering counts.

## II.   <u>MOTIONS *IN LIMINE*</u>

The Government moves *in limine* to limit the defendant's questions and evidence that are irrelevant and will unnecessarily prolong the trial.   Although this is a bench trial, the Government nonetheless believes that the Court should set limitations on the defendant's cross examinations and evidence as discussed below.

### A.   Motion to preclude evidence and argument that the Providers acted negligently in the face of misrepresentations by defendant and co-conspirators.

The Government respectfully moves the Court to preclude Carpenter from introducing evidence, eliciting on cross-examination, or arguing that the Providers failed to adequately screen for STOLI business, and thus acted negligently or carelessly in the face of the alleged fraud. The Government expects that Carpenter may point to the Providers' purported failure to either further probe each insurance application or to adequately supervise their insurance agents and salespeople. Indeed, in his various motions to dismiss the Superseding Indictment, Carpenter repeatedly faults the Providers for not taking additional steps to verify some of the false information in the insurance applications, particularly questions regarding the wealth of the insureds. *See*, *e.g.*, Doc. 65 at 5-6 ("[A]n inexpensive credit report would have flushed out these alleged fraudulent applications."); Doc. 67 at 7 (same); Doc. 89 at 9 (same). While the false financial statements are secondary in the Government's case to the lies regarding premium financing, intent to sell, bona fide insurance need, and life expectancies, Carpenter's motions certainly suggest that he may pursue a strategy of blaming the victim Providers for failing to screen out this fraud.

This evidence should be excluded as irrelevant under Federal Rule of Evidence 401. It is well-settled that negligence or lack of diligence or reasonableness on the part of victim of a

fraudulent scheme is no defense to a federal wire or mail fraud charge. *United States* v. *Isola*, No. 10 Cr. 833 (WHP), 2012 WL 243083, at *1 (S.D.N.Y. Jan. 11, 2012) ("A victim's negligence is not a defense to fraud."); *see United States* v. *Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (adopting rule that victim's lack of reasonableness or negligence is no defense to fraud); *see United States* v. *Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (confirming the same rule applies in prosecution for mail fraud).[8]

Negligence is no defense to mail and wire fraud because: (1) actual reliance by the target of the fraud is not an element of the mail or wire fraud statutes, and, relatedly, (2) materiality under these statutes is an *objective* rather than a subjective standard. *Neder* v. *United States*, 527 U.S. 1, 16, 24-25 (1999). As to the first point, the Supreme Court has explained that "[t]he common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes," because, "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Id.* at 24-25 (citations omitted).

As to the second point, *Neder* confirmed that while materiality is an element of the federal fraud statutes, Congress focused on the "scheme" to defraud rather than the completed fraud; accordingly, the Court adopted a test that did not include reliance: "a false statement is material if it has a *natural tendency* to influence, or is capable of influencing, the decision of the decision making body to which it was addressed." *Id.* at 16 (emphasis added; citation, alteration, and quotation marks omitted)); *see United States* v. *Irvin*, 682 F.3d 1254, 1267-68 (10th Cir. 2012) ("This definition, in referring to natural tendencies and capabilities, establishes materiality

---

[8]   The mail and wire fraud statutes are "analyzed the same way."  *United States v. Slevin*, 106 F.3d 1086, 1088 (2d Cir. 1996).

in the bank fraud context as an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision.").

The Eleventh Circuit's application of the objective materiality test in *United States v. Powell*, 509 Fed. App'x 958 (11th Cir. 2013) (unpublished), a mortgage fraud case, is instructive here. The defendant in *Powell* had "sought to show that the lending institutions that were the nominal victims were, in fact, fully informed participants who, motivated by profit, encouraged an environment in which the ability of the borrower to repay the mortgage was treated as immaterial." *Id.* at 967. The district court, however, granted the Government's motion *in limine* to bar the defense "from referring to (1) the mortgage lenders' negligence and/or failure to investigate further any issues with the mortgage applications originated by [the defendant]; [and] (2) the present foreclosure crisis and the role of the mortgage lenders in any ongoing foreclosure actions[.]" *Id.* at 961. The Eleventh Circuit affirmed, explaining: "Whether the lenders in this case knew or should have known that the loan applications were fraudulent is of no consequence to this action. It has no bearing on the essential element of [the defendant's] conduct, namely her intent to participate in the mortgage fraud scheme." *Id.* at 967. The Eleventh Circuit went on: "Whether the lenders were motivated by profit or did, in fact, profit from [the defendant's] efforts is equally immaterial. . . . [T]he government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived." *Id.* (quotation marks and citation omitted). Finally, the court reasoned, "[l]ikewise, whether the lenders negligently created an environment of lax lending standards is irrelevant. Contributory negligence is not a defense to the crime of fraud." *Id.*

In another analogous context in the Southern District of New York, the trial court precluded defendants charged with wire, mail, and health care fraud, whose principal defense

14

was that their statements were immaterial, from presenting evidence of victim negligence or carelessness. *See United States* v. *Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013). The court excluded the evidence as irrelevant under Federal Rule of Evidence 401, and further explained that "even if it somehow passed the test of relevance," it was inadmissible under Federal Rule of Evidence 403 because "[s]uch evidence might allow the jury to improperly conclude that, even if it found that Defendants did engage in fraudulent conduct as charged, they should not be held responsible because the [the target of the fraud] should have known about the fraud in question." *Id.*

Applying these principles here, the Court should preclude Carpenter from adducing evidence, arguing, or cross-examining Government witnesses about purported negligence or lack of diligence by individual underwriters or other employees in detecting the defendant's fraud. These matters—while perhaps relevant in the civil context, where the elements of reliance, damages, and contributory negligence are often properly and hotly contested—have no bearing on the question of materiality in a federal criminal fraud trial. *Cf. United States* v. *Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis: 'If a scheme to defraud has been or is intended to be devised, it makes no difference whether the person the schemer intended to defraud was gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts.'" (citation omitted)).

### B.    Motion to preclude evidence and argument about the Providers' failure to take legal action over policies revealed to be STOLI, or to settle any of the litigation they initiated.

The Court should preclude as irrelevant under Rule 401 all evidence, questioning, and argument regarding a Provider's failure to seek rescission of or take other legal action with

15

respect to a policy that, after its issuance, the Provider came to learn was procured by an application containing material misrepresentations.  Similarly, the defendant should also be precluded from all evidence, questioning, and argument that a Provider continued to accept premium payments on a policy that, after its issuance, the Provider learned had been procured by an application containing material misrepresentations.

Here, at least two of the Providers sued the Charter Oak Trust and/or its associated entities and individuals based on STOLI claims. In one case, Penn Mutual settled its lawsuit against the Charter Oak Trust related to four specific policies. *See The Penn Mutual Life Insurance Company v. Charter Oak Trust, et al*., No. 3:10CV1520 (RNC). In another case, Phoenix was granted summary judgment in its fraud suit against the Charter Oak Trust related to four different policies, rescinding the policies and permitting Phoenix to keep the premiums already paid. *See PHL Variable Ins. v. Charter Oak Trust*, No. HHDCV106012621, 2015 WL 6964586 (Conn. Super. November 4, 2015) (Robaina, J.).  However, several other Providers have not taken legal action against the Charter Oak Trust, and Penn Mutual and Phoenix have not sued to rescind or void *all* of the Charter Oak policies that they wrote, some of which had passed the contestability period by the time of the lawsuits. The Government seeks to preclude any evidence or argument related to decisions by Providers either to forego litigation, settle litigation once initiated, or to collect premiums related to a STOLI policy.

In *Binday*, the district court granted a substantially similar motion *in limine*.  *See United States v. Binday, et. al.*, No. 1:12cr152(CM), Document Number 243 (hereinafter "*Binday* Motions Decision") at 4-6. In doing so, the district court noted that materiality is judged under the "natural tendency" standard, *see Neder*, 527 U.S. at 16, which "not only is an objective inquiry, but it is one that "focuses on the potential effect of the false statement when it is made

16

rather than on the false statement's actual effect after it is discovered." *Binday* Motions Decision at 5 (quoting *United States ex rel. Antidiscrimination Ctr. of Metro NY., Inc. v. Westchester Cty.*, 668 F. Supp. 2d 548, 569 (S.D.N.Y. 2009) and citing *Lesniewski*, 2013 WL 3776235, at *3 (S.D.N.Y. July 12, 2013)).  The district court held that

> [i]f Defendants have evidence suggesting that the Insurers continued to solicit and court STOLI-type business from [the defendants] after the Insureds became aware of the Government's investigation, or after they knew about the unethical way in which the insurance was procured (i.e., via misrepresentations), such evidence would inform an objective evaluation of whether the misrepresentations were material. But evidence about what the Insureds did concerning the policies well after those policies issued - even, as the Government points out, beyond the contestability dates of some policies - says nothing about whether the misrepresentations used to procure the policies were immaterial at the time they were made.

*Binday* Motions Decision at 6.  Accordingly, this Court should preclude Carpenter from introducing evidence or arguing that the misrepresentations were immaterial because any Provider failed to seek rescission of or take other legal action with respect to a policy or they continued to accept premium payments on a policy that, after its issuance, turned out to have been procured by an application containing material misrepresentations.

Similarly, to the extent that any Provider did sue the Charter Oak Trust or its trustee or sponsor in connection with policies it believed to contain material misrepresentations after the policy was issued, but ultimately settled the lawsuit, Carpenter should be precluded from introducing evidence of such a settlement. This evidence would have little probative value because any litigant's decision to settle depends on a multitude of variables that have nothing to do with whether fraud was committed. For example, there is the litigation risk that—notwithstanding the fraud—a trier of fact could determine a policy cannot be rescinded or treated as void because the two-year contestability period has expired. *Compare Principal Life Ins. Co.*

*v. Erno Altman Ins. Trust, No.* 10 Civ. 1936 (DLI), 2011 WL 7498936, at *4-6 (E.D.N.Y. Sep. 20, 2011) (discussing New York law providing that even fraud claim by insurer was barred by contestability clause), *with Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 28 A.3d 436, 438-39 (Del. Sup. Ct. 2011) (holding that under Delaware law incontestability clause did not bar action to declare policy void ab initio); *see Am. Gen. Life Ins. Co. v. Tomlinson Ins. Trust*, No. 08 Civ. 1747 (SEB-TAB), 2010 WL 3893673 (S.D. Ind. Sep. 30, 2010) (noting split of authority on this issue). Even where the contestability clause is no bar to suit, the litigation costs associated with continuing action might make settlement a more economically sensible option.

Accordingly, this Court should preclude Carpenter from offering evidence about a Provider's lawsuit and subsequent settlement of any action over the policies in this case.

### C. Motion to preclude evidence and argument suggesting that the Providers did not care about STOLI because they allowed sale of policies on the secondary life settlement market.

Next, Carpenter should not be permitted to argue or suggest that the misrepresentations on the insurance applications were immaterial, or that he lacked intent to defraud, because the Providers did not prohibit insureds from selling already-issued policies on the secondary life settlement market. Nor should Carpenter be permitted to argue about the legality of STOLI policies generally, which he has repeatedly done in his motions to dismiss the Superseding Indictment. *See, e.g.*, Doc. 63 at 13 (arguing that STOLI policies are not illegal); Doc 66 at 6 (arguing that "Connecticut (or other states) do not prohibit stranger originated life insurance policies (STOLI); they are not illegal").

This case is not about sales of insurance policies on the secondary market—a legitimate practice supported by the common law of alienability. Indeed, as this Court noted in its recent decision denying Carpenter's various motions to dismiss the Superseding Indictment:

> Notably, every relevant state's law provides that, after a life insurance policy has been issued, an insured may resell that policy to an investor, who would become the policy's beneficiary and assume payment of the premiums. Thus, with respect to transferability, the difference between non-STOLI and STOLI policies is simply one of timing and certainty: whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale from before its issuance. While life insurers are required by law to permit resale of policies originally obtained for estate planning purposes, they are not obligated to issue policies intended for resale from the outset.

> STOLI policies became a popular investment in the mid 2000s for hedge funds and others eager to bet that the value of a policy's death benefits would exceed the value of the required premium payments. In response, many insurance companies . . . adopted rules against issuing STOLI policies and took steps to detect them.

Doc. 154 at 2 (quoting *United States v. Binday*, 804 F.3d 558, 565 (2d Cir. 2015)).

Thus, for example, if an insured purchases a life insurance policy for genuine estate planning purposes and finds after the purchase that he cannot afford or does not want the policy any longer, there is nothing improper about his then selling the policy to an investor.

Nor is this case about whether STOLI is illegal under the various state insurance laws. Rather, this case is about material misrepresentations made on insurance applications to the Providers to procure policies that they would not issue absent the misrepresentations. The legality of STOLI or the fact that the Providers did not bar secondary-market sales of already-issued policies has no bearing on the Providers' posture toward STOLI.

In *Binday*, the district court faced a similar motion *in limine*. *See Binday* Motions Decision at 12-13. Although the court denied a motion to preclude evidence about the insurers knowledge of or participation in a secondary market for insurance policies, the court held that

19

"[d]efendants should not expect . . . that they will be allowed to argue that the existence of an aftermarket, and the Insurers' participation therein, constitutes proof that the Insurers knew that the particular policies at issue in this case would in fact be sold and were intended to be sold, notwithstanding any representation to the contrary; or that the Insurers 'did not care' (to use the Government's phrase) about Stranger-Initiated Ordinary Life policies." *Id*. at 13.

Similarly here, the Court should prohibit Carpenter from arguing that the misrepresentations on the insurance applications were immaterial, or that he lacked intent to defraud, because the Providers did not prohibit insureds from selling already-issued policies on the secondary life settlement market.

### D. Motion to preclude evidence and argument that Carpenter's false representations did not cause actual economic harm.

Next, the Government moves the Court to preclude Carpenter from arguing that there was no *actual* economic effect of any particular policy on the bottom line of the respective Provider. The Government anticipates that representatives of some of the Life Insurance Providers will testify that they believe that the unknowing issuance of STOLI policies is potentially harmful in several ways to the economic interests of the Providers. Generally speaking, the Providers believed STOLI policies undermined certain economic assumptions, as more fully described in Paragraph 16 of the Superseding Indictment.  As a result, witnesses will explain that the Providers asked questions and took other steps to identify and avoid the issuance of STOLI policies, in order to avoid potential economic harms.  The Providers view the answers to these questions as economically valuable information, and factor that information into their decision making.  However, the Government will not attempt to prove, and indeed need not prove, that the potential harms resulting from the issuance of STOLI polices actually materialized.

It is well settled that because (1) reliance and consequent economic loss are not elements of the crimes charged and (2) materiality is an objective inquiry, it is irrelevant to attempt to disprove actual reliance and/or harm. *See, e.g.*, *United States* v. *Rossomando*, 144 F.3d 197, 201 n.4 (2d Cir. 1998) ("It is irrelevant . . . whether the victim of a fraudulent scheme does in fact suffer harm, so long as concrete harm was contemplated."); *Irvin*, 682 F.3d at 1267-68 (in mortgage fraud case, explaining that evidence relating to whether fraud targets "were in fact influenced by [defendant's] fraudulent representations" was "irrelevant"). It follows, therefore, that evidence of how the Providers fared economically in the wake of Carpenter's false representations should be precluded.

Nor can the defendant argue that absence of ultimate economic harm is somehow relevant to the question of intent to defraud. The law is clear that intent to defraud is independent of any actual loss suffered by the fraud's target. *See, e.g.*, *United States* v. *Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008) (affirming jury instruction incorporating the rule that a defendant's belief that his actions will cause no ultimate harm is not a defense to wire or mail fraud); *United States* v. *Koh*, 199 F.3d 632, 641 (2d Cir. 1999); *United States* v. *Berkovich*, 168 F.3d 64, 66-67 (2d Cir. 1999); *United States* v. *Watts*, 934 F. Supp. 2d 451, 470-71 (E.D.N.Y. 2013) (granting motion *in limine* similar to one brought here in case where defendant sought to argue that he believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *see United States* v. *Levis*, 488 Fed. App'x 481, 486 (2d Cir. 2012) ("[E]ven if Levis meant to cause no ultimate harm to investors because he honestly believed Doral to be properly valued, he intended to cause them immediate harm by denying them the right to control [their] assets by depriving [them] of the information necessary to make discretionary economic decisions." (alterations in original; quotation marks and citation omitted)); *United States* v.

*Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (same); *United States* v. *Chandler*, 98 F.3d 711, 716 (2d Cir. 1998) (affirming defendant's conviction for credit card fraud despite lack of evidence that credit card company suffered any loss as a result of defendant's fraud, because defendant's false statements about her identity "expos[ed] [the credit card company] to the risk that the applicant was less creditworthy than it believed").

The Government must of course prove that Carpenter *contemplated* harm, but this element may be satisfied by proof of harm to the Providers' right to control their assets through discretionary economic decisions. *See Rossomando*, 144 F.3d at 201 n.5; *United States* v. *Carlo*, 507 F.3d 799, 801 (2d Cir. 2007); *United States* v. *DiNome*, 86 F.3d 277, 283 (2d Cir. 1996); *United States* v. *Wallach*, 935 F.2d 445, 463 (2d Cir. 1991) (under "right to control" theory, "inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution"). Simply put, proof of an intent to cause harm is separate from the question of whether actual economic harm to the insurance carriers resulted—and accordingly such evidence is irrelevant.

The Second Circuit in *Binday* explains this so-called economic harm principle at length in a case very similar to this one. The court held:

> Because the mail and wire fraud statutes do not require a showing that the contemplated harm actually materialized, the government did not need to prove that the STOLI policies defendants procured, or other such policies that slipped through the safeguards erected by the insurers to detect and reject them, in fact have lower lapse rates or insureds with shorter life-spans. Rather, it suffices that the misrepresentations were relevant to the insurers' economic decision-making because they believed that the STOLI policies differed economically from non-STOLI policies, and thus that the defendants' misrepresentations deprived the insurers of potentially valuable economic information.

*Binday*, 804 F.3d at 574 (internal quotations and citations omitted). The question for a factfinder is thus not whether the insurance companies' expectations of the economic performance of

22

STOLI policies were accurate or actually came to fruition. Rather, they need only be reasonable. In this regard, "a jury is entitled to credit the informed and plausible business decision of a sophisticated entity as to what constitutes, for its purposes, potentially valuable economic information." *Id*. At bottom, "it suffices to prove that the defendants' misrepresentations deprived the insurers of economically valuable information that bears on their decision-making." *Id*. at 576-77.  Indeed, this is already the law of this case. *See United States v. Carpenter*, No. 3:13cr226(RNC), 2015 WL 9305638, at *9 (D. Conn. December 21, 2015) (In the context of denying Carpenter's motion to dismiss, holding that "cognizable harm occurs where the defendant's scheme den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions") (citations omitted).

As explained above, the law's rejection of the need to prove actual economic harm is hardly new and is particularly valid in the context of life insurance, "where insurers enter a multitude of similar transactions based on anticipated aggregate results." *Binday* 804 F.3d at 577. Indeed, the Government anticipates that witnesses will explain that insurance products are not priced based on how any individual policy may perform, but rather the expected aggregate performance over particular classifications of individuals, *e.g*., "standard" cases or "table rated" cases.

The Second Circuit further made clear that the same principle applies to the defendant's intent: "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss -- it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Id*. at 579. The Government need not prove that the defendant knew "the precise nature of the economic differences between STOLI and non-STOLI policies," but only

that his "misrepresentations induced the insurers to enter into economic transactions -- ones that entailed considerable financial risk -- without the benefit of accurate information about the applicant and the purpose of the policy." *Id.*

In short, the Government moves to preclude the defendant from arguing that the Government must prove actual loss to any Provider from a particular insurance policy on the life of a Straw Insured, or that the Government need prove any more than that Carpenter's conduct deprived the Providers of information relevant to their discretionary economic decisions.

### E.   Motion to preclude the defendant from offering his own out-of-court statements.

The Government anticipates offering statements, including numerous emails, made by Carpenter and his indicted and unindicted co-conspirators, for the truth of the matter asserted. All of Carpenter's statements, as well as those of his co-conspirators, are admissible when offered by the Government because these statements are non-hearsay party opponent statements. *See* Fed. R. Evid. 801(d)(2).

On the other hand, a defendant is not entitled to offer his own self-serving out of court statements for the truth of the matters asserted because such statements are "hearsay" and barred by Fed. R. Evid. 801(c). *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *Lesniewski*, 2013 WL 3776235, at *5 (granting Government's motion *in limine* to preclude admission of defendant's self-serving statements made during pre-arrest interviews); *United States v. Annabi*, No. 10 Cr. 7 (CM), 2012 WL 489111, at *1 (S.D.N.Y. Feb. 14, 2012) ("a defendant does not have a parallel ability to offer his own out-of-court statements into evidence").

24

When a defendant wishes to offer his own out of court statements for the truth of the matter asserted, his option is to take the witness stand, make those statements directly to the trier of fact, and be subject to cross-examination.

Similarly, a defendant cannot offer a co-conspirator's statements for the truth of the matter asserted. *See United States v. Milstein*, 401 F.3d 53, 73 (2d Cir. 2005) (holding that defendants may not rely on the co-conspirator exception under Rule 801(d)(2) to introduce out-of-court statements by co-conspirators offered for the truth).

Accordingly, the Court should preclude Carpenter from offering his own self-serving out-of-court statements, or the out-of-court statements of his co-conspirators, for the truth of the matter asserted.

**F.      Motion to permit the Government to cross-examine the defendant about his prior federal convictions for mail and wire fraud in the event he testifies at trial.**

Should Carpenter take the stand and testify, the Court should permit the Government to cross-examine Carpenter about his prior felony convictions pursuant to Rule 609(a)(2) of the Federal Rules of Evidence. Rule 609 governs the admissibility of evidence of prior convictions for impeachment purposes, and provides in relevant part:

> The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction: . . . (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence: . . . (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and (2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement.

Fed. R. Evid. 609(a).

25

Unlike the admissibility of a prior conviction under Rule 609(a)(1), admission under Rule 609(a)(2) is automatic and does not require a balancing test, provided the conviction is less than ten years old. *See United States v. Bumagin*, No. 11-CR-800 WFK, 2015 WL 5725870, at *9 (E.D.N.Y. Sept. 29, 2015) ("evidence of conviction of a certain type of crime [,] one involving dishonesty of false statement[,] must be admitted, with the trial court having no discretion[.]" (quoting *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir.1977) (internal quotation marks and citations omitted))); *United States v. Estrada*, 430 F.3d 606, 615-17 (2d Cir. 2005) (noting that evidence under 609(a)(2) is "automatically admissible" and stating "the only difference between the two provisions is that evidence of convictions for crimes involving "dishonesty or false statement," whether felonies or misdemeanors, *must* be admitted under Rule 609(a)(2) as being *per se* probative of credibility, while district courts, under Rule 609(a)(1), *may* admit evidence of a witness's felony convictions that do not constitute *crimen falsi*, subject to balancing pursuant to Rule 403") (emphasis in original).  If the sentence is more than ten years old, then under Rule 609(b)'s timing constraint, prior convictions would not be admissible "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b).

As relevant here and as the Court is aware, in June 2008 Carpenter was convicted in the District of Massachusetts on 19 counts of mail and wire fraud in connection with his mishandling of client escrow funds. *United States v. Carpenter*, 781 F.3d 599, 603 (1st Cir.) *cert. denied*, 136 S. Ct. 196 (2015) *reh'g denied*, 136 S. Ct. 609 (2015).  The First Circuit summarized the offense as follows:

> In a nutshell, [Carpenter] told clients he would hold their money in escrow accounts for which the client would pay a fixed fee and which would cautiously generate returns of either three or six percent; then (unbeknownst to his clients) he invested the money in high-risk, high-return stock options, hoping to generate excess returns to keep for himself. His option trading fared poorly, and he lost nine million dollars in client funds. At trial, he argued unsuccessfully that he never promised that the client funds would be safe, and that he did not intend to defraud his clients when he failed to disclose his real strategy of using their money to make risky investments to see if he could hit a home run for himself.

*Id.* at 603. The government's theory of the case was that Carpenter's marketing materials and agreements contained misleading statements in that they promised the client's funds would be kept safe. *See id.* at 620. Following post-trial motions and a lengthy appeal, on February 26, 2014, Carpenter was sentenced to 36 months of imprisonment. *Id.* at 607. The convictions became final upon entry of judgment on March 4, 2014—clearly less than 10 years ago. *Id.*

Carpenter's prior convictions for mail and wire fraud are automatically admissible under Rule 609(a)(2) because they are less than ten years old and involve acts of dishonesty or false statements. *See United States v. Newsom*, 438 F. App'x 16, 20 (2d Cir. 2011) (finding that evidence of defendant's prior conviction for mail fraud was admissible under Rule 609(a)(2) because it required "proof or admission of an act of dishonesty or false statement"); *United States v. Orlando-Figueroa*, 229 F.3d 33, 46 (1st Cir. 2000) (noting that mail fraud is a crime involving "dishonesty or false statement" under Rule 609(a)(2)); *United States v. Kuecker*, 740 F.2d 496, 501 (7th Cir. 1984) (stating "there is no doubt that mail fraud involves 'dishonesty or false statement' for rule 609 purposes); *United States v. Chervin*, No. 10 CR 918 RPP, 2013 WL 124270, at *5 (S.D.N.Y. Jan. 10, 2013) (finding that prior conviction for wire fraud was admissible as crime involving dishonest or false statement because one of the essential elements of wire fraud is "obtaining money or property by means of false or fraudulent pretenses, representations, or promises").

Accordingly, the Government should be permitted to introduce evidence of the fact of Carpenter's prior felony convictions and the general nature of the convictions to attack the defendant's credibility if he chooses to testify.

**G.  Motion to require advance notice of privilege claims and advice-of-counsel defense.**

Next, the Government moves the Court to order Carpenter to make any privilege claims no later than February 5, 2016, and/or to provide notice (if any) of an advice-of-counsel defense by the same date.

As the Court is aware from prior filings, there was extensive pre-indictment litigation in this matter following a blanket assertion of privilege by the defendant and other investigative targets over material seized pursuant to search warrant in April 2010 and May 2011. That litigation ended upon the August 20, 2013 "Agreement Pursuant to FRE 502(e)" (hereinafter the "502 Agreement") as incorporated by the August 22, 2013 Order by Chief United States District Judge Janet C. Hall. The 502 Agreement permitted the Government to review without limitation the material seized in the search warrant, with the understanding that the targets would not forfeit their right to challenge the admission of documents upon valid assertions of privilege prior to any trial, and that any viewing by the prosecution team of documents later determined to be privileged would not taint the discovery of any further evidence. The Agreement obliged the Government, should an indictment be returned, to provide notice in advance of trial of which documents it intends to introduce as evidence that include one or more attorneys on an agreed-upon list. The Government provided such notice on December 22, 2015, by letter to counsel for the defendant as well as to counsel for the target entities, identifying approximately one hundred documents—all of which had previously been produced in discovery. To date, the Government

has not received any indication that the defendant intends to move to preclude any of the proffered documents on privilege grounds.

To be clear, the Government is not inviting a privilege claim here. While the Government will respond fully to any privilege claims if and when made, it is likely that such claims would fail because (1) the defendant has no standing to assert privilege over these company-owned documents, *see United States v. Keplinger*, 776 F.2d 678, 699-701 (7th Cir.1986) (no individual attorney-client relationship between corporate employees and corporate counsel where there was no evidence that employees sought legal advice on an individual basis); (2) the proffered documents principally contain non-legal communications, *see In re Grand Jury Subpoena Duces Tecum (Marc Rich & Co.),* 731 F.2d 1032, 1037 (2d Cir. 1984) (when a client seeks business or non-legal advice, there is no privilege as the attorney-client privilege "is triggered only by a client's request for legal, as contrasted with business, advice"); and (3) many of the communications, even if otherwise privileged, involved use of "the attorney-client relationship to engage in ongoing fraud rather than to defend against past misconduct," *see In re Special September 1978 Grand Jury (II),* 640 F.2d 49, 59 (7th Cir. 1980) (citing *Clark v. United States*, 289 U.S. 1(1933) and *United States v. Alridge*, 484 F.2d 655 (7th Cir. 1973)). In all but a handful of these documents, the lawyer involved was the sometime in-house counsel for the Benistar entities, an unindicted co-conspirator in this matter.

Regardless of the lack of validity of any potential privilege claims, the litigation of such claims would be time consuming, fact intensive, and best resolved in advance of trial. Indeed, that is why the Government provided a list to counsel more than a month ago. Even if the defendant decided to raise privilege issues now, it would be a challenge to resolve those issues in advance of the current trial date. Given that counsel has had the Government's list for more than

29

a month, it is eminently reasonable to require the defendant to advance any privilege claims by February 5, 2016, and otherwise forfeit those claims. *See United States v. Construction Prods. Research*, 73 F.3d 464, 473 (2d Cir. 1996) ("The party asserting the privilege must establish the essential elements of the privilege.").

Similarly, the Government moves the Court to require the defendant to provide notice of any advice-of-counsel defense by February 5, 2016. *See United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (requiring defense to provide notice to Government of any advice-of-counsel defense before the final pre-trial conference); *United States v. Mubayyid*, No. 05 Cr. 40026 (FDS), 2007 WL 1826067, at *2 (D. Mass. June 22, 2007) (noting Court's inherent authority to require notice of defenses where, as here, such notice is not required by statute or rule). As with the privilege issue, the Government does not believe that there is a legitimate defense based on good-faith reliance on advice of counsel in the undertaking of the defendant's fraudulent scheme, and has to date received no notice of such a defense. However, having reviewed thousands of documents that include lawyers for the principal entities in the fraud, the Government wishes to avoid any delay that may be occasioned by the mid-trial revelation that the defendant does intend to offer such a defense. Moreover, a late disclosure of an advice-of-counsel defense will likely complicate the privilege issue, as it may require the Government to go back and make additional requests to admit attorney-related documents. It would also likely affect whether the defendant has waived any claim on documents already disclosed, thus potentially obviating any need for the Court to engage in a document-by-document privilege review. Finally, such notice may cause the Government to have to issue further subpoenas.

It is well settled that, by asserting an advice-of-counsel defense, and thereby relying on otherwise privileged attorney-client communications, a defendant waives privilege over all other attorney-client communications about the same subject matter. "[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *see also id.* at 183 n.4 ("The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter." (citation and quotation marks omitted)); Fed. R. Evid. 502(a).  As court-appointed Special Master Daniel Capra explained in *S.E.C. v. Wyly*:

> A client who claims that he acted on advice of counsel cannot use the privilege to prevent inquiry into the communications that the client and lawyer had about that advice.  There is a compelling notion that the adversary cannot be stonewalled by the simultaneous assertion of the [advice of counsel] defense and the privilege. Put another way, the attorney-client privilege can be used to shield information, but it cannot be used as a sword against the adversary.

No. 10 Civ. 5760 (SAS), 2011 WL 3366491, at *2 (S.D.N.Y. July 27, 2011).

As discussed above, the Government is in possession of thousands of documents and electronic files from search warrants, some of which reference internal and external lawyers. The Government does not believe any of those documents provide grounds for an advice-of-counsel defense. However, the Government is mindful that the defendant likely has access to myriad other communications with attorneys to which the Government is not privy. Many of these would be in the hands of whatever lawyer(s) a defendant raising this defense may claim to have consulted.

31

To avoid potential delay during the trial, the Government respectfully requests that the Court order Carpenter to give notice by February 5, 2016 of any intention either to assert privilege over a document listed in the December 22nd letter or to invoke an advice-of-counsel defense. The Government further requests a ruling that if Carpenter is relying on an advice-of-counsel defense, immediately upon communicating such reliance, he must (1) produce to the Government the basis for that reliance and (2) provide the Government with the name(s) and contact information for the attorney(s) alleged to have been consulted.

### H.     Motion to preclude evidence and argument related to selective prosecution.

Next, the Government moves the Court to preclude argument or evidence to suggest that the defendant should be treated more favorably by the factfinder because certain other individuals were not charged for their involvement in this scheme, or to claim that the defendant was somehow unfairly singled out for prosecution. Counsel's questioning of the four deposition witnesses suggests that Carpenter believes it is somehow relevant that he is one of only three people to have been charged with a crime resulting from their involvement in the Charter Oak Trust.

"[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor." *United States v. White*, 972 F.2d 16, 18 (2d Cir. 1992). Indeed, "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607, 84 L. Ed. 2d 547, 105 S. Ct. 1524 (1985). Prosecutorial discretion to charge is limited by "constitutional constraints," *United States v. Batchelder*, 442 U.S. 114, 125 (1979), in particular the Fifth Amendment, through which "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification," *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "To make out a claim of selective prosecution, a

defendant confronts a deliberately rigorous standard; he must provide clear evidence that the prosecutorial decision or policy in question had both a discriminatory effect and [] was motivated by a discriminatory purpose." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (internal quotations and citations omitted). "The discriminatory effect prong requires a showing that similarly situated individuals of a different [classification] were not prosecuted." *Id.* (citations and quotations omitted).

As with any defense based on "defects in the institution of the prosecution," a defense that questions or attacks the Government's decision to prosecute is not properly put before a jury—or, in this case, the Court as factfinder. *See United States v. Cote*, 544 F.3d 88, 104 n.5 (2d Cir. 2008) (quoting F. R. Crim. P. 12(b)(1)). To wit, a claim of selective prosecution may only be presented to the Court by motion. *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983) ("In this Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings."); *United States v. Taylor*, 562 F.2d 1345, 1356 (2d Cir. 1977) (same).  Such a claim is never properly tried to the factfinder. *See United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995); *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973); *United States v. Danielson*, No. 97 Cr. 295 (RPP), 1998 WL 226200, at *1 (S.D.N.Y. May 5, 1998) ("a selective prosecution claim is a claim based on alleged defects in the institution of a prosecution" and therefore must be raised before trial); *United States v. Napper*, 553 F. Supp. 231, 232 (E.D.N.Y. 1982) ("The defendant does not have the right to present a selective prosecution claim to a jury.").

Thus absent such constitutional constraints, a defendant may not argue to the factfinder that he is owed a favorable inference because of the Government's decision not to charge particular individuals. Indeed, the pattern jury instruction says just that:

33

> You may not draw any inference, favorable or unfavorable, towards the government or the defendants on trial, from the fact that certain persons were not named as defendants in the indictment or that certain persons were named as co-conspirators but not indicted. The circumstances that these persons were not indicted must play no part in your deliberations….Whether a person should be named as a co-conspirator or indicted as a defendant is a matter within the sole discretion of the United States Attorney and the grand jury. Therefore, you may not consider it in any way in reaching your verdict as to the defendants on trial.

*Sand*, 103 Modern Federal Jury Instructions-Criminal 3.04; *see also*, *United States v. Stewart*, No. 03 Cr. 717(MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ("any evidence that raises questions of prosecutorial bias against Stewart has no bearing on the issues properly before the jury, including the credibility of cooperating witnesses").

Thus the defense should be precluded from asking the factfinder to infer from the absence of charges against others purportedly similarly situated to Carpenter that he is being singled out for prosecution. If such evidence is allowed, it will require the Government to introduce evidence of why it made certain investigative or prosecutorial decisions. These topics have nothing to do with this trial, and they would cause needless confusion of the issues in violation of Rule 403. Accordingly, Carpenter should not be permitted—through his own testimony, cross-examination of Government witnesses, or argument—to introduce evidence or argument regarding the presence or absence of charges brought or punishments levied against others.

III.    **<u>CONCLUSION</u>**

The Government respectfully requests that the Court grant the above motions *in limine*.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY


*/s/ David E. Novick*
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510


*/s/ Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 29, 2016, a copy of the foregoing Government's Trial Memorandum and Motions *In Limine* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ David E. Novick*
David E. Novick
Assistant United States Attorney

36