**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:13CR226(RNC) |
| | ) | |
| DANIEL E. CARPENTER | ) | |
| | ) | MARCH 13, 2017 |

## DEFENDANT'S MEMORANDUM IN SUPPORT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO F. R. CRIM. Pro. 29

### I.    PRELIMINARY STATEMENT

The Due Process Clause of the Constitution protects the accused from conviction except upon proof beyond a reasonable doubt of every material fact necessary to secure a conviction. *In Re Winship*, 397 U.S. 358, 364 (1970). Therefore, to convict Mr. Carpenter on a conspiracy theory of mail and wire fraud, it must prove beyond a reasonable doubt that Mr. Carpenter contemplated and intended actual concrete harm to the insurance carriers that are the alleged victims in this case. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998). Not only did the government fail to prove a conspiracy or any intent to harm the carriers on the part of Mr. Carpenter, the government failed at trial to explain how paying premiums to an insurance carrier could possibly be proof of an intent to harm the carrier or show contemplation of actual concrete harm as required within the Second Circuit. *See United States v. Regent Office*, 421 F.2d 1174 (2d Cir. 1970), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994), and *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007).

Furthermore, there is no case in any circuit that Mr. Carpenter can find that explains how having the "deceiver" pay money to the "deceived" constitutes mail and wire fraud under any

1

historical understanding or examples of fraud under the common law. In fact, when the government tried to preserve its conviction of someone who lied on a government license application, the Second Circuit called the government's arguments "patently absurd" and cited Judge Leonard Sands' dismissal of a mail and wire fraud indictment in *Evans* as the support for its decision. *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991), *citing United States v. Evans*, 844 F.2d 36 (2d Cir. 1988). Mr. Carpenter respectfully suggests to the Court that not only has the government failed to prove a scheme to defraud, it has not shown how paying millions of dollars in premiums to the carriers could possibly constitute a scheme to obtain "money or property" from the carriers. As the Second Circuit has succinctly stated:

> "...a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. *See Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).

But perhaps the government's biggest obstacle in securing a conviction against Mr. Carpenter is that Mr. Carpenter did not fill out or even assist in filling out the applications with the allegedly false representations. For that reason, virtually none of the counts listed for mail and wire fraud, i.e. Counts 1-33, are mailings and wires "in furtherance" of the alleged scheme to defraud the carriers. The only Counts that discuss the sending in of an allegedly false application are Counts 20 and 23. All of the other Counts involve mailings or wires to request funds to pay premiums to the carriers, which again, cannot possibly constitute "in furtherance" of a fraud to obtain money or property as it was understood under the common law and were certainly not "in furtherance" of any scheme to harm the carriers.

Since the government is well aware that Mr. Carpenter had nothing to do with the allegedly false applications and did nothing wrong, much less knowingly illegal in this case, the government needed to create the fictitious chimera of a "conspiracy to defraud" the carriers,

2

comprised of people that Mr. Carpenter never met or even communicated with, such as the unnamed Outside Agents listed in the Superseding Indictment. The problem with the government's "conspiracy theory", however, is that the government never explained, much less proved at trial, what the "essential terms" of the illegal agreement were, who was part of the so-called agreement, and that the agreement even existed. As the Second Circuit has said concerning conspiratorial agreements: "In order to convict a defendant of conspiracy, the government must prove both the existence of the conspiracy alleged and the defendant's membership in it beyond a reasonable doubt." *See, e.g., United States v. Huezo,* 546 F.3d 174, 180 (2d Cir. 2008). "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end. In order for a defendant to be convicted of a conspiracy, there must be proof beyond a reasonable doubt that the conspirators agreed on the essential nature of the plan." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). This, the government failed to do at Mr. Carpenter's trial.

However, in order to prove a conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999). And, with regard to the "property" as the object of the fraud, the government was required "to prove that the defendants knowingly agreed to participate in a scheme that involved the misappropriation of [information] that they knew—based in part on the firms' conduct—constituted confidential information." *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012), reversing fraud convictions, and citing *United States v. Wallace*, 85 F.3d 1063, 1068

3

(2d Cir. 1996) (defining unlawful intent in conspiracies as "specific intent to achieve th[e] object [of the conspiracy]").

The government not only failed to prove any overt act "in furtherance" of the conspiracy by any conspirator associated with Mr. Carpenter in any conspiracy to harm the carriers, the government also failed to allege or prove that the overt act was committed within the period of the Statute of Limitations. "To constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [a conspirator]." An "overt act . . . [is] meaningful only if [it is] within the scope of the conspiratorial agreement." *United States v. Laspina*, 299 F.3d 165, 176 (2d Cir. 2002). Because the Superseding Indictment created new claims and new possible penalties for Mr. Carpenter, it does not relate back to the original indictment, and instead created a new statute of limitations date of January 2009, based on the Superseding Indictment date of May 2014. *See United States v. Gigante*, 982 F.Supp. 140, 154-55 (E.D.N.Y. 1997). Since Counts 20 and 23 are the only Counts that could possibly be in furtherance of the alleged fraud, and involve brokers in Texas submitting applications on insureds in Texas to Lincoln in North Carolina in early to mid-2008, the government failed to prove an overt act in furtherance of the conspiracy during the applicable statute of limitations period and clearly venue for these Counts was not proper in the District of Connecticut.

Even assuming *arguendo* that the government met its burden to show that the alleged misrepresentations on the applications were actually false and done with the intent to harm, which clearly they were not, the government failed to present any evidence that the misrepresentations were "material", much less "essential to the bargain" as required by Second Circuit precedents. *See, e.g., United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996), one of the more notable mortgage fraud-right to control assets cases, which makes clear that even

4

deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to the "ultimate value of the transaction." *Id.* at 284. More recently, the Second Circuit in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) explained in detail its decisions in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) and *Shellef*, and that the deceit must go to an "essential element of the bargain":

> In *United States v. Mittelstaedt*, where a government employee concealed his ownership interest in property that his department agreed to purchase, we held that it was not sufficient to show that the government, had it known the truth, "would have refused to deal with him on general principles." 31 F.3d 1208, 1218 (2d Cir. 1994). Rather, "[t]o convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the [purchaser] of a pecuniary nature or that the [purchaser] could have negotiated a better deal for itself had it not been deceived." 31 F.3d at 1217. And in *Shellef*, defendants induced a company to sell them its products by falsely representing that they would not resell the products domestically. 507 F.3d at 107–08. We vacated defendants' conviction for wire fraud because the indictment alleged only that defendants' misrepresentation induced the seller "to enter into a transaction it would otherwise have avoided" and not that the misrepresentation "had relevance to the object of the contract." *Id.* at 108–09. *Binday*, 804 F.3d at 570.

The government's attempt to solve this apparent "*Shellef* Doctrine" problem in Mr. Carpenter's case by replicating the inapposite allegations in the indictment from *Binday* is equally unavailing. However, unlike in Mr. Carpenter's case, not only did Mr. Binday, as the broker solicit the "straw-insureds" **fill out** and **sign** the allegedly fraudulent insurance applications, he also personally sent them to the insurance carriers in order to be paid the "high commissions," just as Mr. Waesche did in this case. Even in *Binday*, the government did not claim that STOLI policies were illegal, and they are not. Nor does the government claim that STOLI policies are not as profitable as regular universal life insurance policies sold by the carriers, because just the opposite is true. The reason for this is obvious, in that whether policies are STOLI policies which are premium-financed policies or ones that are self-financed, the insurance carrier takes the same risk and makes the same profits if the insured does not die; and

STOLI policies are far more likely to lapse and create a windfall for the carriers because truly wealthy people can keep the "estate-planning" policies until the day they die, contrary to the government's assertions in Mr. Carpenter's indictments. Therefore, none of the allegedly false misrepresentations go to the **materiality** of the risk or to the elements of the bargain.

The government sought to produce a *Binday* look-a-like indictment, and despite the apparent similarities between the indictments of Mr. Binday and that of Mr. Carpenter, it is highly important in this case that the government presented no evidence that Mr. Carpenter filled out any applications for life insurance, signed any applications, submitted any applications, recruited any of the so-called "straw-insureds" nor did he receive any commissions as Mr. Binday clearly did, just as Messrs. Mactas and Pacini controlled the bulk of applications and commissions in this case. And, unlike Mr. Binday, no evidence was produced at trial contradicting the truth that Mr. Carpenter has not lied or misrepresented anything to anyone. Nor did the government offer any evidence at trial to disprove or impair Mr. Carpenter's "good faith" or impugn his integrity or show any criminal intent on his part to deceive or defraud anyone. The "Bindays" of this case were the outside agents such as Bruce Mactas, Robert Pacini, Lee Alper, and the other brokers and agents that filled out the applications. At worst, Mr. Carpenter and GMC are similar to the innocent investors in *Binday* who provided the money to the Binday-insured trusts. Moreover, the big difference between the superseding indictment in this case and the *Binday* indictment is that in this case, all of the policies were issued to a welfare benefit plan known as the Charter Oak Trust, which eradicates the government's entire theme of the alleged fraud, because it is black-letter law that the Charter Oak Trust had an insurable interest at all times in the policies, and therefore they could not possibly be STOLI policies, where the "future" owner of the policy lacks an "insurable" interest.

6

Even more significant is the fact that the only person who could purchase a "Straw" Insured's policy from the Charter Oak Trust, was the Insured - and only the Insured. Therefore, please see this Court's definition of STOLI based on the Second Circuit's opinion in *Binday*:

> A STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured – essentially, it is a bet on a stranger's life. Notably, every relevant state's law provides that, after a life insurance policy has been issued, an insured may resell that policy to an investor, who would become the policy's beneficiary and assume payment of the premiums. Thus, with respect to transferability, the difference between non-STOLI and STOLI policies is simply one of timing and certainty: whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale from before its issuance. While life insurers are required by law to permit resale of policies originally obtained for estate planning purposes, they are not obligated to issue policies intended for resale from the outset. *Binday*, 804 F.3d at 565, as cited in Doc. 154 at page 2.

Thus, it was impossible to have any fraud committed by Mr. Carpenter against the carriers based on the facts alleged in the indictments or proven at trial beyond a reasonable doubt. Even Mr. Waesche testified that if there was a bona-fide insurable interest in the insured, there could not be STOLI. Furthermore, all the carrier witnesses agreed that if the only person who could purchase the policy from the Trust was the insured, then that could not be STOLI either, as STOLI is understood by the carriers. In fact, unlike the mortgage fraud cases where the defendant lies on a mortgage application and that lie costs the bank hundreds of thousands of dollars, in *Binday* the defendant essentially made "*Shellef*-like" misrepresentations to get the carriers to issue the policies that they might not normally issue so he could pay the carriers money in the form of premium payments based on the essential actuarial components of age, gender, and health of the insured. This is, of course, the fundamental basis of the "*Shellef* Doctrine*", to get the carriers to issue policies that they might not normally issue, but the defendants in *Binday* did contract to pay the correct amount of premium based on the essential elements of the insurance contract, and that is the difference between a scheme to deceive and a

scheme to defraud. In Mr. Carpenter's defense, he would still argue that he made no misrepresentations to anyone, and that the questions on the Lincoln applications were answered correctly, but no one has accused Mr. Carpenter of making any misrepresentation of the essential elements of the insurance bargain, and at trial, the government did not present any evidence that any of the alleged "co-conspirators" lied about the essential elements of age, gender, or health of the insureds. The gist of the government's case is that Mr. Carpenter did not inform the carriers that GMC was providing funding for the Charter Oak Trust. Not only was this assertion not proven beyond a reasonable doubt at trial, this is clearly a constructive amendment of the indictment that requires a grant of a judgment of acquittal for Mr. Carpenter on all Counts.

Moreover, the best evidence presented at trial of Mr. Carpenter's good faith and lack of any criminal intent is that he participated in a conference call on April 15, 2009 with Mr. Ken Elder and half a dozen officers of Lincoln to discuss the tax ramifications of the Charter Oak Trust. After that call, Lincoln paid $30 million in death benefits to the Charter Oak Trust, finding no fraud in the Sash Spencer applications after a year-long investigation, and Lincoln went on to issue another two dozen policies owned by the Charter Oak Trust. At no time did Lincoln sue to rescind any policy issued to the Charter Oak Trust based on any fraudulent misrepresentation. Obviously, if there were no material fraudulent answers on the Sash Spencer applications, then there cannot be any Specified Unlawful Activity (SUA) proceeds involved in this case to support a Money Laundering conviction. But, more importantly, at trial the government introduced no evidence whatsoever that any of the financial transactions done by Mr. Carpenter were done with the intent to hide or conceal the origins and nature of these insurance proceeds or that Mr. Carpenter actually knew that the proceeds were SUA proceeds as opposed to death benefits, insurance proceeds, or proceeds of a lawsuit. If the financial transaction is done without the

intent to conceal the origin and nature of the funds, it is not money laundering. *See United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (reversing money laundering conviction because the funds used were not known by the defendant to be SUA proceeds).

Furthermore, the evidence in this case has shown that Mr. Carpenter was not only unaware of any fraud being perpetrated on the carriers; he was the principal victim that actually suffered from the fraud of the agents of the carriers. The reason this is important is because the agents, general agents, and officers of Lincoln all knew who Mr. Carpenter was and Grist Mill Capital's role in funding the policies of the Charter Oak Trust, and so it is black letter law that the knowledge of the insurance agent is attributable to the carrier. *See, e.g., Stipcich v. Metropolitan Life*, 277 U.S. 311 (1928) (revelations about the insured's health, given to the insurance carrier's agent were attributed to the carrier). Thus, the evidence provided by the government at trial is incontrovertible that Mr. Waesche and Mr. Induddi-Westcott were agents of the carriers and they knew that GMC was providing the funding to the Charter Oak Trust through a split-dollar arrangement, so therefore it is beyond peradventure that the knowledge of the agent is attributable to the carriers in this case, and that the carriers were not deprived of their right to control their assets or deprived of any essential information necessary to their economic decision making, because their agents knew everything that Mr. Carpenter knew and more, because it was proven at trial that Mr. Carpenter did not know anything about the wealth or health of the insured. Therefore, because the carriers were not deprived of any essential information necessary for their economic decision making through the knowledge of their own agents, there was no federal fraud or federal mail and wire fraud properly proven at trial beyond a reasonable doubt, and Mr. Carpenter respectfully requests that this Court issue a judgment of acquittal as to all Counts of the Superseding Indictment.

## II.    LEGAL STANDARD

Under Rule 29 of the Federal Rules of Criminal Procedure, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering and granting a Rule 29 motion, where a fact to be proved is also an element of the offense ". . . *it is not enough that the inferences in the government's favor are permissible*." "We must be satisfied that after drawing all permissible inferences in favor of the government, a rational trier of fact could find that every element of the crime was established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (emphasis added), *citing United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). Therefore, this Court must be satisfied that any such inferences are sufficiently supported with proven facts to find that each essential element is established beyond a reasonable doubt. "[A] conviction based on speculation and surmise alone cannot stand." *D'Amato*, 39 F.3d 1256. The Court must reject "those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative . . . ." *United States v. Ofray-Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008), *quoting United States v. Hernandez*, 218 F.3d 58, 64 (1st Cir. 2000). Courts have recognized that "if the evidence viewed in the light most favorable to the prosecution gives '*equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,*' then a reasonable [factfinder] *must* necessarily entertain a reasonable doubt." *See United States v. Coplan*, 703 F.3d 46, 71 (2d Cir. 2011), *citing United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2000). (Emphasis added). Therefore, if the government does not introduce evidence at trial to prove the defendant guilty beyond a reasonable doubt, then the defendant is not guilty.

When reviewing a claim of insufficiency of the evidence, "the standard of review is exactly the same regardless whether the verdict was rendered by a jury or by a judge after a

bench trial." *See United States v. Pierce*, 224 F.3d 158, 164 (2d Cir. **2000**), *citing McCarthy v. New York City Technical College of City Univ. of New York*, 202 F.3d 161, 166 (2d Cir. 2000); *see also United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) (applying same standard of review after bench trial in criminal case, and *citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In granting a motion for a judgment of acquittal, the Second Circuit has made it clear that a trial court must grant the motion when there is no evidence presented by the government, which proves the defendant's guilt beyond a reasonable doubt:

> "The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal...if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, **the motion must be granted**. *United States v. Temple*, 447 F.3d 130 (2d Cir. 2005), *citing United States v. Taylor*, 424 F.3d 240, 243 (2d Cir. 1972) (emphasis added).

Therefore, Mr. Carpenter respectfully requests that this Court enter a judgment of acquittal in his case on all counts for the reasons elucidated below.

## III. THE GOVERNMENT FAILED AT TRIAL TO PROVE ALL OF THE FACTS NECESSARY TO SECURE A MAIL AND WIRE FRAUD CONVICTION BEYOND A REASONABLE DOUBT

As Justice Harlan stated in his concurrence in *In Re Winship*, 397 U.S. 358 (1970):

"I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Id.* at 372.

At Mr. Carpenter's trial, the government not only failed to prove each of the necessary elements of mail and wire fraud beyond a reasonable doubt, it failed to present the necessary facts to prove those elements at all. Because Mr. Carpenter did not do any of the acts that make up the counts of the Superseding Indictment, the government was forced to create the illusion of a huge conspiracy that Mr. Carpenter was somehow the ringleader of, despite the fact that he did not know or communicate with most of the people accused of being his "co-conspirators." Since Mr. Carpenter did nothing wrong, much less anything illegal, they needed to superimpose the conduct and the allegations of the *Binday* indictment on the otherwise totally innocent conduct of the Charter Oak Trust and Mr. Carpenter's company Grist Mill Capital (GMC) who were the true victims here of the fraud done by the agents of the carriers.

However, unlike in *Binday* where the defendants admitted upfront that they had lied on the insurance applications, Mr. Carpenter still asserts his innocence and his honestly-held good faith belief that the questions on the insurance applications in this case were answered honestly and accurately to the best of his knowledge. Those facts of Mr. Carpenter's good faith and lack of any specific intent to defraud anyone remain intact. The government on the other hand has not proven the facts necessary to show the use of mailings and wires in furtherance of a scheme to defraud in order to obtain money or property. Because the government failed to prove the facts necessary to support any conspiracy, much less a conspiracy that Mr. Carpenter was a party

to, that leaves a gaping void to show that Mr. Carpenter "caused" any of the mailings and wires listed in the indictments and presented at trial "in furtherance" of any scheme to defraud.

Because the government just assumed that there was a huge conspiracy involving the Charter Oak Trust that Mr. Carpenter was somehow the head of, they neglected to present at trial, much less prove beyond a reasonable doubt, the necessary facts to support the elements of mail and wire fraud that all must be proven beyond a reasonable doubt. To make this point, Mr. Carpenter cannot do better than the Supreme Court did in *In Re Winship*, 397 U.S. 358 (1970), *quoting Speiser v. Randall*, 357 U.S. 513, 525-26 (1958):

> The requirement of proof beyond a reasonable doubt plays a vital role in our criminal justice system for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the indictment as well as any conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

> There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of convincing the factfinder of his guilt. To this end, the reasonable-doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue. Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt **of every fact necessary to constitute the crime** with which he is charged. *Winship*, 397 U.S. at 364. (Emphasis added).

Mr. Carpenter's superseding indictment claiming fraud also runs afoul of the unanimous Supreme Court decision in *Skilling v. United States*, 561 U.S. 358 (2010), which reinterpreted the rules for mail and wire fraud after Congress reacted to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), by adding Section 1346 for honest services fraud. The allegations in Mr. Carpenter's Superseding Indictment also do not fit with what the Supreme Court refers to as the "mirror image theory" of fraud that "the victim's loss of money or property suppl[ying] the defendant's gain," *Skilling* at 400. Indeed, though Mr. Carpenter was originally indicted for mail and wire fraud, that was never proven beyond a reasonable doubt at trial, and the government's constructive amendment of the original indictment at trial made Mr. Carpenter's case one of what he allegedly "did not tell the carriers" that his company Grist Mill Capital was funding the policies in the Charter Oak Trust under a split-dollar arrangement so that the government's case at trial resembled the type of "scheme of nondisclosure" that *Skilling* held was "outside the bounds" of the fraud statutes. *Skilling* at 410.

In fact, the historical definition of fraud by the Supreme Court in *Skilling* requires a deprivation of property and occurs only when "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling* at 400, *citing United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987). This is inconsistent with the government's remodeled theory of the case, which is that Mr. Carpenter somehow had a duty to inform the carriers that GMC was funding the policies of the Charter Oak Trust, and this definition of fraud is not even vaguely alluded to in the Superseding Indictment because at no time did any money end up in Mr. Carpenter's pocket. To the contrary, Mr. Carpenter and his company Grist Mill Capital **lost** over $74 million, while the supposed "victim" carriers **received** over $100 million.

14

Typically, for there to be fraud, there must be *both* a material misrepresentation *and* that the defendant intended to harm the victim. Mr. Carpenter did not deceive anyone, nor did he make any misrepresentation to anyone, material or otherwise, and the "property" certainly did not end up in his pocket, and not only was he not aware of any fraud being perpetrated on the carriers, he was the one that actually suffered from the fraud; not the carriers. Most importantly, no evidence was produced at trial to show that Mr. Carpenter had the intent to harm anyone, much less the carriers by providing them with $100 million in premiums through the Charter Oak Trust. Therefore, no federal fraud or federal mail and wire fraud was properly alleged in his Indictment, or proven at his trial. At Mr. Carpenter's trial, the government failed to prove beyond a reasonable doubt that there was any scheme to defraud the carriers of any money or property, and the government also failed to show any mailings or wires in furtherance of a scheme to defraud. Because the government failed to prove each of the elements of mail and wire fraud, when they must prove all of the elements beyond a reasonable doubt, Mr. Carpenter is entitled to a judgment of acquittal on all of the Counts of the Superseding Indictment. "If the evidence at trial was insufficient to prove [an element of the crime] we must reverse and order the dismissal of that count." *Burks v. United States*, 437 U.S. 1, 18 (1978).

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that the elements of mail and wire fraud that must be alleged in an indictment and proven beyond a reasonable doubt are that the defendant(s):

(1)    Used either mail or wire communications **in the foreseeable furtherance**,
(2)    of a scheme to defraud,
(3)    involving a material deception,
(4)    with the intent to deprive another of,
(5)    either property or honest services.

*See Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, CRS Report R41931, July 21, 2011.

Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid. The reason the Charles Doyle report to Congress is so important, is that Congress was told in 2011 there were five elements that must be proven beyond a reasonable doubt to convict someone of mail and wire fraud. There can be no doubt that Mr. Carpenter's Superseding Indictment in May 2014 is based largely on the indictment contained in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). When the defendants in *Binday* were indicted in February 2012, their indictment was based on the three elements of *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004):

(1)     A scheme to defraud,
(2)     to obtain money or property,
(3)     using the mails or wires.

But, whether the Court uses the five elements of Charles Doyle's Report to Congress or the three elements of *Fountain*, the simple truth is the government failed to prove the facts necessary to support each and every element of mail and wire fraud beyond a reasonable doubt. Moreover, Mr. Carpenter's judgment of acquittal should be granted on all Counts and the Superseding Indictment should be dismissed, because it failed to allege any **"knowledge"** on his part that he was **willfully** participating in a scheme to defraud, nor was any crime or conspiracy proven at trial. One of the elements which has been considered **indispensable** to an indictment for any type of crime is **knowledge**; e.g., knowledge that a law was broken. In *Pettibone v. United States*, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court in reversing their conviction stated:

It seems clear that an indictment against a person...must charge a knowledge or notice, on the part of the accused....Unless that fact exists, the statutory offense cannot be

16

committed...and without such knowledge or notice, the evil intent is lacking. *Id.* at 206-07.

This requirement of a direct and explicit allegation of knowledge of breaking the law in an indictment was reiterated in *Direct Sales Co. v. United States,* 319 U.S. 703 (1943), where the Supreme Court affirmed the position it had taken in the *Pettibone* case fifty years prior, stating:

> Without the knowledge, the intent cannot exist....Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal....This, because charges...are not to be made out by piling inference on inference, thus fashioning...a dragnet to draw in all substantive crimes. *Id.* at 711.

Moreover, as the Supreme Court has recently summarized in *Elonis* by citing cases like *Liparota v. United States,* 471 U.S. 419 (1985) and *Morissette v. United States,* 342 U.S. 246 (1952), for there to be a crime in American Jurisprudence, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked." *Id.* at 251-52. There must be some "concurrence" between an evil thinking mind and an evil act to create a crime. *See Morissette* at 250.

There was no scheme to defraud any carrier proven at trial. No witness testified that any of the carriers were deprived of their "economic decision making", nor did anyone prove that Mr. Carpenter lied to anyone or misrepresented anything to any carrier, much less interfered with a carrier's right to control its assets. Understandably, an argument can be made that the agents of the carriers each had a "scheme to deceive" the carriers, but even the most notable of the right to control asset/economic decision making cases, *United States v. Dinome,* 86 F.3d 277 (2d Cir. 1996) makes clear that even "deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to the ultimate value of the transaction."

*Id.* at 284. In *Dinome*, the Second Circuit cited to *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), for the proposition that:

> "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction. *Mittelstaedt*, 31 F.3d at 1217 (citing *Carpenter*, 484 U.S. at 27).... "However, the government must show 'that some actual harm or injury was *contemplated* by the schemer.'" *D'Amato*, 39 F.3d at 1257 (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) (emphasis in *Regent Office Supply*)). Thus, fraudulent intent is "[e]ssential to a scheme to defraud." *Id.*" *Dinome* at 283-84.

But, even deceitfully breaching a contract is not a crime; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), and *Regent Office*.

More importantly, there was no evidence adduced at trial or even any allegations by any witness at trial that Mr. Carpenter **intended** that any of the Carriers to suffer any loss or "actual concrete" harm, which is the *sine qua non* of mail and wire fraud, and Mr. Carpenter certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the pension plan so that the defendant's good faith was unimpaired despite the jury's verdict). Absolutely no one testified that Mr. Carpenter ever intended to harm any carrier, or anyone else for that matter, nor did anyone testify to explain how paying premiums to an insurance carrier could possibly cause the insurance carrier any harm or deprive it of its economic decision-making. Fully 30 of the first 33 Counts of the Superseding Indictment deal with some aspect of funding the premium payments, and only Counts 20 and 23 deal with the issue of sending in applications with allegedly false statements.

The fact that GMC's loss was caused by the licensed agents of the carriers, and not vice-versa, mandates an acquittal of Mr. Carpenter on all counts, but especially of any crime

involving fraud because any fraud in this case was committed against Mr. Carpenter's company GMC, and not by GMC or the Charter Oak Trust against any carrier. Moreover, it is hornbook law that the knowledge of the agent is attributed to the principal as a matter of law, but especially in the world of life insurance applications. *See, e.g.*, the Supreme Court's decision in *Stipcich v. Metropolitan Life*, 277 U.S. 311 (1928), where revelations about the insured's health, given to the insurance carrier's agent were attributed to the carrier, proving that knowledge that the carrier's agent had whether it be J. Edward Waesche, Charles Induddi-Westcott, Fred Prelle, or Bruce Mactas, Robert Pacini, or Lee Alper should be ascribed to Lincoln, Penn Mutual, and Phoenix, just as the agent's knowledge in *Stipcich* was attributed to Metropolitan Life. *See, also, Stockwell v. United States*, 80 U.S. 531 (1871) ("It is not seriously denied that in civil transactions a principal or a partnership is affected by the knowledge of the agent or copartner, and that the knowledge of the agent is in law attributed to his principal…").

Because it is a well understood axiom of the common law that the knowledge of the agent is the knowledge of the principal, in this case, it is clear from even the government's allegations in the Superseding Indictment that all of the agents and officers of the carriers knew that GMC was providing the funding for the policies purchased by the Charter Oak Trust. Therefore, as a matter of law, there were no misrepresentations made to the carriers because the knowledge of the agents like Mactas, Pacini, Alper, Waesche, Prelle, and Induddi-Westcott is attributed to the carrier. *See Stipcich, supra.* Thus, it is faulty logic on the part of the government to assume that Mr. Carpenter is part of any conspiracy to defraud the carriers based on the actions of people that he was not in any agreement to do anything illegal with, but rather these people that he was not associated with, were agents of the carriers and **their knowledge is attributable to the carrier**. This means that because they knew about GMC's funding of the policies in the Charter Oak

Trust, and they knew of the split-dollar arrangement, and the STOLI forms were meant to be filled out by the carriers' agents and not by Mr. Carpenter, there is no possible "scheme to deceive" attributable to Mr. Carpenter because all of the executives of all of the carriers knew who Mr. Carpenter was, and the only representations made to the carriers in this case were made by their own licensed agents and not Mr. Carpenter, and the agents that testified at trial certainly knew who Mr. Carpenter was and GMC's role in the Charter Oak Trust. Whereas the agents had a duty of loyalty to the carrier, and a duty to disclose all facts to their principal, the carrier, Mr. Carpenter had no such duty to disclose, and as the Supreme Court said in *Skilling*, this type of "nondisclosure is outside the bounds of the federal fraud statutes." *See Skilling* at 410. The government's case boils down to Mr. Carpenter being involved in a conspiracy that never existed with people that he did not know, and ignoring one of the most basic tenets of the common law "that the knowledge of the agent is attributable to the principal", or in this case, the knowledge of the agent is attributable to the life insurance carrier.

It is indisputable that J. Edward Waesche, representing Phoenix, Penn Mutual, and even Lincoln, knew about GMC's role in the funding of the Charter Oak Trust's policies. Furthermore, Charles Induddi-Westcott and Fred Prelle and Bruce Mactas, among others, were officers of Lincoln as well as licensed General Agents and Premier Partners of Lincoln. Both Prelle and Westcott had several conference calls with Mr. Carpenter involving the GMC and Charter Oak Trust. As Ken Elder of Lincoln testified, Mr. Carpenter dominated the conference call in April of 2009 concerning the tax implications of the Charter Oak Trust, and that Mr. Carpenter was **"INCREDULOUS"** that anyone could think that the Charter Oak Trust was STOLI or STOLI in disguise. (*See* Trial Tr. Vol. XI, p. 2054, *23-24). More significant than that, however, is the fact that no one on the April 2009 conference call, including Mr. Elder or any of

his colleagues at Lincoln asked: "Mr. Carpenter – who are you and what are you doing on this call? You are not the Trustee of the Charter Oak Trust and you are not licensed with Lincoln. Why are you on this call?" Clearly, all of the Lincoln Officers and Agents on that call knew who Mr. Carpenter was, and if they were concerned about being associated with the Charter Oak Trust, GMC, or Mr. Carpenter, they would not have sent a check for $30 million to Charter Oak Trust the very next month after a year-long investigation into Sash Spencer's insurance policies, and Lincoln would not have issued another two dozen life insurance policies to a trust that they thought was STOLI in disguise or to someone that they suspected was in the process of defrauding them after lengthy conference calls, substantial due diligence, and a year-long investigation conducted by ICS-Merrill and other Lincoln Officers.

Because there was no evidence of any fraudulent activity on the part of Mr. Carpenter or GMC, and there was no intent to harm the carriers, and no intent to obtain money or property from the carriers or deprive them of their economic decision making, and there was no loss to the alleged victim carriers that ended up in Mr. Carpenter's pocket as described by the Supreme Court's reference to the "mirror image of fraud" in *Skilling*, he should be acquitted on all counts as a matter of law.

## IV. THE SECOND CIRCUIT'S RECENT DECISION IN *COUNTRYWIDE* MANDATES A JUDGMENT OF ACQUITTAL FOR MR. CARPENTER ON ALL COUNTS

The Second Circuit's recent decision in *United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016), *reh'g denied*, 2016 U.S. App. LEXIS ___ (2d Cir. Aug. 22, 2016) ("*Countrywide*") totally eviscerates not only the government's theory of culpability in Mr. Carpenter's case, but also the legal reasoning behind the jury instructions and Judge Lynch's opinion in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), on which Mr. Carpenter's case was highly dependent as a matter of law. It would be fair to say that it is impossible for the *Binday* and *Countrywide* decisions to exist in the same universe, much less the same circuit. Ironically, both *Countrywide* and this Court's opinion in Mr. Carpenter's case start with a citation to *Binday*. The scholarly *Countrywide* decision traces the roots of federal mail and wire fraud back to the early days of the common law and the Supreme Court's decision in *Durland v. United States*, 161 U.S. 306 (1896), cites to *Binday* for the "common" elements of mail and wire fraud in the Second Circuit:

1) A Scheme to defraud
2) To obtain money or property
3) By using the mails and wires in furtherance of the scheme to defraud

*Countrywide* 822 F.3d at 657, *citing Binday* at 569.

The bedrock of these elements is the "scheme to defraud," which further requires proof that the defendant had the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation or omission of a "material fact." *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial

discussion." *Countrywide* at 657. Even a cursory reading of *Countrywide* shows that there was no scheme to defraud that Mr. Carpenter was a party to.

The Second Circuit posited the central issue in *Countrywide* as what is fraud in a contract and illustrated the fundamental difference between a mere breach of contract and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide*, 822 F.3d at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion for reconsideration may be based on an intervening change in the law or in this case a Rule 29 motion for a judgment of acquittal. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract.

In *Countrywide,* the Second Circuit concluded that a "scheme to defraud" requires proof of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is no intent not to perform one's obligations under the contract at the time of executing the same, a subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the mail or wire fraud statutes. The legal standard in *Countrywide* was only by a "preponderance of the evidence", whereas in Mr. Carpenter's case it was beyond a reasonable doubt.

Citing *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991), and *Durland*, 161 U.S. at 313, the court buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide*, 822 F.3d at 662. Moreover, the scheme to defraud must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that he or she is lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on it or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.* In Mr. Carpenter's case, not only did he not lie to any of the carriers, he was not even a party to the contracts at the heart of this case: the insurance applications of the insurance policies issued by the carriers to the Charter Oak Trust.

The Second Circuit further emphasized that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that **intention not to perform on the promise when it was made.** *Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the mail and wire fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661–62.

Turning to the evidence presented against Countrywide and its executives, the Second Circuit noted that at trial the government only contended that the defendants had made affirmative misrepresentations. *Id.* at 663. Thus, the court looked to the language of the contracts

and noted that the government identified no statements other than those contained in the contracts as affirmative misrepresentations. *Id.* at 663–64. The court then held that the representations complained of were made on the date of contract execution. *Id.* at 665. However, the government failed to present evidence that Countrywide had intent not to provide investment quality mortgages at the time the contracts were signed. Therefore, there was no "scheme to defraud." *Id.* at 663–66.

The mere fact that Countrywide delivered loans to the Government Sponsored Entities (GSEs) FNMA and FHLML, knowing that the loans were not investment quality, was insufficient. *Id.* at 665–66. In fact, the Second Circuit noted that the government "identified no representations or statements other than those contained in the contracts" to support the fraud claims. *Id.* at 664. Therefore, the jury had a legally insufficient basis to conclude that a misrepresentation was allegedly made with contemporaneous fraudulent intent. *Id.* at 666. For that reason, the Second Circuit reversed the judgment against Countrywide and its CFO, Rebecca Mairone, despite the fact that the fraud at Countrywide was both rampant and notorious. Whereas in *Countrywide* there were thousands of fraudulent loans sold to the government, at Mr. Carpenter's trial there was not a single life insurance application processed by Mr. Carpenter or that had his name on it.

The essential crime found by the jury in *Countrywide* was a mail and wire fraud scheme to induce Fannie and Freddie to purchase risky mortgage loans originated through the "High Speed Swim Lane" ("HSSL" or "Hustle") program by misrepresenting that the loans were of higher quality than they actually were. This is virtually identical to the government alleging here that the scheme was for Mr. Carpenter, in an alleged conspiracy with others, was inducing the Carriers to issue insurance policies based on allegedly false misrepresentations, none of which

were made by Mr. Carpenter. The Hustle program implemented this scheme by transferring primary responsibility for approving loans from quality-focused underwriters to volume-focused loan specialists, eliminating quality-control, and reducing the turn-around time for loan funding from 45 days to 15 days.

The district court observed that the financial motive for the fraud was that the *Countrywide* defendants "managed to unload a vast portfolio of risky assets on unwitting buyers and were thereby able to reduce the risk on their own balance sheet at a crucial moment in time." *United States v. Countrywide*, 33 F. Supp. 3d 494, 501, n.9 (S.D.N.Y. 2014). The district court also noted that "if the victims had known that the defendants were lying to them about the quality of the loans produced by the HSSL process, they would never have purchased any of the loans so generated, or parted with any of their money." *Id.* at 502. This is essentially the government's rationale for fraud in Mr. Carpenter's case, i.e. that the carriers never would have issued the policies to the Charter Oak Trust without the alleged "*Shellef*-like" misrepresentations related to the quality of the policies by the agents and brokers.

The court in *Countrywide* calculated the total penalty at almost $3 billion but, after applying one mitigating factor urged by Countrywide, settled on a penalty of $1.27 billion. The district court rejected all of Countrywide's arguments because the evidence proved convincingly that the defendants were fully prepared to jettison reasonable steps to assure loan quality in favor of volume, speed, and profits—and even lied to Fannie and Freddie. In an email, a Countrywide executive admitted lying to Freddie "to conceal the awful quality" of certain loans. *Id.* at 503, n.11. In stark contrast to *Countrywide*, the government must concede that Mr. Carpenter did not fill out any applications in this case or lie to anyone, and no evidence of such conduct by Mr. Carpenter was presented at trial. Even when Countrywide's own internal quality reports

evidenced rapidly deteriorating loan quality, "the defendants shunted critics and criticisms aside, doubled down on their risky behavior, and applied ever more pressure on loan specialists to ignore loan quality concerns." *Id.* at 503.

On appeal, the *Countrywide* defendants argued that the evidence at trial showed at most an intentional breach of contract—*i.e.,* that they sold mortgages that they knew were not of the quality promised in their contracts—and this was insufficient as a matter of law to constitute mail and wire fraud. The Second Circuit agreed, concluding that the evidence failed to demonstrate the contemporaneous fraudulent intent necessary to prove a scheme to defraud through contractual promises. *Countrywide* at 662.

The Second Circuit first reviewed the trial evidence in detail and found that, pursuant to contracts with Fannie Mae, Countrywide as the seller of mortgages represented that "as of the date [of] transfer," the mortgages sold would be an "Acceptable Investment" (defined as not suffering any defects that would affect the mortgages' value or marketability). Similarly, Freddie Mac's selling guide contained a representation by the seller—again, Countrywide—that "all Mortgages sold to Freddie have the characteristics of an investment quality mortgage." The government's theory was that Countrywide sold loans to Fannie and Freddie under these purchase agreements while knowing that the loans were not investment quality, thus intending to defraud them. However, the government adduced no evidence and made no claim that Countrywide had fraudulent intent during the negotiation or execution of these contracts. *Countrywide*, 822 F.3d at 653.

Certain key individuals at Countrywide (including Mairone) were informed of the poor quality of the Hustle loans by various Countrywide employees, but nonetheless sold them to Fannie and Freddie anyway. The government summarized the evidence showing that these key

individuals at Countrywide "knew of the pre-existing contractual representations, knew that the loans originated through HSSL were not consistent with those representations, and nonetheless sold HSSL loans to [Fannie and Freddie] pursuant to those contracts." *Id.* at 655.

The *Countrywide* defendants argued that—because the only representations involved in the case were contained within contracts with Fannie and Freddie—to demonstrate fraud, rather than a simple breach of contract, under the common law and federal statutes, the government had to prove that defendants never intended to perform those contracts—*i.e.*, at the time of contract execution, defendants knew and intended that they would not perform their future obligations thereunder. *Id.* at 656-57. Similarly here, because the only alleged misrepresentations involved in this case were contained within the insurance applications provided to the Carriers—to demonstrate fraud, rather than a simple breach of contract, under the common law and federal statutes, the issue is whether the government has presented sufficient evidence at trial that the people associated with the Charter Oak Trust never intended to perform on their "contracts"— *i.e.*, insurance policies, at the time of contract execution. As the Second Circuit posed the question in *Countrywide*: "What is required to prove a scheme to defraud when the alleged misrepresentations are contained within a contract?" *Id.* at 658.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland v. United States*, 161 U.S. 306 (1896) and related cases, along with the history of the Common Law and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time.* . . . where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide*, 822 F.3d at 658 (emphasis in

original). The Second Circuit also relied on and cited on more than one occasion the case of *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791-92 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide*, 822 F.3d at 660. The Second Circuit also quotes the First Circuit in *Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007) in saying:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065, (11th Cir.2007); *United States v. Gray*, 405 F.3d 227, 235–36 (4th Cir.2005); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir.2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask."

The Second Circuit began its opinion by noting that the government must prove a "scheme to defraud" affecting a federally insured financial institution in violation of the mail or wire fraud statutes. The court noted that the central question was whether Countrywide engaged in a scheme to defraud. *Id.* at 657. To do so, the court looked to common law to see how it treated fraud in the context of contractual breach and noted "that a representation is fraudulent only if made with the contemporaneous intent to defraud." *Id.* at 658. Thus, to sustain the verdict, the government needed to prove that a promise was made which Countrywide *never* intended to fulfill. *Id.* at 658–59. As the Second Circuit explained, a contractual breach alone is not fraud, because a breach of contract is not an affirmative misrepresentation or omission to the counterparty. *Id.* The Second Circuit then summarized its holding as follows: "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that

promise—even where willful and intentional—cannot in itself transform the promise into a fraud." *Id.* at 662. Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* (emphasis added).

Applying these principles, the Second Circuit concluded that the government's proof at trial failed to meet its burden (using a preponderance of the evidence standard) of proving violations of the mail and wire fraud statutes. Even though Countrywide made blatant affirmative misrepresentations and intentionally sold non-investment quality mortgages to Fannie and Freddie over the course of their contractual relationship, Countrywide intended to sell investment quality mortgages *at the time the contracts were executed.* Thus, while Countrywide's post-execution conduct constituted an intentional breach of contract, it did not rise to the level of mail and wire fraud. The government never argued—much less proved at trial—that the contractual representations at issue were executed with contemporaneous intent never to perform, and the trial record contained no evidence that the key individuals involved had such fraudulent intent in the contract negotiation or execution. "Instead, the government's proof shows only post-contractual intentional breach of the representations. Accordingly, the jury had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with contemporaneous fraudulent intent." *Id.* at 667. Because the mail and wire fraud statutes require such proof, the Second Circuit held that the government had not proven the requisite violations under the mail and wire fraud statutes necessary to sustain an award of penalties under FIRREA.

Application of *Countrywide* to this case is straightforward and warrants Mr. Carpenter's acquittal on all counts of the superseding indictment. If there is a contract involved as there was in Mr. Carpenter's case, then the only way fraud can be shown in a contractual relationship is if the alleged fraudster had no intention of keeping his part of the bargain at the time of executing the contract, or signing of the insurance application. In Mr. Carpenter's case, it is beyond peradventure that he was not a party to the contract in this case, he did not lie to anyone about anything, and that the Charter Oak Trust was the owner of each policy and intended to pay each and every premium on each policy until the day the insured died. There is nothing in the indictment nor any evidence adduced at trial that the Charter Oak Trust, Grist Mill Capital, Ridgewood Finance, or Mr. Carpenter intended to not pay the premiums on the policies. In fact, it was a part of the alleged "scheme" to use Grist Mill Capital's money to pay the premiums for the otherwise alleged "indigent" insureds and somehow Mr. Carpenter would take control of the probably worthless policies to sell them on the open market. This underlying theory by the government is patently absurd and was not addressed, much less proven at trial beyond a reasonable doubt. While the agents of the carriers like J. Edward Waesche, Robert Pacini, and Bruce Mactas may have lied about the wealth of the insureds on the subject applications, nowhere is it alleged in the indictment or even mentioned at trial that the agents lied about the truly "material" representations of the insurance contract which are Age, Gender and Health of the Insured. But, more importantly, the essential part of the insurance contract bargain is that the insured or a premium-payor for the insured (i.e. the Charter Oak Trust) pays the premium until death, and upon the death of the insured, the carrier pays the agreed upon death benefit. If the premium-payor ceases to pay the premium, the policy lapses and there is no fraud based on any alleged misrepresentations made on the insurance application. Once again, Mr. Carpenter did not

31

fill out or sign any of those applications, nor was he a party to any contract with any of the carriers.

The reason that this is important for Mr. Carpenter in this case, is that the jury in *Binday* was only told that it is possible to defraud someone by interfering with their "right to control their assets" or "deprive them of their economic decision making." Nowhere in the scholarly history of the mail and wire fraud statutes in *Countrywide* are the words "deprived of the ability to make an informed economic decisions about what to do with money or property" or the "right to control" assets. See *Binday* jury instructions at 28, for the "right to control" assets theory mentioned: "We refer to that as being deprived of the right to control money or property." But, in the jury instructions in *Binday*, the "right to control assets" was both the "property" obtained as well as the "scheme to defraud." That is why the decision in *Countrywide* wholly undercuts the theory of fraud in *Binday*, because both *Binday* and *Countrywide* are based on contracts and the words "right to control assets" and "deprived of economic decision making" are nowhere to be found in *Countrywide*, which is based on billions of dollars of knowingly fraudulent mortgage applications.

Based on the *Countrywide* decision, there was no evidence adduced at trial or even suggested that Mr. Carpenter did not intend to perform on the contract because he did not prepare or even sign the application or the contract, or have a contract with any of the carriers. More importantly, no evidence was presented at trial that the Charter Oak Trust as the contract holder intended to not pay the premiums, which is the essential element of the insurance bargain. Mr. Carpenter was not a party to the contract as Countrywide was in *Countrywide*, and Mr. Carpenter was not the agent that recruited straw insureds and lied on the applications as Binday did in *Binday*. Mr. Carpenter had no duty to disclose anything to the carriers as he was not an

agent and he did not fill out or sign any of the applications here, nor was he a "boss" of any of the agents and brokers here as Mairone was in *Countrywide*. No evidence was produced at trial showing that Mr. Carpenter lied to anyone. If Mairone and Countrywide were not responsible for the lies told by their employees in *Countrywide*, Mr. Carpenter cannot possibly be responsible for alleged misrepresentations made by agents of the carriers that he never met.

If the "right to control assets" theory has any application, it would be in filling out a complete and honest mortgage application. If someone lies about their income, wealth, or the value of their home, they literally are stealing money from the bank, but when someone lies on an insurance application other than about Age, Gender, and Health, they are merely deceiving the carrier into issuing a policy that they might not normally issue.. Countrywide had thousands of fraudulent mortgage applications that cost taxpayers billions of dollars, and yet no one was indicted at Countrywide and the Second Circuit does not even mention the words "right to control assets" or "deprived of economic decision making" in describing the history of mail and wire fraud in America and the Second Circuit.

The Second Circuit in *Countrywide* also observed that the only representations alleged to be false were the contractual guarantees of mortgage quality and the government did not prove, or even attempt to prove, that Countrywide did not intend to perform its promise at the time it executed the contracts. The same reasoning applies here. In this case, the government likewise failed to offer any proof that the contractual representations at issue were made with contemporaneous intent not to perform or that anyone later made other misrepresentations not contained in the contracts as to which fraudulent intent could be found. Therefore, just as the Second Circuit found no mail and wire fraud in *Countrywide*, so too should this Court grant Mr. Carpenter's judgment of acquittal.

## V.   THERE WAS NO SCHEME TO DEFRAUD PROVEN AT MR. CARPENTER'S TRIAL

In a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive", so as to satisfy that requirement under the Federal mail and wire fraud statutes. See *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then the government failed to allege a scheme to defraud much less prove it beyond a reasonable doubt at Mr. Carpenter's trial, and therefore the Court should enter a judgment of acquittal as to Mr. Carpenter on all counts.

To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

Unlike the Parable of the Deceitful Neighbor, nowhere at trial did the government allege, much less prove, that Mr. Carpenter lied to anyone or filled out any of the allegedly false insurance applications. Not only was there no scheme to defraud in Mr. Carpenter's case, there

was not even a scheme to deceive as described in *Takhalov* by referring to the standards of mail and wire fraud in the Second Circuit. Even deceitfully breaching a contract is not a crime per se; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g., United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited in *Takhalov* by the Eleventh Circuit describing the law of mail and wire fraud in the Second Circuit. If the alleged deceit merely and solely causes the victim to enter into a contract that they would not normally enter, that is merely a "scheme to deceive" and not an illegal scheme to defraud. *Takhalov* at 1314, *citing Shellef* at 108, and *Starr* at 98.

Mr. Carpenter's indictment is filled with speculation about how STOLI policies might affect insurance carriers, speculation by the government that is not just specious, but has been proven false in numerous civil lawsuits and was clearly not proven at trial. There was no specific claim of actual fraud, or allegations that Mr. Carpenter intended any of the Carriers to suffer any "actual concrete" harm, which is the *sine qua non* of mail and wire fraud, and Mr. Carpenter certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See, also, the dispositive quote from *Takhalov* about harm:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*. *Takhalov* at 1313.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation of the law in that: "a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive", but not one *to defraud.* (Emphasis in original) See *Takhalov* at 1313-14. Even assuming the worst about Mr. Carpenter's alleged co-conspirators, they merely wanted to "deceive" the carriers into issuing the policy they might not have issued had they known the alleged true facts. But, even that was not proven at trial, because no one proved that the Charter Oak Trust was not a bona fide welfare benefit trust.

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit distinguishes between a high-end rare premium bourbon whisky and a cheap bar brand. The fact that the bar-girl secretly worked for the bar does not matter because the businessman got what he bargained for; which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if the bar substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that may be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the deceitful neighbor gave her a real dollar for the four quarters was merely a scheme to deceive, but in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used

the phone to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit.

To be a "scheme to defraud" the schemer must also make a misrepresentation that is "material" or essential to the very nature of the bargain. This is important to Mr. Carpenter's case because the *Binday* scheme, upon which his indictment was based on, was merely a scheme to deceive in that any misrepresentations were merely to induce the insurance carriers to issue the policies. In Mr. Carpenter's case, there was no proof at trial that Mr. Carpenter lied or deceived anyone, unlike in *Binday* where the defendants admitted that they misrepresented certain answers on the insurance applications; and Mr. Carpenter still believes the questions at issue to prevent STOLI policies were answered truthfully and accurately on the applications filled out by other people for the Charter Oak Trust. The Court's Opinion rightly refers to witnesses' testimony regarding Mr. Carpenter's firmly-held belief in the differences between Split-Dollar funding arrangement and premium financing, in the context of the insurance industry. See Op. at 44. If at this late date, we can still debate over what is Split-Dollar and what is premium financing, then Mr. Carpenter's case is not even one of a "scheme to deceive" like *Binday*, much less a "scheme to defraud", which is required under the mail and wire fraud statutes.

There were no allegations in Mr. Carpenter's indictment or evidence produced at trial that any broker lied about the essential elements of the insurance bargain, which are age, gender, and health. Even J. Edward Waesche, Bruce Mactas, Robert Pacini, Charles Induddi-Westcott, and Ezekiel Lambert only lied about wealth and not the age, health, or gender of their insurance clients. (See, e.g., Ezekiel Lambert's testimony at Tr. Vol. VII, p. 1277 at *20-21). If lying about the reason you want a $10 million insurance policy is a crime, then the government should have indicted Mr. Lambert and his mother and not Mr. Carpenter. It is clear from his testimony that

Mr. Lambert lied to the IRS on his father's estate tax audit, not the Grist Mill Capital forms, because if his family estate was really only $12 million instead of the $18 million-plus he put on the Charter Oak Trust and Grist Mill Capital forms, then he did not really need a $10 million policy on "Momma" after all. Mr. Lambert's fraud alone cost Grist Mill Capital over $1.3 million in premiums paid due to his fraud on the Charter Oak Trust.

In describing and adopting the law of the Second Circuit, the difference between a "scheme to deceive" and a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, the Eleventh Circuit stated the following:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef*, 507 F.3d at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at 1314-15, citing *Shellef*, 507 F.3d at 108.

38

This statement by the Eleventh Circuit conforms to other case law emanating from the Circuit that without the "intent to harm" there can be no scheme to defraud. See *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to prove that the defendant actually intended and contemplated "concrete harm" to the pension fund). Therefore, based on the Eleventh Circuit's description of the law of mail and wire fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that the scheme in *Binday* was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder* and *Skilling v. United States*, 561 U.S. 358 (2010). Since the indictment in Mr. Carpenter's case is a virtual carbon copy of the indictment in *Binday*, and because the government has failed to demonstrate, much less prove beyond a reasonable doubt any "scheme to defraud" knowingly joined by Mr. Carpenter with the intent to deceive with "material" misrepresentations to harm some carrier, this Court should grant a judgment of acquittal on all counts based on the government's failure to properly allege federal fraud and to prove it beyond a reasonable doubt at trial based on Second Circuit precedents that have now been adopted and memorialized by the Eleventh Circuit in *Takhalov*.

## VI. MR. CARPENTER IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE NONE OF THE MAILINGS OR WIRES WERE IN FURTHERANCE OF THE ALLEGED FRAUD

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Schmuck v. United States*, 489 U.S. 705, 710 (1989), *quoting Kann v. United Sates*, 323 U.S. 88, 95 (1944). "[T]he mailing must be 'for the purpose of executing the scheme, as the statute required.'" *United States v. Maze*, 414 U.S. 395, 400 (1974), *quoting Kann*, 323 U.S. at 94.

In *Parr v. United States*, 363 U.S. 370 (1960), the Supreme Court once again tried to determine the relationships between an alleged scheme to defraud and the use of certain mailings to satisfy the "in furtherance" element of mail and wire fraud. The defendants in *Parr* were public officials who diverted to themselves money mailed by taxpayers. The Supreme Court held that these mailings could not be "in furtherance" of the fraud since the mailings by the taxpayers were legal mailings that cannot be seen as to have been "unlawful steps in a plot." *Parr* at 391.

The Supreme Court added to its restrictive reading of the "in furtherance" element in *Maze*. In *Maze*, the defendant stole his roommate's credit card to obtain goods and services on his road trip at his roommate's expense. *Maze* at 396. The government alleged that this act of theft constituted mail fraud because the defendant knew that the credit card bills would be sent to the victim's bank and then the victim himself, but the Supreme Court ruled that this type of mailing did not satisfy the "in furtherance" of the fraud element of mail fraud, because these mailings were innocent and ordinary business mailings not for the purpose of defrauding anyone. *See Maze* at 405.

Of all the Counts in Mr. Carpenter's Indictment, only Count 20 (faxing of the application on SI-8 on December 29, 2008) and Count 23 (faxing of application on SI-10's life) deal with wires that could be logically or rationally argued to be "in furtherance" of the alleged fraud in the Court's Opinion, which is inducing the carriers to issue the policies. **If the alleged object of the fraud was to get the carriers to issue the policies, then the only mailings and wires that could logically be argued as being "in furtherance" of the fraud would be the sending in of the applications**. None of the other "Funding Memorandums" or "Disbursement and Funding" requests, or payments of premium can possibly constitute steps in the plot of the fraud, but are rather innocent mailings and wires in the ordinary course of business, pursuant to the common law in this and other Circuits discussed below. Moreover, the defense can direct the court to no case in which paying money to a bank or an insurance carrier has been legally sufficient to constitute mailings or wires in "furtherance" of a fraud. If a mortgage application is false and mailed to the prospective mortgagor, that mailing is where the fraud lies, and the use of the mails to send in the knowingly false mortgage application is the mail fraud. The monthly mortgage payments are not "in furtherance" of the fraud. *See, e.g., United States v. Chandler*, 98 F.3d 711 (2d Cir. 1996).

Counts 34-57 deal with the Money Laundering and Illegal Monetary Transaction allegations, which are dealt with later in this Memorandum, and Count 33 deals with the Conspiracy Count, but Counts 1-32 all fail because the government submitted no evidence whatsoever at trial that these mailings and wires were "in furtherance" of the scheme to defraud the carriers into issuing the policies much less prove so beyond a reasonable doubt. But, by their very nature, Funding Memorandums or Disbursement Requests are not part of the alleged scheme to defraud the carriers into issuing the policies. Not only did the government not explain

41

at trial how these Disbursement Requests or Funding Memorandums could be "in furtherance" of the scheme to defraud, they did not even introduce evidence showing that Mr. Carpenter had anything to do with causing these mailings, and so they are akin to the "rejection" letters in *Tavares* that were not caused by the defendants and were not part of the fraudulent "hiring" scheme. Here, the alleged fraud is inescapably causing the carriers to issue the policies based on the allegedly false (which was not proven by the evidence at trial) and material (which was not demonstrated at trial) misrepresentations.

Moreover, the government's case is not saved by Counts 20 and 23. Count 20 involves faxing an application on SI-8's life, the Insured Ronald Goelzer, who had submitted applications to Lincoln directly from Robert Pacini and Fred Prelle's office in Houston. The only apparent reason the fax was being sent from Simsbury is because Wayne Bursey, the trustee of the Charter Oak Trust, was required to sign the new application as the Trustee of the new owner of the policy. The alleged and unproven misrepresentations, if any, had thus already been made directly to Lincoln by Robert Pacini (Outside Agent 2), and by Fred Prelle, who was an officer of Lincoln in Houston, Texas, an Office of Managerial Jurisdiction (OMJ).

Similarly, Mr. Pacini and Mr. Prelle also filled out and submitted the application for SI-10, Joan Pennington, in June of 2008 as well as a second application on September 9, 2008 and a new policy was issued on September 18, 2008, two days after the new application with Wayne Bursey's signature went in to Lincoln. As with all of these insureds, the brokers and agents with Lincoln like Bruce Mactas, Mr. Pacini, Lee Alper, and Mr. Prelle, were all agents of Lincoln and did not work for or with Mr. Carpenter. As we discovered at trial, none of these allegedly duplicitous and deceitful agents of the insureds were fired or disciplined in any way for allegedly lying on an application or engaging in a so-called "STOLI in disguise" scheme. Mr. Carpenter,

on the other hand, was not an agent of Lincoln, or any other insurer relevant to these proceedings, and neither answered the questions on the application or signed the application. While Counts 20 and 23 merited dismissal after Mr. Bursey passed away, and the charges against him were correspondingly dismissed. As was borne out at trial, the relevant applications were filled out in Houston and sent directly to Lincoln in North Carolina. Mr. Carpenter did not cause these faxes to be sent, did not answer the questions, and the government failed to call Mr. Pacini or Mr. Prelle at Mr. Carpenter's trial to establish whether the questions were, in fact, answered correctly.

Recently, the First Circuit reversed the mail fraud convictions of several individuals involved in a massive hiring fraud involving the Massachusetts Probation Department. *See United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016). Significantly, the defendants in that case, unlike Mr. Carpenter, did participate in a massive hiring fraud and were accused of RICO and being in a scheme that reached to the highest levels of the Massachusetts legislature, where people were bribed to provide jobs for individuals in the Probation Department. However, the mailings that the government looked to in order to satisfy the "in furtherance" element of the mail and wire fraud statutes were the rejection letters sent to the unsuccessful candidates who were not hired, and these letters had nothing to do with the alleged fraudulent hiring scheme. As the First Circuit stated in its decision in *Tavares*:

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie*, 549 F.3d at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. These mailings fulfilled a requirement in the Manual that "[a]pplicants who are not selected for appointment must be notified in writing that they have not been selected." n.10: "Some of the rejection letters were mailed before Judge Mulligan approved the person eventually hired. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition, while the government asserts that the scheme was not complete until Judge Mulligan gave his final approval.

Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann*, 323 U.S. at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Tavares* at 59.

Closer to home, Judge Jed Rakoff of the Southern District of New York, sitting by designation for the Court of Appeals for the Ninth Circuit, provided a useful example of the limits of the federal mail and wire fraud statutes in *United States v. Phillips*, 704 F.3d 754 (9th Cir. 2012). The mailing at issue in *Phillips* involved a retailer in Arizona mailing an expensive watch to Phillips in California, who had created false invoices for his startup tech company in order to provide money to his girlfriend to pay for some of his personal expenses, including the purchase of the expensive watch. In reversing Phillips' mail fraud conviction, Judge Rakoff wrote the opinion for the Ninth Circuit stating that the government had failed to prove that the mailing was made "for the purpose of executing a fraudulent scheme or artifice." *Phillips* at 762. The decision in *Phillips* by Judge Rakoff is particularly instructive because, long before he came to the bench while serving as a federal prosecutor, he wrote the following oft-quoted description of the mail fraud statute:

> To federal prosecutors of white collar crime, the mail fraud statute is our Stradivarius, our Colt 45, our Louisville Slugger, our Cuisinart – and our true love. We may flirt with RICO, show off with 10b-5, and call the conspiracy law "darling," but we always come home to the virtues of 18 U.S.C. § 1341...." Jed S. Rakoff, *The Federal Mail Fraud Statute*, 18 Duq. L. Rev. 771 (1980) (citations omitted).

If the mailing of the watch in *Phillips*; the credit card receipts in *Maze*; the tax payments in *Parr*; the checks in *Kann*; or most recently, the rejection notices in *Tavares* do not constitute mailings "in furtherance" of the fraud, then certainly the normal business operations and transactions associated with receiving notices of insurance premiums due and wiring the same to insurers due to commercial contractual obligations could not be considered mailings or wires "in furtherance" of any fraud. With or without the allegation of any conspiracy, these patently

innocent mailings and wires in the ordinary course of business transactions cannot constitute any type of mailing or wire in the furtherance of the fraud, as was similarly determined in *Schmuck*, where the defendant re-registered the titles of the automobiles with the odometers pushed back in the course of an alleged fraud. As such, the mailings and wires described in the Superseding Indictment cannot possibly satisfy the "in furtherance" element of mail and wire fraud under the jurisprudence of this Circuit, as well as other Circuits and the Supreme Court, and therefore Mr. Carpenter is entitled to a Judgment of Acquittal on all Counts 1-33.

## VII. A JUDGMENT OF ACQUITTAL MUST BE ENTERED FOR ALL OF THE COUNTS OF THE SUPERSEDING INDICTMENT DUE TO VIOLATION OF THE STATUTE OF LIMITATIONS

A superseding indictment will relate back to the date of the original indictment only if the superseding indictment does not "broaden or substantially amend the original charges." *United States v. Ben Zvi*, 168 F.3d 49, 55 (2d Cir. 1999), *citing United States v. Gengo*, 808 F.2d 1, 3 (2d Cir. 1986); *see also United States v. Grady*, 544 F.2d 598, 602 (2d Cir. 1976). Superseding indictments have been deemed timely when they simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous. *See Gengo*, 808 F.2d at 3-4 (relation back where superseding indictment does not present new factual allegations or require defendant to prepare new evidence or defenses); *Grady*, 544 F.2d at 602 (relation back where superseding indictment narrowed, rather than broadened, charges).

> "A superseding indictment that supplants a pending timely indictment relates back to the original pleading and inherits its timeliness as long as the later indictment does not materially broaden or substantially amend the original charges. In determining whether a superseding indictment materially broadens or amends the original charges, we will consider whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence. *See United States v. Ben Zvi*, 168 F.3d 49, 55 (2d Cir. 1999). No single factor is determinative; rather, the "touchstone" of our analysis is notice, i.e., whether the original indictment fairly alerted the defendant to the subsequent charges against him and the time period at issue. *See United States v. Gengo*, 808 F.2d at 3, *cf. Ben Zvi*, 168 F.3d at 55 (holding that notice must come in indictment)." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003).

In *Grady*, the Second Circuit made it clear that when the Government, as in the instant matter, chooses to expand, broaden or substantially amend the charges, the new statute of limitation date of the superseding indictment applies. In this case, the Superseding Indictment materially broadened the original indictment, as all four elements discussed in *Salmonese* are present here. *See Salmonese, supra.* As such, the date on which the limitation period was to run

46

in this case was January 14, 2009 (i.e. May 14, 2009 with four months of tolled time based on the tolling agreement signed by Mr. Carpenter). Since the alleged misconduct occurred outside the five year limit, all of the counts involving the so-called straw insureds are barred by the statute of limitations, as virtually none of the mailings and wires were "in furtherance of the fraud" once the policies were issued and the policies were issued prior to January 2009.

Subsequent premium payments may be "evidence" of some nexus between the various parties in a loose sense, but not a series of separate crimes, as the Government appears to claim in its recurrent attempts to circumvent the restrictions of 18 U.S.C. §3282. This was essentially the point being made in *United States v. Salmonese*, 352 F.3d 608, 616 (2d Cir. 2003), wherein it is noted that where the action, subject of the prosecution, consists of an indefinite series of typical noncriminal unilateral actions (e.g. premium payments made to insurers in the course of normal business transactions), and there is otherwise no evidence that any of the concerned actions constitute a societal danger, it is <u>not</u> an overt act. The only purpose of the subject premium payments (all to the economic benefit of the alleged "victim" carrier and to the relative indebtedness of GMC and the Charter Oak Trust) was to fulfill the contractual obligations with the insurance carriers and the employer creating the welfare benefit plan. Consequently, since the alleged criminal conduct in this case was obtaining life insurance policies by fraud prior to January 10, 2009, all of the counts involving the so-called Straw Insureds are barred by the statute of limitations, irrespective of whether premium payments or money transfers happened to occur after January 10, 2009, as none of these mailings or wires were in furtherance of the scheme to defraud (*See* Section VI, *supra*).

"Criminal limitation statues are to be <u>liberally</u> interpreted in favor of repose...." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (emphasis added). So it is in the instant matter, where

in count after count the Government seeks to ignore or circumvent 18 U.S.C. §3282, which

clearly requires that an indictment must be brought within five years of the commission of the

crimes alleged. The limitation period begins to run when the crime is complete. *See Pendergast*

*v. United States*, 317 U.S. 412 (1943). Further, a crime is complete when each element of the

crime has occurred. *See Toussie, supra* at 123. "The limitations period is measured from the

point at which the crime is complete." *See United States v. Persico*, 832 F.2d 705, 713 (2d Cir.

1987), *citing Toussie*, 397 U.S. at 115. Section 3282(a) of Title 18 of the United States Code,

which governs the time within which most noncapital federal offenses may be prosecuted,

provides that:

> [N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the
> indictment is found or the information is instituted within five years next after such
> offense shall have been committed. 18 U.S.C. §3282(a). Statutes of limitations are
> statutes of repose. Those applicable to criminal prosecutions are principally designed to
> protect individuals from having to defend themselves against charges when the basic
> facts may have become obscured by the passage of time and to minimize the danger of
> official punishment because of acts in the far-distant past. *Toussie v. United States*, 397
> U.S. 112, 114-15 (1970). "'[S]tatutes of limitations normally begin to run when the crime
> is complete.'" *Id.* at 115, (*quoting Pendergast*, 317 U.S. at 418).

For conspiracies, the general rule is that the crime is concluded when the conspiracy has

been abandoned or its purposes accomplished. *See, e.g., United States v. Gigante*, 982 F. Supp.

140, 155 (2d Cir. 1997), *citing Hyde v. United States*, 225 U.S. 347, 369 (1912); *United States v.*

*Rastelli*, 870 F.2d 822, 832, 838–40 (2d Cir. 1989); *Persico*, 832 F.2d at 713. Thus, "the statute

of limitations for a conspiracy does not begin to run until the objectives of the conspiracy have

been either achieved or abandoned." *United States v. Eisen*, 974 F.2d 246, 264 (2d Cir. 1992);

*see, also, Persico*, 832 F.2d at 713, and *United States v. Eppolito*, 543 F.3d 25, 48-49 (2d Cir.

2008). "Whenever a jury returns a verdict of guilty upon charges that are time-barred, those

charges must be dismissed. *Gigante* at 159, *citing Toussie* at 114-15. "The statute of limitations

issue becomes more complex when the government files more than one indictment against a criminal defendant. There is no statute approving the common practice of issuing superseding indictments. *Gigante* at 155, *citing United States v. Rojas–Contreras,* 474 U.S. 231, 237 (1985).

The Second Circuit in its noteworthy decision in *United States v. Grimm,* 738 F.3d 498 (2d Cir. 2013), which is based on *Salmonese,* which in citing *United States v. Doherty,* 867 F.2d 47 (1st Cir. 1989) specifically notes that such ongoing payment streams such as premium payments are **not** continuing overt acts. **Overt acts end when the conspiracy ends.** **The alleged conspiracy ends when the object of the conspiracy has been achieved.** *See, also, Eppolito,* 543 F.3d at 49, and *Gigante,* 982 F. Supp. 140, 155. In the instant matter, once the alleged co-conspirator agents and brokers "tricked" or "fooled" the insurance company to induce the company to sell them the life insurance policy the fraud was complete. Whether the policy was paid for in a one-time lump sum or over a number of years matters not; the allegedly fraudulent deed was done, the conspiracy was complete and the statute of limitations clock had started running upon the submission of the application, and certainly by the time the policy was effective and issued. Indeed, if this were not true, then presumably if one of the co-conspirators had unilaterally stopped making premium payments and the policy lapsed or was rescinded, under the Government's theory they could not be prosecuted because no crime had yet been completed. Thus, because all of the policies on the straw insureds discussed at the trial were applied for and issued prior to January 10, 2009, Counts 1-33 are barred by the statute of limitations, and therefore Mr. Carpenter is entitled to a judgment of acquittal on all of the mail and wire fraud counts.

As stated above, in Mr. Carpenter's case, it is apparent that the Superseding Indictment substantially and materially broadened and amended the original indictment in light of the

jurisprudence in this Circuit. *See Salmonese, supra.* It is also clear that the alleged acts which constituted or were in furtherance of crimes cited in the Superseding Indictment as alleged, were all **well before** January 10, 2009, when the elements of either wire fraud or mail fraud were allegedly completed. The simple test, of course, is whether if Mr. Carpenter was indicted in 2009, after the submission of the allegedly false and material deceptive information found in these very same counts, would there have been sufficient facts to present the charges to the trier of fact? In fact, this has to be the very logic employed by the Government in their charging document. The Second Circuit in *Grimm* on this subject notes that even conspiracies end, notwithstanding continued receipts of anticipated benefits by the co-conspirators, and that these serial actions of ongoing payments (i.e., continued payment of premiums) do not extend the conspiracy past the date it was completed, which in this case was having the insurance carriers either approve or issue the policies.

After the object of the conspiracy has been achieved, (getting insurance companies to issue policies on the lives of the alleged "Straw Insureds"), the types of activities listed in the superseding indictment do not constitute overt acts in furtherance of the fraud or the conspiracy. Lengthy, indefinite, ordinary and typical non-criminal acts (such as causing money to be sent to the so-called insurance carrier victims who expected payment) cannot extend the time period because either the wire fraud or the mail fraud had been completed, and the criminal objective with the carriers achieved. *See Grimm* and *Salmonese.* Therefore, all of the aforementioned group of criminal charges are also barred by 18 U.S.C. §3282 and should be dismissed as a matter of law and a judgment of acquittal be entered because the subsequent "alleged misconduct" cited in the respective counts occurred after the alleged crimes were completed, and therefore cannot and do not represent "overt" acts. Nothing can save the respective counts from

the effects of 18 U.S.C. §3282 because the alleged "overt" acts were not **"in furtherance"** of any fraud or conspiracy, and were well after the alleged criminal act of submitting the false insurance applications was complete (which, of course, no evidence was presented that Mr. Carpenter had anything to do with in any of the alleged Counts).

For example, from the chart appended to the end of this section, it can be seen that Count 5 involves Straw Insured #2, Vito Esparo, who applied for insurance in July 2007, which was issued in February 2008, along with others submitted the insurance applications which in this case was accepted by Penn Mutual, and a contract between Charter Oak Trust and Penn Mutual became binding in February 2008. The Government, in recognizing that such alleged misconduct is beyond the five year statute of limitations, cites an April 14, 2010 event, wherein it is alleged that Mr. Carpenter and others caused various paperwork to be done to cause a subsequent premium payment to be made to the carrier, Penn Mutual, to occur. These allegations are common to most, if not all, of the aforementioned counts, because the government knows that Mr. Carpenter had nothing to do with the submission of the initial applications for any of the insureds in the Charter Oak Trust, and bolsters the fact that these counts are untimely because the alleged criminal act was committed (and completed) when the allegedly false and fraudulent insurance applications were sent in by the agents of the carriers, not Mr. Carpenter.

Therefore, the alleged crime was complete when the insurance carriers decided to issue the policies based on the allegedly fraudulent misrepresentations put in by the brokers and the straw insureds. The listed mailings and wires occurring after January 10, 2009 cannot be in furtherance of the alleged scheme to defraud. However, it is indisputable from the trial that Mr. Carpenter did not assist in the filling out and submission of any insurance application in this

51

case. Therefore, all such counts must be dismissed because there was no conspiracy mentioned by any witness during the trial, much less determined beyond a reasonable doubt, and all of the applications and policies mentioned at the trial were applied for and issued prior to January 10, 2009, which is the applicable date on which the statute of limitations ran in this case.

Thus in this example, by February 2008, the alleged scheme to buy a life insurance policy by Charter Oak Trust on behalf of the named "Straw Insured" #2 had occurred. The alleged object of the conspiracy had been achieved. *See Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992). The alleged wrongful conspiracy or fraud was complete. The subsequent premium payments are a common form of a commercial arrangement in the ordinary course of business; they are non-criminal in themselves; they are made unilaterally, typically by a single person or entity; and they are made over a long period of time. *Grimm*, 738 F.3d at 503, *citing Salmonese*, 352 F.3d 608, 616.

As noted previously, in the "In Furtherance Section" of this brief, (see Section VI, *supra*), the only mailings and wires that could arguably have been done in furtherance of the fraud would be those related to Straw Insured #8, Ronald Goelzer, Count 20, and Straw Insured #10, Joan Pennington, Count 23, where the applications were sent in from Robert Pacini's office in Texas to Lincoln in North Carolina. Significantly, Mr. Goelzer had the application date of 12/24/2008 with a policy issue date of 12/28/2008. Of the twelve original Straw Insureds, Mr. Goelzer is the only one issued close to the applicable statute of limitations date of the Superseding Indictment of January 10, 2009. The Straw Insureds 13, 14, and 15 were added for the money laundering counts, and Christine Lambert's policy was applied for on 11/14/2008, and was issued on January 6, 2009, but the Spencer, Lambert, and Sanders policies did not have mail and wire fraud counts attached to them. In any event, those policies were issued before January 10, 2009, and

therefore are barred by the applicable statute of limitations as well. *Toussie* states that statute of limitations should not be expanded, except where provided by law. *See, also, Finkel.*

In *Finkel*, once the sale had been made the wrongful conspiracy was completed, and the statute of limitations clock began to tick. Overt acts end when the conspiracy ends. In these counts as well as many other counts, there is now a set of new criminal wrongdoings, based on the government's Superseding Indictment. According to the Superseding Indictment, Counts 20 and 23, along with all the other first 33 Counts, now concern themselves with Money Laundering, Illegal Monetary Transactions as well as Aiding and Abetting in violation of federal law. Thereby, the Government materially broadened all of the first 33 Counts of the original Indictment when it incorporated all of these Counts by reference in paragraphs 122, 136, 138, and 140 of the Superseding Indictment. As all of these policies, except for the Marvin Carrin policy with Penn Mutual, were applied for and issued prior to January 14, 2009, and correspondingly all of the counts related to these insureds' policies are barred by the Statute of Limitations and a judgment of acquittal should be issued on Mr. Carpenter's behalf. As for the Marvin Carrin policy, it was rescinded and Penn Mutual returned the premiums well before the Indictments in this case. Additionally, Mr. Waesche was the agent who filled out and submitted the application, and retained all of the commissions therefrom, so Counts 1-4 have substantively no nexus with Mr. Carpenter or any conspiracy including him. Moreover, there are numerous emails presented in the course of trial showing that after the negotiations on Mr. Carrin's earlier policy (the previous policy on Mr. Carrin's life was in the Grist Mill Trust, not the Charter Oak Trust), Mr. Carpenter wanted nothing to do with Mr. Carrin and his friends and associates, and that Mr. Carpenter had no knowledge of Edward Waesche's illicit commission-sharing arrangement with Mr. Carrin.

Since Mr. Waesche was deceiving Mr. Carpenter on an apparently regular basis, and deceiving and defrauding Mr. Carpenter's company, Grist Mill Capital, as well as the Charter Oak Trust, it is his testimony relating to Mr. Carpenter being in any type of conspiracy with him or Mr. Carrin should not be credited by the court. While there is no trustworthy evidence showing that Mr. Carpenter and Mr. Waesche were partners in any criminal conspiracy, the evidence is overwhelming that Mr. Waesche lied to, cheated, and defrauded Mr. Carpenter and his business over the course of years. Thus, there are no "overt acts" in furtherance of the fraud or the alleged conspiracy that would prevent the statute of limitations from barring Mr. Carpenter's prosecution on any of these counts and the interests of justice mandate a judgment of acquittal for Mr. Carpenter as to all counts based on the Statute of Limitations.

Since virtually none of the acts described in Counts 1-33 are "in furtherance" of the scheme to defraud, they do not constitute "overt acts" for the purposes of falling within the statute of limitations. "To constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [a conspirator]. *Ben Zvi*, 242 F.3d at 97. An overt act...[is] meaningful only if [it is] within the scope of the conspiratorial agreement, *Grunewald*, 353 U.S. at 414, but an overt act may be made by only a single one of the conspirators and need not be itself a crime." *United States v. Laspina*, 299 F.3d 165, 176 (2d Cir. 2002). The Supreme Court has made it clear that when a defendant raises a statute of limitations defense prior to trial, the onus is on the government to prove the timeframe of the conspiracy and each overt act and offense of the conspiracy beyond a reasonable doubt:

> To be sure, we have held that the government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised. *Smith v. United States*, 133 S.Ct. 714 (2013), *citing Grunewald*, 353 U.S. at 396.

In this case, the government has failed to produce any evidence showing Mr. Carpenter was in any conspiracy with anyone, much less proof beyond a reasonable doubt. But, even assuming, *arguendo,* there was such a conspiracy, the jurisprudence of this Circuit supports that assertion that the conspiracy ended when the policies were issued and, therefore, the government has not carried its burden of proving any overt act of any conspiracy within the timeframe of the statute of limitations as it relates to this case. As such, the Court should issue a Judgment of Acquittal in Mr. Carpenter's favor as to all Counts of the Superseding Indictment.

Please see the chart appended below, with the relevant policy application and policy issuance dates for all of the Straw Insureds in this case, as supported by the evidence produced at trial:

| | INSURED | STATE | CARRIER | COUNTS | APP DATE | POLICY DATE | CHARGE DATE |
|---|---|---|---|---|---|---|---|
| Straw 1 | Carrin, Marvin | NY | PHX | 1,2,3,4 | 7/18/06 | 8/14/06 | 6/16/09 |
| Straw 2 | Esparo, Vito | CT | PM | 5 | 7/11/07 | 2/28/08 | 4/14/10 |
| Straw 3 | Knobloch, Miriam | NY | PM | 6 | 6/30/08 | 8/1/08 | 8/29/08 |
| Straw 4 | Martinez, Teresa | CA | PM | 7,8,9,10 | 5/23/08 | 9/26/08 | 3/25/09 |
| Straw 5 | Paulsrud, Luella Mae | AZ | PHX | 11,12,13,14 | 3/14/08 | 7/4/08 | 2/1/10 |
| Straw 6 | Amsterdam, Judith | NJ | SUN | 15,16,17,18 | 3/11/08 | 5/27/08 | 8/21/09 |
| Straw 7 | Cooper, Henry | NY | PHX | 19 | 4/5/07 | 6/22/07 | 5/10/10 |
| Straw 8 | Goelzer, Ronald | TX | LFG | 20, 21 | 12/24/08 | 12/28/08 | 12/30/08 |
| Straw 9 | Musiker, Judith | NY | LFG | 22 | 3/2/07 | 3/29/07 | 3/26/09 |
| Straw 10 | Pennington, Joan | TX | LFG | 23, 24, 25 | 9/9/08 | 9/18/08 | 8/26/09 |
| Straw 11 | Jacobson, Rosa | TX | LFG | 26,27,28 | 6/19/08 | 7/7/08 | 11/4/09 |
| Straw 12 | Zahner, Beat (CT) | CT | PHX | 29,30,31,32 | 4/8/08 | 5/7/08 | 5/6/09 |
| Straw 13 | Spencer, Sash | FL | LFG | 34,48,59 | 12/17/06 | 12/22/06 | 6/3/09 |
| Straw 14 | Lambert | GA | LFG | 51 | 11/14/08 | 1/6/09 | 6/2/09 |
| Straw 15 | Sanders | TX | LFG | 54, 55 | 6/11/08 | 7/21/08 | 6/17/09 |

## VIII. THE GOVERNMENT FAILED TO DISPROVE MR. CARPENTER'S GOOD FAITH

It is axiomatic that good faith is a complete defense to a charge of mail and wire fraud, and that the prosecution bears the burden of disproving good faith beyond a reasonable doubt. *United States v. Alkins,* 925 F.2d 541 (2d Cir. 1991). As the Second Circuit has held: "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to [commit mail fraud]." *United States v. Daugerdas,* 837 F.3d 212, 221 (2d Cir. 2016), *citing Alkins,* 925 F.2d at 550. The good faith defense that the Second Circuit has approved focuses on (1) "a good faith, unconflicted decision may not be second-guessed by the government or by the courts", *United States v. D'Amato,* 39 F.3d 1249, 1258 (2d Cir. 1994), or (2) on a defendant's "honest belief in the truth of ...representations made..., however inaccurate the statement may turn out to be." *Alkins,* 925 F.2d at 550. The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan. "[T]he focus of the good faith defense is on the representations made by the defendant, and on the intent with which the he made them." *United States v. Gole,* 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997).

A defendant can assert a good faith defense to a mail or wire fraud charge at any time because the question of intent is of paramount importance and therefore a good faith defense provides a complete defense to a charge of mail and wire fraud. *See Coleman v. United States,* 167 F.2d 837, 839 (5th Cir. 1948). *See, also, United States v. Rossomando,* 144 F.3d 197, 201 (2d Cir. 1998) (holding that a good faith defense is an appropriate defense); and *United States v. Wall,* 130 F.3d 739, 746 (6th Cir. 1997) (holding that since mail fraud is a specific intent crime, a good faith defense is a complete defense to mail and wire fraud). As stated in the Second Circuit's decision in *Rossomando,* absent the intent to defraud, there is no crime. See

*Rossomando* at 201. Therefore, a good faith defense is directly related to the *mens rea* element of crimes involving fraud. *See, e.g., United States v. Grissom,* 44 F.33d 1507, 1512 (10th Cir. 1995) (holding that "good faith" negates the requisite element of intent); *United States v. Hohn,* 963 F.2d 380 (9th Cir. 1992) (holding that good faith belief in truth negates intent to defraud); and *United States v. Somerstein,* 971 F. Supp. 736, 741 (E.D.N.Y. 1997) (stating that good faith defense is a complete defense to mail fraud).

As the Second Circuit described in *Alkins,* good faith is a complete defense to a mail fraud charge, *citing United States v. Bronston,* 658 F.2d 920, 931 (2d Cir.1981), *550 *cert. denied,* 456 U.S. 915 (1982).

> "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud. The government must prove lack of good faith beyond a reasonable doubt. *Id.* In the instant case, the district court instructed the jury as follows:
>
> Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of fraud. A defendant has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.
>
> Under the anti-fraud statutes, even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, still it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be." *Bronston* at 931.

The Court's Opinion in Mr. Carpenter's case does not mention the words "good faith" anywhere. In fact, the Court probably does not mention the words "good faith" in its Opinion because nowhere during the trial did the prosecution address Mr. Carpenter's good faith, much less disprove it beyond a reasonable doubt. On the other hand, Mr. Carpenter testified extensively at trial about his good faith beliefs, and no witness contradicted him as to his firm belief that the Charter Oak Trust was, in fact, a bona fide welfare benefit trust, that had a

legitimate insurable interest in each and every one of the insureds, and that the only person who could purchase the insurance policy from the Charter Oak Trust was the insured. Therefore, it was legally impossible for the Charter Oak Trust to be STOLI or STOLI in disguise. Even the Court mentions that Mr. Carpenter believed the Charter Oak Trust arrangement with Grist Mill Capital was a split-dollar arrangement, and that numerous witnesses referred to the arrangement as a modified split-dollar arrangement. See Op. at 44, n. 26. Most importantly, each of the broker witnesses acknowledged that they knew what Split-Dollar was, and that Mr. Carpenter believed the arrangement was not "premium financing" but was, in fact, a split-dollar arrangement.

Just as the Second Circuit has required an actual intent to do "concrete harm" to the alleged victim, *see, e.g., Rossomando*, and *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)(holding that an intent to harm has to have been contemplated); a good faith defense provides a complete defense for the defendant because mail and wire fraud are specific intent crimes, and if the criminal intent or *mens rea* is negated by the defendant's good faith, there can be no crime under American jurisprudence.

By having the Court consider Mr. Carpenter's good faith belief that he was not committing a crime or participating in any type of conspiracy to do something illegal or prohibited by statute, it is consistent with holding the government to a strict standard of proving criminal intent beyond a reasonable doubt. The good faith defense forces the government to prove not only criminal intent, but that the defendant lacked any good faith. The defendant is under no burden to prove his good faith. Instead, the government has the burden of disproving the defendant's good faith, and this the government failed to do at trial. Nowhere does the government attack Mr. Carpenter's good faith in the Trial Transcript and the words "good faith" are nowhere to be found in the Court's Opinion. Therefore, based on the testimony below

asserting Mr. Carpenter's good faith, which is left uncontroverted by the government, Mr.

Carpenter respectfully believes he is entitled to a Rule 29 judgment of acquittal based on his

good faith defense. As the colloquy below shows, the government did not disprove nor even

question Mr. Carpenter's good faith, and indeed, Mr. Carpenter's good faith remains unimpaired:

THE COURT: Okay. I understand the witness to be saying he would not have participated in a scheme like this because on the sale of the policies, the providers would have investigated and it all would come to light. I'll leave it at that and we can proceed.

MR. NOVICK: I understand.

BY MR. BROWN:

Q. Mr. Carpenter, if you're really sinister, could you have avoided this detection in your belief as it related to these carriers if instead of selling the policy, you simply sold the life interest in those policies?

A. We wouldn't have been able to do that because Christiana would have blocked it. And if we were really in the STOLI in disguise business, it would have been better to use individual trusts or individual LLC's because you could sell the trust or you could sell the LLC without disturbing the underlying policy.

Q. Now, just for some clarification purpose, did there come a time when instead of Ridgewood, Grist Mill Capital itself was funding these various policies?

A. Yes.

Q. And tell the Court how that came about, please.

A. In 2009 we created a new trust, the Charter Oak Trust 2009. I believe all of those -- I believe all of those policies were with Lincoln and they were funded by Grist Mill Capital.

Q. And do you know if they were funded before or after the Lincoln people started to investigate the claims relative to Sash Spencer's policies?

A. Yes, all of those policies were after the death of Sash Spencer and the investigation.

Q. Sir, do you recall during the course of the testimony of a representative of Lincoln that apparently they had some sort of phone conversation with people from Charter Oak Trust? I could be wrong, but I thought it roughly around -- I thought it was around April 15, 2009. Do you recall that conversation?

A. Yes, I do.

Q. And you participated in that conversation?

A. Yes, I did.

Q. Did you limit Lincoln to what they could ask?

A. No.

Q. Now, you heard the individual testify from Lincoln in terms of characterizing your response to his inquiries about possible STOLI?

A. Yes.

Q. And do you recall he indicated that I think it was shock, and I don't know if it was astounded, but something similar to that; do you recall that testimony?

A. I believe he said I was **INCREDULOUS**.

Q. Incredulous, thank you. And I thought I heard the word shocked, but at least incredulous. Was his characterization of your response accurate or inaccurate?

A. It was very accurate.

Q. And what caused you to be incredulous over the inquiry of possible STOLI?

A. Basically because of my firm belief that we were operating in good faith and that there's no way that we would try to be STOLI in disguise, and that I believe because of the tax issues that we were going to be talking to Lincoln about, that they were really concerned about tax issues like listed transaction. And I just truly didn't believe they would think we were STOLI.

Q. Let's get onto the subject of these applications. And I guess I would characterize, among other things, as the infamous four questions that seemed to find its way after I believe 2006 in the evidence on policies from Lincoln, Penn Mutual and Phoenix. You heard that conversation?

A. Yes.

Q. And it appears that to those four STOLI type questions -- you know what I'm referring to?

A. Yes, sir.

Q. And I believe the general testimony was that for whatever reason, one way or the other, that those four questions were answered no, correct?

A. Correct.

Q. And I believe that there was testimony from virtually every executive representing the three companies that those are incorrect answers. You heard that testimony? Given what they believed to be true?

A. I actually didn't understand the testimony to be that. So I know that Charlie and Ed said that they think the answer should be yes, but I actually don't remember the insurance executives commenting on that.

Q. All right. In any event, on the question about funding, do you recall the questioning? And it's really asking in different ways, but really they're asking I believe whether or not there was any funding of any of the premiums in the policies, for payment of the premium policies. Do you recall that?

A. The term they kept using was premium financing.

Q. Right. But I also believe that there may be one or two times when instead of premium financing, it was financing the premium?

A. I don't remember. All I remember was the conversation was premium financing and that they kept talking about non-recourse premium financing.

Q. And let me ask it this way: If you were answering those questions for those applications, would you have checked off yes or no?

A. **I STILL WOULD ANSWER "NO" EVEN TODAY.**

Q. And could you explain to the Court why? I mean, after all, there's no doubt from the records that were produced into evidence that money was going from Grist Mill Capital at some point to Charter Oak Trust directly or indirectly and then PNC Bank was floating the money to the various carriers; you've heard that testimony?

A. Correct.

Q. Do you dispute that testimony?

A. No. The movement of the money, no, not at all.

Q. And so given that, could you explain to the Court why that, in your mind -- and again quite frankly what I'm concerned about is your mind during the period of 2006, 2007, 2008, 2009 -- why those are not incorrect -- or that is not an incorrect answer?

A. **Charter Oak Trust was the owner/beneficiary, the applicant and the premium payer for all of those policies and Grist Mill Capital had a split dollar arrangement with Charter Oak Trust. We were not non-recourse, we were just the opposite of non-recourse, we had a full UCC filing and we had a full collateral assignment of each and every policy that was in the Charter Oak Trust.**

**So I strongly believe, and I still do, that split dollar and a split dollar funding arrangement is recognized by the Treasury in regulations 1.61-22, where it says a relationship between any two parties where one is the owner of the insurance and another party is the premium provider of premiums, whether you want to call it funding or whatever.**

**So I believe that we clearly had a split dollar funding arrangement and it was the total antithesis of non-recourse premium financing.**

Q. Split dollar, could you expound upon that term?

A. Split dollar goes back to the 70's. And basically the first split dollar plans were done before -- were done between employers and employees back in the 1950's. And then split dollar evolved into the 70's where it could be done between trusts. And in the 1990's and 2000's, it's a very effective estate planning vehicle.

So that you even have grandparents doing split dollar funding with trusts where the grandparents will provide funding so that a policy is on husband and wife and the policy will be payable to a trust for the children.

So the IRS recognizes that there's a funding relationship anytime that there are two parties. It does not have to be employer/employee related as the folks from Lincoln were referring to it. And when the Lincoln talks about it in all of their documentation, they basically say you don't have to answer the premium financing questions if you're doing split dollar. And it was very clear that they're talking about traditional split dollar between an employer and employee. That's not the type of split dollar that I was thinking about or that I was talking about.

Q. What were you thinking about that was different from that?

A. In other words, my belief is that we were providing money to the Charter Oak Trust just as if the employers had been making contributions.

In the past, all of our welfare benefit trusts had an employer making a contribution to the welfare benefit trust. The welfare benefit trust at the beginning of the day had no money. The welfare benefit trust had to get money from contributions from the employer.

The origins of Grist Mill Capital were that it had money from the Benistar 419 plan and turned around and lent that money to employers to put money into the Benistar 419 plan. We did tens of millions of dollars of that type of funding and we never once reported it to the carrier that instead of the money coming from the employer, the money was in fact coming from Grist Mill Capital. So to me it's shocking that anybody thinks there's any difference between the old funding that we had done as Grist Mill Capital and the new funding that we were doing in the Charter Oak Trust.

The difference being in the old days of welfare benefit plans, you really did have a deduction for the contributions. That deduction was being challenged by the IRS and we came up with what I

thought was a creative way of using split dollar funding to do exactly what we had been doing with the old welfare benefit plans.

Q. And is that why when you received the phone call from Lincoln at that meeting in April 15 of 2009, you responded the way that you did?

A. Yes. And if he had said, Mr. Carpenter was incredulous and indignant, I probably would have said, yes, that's a fair assessment as well.

Q. And that's what was in your mind at the time?

A. **I was genuinely upset that they would think of us as any type of STOLI in disguise.**

Q. And in your emails that we talked about in Exhibits 6 and 7, I believe, where you had indicated what appeared to be a lack of concern about the various carriers being contacted, not just Lincoln, but any of the carriers involved with these policies, was that in your mind at the time you responded the way you did in terms of what are we afraid of?

A. Not at all.

Q. If you had known that, would you have been concerned that indeed Mr. Cooper might call up the insurance company and say, hey, what's going on? I was promised this policy would be sold and I'd make some money on it?

A. Would I be concerned?

Q. Would you have been concerned?

A. **No. If I had known that Ed had lied to them, I probably would have called up Mr. Cooper and I probably would have apologized, and I would have said that you probably don't understand this, but you should buy the policy and go out and sell it on the open market. Because if you believe in these numbers, you could sell that policy for a million four, so you could make $870,000. But I had no knowledge whatsoever that Ed had promised him $400,000.**

Q. And did you have any knowledge that they had discussed selling the policy from the get-go, that there really was no intent to keep this policy for estate planning?

A. **None whatsoever. I had no idea.**

Q. Now, I could go through a bunch of other letters that are already in evidence, but if I did, would your testimony be the same as to those individuals?

A. **Absolutely. I had no knowledge of any promise that was made to Henry Cooper or any of the other insureds.**

Q. Now, there was testimony, sir, that this policy would cost this individual, based upon this Exhibit, $530,549; do you see that, sir?

A. Yes, sir.

Q. And there's again been some discussion as to financially, not practical, I guess is a way to characterize it for purposes of this question, to purchase such a policy?

A. Yes.

Q. That this is nothing more than just a sham, that the real objective is to sell the policy. You understand that testimony?

A. Yes, I've heard that testimony.

Q. But in fact does it make financial sense notwithstanding the fact that you have all these I would characterize them as significant fees attached to the sale?

**A. If from what I heard of Mr. Cooper's testimony and looking at the proformas that Ed had done for Mr. Cooper and if his wife really did have $6.8 million in assets, I would have counseled Mr. Cooper to buy the policy and then do the exact thing that Ed Waesche had told him, sell the policy for a million four, use his friend Marvin Carrin to help him sell the policy, and he would have pocketed $870,000.**

Q. But would you or would you not have instructed him to do that at the beginning of the application process?

A. Not only did I not instruct him to do that, I never would have had that conversation with anybody involved with the Charter Oak Trust at the beginning of the process.

Q. Why do you say that, sir?

A. Because two reasons. One, I believe I firmly understood the evils of STOLI to the insurance industry and that, you know, if you were going to do a life settlement, if you knew you were purchasing the policy to do a life settlement, that is totally legitimate, the courts have said it's totally legal, it's totally legitimate. It crosses the line when you have a prearranged sale to a third-party who doesn't have an insurable interest.

**So if Mr. Cooper wanted to buy a policy and he knew he was planning on selling it sometime down the road, that's totally legitimate, that's totally legal; but if he was going to use the Charter Oak Trust to basically have that policy sold to a third-party, then I believe that that really crosses the line. And not only would I have been upset with that, Ridgewood would have been very upset with that as well.**

T. Tr. Vol. XVI. (Emphasis added).

## IX. A JUDGMENT OF ACQUITTAL SHOULD BE ENTERED AS TO ALL OF THE MONEY LAUNDERING COUNTS AS A MATTER OF LAW

At Mr. Carpenter's trial, the government failed to prove at all, much less beyond a reasonable doubt, that the Sash Spencer (SI-13) life insurance death benefits were proceeds from a Specified Unlawful Activity (SUA) as described under 18 U.S.C. §1956, and that Mr. Carpenter entered into any of the financial transactions with the intent to conceal the nature and origin of the funds. Because the Sash Spencer insurance proceeds were not SUA proceeds, the government fails on all four elements that it must prove beyond a reasonable doubt and this Court should issue a judgment of acquittal on all of the Money Laundering counts.

The monies referred to in Counts 34 through 57 involved money obtained from legitimate insurance contracts issued in 2007. There is nothing inherently illegal about using life insurance policy proceeds in a commercial transaction. Clearly death benefits from a trust or a life insurance policy are not SUA proceeds that are the *sine qua non* of the Money Laundering statutes, so the government's Money Laundering Counts 34-57 must all fail as a matter of law. Because the proceeds came from policies written within the first two years of their existence, they were "contestable" and subject to challenge and investigation by Lincoln, who had conducted their own year-long due diligence investigation into both the issuance of the policy and in checking for fraud. After their investigation, Lincoln obviously felt legally bound to pay on the two policies as they could have challenged the legitimacy of the policies in a court of law, because that is what the two-year contestability provision is all about in a modern life insurance contract. Thirty million dollars is a lot of money, and if Lincoln felt that the policies were procured fraudulently, they would have challenged the policies in court; and they did not. In fact, unlike Penn Mutual and Phoenix, Lincoln chose not to sue to rescind any of the Charter Oak Trust policies, nor did they fire or terminate the alleged "Outside Agents" Mactas, Pacini, Alper,

or any of the alleged co-conspirators like Trudeau and Prelle and the agents on the Lambert policy that Ezekiel Lambert testified were still his friends, even after getting the policy on his mother issued based on allegedly false information provided to Grist Mill Capital and the Charter Oak Trust.

If Lincoln Life Insurance Company with all of its legal resources did not feel the life insurance policies were obtained by fraud, why would Mr. Carpenter be presumed to know? (At least Mr. Carpenter had every right to believe the money was lawfully obtained and not SUA proceeds.) The checks involved left a paper trail; there was no attempt to hide the various financial transactions with the lawful proceeds. Since the government did not prove any intent on Mr. Carpenter's part to conceal the nature and origin of the proceeds and now is barred by 18 U.S.C. §3282 from reviewing conduct from 2006, 2007, and 2008, and since it would need to do just that to prove its case on Counts 34 to 57, a judgment of acquittal should be entered as to all of these counts.

To sustain the substantive money laundering charges, the government had to establish at trial beyond a reasonable doubt that Mr. Carpenter:

> "(1) **knowing** that the property involved in a financial transaction represented the **proceeds** of some form of **unlawful activity**, (2) conducted or attempted to conduct a financial transaction, (3) which in fact involved the **proceeds** of **specified unlawful activity**, (4) either with (a) **the intent to promote** the carrying on of **specified unlawful activity** or (b) the **knowledge** that the transaction was designed at least in part to **conceal** or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity." *United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006) (emphasis added). *See, also,* 18 U.S.C. §1956(a).

The Second Circuit, as well as most other circuits, has distinguished between the underlying crime that produces tainted proceeds and any subsequent financial transaction intended to launder those illegal proceeds. Absent this distinction, any crime involving a financial

transaction could simultaneously constitute money laundering. *See United States v. Hassan*, 578

F.3d 108 (2d Cir. 2008):

> In order to establish that a defendant committed a "money laundering" offense or conspired to launder money in violation of 18 U.S.C. §1956(h) or §1957, the government must prove beyond a reasonable doubt that the defendant agreed to: (1) conduct a financial transaction; (2) involving the **proceeds** of some **Specified Unlawful Activity (SUA)**; (3) **knowing** that the property involved in the transaction represented the **proceeds** of some form of **unlawful** activity; and (4) **knowing** that the financial transaction was designed in whole or in part to **conceal** or **disguise** the nature, source, location, ownership, or control of those **proceeds**. *Hassan* at 127-28, *citing United States v. Henry,* 325 F.3d 93, 103 (2d Cir. 2003). (Emphasis added).

The government had to prove each and every one of these elements beyond a reasonable doubt. That they failed to do. Additionally, Mr. Carpenter would respectfully suggest that the government failed to prove any of the necessary four elements, when they must prove all four beyond a reasonable doubt. In fact, the government claimed in Paragraph 133 of the Superseding Indictment that "the defendants used the **death benefit funds** to pay for, among other things, insurance premiums, and a home in Rhode Island." Not only was that statement proven to be categorically false, it is surplusage that should have been struck from the Indictment because it fails to state **any** type of criminal offense, much less money laundering.

Moreover, if an insurance carrier discovers that an application is a total fraud as has happened in several well-known STOLI lawsuits, the carrier has up to six years to order the contract rescinded. In the state of Connecticut, an insurance carrier arguing for rescission due to fraud must refund all premiums paid to the owner of the policy before the policy can be rescinded. All circuits recognize that a breach of contract does not rise to the level of criminal fraud. *See, e.g., Regent Office* and *Countrywide, supra.* Therefore, there were no SUA proceeds even suggested during the trial, much less proven at trial beyond a reasonable doubt.

This is critical because Paragraph 131 is fatal to the government's assertion of SUA proceeds, and especially the "money-laundering" charges contained in Counts 35-57. Paragraph 131 acknowledges that Mr. Bursey, on behalf of the Charter Oak Trust, sued Lincoln for the death benefit under the two insurance policies owned and payable to the Trust, and 10 days later Lincoln paid both policies' death benefits of over $30 million. The facts of the lawsuit and Lincoln's capitulation were discussed at length by the government at trial, but nowhere does the government refer to the proceeds as SUA proceeds. This is after an exhaustive year-long investigation by Lincoln. Big insurance carriers do not pay out "fraudulent" death claims from "fraudulent" applications, especially if they think STOLI is involved. In reality, carriers look for any reason to not pay a claim for even minor misrepresentations like being a smoker while representing being a nonsmoker on the application. Nonetheless, Lincoln paid the claim, when many other big insurance carriers were being sued by state and federal regulators for failure to pay legitimate claims, much less "disputed" claims like this one. At trial, Mr. Carpenter testified that he believed the questions were answered accurately and truthfully, and no one from Lincoln testified that the answers were incorrect after a year-long investigation. Trial Tr. Vol. XVI, p. 2824. Significantly, no one testified at Mr. Carpenter's trial that the questions were answered incorrectly on the Sash Spencer applications, much less fraudulently. As the Second Circuit has held: "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to [commit mail fraud]." *United States v. Daugerdas*, 837 F.3d 212, 221 (2d Cir. 2016), *citing United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991).

This simple fact requires that the Court issue a judgment of acquittal as to all of the Money Laundering Counts because none of the proceeds were SUA proceeds. Even assuming *arguendo* that they were somehow SUA proceeds stemming from the allegedly fraudulent Sash

Spencer applications, there was no evidence presented at trial that Mr. Carpenter knew that Mactas and Spencer had allegedly "lied" on Mr. Spencer's insurance applications, and that the proceeds could somehow be fraudulent, or SUA proceeds. Significantly, there was no testimony presented at Mr. Carpenter's trial that the Sash Spencer applications were answered incorrectly, much less fraudulently. Nowhere does any government witness even refer to the insurance proceeds as SUA proceeds, much less prove beyond a reasonable doubt that the insurance proceeds were actually SUA proceeds. In fact, the first time the government alleges the Sash Spencer insurance proceeds were SUA proceeds, were proceeds from a Specified Unlawful Activity, was in the government's closing arguments responding to Mr. Carpenter's testimony in defense:

> Your Honor, I'm pretty much done. I'm just briefly going to mention the money laundering counts. And I'm really not going to belabor it all that much because it's my understanding the defendant's principal defense here is simply that Spencer was not a specified unlawful activity. Trial Tr. Vol. XIX, p. 3259.

The testimony that AUSA Novick is responding to is Mr. Carpenter's uncontroverted testimony that he did not believe that the Sash Spencer insurance proceeds were from a Specified Unlawful Activity, or any illegal criminal activity:

> **Q.** Did you at any time, at the time that you, for example, apparently used some of that money to pay off certain debts or submit to other corporations that used it for other reasons, apparently including buying some property in Rhode Island, otherwise known as Moonstone, at any time you used any of that money, did you have a belief that that was money that you had obtained or you, along with others, had obtained by engaging in deception and deceit in order to trick or fool or induce insurance companies to issue insurance policies?
> **A. I definitely did not believe that those proceeds were from specified unlawful activity as required by the law.**
> **Q.** Finally, sir, do you understand about illegal money transactions typically used in sums in excess of $10,000, money that really was obtained through illegal means?
> **A.** Yes, sir, I understand that.
> **Q.** And at any time that you may have used any such funds, that you did so knowing that said funds were in fact the product of illegal criminal activity?

**A. I had no such knowledge that there was any criminal activity involved with any of those proceeds.**
MR. BROWN: I have no further questions, Your Honor.

Trial Tr. Vol. XVI, p. 2871-72. (Emphasis added).

**Q.** Let me ask you this, sir: At the time, irrespective of where that money went to, **at the time that you gained any control over that money, did you believe that those were proceeds from an illegal transaction or criminal transaction?**
**A. Absolutely not.**
**Q.** And why do you say that, sir?
**A.** Because I worked with Wayne Bursey on the original lawsuit against Lincoln. I was the one that brought Dan Scapellati and Halloran & Sage in to help sue Lincoln. So any way you look at it, the proceeds are either death proceeds from a welfare benefit plan, insurance proceeds from Lincoln, the proceeds of a lawsuit because we sued Lincoln as the Charter Oak Trust and Wayne Bursey or it's the settlement. And the settlement, even though they paid money on May 18, or May 19, the final settlement with Lincoln was not entered until December of 2009. So Sash Spencer died May of 2008, there was an extensive investigation by Lincoln, and we had to sue them in early May, and they didn't pay until the third week in May. **So clearly they're not specified unlawful activity proceeds. It's clearly proceeds from a lawsuit, proceeds of a settlement, life insurance policy from Lincoln, or death proceeds from a welfare benefit plan, but it's certainly not drug money or any other money from an illicit transaction.**

Trial Tr. Vol. XVIII, p. 3144-45. (Emphasis added).

More importantly, the only person to testify at trial about the Sash Spencer application, and the four questions on the Lincoln applications in general, was Mr. Carpenter, and he testified that the questions were answered accurately and truthfully to the best of his knowledge. Similarly, there was no evidence produced at trial that Mr. Mactas told Lincoln and the investigators from ICS that the questions were answered anything but truthfully, honestly, and accurately. Therefore, no one testified at Mr. Carpenter's trial that the Sash Spencer questions were answered incorrectly, much less fraudulently. Assuming that the questions were answered incorrectly, they were not material to Lincoln's "economic decision making" because Lincoln could have refused to pay the claim, and based on the Second Circuit's decision in *Countrywide*, the false application would still not constitute mail and wire fraud. If the Sash Spencer insurance

proceeds are not a product of mail and wire fraud, then this Court has no choice but to grant a judgment of acquittal based on *Countrywide*, because there are no SUA proceeds involved in this case.

Furthermore, there was no evidence presented at trial that even suggested that Mr. Carpenter engaged in any financial transaction with the **intent to conceal** the nature of the proceeds as the Second Circuit requires; nor did the government offer **any** proof that the purpose of the transfer from the Charter Oak Trust to Grist Mill Capital was other than for the Trust to pay back some of the money that was owed to Grist Mill Capital from the Trust. It is indisputable that in October 2009, the Charter Oak Trust owed Grist Mill Capital almost $38 million, and so the payment of $19 million to Grist Mill Capital was not just a legitimate repayment of a debt owed, it was a wholly innocent payment in the ordinary course of business between the funder, GMC and the owner of the policy, Charter Oak Trust, in a normal split-dollar arrangement. Agent Allen's depiction of the transfers did not even mention Mr. Carpenter's intent, much less satisfy the requirement that the transfer of money was in order to conceal the origin and nature of the funds.

Unless the **purpose** of the financial transaction is to **conceal** the origin or nature of the proceeds, then the financial transaction is not money laundering according to the Second Circuit. *See, e.g., United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009), citing the Supreme Court's decision in *Cuellar v. United States*, 553 U.S. 550 (2008), where if the purpose of the transaction is not to conceal the nature of the proceeds, it is not money laundering or illegal. The Concealment Element requires the purpose of the financial transaction must be to conceal or disguise the nature of the proceeds. "How one moves the money is distinct from *why* one moves the money." *Cuellar* at 566 (emphasis added). Furthermore, "[m]oney in motion does not

necessarily equal money laundering. The purpose of moving the money was not to conceal the nature of the funds – nor could it." *United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010).

Similarly, the spending of the alleged "ill-gotten gains" does not constitute money laundering in the Second Circuit as well. *See, e.g., United States v. Stephenson*, 183 F.3d 110 (2d Cir. 1999), where the Second Circuit determined that the defendant's purchase of a new Acura with the "ill-gotten gains" was just an ordinary purchase and not money laundering, because there was no intent to conceal the nature of the proceeds. So, not only did the purchase of the house in Rhode Island not come from the Sash Spencer proceeds, as falsely alleged by Agent Allen, it is still not "money laundering" to spend SUA proceeds on a house or a car unless the purpose is to conceal the origin and nature of the funds.

Therefore, the $30 million "Sash Spencer" proceeds were paid either as legitimate death benefits, life insurance proceeds, or as settlement of the Bursey lawsuit described in Paragraph 131 of the Superseding Indictment. So the proceeds are not **SUA** proceeds as required by all of the money laundering statutes. Moreover, if Sash Spencer's application by Mactas was not, in fact, fraudulent, then there is a good chance that none of the Lincoln applications in this case were fraudulent because the answers on those applications were accurate as well and were not "material" and did not go to the essential element of the insurance bargain. Please see AUSA Novick's description of the Sash Spencer policy:

> The point here, Judge, is that the Spencer policy is the first of the Charter Oak policies and follows the same pattern. It is -- was designed and put into effect for the purpose of a life settlement. That was Mr. Spencer's purpose. Trial Tr. Vol. XIX, p. 3259.

But, even if the applications were incorrect, material, and fraudulent, we know that lying on an insurance application does not rise to the level of mail and wire fraud because "deceit is not enough" to establish mail and wire fraud. *See, Countrywide, Shellef, Starr,* and *Regent*

72

*Office, supra.* But, assuming *arguendo* even if that were the case, Mr. Carpenter did not fill out, sign, or submit any of those applications, and nowhere during the trial does it say that Mr. Carpenter even met with these Straw Insureds to induce them to lie on their insurance applications, if in fact they actually did lie on their insurance applications. No witness testified at trial that Mr. Carpenter filled out any application, and certainly no one testified that Mr. Carpenter had anything to do with the Sash Spencer application, which is the focal point of the money laundering counts. Instead, it is now known that Bruce Mactas approached Sash Spencer in the Spring of 2006, long before the creation of the Charter Oak Trust. Bruce Mactas and Don Trudeau are the two Lincoln agents listed on the Spencer applications, and there was no evidence produced at trial that either one of them had been terminated. If Bruce Mactas and Don Trudeau were not terminated by Lincoln for fraud or participating in a STOLI transaction, then clearly Mr. Carpenter should get a judgment of acquittal on all counts because the entire premise of the government's case is all wrong, because after an intensive investigation, Lincoln found no STOLI involving the Charter Oak Trust, and certainly no fraud.

Moreover, at the trial, the government did not even suggest much less prove beyond a reasonable doubt, that Mr. Carpenter had **knowledge** that the proceeds were from an illicit SUA transaction, or that he was doing the financial transactions **to conceal the nature and origin** of the funds as required by the money laundering statutes. Even the superseding indictment refers to the $30 million as "death benefit funds" to pay for "insurance premiums" as well as the famous "home" in Rhode Island. Also in Paragraph 133 is the statement: "The **death benefit funds** were passed through various bank accounts controlled by Carpenter and others working for or with the defendants." Without specific knowledge of an SUA, without real SUA proceeds, and without knowledge and intent to **conceal** or disguise the nature of the SUA or to promote the SUA, a

73

judgment of acquittal must be granted as to all of the alleged Money Laundering Counts. Even if the proceeds were from ill-gotten gains, Mr. Carpenter never made any attempt to conceal any transaction, so without knowledge, specific intent, and proceeds from an SUA, a "money-laundering" indictment just becomes a chronicle of bank statements and "money moving," which is not a crime anywhere. *See, e.g., Hassan* and *Faulkenberry, supra.*

## X. MR. CARPENTER DID NOT RECEIVE FAIR WARNING OR FAIR NOTICE THAT HIS CONDUCT VIOLATED ANY LAW AS REQUIRED BY THE CONSTITUTION BECAUSE

"It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Cole* v. *Arkansas*, 333 U.S. 196, 201 (1948). Petitioner's conviction cannot, therefore, be allowed to stand." *Rabe v. Washington*, 405 U.S. 313, 315 (1972).

See, also, *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005): "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *quoting United States v. Harriss*, 347 U.S. 612, 617 (1954). "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language. As the Court recognized in *Pierce* v. *United States*, 314 U.S. 306, 311 (1941), judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

In *United States v. Marks*, 430 U.S. 188 (1977), the Supreme Court required the reversal of convictions based on an unexpected construction and judicial expansion of the state trespass statute by relying on its decision in *Bouie*, 378 U.S. at 353-54:

"Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a crime, or makes it *greater* than it was, when committed.' If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Marks*, 430 U.S. at 192, *citing Bouie* at 353-54.

This is exactly what happened to Mr. Carpenter in that the Court allowed the government to expand the mail and wire fraud statutes far beyond any conduct covered before either by the statute or by the courts of the Second Circuit. The theory of misrepresentations depriving someone of "money or property" in the form of access to information important to their economic decision making and, thereby, right to control one's assets, is a "judicial expansion" by the Second Circuit and has normally been found only in the area of mortgage fraud, loan fraud, and insurance claim fraud. *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996), *United States v. Dinome*, 86 F.3d 277, 284–85 (2d Cir. 1996), and *United States v. Rodolitz*, 786 F.2d 77, 80–81 (2d Cir. 1986). *See United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015). Additionally, such a conception of "money or property" has also been used in cases involving securities fraud cases like *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991), or in loan fee cases like *United States v. Carlo*, 507 F.3d 799 (2d Cir. 2007). *See Binday* at 570. However, the Government is unable to point to a single case predating *Binday* wherein a conviction is based solely on misrepresentations on an insurance application. The entire universe of misrepresentations affecting someone's economic decision making amounting to fraud stems from *Wallach* to *Dinome, Rossomando*, and *Carlo*, all of which were clarified and distinguished by the "*Shellef* Doctrine" of *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007):

> "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," we concluded that such a charge cannot apply to situations where the alleged victims "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." *Shellef*, 507 F.3d at 107-09, *citing United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987).

In fact, prior to *Carlo* and *Shellef*, the only mail and wire fraud case dealing with insurance transactions was *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit stated that there was "no precedent for criminal liability based on nondisclosures to

sophisticated corporations in arms-length contractual insurance relationships, in circumstances like those presented here." *Id.* at 150.

The Second Circuit's decision in *Brennan* in 1999 suggests that there is no precedent for criminal liability based on nondisclosure and misrepresentations between sophisticated parties in insurance contract negotiations. Furthermore, in 2000, the Second Circuit stated in *Pierce*: "a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000), *citing Carpenter v. United States*, 484 U.S. 19, 27-28 (1987). "Economic decision making" is not a property right or property that can be taken or obtained from the victim. From *Carlo* and *Shellef* in 2007, there is nothing concerning economic decision-making until the *Binday* indictment of February 2012. However, there is a big difference between lying on a mortgage application and making "*Shellef*-like" immaterial misrepresentations that do not go to an essential element of the bargain on an insurance application, as Binday was accused of doing. In this case, there was no fraud on the carrier's economic decision making through "material" misrepresentations and there was no attempt to obtain money or property as required by the Second Circuit in *Pierce* and the Supreme Court's "mirror image theory of fraud" as in *Skilling v. United States*, 561 U.S. 358, 400 (2010) ("the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other"); *Starr*, 816 F.2d at 98-99. *See, also, United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) (rejecting government's theory that merely inducing the customers "to part with their money because of the false representations...amounted to fraud"), and *United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994) (reversing conviction for mail and wire fraud where the government failed to show an intent **to harm** the victim), and *United*

*States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to show that the defendant actually intended and contemplated "actual concrete harm" to the pension fund).

Therefore, because Mr. Carpenter's indictment, trial, and verdicts were for past conduct done by other people that was clearly innocent at the time that they did it, and is arguably still innocent to this day, and because neither those people nor Mr. Carpenter had any "Fair Warning" of what was criminal at the time, and because Mr. Carpenter was a victim of an unconstitutional judicial expansion of the mail and wire fraud statute without any warning or notice, Mr. Carpenter should be entitled to protection under the Fair Warning Doctrine. Therefore, Mr. Carpenter's verdict should be reversed and a judgment of acquittal as to all charges be made in its place based on the Constitution's requirement of Fair Warning as contained in the Due Process Clause of the Fifth Amendment.

## A. MR. CARPENTER'S PROSECUTION ALSO VIOLATES THE EX POST FACTO CLAUSE

While the *Ex Post Facto* Clause (Article I, Sections 9 and 10) is generally thought of as a limitation on the power of the legislature to create new laws, the principal on which the *Ex Post Facto* Clause is based is "the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of Constitutional liberty." *See United States v. Marks*, 430 U.S. 188 (1977), *citing United States v. Harriss*, 347 U.S. 612, 617 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). As such, the right of the Due Process Clause of the Fifth Amendment protects the individual from such judicial expansion of statutes and judicial action that the legislature would be prohibited from doing under the *Ex Post Facto* Clause.

Similarly, in *Rabe v. Washington*, 405 U.S. 313 (1972), the Supreme Court reversed a conviction under a state obscenity law because it rested on an unforeseeable judicial construction of the statute. The Supreme Court in reversing the conviction in *Marks*, discussed the judicial expansion in *Rabe*, and stressed that "reversal was mandated because affected citizens lacked fair notice that the statute would be thus applied." *See Marks* at 192. The Supreme Court's decisions in both *Rabe* and *Marks* show that Mr. Carpenter's prosecution violated the Constitution's prohibition against *Ex Post Facto* laws, even if created by a judicial expansion of the statute as was done in *Binday*. The *Ex Post Facto* Clause prohibits any prosecution by the government for conduct that was innocent when performed, and it is based on the principal that "persons have a right to fair warning of that conduct which will give rise to criminal penalties." *See United States v. Rosengarten*, 857 F.2d 76 (2d Cir. 1988), *quoting Marks*, 430 U.S. at 191. *See, also, Casillas v. Scully*, 769 F.2d 60, 65 (2d Cir. 1985), which reiterated the Supreme Court's conclusion in *Bouie v. City of Columbia*, 378 U.S. 347 (1964).

In fact, the Supreme Court in *Marks* cites another pornography case *Hamling v. United States*, 418 U.S. 87, 102 (1974), for the proposition that any judicial expansion of a statute is prohibited, whereas any judicial narrowing of a statute by the Supreme Court must be applied on a retroactive basis for the benefit of the defendant. Because the obscenity standards in *Miller v. California*, 413 U.S. 15 (1973) both helped and hurt the defendants in *Marks*, the Supreme Court had to decide what was to be applied retroactively and what was not. The Supreme Court cited *Hamling* in *Marks* for the proposition that "any constitutional principal enunciated in *Miller* which would serve to benefit petitioners must be applied in this case," while any retroactive judicial expansion of the interpretation of a statute is constitutionally prohibited. *See Marks* at 197, *citing Hamling* at 102.

Therefore, the Supreme Court's rulings in the obscenity cases make clear that judicial expansion of a statute by the courts violates the *Ex Post Facto* Clause and any positive pronouncement by the Supreme Court or the Second Circuit that benefits a defendant must be used retroactively for Mr. Carpenter's benefit. A clear example of this, is the Second Circuit's decision in *Countrywide*, which came after Mr. Carpenter's indictment and trial, and makes clear that unless they can show that Mr. Carpenter had no intention of living up to his contractual promises at the inception of the contracts between 2006 and 2008, that there can be no mail and wire fraud in the performance or non-performance of a contract between private parties. *See United States v. Countrywide Home Loans*, 822 F.3d 650 (2d Cir. 2016). Just as *Countrywide* narrowed the definition of mail and wire fraud in contractual relations, and the Supreme Court's decision in cases like *Elonis* required clear evil intent, and even *Skilling* narrowed the reach of the fraud statutes, that narrowing should inure to Mr. Carpenter's benefit.

## B. MR. CARPENTER WAS NOT GIVEN ADEQUATE NOTICE OR FAIR WARNING THAT HIS CONDUCT WAS PROSCRIBED IN VIOLATION OF THE DUE PROCESS CLAUSE

Constitutional substantive due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954); *see also Kolender v. Lawson*, 461 U.S. 352 (1983); *Lanzetta v. New Jersey*, 306 U.S. 451 (1939). **At this late date, the government has failed to state with particularity what act of Mr. Carpenter's alone (as opposed to anyone else's conduct) was a crime.** Mr. Carpenter was not a party to the contracts with the carriers and did not help to fill out the applications or cause any of the mailings or wires that may have been in furtherance of the scheme. The unwarranted expansion of the mail and wire fraud statutes to the private contractual relationships in this case based on the alleged yet unproven conspiracy, where

80

the government has inferred Mr. Carpenter's fraudulent intent based on the alleged conduct of others, has eviscerated the distinction between breach of contract and fraud—precisely the harm the Second Circuit sought to avoid in *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994), in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. *See also Countrywide*, where the Second Circuit reviewed the history of the mail and wire fraud statutes from 1896 on, and determined that a contemporaneous fraudulent intent at the time of making the contractual promises is necessary to transform a breach of contract into a fraud. Even an intentional breach of contract is not enough to turn a simple breach of contract into a fraud. More importantly, if there was no fraud in the misrepresentations in the thousands of mortgage applications in *Countrywide*, it is difficult to understand how there can be a scheme to defraud in this case, or interference with the carriers' economic decision-making by paying them insurance premiums. If the billions of dollars of losses in *Countrywide* did not constitute mail and wire fraud, how could there be fraud in this case where the intent was to pay premiums on the insurance policy and the insurance carriers ended up making millions of dollars at Mr. Carpenter's and GMC's expense?

The Supreme Court emphasized the importance of this limitation:

Although the [due process] doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Court has] recognized that the more important aspect of the doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections. *Kolender*, 461 U.S. at 357-58.

Imprecise laws—or imprecise applications of laws—give rise to "arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Both the actual notice and the fair warning requirements of the Due Process Clause were violated in this case.

The guilty verdict here is clearly not supported by the Second Circuit's recent decision in *Countrywide*, and *Countrywide* mandates not just a judgment of acquittal, but would seem to suggest that this Court should entertain a motion for reconsideration on Mr. Carpenter's behalf based on *Countrywide*. If not set aside, Mr. Carpenter's verdict would open a virtual Pandora's Box of unlimited mail and wire fraud prosecutions for any *unintentional* breach of a commercial contract between private parties involving the use of the mails or wires based on a conspiracy theory that all businesspeople are involved in conspiracy. After the decision in *Binday*, anyone who lies on insurance application is guilty of mail and wire fraud because the "misrepresentation" conflates the intent of the scheme to defraud with the money or property element so that the only other thing to be proven is the "foreseeable" use of the mails and wires, which of course every modern business clearly uses in the day-to-day innocent performance of its business. The three elements of mail and wire fraud of *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005) have now been conflated to just one element, which is the material misrepresentation on any application because there is no business that would not either send in the application by mail, fax machine, email, or even FedEx. This is especially true in Mr. Carpenter's case where, because of the conspiracy theory, conduct by people that he never met or even talked to is somehow allowed to be imputed to him by the Court's decision. Such expansion of the mail and wire fraud statutes is not permitted by the Due Process Clause, which precludes the use of general statutory provisions in order to criminalize minor breaches of contractual provisions. *See United States v. Bass*, 404 U.S. 336, 347-50 (1971). Moreover, in the Supreme Court's unanimous decision in the famous *Arthur Andersen* case, the Supreme Court emphasized the principle that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a

certain line is passed" and that "legislatures and not courts should define criminal activity." *Id.*

at 696 (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.)).

Congress may have constitutional authority to extend the application of the mail and wire fraud statutes to govern civil disputes between private parties involving mere nondisclosures or misrepresentations involving a contract, but it has yet to do so, and this Court should not allow the government to usurp the role of Congress in this fashion. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a statute broader than that clearly warranted by the text." *Ratzlaf v. United States*, 510 U.S. 135, 148 (1994) (quoting *Crandon v. United States*, 495 U.S. 152, 160 (1990)). The guilty verdict in this case violates all of these fundamental principles of due process. Moreover, the only mail and wire fraud case in the Second Circuit dealing with insurance prior to the *Binday* indictment of 2012 is the Second Circuit's reversal of mail and wire fraud convictions in *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit stated that there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships." *Id.* at 150.

### C. MR. CARPENTER'S INDICTMENT FAILED TO APPRISE HIM OF WHAT CONDUCT WAS UNLAWFUL AS REQUIRED BY THE SIXTH AMENDMENT

The Notice Clause of the Sixth Amendment requires that a criminal defendant must be informed of the actual nature and the cause of the accusations against him. An indictment that merely tracks the language of a statute and alleges vague criminality **but alleges no facts that actually violate the statute it charges** cannot be sustained. See, *United States v. Simmons*, 96 U.S. 360, 362 (1878):

> "…the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defence….An indictment not so framed is defective, although it may follow the language of the statute."

"Real notice of the true nature of the charge...is the first and most universally recognized requirement of Due Process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). "Fair warning should be...in language the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen v. United States*, 544 U.S. 696 (2005) citing *McBoyle v United States*, 283 U.S. 25, 27 (1931). "The office of the indictment demands specific facts of what conduct by the accused constitutes a crime, and that conduct must be correlated with what is prohibited by the statute and what is the very core of criminality." *United States v. Russell*, 369 U.S. 749, 764 (1962). Far from informing Mr. Carpenter of the nature of the accusation, the indictment here left the prosecution free to roam at large; to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal. See *Russell* at 768.

Mr. Carpenter should receive a judgment of acquittal because his indictment (1) failed to sufficiently allege that anyone was deprived of "property" within the meaning of the statutes; (2) failed to sufficiently allege that he intended to defraud anyone of anything; and (3) failed to sufficiently allege any mailing or wiring that was in furtherance of the scheme to defraud, as required by the Supreme Court in *Parr v. United States*, 363 U.S. 370 (1960), *United States v. Maze,* 414 U.S. 395 (1974), and *Kann v. United States*, 323 U.S. 88 (1944). For these reasons, as written, Mr. Carpenter's Indictment was defective and insufficient on its face, and therefore this Court should issue a judgment of acquittal in his favor.

Mr. Carpenter should also be granted a judgment of acquittal because his indictment fails to allege any "**knowledge**" on his part that he was **willfully** participating in a scheme to defraud or that he knew that any of his conduct was actually breaking the law. Nor was there any evidence adduced at trial that showed Mr. Carpenter had the knowledge that there was any criminal conspiracy going on and that he "willingly" participated in the alleged conspiracy. In

*Pettibone v. United States*, 148 U.S. 197 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their conviction, stated: "It seems clear that an indictment against a person...must charge a knowledge or notice, on the part of the accused....Unless that fact exists, the statutory offense cannot be committed...and without such knowledge or notice, the evil intent is lacking." *Id.* at 206-7. This requirement of a direct and explicit allegation of knowledge of breaking the law or knowledge that a law was broken in an indictment was reiterated by the Supreme Court 50 years later in *Direct Sales v. United States*, 319 U.S. 703 (1943), where the Supreme Court reaffirmed *Pettibone* by citing *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940), *aff'd* 311 U.S. 205 (1940), where conspiracy allegations would turn innocent conduct into crimes:

> Without the knowledge, the intent cannot exist....Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal....This, because charges...are not to be made out by piling inference on inference, thus fashioning...a dragnet to draw in all substantive crimes. *Direct Sales*, 319 U.S. at 711.

It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. "There can be no constructive offences, and before a man can be punished, his case must be plainly and unmistakably within the statute." *United States v. Lacher*, 134 U.S. 624 (1890). But in this case the government seeks to punish Mr. Carpenter for unspecific "otherwise innocent conduct" that he did not cause and could not possibly foresee. See *United States v. Cleveland*, 531 U.S. 12 (2000).

## XI. THE RULE OF LENITY REQUIRES GRANTING MR. CARPENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS OF THE INDICTMENT

It is axiomatic that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997). "[T]he touchstone [of due process] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267. "[A] defendant must have knowledge of 'the facts that make his conduct fit the definition of the offense.'" *Staples v. United States*, 511 U.S. 600, 608 (1994).

Thus, in order to be exposed to criminal penalties, a defendant must have been put on notice that his conduct was criminal. See *Lanier* 266-67. A criminal statute "must give a clear and unmistakable warning as to the acts which will subject one to criminal punishment. And courts are without power to supply that which Congress has left vague." *Screws v. United States*, 325 U.S. 91, 136 (1945). The Supreme Court's ruling in *Lanier* as to the Rule of Lenity is based in large part of the Supreme Court's decision in *United States v. Bass*, 404 U.S. 336 (1971):

> "As we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bass*, 404 U.S. at 347, which in turn is based on *Harriss*, "no man shall be held criminally responsible for conduct for which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954). *Bass* goes on to say "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distaste among men languishing in prison unless the lawmaker has clearly said they should." *Bass*, 404 U.S. at 348

In the famous *Arthur Andersen* case, the unanimous Supreme Court stated "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress...and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703

(2005). In *Lanier*, a judge that forced women defendants to have oral sex with him was protected by the Rule of Lenity from criminal prosecution: "The canon of strict construction of criminal statutes, or Rule of Lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it to only conduct covered... due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266.

Two good examples of the Rule of Lenity in action are *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999), where the Second Circuit reversed the mail fraud convictions of an insurance executive based on the Rule of Lenity because the government could point to no precedent, and the Second Circuit could find no case, for criminal liability for nondisclosures and/or misrepresentations between sophisticated parties involving an insurance transaction, stating that there was "no precedent for criminal liability based on nondisclosures to sophisticated corporations in arms-length contractual insurance relationships." *Brennan*, 183 F.3d at 150. Therefore, the Second Circuit reversed *Brennan*'s conviction and dismissed the indictment against him.

Similarly, Judge Eginton made a decision in *United States v. $52,037.96*, No. 14-cv-00591 (D. Conn. Sept. 2015), to dismiss criminal charges against the corporation based on the Rule of Lenity concerning a scheme by a Connecticut corporation to have straw buyers purchase BMW's in Connecticut that would then be shipped to China. Not only does Judge Eginton base his decision on the *Skilling* "Mirror Image of Fraud" theory first discussed in *Starr* and adopted by the unanimous Court in *Skilling*, Judge Eginton states that the basic rules of property go back more than 500 years, and that once someone buys a piece a property, what the purchaser does with the property is the purchaser's business, not BMW's business. The same can be said in this

case, that once the policy is purchased, the carrier has no say in the policy unless they want to bring a civil case of fraud to rescind the policy. But just as Judge Eginton found it ludicrous that the sale of a few BMW's in Connecticut could affect BMW's sales or its "economic decision making" in China, so too is the thought ludicrous that misrepresentations on 70-80 insurance policies could possibly affect the economic decision making or right to control assets of a major insurance carrier like Lincoln.

Furthermore, Your Honor needs to take judicial notice that at no time then or now was STOLI (Stranger Originated Life Insurance) illegal. In fact, several of the largest decisions against the carriers trying to void STOLI contracts happened in New York. For example, Lincoln was ordered to pay out $10,000,000 in the "Butcher of Brooklyn" case where the poor butcher died just weeks after using a hedge fund's money to purchase a life insurance contract. See *Life Product Clearing, LLC v. Angel*, 530 F.Supp.2d 646 (2008). And, in 2010, see the famous case of *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 940 N.E.2d 535 (2010), where multiple policies were paid out to investors in the death of famous attorney Arthur Kramer. So it can only be said that Mr. Carpenter's indictment in December 2013 was not just shocking and a surprise, it was an "unconstitutional expansion" of the mail and wire fraud statute that gave him no Fair Warning that he was committing a crime, or Fair Notice that he was violating the statute. And, because of the ambiguity caused by this unconstitutional and judicial expansion, he should be protected by the Due Process Clause's "Rule of Lenity" as well. Therefore, Your Honor should grant this motion, and issue a judgment of acquittal in this case.

A review of these principles and the cases above shows that the statutes used in this case do not pass muster with the Rule of Lenity, Fair Warning, or Due Process. How would any lay person or insurance professional know that filling out an insurance application and paying

premiums in 2006-2008 would become a federal crime in 2015-2016? Thus, the language of the statutes in Mr. Carpenter's case are impermissibly vague, as they do not give any fair warning and violate the Rule of Lenity. So, therefore, this Court should grant a judgment of acquittal as to all counts based on the Rule of Lenity.

The Rule of Lenity dictates that criminal liability not be imposed for otherwise legal acts done in the ordinary course of business. As the First Circuit has stated, "[t]he federal mail fraud statute . . . is built upon a single, archaic 204-word sentence which . . . has undergone repeated periods of rapid expansion and contraction." *United States v. Urciuoli*, 513 F.3d 290, 293 (1st Cir. 2008). During the period referenced in the indictment, there was no federal or state statute, no federal or state regulation, no federal or state revenue ruling or advisory opinion, and no federal or state judicial decision, which prevented stranger owned life insurance business. There is no possible way that Mr. Carpenter could have known in 2006-2008 (or at any time for that matter) that the government in 2015, almost 10 years after-the-fact would seek to brand him a criminal for doing something that neither a statute, nor any construction thereof, nor any case, had ever before held was unlawful or improper in any way. See *United States v. Emmons*, 410 U.S. 396, 411 (1973) ("this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity."); *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) ("The Rule of Lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

The Rule of Lenity is founded on "two policies that have long been part of our tradition": (i) provision of notice to the public, and (ii) separation of powers between the legislature and judiciary. *Bass*, 404 U.S. at 348. As the Supreme Court explained:

> [The Rule of Lenity] reflects not merely a convenient maxim of statutory construction.
> Rather, it is rooted in fundamental principles of due process which mandate that no

individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. *Dunn v. United States*, 442 U.S. 100, 112 (1979).

The Rule of Lenity also serves as a key mechanism in preserving the separation of powers between Congress and the Judiciary. The Supreme Court elaborated upon this principle in *Bass*. "[A]s we have recently reaffirmed, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bass*, 404 U.S. at 347 (citing *Rewis*, 401 U.S. at 812); *Ladner v. United States*, 358 U.S. 169, 177 (1958); *Bell v. United States*, 349 U.S. 81 (1955)). The Supreme Court went on to state:

> [B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Bass*, 404 U.S. at 348. Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. More importantly, before the government can deprive a citizen of his liberty for conducting himself in the ordinary course of business and doing normally noncriminal acts in the ordinary course of business, it must be clear that Congress defined those specific acts to be criminal. *Bass*, 404 U.S. at 348.

"The criminal law should not be a series of traps for the unwary." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003). To that end, the Due Process Clause demands that criminal statutes describe each particular offense with sufficient definiteness to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Harriss*, 347 U.S. at 617. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.*; see also the famous *Arthur Andersen* case: "We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress . . . and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP*, 544 U.S. at 703, *citing McBoyle v. United States*, 283 U.S. 25 (1931).

In *McBoyle*, Justice Oliver Wendell Holmes emphasized the fair notice rationale inherent in the Due Process Clause. Such notice must be provided even if defendants did not actually read the United States Code or the Federal Register (which would not have helped in this case in any event because no regulations govern how a life insurance policy can be sold or paid for). "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle*, 283 U.S. at 27.

The Supreme Court reiterated this point forty years later. See *Bass*, 404 U.S. at 348. The need for fair warning is especially acute in the context of criminal statutes like mail and wire fraud that mandate the imposition of severe penal sanctions for the ordinary use of the mails and wires in the ordinary course of otherwise legal and non-fraudulent business activities. In Mr. Carpenter's case, there was no "bright-line" warning of any kind. "There are three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The two that are applicable here are the Rule of Lenity and the unforeseeably expansive interpretation doctrine:

> [T]he canon of strict construction of criminal statutes, or Rule of Lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct covered . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. *Id.*

"Under the Rule of Lenity, grievous ambiguity in a penal statute is resolved in the defendant s favor." The unforeseeably expansive interpretation doctrine "principally bars unforeseeable and retroactive judicial expansion of narrow and precise statutory language." "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it

reasonably clear at the relevant time that the defendant s conduct was criminal." *Lanier*, 520 U.S. at 267.

## A. THE RULE OF LENITY DICTATES THAT CRIMINAL LIABILITY NOT BE IMPOSED FOR OTHERWISE LEGAL ACTS DONE IN THE ORDINARY COURSE OF BUSINESS

Developed in the common law courts in the seventeenth and eighteenth centuries to limit the harshness of English criminal law, the Rule of Lenity was adopted by the Supreme Court in 1820 in Chief Justice Marshall's oft-cited decision in *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (acknowledging that the Rule of Lenity reflects "the tenderness of the law for the rights of individuals"). The Rule was endorsed a century later by Justice Holmes in *McBoyle*, and the Supreme Court has consistently acknowledged its validity ever since. See, e.g., *United States v. Granderson*, 511 U.S. 39, 54 (1994); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992); *Taylor v. United States*, 495 U.S. 575, 596 (1990); *McNally v. United States*, 483 U.S. 350, 359-60 (1987), as recognized in *Cleveland v. United States*, 531 U.S. 12 (2000); *Dowling v. United States*, 473 U.S. 207, 213-14 (1985); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 284-85 (1978); *Rewis v. United States*, 401 U.S. 808, 812 (1971); *Ladner v. United States*, 358 U.S. 169, 177-78 (1958); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952).

Modern cases recognize that the rule of strict construction now known as the Rule of Lenity has three fundamental purposes: "to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Each of these purposes is essential to the proper functioning of the criminal justice system. The first purpose is to ensure fair notice. Warning must be given "to the world in

language that the common world will understand." *Bass*, 404 U.S. at 348 (quoting *McBoyle*, 283 U.S. at 27). And although it is typically fictitious to assume that wrongdoers read statutes, fair notice is nevertheless "required in any system of law." *United States v. R.L.C.*, 503 U.S. 291, 309 (1992) (Scalia, J., concurring). Indeed, fair notice is closely tied to the principle of legality itself.

Two ramifications stem from the need for fair notice. First, a premium is put on the common sense meaning of a statute. See, e.g., *McBoyle*, 283 U.S. at 27. It is inherently unfair to impose on "the common world" a statutory interpretation that is overly obscure or clever. Second, a premium is put on the text itself. Judges should not rely on extratextual considerations to construe an unclear criminal statute against a defendant. "Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon v. United States*, 494 U.S. 152, 160 (1990). The Rule of Lenity "preclude[s] our resolution of [an] ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history." *Hughey v. United States*, 495 U.S. 411, 422 (1990).

Lenity's second purpose is to preserve the separation of powers. See *Bass*, 404 U.S. at 348. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.* "This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* (citations omitted). "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think, perhaps along with some Members of Congress, is the preferred result . . . This admonition takes on a particular importance when the Court construes criminal laws." *United States v. Granderson*, 511 U.S. 39, 68-69 (1994) (Kennedy, J., concurring) (citations omitted).

Lenity prevents the imposition of punishments that are not clearly authorized by Congress, the only branch of government competent to establish **federal** criminal penalties.

Lenity's third purpose is to avoid arbitrariness and inconsistency in the enforcement of criminal statutes. See *Kozminski*, 487 U.S. at 952. The Rule of Lenity responds to this need by "fostering uniformity in the interpretation of criminal statutes." It fosters uniformity because, in each case of criminal statutory interpretation, it requires courts to examine the text for ambiguity and to resolve any such ambiguity in the same direction. Faithfully applied, the Rule of Lenity prevents the government from punishing individuals based on an innovative or ambiguous reading of the criminal code as was clearly done here in this case, where even at this late date there has been no proof of any "scheme to defraud" (See, e.g., *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), describing the law of mail and wire fraud in the Second Circuit and the differences between a "scheme to deceive", which is not illegal, and a "scheme to defraud" which is. Nor was there any scheme to obtain money or property from the carriers, but rather to pay the carriers millions of dollars in premiums. (See *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. See *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)"). Nor was there any mailing or wire that Mr. Carpenter caused to be made in "furtherance" of any scheme even assuming the foreseeability of mailings and wires in modern business today; see the First Circuit's recent decision reversing a massive fraud conviction where the mailings charged in the indictment were not in furtherance of the scheme. *United States v. Tavares*, No. 14-2313, 2016 U.S. App. LEXIS 22502 (1st Cir. Dec. 19, 2016) (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied,"

*id.* at \*33 (internal citations omitted), the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States*, 323 U.S. 88, 95 (1944)). In Mr. Carpenter's indictment, there is not even a single mailing or wire that was made by him or even attributed to him much less caused by him, and at trial the only mailings and wires discussed were done by other people and were innocent acts not done in the furtherance of any scheme to defraud. If for no other reason than this gaping void in causation, and lack of furtherance in a scheme to defraud, in addition to the Rule of Lenity, a judgment of acquittal should be entered as to all counts on Mr. Carpenter's behalf.

## B. THE RULE OF LENITY CLEARLY APPLIES IN THIS CASE

The Second Circuit has defined the Rule of Lenity as a canon of statutory construction so that "in criminal prosecutions... ambiguities in a statute are resolved in the defendants' favor." See *United States v. Plaza Health Labs, Inc.*, 3 F.3d 643, 649 (2d Cir. 1993). It is utilized in those situations in which a reasonable doubt exists about a statute's intended scope and those concerns over the scope of a statute or any ambiguity in the reach of the statute "should be resolved in favor of lenity." *Liparota v. United States*, 71 U.S. 419, 427 (1985) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971). See also *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952) ("We should not derive criminal outlawry from some ambiguous implication.").

While the Rule of Lenity is a canon of statutory construction and not a federal statute itself, the rule is called into service to protect the constitutional rights of Fair Warning and Due Process: "Application of the Rule of Lenity ensures that criminal statutes will provide *fair warning* concerning conduct rendered illegal. *Liparota*, 417 U.S. at 427 (emphasis in original). The Rule of Lenity insures the Constitutional rights of fair warning and fair notice granted in the

Due Process Clause guarantee of the Fifth Amendment and as established by the Supreme Court, by resolving any ambiguity in a criminal statute as to apply the statute only to conduct clearly prohibited by the statute and no other conduct, because the Rule of Lenity requires a criminal statute to "give fair warning of the conduct that makes it a crime." See *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964). See also *Connally v. General Construction Company*, 269 U.S. 385, 391 (1926).

The touchstone of the Due Process analysis of the Rule of Lenity is whether the statute made it reasonably clear that at the relevant time that the defendant's conduct was criminal. See *United States v. Lanier*, 520 U.S. 259, 266-67 (1997), citing *Kolender v. Lawson*, 461 U.S. 352, 355-57 (1983). Clearly, in this case, no one in America much less the Second Circuit, was ever accused of criminal charges just for making misrepresentations on an insurance application before the indictment in *Binday* in February 2012. In fact while there were literally hundreds of civil lawsuits involving STOLI cases prior to Mr. Carpenter's indictment in December of 2013, (most of which were lost by the carriers) there was not a single indictment anywhere in the country involving "*Shellef*-like" misrepresentations of deceit as used by the Binday Agency in the insurance applications in that case. The *Binday* Indictment in February 2012 was four years after most of the applications in this case, and more than **FIVE YEARS** after the first Sash Spencer application. Therefore, Mr. Carpenter's indictment and prosecution was "unconstitutionally surprising" as the Second Circuit stated in reversing the conviction of an individual found in a Connecticut State park with 14 pictures of child pornography. See *United States v. Dauray*, 215 F 3d 257, 265 (2d Cir. 2000).

The Supreme Court's recent decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015) also confirms that the cornerstone of our judicial heritage is that a person should not be deemed

criminally responsible for mere negligence but only from the "concurrence of an evil-meaning mind with an evil-doing hand." "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." After all, "[e]ven a dog distinguishes between being stumbled over and being kicked." *Morissette* v. *United States,* 342 U.S. 246, 250-52 (1952). See, also, *United States* v. *United States Gypsum,* 438 U.S. 422 (1978), in which the requirement of some *mens rea* for a crime is firmly embedded in the American System of Justice. As the Supreme Court has observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Id.* at 436. "Thus, to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the statute prohibits." *Id.* at 445. Therefore, something more is required than the doing of the act proscribed by the statute. *United States v. Balint,* 258 U.S. 250 (1922).

Furthermore, not only does Mr. Carpenter's Indictment not contain the words *"mens rea"*, "scienter", or "specific intent to defraud", he did not **cause** any of the mailings or wires in this case, and none of the mailings or wires were done in the furtherance of any fraud, because there was no scheme to defraud. See, for example, the First Circuit's recent decision in *Tavares*, where the First Circuit overturned massive fraud convictions because none of the mailings were caused by the defendants, and none of the mailings were in furtherance of the alleged fraud.

Not only did Mr. Carpenter not have constitutional fair notice in his indictment, he clearly had no "Fair Warning" that by people he knew working in association with the "Outside Agents" and the "Inside Brokers" in various life Insurance cases during the period 2006-2008, that he could be somehow be found guilty for a non-crime that he certainly did not commit and

he was unaware that anything he was doing was "evil conduct", much less "criminal" conduct. Undoubtedly he was not in a conspiracy with anyone here, and at worst the brokers' "*Shellef*-like*" misrepresentations were deceitful and not a scheme to defraud. No evidence was adduced at trial showing **any** false misrepresentations by Mr. Carpenter. Moreover, at no time prior to *Binday* has the Second Circuit extended the right to control assets theory to a case where the "deceiver" e.g. the "Bindays" of the world had to pay the "deceived", i.e. premiums to the carriers. Clearly this does not fit in with the *Skilling* "mirror image of fraud" where the "victims loss of money or property supplied the defendants' gain, with one the mirror image of the other. See *Skilling v. United States*, 561 U.S. 358, 400 (2010), citing *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987). Nor does it fit in with the Second Circuit's decision in *Brennan*, that there can be no mail and wire fraud for misrepresentations and nondisclosures between sophisticated parties in an insurance transaction. See *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999).

If someone lies on a mortgage application and then receives $400,000 to buy a house that is only worth $200,000, the fraudster has clearly "stolen" at least $200,000 if not more from the bank. But in this case, if the "essence of the fraud" was the "commissions" as Judge Lynch asserts in the *Binday* opinion at 56-57, then the only way these commissions were created in the *Binday* case or this case was with the payment of premiums by the Charter Oak Trust with money from Grist Mill Capital that was paid to the carriers, and the carriers enjoyed a huge windfall, not a loss of "money or property" as required by the Second Circuit's decision in *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("a scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. See *Carpenter v. United States*, 484 U.S. 19, 27-28 (1987)."

Therefore, as in *Starr*, and in *Binday*, Binday may have "defrauded" the investors (Postal Service in *Starr*), but he did not defraud the carriers (the customers in *Starr*), and in *Binday*, the defendants were indicted for "defrauding" the carriers. In this case, Mr. Carpenter deceived no one and was not in a conspiracy to deceive anyone, and in fact, he merely paid the carriers money through the Charter Oak Trust at his company's expense and the carriers' gain. Once again, there was no evidence presented at trial that Mr. Carpenter lied about anything to anyone, or that paying premiums to a carrier somehow deprived the carrier of its "economic decision making" or right to control its assets. In fact, Your Honor recognized in Mr. Waesche's testimony, that Your Honor was hearing two different stories:

> THE COURT: This is what I'm trying to understand, because the government depicts you in your direct testimony as a co-conspirator with others, including Mr. Carpenter, in putting together these packages that were knowingly false for the purpose of deceiving the insurance companies into issuing the policies to the trust, and based on your direct, it would seem that Mr. Carpenter would be delighted to have you do whatever needed to be done to make the package look the way it needed to look to pass muster with the insurance company.
>
> Mr. Brown, it seems to me, is seeking to have me understand that, in fact, you were deceiving Mr. Carpenter; that if Mr. Carpenter knew you were inflating the figures, he would terminate you as a representative of Charter Oak Trust.
>
> So which was it?

T. Tr. Vol. VI, p. 1193, *6-22.

Just as the Rule of Lenity protected the perverted Judge Lanier and the sexual deviant Charles Dauray, an even more stunning case can be found in the Second Circuit's recent decision in *United States v. Valle*, No. 14-2710 (2d Cir. 2016). Gilberto Valle, a former New York City police officer, was accused of conspiring with a man named Bollinger to kidnap, rape, torture, and then to kill and cannibalize a woman he knew from college as well as the unauthorized use of a computer to track that woman, as well as other women, to satisfy their perverse fantasies.

Based on the Rule of Lenity, the district court judge, the Honorable Judge Gardephe, granted Valle's motions for a Rule 29 judgment of acquittal and a Rule 33 Motion for a New Trial. Judge Gardephe let stand the jury's verdict of unauthorized computer use, for which Judge Gardephe gave Valle 22 months. Of course, the government appealed and surprisingly the Second Circuit affirmed the Rule 29 judgment of acquittal, but vacated Valle's conviction of unauthorized use of the computer to track down the real life victims of his perverse fantasies, also based on the Rule of Lenity. Gilberto Valle was found to be an innocent man under the law, despite the fact that the Second Circuit detailed dozens of emails where Valle planned on doing unspeakable things to real women with real co-conspirators that he met on a fantasy website. The details are so graphic in both opinions because the Second Circuit mentions the names of the real victims and what Valle and his alleged co-conspirators intended to do to them.

Valle, according to Judge Gardephe and the Second Circuit, provided Bollinger and other alleged co-conspirators with the real name and real addresses of real women who could have been kidnapped, raped, tortured, and killed by Valle's co-conspirators. Assuming *arguendo* that Valle was just a sexual miscreant participating in disgusting sexual fantasies on the internet, how does Valle know that Bollinger was not a homicidal maniac? If Valle and Bollinger were not in a conspiracy, then clearly Mr. Carpenter was not in a conspiracy with any of the alleged co-conspirators in this case. And, if Judge Lynch was correct in the *Binday* opinion for the Second Circuit that the "object" of the *Binday* conspiracy was the "millions of dollars in commissions", then clearly under the *Studley* factors and elements (see *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)), Mr. Carpenter was not part of any conspiracy with the Outside Agents and other brokers in this case, as he did not personally receive a single penny from the alleged victims, the insurance carriers, nor did he share resources or profits with any of the alleged co-conspirators

(many of whom he never met or even communicated with). And, whereas the Second Circuit's opinion in *Valle* details many explicit emails between Valle and Bollinger and others, there is not a single email mentioned in this Court's opinion that shows Mr. Carpenter was part of any conspiracy or any agreement with anyone to do some illegal act, much less a conspiracy to defraud some of the largest insurance carriers in the country. In fact, the actual accusations against Mr. Carpenter are very few and involve only innocent conduct. At trial, the government actually presented witnesses who did not even know who Mr. Carpenter was, as they had never talked with him much less entered a conspiracy with him and **NO WITNESS** claimed that Mr. Carpenter defrauded them or anyone else. Moreover, there is not a single mailing or wire listed in the indictment that is attributable to Mr. Carpenter or was "caused" by Mr. Carpenter in "furtherance" of the non-existent "scheme to defraud" or the alleged conspiracy. Because the indictment is totally defective in not giving Mr. Carpenter notice of the **TRUE** nature and cause of the accusations against him as required by the Sixth Amendment, it must be dismissed and a judgment of acquittal must be granted on his behalf. But, clearly the Rule of Lenity should be invoked to protect Mr. Carpenter from a novel and ambiguous application of the mail and wire fraud statutes through a judicial expansion in *Binday*, that no one could imagine in 2006-2008 would be deemed criminal by this Court in 2016.

If the Rule of Lenity can be utilized to protect the constitutional rights of perverts and deviants like Gilberto Valle, Charles Dauray, and Judge Lanier, then it should also be used to protect the Due Process rights of a charitable and magnanimous person like Mr. Carpenter. At all times, the Charter Oak Trust was a bona fide trust, with a legitimate insurable interest in each of the insureds and had a bona fide insurance trustee, Christiana Bank. The carriers received over $100 million in premiums from Grist Mill Capital through the Charter Oak Trust, and the

Outside Agents like Mactas and Pacini were the ones who received millions in commissions; while for his efforts Mr. Carpenter's company Grist Mill Capital lost over $70 million, which is documented by his accountants and his tax returns, which were audited by the IRS and received a No Change Letter. There is no doubt that Mr. Carpenter received a guilty verdict from this Court for conduct that he could not have possibly known or foreseen in 2006-2008 would be deemed criminal by the Second Circuit in the *Binday* case in 2015 and by this Court in 2016.

And, unlike in Gilberto Valle's case, there were no emails between Mr. Carpenter and any other alleged co-conspirators that showed the "agreement on any conspiracy" much less an agreement on some grossly illegal conduct. Clearly, there were no emails produced at trial that shows Mr. Carpenter knew that he was breaking the law or committing a crime as is required by both the Due Process Clause and the Law of Conspiracy. But, if anything, the emails produced at Mr. Carpenter's trial prove that his conduct was innocent, his Good Faith was unimpaired, and that he never agreed to do anything knowingly illegal with anyone. Therefore, the Rule of Lenity mandates that this Court enter a judgment of acquittal as to Mr. Carpenter on all counts of the indictment in this case.

## XII. THERE WAS NO CONSPIRACY INVOLVING MR. CARPENTER IN THIS CASE

In Mr. Carpenter's case, not a single witness testified that he was in any conspiracy with Mr. Carpenter, nor did any witness testify that he had agreed to perform an "illegal act" or crime with Mr. Carpenter, and certainly no one other than Mr. Waesche admitted to doing anything illegal. Other than emails taken out of context by the government and, with all due respect, presented in a misinterpreted fashion to the Court, there was no evidence introduced by the government at trial that established that Mr. Carpenter had an agreement with Stefan Cherneski, J. Edward Waesche, or Charles Induddi-Westcott in any regard. In fact, the evidence adduced at trial showed just the opposite: that Messrs. Cherneski, Waesche, and Induddi-Westcott believed that they were doing nothing wrong, much less criminal during the life of the Charter Oak Trust from January 2007 through December 2009. If these alleged co-conspirators did not believe they were doing anything illegal or criminal, how then could they then "agree" and conspire with Mr. Carpenter to perform an illegal act or engage in criminal conduct? Not only did the government fail to prove that Mr. Carpenter agreed to join a conspiracy, it also failed to prove there was a conspiracy between Mr. Carpenter and any third person, and they failed to prove there was any agreement to commit the underlying substantive crime or that there was an actual conspiracy among anyone in this case, much less that Mr. Carpenter had knowledge of the alleged conspiracy and that he actively joined it. As the Second Circuit has said in reversing several conspiracy convictions:

> Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell. It is axiomatic that more is required than mere knowledge of the purpose of a conspiracy. *See, e.g., Direct Sales Co. v. United States*, 319 U.S. 703, 711-13 (1943); *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003). Such knowledge alone would not establish aiding and abetting liability, which requires proof of the intent to contribute to the

success of the underlying crime, *see United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006), let alone conspiracy. ("**A person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider or abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone.**"); *United States v. Tyler*, 758 F.2d 66, 70-71 (2d Cir. 1985) (reversing conviction for conspiracy to distribute heroin of defendant who helped willing buyer find willing seller, but affirming his conviction for aiding and abetting heroin distribution). *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) (Emphasis added).

In fact, in *United States v. Santos*, 541 F.3d 63 (2d Cir. 2008), the Second Circuit gives a detailed list of conspiracy convictions that were overturned due to insufficient evidence despite the fact that the evidence in those cases may be considered substantial in compared relatively to the dearth of evidence on this issue produced by the government at Mr. Carpenter's trial:

> We have overturned conspiracy convictions for insufficiency of the evidence where the government presented insufficient evidence from which the jury could reasonably infer that the defendant had knowledge of the conspiracy charged. See *United States v. Friedman*, 300 F.3d 111, 126 (2d Cir. 2002), *cert. denied* 538 U.S. 981 (2003); *United States v. Samaria*, 239 F.3d 228, 236-38 (2d Cir. 2001); *Atehortva*, 17 F.3d at 551; *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989). In *Atehortva*, for example, the defendant was hired to commit a kidnaping for ransom, the purpose of which was to enforce a drug debt. *Atehortva*, 17 F.3d at 548. We concluded that the evidence was insufficient to support a conviction for a narcotics conspiracy because the government failed to prove that the defendant, although he knowingly joined and participated in the kidnaping plot, "knew of the existence of the . . . debt, or that he knew or should have known that the debt resulted from a narcotics transaction." *Id.* at 551 (footnote omitted).

> We have similarly overturned conspiracy convictions where, although the defendant had knowledge of the conspiracy, there was insufficient evidence from which the jury could reasonably have inferred that the defendant intended to join it. See *Ceballos*, 340 F.3d at 127-28; *United States v. Young*, 745 F.2d 733, 764 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985); *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir. 1984). In the absence of an explicit agreement to join a conspiracy, we typically look for evidence that the defendant, in addition to knowing the essential nature of the plan, has "associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *United States v. Vargas*, 986 F.2d 35, 39 (2d Cir. 1993), *cert. denied*, 510 U.S. 827 (1993); *see also Desimone*, 119 F.3d at 223 ("An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed. Instead, membership requires proof of purposeful behavior aimed at furthering the goals of the conspiracy."). *Santos*, 541 F.3d at 71-72.

While there are several cases where the defendant is actually committing a criminal act, or is involved in a conspiracy for drugs, but not for bribery, or as in *Atehortva*, the Second Circuit found the defendant to be involved in a kidnapping scheme, but was not involved in the underlying drug conspiracy, so they reversed his convictions for use of a firearm in a drug crime and for being part of a drug conspiracy. See, also, *United States v. Gore*, 154 F.3d 34 (2d Cir. 1998), where the Second Circuit reversed the judgment of conviction on a charge of conspiracy to distribute heroin, holding that the government had not satisfied the most basic element of a conspiracy charge – an agreement to distribute drugs.

Based on the above cases, the Second Circuit has made it clear that to sustain a conspiracy conviction, the government must present sufficient credible evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004). That is, because "[c]onspiracy is a specific intent crime ... [p]roof that the defendant knew that *some crime* would be committed is not enough." *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) (emphasis added). A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute. *United States v. DiTommaso*, 817 F.2d 201, 218 (2d Cir. 1987). Further, if direct evidence is absent, "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime." *Samaria*, 239 F.3d at 235. For mail and wire fraud, that would entail at least the three elements of *United States v. Fountain*, plus the criminal intent or *mens rea* to commit a crime and the intent to do "actual

105

concrete harm" to the carriers, which was not proven at trial. *See United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998).

"The Supreme Court has warned that it view[s] with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Krulewitch v. United States*, 336 U.S. 440, 456 (1949). "A conspiracy involves an agreement by at least two parties to achieve a particular illegal end. In order for a defendant to be convicted of a conspiracy, 'there must be proof beyond a reasonable doubt that the conspirators agreed on the essential nature of the plan.' *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). We therefore 'focus on the essence of the underlying illegal objective to determine' the scope of the conspiracy." *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992).

A conspiracy is an "agreement among the conspirators." *United States v. Falcone*, 311 U.S. 205, 210 (1940). A "meeting of minds" is required. *Krulewitch*, 336 U.S. at 448. "[U]nless at least two people commit [the act of agreeing], no one does. When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone." *See Sears v. United States*, 343 F.2d 139 (5th Cir. 1965) (No conspiracy with person who feigns agreement). According to the government's theory of the case, to the extent evidence was presented regarding alleged co-conspirator's interactions with Mr. Carpenter, apparently everyone only "pretended" to agree with Mr. Carpenter so he would not yell at them. Significantly, no witness admitted or confessed to being in a conspiracy with Mr. Carpenter to commit any crime; not one. Moreover, the evidence adduced at trial strongly supports that Mr. Carpenter was lied to by the alleged co-conspirators.

Other than the government's speculative conclusions, there was not a single witness that said the carriers were harmed or deprived of their "economic decision making." Those words do

not exist in the insurance witnesses' testimony. The Second Circuit has said "to be convicted of a conspiracy, the government must prove that the defendant knew of the existence of the scheme alleged in the indictment, and knowingly joined and participated in it." *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2009); *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984). "Where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the *specific intent* to violate the substantive statute[s]." *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008), *citing DiTommasso*, 817 F.2d at 218. *See, also, United States v. Soto*, 716 F.2d 989, 993 (2d Cir. 1983). It is not enough just to prove that the defendant knew that some sort of crime would be committed. The defendant, to be guilty of conspiracy, must know exactly what crime was being committed, and essentially agreed to participate in the commission of that crime. *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002).

To prove intent to participate and commit the substantive offense there must be something more than [m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy; the defendant must in some sense promote their venture himself, make it his own, have a stake in its outcome,' or make 'an affirmative attempt to further its purposes.'" *United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003) (*quoting Direct Sales Co.*, 319 U.S. at 713). Conspiracy requires proof that the participants actually depend on each other—not for mere whimsy or pleasure, but to achieve "a shared, single criminal objective." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011).

The law of conspiracy requires agreement as to the "object" of the conspiracy. This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the "essential nature of the plan" that the conspirators allegedly

agreed upon, must be proven by the government. *Blumenthal*, 332 U.S. at 557. This, the government also failed to do at trial. It was never properly alleged in the indictment, much less proven at trial, that Mr. Carpenter engaged in a "meeting of minds" with any of the unindicted brokers, any Straw Insureds, or anyone else for that matter, and therefore the alleged agreement to or knowledge of an agreement to defraud does not exist in this case. To be a member of a conspiracy one must, under Judge Learned Hand's formulation, "in some sense promote [the illegal] venture himself, make it his own, have a stake in its outcome." *Falcone*, 109 F.2d at 581. Accordingly, unless two persons have a shared **purpose** or stake in the promotion of an illegal objective, there is no conspiracy. Compare Henry Cooper's account of what Mr. Waesche told him versus what Mr. Carpenter described as the agreement that Henry Cooper signed. There is no "agreement" here, and no meeting of the minds on anything beyond the black and white of the agreements between the Charter Oak Trust and Mr. Carpenter's company, GMC.

Instead, to sustain a conspiracy conviction, the Second Circuit requires that the government present evidence that proves beyond a reasonable doubt that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Rodriguez*, 392 F.3d at 544-45. In *Rodriguez*, while the defendant was the lookout for a heroin transaction and was the driver of the car with the heroin in it, he was found to not be a part of the conspiracy to possess or distribute the heroin by the Second Circuit. *See, also*, the related case of *United States v. Cruz*, 363 F.3d 187, 199-200 (2d Cir. 2004) stating similar. *Rodriguez* is also mentioned in the noteworthy case involving an Ernst & Young auditor whose conviction was overturned. *See United States v. Coplan*, 703 F.3d 46, 72 (2d Cir. 2011). The evidence at trial not only failed to demonstrate that Mr. Carpenter participated in any

conspiracy, it failed to demonstrate that he was even aware of any conspiracy to defraud the insurance carriers and, or that he knowingly joined or participated in any such conspiracy.

Just as the Second Circuit has relied on the Supreme Court's decision in *Direct Sales* above, the Second Circuit in *United States v. Gallishaw*, 428 F.2d 760 (2d Cir. 1970), quotes the Supreme Court opinion in *Ingram v. United States*, 360 U.S. 672 (1959), where it stated that: "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." 360 U.S. at 678. In Gallishaw's case, just because he provided a gun to Carballo did not mean that he was part of the conspiracy to rob the bank. In this case, other than the government's surmise and conjecture, there were no facts adduced at trial that even suggest, much less prove beyond a reasonable doubt, that Mr. Carpenter had any intent, much less the required *scienter* or *mens rea* necessary for a crime, or that he participated in any conspiracy to defraud or harm anyone, much less the carriers, because no one testified that Mr. Carpenter helped to fill out any of the so-called "Straw-Insured" applications. None of the Straw Insureds that testified, including Mr. Cooper, Mrs. Paulsrud, Mrs. Martinez, or the Von Noordens, even knew who Mr. Carpenter was. Moreover, even using the inapposite metaphor that Mr. Carpenter was a "drug kingpin" that was in a position of ultimate authority over the alleged conspiracy, there was no evidence at all presented at the trial that the Outside Agents Bruce Mactas, Robert Pacini, or Lee Alper even knew who Mr. Carpenter was, much less were taking suggestions from him or "following his orders", or any other baseless specious conclusions the government wishes to make concerning Mr. Carpenter's lack of participation in any conspiracy, as well as not filling out the applications in this case.

The government further alleged that Mr. Carpenter and others had an agreement to defraud the "victim" carriers in order to achieve their alleged "scheme", which was allegedly to

have Mr. Carpenter somehow take control of the Charter Oak Trust insurance policies held by Christiana Bank for the benefit of Ridgewood so that he could somehow sell those policies at a profit in the secondary market for life insurance policies that had already collapsed in early 2008, despite the fact that he was not the Trustee of the Charter Oak Trust, and did not control or own Christiana Bank. Moreover, at no time did the government present any evidence in the course of trial, much less prove beyond a reasonable doubt that Mr. Carpenter owned or controlled Nova Group, Inc., which was the Sponsor of the Charter Oak Trust. In fact, documents filed with the State of Connecticut by the law firm of Halloran & Sage show that Nova Group, Inc. was a Connecticut corporation formed in January of 2007 by Halloran & Sage, with Wayne Bursey as the President and Secretary. Mr. Carpenter's name is nowhere to be found in the State of Connecticut documents or in the Charter Oak Trust's declaration of trust; nor did Mr. Carpenter ever sign for the Charter Oak Trust, have signatory authority over the Charter Oak Trust, or have any control of the Charter Oak Trust or the policies in the Trust held at Christiana Bank. Furthermore, even a cursory glance at the Charter Oak Trust documents show that the **only person who could buy their insurance policy from the Trust, was the Insured, and only the Insured**. Therefore, it was physically impossible for Mr. Carpenter to ever take control of the insurance policies that were owned by the Charter Oak Trust, and controlled by Christiana Bank as the Insurance Trustee.

Moreover, it is beyond contest that Mr. Carpenter had absolutely no contact with the "known and unknown" individuals referenced in Count 33, and therefore Mr. Carpenter could not have had or been in any form of agreement with these parties or in "conspiracy" with these parties, or the government would have presented such evidence at trial. Certainly paying premiums on policies – an act that gives money to the carriers rather than "steals" it – cannot be

used to infer or establish or show the requisite "intent" that must be proven by the government beyond a reasonable doubt for any crime. Moreover, it was proven at trial that Mr. Carpenter did not know or even communicate with most of the people on the long list of alleged co-conspirators. Out of the more than one million or emails seized in this case, the government could not show a single email between Mr. Carpenter and Outside Agent One (Bruce Mactas), Outside Agent Two (Robert Pacini), or Outside Agent Three (Lee Alper). In fact, Mr. Carpenter's counsel had to confirm the identity of Outside Agent Three, because Mr. Carpenter had no idea who it was from the limited description in the indictment. Even in considering the drug cases detailed above, and even assuming *arguendo* that Mr. Carpenter is the "drug kingpin" that controls everything in this case, the government failed to produce at trial even a single email from Messrs. Mactas, Pacini, and Alper taking their orders from Mr. Carpenter.

Above, in *Gallishaw's* case, just because he provided a gun to Carballo did not mean that he was part of the conspiracy to rob the bank. In this case, just because Mr. Carpenter's company provided the funding for the Charter Oak Trust does not mean there was any criminal intent much less an "agreement" or a criminal "conspiracy" to commit a crime. Other than the government's speculative conjecture on this issue, there were no facts presented at trial that suggested Mr. Carpenter had any intent, much less the required *scienter* or *mens rea* necessary for a crime to defraud anyone, much less the carriers in the insurance community in which he had spent his entire working life. He testified at trial that these were his friends and partners, not just contractual vendors. If there was a scheme here, it was against the Trust and Mr. Carpenter's company Grist Mill Capital by the Straw Insureds, the brokers, and the agents of the carriers that resulted in a substantial gain to the carriers and correspondingly substantial losses to Mr. Carpenter's company through the payment of premiums by the Charter Oak Trust.

Nowhere during the trial did the government prove or even describe the "essential nature" of the alleged agreement to commit a crime that Mr. Carpenter was alleged to be a party to or with whom he was in such conspiracy. While no one testified to being in a conspiracy with Mr. Carpenter, Mr. Carpenter also denied being in a conspiracy with anyone several times in the course of his testimony. The problem of identifying the "essential nature" of the conspirators' plan often arises in cases in which "knowledge" is an issue. An examination of those cases sheds some light on the degree of specificity that is required as to establish the agreement. In *Ingram*, two individuals who had assisted in the operation of a lottery that was illegal under state law were convicted of conspiracy to evade federal wagering taxes for which their employers were liable. The Supreme Court reversed because there had been no evidence that the individuals in *Ingram* knew of the tax liability. Absent such knowledge, tax evasion could not have been one of the objectives of their conspiracy, and the convictions could not stand. *See Ingram*, 360 U.S. at 678. Thus, it is clear that a general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan. *See, e.g., Freidman*, 300 F.3d at 124 ("Proof that the defendant knew some crime would be committed is not enough").

In this case, there was no evidence adduced at trial that there was any crime. As the court is aware from the testimony, STOLI is not a crime. Even making misrepresentations on an insurance application was not a crime before *Binday*. There was no evidence adduced at trial showing any agreement with anyone to commit a crime in 2007 or 2008. There was no underlying crime here for Mr. Carpenter to knowingly participate in, nor any person that he agreed to conspire with to commit any crime, nor did the government introduce any evidence proving that Mr. Carpenter joined any conspiracy.

Furthermore, mere knowledge, approval, or acquiescence in the object or purpose of a conspiracy is insufficient to prove participation in it. *Falcone*, 311 U.S. 205. A conspiracy conviction requires that a defendant's membership in a conspiracy be proved on the basis of his own words and actions, and not on the basis of mere association or knowledge of wrongdoing; and as the Second Circuit has previously emphasized, a person can have knowledge that a criminal conspiracy exists, but the person still would **not be guilty** so long as he/she does not join and intentionally aid in the conspiracy. *Rodriguez*, 392 F.3d at 544-45. A person's knowledge about criminal activity does make one a co-conspirator so long as he/she does not join and intentionally aid in that conspiracy. The government presented no evidence that Mr. Carpenter had a discussion, plan, or agreement about harming the carriers with anyone. Being merely present in a place where a criminal conspiracy is occurring, or associating with members of a conspiracy, is insufficient evidence that such person became a member of the conspiracy. *Id.* If the defendant in *Rodriguez* was not in a conspiracy despite being the lookout and getaway driver for the drug deal, the same reasoning would suggest that Mr. Carpenter was not in any conspiracy with anyone to defraud any of the alleged victims in this case. Since the government has failed to prove any conspiracy that Mr. Carpenter was part of, and more importantly, has failed to show that Mr. Carpenter had the *mens rea* or criminal intent to **commit any underlying crime**, Mr. Carpenter's judgment of acquittal should be granted on all counts.

## XIII. THE AIDING AND ABETTING CHARGES MUST BE DISMISSED AND A JUDGMENT OF ACQUITTAL MUST BE ENTERED AS TO ALL OF THESE COUNTS, BECAUSE THERE WAS NO CRIME ALLEGED IN THE INDICTMENT, NOR WAS THERE ANY PROOF ADDUCED AT TRIAL SHOWING THAT MR. CARPENTER AIDED OR ABETTED ANYONE IN ANY SCHEME TO DEFRAUD

Based largely on the allegations contained in *Binday*, the Indictment in this case was apparently patched together as a hodgepodge of normal business practice and procedures following the submission of insurance applications containing allegedly false statements made by the broker or by the insured (but not by Mr. Carpenter), **without** each of the counts being crafted and evaluated in relation to the applicable legal elements. Perhaps the best example of this is that the government has used its "stand-by" charge of aiding and abetting to charges for which it cannot legally apply. Counts 1-33 each allege a substantive offense, but has also included the standard boilerplate reference to 18 U.S.C. §2. In this case, that section cannot apply as a matter of law. It certainly cannot apply to Mr. Carpenter if the government wants to allege that Mr. Carpenter is the "criminal mastermind" behind the alleged Charter Oak Trust conspiracy.

While it is theoretically possible for two or more people to conspire to commit mail and/or wire fraud that is not what is charged here. Instead, the Indictment alleges that Mr. Carpenter committed the substantive offenses, somehow, as an alleged ringleader of people he never met and that STOLI itself is somehow *per se* "evil", if not illegal. The reality is that the evidence presented at trial supports the fact that Mr. Carpenter and the Charter Oak Trust are indeed the leaders of the "anti-STOLI" movement and that the fair and accurate presentation of the thousands of documents and emails presented by the Government at trial clearly show that not only did the Charter Oak Trust **not promote** Life Settlements or STOLI, **it prohibited** both practices in all of the documents and agreements signed by the brokers and the participating

114

insureds. Because Mr. Carpenter is not guilty of the substantive offense, the offense was not committed by anyone and there is no other person for Mr. Carpenter to have aided and abetted in committing a substantive offense, as no one else is currently under indictment. Consequently, the aiding and abetting charge cannot stand. *See, e.g., California v. Roy*, 519 U.S. 2, 3 (1996) (reversing aiding and abetting conviction because jury was not told it must find the defendant intended to aid another in committing the crime); *Standefer v. United States*, 447 U.S. 10, 19 (1980) (aiding and abetting requires defendant to aid another in committing an offense); *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949), where the Supreme Court quoted Judge Learned Hand's definition of aiding and abetting in *United States v Peoni*, 100 F.2d 401, 402 (2d Cir. 1938):

> "In order to aid and abet another to commit a crime, it is necessary that a defendant in some way associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seeks by his own action to make it succeed." *Nye & Nissen*, at 619.

Furthermore, if there is no crime properly alleged in the Indictment as Mr. Carpenter firmly has asserted on numerous occasions, there can be no "aiding and abetting" of the non-alleged crime. Moreover, the government failed to address this issue at trial, much less prove it beyond a reasonable doubt, and also failed to prove which party is the **principal** of the crime, and which party is the aider and abetter, which also requires the dismissal of the aiding and abetting charge because it is unknown whether the Grand Jury indicted Mr. Carpenter as a principal or as an aider and abetter, and it is clear that one cannot be tried for both. While this discrepancy may have been cured by the issuance of a bill of particulars, which was denied by the Court, it is nonetheless black-letter law that a faulty and facially defective indictment cannot be saved by any bill of particulars, which was not allowed by the Court here in any event. *See, e.g.*, the Supreme Court's ruling in *United States v. Russell*, 369 U.S. 749, 770 (1962): "But it is

a settled rule that a bill of particulars cannot save an invalid indictment. *See United States v. Norris*, 281 U.S. 619, 622 (1930)."

It is axiomatic that more is required than mere knowledge of the purpose of the conspiracy. *See, e.g., United States v. Ceballos*, 340 F.3d 115, 124 (2d Cir. 2003), *citing* among other cases, *Direct Sales Co. v. United States*, 319 U.S. 703, 711-13 (1943)). Moreover, such knowledge alone would not establish aiding and abetting liability, which requires proof of the intent to contribute to the success of the underlying crime, let alone the conspiracy. *See United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006). Similarly, in *United States v. Samaria*, 239 F.3d 228, 256 (2d Cir. 2000), the Second Circuit reversed Elaiho's conviction, ruling that "the absence of evidence linking defendant to the specific object of the conspiracy proved fatal."

Since the alleged fraud in this case is filling out and submitting allegedly fraudulent insurance applications, the Indictment must be dismissed as to Mr. Carpenter because he never helped or assisted any of the supposed "Straw-Insureds" in filling out an insurance application, let alone submitting it to a carrier. Moreover, the trial record is clear, other than Marvin Carrin, Mr. Carpenter never knew, met, or even spoke with any of the so-called "Straw Insureds" before or after they filled out their insurance applications and the enrollment documents to join the Charter Oak Trust. In fact, **Mr. Carpenter was not licensed with any of the carriers**, so he would not have been able to sign as an in the submission of the application. Therefore, Mr. Carpenter could not have acted as a principal or as an "aider" on filling out the applications. But, even if he did, there would be no crime here as Mr. Carpenter's company's goal was to pay the premiums to fund the policies, not **harm** the insurance carriers by **taking their money** or property by chicanery and deceit. Mr. Carpenter's company **paid premiums** to the insurance carriers. That is not a crime. No carrier ever accused Mr. Carpenter or his company, Grist Mill

116

Capital, of any fraudulent activity, and Mr. Carpenter never filled out, signed, or submitted **any** of the allegedly fraudulent insurance applications listed in the superseding indictment. Nor does the superseding indictment state that Mr. Carpenter did anything regarding the applications themselves, so he did not "aid and abet" anyone.

Since there was no one introduced at Mr. Carpenter's trial as the principal, and there was no witness at the trial that provided any evidence of Mr. Carpenter participating in any criminal activity and certainly no insurance carrier witness testified that Mr. Carpenter interfered with their economic decision making, and no one was identified as the principal that Mr. Carpenter allegedly aided and abetted, and as the only person currently under indictment, the aiding and abetting allegations must be dismissed as a matter of law, and a judgment of acquittal entered as to all counts as they relate to Mr. Carpenter. Therefore, as to Mr. Carpenter, the only person under indictment, the aiding and abetting Counts must be dismissed as a matter of law and a judgment of acquittal entered as to all Counts.

## XIV. A JUDGMENT OF ACQUITTAL MUST BE GRANTED AS TO MOST OF THE COUNTS IN THE SUPERSEDING INDICTMENT AS VENUE WAS NOT PROPER IN THE DISTRICT OF CONNECTICUT

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). The Indictment, however, lists Straw Insureds and outside brokers from as far away as Texas, Arizona, and California. Specifically, Counts 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 26 of the Indictment concern non-resident, non-Connecticut insureds, that Mr. Carpenter never met with nor talked to, nor helped in any way to fill out their allegedly false insurance applications. Not only is this a fact, the Indictment does not allege anything different, but Mr. Carpenter is the indicted person here; not the people that filled out the applications, signed the applications, or submitted the allegedly false applications to the insurance carriers. In fact, only two of the alleged Straw Insureds are from Connecticut, and there is nothing alleged in the Indictment that says Mr. Carpenter had anything to do with the applications of these two Straw Insureds, and nothing was mentioned concerning Venue during Mr. Carpenter's trial, much less proof by a preponderance of the evidence. See *United States v. Brennan*, 183 F.3d 139 (2d Cir. 1999). Nowhere in the Indictment does the government allege the facts sufficient to show **any** criminal activity by Mr. Carpenter anywhere, nor were any of the elements of Venue for mail and wire fraud discussed at trial, much less proven beyond a reasonable doubt. Nowhere in the Indictment does the government allege the necessary "core of criminality" that occurred in the District of Connecticut. Instead, the Indictment goes on for more than 40-50 pages talking about the activity of other people, including the unindicted Straw Insureds from New York, Florida, California, Arizona, and Texas. The carriers, such as Lincoln and Penn Mutual, conducted their business out of state as well, wherever their agents did

business. There is an insufficient nexus for said counts to be prosecuted in Connecticut, and the government must prove Venue with a preponderance of the evidence, which is impossible in this case just based on the conclusory allegations made by the government in the Indictment. Hence, all of these specific counts should be dismissed for lack of proper venue, and especially as to Mr. Carpenter the Indictment must be dismissed in its entirety because he had nothing to do with these applications. *See United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014).

As explained in the Third Circuit's noteworthy decision in *Auernheimer*, these constitutional protections as to venue manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. Mr. Carpenter did nothing wrong, illegal, or criminal in the District of Connecticut, and yet the people who **did** fill out, sign, and submit the allegedly false insurance applications for the Straw Insureds in other states remain unindicted, and that means even as part of a conspiracy, the District of Connecticut is not only the wrong jurisdiction for this case, but also the wrong venue. "Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." *United States v. Tzolov*, 642 F.3d 214, 218 (2d Cir. 2011)(referencing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)).

> "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Svoboda*, 347 F.3d 471, 482-83 (2d Cir.2003). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue. *Id.*" *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004).

*See, also, Brennan*, 183 F.3d at 147 (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs").

In *Geibel*, the Second Circuit VACATED the defendants' convictions for counts 2-82 because the government failed to prove that the defendant did the allegedly illegal trades on the AMEX, which would have arguably made the Southern District of New York ("SDNY") an appropriate venue for the trial. The Second Circuit cited *Rosenblatt* for the proposition that the traders involved in the illegal trading could not be in a conspiracy just because they knew some of the people:

> Similarly, in this case, defendants' awareness of Freeman, the source of information, is not sufficient evidence to link them in a conspiracy with Freeman because mere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal. *See, e.g., United States v. Rosenblatt*, 554 F.2d 36, 38 n. 2 (2d Cir. 1977) (holding that federal definition of conspiracy retains traditional, common law requirement of "bilateral" formation which mandates a "meeting of the minds"). *Geibel*, 369 F.3d at 692.

Although there were eight defendants in *Geibel* charged in the conspiracy to trade on inside information, it was clear that not every trader was involved in every trade. Furthermore not all of the trades happened on the New York exchanges, but the Second Circuit determined that there was enough evidence to show that Geibel was part of the conspiracy and made certain trades based on tips and insider information. The Second Circuit then went on to review if Venue was proper **for each and every count** of the indictment:

> "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Svoboda*, 347 F.3d at 482-83 (quoting, in part, *United States v. Cabrales*, 524 U.S. 1, 5 (1998) (quotation marks omitted)). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *Id.* at 483. Finally, "when a defendant is charged in more than one count, venue must be proper with respect to each count. *Beech-Nut Nutrition Corp.*, 871 F.2d at 1188. "In a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *Smith*, 198 F.3d at 382 (internal quotation marks and citations omitted). In this case, Freeman was not a member of defendants'

120

conspiracy, and thus his acts in New York cannot form the basis for venue in the Southern District of New York ("SDNY"). Our analysis then turns on whether any acts taken in furtherance of the narrower conspiracy between and among the defendants were committed in the SDNY. *Geibel* at 696.

The reason that the defendants' convictions on so many counts (the eighty substantive insider trading counts) were overturned is because while Freeman was in New York, another conspirator, Cooper, was in Kentucky, and while cash payments were made to Freeman in New York, that did not create proper venue in New York for the traders outside New York just because they worked with Freeman. The Second Circuit in *Geibel* used *Cabrales* to show that just because Freeman was in New York, that did not make New York the proper venue for all of the counts, or all of the illegal trades:

> In *Cabrales,* the Supreme Court held that Missouri was not a proper venue for money laundering offenses even though the laundered funds originated from criminal activity in Missouri. 524 U.S. at 3-4, 10. The Court found that, even though the scheme originated in Missouri, the actual crime charged against the defendant began, continued, and was completed in Florida. *Id.* at 7-9. Analogously, although Freeman's actions ultimately resulted in defendants' trades, his conduct was too anterior and remote to confer venue in the SDNY. Indeed, as Geibel aptly notes, to hold otherwise "would be to in effect grant the Southern District of New York carte blanche on venue in virtually all insider trading cases." Geibel Br. at 30. *Geibel* at 697.

Simply put, when the government submitted evidence of a letter from the AMEX showing the brokers involved with the trade, neither Geibel's name nor his partner's name was listed as having been involved with the trades, therefore all of the insider trading convictions for Geibel had to be vacated. The same is true in this case. Mr. Carpenter was not involved with the Straw Insureds or their brokers, so Venue was not proper for most of the counts in this case and a judgment of acquittal should be issued on Mr. Carpenter's behalf.

## XV. SUMMARY AND ANALYSIS OF WHY A JUDGMENT OF ACQUITTAL SHOULD BE ENTERED AS TO EACH AND EVERY COUNT OF THE SUPERSEDING INDICTMENT AS A MATTER OF LAW

Virtually all of the Counts 1-33 in the Superseding Indictment should be dismissed as a matter of law because they merely reflect innocent acts which were not "in furtherance" of any scheme to defraud, and which were done after the alleged fraud was completed. Additionally, most of the Counts are also defective due to improper venue, statute of limitations issues, or because they fail to refer to any act of Mr. Carpenter that caused the specific mailing or wire in furtherance of any fraud. Moreover, because the Superseding Indictment substantially broadened the charges in the original indictment, the actual date where the acts in furtherance of a fraud must be found is after January 10, 2009 (*See United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003)), and any application before that is barred by the statute of limitations. Since all of the insurance policies were applied for and issued prior to January 2009, except for so-called Straw Insured One – Marvin Carrin – a judgment of acquittal must be issued as to all of the Counts 5 through 33 based on the fact that the alleged fraud was in making misrepresentations to the carriers on certain life insurance applications. Furthermore, all of the Counts 2-33 other than Counts 20 and 23, deal with innocent acts in the ordinary course of business and acts not "in furtherance" of any fraud.

In addition, a judgment of acquittal should issue on all of the Money Laundering Counts, Counts 34-57, because the government has failed to show at trial, much less proven beyond a reasonable doubt, how the Sash Spencer death proceeds could be anything other than insurance proceeds or the proceeds from the settlement of a lawsuit, not proceeds from any Specified Unlawful Activity (SUA). Since the government did not allege, much less prove at trial, that Mr. Carpenter knew the Sash Spencer proceeds were the product of a fraud by Bruce Mactas and/or

Mr. Spencer, a judgment of acquittal must be issued on all of the Money Laundering Counts. This is further supported by the facts that Lincoln Life Insurance Company investigated the Charter Oak Trust and the Sash Spencer death benefits for a year, and Ken Elder testified at trial that anyone lying on an application or doing STOLI would be terminated from Lincoln. Bruce Mactas is apparently still a major producer with Lincoln, and has not been terminated; ergo, Mr. Carpenter could not have known the insurance proceeds were SUA proceeds (because they were not), when even Lincoln still believes there was no fraud here.

Moreover, the only counts that mention Mr. Carpenter personally and specifically relate to his signing a form to complete a wire request to pay a premium after the allegedly fraudulent application had been submitted to the carriers by others and the policy already approved and issued. The Court's Opinion states that the fraud was in inducing the carriers to issue the policies based on less-than-accurate representations on the insurance applications. Therefore, the subsequent innocent conduct of paying a premium to a carrier is not "in furtherance" of a scheme to defraud for at least three reasons. The payment of the premium is not in furtherance of the allegedly fraudulent scheme to issue the policies. The payment of money to the carrier is certainly not deceitfully cheating the carrier out of its money or property by making material misrepresentations that effect its economic decision making. And, most importantly, the paying of money on an insurance policy does not show the intent to cause "concrete harm" to the carrier as the government has acknowledged that it must prove to find Mr. Carpenter guilty. *See Rossomando, Shellef, Starr, Regent Office, D'Amato*, and *Autuori*.

The only other mention of Mr. Carpenter's name in Counts 1-33, is signing the Disclosure Acknowledgment and Certification Agreements (DAC) between Grist Mill Capital, LLC and the Insureds' Employers. However, while the government recurrently drew the court's

attention at trial to the fact that these forms were never sent to the carriers, it is hard to see how these documents could be part of the fraud, particularly when the carriers' own agents had to get these Grist Mill Capital DAC forms filled out and submitted to GMC. Further, it is Hornbook Law that "knowledge of the agent is attributed to the principal" especially in the context of an insurance application. *See, e.g., Stipcich v. Metropolitan Life*, 277 U.S. 311 (1928).

More importantly, the government's insistence that these forms were not disclosed to the carrier means the government constructively amended the indictment at trial from a case of affirmative misrepresentations to a case of fraud by omission and non-disclosure. That modification alone mandates a judgment of acquittal in Mr. Carpenter's favor. The DAC form also discredits the government's entire theory of the case, because while the Insured might enjoy two years of "free" life insurance in a welfare benefit plan, his Employer was financially liable to GMC through the agreements signed by the Employer with GMC, thereby keeping the employer liable for all future payments to the Trust. Additionally, the COT appointed Christiana Bank as the Insurance Trustee in control of the policies for Ridgewood's benefit, and all versions of the Trust documents allowed for the Insured – and only the insured – to purchase the policy from the Trust, thereby negating any possible connotation of STOLI from a future third-party purchase. Nothing was shown, much less proven at trial that Mr. Carpenter owned or controlled Christiana Bank or Nova Group, Inc., or the trustees of the Charter Oak Trust. Wayne Bursey was the President and controlling officer of Nova Group, Inc., not Mr. Carpenter. Most importantly, there was no way for Mr. Carpenter to own or exercise control over those policies without the Insured purchasing the policy first, because in the event of default on the credit extended for premium payments, it would be Ridgewood and not Mr. Carpenter that the policies reverted to. If the Insured did not buy the policy or die, there would be no funds available for the Charter

Oak Trust to pay off its debt to GMC, or correspondingly for GMC to pay off Ridgewood, so the government's entire theory of the case is "patently absurd." *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991). With these concepts in mind, a judgment of acquittal should be issued as to each and every count of the Superseding Indictment on Mr. Carpenter's behalf for the following reasons.

Counts 1-4 involve so called Straw Insured One, Marvin Carrin, who the indictment says was a resident of New York City, and who filled out the Penn Mutual application that was sent in by Mr. Waesche to Penn Mutual, a Pennsylvania insurance carrier. Venue is not proper in the District of Connecticut for these Counts, and the only count that mentions Mr. Carpenter's name is Count 3, which is a premium payment in the second year for the policy, which cannot be wire fraud as it was not intended to harm or defraud the carrier in any way and is not in furtherance of any fraud. The other three counts do not mention or refer to Mr. Carpenter at all, so a judgment of acquittal should be granted as to all four Counts. There is no conspiracy in this case, but it was revealed at trial by Special Agent Allen's summary sheets that Mr. Waesche was paid and kept 100% of the Penn Mutual commissions on Mr. Carrin's policy. Mr. Carpenter was not a participant in any conspiracy, and since Mr. Waesche did not pool resources or share commissions or profits with Mr. Carpenter, there was no conspiracy between Mr. Waesche and Mr. Carpenter proven at trial under the elements listed in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995).

Count 5 involves a Connecticut friend of Mr. Carrin's named Vito Esparo. Mr. Carpenter's only involvement was signing the DAC document on behalf of Grist Mill Capital. Since Count 5 involves an application submitted in January 2008 (*See* Para. 52 of Superseding Indictment), this Count should be barred by the applicable statute of limitations.

125

Similarly, Count 6 involves Mr. Waesche and Insured 3 – Miriam Knobloch – a resident of New York, and Penn Mutual. Mr. Waesche sent in the allegedly false application to Penn Mutual in July 2008. The only mention of Mr. Carpenter is signing the DAC document. There is no fraud here by Mr. Carpenter, so this count is clearly barred by the statute of limitations, and venue is improper in Connecticut. If there is any fraud here, it was all committed by Mr. Waesche outside of Connecticut and outside the statute of limitations, and there are no mailings or wires in furtherance of any fraud.

Counts 7-10 involve Theresa Martinez, a California woman known as Insured 4, *See* Paragraph 62. As clearly shown by her deposition, Ms. Martinez did not even want the insurance policy, but was talked into it or lied to by a broker named Sam Nunes, who was not listed as a co-conspirator of Mr. Carpenter. Since Waesche sent in the false application and because of his relationship with Ken Landgaard and chain of brokers related to Landgaard that got the false application from Nunes, these counts are also barred by the statute of limitations, and venue is improper in the District of Connecticut. Once again, Mr. Carpenter is only mentioned in Counts 7 and 9 for requesting money to make premium payments after the allegedly false insurance application was already sent in and approved by the carrier. Unlike the other cases, Mr. Waesche and Ms. Martinez signed the DAC form, not Carpenter (see Paragraph 65). Since the Martinez application was submitted in June 2008 through the Oregon office of Penn Mutual, these counts are barred by the statute of limitations and improper venue. Certainly there was no fraud here on Mr. Carpenter's part, as Ms. Martinez never heard of Mr. Carpenter, and Mr. Carpenter and Mr. Bursey agreed to a settlement with Penn Mutual to rescind the Martinez policy along with the Carrin and Knobloch policies written by Waesche in the Charter Oak Trust. There cannot be fraud if Penn Mutual brought an action to rescind the policies, and

agreed to pay back Grist Mill Capital the premiums paid. This all happened prior to Mr. Carpenter's indictment.

Counts 11-14 involved Luella Mae Paulsrud, a friend of Ken Landgaard's mother, who lives in Arizona and who also stated in her deposition that she knew nothing of Mr. Carpenter. Her application was submitted by Mr. Waesche to the Phoenix office in Massachusetts in April 2008. Once again, Waesche signed the DAC agreement in this case, *See* Paragraph 70, and Mr. Carpenter is only mentioned in Counts 11 and 13 for initiating wire transfers to pay subsequent premiums on the Phoenix policy. Clearly there are venue problems here, and prosecution is barred by the statute of limitations. The subsequent payments of premium, once Waesche completed the fraud in April 2008, makes the innocent premium payments not in furtherance of any fraud. The civil litigation over the Paulsrud policy is still ongoing with Phoenix.

Counts 15-18 involved Insured 6, a resident of New Jersey, Judith Amsterdam, and a client of Outside Agent One – Bruce Mactas of New York – who sent an application to Sun Life of Canada. The application was submitted directly to Sun Life by Mr. Mactas from his office, because Mr. Mactas answered all of the questions in New Jersey and/or New York in March 2008. (*See* Paras. 74 and 75). According to Paragraph 76, the DAC form was signed by Mr. Bursey, not Mr. Carpenter, and once again Mr. Carpenter's name is only mentioned in Counts 16 and 17 dealing with wires to make subsequent premium payments on the policy after Mr. Mactas and Ms. Amsterdam allegedly lied on the insurance application. Since the government did not call Mr. Mactas, Ms. Amsterdam, or anyone from Sun Life, a judgment of acquittal should enter as to Counts 15-18.

Count 19 for Mail Fraud involves another friend of Marvin Carrin given to Mr. Waesche, a New Jersey resident, Henry Cooper, whose allegedly false application to Phoenix was sent in

127

by Mr. Waesche on April 5, 2007. Not only are there venue problems with this count, it is clearly barred by the statute of limitations. Once again, the only mention of Mr. Carpenter in regard to Mr. Cooper is his signing the DAC agreement in August 2007 to fund the policy that was approved in June 2007. Paying premiums does not prove that Mr. Carpenter was involved in any way with the Waesche or Carrin webs of fraud and deceit. At trial, Mr. Cooper had no idea who Mr. Carpenter was, nor did Mr. Cooper have any interaction with Mr. Carpenter.

Count 20 involves a Houston resident, Ronald Goelzer and Outside Agent 2, Pacini, also of Houston. The original application was sent in by Pacini's Texas office in October 2008 to Lincoln in North Carolina. Any fraud here was completed at that time, so any further action by anyone was not in furtherance of any fraud. Clearly, venue is improper for this count in the District of Connecticut, as the only insurance agents involved are Pacini in Houston and Charles Induddi-Westcott, a resident of New York sending an application from Houston to Lincoln in North Carolina. Once again, the only mention of Mr. Carpenter is signing the DAC agreement in December 2008, long after the application was sent in and well after the completion of any fraud by Pacini and Prelle and other agents of Lincoln in Houston. Therefore, a judgment of acquittal should issue on this count as well.

Count 21 also involves Insured 8, and Outside Agent 2, Pacini in Houston, and literally involves the same Funding Memorandum and Disbursement Request as Count 20, totally ignoring the fact that the application for Mr. Goelzer had been submitted by Mr. Pacini to Lincoln several months before Mr. Pacini brought the case to the Charter Oak Trust. The policy was taken over by Ridgewood and Mr. Goelzer has since died, but neither Pacini nor his General Agent and Officer of Supervisory Jurisdiction, Fred Prelle, have been terminated, and Lincoln did contest or investigate the Goelzer death claim. No one from the Houston office of Lincoln

was called to testify, and no one from the Houston office was indicted, and as stated above, Lincoln did not challenge any of the Charter Oak Trust policies, several of which were written after the April 15, 2009 conference call with Ken Elder and after the payment of the Sash Spencer proceeds in May 2009.

Count 22 for Mail Fraud involves a 72 year old woman from California, Judith Musiker, who was solicited by Outside Agent-3 (OA-3), who was Bruce Mactas's partner, Lee Alper. Obviously, since neither Insured 9 nor OA-3 was called to testify during the trial, whatever they thought the Charter Oak Trust "deal" was, can only be deemed hearsay at best or rank speculation on the part of Agent Allen. In any event, the Musiker Insured-9 application went in on March 14, 2007, over nine years ago. (*See* Superseding Indictment Paragraph 94). OA-1 Mactas and OA-3 Alper signed the "Required Producer & Representative Certification Regarding Stranger Owned Life Insurance." (*See* Paragraph 95). The application was sent in to Lincoln in North Carolina on a California resident from the Mactas-Alper office in New York. Not only is prosecution barred by the statute of limitations, venue is clearly improper in the District of Connecticut (*See, e.g., United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) and *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989), "venue must be determined to be proper for each and every count"). Moreover, neither Mactas nor Alper has been indicted or terminated by Lincoln, so Mr. Carpenter should receive a judgment of acquittal on this Count as well, since the only mention of Mr. Carpenter is signing the DAC agreement in Paragraph 97. And, of course, as the government made clear at trial, the DAC agreement was never sent to Lincoln, so it could not be in furtherance of any fraud against Lincoln or have affected Lincoln's economic decision making in any possible way.

Counts 23, 24, and 25 involved another woman out of Texas, Joan Pennington, Insured-10 and OA-2, Mr. Pacini. Once again, the only mention of Mr. Carpenter is signing the DAC agreement, which again, was never sent to the carrier so it cannot possibly be in furtherance of any fraud. The "Required Producer Form Regarding STOLI" was sent in by Pacini on September 17, 2008 from Texas to North Carolina. (*See* Paragraph 100). Thus, there are venue and statute of limitations problems with these Counts, and once again, Pacini has not been indicted and Lincoln has not terminated Pacini or Prelle, nor did it seem to rescind the Pennington policy. Ergo, it must not have been STOLI, and only Agent Allen thinks the questions were answered incorrectly on the application and the Required Producer Form Regarding STOLI. Clearly, a judgment of acquittal must be entered on these Counts for Mr. Carpenter.

Counts 26, 27, and 28 involve the Von Noordens and Pacini out of Houston. Once again, Mr. Carpenter is only mentioned in the Superseding Indictment as signing the DAC agreement and making two funding requests through the normal process with Christiana Bank and Ridgewood. The Court need only listen to Mrs. Von Noorden's deposition to know that Mr. Carpenter had nothing to do with any fraud in this case, and that Mrs. Von Noorden trusted her husband in making life-long business decisions, but he was now suffering from dementia and Alzheimer's, and she did not even want the policy. If there was any fraud here, it was carried out by Pacini and other licensed Lincoln agents in Houston. The Von Noorden Exhibits even have a proposal from Mr. Pacini stating that Credit Suisse will buy the policy at the end of two years, and the Von Noordens will make $500,000. No mention is made of the Charter Oak Trust requirement that the Von Noordens would need to purchase the policy first before it was sold to Credit Suisse. When the Von Noordens' attorney, Floyd Guest, gets involved, the amount goes

down to $100,000 and Pacini stops returning their phone calls. Nowhere is Mr. Carpenter mentioned in this disgusting debacle of Mr. Pacini's greed in taking advantage of an elderly couple. Once again, none of the documents Mr. Carpenter signed had anything to do with any fraud against the carriers, and a judgment of acquittal must be issued on Mr. Carpenter's behalf on all of these Counts.

Counts 29 through 32 involve Insured-12, Beat Zahner, who was introduced to Waesche by a friend of a friend of Marvin Carrin, and Mr. Zahner testified that he did not even remember meeting Marvin Carrin and barely remembers anything that Waesche told him since the application to Phoenix went in almost 9 years ago on April 9, 2008. Once again, there are severe statute of limitations problems here, but Counts 30 and 32 should be dismissed as they only mention Mr. Bursey and not Mr. Carpenter, and the Counts 29 and 31 mention the same $57,000 in premiums that Mr. Carpenter is authorizing for the payment of premium, long after the allegedly false application was sent in by Waesche. The civil litigation with Phoenix is still ongoing as to this policy. Since paying premiums on an insurance policy cannot possibly be fraud or in furtherance of any fraud, and since that is the only thing Mr. Carpenter is charged with, he should receive a judgment of acquittal on all of these Counts as well.

Count 33 is Conspiracy to Commit Mail and Wire Fraud and must be dismissed as there was no evidence adduced at trial that Mr. Carpenter was part of any conspiracy, or that Mr. Carpenter knew of any conspiracy or participated in any conspiracy with anyone or had any "agreement" with anyone to do an illegal act, therefore a judgment of acquittal must be entered as to this Count as well. Please notice that the superseding indictment states in Paragraph 121 that the "scheme to defraud the Life Insurance Providers by means of false and fraudulent pretenses, representations, and promises" was changed by the end of the trial as the government

was now claiming that Mr. Carpenter did not tell the carriers that GMC was funding the premiums, and did not send in the DAC agreements or the agreements with Ridgewood or even the agreements between the Insured's Employer and GMC. That is clearly a dramatic shift in the required proof at trial and a constructive amendment, or at least a prejudicial variance, from a case of affirmative misrepresentations to a case of fraud by omissions and nondisclosure, which should cause this Court to dismiss the Superseding Indictment in its entirety because Mr. Carpenter had no duty to disclose anything to the carriers. While it is clear that the agents of the carriers might have had a duty to disclose to the carrier, and they did not, Mr. Carpenter did not have any duty to disclose. But, the agents also had a duty to GMC and Mr. Carpenter and they lied to GMC and the COT. Therein lies the real fraud in this case.

Moreover, Wayne Bursey did submit all of the documents to Lincoln for the Sash Spencer investigation, **including the Beneficiary Designation Form showing that Grist Mill Capital was, in fact, the primary beneficiary of the Sash Spencer proceeds because of GMC's funding of the policy and the outstanding amounts owed by the Charter Oak Trust to GMC.** This was in 2008, a year before Lincoln finally paid the claim, and once again, on the April 15, 2009 phone call with Lincoln and Lincoln officers at no time did anyone on the phone ask who Mr. Carpenter was and why he was on the phone call. So, for the government to suggest at trial that Lincoln and its officers and agents were not familiar with Mr. Carpenter and Grist Mill Capital's role in the Charter Oak Trust is baseless and meritless. Therefore, it is Mr. Carpenter's company, Grist Mill Capital, that is the real victim in this case, and none of the alleged Outside Agents, including Bruce Mactas, Robert Pacini, or Lee Alper were fired, terminated, or indicted. If they did lie on the Lincoln applications, the misrepresentations could not be "material" because Lincoln does not seem to have cared, or perhaps Lincoln believes they

did not lie or misrepresent on the applications, which means there was no scheme to deceive much less a scheme to defraud. In either case, Mr. Carpenter is entitled to a judgment of acquittal as to all Counts, including the Money Laundering Counts, because no fraud was proven at trial on the Sash Spencer applications or any of the other Lincoln applications. If the Lincoln agents did not lie on the applications, there can be no scheme to defraud here, because Mr. Carpenter was not in a conspiracy to harm anyone, much less a carrier, and there was no evidence adduced at trial that he lied or presented false applications to anyone. Moreover, if the Lincoln agents lied on the applications, or misrepresented something, and Lincoln did not care about the misrepresentations, then that means that misrepresentations must not have been material, and that means they were not fraudulent as well.

In either case, it is beyond peradventure that Mr. Carpenter did not fill out, sign, or send in any application, or tell anyone else to send in any allegedly false application or cause any of the applications to go to the carriers. In that respect, this case is totally dissimilar from *Binday*, which was all about the misrepresentations on the fraudulent applications. In this case, the government has tried to make a big deal about the funding of the policies, yet none of the counts in *Binday* had to do with the payment of premiums, and the government failed to prove at trial that Mr. Carpenter had anything to do with the filling out or submission of the allegedly false applications. The only essential representations concerning an application for life insurance are the Insured's Age, Gender, and Health. There were no allegations of misrepresentations of these essential aspects of the life insurance bargain. If there really was any fraud involved in the Charter Oak Trust, Lincoln would not have paid $30 million in a death claim for the Trust's very first insured. If there was no fraud in the Sash Spencer applications after an intensive year-long investigation, there were likely no material misrepresentations or fraud involving the other

applications, and certainly no Money Laundering. Therefore, Mr. Carpenter respectfully submits

that this Court should issue a Rule 29 Judgment of Acquittal on Mr. Carpenter's behalf for all of

the Counts of the Superseding Indictment.

WHEREFORE, it is respectfully requested a Judgment of Acquittal be ordered with respect to each count of the Superseding Indictment, pursuant to F. R. Crim. Pro. 29:

**Respectfully submitted,**
Defendant, Daniel Carpenter

By_____
      Richard R. Brown, Esq.
      Brown Paindiris & Scott, LLP
      100 Pearl Street, 2nd Floor
      Hartford, CT 06103
      Tel 860.522.3343
      Fax 860.522.2490
      Fed. Bar Ct00009
      rbrown@bpslawyers.com

## CERTIFICATION

This is to certify that March 13, 2017, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009