**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 3:13CR226(RNC) |
| | ) |
| DANIEL E. CARPENTER | ) |
| | ) MARCH 15, 2017 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## DANIEL E. CARPENTER'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33

### I. PRELIMINARY STATEMENT

Daniel Carpenter is an innocent man, wrongfully accused, wrongfully indicted, and wrongfully tried for a nonexistent crime which he had nothing to do with, and which was based on a conspiracy which he was not a part of, never participated in, and certainly never joined. He is also the victim of prosecutorial abuse and government misconduct that, at the very least, should merit granting him a new trial in the interests of justice pursuant to Fed. R. Crim. P. 33(a).

In addition to the numerous constitutional infirmities addressed at length in Mr. Carpenter's Motion for a Judgment of Acquittal pursuant to Rule 29(c), Mr. Carpenter did not receive a fair trial or Due Process for a number of additional reasons addressed herein, and this Court is asked to exercise its broad discretion to grant Mr. Carpenter a new trial in the interests of justice. Alternatively, the Court is asked to vacate the June 6, 2016, verdict in this case and allow Mr. Carpenter to present additional witnesses that will testify on his behalf, all of whom were expected to have testified during the government's case-in-chief per its witness disclosure but were not called. Through these additional witnesses it is believed that the Court will quickly see that it has been misled with regard to the true facts and circumstances of this case. This is a result of the government's blatant attempt to obfuscate the truth by selecting a handful of emails, out of several

1

million, that have nothing to do with the Charter Oak Trust or Grist Mill Capital, but rather Guy Neumann's company (REX Insurance Services) and other companies that operated out of 100 Grist Mill Road.

It is not happenstance that the government only called as witnesses people who left employment at 100 Grist Mill Road long ago (i.e. Jenny Valedaserra in 2009, and her husband Stefan Cherneski in 2010), or who were never actually employed there (J. Edward Waesche worked in the Stanford Office of Benistar, and Charles Induddi-Westcott worked out of his home in Millbrook, New York and severed all ties with Mr. Carpenter and the Benistar companies after the raid of April 20, 2010). Therefore, if Mr. Carpenter had any idea that he was to be held accountable for the conduct of agents of the various carriers that he never met, such as Bruce Mactas, Robert Pacini, and Lee Alper, as well as for the conduct of people like Mr. Waesche and Mr. Induddi-Westcott, who admitted to lying and deceiving Mr. Carpenter on the forms they filled out, Mr. Carpenter would have called eight different witnesses that would have supported up his version of events and how the Charter Oak Trust really operated, thereby proving that the Court's conclusions are unsupported as a result of the government's biased and incomplete presenting of the facts and circumstances of this case..

However, instead of calling these vital witnesses for the truth, and throughout these proceedings, the government has essentially intimidated these witnesses in reminding the defense that these witnesses could face potential criminal exposure if their testimony implicated them in the alleged criminal conspiracy. As it will be demonstrated that Mr. Carpenter did not receive a fair trial, and that his rights under the Fourth, Fifth, and Sixth Amendments of the Constitution were thereby violated, this Court should remedy all of the constitutional wrongs done to Mr.

2

Carpenter in this case by granting this motion for a Rule 33 New Trial in addition to granting Mr. Carpenter's Rule 29 Judgment of Acquittal, along with a new trial pursuant to Rule 29(d).

## II.    LEGAL STANDARD

This Court has wide discretion to grant a new trial. Rule 33(a) of the Federal Rules of Criminal Procedure grants the Court "broad discretion...to set aside a verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Serrano*, 191 F.Supp.3d 287 (S.D.N.Y. 2016) granting motion for a new trial pursuant to Rule 33, *citing United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). Rule 33(a) provides that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

The Second Circuit has explained the standard of review for Rule 33 motions as follows: In deciding a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. To grant the motion, there must be a real concern that an innocent person may have been convicted." *See United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013), *quoting Ferguson*, 246 F.3d at 134. Innocent means "innocent of the *crime charged*[.]" *United States v. Ferguson*, 49 F. Supp. 2d 321, 324 n.3 (S.D.N.Y. 1999) (emphasis in original) *(citing United States v. Thai*, 29 F.3d 785, 818-19 (2d Cir. 1994) (though defendant had conspired to bomb a restaurant, he was not guilty of doing so in aid of racketeering because there was a failure of proof of the motivation element)), *aff'd*, 246 F.3d 129 (2d Cir. 2001). In this case, there was no conspiracy proven at trial, much less a conspiracy that Mr. Carpenter was a party to, and no evidence was adduced at trial to show Mr. Carpenter filling out or sending in any allegedly fraudulent insurance applications.

3

Under Rule 33, and unlike Rule 29, the Court need not view the evidence in the light most favorable to the government. The Court also may hold an evidentiary hearing to resolve factual disputes or receive additional testimony. *See, e.g., Ferguson*, 246 F.3d at 133 *(quoting United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)). The Court has wide discretion to order a new trial. *Ferguson*, at 133. And the Court may grant a new trial even if it does not find that a specific legal error occurred at trial. *See, e.g., United States v. Scroggins*, 379 F.3d 233, 255 (5th Cir. 2004), and *United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994).

Given the grave doubts that Mr. Carpenter is guilty of any of the alleged charges, the Court should hold that the verdict is contrary to the weight of the evidence, and grant a new trial. Courts have ordered new trials under Rule 33(a) when, for example: (1) the verdict was against the weight of the evidence, *United States v. Robinson*, 303 F. Supp. 2d 231, 233-34 (N.D.N.Y. 2004) (adhering to earlier ruling granting a new trial because the evidence "was far too flimsy to support a conviction" and because of "the very real concern that an innocent person may have been convicted"); *Ferguson*, 49 F.Supp.2d at 329 (granting new trial because the evidence provided "too slender a reed to support a guilty verdict."), or (2) there were procedural errors by the government that deprived the defendant of a fair trial, which the remainder of this brief describes in some detail. "If a constitutional error has occurred, we must order a new trial unless the government has shown that any error was harmless beyond a reasonable doubt." *United States v. Earle*, 488 F.3d 537, 543 (1st Cir. 2007), *citing Olden v. Kentucky*, 488 U.S. 227, 232 (1988), *citing Chapman v. California*, 386 U.S. 18 (1967).

As discussed below, both of these grounds and several other justifications for a new trial are present in this case. Accordingly, in order to prevent a miscarriage of justice, and given the real concern that Mr. Carpenter is an innocent man, wrongfully prosecuted and convicted, the

4

Court should set aside its verdict and, if it does not enter a judgment of acquittal, order a new trial, or at the very least, permit the proceedings in this matter to be reopened for the Defendant to take additional testimony and enter a new judgment pursuant to Rule 33(a).

## III. THE CUMULATIVE EFFECT OF THE PROSECUTORIAL MISCONDUCT AND IMPROPER GOVERNMENTAL ACTIONS AGAINST MR. CARPENTER CONSTITUTE FUNDAMENTAL UNFAIRNESS THAT DEPRIVED MR. CARPENTER OF DUE PROCESS AND A FAIR TRIAL

While each of the constitutional and procedural issues set forth in Mr. Carpenter's Rule 29 Motion are each independently sufficient to warrant setting aside his verdict and granting him a new trial, cumulatively the issues presented require it. In combination, these infirmities served to prevent Mr. Carpenter from preparing and presenting any meaningful defense to the charges, much less his best defense, which is guaranteed by the Constitution, and essentially permitted the government to assassinate his character and distort the truth in a trial by ambush with a select group of emails taken out of any relevant context. Moreover the government did not give the Defendant warning of the select emails they intended to present at trial until the eleventh hour.

The "cumulative unfairness" doctrine is firmly embedded in the Second Circuit. *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008), *citing United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967) (determining that, singly, the errors at trial might not require reversal, but that "occurring at the same trial, the total effect of the errors…found…cast such a serious doubt on the fairness of the trial that the convictions must be reversed"). Accordingly, the substantial accumulation of errors, as set forth in Mr. Carpenter's Rule 29 Memorandum and as set forth below, requires the granting of a new trial pursuant to Rule 33.

Similarly, the concept of cumulative error is also well established. As the Second Circuit noted in *Al-Moayad*, "[t]he Supreme Court has repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation

5

of due process requiring reversal of a conviction." *Al-Moayad*, 545 F.3d at 178, *citing Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978), and *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

**IV.    THE GOVERNMENT'S FAILURE TO PROVIDE THE DEFENSE WITH EXCULPATORY EVIDENCE DEPRIVED MR. CARPENTER OF A FAIR TRIAL AND VIOLATED HIS CONSTITUTIONAL RIGHTS UNDER *BRADY, GIGLIO, BAGLEY,* AND *JENCKS***

In a criminal prosecution, the government is constitutionally obliged to disclose evidence favorable to the accused when such evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The government's duty under *Brady* is fairly settled:

> To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant. Information coming within the scope of this principle…includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the [] assessment of the credibility of a significant prosecution witness. *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002), *citing Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001), *quoting United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the government, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "*Brady* material must be disclosed in time for its effective use at trial." *Gil* at 105. "When such a disclosure is first made on the eve of trial, or when the trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case." *Gil* at 106, *citing Leka*, 257 F.3d at 101.

"[The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he receives a fair trial, understood as a trial resulting in a verdict worth of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of trial." *Gil* at 103, *citing Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Perhaps the most important witness not called by the government at Mr. Carpenter's trial was Bruce Mactas. While Mr. Mactas is listed as "Outside Agent 1" in the indictments and is listed as a major "co-conspirator" of Mr. Carpenter, and is the Lincoln Agent responsible for the Sash Spencer application, the government chose not to call him at trial. Mr. Mactas' partner, Lee Alper, is referred to as "Outside Agent 3" in the indictments and was responsible for other policies sold to the Charter Oak Trust, but since Mr. Carpenter had no contact with Mr. Mactas or Mr. Alper, he was forced to ask the government at the beginning of his trial as to the identity of Outside Agent 3, because he was identified only as a partner of Outside Agent 1. This simple fact highlights the prejudice to Mr. Carpenter in that the government did not provide Mr. Carpenter with any Jencks Act 3500 information on Mr. Mactas, and certainly did not provide the wholly exculpatory *Brady-Giglio-Bagley* material of Mr. Mactas' sworn testimony in the *Universitas v. Nova Group, Inc.* arbitration in December of 2010. Even a cursory glance at the excerpts provided below should prove to the Court that Mr. Carpenter merits a new trial because he is innocent of all charges and the government was certainly negligent or deficient in its *Brady-Giglio-Bagley* obligations to Mr. Carpenter as well as the Court.

While Mr. Carpenter believes that there are literally hundreds of emails and documents that the government should have turned over in terms of its *Brady-Giglio-Bagley* obligations and

Jencks Act 3500 material before trial, and that the information provided was woefully inadequate based on the list of witnesses and co-conspirators the government provided to Mr. Carpenter at the beginning of the trial, for the purposes of this new trial motion Mr. Carpenter wishes to focus the Court's attention on just one document that was clearly material to these proceedings, which was in the government's possession, and was suppressed either intentionally or inadvertently by the government as it was not provided to Mr. Carpenter. This document is the sworn testimony of Bruce Mactas on December 6, 2010, in the arbitration proceedings conducted by the American Arbitration Association in the matter of *Universitas Education, LLC v. Nova Group, Inc.*, concerning Sash Spencer's death benefit in the Charter Oak Trust. Mr. Carpenter would respectfully assert to the Court that he feels that the attorney for Universitas, Paula Colbath, was working hand-in-glove these past seven years with both AUSA Novick and Agent Allen in order to put pressure on Mr. Carpenter through prosecution by the government, because Mr. Carpenter's company Grist Mill Capital was dismissed prior to the beginning of the arbitration, and Mr. Carpenter was dismissed **after** the arbitration was completed.

Despite being dismissed from the Universitas Arbitration, while Mr. Carpenter was at FPC Canaan and unable to defend himself, Ms. Colbath was able to successfully make a fraudulent conveyance claim against Mr. Carpenter, and actually filed that judgment with this Court. By accepting the validity of said judgment, this Court recognized Judge Swain's decision that the Charter Oak Trust was a bona fide 419 welfare benefit plan and trust and that the Sash Spencer proceeds were bona fide insurance proceeds and the benefit claim of Universitas was superior to the "secured creditor" claim of Grist Mill Capital as the funder of the Charter Oak Trust policies. If the government is correct that the Sash Spencer policy was procured by fraud, this Court should vacate the Universitas judgment *sua sponte*. However, if Judge Swain is correct that the Charter

8

Oak Trust was a bona fide welfare benefit plan and trust and that there were no misrepresentations on the Sash Spencer applications, and the net insurance proceeds should have been paid to Universitas, then Mr. Carpenter is entitled to a new trial in the interests of justice. At that new trial, Mr. Carpenter will call Mr. Mactas to testify for the defense. The reason Mr. Carpenter needs to make that point is that at trial, Mr. Carpenter stated without equivocation that the famous "four questions" on the Lincoln applications were answered correctly. Mr. Mactas also asserts in his testimony during the Universitas Arbitration that those same questions on the Sash Spencer applications were answered truthfully and accurately.

Mr. Carpenter testified that the Sash Spencer application questions were answered correctly, and Mr. Mactas testified that the questions were answered honestly, accurately, and truthfully, and after a year-long investigation, Lincoln obviously believed him, and the two agents on the Sash Spencer application (Mr. Mactas and Mr. Trudeau) are still licensed agents with Lincoln. Since Lincoln did not terminate either agent, Lincoln believes the Sash Spencer policies were issued in good faith and the questions were answered honestly or accurately, or the questions, if not answered correctly, means the questions were not material to the insurance carrier's decision making, so it was not mail and wire fraud in any event. Therefore, just based on Mr. Mactas and his testimony in the Universitas Arbitration hearing, this Court should vacate its verdict and order a new trial for Mr. Carpenter based on this apparent *Brady-Giglio-Bagley* violation.

### A. *The Mactas Arbitration Testimony*

For the ease of the Court, Mr. Carpenter will focus the Court's attention on the specific pages of the Mactas arbitration testimony relevant to this brief. Mr. Carpenter's wife received this information from another party in litigation with Universitas a month ago, and Mr. Carpenter's attorneys have not yet fully reviewed this material. Because the testimony is from December 6,

9

2010, Mr. Carpenter is not asserting this as newly-discovered evidence, but would rather suggest that the Court read these excerpts and then the entire transcript if it should please the Court. Moreover, Mr. Carpenter's name is only mentioned once, and Mr. Mactas states that he does not know Mr. Carpenter nor did he have any contact with him. This, of course, destroys the government's whole theory of the case that Mr. Carpenter was somehow in a "conspiracy" with these people he never met, to allegedly deprive the carriers of valuable information they needed for their economic decision making (none of which was alleged in the indictments). More importantly, Mr. Mactas is a well-respected agent of Lincoln, and he clearly had knowledge and insight into the true workings and benefits of the Charter Oak Trust as Mr. Carpenter testified to at trial.

In his testimony during the Universitas arbitration hearing, Mr. Mactas makes the following positive affirmations, all of which are extremely beneficial to Mr. Carpenter's claims of innocence:

P. 80:    **Q**: …Tell me the advantages that you were told about by anyone at Charter Oak Trust or the related entities that do not appear on Exhibit 214.

   **A**: It was mainly the funding arrangement that would be available to employers.

P. 88:    **Q**: And do you recall why you had Mr. Spencer sign this [Mactas firm HIPAA form] on or about May 17, 2006?

   **A**: Because we were going to be initiating the underwriting process, which involves collecting attending physicians' statements from Mr. Spencer's doctors and an insurance exam. (N.B. – This is well before the creation of the Charter Oak Trust and the funding agreement with Ridgewood at the end of February 2007.)

P. 92-93:  **Q**: If you turn to page five—well, 4A states: "Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider?"

It says: "If yes, provide the details." And the box "no" is checked. As far as you know, was that true and accurate as to Mr. Spencer at the time this application was submitted to Lincoln Life?

**A**: That's correct.

**Q**: And 4B states: "Have you ever sold a policy to a life settlement, viatical, or other secondary market provider? If yes, provide details."

And the box for "no" is checked. To your knowledge, was that a true statement –

**A**: Yes.

P. 98: **Q**: And was everything in that certification true and accurate at the time you put your signature there?

**A**: **Yes**.

**Q**: -- with regard to Mr. Spencer at the time that this application –

**A**: **Yes**.

**Q**: -- was submitted to Lincoln Life?

**A**: **Yes**. (Emphasis added).


P. 110-11: **Q**: Okay. Paragraph ten states: "The insured has the option of acquiring the policy from the trust at any time on terms to be mutually determined by the trust and the insured." That is the preprinted text. And then there is some handwritten addition. Do you see that?

**A**: Yes.

**Q**: Can you tell me what the handwritten addition says?

**A**: "But no event at a cost than is set forth in number nine above."

**Q**: Whose handwriting is that in paragraph ten?

**A**: Mr. Spencer

**Q**: Did you have a discussion with him about adding that language?

**A**: I did.

11

**Q:** And can you tell us about those discussions?

**A:** Mr. Spencer saw A through D as the deal, and that those were the fees to the deal. He saw paragraph ten as an extension of the deal and felt that those terms should be the same as outlined in A through D – again, asked me to speak with them about it, which I did, and it was agreed to.

P. 111-12: **Q:** We will go to paragraph 13 on the document: "The insured" – it states, "The insured understands and appreciates the nature and the magnitude of the risks assumed by him in entering into the transactions contemplated by the funding arrangement. The insured voluntarily and knowingly makes the" decisions – "decision to take those risks, free of any coercion or duress."

Do you have an understanding as to what risks are being referred to there?

**A:** Not specifically, but there are general risks.

**Q:** What are the general risks?

**A:** One that might come to mind is that, on a face amount of this size, the insurance company might require Mr. Spencer to take a stress test. If he takes that stress test, then it involves exerted exercise. There could be a problem during that exerted exercise. I am speculating. That is just one risk. Anything can happen.

P. 112: **Q:** Look at paragraph 15. It's longer. I will let you read it to yourself and just confirm that at the time that Mr. Spencer signed this adoption agreement, on December 17, 2006, to the best of your knowledge, that was a true statement?

**A:** It's a true statement.

P. 113: **Q:** Now, am I correct that paragraph ten contemplates Mr. Spencer acquiring the policy from the trust, right?

**A:** Yes.

**Q:** And paragraph 17 states: "The insured understands that, if at some point in the future he wishes for the policy to be sold, a settlement sale of the policy may not be appropriate or desirable for various reasons." Do you see that?

**A:** Yes.

**Q:** Do you recall if – at the time this adoption agreement was signed by Mr. Spencer, had you had any discussions concerning settling the policy at that point?

**A:** No.

12

**Q:** By the way, did Mr. Spencer to your knowledge ever meet with anyone at Charter Oak Trust?

**A:** He did not.

**Q:** In person?

**A:** Not that I know of.

P. 132-34: **Q:** And number paragraph – paragraph number four states: "The policy is not being purchased with the intent of selling it in the settlement or viatical sale, and there have been no offers to sell or buy the policy. Neither agent nor funder nor the trust have recommended such a sale."

When you signed this document on March 19, 2007, was that statement true?

**A:** Yes.

**Q:** Paragraph seven states: "No rebate to the participant slash insured or remuneration to the agent of any kind has been offered." Do you see that?

**A:** Yes.

**Q:** As of March 19, 2007, when you signed this document, was that a true statement?

**A:** Yes.

**Q:** Now, if you look at page 36, paragraph ten addresses the fees to be paid in connection with the transaction, correct?

**A:** Yes.

**Q:** And the fees set forth in 10A, 10B, 10C related to the $20 million policy, correct?

**A:** Correct.

**Q:** Now, 10C, the amount that has been reduced from 3 percent to 2 percent; do you see that?

**A:** Yes.

**Q:** And then someone has written an initial; do you see that?

**A:** Yes.

**Q:** Is that Mr. Spencer's initial?

13

**A**: Yes.

P. 135-36: **Q**: That statement says: "The participant slash insured has the option of acquiring the policy from the trust at any time on terms" – he inserts "reasonable" – "on reasonable terms that release the plan from ongoing benefit obligations and such other terms to be mutually determined by the trust and the participant slash insured."

When you placed your signature on this document on March 19, 2007, did you understand that to be true?

**A**: Yes.

**Q**: And you understood that, pursuant to that paragraph, Mr. Spencer had the option to purchase the policy from the trust, right?

**A**: Yes.

**Q**: Now...paragraph 18: "The participant/insured understands that, if, at some point in the future he/she wishes for the policy to be sold, a settlement sale of the policy may not be appropriate" for desire – "or desirable for various reasons."

As of March 19, 2007, did you understand that statement to be true?

**A**: Yes.

P. 159-60: **Q**: Was everything on each of those applications true and accurate as of the time you signed the application.

**A**: **YES**. (Emphasis added).

P. 352-53: **Q**: Now, did you know Bill Hutchinson before December of 2006?

**A**: I did.

**Q**: And so how did it come about that Bill Hutchinson was introducing you to Don Trudeau in connection with the Charter Oak Trust?

**A**: I had somewhat of a business friendship with Bill over a lot of years. I had done some stop loss health insurance business with him years and years ago. And we had kept in touch through the friendship. He had a friendship with Don. He may still have that friendship. I am not privy. And he introduced me to Don as a great guy with some really good ideas. I met Don and agreed with him.

**Q:** And can y□st in general that you were meeting Don, or it was specifically related
      encer?
  **:** Mr. Spenc□

**A** He saw pa□specifically – it was specific to the concept of the Charter Oak Trust.
  be the sam□

**Q** it, which I

**A:** We will g□hing to do with Sash Spencer at the time.
  insured un

**Q** assumed □at what point in 2006 did you learn about the Charter Oak Trust?
  arrangeme□

**A** "decision □as the fall of 2006.

P. 354-55: **Q** Do you ha□sted you in the Charter Oak Trust?

**A:** Not specifi□was a clever way to procure insurance.

**Q:** What are t□u – what made it so clever?

**A:** One that m□ is a very bright guy.
  company n

**Q** then it inva□t made you think that the Charter Oak Trust was a clever way to procure
  exercise. I

**A:** Look at pa□at the insurance was funded, you know, **was acceptable to the carriers**.
  that at the □

**Q** 2006, to th□ what?

**A:** It's a true sr Oak Trust had millions and millions of dollars of cash, as I understand
      □t permitted the client to answer the question on the application – or not
  **:** Now, am I □ the owner, the Charter Oak Trust, as to say that they were not financing
  from the tr and the owner of the – the owner – it was the funding arrangement that
      active.

  **:** Yes.

**Q**         er attraction the fact that the insured did not have to pay for premiums?
  **:** And parag

**A** future he v (Emphasis added).
  be appropr

P. 355: **Q**       □ you learned about the Charter Oak Trust not specifically in connection
  **:** Yes.    pencer. So my question is –

**A:** Do you rec generally, yes.
  had you ha

**Q**       □ so when – what made you put Sash Spencer together with the Charter
  **:** No.

**A:** There were many different choices for how to finance a life insurance policy that I was considering. The Charter Oak Trust was one of those choices. I could have gotten this deal done otherwise. I wanted to do business with my friend Bill Hutchinson.

Okay. In addition to that, it was a very clever arrangement because it enabled me to answer a question on the Lincoln application truthfully. And the, client yes, did not have to fund premiums.

P. 356: **Q:** And what interest – what interest – what interested Mr. Spencer in the plan?

**A:** Well, he liked the concept that he could be – we could be forthcoming with the insurance company through the 419 plan being the owner and answering that question a certain way, and only having the **policy** as collateral on the funding arrangement.

**Q:** Were you considering products that you could not be forthcoming with the insurance carrier on?

**A:** **No.** (Emphasis added).

See Excerpt attached as **Exhibit One**

### B. *General Principles Governing the Government's Disclosure Obligations*

By excluding from Mr. Carpenter's trial both Mr. Mactas and his exculpatory testimony from the Universitas Arbitration concerning the Sash Spencer policies, the government was allowed to tell a very stilted and one-sided, biased story that conflated emails from a number of different people associated with different companies and ventures operating out of 100 Grist Mill Road and elsewhere, as well as the Stanford offices of Benistar, where J. Edward Waesche and Don Trudeau worked, despite the fact that most of these people and ventures had nothing to do with Mr. Carpenter, Grist Mill Capital, or the Charter Oak Trust. As the Second Circuit explained recently in *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72 (2d Cir. 2014) ("*CES*"), "[u]nder *Brady* and its progeny, the government has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt or to punishment." *Id.* at 91, *quoting United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). In that context:

16

> [t]here are three components of a true *Brady* violation:
> (1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the [government], either willfully or inadvertently; and (3) prejudice must have ensued. *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003), *quoting Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). *CES*, 753 F.3d at 91.

*See Moore v. Illinois*, 408 U.S. 786, 794-95 (1972), and *United States v. Thomas*, 981 F.Supp.2d 229, 233 (S.D.N.Y. 2013) ("[w]hen *Brady* material is withheld, the government's case is 'much stronger, and the defense case much weaker, than the full facts would have suggested'"), *citing Kyles v. Whitley*, 514 U.S. 419, 429 (1995). Regarding the prong by which *Brady* material is defined, in *CES*, the Second Circuit pointed out that:

> "evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed the result of the proceeding would have been different, such that the failure to disclose undermine[s] confidence in the verdict. *Cone v. Bell*, 556 U.S. 449, 469-70 (2009), *quoting Kyles v. Whitley*, 514 U.S. at 435." *CES*, 753 F.3d at 91.

The standard for the inquiry regarding prejudice, as the Supreme Court explained in *Kyles v. Whitley*, asks not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles,* 514 U.S. at 434. *See, also, Lambert v. Beard*, 537 Fed. Appx. 78, 87 (3d Cir. 2013), *after remand by, Wetzel v. Lambert*, 565 U.S. 520 (2012), *vacating and remanding*, 633 F.3d 126 (3d Cir. 2011).

As the Court in *Kyles* noted, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal...[M]ateriality is a reasonable probability of a different result, and the adjective is important." *Kyles* at 434. *See, also, Thomas*, 981 F.Supp.2d at 242-43. A reasonable probability of a different outcome "is not a sufficiency of evidence test," and thus, does not require that the "evidence would have rendered the evidence as a whole insufficient to support a

17

Q *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995), *quoting Kyles*, 514 U.S.

er, evidence must be disclosed if it "could reasonably [have been] taken to put the
A
ı such a different light as to undermine confidence in the verdict." *Coppa*, 367 F.3d
Q
*Kyles*, 514 U.S. at 435.
A
ıe Second Circuit has held, even when evidence may be both inculpatory and
Q
its disclosure is not thus precluded under *Brady*. *See United States v. Mahaffy*, 693
A
Э (2d Cir. 2012) ("[t]he fact that the government is able to argue that portions of the
P. 354-55: Q
ere consistent with the prosecution's theory failed to lessen the exculpatory force" of
A
g parts); *see also United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004). In
Q
even when exculpatory evidence is disclosed, a *Brady* violation can still occur if the
A
untimely. As the court in *Thomas* stated, "[e]vidence is suppressed when the
Q
es not disclose it 'in time for its effective use at trial." 981 F.Supp.2d at 239, *quoting*

A⁊.3d at 135, *and citing United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

QCircuit in *CES* elaborated that:

A aspect of *Brady* affects not only what the government is obligated to disclose, but
it is required to do so. Temporally, the timing of a disclosure required by *Brady*
ependent upon the anticipated remedy for a violation of the obligation to disclose: the
cutor must disclose...exculpatory and impeachment information no later than the
at which a reasonable probability will exist that the outcome would have been
ent if an earlier disclosure had been made. *CES*, 753 F.3d at 92, *quoting Coppa*, 267
Qat 142.

As have also encouraged prosecutors to err on the side of disclosure for reasons of

P. 355: Qvell as fairness. As the court in *Cone v. Bell* cautioned, "[a]s we have often observed,

ırosecutor will err on the side of transparency, resolving doubtful questions in favor
A
." *Id.* at 470, *citing Kyles*, 514 U.S. at 439, *Bagley*, 473 U.S. at 711, n.4, *United States*
Q
U.S. 97, 108 (1976). *See, also, United States v. Van Brandy*, 726 F.2d 548, 552 (9th

18

Cir. 1984) ([W]here doubt exists as to the usefulness of evidence, [the prosecutor] should resolve such doubts in favor of full disclosure...). As the Court in *Thomas* recognized, questions about the reliability of exculpatory information are judgment calls for a defendant and his counsel, not the government; "to allow otherwise would be to appoint the fox as henhouse guard." *Thomas*, 981 F.Supp.2d at 241, *quoting DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006).

Thus, in contemplating whether and when to disclose, "[t]he government must bear in mind, however, that it has the affirmative duty to resolve doubtful questions in favor of disclosure, and that if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [government]." *United States v. Hsia*, 24 F.Supp.2d 14, 30 (D.D.C. 1998). Thus, when the "exculpatory character harmonize[s] with the theory of the defense case", failure to disclose that evidence in a timely fashion before the start of a trial, when the defense counsel can take advantage of it, constitutes a *Brady* violation. *United States v. Triumph Capital Group*, 544 F.3d 149, 164 (2d Cir. 2008).

As the Second Circuit explained in *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001), "[t]he opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. *Id.* at 101-03. *See, also, Thomas*, 981 F.Supp.2d at 240; *St. Germain v. United States*, 2004 WL 1171403, at *18 (S.D.N.Y. May 11, 2004) (defense strategies are largely formed prior to trial...and the necessary predicate is that the strategies selected were chosen after careful consideration of all constitutionally-compelled disclosure). Consequently, as the Second Circuit described Mr. Carpenter's similar situation in *Leka*:

> [w]hen such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.

*Leka*, 257 F.3d at 101, *citing United States v. Washington*, 294 F.Supp.2d 246, 250 (D. Conn. 2003) (government's failure to disclose evidence impeaching the central witness until after the first day of trial prejudiced defendant because the late disclosure prevented defense counsel from investigating and planning overall trial strategy. Indeed, even in *CES*, in which the Second Circuit did not find a *Brady* violation because, *inter alia*, the notes at issue "were at best marginally helpful to the defense[,]" 753 F.3d at 93, and the undisclosed reference in the notes "was not inconsistent with [the prior] testimony[,]" *id.*, the Second Circuit nevertheless added that:

> [t]his is not to suggest, however, that the prosecutors did nothing wrong in failing to disclose [the] handwritten notes along with the typewritten summaries. To begin with, we see no reason – and the government offers none – why the prosecutors here could not and should not have acted in favor of disclosing the *Brady* material earlier. *Id.*, *quoting United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008).

Also, the timeliness requirement incorporated in the *Brady* disclosure obligation compels disclosure of materially favorable evidence in sufficient time to permit the defense the opportunity to use it effectively before trial. *Coppa*, 267 F.2d at 142 (whether the disclosure is made in a timely fashion depends on the "sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made"); *see also United States v. Solomonyan*, 451 F.Supp.2d 626, 644-45 (S.D.N.Y. 2006). Thus, implicit in the government's *Brady* obligation is the requirement that the defense is able to use the materially favorable evidence, even if only to uncover additional exculpatory evidence. *See, e.g., United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (materially favorable evidence, even if not admissible itself, must be disclosed pursuant to *Brady* if it "could lead to admissible evidence"). Indeed, in *Gil*, the inclusion of critical exculpatory (and impeachment) information in boxes of documents produced pursuant to 18 U.S.C §3500 the weekend prior to trial was deemed insufficient notice. *Id.* at 106-07.

20

Moreover, delaying disclosure until it is contemporaneous with production of § 3500 material does not absolve the government of its responsibility to disclose exculpatory material and information in time for the defense's effective use at trial. As the Court in *Hsia* recognized, "the existence of a duty to disclose witness statements at trial pursuant to the Jencks Act, 18 U.S.C. §3500, does not eviscerate the government's *Brady* obligation to disclose witness statements well in advance of trial if portions of those statements also fall under *Brady*. *See Hsia*, 24 F.Supp.2d at 29, *citing United States v. Tarantino*, 846 F.2d 1384, 1414 n.11 (D.C. Cir. 1988). As the Court in *Hsia* pointed out, "[t]his is important because the government is required to disclose *Brady* material in sufficient time for the defendant to use the favorable material effectively in the preparation and presentation of its case, while Jencks material is not required to be disclosed until after the witness has testified." *Id.* at 29. *See, also, Thomas*, 981 F.Supp.2d at 241 ("[t]he government's argument conflates its Jencks Act and *Brady* obligations. While those responsibilities overlap at times, they are distinct legal concepts. The Jencks Act is concerned with discovery to be produced by the government. *Brady* is concerned with fairness").

The Court in *Thomas* further recognized a reactive defense maneuver "after a late *Brady* disclosure is no substitute for thoughtful preparation and a considered strategy." *Brady* material must be provided to a defendant "in time for its *effective* use at trial." *Thomas*, 981 F.Supp.2d at 242, *quoting Coppa*, 267 F.3d at 135 (emphasis supplied in *Thomas*), *and citing Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir. 1974) (refusing to infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on [the suppressed witness], that defense counsel would have by-passed the opportunity had the prosecutor apprised him of the [evidence] at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information).

21

**C.** *The Government Failed to Turnover any Exculpatory Evidence to Mr. Carpenter*

In *Thomas*, the Second Circuit also emphasized "the importance of the manner of the government's disclosure." *Id.* at 240, *citing Gil*, 297 F.3d at 93 (labeling *Brady* evidence as § 3500 material and producing it as part of a large § 3500 production on the eve of trial constitutes suppression), and *United States v. Breit*, 767 F.2d 1084, 1090 n.4 (4th Cir. 1985) (government may not discharge its *Brady* obligation merely by tendering a witness without providing any indication that the witness's testimony may be helpful to defense). In that context, "the government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials." *Thomas*, 981 F.Supp.2d at 239, *citing United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part and vacated in part on other grounds*, 561 U.S. 358 (2010) (suggesting that *Brady* violations related to voluminous open file discovery depend on what the government does in addition to allowing access to a voluminous open file). *See, also, Hsia*, 42 F. Supp. 2d at 29-30 ([g]overnment cannot meet its *Brady* obligations by providing…600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information). In Mr. Carpenter's case, the government turned over hundreds of thousands of documents, comprising millions of pages of computer records, but did not turn over a single piece of exculpatory evidence as the government is obligated to do. Using the above metaphor mentioned in *Skilling*, the government turned over a thousand haystacks to Mr. Carpenter's attorneys, but not a single "exculpatory needle" - not even one.

Thus, this Court should grant Mr. Carpenter's Rule 33 Motion because the government failed to produce exculpatory material in a timely fashion that would have permitted the defense effective use of the material and information at trial. Moreover, while the government's intent is not required for a *Brady* violation, in this case the government's concealment was clearly willful

and calculated, as Mr. Carpenter contends all of the government's acts were designed to deprive Mr. Carpenter of a fair trial and a level playing field. It provided a miniscule percentage of information it possessed regarding millions of emails, and none that were exculpatory for Mr. Carpenter. That constituted material non-disclosure that was only aggravated by the government's manipulation of the timeframe to delay Mr. Carpenter's trial for the Connecticut charges until he was imprisoned at Canaan.

## V.   A NEW TRIAL IS REQUIRED IN THE INTERESTS OF JUSTICE BECAUSE THE GOVERNMENT DEPRIVED MR. CARPENTER OF HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO PREPARE, ASSIST IN, AND PRESENT HIS BEST POSSIBLE DEFENSE

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to **present** a complete **defense.**" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "[T]he erroneous exclusion of critical, corroborative defense may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense. *Young v. Conway*, 761 F.Supp.2d 59, 77 (W.D.N.Y. 2011) *citing Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), *affirmed* 698 F.3d 69 (2d Cir. 2012). In *Chambers*, Mississippi's "voucher" rule prevented a defendant from impeaching a witness who had previously confessed to the crime. The Supreme Court determined that the rule, "as applied in this case, plainly interfered with [the defendant's] right to defend against the State's charges." *Chambers*, 410 U.S. at 298.

A defendant has a right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This right is violated when the State arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense. *Washington v. Texas*, 388 U.S. 14, 23 (1967). The guarantee, of course, encompasses the right to compel the attendance of witnesses favorable to one's defense. *See, e.g., United States v. Taylor*, 562 F.2d 1345, 1361-62 (2d Cir. 1977). In Mr. Carpenter's case, however, he was

deprived of favorable witnesses because anyone who appeared to be a witness in his favor was accused of being a "co-conspirator", and threatened with possible prosecution. There is no doubt that the government effectively intimidated a number of Mr. Carpenter's potential favorable witnesses. (*See* Declaration of Daniel E. Carpenter, paragraph 6, attached as **Exhibit Two**).

The public conscience must be satisfied that fairness dominates the administration of justice. An accused must have the means of presenting his best defense. The accused must have time and facilities for investigation, and for the production of evidence. But evidence and truth are of no avail unless they can be adequately presented. Essential fairness is lacking if an accused cannot present his case effectively in court. *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942).

The Sixth Amendment includes a compact statement of the rights necessary to a full defense:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

> Because these rights are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States. The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice— through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. *See Faretta v. California*, 422 U.S. 806, 818 (1975), *citing California v. Green*, 399 U.S. 149, 176 (1970).

The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his best defense. "It is the accused, not counsel, who must be informed of the nature and cause of the accusation, who must be

confronted with the witnesses against him, and who must be accorded compulsory process for obtaining witnesses in his favor. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Faretta*, 422 U.S. at 819-20.

The Supreme Court's decision in *Faretta* is based largely on two Second Circuit cases, *United States v. Plattner*, 330 F.2d 271 (2d Cir. 1964), and *United States ex rel. Maldonado v. Denno*, 348 F.2d 12 (2d Cir. 1965), where the Second Circuit emphasized that the Sixth Amendment grants the accused the rights of confrontation, of compulsory process for witnesses in his favor, and of assistance of counsel as minimum procedural requirements in federal criminal prosecutions. The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair the absolute and primary right to conduct one's own defense. *Plattner* at 274. On these grounds, the Second Circuit held that implicit in the Fifth Amendment's guarantee of Due Process of law, and implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is the right of the accused personally to manage and conduct his own defense in a criminal case. *Plattner* at 274. *See also Denno*, 348 F.2d at 15. These, then, are the concerns for the criminal adversary process which animate both the majority decision and dissents in *Faretta*: that the accused have the opportunity to present his best defense; that the accused perceive the criminal justice process as fair; and that the public have confidence in the fairness of the adversary process.

Each of these concerns of the Second Circuit and the Supreme Court are flouted when a defendant like Mr. Carpenter, who has been unable to prepare an adequate defense much less his "best defense" because of pretrial incarceration, confronts the adversary process. An accused who cannot research an indictment cannot present his best defense because he has no way of discovering what possible defenses exist; a defendant who has been restrained from interviewing

witnesses and conducting an investigation has little chance to present any defense at all, let alone his "best defense." It would be difficult for an incarcerated defendant to perceive the criminal justice process as fair when that process holds out with one hand the right to assist in his own defense, yet with the other prevents him from effectively exercising that right—especially when most other defendants, free on bail as Mr. Carpenter would have been, may exercise the "traditional right to freedom before conviction [that] permits the unhampered preparation of defenses." Nor can the public have much confidence in an adversary process in which a defendant not only faces a team of trained government lawyers, but also has been prevented by the government from acquiring the rudimentary computer access or access to his attorneys and evidence that he needs in order to present his case. Finally, the greatest violation of Due Process may be in the case of a defendant who is unable to prepare because he is incarcerated. In short, the concerns animating *Faretta* are violated when an incarcerated defendant is denied the opportunity to prepare his defense as the government clearly did to Mr. Carpenter in this case.

[The accused] "must have the means of presenting his best defense," and to this end he must have complete access to and confidence in his counsel. *Denno*, 348 F.2d at 15. As the Supreme Court said in *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942), "[The defendant] must have time and facilities for investigation and for the production of evidence. But evidence and truth are of no avail unless they can be adequately presented. Essential fairness is lacking if an accused cannot put his case effectively in court." *Id.* at 279.

Due process is involved only marginally with who wins or who loses; its primary focus is on how the accused was brought to trial and how his case was tried. The judicial system's credibility depends on this. Crucial to this credibility is the defendant's own determination of his defense, i.e., his trial strategy, his theory of defense, his decision whether or not to take the witness

stand. The choice should be left to him because he has the most to lose if the choice is wrong and the community-at-large must not be allowed to believe that the fate of an accused was sealed before trial began due to government dictation as to methods of defense. The same due process considerations that allow a defendant to choose his defense also require that he be allowed the choice of representing himself. Without this right of choice, the defendant becomes a mere spectator at his trial, his destiny to be decided by a system over which others exercise complete control.

The fundamental importance of the right of an accused "personally to manage and conduct his own defense in a criminal case" *United States v. Plattner*, 330 F.2d 271, 274 (2d Cir. 1964) is truly the heart of the Sixth Amendment. In our system of justice, just as every defendant has an absolute right to the presumption of innocence and to counsel, every defendant has a right to assist in his own defense. This includes assistance in counsel's cross-examination of witnesses, in the selection and preparation of defense witnesses, and in the decision whether the defendant should take the stand. When a defendant is incapable of rendering such assistance in any substantial or meaningful way as happened in Mr. Carpenter's case, there can still be a trial, to be sure—but it would not be a fair one under our Constitution, and any conviction would be inherently defective. This is not because there may be no evidence of guilt, but rather because the defendant would have been denied a fundamental right that must always be available to all defendants. If left standing, such a conviction would violate the constitutional guarantee of due process and the principles of justice on which our society is based, and which predate even our Constitution. *See United States v. Helmsley*, 733 F.Supp. 600, 605 (S.D.N.Y. 1989), *citing Drope v. Missouri*, 420 U.S. 162, 171 (1975).

The Supreme Court has explained that "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope* at 171. The prohibition against forcing such a defendant to proceed to trial, the Supreme Court concluded, "is fundamental to an adversary system of justice." *Id.* at 172. On another occasion, the Supreme Court determined that "it is not enough ... that the defendant is oriented to time and place and has some recollection of events ... [T]he test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (citation omitted).

While Mr. Carpenter is in no way saying that he was mentally incapacitated, he still feels strongly that his rights to prepare and present his best defense were compromised because he was shackled every day, detained at Wyatt, and was suffering from both a heart condition and a terrible case of Cellulitis. (*See* Carpenter Decl. paragraphs 13-18). Several purposes are served by this rule that bars trying a defendant who remains unable to assist in his own defense. First, it helps safeguard the accuracy of any adjudication. Second, and more important, as the Supreme Court has recognized, it preserves the fundamental rights of the defendant. Those rights include his right to consult with counsel, to testify in his own behalf, to confront hostile witnesses and generally to comprehend the evidence presented against him at trial.

Although this brief concentrates on a due process right to an adequate opportunity to prepare and present a defense, it might also be argued that the Sixth Amendment rights to be informed of the nature and cause of the accusation, to be confronted with witnesses, and to have compulsory process for obtaining witnesses by implication include the right to the preparation

necessary to exercise these rights. The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice—through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. *Faretta* 422 U.S. at 818. Yet if a defendant's calling and interrogating favorable witnesses, cross-examination of adverse witnesses, and introduction of evidence is to be more than mere charade, he must have the opportunity to prepare for trial. Mr. Carpenter was necessarily deprived of those rights by being detained at Wyatt where he did not have internet access or any ability to prepare for and assist in his defense.

American courts have traditionally followed Blackstone's "ancient" English rule, that ("[O]ne at the trial should have the unrestrained use of his reason, and all advantages, to clear his innocence. Our American courts adhere pretty closely to this doctrine" *Deck v. Missouri*, 544 U.S. 622 (2005) (internal quotation marks omitted)).

WHEREFORE, it is respectfully requested a New Trial be ordered pursuant to F. R. Crim. Pro. 33:

                     **Respectfully submitted,**
                     Defendant, Daniel Carpenter

By _____

                     Richard R. Brown, Esq.
                     Brown Paindiris & Scott, LLP
                     100 Pearl Street, 2nd Floor
                     Hartford, CT 06103
                     Tel 860.522.3343
                     Fax 860.522.2490
                     Fed. Bar Ct00009
                     rbrown@bpslawyers.com

## **CERTIFICATION**

This is to certify that March 15, 2017, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009