# EXHIBIT ONE

Page 1

```
 1
 2
 3           THE AMERICAN ARBITRATION ASSOCIATION
 4              AAA Case No. 13 195 Y 1558 10
 5        IN THE MATTER OF THE ARBITRATION BETWEEN
 6    ------------------------------------------
 7    UNIVERSITAS EDUCATION, LLC,
              Claimant,
 8
          vs.
 9
      NOVA GROUP, INC.,
10
              Respondents.
11
      ------------------------------------------
12
13                      VOLUME I
14
15
16          TRANSCRIPT of the stenographic
17    notes of the proceedings in the
18    above-entitled matter, as taken by and
19    before TAB PREWETT, a Registered
20    Professional Reporter, a Certified
21    Shorthand Reporter, a Certified LiveNote
22    Reporter, and Notary Public, held at the
23    Offices of EPSTEIN, BECKER & GREEN LLP, 250
24    Park Avenue, New York, New York, on Monday,
25    December 6, 2010, commencing at 9:30 a.m.
```

Page 62

Universitas v. Nova Group

As housekeeping, if you can, if you think of it, if somebody has access to tabs and binders just so I can keep my stuff with three-hole punched, that would be a lot easier for tomorrow.

MS. COLBATH: We will furnish that. We had thought we brought that with us.

THE ARBITRATOR: Excellent. Anything else?

MR. ORDER: That's it.

MS. COLBATH: Okay.

THE ARBITRATOR: Just one proceeding -- I don't know if anybody has any time limitations on any of the three days. I would sort of do this Federal Court style of going about an hour and a half with the 10- or 15-minute break going to about 12:30, or 1, breaking for an hour at lunch, going till 5 each day -- is sort of how I would anticipate. But if any of the parties of counsel have specific needs in a given day, otherwise, I am

Page 63

Universitas v. Nova Group

certainly willing to accommodate that.

MS. COLBATH: Fine.

MR. PASTORE: I am -- I have got to be in a hearing at 4 o'clock on Wednesday here in New York. I will leave a little earlier just so you know.

MS. COLBATH: Is the gentleman who joined us Mr. Egan?

MR. ROBINSON: No, he's Mauricio Agudelo. He's my assistant.

MS. COLBATH: Is he employed by one of the respondents?

MR. ORDER: Yes.

MR. ROBINSON: Benistar Admin Services, Inc.

MS. COLBATH: Could I have Mr. Robinson's comment? I think he said he is my associate or something.

MR. ROBINSON: My assistant.

THE ARBITRATOR: Okay. Do you want to get your first witness?

(There was a discussion off the record.)

Page 64

Universitas v. Nova Group

MS. COLBATH: This is Sharon Siebert, who is a principal of Universitas Education LLC. She was waiting outside. I told her that she come in. She didn't realize that.

MR. ORDER: That's fine.

(There was a discussion off the record.)

B R U C E   J.   M A C T A S, doing business at Mactas, Alper & Szrolovits, 292 Madison Avenue, Seventh Floor New York, New York 10017, having been sworn by the notary public to testify to the truth, testified as follows:

DIRECT EXAMINATION
BY MS. COLBATH:

Q Good morning, Mr. Mactas.
A Good morning.
Q As you know, my name is Paula Colbath. And I am with the firm of Loeb & Loeb LLP. We represent claimant Universitas Education LLC in this arbitration.

Page 65

Universitas v. Nova Group

Could you state your full name for the record?
A Bruce J. Mactas.
Q And what is your current business address?
A 292 Madison Avenue, Seventh Floor, New York, New York 10017.
Q Could you give us a very brief educational background?
A I have a B.S. in finance from Lehigh University. I graduated in 1982.
Q And by whom are you currently employed?
A My main employer is Mass Mutual.
Q And do you have any other employers?
A The name of my firm is Mactas, Alper & Szrolovits.
Q And what is your position at Mactas, Alper & Szrolovits?
A Szrolovits. I am the managing partner.
Q And when was that firm

17 (Pages 62 to 65)

Page 78
Universitas v. Nova Group

1 Group, Inc.?
2 A    I don't specifically know. I
3 didn't ask him, and I didn't think it was
4 relevant to what we were discussing.
5 Q    Okay. Sorry to do this. We
6 are going to have to do some toggling. If
7 you could get, I believe it's --
8     MR. ORDER: If we are
9     "toddling" here, we are in big
10    trouble.
11    MS. COLBATH: "Toggling."
12 Q    Exhibit 214, so just keep --
13 try and --
14 A    Keep it open.
15 Q    You are going to be using the
16 first notebook for the most part today, but
17 I want you to take a look at 214; so it's
18 probably in exhibit volume four.
19     (Exhibit No. 214, Documents to
20    implement Charter Oak Trust for Mr.
21    Spencer is introduced and accepted
22    into the record.)
23 Q    Have you ever seen that
24 document before? Take your time.

Page 79
Universitas v. Nova Group

1 A    I have.
2 Q    And, approximately, when did
3 you see it for the first time?
4 A    I don't have a specific
5 recollection, but I would think it would be
6 November, December of 2006.
7 Q    Okay. And what were the
8 circumstances under which you saw
9 Exhibit 214?
10 A    Mr. Sash Spencer was the first
11 negotiation I was having in the Charter Oak
12 Trust. When it became time to implement,
13 these were the documents required to
14 implement. And that was the first time
15 that I had occasion to see these documents.
16 Q    What were you told were the
17 benefits of the Charter Oak Trust -- strike
18 that.
19     Were you told of any benefits
20 other than those that are set forth on
21 Exhibit 214?
22 A    I would like to take a moment
23 to read them.
24 Q    Sure.

Page 80
Universitas v. Nova Group

1 A    Sir, would you mind repeating
2 the question.
3     (Reporter read back pending
4     question.)
5 A    I would say yes.
6 Q    Okay. Tell me about the
7 advantages that you were told about
8 regarding -- let me finish. Just so that
9 we have a clear record, let me finish the
10 question and then -- then you can start.
11     Tell me the advantages that you
12 were told about by anyone at Charter Oak
13 Trust or the related entities that do not
14 appear on Exhibit 214.
15 A    It was mainly the funding
16 arrangement that would be available to
17 employers.
18 Q    If you could put before you
19 Exhibit 104, which contains the obituary of
20 Mr. Spencer, and turn to page LFG 330.
21     (Exhibit No. 104, Document with
22    Obituary of Mr. Spencer, Bates No. LFG
23    330, is introduced and accepted into
24    the record.)

Page 81
Universitas v. Nova Group

1 A    104?
2 Q    Yes.
3     (There was a discussion off the
4     record.)
5     THE ARBITRATOR: All set?
6 Q    Before we get to Exhibit 104, I
7 would like you to pull out for one quick
8 question Exhibit 131. Do you have that?
9 A    I have it -- oh, 131?
10    (There was a discussion off the
11    record.)
12    (Exhibit No. 131, Document,
13    including Bates No. LFG 000139, is
14    introduced and accepted into the
15    record.)
16 Q    We will wait for the arbitrator
17 to get his book, and I take full
18 responsibility for this mountain of
19 documents. I totally apologize. It's the
20 first exhibit in the binder. If you turn
21 to the second page, it bears Bates stamp
22 number LFG 000139.
23    At paragraph eight, there is a
24 statement:

21 (Pages 78 to 81)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 86

Universitas v. Nova Group

Q  Did there come a point in time when you discussed the benefits of owning life insurance with Mr. Spencer?
A  Yes.
Q  And when was that?
A  That probably would have been in our second meeting, perhaps in the spring of 2006.
Q  Did you meet with Mr. Spencer in person?
A  I did.
Q  On approximately how many occasions?
A  Maybe as many as a half a dozen.
Q  Did you ever have telephone calls with him?
A  Yes.
Q  Did you ultimately do any life insurance transactions with Mr. Spencer?
A  Yes.
Q  Okay. In general terms, what insurance transactions did you do with Mr. Spencer?

Page 87

Universitas v. Nova Group

A  The transactions specific to the Charter Oak plan.
Q  What were those, just generally?
A  There were two policies that were written. They were written by me in conjunction with Don Trudeau. The first one was a $10 million policy, and the second one was a $20 million policy. I can expand on why it was done that way if it's relevant now.
Q  We will get into that. I just wanted you to lay the foundation, to talk about the transactions.
     Exhibit 440, can you tell me what that is?
A  This is my firm HIPAA form, which is required by law.
Q  Required for what purpose?
A  There are HIPAA privacy rules, and so this form is required. There is language in the form, and there is a list of companies that would be interacted with. And whether a client was ten years old or

Page 88

Universitas v. Nova Group

75 years old, we use the same format every single time.
Q  And do you recall why you had Mr. Spencer sign this on or about May 17, 2006?
A  Because we were going to be initiating the underwriting process, which involves collecting attending physicians' statements from Mr. Spencer's doctors and an insurance exam.
Q  Does this -- does what I have shown you as Exhibit 440 refresh your recollection that you were dealing with Mr. Spencer as early as May of 2006?
     MR. ORDER: Objection.
     MS. COLBATH: What's the objection?
     MR. ORDER: He didn't say that his recollection needed to be refreshed.
     MS. COLBATH: Well, he testified --
     THE ARBITRATOR: Overruled. You may answer.

Page 89

Universitas v. Nova Group

A  I met Mr. Spencer prior to this date.
Q  At any time did you discuss with Mr. Spencer how much life insurance he would need to satisfy -- how much life insurance we would need to seek to satisfy his needs?
A  Mr. Spencer was very sophisticated financially. All of our discussions were general in the beginning. He was not the kind of person that you told what to do as far as financial strategies were concerned. You gave him information. He used me an as an expert, and then he made his own decisions.
Q  Was there ever any amount of total insurance discussed with Mr. Spencer?
A  50 million, that was -- excuse me for saying -- I would like to finish. That was an amount that Mr. Spencer came to on his own initially.
Q  Okay. And at some point in time, you submitted a life insurance application on Mr. Spencer's behalf to

23 (Pages 86 to 89)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

```
                                                    Page 90
1         Universitas v. Nova Group
2    Lincoln Life, correct?
3       A    Yes.
4       Q    And do you recall how much
5    insurance you were seeking to place with
6    Mr. Spencer at the time you submitted the
7    first application?
8       A    $50 million.
9       Q    I think we are going to go to
10   Exhibit 10, and then you can keep the
11   notebook with 10 in front of you because I
12   will be using --
13      A    Do I still need this?
14      Q    No.
15           (Exhibit No. 10, Life Insurance
16      Application for Lincoln National Life
17      Insurance Company, is introduced and
18      accepted into the record.)
19      Q    Do you have 10 in front of you?
20      A    Yes, I do.
21      Q    We will wait until the
22   arbitrator catches up.
23           THE ARBITRATOR: All set.
24      Q    Okay. Turn to page -- the
25   second page of Exhibit 10. It has the
```

```
                                                    Page 91
1         Universitas v. Nova Group
2    number 530 down in the lower right-hand
3    corner. Do you see that?
4       A    I do.
5       Q    Okay. And can you identify
6    this, the document first, Exhibit 10?
7       A    I see it.
8       Q    What is Exhibit 10?
9       A    It's a life insurance
10   application for Lincoln National Life
11   Insurance Company.
12      Q    And who was the proposed
13   insured for purposes of this application?
14      A    Sash Spencer.
15      Q    Now, if you look at line 2A, it
16   states:
17           "What is the total face amount
18   of all life insurance policies presently in
19   force on your life?"
20           And someone wrote "$50,000."
21   Do you know who wrote the $50,000?
22      A    Somebody in my office.
23      Q    And was that accurate?
24      A    Excuse me.
25      Q    Was that an accurate number?
```

```
                                                    Page 92
1         Universitas v. Nova Group
2       A    Yes.
3       Q    Now, 2B:
4            "What is the total amount of
5    new life insurance coverage currently
6    applied for on your life with all
7    companies?"
8            And someone has inserted
9    10 million, correct?
10      A    Yes. Yes.
11      Q    So was the initial application
12   that was submitted to Lincoln National Life
13   Insurance Company seeking to apply for
14   10 million in life insurance?
15      A    That is correct.
16      Q    If you turn to page five --
17   well, 4A states:
18           "Have you been involved in any
19   discussion about the possible sale or
20   assignment of this policy to a life
21   settlement, viatical, or other secondary
22   market provider?"
23           It says:
24           "If yes, provide the details."
25           And the box "no" is checked.
```

```
                                                    Page 93
1         Universitas v. Nova Group
2            As far as you know, was that
3    true and accurate as to Mr. Spencer at the
4    time this application was submitted to
5    Lincoln Life?
6       A    That's correct.
7       Q    And 4B states:
8            "Have you ever sold a policy to
9    a life settlement, viatical, or other
10   secondary market provider? If yes, provide
11   details."
12           And the box for "no" is
13   checked.
14           To your knowledge, was that a
15   true statement --
16      A    Yes.
17      Q    -- with regard to Mr. Spencer
18   at the time that this application --
19      A    Yes.
20      Q    -- was submitted to Lincoln
21   Life?
22      A    Yes.
23      Q    If you turn to page 536, and at
24   the top, 6A says, "Plan of insurance," and
25   someone has inserted, "Lincoln UL DB2."
```

24 (Pages 90 to 93)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 98

1    Universitas v. Nova Group
2    as, "Licensed representative slash agent's
3    signature"?
4       A    Yes.
5       Q    And was everything in that
6    certification true and accurate at the time
7    you put your signature there?
8       A    Yes.
9       Q    Now, the compensation
10   information lists your name and Donald
11   Trudeau. Do you see that?
12      A    I do.
13      Q    And do I understand that the
14   life insurance commissions on the
15   $10 million policy were to be split between
16   you and Mr. Trudeau on a 70/30 basis?
17           MR. ORDER: Objection. It's
18      her witness, but she keeps asking
19      leading questions. I'd ask that she
20      not ask leading questions.
21           THE ARBITRATOR: I think -- you
22      know, we don't have a jury here. We
23      want to proceed. And, you know, I
24      think you should do your best; but I
25      think I am going to overrule the

Page 99

1    Universitas v. Nova Group
2    objection.
3           MR. ORDER: I have been
4       trying -- you know, I haven't objected
5       before on this. But it has been going
6       on for a while, so I just thought I'd
7       mention it.
8           MS. COLBATH: And a lot of it
9       is not so controversial. We just want
10      to get it into the record with a
11      little explanation.
12          MR. ORDER: Understood. Let's
13      go.
14      Q    Did you and Mr. Trudeau split
15   the commissions as indicated --
16      A    We did split the commissions.
17      Q    -- on the $10 million policy?
18      A    Yes.
19      Q    And I think it's your
20   testimony -- I just want to make sure --
21   that Mr. Trudeau was president of
22   Benistar --
23      A    That was my understanding.
24      Q    -- at the -- at the time this
25   application was submitted to Lincoln?

Page 100

1    Universitas v. Nova Group
2       A    That was my understanding.
3       Q    Do you have a view as to
4    whether that life insurance commission
5    payment to Mr. Trudeau is an illegal
6    rebate?
7       A    I don't have a view on that.
8       Q    Okay. Let's turn to
9    Exhibit 18. Can you identify Exhibit 18
10   for the record?
11          (Exhibit No. 18, Copy of the
12      $10 million policy issued on the life
13      of Sash Spencer owned by the Charter
14      Oak Trust, is introduced and accepted
15      into the record.)
16      A    This is a copy of the
17   $10 million policy issued on the life of
18   Sash Spencer owned by the Charter Oak
19   Trust.
20          MS. COLBATH: Can you read the
21      answer.
22          (Reporter read back last
23      answer.)
24      Q    We are going to spend a little
25   time on 406 now.

Page 101

1    Universitas v. Nova Group
2           (Exhibit No. 406, Information
3       Package Requested by the Charter Oak
4       Trust, is introduced and accepted into
5       the record.)
6           (There was a discussion off the
7       record.)
8       Q    Do you have 406?
9       A    I have it.
10      Q    Can you identify that document
11   for the record, or series of documents?
12      A    This is the information package
13   requested by the Charter Oak Trust.
14      Q    Did the Charter Oak Trust send
15   the documents that comprise Exhibit 406 to
16   you? And by the 'you,' I mean to your
17   office.
18      A    I went over this document with
19   Mr. Spencer personally.
20      Q    Where did you get the document?
21      A    Don Trudeau.
22      Q    Did you arrange for Mr. Spencer
23   to sign the documents that are part of 406?
24      A    I did.
25      Q    Let's turn to page 746. It's

26 (Pages 98 to 101)

Case 3:13-cr-00226-RNC   Document 232   Filed 03/15/17   Page 8 of 13

```
                                                          Page 110
 1         Universitas v. Nova Group
 2   and 9D?
 3      A   No.
 4      Q   What was your understanding as
 5   to what --
 6      A   As with everything else that
 7   Mr. Spencer did, he wanted a better deal
 8   than everybody else.
 9      Q   Okay. Paragraph ten states:
10          "The insured has the option of
11   acquiring the policy from the trust at any
12   time on terms to be mutually determined by
13   the trust and the insured."
14          That is the preprinted text.
15   And then there is some handwritten
16   addition.
17          Do you see that?
18      A   Yes.
19      Q   Can you tell me what the
20   handwritten addition says?
21      A   "But no event at a cost than is
22   set forth in number nine above."
23      Q   Whose handwriting is that in
24   paragraph ten?
25      A   Mr. Spencer.
```

```
                                                          Page 111
 1         Universitas v. Nova Group
 2      Q   Did you have a discussion with
 3   him about adding that language?
 4      A   I did.
 5      Q   And tell you us about those
 6   discussions?
 7      A   Mr. Spencer saw A through D as
 8   the deal, and that those were the fees to
 9   the deal. He saw paragraph ten as an
10   extension of the deal and felt that those
11   terms should be the same as outlined in A
12   through D -- again, asked me to speak with
13   them about it, which I did, and it was
14   agreed to.
15      Q   At some point prior to
16   Mr. Spencer signing the document 749
17   through 751 -- strike that.
18          We will go to paragraph 13 on
19   the document:
20          "The insured" -- it
21   states, "The insured understands and
22   appreciates the nature and the magnitude of
23   the risks assumed by him in entering into
24   the transactions contemplated by the
25   funding arrangement. The insured
```

```
                                                          Page 112
 1         Universitas v. Nova Group
 2   voluntarily and knowingly makes the"
 3   decisions -- "decision to take those risks,
 4   free of any coercion or duress."
 5          Do you have an understanding as
 6   to what risks are being referred to there?
 7      A   Not specifically, but there are
 8   general risks.
 9      Q   What are the general risks?
10      A   One that might come to mind is
11   that, on a face amount of this size, the
12   insurance company might require Mr. Spencer
13   to take a stress test. If he takes that
14   stress test, then it involves exerted
15   exercise. There could be a problem during
16   that exerted exercise. I am speculating.
17   That is just one risk.
18          Anything can happen.
19      Q   Look at paragraph 15. It's
20   longer. I will let you read it to yourself
21   and just confirm that at the time that
22   Mr. Spencer signed this adoption agreement,
23   on December 17, 2006, to the best of your
24   knowledge, that was a true statement?
25      A   It's a true statement.
```

```
                                                          Page 113
 1         Universitas v. Nova Group
 2      Q   Now, am I correct that
 3   paragraph ten contemplates Mr. Spencer
 4   acquiring the policy from the trust, right?
 5      A   Yes.
 6      Q   And paragraph 17 states:
 7          "The insured understands that,
 8   if at some point in the future he wishes
 9   for the policy to be sold, a settlement
10   sale of the policy may not be appropriate
11   or desirable for various reasons."
12          Do you see that?
13      A   Yes.
14      Q   Do you recall if -- at the time
15   this adoption agreement was signed by
16   Mr. Spencer, had you had any discussions
17   concerning settling the policy at that
18   point?
19      A   No.
20      Q   By the way, did Mr. Spencer to
21   your knowledge ever meet with anyone at
22   Charter Oak Trust?
23      A   He did not.
24      Q   In person?
25      A   Not that I know of.
```

29 (Pages 110 to 113)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 130

1 Universitas v. Nova Group
2 ending in 810, correct?
3   A   Yes.
4   Q   Let's go to Exhibit 31.
5       (Exhibit No. 31, Document, is
6   introduced and accepted into the
7   record.)
8   Q   Well, did Mr. Spencer take the
9 life insurance policy, the $20 million life
10 insurance policy that ended in 810?
11  A   He did not.
12  Q   But he did take the 809 policy,
13 right?
14  A   He did.
15  Q   Okay. So Exhibit 31, okay. Am
16 I correct -- see the box in the middle of
17 the first page of the exhibit? See the box
18 with the entries, "Participant slash
19 insured carrier and policy number"?
20  A   Correct. Yes, yes.
21  Q   Am I correct that the documents
22 that make up Exhibit 31 relate to
23 Mr. Spencer's $20 million policy ending in
24 policy number 809?
25  A   Yes.

Page 131

1   Universitas v. Nova Group
2   Q   Now, when Mr. Spencer accepted
3 the 809 policy in the face amount of
4 $20 million, did he cancel the $10 million
5 policy?
6   A   No, he did not.
7   Q   At this point -- well, let's
8 find out what the date is.
9       So if you look at page 38 in
10 Exhibit 31, is that your signature that
11 appears on the line below the word "agent"?
12  A   Yes.
13  Q   And am I correct that
14 Mr. Spencer signed on the line indicated
15 for "participant slash insured"?
16  A   Yes.
17  Q   Now, let's go back to page 35
18 of the exhibit.
19      THE ARBITRATOR: Did he sign
20   that about the same time you did,
21   around March 19th?
22      THE WITNESS: Yes.
23  A   What page are we on, please?
24  Q   We are on page 35.
25  A   Thank you.

Page 132

1   Universitas v. Nova Group
2   Q   And I want you to read
3 representation two:
4       "The policy shall be solely
5   owned."
6       Do you see that?
7   A   I see it.
8   Q   And was that a true statement
9 as of March 19, 2007, when you signed this
10 document?
11  A   Yes.
12  Q   And number paragraph --
13 paragraph numbered four states:
14      "The policy is not being
15 purchased with the intent of selling it in
16 the settlement or viatical sale, and there
17 have been no offers to sell or buy the
18 policy. Neither agent nor funder nor the
19 trust have recommended such a sale."
20      When you signed this document
21 on March 19, 2007, was that statement true?
22  A   Yes.
23  Q   Paragraph seven states:
24      "No rebate to the participant
25 slash insured or remuneration to the agent

Page 133

1   Universitas v. Nova Group
2 of any kind has been offered."
3       Do you see that?
4   A   Yes.
5   Q   As of March 19, 2007, when you
6 signed this document, was that a true
7 statement?
8   A   Yes.
9   Q   Now, if you look at page 36,
10 paragraph ten addresses the fees to be paid
11 in connection with the transaction,
12 correct?
13  A   Yes.
14  Q   And the fees set forth in 10A,
15 10B, 10C relate to the $20 million policy,
16 correct?
17  A   Correct.
18  Q   Now, 10C, the amount has been
19 reduced from 3 percent to 2 percent; do you
20 see that?
21  A   Yes.
22  Q   And then someone has written an
23 initial; do you see that?
24  A   Yes.
25  Q   Is that Mr. Spencer's initial?

34 (Pages 130 to 133)

```
                                                Page 134
 1          Universitas v. Nova Group
 2     A    Yes.
 3     Q    Okay. And do you know who
 4  reduces the 3 percent to 2 percent on the
 5  document?
 6          MR. ORDER: Do you mean
 7  physically wrote it in?
 8     Q    On the document?
 9     A    I wrote that in.
10     Q    Okay. And why?
11     A    Because that was part of the
12  original negotiation.
13     Q    The --
14     A    Mr. Spencer made me talk to Don
15  Trudeau about reducing that fee from
16  3 percent to 2 percent -- followed suit
17  here, as to -- as related to the
18  $10 million policy.
19     Q    Mr. -- strike that.
20          And in paragraph 11, someone
21  has inserted the word "reasonable"; do you
22  see that?
23     A    Yes.
24     Q    And who -- do you recognize the
25  handwriting?
```

```
                                                Page 135
 1          Universitas v. Nova Group
 2     A    That's Mr. Spencer's
 3  handwriting.
 4     Q    That statement says:
 5          "The participant slash insured
 6  has the option of acquiring the policy from
 7  the trust at any time on terms" -- he
 8  inserts "reasonable" -- "on reasonable
 9  terms that release the plan from ongoing
10  benefit obligations and such other terms to
11  be mutually determined by the trust and the
12  participant slash insured."
13          When you placed your signature
14  on this document on March 19, 2007, did you
15  understand that to be true?
16     A    Yes.
17     Q    And you understood that,
18  pursuant to that paragraph, Mr. Spencer had
19  the option to purchase the policy from the
20  trust, right?
21     A    Yes.
22     Q    Now, 18 -- first let me just
23  ask -- well, strike that.
24          Paragraph 18:
25          "The participant/insured
```

```
                                                Page 136
 1          Universitas v. Nova Group
 2  understands that, if, at some point in the
 3  future he/she wishes for the policy to be
 4  sold, a settlement sale of the policy may
 5  not be appropriate" for desire -- "or
 6  desirable for various reasons."
 7          As of March 19, 2007, did you
 8  understand that statement to be true?
 9     A    Yes.
10     Q    Paragraph --
11          MR. ORDER: Object. I move to
12  strike the answer. Lack of
13  foundation.
14          THE ARBITRATOR: May I have the
15  question read back, please.
16          (Reporter read back last
17  question and answer.)
18          THE ARBITRATOR: I'll deny the
19  motion.
20     Q    In fact, pursuant to paragraph
21  18, the insured had a right to settle the
22  policy if physical he wanted to, correct?
23     A    Yes.
24     Q    Now, page 37, paragraph 21, am
25  I correct that that is some handwriting
```

```
                                                Page 137
 1          Universitas v. Nova Group
 2  that has been added to that paragraph, and
 3  do you recognize the handwriting?
 4     A    Sash Spencer's.
 5     Q    Okay. Let's turn to page 55 of
 6  the document. And can you tell me what
 7  page 55 is?
 8     A    It's the adoption agreement.
 9     Q    Am I correct that it's the
10  adoption agreement that relates to the
11  $20 million life insurance policy --
12     A    That is correct.
13     Q    Let me finish, please --
14  assigned policy number 7320809?
15     A    That is correct.
16     Q    Now, page 57 -- 58, is that
17  Sash Spencer's signature that appears
18  there?
19     A    Yes.
20     Q    And on page 57, am I correct
21  that -- what I am looking at is about
22  midway on the page. It states, "In
23  particular, the carrier."
24          Who did you understand "the
25  carrier" to be here?
```

35 (Pages 134 to 137)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 158

Universitas v. Nova Group

2 your office to complete these forms?
3    A   Myself and Mr. Spencer.
4    Q   Okay. And was the instruction
5 to complete them to make Universitas
6 Education LLC irrevocable beneficiaries
7 under the plan?
8    A   Yes, yes.
9    Q   And, again, did you have any
10 understanding as to why Mr. Spencer wanted
11 to do that?
12    A   No. You don't question -- you
13 didn't question Mr. Spencer.
14    Q   Did it ever come to your
15 attention in this April/May time frame that
16 Mr. Spencer had bladder cancer?
17    A   Yes.
18    Q   Do you recall when you learned
19 that?
20    A   Not specifically on this date.
21    Q   Okay. And were you aware that
22 he was undergoing chemotherapy?
23    A   I was aware of it.
24    Q   Approximately, how much were
25 the commissions for both policies that

Page 159

Universitas v. Nova Group

2 Mr. Trudeau got paid?
3    Would it be easier if I asked
4 what the total commissions were and what
5 you got paid?
6    A   You know, I don't even remember
7 specifically what I got paid. I think he
8 was 4 or $500,000.
9    Q   Okay. And what were your
10 commissions for both policies combined?
11    A   More than double that. If his
12 percentage was 30 percent and mine was 70,
13 I would have received 70 over 30 times his
14 amount.
15    Q   Now, we have looked at both of
16 the life insurance applications, and I just
17 want to ask you:
18    To your knowledge, at the time
19 the Lincoln applications were made for the
20 $10 million policy and the $20 million
21 policy, on those that you signed -- you
22 signed both applications, correct?
23    A   I did.
24    Q   Was everything on each of those
25 applications true and accurate as of the

Page 160

Universitas v. Nova Group

2 time you signed the application?
3    A   Yes.
4    Q   Okay. Were you taking any
5 financial -- strike that.
6    Were you taking any business
7 actions on Spencer's behalf with respect to
8 the Lincoln Life policies after March of
9 2007, between March 2007 and his death?
10    A   There was no action taken.
11    Q   Do you recall when Mr. Spencer
12 died?
13    A   I don't recall the specific
14 date. I apologize.
15    Q   Did there come a point in time
16 when you started to have some discussions
17 with Mr. Spencer about him acquiring or
18 selling the policies or his interests in
19 the Charter Oak Trust?
20    A   There were discussions.
21    Q   Who were the discussions with?
22    A   I had probably a few
23 discussions, a few theoretical discussions
24 with Mr. Spencer, that were initiated by
25 him. Then I had discussions with

Page 161

Universitas v. Nova Group

2 Don Trudeau based on those discussions.
3    Q   And what time frame are we
4 looking at?
5    A   Perhaps a year after the
6 policies were issued. There were numbers
7 kicked around by Mr. Trudeau, but there was
8 nothing formalized. And there was never
9 any agreements in principle.
10    Q   Are me as best you can recall
11 all of the discussions you had with Mr.
12 Trudeau on the subject?
13    A   After having conversations with
14 Mr. Spencer, I had discussions with
15 Mr. Trudeau as to the concept of settling
16 the two policies.
17    Q   Okay.
18    A   At this point in time,
19 Mr. Spencer was still in the same health as
20 when he initially procured the policies.
21    Q   And --
22    A   And Mr. Trudeau went back to
23 his people, kicked around some numbers; and
24 there were discussions, but there was never
25 anything formalized, put in writing, never

41 (Pages 158 to 161)

Case 3:13-cr-00226-RNC   Document 232   Filed 03/15/17   Page 12 of 13

## Page 350

Universitas v. Nova Group

Plan, what type of products was he considering or were you showing him?

A   Most of our initial discussions were general discussions about finance. I asked him about his business. It started more as a friendly thing. I asked him about his business, what he was doing.

He asked me about my business, what I was doing. The concept of life insurance as an asset class came up. There were a lot of discussions with regard to that.

This was not a person that you would sell. You would have an intellectual discussion, and then he would direct you. Okay. So there really was for a very long time no specific proposal for many, many months. Okay.

Q   So when you were introduced to him by your current clients, what was your understanding of the purpose of the introduction?

A   Well, my purpose was to attempt to sell him life insurance.

## Page 351

Universitas v. Nova Group

Q   And did you understand from his perspective what -- why he wanted to be in touch with you?

A   There were two reasons. One was intellectual, and one was to find out whether or not what I sell had merit for him. And that took a process.

Q   Did it surprise you that a man of such high net worth had only $50,000 in insurance, life insurance?

A   A little bit, but then again he was very liquid. So that would balance off the surprise.

Q   How does that balance it off?

A   When you buy insurance for estate planning, the case to buy, to procure the insurance is much more compelling the more illiquid the client's estate is. If they had a large business or real estate holdings, it's more compelling to buy insurance.

It's not as compelling, although it makes sense from an internal rate of return perspective -- it's not as

## Page 352

Universitas v. Nova Group

compelling if you have the cash to -- you know, to pay tax.

Q   But you did indicate earlier today that life insurance helps avoid excessive estate tax?

A   Well, no, the tax is the tax. It helps you fund the tax.

Q   I see.

A   It avoids disruption.

Q   But there's no tax on the insurance proceeds; is there?

A   Depending on the way that it's owned.

Q   Now, did you know Bill Hutchison before December of 2006?

A   I did.

Q   And so how did it come about that Bill Hutchison was introducing you to Don Trudeau in connection with the Charter Oak Trust?

A   I had somewhat of a business friendship with Bill over a lot of years. I had done some stop loss health insurance business with him years and years ago. And

## Page 353

Universitas v. Nova Group

we had kept in touch through the friendship.

He had a friendship with Don. He may still have that friendship. I am not privy.

And he introduced me to Don as a great guy with some really good ideas. I met Don and agreed with him.

Q   Was that just in general that you were meeting Don, or it was specifically related to Sash Spencer? Let me ask if this way.

A   It was not specifically -- it was specific to the concept of the Charter Oak Trust.

Q   I see.

A   Having nothing to do with Sash Spencer at the time.

Q   So what -- at what point in 2006 did you learn about the Charter Oak Trust?

A   I think it was the fall of 2006.

Q   What interested you in the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 354

```
 1        Universitas v. Nova Group
 2   Charter Oak Trust?
 3       A    I thought it was a clever way
 4   to procure insurance.
 5       Q    And did you -- what made it so
 6   clever?
 7       A    I think Don is a very bright
 8   guy.
 9       Q    Okay. What made you think that
10   the Charter Oak Trust was a clever way to
11   procure insurance?
12       A    The way that the insurance was
13   funded, you know, was acceptable to the
14   carriers.
15       Q    Which was what?
16       A    The Charter Oak Trust had
17   millions and millions of dollars of cash,
18   as I understand it. And that permitted the
19   client to answer the question on the
20   application -- or not the client -- the
21   owner, the Charter Oak Trust, as to say
22   that they were not financing premiums, and
23   the owner of the -- the owner -- it was the
24   funding arrangement that was so attractive.
25       Q    Was another attraction the fact
```

Page 355

```
 1        Universitas v. Nova Group
 2   that the insured did not have to pay for
 3   premiums?
 4       A    Naturally.
 5       Q    So you said you learned about
 6   the Charter Oak Trust not specifically in
 7   connection with Mr. Spencer. So my
 8   question is --
 9       A    Generally, generally, yes.
10       Q    Right. And so when -- what
11   made you put Sash Spencer together with the
12   Charter Oak Trust?
13       A    There were many different
14   choices for how to finance a life insurance
15   policy that I was considering. The Charter
16   Oak Trust was one of those choices. I
17   could have gotten this deal done otherwise.
18   I wanted to do business with my friend Bill
19   Hutchison.
20            Okay. In addition to that, it
21   was a very clever arrangement because it
22   enabled me to answer a question on the
23   Lincoln application truthfully. And the,
24   client yes, did not have to fund premiums.
25       Q    And what interest -- what
```

Page 356

```
 1        Universitas v. Nova Group
 2   interest -- what interested Mr. Spencer in
 3   the plan?
 4       A    Well, he liked the concept that
 5   he could be -- we could be forthcoming with
 6   the insurance company through the 419 plan
 7   being the owner and answering that question
 8   a certain way, and only having the policy
 9   as collateral on the funding arrangement.
10       Q    Were you considering products
11   that you could not be forthcoming with the
12   insurance carrier on?
13       A    No.
14       Q    Okay.
15       A    You can check my record, but I
16   am sure you have.
17       Q    I am just asking you a
18   question.
19       A    I'm just answering you --
20            THE ARBITRATOR: Let's go to
21   the next question.
22       Q    Did you run any scenarios?
23            (There was a discussion off the
24   record.)
25       Q    Did you run any -- before
```

Page 357

```
 1        Universitas v. Nova Group
 2   entering or enrolling Mr. Spencer in the
 3   Charter Oak Trust Welfare Benefit Plan, did
 4   you run any scenarios for him with respect
 5   to life insurance products from Lincoln?
 6       A    Of course, I showed him policy
 7   illustrations.
 8       Q    What did they illustrate?
 9       A    They illustrate a schedule of
10   premiums and death benefits.
11       Q    Was there anything else in
12   those -- what could you call them,
13   projections, scenarios?
14       A    Anything that is included in
15   that, normally, interest rates and so on.
16       Q    And how do you run those
17   scenarios?
18       A    They are run on the computer.
19       Q    But you have to input some
20   information, right?
21       A    Sure.
22       Q    Okay. And so do you -- did you
23   personally run those or --
24       A    Sometimes I run the
25   illustration. Sometimes I have other folks
```

90 (Pages 354 to 357)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022