# EXHIBIT

# ONE

THE AMERICAN ARBITRATION ASSOCIATION
AAA Case No. 13 195 Y 1558 10
IN THE MATTER OF THE ARBITRATION BETWEEN

---

UNIVERSITAS EDUCATION, LLC,
Claimant,

vs.

NOVA GROUP, INC.,

Respondents.

---

VOLUME I

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified Shorthand Reporter, a Certified LiveNote Reporter, and Notary Public, held at the Offices of EPSTEIN, BECKER & GREEN LLP, 250 Park Avenue, New York, New York, on Monday, December 6, 2010, commencing at 9:30 a.m.

Page 62

Universitas v. Nova Group

As housekeeping, if you can, if you think of it, if somebody has access to tabs and binders just so I can keep my stuff with three-hole punched, that would be a lot easier for tomorrow.

MS. COLBATH: We will furnish that. We had thought we brought that with us.

THE ARBITRATOR: Excellent. Anything else?

MR. ORDER: That's it.

MS. COLBATH: Okay.

THE ARBITRATOR: Just one proceeding -- I don't know if anybody has any time limitations on any of the three days. I would sort of do this Federal Court style of going about an hour and a half with the 10- or 15-minute break going to about 12:30, or 1, breaking for an hour at lunch, going till 5 each day -- is sort of how I would anticipate. But if any of the parties of counsel have specific needs in a given day, otherwise, I am

Page 63

Universitas v. Nova Group

certainly willing to accommodate that.

MS. COLBATH: Fine.

MR. PASTORE: I am -- I have got to be in a hearing at 4 o'clock on Wednesday here in New York. I will leave a little earlier just so you know.

MS. COLBATH: Is the gentleman who joined us Mr. Egan?

MR. ROBINSON: No, he's Mauricio Agudelo. He's my assistant.

MS. COLBATH: Is he employed by one of the respondents?

MR. ORDER: Yes.

MR. ROBINSON: Benistar Admin Services, Inc.

MS. COLBATH: Could I have Mr. Robinson's comment? I think he said he is my associate or something.

MR. ROBINSON: My assistant.

THE ARBITRATOR: Okay. Do you want to get your first witness?

(There was a discussion off the record.)

Page 64

Universitas v. Nova Group

MS. COLBATH: This is Sharon Siebert, who is a principal of Universitas Education LLC. She was waiting outside. I told her that she come in. She didn't realize that.

MR. ORDER: That's fine.

(There was a discussion off the record.)

B R U C E J. M A C T A S,
doing business at
Mactas, Alper & Szrolovits,
292 Madison Avenue, Seventh Floor
New York, New York 10017,
having been sworn by the notary public to testify to the truth, testified as follows:

DIRECT EXAMINATION

BY MS. COLBATH:

**Q Good morning, Mr. Mactas.**

A Good morning.

**Q As you know, my name is Paula Colbath. And I am with the firm of Loeb & Loeb LLP. We represent claimant Universitas Education LLC in this arbitration.**

Page 65

**Universitas v. Nova Group**

**Could you state your full name for the record?**

A Bruce J. Mactas.

**Q And what is your current business address?**

A 292 Madison Avenue, Seventh Floor, New York, New York 10017.

**Q Could you give us a very brief educational background?**

A I have a B.S. in finance from Lehigh University. I graduated in 1982.

**Q And by whom are you currently employed?**

A My main employer is Mass Mutual.

**Q And do you have any other employers?**

A The name of my firm is Mactas, Alper & Szrolovits.

**Q And what is your position at Mactas, Alper & Szrolovits?**

A Szorolovits. I am the managing partner.

**Q And when was that firm**

Page 78

Universitas v. Nova Group

**Group, Inc.?**

A I don't specifically know. I didn't ask him, and I didn't think it was relevant to what we were discussing.

**Q Okay. Sorry to do this. We are going to have to do some toggling. If you could get, I believe it's --**

MR. ORDER: If we are "toddling" here, we are in big trouble.

MS. COLBATH: "Toggling."

**Q Exhibit 214, so just keep -- try and --**

A Keep it open.

**Q You are going to be using the first notebook for the most part today, but I want you to take a look at 214; so it's probably in exhibit volume four.**

**(Exhibit No. 214, Documents to implement Charter Oak Trust for Mr. Spencer is introduced and accepted into the record.)**

**Q Have you ever seen that document before? Take your time.**

Page 79

Universitas v. Nova Group

A I have.

**Q And, approximately, when did you see it for the first time?**

A I don't have a specific recollection, but I would think it would be November, December of 2006.

**Q Okay. And what were the circumstances under which you saw Exhibit 214?**

A Mr. Sash Spencer was the first negotiation I was having in the Charter Oak Trust. When it became time to implement, these were the documents required to implement. And that was the first time that I had occasion to see these documents.

**Q What were you told were the benefits of the Charter Oak Trust -- strike that.**

**Were you told of any benefits other than those that are set forth on Exhibit 214?**

A I would like to take a moment to read them.

**Q Sure.**

Page 80

Universitas v. Nova Group

A Sir, would you mind repeating the question.

(Reporter read back pending question.)

A I would say yes.

**Q Okay. Tell me about the advantages that you were told about regarding -- let me finish. Just so that we have a clear record, let me finish the question and then -- then you can start.**

**Tell me the advantages that you were told about by anyone at Charter Oak Trust or the related entities that do not appear on Exhibit 214.**

A It was mainly the funding arrangement that would be available to employers.

**Q If you could put before you Exhibit 104, which contains the obituary of Mr. Spencer, and turn to page LFG 330.**

**(Exhibit No. 104, Document with Obituary of Mr. Spencer, Bates No. LFG 330, is introduced and accepted into the record.)**

Page 81

Universitas v. Nova Group

A 104?

**Q Yes.**

**(There was a discussion off the record.)**

THE ARBITRATOR: All set?

**Q Before we get to Exhibit 104, I would like you to pull out for one quick question Exhibit 131. Do you have that?**

A I have it -- oh, 131?

(There was a discussion off the record.)

(Exhibit No. 131, Document, including Bates No. LFG 000139, is introduced and accepted into the record.)

**Q We will wait for the arbitrator to get his book, and I take full responsibility for this mountain of documents. I totally apologize. It's the first exhibit in the binder. If you turn to the second page, it bears Bates stamp number LFG 000139.**

**At paragraph eight, there is a statement:**

Page 86

Universitas v. Nova Group

**Q Did there come a point in time when you discussed the benefits of owning life insurance with Mr. Spencer?**

A Yes.

**Q And when was that?**

A That probably would have been in our second meeting, perhaps in the spring of 2006.

**Q Did you meet with Mr. Spencer in person?**

A I did.

**Q On approximately how many occasions?**

A Maybe as many as a half a dozen.

**Q Did you ever have telephone calls with him?**

A Yes.

**Q Did you ultimately do any life insurance transactions with Mr. Spencer?**

A Yes.

**Q Okay. In general terms, what insurance transactions did you do with Mr. Spencer?**

Page 87

Universitas v. Nova Group

A The transactions specific to the Charter Oak plan.

**Q What were those, just generally?**

A There were two policies that were written. They were written by me in conjunction with Don Trudeau. The first one was a $10 million policy, and the second one was a $20 million policy. I can expand on why it was done that way if it's relevant now.

**Q We will get into that. I just wanted you to lay the foundation, to talk about the transactions.**

**Exhibit 440, can you tell me what that is?**

A This is my firm HIPAA form, which is required by law.

**Q Required for what purpose?**

A There are HIPAA privacy rules, and so this form is required. There is language in the form, and there is a list of companies that would be interacted with. And whether a client was ten years old or

Page 88

Universitas v. Nova Group

75 years old, we use the same format every single time.

**Q And do you recall why you had Mr. Spencer sign this on or about May 17, 2006?**

A Because we were going to be initiating the underwriting process, which involves collecting attending physicians' statements from Mr. Spencer's doctors and an insurance exam.

**Q Does this -- does what I have shown you as Exhibit 440 refresh your recollection that you were dealing with Mr. Spencer as early as May of 2006?**

MR. ORDER: Objection.

MS. COLBATH: What's the objection?

MR. ORDER: He didn't say that his recollection needed to be refreshed.

MS. COLBATH: Well, he testified --

THE ARBITRATOR: Overruled. You may answer.

Page 89

Universitas v. Nova Group

A I met Mr. Spencer prior to this date.

**Q At any time did you discuss with Mr. Spencer how much life insurance he would need to satisfy -- how much life insurance we would need to seek to satisfy his needs?**

A Mr. Spencer was very sophisticated financially. All of our discussions were general in the beginning. He was not the kind of person that you told what to do as far as financial strategies were concerned. You gave him information. He used me an as an expert, and then he made his own decisions.

**Q Was there ever any amount of total insurance discussed with Mr. Spencer?**

A 50 million, that was -- excuse me for saying -- I would like to finish. That was an amount that Mr. Spencer came to on his own initially.

**Q Okay. And at some point in time, you submitted a life insurance application on Mr. Spencer's behalf to**

Page 90

Universitas v. Nova Group

Lincoln Life, correct?
A Yes.
Q And do you recall how much insurance you were seeking to place with Mr. Spencer at the time you submitted the first application?
A $50 million.
Q I think we are going to go to Exhibit 10, and then you can keep the notebook with 10 in front of you because I will be using --
A Do I still need this?
Q No.
(Exhibit No. 10, Life Insurance Application for Lincoln National Life Insurance Company, is introduced and accepted into the record.)
Q Do you have 10 in front of you?
A Yes, I do.
Q We will wait until the arbitrator catches up.
THE ARBITRATOR: All set.
Q Okay. Turn to page -- the second page of Exhibit 10. It has the

Page 91

Universitas v. Nova Group

number 530 down in the lower right-hand corner. Do you see that?
A I do.
Q Okay. And can you identify this, the document first, Exhibit 10?
A I see it.
Q What is Exhibit 10?
A It's a life insurance application for Lincoln National Life Insurance Company.
Q And who was the proposed insured for purposes of this application?
A Sash Spencer.
Q Now, if you look at line 2A, it states:
"What is the total face amount of all life insurance policies presently in force on your life?"
And someone wrote "$50,000."
Do you know who wrote the $50,000?
A Somebody in my office.
Q And was that accurate?
A Excuse me.
Q Was that an accurate number?

Page 92

Universitas v. Nova Group

A Yes.
Q Now, 2B:
"What is the total amount of new life insurance coverage currently applied for on your life with all companies?"
And someone has inserted 10 million, correct?
A Yes. Yes.
Q So was the initial application that was submitted to Lincoln National Life Insurance Company seeking to apply for 10 million in life insurance?
A That is correct.
Q If you turn to page five -- well, 4A states:
"Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider?"
It says:
"If yes, provide the details."
And the box "no" is checked.

Page 93

Universitas v. Nova Group

As far as you know, was that true and accurate as to Mr. Spencer at the time this application was submitted to Lincoln Life?
A That's correct.
Q And 4B states:
"Have you ever sold a policy to a life settlement, viatical, or other secondary market provider? If yes, provide details."
And the box for "no" is checked.
To your knowledge, was that a true statement --
A Yes.
Q -- with regard to Mr. Spencer at the time that this application --
A Yes.
Q -- was submitted to Lincoln Life?
A Yes.
Q If you turn to page 536, and at the top, 6A says, "Plan of insurance," and someone has inserted, "Lincoln UL DB2."

24 (Pages 90 to 93)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 98

Universitas v. Nova Group

**as, "Licensed representative slash agent's signature"?**

A Yes.

**Q And was everything in that certification true and accurate at the time you put your signature there?**

A Yes.

**Q Now, the compensation information lists your name and Donald Trudeau. Do you see that?**

A I do.

**Q And do I understand that the life insurance commissions on the $10 million policy were to be split between you and Mr. Trudeau on a 70/30 basis?**

MR. ORDER: Objection. It's her witness, but she keeps asking leading questions. I'd ask that she not ask leading questions.

THE ARBITRATOR: I think -- you know, we don't have a jury here. We want to proceed. And, you know, I think you should do your best; but I think I am going to overrule the

Page 99

Universitas v. Nova Group

objection.

MR. ORDER: I have been trying -- you know, I haven't objected before on this. But it has been going on for a while, so I just thought I'd mention it.

MS. COLBATH: And a lot of it is not so controversial. We just want to get it into the record with a little explanation.

MR. ORDER: Understood. Let's go.

**Q Did you and Mr. Trudeau split the commissions as indicated --**

A We did split the commissions.

**Q -- on the $10 million policy?**

A Yes.

**Q And I think it's your testimony -- I just want to make sure -- that Mr. Trudeau was president of Benistar --**

A That was my understanding.

**Q -- at the -- at the time this application was submitted to Lincoln?**

Page 100

**Universitas v. Nova Group**

A That was my understanding.

**Q Do you have a view as to whether that life insurance commission payment to Mr. Trudeau is an illegal rebate?**

A I don't have a view on that.

**Q Okay. Let's turn to Exhibit 18. Can you identify Exhibit 18 for the record?**

**(Exhibit No. 18, Copy of the $10 million policy issued on the life of Sash Spencer owned by the Charter Oak Trust, is introduced and accepted into the record.)**

A This is a copy of the $10 million policy issued on the life of Sash Spencer owned by the Charter Oak Trust.

MS. COLBATH: Can you read the answer.

(Reporter read back last answer.)

**Q We are going to spend a little time on 406 now.**

Page 101

**Universitas v. Nova Group**

**(Exhibit No. 406, Information Package Requested by the Charter Oak Trust, is introduced and accepted into the record.)**

**(There was a discussion off the record.)**

**Q Do you have 406?**

A I have it.

**Q Can you identify that document for the record, or series of documents?**

A This is the information package requested by the Charter Oak Trust.

**Q Did the Charter Oak Trust send the documents that comprise Exhibit 406 to you? And by the 'you,' I mean to your office.**

A I went over this document with Mr. Spencer personally.

**Q Where did you get the document?**

A Don Trudeau.

**Q Did you arrange for Mr. Spencer to sign the documents that are part of 406?**

A I did.

**Q Let's turn to page 746. It's**

Page 110

Universitas v. Nova Group

**and 9D?**

A No.

**Q What was your understanding as to what --**

A As with everything else that Mr. Spencer did, he wanted a better deal than everybody else.

**Q Okay. Paragraph ten states:**

**"The insured has the option of acquiring the policy from the trust at any time on terms to be mutually determined by the trust and the insured."**

**That is the preprinted text.**

**And then there is some handwritten addition.**

**Do you see that?**

A Yes.

**Q Can you tell me what the handwritten addition says?**

A "But no event at a cost than is set forth in number nine above."

**Q Whose handwriting is that in paragraph ten?**

A Mr. Spencer.

Page 111

Universitas v. Nova Group

**Q Did you have a discussion with him about adding that language?**

A I did.

**Q And tell you us about those discussions?**

A Mr. Spencer saw A through D as the deal, and that those were the fees to the deal. He saw paragraph ten as an extension of the deal and felt that those terms should be the same as outlined in A through D -- again, asked me to speak with them about it, which I did, and it was agreed to.

**Q At some point prior to Mr. Spencer signing the document 749 through 751 -- strike that.**

**We will go to paragraph 13 on the document:**

**"The insured" -- it states, "The insured understands and appreciates the nature and the magnitude of the risks assumed by him in entering into the transactions contemplated by the funding arrangement. The insured**

Page 112

Universitas v. Nova Group

**voluntarily and knowingly makes the" decisions -- "decision to take those risks, free of any coercion or duress."**

**Do you have an understanding as to what risks are being referred to there?**

A Not specifically, but there are general risks.

**Q What are the general risks?**

A One that might come to mind is that, on a face amount of this size, the insurance company might require Mr. Spencer to take a stress test. If he takes that stress test, then it involves exerted exercise. There could be a problem during that exerted exercise. I am speculating. That is just one risk.

Anything can happen.

**Q Look at paragraph 15. It's longer. I will let you read it to yourself and just confirm that at the time that Mr. Spencer signed this adoption agreement, on December 17, 2006, to the best of your knowledge, that was a true statement?**

A It's a true statement.

Page 113

Universitas v. Nova Group

**Q Now, am I correct that paragraph ten contemplates Mr. Spencer acquiring the policy from the trust, right?**

A Yes.

**Q And paragraph 17 states:**

**"The insured understands that, if at some point in the future he wishes for the policy to be sold, a settlement sale of the policy may not be appropriate or desirable for various reasons."**

**Do you see that?**

A Yes.

**Q Do you recall if -- at the time this adoption agreement was signed by Mr. Spencer, had you had any discussions concerning settling the policy at that point?**

A No.

**Q By the way, did Mr. Spencer to your knowledge ever meet with anyone at Charter Oak Trust?**

A He did not.

**Q In person?**

A Not that I know of.

29 (Pages 110 to 113)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 130

Universitas v. Nova Group

ending in 810, correct?

A Yes.

Q Let's go to Exhibit 31.

(Exhibit No. 31, Document, is introduced and accepted into the record.)

Q Well, did Mr. Spencer take the life insurance policy, the $20 million life insurance policy that ended in 810?

A He did not.

Q But he did take the 809 policy, right?

A He did.

Q Okay. So Exhibit 31, okay. Am I correct -- see the box in the middle of the first page of the exhibit? See the box with the entries, "Participant slash insured carrier and policy number"?

A Correct. Yes, yes.

Q Am I correct that the documents that make up Exhibit 31 relate to Mr. Spencer's $20 million policy ending in policy number 809?

A Yes.

Page 131

Universitas v. Nova Group

Q Now, when Mr. Spencer accepted the 809 policy in the face amount of $20 million, did he cancel the $10 million policy?

A No, he did not.

Q At this point -- well, let's find out what the date is.

So if you look at page 38 in Exhibit 31, is that your signature that appears on the line below the word "agent"?

A Yes.

Q And am I correct that Mr. Spencer signed on the line indicated for "participant slash insured"?

A Yes.

Q Now, let's go back to page 35 of the exhibit.

THE ARBITRATOR: Did he sign that about the same time you did, around March 19th?

THE WITNESS: Yes.

A What page are we on, please?

Q We are on page 35.

A Thank you.

Page 132

Universitas v. Nova Group

Q And I want you to read representation two:

"The policy shall be solely owned."

Do you see that?

A I see it.

Q And was that a true statement as of March 19, 2007, when you signed this document?

A Yes.

Q And number paragraph -- paragraph numbered four states:

"The policy is not being purchased with the intent of selling it in the settlement or viatical sale, and there have been no offers to sell or buy the policy. Neither agent nor funder nor the trust have recommended such a sale."

When you signed this document on March 19, 2007, was that statement true?

A Yes.

Q Paragraph seven states:

"No rebate to the participant slash insured or remuneration to the agent

Page 133

Universitas v. Nova Group

of any kind has been offered."

Do you see that?

A Yes.

Q As of March 19, 2007, when you signed this document, was that a true statement?

A Yes.

Q Now, if you look at page 36, paragraph ten addresses the fees to be paid in connection with the transaction, correct?

A Yes.

Q And the fees set forth in 10A, 10B, 10C relate to the $20 million policy, correct?

A Correct.

Q Now, 10C, the amount has been reduced from 3 percent to 2 percent; do you see that?

A Yes.

Q And then someone has written an initial; do you see that?

A Yes.

Q Is that Mr. Spencer's initial?

Universitas v. Nova Group

A Yes.

Q Okay. And do you know who reduces the 3 percent to 2 percent on the document?

MR. ORDER: Do you mean physically wrote it in?

Q On the document?

A I wrote that in.

Q Okay. And why?

A Because that was part of the original negotiation.

Q The --

A Mr. Spencer made me talk to Don Trudeau about reducing that fee from 3 percent to 2 percent -- followed suit here, as to -- as related to the $10 million policy.

Q Mr. -- strike that.

And in paragraph 11, someone has inserted the word "reasonable"; do you see that?

A Yes.

Q And who -- do you recognize the handwriting?

Universitas v. Nova Group

A That's Mr. Spencer's handwriting.

Q That statement says:

"The participant slash insured has the option of acquiring the policy from the trust at any time on terms" -- he inserts "reasonable" -- "on reasonable terms that release the plan from ongoing benefit obligations and such other terms to be mutually determined by the trust and the participant slash insured."

When you placed your signature on this document on March 19, 2007, did you understand that to be true?

A Yes.

Q And you understood that, pursuant to that paragraph, Mr. Spencer had the option to purchase the policy from the trust, right?

A Yes.

Q Now, 18 -- first let me just ask -- well, strike that.

Paragraph 18:

"The participant/insured

Universitas v. Nova Group

understands that, if, at some point in the future he/she wishes for the policy to be sold, a settlement sale of the policy may not be appropriate" for desire -- "or desirable for various reasons."

As of March 19, 2007, did you understand that statement to be true?

A Yes.

Q Paragraph --

MR. ORDER: Object. I move to strike the answer. Lack of foundation.

THE ARBITRATOR: May I have the question read back, please.

(Reporter read back last question and answer.)

THE ARBITRATOR: I'll deny the motion.

Q In fact, pursuant to paragraph 18, the insured had a right to settle the policy if physical he wanted to, correct?

A Yes.

Q Now, page 37, paragraph 21, am I correct that that is some handwriting

Universitas v. Nova Group

that has been added to that paragraph, and do you recognize the handwriting?

A Sash Spencer's.

Q Okay. Let's turn to page 55 of the document. And can you tell me what page 55 is?

A It's the adoption agreement.

Q Am I correct that it's the adoption agreement that relates to the $20 million life insurance policy --

A That is correct.

Q Let me finish, please -- assigned policy number 7320809?

A That is correct.

Q Now, page 57 -- 58, is that Sash Spencer's signature that appears there?

A Yes.

Q And on page 57, am I correct that -- what I am looking at is about midway on the page. It states, "In particular, the carrier."

Who did you understand "the carrier" to be here?

Page 158

Universitas v. Nova Group

**your office to complete these forms?**

A Myself and Mr. Spencer.

**Q Okay. And was the instruction to complete them to make Universitas Education LLC irrevocable beneficiaries under the plan?**

A Yes, yes.

**Q And, again, did you have any understanding as to why Mr. Spencer wanted to do that?**

A No. You don't question -- you didn't question Mr. Spencer.

**Q Did it ever come to your attention in this April/May time frame that Mr. Spencer had bladder cancer?**

A Yes.

**Q Do you recall when you learned that?**

A Not specifically on this date.

**Q Okay. And were you aware that he was undergoing chemotherapy?**

A I was aware of it.

**Q Approximately, how much were the commissions for both policies that**

Page 159

Universitas v. Nova Group

**Mr. Trudeau got paid?**

**Would it be easier if I asked what the total commissions were and what you got paid?**

A You know, I don't even remember specifically what I got paid. I think he was 4 or $500,000.

**Q Okay. And what were your commissions for both policies combined?**

A More than double that. If his percentage was 30 percent and mine was 70, I would have received 70 over 30 times his amount.

**Q Now, we have looked at both of the life insurance applications, and I just want to ask you:**

**To your knowledge, at the time the Lincoln applications were made for the $10 million policy and the $20 million policy, on those that you signed -- you signed both applications, correct?**

A I did.

**Q Was everything on each of those applications true and accurate as of the**

Page 160

Universitas v. Nova Group

**time you signed the application?**

A Yes.

**Q Okay. Were you taking any financial -- strike that.**

**Were you taking any business actions on Spencer's behalf with respect to the Lincoln Life policies after March of 2007, between March 2007 and his death?**

A There was no action taken.

**Q Do you recall when Mr. Spencer died?**

A I don't recall the specific date. I apologize.

**Q Did there come a point in time when you started to have some discussions with Mr. Spencer about him acquiring or selling the policies or his interests in the Charter Oak Trust?**

A There were discussions.

**Q Who were the discussions with?**

A I had probably a few discussions, a few theoretical discussions with Mr. Spencer, that were initiated by him. Then I had discussions with

Page 161

Universitas v. Nova Group

Don Trudeau based on those discussions.

**Q And what time frame are we looking at?**

A Perhaps a year after the policies were issued. There were numbers kicked around by Mr. Trudeau, but there was nothing formalized. And there was never any agreements in principle.

**Q Are me as best you can recall all of the discussions you had with Mr. Trudeau on the subject?**

A After having conversations with Mr. Spencer, I had discussions with Mr. Trudeau as to the concept of settling the two policies.

**Q Okay.**

A At this point in time, Mr. Spencer was still in the same health as when he initially procured the policies.

**Q And --**

A And Mr. Trudeau went back to his people, kicked around some numbers; and there were discussions, but there was never anything formalized, put in writing, never

Page 350

Universitas v. Nova Group

**Plan, what type of products was he considering or were you showing him?**

A Most of our initial discussions were general discussions about finance. I asked him about his business. It started more as a friendly thing. I asked him about his business, what he was doing.

He asked me about my business, what I was doing. The concept of life insurance as an asset class came up. There were a lot of discussions with regard to that.

This was not a person that you would sell. You would have an intellectual discussion, and then he would direct you. Okay. So there really was for a very long time no specific proposal for many, many months. Okay.

**Q So when you were introduced to him by your current clients, what was your understanding of the purpose of the introduction?**

A Well, my purpose was to attempt to sell him life insurance.

Page 351

Universitas v. Nova Group

**Q And did you understand from his perspective what -- why he wanted to be in touch with you?**

A There were two reasons. One was intellectual, and one was to find out whether or not what I sell had merit for him. And that took a process.

**Q Did it surprise you that a man of such high net worth had only $50,000 in insurance, life insurance?**

A A little bit, but then again he was very liquid. So that would balance off the surprise.

**Q How does that balance it off?**

A When you buy insurance for estate planning, the case to buy, to procure the insurance is much more compelling the more illiquid the client's estate is. If they had a large business or real estate holdings, it's more compelling to buy insurance.

It's not as compelling, although it makes sense from an internal rate of return perspective -- it's not as

Page 352

Universitas v. Nova Group

compelling if you have the cash to -- you know, to pay tax.

**Q But you did indicate earlier today that life insurance helps avoid excessive estate tax?**

A Well, no, the tax is the tax. It helps you fund the tax.

**Q I see.**

A It avoids disruption.

**Q But there's no tax on the insurance proceeds; is there?**

A Depending on the way that it's owned.

**Q Now, did you know Bill Hutchison before December of 2006?**

A I did.

**Q And so how did it come about that Bill Hutchison was introducing you to Don Trudeau in connection with the Charter Oak Trust?**

A I had somewhat of a business friendship with Bill over a lot of years. I had done some stop loss health insurance business with him years and years ago. And

Page 353

Universitas v. Nova Group

we had kept in touch through the friendship.

He had a friendship with Don. He may still have that friendship. I am not privy.

And he introduced me to Don as a great guy with some really good ideas. I met Don and agreed with him.

**Q Was that just in general that you were meeting Don, or it was specifically related to Sash Spencer?**

**Let me ask if this way.**

A It was not specifically -- it was specific to the concept of the Charter Oak Trust.

**Q I see.**

A Having nothing to do with Sash Spencer at the time.

**Q So what -- at what point in 2006 did you learn about the Charter Oak Trust?**

A I think it was the fall of 2006.

**Q What interested you in the**

Page 354

**Universitas v. Nova Group**

**Charter Oak Trust?**

A I thought it was a clever way to procure insurance.

**Q And did you -- what made it so clever?**

A I think Don is a very bright guy.

**Q Okay. What made you think that the Charter Oak Trust was a clever way to procure insurance?**

A The way that the insurance was funded, you know, was acceptable to the carriers.

**Q Which was what?**

A The Charter Oak Trust had millions and millions of dollars of cash, as I understand it. And that permitted the client to answer the question on the application -- or not the client -- the owner, the Charter Oak Trust, as to say that they were not financing premiums, and the owner of the -- the owner -- it was the funding arrangement that was so attractive.

**Q Was another attraction the fact**

Page 355

**Universitas v. Nova Group**

**that the insured did not have to pay for premiums?**

A Naturally.

**Q So you said you learned about the Charter Oak Trust not specifically in connection with Mr. Spencer. So my question is --**

A Generally, generally, yes.

**Q Right. And so when -- what made you put Sash Spencer together with the Charter Oak Trust?**

A There were many different choices for how to finance a life insurance policy that I was considering. The Charter Oak Trust was one of those choices. I could have gotten this deal done otherwise. I wanted to do business with my friend Bill Hutchison.

Okay. In addition to that, it was a very clever arrangement because it enabled me to answer a question on the Lincoln application truthfully. And the, client yes, did not have to fund premiums.

**Q And what interest -- what**

Page 356

**Universitas v. Nova Group**

**interest -- what interested Mr. Spencer in the plan?**

A Well, he liked the concept that he could be -- we could be forthcoming with the insurance company through the 419 plan being the owner and answering that question a certain way, and only having the policy as collateral on the funding arrangement.

**Q Were you considering products that you could not be forthcoming with the insurance carrier on?**

A No.

**Q Okay.**

A You can check my record, but I am sure you have.

**Q I am just asking you a question.**

A I'm just answering you --

THE ARBITRATOR: Let's go to the next question.

**Q Did you run any scenarios?**

**(There was a discussion off the record.)**

**Q Did you run any -- before**

Page 357

**Universitas v. Nova Group**

**entering or enrolling Mr. Spencer in the Charter Oak Trust Welfare Benefit Plan, did you run any scenarios for him with respect to life insurance products from Lincoln?**

A Of course, I showed him policy illustrations.

**Q What did they illustrate?**

A They illustrate a schedule of premiums and death benefits.

**Q Was there anything else in those -- what could you call them, projections, scenarios?**

A Anything that is included in that, normally, interest rates and so on.

**Q And how do you run those scenarios?**

A They are run on the computer.

**Q But you have to input some information, right?**

A Sure.

**Q Okay. And so do you -- did you personally run those or --**

A Sometimes I run the illustration. Sometimes I have other folks