# EXHIBIT TWO

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:13CR226(RNC) |
| ) | |
| DANIEL E. CARPENTER ) | |
| ) | MARCH 15, 2017 |

## DECLARATION OF DANIEL E. CARPENTER

I, **DANIEL E. CARPENTER**, being duly sworn and over eighteen years of age, state:

1. The government prevented me from preparing for trial, consulting with my attorneys, and from assisting my counsel with my defense. Because the government actively opposed my placement in the local Halfway House in Hartford, or Home Confinement as provided for by the Second Chance Act and 18 U.S.C. §3624, they prevented me from playing an active role in preparing and presenting an adequate defense, much less my best defense as required by the Constitution.

2. The government could also have easily facilitated a furlough in my case pursuant to 18 U.S.C. §570.33, as the judge in the Boston case recommended to allow me to prepare for and attend my trial in Connecticut. Instead, without any notice to my attorneys or the Court, the AUSA filed a detainer writ against me and I was literally pulled out of the Federal Prison Camp at Canaan on December 28th, 2015, in the middle of the night. I was stripped down, shackled, and put on a bus with other prisoners from USP Canaan (hereinafter "Canaan") and shipped to MDC Brooklyn, where I was to remain for two weeks without medical attention or any contact with my attorneys.

1

3. Unlike at Canaan, while at Brooklyn I had no access to the law library or visitation rights because I was classified as "in transit." Eventually, I was shipped out of Brooklyn in January of 2016 to the Donald W. Wyatt Detention Center (hereinafter "Wyatt") in Rhode Island, where my attorneys were allowed to visit me, but where I had no access to any law library there and very limited access (three occasions) to the computers necessary to review evidence that had been sent to me, such as the Paulsrud, Martinez, and Von Noorden deposition transcripts. At Wyatt 760 detainees had limited access to three computers and no internet access, such as I had at the Federal Prison Camp at Canaan, and where I also had stored all the files from my case.

4. Unlike at Canaan, at Wyatt I had no files except what my attorneys brought me on visits, and I had no internet access or access to a law library like at Canaan. Worst of all, we always seemed to be in a state of constant lockdown, where we could not leave our cells. Thus, while there was no internet to communicate with my attorneys, nor was there any way to review the millions of documents produced by the government.

5. I did not have the benefit of a Bill of Particulars, Rule 17 subpoena discovery, and the witnesses whose testimony I anticipated being called by the Government and would be helpful to presenting a fair picture of the events in this case were either led to fear personal criminal exposure by the government or had passed away, like Wayne Bursey who died in March of 2015, which greatly prejudiced my defense. To that end, it is telling that the Government made an immunity/cooperation deal with Mr. Induddi-Westcott the week of my trial, and not with Mr. Bursey and the people who stayed at the Benistar offices, such as Kathy Kehoe, Ineke Murphy, Barbara Korfel, Amanda Rossi, and Joe Castagno, all of whom still work at Benistar.

2

6. Not only did the government not grant immunity to the witnesses that would be favorable to me and a fair and balanced presentation of the circumstances surrounding the Charter Oak Trust, the government informed them that to testify in such a way as to contradict their earlier statements to federal agents or implicate themselves in any alleged criminal conspiracy could lead to personal criminal exposure for them. Even my wife was listed as an alleged co-conspirator. The government put these people on their witness list, put them on the list of alleged co-conspirators, but then did not call them. Instead, they called Jenny Valedaserra, who left Benistar in 2009, and her husband Stefan Cherneski, who left in 2010 after conspiring with Guy Neumann and government agents in both the raid of April 20, 2010 and the raid of May 26, 2011. The discovery and litigation in those two cases is still ongoing.

7. If a new trial were granted by the court, we would anticipate asking Agent Allen about all of **her** emails with Guy Neumann and Erik Schneider, including those before the raid of May 26, 2011.

8. Therefore, the government prejudiced my defense by effectively intimidating witnesses that would have been helpful to my defense, not turning over documents that were searchable on a timely basis, and denying me access to even basic abilities to meet and work with my attorneys in order to review documents and prepare my own defense.

9. While at Wyatt, and prior to my trial, I was awoken at 4:00AM on February 10, taken downstairs, shackled and transported to Hartford by the van drivers that worked under the US Marshall Service. I was kept in a holding cell all day. We were delivered at the back door of the courthouse building and had to walk down the same corridors that other people had to walk down, and we had to take the elevators to the top floor. There was no doubt in my mind that

there would be a chance for a potential juror to see me shackled, which was one of the big reasons that I wanted to go with a bench trial rather than a jury trial.

10. If the Court grants me a new trial, now that I am no longer incarcerated and I now know what misrepresentations the government plans to tell and what emails they plan to distort and take out of context, I would actually welcome having a jury trial because my biggest fear was having the Marshalls there and having people see me in the hallways handcuffed as I was being led from the courtroom to the holding cell and vice-versa.

11. Being in the holding cell at breaks in the trial also prevented me from working with my attorneys or even discussing the presentation of evidence with them, and, of course, the government complained to the Court that my whispering was "too loud." Perhaps if the Court grants me a new trial, I will have a greater opportunity to work with and consult with my attorneys as is guaranteed by the Constitution.

12. Having to wake up at 4:00AM to have breakfast, get medications, and then be shackled for the two-hour journey each way is not just exhausting, it deprives an individual of vital energy and it is depressing. For the six weeks of trial, my breakfast was corn flakes and my lunch was a bologna sandwich. Even if the court was over at 3:00PM, I would not be picked up by the prison van until 5:00-5:30PM, and I would be put in a holding cell at Wyatt to have dinner and then return to my cell at 8:30PM for lights-off and lockdown at 9:00PM when, of course, it was impossible to read notes or study anything.

13. The worst part of the shackling is that the shackles scraped my legs, causing bacteria to get under my skin and caused the **worst** case of Cellulitis that either Doctor Blanchette or any of the nurses at Wyatt had ever seen. Not only did I suffer from terrible flu-like symptoms during the trial, there was one day when I felt as though I was having a heart

4

attack and asked the CO to call medical because I had never felt that bad before at any time in my life.

14. The woman CO and nurse that came to escort me down to medical did an excellent job of keeping me calm, and the two nurses who spent the next 5-6 hours with me at medical literally nursed me back to life. They also arranged for Dr. Blanchette to have me examined. Most detainees at Wyatt only see a nurse or PA for even serious medical problems. Doctor Blanchette not only prescribed super antibiotics for my Cellulitis, he also prescribed a number of drugs for my high blood pressure and a suspected cardiac event.

15. It was not until I returned to Canaan at the end of May 2016 that I was examined by Dr. Mowatt, and when she reviewed my EKG, she said that I had a "cardiac event" at Wyatt. She did not know when it happened, but it clearly happened. I told her that I knew when it happened, and I told her about the worst feeling I ever had and that the nurses at Wyatt believed I was not getting enough air or exercise and needed to breathe more and walk in the locked-in (indoor) basketball court. They thought I was having an "anxiety attack" because of my upcoming trial, but the seasoned CO in charge of my unit at Wyatt said "That is bull. You looked like you were turning gray to me; that was no panic attack."

16. As Doctor Mowatt explained to me, the Cellulitis caused severe swelling; the infection and the swelling probably caused a blood clot in my leg that travelled to my heart causing some type of stroke or "cardiac event" or minor heart attack. I felt bad, but I did not die.

17. I am extremely grateful for the medical care I received from Doctor Blanchette at Wyatt and from Doctor Mowatt at Canaan, and I would not be here today if not for the care I received from the PA's, Ms. Carey, and Mr. Baron at Canaan. Considering how bad medical care is in the BOP, I know that I am extremely fortunate.

18. Because of my physical condition, the Cellulitis and cardiac event, there is no doubt that my trial should have been postponed. The government had delayed my indictment to several years after the raid of April 2010 and the raid of May 2011, probably because I received my second New Trial Order in Boston on September 1, 2011. The government did not indict me until two weeks after that New Trial Order was overturned on November 28, 2013. Then, after I sued Agent Lynn Allen several months later in April 2014, the government did a truly baseless superseding indictment in May of 2014. I strongly believe that I am a victim of ongoing prosecutorial vindictiveness because I had the temerity to sue Agent Schrader and Agent Allen for the commando raids on my building at 100 Grist Mill Road in Simsbury.

19. By issuing a detainer writ on me and transporting me to Brooklyn and then Wyatt, the government not only violated my constitutional rights and Due Process, but also the "anti-shuttling" provision of the Interstate Agreement on Detainers Act ("IAD"). Wyatt is not part of the BOP or under Federal jurisdiction. When I was brought from Wyatt to the Federal Court House on February 10th and then brought back to Wyatt, which is exactly the same situation as described in *Alabama v. Bozeman*, 533 U.S. 146 (2001). In *Bozeman*, the Supreme Court made clear there is no "*de minimus*" exception to the IAD, so my Connecticut indictment should be dismissed and the government made to re-indict me, if they can.

20. I realize that if I was transferred from one federal prison to another federal prison such as Brooklyn, then the IAD would not be triggered. But, the AUSA in this case issued a Detainer Writ without notifying my attorneys or the Court, sent me to a private detention center in a different state, and then before my trial was over and a verdict rendered, sent me back to my federal prison. The IAD was triggered and the "anti-shuttling" provision was violated multiple times by taking me from Wyatt to Federal Court and then back to Wyatt each time, and then

6

sending me back to Canaan where they deprived me of Halfway House time and Home Confinement under 18 U.S.C. §3624.

21. The government deprived me of my rights to a fair trial, the right to prepare and present my best defense, and my right to assist counsel in preparation of my defense. They did this purposefully and maliciously as they could have arranged for a furlough under 18 U.S.C. §570.33, or Home Confinement for me under 18 U.S.C. §3624. Instead, they did neither. Rather, they violated the IAD's "anti-shuttling" provision by having me shackled from Canaan to Brooklyn to Wyatt to Hartford Federal Court, back to Wyatt and then back to Canaan.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 15th day of March, 2017.

_____
DANIEL E. CARPENTER

Sworn to before me this
15th day of March, 2017

_____
Notary Public
My commission expires:
(Notary seal/stamp)



AMANDA ROSSI
Notary Public, State of Connecticut
My Commission Expires April 30, 2017



7