# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 3:13CR226(RNC) |
| ) | |
| v. ) | |
| ) | |
| DANIEL E. CARPENTER ) | |
| ) | SEPTEMBER 5, 2017 |

## DEFENDANT'S REPY TO THE GOVERNEMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33

In the government's Opposition Brief (Doc. 263) ("Gov. Opp."), it is submitted that the government greatly misapprehends and underestimates the significance of the Bruce Mactas testimony at the Universitas Arbitration Hearing in December 2010. It is what the Court as the trier of fact believes that is the important element in the analysis of what constitutes *Brady-Giglio-Bagley* evidence, and the Mactas testimony absolutely refutes each and every point that the government refers to as "overwhelming" evidence in the Court's Verdict (Doc. 212). Mr. Carpenter is entitled to a new trial in the interest of justice and for the government's several violations of *Brady*.

### I. THE GOVERNMENT MISUNDERSTANDS AND MISCONSTRUES ITS OBLIGATIONS UNDER *BRADY*

Just two months ago in *Turner v. United States*, 137 S.Ct. 1855 (2017), both the Majority and even the Dissent in the Supreme Court's opinion cited *Kyles v. Whitley*, 514 U.S. 419 (1995) for the famous "*Berger* standard," describing the government's obligation to pursue justice rather than convictions while restating the standard for a *Brady* claim:

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Neither does the Government contest petitioners' claim that it "suppressed" the evidence, "either willfully or inadvertently." *Id.* at 282. It does, as it must, concede that the Brady rule's " 'overriding concern [is] with

-1-

the justice of the finding of guilt,'" *United States v. Bagley*, 473 U.S. 667, 678 (1985) (*quoting United States v. Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "'interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" *Kyles* at 439 (1995) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a "**generous policy of discovery**" in criminal cases under which it discloses any "information that a defendant might wish to use." Tr. of Oral Arg. 47–48. As we have recognized, and as the Government agrees, "[t]his is as it should be." *Kyles* at 439 (explaining that a "'prudent prosecutor['s]'" better course is to take care to disclose any evidence favorable to the defendant (*quoting Agurs* at 108)). *Turner* at 1893. (Emphasis added.)

Petitioners and the Government, however, do contest the materiality of the undisclosed Brady information. "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (*citing Bagley* at 682). "A 'reasonable probability' of a different result" is one in which the suppressed evidence "'undermines confidence in the outcome of the trial.'" *Kyles* at 434 (*quoting Bagley* at 678). In other words, petitioners here are entitled to a new trial only if they "establis[h] the prejudice necessary to satisfy the 'materiality' inquiry." *Strickler* at 282.

Pursuant to the Due Process Clause, the Government must disclose to the defense any material information in the Government's possession that is materially exculpatory or that may be used to impeach Government witnesses. *Bagley* at 676-77. In the context of interviews, the Government must disclose all material exculpatory information it learns, regardless of whether it reduces the statements to writing or takes written notes of the interview. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).

In assessing post-trial claims that the prosecution violated its *Brady* duties, it does not matter whether or not the prosecution acted willfully or inadvertently, *Strickler* at 281-82, nor does it matter what Mr. Carpenter believes what Mr. Mactas testified to in the Universitas Arbitration of December 2010. Thus, the Court need not decide whether "non-disclosure was a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the evidentiary significance of the material." *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). Rather, what matters is that evidence that should have been disclosed to

the defense so that it could be effectively used at trial was not disclosed or identified to the defense, resulting in the defendant suffering prejudice. To show prejudice, a defendant need not prove he necessarily would have prevailed at trial had the information been disclosed. Rather, he need only show that there is a reasonable "**possibility of a different result.**" *Strickler* at 300 (explaining that this is the meaning of the traditional "reasonable probability" standard). *See Kyles* at 433-35 (A "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (*citing Bagley* at 682). Mr. Carpenter would respectfully point out to the Court that the very exhibits that the government points to as establishing that Mr. Carpenter "thinks Mr. Mactas is lying" establishes Mr. Carpenter's innocence and effectively undermines the government's entire theory of the case. For instance, according to the government's email exhibits, Mr. Carpenter accuses Mr. Mactas of using the Charter Oak Trust to do a "STOLI" deal for Sash Spencer whose mistress was running the suspect charity Universitas, see Doc. 263 at 12-13, yet it was Mr. Carpenter who was indicted for allegedly lying to the carriers to induce them to issue "STOLI" policies to the Charter Oak Trust.

The fact that Mr. Mactas says that all four questions were answered truthfully and accurately is of course *Brady* exculpatory evidence that destroys the government's case. But even more interesting is the fact that agents like Mr. Mactas were alleged by the government to be Mr. Carpenter's "co-conspirators" in this case and that the government's theory of the case is that Mr. Carpenter created a bogus welfare benefit trust to do "STOLI in disguise" so that he could somehow obtain ownership of the Charter Oak policies and then somehow sell the policies without Christiana Bank or Ridgewood approving the transaction. Yet the newly presented email evidence just recently **provided by the government itself** shows that Mr. Carpenter in the

-3-

emails is defending the sanctity of the Charter Oak Trust and is accusing Mactas, Spencer, and Universitas of fraudulently using the Charter Oak Trust to get money to Mr. Spencer's purported former mistress at Universitas through the fraud of listed government witnesses Mactas, Seibert, and Vassar. See Doc. 263 email Exhibits filed under seal.

The government's own recent disclosures of Mr. Carpenter's reaction to the Mactas testimony are quintessential *Brady* evidence in and of themselves. The fact that Mr. Carpenter would be indicted three years later for allegedly creating a welfare benefit plan to act as "STOLI in disguise" proves that not only is the Mactas arbitration testimony material and exculpatory evidence that was not identified **or given** by the government as *Brady-Giglio-Bagley* documents, it clearly would have changed the outcome of the case and the standard for *Brady-Giglio-Bagley* material is if there is any "**reasonable possibility** that disclosure of the evidence would have led to a different outcome." See *Turner* at 1893. This new email evidence also destroys the illusion of any possible conspiracy between Mr. Carpenter and Mr. Mactas, who was 100% responsible for the submission of the Spencer applications to Lincoln. At trial, Ken Elder stated that had Lincoln known someone was lying on an application or purposefully doing STOLI they would have been terminated. See Doc. 229 at 122-123. Yet to this day, neither Mr. Mactas nor Mr. Trudeau (the only two agents on the Spencer applications) have been terminated by Lincoln, so Lincoln obviously believes that the four questions were answered correctly or were not material, and therefore there is no mail fraud or wire fraud involving the Spencer insurance applications and no "Specified Unlawful Activity" proceeds in this case. The SUA proceeds charged in the indictment were not the same. So, therefore, not only is Mr. Carpenter entitled to a new trial, he is entitled to a judgment of acquittal on the Money Laundering counts and he is clearly entitled to access to the government's entire discovery file because he is the Accused in this case and

there is voluminous *Brady-Giglio-Bagley* evidence that was not adequately identified or even disclosed to Mr. Carpenter's attorneys in time for it to be used at trial. As the Second Circuit stated in *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002):

> *Brady* material must be disclosed in time for its effective use at trail. The critical *Brady* evidence in that case was a memo that was provided in a Box marked 3500 material along with 2700 other pages a day before the trial began. The Second Circuit also went on to say that "The Government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the prosecution team. See *Kyles* at 438. The government thus constructively possessed the [Bradford] memo long before it was turned over to the defense." *Gil* at 105-07.

Therefore, since the government is just now pinpointing the Mactas testimony emails from December 2010, they have clearly delayed identifying *Brady* evidence that was in their possession. This fact alone requires a new trial for Mr. Carpenter under the law of the Second Circuit. Plainly, then, none of the Government's efforts to downplay the materiality of the information have force. For the reasons described above, the **non-identified Mactus** information was most certainly **material** and **exculpatory**. The remedy for a *Brady* violation is a new trial. In any event, even had these precise issues been addressed by the government in its Opposition, the law of the case doctrine does not apply when there are "cogent" and "compelling" reasons for revisiting prior rulings such as clarifications of governing law. The Second Circuit's decisions in *Countrywide* and *Finazzo* constitute just that, and the "availability of new evidence" such as the Mactas *Brady* evidence is a classic reason for examining an issue afresh. *See Gordon v. United States*, 2011 WL 2638133, at *4 (S.D.N.Y. 2011). The law and now-available facts clearly show today that there were several *Brady* violations here by the government and Mr. Carpenter is entitled to a new trial based on the multiple *Brady* violations.

The government also misapprehends and misconstrues the significance of the Mactas testimony in regard to other issues surrounding this case. Not only does Mr. Mactas state that all

of the questions on the Sash Spencer applications were answered accurately and honestly – which he also stated on the Agent's Statement during the year-long investigation into Sash Spencer's death and applications – he also states that utilizing the Charter Oak Trust welfare benefit plan to purchase the Spencer policies was the **only** way that the four questions could be answered truthfully. Thus the Mactas testimony also bolsters Mr. Carpenter's testimony at trial that the Charter Oak Trust was a bona fide welfare benefit trust, the Trust had an insurable interest in the insured as a matter of law, the Split-Dollar Arrangement was **not** premium financing, and all of the carriers knew about Mr. Carpenter's company because "knowledge of the agent is knowledge of the carrier." *See Stipcich* at 320-21. It is beyond dispute that Mr. Carpenter never spoke to Mr. Mactas or Mr. Spencer and that Mr. Mactas and his staff handled all aspects of the submission of the Spencer Applications. If Mr. Mactas and Sash Spencer did not lie on those applications, then there was no mail and wire fraud involving the Spencer Applications and therefore there was no mail and wire fraud to convert the Spencer insurance proceeds into Specified Unlawful Activity (SUA) proceeds. If there are no SUA proceeds in this case, then Mr. Carpenter is entitled to a Judgment of Acquittal on all of the Money-Laundering Counts (Counts 34-57) as a matter of law; but at the very least, he is entitled to a new trial pursuant to Rule 33 because the "Mactas Testimony" is clearly classic *Brady-Giglio-Bagley* evidence that should have been identified as such and provided before the trial began, but it certainly was not.

Furthermore, not only was there no meeting of the minds here – as soon as Sash Spencer died – Mactas and Carpenter were diametrically opposed to each other – far from alleged "co-conspirators" they were "courtroom" adversaries both in the negotiations with Wayne Bursey and in the Universitas Arbitration. Everyone involved knew that Mr. Carpenter's company Grist

Mill Capital had a competing claim for the Sash Spencer death proceeds. Even a cursory glance of the unlawfully seized evidence that was unlawfully used by the government at his trial shows that Mr. Carpenter distrusted both Mactas and Universitas – and was certainly not in a conspiracy to defraud the carriers with them. See Mactas presentation of Charter Oak Trust Funding by Grist Mill Capital to Tucker and Spencer attached as Exhibit One.

The Court references the Wayne Bursey memo to Lincoln stating that the Charter Oak Trust had a duty to pay Universitas – what Mr. Bursey thought was a noble charity meant to provide inner-city children with scholarships. It was not until much later that Mr. Bursey would discover that Universitas was a cover for Sash Spencer's illicit affair with his mistress Sharon Seibert and her friend Donna Vassar. Universitas was not going to provide scholarships – it was going to build a "pleasure palace" in Las Vegas for overworked executives. See Exhibit Two. That is why at no time did Mary Spencer, the widow, know there was $30 million being paid to her husband's alleged former mistress. In fact, once Mary Spencer got involved, her attorneys threatened Jack Robinson and Wayne Bursey with litigation if they were to pay the "two floozies". The government did not produce any of these emails at trial – or the illicit agreement whereby Universitas would give up its right to the $30 million in exchange for a $5 million "gift" from Mary Spencer. See Exhibit Three. An evidentiary hearing is required by Fundamental Fairness to prevent a miscarriage of justice in this case

Nowhere did the government turn over any information stating this is *Brady-Giglio-Bagley* information that the defense requested. Moreover, at this late date, Mr. Carpenter, as the accused, has received nothing personally and would not have been able to do *Brady* searches of the material provided by the government as he has not yet "received" access to the data as required by *Brady* and the Sixth Amendment of the Constitution. (See Doc. 258 Mr. Carpenter's

Motion for Personal Access to the Discovery Material Filed on July 20, 2017 a year after Mr. Carpenter's trial). Mentioning *Ohle* and *Faux* are unavailing because the courts in those cases made sure the defendants **had access** to the alleged *Brady* information. See Gov. Opp. at 4.

## I1. THE INTERESTS OF JUSTICE REQUIRE A NEW TRIAL FOR MR. CARPENTER

Mr. Carpenter is entitled to a new trial pursuant to Rule 33 for a number of reasons in the interests of justice including, but not limited to, the following reasons:

1. The government did not comply with its constitutional obligations under *Brady*, *Giglio*, and *Bagley*, and the government committed multiple violations of the Fourth, Fifth, and Sixth Amendments of the Constitution, as well as these multiple *Brady* violations.

2. The government has limited Mr. Carpenter's access to the evidence in this case to this very day, and made sure he was shuttled back and forth from Wyatt every day instead of being at Watkinson House in Hartford or at home under a furlough pursuant to 28 C.F.R. §570.33.

3. In searching to prove that the testimony of Bruce Mactas in the Universitas Arbitration in December 2010 was neither "exculpatory" for Mr. Carpenter nor *Brady-Giglio-Bagley* evidence inadvertently suppressed by the government, they again violated the Fourth Amendment by searching the unlawfully-seized servers in the Raid of May 26, 2011 to find emails of Mr. Carpenter showing that he thought Mr. Mactas was lying and accused Mr. Mactas and Sash Spencer of defrauding his company Grist Mill Capital by doing "STOLI in disguise"; the same crime the government would accuse Mr. Carpenter of three years later.

4. The government to date has not identified a single email or piece of paper as *Brady-Giglio-Bagley* evidence, so that anything the Court now sees going forward that is helpful to Mr. Carpenter's case is by definition suppressed *Brady-Giglio-Bagley* evidence.

5. The Mactas testimony and the Carpenter emails also prove there are no SUA proceeds in this case, because the crime alleged was Mr. Carpenter inducing the carriers to issue policies that he would somehow take control of and then sell after the two year contestability period was over. Therefore, Spencer's death is an intervening event that creates non-SUA proceeds or proceeds that cannot be SUA proceeds by any stretch of the definition since Spencer's death proceeds were not the product of the scheme charged in the Indictment.

6. Similarly, Mr. Carpenter wishes to point out that Mr. Mactas shopped the Sash Spencer applications to Lincoln in 2006 before the defendants in *Binday* became successful in the "STOLI" business in 2008, much less the Second Circuit's decision of October 2015. Once again, Mr. Mactas states he was 100% responsible for the Sash Spencer applications, and he was in the "STOLI" business before the defendants in *Binday*.

7. The government is guilty of a Prejudicial Variance because the indictments accused Mr. Carpenter of being in a conspiracy to make false misrepresentations on various insurance applications, but now claims that Mr. Carpenter did not tell the carriers his company was funding the policies. However, all of the carriers involved in this case accept millions of dollars from banks, corporations, and premium financing companies each year, and no one in America has been indicted for funding a life insurance policy, that is, except Mr. Carpenter.

8. The Mactas *Brady* evidence also proves that the mailings and wires were not "in furtherance" of any fraud because Mactas states he could have found the funding himself and that Spencer, as a billionaire, could have funded the premiums himself. Moreover, the Mactas *Brady* evidence also proves that the government needed to use the premium-paying wires because none of the applications were within the Statute of Limitations when they were submitted to the carriers. See Exhibit Four listing mailings and wires from Doc. 229 at 55.

9. The government has also violated the Anti-Shuttling Provision of the IAD. By shuttling Mr. Carpenter out of Canaan where all of his legal files were held, to Brooklyn and then to Wyatt – a non-federal detention center – the government interfered with his ability to prepare his defense as well as affected his rehabilitation as the government ended up costing him **ALL** of his Halfway House time as well as his Home Confinement time under 18 U.S.C. §3624(c). So, instead of receiving the one year of Halfway House and Home Confinement that every nonviolent prisoner receives, Mr. Carpenter received no Halfway House time at all. Instead of recommending a furlough pursuant to 28 C.F.R. §570.33, he had to travel in chains back and forth from Wyatt every day. But, the van drivers were not US Marshals, so contrary to the government's Opposition, he was not in the custody of the US Marshals at all times.

10. The Anti-Shuttling Provision also guarantees that the defendant can participate in the development of his defense. The IAD expressly sought to discourage unexpected transfers at the caprice of prosecutors, which can cripple a prisoner's efforts at rehabilitation. *See Alabama v. Bozeman*, 533 U.S. 146, 154 (2001), stating the "point is obvious that the violations of the anti-shuttling provision directly and intentionally impact a prisoner's rehabilitation; S. Rep. No. 91-1356, at 6; H.R. Rep. No. 91-1018, at 7."

## CONCLUSION

For the above reasons, Mr. Carpenter moves that based on the many different implications of the Mactas *Brady* evidence, the government's violation of the IAD, and the decisions the government made to prevent his preparation for his best defense and a fair trial, the Court should grant Mr. Carpenter's Motion for a New Trial based on the many interests of justice raised in this Motion.

**Respectfully submitted,**
Defendant, Daniel Carpenter

By: _____
Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar No. Ct00009
rbrown@bpslawyers.com

## CERTIFICATION

This is to certify that on September 5, 2017, a copy of the foregoing Reply was served by email to all parties by operation of the Court's electronic filing system or by email on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

A.U.S.A. Neeraj Patel
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar No. Ct00009