UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.  3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | September 6, 2017 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR RECONSIDERATION OF THE COURT'S SUPPRESSION RULING**

# TABLE OF CONTENTS

I.   Relevant Background ...................................................................................................... 2

     A.   The 2010 Search ................................................................................................. 2

     B.   2011 Seizure of 2010 Search Materials .............................................................. 3

     C.   Motion Practice ................................................................................................... 6

     D.   The Trial ............................................................................................................. 10

II.  Legal Standard .............................................................................................................. 11

III. Carpenter's Motion for Reconsideration is Untimely and Fails on the Merits ................ 13

     A.   The Search Warrant Was Sufficiently Particular and not Overbroad ................... 14

          1.   Failure to Name the Crime Under Investigation Does Not Render the
               Warrant Insufficiently Particular. ............................................................. 15

          2.   Carpenter Points to No New Controlling Law to the Contrary. ................ 22

          3.   The Court Can Also Find Good Faith as an Alternative Basis for Denial of
               Suppression. ............................................................................................. 25

          4.   *United States v. Wey* Is Factually Distinct and Is Not Controlling Law ... 30

     B.   There Is No Basis to Reconsider the Court's Ruling Regarding Retention of
          Records ................................................................................................................ 34

     C.   Carpenter Does Not Have Standing to Suppress Almost All of the Government
          Trial Exhibits Gleaned from the 2010 Search ...................................................... 38

IV.  Conclusion .................................................................................................................... 40

The Government files this memorandum in opposition to defendant Daniel Carpenter's motion (Doc. 243) for reconsideration of the Court's denial of his motion to suppress evidence recovered pursuant to a search warrant issued on April 16, 2010 and executed on April 20, 2010 by agents of the Internal Revenue Service at 100 Grist Mill Road, Simsbury, Connecticut (the "2010 search"). Carpenter previously filed a motion to suppress that evidence (Doc. 82) and a memorandum in support (Doc. 83) on September 15, 2014. Following briefing and argument, the motion was denied by the Court in a written opinion dated December 14, 2015 (Doc. 155).

## I.    Relevant Background

### A.    The 2010 Search

The relevant factual background of the 2010 search is set out in the Government's response to the defendant's motion to suppress, filed on November 5, 2014 (Doc. 97), which is incorporated by reference—and not repeated in full—here. In brief, on April 16, 2010, the Internal Revenue Service-Criminal Investigations ("IRS-CI") obtained a search warrant from the Honorable Thomas P. Smith, United States Magistrate Judge, as part of an investigation being supervised by agents and federal prosecutors in Wisconsin (the "IRS warrant" or the "2010 warrant"). *See* Doc. 83-1 (2010 warrant and application). The investigation focused on the promotion and administration of abusive 419 welfare benefit plans by entities and individuals located at 100 Grist Mill Road in Simsbury, Connecticut ("100 GMR"). Judge Smith signed the warrant based upon a 57-page affidavit by Special Agent Shaun Schrader of the IRS-CI (the "Schrader Affidavit"), based in part on the assistance of a Cooperating Witness ("CW") and undercover agents. *See* Doc. 83-2 (Affidavit of Special Agent Schrader, with attachments). The warrant authorized the search of 100 GMR for certain specified documents and records maintained by and/or on behalf of Nova Benefit Plans LLC; Benistar; Benefit Plan Advisors; Benistar 419 Advantage Plan; Benistar 419 Plan & Trust; Nova Sickness, Accident, Disability & Indemnity Trust ("SADI"); US Benefits

Group, Inc.; Nova Long Term Care Trust; Nova Life One Plan & Trust; Grist Mill Trust; and any other trusts, businesses or entities that promote, administer, or utilize 419 plans for the time period 2004 to the present. *See* Docs. 83-1, 83-2. The warrant also authorized the search of computers, electronic devices, and related storage media for the specified categories of material. *Id.*

The warrant was executed at 100 GMR on April 20, 2010. In addition to copies of the warrant itself, executing agents were provided with a "search warrant plan" that included an extensive summary of the investigation. *See* Doc. 97-1 (Excerpt from Search Warrant Plan). That summary specified the crimes under investigation and contained a statement of objectives for the warrant execution, which included securing evidence of abusive 419 plans. *Id.* The summary explained how 419 plans worked and discussed information from the CW regarding the abusive nature of the 419 plans, including the approval of frivolous claims and the termination of plans, which allowed "business owners and individuals to underpay their taxes." *Id.* The plan identified the "known businesses and trusts," but also noted that "the above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans." *Id.*

Agents seized 322 boxes of documents along with 13 images of computers located at 100 GMR. *See* Declaration of IRS-CI Special Agent Patrick J. Debbink ("Debbink Decl.") ¶ 1 (located at Doc. 97-2). The material taken was a small fraction of the total on site. *See* Doc. 97-3 (sample entry and exit photos).

**B. 2011 Seizure of 2010 Search Materials**

Following the IRS search, privilege and Rule 41(g) litigation ensued, both in Connecticut and in Wisconsin. *See* Debbink Decl. ¶¶ 4-16. Among other things, several individuals and entities—including Carpenter—issued blanket claims of privilege over the seized material. Debbink Decl. ¶ 4. In connection with that litigation, United States District Judge Lynn Adelman

of the Eastern District of Wisconsin issued three orders regarding the operation of a filter team to review the seized material for privilege, on March 11, March 22, and August 5, 2011. *See* Debbink Decl. ¶ 7; *In Re Grand Jury Proceedings*, No. 10-MC-049 (E.D. Wisc.) (Adelman, J.) (three orders attached at Doc. 97-4). The parties settled the Rule 41(g) litigation—which did not involve Carpenter—when the Government agreed to return the hard copy documents after a reasonable opportunity to copy them. Debbink Decl. ¶ 6. Boxes with relevant documents were returned to Halloran and Sage ("Halloran"), counsel for Benistar Admin Services Inc. ("BASI"), an umbrella company for the 100 GMR entities, while boxes with no responsive documents were sent directly to the targets. Debbink Decl. ¶ 9.

Meanwhile, on May 25, 2011, the United States Department of Labor ("DOL") sought search warrants for an unrelated investigation being run out of Connecticut (the "DOL warrants"), including a request to search some of the material previously seized by the IRS. As of the time of the May 26, 2011 execution of the various DOL warrants, the targets in the IRS investigation (including Carpenter) had not provided privilege logs related to either Electronically Stored Information ("ESI") or hard copy material seized in 2010, there was no resolution as to the privilege claims by the targets, and thus the Wisconsin prosecution team was prohibited from searching the material seized in April 2010. Debbink Decl. ¶ 10. Indeed, the targets did not produce their first privilege log until June 22, 2011, Debbink Decl. ¶ 12, and the targets were still preventing the investigative team from searching non-privileged material as of September 27, 2011, Debbink Aff. ¶ 16. Moreover, as of May 26, 2011, there were some boxes of seized material that had already been returned to Halloran, while others remained at the IRS in Wisconsin. Debbink Aff. ¶ 11.

The DOL investigation focused on a separate 419-related scheme utilizing the Charter Oak

Trust, Charter Oak Trust 2009, and the Charter Oak Trust Welfare Benefit Plan (collectively the "COT"), along with certain other associated entities and individuals located at 100 GMR and 300 First Stamford Place in Stamford, Connecticut ("300 FSP"). The DOL warrants did not seek records related to all 419 plans, but only as to the specific entities and individuals related to the operation of the COT. Some of the DOL warrants authorized the search of materials that had been seized through IRS warrant at 100 Grist Mill Road, while others called for new physical and electronic searches, both at 100 Grist Mill Road and at other locations:

- Warrants in Connecticut to search the 13 images of digital media made in the IRS search;

- A warrant in Wisconsin to search the few remaining boxes from the IRS search that had not been sent to Halloran and Sage or back to 100 Grist Mill Road;

- A new physical search of 100 Grist Mill Road, including imaging servers and several other computers;

- A search of 300 First Stamford Place in Stamford, a second business location for the 100 Grist Mill Road businesses;

- A search of the offices of Ridgewood Finance in Stamford; and

- A search of the offices of Pacini and Company in Houston, Texas.

Simultaneous to the execution of the DOL warrants on May 26, 2011, agents served on Halloran a grand jury subpoena for COT-related documents that had been seized from 100 GMR in the IRS search, but had been returned to the custody of Halloran as counsel for BASI pursuant to the second Judge Adelman filter order.

Following the DOL seizures, further privilege and return-of-property litigation ensued that is well documented elsewhere in this case and not relevant to the present motion for

reconsideration.   *See* Doc. 97 at 19-20.

## C.    Motion Practice

On December 12, 2013, a federal grand jury sitting in Hartford, Connecticut returned a 33-count indictment charging defendant-movant Carpenter ("Carpenter") and co-defendant Wayne Bursey ("Bursey") (collectively "the defendants") with Wire Fraud, in violation of 18 U.S.C. § 1343; Mail Fraud, in violation of 18 U.S.C. § 1341; and Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349.   On May 14, 2014, the same federal grand jury returned a superseding indictment that included the original 33 counts of mail and wire fraud and conspiracy, and then added an additional 24 counts of money laundering, illegal monetary transactions, and conspiracy to commit money laundering.   The charges in the indictment mirror the allegations in Special Agent Allen's affidavit in support of the DOL warrants.

On September 15, 2014, Carpenter filed a motion to suppress evidence seized in the IRS search (Doc. 82) and a memorandum in support (Doc. 83).   This was in addition to motions to suppress evidence seized in the DOL searches (Docs. 72, 80, and 81), which are not subject to Carpenter's current motion for reconsideration.   Carpenter's motion to suppress evidence seized in the IRS search made several principal arguments: that the affidavit in support of the warrant application contained material misstatements and omissions; that the affidavit lacked probable cause; that the warrant was invalid because it did not attach the affidavit in support; that the warrant was overbroad, i.e., that it authorized a search for more than the affidavit permitted; that the warrant was insufficiently particular, i.e., that it failed to state with enough detail the material that was authorized to be seized; that the IRS held the fruits of the search, and in particular electronic material, for too long, pursuant to the since-vacated panel decision in *United States v. Ganias*; and that the manner of execution of the warrant violated due process.   *See* Doc. 83.

On November 5, 2014, the Government responded in one memorandum to both of

Carpenter's motions to suppress (as well as to co-defendant Wayne Bursey's motion to suppress the DOL-seized evidence). *See* Doc. 97. The Government addressed every one of Carpenter's arguments. Among other things, the Government explained at length the legal standard for overbreadth and particularity challenges, *see* Doc. 97 at 39-43, and why the IRS warrant was not overbroad and was sufficiently particular, *see* Doc. 97 at 54-62. The Government directly addressed Carpenter's claim that the warrant was invalid because it did not name on its face the offense under investigation, explaining that "there is no such requirement in the constitution or in the law of this circuit, especially in cases of complex fraud." Doc. 97 at 61. The Government also explained how the cases employed by Carpenter were distinguishable on the law and the facts. *Id*. The argument was virtually the same for the DOL warrant, where the defendant attempted to rely on *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013), and *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), in which the warrants authorized searches for evidence of any criminal offense, even though the underlying affidavits' probable cause supported significantly narrower violations. The Government explained that those cases were easily distinguishable from this one, where the "the categories [to be seized] are highly particularized and directed the executing agents not just to particular categories of documents, but further directed them to seize those categories only related to a particular time frame, entities, and individuals." Doc. 97 at 52-53. Finally, the Government attached the operational or search warrant plans for both the 2010 and 2011 warrants, which made clear the offenses that were under investigation, thereby rendering the execution of the warrant in good faith. *See* Doc. 97 at 62-67.

The Government also responded to Carpenter's argument that the Government held the 2010 warrant material for an unreasonably long time. *See* Doc. 97 at 67-72. The Government explained that the relevant inquiry in *this* criminal prosecution was whether the IRS was still

reasonably in possession of the 2010 search material at the time the DOL seized portions of it and not, as Carpenter claimed, whether the IRS was legitimately still in possession of material at the time of the motion practice (long after the DOL had seized portions of it). Doc. 97 at 67 n. 11. At the time of the Government's opposition brief, the panel opinion in *United States v. Ganias*, 755 F.3d 125, 135 (2d Cir. 2014) was still precedential, and so the Government explained why the process here did not trigger the panel's concerns in *Ganias*. Unlike in *Ganias*—where agents obtained an unrelated new warrant for a computer after the initial search of that computer had allegedly been completed—when DOL agents seized some of the 2010 warrant material, prosecutors and agents in Wisconsin had been prevented from even beginning their search because of privilege claims by Carpenter and other targets, and thus still reasonably possessed each of the IRS-seized images in its entirety. *See* Doc. 97 at 70-71.

The Government also responded to Carpenter's due process claims, pointing out that he provided no evidence that would satisfy the standards for such a violation. *See* Doc. 97 at 72-74.[1]

On December 24, 2015, the Court issued a ruling denying the motion to suppress evidence as to both warrants. *See* Doc. 155. The Court addressed the issue of particularity, finding as to the 2010 warrant that "[i]n contrast to a general warrant, Attachment 6 limits the search to documents that were maintained by or on behalf of an entity or trust that 'promote[d], administer[ed], or utilize[d] 419 plans,' between 2004 and 2010; the documents are further subdivided into several enumerated categories." Doc. 155 at 10.[2] Similarly, the Court found the

---

[1] The Government also responded to Carpenter's other claims, including that the affidavit included material misrepresentations and omissions, and that it lacked probable cause, but Carpenter does not appear to revisit those claims in the current motion.

[2] The Court referred to Attachment 6 rather than Attachment B to the 2010 Warrant. "Attachment 6" was actually an attachment to the IRS search warrant execution plan that the Government attached to its initial motion response, *see* Doc. 97-1 at 6-8, and was identical to Attachment B to the search warrant. Attachment B in its original form was included in Carpenter's initial motion to suppress at Doc. 83-2, which contains the Schrader affidavit, and is also included as part of Exhibit 2 to his motion for reconsideration. However, there is no difference between the two

2011 warrant sufficiently particular because "Attachment D limits the search to certain documents related to certain individuals and entities between 2006 and 2011. The documents are subdivided into various categories, including copies of federal and state income tax returns related to certain individuals, and records of income and expenses relating to certain businesses." *Id*. at 10-11. The defendant misleadingly attached the 2010 application and warrant as one document, which seemingly caused the Court to note that the crime was listed on the face of the warrant (it was actually on the face of the application). Nonetheless, in finding that the warrant was not a general one, the Court relied principally on the particularity of the incorporated attachment. *See* Doc. 155 at 10. Moreover, the Court found the 2011 warrant sufficiently particular even though it did not name the crime in the attachment, but instead had an attachment which was detailed similarly to the one from 2010.

The Court also addressed the retention of evidence. *See* Doc. 155 at 15-18. The Court distinguished the panel decision in *Ganias*, which by that time had been reheard *en banc* and was pending decision, because the Government still had not finished its search of the material from either warrant. *See* Doc. 155 at 17. In other words, in accord with the panel decision in *Ganias*, the Government was not simply holding unresponsive material in the hope it would be useful in some future investigation. *Id*. The Court applied a reasonableness standard to the Government's retention of evidence, and found that "in light of the delay caused by the privilege litigation, and the volume of the documents, the Government's retention of the documents pending further proceedings in this case is reasonable." *Id*. at 18.

Finally, the Court dismissed Carpenter's due process claims, finding that he had done nothing to sustain his burden to show that the Government's conduct was "conscience-shocking."

---

documents, and therefore any confusion is irrelevant to the Court's analysis.

*Id.* at 19.[3]

### D. The Trial

A bench trial took place between February 22, 2016 and March 21, 2016. During the course of the trial, the Government introduced more than 800 exhibits (and more than a thousand considering the composite exhibits 1601-1605). The exhibits came from many different sources, including third-party subpoenas to banks, insurance companies, and other entities; warrants executed at non-Carpenter entities; the 2011 warrant executed at 300 FSP; the 2011 warrant executed at 100 GMR; and the 2010 warrant for 100 GMR, via the subpoena to Halloran, the search warrant for the remaining IRS boxes in Wisconsin, and the search warrant for computer images held by the IRS. *See* Doc. 207 (Government Exhibit List). Of the more than one thousand documents introduced as exhibits, only approximately 37 came from the Halloran subpoena; one came from the IRS boxes in Wisconsin; and 5 came from the computers seized in 2010. The computer server taken in the 2010 search was never analyzed; rather, the main source of internal e-mails introduced at trial was the computer server imaged in the 2011 search.

On June 6, 2016, following a 19-day bench trial, the Court issued a 91-page Verdict and Special Findings ("Verdict") finding Carpenter guilty on all 57 counts of the superseding indictment. (Doc. 212). The Court determined there was "overwhelming evidence that the defendant orchestrated a scheme to defraud the [life insurance] carriers into issuing policies based on STOLI-related misrepresentations which defeated the carriers' attempts to detect and avoid STOLI business." Verdict at 10 n.7. Of the more than 100 exhibits cited by the Court in its verdict, only one (Gov't Ex. 1922) was drawn from material taken in 2010. *See* Verdict at 26.

On May 23, 2017, almost a year after the Verdict and 18 months after the Court's

---

[3] Again the Court addressed other claims by Carpenter that do not appear to be the subject of Carpenter's motion for reconsideration.

suppression ruling, Carpenter moved the Court to reconsider its ruling denying his motion to suppress evidence seized pursuant to the 2010 warrant.

## II. <u>Legal Standard</u>

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a motion for suppression of evidence must be made no later than the earlier of the court's deadline or the start of trial. *See* Fed. R. Crim. P. 12(b)(3)(C), (c)(1). An untimely motion will only be considered on a showing of good cause. Fed. R. Crim. P. 12(c)(3).

In certain limited instances, and within set time limits, a defendant may move for reconsideration of a court's decision, including for denial of suppression. "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18B C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 4478); *see also United States v. Natal*, No. 3:12-cr-164 (JBA), 2014 WL 5361469, *3 (D. Conn. Oct. 21, 2014) (applying same to a criminal case). "This standard is 'strict,' however, and reconsideration should be granted only if 'the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Id*. (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). A judge's decision to grant a motion for reconsideration is reviewed for abuse of discretion. *See United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2013) ("We conclude that the abuse of discretion standard accurately reflects the degree of deference properly accorded a district court's decisions regarding evidentiary matters and the general conduct of trials, and join our sister circuits in adopting it."). A motion for reconsideration cannot be used "solely to relitigate an issue already decided." *Id*.

Under the Local Rules of Criminal Procedure, a party must file a motion for reconsideration

within seven days of the ruling of which the party seeks reconsideration. *See* D. Conn. L. Crim. R. 1(c) (incorporating D. Conn. L. Civ. R. 7(c) regarding motions for reconsideration).); D. Conn. L. Civ. R. 7(b)(2) ("[Motions for Reconsideration] shall be filed and served within seven (7) days of the filing of the decision or order from which such relief is sought[.]").

Failure to timely file a motion for reconsideration is by itself sufficient grounds to deny the motion. *See, e.g., Palmer v. Sena*, 474 F.Supp.2d 353, 355 (D. Conn. 2007) ("A failure to timely file a motion for reconsideration may constitute sufficient grounds for denying the motion[.]"); *Lopez v. Smiley,* 375 F.Supp.2d 19, 21 (D. Conn. 2005) ("Ordinarily, a failure to timely file a motion for reconsideration constitutes sufficient grounds for denying the motion."); *see also Brown v. Tuttle*, No. 3:13-CV-1444 VAB, 2015 WL 4546092, at *1 (D. Conn. July 28, 2015) (citing *Davis v. U.S. Dep't of Homeland Sec.*, No. 11–CV–203(ARR)(VMS), 2013 WL 6145749, at *1 (E.D.N.Y. Nov. 20, 2013) ("[a] party's failure to make a motion for reconsideration in a timely manner is by itself a sufficient basis for denial of the motion.") (citations and internal quotation marks omitted)). Indeed, "[t]he courts of this District have frequently enforced Local Rule 7(c) to deny . . . untimely motions for reconsideration." *Jackson v. Post Univ., Inc.*, No. 3:08-CV-1810 CSH, 2012 WL 1189075, at *3 (D. Conn. Apr. 9, 2012); *see, e.g., United States v. Bohannon*, No. 3:13-CR-229 (JCH), 2017 WL 1134380, at *2-3 (D. Conn. Mar. 27, 2017) (denying defendant's motion to reconsider suppression ruling because it was untimely); *United States v. Durrani*, No. 5:86-CR-59 (SRU), 2017 WL 3300531, at *4 (D. Conn. Aug. 2, 2017) ("Because the instant request for reconsideration was filed nearly a year after my order, it is untimely under the Local Rules and will not be considered as a motion for reconsideration.").

## III.  Carpenter's Motion for Reconsideration is Untimely and Fails on the Merits

In the first instance, Carpenter's motion is inexcusably untimely.[4]  It was filed 18 months after the Court's decision, that is, far more than the seven days permitted by the local rule.  Nor did Carpenter actually seek leave from the Court for such a late filing, or provide any justification at all for its tardiness.[5]  The Court can deny Carpenter's motion on that basis alone. Notwithstanding its failure to follow the rule, however, the motion fails on the merits.  Carpenter raises two principal arguments, both of which were previously litigated and denied by the Court: an alleged overbreadth and lack of particularity, mainly because the warrant does not state the crime under investigation on its face, Def. Mem. at 8-22; and a claim that the Government held search material unreasonably long, *see* Def. Mem. at 23-31.  Each of these arguments fail the test set out in *Shrader*—none present any new controlling law, new facts, or error that could

---

[4] Carpenter filed his motion for reconsideration pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. However, as the Government explained in its memorandum in opposition to Carpenter's motion for reconsideration of the Court's verdict, the Federal Rules of Civil Procedure are not applicable to criminal cases.  *See* Doc. 274 at 2-3.  Thus, Rule 60(b) provides no bases for reconsideration in this case.

[5] In Carpenter's declaration in support of his motion, Carpenter claims he had no access to the suppression briefing and exhibits, or a copy of the Court's decision, until recently, after his release from prison.  Carpenter Declaration ¶¶ 3, 5-7.  However, on November 25, 2014, prior to the oral argument on the suppression motion, Carpenter's counsel sought permission to provide copies of the suppression brief, including sealed documents, to Carpenter in prison. *See* Doc. 108.  The Government consented to this request and the Court granted Carpenter's request. *See* Docs. 108, 112. Carpenter also expressly waived his right to be present at the argument on the suppression motion. *See* Docs. 105, 107.  Moreover, and perhaps most speciously, Carpenter fails to acknowledge that Attachment 6 to the search warrant plan (which he claims not to have seen) is the same as Attachment B to the search warrant, which he concedes was incorporated explicitly in the warrant.  *See* Def. Mem. at 3.  Finally, although it is clear Carpenter actually had access to the documents he complains about now, at all times in this case Carpenter was represented by retained counsel, and there is no dispute that his counsel had access to these documents.  Carpenter was not a *pro se* defendant.

It also bears noting that with respect to the 2010 warrant, which Carpenter suggests that the Government is keeping under seal, it was Carpenter who sought to keep the warrant affidavit sealed.  In fact, after the 2010 search, the Government moved to unseal the warrant affidavit, and Carpenter filed a motion to reseal the documents. *See Carpenter v. Koskinen*, Case No. 3:13-cv-00563 (SRU) (D. Conn.), Doc. 129-6 at 75 (Deposition of Daniel Carpenter, where Carpenter testified "I was fighting to get the [2010] search warrant affidavit unsealed. As soon as we got it unsealed, we did a motion to seal it again, to reseal it, and the government fought us on that motion. Judge Covello ordered the search warrant affidavit to be released.").

"reasonably be expected to alter the conclusion reached by the court." *Shrader*, 70 F.3d at 257.[6]

### A. The Search Warrant Was Sufficiently Particular and not Overbroad

Carpenter's first argument, that the search warrant was overbroad and insufficiently particular, was fully litigated and denied by the Court. On reconsideration, Carpenter cites many of the same cases as he did before; indeed, he concedes as much explicitly. *See* Def. Mem. at 20 ("the Court cited the right cases and the correct standard for a constitutional search warrant"). Carpenter's argument centers, rather, principally on one point—that the Court erred in concluding that the crime under investigation was included on the face of the 2010 warrant, thereby rendering void its finding that the warrant was sufficiently particularized. While it seems that the Court may have been misled by the confusing attachments provided by Carpenter in his original memorandum of law, it does not undermine the Court's ruling denying suppression.

The Court found that "[the] face of the 2010 warrant describes the place to be searched and explains that the search is for 'fruits, evidence and/or instrumentalities concerning violations of Title 18 United States Code, Section 371 and Title 27 United States Code, Section 7206(2).'" Doc. 155 at 19 (citing Ex. A to Def.'s Memo. (ECF No. 83-1)). Confusingly, Carpenter had attached the warrant and application as one document (Doc. 83-1), even though the warrant did not incorporate the application; then appended in a separate exhibit (Doc. 83-2) the affidavit and attachments, even though the affidavit was incorporated into the application and Attachment B was incorporated into the search warrant. While the application did identify the crime under investigation (as is called for by the form), the warrant did not do so, and instead incorporated Attachment B to the affidavit. At any rate, the Government has never claimed that the warrant

---

[6] Carpenter also raises a "due process" argument that does not mirror his earlier one, and appears redundant to his particularity and overbreadth arguments. *See* Def. Mem. at 32-34.

incorporated the affidavit,[7] nor has the Government claimed that the warrant named the crime under investigation on its face. Rather the Government has maintained that the nature of this complex business crime renders unnecessary a reference to the crime under investigation so long as the warrant (and in this case the incorporated Attachment B) is sufficiently particular and its breadth is supported by probable cause in the affidavit. *See* Doc. 97 at 61. Critically, it is also clear that the Court's assessment of Carpenter's mismatched attachments was not central to its ruling, as the 2011 warrant also did not name the crime under investigation on its face, and the Court nonetheless found the warrant sufficiently particular without a reference to the application (but with reference to an incorporated attachment listing material to be seized). *See* Doc. 155 at 10-11.

      1.    <u>Failure to Name the Crime Under Investigation Does Not Render the Warrant Insufficiently Particular.</u>

As the Government explained in its initial response to Carpenter's motion, the Second Circuit, like most others, has approached particularity and overbreadth differently in complex fraud cases, holding that where "there was probable cause to believe that [a] business was permeated with fraud . . . the agents could properly seize all of the business records." *National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980); *accord United States Postal Service v. CEC Services*, 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements"). In fact, the Second Circuit reaffirmed this principal earlier this year. *See United States v. Ulbricht*, 858 F.3d 71, 102

---

[7] Carpenter incorrectly cites *Groh v. Ramirez* for the proposition that an affidavit must be attached to the warrant. That is not the holding in *Groh*. Rather, *Groh* held that Courts may not rely on an unattached affidavit to determine if a warrant is sufficiently particularized. 540 U.S. 551, 558 (2004)

(2d Cir. 2017) (reaffirming all records exception).

"In order to fall within the 'all records' exception, it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'" *United States v. Burke*, 718 F. Supp. 1130, 1139-40 (S.D.N.Y. 1989) (quoting *United States v. Offices Known as 50 State Distributing Co.*, 708 F.2d 1371, 1372-75 (9th Cir. 1983)) (quoting *United States v. Brien*, 617 F.2d 299, 308 (1st Cir. 1980)).

In truth, the all records "exception" is less an exception than "a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based." *United States v. Bowen*, 689 F. Supp. 2d 675, 683 n.6 (S.D.N.Y. 2010) (citations omitted). Nowhere is this more evident than in fraud cases, where "[t]he degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated." *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989); *see also Coban*, 628 F. Supp. 2d at 362 ("It also bears noting that here, as in *Andresen*, the charged offense is a "complex . . . scheme whose existence could be proved only by piecing together many bits of evidence," not a straightforward crime such as drug possession where the types of evidence that will be relevant are few and obvious) (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.10 (1976)); *United States v. Abboud*, 438 F.3d 554, 575 (6th Cir. 2006) ("In a business fraud case, the authorization to search for general business records is not overbroad.").

As the Government argued in its initial response, which is incorporated by reference and set out in part again here, the 2010 warrant was supported by an affidavit that set forth probable

cause to show that the Nova-related 419 plans were "permeated by fraud." *National City Trading Corp.* 635 F.2d at 1026. The Schrader Affidavit provided evidence that Nova Benefit Plan Advisors, Benistar, and Benefit Plan Advisors—among other entities—existed to promote and administer a series of abusive IRC § 419 plans, i.e., plans designed to circumvent IRS rules and regulations. Schrader Affidavit ("SA") ¶ 5. Those plans were specifically designed and operated to defraud the IRS in three ways: by allowing an employer a tax deduction from plan contributions, but permitting employees to gain access to that money, tax-free, through frivolous injury claims; by allowing the beneficiary to cash-out of a plan without paying the appropriate taxes; and encouraging participants to backdate enrollment documents in order to take undeserved deductions in a prior year. SA ¶ 5. The affidavit makes clear that these aspects of the scheme were not simply ancillary benefits, but the essence of the sales pitch made by employee Guy Neumann, *see*, *e.g.*, SA ¶ 31 ("now again, it is in our best interest to pay out claims because it makes us look more like a legitimate welfare benefit plan"), and by the CW to his clients, SA ¶ 22 ("the CW sold the 419 plans to his clients as purported disability plans with the ability to get money out tax free"). Since the beneficiaries were typically the employers' principals or their relatives, it is clear that the 419 plans were nothing more than illegitimate ways for those principals to extract money from their businesses tax-free. SA ¶ 22. Moreover, even the 419 aspect of these plans may be fraudulent, as the manner in which the employers are accounted for is contrary to the requirements of the Internal Revenue Code. SA ¶25.

Nor is the probable cause in the affidavit limited to one specific 419 plan. Rather, the evidence in the affidavit was that these plans were promoted generically. *See*, *e.g.*, SA ¶ 21 ("some of [the CW's client] employers utilized more than one 419 plan"); SA ¶ 24 ("the CW provided information that Nova and Benistar set up and administered various trusts for their

plans"); SA ¶ 27 ("in essence what we do here are welfare benefit plans that are basically established under Code Section 419 and 419(a)"). The CW identified several specific plans, but acknowledged that this was not necessarily the entire universe. SA ¶ 24.

The information in the affidavit was not based upon a single transaction or event, but upon information and records of numerous transactions and undercover communications with people inside Nova. *See Burke*, 718 F. Supp. at 1140 (evidence of the extent of the fraud "could consist of a large number of fraudulent transactions or of documentation -- in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation -- that the entire operation is a scam"). The CW provided information on 14 clients whom s/he assisted in setting up Nova/Benistar 419 plans, in some cases more than one per employer. SA ¶ 21. SA Schrader examined the tax records for the CW's clients and found that in all but one of the 14 cases "due to the improper [cost] basis, the individuals were able to evade the payment of taxes on the money they received from cashing out their policies." SA ¶ 23. In explaining to the UCAs and the CW how to avoid paying taxes at termination, Neumann said, "we've done thousands of these, basis is the same." SA ¶ 45. Similarly, Neumann told the UCAs that between Grist Mill Trust and Nova Benefit Plans, they had a "few million dollar run." SA ¶ 51.

Moreover, the fraud was not propagated by one isolated employee, but by a high-level salesman (Neumann) in the presence and/or with the assistance of Bursey—the trustee and administrator—and other Nova employees. SA ¶¶ 26, 29, 37. For example, in a meeting where Stefan Cherneski and Bursey were present, Neumann guaranteed that any claim submitted will be approved as a disability so that a client can get his money back tax-free. SA ¶ 37. Moreover, Nova and its related entities were able to hide their malfeasance by failing to file required IRS forms. *See* SA ¶ 50.

In sum, this was a complex tax avoidance scheme, run across multiple trusts and promoting entities, where the central objective of the trusts was a fraud. In such a case, it is wholly appropriate to seize broad sets of records of the relevant enterprises. *See C.E.C. Services*, 869 F.2d at 185 (approving warrant calling for seizure of, among other things, "business, personnel, and financial records of the entities named herein"); *United States v. D'Amico*, 734 F.Supp.2d 321, 358 (S.D.N.Y. 2010) (approving warrant authorizing the seizure of, among other things, "all documents related to American Blast, Ltd.," and "computers, computer storage, and files…").

That said, this was far from a general warrant in that it carefully limited its scope to "the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6. Indeed, the 2010 warrant did *not* ask for all records present at 100 GMR. Rather, the breadth of the warrant is limited in three distinct ways – it must be maintained by or on behalf of an entity or trust that "promote[s], administer[s], or utilize[s] 419 plans," it must be within the time period 2004 to 2010, and it must fall within one of several enumerated categories of documents. *See* 2010 Warrant, Attachment B. Moreover, these limitations are collective; i.e., a document must fall within the temporal restriction, must come from a specified entity, and must fall within one of the enumerated categories of documents in order to be covered by the warrant.

First, the temporal restriction on the material—2004 and forward—was reasonable and supported by the affidavit. In fact, it likely restricted the warrant further than was necessary according to the probable cause. Indeed, the affidavit made clear that Benistar began in 1994, started the Benistar 419 Plan in 1997, and Nova Benefit Plans and Benefit Plan Advisors came into being with their own 419 plans around 2003. SA ¶ 51. Thus the period 2004 to the present was well within the timeframe of the fraud.

Second, there was clearly probable cause to believe that the various entities and trusts in

the introductory paragraph of Attachment B were involved in the operation of 419 plans. Specifically:

- Nova Benefit Plans, LLC ("Nova"), Benistar, Benefit Plan Advisors, and US Benefits Group are all entities that operated out of 100 GMR and that were responsible for the operation of the various fraudulent 419 plans. Benistar was the original 419-promoting company at 100 GMR that was founded in 1994, and went out of business in 2005 as the IRS began to apply pressure because of the plans it was selling. SA ¶¶ 51, 52. Nova was created in its place, with the same employees and business. SA ¶ 52. Nova and Benefit Plan Advisors each had their own selection of 419 plans. SA ¶51. In response to new regulations in 2007, US Benefits Group was created to buy out Benefit Plan Advisors and "to be a sales and marketing arm for all the companies involved and bring all of the companies under one umbrella." SA ¶ 51. Employees work interchangeably with the various 419 companies. SA ¶ 51 ("We used to walk into a meeting and, you know, depending upon who we are, give you a Benefit Plan card or a NOVA card or a US Benefits card or, I literally have eight cards ... "). In sum, it was eminently reasonable to find probable cause that all of these entities were primarily involved in the promotion of 419 plans.

- Benistar 419 Advantage Plan, Benistar 419 Plan & Trust; NOVA Sickness, Accident, Disability, and Indemnity Trust ("SADI"), NOVA Long Term Care Trust, NOVA Life One Plan & Trust, and Grist Mill Trust are all 419 plans and trusts identified in the affidavit as being run by the various 419-promoting entities at 100 GMR. SA ¶ 24.

- The warrant also authorizes seizure related to "and any other trusts, businesses or entities that promote, administer, or utilize 419 plans." Although the CW was able to articulate the names of some of the 419 plans, the affidavit made clear that this list was not exclusive. Moreover, as described above, the scheme related to the operation of 419 plans in general from 100 GMR. Thus it was reasonable at that point of the investigation to presume the possibility of additional 419 plans other than those that the CW could specifically name. *See Buck*, 813, F.2d at 590 ("Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to uncover, and have insured that all those facts were included in the warrant.").

Finally, when limited by the time period, individuals, and entities discussed above, the categories of documents to be seized are appropriately tailored to the probable cause provided by the warrant. More specifically:

•    Paragraphs 1 and 2 relate specifically to clients and participants of the 419 plans, including client files, enrollment documents, termination documents, claim documents, and correspondence (1), and the investment of funds from clients (2).   These records are at the core of the scheme, and are directly relevant to showing whether particular clients evaded taxes and to what degree.

•    Paragraphs 3, 4, 6, and 7 relate to the operation of the trusts and promoting entities, as opposed to the clients – trust documents and financial records (3), bookkeeping and financial records (4), income and expense records (6), and corporate records (7).   In that the 419 plans are promoted as abusive tax shelters, these records would reasonably be expected to show how the trusts and promoting entities are set up, how they make money, and how money from clients is utilized.

•    Paragraph 5 authorized the seizure of client loan records.   Neumann described to UCA 2 how Nova utilizes loans from insurance policies in 419 plans in order to allow the participant to get access to the value of the policy without paying taxes.   SA ¶ 43.

•    Paragraph 8 authorized the seizure of legal opinions regarding 419 plans.   The existence and use of such legal opinions was evidenced in the affidavit, which notes that "they were routinely included in promotional literature."   SA ¶ 18 n.1.

•    Paragraph 9 and 10 authorized seizures related to promotion of 419 plans, including promotional materials (9) and communications with brokers and middlemen (10).   Indeed, much of the affidavit discusses the way in which the 419 plans are promoted as abusive tax shelters.

•    Paragraph 11 calls for the seizure of communications, including e-mail, between employees, clients, insurance companies, brokers, and related parties.   The affidavit makes clear that e-mail and other forms of communication were commonly used in furtherance of the scheme.   *See, e.g.*, SA ¶¶ 41 (referencing e-mail from Neumann to CW), 58 (referencing e-mails between Neumann, CW, and UCA2).

•    Paragraph 12 called for appointment records for the various 419 entities.   As the affidavit makes clear that the essence of the scheme was to sell 419 plans to prospective clients, appointment records are highly probative of, among other things, which employees met with which brokers or clients, when, and how often.

•    Paragraph 13 calls for seizure of IRS publications, which are relevant to showing the knowledge, and willful avoidance, of the IRS rules.

•    Paragraphs 14, 15, and 16 relate to electronic media.   Paragraph 15 authorizes the seizure of computer devices (but not data or information) maintained by the various

entities, but provides no independent basis to search those devices. Paragraph 14 then authorizes the search of data from the seized devices for material described in paragraphs 1-13. Finally, paragraph 16 authorizes the seizure of programs or instruction manuals, but also does not provide any substantive basis for a search. Neumann, in providing a tour to the UCAs of 100 GMR, pointed out numerous computer workstations and a server room. SA ¶ 57.

In short, the 2010 warrant authorized the seizure of an extensive list of material that was clearly articulated and limited according to the affidavit's probable cause related to the operation of 419 plans from 100 GMR. The resulting list of categories "was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, No. 09 CR 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. January 6, 2010). The Court therefore found that these categories met the standard for particularity, that is, that they were "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." Doc. 155 at 11 (quoting *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986)). Again, "[t]he validity of a warrant is not affected by the fact that a vast amount of material falls within its scope." *United States v. Dinero Express, Inc.*, No. 99 Cr. 975 (SWK), 2000 WL 254012, at *8 (S.D.N.Y. Mar. 6, 2000). Rather, because the affidavit contained probable cause that the Nova/Benistar 419 plans were permeated by fraud, and the breadth of the warrant tracked reasonably the information provided by the affidavit, the warrant is legitimate precisely because "its scope [did] not exceed the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6.

### 2. Carpenter Points to No New Controlling Law to the Contrary.

On reconsideration, Carpenter relies either on the identical cases he employed in his initial motion or on cases that stand for the same principals in an effort to claim that the warrant was insufficiently particular, including *United States v. George*, 975 F.2d 72 (2d Cir. 1992), *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), and *United States v. Galpin*, 720 F.3d 436 (2d Cir.

2013). *See* Doc. 97 at 52 ("The defendants' attempt to invoke this circuit's recent decisions in [*Galpin*] and [*Rosa*] is misplaced and again based on a mischaracterization of the warrant here."); Doc. 122 (Transcript of Dec. 4, 2014 Motion Hearing) at 79 ("looking at the issue of particularity, the defendant is sort of missing the point. The point is that this is a different type of case from *Galpin*, from *Rosa*, from *George*, and that the agents acted or that the warrant was . . . more than sufficiently particularized").

Carpenter's invocation of *Galpin*, *Rosa*, and *George* is as inapt as it was in his initial motion to suppress. All three cases involved warrants that essentially permitted general searches for evidence of any crime, without specifying a particular crime. In *Galpin*, 720 F.3d at 447, the court found insufficiently particular a warrant that, in a case where the probable cause was limited to a sex offender internet registration offense, authorized a non-specific search of electronic devices for that offense as well as "evidence of NYS Penal Law and Federal Statutes," and provided no other restriction on the executing agent. Similarly, in *Rosa*, 626 F.3d at 58, the court found insufficiently particular a warrant that—in a case that involved specific allegations of sex offenses, child pornography, and firearms offenses—permitted a search for evidence of any criminal offense, again with no other direction to the executing agent as to what he or she would seize. Finally, in *George*, 975 F.2d at 75, the court invalidated a search where the affidavit concerned a single armed robbery, while the warrant authorized a search for (in addition to an enumerated list of robbery-related evidence), "other evidence relating to the commission of a crime."

Although the defendant would have this Court believe that the warrant here is similarly vague, that is simply not the case. Rather, the agents here were directed in their review by much more than the unfettered discretion allowed by the warrants in *Rosa*, *Galpin*, and *George*. As

discussed at length above, the categories are highly particularized and directed the executing agents not just to particular categories of documents, but further directed them to seize those categories only related to a particular time frame and entities or types of entities, i.e., those that administer 419 plans. Most importantly, those categories—as this Court already found—were supported by the lengthy statement of probable cause in Schrader's affidavit.

Moreover, *Galpin*, *Rosa*, and *George* are further distinguishable in that they are outside of the line of fraud-related cases that treat particularity more broadly where there is probable cause to believe that an enterprise is permeated by fraud. *See C.E.C. Services, Inc.*, 869 F.2d at 185. In such cases, courts have found sufficiently particular categories of documents related to the particular enterprise, regardless of whether the warrant specifically references the crime under investigation. *See C.E.C. Services, Inc.*, 869 F.2d at 185 (approving a warrant that had no reference to the crime charged, but called for the seizure of broad categories of records related to a particular enterprise); *D'Amico*, 734 F.Supp.2d at 364 (approving a fraud-related warrant without reference to crime, and observing that "there is no constitutional requirement that a warrant must specify the crime for which a search is being conducted"); *Dinero Express*, 2000 WL 254012 at *8 (approving warrant for several categories of records, with no reference to crime, and noting "the Court is confident that an agent can rationally understand and implement these terms") (quotations omitted); *22 Blackwatch Trail, Apt. 8, Fairport, N.Y. 14450 v. United States*, 271 F. App'x 52, 53 (2d Cir. 2008) (finding that warrant was sufficiently specific to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize" and "[a]ccordingly, there was no need to identify the particular criminal activities under investigation.") (internal citations omitted).[8] Indeed, the

---

[8] Other courts have similarly held that listing the crime on the warrant is not necessary when the list of items to be seized is sufficiently particularized. *See, e.g., In re Application of Madison*, 687 F. Supp. 2d 103, 113 (E.D.N.Y. 2009)

terms of the warrant here were clear; any rational agent could—and in fact did—follow them.[9]

3. The Court Can Also Find Good Faith as an Alternative Basis for Denial of Suppression.

In its decision, the Court declined to address the Government's alternative good faith arguments as to either the 2010 or 2011 warrant, because it upheld the warrants on constitutional grounds. *See* Doc. 155 at 14. The Court added that "[i]t bears noting, however, that the defendant's sweeping assertions of bad faith on the part of the agents are not well-supported." *Id*. Indeed, Carpenter did nothing at the motions hearing or in his brief to support his claim of bad faith or to refute the evidence of good faith presented by the Government. While the Court certainly need not entertain any part of this late-filed motion for reconsideration, it may wish to make some findings based on the record presented by the Government and largely unrefuted by Carpenter.[10]

---

("the Fourth Amendment does not require a warrant to state with particularity the suspected criminality."); *United States v. Rios*, 434 F. App'x 648, 650 (9th Cir. 2011) ("there is no requirement that an affidavit or search warrant explicitly identify the suspected offense"); *United States v. Horn*, 187 F.3d 781, 787 (8th Cir. 1999) ("neither the fourth amendment nor our holdings require particularity with respect to the criminal activity suspected."); *United States v. Albert*, 195 F. Supp. 2d 267, 276 (D. Mass. 2002) ("The Fourth Amendment's particularity requirement does not require a warrant to specify the criminal offense to which the objects of the search are related . . . where, as here, the warrant does not authorize general rummaging of a person's property.")

[9] Carpenter's argument that suppression is warranted because the IRS agents did not follow guidance contained in the IRS manual is also misplaced. *See United States v. Boykoff*, 186 F.Supp.2d 347, 350 (S.D.N.Y.2002) ("It has been the law for over two decades that violation of agency rules in the conduct of an investigation does not warrant suppression of evidence obtained during that investigation"), *aff'd*, 67 Fed. App'x 15 (2d Cir. 2003) (summary order).

[10] The Court could also make the similar findings of good faith as an alternative basis for denial of suppression related to evidence seized through the 2011 warrants. Just as in the case of the 2010 warrant, there is enough evidence in the record to find that the agents who executed the 2011 warrant acted in good faith reliance on a validly issued warrant. The agents who executed the warrant were well aware of the crimes under investigation in that they received an operational plan prior to executing the search, which listed the statutes under investigation (wire, mail, and insurance fraud), included a summary of the investigation into the Charter Oak Trust, and directed the agents to "search and seize evidence in accordance with . . . the SW *and its accompanying affidavit*." Doc. 97-7 (emphasis added). The agents did not treat the search as a general one—they only seized 41 boxes of material, which is a small fraction of the documents held at 100 GMR, and only seized documents related to the operation of the Charter Oak Trust. *See* Doc. 97-10 (DOL inventories); Doc. 97-9 (DOL entry and exit photos). Indeed, many of the "inventory" pages show agents purposely seizing nothing from various locations in 100 GMR. Moreover, the case agent for the 2011 Warrant, Special Agent Lynn Allen, was both the affiant on the warrant and the agent who principally conducted the search of the electronically stored information, aided by her co-case agent, Senior Investigator Mary Goreham, who participated in the investigation since its inception.

It is well settled that even where a search warrant is deemed overbroad or insufficiently particular, a court nonetheless may determine that the "good faith" exception applies. *See United States v. Leon*, 468 U.S. 897 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (applying exception to particularity requirement). "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). In certain circumstances, however, "the conduct at issue [is] not so objectively culpable as to require exclusion." *Id.* at 146. Where "[an] officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable," a reviewing court's subsequent determination that the warrant was constitutionally infirm will not trigger the exclusionary rule. *Leon*, 468 U.S. at 922; *see also Sheppard*, 468 U.S. at 989-90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested."). Accordingly, the exception protects from suppression a search and seizure made in good faith reliance by government agents based on a search warrant in all but four situations: "(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient . . . that reliance upon it is unreasonable." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (citations omitted).

In undertaking a good faith analysis with respect to particularity and overbreadth, a court may look to factors outside the warrant, including any unincorporated supporting documents such as an affidavit or application, to make an "assessment of the officers' conduct in a particular case." *See Rosa*, 626 F.3d at 63. In *Rosa*, the court found that despite the warrant's overbreadth—as

discussed above, it authorized a search for evidence of any crime, without further particularity—the executing investigator knew and acted in accordance with the limits of the search contemplated in the affidavit. *Id.* In that regard, the executing agents' familiarity with the supporting documents, instructions regarding the scope of the search, and the scope of the actual search is relevant. *See Id.*; *United States v. Markey*, 131 F. Supp. 2d 316, 326 (D. Conn. 2001) (upholding warrant, but finding good faith would have applied in part because "the agents were instructed that there was to be a limited search related to Marquis International, and they took care to follow those instructions" and because the evidence custodian reviewed the supporting affidavit). Similarly, the complexity of the investigation may be considered in assessing whether an agent reasonably relied on a warrant. For example, "an agent would reasonably expect to seize a broad swath of e-mails in a case involving a multi-year, complex fraud scheme in which e-mail communications allegedly played a key role," and thus would expect a broadly worded warrant. *Bowen*, 689 F. Supp. 2d at 684; *see also United States v. Liu*, No. 12 Cr. 934 (RA), 2014 WL 101672 at *8-*9 (S.D.N.Y. Jan. 10, 2014) (same).

Here, even if the Court were to find the warrants defective in some way, the "good faith" exception would apply. The first three of the *Falso* factors clearly do not apply here—there is no evidence presented by Carpenter that Schrader "knowingly misled" the issuing judge, that the issuing judge "wholly abandoned his or her judicial role," or that the "application is so lacking in indicia of probable cause as to render reliance upon it unreasonable." *See Falso*, 544 F.3d at 125. The Court determined as much in its prior ruling denying Carpenter's motion to suppress. See Doc. 155 at 12-15 (finding Carpenter failed to show that Schrader misled the Court or that the affidavit lacked probable cause). Even considering Carpenter's attacks on the probable cause in the 2010 affidavit, it certainly contained sufficient facts in its 57 pages such that a "reasonably

well-trained officer" would not have known that "the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S at 922 n.23.

Thus the only remaining inquiry is "whether the warrant is so facially deficient . . . that reliance upon it is unreasonable." *Falso*, 544 F.3d at 125. Here, the complexity of the scheme in the Schrader affidavit would lead a reasonable officer to expect similarly broad categories of records to be included in a warrant. *See Bowen*, 689 F. Supp. 2d at 684; *Hernandez*, 2010 WL 26544 at 12 ("although the search warrant included fairly broad categories…it is by no means "so facially deficient" as to render reliance unreasonable. Given the nature of a complex tax fraud case like this one, a government agent would likely expect to find fairly broad categories of tax-related documents to be seized.").

Beyond the complexity of the scheme, it is evident on the current record that the executing agents were properly directed towards material related to the matters and statutes under investigation. *See Markey*, 131 F. Supp. 2d at 326 (D. Conn. 2001). First, the executing agents were provided with a sufficient summary of the nature of the investigation so as to undertake a properly limited seizure of evidence. Specifically, as to the 2010 search, each agent was provided with an extensive operations plan that included a 2 ½ page summary of the investigation, as well as a copy of Attachment B to the warrant (restated as Attachment 6 to the search warrant plan). *See* Doc. 97-1. Those agents also met with SA Schrader and others involved in the investigation prior to the search to discuss the investigation, and there were agents at the search site familiar with the facts in the affidavit—including SA Schrader—available to direct the seizures. *See Carpenter v. Koskinen*, Case No. 3:13-cv-00563 (SRU) (D. Conn.), Doc. 129-4 at 14-16 (Deposition of Shaun Schrader).[11]

---

[11] Carpenter argues that the operations plan was not presented to the Magistrate Judge prior to approval of the search warrant. However, there is no requirement—and Carpenter cites no authority—that an operations plan must be

Moreover, the facts surrounding the execution of the warrant indicate that the executing agents did not view these as general warrants, and were well aware of the crimes under investigation. Indeed, despite the hallways and offices full of records that were encountered at 100 GMR, the IRS seized a mere 322 boxes. *See Rosa*, 626 F.3d at 66 (officers acted "as though the limitations contemplated by the supporting documents were present in the warrant itself"). The sample entry and exit photos provided as part of the Government's response to the motion to suppress are dispositive evidence that the agents did not simply seize everything they could find. *See* Doc. 97-3. Indeed, those photos show a fairly minimal change in the volume of material present in Carpenter and Bursey's offices, and in the storage area. Likewise, a review of the inventories of the search show that the search limited itself to material relevant to the 419-promoting businesses under investigation. *See* Doc. 83-3 (IRS search inventories). It is hard to imagine, given the information provided to the agents, that simply naming the statute in the warrant would have provided any additional meaningful guidance to the agents. *See United States v. Romain*, 678 Fed. App'x 23, 26 (2d. Cir 2017) ("Paralleling *Rosa*, the district court credited the government's assertions that the agent who reviewed the contents of the device seized and prepared the warrant and supporting materials did not search items other than what [he] would have searched had the Warrant referenced the statute." (quotation marks omitted)).

Finally, the good faith of the agents executing the off-site searches of the IRS-seized computer images is even more straightforward. In fact, at issue here is *not* the IRS search of the computer image based on the 2010 warrant, which had not even begun as of the time of the DOL search in 2011 because of privilege litigation. There is nothing in this case that was located as a result of any electronic search based on the 2010 warrant. Rather, the electronic evidence seized

---

approved by the Magistrate Judge that issued the warrant.

in this case was based on the 2011 DOL warrant for the *unsearched* IRS images, for evidence of an entirely different scheme.   In that instance, it is clear that agents could, in good faith, go back and get a new warrant to search for evidence of a different scheme, so long as the Government was still reasonably in possession of the digital media from the original warrant.   *See United States v. Ganias*, 824 F.3d 199, 224 (2d Cir. 2016) (*en banc*) (finding good faith where agents relied on warrant to search computer drive obtained through a prior, unrelated warrant).   As was well-established in the earlier suppression litigation, and discussed at greater length below, the reasonableness of the continued IRS possession of the computer images as of the 2011 search was obvious.

4.      *United States v. Wey* Is Factually Distinct and Is Not Controlling Law.

Subsequent to his motion for reconsideration, Carpenter has now filed two supplemental briefs arguing that the district court decision in *United States v. Wey*, __ F. Supp. 3d __, No. 11-CR-611 (AJN), 2017 WL 2574026 (S.D.N.Y. June 14, 2017), augurs for suppression here.   *See* Docs. 259, 280.   As initial matter, *Wey* is a district court decision from another district and applies pre-existing law—in other words, it is not a basis for reconsideration because it announces no new controlling law nor any error by the Court.   However, even taking the case on its merits, it is easily distinguishable.

First, the *Wey* court's refusal to apply the all records exception was based on facts that are not present here.   In *Wey*, the warrant affidavit "connected NYGG and Wey to a scheme implicating, at most, five or six discrete deals involving specifically identified Issuers, with the alleged misconduct pertaining to each company occurring in some at least roughly defined timeframe."   2017 WL 2574026 at *24.   The court found that the affidavit did not support the conclusion either that this information was just the "tip of the iceberg" or that the fraud scheme was a substantial portion of NYGG's overall business, as discussed in *Burke*, 718 F.Supp.3d at

1139-40. *Id.* As discussed above in Section III. A. 1., the information in the Schrader affidavit was not based upon isolated transactions or events, but upon information and records of numerous transactions and undercover communications with people inside Nova. *See Burke*, 718 F. Supp. at 1140 (evidence of the extent of the fraud "could consist of a large number of fraudulent transactions or of documentation -- in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation -- that the entire operation is a scam"). Moreover, the Schrader affidavit showed that, as a matter of course, the business located at 100 GMR that promoted 419 plans were permeated by fraud. *See, e.g.*, SA ¶ 27 ("in essence what we do here are welfare benefit plans that are basically established under Code Section 419 and 419(a)"). Unlike in *Wey*, which authorized the search of all NYGG records despite it also having legitimate operations, *see* 2017 WL 2574026 at *25, the warrant here authorized just the seizure of the records for the businesses engaged in promoting fraudulent 419 plans. Moreover, unlike in *Wey*, which placed no temporal limitation on the seizure, the warrant here was limited to 2004-2010, i.e., the period of time that the affidavit supported.

Similarly, the facts undermining good faith in *Wey* are unique and not present here. In *Wey*, "the Government provided no credible evidence suggesting that anything beyond high-level generalities was actually conveyed to the executing officers through the Operations Order or briefing." 2017 WL 2574026 at *33. In contrast, in this case the executing IRS agents were provided with a "search warrant plan" that included an extensive summary of the investigation. *See* Doc. 97-1. That summary contained a statement of objectives for the plan, which included securing evidence of abusive 419 plans and tax-related criminal violations. *Id.* The summary explained how 419 plans worked and discussed information from the CW regarding the abusive nature of the 419 plans, including the approval of frivolous claims and the termination of plans,

which allowed "business owners and individuals to underpay their taxes." *Id*. The plan identified the "known businesses and trusts," but also noted that "the above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans." *Id*. Tellingly, in his Exhibit 7 to his motion to reconsider, Carpenter includes three pages from the IRS search warrant plan, but leaves out two full pages of the investigation description provided to the agents, including that "[i]n essence, NOVA is providing a blue print, and the means, for business owners and individuals to underpay their taxes." *See* Doc. 97-1 at 3. Although Carpenter omits them now, those additional pages were provided by the Government in its original motion response. *See* Doc. 97-1 at 2-3.

Likewise, in *Wey* the court found that "nothing suggests that any [overview instructions] guided the agents' seizure decisions," and the agents therefore seized a number of purely personal documents such as medical information of Wey's family, educational records, scholastic "mementos," divorce records, resumes, family photos, recreational schedules, etc., because of some possible connection his overall finances. 2017 WL 2574026 at *34-35. In other words, the agents in *Wey* did not behave as if the search was limited to evidence of the investigation. Rather, the court found what amounts to bad faith, holding that "conscious effort was made to deem patently unresponsive materials responsive to the Warrants," and calling the agents' conduct "a product of the intentional execution of what amounted to general warrants." *Id*. at *35. In contrast, here the agents seized 322 boxes of material related to the 419 plan-promotion businesses. Such is easily gleaned from the inventories from the IRS search, which was attached as Exhibit 3 to Carpenter's original motion to dismiss. *See* Doc. 83-3. Moreover, in *Wey* it appears based on the court's recitation of the facts that the agents seized a significant portion of the limited number of records at the NYGG office. 2017 WL 2574026 at *10. In contrast, as explained above, the

records taken were a tiny fraction of the overall number of documents onsite, which is hardly reflective of a bad faith execution of a general warrant.

As to good faith in the context of electronic documents, the court in *Wey* was concerned with the Government's "expanding searches" of the electronic evidence as time went on. 2017 WL 2574026 at *36. The court cited with approval the Government's actions in *Ganias*, where it returned for a second warrant in order to search for evidence of a separate scheme. *Id.* at *37. Here, similar to *Ganias* and as discussed above, (1) the IRS had not even looked at the computer material—through no fault of its own—at the time the DOL copied the electronic material; and (2) when the DOL wished to search the IRS-seized drives for a new scheme, it got a warrant to do so for evidence of that separate scheme.[12]

Finally, it is not at all clear, as the *Wey* court suggests, that a reasonable agent should have (1) read *Galpin* to require reference to the criminal statute under investigation and (2) understood that this applied prior to the *Galpin* decision in 2013. *See* 2017 WL 2574026 at *17 n.5. Indeed, as discussed above, the relevant precedent on the subject prior to *Galpin*—specifically the *Rosa* and *George* cases—both took issue with warrants that permitted a search for evidence of any crime, rather than specifying a particular crime that was supported by the affidavit; indeed, *Galpin* concerned the same scenario. Those cases did *not* invalidate an otherwise sufficiently particularized warrant that simply left off a statutory citation. In fact, as of 2008, 16 years after the decision in *George*, the Second Circuit upheld a search for records where the warrant did not reference the statute under investigation but was otherwise sufficiently particular. *See 22 Blackwatch Trail*, 271 Fed. Appx. at 53 ("The list of items was neither generic nor so wide-ranging

---

[12] The court in *Wey* is not clear whether it would take issue with continuing searches based on the parameters of the original warrant through the time of trial. Since that is not at issue relative to the 2010 warrant, the Government does not address it here.

as to authorize the seizure of any "evidence." Accordingly, there was no need to identify the particular criminal activities under investigation."). Indeed, the court *invoked George* for that proposition. *Id.*; *see also*, *United States v. McDarrah*, 351 Fed. App'x 558 (2d Cir. 2009) (upholding as sufficiently particular a warrant with no reference to the crime under investigation, where "[t]he warrant described the items subject to search with particularized detail and did not include a catch-all provision providing for the search of 'any other evidence' or allow for wide-ranging searches beyond what was described").

### B. There Is No Basis to Reconsider the Court's Ruling Regarding Retention of Records

Next, Carpenter fails to provide a basis for revisiting the Court's decision regarding the reasonableness of the Government's retention of records. Def. Mem. at 23-31. Carpenter raised the issue in his initial motion to suppress the fruits of both the 2010 and 2011 warrants. *See* Docs. 81 at 29-32 and 83 at 28-31, and presents no new facts or controlling law now.

In its decision denying Carpenter's motion to suppress, the Court first found that, based on the information provided by the Government (which in turn was based on a series of exhibits to the Government's memorandum in opposition to suppression), the Government was not unreasonably retaining nonresponsive search material because the review of that material was ongoing, and the extensive privilege litigation had significantly slowed the review. *See* Doc. 155 at 17. The Court made this finding applying the since-vacated (and more restrictive) *Ganias* panel decision. *Id.* The Government would add that, as concerns this motion to reconsider—related solely to the 2010 warrant—the only relevant question is the state of affairs at the time DOL agents seized material in 2011 for the present investigation. As the Government explained at greater length above and in its motion response, *see* Doc. 97 at 69-70, by the time the DOL sought its warrant in May 2011 to search the previously seized IRS media (in Connecticut) and the remaining

boxes (in Wisconsin), the targets—including Carpenter and Bursey—had not provided privilege logs related to either ESI or hard copy material, there was no resolution as to any privilege claims by the targets, and thus the prosecution team had not yet begun to search the material seized in April 2010. Debbink Decl. ¶ 10. In fact, the targets were still preventing the Wisconsin-based investigative team from searching non-privileged material as of September 27, 2011, Debbink Decl. ¶ 16. Carpenter continues to ignore entirely these facts.

Second, the Court (Doc. 155 at 17-18) looked to *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc* ("*Gmail*")., 33 F.Supp.3d 386, 398 (E.D.N.Y. 2014), where the Magistrate refused to impose any *ex ante* time limit on a search warrant "because we recognize that the Government has a need to retain materials as an investigation unfolds for the purpose of retrieving material that is authorized by the warrant." The Court thus found the Government's retention of the search material reasonable because "the Government has a legitimate interest in retaining the documents for review and possible use as evidence at a trial." Doc. 155 at 18.

Third, the Court observed that Carpenter neither had standing to demand return of a great number of the seized documents, nor had demonstrated any significant countervailing interest in the documents. Doc. 155 at 18. This is particularly true where the electronic material had been imaged and left at 100 Grist Mill Road, and where the paper copies were made available to him through stipulation with the Government.

On reconsideration, Carpenter first incorrectly claims that the Court misread *Gmail*.[13] In fact, the Court cited *Gmail* for precisely its core holding. *Compare* Doc. 155 at 17 ("the court [in *Gmail*] declined to impose a time limit on the Government's retention of seized evidence that was

---

[13] Carpenter also intersperses repetitions of his particularity argument within his evidence-retention section; the Government addresses that above and will not do so again here.

still being reviewed."); *Gmail*, 33 F. Supp. 3d at 398 ("[W]e recognize that the Government has a need to retain materials as an investigation unfolds for the purpose of retrieving material that is authorized by the warrant.").   The Court did not suggest—as Carpenter now claims—that the manner of execution was otherwise unfettered, instead acknowledging that "the time permitted for offsite review of electronic evidence is not unlimited," and is "still subject to the rule of reasonableness." Doc. 155 at 16.   Nor does Carpenter's use of a Rule 41(g) motion change the analysis here, as he claims.   While *Gmail* recognized a Rule 41(g) motion as a potential tool to guard against unreasonable retentions of evidence (in addition to suppression and civil damages), *see* 33 F. Supp. 3d at 398, it does not provide any factual weight at all to the substance of Carpenter's claims of unreasonableness.   Indeed, Carpenter has repeatedly failed to adduce support for any of his allegations of unreasonable retention of documents, beginning with his companies' initial Rule 41(g) motion in 2010, which was settled well before the DOL warrant in 2011, *see* Debbick Decl. ¶ 6, and continuing through the Court's decision denying suppression on the same grounds.   It can hardly be unreasonable for the Government to continue to hold certain material after the Court explicitly granted it permission.[14]

Carpenter also invokes *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), claiming incorrectly that it provides guidance on a temporal limitation for searches that could be applicable on other facts.   *See* Def. Mem. at 28-31.   In fact, the court in *Metter* provides no support for any particular upper limit, and acknowledges that the only limit is what is reasonable under the facts.   *See* 860 F.Supp.3d at 215.   In *Metter*, the court suppressed not because it found that the Government took too long to complete the search, but because (despite court orders

---

[14] Whether the IRS continued to hold material from the 2010 warrant other than what was seized by the DOL is irrelevant in this criminal case.   That material was never seized as part of this investigation and thus is not subject to suppression in this criminal case.

demanding it) the Government never even began the search and instead called upon defendants to identify material that was not responsive. *Id*. Such is far from the case here, where the Government was prohibited from starting its search due to a great deal of litigation based on the targets' objections.

Finally, Carpenter entirely ignores the Second Circuit's *en banc* decision in *Ganias*, which is also fatal to Carpenter's arguments here. *See United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) (en banc). In the *en banc* decision, the court found good faith for two critical reasons that are also present here. First, the agent in *Ganias* "provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding the retention" of computer drives seized under an earlier, unrelated warrant, thus making the agent's reliance on the subsequently issued warrant reasonable. 824 F.3d at 224. Similarly, here Special Agent Allen, in her 2011 warrant affidavit, informed the magistrate of the salient details regarding the previously seized material. *See* May 25, 2011 Affidavit of Special Agent Lynn Allen at ¶¶ 131-134 (available at Doc. 97-5). Second, the agent in *Ganias* had no reason to believe that her action, "the retention of a mirrored hard drive during the pendency of an investigation," could violate the Fourth Amendment based on the law as it existed at that time. 824 F.3d at 224. Similarly, there was no change in the law as of Special Agent Allen's 2011 warrant that would have informed her of the unreasonableness of the warrant.

Moreover, even though *Ganias* did not decide the constitutional issue, it nonetheless offered *dicta* that further undermines Carpenter's arguments. Specifically, the court in *Ganias* strongly suggested that there are compelling reasons that the Government should be able to retain a computer drive throughout the pendency of an investigation, at least through any trial. *See* 824 F.3d at 209-215. Specifically, the court pointed to the technological barriers to culling responsive

"files" from a computer drive, where fragments of each file are actually interspersed throughout the drive, *see id*. at 212-13; the need to search so-called "unallocated" space for deleted files, *see id*. at 213-14; and the need to preserve the integrity of the data to authenticate at trial, *see id*. at 215. *See also id*. at 216 (Although not deciding the issue, noting that "the Government plausibly argues that . . . a digital storage medium or its forensic copy may need to be retained, during the course of an investigation and prosecution, to permit the accurate extraction of the primary evidentiary material sought pursuant to the warrant; to secure metadata and other probative evidence stored in the interstices of the storage medium; and to preserve, authenticate, and effectively present at trial the evidence thus lawfully obtained.").

In short, Carpenter has shown nothing that would warrant reconsideration of the Court's ruling that the Government's retention of search warrant materials is reasonable.

### C. Carpenter Does Not Have Standing to Suppress Almost All of the Government Trial Exhibits Gleaned from the 2010 Search

Finally, upon considering Carpenter's motion for reconsideration, the Court may wish to revisit and/or make additional findings regarding standing. In its decision, the Court permitted Carpenter to challenge the validity of the 2010 and 2011 warrants because his office was one of the places entered in the course of each search. *See* Doc. 155 at 7-8. However, the Court also found that "[t]he defendant, on the other hand, has not established that he has standing to demand return of the vast majority of documents, which are in the nature of corporate records. *Id*. at 18. Now, with the benefit of the trial, the record should reflect that Carpenter has standing to suppress very little of the material seized in 2010 and used as a Government trial exhibit.

In fact, nearly all of the material that was used in the trial against Carpenter from the 2010 warrant came from a place other than Carpenter's office:

- Of the 37 government trial exhibits (including those that were part of composite

exhibits) taken from the boxes maintained by Halloran and Sage, *none* of them came from Carpenter's office.  Rather, they came from file cabinets in Cubicle #27 or a storage room. *See* Ex. 1 (attached hereto).

- The sole exhibit taken from the boxes that were maintained by the IRS in Wisconsin as of the 2011 DOL search, Gov't Ex. 1915, was from a storage room, not from Carpenter's office.  *See id.*

- Of the five exhibits taken from the 2010 computer images, only one (Gov't Ex. 1922) was taken from a computer in Carpenter's office.  The others were taken from Bursey's computer. *See* Ex. 2 (attached hereto).

Even as to the sole exhibit from Carpenter's computer, Carpenter has made no showing that the computer was anything other than a business computer.   Indeed, the sole exhibit taken from it concerned the operation of the businesses located at 100 Grist Mill Road.   In fact, in their recent depositions, Carpenter and his wife both assert that all of the records seized in the 2010 warrant were owned by Benistar Admin Services Inc. ("BASI"). *See Carpenter v. Koskinen*, Case No. 3:13-cv-00563 (SRU) (D. Conn.), Doc. 129-6 at 62 (Deposition of Daniel Carpenter); Doc. 129-7 at 26 (Deposition of Molly Carpenter).

In short, at a minimum, the Court may wish to add as another basis for denial of suppression a lack of standing as to all documents seized from locations other than Carpenter's office.

## IV.    <u>Conclusion</u>

For the reasons stated herein, the Government respectfully requests that the defendant's motion for reconsideration be denied.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *David E. Novick*

_____

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: David.Novick@usdoj.gov

/s/ *Neeraj N. Patel*

_____

NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

## CERTIFICATION OF SERVICE

This is to certify that on September 6, 2017, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

/s/
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY