**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13-CR-226(RNC) |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL E. CARPENTER | ) | |
| | ) | OCTOBER 2, 2017 |

**MR. CARPENTER'S REPLY IN SUPPORT OF HIS MOTION FOR
RECONSIDERATION OF THE COURT'S ORDER DENYING HIS
MOTION TO SUPPRESS**

**I.    MR. CARPENTER'S MOTION FOR RECONSIDERATION IS NOT ONLY
APPROPRIATE, IT IS JUSTIFIED**

Whereas the Court may have been correct in its Order denying Mr. Carpenter's motion to

suppress in December 2015 where the Court stated: "[w]ithin the Second Circuit, there is no

settled formula for determining whether a warrant lacks particularity" Doc. 155 at *9, *citing*

*United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453 (S.D.N.Y. 2013); that is clearly no longer

the case based on several major decisions in the Second Circuit since then, cited in *United States*

*v. Benjamin Wey*, No. 15-cr-00611 (S.D.N.Y. June 13, 2017), *quoting United States v. Ulbricht*,

858 F.3d 71 (2d Cir. 2017), and based on this pronouncement by the Second Circuit in July 2016

in *In Re 650 Fifth Avenue and Related Properties*, 830 F.3d 66 (2d Cir. 2016):

> The Fourth Amendment requires a search warrant "particularly [to] describ[e] the place
> to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Such
> particularity is necessarily tied to the Amendment's probable cause requirement. "By
> limiting the authorization to search to the specific areas and things for which there is
> probable cause to search, the requirement ensures that the search will be carefully tailored
> to its justifications, and will not take on the character of the wide-ranging exploratory
> searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84
> (1987). Thus, for a warrant to meet the particularity requirement, it must identify the
> alleged crime for which evidence is sought. *See United States v. George*, 975 F.2d 72, 76
> (2d Cir. 1992) (observing that warrant lacked particularity where "**[n]othing on the face
> of the warrant tells the searching officers for what crime the search is being**

1

**undertaken**"); *United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013). *In Re 650 Fifth Ave.* at 99-100. (Emphasis added).

Respectfully, Mr. Carpenter would like to suggest to the Court that not only did the Court misapprehend a number of salient facts as to the constitutional facial defects of both warrants, the Court also misapprehended the law of the Second Circuit, which requires that the Search Warrant Affidavit be attached to the Search Warrant if there are no crimes listed on the face of the warrant itself. In fact, two agents during the raid of April 20, 2010 agreed with Mr. Carpenter and in front of everyone gathered in the conference room at 100 Grist Mill Road stated: "He's right. That is the way we do it in New York." (See Carpenter Declaration attached as Exhibit One at 5). At this point, there can be no denying that both Search Warrants in this case were constitutionally defective as they each lacked "particularity" in failing to state any crime, criminal act, or the violation of any federal statute on the face of the Warrant. See "Schrader-Enstrom Search Warrant" attached as Exhibit Two and "Agent Allen" Search Warrant attached as Exhibit Three. Significantly, in her recent deposition, Agent Enstrom did not recall giving anything other than the one page constitutionally-defective Search Warrant (Exhibit Two) to the Carpenters, despite Mr. Carpenter repeatedly asking for a copy of the Search Warrant Affidavit. See Carpenter Declaration at 4.

Therefore, where the government misapprehends and confuses the separate problems of "particularity" and "overbreadth" in a warrant, Agents Schrader and Enstrom have no excuse for being confused, as the General Counsel of the IRS sent out a detailed memorandum to all IRS-CID (Criminal Investigation Division) Agents, as well as put a separate section in the IRS Manual (IRM) and the IRS's own Search Warrant Manual after the Ninth Circuit's decision in *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003), and the Supreme Court's decision in *Groh v. Ramirez*, 540 U.S. 551 (2004). See the Chief Counsel Memorandum of March 19, 2004

2

attached as Exhibit Four. See excerpts from IRM attached as Exhibit Five. See excerpts from IRS Search Warrant Manual attached as Exhibit Six, and materials provided to the ACLU pursuant to a FOIA request as Exhibit Seven. The IRS Chief Counsel Memorandum of March 19, 2004 clearly explains the state of federal law of search warrants at that time based on *Bridges* and *Groh*, and declares: "The holdings in *Ramirez* and *Bridges* reinforce the need for the actual warrant to be complete on its face." See Exhibit Four at 5. Neither of the Search Warrants in this case were "particular" or "complete on its face", and therefore both searches and seizures were constitutional violations of the Fourth Amendment.

In the government's Opposition Brief (Gov. Opp. at 22), the government suggests that Mr. Carpenter has presented no "new controlling law" to support his Motion for Reconsideration of his original Motion to Suppress. On page 30, the government suggests that because *Wey* is from the foreign district of New York and relies on fundamental Second Circuit precedent, it provides no basis for reconsideration. *See* Gov. Opp. at 30. Being as charitable as possible to the government's baseless assertions, these arguments lack merit. Even a cursory glance at *Wey* shows that it is crucially based on the recent Second Circuit decisions in *Ulbricht* and *In Re 650 Fifth Ave.*, which has already been cited at length by Mr. Carpenter. Just like the government fails to acknowledge the force of *Countrywide, Takhalov,* and *Weimert* in Mr. Carpenter's other Motion for Reconsideration, the government could have challenged Judge Nathan's decision in *Wey* pursuant to 18 U.S.C. §3731, but instead they dismissed all charges against Mr. Wey. Once again, Mr. Carpenter has filed several Rule 41(g) motions in this case and two major *Bivens* actions against the government. The government not only lacks "good faith" here, it lacks a convincing argument. Similarly, the government's reliance on the inapposite *Ganias en banc* decision lacks all credibility because the search warrant in *Ganias* listed his name, what he was

3

accused of, and what the government agents were to seize. None of those things are listed on the face of the Search Warrants in this case. See Exhibits Two and Three.

If *Wey* is too remote a forum, and *In Re 650 Fifth Ave.* and *Ulbricht* are not recent enough, then Mr. Carpenter respectfully submits Judge Meyer's recent discussion of the Fourth Amendment in *United States v. Ellsworth Robertson*, No. 16-cr-00107-JAM, Doc. 53, which resulted in the dismissal of all charges against Robertson last month in the District of Connecticut. But despite this, the cases the government tries to distinguish from the facts of this case are precisely why Mr. Carpenter believes he is entitled to not just have his Motion for Reconsideration granted, but also to a favorable decision as to suppressing the "poisonous fruits" of both Search Warrants as a matter of law. Just as in the past, where Mr. Carpenter cited *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) and *United States v. George*, 975 F.2d 72 (2d Cir. 1992), he has persevered in asserting that the IRS raid of April 2010 should be governed by *Groh v. Ramirez* and that is exactly what the Second Circuit based its decision on in *In Re 650 Fifth Avenue and Related Properties*, 830 F.3d 66 (2d Cir. 2016):

> In *Groh*, the Supreme Court stated that the Fourth Amendment's particularity requirements must be satisfied "in the warrant, not in the supporting documents." *Groh*, 540 U.S. at 557. Thus, for a warrant to be sufficiently particular, the alleged crimes must appear in either (1) the warrant itself, or (2) in a supporting document if the warrant uses appropriate words of incorporation and if the supporting document accompanies the warrant. *See id.* Language in a warrant that simply references an underlying affidavit does not incorporate the affidavit so as to allow the documents together to satisfy the particularity requirement. *See George*, 975 F.2d at 76 (holding "recitation in...warrant that it [was] issued upon the basis of an application and affidavit" insufficient to incorporate affidavit by reference (internal quotation marks omitted)).

In making its decision in *In Re 650 Fifth Avenue*, the Second Circuit lists the very same problems with the warrants in this case:

> On its face, the warrant in this case plainly lacked particularity as to the crimes at issue. Indeed, the Government concedes this point. See Government Br. 81 (acknowledging that "warrant should have listed the alleged offenses, but did not"). Nor did the warrant

4

particularize categories of computerized information for which there was probable cause to seize, or the temporal scope of the materials that could be seized. Instead, the warrant authorized the search and seizure of (1) "[a]ny and all...documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in [650 Fifth Ave. Co.]," (2) "[a]ny and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of [650 Fifth Ave. Co.] or any of the officers and employees of these entities," and, most broadly, (3) "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs[;]...and related or connected computer or data storage equipment" located on the premises to be searched. Thus, even assuming that the affidavit can be construed to signal that only evidence relating to the alleged forfeitable offenses was to be seized, the failure of deliberate incorporation precludes a reviewing court's reliance on the affidavit to cure the warrant's lack of particularity. *See Groh*, 540 U.S. at 557–58. *In Re 650 Fifth Avenue* at 100.

Mr. Carpenter's reliance on the Supreme Court's decision in *Groh* is crucially important not just because it is the adopted law of the Second Circuit; it is also the basis for all **constitutional** searches and seizures done by the IRS after 2004. Significantly, if the Schrader-Enstrom Search and Seizure of April 2010 was "unreasonable" and "unconstitutional", then the boxes taken by AUSA Novick's subpoena to Halloran & Sage of May 25, 2011 (see AUSA Novick Subpoena attached as Exhibit Eight) – most of which have **not** been returned to date – constitute "fruits of the poisonous tree" that should never have been used against Mr. Carpenter at his trial. See Carpenter Declaration Exhibit Seven. Since the Court's June 6, 2016 Opinion is primarily comprised of 107 government exhibits, 63 of which are emails taken out of context that the Court, with all due respect, utilized to form its own erroneous opinions of Mr. Carpenter's sworn testimony, each and every one of these emails are individually and separately all "fruits of the poisonous tree." Mr. Carpenter wishes to respectfully move that he is entitled to both a motion to suppress as to the raid of April 20, 2010 and to a new trial as a matter of law in accordance with *Groh*, and Second Circuit precedent including *George, Rosa, In Re 650 Fifth Ave., Ulbricht*, and *Wey*. To give the Court just one specific example of how these email "fruits

5

of the poisonous tree" misled the Court into clearly erroneous conclusions concerning Mr. Carpenter's conduct and intent, Mr. Carpenter wishes to draw the Court's attention to Footnote 25 on Page 42 of the Court's June 6, 2016 Opinion:

> As the defendant remarked to Charles Westcott in an email in March 2010, "in some cases we have offered the people back their own policies at no cost and the people wouldn't even take back their own policy after we paid for it for two years." Gov't Ex. 2272 at 1.

This one example shows that if the Court was not allowed to use **any** of the government's unlawfully-seized emails in the Opinion, the Court would be unable to contradict Mr. Carpenter's sworn testimony with misrepresentations by the government taken out of context. Not only can Mr. Carpenter point out the clear errors of every single email, misused and mischaracterized by the government in its questionable email strategy, the government continues to this very day to violate the Fourth Amendment by searching through files that it should have returned years ago. *See Wey* at 36-37. In FN25, Mr. Carpenter is explaining to Mr. Westcott that he actually offered to give the policy on the life of one of the Insureds to the son of that Insured at "no cost", and the son refused despite the fact that Mr. Carpenter's company Grist Mill Capital had funded two premium payments on that policy. Not only does that show that Mr. Carpenter is a very generous person, it also destroys the theory that Mr. Carpenter's "criminal intent" was to fraudulently induce the carriers into issuing policies that Mr. Carpenter could later control and sell on the open market at a great profit to himself. But nowhere, at trial or in the Court's Opinion, is it explained how Mr. Carpenter could possibly get the policies funded by Ridgewood away from Christiana Bank, which was Ridgewood's proxy and the all-powerful Insurance Trustee of the Charter Oak Trust. In like manner, Mr. Carpenter can dispute, explain away, or even devalue each and every email cited by the Court in its June 6, 2016 Opinion, but that is not Mr. Carpenter's point in this Motion to Reconsider the Court's denial of Mr.

6

Carpenter's Motion to Suppress. Instead, the purpose of this Motion is to assert that each and every email used against Mr. Carpenter at his trial and in the Court's Opinion constitutes "fruit of the poisonous tree" that never should have been allowed into his trial, and by doing so, constitutes a violation of the Fifth Amendment:

> "To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment, and the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." *Olmstead v. United States*, 277 U.S. 438, 485 (1928)

Therefore, Mr. Carpenter respectfully moves this Court to reconsider its denial of Mr. Carpenter's Motion to Suppress because **both** Warrants were constitutionally defective and lacked "particularity" by not stating any crime on the face of the Warrant and **both** Warrants were "overly-broad" because they both sought to seize, and did seize, all of the computer servers and cellphones at 100 Grist Mill Road containing several terabytes of personal information from innocent people and businesses. The Schrader-Enstrom Search Warrant is particularly constitutionally egregious because neither Schrader nor Enstrom followed the guidelines set out in the IRS's own Handbook, Manual, and Chief Counsel Memorandum. Agent Enstrom even admits in her deposition that she can only recall giving the Carpenters the one page Search Warrant (Exhibit Two), and does not recall giving them a list of items to be seized. But, that list of items to be seized is far more "overbroad" than the constitutionally-defective search warrant in *Bridges* that is also listed in the IRS Manual (Exhibit Five) and the IRS Search Warrant Handbook (Exhibit Six). The IRS Search Warrant Handbook also cites the Tenth Circuit in *United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009), that computer searches must list with even greater specificity and particularity what evidence is being sought and for what crime. See Exhibit Six at 57. Moreover, because the unlawful raid of April 20, 2010 was clearly an

unreasonable and unconstitutional search and seizure prohibited by the Fourth Amendment, all 322 boxes and all of the computer servers containing the unlawfully-seized emails are "fruits of the poisonous tree" and should not have been used at Mr. Carpenter's trial or cited in the Court's Opinion. Additionally, AUSA Novick's May 25, 2011 Subpoena did not purge the taint of the unconstitutional seizing, but rather exacerbated the constitutional violations in this case, and that Subpoena was three years prior to Mr. Carpenter's Superseding Indictment and five years after the Sash Spencer policy was originally applied for by Bruce Mactas. Therefore, if the Court were to compare the constitutional violations that led to the dropping of all charges against Benjamin Wey and Ellsworth Robertson to the constitutional violations in not one, but two raids on 100 Grist Mill Road, Mr. Carpenter firmly believes the scales of justice weigh heavily in his favor and against the government, and that requires the Court to grant this Motion for Reconsideration and grant Mr. Carpenter's Motion to Suppress all of the evidence seized in both unlawful raids of 100 Grist Mill Road.

## II. MR. CARPENTER'S MOTION CLEARLY SATISFIES THE STANDARD FOR A MOTION FOR RECONSIDERATION

Federal Rule of Criminal Procedure (Fed.R.Crim.P.) 57(b) allows the Court to "draw from and mirror" the Federal Rules of Civil Procedure in any instance where there are no rules or guidelines under the Rules of Criminal Procedure. *See, e.g., United States v. Moreno*, 12 F.Supp.3d 313, 315 (N.D.N.Y. 2014):

> However, such motions in the criminal context have historically been allowed within the Second Circuit as a "traditional and virtually unquestioned practice." *United States v. Clark*, 984 F.2d 31, 33 (2d Cir. 1993) (*quoting United States v. Dieter*, 429 U.S. 6, 8 n. 3 (1976), *quoting United States v. Healy*, 376 U.S. 75, 79 (1964) (referring to motions to reconsider in criminal cases as a "traditional and virtually unquestioned practice"); *United States v. Ibarra*, 502 U.S. 1, 4-7 (1991)). Where, as here, "the Rules of Criminal Procedure do not speak specifically to a matter, a court conducting a criminal case is permitted to draw from and mirror a practice that is sanctioned by the Federal Rules of Civil Procedure." *United States v. Morrison*, 521 F.Supp.2d 246, 251-52 (S.D.N.Y.2007).

8

In fact, *Dieter*, which cites *Healy*, involved a victory for the defendant on a motion to suppress that the government sought to overturn through the use of a motion for reconsideration. *Dieter* at 8, *citing Healy* at 79. Another example of the government doing a motion for reconsideration to overturn a court's decision as to a motion to suppress can be found in the District of Vermont, where the court found the search warrant to be constitutionally defective on its face and granted the defendant's motion to suppress. *See United States v. John Perry Ryan*, 2:07-cv-00035-WKS, Doc. 80, filed 02/24/2009. In *Ryan*, no one recognized the mistakes in the search warrant until the defendant filed his motion to suppress, clearly similar to this case as the government still fails to recognize any errors in this case by the agents raiding 100 Grist Mill Road during the unlawful raids of April 20, 2010 and May 26, 2011. Because of the errors on the face of the constitutionally defective warrant, the District Court of Vermont ruled that these defects fell within the "core application of the exclusionary rule," such that the application of the exclusionary rule would "achieve significant deterrence." *Id.* at 2. The same federal government that is prosecuting Mr. Carpenter in this case cited Rule 60(b), stating the same grounds for relief that Mr. Carpenter has made in his motions for reconsideration, and then cites the following in its brief – eerily reminiscent of both of Mr. Carpenter's motions to reconsider in this case:

> Pursuant to Rule 60(b), a court may reconsider an earlier decision when a party can point to an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. *See Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004); *accord Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (same). In this case, the government seeks reconsideration of the Court's Opinion and Order granting defendant's Motion to Suppress pursuant to Rule 60(b) because the Supreme Court's recent decision in *Herring* represents a change in controlling law. *Ryan*, Doc. 80 at 3.

While there are several other good quotes from the government's brief in *Ryan* supporting Mr. Carpenter's arguments here, the court in *Ryan* does an excellent analysis of the

Supreme Court's decision in *Herring* and makes two favorable conclusions, both beneficial to Mr. Carpenter's Motion for Reconsideration before this Court: "A court may reconsider an earlier ruling or decision where there is an intervening change in controlling law, among other circumstances. *See* Fed.R.Civ.P. 60(b); *Virgin Atl. Airways, Ltd.* at 1255; and the Supreme Court's decision in *Herring* did not preclude the use of the exclusionary rule under the circumstances in *Ryan*." Therefore, based on previous motions for reconsideration made by the government in other cases, notably *Dieter, Healy, Moreno,* and *Ryan* described above, Mr. Carpenter respectfully asks the Court to grant his Motion to Reconsider and to grant his Motion to Suppress the evidence from both raids in the interests of justice.

## III. THE SCHRADER-ENSTROM "SYNOPSIS OF THE CASE" FOR THE RAID OF APRIL 20, 2010 DOES NOT EVEN MENTION MR. CARPENTER OR HIS COMPANY GRIST MILL CAPITAL

It is beyond dispute that, unlike in other recent famous cases, Mr. Carpenter's name is nowhere to be found on the face of the Search Warrant being used to prosecute him. *See, e.g.,* in addition to *Benjamin Wey*, the case of *Ellsworth Robertson*, in front of Judge Meyer, where after Judge Meyer granted Robertson's motion to suppress, the government dismissed all charges against Mr. Robertson. See Judge Meyer's September 11, 2017 order on PACER, *United States v. Robertson*, No. 3:16-cr-00107-JAM, at Doc. 53. Not only is Mr. Carpenter's name not mentioned anywhere on the face of the Warrant, in the items to be seized, or in the Grand Jury Subpoena that was dropped off, Mr. Carpenter is mentioned only in passing in a 56-page Search Warrant Affidavit that is all about the "Guy Neumann Investigation", and is not mentioned at all in the "Synopsis of the Case" provided by Agents Schrader and Enstrom to get approval for the April 20, 2010 raid. See "Synopsis of the Case" attached as Exhibit Nine. In fact, the only comment made about Mr. Carpenter in the sealed Search Warrant Affidavit was that he was

subject to a Summons Enforcement Action that was in front of Magistrate Martinez and this Court. When Mr. Carpenter suggested that it was unlawful and improper to use a search warrant while a Summons Enforcement proceedings was being tried, the government produced a copy of the Julio La Rosa declaration **to this Court**, showing that there was no criminal referral as to Mr. Carpenter as of May 2010. See Exhibit Ten Declaration of Julio La Rosa, which was filed in a case before this Court. *See United States v. Bursey*, 3:09-mc-00272-RNC and *United States v. Carpenter*, 3:08-mc-00111-RNC. Significantly, in his deposition, Agent Schrader admits that the purpose of the raid was to get the names of people in the various benefit plans, though that is an unlawful use of a search warrant. *See* Carpenter Declaration at 27.

Unfortunately for Mr. Carpenter, it was not until July 2017, during Agent Enstrom's deposition, that Mr. Carpenter could put all the pieces together for this constitutional violation because Mr. La Rosa, who has since passed away, was in charge of the IRS Midwest Division that had to get approval from Washington for the raid on 100 Grist Mill Road. See Exhibit Nine containing the "Synopsis of the Case" where Mr. Carpenter's name is not mentioned in the description of the entities and 419 plans located at 100 Grist Mill Road as of April 9, 2010. It is clear that as of April 2010, the Charter Oak Trust had been "over" for five months, and two months away from being foreclosed upon by Ridgewood. Even the June 2016 Opinion references that all of the Charter Oak Trust money was gone by October 2009. See Op. at 79.

The Schrader-Enstrom Raid was prompted by a Social Security fraud investigation of Lawrence Popp (see Carpenter Declaration at 10), who eventually pled guilty and served one year in prison. Before he was caught on tape by federal agents in Milwaukee (which is still available on the Internet), Popp was assisted by the Cooperating Witness in the Guy Neumann investigation, Michael Tessier, who had done a number of policies with Guy Neumann in the

Nova Benefit Plans' Sickness Accident Disability Indemnity (SADI) Trust, one of which was on the real fraudster, Lawrence Popp. The Schrader-Enstrom "Synopsis of the Case" even mentions that Nova Benefit Plans was incorporated in 2004, long after Mr. Carpenter stepped down from and resigned from anything having to do with "Benistar" in January 2004, prior to his indictment in Boston in February 2004. *See* Carpenter Declaration at 18. None of these facts were presented to Magistrate Smith when he approved the April 20, 2010 Warrant:

1. The search was a "low risk" "tax shelter" investigation, yet the agents were all armed in violation of IRC Section 7608;

2. There were currently two Summons Enforcement Actions in front of this Court and Magistrate Martinez. *See United States v. Bursey*, 3:09-mc-00272-RNC and *United States v. Carpenter*, 3:08-mc-00111-RNC. Within weeks of the raid, the government produced a declaration from Julio La Rosa saying there was no criminal referral as to Mr. Carpenter or Wayne Bursey, so as of April 20, 2010, there was no "probable cause" as to Mr. Carpenter or anyone else at 100 Grist Mill Road, other than Guy Neumann. There certainly was no probable cause to seize any property from Mr. Carpenter, including his three cellphones;

3. Mr. Carpenter's company still owns the building at 100 Grist Mill Road and the government trespassed on his property and unlawfully seized his personal property, which the government admits in its brief still has not been returned. The government also knew there was an attorney on site at 100 Grist Mill Road, so they had a special taint team. Neither Schrader nor Enstrom remembered the name of the attorney, but Mr. Carpenter was the only attorney in residence at 100 Grist Mill Road;

4. Though the Warrant was only good from 6:00AM to 10:00PM, the agents were still loading an 18-wheeler truck well past midnight. See Exhibit Eleven.

The significance here is that it is extremely doubtful that, had Magistrate Smith known that the Schrader-Enstrom raid on 100 Grist Mill Road was just a pretext to get the names of the individuals participating in the totally-legal and legitimate Nova Benefit Plans, while at the same time there was a Summons Enforcement Action in front of this Court and Magistrate Martinez, there is no way that Magistrate Smith would have countenanced this unreasonable search and seizure because it was clearly an illegitimate end-around the civil Summons Enforcement

12

process. At least 60 employers suffered IRS audits and penalties based on the unlawful Schrader-Enstrom raid, and yet none of the subjects of the "Guy Neumann" investigation have ever been indicted. See Pamela Ciccotelli Letter ending 6700 investigation of Nova Benefit Plans attached as Exhibit Twelve, and June 9, 2016 letter ending Milwaukee Nova Benefit Plan investigation attached as Exhibit Thirteen.

Once again, this investigation and raid by the IRS was six months after all of the funds in the Charter Oak Trust had been spent or otherwise dissipated (Op. at 79) and Julio La Rosa said there was no criminal investigation of Mr. Carpenter (or Wayne Bursey) as of May 2010. Mr. Carpenter's name is nowhere to be found on the Search Warrant or the "Synopsis of the Case," and the government even questioned Mr. Carpenter's rights and standing to challenge the search and seizure in a building his company owned and is his only office. In *Ellsworth Robertson*, Judge Meyer granted the motion to suppress because the agents opened up one drawer and seized Robertson's safe without a warrant. In Mr. Carpenter's case, they seized a number of boxes clearly marked "Attorney-Client Privileged" that dealt with Mr. Carpenter's criminal case in Boston. In the case in front of Judge Underhill and the Second Circuit, the government still has not returned over 30 boxes unlawfully seized by the IRS and those taken by the DOL pursuant to AUSA Novick's Subpoena and none of the electronic information seized has been returned from either raid. Based on these facts alone, the searches and seizures in this case were both "unreasonable" and unconstitutional. *See* Carpenter Declaration Exhibit Seven.

## IV. THE GOVERNMENT'S OPPOSITION BRIEF CONFIRMS THE COURT'S CLEAR ERRORS IN THIS CASE AS A MATTER OF LAW

The government admits and acknowledges on Page 9 of its Opposition Brief (Gov. Opp. at 9) that the Search Warrant lacked particularity because no crime was listed on the face of the Warrant. Because the 2011 Agent Allen Search Warrant does not list any crimes on the face of

the Warrant (see Exhibit Three), it is *per se* a constitutionally-defective warrant, and that in and of itself renders all of the emails used in this case as "fruits of the poisonous tree." Second Circuit law bars exactly what the government says the Court did in this case:

> Nonetheless, in finding that the warrant was not a general one, the Court relied principally on the particularity of the incorporated attachment. *See* Doc. 155 at 10. Moreover, the Court found the 2011 warrant sufficiently particular even though it did not name the crime in the attachment, but instead had an attachment which was detailed similarly to the one from 2010. *See* Gov. Opp. at 9.

Moreover, on Page 10 of its brief, the government then states that the computer servers "taken in the 2010 search were never analyzed," which creates a new Fourth Amendment violation itself. *See United States v. Wey* at 19, *citing United States v. Metter*, 860 F.Supp.2d 205 (E.D.N.Y. 2012). *See, also*, the government's description on Page 3:

> Agents seized 322 boxes of documents along with 13 images of computers located at 100 GMR. *See* Declaration of IRS-CI Special Agent Patrick J. Debbink ("Debbink Decl.") ¶ 1 (located at Doc. 97-2). Gov. Opp. at 3.

Then, surprisingly, on Page 14 of the government's Opposition Brief, the government blames the Court's clear legal error in its denial of Mr. Carpenter's original motion to suppress (Doc. 155) on Mr. Carpenter, who was in prison at the time. While Mr. Carpenter gladly accepts all responsibility for "confusing" the Court, he also wishes to assert there was something else missing on the face of both Warrants, in addition to the failure to state a crime, and that is Mr. Carpenter's name. Because Mr. Carpenter's name is **nowhere** mentioned on the Warrants, or even on the "confusing" Application erroneously attached in Doc. 83-1 instead of 83-2, that means the government had no "probable cause" and no reason to search Mr. Carpenter's office, conference room, computer, personal cellphones (all of which were seized), and even his personal bathroom. *See* the Supreme Court's recent decisions in *Riley v. California*, 134 S. Ct. 2473 (2014) and *United States v. Wurie*, 134 S. Ct. 999 (2014). The Supreme Court

unanimously affirmed *Wurie*, and in doing so validated the view of the intrusion into personal privacy which is effected by a search of a modern cell phone:

> "Cell phones . . . place vast quantities of personal information literally in the hands of individuals," *Riley,* at 2485, as cell phones contain "a digital record of nearly every aspect of [the individuals'] lives – from the mundane to the intimate." *Id.* at 2490. Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life" . . . . The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. *Id.* at 2495. Because of the vast amount of data – often quite personal and intimate data – that modern cell phones can store, they should be subject to the same particularity concerns as are searches of computers.

But, the government's sophistry reaches its apex on Page 15 of its Opposition Brief, where it suggests that *Groh* does not require that a search warrant affidavit be attached to the warrant (Gov. Opp. at 15, n.7) and that *Ulbricht*, where the government cleverly seized the laptop computer of the founder of Silk Road somehow reaffirms the "all records" exception. *See* Gov. Opp. at 16. Amazingly, to support these incredible statements that *Groh* is not the law of the Second Circuit and *Ulbricht* supports the notion that fraud permeated the entire "enterprise" or building at 100 Grist Mill Road, the government cites a Ninth Circuit case from 1983 and a First Circuit case from 1980; both cases are prior to the creation of the Internet and 20 years before *Groh* and 30 years before *Riley* and *Wurie*. *See* Gov. Opp. at 16. Even more amazing than this, however, is the lack of any discussion in the government's brief on the Second Circuit's decision in *In Re 650 Fifth Ave.*, which was decided by the Second Circuit in July 2016, after the Court's decision in Doc. 155 and 35 years after the cases cited by the government from other Circuits. *See* Gov. Opp. at 16.

As for the government's "permeated by fraud" argument (Gov. Opp. at 17), that is easily defeated by Agent Schrader's own Search Warrant Plan of Operation at Page 8 (see Exhibit Fourteen), where Agent Schrader himself states: "The investigation has shown that some

businesses being run out of the building *may* be legitimately providing insurance and other financial services including: Rex Insurance Services." The significance of this one paragraph in and of itself defeats the whole "permeated by fraud" argument because it was the "Guy Neumann" investigation and not the "Dan Carpenter" investigation, and Rex Insurance Services was run by Guy Neumann and Stefan Cherneski and **not** Mr. Carpenter, and Rex Insurance Services was not just one of the "legitimate" businesses at 100 Grist Mill Road, it was the only business involved in Life Settlements and the buying and selling of insurance policies.

When the government goes on to talk about "probable cause" (Gov. Opp. at 17-18), we now know that the Cooperating Witness from Wisconsin – Michael Tessier – did not know what he was talking about and that this investigation started as a Social Security fraud between Lawrence Popp and Michael Tessier. See Carpenter Declaration at 10-11. Popp pled guilty and served one year, and Tessier became a Cooperating Witness in the "Guy Neumann" investigation. Nowhere in the Schrader 56-page Affidavit does Tessier (or anyone else) mention Mr. Carpenter in reference to the Nova Benefit Plans. As the Court knows, the "Neumann" investigation was closed on June 9, 2016 without any indictments. See Exhibit Thirteen. Also, because it was a "tax shelter" investigation, that was closed as well. See Exhibit Twelve. As a Grand Jury "tax shelter" investigation, the agents should not have been armed. See IRC §7608.

Perhaps the most amazing thing about the government's Opposition Brief is that it cites the Schrader Affidavit at length the "suspicion" of criminal activity between Guy Neumann and the government witness, Stefan Cherneski, and Wayne Bursey (deceased), who was the trustee of the various plans. See Gov. Opp. at 18-20 citing the Schrader Affidavit. Please notice in trying to make up a "crime" where none existed, the government goes to great lengths to talk about a meeting where Neumann was taped by undercover agents and Cherneski and Bursey were there.

16

Not surprisingly, Mr. Carpenter's name is not mentioned on Page 18, or on the following pages describing details from Agent Schrader's Affidavit. Ignoring the fact that all of the cases cited by the government on pages 18-22 are inapposite to the facts of this case, the government seems to forget that they investigated "Guy Neumann" based on the information provided by someone from Wisconsin who never even visited 100 Grist Mill Road, and then they searched Mr. Carpenter's office and seized his cellphones without "probable cause" or a "particularized" search warrant, and then they indicted Mr. Carpenter for innocent conduct that apparently had nothing to do with the original "Guy Neumann" investigation. Yet the only legitimate business at 100 Grist Mill Road according to Agent Schrader's Plan of Operation was Rex Insurance Services, which was the only business that was involved in the "business" that Mr. Carpenter was indicted for, which is the processing of insurance applications to be sold to investors in the Life Settlement market. To this date, Mr. Carpenter has not sold an insurance policy, nor has he prepared or submitted any application for any insurance policies to be sold to any investor. See Carpenter Declaration at 24.

The government's attempts to defend the indefensible has been severely weakened by the recent depositions of both Agent Schrader (who drafted the Search Warrant Affidavit quoted by the government and the Search Warrant Operation Plan that listed Rex Insurance Services as the only legitimate business at 100 Grist Mill Road, yet ironically Rex was run by Guy Neumann, who was, of course, the target of the "Guy Neumann" investigation), and Agent Kathy Enstrom, who was the Special Agent in charge of the April 20, 2010 raid that had a constitutionally-defective Search Warrant, and who along with Agent Schrader is being sued by Mr. Carpenter due to their personal unconstitutional conduct during the raid of 2010. From those depositions came hundreds of pages of newly-discovered evidence that both Agents and the government

have **knowingly** withheld for over seven years. For the sake of brevity, Mr. Carpenter will only discuss one exhibit provided by Agent Enstrom, which is the statement given to two federal agents by the government witness Stefan Cherneski. Mr. Carpenter will file a separate motion for a mistrial pursuant to Section 3500(d) for the government's knowing and purposeful withholding of this *Jencks* statement, which is also clearly material exculpatory *Brady* evidence as well. But, for the purposes of this Motion, Mr. Carpenter wishes to point out to the Court several salient points of the Statement attached as Exhibit Fifteen:

1. Cherneski provides the statement regarding "Guy Neumann" investigation. See Exhibit Fifteen at top of the page. Cherneski admits in paragraph 3 that he had no knowledge or experience with 419 welfare benefit plans. Cherneski reports to Guy Neumann and Wayne Bursey. He does not work for Dan Carpenter, contrary to the government's suggestions at trial. Cherneski mentions that Neumann also runs a life insurance business called Rex Insurance in paragraph 26.

2. Cherneski says that he did not deal with the Benistar plans and was not familiar with them, contrary to his comments about knowing the Charter Oak Trust was amended.

3. Cherneski discusses collateral assignments in paragraph 10, which are the central element of split-dollar funding, and states "If Nova loans money for the covered employee to purchase the Plan, Nova puts a collateral assignment on the policy. Collateral assignments are placed on both annuities and life insurance policies. Cherneski stated that he does not know much about the loan documents."

4. Cherneski does not describe Mr. Carpenter's role at 100 Grist Mill Road until paragraph 29, where he states: "Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA."

## V.    IT IS TOO LATE FOR THE GOVERNMENT TO CLAIM GOOD FAITH

Unlike in *Wey, Ryan, Robertson*, and even *Ganias*, Mr. Carpenter filed a *Bivens* action against the government and several Rule 41(g) motions for the return of property from both raids. While the lawsuit against Agent Allen for the raid of May 26, 2011 has been stayed in Judge Bolden's court, Judge Underhill already ruled that the Schrader-Enstrom raid of April 20,

2010 was a violation of the Fourth Amendment on several counts and ordered that all of the

property, except for two boxes related to the Charter Oak Trust, must be returned:

> Because the Government has failed to demonstrate that its ongoing retention of the 316
> bankers boxes of original documents is reasonable, and because it has deprived the
> plaintiffs of their property for over five years, it shall return to the plaintiffs the originals
> of the non-responsive documents held in the 316 bankers boxes, and it shall destroy any
> and all copies, electronic or otherwise, of all non-responsive documents (including
> computer "mirror images") seized during the April 20, 2010 search. *Carpenter v.
> Koskinen*, No. 13-cv-00563 (SRU), Doc. 55 at *14.

Nor does *Ganias* help save the government, because unlike the defendant in *Ganias*, Mr.

Carpenter has repeatedly demanded his property back pursuant to Rule 41(g). Recently in

*Robertson*, Judge Meyer refused to apply the "good faith" exception in *Leon* because the

officer's statements were so misleading just as Agent Schrader's Affidavit was in this case, and

cited to the Second Circuit's decision in *Reilly*:

> *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.) (good faith exception not
> applicable where officer included facts in warrant affidavit that were "almost calculated
> to mislead" such that "the issuing judge could not possibly make a valid assessment of
> the legality of the warrant that he was asked to issue"), *aff'd and amended*, 91 F.3d 331
> (2d Cir. 1996) *(per curiam)*. *Robertson*, Doc. 53 at *48.

Moreover, in a recent decision from the D.C. Circuit, the Court of Appeals there also

rejected the government's application for the *Leon* good faith exception because, as with the

warrants in this case, the agents should have known that there was no probable cause supporting

the warrant and that the warrant was overbroad and lacked particularity, once again citing *Groh*:

> Taken together, those failings as to probable cause and overbreadth bring the warrant
> beyond the good-faith exception's reach. In so holding, we stress that the inquiry is an
> objective one. We have no occasion to suspect any ill motive or subjective bad faith on
> the part of the officers who prepared and executed the warrant. The Supreme Court has
> found *Leon's* objective standard unmet notwithstanding the absence of any reason to
> suppose that officers acted in bad faith in relying on an invalid warrant. *See Groh* at 563-
> 65. We do the same here. *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017).

Simply put, of the 322 boxes seized during the raid of April 20, 2010, Mr. Carpenter has already won on 320 boxes (4 originally returned and 316 in Judge Underhill's ruling) and all of the computer drives the government says that it has not reviewed seven years after the raid. The discovery in Judge Bolden's court has not yet begun, but it is too late for the government to claim "good faith" in the raid of 2010. Similarly, the government's final argument in its brief that Mr. Carpenter lacks standing to challenge the government on the Motion to Suppress is equally unavailing. At the end of its Opposition Brief, the government attempts to do its own "motion for reconsideration" to challenge Mr. Carpenter's standing to challenge the Search Warrants in this case, based on the government's own biased view of its conduct in this case. The building raided **twice** in this case belongs to Mr. Carpenter's company. As the owner of property that was illegally and improperly seized during the raids, Mr. Carpenter clearly has standing to make this Motion. As the Supreme Court stated in *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), "[i]t has long been settled that one has standing to object to a **search of his office**, as well as of his home." (Emphasis added).

Neither he nor his office in the building had anything to do with Guy Neumann or Michael Tessier, and yet his cellphones and 40 boxes marked Attorney-Client Privileged and dealing with his Boston case were taken from **his** office in **his** building. Respectfully, that information is much more "personal" and much more "important" than the children's school reports in *Wey*. The government has repeatedly moved for stays in front of Judge Bolden and they have repeatedly lost in front of Judge Underhill, so all of their arguments as to Mr. Carpenter's standing are "collaterally estopped" if not precluded by *res judicata*.

20

**Respectfully submitted,**
Defendant, Daniel Carpenter

By_____

        Richard Brown, Esq.
        Brown Paindiris & Scott, LLP
        100 Pearl Street, 2nd Floor
        Hartford, CT 06103
        Tel 860.522.3343
        Fax 860.522.2490
        Fed Bar No. ct00009
        rbrown@bpslawyers.com

## CERTIFICATION

This is to certify that on October 2, 2017, a copy of the foregoing Reply was served by email to all parties by operation of the Court's electronic filing system or by email on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

A.U.S.A. Neeraj Patel
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel  860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009