# EXHIBIT ONE

## CARPENTER DECLARATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13-CR-226(RNC) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DANIEL E. CARPENTER | ) |  |
|  | ) | OCTOBER 2, 2017 |

### DECLARATION OF DANIEL E. CARPENTER

I, **DANIEL E. CARPENTER**, being duly sworn and over eighteen years of age, state that:

1. Currently I, and my company Grist Mill Capital, LLC, have an action captioned as *Carpenter v. Koskinen*, No. 13-cv-00563 (SRU), in front of the Honorable Stefan Underhill.

2. In these proceedings before Judge Underhill, my attorneys took the depositions of Agent Shaun Schrader who drafted the constitutionally defective Search Warrant and other documents that were under seal for the April 20, 2010 raid of 100 Grist Mill Road, and Agent Kathy Enstrom who was the Agent in Charge of the constitutionally unlawful search and seizure of that day. I have just seen many of these newly discovered documents for the first time in connection with the July 2017 Depositions of Agents Schrader and Enstrom.

3. The Search Warrant drafted by Agent Schrader was constitutionally defective because it did not list any crime on the face of the warrant and did not list with particularity what was to be seized for the investigation of what crimes. The same is true with the Search Warrant drafted by Agent Lynn Allen for the raid of May 26, 2011, but discovery in that case under Judge Bolden has been stayed indefinitely pending the criminal action in this case.

4. In her deposition, Agent Enstrom after consulting her notes from that day (Attached as Exhibit One) confirmed that she only gave the one page Search Warrant to my wife and me. She did not give us a copy of the Search Warrant Application or the Search Warrant Affidavit though

-1-

I asked for a copy of the Search Warrant Affidavit repeatedly in front of a conference room filled with Benistar employees and federal agents as witnesses.  Both the Schrader Search Warrant Application and the Search Warrant Affidavit were under seal.

5.  In fact, after all of the people in the building had been herded into the conference room, all of the Benistar employees there heard me ask repeatedly for the Search Warrant Affidavit, and two of the government agents in the conference room came up behind me and looked over my shoulder at the one page warrant missing the Affidavit and said: "He's right, that's the way we do it in New York."

6.  Prior to the Raid of 2010, there were two Summons Enforcement actions in front of Judge Chatigny and Magistrate Martinez.  *See United States v. Bursey*, 3:09-mc-00272-RNC, and *United States v. Carpenter*, 3:08-mc-00111-RNC.

7.  In his deposition, Agent Schrader actually admits that the main goal of the raid on 100 Grist Mill Road was to get the names of the Participating Employers and the Plan Participants that I and Wayne Bursey had refused to turn over.  In reality, the only time my name is mentioned in the Schrader Affidavit was stating that I (and Wayne Bursey) had not fully complied with a decade long summons enforcement action.  The truth is that the only information that I had not provided the government in answers to various subpoenas and summonses was the names of the Participating Employers and the Plan Participants from the Benistar 419 Plan, which stopped taking new Employers and Participants in December 2003.

8.  Following the raid of April 20, 2010 there were 50-60 Employers who were audited costing these employers tens of millions of dollars in taxes and penalties – and the litigation and lawsuits concerning these employers continues to this very week.

9. For example, just last week an employer in Texas, suing a different 419 plan and trust, enclosed a copy of the Schrader Affidavit (despite it being under seal by Judge Covello's order) and a ruling from this Court (June 6, 2016 Opinion) in trying to suggest that I fraudulently controlled the Plan being sued in that case.

10. Agent Schrader disclosed during his deposition that the cause of the April 20, 2010 raid was information given by a Wisconsin insurance agent, Michael Tessier, about Guy Neumann because Tessier was involved with a Social Security fraud investigation concerning Lawrence Popp of Wisconsin. If one searches Lawrence Popp's name or "Social Security fraud in Wisconsin," you can still see the government tapes of Popp's fraud where he collected Social Security, claiming to be blind but he was filmed driving a car, working, and even water skiing.

11. Tessier arranged an insurance policy with the SADI Trust on Popp's life through Guy Neumann so that Popp could also defraud the SADI Trust by claiming he had become blind as well. I had no knowledge of this fraud or Popp's participation in the SADI Trust until Agent Schrader's Deposition and looking up Popp's case on Google.

12. My lack of involvement in the NOVA Benefit Plans is confirmed by the Schrader-Enstrom "Synopsis of the Case" attached as Exhibit Two. In describing the case to their higher-ups that had to sign off on the raid, my name is nowhere mentioned as being a part of the activity at 100 Grist Mill Road – criminal activity or otherwise – and Agent Schrader and Enstrom both stated that there are a number of companies at 100 Grist Mill Road – and Wayne Bursey runs them. See "Synopsis of the Case" attached as Exhibit Two.

13. Additionally, in his Search Warrant Plan of Operation page 8, Agent Schrader supposes there are several "legitimate" businesses located at 100 Grist Mill Road, including Rex Insurance Services, Inc. which was a Company founded and run by Guy Neumann. See Exhibit Three.

-3-

14. Significantly, Mr. Carpenter's name is not mentioned on the face of the Search Warrant, the Search Warrant Application, or in the "Synopsis of the Case."

15. More proof that the raid on 100 Grist Mill Road was the "Guy Neumann Investigation" and not the "Dan Carpenter" investigation can be found in the statements made by Stefan Cherneski and Kevin Slattery to federal agents on the day of the raid. These documents were just recently turned over to my attorneys in discovery in my lawsuit against Agents Schrader and Enstrom in Judge Underhill's court.

16. In the Cherneski April 20, 2010 statement, my role at 100 Grist Mill Road is not even discussed until Paragraph 29. See Cherneski Statement attached as Exhibit Four.

17. Similarly in Slattery's statement, my name is only mentioned in passing and Slattery was actually screaming for help because he thought his life was in danger. Slattery confirmed his fear and the illegal conduct of government agents that day in his recent deposition taken by the government. Significantly, Slattery states in Paragraph 18 that I "left Benistar in 2004." See Slattery statement attached as Exhibit Five. Obviously this statement by Slattery on April 20, 2010 constitutes newly-discovered, material and exculpatory *Brady* evidence, that certainly contradicts many of the erroneous conclusions made by the Court in its June 6, 2016 Opinion.

18. The "Synopsis of the Case" and the Slattery and Cherneski Statements confirm the truth of this case that I stepped down from all things Benistar in January 2004 – before my pending indictment in Boston in February 2004. The only people scheduled for interviews that day were Cherneski, Slattery, and Belding. Significantly, Guy Neumann, the target of the investigation, was lured to a coffee shop in Hartford, and Wayne Bursey was stopped from coming to the office at the end of Grist Mill Road. According to Agent Schrader, I was not to be interviewed at all that day. (Schrader Depo. at 118).

19. Thus there was no "probable cause" based on Agent Schrader's own Affidavit and certainly not in the section of Agent Schrader's Affidavit quoted in the government's Opposition Brief Doc. 285 at 18-22 where once again my name is not even mentioned or referenced anywhere.

20. As there was no "probable cause" to raid **my building** and **my office** much less seize my three cell phones, there can be no doubt that the search and seizure of my person on April 20, 2010 was particularly unreasonable as well as non-particularized and overbroad, because in addition to 100 boxes of ARIA and Grist Mill Capital files, the Agents seized 40 boxes marked "Attorney Client Privileged" dealing with my case in Boston. The Agents also took my personal tax returns and personal information having nothing to do with the "Guy Neumann Investigation" or NOVA Benefit Plans.

21. Since the Julio La Rosa Declaration (attached as Exhibit Six) says that as of May 2010, there was no criminal investigation as to myself and Wayne Bursey, and my name was not mentioned in either the "Synopsis of the Case" or the Search Warrant or the Search Warrant Application, and I am only mentioned in passing in the Cherneski and Slattery statements given to federal agents that day, the Court needs to reconsider both its conclusions in its June 6, 2016 Opinion (Doc. 212) that I controlled all of the Benistar entities as well as the December 2015 denial of my Motion to Suppress (Doc. 155) based on the fact that the April 20, 2010 Search Warrant lacked probable cause, particularity, and was clearly **overbroad** as it relates to the search of my office and the seizure of my person, my property, and my cell phones.

22. The boxes taken from Halloran & Sage pursuant to AUSA Novick's May 25, 2011 Subpoena have not been returned even as of this week. See List of Boxes taken and list of boxes still not returned seven years after the raid of April 20, 2010 and six years after the raid of May

26, 2011 attached as Exhibit Seven. These are separate Fourth Amendment violations in and of themselves.

23. Moreover, the Cherneski Statement (Exhibit Four) confirms that not only did I not control all of the "Benistar Entities" as the Court erroneously concluded in its Opinion of June 6, 2016; it also shows my main activity was with a company called ARIA. The Julio La Rosa Declaration (Exhibit Six) confirms that I was not suspected of any crime as of April 20, 2010, therefore any search of **my office** lacked "probable cause" as a matter of law; and the Schrader-Enstrom "Synopsis of the Case" (Exhibit Two) does not even mention my name and states that Wayne Bursey controls the NOVA Benefit Plans. Finally, the newly-discovered Slattery Statement confirms my testimony that I left Benistar in January 2004, and did not have any day-to-day active role in the Benistar entities or the Nova Benefit Plans. See Exhibit Five at paragraph 18. This lack of "probable cause" on top of the lack of particularity on the face of the Search Warrant, combined with the overbreadth of the search itself, mandates a complete review by this Court of the unconstitutional search and seizure of **my office** in **my building** on April 20, 2010.

24. Furthermore, the Schrader Search Warrant Plan (Exhibit Three) suggests that Rex Insurance Services, Inc. is one of the only "legitimate "businesses located at 100 Grist Mill Road, but that business was owned and controlled by Guy Neumann, who was the subject of the investigation leading to the raid of April 20, 2010. This is significant because Rex was the **only** business at 100 Grist Mill Road involved in the sale of life insurance policies to banks and investors. See the Court's Opinion (Doc. 212) citing my emails to Chad Gerdes, introducing Guy Neumann to Chad Gerdes and discussing the potential sale of Rex policies. Don Trudeau working with Ridgewood was after the September 30, 2010 foreclosure agreement when

Ridgewood took over all of the Charter Oak policies. At this late date, I have not applied for or sold any life insurance policies to any investors, nor did I ever have the ability to sell any of the Charter Oak Trust policies to anyone but the insured, and only with the written permission of Christiana Bank as the Insurance Trustee, which was protecting Ridgewood's interests in the policies, not mine. No evidence was adduced at my trial showing my name on any Charter Oak Trust insurance policy application or showing my involvement in the application process for any policy with any of the carriers.

25. Therefore, since my name was not mentioned in the Schrader-Enstrom "Synopsis of the Case" and my name is not mentioned in any of the Subpoenas involved in this case including the Grand Jury Subpoenas of April 20, 2010 and May 26, 2011 and the AUSA Novick Subpoena to Halloran & Sage of May 25, 2011, it should be clear that **my office** in **my building** should not have been searched, and I should not have been "seized" during either of the two raids at 100 Grist Mill Road.

26. In fact, Agent Schrader confirms as much in his Deposition where he states that I was "not a target of the Search Warrant" (Schrader Deposition at 77); agents were "instructed not to interview me" (Schrader Deposition at 118); and Agent Schrader made it clear that he "wasn't looking to seize" me (Schrader Deposition at 124).

27. Agent Schrader also makes it clear in his Deposition that the true goal of the raid was to secure the names of the Plan Participants in the various 419 Plans despite the fact that both of the Summons Enforcement Actions were in front of Judge Chatigny and Magistrate Martinez. Getting those names was "why we wanted to do the Search Warrant." (Schrader Deposition at 127). Clearly that is not a legitimate use for an IRS Search Warrant as it is prohibited by the IRS Manual, and it is extremely doubtful that Magistrate Smith would have approved a search

warrant seeking to do an end run around two Summons Enforcement actions in front of Judge Chatigny and Magistrate Martinez.

28. Since my name was not mentioned on the face of either Search Warrant nor in any of the three Subpoenas involved in the two raids, nor the Search Warrant Synopsis of the Case, and since the true facts of the reason for the raid of April 20, 2010 were not disclosed to Magistrate Smith, there was no "probable cause" to search my office at 100 Grist Mill Road or to seize my three cell phones (none of which was a Blackberry) or to seize me personally as I was escorted at gun point from my office to the conference room and then was escorted back to my office by two armed federal agents to seize those cell phones – all without probable cause and a valid Search Warrant. Therefore, any and all files, emails, or any other documents seized from **my office** in **my building** are all "fruits of the poisonous tree" that should cause this Court to reconsider its original order and now grant my Motion to Suppress as to all evidence seized from 100 Grist Mill Road from both raids.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 2nd day of October, 2017.

DANIEL E. CARPENTER

Sworn to before me this
2nd day of October, 2017

Notary Public
My commission expires JASON J. CONCATELLI
(Notary seal/stamp)    *NOTARY PUBLIC*
MY COMMISSION EXPIRES MAR. 31, 2022

-8-

# EXHIBIT ONE

## AGENT ENSTROM NOTES

9:05 AM - Entered.

IDed ourselves at the front desk
Gathered all employees into large conference room
IDed myself to Molly and Dan
Told them about the search warrant and gave them
    the warrant.
They asked to call their attorney - I told them
    to wait until we have everyone in the conference
    room before allowing them. Gave them my name + AUSA's
    name + #
Employee's were individually pulled out of the
    conference room and identified. Each employee
    was escorted back to their desk to unlock
    cabinets - gather belongings and leave.
Let them (carpenters) use the kitchen phone to
    call their attorney.
Let him get his phone at his desk - gave us a
    small phone. (Do ever seen me text?)
Repeatedly Explained to them it was a separate investigation
    regarding civil summons and this S.W. They
    didn't relate ~~~~~ to each other.

Phone - we are going to have to search you - for safety
    Do you have any phones on you?
    Refused to be searched - wanted a lawyer.
    Molly calmed him down - just cooperate.
    I asked him to empty his pockets - he ~~~~~
        he started slowly & after another request
        finally produced his Blackberry
    Upset by him - calmed down

PLAINTIFF'S
EXHIBIT
NO 5 DMP

\* Molly got upset about Pat Mahay — S/A smoking thru a
door at her. She confronted him and started
yelling and asking if it was a joke. I took over
the conversation and calmed it down.

D. Carpenter - explained the history of IRS & him - his charges
  convicted twice & overturned twice
- Allegations behind the SW - sealed
- Asked Gordon what I can say
- Attorney
- Who can I sue when the allegations are unfounded
- Attorneys arrived. Brought them out to see them.

◎ Intro - myself to attorneys explained the situation
  and
  Told them who was inside
  They said they were representing everyone
  I explained who the AUSA was & provided a #
  and they can't issue blanket statement - they
  said they would send a list to the AUSA
  Brought Carpenter out
  Eventually everyone went outside

The lawyers requested my presence & asked if Mr. Chernosk,
  was in the bldg. Yes, and I would get him
  He came. I retrieved him & he came out.

\* Heard a commotion in an interview room.
Kevin Slattery was upset and yelling at Matt Reah
and Mike Dragan were interviewing him.

\* When I approached, I took control of
the situation to calm Slattery down. He
explained that he felt threatened for his
life and wanted to press charges. He
said S/A Reah was standing over him, pointing
his finger and accusing him of lying. He
again said he wanted to press charges and
wanted our names. I spoke with him
and calmed him down to the point he agreed
to not to press charges.

\* I then explained we were to take his Blackberry
He objected & I told him he could write down
some #'s while we had possession of it.

11:10   \* Approx. 10 minutes later — I escorted him outside.
to the attorneys.

\* The attorneys confronted me on who else was in
the building — no one else. I corrected my
earlier statement about employees and explained
I had forgotten Slattery was in the building.

\* They asked why it took 10 minutes to get out.
I explained we stopped the interview — I calmed
the situation down and explained ~~the problem~~
to the attorneys. That I calmed the situation down
and allowed him to write down some phone #'s.
We did not question him any more.

The site was video taped and sketched out in detail.
The rooms were all #ed and
The searching began in pairs. All rooms were
searched. CIS's imaged the servers and
select computers. The Blackberrys and one
mobile phone was seized.
All items seized were inventoried boxed and
placed in a rented U.Haul for transportation.

Attorney LaBelle spoke to me again regarding
how long we would be - he asked an
associate to replace him and at 740 PM
Jim Summers arrived.

At 10:00P I gave attorney a
copy of the items seized

James V. Somer

# EXHIBIT
# TWO

## AGENT ENSTROM
## SYNOPSIS OF THE CASE

## Enforcement Action Review Form

### 1) GENERAL INFORMATION

**A. Field Office**
St. Paul

**B. Date**
04/05/2010

**C. Subject Name (Last, First, M)**
Neumann, Guy

**D. Occupation**
419 Salesman

**E. CI Investigation Number (if applicable)** 1000230004

**F. Special Agent Name**
Shaun Schrader

**G. Type of Enforcement Operation:**
☒ Search Warrant  ☐ Arrest Warrant  ☐ Seizure Warrant
☐ Other

**H. Have the Asset Forfeiture Coordinator, Computer Investigative Specialist and Public Information Officer been notified of pending action?**
☒ Yes ☐ No ☐ Not Applicable

**I. Proposed Date and Time of Execution**
04/20/2010 9:00 AM

**J. Previous Enforcement Action**
Date        Type

**K. Type of Investigation:**
☐ Legal Income  ☐ Illegal/Non Narcotic  ☐ OCDETF
☐ Counterterrorism  ☒ Other Explain Tax Shelter

**L. Is a CI special agent the Affiant?**  ☒ Yes  ☐ No
If "no", what is the Affiant's agency?

**M. Is CI participation incident to an ongoing task force?**
☐ Yes ☒ No
☐ OCDETF ☐ HIDTA ☐ Counterterrorism
☐ Other

**N. Address where enforcement action is to be conducted:**
Street: 100 Grist Mill Road
City and State: Simsbury, CT

Type of location : ☐ Residence  ☒ Business  ☐ Both
Or ☐ Other – Describe
(if there are multiple sites, attach list to synopsis section)

**O. Is this a Grand Jury Investigation?** ☐ Yes ☐ No

**P. Is a Service Initiated Grand Jury Request pending?**
☐ Yes ☒ No
(If YES, the proposed grand jury request should be held in abeyance).

### 2) SPECIAL PERSONS

**A. Is this a Title 26 or Title 18 tax-related warrant that pertains to any of the following persons or representatives?**

Accountant, Lawyer, Physician, Public Official or Candidate, Clergy, News Media Representative, Labor Union Representative, Exempt Organization Member.

☐ Yes (Explain) ☒ No
(If yes, CT Counsel review, Director, Field Operations concurrence, and DOJ Tax Division approval is required)

**B. Does the warrant pertain to a foreign national?**
☐ Yes ☒ No
Agent designated to notify arrestee of their right to Consular access _____
Agent designated to notify the arrestee's embassy

**C. Do you expect the enforcement action to draw publicity?**
☐ Yes ☒ No
☐ National ☐ Regional ☐ Local

**D. What is the subject's notoriety in the community?**
☐ High ☐ Medium ☒ Low

### 3) INFORMANT INFORMATION
### CRIMINAL INVESTIGATION WARRANT ONLY

| | YES | NO |
|---|---|---|
| A. Is the primary source of information a confidential informant? | ☐ | ☒ |
| B. Has the confidential informant been paid for information? | ☐ | ☐ |
| C. Has the confidential informant furnished reliable information to CI in the past? | ☐ | ☐ |
| D. Has the information provided by the confidential informant for this warrant been corroborated? | ☐ | ☐ |
| E. If "D" is "no", has a polygraph exam been considered? (If "yes", discuss details in explanation section) | ☐ | ☐ |
| F. Is there documentary evidence to support the confidential informant's information in this instance? | ☐ | ☐ |
| G. Does the confidential informant have a criminal record? (If "yes", attach detail in explanation section) | ☐ | ☐ |
| H. Does another informant corroborate this information? | ☐ | ☐ |
| I. If this informant is not controlled by Criminal Investigation, note the Agency name : | | |

### 4) COMPLETE FOR NON-TAX CI SEARCH WARRANTS ONLY

| | | |
|---|---|---|
| A. Are there other methods of acquiring the same evidence? If "yes", explain | ☐ | ☐ |
| B. Is the potential for destruction of evidence likely in this investigation, if this action does not occur? | ☐ | ☐ |
| C. Is contraband expected to be encountered? (If "yes" detail in explanation section) | ☐ | ☐ |

### 5) CI TAX AND TAX RELATED WARRANTS ONLY (Detail on Page 2)

A. Significance Evaluation: Discuss the significance of the case – tax due, nature of the fraud, need for evidence to be seized, anticipated effect on voluntary compliance

B. Intrusiveness Evaluation: Discuss why other investigative methods cannot produce the evidence being sought, and why the search warrant represents the best and least intrusive method to secure the evidence

### 6) RISK ASSESSMENT IN CI ENFORCEMENT OPERATIONS

☐ High ☐ Medium ☒ Low
(If there are multiple sites, state level for each in synopsis section)
Attach Risk Assessment Guide(s)

### 7) RISK ASSESSMENT – NON CI WARRANTS

**A. How do you rate the physical risk factors of this warrant?**
☐ High ☐ Medium ☐ Low
( Explain in detail if High)

**B** Explain what equipment and attire will be used:

**C** How many CI agents will participate and what are their roles in the enforcement action.

**D.** List other agencies participating, and agent number
1.
2.
3.

IRS00005

| Enforcement Action Review Form |
|---|

**Synopsis of the Case**  ☒ Attachment

*(Give a brief description of the case, any unusual circumstances, and the role of CI in the enforcement action.)*
See Attached

**Additional Explanation Section (include all information by item number from the first page)**

**Explanation of Items**

| Item # | |
|---|---|
| Item # | |
| Item # | |
| Item # | |

**CI Tax and Tax Related Warrants**  ☒ Attachment

A) Significance Evaluation  See Attached

B) Intrusiveness Evaluation  See Attached

**Review/Approval Section**

| Level | Signature | Date |
|---|---|---|
| Reviewed by:<br>Supervisory Special Agent | *Kathy A. Enstrom* ͤ | 04/09/2010 |
| Reviewed/Approved by:<br>Assistant Special Agent in Charge | *Joon Tatoni* ͤ | 04/09/2010 |
| Approved by:<br>Special Agent in Charge | ͤ | 04/09/2010 |
| Concurrence* :<br>Director,<br>Field Operations | ✔ | |

*The Director, Field Operations concurrence is required for all enforcement actions involving "sensitive investigations." A "sensitive investigation" is defined as an investigation that involves one of the following: a currently serving elected federal official; a currently serving Article III judge; a currently serving high-level Executive Branch official; a currently serving elected statewide official; a currently serving member of the highest court of the state; a mayor currently serving a population of 250,000 or more; perjury in the U.S. Tax Court; an exempt organization.

| Form 13739 (10-2005) | Cat. #47325A | Page 2 of 4 | Department of Treasury-Internal Revenue Service |
|---|---|---|---|

Continued ... Enforcement Action Review Form

### Synopsis of the Case

NOVA Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans -- with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage.

NOVA Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that the head of these companies is Wayne Bursey.

419 Plans, or Welfare Benefit Plans, are non-qualified plans which businesses can establish to compensate employees in the event of situations such as sickness, disability, and/or disfigurement. Due to the fact that the plans are non-qualified, as opposed to a qualified plan like a 401K, there are no funding limits for the Plan and employers do not have to fund the plan for all employees. Employers can be selective and fund the Plan for as few as one or two employees. Money that is contributed to the plans can be written off by the business as an expense in the year that the contribution is made. NOVA Plans sells its 419 Plans as "10 or more employer plans", meaning that purportedly at least 10 employers contribute to the same plan which is then considered a single plan. If an employer is invested in a 10 or more employer plan, the IRS allows the business to expense an unlimited contribution amount.

The funding of a 419 plan works as follows:
* A business signs up for the 419 Plan and sends a contribution to a trust administered by NOVA.
* The business then claims an expense for the full amount of the contribution.
* The trust, for its part, purchases an annuity or life insurance policy from an insurance company with the covered employee as the beneficiary.

If the plan is administered properly, beneficiaries of the 419 Plans are only able to receive a distribution by filing a valid claim for a sickness, disability, or disfigurement. Per IRS regulations, if a valid claim is approved, the beneficiary receives a distribution from the plan, usually tax free.

Information received from a reliable cooperating witness (CW), indicates that NOVA Benefit Plans is promoting and administering abusive 419 Plans. The CW is an independent broker who sold NOVA 419 Plans to numerous clients in the Milwaukee, WI area. The CW has been selling 419 and 412i Plans through NOVA and their predecessor Benistar since 2002. The CW said that 412i plans were similar to 419 plans; however in 2006, IRS rules changed and 412i plans became less attractive compared to 419 Plans. The CW provided information on 14 clients who he assisted in setting up NOVA and/or Benistar 419 Plans. The 14 Plans had contributions totaling well over $8 million.

Per the CW, NOVA knowingly administers their 419 Plans in a way that allows clients to use the plans as abusive tax shelters. The CW explained that he sold the 419 Plans to his clients as a disability plan with the option to get money out of the plan tax free. NOVA is allowing beneficiaries to abuse the Plans in at least two ways:

* First, per the CW, NOVA approves just about any claim that is filed by a beneficiary no matter how frivolous. For example, one of the CW's clients filed a claim for having a mole removed that left a small scar. NOVA approved the claim and is currently paying out the full contribution amount, less fees, over 60 months. The CW has had conversations with Wayne Bursey where Bursey said that if a beneficiary wants to get money out of the plan, NOVA encourages them to file a claim because they have made it so easy for a claim to be approved.

* Secondly, NOVA allows businesses to terminate their 419 Plans. If a business terminates the plan, NOVA gives the beneficiary the option of purchasing the Plan for 10% of its cash value. Once the beneficiary buys out the plan, they receive a 1099 from the insurance company that held the annuity. The 1099 will reflect the basis of the original purchase amount; however that is not the proper basis for the beneficiary. The beneficiary should have no basis in the annuity since the business, not the beneficiary, made the contribution. Due to the incorrect basis, the taxpayer is told that they owe little or no taxes. The CW said that NOVA knows that 1099's issued to the beneficiary by the insurance company are incorrect.

Of the 14 plans set up by the CW, eight plans, totaling well over $4 million in contributions, have been terminated and cashed out. In addition, multiple claims totaling approximately $1 million have been approved.

Due to the ease of getting money out of the plans virtually tax free, by filing a claim or terminating, the plans are being sold as abusive tax shelters.

Continued ... Enforcement Action Review Form

The fact that NOVA's 419 Plans qualify for the 10 or more employer exemption is also in question. In a 10 or more employer plan, the contributions of all of the employers are supposed to be pooled together and accounted for as one plan. However, NOVA appears to be treating each employer separately. For example, NOVA purchases an annuity for each individual beneficiary. If the beneficiary files a claim or terminates the plan they are only entitled to what they contributed.

This investigation utilized a Three Contact Operation and also a Group II Undercover Operation. The undercover contacts confirmed the CW's allegations regarding NOVA. The end result of the abusive 419 plans is that individuals are able to circumvent IRS regulations and obtain money from businesses that they have an interest in virtually tax free. By using a 419A(f)(6) plan, a business can contribute money, which is deductible as a business expense, to the plan on behalf of a covered employee. Then, with the assistance of NOVA, at a later date the covered employee is able to obtain the money contributed to the plan tax free either through a ginned-up disability (disability payments are generally not includable in income under Section 104 of the Internal Revenue Code) or through a misstated basis when the 419A(f)(6) plan is terminated. In essence, NOVA is providing a blue print, and the means, for business owners and individuals to underpay their taxes.

A) Significance Evaluation

Per contacts with Neumann, NOVA has thousands of clients and over a billion dollars invested for those clients. The CW provided information that he alone has 14 clients who have invested over $6 million in the 419 Plans. Due to the statements of Neumann and the information provided by the CW, the tax loss associated with NOVA's clients is anticipated to be very significant.

SB/SE has identified some 419 Plans as Abusive Tax Avoidance Transactions. Per their website, promoters are offering plans that purport to provide pre-retirement or post-retirement benefits, such as death, medical, dental, life insurance, disability and severance pay. Promoters claim that employer contributions to these plans are tax-deductible when paid, relying on the use of single employer plans under IRC Section 419(e), the 10 or more employer exception in IRC Section 419A(f)(6) or the Bargaining Agreement exception in IRC 419A(f)(5). Arrangements providing welfare benefits may have tax consequences different than what the promoter claims. Depending on the facts and circumstances, a particular arrangement could instead be providing dividends to the owners of a business that are includible in the owners' income and not deductible by the business. The arrangement could also be subject to the split dollar regulations or be a nonqualified deferred compensation plan.

LMSB has an open Promoter Case, or "6700 Investigation", on Wayne Bursey and NOVA. Currently, the case is stalled due to the fact that Bursey has not complied with a summons issued for his testimony. LMSB is currently pursuing summons enforcement activities in order to force Bursey to comply. LMSB believes that the summons enforcement process could take several months.

Pursuant to an ongoing project, LMSB is currently disallowing NOVA 419 Plan contributions for companies that expense the contributions. The contributions may also be includable as income on the personal tax returns of beneficiaries in the year that the contributions are made.

The LMSB case on NOVA is related to an earlier investigation of a company by the name of Benistar. NOVA was created by the operators of Benistar. The CW believes that NOVA may have been created because the IRS was having issues with Benistar's 419 Plans.

B) Intrusiveness Evaluation

It is unlikely that records, including customer lists, pertinent to the investigation would be obtained through the use of a subpoena. LMSB currently has an open 6700 investigation on NOVA and Wayne Bursey. The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony. Due to the noncompliance with the summons, it is anticipated that a subpoena would garner the same result. Further, based on the investigation to date, it appears that NOVA makes a living out of impeding the IRS. Therefore, NOVA's cooperation with a criminal investigation is highly unlikely.

# EXHIBIT THREE

## AGENT SCHRADER SEARCH WARRANT OPERATION PLAN

INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION
SEARCH WARRANT PLAN

US Benefits Group, Inc
Benefit Plan Advisors

**Unknown Businesses and Trusts**
The above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans.

The investigation has shown that some businesses being run out of the building *may* be legitimately providing insurance and other financial services including: Rex Insurance Services.

**Inventory Procedures**

Due to the large amount of evidence that is expected to be seized, multiple evidence loggers will be utilized. Three TFIAs will be utilized to log evidence. Once all evidence has been logged, the three TFIAs will merge their data into one complete inventory.

**Evidence Custodian**

SA Stegenga will be the on-site evidence custodian.

At the conclusion of the search, all seized evidence will be loaded into the rental truck which SA Stegenga will have control of. SAs Stegenga and Leming will transport the evidence back to Milwaukee.

**Legal Records and Taint Team**

NOVA and BENISTAR are currently under civil investigation, therefore it is anticipated that there will be attorney/client type documentation at the search warrant site. We are authorized to take legal documents such as legal opinions related to 419 plans. However, if any document appears to have attorney/client type privilege, it should be tagged and given to the taint team for review as to whether we will take the documents. They will make the decision of whether it contains privileged information. If they are unsure, it will be logged into evidence, boxed separately and later reviewed by an independent AUSA in Milwaukee.

**Medical Emergency**

911 Should be the first call

**Nearest Medical Facility**

St. Francis Hospital
114 Woodland Street
Hartford, CT 06105

8

14176956.1

# EXHIBIT FOUR

## CHERNESKI STATEMENT



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000230004 | **Location:** | NOVA/Benistar |
| **Investigation Name:** | Guy Neumann | | 100 Grist Mill Road |
| **Date:** | April 20, 2010 | | Simsbury, CT  06070 |
| **Time:** | ~9:05 - 11:10 am | | |
| **Participant(s):** | Stephen Cherneski, Witness | | |
| | Jeffrey A. Hencke, Special Agent | | |
| | Crystal Brinson, Special Agent | | |

On the above date and approximate time, Special Agent Crystal Brinson and I met with Stephen Cherneski at the above stated location. We identified ourselves to Cherneski and I explained to him that we were assisting the United States Attorney's Office located in the Eastern District of Wisconsin with a Grand Jury investigation and wanted to ask him some questions. Cherneski agreed to answer our questions, however, at one point during the interview Cherneski asked if he was required to answer the questions. I explained to Cherneski that he was not required to answer the questions and could choose not to answer some questions or stop the interview at any point. In response to our questions, Cherneski provided the following information.

1. Cherneski currently resides at 6-C Talcott Forrest Road, Farmington, CT. His cell phone number is ▮▮▮▮▮▮▮▮. Cherneski received a bachelor's degree in economics with a minor in finance from Central Connecticut State. Cherneski was previously a professional hockey player.

2. Cherneski described his role for NOVA Benefit Plans/Benistar as providing technical and educational support for employers and advisors. Cherneski currently receives his paycheck from Benistar Admin Services and has been working for Benistar Admin Services since February, 2005. Cherneski believes that all employees located at 100 Grist Mill Road, Simsbury, CT receive their paycheck from Benistar Admin Services even though there are various businesses being operated out of the building. Cherneski is paid $60,000 per year plus bonuses. Cherneski became employed by Benistar Admin Services because of his friendship with Guy Neumann.

3. Cherneski had no prior knowledge or experience with 419 welfare benefit plans prior to his employment for Benistar Admin Services and his work for NOVA/Benistar. Cherneski learned about 419 welfare benefit plans through on the job training and read various books and tax law to educate himself to do his

IRS00221

job. Cherneski reports to Guy Neumann and Wayne Bursey. No person reports to Cherneski.

4. US Benefits Group is a business that provides information on various employee plans to a network of brokers. US Benefits Group does not administer welfare benefit plans. Cherneski stated that US Benefits Group is run by a collection of people and no one person. Cherneski stated that many individuals work for various companies operating out of the building at 100 Grist Mill Road, Simsbury, CT. Cherneski believes that US Benefits Group was started prior to his employment.

5. Benistar is a 3rd party administer of various retirement plans. Benistar was started prior to Cherneski's employment. Molly Carpenter is the chair person of Benistar. Cherneski stated that he does not deal with Benistar plans and is not familiar with its' plans.

6. Benefit Plan Advisors previously administered 419(e) welfare benefit plans, including the Grist Mill Trust. Cherneski stated that as of January 1, 2010, all 419 plans are administered by NOVA Benefit Plans. (NOVA)

7. NOVA currently administers all 419 welfare benefit plans. Prior to 1/1/2010, NOVA only administered NOVA 419A(f)(6) plans. NOVA was started prior to Cherneski's employment. NOVA is operated through a board containing Cherneski, Guy Neumann, Wayne Bursey, Dan Carpenter, Molly Carpenter, and Kathy Kehoe. NOVA administers its 419A(f)(6) plans through four (4) trusts. These trusts are SADI, LTC, Life 1, and Life 5.

8. A 419A(f)(6) welfare benefit plan is a plan containing 10 or more employers. In a 419A(f)(6) plan, the employer can deduct the amount of the contribution as a business expense, with no limitation.

9. In a NOVA 419A(f)(6) welfare benefit plan, a company/employer contributes money for the benefit of one or more employees (covered employee) of that company. In the plan, a trust (i.e. SADI) is the owner and beneficiary of the policy. The covered employee than designates a beneficiary for the plan. The trust then purchases an annuity or life insurance policy with the proceeds contributed to the trust by the employer. The trust does keep 5% of the amount contributed and the employer is required to pay an additional $1,500 enrollment fee to NOVA. The initial contribution by the company/employer is given to the trust (i.e. SADI). The trust would then deposit the check and write a separate check to the appropriate insurance company in which the trust has purchased the annuity and life insurance from.

10. Beneficiaries in 419A(f)(6) plans administered by NOVA received benefits from the plan through either a qualifying event or death. The death benefit for the 419A(f)(6) plans is discussed in the plan documents, but is usually the value of the annuity or life insurance. A qualifying event is a permanent disability or disfigurement to the covered employee. An employer can also terminate the

U.S. Treasury Criminal Investigation

IRS00222

plan. If the employer terminates the plan, the policy becomes an asset of the trust and the employer never receives any contributed money back. The covered employee can continue in the plan by purchasing the plan from the trust for the fair market value (FMV) of the annuity or life insurance policy purchased with the amount originally contributed by the employer. Revenue Procedure 2002-25 defines how the FMV of a life insurance policy is valued. The trust will also make a loan arrangement with the covered employee to assist the covered employee in purchasing the plan. In this loan arrangement, the covered employee is required to pay three years of interest up front. If NOVA loans money for the covered employee to purchase the plan, NOVA puts a collateral assignment on the policy. Collateral assignments are placed on both annuities and life insurance policies. Cherneski stated that he does not know much about the loan documents.

11. If the employer terminates the plan and the covered employee does not choose to continue in the plan, the money contributed by the employer is forfeited. Cherneski believes that money has been forfeited in the past but can not cite specific examples.

12. If an annuity is purchased with the employer contribution and there is a qualifying event, the covered employee receives money based upon a created formula. This money is paid out over 60 months after a one year waiting period. The formula is based upon the amount of the contribution and the amount of time in the plan. Cherneski stated that the covered employee can receive more money than what was initially contributed. Cherneski stated that the list of what qualifies as a disability of disfigurement is written in the plan documents, but does not know what the plans rely on for their definition of disability or disfigurement.

13. If a covered employee wishes to make a disability or disfigurement claim, the covered employee submits a claim form along with documents from the employer and a doctor. Wayne Bursey, the trustee, makes the decision to either accept or not accept the claim. Cherneski does not know if there have been any claims denied.

14. Cherneski stated the money contributed by employers into NOVA plans are comingled into trust accounts. (i.e. SADI) Cherneski stated that he does not deal with the accounting side of the client funds.

15. Cherneski is not familiar with the covered employee being able to pay 10% of the FMV of an annuity policy and obtain the proceeds of the annuity. (10% buy-out) Cherneski believes that 10% buyouts were allowed in prior to his employment, but a 100% buy-out has been required since Cherneski began his employment. Cherneski stated when he talks to clients, he advises them to never buy-out of the plans, however the plan documents do state the covered employee can pay 100% of the FMV to purchase the plan. Cherneski does not know of any employee of NOVA/Benistar that is allowing a 10% buy-out.

16. I explained to Cherneski that I believed that 10% buy-outs were still happening in the last few years. Cherneski stated that he is close to 100% sure that there are no 10% buy-outs. Cherneski again stated that he did not promote 10% buy-outs and has not heard of 10% buy-outs in the last 3 or 4 years. Cherneski stated that clients may ask about a 10% buy-out, however Cherneski would tell the client that there is only 100% buy-outs.

17. I explained to Cherneski that lying to a federal agent is a crime. Cherneski stated that he understood.

18. Cherneski stated that he does not believe that the NOVA 419 plans can be abused because the covered employee is required to pay 100% of the fair market value of the policy. Cherneski stated that he does not know of any way plans can be used as abusive tax shelters.

19. I showed Cherneski a document titled, "Sickness Accident Disability Indemnity Plan & Trust." (Attachments 1 - 24)  Cherneski stated that the document describes the SADI plan, however the document shown to him is an old version. The new version would show a revision date on the cover page.

20. I showed Cherneski a copy of a letter dated April 18, 2005 to NOVA Benefit Plans, LLC from John Reid of Edwards & Angell LLP.  (Attachments 25 - 38)  Cherneski stated he is familiar with the letter, but does not give the letter to clients unless the client requests it. Cherneski has never met John Reid.

21. Cherneski is not aware of the insurance companies from whom they purchase annuities or life insurance contract having had concerns with the collateral assignments and any Forms 1099 to be issued by them.

22. Cherneski is aware that Benistar 419 Plan and Trust is in a dispute with the IRS and the dispute is being resolved through the courts. The Benistar 419 Plan & Trust is a pre-2003 plan.

23. Cherneski stated that the SADI plan is not a listed transaction. Cherneski stated there is a document that explains why NOVA plans are not listed transactions. I then showed Cherneski a document title "NOVA Benefit Plans LLC and "Why we not a Tax Shelter..." (Attachments 39 - 55)  Cherneski stated this document explains why NOVA plans are not listed transactions. Cherneski does not know who prepared the document, however the document I showed to him is an old version. The new document does not contain the statement in the third paragraph about being audited if one files a Form 8886.

24. The difference between Grist Mill trust and the NOVA plans is in the timing of the deduction. In the Grist Mill Trust, the employer is able to only deduct qualifying costs. Also, in the Grist Mill Trust, the trust files Forms 8886 for clients even though it may not be required. The Forms 8886 are filed as a precaution.

25. Other individuals that do the same type of work as Cherneski, include Guy Neumann, Rich Belding and Ron Lanza.

26. Neumann and Belding provide technical and education support for employers and advisors. Neumann also runs a life insurance business call Rex Insurance. Cherneski is not involved in Rex Insurance

27. Wayne Bursey is the trustee for all of the 419 plans. Bursey works full time at the offices locate at 100 Grist Mill Road, Simsbury, CT.

28. Kevin Slattery does not know much about 419 plans. Slattery handles much of the administrative stuff involving benefits.

29. Dan Carpenter is a consultant and outside counselor for all of the businesses. Carpenter also operates a business named ARIA.

30. Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI)  Molly runs the day to day operations of the various businesses.

31. Cherneski stated that some of its clients are or have been audited by the IRS. Attorney Ira Stechel is representing Benistar Plan clients with the IRS.

32. STEP plans are older plans and are not currently sold.

33. Physical files for the clients are kept on site. Kathy Kehoe handles the administrative side of the business. Cherneski is now aware of files being stored off-site. Cherneski stated that a lot of the plan and client information is stored on the computers.

At approximately 11:10 am, Supervisory Special Agent Kathy Enstrom entered the room and stated that an attorney outside of the building wished to speak with Cherneski. The interview was then concluded.


I prepared this memorandum on April 23, 2010, after refreshing my memory from notes made during and immediately after the interview with Stephen Cherneski.


Memorandum Author   *Jeffrey A. Hencke*

Jeffrey A. Hencke
Special Agent

*Crystal of Brinson*

Crystal Brinson
Special Agent

U.S. Treasury Criminal Investigation

IRS00226

# EXHIBIT FIVE

## SLATTERY STATEMENT



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000230004 | **Location:** | NOVA Benefit Plans a/k/a Benistar |
| **Investigation Name:** | Guy Neumann | | 100 Grist Mill Road |
| **Date:** | April 20, 2010 | | Simsbury, CT |
| **Time:** | Approximately 9:40 a.m. to Approximately 11:40 a.m. | | |
| **Participant(s):** | Kevin Slattery, Salesman for US Benefits Matt Rech, Special Agent Michael Dragan, Special Agent | | |

On above date and time Special Agents Matthew Rech and Michael Dragan introduced themselves to Kevin Slattery as Special Agents with the Internal Revenue Service (IRS), Criminal Investigation and displayed their credentials. Special Agent Rech was introduced to Slattery by IRS-CI personnel in the parking lot of the above listed business. Slattery was informed that a federal search warrant was being conducted on the premises. Agent Rech asked Slattery if he had a permit for a concealed carry handgun and/or if he had any weapons on his person. Slattery stated that he does not have a carry permit for Connecticut and that he had no weapons on his person. Agent Rech notified Slattery that he was acting as an assistant to the attorney for the government in conjunction with a grand jury investigation. Slattery stated that he was aware of his rights and was willing to answer questions; however, he would end the interview when he felt that he needed an attorney. Agent directed a Special Agent (name unknown) to advise Supervisory Special Agent Kathy Engstrom that Agent Rech was conducting an interview with his (assigned) interviewee. Special Agent Rech observed Slattery attempt to place a call on his Blackberry phone. Slattery stated that he uses this phone for work and personal purposes. Slattery and Rech agreed to leave the phone on the table during the course of the interview. Slattery provided the following information in response to the questions asked by Agent Rech.

1. Slattery provided a New Hampshire Drivers license for identification purposes, but he moved to Connecticut in 2007 and now rents a place at 54 Oxford St., Hartford, Connecticut. Slattery graduated from Colby Sawyer College in 1997 with a degree in Business administration.

2. Slattery was previously a self-employed commercial real estate agent for Phoenix Realty Group in Bedford, New Hampshire. Slattery then began to work in Financial Management and received the following licenses to solicit financial instruments: Series 6, 65, 7, life & health insurance.

3.  Slattery is a former bouncer, and has former training in boxing, and mixed martial arts. Slattery has some persistent ringing in his ears from listening to loud music. Slattery has been employed With Benistar/ Nova since November 2007.

4.  A phone call was received from Guy Neumann, but Slattery did not answer the phone.

5.  Slattery has very little knowledge of tax law. Slattery had no previous knowledge of 419 plans prior to his current employment.  Slattery did his own internet research on 419 plans and is aware that they date back to the 1800's and of their (a), (f), and (e) IRS code sections.

6.  Slattery was hired as a Benistar employee, but now works for their division identified as U. S. Benefits Co. He interviewed for the position with "Molly" and usually directs any questions to either Dan or Molly. Slattery was originally hired to service the 419 plans, but does not because the 419 sales business is currently non-existent.

7.  Slattery currently researches new business ideas on the internet. For instance, the sales of insurance through Roth IRA's. Slattery defined the 419 business as dead; however, Benistar has five tax cases before the IRS that are waiting on a decision.  Slattery currently does not handle 419 plans, but will begin to sell them if the IRS court decisions favor the continuing sales of the products.

8.  Slattery works with a group of people he identified as the "bullpen". These individuals are Guy, Ron and Stephan. Slattery currently earns approximately $72,000.00 in *salary* from U.S. Benefits. Formerly, 419 plans were sold by Benistar, Benefit Plan Advisors and U.S. Benefits (U.S. Benefits name originated in 2004 but not used until 2007). Slattery described Nova as the sponsor of these plans; however, he was unable to articulate what exactly the nature and/or purpose of the sponsor company.

9.  A phone call was received by Joe Castagno (860-424-1605 at 10:06 A. M.) but Slattery did not answer the call.

10. Slattery, Stephan, and Guy Neumann had a meeting with Amanda (from Administration) regarding the most recent name change of the company to U.S. Benefits.

11. At this point of interview, Slattery announced that he will get an attorney if we (Agent Rech and Dragan) continue to state that he (Slattery) is not answering the questions directly.  Agent Rech then stopped the interview and asked Slattery if he was finished and if he wanted to consult an attorney. Slattery responded that he did not want to stop the

interview and that he wanted to continue with the interview.

12. Currently, Slattery deals with clients who call U.S. Benefits and inquire about creating businesses to be associated with investments because they need the business to be the vehicle that would receive the investment income. Subsequently, Slattery assists in setting up a Limited Liability Company (LLC) for the client and Slattery usually incorporates the new company for the client in Delaware. Slattery also advises clients on various stock option plans, 412 (e) plans and Roth IRA plans. Slattery has not sold any 412 plans since arriving at U. S. Benefits. Slattery further described 412 (e) plans as defined contribution plans for self-employed people who did not have a retirement plan.

13. The other bullpen persons, Guy, Stephan and Ron are the individuals who are responsible for dealings with independent brokers. Slattery does not field any phone calls from these brokers.

14. A phone call was received from 203-969-3416 at 10:21 A. M.; however, Slattery did not answer the call.

15. Slattery has his own business venture (independent from U.S. Benefits) through Lincoln Financial Securities. Slattery represents one client (one million under management) and conducts approximately two trades per month for this account.  Slattery has also written contracts under Penn Mutual.

16. According to Slattery, no one in insurance industry utilizes 419 plans. For example, Metropolitan Life does not write 419 plans. Benistar's 419 plans have been dead since Slattery started.

17. Slattery assumes or guesses that some individuals he currently works with have written a couple of 419 plans since he has been an employee. Slattery has seen a Form 8886, but has never completed one for a client.  Benistar is currently involved in a test case with a "Step Plan" that is being tried in a New York Tax Court. The "Step Plan" is a plan from a different company that Benistar now controls.

18. Benistar was originally started in 1998 by Dan Carpenter. Carpenter left Benistar in 2004. Molly Carpenter joined Benistar later and the company is now a third party administrator of health plans. Benistar has approximately thirty to forty employees.

19. An additional phone call was received form Guy Neumann at approximately 10:35 A.M.; however, Slattery did not answer the call.

20. Dan Carpenter was also affiliated with a company entitled Benistar Property Exchange Trust Company (BPETCO). BPETCO was a Massachusetts company that was primarily involved in 1031 Real Estate

IRS00238

Property Exchanges.

21. Currently, Carpenter's law license is suspended and he is defending himself against several lawsuits stemming from approximately six or seven of these property exchanges that went bad. Slattery is aware that Merrill Lynch withheld evidence in the case against Carpenter.

22. Slattery was not trained by Nova/Benistar or U.S. Benefits on the sales of 419 plans. He was supplied with no training material on these plans, but has read a few pamphlets at work and has done his own research on the internet. Slattery has heard of the ten or more employer plan, but has never sold a plan.

23. Slattery repeated several times that he never went out on any 419 sales calls with any of his current co-workers, has never visited any independent 419 brokers or sat in on any conferences with brokers and or current employees  that were discussing the sale of 419 plans.

24. Slattery has heard about the termination of 419 plans and Guy Neumann has told him some competitor companies illegally perform termination actions that allow for return of money; however, 419 plans are not supposed to function in that manner.

25. Wayne Bursey is probably the Trustee of Benistar. Slattery does not know if anyone has terminated their 419 plan through Benistar or its affiliated companies. Slattery has never talked to Bursey about 419 plans or terminations.

26. Slattery is not sure who at Benistar or any of its affiliates would approve of a 419 termination, but Slattery expects that Bursey would eventually have to talk to the client that wanted to terminate their plan.

27. Slattery is aware that many of the independent brokers affiliated with Benistar have started their own 419 plans that are modeled on the Benistar format. One of these independent brokers started a plan called the Millennium Plan. The millennium Plan was not a Benistar Plan.

28. Slattery reiterated that Benistar was not involved in any illegal activities and the company follows the letter of the Internal Revenue Code.

29. An additional call was received from Guy Neumann; however, Slattery did not answer the call.

30. Slattery understood the value of a 419 plan to be a discretionary benefit plan for some employees.

Special Agent Rech asked Slattery about his knowledge regarding the marketing and sale of the Sickness and Disability Indemnity Plan (SADI).

IRS00239

31. Slattery stated the plan will pay out each month to provide assisted living for what Slattery described as the usual things. Slattery was aware of approximately six to seven items (signed off by a physician) that will trigger a payout, but was unable to specify these payout provisions. Slattery does know that the payout money never goes back to the employer. The payout is to be given to the disabled employee only. Slattery identified a payment to the employer as reversion and stated that it is illegal.

32. Slattery is aware of literally hundreds or thousands of brokers who sold 419 plans. Slattery has never sold a 419 or SADI 419 plan. Slattery is not aware of anyone or any company that is currently marketing 419 plans.

33. Slattery last saw Dan Carpenter yesterday (04/19/2010), and Slattery does not know who currently operates Nova.

Special Agent Rech displayed the letter from Edwards & Angel and asked Slattery to identify this letter.

34. Slattery identified the letter as coming from the law firm that Dan Carpenter has hired to help defend the Benistar 419 Plan.

35. Slattery does not know if any Form 1099's are issued to any beneficiary of the plans. Slattery is aware of client records on paper and is not aware of any electronic records. Slattery stated that the 419 plans offered by Benistar were known as listed transactions.

36. At this point, Slattery directed Special Agent Rech and Special Agent Shaun Schrader to various paper record locations in the building.

Slattery and Agent Rech then proceeded back to the room where Agent Dragan was waiting. Agent Rech asked Slattery if he ever had knowledge of any company meetings he attended (either with or without the presence of a company salesman or independent brokers) that was held with the purpose of marketing and/or sales of any 419 plans under any of the various names that Nova sponsored.

37. The completion of the interview is chronicled in the Memorandum of Interview by Special Agent Michael Dragan.

I prepared this memorandum on April 26, 2010, after refreshing my memory from notes made during and immediately after the   interview with Kevin Slattery.


Memorandum Author     *Matthew J. Rech III* E

                                Matthew  Rech
                                Special Agent


                                *Michael Dragan* E

                                Michael Dragan
                                Special Agent

# EXHIBIT SIX

## JULIO LA ROSA DECLARATION

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
)
Petitioner, )
)
v. )                    Civil No. 3:09-mc-00272-VLB
)
WAYNE BURSEY, as OFFICER/ )
DIRECTOR of NOVA BENEFIT PLANS )
LLC, )
)
Respondent. )

DECLARATION OF JULIO LA ROSA

1. I am the Special Agent in Charge of the St. Paul Field Office, Internal Revenue Service - Criminal Investigation Division. As the head of the St. Paul Field Office, I am the individual charged with making all criminal referrals for this field office, including recommendations for initiation or expansion of grand jury investigations. In the course of my duties I have access to the records of the Internal Revenue Service concerning criminal referrals made to the Department of Justice. Specifically, I directed an attorney from Area Counsel, Criminal Tax, to run a search on Area Counsel's databases to determine whether any referral had been made, nationwide, with respect to Daniel Carpenter or Wayne Bursey. There were no results to that search, and, as counsel has advised me, that means that no referrals have been made with respect to Daniel Carpenter or Wayne Bursey.

2. Based on the facts detailed above, as of the date of this declaration, the Internal Revenue Service has not made a referral of Daniel Carpenter or Wayne Bursey to the Department of Justice within the meaning of 26 U.S.C. § 7602(d)(1).

Case 3:09-mc-00272-RNC   Document 19-1   Filed 05/03/10   Page 2 of 2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: MAY 3, 2010.

JULIO La ROSA
Special Agent in Charge
St. Paul Field Office

S4276515

# EXHIBIT SEVEN

## LISTS OF BOXES



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

| | |
|---|---|
| *Abraham A. Ribicoff Federal Building* | *(860) 947-1101* |
| *450 Main Street, Room 328* | *Fax (860) 760-7979* |
| *Hartford, Connecticut 06103* | *www.usdoj.gov/usao/ct* |

May 25, 2011

Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739
Attention: Dan E. LaBelle, Esq.

       Re:   <u>Non-Disclosure of Subpoena</u>

Dear Sir or Madam:

      You have been served with a subpoena which requires you to appear before a federal grand jury June 28, 2011 with certain specified documents. Because this subpoena is being issued as part of an ongoing investigation, we request that you do not disclose its existence or its contents to any person who is not involved in your internal document production process. If at some point you decide that it is necessary to disclose the existence and/or the contents of this subpoena, I request that you notify me of your intent to do so prior to the time of the disclosure.

      In addition, to the extent that you do not produce certain responsive materials on the basis that you believe they are protected by the attorney-client or any other privilege, please include with your production a log identifying any documents withheld on the basis of privilege.

      YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY WILL BE EXCUSED if these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

      Very truly yours,

      DAVID B. FEIN
      UNITED STATES ATTORNEY

      DAVID E. NOVICK
      ASSISTANT UNITED STATES ATTORNEY

Enclosure

<u>Attachment to Subpoena</u>

TO:  Halloran and Sage, LLP
     315 Post Road West
     Westport, CT 06880-4739

     Attention: Dan E. LaBelle, Esq.

    Provide all documents and other items seized pursuant to a search warrant executed at 100 Grist Mill Road, Simsbury, Connecticut, by the IRS-CID of Milwaukee, Wisconsin, on April 20, 2010, that are related to Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, and Avon Capital and associated entities, including but not limited to IRS evidence box numbers 36, 38, 54, 75, 81, 103, 205, 238, 249, 287, 293, 300, 308, 35, 37, 121,128, 129, 125, 239, 32, 90, 124, 204, 237, 243, 247, 253 and 291.

    In lieu of personally appearing before the Grand Jury, these records may be provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date.

| | | |
|---|---|---|
| 32 | 124 | 249 |
| 35 | 125 | 253 |
| 36 | 128 | 287 |
| 37 | 129 | 291 |
| 38 | 204 | 293 |
| 54 | 205 | 300 |
| 75 | 237 | 308 |
| 81 | 238 | 14.5 |
| 90 | 239 | |
| 103 | ~~243~~ | |
| 121 | 247 | |

# AUSA NOVICK SUBPOENA
# BOXES NOT RETURNED

| | | |
|---|---|---|
| 32 | 124 | 247 |
| 35 | 125* | 249 |
| 36 | 128 | 253 |
| 37 | 129* | 287 |
| 38 | 145 | 291 |
| 54 | 204* | 293 |
| 75 | 205 | 300 |
| 81* | 237 | 308* |
| 90 | 238 | |
| 103 | 239 | |
| 121* | 243 | |

*Boxes Returned

# BOXES NEVER
# RETURNED OR MISSING

55
62
91
177
179
276
301
314
317