# EXHIBIT TWO

## SCHRADER-ENSTROM
## APRIL 20, 2010
## SEARCH WARRANT

United States District Court

DISTRICT OF _____ CONNECTICUT

In the Matter of the Search of
(Name, address or Brief description of person,
property or premises to be searched)

The office of NOVA BENEFIT PLANS LLC, also
known as BENISTAR, located at 100 Grist Mill
Road, Simsbury, Connecticut.

**SEARCH WARRANT**

**CASE NUMBER:**

To: Shaun Schrader, IRS-CID and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Shaun Schrader who has reason to believe that
on the person of or x on the property or premises known as (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury,
Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists
of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is
accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign
attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden
sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

in the _____ District of _____ CONNECTICUT _____ there is now
concealed a certain person or property, namely (describe the person or property to be seized)

*See* Attachment B.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the
person or property so described is now concealed on the person or premises above-described and
establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before *April 25, 2010*

(not to exceed 10 days) the person or place named above for the person or property specified, serving this
warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night
as I find reasonable cause has been established)~~ and if the person or property be found there to seize
same, leaving copy of this warrant and receipt for the person or property taken, and prepare a written
inventory of the person or property seized and promptly return this warrant to THOMAS P. SMITH,
UNITED STATES MAGISTRATE JUDGE as required by law.

April *16* 2010 at *1:05 p.m.*
Date and Time Issued

THOMAS P. SMITH
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

at ___ HARTFORD, CONNECTICUT ___
City and State

*[signature]*
Signature of Judicial Officer

# EXHIBIT THREE

## AGENT ALLEN
## MAY 26, 2011
## SEARCH WARRANT

11-92M-01 (J6_)

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
District of Connecticut

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
| The entirety of the premises located at 100 Grist Mill Road in Simsbury, Connecticut, and more particularly described in Attachment B | ) ) ) | |

COPY

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Connecticut_____
*(identify the person or describe the property to be searched and give its location):*
The entirety of the premises located at 100 Grist Mill Road in Simsbury, Connecticut, and more particularly described in Attachment B

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See Attachment D

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before ___6/4/11___
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Joan G. Margolis
                              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                       ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   5/25/11, 12:45 p.

City and state:   New Haven, CT

_____
Judge's signature

Joan G. Margolis
*Printed name and title*

# EXHIBIT
# FOUR

## CHIEF COUNSEL MEMORANDUM

**Office of Chief Counsel**
**Internal Revenue Service**

# memorandum

CC:CT-112064-04
EEBoody/MENeedle

MAR 1 9 2004

date:  March 19, 2004

to:  Chief, Criminal Investigation

from:  Edward F. Cronin, Division Counsel/Associate Chief Counsel (Criminal Tax)

subject:  *Groh v. Ramirez (Ramirez)*—Supreme Court Holds Flawed Search Warrant Invalid.

In *Groh v. Ramirez*, 124 S. Ct. 1284 (February 24, 2004) (copy attached), the U.S.
Supreme Court held by a 7 to 2 majority that a search warrant that failed to describe the
persons or things to be seized was invalid on its face, notwithstanding that the requisite
particularized description was provided in the unincorporated search warrant
application. By a slim 5 to 4 majority, the Court also ruled that the federal agent who
had prepared the search warrant and supervised its execution was not entitled to
qualified immunity from liability. This decision, along with the Ninth Circuit's recent
decision in *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003) (copy attached),
clearly highlight the need for a warrant to contain on its face sufficient information to
instruct both the executing officer as well as the occupant of the place to be searched of
the nature of the alleged violation(s) and a description of the items to be seized.
Accordingly, increased attention must be paid to the actual search warrant to ensure
that there are no deficiencies in the document.

## BACKGROUND

### Procedure:

Rule 41 of the Federal Rules of Criminal Procedure sets forth the procedures for
obtaining a search warrant. Pursuant to Rule 41(d), a search warrant application is
submitted to a magistrate judge along with an affidavit establishing probable cause to
search for and seize property which evidences a crime. After finding probable cause, a
magistrate judge will issue the actual court order authorizing the search (the warrant).
Rule 41(e)(1). Rule 41(e)(2) further provides that the warrant must identify the property
to be searched as well as the items to be seized. Thus, the warrant must instruct the
executing officer where to go, why they are there (what crimes have been committed),

- 2 -

CC:CT-112064-04

and what to look for. According to Rule 41(f)(3), the executing officer must also provide the occupant of the property with a copy of the warrant which describes the place to be searched, the alleged violations, and the items to be seized. One way to accomplish this is to include the information in an affidavit which is incorporated by reference and attached to the warrant. Affidavits which are sealed and not given to the occupant can not be considered in determining whether the requirements of Rule 41 have been satisfied.

### _Groh v. Ramirez_

**Facts:**

Based on information received from a "concerned citizen," Groh, a veteran Bureau of Alcohol, Tobacco, and Firearms special agent, submitted an application for a warrant to search the Ramirez's large ranch in Montana. Although both the application and Groh's supporting affidavit stated that the search was for specified weapons, explosives, and records, the section of the warrant form calling for the description of the "person or property" to be seized, mistakenly contained a description of Ramirez's ranch house rather than the items of contraband being sought. Moreover, the warrant did not incorporate by reference the application's itemized list. Nevertheless, a U.S. Magistrate Judge signed the warrant form prepared by Groh, even though it failed to identify the items that Groh intended to seize.

The next day, Groh led a group of federal agents and county law enforcement officials to Ramirez's ranch to execute the search warrant. Mrs. Ramirez, but not Mr. Ramirez, was present during the search. No illegal weapons or explosives were discovered during the search. Groh left a copy of the warrant, but not the application with Mrs. Ramirez. Groh asserts that he orally described the objects of the search to Mrs. Ramirez in person, and to Mr. Ramirez by telephone. Mrs. Ramirez, however, disputes this assertion, claiming that Groh "explained only that he was searching for 'an explosive device in a box.'" The officers conducting the search acted professionally, exercising restraint in limiting the scope of the search to that indicated in the application. There is no evidence that suggests Groh acted maliciously, or that even his failure to include on the warrant form a list of the contraband that was being sought was anything other than a clerical oversight that was inadvertently made.

Ramirez filed a civil lawsuit against Groh and others in a _Bivens_ action under 42 U.S.C. § 1983, claiming _inter alia_, a violation of his Fourth Amendment rights. The district court granted Groh and the other civil defendants summary judgment, finding no Fourth Amendment violation, and finding that even if such a violation occurred, all of the defendants were entitled to qualified immunity. The Ninth Circuit affirmed the district

- 3 -

CC:CT-112064-04

court's ruling, except as to the Fourth Amendment claim against Groh, ruling that the warrant was invalid and that Groh was not entitled to qualified immunity because he was the leader of the search party.

### Holding:

A 7 to 2 majority on the Supreme Court held that Ramirez's constitutional rights were violated because the search warrant was plainly invalid because it did not adequately describe the persons or things to be seized.   The Court observed that "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.  Because [Groh] did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment."  Thus, the Court held the search to be unlawful despite clear probable cause and an adequate description contained in both the sealed affidavit and the unincorporated application.

By a 5 to 4 vote, the Supreme Court narrowly held that Groh, the affiant on the search warrant and the leader of the search party, acted unreasonably in carrying out a search with a fatally flawed warrant, and thus was not entitled to qualified immunity.  Two dissents opined that Groh's actions were objectively reasonable under the circumstances and that he should be entitled to qualified immunity like the other agents and officers that participated in the search.  Noteworthy *dicta* includes criticism of warrants that merely recite as items to be seized "fruits and instrumentalities" of a particular crime, noting that such warrants are considered invalid general searches under the Fourth Amendment.

### *United States v. Bridges*

### Facts:

Bridges, through his tax consulting business, ATC, advised clients to proclaim themselves non-resident aliens to avoid payment of Federal income taxes.  From 1997 through 2000, ATC filed more than 100 claims with the IRS requesting tax refunds on behalf of its "non-resident alien" clients.  After a successful undercover operation, a search warrant application was submitted and approved by a magistrate.  The warrant, however, did not describe or allege the fraudulent activities that ATC and Bridges were suspected of committing.  The closest the search warrant came to any allegation of criminal conduct was its reference to the affidavit.  The affidavit, meanwhile, was neither incorporated by reference nor physically attached to the warrant.  In fact, it was sealed.  The attached list of items to be seized included a comprehensive laundry list of items one would expect to find in any small to medium sized business and included the following wording "including but not limited to."

- 4 -

CC:CT-112064-04

IRS Special Agents executed the search warrant on ATC's offices in January 2000. The agents seized ATC's computer system, client files, tax codes, correspondence from ATC's clients, ATC's seminar video tapes, and other business documents and equipment found on the premises. In April 2001, Bridges was convicted of, *inter alia*, filing false claims for refund and attempting to interfere with the administration of tax laws, based on evidence seized pursuant to the search warrant. Bridges appealed his conviction, arguing the search and seizure violated the Fourth Amendment because the warrant was defective and overbroad.

### Holding:

Although the Ninth Circuit found the application for the search warrant was supported by the affidavit and was more than sufficient to demonstrate probable cause, it found the scope of the warrant itself overly broad and tantamount to a general warrant, since the affidavit was neither attached to the warrant nor incorporated by reference. The Ninth Circuit reviewed the Supreme Court's interpretation of the Fourth Amendment's particularity requirement as well as its prior decisions over the past twenty years and noted the purpose of the requirement is to ensure targets of search warrants are able to ascertain what crimes are alleged to have been committed and what corresponding items are authorized for seizure. Here, the warrant itself failed to allege any specific violations being investigated even though the agent's affidavit included sufficient detail. The court noted a warrant may be construed by reference to the affidavit only if the affidavit accompanies the warrant and if the warrant incorporates it by reference, neither of which applied here.

The court also criticized language in the list of items to be seized attached to the warrant, finding the verbiage "including, but not limited to" overly broad, since the effect was unclear what exactly the agents were expected to seize. It was also not enough for the district court to find the business permeated with fraud since the agent's affidavit did not clearly state the business was entirely fraudulent and there was no evidence the government thought the business was permeated with fraud when making its application.

### ANALYSIS

Following the decisions in *Bridges* and *Ramirez*, it is clear courts will hold search warrants to a high standard. They will ensure that the warrant serves as a guide to the executing officer and gives fair notice to the occupant(s) of the premises to be searched of the reasons supporting the search (i.e., the alleged violations) and the items sought. The warrant, therefore, must be complete and specific on its face. An executing officer must be able to ascertain where they are going and what they intend to take from the

- 5 -

CC:CT-112064-04

warrant itself. Details contained in the search warrant application or affidavit that are not attached or incorporated by reference, will not be considered. Similarly, affidavits that are sealed will not be considered.

Moreover, the holding in *Ramirez* reinforces the vulnerability of CI special agents should there be errors in the drafting of a search warrant. The Supreme Court in *Ramirez* noted that the executing officer could not rely on the fact a magistrate had approved the warrant to avoid liability.

### CONCLUSION

The holdings in *Ramirez* and *Bridges* reinforce the need for the actual warrant to be complete on its face. Agents must be mindful of the particular requirements when preparing their search warrant applications. Much effort goes into the creation of the agent's affidavit; however, the actual warrant must not be overlooked. We would encourage you to have your agents submit to CT attorneys for review the actual warrant in addition to their affidavit and Enforcement Action Review Form.

As a related matter, it is our understanding that the search warrant template on CI's Document Manager (copy attached) does not clearly instruct agents to include a list of potential violations on the face of the search warrant.

If we can be of further assistance to you regarding this matter, please feel free to contact me or Martin Needle of the Criminal Tax Division at (202) 622-4470.

Attachment: As Stated

# EXHIBIT FIVE

## INTERNAL REVENUE MANUAL EXCERPTS



**Part 9. Criminal Investigation**
**Chapter 4. Investigative Techniques**
**Section 9. Search Warrants, Evidence and Chain of Custody**

### 9.4.9 Search Warrants, Evidence and Chain of Custody

- 9.4.9.1   Overview
- 9.4.9.2   General Search Warrant Procedures
- 9.4.9.3   Search Warrant Process
- 9.4.9.4   Uniform Policy for Search Warrant File Maintenance
- 9.4.9.5   Search Warrants and Less Intrusive Methods for Obtaining Stored Wire and Electronic Communications
- 9.4.9.6   Computer Searches and Seizures
- 9.4.9.7   Probable Cause and Preparation of Search Warrant
- 9.4.9.8   The Approach and Search
- 9.4.9.9   Custody and Storage of Seized Property
- Exhibit 9.4.9-1   Sample 18 USC §2703(f) "Preservation Letter"
- Exhibit 9.4.9-2   Risk Assessment Guide
- Exhibit 9.4.9-3   Post Enforcement Operations Summary Form

### 9.4.9.1  (10-05-2007)
### Overview

1.  This section discusses agency policy and procedural requirements for use of search warrants by Criminal Investigation (CI) special agents. It includes guidelines regarding the execution of the search warrant and the seizure of evidence, computers, and contraband. Further, it sets forth the proper procedures for maintaining the chain of custody and transferring evidence to the forensic lab.
2.  Special agents should be aware that not every investigation requires the execution of a search warrant. Form 6884, Voluntary Consent to a Search of Person, Premises or Conveyance, (see Document Manager), is an effective tool for obtaining investigative evidence. Special agents should discuss with their Supervisory Special Agent (SSA) the benefits and risks of confronting the individual in possession of the evidence sought as opposed to executing a search warrant.

**9.4.9.2 (06-19-2008)**
**General Search Warrant Procedures**

1. A numbered subject criminal investigation (SCI) is required when CI is the affiant for a search warrant. The Criminal Investigation Management Information System (CIMIS) must be updated to reflect search warrant activity for **CI affiant and non-CI affiant search warrants**.
2. Special agents need either a numbered primary investigation (PI) or SCI to participate in the execution of non-CI affiant search warrants. Please refer to IRM 9.9.4 for additional information.
3. Search warrants for tax and tax-related offenses will be utilized with restraint and only in significant tax investigations. All other investigative tools (i.e., mail covers, surveillance, informants, trash pulls) should be considered before deciding that a search warrant is the least intrusive means to acquire the evidence. The significance of a tax investigation can be evaluated by considering the following:
   - amount of tax due
   - nature of the fraud
   - need for evidence to be seized
   - impact of the potential criminal tax investigation on voluntary compliance
4. All requests for tax and tax-related search warrants will require a written evaluation by Criminal Tax (CT) Counsel of the intrusiveness issue. Internal Revenue Manual (IRM) 9.1.4, Criminal Investigation Directives (Directive No. 1) is interpreted to mean that CI special agents will employ the least intrusive means necessary to acquire evidence in tax and tax-related Title 18 investigations.

   **Note:**

   In this context, tax-related investigations are those that must be authorized by the Department of Justice (DOJ), Tax Division. Typically, these investigations involve violations of 18 USC §286, 18 USC §287, and 18 USC §371.

5. In addressing intrusiveness, the special agent will explain in Form 13739, Enforcement Action Review Form (EARF) (see Document Manager) why other investigative methods cannot produce the evidence being sought, and why the search warrant represents the best and least intrusive method to secure the evidence. Some factors that will be considered by management and CT Counsel in evaluating the intrusiveness issue are:
   - type of records sought

- any objective evidence indicating the subject may destroy the evidence
- any objective evidence of the subject's attempt to obstruct the investigation
- facts that establish that other attempts to acquire the records were ineffective
- facts that indicate that other methods of acquiring the records may compromise the investigation

### 9.4.9.3  (02-09-2005)
### Search Warrant Process

1. A search warrant can be an effective investigative tool once it has been determined that crucial evidence of a particular crime exists, is likely to be found at a specific location, and cannot be obtained by any other means. There are five major steps to the process:
   A. preparing the search warrant application
   B. planning the enforcement action
   C. obtaining approval
   D. executing the search warrant and preserving the evidence
   E. adhering to the applicable post operation procedures
2. It is the special agent's responsibility to proof all documents prepared by the attorney for the government. The search warrant is returned by the court giving the special agent the legal authority to execute the warrant at the particular place and time, and to seize the specific items or person(s) described. It is imperative that the special agent review the prepared search warrant to ensure all the proper information from the Application and Affidavit for Search Warrant is contained in the search warrant issued by the court. The warrant must be sufficient on its face or refer to an affidavit that is sufficiently incorporated therein, and specifically set forth:
   - the violations being investigated
   - a description of the person/premises to be searched
   - a description of the items to be seized

**Note:**

The Supreme Court, in *Groh v. Ramirez, 124 S. Ct. 1284* (February 24, 2004), ruled a search warrant that failed to describe the persons or things to be seized was invalid on its face, notwithstanding that the requisite particularized description was provided in the unincorporated search warrant application. The court also ruled that the Federal agent who had prepared the search warrant and supervised its execution was not entitled to qualified immunity from liability. This decision, along with the Ninth

Circuit's recent decision in *United States v. Bridges, 344 F.3d 1010* (9th Cir. 2003), clearly highlights the need for a warrant to contain on its face or in an incorporated and attached search warrant application, sufficient information to instruct both the executing officer and the occupant of the place to be searched of the nature of the alleged violation(s) and the description of the items to be seized.

### 9.4.9.3.1 (10-05-2007)
### Preparing the Search Warrant Documents

1. A search warrant consists of a set of documents, each with a specified legal purpose. These documents are:
   A. Application for Search Warrant
   B. Affidavit
   C. Search Warrant
   D. Search Warrant Attachment "A" description of "Location to be searched"
   E. Search Warrant Attachment "B" description of "Items to be seized"
   F. Search Warrant Return

### 9.4.9.3.1.1 (10-05-2007)
### Application and Affidavit for Search Warrant

1. The Affidavit for Search Warrant, (see Document Manager), is a standard form signed and sworn by the special agent that summarizes the specifics of the search warrant. The application addresses the particulars of the person, property, or premises to be searched; the title and employing agency of the special agent; the judicial district where the person or property exists; a description of the items to be seized; and the nature of the alleged criminal violations. This section of the form is generally prepared by the attorney for the government assigned to the investigation.
2. In order to obtain a search warrant, the special agent must convince internal and external approving officials, and ultimately a Federal Judge Magistrate (magistrate), that there is probable cause to believe that:
   A. A crime has been committed.
   B. Items sought may be seized by virtue of their connection to the crime.
   C. Items sought are on the premises to be searched.
3. The remainder of the application is the affidavit in support of the application drafted by the special agent along with input from CT Counsel and, if it is a grand jury investigation, the attorney for the government.

# EXHIBIT
# SIX

# INTERNAL REVENUE
# SEARCH WARRANT MANUAL
# EXCERPTS

# SEARCH WARRANT HANDBOOK

**Office of Chief Counsel**
**Criminal Tax Division**

**2009**

IRS—ACLU 00202

## PREFACE

Criminal Tax attorneys frequently provide legal advice to Criminal Investigation personnel with respect to search warrant applications. To assist in evaluating such applications, this handbook provides an overview of search warrant law. The overview provided herein is not intended to take the place of thorough legal research with respect to a particular search warrant application.

This handbook does not create or confer any rights, privileges, or benefits on any person. It is not intended to have the force of law or of a statement of Internal Revenue Service policy. See United States v. Caceres, 440 U.S. 741 (1979).

> s/ Edward F. Cronin
> EDWARD F. CRONIN
> Division Counsel/Associate Chief Counsel
> (Criminal Tax)
> Internal Revenue Service

i

IRS-ACLU 00203

## TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

    A.   Primary Authorities ......................................................................2

        1.   Fourth Amendment..............................................................2

        2.   Federal Rules of Criminal Procedure, Rule 41 .....................3

    B.   Primary Legal Issues ..................................................................4

        1.   Reasonable Expectation of Privacy......................................4

        2.   Probable Cause....................................................................4

        3.   Particularity...........................................................................5

II.  REASONABLE EXPECTATION OF PRIVACY .....................................5

    A.   Subjective Expectation of Privacy ...............................................5

    B.   Reasonableness...........................................................................6

III. PROBABLE CAUSE ..............................................................................9

    A.   Standards of Review ....................................................................9

    B.   Factual Showing.........................................................................10

    C.   Agent's Conclusions ..................................................................10

    D.   Informants .................................................................................12

        1.   Totality-of-the-Circumstances Analysis .............................12

        2.   Factors Considered ............................................................13

        3.   Criminal Activity of Informants ...........................................14

        4.   Anonymous and Confidential Informants.............................15

        5.   Corroboration .....................................................................15

    E.   Staleness....................................................................................17

        1.   Factors ................................................................................18

        2.   Ongoing Pattern of Criminal Activity..................................18

IRS-ACLU 00204

|   |   | 3. | Business Records .................................................................................. 19 |
|   | F. |   | Anticipatory Search Warrants ........................................................... 19 |
|   | G. |   | Effect of False Statements or Omissions......................................... 20 |
|   |   | 1. | Material False Statements............................................................ 20 |
|   |   | 2. | Material Omissions....................................................................... 21 |
| IV. | PARTICULARITY .......................................................................................... 22 |
|   | A. |   | Generality vs. Overbreadth.............................................................. 22 |
|   | B. |   | Standards of Review ........................................................................ 24 |
|   | C. |   | Place to be Searched ....................................................................... 25 |
|   | D. |   | Items to Be Seized ........................................................................... 26 |
|   |   | 1. | Factors Considered ..................................................................... 28 |
|   |   | 2. | Best Practices .............................................................................. 28 |
|   |   |   | a. | Inclusion of All Available Information....................... 29 |
|   |   |   | b. | Reference to Criminal Violations............................. 30 |
|   |   |   | c. | Reference to Time Frame ........................................ 32 |
|   |   |   | d. | Incorporation and Attachment of Affidavit............... 32 |
|   |   |   | e. | Examples ................................................................. 33 |
|   |   | 3. | Generic Descriptions ................................................................... 34 |
|   |   | 4. | Catch-All Phrases........................................................................ 35 |
|   |   |   | a. | "Including but Not Limited to" .................................. 35 |
|   |   |   | b. | Other Catch-All Phrases.......................................... 36 |
|   |   | 5. | "Permeated With Fraud"............................................................... 38 |
| V. | EXECUTING THE WARRANT: THE PLAIN VIEW DOCTRINE ........................ 41 |
|   | A. |   | General Requirements ...................................................................... 42 |
|   | B. |   | Immediate Apparency....................................................................... 43 |

IRS-ACLU 00205

VI.    REMEDIES FOR UNLAWFUL SEARCHES AND SEIZURES...........................45

   A.    The Exclusionary Rule.............................................................................45

        1.    Total vs. Partial Suppression..........................................................46

        2.    Good Faith Exception.....................................................................47

        3.    Attenuation Exception....................................................................50

        4.    Independent Source Exception ......................................................51

        5.    Inevitable Discovery Exception.......................................................52

   B.    Agent Liability and Qualified Immunity...............................................54

   C.    Government Liability.............................................................................55

VII.   COMPUTER-RELATED SEARCHES AND SEIZURES ...................................55

   A.    Reasonable Expectation of Privacy......................................................56

   B.    Probable Cause.....................................................................................56

   C.    Particularity...........................................................................................57

   D.    Ninth Circuit Procedural Requirements ...............................................59

   E.    Privacy Statutes that May Apply to Computer Searches ...........................59

        1.    The Stored Communications Act.....................................................59

        2.    The Privacy Protection Act ............................................................60

IRS-ACLU 00206

search; threw her to the ground, and handcuffed her so tightly as to cause pain. Assuming these allegations to be true, the court concluded that the agent's conduct violated the Fourth Amendment, that a reasonable agent in his position would have known that it did, and that therefore the agent was not entitled to qualified immunity on those charges. 342 F.3d at 1059. However, with respect to the plaintiff's claim that detaining her in handcuffs during the search was unlawful, the court held that even though the agent had violated her constitutional rights, he was entitled to qualified immunity as to this portion of her claim. The court explained that, at the time of the search, the case law had not clearly established that this conduct violated the plaintiff's constitutional rights. *Id.* at 1065.

Qualified immunity was held not to apply with respect to any of the claims brought against IRS agents in *Tekle v. United States*, 511 F.3d 839 (9th Cir. 2007). In that case, the agents executed search and arrest warrants at the home of the plaintiff's parents, who were suspected of narcotics trafficking and tax-related offenses. During the search, the agents allegedly held a gun to the head of the eleven-year-old plaintiff, who was unarmed and barefoot, handcuffed him, pulled him up by the chain of the handcuffs, and detained him with the handcuffs on for approximately 15 minutes and then for an additional 10-15 minutes with guns still drawn. The plaintiff brought a *Bivens* action against the agents for the use of excessive force and for subjecting him to an unreasonable detention. The Ninth Circuit held that agents were not entitled to assert qualified immunity because "a reasonable officer should have known that it was constitutionally excessive to use such force and to use the handcuffs in the manner alleged against an unarmed eleven-year-old child who was fully complying with the officer's requests." 511 F.3d at 856.

### C.    Government Liability

In addition to claims against individual officials, the Federal Tort Claims Act ("F.T.C.A.") provides that a civil action alleging an illegal arrest, search, or seizure by a federal officer may be brought directly against the United States government. 28 U.S.C. § 2680(h). The relevant portion of § 2680(h) provides that the federal government is not immune to suit with regard to "acts or omissions of investigative or law enforcement officers of the United States Government" for "any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." *Id.* The provision defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

### VII.    COMPUTER-RELATED SEARCHES AND SEIZURES

Computer-related searches and seizures are subject to the same Fourth Amendment requirements that apply to any search or seizure: a warrant is generally required if the target has a reasonable expectation of privacy in the computer to be searched, and the warrant application must be evaluated for probable cause and particularity. However, the legal analysis of these issues must take into account the unique characteristics of computers, which enable users to store vast amounts of

55

IRS-ACLU 00207

Information and to share or restrict access to that information in various ways. Further, when searching computers, law enforcement agencies are subject to specific restrictions and obligations under the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, et seq. and the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa et seq.

### A.    Reasonable Expectation of Privacy

The analysis of an individual's expectation of privacy with respect to a computer depends on the location and ownership of the computer and the extent to which it may be accessed by others. Courts have held that an individual generally has a reasonable expectation of privacy with respect to his or her home computer. *See United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004); *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001). Conversely, an employee may have a reduced expectation of privacy in his or her office computer, especially if that computer is subject to some level of monitoring by his or her employer. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000).

When two or more individuals share a computer, or when an individual's computer has file-sharing software or is attached to a network, courts must engage in a fact-intensive analysis to determine whether Fourth Amendment protections apply. In such situations, if access to files is limited by a password or other means, there may be a reasonable expectation of privacy. *See Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001); *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007).

Like files shared over a network, emails and other transmissions generally lose their reasonable expectation of privacy and thus their Fourth Amendment protection once they have been sent from an individual's computer. *See United States v. Lifshitz*, 369 F.3d at 190; *Guest v. Leis*, 255 F.3d at 333. A similar principle applies to a computer user's subscriber information, which is shared with an Internet service provider and is therefore not subject to Fourth Amendment protections. *See United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008).

### B.    Probable Cause

As with all searches, if there is a reasonable expectation of privacy and the warrant requirement applies, applications for computer-related warrants must be evaluated for probable cause. In general, the probable cause analysis for computer-related searches is no different from the analysis for other searches. *See United States v. Giberson*, 527 F.3d 882, 888-89 (9th Cir. 2008) (stating, with respect to a computer search for tax records and other documents, that "the potential intermingling of materials [on a computer] does not justify an exception or heightened procedural protections for computers beyond the Fourth Amendment's reasonableness requirement."). *But see United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009) (en banc) (imposing new procedural requirements with respect to the search and seizure of electronic data from a non-suspect third party). As with other types of searches, the connection between the place to be searched and the items to be seized may be inferred if that inference has "common sense appeal." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).

IRS-ACLU 00208

For example, in *United States v. Khanani*, a case involving immigration violations, money laundering conspiracy, and the evasion of federal employment and income taxes, the defendant contended that the seizure of his computers was without probable cause because the affidavit submitted with the warrant application provided no fact-specific reason to believe there were computers in his office, or that his computers had been used to facilitate the commission of any of the alleged criminal violations. 502 F.3d 1281, 1290 (11th Cir. 2007). The court disagreed, noting that the affidavit described the defendant as an accountant for one of the co-conspirators and that one of the tax returns for that individual had been found in the trash outside the defendant's office:

> While the Master Affidavit did not indicate that it was a computer-generated tax form, in reviewing the affidavit to ascertain whether it furnished probable cause for the warrant sought, the affidavit is given a "common sense and realistic" interpretation. ... Additionally, [a witness for the government] testified that prior to the warrant application, he had entered [the defendant's] office and observed connected computers. The district court did not err in concluding that the allegations of the Master Affidavit were sufficient to provide probable cause for the seizure of computers from [the defendant's] accounting business.

*Id.* (citations omitted). As this quotation indicates, the same "common sense" standard that applies to probable cause determinations in general also applies in the context of computer-related searches and seizures. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, .... there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

### C.     Particularity

Computer technology poses unique challenges with respect to the particularity requirement. Because computers are capable of storing and intermingling a great deal of information, and because computer data may be mislabeled or otherwise concealed, it may be difficult to draft a computer search warrant that is comprehensive without being overbroad. This potential for overbreadth, however, underscores the importance of drafting computer search warrants with sufficient particularity. *See United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important.").

In *Otero*, a case involving charges of mail fraud and credit card theft against a postal carrier, the Tenth Circuit emphasized that "warrants for computer searches must *affirmatively limit* the search to evidence of specific federal crimes or specific types of

IRS–ACLU 00209

material." 563 F.3d at 1132 (citation omitted; emphasis in original). The court held that the warrant at issue lacked sufficient particularity on the following grounds:

> Attachment B is quite neatly divided into two subsections: "ITEMS TO BE SEIZED" and "COMPUTER ITEMS TO BE SEIZED." Each paragraph under the first section takes pains to limit the search to evidence of specific crimes or evidence pertaining to specific persons along Ms. Otero's delivery route. Each paragraph under the second section, in contrast, has no limiting instruction whatsoever. Read alone, they each authorize a search and seizure of "[a]ny and all" information, data, devices, programs, and other materials. There is no explicit or even implicit incorporation of the limitations of the first five paragraphs. The computer-related paragraphs do not even refer to the rest of the warrant. In fact, the presence of limitations in each of the first five paragraphs but absence in the second four suggests that the computer searches are *not* subject to those limitations. Even when read in the context of the overall warrant, therefore, the paragraphs authorizing the computer search were subject to no affirmative limitations.

*Id.* at 1132-33. The *Otero* holding indicates that explicit references to "affirmative limitations," such as a description of the specific crimes suspected, must be made in the computer section of a search warrant in order to satisfy the particularity requirement. *See also United States v. Adjani,* 452 F.3d 1140, 1149 (9th Cir. 2006) (holding that the warrant at issue satisfied the particularity requirement in part because "the government here did describe at some length both the nature of and the means of committing the crime.").

Although courts have emphasized the need for particularity in computer search warrants, they also recognize that the government may be unable to search for specific computer files during the execution of a warrant and may need to conduct a wholesale seizure of the computers themselves for subsequent searching. *See, e.g., Guest v. Leis,* 255 F.3d 325, 335 (6th Cir. 2001) ("Because of the technical difficulties of conducting a computer search in a suspect's home, the seizure of the computers, including their content, was reasonable in these cases to allow police to locate the offending files."); *Upham,* 168 F.3d at 535 ("It is no easy task to search a well-laden hard drive by going through all of the information it contains ... The record shows that the mechanics of the search for images later performed off site could not readily have been done on the spot."). It cannot be assumed, however, that the seizure of a computer for off-site searching is justified in every instance. Rather, to satisfy the particularity requirement, a search warrant affidavit must provide facts that support the need for an off-site search. *See United States v. Hill,* 459 F.3d 966, 975-76 (9th Cir. 2006) ("We do not approve of issuing warrants authorizing blanket removal of all computer storage media for later examination when there is no affidavit giving a reasonable explanation ... as to why a wholesale seizure is necessary.").

IRS-ACLU 00210

Consideration should also be given to the possibility of imaging a computer's hard drive rather than seizing the computer itself, because removal of the computer may make it impossible for the target to continue conducting business. *See, e.g., United States v. Rayburn House Office Building, Room 2113, Washington, D.C. 20515*, 497 F.3d 654, 670 (D.C. Cir. 2007) (noting that one of the ways in which FBI agents who searched a congressman's office minimized disruption was by "imaging computer hard drives rather than searching the computers").

### D.   Ninth Circuit Procedural Requirements

In a recent en banc opinion involving the search of a non-suspect third party's computers, the Ninth Circuit introduced new procedural requirements for computer-related searches. *See United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009). The court described these new guidelines as follows:

1. Magistrates should insist that the government waive reliance upon the plain view doctrine in digital evidence cases. ...

2. Segregation and redaction must be either done by specialized personnel or an independent third party. ...

3. Warrants and subpoenas must disclose the actual risks of destruction of information as well as prior efforts to seize that information in other judicial fora. ...

4. The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents. ...

5. The government must destroy or, if the recipient may lawfully possess it, return non-responsive data, keeping the issuing magistrate informed about when it has done so and what it has kept.

579 F.3d at 1006.

### E.   Privacy Statutes that May Apply to Computer Searches

#### 1.   The Stored Communications Act

In general, the Fourth Amendment does not protect communications held in electronic storage, such as email messages stored on a server, because internet users do not have a reasonable expectation of privacy in such communications. Further, because the Fourth Amendment applies to government searches rather than searches by private actors, it does not appear to limit the ability of internet service providers ("ISPs") to obtain customer information and disclose it to the government. To fill this

IRS-ACLU 00211

gap, the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-11,[19] establishes certain protections for customer information in the possession of ISPs. *See* 18 U.S.C. § 2703. Specifically, if the government seeks to compel disclosure of the contents of electronic communications and other information without prior notice to customers or subscribers, the SCA requires that a valid search warrant be obtained. *See Guest v. Leis,* 255 F.3d 325, 339 (6th Cir. 2001).

### 2.    The Privacy Protection Act

The Fourth Amendment also does not apply to searches and seizures of documentary evidence in the possession of innocent third parties, such as the press. *See Zurcher v. Stanford Daily,* 436 U.S. 547 (1978). However, the Privacy Protection Act of 1980 ("PPA"), 42 U.S.C. § 2000aa *et seq.*, makes it unlawful for a government employee to search for or seize documentary materials possessed by a person with a purpose to disseminate some form of public communication. 42 U.S.C. §§ 2000aa(a); (b). The PPA generally does not apply if the materials sought constitute contraband or the means of committing a criminal offense, or if there is probable cause to believe the person possessing the materials has committed a criminal offense to which the materials relate. 42 U.S.C. § 2000aa(a).

As the Sixth Circuit has observed, interpretation of the PPA presents particular challenges in the context of computer searches. *See Guest v. Leis,* 255 F.3d 325, 341 (6th Cir. 2001). These challenges stem from the difficulty of "separat[ing] the offending materials from other 'innocent' material on the computer." *Id.* at 341-42. In *Guest,* the court expressed concern that criminals might seek to insulate electronically-held criminal evidence from search and seizure by including PPA-protected materials on their computers. *See id.* at 342. Accordingly, the court held that "when protected materials are commingled on a criminal suspect's computer with criminal evidence that is unprotected by the act, we will not find liability under the PPA for seizure of the PPA-protected materials." *Id.* The court cautioned, however, that "police may not then search the PPA-protected materials that were seized incidentally to the criminal evidence." *Id.* In the case before it, the court declined to find the defendants liable under the PPA because the owner or operator of the computers at issue was a criminal suspect, and the PPA-protected materials were not searched. *Id.*

---

[19] The SCA is Title II of the Electronic Communications Privacy Act ("ECPA"), Pub. L. 99-508, 100 Stat. 1848.

IRS-ACLU 00212

# EXHIBIT
# SEVEN

## ACLU FOIA DOCUMENTS



**IRS Office of Chief Counsel**
**Search Warrants**

Division Counsel / Associate Chief Counsel (Criminal Tax)
2010



Presenters

- Richard Pietrofeso
  - Area Counsel, Criminal Tax, Area 6
- Frank Jerich
  - Senior Attorney, San Francisco
- Lorraine Yu
  - Senior Attorney, Los Angeles



Topics

- Anatomy of a Search Warrant
- Fed. R. Crim. P. 41
- Probable Cause
- Particularity
- Intrusiveness
- Computer Issues
- Sensitive Search Warrants



Fourth Amendment

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.



Anatomy of a Search Warrant

- Application for Search Warrant
- Attachment A (Where)
- Attachment B (What)
- Affidavit In Support of Application
- Search Warrant
- Sealing Order
- Inventory Return



Nonresponsive

 Nonresponsive

 Nonresponsive

 Nonresponsive

 Nonresponsive

 Nonresponsive



### Inventory Return

- Computerized
- Provide Copy at Search Site
- Filed "promptly" with the Court (10 days)
- Specificity Issues
  - Count the Money
  - CT review

## Federal Rules of Criminal Procedure, Rule 41



- Gives Government Authority to Request and Court Authority to Issue Search Warrants.
- Describes What Can Be Searched and/or Seized.
- Provides Procedures for Seeking Return of Property and Suppression of Evidence.

## Authority to Request and Issue Warrant



- Requires a Showing of Probable Cause.
- Generally, Issued by Magistrate Where Property/ Evidence Is Located.

## Persons or Property Subject to Search and/or Seizure



- Evidence of a Crime
- Illegally Possessed Items
- Property Used to Commit Crime
- Person Committing the Crime

## Return of Property/Motion to Suppress (Rule 41(g) & (h))



- Person Aggrieved May File Motion for Return of Property.
- Suppression Appropriate if Warrant or Its Execution Unlawful.

## Recent Amendments



- Tracking Devices
- Computers

## Tracking Devices Rule 41(b)(4)



- 2006
- Magistrate May Authorize to Track Movement of Person or Property.
- Request Should Include Inside and Outside District Movement.
- Required When 4th Amendment Privacy Concerns at Issue – United States v. Karo, 468 U.S. 705 (1984).
- U.S. v. Pineda-Moreno, 2010 WL 59215, (9th Cir. 2010)
  - placing tracking device on car while in the driveway without a warrant does not violate 4th Amendment
  - no reasonable expectation of privacy in a driveway

IRS-ACLU 00195



## Computers
## Rule 41(e)(2)(B)

- 2009
- Warrant May Authorize Seizure of Electronic Storage Media.
- May Review Content Offsite at a Later Date.



## Probable Cause

- Fourth Amendment Requirement
- Defined
- Agent Experience and Conclusions
- Informants
- Staleness
- Effects of False Statement or Omissions



## Fourth Amendment Requirements

- Reasonable Expectation of Privacy
  - Subjective expectation
  - Is the expectation reasonable?
- 2 requirements for Search Warrants:
  - Probable Cause
  - Particularity
    - Description of search site
    - List of items to be seized



## Probable Cause Defined

- KNOWN FACTS AND CIRCUMSTANCES ARE SUFFICIENT TO WARRANT A MAN OF REASONABLE PRUDENCE IN THE BELIEF THAT CONTRABAND OR EVIDENCE OF A CRIME WILL BE FOUND. Ornelas v. US, 517 U.S. 690 (1996).

## Standard of Review

- Totality of Circumstances. Illinois v. Gates, 462 U.S. 213 (1993).
- To establish probable cause, affidavit must show:
  1) Reasonable ground for belief that a crime has been committed. Brinegar v. US, 338 US 160 (1949).
  2) Reasonable to seek the Evidence in the Place Indicated. United States v. Fernandez, 388 F.3d 199 (9th Cir. 2004).



## Agent Experience and Conclusions

- When Combined with Sufficient Factual Showing, Conclusions of an Experienced Agent Can Add Support to Probable Cause. United States v. Fernandez, 388 F.3d 199 (9th Cir. 2004).
- Experience Alone Insufficient. United States v. Watts, 535 F.3d 650 (9th Cir. 2008).

IRS-ACLU 00196

## Informants



- Probable Cause May be Founded Upon Informant Information If Totality of Circumstances Supports Reliability. *Franks v. Delaware*, 438 U.S. 154 (1978).
  - Hearsay is OK
- Informant Can Be Criminal. *United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993).
- Anonymous Tip may be OK. *United States v. Luong*, 407 F.3d 898 (9th Cir. 2005).
- Corroboration Helps.

## Staleness

- Proof of Probable Cause Must be of Facts Closely Related to the Time of the Issue of the Warrant. *United States v. Grubbs*, 547 U.S. 90 (2006); *Sgro v. United States*, 287 U.S. 206 (1932).
- No Bright Line Test
- Factors:
  - Whether criminal activity is ongoing;
  - Whether target stays in one place;
  - Whether items to be seized are of lasting value; and
  - Whether place to be searched is long-term operational base.
- Old Facts with Recent Facts May be OK. *United States v. McElroy*, 587 F.3d 73 (1st Cir. 2009).

## Effect of False Statement or Omission

- *Franks v. Delaware*, 438 U.S. 154 (1970). Defendant Can Challenge Truthfulness of Affidavit.
- *Franks* Hearing – Defendant Attempts to Show Deliberate Falsehood or Reckless Disregard For Truth.
- High Standard for Defendant.

## Particularity

- Fourth Amendment Mandates Warrant Particularly Describe Place and Items to be Searched and Seized. *Groh v. Ramirez*, 540 U.S. 551 (2004).



## Two Prong Test for Place to be Searched

- Is Description Sufficiently Detailed to Locate and Identify;
- Probability that Another Place Might Mistakenly Be Searched.
- *United States v. Mousli*, 511 F.3d 7 (1st Cir. 2007); *Harman v. Pollock*, 446 F.3d 1069 (10th Cir. 2006).

## Particularity Test

- When Evaluating the Particularity of a List of Items to be Seized, Courts Consider Several Factors, which the Ninth Circuit has Grouped into a Three-Prong Test:
  - Whether probable cause existed to seize all items of a category described in the warrant;
  - Whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and
  - Whether the government could have described the items more particularly in light of the information available to it at the time the warrant issued.
- *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008).

IRS-ACLU 00197

## Overbreadth

- Warrants that Exceed the Scope of Probable Cause. United States v. Yusuf, 461 F.3d 374 (3rd 2006).
- Catch-All Phrases:
  - "Including but not limited to" is meaningless, United States v. Bridges, 344 F.3d 1010 (9th Cir. 2003).
  - Best Practice:
    - Be as descriptive as possible
    - Specify criminal violation
    - Include time frames
    - Avoid catch-all




## Permeated With Fraud

- Probable Cause to Believe Entire Business Is a Scheme to Defraud and All Records are Evidence. United States v. Lamagazianie, 251 F.3d 519 (5th Cir. 2001).
- Warrant Must Allege. United States v. Bridges, 344 F.3d 1010 (9th Cir 2003).
- Usually Restricted to Businesses. United States v. Falon, 959 F.2d 1143 (1st Cir 1992).

## Incorporate Affidavit By Reference and Attach to Warrant

- Incorporation or Attachment of Affidavit May Establish Particularity, and Some Circuits Require Both. Groh v. Ramirez, 540 U.S. 551 (2004).
  - United States v. SDI Future Health, Inc., 553 F.3d 684 (9th Cir. 2009);
  - United States v. Hewitt, 459 F.3d 463 (4th Cir. 2006);
  - Baranski v. Fifteen Unknown ATF Agents, 452 F.3d 433 (6th Cir. 2006);
  - United States v. Dale, 991 F.2d 819 (D.C. Cir. 1993).

## Cars

- Search of Passenger Compartment Incident to Arrest OK Only if Officers Reasonably Believe that:
  - Arrestee has access; or
  - Vehicle contains evidence of the offense of arrest.
  - Arizona v. Gant, 129 S.Ct. 1710 (2009).

## Intrusiveness

- IRM 9.4.9.2(4)
  - SW for tax and tax related offenses will be utilized with restraint and only in significant tax investigations.
  - Evaluate significance by:
    - Tax due
    - Nature of the fraud
    - Evidentiary Need
    - Deterrence
- CCDM 38.1.1.3.2/1 – CT Discussion Should Address Why Other Methods Insufficient.

## Other Methods to Consider

- Obtain Evidence from Third Party (Banks)
- Obtain Evidence from Service Center (QRP/RPP).
- Obtain Evidence Through Summons or Subpoena.

## Computer-Related Issues

- Fourth Amendment Applies
- Comprehensive Drug Testing
- Other Circuits and CDT
- Stored Communications Act
- The Privacy Protection Act



## Fourth Amendment Applies

- People Possess a Reasonable Expectation of Privacy in their Computers.
- Location and Access of Computer Determinative.
- Emails – Generally No Privacy. United States v. Lifshitz, 369 F.3d 173 (2nd Cir. 2004).
- Subscriber Information No Privacy. United States v. Perrine, 518 F.3d 1196 (10th Cir. 2008).
- Overbreadth Considerations.
- Same Probable Cause Analysis, BUT...

## Comprehensive Drug Testing

- United States v. Comprehensive Drug Testing, 579 F.3d 989 (9th Cir. 2009).
- New Procedural Requirements:
  - Waive reliance on Plain View Doctrine.
  - Segregate and redact by third party.
  - Disclose destruction risks and prior seizure efforts.
  - Search for items must be designed so that only probable cause items are uncovered and case agent will only view these items.
  - Destroy or return non-responsive data.

## Other Circuits v. CDT

- 7th Circuit rejects: Plain View Doctrine Applies to Computer Searches. United States v. Mann, 592 F.3d 779 (7th Cir. 2010).
- 4th Circuit rejects: Plain View Doctrine Applies to Computer Searches. United States v. Williams, 592 F.3d 511 (4th Cir. 2010).



## Stored Communications Act

- 18 U.S.C. § 2701
- 4th Amendment Does Not Protect Emails Stored on Server.
- No Privacy Expectation.
- SCA Protects the Communication.
  - Warrant required if government seeks to compel disclosure of electronic communications without prior notice to customers or subscribers.



## The Privacy Protection Act

- 42 U.S.C. § 2000aa
- 4th Amendment Does Not Apply to Documentary Evidence in Possession of Third Party with a Purpose to Disseminate Public Communication Such as the Press.
- PPA Prohibits Warrantless Searches.
- PPA Does Not Protect Contraband or Means of Committing Crime.

IRS-ACLU 00199



### Sensitive Search Warrants
- IRM 9.4.9.3.3.3
- Tax Division Directive 52
- Reviewed by NO – CCDM 38.1.1.9.2.2
- Includes:
  - Accountant
  - Lawyer
  - Physician
  - Public Official
  - Clergy
  - News Media
  - Labor Union
  - 501(c)(3)



### Sensitive Search Warrants (continued)
- Disinterested Third Parties
  - Sensitive
  - Disinterested difficult to define
  - Exception: E-mail providers
- Accountant v. Return Preparer
  - No bright line test
  - CPA/Bookkeeper – yes
  - No accounting services - no



### Conclusion
- Break Out Session
  - More on CDT
  - Imaging Demonstration by CI, CIS Wally Drueck
- Reference: Search Warrant Handbook (2009)





# EXHIBIT EIGHT

## AUSA NOVICK SUBPOENA TO HALLORAN & SAGE



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

Abraham A. Ribicoff Federal Building          (860) 947-1101
450 Main Street, Room 328                     Fax (860) 760-7979
Hartford, Connecticut  06103                  www.usdoj.gov/usao/ct

May 25, 2011

Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739
Attention: Dan E. LaBelle, Esq.

            Re:   Non-Disclosure of Subpoena

Dear Sir or Madam:

        You have been served with a subpoena which requires you to appear before a federal grand jury
June 28, 2011 with certain specified documents.  Because this subpoena is being issued as part of an
ongoing investigation, we request that you do not disclose its existence or its contents to any person who
is not involved in your internal document production process.  If at some point you decide that it is
necessary to disclose the existence and/or the contents of this subpoena, I request that you notify me of
your intent to do so prior to the time of the disclosure.

        In addition, to the extent that you do not produce certain responsive materials on the basis that
you believe they are protected by the attorney-client or any other privilege, please include with your
production a log identifying any documents withheld on the basis of privilege.

        YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY WILL BE EXCUSED if
these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of
Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526,
facsimile (203) 630-9530 on or before the grand jury date

                    Very truly yours,

                    DAVID B. FEIN
                    UNITED STATES ATTORNEY

                    DAVID E. NOVICK
                    ASSISTANT UNITED STATES ATTORNEY

Enclosure

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

H-10-2-9(416)

for the

District of Connecticut

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:
Halloran & Sage, LLP
315 Post Road West
Westport, CT

YOU ARE COMMANDED to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Court   (Grand Jury Room, 3rd Floor) | Date and Time: |
|---|---|
| 450 Main Street Hartford, CT 06103 | June 28, 2011 at 9:30 a.m. |

You must also bring with you the following documents, electronically stored information, or objects (blank if not applicable):

### SEE ATTACHMENT.

PLEASE NOTE:

In lieu of personally appearing before the Grand Jury, these records may be provided to these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

Date: May 25, 2011

CLERK OF COURT

*Yelena Shutzinez*

Signature of Clerk or Deputy Clerk

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Assistant U.S. Attorney David E. Novick
450 Main Street, Room 328
Hartford, CT 06103
Tel: (860) 947-1101     CONTROL #416

<u>Attachment to Subpoena</u>

TO:   Halloran and Sage, LLP
      315 Post Road West
      Westport, CT 06880-4739

      Attention: Dan E. LaBelle, Esq.


      Provide all documents and other items seized pursuant to a search warrant executed at 100 Grist Mill Road, Simsbury, Connecticut, by the IRS-CID of Milwaukee, Wisconsin, on April 20, 2010, that are related to Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, and Avon Capital and associated entities, including but not limited to IRS evidence box numbers 36, 38, 54, 75, 81, 103, 205, 238, 249, 287, 293, 300, 308, 35, 37, 121, 128, 129, 125, 239, 32, 90, 124, 204, 237, 243, 247, 253 and 291.


      In lieu of personally appearing before the Grand Jury, these records may be provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date.

On this date, September 21, 2011, Special Agent Lynn Allen and Senior Investigator, Mary Goreham, pursuant to duly issued Federal Grand Jury Subpoena, removed from the custody of Halloran & Sage LLP 29 numbered boxes of documents held by Halloran & Sage LLP in conjunction with a Grand Jury investigation pending in the eastern district of Wisconsin. The boxes are identified by number on the page attached hereto.

_____          _____
Lynn Allen                        Mary Goreham

_____
William J. McGrath, Jr.

| | | |
|---|---|---|
| 32 | 124 | 249 |
| 35 | 125 | 253 |
| 36 | 128 | 287 |
| 37 | 129 | 291 |
| 38 | 204 | 293 |
| 54 | 205 | 300 |
| 75 | 237 | 308 |
| 81 | 238 | 14 5 |
| 90 | 239 | |
| 103 | ~~243~~ | |
| 121 | 247 | |

# EXHIBIT NINE

## ENSTROM
## SYNOPSIS OF THE CASE

**Enforcement Action Review Form**

## 1) GENERAL INFORMATION

| A. Field Office<br>St. Paul | B. Date<br>04/05/2010 |
|---|---|

C. Subject Name (Last, First, M)
Neumann, Guy

D. Occupation
419 Salesman

E. CI Investigation Number (if applicable)1000230004

F. Special Agent Name
Shaun Schrader

G. Type of Enforcement Operation:
☒ Search Warrant ☐ Arrest Warrant ☐ Seizure Warrant
☐ Other

H. Have the Asset Forfeiture Coordinator, Computer Investigative Specialist and Public Information Officer been notified of pending action?
☒ Yes ☐ No ☐ Not Applicable

I. Proposed Date and Time of Execution
04/20/2010 9:00 AM

J. Previous Enforcement Action
Date        Type

K. Type of Investigation:
☐ Legal Income ☐ Illegal/Non Narcotic ☐ OCDETF
☐ Counterterrorism ☒ Other Explain Tax Shelter

L. Is a CI special agent the Affiant?   ☒ Yes ☐ No
If "no", what is the Affiant's agency?

M. Is CI participation incident to an ongoing task force?
☐ Yes ☒ No
☐ OCDETF ☐ HIDTA ☐ Counterterrorism
☐ Other

N. Address where enforcement action is to be conducted:
Street: 100 Grist Mill Road
City and State: Simsbury, CT

Type of location : ☐ Residence ☒ Business ☐ Both
Or ☐ Other – Describe
Or if there are multiple sites, attach list to synopsis section)

O. Is this a Grand Jury Investigation? ☒ Yes ☐ No

P. Is a Service Initiated Grand Jury Request pending?
☐ Yes ☒ No
(If YES, the proposed grand jury request should be held in abeyance).

## 2) SPECIAL PERSONS

A. Is this a Title 26 or Title 18 tax-related warrant that pertains to any of the following persons or representatives?

Accountant, Lawyer, Physician, Public Official or Candidate, Clergy, News Media Representative, Labor Union Representative, Exempt Organization Member.

☐ Yes (Explain) ☒ No
(If yes, CT Counsel review, Director, Field Operations concurrence, and DOJ Tax Division approval is required)

B. Does the warrant pertain to a foreign national?
☐ Yes ☒ No
Agent designated to notify arrestee of their right to Consular access _____
Agent designated to notify the arrestee's embassy

C. Do you expect the enforcement action to draw publicity?
☐ Yes ☒ No
☐ National ☐ Regional ☐ Local

D. What is the subject's notoriety in the community?
☐ High ☐ Medium ☒ Low

## 3) INFORMANT INFORMATION
### CRIMINAL INVESTIGATION WARRANT ONLY

| | YES | NO |
|---|---|---|
| A. Is the primary source of information a confidential informant? | ☐ | ☒ |
| B. Has the confidential informant been paid for information? | ☐ | ☐ |
| C. Has the confidential informant furnished reliable information to CI in the past? | ☐ | ☐ |
| D. Has the information provided by the confidential informant for this warrant been corroborated? | ☐ | ☐ |
| E. If "D" is "no", has a polygraph exam been considered?<br>(If "yes", discuss details in explanation section) | ☐ | ☐ |
| F. Is there documentary evidence to support the confidential informant's information in this instance? | ☐ | ☐ |
| G. Does the confidential informant have a criminal record?<br>(If "yes", attach detail in explanation section) | ☐ | ☐ |
| H. Does another informant corroborate this information? | ☐ | ☐ |
| I. If this informant is not controlled by Criminal Investigation, note the Agency name : | | |

## 4) COMPLETE FOR NON-TAX CI SEARCH WARRANTS ONLY

| | YES | NO |
|---|---|---|
| A. Are there other methods of acquiring the same evidence? If "yes", explain | ☐ | ☐ |
| B. Is the potential for destruction of evidence likely in this investigation, if this action does not occur? | ☐ | ☐ |
| C. Is contraband expected to be encountered?<br>(If "yes" detail in explanation section) | ☐ | ☐ |

## 5) CI TAX AND TAX RELATED WARRANTS ONLY
(Detail on Page 2)

A. Significance Evaluation: Discuss the significance of the case – tax due, nature of the fraud, need for evidence to be seized, anticipated effect on voluntary compliance

B. Intrusiveness Evaluation: Discuss why other investigative methods cannot produce the evidence being sought, and why the search warrant represents the best and least intrusive method to secure the evidence

## 6) RISK ASSESSMENT IN CI ENFORCEMENT OPERATIONS

☐ High ☐ Medium ☒ Low
(If there are multiple sites, state level for each in synopsis section)
Attach Risk Assessment Guide(s)

## 7) RISK ASSESSMENT – NON CI WARRANTS

A. How do you rate the physical risk factors of this warrant?
☐ High ☐ Medium ☐ Low
( Explain in detail if High)

B. Explain what equipment and attire will be used:

C. How many CI agents will participate and what are their roles in the enforcement action.

D. List other agencies participating, and agent number
1.
2.
3.

| Enforcement Action Review Form |
|---|

**Synopsis of the Case**

*(Give a brief description of the case, any unusual circumstances, and the role of CI in the enforcement action.)*  ☒ Attachment
See Attached

**Additional Explanation Section (include all information by item number from the first page)**

**Explanation of Items**

| Item # | |
|---|---|
| Item # | |
| Item # | |
| Item # | |

**CI Tax and Tax Related Warrants**   ☒ Attachment

A) Significance Evaluation  See Attached

B) Intrusiveness Evaluation  See Attached

**Review/Approval Section**

| Level | Signature | Date |
|---|---|---|
| Reviewed by:<br>Supervisory Special Agent | *Kathy A. Enstrom* ᴱ | 04/09/2010 |
| Reviewed/Approved by:<br>Assistant Special Agent in Charge | *Joan Tabone* ᴱ | 04/09/2010 |
| Approved by:<br>Special Agent in Charge | ᴱ | 04/09/2010 |
| Concurrence*:<br>Director,<br>Field Operations | ✔ | |

*The Director, Field Operations concurrence is required for all enforcement actions involving "sensitive investigations." A "sensitive investigation" is defined as an investigation that involves one of the following: a currently serving elected federal official; a currently serving Article III judge; a currently serving high-level Executive Branch official; a currently serving elected statewide official; a currently serving member of the highest court of the state; a mayor currently serving a population of 250,000 or more; perjury in the U.S. Tax Court; an exempt organization.

| Form 13739 (10-2005) | Cat.#47325A | Page 2 of 4 | Department of Treasury-Internal Revenue Service |
|---|---|---|---|

IRS00006

Continued ... Enforcement Action Review Form

Synopsis of the Case

NOVA Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans – with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage.

NOVA Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that the head of these companies is Wayne Bursey.

419 Plans, or Welfare Benefit Plans, are non-qualified plans which businesses can establish to compensate employees in the event of situations such as sickness, disability, and/or disfigurement. Due to the fact that the plans are non-qualified, as opposed to a qualified plan like a 401K, there are no funding limits for the Plan and employers do not have to fund the plan for all employees. Employers can be selective and fund the Plan for as few as one or two employees. Money that is contributed to the plans can be written off by the business as an expense in the year that the contribution is made. NOVA Plans sells its 419 Plans as "10 or more employer plans", meaning that purportedly at least 10 employers contribute to the same plan which is then considered a single plan. If an employer is invested in a 10 or more employer plan, the IRS allows the business to expense an unlimited contribution amount.

The funding of a 419 plan works as follows:
- A business signs up for the 419 Plan and sends a contribution to a trust administered by NOVA.
- The business then claims an expense for the full amount of the contribution.
- The trust, for its part, purchases an annuity or life insurance policy from an insurance company with the covered employee as the beneficiary.

If the plan is administered properly, beneficiaries of the 419 Plans are only able to receive a distribution by filing a valid claim for a sickness, disability, or disfigurement. Per IRS regulations, if a valid claim is approved, the beneficiary receives a distribution from the plan, usually tax free.

Information received from a reliable cooperating witness (CW), indicates that NOVA Benefit Plans is promoting and administering abusive 419 Plans. The CW is an independent broker who sold NOVA 419 Plans to numerous clients in the Milwaukee, WI area. The CW has been selling 419 and 412I Plans through NOVA and their predecessor Benistar since 2002. The CW said that 412I plans were similar to 419 plans; however in 2006, IRS rules changed and 412I plans became less attractive compared to 419 plans. The CW provided information on 14 clients who he assisted in setting up NOVA and/or Benistar 419 Plans. The 14 Plans had contributions totaling well over $8 million.

Per the CW, NOVA knowingly administers their 419 Plans in a way that allows clients to use the plans as abusive tax shelters. The CW explained that he sold the 419 Plans to his clients as a disability plan with the option to get money out of the plan tax free. NOVA is allowing beneficiaries to abuse the Plans in at least two ways:

- First, per the CW, NOVA approves just about any claim that is filed by a beneficiary no matter how frivolous. For example, one of the CW's clients filed a claim for having a mole removed that left a small scar. NOVA approved the claim and is currently paying out the full contribution amount, less fees, over 60 months. The CW has had conversations with Wayne Bursey where Bursey said that if a beneficiary wants to get money out of the plan, NOVA encourages them to file a claim because they have made it so easy for a claim to be approved.

- Secondly, NOVA allows businesses to terminate their 419 Plans. If a business terminates the plan, NOVA gives the beneficiary the option of purchasing the Plan for 10% of its cash value. Once the beneficiary buys out the plan, they receive a 1099 from the insurance company that held the annuity. The 1099 will reflect the basis of the original purchase amount; however that is not the proper basis for the beneficiary. The beneficiary should have no basis in the annuity since the business, not the beneficiary, made the contribution. Due to the incorrect basis, the taxpayer is told that they owe little or no taxes. The CW said that NOVA knows that 1099's issued to the beneficiary by the insurance company are incorrect.

Of the 14 plans set up by the CW, eight plans, totaling well over $4 million in contributions, have been terminated and cashed out. In addition, multiple claims totaling approximately $1 million have been approved.

Due to the ease of getting money out of the plans virtually tax free, by filing a claim or terminating, the plans are being sold as abusive tax shelters.

IRS00007

Continued ... Enforcement Action Review Form

The fact that NOVA's 419 Plans qualify for the 10 or more employer exemption is also in question. In a 10 or more employer plan, the contributions of all of the employers are supposed to be pooled together and accounted for as one plan. However, NOVA appears to be treating each employer separately. For example, NOVA purchases an annuity for each individual beneficiary. If the beneficiary files a claim or terminates the plan they are only entitled to what they contributed.

This investigation utilized a Three Contact Operation and also a Group II Undercover Operation. The undercover contacts confirmed the CW's allegations regarding NOVA. The end result of the abusive 419 plans is that individuals are able to circumvent IRS regulations and obtain money from businesses that they have an interest in virtually tax free. By using a 419A(f)(6) plan, a business can contribute money, which is deductible as a business expense, to the plan on behalf of a covered employee. Then, with the assistance of NOVA, at a later date the covered employee is able to obtain the money contributed to the plan tax free either through a ginned-up disability (disability payments are generally not includable in income under Section 104 of the Internal Revenue Code) or through a misstated basis when the 419A(f)(6) plan is terminated. In essence, NOVA is providing a blue print, and the means, for business owners and individuals to underpay their taxes.

### A) Significance Evaluation

Per contacts with Neumann, NOVA has thousands of clients and over a billion dollars invested for those clients. The CW provided information that he alone has 14 clients who have invested over $8 million in the 419 Plans. Due to the statements of Neumann and the information provided by the CW, the tax loss associated with NOVA's clients is anticipated to be very significant.

SB/SE has identified some 419 Plans as Abusive Tax Avoidance Transactions. Per their website, promoters are offering plans that purport to provide employee pre-retirement or post-retirement benefits, such as death, medical, dental, life insurance, disability and severance pay. Promoters claim that employer contributions to these plans are tax-deductible when paid, relying on the use of single employer plans under IRC Section 419(e), the 10 or more employer exception in IRC Section 419A(f)(6) or the Bargaining Agreement exception in IRC 419A(f)(5). Arrangements providing welfare benefits may have tax consequences different than what the promoter claims. Depending on the facts and circumstances, a particular arrangement could instead be providing dividends to the owners of a business that are includible in the owners' income and not deductible by the business. The arrangement could also be subject to the split dollar regulations or be a nonqualified deferred compensation plan.

LMSB has an open Promoter Case, or "6700 investigation", on Wayne Bursey and NOVA. Currently, the case is stalled due to the fact that Bursey has not complied with a summons issued for his testimony. LMSB is currently pursuing summons enforcement activities in order to force Bursey to comply. LMSB believes that the summons enforcement process could take several months.

Pursuant to an ongoing project, LMSB is currently disallowing NOVA 419 Plan contributions for companies that expense the contributions. The contributions may also be includable as income on the personal tax returns of beneficiaries in the year that the contributions are made.

The LMSB case on NOVA is related to an earlier investigation of a company by the name of Benistar. NOVA was created by the operators of Benistar. The CW believes that NOVA may have been created because the IRS was having issues with Benistar's 419 Plans.

### B) Intrusiveness Evaluation

It is unlikely that records, including customer lists, pertinent to the investigation would be obtained through the use of a subpoena. LMSB currently has an open 6700 investigation on NOVA and Wayne Bursey. The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony. Due to the noncompliance with the summons, it is anticipated that a subpoena would garner the same result. Further, based on the investigation to date, it appears that NOVA makes a living out of impeding the IRS. Therefore, NOVA's cooperation with a criminal investigation is highly unlikely.

IRS00008

# EXHIBIT TEN

## DECLARATION OF JULIO LA ROSA

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　Petitioner,　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　　　）　　Civil No. 3:09-mc-00272-VLB
　　　　　　　　　　　　　　　　　　　）
WAYNE BURSEY, as OFFICER/　　　　　）
DIRECTOR of NOVA BENEFIT PLANS,　）
LLC,　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　Respondent.　　　　　）

DECLARATION OF JULIO LA ROSA

1.  I am the Special Agent in Charge of the St. Paul Field Office, Internal Revenue Service - Criminal Investigation Division. As the head of the St. Paul Field Office, I am the individual charged with making all criminal referrals for this field office, including recommendations for initiation or expansion of grand jury investigations. In the course of my duties I have access to the records of the Internal Revenue Service concerning criminal referrals made to the Department of Justice. Specifically, I directed an attorney from Area Counsel, Criminal Tax, to run a search on Area Counsel's databases to determine whether any referral had been made, nationwide, with respect to Daniel Carpenter or Wayne Bursey. There were no results to that search, and, as counsel has advised me, that means that no referrals have been made with respect to Daniel Carpenter or Wayne Bursey.

2.  Based on the facts detailed above, as of the date of this declaration, the Internal Revenue Service has not made a referral of Daniel Carpenter or Wayne Bursey to the Department of Justice within the meaning of 26 U.S.C. § 7602(d)(1).

3427051.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: MAY 3, 2010.

JULIO La/ROSA
Special Agent In Charge
St. Paul Field Office

8427631/T

# EXHIBIT ELEVEN

## EMAILS SHOWING AGENTS STAYING PAST WARRANT DEADLINE

| | |
|---|---|
| **From:** | DCarpenter US Benefits |
| **To:** | Joe Castagno |
| **Cc:** | DCarpenter US Benefits |
| **Subject:** | FW: Charter Oak Inventory at 3:00 AM May 27, 2011 |
| **Date:** | Monday, October 02, 2017 2:39:43 PM |
| **Attachments:** | INVENTORY 05262011.pdf |

From: DA Wayne
Sent: Friday, May 27, 2011 2:03 AM
To: 'LaBelle, Dan E.'; robinsonesq@aol.com; Giaimo, Gerald T.; DCarpenter US Benefits
Cc: MCGRATH@halloran-sage.com; Joe Pastore; Don Trudeau
Subject: RE: Charter oak

-----Original message-----
From: robinsonesq@aol.com
To: dawayne@benistar.com, "Giaimo, Gerald T." <giaimo@halloran-sage.com>, Dan <dcarpenter@usbgi.com>,
Dan LaBelle <labelle@halloran-sage.com>
Cc: "McGrath Jr., William J." <MCGRATH@halloran-sage.com>, Joe Pastore <jpastore@foxrothschild.com>, Don
Trudeau <dtrudeau@benistar.com>
Sent: Fri, May 27, 2011 03:01:03 GMT+00:00
Subject: Re: Charter oak
We have the inventory, investigation name is "Charter Oak"

-----Original Message-----
From: robinsonesq@aol.com
Date: Fri, 27 May 2011 02:38:14
To: ; Giaimo, Gerald T.; Dan; Dan LaBelle
Reply-To: robinsonesq@aol.com
Cc: McGrath Jr., William J.; Joe Pastore; Don Trudeau
Subject: Re: Charter oak

Finished in Stamford 20 mins ago. Took all COT files, imaged server &
All hard drives. 2 guys still here finishing server, but we have control of office.

-----Original Message-----
From: dawayne@benistar.com
Date: Fri, 27 May 2011 02:00:35
To: Giaimo, Gerald T.; DCarpenter US Benefits; robinsonesq@aol.com; Dan LaBelle
Reply-To: dawayne@benistar.com
Cc: McGrath Jr., William J.; JPastore@foxrothschild.com; Don Trudeau
Subject: Re: Charter oak

Everyone still here. Can see through window as they are going through Kehoe's office.
Sent from my BlackBerry

-----Original Message-----
From: "Giaimo, Gerald T."
Date: Thu, 26 May 2011 21:31:17
To: DA Wayne; DCarpenter US Benefits; robinsonesq@aol.com; LaBelle, Dan E.
Cc: McGrath Jr., William J.; JPastore@foxrothschild.com; Don Trudeau
Subject: Re: Charter oak

Thank you Donna. Hold tight.

----- Original Message -----
From: dawayne@benistar.com [mailto:dawayne@benistar.com]
Sent: Thursday, May 26, 2011 09:20 PM
To: Giaimo, Gerald T.; DCarpenter US Benefits ; robinsonesq@aol.com ; LaBelle, Dan E.
Cc: McGrath Jr., William J.; JPastore@foxrothschild.com ; Don Trudeau
Subject: Re: Charter oak

Thanks. I just spoke to her and another agent and when she said that there is no 10pm deadline, I told her that was
what they said last time but calls were made and they that's not how it worked out, so I wasn't going to leave until I
heard otherwise from our attorneys.

They have door padlocked from inside.

Sent from my BlackBerry

-----Original Message-----
From: "Giaimo, Gerald T."
Date: Thu, 26 May 2011 21:17:17
To: DA Wayne; DCarpenter US Benefits; robinsonesq@aol.com; LaBelle, Dan E.
Cc: McGrath Jr., William J.; JPastore@foxrothschild.com; Don Trudeau
Subject: Re: Charter oak

Donna: they have it wrong. LaBelle is going to call the agent in charge and explain the law to her in this regard.

----- Original Message -----
From: dawayne@benistar.com [mailto:dawayne@benistar.com]
Sent: Thursday, May 26, 2011 09:01 PM
To: DCarpenter US Benefits ; Giaimo, Gerald T.; robinsonesq@aol.com ; LaBelle, Dan E.
Cc: McGrath Jr., William J.; JPastore@foxrothschild.com ; Don Trudeau
Subject: Re: Charter oak

They just told me that they will be at least another 4 hours in Simsbury! I said "I thought you had to be out by
10pm?" He said "no it has to be executed by 10 pm" -he said they have could be here until morning or until it is
done.
Sent from my BlackBerry

# EXHIBIT
# TWELVE

## PAMELA CICCOTELLI LETTER
## ENDING §6700 INVESTIGATION



**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
**Washington, D.C. 20224**

SMALL BUSINESS/SELF-EMPLOYED DIVISION

Date:  Feb. 28, 2014

NOVA Benefits Plan LLC
100 Grist Mill Lane
Simsbury, CT  06070

Penn Office Building
4314 Old Wm. Penn Hwy
Suite 200
Monroeville, PA  15146

Group Manager:  J. Kohut
Telephone Number:
(330) 253-7301

Person to Contact:
   Pamela A. Ciccotelli
Employee No.  0349450
Telephone Number:
      (412) 666 - 5520
Fax:  (412) 856 – 5831

Dear Taxpayer,

We are discontinuing our civil investigation into whether you are liable for a penalty
under Internal Revenue Code (IRC) Section 6708.  This letter should not be construed
to mean that the Internal Service (IRS) approves your conduct: rather, it is simply a
notice that our civil investigation has been discontinued at this time.  This investigation
did not constitute an examination of your income tax return(s).

The IRS is not precluded from taking any additional action against you or others with
respect to your conduct.  This includes the commencement of income tax examinations
of investors/participants whom you advise or aided.

If you have any questions, please contact me.

Thank you for your cooperation.

Sincerely,

- *COPY* -

Pamela A. Ciccotelli
Revenue Agent

**Letter 1866**

# EXHIBIT THIRTEEN

## JUNE 9, 2016 LETTER ENDING MILWAUKEE INVESTIGATION



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of Wisconsin*

| | |
|---|---|
| *Federal Courthouse* | *(414)297-1700* |
| *517 E. Wisconsin Ave, Rm 530* | *Fax (414) 297-1738* |
| *Milwaukee WI 53202* | *www.justice.gov/usao/wie* |

June 9, 2016

Attorney Eric J. Wilson
Godfrey & Kahn, S.C.
One East Maine Street, Suite 500
Madison, WI 53701

     Re:   NOVA/Benistar

Dear Mr. Wilson:

     As you know, the United States was conducting an investigation into possible criminal violations committed by NOVA/Benistar and its executives, including Daniel Carpenter. The matter was initially handled by Assistant United States Attorney Gordon P. Giampietro and was later transferred to Thomas Agnello, a trial attorney with the Criminal Enforcement Section of the Tax Division, following Gordon's departure from the U.S. Attorney's Office. I am writing to advise you that criminal prosecution has been declined and the matter will be closed.

     If you have any questions or concerns regarding this matter, you may call me directly at (414) 297-1801.

                        Sincerely,

                        GREGORY J. HAANSTAD
                        United States Attorney

          By:

                        KELLY B. WATZKA
                        Deputy Criminal Chief

CC:   Attorney Thomas Agnello

# EXHIBIT FOURTEEN

## SCHRADER SEARCH WARRANT PLAN OF OPERATION PAGE 8

INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION
SEARCH WARRANT PLAN

US Benefits Group, Inc
Benefit Plan Advisors

**Unknown Businesses and Trusts**
The above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans.

The investigation has shown that some businesses being run out of the building *may* be legitimately providing insurance and other financial services including: Rex Insurance Services.

**Inventory Procedures**

Due to the large amount of evidence that is expected to be seized, multiple evidence loggers will be utilized. Three TFIAs will be utilized to log evidence. Once all evidence has been logged, the three TFIAs will merge their data into one complete inventory.

**Evidence Custodian**

SA Stegenga will be the on-site evidence custodian.

At the conclusion of the search, all seized evidence will be loaded into the rental truck which SA Stegenga will have control of. SAs Stegenga and Leming will transport the evidence back to Milwaukee.

**Legal Records and Taint Team**

NOVA and BENISTAR are currently under civil investigation, therefore it is anticipated that there will be attorney/client type documentation at the search warrant site. We are authorized to take legal documents such as legal opinions related to 419 plans. However, if any document appears to have attorney/client type privilege, it should be tagged and given to the taint team for review as to whether we will take the documents. They will make the decision of whether it contains privileged information. If they are unsure, it will be logged into evidence, boxed separately and later reviewed by an independent AUSA in Milwaukee.

**Medical Emergency**

911 Should be the first call

**Nearest Medical Facility**

St. Francis Hospital
114 Woodland Street
Hartford, CT 06105

8

14176956.1

# EXHIBIT FIFTEEN

## CHERNESKI STATEMENT



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| Investigation #: | 1000230004 | **Location:** | NOVA/Benistar |
| Investigation Name: | Guy Neumann | | 100 Grist Mill Road |
| Date: | April 20, 2010 | | Simsbury, CT  06070 |
| Time: | ~9:05 - 11:10 am | | |
| Participant(s): | Stephen Cherneski, Witness | | |
| | Jeffrey A. Hencke, Special Agent | | |
| | Crystal Brinson, Special Agent | | |

On the above date and approximate time, Special Agent Crystal Brinson and I met
with Stephen Cherneski at the above stated location.  We identified ourselves to
Cherneski and I explained to him that we were assisting the United States Attorney's
Office located in the Eastern District of Wisconsin with a Grand Jury investigation and
wanted to ask him some questions.  Cherneski agreed to answer our questions,
however, at one point during the interview Cherneski asked if he was required to
answer the questions.  I explained to Cherneski that he was not required to answer the
questions and could choose not to answer some questions or stop the interview at any
point.  In response to our questions, Cherneski provided the following information.

1.  Cherneski currently resides at 6-C Talcott Forrest Road, Farmington, CT.  His
cell phone number is ▮▮▮▮▮▮▮.  Cherneski received a bachelor's degree
in economics with a minor in finance from Central Connecticut State.  Cherneski
was previously a professional hockey player.

2.  Cherneski described his role for NOVA Benefit Plans/Benistar as providing
technical and educational support for employers and advisors.  Cherneski
currently receives his paycheck from Benistar Admin Services and has been
working for Benistar Admin Services since February, 2005.  Cherneski believes
that all employees located at 100 Grist Mill Road, Simsbury, CT receive their
paycheck from Benistar Admin Services even though there are various
businesses being operated out of the building.  Cherneski is paid $60,000 per
year plus bonuses.  Cherneski became employed by Benistar Admin Services
because of his friendship with Guy Neumann.

3.  Cherneski had no prior knowledge or experience with 419 welfare benefit plans
prior to his employment for Benistar Admin Services and his work for
NOVA/Benistar.  Cherneski learned about 419 welfare benefit plans through on
the job training and read various books and tax law to educate himself to do his

job. Cherneski reports to Guy Neumann and Wayne Bursey. No person reports to Cherneski.

4. US Benefits Group is a business that provides information on various employee plans to a network of brokers. US Benefits Group does not administer welfare benefit plans. Cherneski stated that US Benefits Group is run by a collection of people and no one person. Cherneski stated that many individuals work for various companies operating out of the building at 100 Grist Mill Road, Simsbury, CT. Cherneski believes that US Benefits Group was started prior to his employment.

5. Benistar is a 3rd party administer of various retirement plans. Benistar was started prior to Cherneski's employment. Molly Carpenter is the chair person of Benistar. Cherneski stated that he does not deal with Benistar plans and is not familiar with its' plans.

6. Benefit Plan Advisors previously administered 419(e) welfare benefit plans, including the Grist Mill Trust. Cherneski stated that as of January 1, 2010, all 419 plans are administered by NOVA Benefit Plans. (NOVA)

7. NOVA currently administers all 419 welfare benefit plans. Prior to 1/1/2010, NOVA only administered NOVA 419A(f)(6) plans. NOVA was started prior to Cherneski's employment. NOVA is operated through a board containing Cherneski, Guy Neumann, Wayne Bursey, Dan Carpenter, Molly Carpenter, and Kathy Kehoe. NOVA administers its 419A(f)(6) plans through four (4) trusts. These trusts are SADI, LTC, Life 1, and Life 5.

8. A 419A(f)(6) welfare benefit plan is a plan containing 10 or more employers. In a 419A(f)(6) plan, the employer can deduct the amount of the contribution as a business expense, with no limitation.

9. In a NOVA 419A(f)(6) welfare benefit plan, a company/employer contributes money for the benefit of one or more employees (covered employee) of that company. In the plan, a trust (i.e. SADI) is the owner and beneficiary of the policy. The covered employee than designates a beneficiary for the plan. The trust then purchases an annuity or life insurance policy with the proceeds contributed to the trust by the employer. The trust does keep 5% of the amount contributed and the employer is required to pay an additional $1,500 enrollment fee to NOVA. The initial contribution by the company/employer is given to the trust (i.e. SADI). The trust would then deposit the check and write a separate check to the appropriate insurance company in which the trust has purchased the annuity and life insurance from.

10. Beneficiaries in 419A(f)(6) plans administered by NOVA received benefits from the plan through either a qualifying event or death. The death benefit for the 419A(f)(6) plans is discussed in the plan documents, but is usually the value of the annuity or life insurance. A qualifying event is a permanent disability or disfigurement to the covered employee. An employer can also terminate the

U.S. Treasury Criminal Investigation

plan. If the employer terminates the plan, the policy becomes an asset of the trust and the employer never receives any contributed money back. The covered employee can continue in the plan by purchasing the plan from the trust for the fair market value (FMV) of the annuity or life insurance policy purchased with the amount originally contributed by the employer. Revenue Procedure 2002-25 defines how the FMV of a life insurance policy is valued. The trust will also make a loan arrangement with the covered employee to assist the covered employee in purchasing the plan. In this loan arrangement, the covered employee is required to pay three years of interest up front. If NOVA loans money for the covered employee to purchase the plan, NOVA puts a collateral assignment on the policy. Collateral assignments are placed on both annuities and life insurance policies. Cherneski stated that he does not know much about the loan documents.

11. If the employer terminates the plan and the covered employee does not choose to continue in the plan, the money contributed by the employer is forfeited. Cherneski believes that money has been forfeited in the past but can not cite specific examples.

12. If an annuity is purchased with the employer contribution and there is a qualifying event, the covered employee receives money based upon a created formula. This money is paid out over 60 months after a one year waiting period. The formula is based upon the amount of the contribution and the amount of time in the plan. Cherneski stated that the covered employee can receive more money than what was initially contributed. Cherneski stated that the list of what qualifies as a disability of disfigurement is written in the plan documents, but does not know what the plans rely on for their definition of disability or disfigurement.

13. If a covered employee wishes to make a disability or disfigurement claim, the covered employee submits a claim form along with documents from the employer and a doctor. Wayne Bursey, the trustee, makes the decision to either accept or not accept the claim. Cherneski does not know if there have been any claims denied.

14. Cherneski stated the money contributed by employers into NOVA plans are comingled into trust accounts. (i.e. SADI) Cherneski stated that he does not deal with the accounting side of the client funds.

15. Cherneski is not familiar with the covered employee being able to pay 10% of the FMV of an annuity policy and obtain the proceeds of the annuity. (10% buy-out) Cherneski believes that 10% buyouts were allowed in prior to his employment, but a 100% buy-out has been required since Cherneski began his employment. Cherneski stated when he talks to clients, he advises them to never buy-out of the plans, however the plan documents do state the covered employee can pay 100% of the FMV to purchase the plan. Cherneski does not know of any employee of NOVA/Benistar that is allowing a 10% buy-out.

IRS00223

16. I explained to Cherneski that I believed that 10% buy-outs were still happening in the last few years. Cherneski stated that he is close to 100% sure that there are no 10% buy-outs. Cherneski again stated that he did not promote 10% buy-outs and has not heard of 10% buy-outs in the last 3 or 4 years. Cherneski stated that clients may ask about a 10% buy-out, however Cherneski would tell the client that there is only 100% buy-outs.

17. I explained to Cherneski that lying to a federal agent is a crime. Cherneski stated that he understood.

18. Cherneski stated that he does not believe that the NOVA 419 plans can be abused because the covered employee is required to pay 100% of the fair market value of the policy. Cherneski stated that he does not know of any way plans can be used as abusive tax shelters.

19. I showed Cherneski a document titled, "Sickness Accident Disability Indemnity Plan & Trust." (Attachments 1 - 24) Cherneski stated that the document describes the SADI plan, however the document shown to him is an old version. The new version would show a revision date on the cover page.

20. I showed Cherneski a copy of a letter dated April 18, 2005 to NOVA Benefit Plans, LLC from John Reid of Edwards & Angell LLP. (Attachments 25 - 38) Cherneski stated he is familiar with the letter, but does not give the letter to clients unless the client requests it. Cherneski has never met John Reid.

21. Cherneski is not aware of the insurance companies from whom they purchase annuities or life insurance contract having had concerns with the collateral assignments and any Forms 1099 to be issued by them.

22. Cherneski is aware that Benistar 419 Plan and Trust is in a dispute with the IRS and the dispute is being resolved through the courts. The Benistar 419 Plan & Trust is a pre-2003 plan.

23. Cherneski stated that the SADI plan is not a listed transaction. Cherneski stated there is a document that explains why NOVA plans are not listed transactions. I then showed Cherneski a document title "NOVA Benefit Plans LLC and "Why we not a Tax Shelter..." (Attachments 39 - 55) Cherneski stated this document explains why NOVA plans are not listed transactions. Cherneski does not know who prepared the document, however the document I showed to him is an old version. The new document does not contain the statement in the third paragraph about being audited if one files a Form 8886.

24. The difference between Grist Mill trust and the NOVA plans is in the timing of the deduction. In the Grist Mill Trust, the employer is able to only deduct qualifying costs. Also, in the Grist Mill Trust, the trust files Forms 8886 for clients even though it may not be required. The Forms 8886 are filed as a precaution.

25. Other individuals that do the same type of work as Cherneski, include Guy Neumann, Rich Belding and Ron Lanza.

26. Neumann and Belding provide technical and education support for employers and advisors. Neumann also runs a life insurance business call Rex Insurance. Cherneski is not involved in Rex Insurance

27. Wayne Bursey is the trustee for all of the 419 plans. Bursey works full time at the offices locate at 100 Grist Mill Road, Simsbury, CT.

28. Kevin Slattery does not know much about 419 plans. Slattery handles much of the administrative stuff involving benefits.

29. Dan Carpenter is a consultant and outside counselell for all of the businesses. Carpenter also operates a business named ARIA.

30. Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI) Molly runs the day to day operations of the various businesses.

31. Cherneski stated that some of its clients are or have been audited by the IRS. Attorney Ira Stechel is representing Benistar Plan clients with the IRS.

32. STEP plans are older plans and are not currently sold.

33. Physical files for the clients are kept on site. Kathy Kehoe handles theat administrative side of the business. Cherneski is notw aware of files being stored off-site. Cherneski stated that a lot of the plan and client information is stored on the computers.

At approximately 11:10 am, Supervisory Special Agent Kathy Enstrom entered the room and stated that an attorney outside of the building wished to speak with Cherneski. The interview was then concluded.

I prepared this memorandum on April 23, 2010, after refreshing my memory from notes made during and immediately after the interview with Stephen Cherneski.

Memorandum Author    *Jeffrey A. Hencke*

Jeffrey A. Hencke
Special Agent

U.S. Treasury Criminal Investigation

IRS00225

Crystal Brinson
Special Agent

U.S. Treasury Criminal Investigation

IRS00226