# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DANIEL E. CARPENTER | ) |  |
|  | ) | OCTOBER 18, 2017 |

## MR. CARPENTER'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33(b) FOR NEWLY-DISCOVERED *BRADY-GIGLIO-BAGLEY* EVIDENCE

### PRELIMINARY STATEMENT

The "newly discovered evidence" that Mr. Carpenter refers to in this Motion comes from the discovery provided in the July 2017 Depositions of now FBI Agent Shaun Schrader and Special Agent Kathy Enstrom, both of the IRS-CID (Criminal Investigation Division) at the time of the April 20, 2010 Raid on 100 Grist Mill Road. Agent Schrader created the defective Search Warrant Application that was under seal, and Agent Enstrom conducted the unlawful raid of April 20, 2010 based on a clearly unconstitutional and facially defective Search Warrant. *See United States v. Benjamin Wey*, No. 15-cr-00611 (S.D.N.Y. June 13, 2017), *citing Groh v. Ramirez*, 540 U.S. 551 (2004). Thanks to the two Depositions, Mr. Carpenter was able to get hundreds of official government documents that were not only withheld from Mr. Carpenter for the past seven years, but were also the subject of substantial and continuous litigation where the government vigorously fought to keep this vital evidence from Mr. Carpenter.

The significance of this newly-discovered evidence is not just that it is clearly **material** and **exculpatory** *Brady-Giglio-Bagley* evidence that was withheld by government agents, it is also significant because it also significantly contradicts many of the Court's conclusions from the unlawfully-seized emails that the Court misinterprets its June 6, 2016 Verdicts and Findings of

1

Fact (hereinafter "Opinion" or "Op."). This newly-discovered evidence puts the entire case in such a different light because it supports Mr. Carpenter's innocence and refutes the government's theory of the case, such that the Court has a sufficient basis to grant Mr. Carpenter's pending Rule 29 Motion for a Judgment of Acquittal (see Doc. 229), as well as this Rule 33(b) Motion for a New Trial based on the newly-discovered *Brady-Giglio-Bagley* evidence in the interests of justice.

## I.      LEGAL STANDARD

Relief under Rule 33(b) based on "newly discovered evidence" should be granted upon demonstration of all five of the following factors: "(1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal." *United States* v. *James,* 712 F.3d 79, 107 (2d Cir. 2013) (internal quotation marks and citations omitted); *United States* v. *Owen,* 500 F.3d 83, 87-88 (2d Cir. 2007). When a trial court learns of newly discovered evidence after a conviction, it should grant a new trial "if the defendant makes a showing that the evidence is in fact 'new', i.e., it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and noncumulative that its admission 'would probably lead to an acquittal.'" *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992) (*quoting United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)). Mr. Carpenter contends that the newly-disclosed information that required judicial intervention to receive "is so material and noncumulative that its admission would probably lead to an acquittal." *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997).

2

Rule 33(a) of the Federal Rules of Criminal Procedure provides, in part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The failure to disclose *Brady-Giglio-Bagley* material has been found to be a basis for granting a new trial pursuant to Rule 33(a). For example, in *United States v. Cuffie,* 80 F.3d 514 (D.C.Cir.1996), the Court of Appeals found that the failure to disclose that a key witness against the defendant had perjured himself in another judicial proceeding was the basis for a new trial: "Because there is a reasonable probability that the verdict would have been different if [Carpenter] had been able to use the undisclosed evidence to impeach [Cherneski] at trial, we reverse and remand for a new trial." *Id.* at 515. In this case, had the government not failed to disclose Mr. Cherneski's *Jencks* Statement before trial, that information could have been used to impeach Mr. Cherneski's testimony and cast doubt on the government's entire theory of the case, as his impeachment could have cast doubt on the authenticity of the charges brought against Mr. Carpenter. See Doc. 296 filed under seal.

Where, as here, the Defendant could not have, in the exercise of due diligence, discovered the impeachment material prior to trial, the Court may grant a motion for new trial based on newly discovered evidence "if the interests of justice so require." Fed R Crim P 33. The critical question for the Court is whether, taking all of the evidence into consideration, the undisclosed newly-discovered evidence was likely to have altered the outcome of the case. "To secure a new trial based on a violation of *Brady* or *Giglio* a defendant must demonstrate 'a reasonable probability that, had the suppressed information been disclosed to the defense, the result of the proceeding would have been different.'" *See United States v. Basciano,* 384 Fed. Appx. 28, 2010 WL 2802566, at *1 (2d Cir.2010) (quoting *Kyles v. Whitley,* 514 U.S. 419, 433–34 (1995)).

3

## II.   THE   NEWLY-DISCOVERED   *BRADY-GIGLIO-BAGLEY*   EVIDENCE REQUIRES THIS COURT GRANT MR. CARPENTER'S NEW TRIAL MOTION AS A MATTER OF LAW

Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation omitted).

*Brady* requires that the government disclose material evidence favorable to a criminal defendant. *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir.2004). Evidence is favorable if it is either exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quotation marks omitted). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but rather, a conviction must be reversed "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*   Where suppressed evidence is inculpatory as well as exculpatory, and "its exculpatory character harmonize[s] with the theory of the defense case," a Brady violation has occurred. *United States v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008).

In this case, all of the newly-discovered evidence is **exculpatory** and none of it is inculpatory, so Mr. Carpenter is entitled to a new trial as a matter of law because the binders full of newly-discovered evidence are not just **material** and **exculpatory**, they actually support Mr. Carpenter's innocence and the fact that he should not have been indicted or prosecuted in the

4

first place. It is clear that no amount of due diligence would have caused the government to disclose this information as the government has fought Mr. Carpenter every step of the way for the past seven years from Judge Covello in 2010 to Judge Underhill in 2017. Without Judge Underhill's intervention, the evidence would still be secret. The evidence is certainly not cumulative as it diametrically refutes the government's theory of the case and the underpinnings of the Court's June 6, 2016 Opinion. While Mr. Carpenter need only show the reasonable possibility of a different outcome, he firmly believes this newly-discovered evidence proves his innocence:

> "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (*citing Bagley* at 682). "A 'reasonable probability' of a different result" is one in which the suppressed evidence "'undermines confidence in the outcome of the trial.'" *Kyles* at 434 (*quoting Bagley* at 678). In other words, petitioners here are entitled to a new trial only if they "establis[h] the prejudice necessary to satisfy the 'materiality' inquiry." *Strickler* at 282. *Turner v. United States,* 137 S.Ct. 1855, 1893 (2017).

Where, as here, the government suppressed evidence in its possession which was both exculpatory and impeaching,…there is a reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different. See *Triumph Capital*, 544 F.3d at 164. Even if "[i]t is by no means certain that" arguments based on wrongfully withheld evidence "would have swayed the [court],…it is a real enough possibility to undermine confidence in the verdict." *Id.* at 163.

"[T]he government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (*citing United States v. Agurs*, 427 U.S. 97 (1976); and *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). A grant of a new trial is warranted if this obligation is not fulfilled. *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996). Evidence is material if there is "a reasonable

5

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

### III. AT NO TIME DID MR. CARPENTER OWN OR CONTROL THE BENISTAR ENTITIES

On Page 23 of the Opinion, the Court asserts that Mr. Carpenter had complete control over the Benistar Entities located at 100 Grist Mill Road including BASI, which "provided administrative services to the Benistar Entities." This is one example of a facet of the government's case which it is contradicted and disputed by the *Brady-Giglio-Bagley* evidence in this case, including the government's own extensive undercover investigation of the business entities at 100 Grist Mill Road "Synopsis of the Case" attached as Exhibit One, and most assuredly by the Cherneski *Jencks* Statement attached as Exhibit Two, which fails to even discuss Mr. Carpenter's role at 100 Grist Mill Road until paragraph 29 wherein it states: "Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA." Exhibit Two, Paragraph 29.

In fact, the Synopsis of the Case is very specific in that Agents Enstrom and Schrader make clear that all of the entities located at 100 Grist Mill Road were controlled by <u>Wayne Bursey</u>, who, as the Opinion acknowledges, is now deceased: "Mr. Carpenter's brother-in-law, Wayne Bursey, also was a named defendant. However, he died during the pendency of the case, and the charges against him have been dismissed." Op. page 2, n.4. This is what the government agents had to say about the activities of the "various entities" at 100 Grist Mill Road: "It is believed that all of the companies are run by the same individuals, and that the head of these companies is Wayne Bursey." See Exhibit One, Page One.

6

Therefore, this is merely one example of newly discovered evidence which undermines the government's theory of the case and, *ipso facto,* the Court's opinion.

## IV.   THE   NEWLY-DISCOVERED   *BRADY*   EVIDENCE   THOROUGHLY CONTRADICTS THE COURT'S OPINION

There are several other benefits to Mr. Carpenter from the newly-discovered *Brady-Giglio-Bagley* evidence in this case. Whereas the "Synopsis of the Case" does not even mention Mr. Carpenter's name, much less suggest that he controls anything at 100 Grist Mill Road ("It is believed that all of the companies are run by the same individuals, and that the head of these companies is Wayne Bursey.") see Exhibit One, and the Cherneski *Jencks* Statement only vaguely refers to Mr. Carpenter's role in Paragraph 29: "Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA." This extensive undercover operation of 100 Grist Mill Road does not even mention the Charter Oak Trust or Grist Mill Capital. It does, however, mention Guy Neumann's company Rex Insurance Services as being an example of one of the "legitimate" businesses at 100 Grist Mill Road. See Agent Schrader's Search Warrant Plan of Operation at Page 8, attached as Exhibit Three. In fact, in the government's Search Warrant Plan of Operation, the government suggests that one of the only legitimate businesses at 100 Grist Mill Road is Rex Insurance Services. This is important because this was made four months after the last Charter Oak Trust policy was done. Rex was the only business in the building involved in the life settlement arena and STOLI, but was left untouched as the legitimate welfare benefit plans and other businesses had their documents unlawfully searched and seized.

Agent Schrader's statement supports Mr. Carpenter's innocence in a few important ways. First, this extensive investigation is four months **after** the last Charter Oak Trust policy was issued. No one from the government knew that the Charter Oak Trust existed, much less was a

7

"criminal" enterprise. Second, the statement that Rex Insurance Services was a "legitimate" company means the government examined it and determined it to be legitimate, despite the fact that it was run by Guy Neumann (the target of the investigation) and Mr. Cherneski. Third, the **only** business involved in the controversial Life Settlement business or the "STOLI" business was Guy Neumann's Rex Insurance Services. Therefore, if Rex was "legitimate" in April of 2010, it is factually impossible for Mr. Carpenter to be guilty of allegedly similar conduct for any "known" crime from January 2007-December 2009, even if one assumes that Mr. Carpenter was doing the exact same things that Guy Neumann did as Rex, which clearly he was not.

Moreover, Mr. Carpenter had nothing to do with the running of Rex, which was run by Guy Neumann and Mr. Cherneski – the government's lead-off witness to introduce the case during trial – and Mr. Carpenter also had nothing to do with Benefit Plan Advisors (BPA). Mr. Carpenter never carried REXIS or BPA cards, nor did he use REXIS or BPA emails unlike Mr. Cherneski, Jenny Valedaserra, Ed Waesche, and Charlie Induddi-Westcott. Significantly, Ms. Valedaserra left BASI in 2009, Mr. Cherneski left shortly after the Raid of April 2010, Mr. Waesche never had an office at 100 Grist Mill Road, and Mr. Westcott lived in Millerton, New York at that time. If for no other reason than that, the Court should grant Mr. Carpenter a new trial because none of these witnesses were at 100 Grist Mill Road for both raids, and none of them admitted to agreeing with Mr. Carpenter to commit a crime.

As the Court can see from Exhibit Four, both Guy Neumann and Mr. Cherneski mailed out Life Settlement details and "STOLI" applications for Rex to agents in all 50 states. See description of the email notice in Exhibit Five, sent to REXIS reps in all 50 states. Please note that Guy Neumann's title is Chief Operating Officer, and his phone number of 860-408-1100 is different from the BASI phone number of 860-408-7000. Whereas Exhibit Four shows Mr.

Cherneski as Stefan @ BPA, Exhibit Six shows him as Stefan @ REXIS. Mr. Carpenter is not on any of these emails, nor did any of these emails come from government discovery, to which Mr. Carpenter is still not allowed personal retention. Also important to contesting that Mr. Carpenter "controlled" everything at 100 Grist Mill Road is Exhibit Seven, where Guy Neumann and Mr. Cherneski are communicating with Ken Grubb in December 2006, four months before Ridgewood finalized funding for Grist Mill Capital and the Charter Oak Trust, about a national campaign through REXIS involving AXA applications for a dozen different states ranging from California to New York. While Mr. Carpenter never met with or engaged with Ken Grubb, Mr. Grubb was attached to the same Texas General Agency with Lincoln as Robert Pacini and Fred Prelle were, and Robert Pacini and Mr. Grubb sent several cases each to the Charter Oak Trust.

Similarly, attached as Exhibit Eight, Mr. Cherneski as "Stefan @ REXIS" is sending out applications for REXIS to an agent in Michigan on February 20, 2007, which is a month before the "no more stupid deals" memo that led the Court to believe that Mr. Carpenter controlled all business activity at 100 Grist Mill Road. Suffice it to say, not only was Mr. Carpenter not in control of the various business entities at 100 Grist Mill Road, the only business that the government believed to be "legitimate" in April 2010 was the only business involved in the controversial "Life Settlement" or "STOLI" business of lying to insurance carriers to induce them into issuing policies that would later be sold to investors. That was not Mr. Carpenter's business, it was Guy Neumann's and Mr. Cherneski's business: Rex Insurance Services. Since that was the "crime" Mr. Carpenter would be charged with four years after the raid of April 20, 2010, all of this newly-discovered *Brady-Giglio-Bagley* evidence requires a new trial for Mr. Carpenter in the interests of justice.

9

**V.   THIS NEWLY-DISCOVERED EVIDENCE PROVES THERE WAS NO CONSPIRACY HERE INVOLVING MR. CARPENTER**

It is beyond dispute that Mr. Carpenter did not fill out, sign, or submit any application in this case. Not only has the government failed to prove any conspiracy here, the government has failed to name, much less prove beyond a reasonable doubt, anyone who was Mr. Carpenter's co-conspirator. In fact, it is only on page 86 of a 91-page Opinion that the Court names Don Trudeau and Bruce Mactas as Mr. Carpenter's co-conspirators. However, no evidence was adduced at trial showing either of the two Lincoln agents as agreeing with Mr. Carpenter to commit an illegal act, and certainly the government portrayed Mr. Westcott, Mr. Waesche, and Mr. Cherneski as blindly following Mr. Carpenter's orders as opposed to being in an illicit agreement with him. That is why this newly-discovered *Brady-Giglio-Bagley* evidence is so important, because the Court in its Opinion draws significantly on emails between Mr. Carpenter and a friend of his, Chad Gerdes, who the Court describes as "an active participant in the life settlement market." See Op. at 38, n.19.

Undoubtedly Guy Neumann, the target (and name) of the April 2010 investigation, as well as Mr. Cherneski (the government's main witness), were much more significant within STOLI-Life Settlement business than Mr. Chad Gerdes was, who is mentioned again on page 62 of the Opinion involving potential sales of other policies in 2010, when it became clear that Ridgewood would be shortly taking over the policies and that most of the insureds had no interest in buying their own policy, which was the only way that an insured could get his policy out. See Exhibit Two, Cherneski *Jencks* Statement, at paragraphs 10, 15, 16, and 18.

Not only does all of this newly-discovered evidence support Mr. Carpenter's innocence, it significantly undermines the Court's conclusions of fact. Nowhere in the Indictment or at trial

10

was it suggested that Chad Gerdes was one of Mr. Carpenter's "co-conspirators", and yet Mr. Gerdes is mentioned more times than Don Trudeau or Bruce Mactas, or any of the other agents alleged by the government to be co-conspirators. Moreover, there is also a subtle point to be made that Mr. Gerdes represented the "Buy Side" of the Life Settlement transaction, i.e., he had investor clients interested in buying policies, whereas Guy Neumann and Mr. Cherneski ran one of the largest "manufacturers" of life insurance policies on the East Coast as REXIS had produced over 500 policies for sale to various banks and investors. The entire Charter Oak Trust portfolio was only 87 policies, and none of those policies were ever sold while in the Charter Oak Trust. Whatever happened to those policies after the Ridgewood foreclosure in September 2010 was none of Mr. Carpenter's business. Therefore, any discussion of Mr. Carpenter's emails with Mr. Gerdes is not only not evidence of any crime, it does not prove any criminal intent on the part of Mr. Carpenter to lie to any insurance carrier in 2007, unlike the policies that Guy Neumann and Mr. Cherneski lied on in the creation of the 500 policies controlled by REXIS.

11

## CONCLUSION

For the above reasons, Mr. Carpenter firmly believes that he is entitled to a new trial in the interests of justice, and for the newly-discovered *Brady-Giglio-Bagley* evidence that was purposefully withheld by the government for the past seven years.

**Respectfully submitted,**
Defendant, Daniel Carpenter

By_____

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009
rbrown@bpslawyers.com

12

## CERTIFICATION

This is to certify that October 18, 2017, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. Also sent to the following by U.S. postal mail:

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed. Bar Ct00009