UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.  3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | November 17, 2017 |

**GOVERNMENT'S OMNIBUS MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTIONS FOR A MISTRIAL AND/OR NEW TRIAL
FOR ALLEGED *BRADY/GIGLIO/JENCKS* VIOLATIONS**

**TABLE OF CONTENTS**

I. LEGAL STANDARD................................................................................................1

    A.    New Trials Under Fed. R. Crim P. 33..........................................................1

    B.    *Brady/Giglio* violations..............................................................................2

    C.    18 U.S.C. § 3500 and *Jencks* Act violations...........................................7

II. DISCUSSION .....................................................................................................12

    A.    There Was No *Brady/Giglio* Violation ..................................................12

            1.    The Government provided the Cherneski/Neumann Emails, 2010 IRS Search Warrant Plan, and the contents of the IRS Case Synopsis to the defense prior to trial...........................................13

            2.    The DOL Prosecution Team did not have possession or knowledge of the Cherneski MOI or the actual IRS Case Synopsis. ........................15

            3.    The Motion Exhibits are not material and Carpenter cannot show prejudice...............................................................................................19

    B.    There Was No *Jencks* Act Violation.......................................................26

            1.    The DOL Prosecution Team did not have possession of the Cherneski MOI......................................................................................26

            2.    Cherneski's MOI is not *Jencks* Act material ..........................................26

            3.    The Cherneski MOI is not material and Carpenter cannot show prejudice...............................................................................................27

    C.    Carpenter Has Not Met the Standard for a New Trial Under Rule 33................28

III. CONCLUSION...................................................................................................29

The Government files this memorandum in opposition to defendant Daniel Carpenter's (1) motion and accompanying memorandum of law for a mistrial pursuant to 18 U.S.C. § 3500 or new trial pursuant to Fed. R. Crim P. 33 based on alleged *Jencks* Act and *Brady* violations (Docs. 295, 296) (hereinafter, the "*Jencks/Brady* Motion"), and (2) motion for a new trial pursuant to Fed. R. Crim P. 33 based on alleged *Brady* and *Giglio* violations (Doc. 298) (hereinafter, the "*Brady/Giglio* Motion").

I.  **LEGAL STANDARD**

   A.  **New Trials Under Fed. R. Crim P. 33**

   Federal Rule of Criminal Procedure 33 ("Rule 33") provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." It is well-settled that motions for new trials are "not favored." *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993); *see United States v. Costello,* 255 F.2d 876, 879 (2d Cir. 1958) ("Motions for new trials are not favored and should be granted only with great caution."). Courts should grant a new trial under Rule 33 "sparingly" and only in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal citations and quotations omitted); *see also United States v. Sanchez*, 969 F.2d 1409. 1414 (2d Cir. 1992) ("[D]iscretion [to grant new trial] should be exercised sparingly."). The test is whether it would be a "manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (internal citations and quotations omitted); *see Ferguson*, 246 F.3d at 134 ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."). In order to grant a Rule 33 motion, the trial judge "must harbor 'a real concern that an innocent person may have been convicted.'" *Guang*, 511 F.3d at 119 (quoting *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007).

Where a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears a particularly high burden. "To merit relief based on a claim of newly discovered evidence, the burden is on the defendant to satisfy five elements: (1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (internal quotations and citation omitted).

The decision whether to conduct an evidentiary hearing on a motion for a new trial is discretionary. *See United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995). "No hearing is required on a new trial motion if '[t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing.'" *United States v. Helmsley*, 985 F.2d 1202, 1209-10 (2d Cir. 1993) (quoting *United States v. Slutsky*, 514 F.2d 1222, 1226 (2d Cir.1975)); *United States v. Ghavami*, 23 F. Supp. 3d 148, 157-58 (S.D.N.Y. 2014) (quoting the same and denying request for hearing on Rule 33 motion); *see United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992) (evidentiary hearing not required in Rule 33 context where not necessary to the resolution of the relevant issues).

## B.      *Brady/Giglio* **violations**

Under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the Government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment. This obligation also includes evidence that can be used to impeach a Government witness. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). To demonstrate a *Brady* or *Giglio* violation, the burden is on the defendant to show: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir.

2001).

The Government's disclosure obligations are not, however, limitless. *See United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("[T]he Constitution does not require the prosecutor to share all useful information with the defendant."). Rather, the duty to disclose favorable evidence to the accused is an obligation that extends only "to material evidence . . . known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). A prosecutor is presumed to know all information gathered by his office in connection with an investigation of the case. *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *Avellino*, 136 F.3d at 255. In addition, a prosecutor has constructive knowledge of "evidence in the hands of investigators, who are part of the 'prosecution team.'" *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002); *Strickler*, 527 U.S. at 280–81 (stating *Brady* "encompasses evidence 'known only to police investigators and not to the prosecutor'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).).

But as the Second Circuit has cautioned, "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [the court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255 (citation omitted); *see United States v. Morris*, 80 F.3d 1151, 1169-70 (7th Cir. 1996) (district court properly concluded that *Brady* did not require the Government to seek out potentially exculpatory information obtained by IRS and other federal agencies in separate investigations because they were not "part of the team that investigated this case or participated in its prosecution"); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993) (holding that the reports made by FBI agents in the course of investigations apparently unrelated to the defendants' prosecutions should not be imputed); *United States v. Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y.

2006) (rejecting argument that *Brady* required disclosure of IRS civil audit files regarding defendants that were not in possession of prosecution team; "[T]he prosecution's disclosure obligation . . .does not extend to the collective knowledge of the entire United States government or even to the entire government agency concerned."); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (refusing to impute evidence in custody of federal agencies that did independent investigation of United Nations Oil-For-Food program to prosecution team).

"Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual" and "there is no clear test to determine when an individual is a member of the prosecution team." *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013) (citation omitted). "[U[nder the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members." *Id.* at 442. (citation omitted). "Among many others, these circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *Id.* (citation omitted).

Significantly, merely "interacting with the prosecution team, without more, does not make someone a team member." *Id.* at 441-42 (citation omitted). "Even when agents are involved in the investigation, they are not always so integral to the prosecution team that imputation is proper." *Id.* at 441 (citing *United States v. Stewart*, 323 F.Supp.2d 606, 616–18 (S.D.N.Y.2004) (declining to impute knowledge of a forensic expert from the Secret Service lab who provided trial support for the prosecution and testified as an expert)); *see United States v. Ferguson*, 478 F. Supp. 2d 220, 240 (D. Conn. 2007) (citing *Avellino* to find *Brady* did not require disclosure of information from New York Attorney General's office, even where Government "coordinate[d] pieces of its investigation with the NYAG").

Even if material is in the possession of the prosecution team, "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (internal citations and quotations omitted); *accord Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). Moreover, as circuit courts have consistently held, the Government is under no duty to direct a defendant to exculpatory evidence within a mass of disclosed evidence. *See United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("To charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule."); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) (finding the Government was "under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence."), *aff'd in part, vacated in part on other grounds, remanded*, 561 U.S. 358 (2010); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997) ("[T]here is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over." (quoting *United States v. Mmahat,* 106 F.3d 89, 94 (5th Cir. 1997))); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("When defendants miss the exculpatory nature of documents in their possession or to which they have access, they cannot miraculously resuscitate their defense after conviction by invoking *Brady*."); *see also United States v. Ohle*, No. S3 08 CR 1109 (JSR),

2011 WL 651849, at \*4 (S.D.N.Y. Feb. 7, 2011) ("[T]he Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."); *aff'd*, 441 F. App'x 798 (2d Cir. 2011); *United States v. Faux*, No. 3:14-CR-28 (SRU), 2015 WL 1190105, at \*7 (D. Conn. Mar. 16, 2015) (same).

In addition, "prosecutors may satisfy their *Brady* obligations through 'open file' policies or disclosures of exculpatory or impeachment material within large productions of documents or files." *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 455 (S.D.N.Y. 2011); *see also Strickler v. Greene*, 527 U.S. 263, 283 n. 23 (1999) ("We certainly do not criticize the prosecution's use of an open file policy. We recognize that this process may increase the efficiency and the fairness of the criminal process."); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) ("The defendants next argue that the government shrugged off its obligations under *Brady* by simply handing over millions of pages of evidence and forcing the defense to find any exculpatory information contained therein. This argument comes up empty."); *Skilling*, 554 F.3d at 576; *Ohle*, 2011 WL 651849, at \*3.

This is especially true when the prosecution provides a searchable database or takes other additional steps "to relieve some of the burden of its 'voluminous' disclosure, so that Defendants are in at least as good a position as the Government to identify *Brady* material therein." *Rubin/Chambers*, 825 F. Supp. 2d at 456-57 (citations omitted) (noting the Government had provided "searchable electronic productions"); *see Skilling*, 554 F.3d at 576–77 ("The open file was electronic and searchable."); *Ohle*, 2011 WL 651849, at \*4 ("[T]he Government, to facilitate review of the documents, provided defense counsel with an electronically searchable Concordance database."), *aff'd*, 441 F. App'x at 804 (rejecting Brady claims "as meritless" and declining defendant's request to remand for evidentiary hearing).

Likewise, a defendant may not, by invoking *Brady/Giglio*, escape from his own responsibility to review and make use of documents made available to him. *See, e.g.*, *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.'" (citations omitted)). *Brady* does not place any burden upon the Government "to conduct a defendant's investigation or assist in the presentation of the defense's case." *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996) (quotations omitted).

Not only does a defendant seeking a new trial on the basis of an alleged *Brady/Giglio* violation bear the burden of demonstrating that the Government "suppressed" exculpatory information, but he must also establish that the information was "material." *See, e.g.*, *Coppa*, 267 F.3d at 140. Allegedly suppressed evidence is material, for these purposes, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003); *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). In other words, "undisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Payne*, 63 F.3d at 1209 (quoting *Kyles*, 514 U.S. at 435); *see also United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998).

**C.      18 U.S.C. § 3500 and *Jencks* Act violations**

The *Jencks* Act, codified at 18 U.S.C. § 3500, provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement [] of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." A "statement" within the meaning of the *Jencks* Act is defined as either "a written statement made by said witness and

signed or otherwise adopted or approved by him"; a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously"; or a statement made by a witness to the grand jury. 18 U.S.C. § 3500(e).

In *Palermo v. United States,* the Supreme Court held that because the *Jencks* Act is meant to restrict the defendant's use of discoverable statements to impeachment, 360 U.S. 343, 349 (1959), "only those statements which could properly be called the witness' own words should be made available to the defense." *Id.* at 352. However, the Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *Id.* at 352-53; *see United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995) (noting that *Jencks* Act "does not [] require the government to divulge even verbatim statements by the witness if the writer 'merely select[ed] portions, albeit accurately, from a lengthy oral recital.'" (quoting *Palermo*, 360 U.S. at 352)).

Consistent with *Palermo,* an agent's memorandum of interview generally is not discoverable under the *Jencks* Act because it is not a statement of the witness within the meaning of the statute.[1] Unless the witness has reviewed and adopted the memorandum of interview, the memorandum is not a statement of the witness under subsection (e)(1) of the *Jencks* Act. Moreover, because such memoranda of interviews are written after interviews are completed and reflect the thought processes and interpretations of the agent, they do not constitute a contemporary and substantially verbatim recital of the witness's statement under subsection (e)(2).

---

[1] Of course, the memorandum of interview would be discoverable under the *Jencks* Act as a statement of the agent, if the agent who prepared it is called as a witness to testify regarding the subject matter contained in the report.

Every circuit court to address the question has held that memoranda of interviews generally are not discoverable under the *Jencks* Act. *See United States v. Sepulveda-Hernandez*, 752 F.3d 22, 33 (1st Cir. 2014) (holding that district court did not abuse its discretion in refusing to order production pursuant to *Jencks* Act of DEA reports of witness interviews where reports were narrative summaries prepared by DEA agents, not substantially verbatim witness accounts); *United States v. Price*, 542 F.3d 617, 621 (8th Cir. 2008) (holding that absent evidence that the witnesses "approved or adopted" the FBI 302s, "these documents are not discoverable under . . . the *Jencks* Act"); *United States v. Dorman*, 108 F. App'x 228, *14-16 (6th Cir. 2004) (finding that FBI 302 forms were not subject to disclosure under *Jencks* Act, where witnesses did not adopt or approve forms); *United States v. Jordan*, 316 F.3d 1215, 1255 (11th Cir. 2003) (holding that FBI 302s "are not *Jencks* Act statements of the witness unless they are substantially verbatim and were contemporaneously recorded, or were signed or otherwise ratified by the witness"); *United States v. Donato*, 99 F.3d 426, 433 (D.C. Cir. 1996) ("[T]he agent's notes and 302 report . . . are not covered by the *Jencks* Act"); *United States v. Roseboro*, 87 F.3d 642, 646 (4th Cir. 1996) ("[T]he district court's finding that the FBI 302 Report was not a *Jencks* Act statement is not clearly erroneous"); *United States v. Farley*, 2 F.3d 645, 654-55 (6th Cir. 1993) (holding that because there was "no proof that the statement was adopted or approved . . . it was not clearly erroneous . . . to deny defendants access to the FBI 302"); *United States v. Williams*, 998 F.2d 258, 269 (5th Cir. 1993) ("We hold that the FBI Forms 302 were not discoverable statements under the *Jencks* Act"); *United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992) ("[T]he documents are not statements producible under the *Jencks* Act because they were neither signed nor adopted . . . and further because they are not a verbatim recital . . . but rather only an agent's summary"); *United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985) (holding that because "the summaries

represent . . . the *agents*' selection of certain information . . . the district court properly characterized the summaries as non-*Jencks* Act material"), *abrogated on other grounds by Ross v. Oklahoma*, 487 U.S. 81 (1988); *see also United States v. Artis*, 523 F. App'x 98, 101 (2d Cir. 2013) (holding that agent's notes of interview did not qualify as *Jencks* Act material because the notes, which contained no direct quotes of witness, were not shown to be "signed or otherwise adopted or approved" by witness and were not a substantially verbatim recital of the witness's words).

Thus, an agent's interview report containing a summary of the substance of the witness's statements will not qualify as a statement under the *Jencks* Act. *See United States v. Cavazos*, 542 F. App'x 263, 271 (4th Cir. 2013) (FBI 302s of pretrial interviews with prosecution witness who had been charged in a different district were not *Jencks* Act material where "the reports were not written or adopted by [the witness], nor did they purport to be a substantially verbatim account of [the witness's] statements. Rather, they were simply agents' summaries of the substance of [the witness's] statements.")

Moreover, the Government's disclosure obligation under the *Jencks* Act is not limitless. As under *Brady*, the Government's disclosure obligation extends only to members of the prosecution team. *See, e.g., United States v. Naranjo,* 634 F.3d 1198, 1211–12 (11th Cir. 2011) ("A statement is 'in the possession of the United States' for *Jencks* Act purposes if it is in the possession of a federal prosecutorial agency"; *Jencks* Act and *Brady* "appl[y] only to information possessed by the prosecutor or anyone over whom he has authority"); *United States v. Merlino*, 349 F.3d 144, 155 (3d Cir. 2003) (rejecting argument that Government was required to obtain recorded calls from BOP under the *Jencks* Act when "the BOP was not part of the prosecutorial arm of the federal government as it was not at all involved in either the investigation or the prosecution of the defendants"); *United States v. Rentas-Felix*, 235 F. Supp. 3d 366, 385 n.9

(D.P.R. 2017) ("the government's obligation under the *Jencks* Act and Rule 26.2 only extends to information in its possession, custody, or control, not to information possessed by agents not working with the prosecution nor acting on its behalf"); *United States v. Baker*, No. A-13-CR-346-SS, 2014 WL 722097, at *3 (W.D. Tex. Feb. 21, 2014) ("the Government's obligation to provide *Brady* and *Jencks* material only extends to members of the 'prosecution team,' those investigative and prosecutorial personnel closely related to the case."); *United States v. Rivera*, No. 13-CR-149 KAM, 2015 WL 1540517, at *3 (E.D.N.Y. Apr. 7, 2015) (finding no *Jencks* Act violation for failing to disclose materials in possession of BOP because "defendant has not presented any evidence suggesting that the BOP was involved in the investigation or prosecution of this case").

Finally, even if the Government fails to disclose *Jencks* Act material in its possession, a new trial is only warranted if the Government deliberately suppressed the material. *See United States v. Zhao Wu Chen*, 322 F. App'x 43, 48 (2d Cir. 2009) (citing *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir. 1975)). If the Government's failure to disclose was inadvertent, "the failure to disclose may be disregarded if there is no reasonable probability that had the evidence been disclosed, the result would have been different." *United States v. Jackson*, 345 F.3d 59, 77 (2d Cir. 2003) (quoting *United States v. Gonzalez*, 110 F.3d 936, 943 (2d Cir. 1997)); *see Zhao Wu Chen*, 322 F. App'x at 48 ("[n]o new trial is necessary under the *Jencks* Act unless there is a significant chance that the evidence could have induced a reasonable doubt in the mind of a juror.").

## II.    DISCUSSION

Carpenter has failed to show any circumstances, let alone extraordinary circumstances, that would warrant a new trial under Rule 33. He also fails to show any basis for a mistrial under 18 U.S.C. § 3500. Although Carpenter claims the Government has violated its obligations under *Brady*, *Giglio*, and the *Jencks* Act, his claims are without merit, and his motions should be denied.

### A.    There Was No *Brady/Giglio* Violation

Carpenter accuses the Government of failing to provide the defense with *Brady/Giglio* material. *See* Doc. 298 at 1-11; Doc. 296 at 3-12. Specifically, he claims that the Government did not turn over the following documents, which are attached to his *Brady/Giglio* Motion as Exhibits One through Eight (collectively, the "Motion Exhibits"):

- an internal IRS-CI "Synopsis of the Case" prepared by IRS-CI Special Agent Kathy Enstrom in connection with the IRS Investigation (Doc. 298-1) (hereinafter, the "IRS Case Synopsis");

- a Memorandum of Interview of Stephen Cherneski prepared by IRS-CI Special Agent Jeffrey Hencke following his interview of Cherneski on April 20, 2010 during the execution of the 2010 IRS Search Warrant (Doc. 298-2) (hereinafter, the "Cherneski MOI");[2]

- an IRS-CI "Search Warrant Plan" prepared by IRS-CI Special Agent Shaun Shrader in connection with the execution of the 2010 IRS Search Warrant (Doc. 298-3) (hereinafter, the "2010 IRS Search Warrant Plan"); and

- five emails involving Cherneski and/or Guy Neumann (Docs. 298-4 to 298-8) (hereinafter, the "Cherneski/Neumann Emails").

Carpenter argues that these documents are material and exculpatory because he believes they undermine the Court's verdict and findings of fact and demonstrate his innocence. Carpenter's arguments are meritless.

---

[2] In Carpenter's *Jencks/Brady* Motion, Carpenter also argues that the Government violated the *Jencks* Act by failing to disclose the Cherneski MOI. *See* Doc. 296 at 3-12. The Government addresses the alleged *Jencks* Act violation later in this memorandum.

1. <u>The Government provided the Cherneski/Neumann Emails, 2010 IRS Search Warrant Plan, and the contents of the IRS Case Synopsis to the defense prior to trial</u>

As a threshold matter, there is no *Brady* or *Giglio* violation with respect to the Cherneski/Neumann Emails and the 2010 IRS Search Warrant Plan because the Government provided these documents to the defense over a year prior to trial. In addition, there is no *Brady* or *Giglio* violation with respect to the IRS Case Synopsis because the contents of this document was included in 2010 IRS Search Warrant Plan. Accordingly, the Government did not withhold or suppress these materials and they do constitute newly-discovered evidence.

As the Court is aware, the Government began producing discovery on a rolling basis in January 2014, shortly after Carpenter was arraigned on the original indictment. *See* Doc. 122 (Dec. 4, 2014 Mot. Hr'g Tr.) at 82-84; Doc. 116 at 1 (describing Government's discovery productions).

All of the Cherneski/Neumann emails were produced to the defense in a searchable database on October 24, 2014—16 months prior to trial. *See* Ex. 1 (Government's Discovery Letter to Attorney Brown). As the index accompanying the discovery letter shows, the Government produced, among other items, documents with a Bates range of 100GMR_CMP_SVR1_000001 to 1662769. *Id*. at 5. Each of the Cherneski/Neumann emails was included in that production. *Compare* Exs. 2-6 (emails bearing Bates numbers within range of documents produced on October 24, 2014) *with* Docs. 298-4 to 298-8 (same emails, without Bates numbers, attached to Carpenter's *Brady/Giglio* Motion). Carpenter's counsel even signed the letter acknowledging receipt of the discovery. Ex. 1 at 4.

Similarly, on November 5, 2014—again, 15 months prior to trial—the Government provided the defense with the 2010 IRS Search Warrant Plan when the Government filed it with the Court as Exhibit 1 to its memorandum in opposition to Carpenter's motion to suppress. *See* Doc. 97-2, Ex. 1. The defense even filed a reply to the Government's memorandum. *See* Doc.

113). Thus, the defense cannot now claim that it was unaware of this document before trial.

Finally, the contents of the IRS Case Synopsis is included in the "Background of the Investigation" section of the 2010 IRS Search Warrant Plan, which, as discussed above, was provided to the defense 15 months prior to trial. *Compare* Doc. 97-2, Ex. 1 *with* Doc. 298-1. For example, in his *Brady/Giglio* Motion, Carpenter argues that the IRS Case Synopsis states that "[i]t is believed that all of the companies are run by the same individuals, and that the head of these companies is Wayne Bursey." Doc. 298 at 6 (quoting IRS Case Synopsis at 1). Carpenter argues that this statement undermines the Government's case. *See id.* at 6-7. However, this exact statement appears in the 2010 IRS Search Warrant Plan that the defense had prior to trial. *See* Doc. 97-2, Ex. 1 at 2. If Carpenter thought this information was material to his case, he could have subpoenaed an IRS agent to testify about it at his trial. He did not do so.

Accordingly, Carpenter cannot demonstrate that the Government withheld or suppressed any of these materials or information. As such, Carpenter cannot satisfy the first prong of proving a *Brady/Giglio* violation, and therefore, his *Brady/Giglio* claim with respect to these documents should be denied. *See Coppa*, 267 F.3d at 140 (to demonstrate a *Brady* violation, defendant must show that "the Government, either willfully or inadvertently, suppressed evidence[.]"); *Rubin/Chambers*, 825 F. Supp. 2d at 456-57 (citations omitted) (no *Brady* violation where Government provided searchable electronic productions to the defense); *Skilling*, 554 F.3d at 576–77 (same); *Ohle*, 2011 WL 651849, at *4 (same); *Payne*, 63 F.3d at 1208 ("[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence" (internal citations and quotations omitted)); *Zagari*, 111 F.3d at 320 ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information or

if the documents are part of public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.'" (citations omitted)).

2. The DOL Prosecution Team did not have possession or knowledge of the Cherneski MOI or the actual IRS Case Synopsis.

There also is no *Brady* or *Giglio* violation with respect to the Cherneski MOI because the Government prosecution team that investigated and prosecuted the instant case did not have possession of this document until last month, when Carpenter attached it to his pending motions. Likewise, even though the contents of the IRS Case Synopsis was contained in the 2010 IRS Search Warrant Plan, to the extent Carpenter claims that the Government should have turned over the document itself, the Government prosecution team did not have possession of this document until Carpenter filed it with his motions. In fact, the Government prosecution team did not even know about the existence of either of these documents until last month. These documents were created by and were in the possession of IRS agents as part of a separate and unrelated investigation in Wisconsin, none of whom were part of the prosecution team in this case.

As the Court noted in its prior decision denying Carpenter's motion to suppress, Carpenter was the subject of two separate federal criminal investigations: one conducted by agents of the Department of Labor ("DOL") under the supervision of the United States Attorney's office in Connecticut; the other conducted by agents of the Internal Revenue Service ("IRS") under the supervision of the United States Attorney's Office in the Eastern District of Wisconsin. *See* Doc. 155 at 2. The DOL investigation concerns the STOLI fraud that is the subject of the superseding indictment and trial in this case, and involves the Charter Oak Trust ("COT") and related entities. *See id*. The IRS investigation concerned tax violations related to abusive section 419 welfare benefit plans involving Nova Benefit Plans LLC and related entities. *See id*.

The prosecution team for the DOL investigation consisted of DOL agents and investigators; agents with the Office of the Special Inspector General of the Troubled Asset Relief Program ("SIGTARP"); and the undersigned Assistant United States Attorneys (collectively, the "DOL Prosecution Team"). The prosecution team for the IRS investigation consisted of IRS agents and Assistant United States Attorneys from the United States Attorney's Office in the Eastern District of Wisconsin (collectively, the "IRS Prosecution Team"). None of the members of the DOL Prosecution Team were present for the execution of the 2010 IRS Search Warrant or participated in the IRS investigation,[3] and none of the members of the IRS Prosecution Team participated in the DOL investigation, except that as part of the DOL investigation, DOL agents obtained search warrants in 2011 to search some of the documents and computer images that the IRS seized from Benistar entities during the 2010 IRS search.

Carpenter himself acknowledges that the two investigations were unrelated. In Carpenter's *Bivens* action related to the execution of the 2010 IRS Search Warrant, Carpenter sued various agents of the IRS, but no one from DOL. *See Carpenter v. Koskinen*, Case No. 3:13-cv-00563 (SRU) (D. Conn.), Doc. 112 (Third Amended Complaint). The depositions in that *Bivens* action of IRS Special Agents Shaun Schrader and Kathy Enstrom—who participated in the investigation and search—make clear that no members of the DOL Prosecution Team were involved in the investigation or execution of the 2010 IRS Search Warrant. *See id.*, Doc. 129-4 (Deposition of Shaun Schrader); *id.*, Doc. 129-5 (Deposition of Kathy Enstrom). Carpenter also acknowledges that no one from the IRS participated in the DOL investigation. *See id.*, Doc. 112 at ¶ 14 (Third Amended Complaint: "This indictment makes allegations involving an entity known as the Charter

[3] As a courtesy, AUSA Mike Gustafson from the District of Connecticut helped the IRS agents from Wisconsin in setting up an appointment with the Magistrate Judge in Connecticut to obtain the 2010 IRS Search Warrant. AUSA Gustafson had no role in the execution of the search warrant or in the investigation of the IRS case.

Oak Trust, and involves the Department of Labor rather than the IRS"). In fact, in Carpenter's prior motion to suppress in the instant case, Carpenter concedes that the two criminal investigations concerned "completely unrelated allegations of criminal activity" (Doc 83 at 2) and that the 2010 IRS search "had nothing to do with the subject matter of the Superseding Indictment, an insurance fraud scheme" (Doc 81 at 3).

Moreover, the Cherneski MOI itself makes clear that Cherneski's interview took place during the execution of the 2010 IRS Search Warrant and was conducted by two IRS agents; no members of the DOL Prosecution Team were involved. *See* Cherneski MOI at 1. Similarly, as Carpenter acknowledges in his motion, the IRS Case Synopsis was prepared by IRS Special Agent Kathy Enstrom, before the 2010 IRS Search was executed. Again, no one from the DOL Prosecution Team was involved.

In short, the DOL Prosecution Team was not involved in the IRS investigation, had no knowledge that Cherneski was interviewed, and had no knowledge that the Cherneski MOI or the IRS Case Synopsis even existed until Carpenter attached them to his pending motions. Likewise, no one from the IRS Prosecution Team was involved in the DOL investigation. As such, knowledge of these documents cannot be imputed to the DOL Prosecution Team.[4]

In his motions, Carpenter offers no evidence whatsoever to show that anyone from the DOL Prosecution Team knew about or had possession of the Cherneski MOI or the IRS Case Synopsis, nor does he offer any evidence for the Court to find that the IRS agents were part of the

---

[4] Even if the DOL Prosecution Team had been aware that Cherneski was interviewed by IRS agents in 2010, the DOL Prosecution Team had no reason to believe he discussed anything related to the COT. Indeed, the COT is not mentioned in the Cherneski MOI. That is because the IRS investigation was concerned with tax violations related to abusive section 419 welfare benefit plans involving Nova Benefit Plans LLC and related entities. The IRS investigation had nothing to do with STOLI or misrepresentations on insurance applications in order to defraud the carriers. In fact, during trial, Carpenter's counsel pointed out that he represented Cherneski in connection with the IRS investigation. Tr. 48-50. Although counsel could not recall his conversations with Cherneski, he informed the Court, "I don't think those conversations had anything or have anything to do with this trial or the subject matter." Tr. 50.

DOL Prosecution Team. Instead, in his *Jencks/Brady* Motion, Carpenter simply states "there is little doubt that the U.S. Attorney's Office and the Department of Labor investigators were in contact with IRS-CID agents regarding the investigation and prosecution of the Defendant in this case." However, mere contact is not enough. *Meregildo*, 920 F. Supp. 2d at 441-42 ("interacting with the prosecution team, without more, does not make someone a team member."). The defendant needs to show that the IRS agents "actively investigate[d]" the DOL case, "act[ed] under the direction of the" DOL Prosecution Team prosecutors, or "aid[ed] the prosecution in crafting trial strategy." *Id.* at 442. They did not.

While it is true that members of the DOL Prosecution Team contacted members of the IRS Prosecution Team in order to serve search warrants on the IRS and coordinate the execution of those warrants, that contact did not make the anyone from the DOL Prosecution Team a member of the IRS Prosecution Team, or vice-versa. The DOL warrants served on the IRS were limited to seizing computers and documents that the IRS seized in 2010. It did not permit a search of their investigative files.

Similarly, once Carpenter filed his motion to suppress and his *Bivens* action, members of DOL Prosecution Team contacted members of the IRS Prosecution Team to understand the procedural posture of their investigation in order to respond to the motion to suppress. In connection with preparing its response to the motion to suppress, the DOL Prosecution Team obtained copies of the 2010 IRS Search Warrant Plan and pictures taken during the execution of the search, which were turned over to the defense prior to trial. Similarly, in connection with the *Bivens* action, Government lawyers representing the IRS agents contacted the DOL Prosecution Team to understand the procedural posture of the instant criminal case against Carpenter and the status of the documents the DOL seized in 2011. However, at no time did the DOL Prosecution

Team or the IRS Prosecution Team assist each other in crafting investigation or prosecution strategies or discuss Cherneski's interview on the day of the search.

Aside from those documents, the only other documents that the DOL Prosecution Team obtained from the IRS was a June 2010 memorandum of interview of a former employee, Erik Schnieder, who the Government did not call as a witness at trial—and then only because Schneider discussed the COT.

As discussed, this limited contact cannot serve as a basis to impute knowledge of the Cherneski MOI or the IRS Case Synopsis to the DOL Prosecution Team. *See, e.g., Meregildo*, 920 F. Supp. 2d at 441-42; *Ferguson*, 478 F. Supp. 2d at 240 (finding no *Brady* violation even where Government "coordinate[d] pieces of its investigation with the NYAG"). At no point did IRS agents actively participate in the DOL investigation, act under the direction of the DOL Prosecution Team, or aid the DOL Prosecution Team in crafting trial strategy. Therefore, Carpenter cannot demonstrate that the DOL Prosecution Team suppressed these documents, and Carpenter's *Brady* and *Giglio* claims should be denied.

3.      <u>The Motion Exhibits are not material and Carpenter cannot show prejudice.</u>

Putting aside the fact that the DOL Prosecution Team did not suppress the Motion Exhibits, Carpenter cannot show that any of the documents are material and would have changed the outcome of the case, as Carpenter is required to show in order to prove there was a *Brady/Giglio* violation.

In his motions, Carpenter claims these exhibits undermine the Court's verdict because, in his view, they show that Carpenter did not own or control the Benistar entities and that there was no conspiracy involving Carpenter. *See* Doc 298 at 6-11; 296 at 5-12. For example, as discussed, Carpenter argues that the IRS Case Synopsis indicates that Wayne Bursey, not Carpenter, ran all

the companies. *See* Doc. 298 at 6-7. He claims that according to the Cherneski MOI, Cherneski told the IRS that Carpenter is only a consultant for the businesses. *See id*. Carpenter also claims that the Motion Exhibits show that Rex Insurance Services ("Rex") was the only business involved in STOLI, which he claims was run by Neumann and Cherneski. *See id.* at 7-11. Carpenter believes these documents support his argument that he had nothing to do with the running of Rex or another company mentioned during trial, Benefit Plan Advisors ("BPA"). *See id.*

Carpenter's claims are without merit. As the Court set forth in its verdict, there was overwhelming evidence—both documentary evidence and testimony from a variety of witnesses—"which demonstrates that [Carpenter] and Benistar employees consistently acted as though he was in charge." Verdict at 24. For example, Carpenter's wife sent an email sent to certain BASI employees directing them to "hold up any payments" by TPG to agents "until Dan approves." *Id.* Verdict at 24 (quoting Gov't Ex. 1926 at 1). Carpenter sent another email to Ed Waeshe, telling him that that a particular allocation of commissions between TPG and the internal agents was appropriate. Verdict at 24 (citing Gov't Ex. 1947 at 1). Carpenter also sent a memorandum to employees of Benistar in which the he mandated that "all deals" had to be "approved" by him. Verdict at 24 (quoting Gov't Ex. 2033 at 2). The Court found that "the formal corporate structure of the various Benistar Entities had little meaning for the people involved" and that "corporate entities were created and discarded at Mr. Carpenter's direction when it suited his purposes." Verdict at 24-25 (citing Gov't Ex. 1922 at 2-3; Gov't Ex. 1923 at 1-2).

The Court also found "overwhelming evidence that the defendant orchestrated [the] scheme" to defraud the carriers and "oversaw its development and execution." Verdict at 10 n.7, 85. For example, early on, shortly after the COT was formed, Carpenter sent a memorandum to several Benistar Employees directing that all application materials for the COT policies be sent

and processed through the Simsbury office, where Carpenter had his office. *See* Verdict at 55 (referencing Gov't Ex. 2033). In the memo, Carpenter further ordered "[a]ll questions regarding the COT . . . be directed to [him.]" Verdict at 53 (quoting Gov't Ex. 2033). Through email, he instructed another witness, Charlie Westcott, to send him details on all cases. Verdict at 56 (referencing Gov't Ex. 2133). In another email regarding a COT participant, Carpenter requested the premium illustrations, life expectancy reports, and the COT documents. Verdict at 54-55 n.38 (referencing Gov't Ex. 2079). With respect to another participant, Carpenter sent an email to Westcott stating "[d]o everything thru me please. . . . I am privy to all the issues and problems." Verdict at 54 (quoting Gov't Ex. 2077). Westcott further testified that Carpenter was "privy to all issues related to the application process." Tr. 1513-14. When asked if Carpenter was "involved in just the application process or just the funding process or both[,]" Westcott responded, "Everything." *Id.* Westcott also provided "credible testimony" that Carpenter instructed him how to answer STOLI related questions on application and certification forms. Verdict at 51-52; *see* Tr. 1575-80; 1628-35 (Westcott's testimony describing Carpenter's instructions on how to answer STOLI-related question on insurance application). As the Court noted, there was e-mail evidence that "corroborated" Westcott's testimony. Verdict at 51-52 (discussing Gov't Exs. 2189, 2159-2162).

In addition, testimony from Edward Waesche and e-mail evidence showed that Carpenter instructed Bursey and Waesche on how to answer STOLI-related questions on insurance applications and certifications. *See* Verdict at 52-53 (discussing Gov't Exs. 2099, 2101); Tr. 847-57, 862-87 (Waesche's testimony regarding Carpenter's directions on how to answer STOLI related questions). Testimony from other witnesses further demonstrated that Carpenter was the person ultimately in charge of the COT. *See, e.g.*, Tr. 1811 (Testimony of Jenny Cherneski

indicating her understanding that Carpenter was in charge of the COT).

The testimony and evidence showed that everyone involved, including Carpenter, knew that the COT was designed for the purpose of obtaining life insurance policies on elderly individuals with the intent to sell them in two years. *See, e.g.*, Verdict at 28 (describing testimony of Waesche, and Westcott); Tr. 705, 1497 (testimony of Waesche, and Wesctcott regarding the purpose of the COT, quoted more specifically above); Gov't Ex. 2067 (email from Westcott to Carpenter discussing Pacini's conversation with potential COT participant); Gov't Ex. 2033 (email from Carpenter to employees setting forth the application, underwriting and compensation process for COT and stating "[w]e do not get paid until if and when the deal is completed satisfactorily 25-30 months from now").

There can also be no dispute that Carpenter spoke directly with some of his co-conspirators, including Waesche, Trudeau and Westcott, about the COT. *See, e.g.*, Verdict at 50-53, 64-68 (describing conversations and emails with Carpenter about COT). While Carpenter may not have personally spoken with most of the straw insureds or other outside agents such as Mactas, Pacini, or Alper, the evidence shows that he was aware of their involvement and what the straw insureds were promised. *See, e.g.*, Gov't Ex. 2067 (email from Westcott to Carpenter discussing Pacini's conversation with potential COT participant); Tr. 1509-12 (Westcott's testimony regarding Gov't Ex. 2067); Gov't Exs. 2133, 2079 (emails from Carpenter instructing Westcott to send him details on certain cases); Gov't Ex. 2077 (email from Carpenter to Westcott stating "[d]o everything thru me please. . . . I am privy to all the issues and problems"); Gov't Ex. 2155 (email from Carpenter to Westcott instructing him to "get Lambert and Twiggs done as $5MM cases."); Gov't Ex. 2303 (email from Carpenter to Waesche acknowledging that a COT participant received "two years of free insurance"); Gov't Ex. 2065 (emails between Westcott and Carpenter discussing potential

COT client who was "thinking after 2yrs to turn over the profit to charity" to which Carpenter responded "go for it.").

Despite Carpenter's claim that the Motion Exhibits demonstrate his innocence, the evidence at trial overwhelmingly demonstrated that Carpenter "played a key role in instructing others how STOLI-related questions should be handled." Verdict at 50. Contrary to Carpenter's claim that he did not control the Benistar entities, was not part of the conspiracy, or had nothing to do with the false applications, the evidence showed that Carpenter was intimately involved with all aspects of the COT, including the submission of the false applications and related certification forms to the insurance carriers. As the Court noted, "[t]he record shows that [Carpenter] instructed others about policies that should be sought, approved potential applicants, reviewed materials related to prospective insureds, decided what documents should be sent and when, determined the amount of commissions agents would receive, and even provided funding for some of the policies." Verdict at 54-55. In sum, Carpenter participated in all aspects of the conspiracy and his claim that the Motion Exhibits undermine the Court's verdict rings hollow.

Nothing in the Motion Exhibits undermines the Court's conclusions or calls them into doubt. With respect to the IRS Case Synopsis, it bears repeating that the information within that document was in the 2010 IRS Search Warrant Plan, which Carpenter had before trial, but Carpenter choose to do nothing with that information. He cannot now use that information as a basis for a new trial.

Carpenter's claim that the Cherneski/Neumann Emails show that the Rex company was the only company involved in STOLI, and that Carpenter had nothing to do with Rex, fairs no better. Putting aside that the Government provided these emails to the defense 16 months before trial, the record shows that Rex was discussed multiple times during the course of the trial, in both testimony

and documents, and detailed the involvement of Carpenter, Neumann and Cherneski at Rex. *See* Tr. 115, 177-78, 282-84, 411-14, 459-60, 932, 1011-12, 1016-17, 1234-35, 2732-34, 2846, 3105-06; Gov't Exs. 1924, 2051, 2123, 2154. Indeed, email evidence at trial showed Carpenter associated himself with Rex. See Gov't Ex. 1934 (email from Carpenter stating "Rex is us"); Gov't Ex. 2051 (email from Carpenter saying "Let Rex do underwriting"); Tr. 177-78, 1235 (discussing the same).

Finally, nothing in the Cherneski MOI contradicts or undermines Cherneski's testimony at trial. Carpenter argues that in Paragraph 2 of the Cherneski MOI, Cherneski described his role as providing technical and educational support for employers and advisors, but he later told DOL agents his title was Plan Administrator and helped facilitate trust participants getting out of the various trusts. *See* Doc. 296 at 6. These two statements are not contradictory. Helping facilitate trust participants get out of trusts is consistent with providing technical and educational support.

Similarly, Carpenter claims that in Paragraph 3 of the Cherneski MOI, Cherneski told the IRS agent that he learned about 419 welfare benefit plans through on the job training and read various books and tax law to educate himself to do his job. *See id.* at 7. At trial, Cherneski stated he was taught by Dan Carpenter and Guy Neumann. *See id.* Again, these statements are not contradictory. Being taught by Carpenter and Neumann is consistent with on the job training.

Carpenter also points to the information in the Cherneski MOI where Cherneski indicated he reported to Neumann and Bursey, but Carpenter claims Cherneski testified differently at trial. *See id.* In support of this argument, Carpenter misleadingly quotes Cherneski's testimony about who Bursey reported to, not who Cherneski reported to: "Q. Who did [Bursey] answer to or report to? A. To Dan Carpenter." *id.* (quoting Tr. 93). These two statements are in no way inconsistent as they concern the direct reporting arrangement of two different people. In any event, as was

apparent at trial, the testimony at trial dealt with who was in ultimate control of all the Benistar entities, not who each individual reported to.

Carpenter next notes that in the Cherneski MOI, Cherneski informed the IRS agent that Carpenter was a consultant, kept a distance from the transactions, and had other individuals author documents but did not sign them himself. *See id.* at 7-8. Carpenter believes this information is inconsistent with Cherneski's trial testimony that Carpenter was in charge and designed and created the COT. Again, these statements are not inconsistent. In fact, other evidence at trial, aside from Cherneski's testimony, showed that Carpenter designed the COT, which was signed by Bursey, and that Carpenter later caused the alteration of the COT declaration of trust in order to increase the amount of benefits he could keep following the death of Sash Spencer. *See* Verdict at 72-74. Moreover, Cherneski's reference to Carpenter being a consultant does not mean he was not in charge and orchestrating the activities, as set forth in the testimony and documentary evidence set forth above.

Finally, Carpenter points out there are a number of things about the COT that are not contained in the Cherneski MOI. *See id.* at 9-11. For example, Carpenter claims that the Cherneski MOI fails to mention premium financing. The absence of information does not mean that the Cherneski MOI somehow contradicts his trial testimony. For one thing, there is no information in the Cherneski MOI about what questions the IRS agent asked him. It is very likely that the IRS agent did not ask him about the COT or premium financing or about any other items that Carpenter claims is not in the MOI. As discussed, the IRS investigation concerned tax violations related to abusive section 419 welfare benefit plans involving Nova Benefit Plans LLC and related entities. The IRS investigation had nothing to do with STOLI or misrepresentations on insurance applications in order to defraud the carriers. Without knowing what questions the agent asked

Cherneski, the absence of information in the Cherneski MOI is meaningless.

In sum, the Cherneski MOI does not undermine Cherneski's trial testimony. However, even if the Court determines that the Cherneski MOI contradicts his testimony, there was still overwhelming evidence of Carpenter's guilt without Cherneski's testimony, as set forth above.

Accordingly, there is no reason to believe the Court's verdict finding Carpenter guilty on all counts would have been different, and his motion should be denied.

### B.     There Was No *Jencks* Act Violation

Carpenter also claims that the Government's failure to provide the defense with the Cherneski MOI constitutes a violation of the *Jencks* Act. Again, Carpenter's argument is without merit.

### 1.     The DOL Prosecution Team did not have possession of the Cherneski MOI

As an initial matter, there is no *Jencks* Act violation with respect to the Cherneski MOI because, as discussed above, the DOL Prosecution Team did not have possession or knowledge of the document until last month. Nor was the DOL Prosecution Team obligated to search the IRS's investigative files and obtain this document, because, as discussed, no one from the IRS was part of the DOL Prosecution Team. As such, the Government did not suppress the document.

### 2.     Cherneski's MOI is not *Jencks* Act material

Even if the Court finds that the DOL Prosecution team did suppress the Cherneski MOI, there is no *Jencks* Act violation because the document does not qualify as *Jencks* Act material. Cherneski did not sign or otherwise adopt or approve the agent's memorandum.  Nor does it purport to be or appear to be a substantially verbatim recitation of Cherneski's oral statements. As the document plainly states on page 1, it contains the "information" provided by Cherneski, not a verbatim recitation of his interview.  In fact, the memorandum indicates that Cherneski was

interviewed for over 2 hours, from 9:05am to 11:10am. Yet, the memorandum of interview is only 7 pages in length and there are no direct quotes from Cherneski. The memorandum also was prepared three days after the interview, and states that it is is based on notes that the agent made during and *after* the interview.

Thus, while the Cherneski MOI may be a summary of the "information" that Cherneski provided, it reflects the thought processes and interpretations of the agent and is not a contemporaneous and substantially verbatim recital of the Cherneski's oral statements. As such, it is not *Jencks* Act material. *See, e.g., Cavazos*, 542 F. App'x at 271 (FBI 302s of pretrial interviews with prosecution witness who had been charged in a different district were not *Jencks* Act material where "the reports were not written or adopted by [the witness], nor did they purport to be a substantially verbatim account of [the witness's] statements. Rather, they were simply agents' summaries of the substance of [the witness's] statements.").

3.  The Cherneski MOI is not material and Carpenter cannot show prejudice.

Finally, as discussed above, Carpenter cannot show that the statement was material because it would not have changed the outcome of the case. Even if the Court finds that the DOL Prosecution Team should have obtained and disclosed the document, any failure to do so was inadvertent because the DOL Prosecution Team did not even know it existed. Given the overwhelming evidence of Carpenter's guilt, as set forth in the *Brady* analysis above, there is no reasonable probability that had the evidence been disclosed, the result would have been different. Even without Cherneski's trial testimony, there was overwhelming evidence from documents and emails, including documents and emails prepared by Carpenter himself, as well as credible and corroborated testimony of other witnesses, that showed that Carpenter orchestrated the scheme to

defraud the carriers. Accordingly, the Court should find no *Jencks* Act violation.[5]

## C. Carpenter Has Not Met the Standard for a New Trial Under Rule 33.

Not only has Carpenter failed to show a *Brady*, *Giglio* or *Jencks* Act violation, he has failed to meet the standard for a new trial based on newly-discovered evidence. "To merit relief based on a claim of newly discovered evidence, the burden is on the defendant to satisfy five elements: (1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal." *James*, 712 F.3d at 107.

Here, aside from the Cherneski MOI, all of the Motion Exhibits were available to the defense before trial. In addition, as discussed in the *Brady, Giglio* and *Jencks* Act analysis above, none of the Motion Exhibits were material or would have resulted in an acquittal. Accordingly, Carpenter has not sustained his burden, and his motions for a mistrial or a new trial should be dismissed.

---

[5] Carpenter also appears to have waived his right to bring a *Jencks* Act claim because he did not move for the disclosure of statements during trial after the witness testified, as required under the Jencks Act, 18 U.S.C. § 3500, and its counterpart, Fed. R. Crim. P. 26.2. The *Jencks* Act provides that witness statements may be sought only *after* the witness has testified on direct examination. 18 U.S.C. § 3500(b). Although Carpenter moved for *Jencks* Act material prior to trial, the Court denied the motion because it could not order early disclosure of *Jencks* Act material. Doc. 156 at 7 (citing *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 523 (S.D.N.Y. 2007) ("[d]istrict courts lack the authority to compel early disclosure of *Jencks* Act material"). Thus, Carpenter was obligated to renew his motion at trial, after the witness testified. He did not do so, and therefore, he waived his right to make a *Jencks* Act claim. *See, e.g., United States v. Van Poyck*, 77 F.3d 491 (Table Decision), 1996 WL 7338, at *2 (9th Cir. 1996) ("Because Van Poyck requested the tapes more than four months before trial, and did not renew his request after the government witnesses testified, his motion for *Jencks* material was untimely"); *United States v. McKenzie*, 768 F.2d 602, 607–08 (5th Cir. 1985) (holding that because the defendants did not renew their request for the alleged *Jencks* material after having requested it prior to the trial, the defendants effectively abandoned any claim to the material); *United States v. Wright*, 506 F.3d 1293, 1301 (10th Cir. 2007) (finding no *Jencks* Act violation because defendant did not renew his motion for production of the notes after witness testified); *see also United States v. Scotti*, 47 F.3d 1237, 1251 (2d Cir. 1995) (district court did not err in denying defendant relief where defendant failed to make timely and sufficient motion under Rule 26.2); *United States v. Petito*, 671 F.2d 68, 73-74 (2d Cir. 1982) (although defendant was entitled to production of report under *Jencks* Act, defendant waived any right to relief under the Act by failing to make a sufficient motion).

## III.    CONCLUSION

For the reasons stated herein, the Government respectfully requests that the defendant's motions for mistrial or new trial be denied. The Government further submits that no evidentiary hearing is necessary. *See Helmsley*, 985 F.2d at 1210 ("No hearing is required on a new trial motion if [t]he moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing.") (quotations and citation omitted); *Ohle*, 441 F. App'x at 804 (holding "there is no need to remand, as defendants urge, for an evidentiary hearing on their *Brady* claims").

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ David E. Novick*

————————————————————
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: David.Novick@usdoj.gov

*/s/ Neeraj N. Patel*

————————————————————
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

<u>CERTIFICATION OF SERVICE</u>

      This is to certify that on November 17, 2017, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

*/s/ Neeraj N. Patel*

_____
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY