## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:13CR226(RNC) |
| v. | |
| DANIEL E. CARPENTER | DECEMBER 1, 2017 |

## MR. CARPENTER'S REPLY TO THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A MISTRIAL PURSUANT TO 18 U.S.C. §3500(d) OF THE *JENCKS* ACT

The Constitution guarantees the accused in a criminal action a fair, public, and speedy trial. Mr. Carpenter respectfully submits to the Court that he has not received the benefit of any of these constitutional guarantees. Now the government submits what can only be called a non-responsive answer (Doc. 313) to Mr. Carpenter's substantive call for a mistrial pursuant to 18 U.S.C. §3500(d) (Doc. 296) and for a new trial pursuant to the government's multiple *Brady-Giglio-Bagley* violations in this case. See Doc. 298.

In its Omnibus Opposition Brief, Doc. 313 (Gov. Opp.), the government makes several incredible claims in its attempts to disavow that the Cherneski *Jencks* Statement is, in fact, a verbatim recital of Stefan Cherneski's interview by federal agents during the raid of April 20, 2010, and therefore does not qualify as a "statement" for the purposes of the *Jencks* Act, 18 U.S.C. §3500. See attached as Exhibit One, the Cherneski *Jencks* Statement that is the subject of this Motion. There is no doubt that Mr. Cherneski testified at Mr. Carpenter's trial and that the Court put a lot of stock in Mr. Cherneski's testimony at trial as the basis for the Court's June 6, 2016 Verdict and Statement of Facts. There is also no dispute that this document was in the possession of the government through IRS Special Agent Kathy Enstrom, who is soon to become

1

the head of the IRS Criminal Investigation Division (CID) in Washington, D.C.. Agent Enstrom turned over a number of documents previously withheld from Mr. Carpenter for the past seven years, despite his ongoing *Bivens* action against the government in Judge Underhill's Court. Agent Enstrom also turned over a document never seen before called the "Synopsis of the Case," which was sent to the IRS officials in Washington to seek approval for the unprecedented commando raid on 100 Grist Mill Road, where over 57 agents – many of whom were armed in violation of IRC Section 7608 – unlawfully seized 322 boxes of documents and a number of computer servers filled with several terabytes of information and millions of documents. See the Synopsis of the Case attached as Exhibit Two.

Nowhere in the Synopsis of the Case is Mr. Carpenter's name listed. This is also true as well of the defective Search Warrant for the raid which does not list Mr. Carpenter's name or any crime on its face as is required by black-letter Second Circuit law. *See, e.g., United States v. Wey*, 256 F.Supp.3d 355 (S.D.N.Y. 2017), *citing Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (the Fourth Amendment "requires particularity in the warrant, not in the supporting documents," and, accordingly, "the fact that the warrant *application* adequately described the 'things to be seized' does not save the *warrant*" from failure to satisfy that requirement), *United States v. Rosa,* 626 F.3d 56, 62 (2d Cir. 2010) (warrant "defective in failing to link the items to be searched and seized to the suspected criminal activity" because it "thereby lacked meaningful parameters on an otherwise limitless search"), and *United States v. George*, 975 F.2d 72, 75–76 (2d Cir. 1992) (warrant permitting seizure of evidence "relating to the commission of a crime" was constitutionality infirm because "[n]othing on the face of the warrant tells the searching officer for what crimes the search is being undertaken"). See the constitutionally defective warrant from the Raid of 2010 attached as Exhibit Three.

2

## I.    THE GOVERNMENT MISUNDERSTANDS THE SECOND CIRCUIT'S DECISION IN *SCOTTI* AND ITS OBLIGATIONS UNDER *JENCKS*

The Jencks Act was intended "to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful." *United States v. Aaron*, 457 F.2d 865, 869 (2d Cir. 1972). "Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively." *Aaron* at 869, *citing Clancy v. United States*, 365 U.S. 312, 316 (1957).

As stated in Mr. Carpenter's Motion for a Mistrial pursuant to 18 U.S.C. §3500(d) (Doc. 296), Mr. Carpenter need not show "prejudice" or "materiality" as in *Brady*. Instead, he need only show that the Cherneski *Jencks* Statement was a virtual "**verbatim**" transcription of the Cherneski interview of April 20, 2010 and that it was in the government's possession. Mr. Cherneski testified as a government witness and Agent Enstrom is with the government. But, on page 28 of its brief in a footnote, the government suggests that the defendant needs to send a separate letter requesting *Jencks* material after each government witness testifies, and relies on *United States v. Scotti*, 47 F.3d 1237 (2d Cir. 1995) for that remarkable claim. In fact, counsel for the defendant made more than legally sufficient requests for discovery material, including materials under the *Jencks* Act, and the Government assured that Court and defense that any and all such material would be provided to the defense in a timely manner.[1]

---

[1] On December 4, 2014, the Court held a hearing to address the Defendant's outstanding pretrial motions. Among those motions were a number that related to pretrial discovery, including seeking disclosures under the *Jencks Act*. At that hearing Attorney Novick represented to the court as follows: "As far as other discovery, we've provided 90 percent of the prospective witnesses. I don't expect anywhere near the number of witnesses we've provided to them to actually testify. But in the spirit of cooperative discovery and not having to litigate these issues, we've provided them with all of these statements. We've not provided maybe 10 percent of those statements for various reasons, some of which are we don't know who are our witnesses are

Moreover, the government's reliance on *Scotti* is misplaced. In *Scotti*, the defendant did a Rule 26.2(f) Motion after his trial was over. While Rule 26.2 is very much like the *Jencks* Act and provides for a mistrial in circumstances like this case, *Scotti* is not *Jencks*, and Rule 26.2, though similar is not the *Jencks* Act. In fact, based on *Scotti*, the government's argument is both inapposite and backwards. Mr. Carpenter is doing a motion for a mistrial based on the fact that

---

going to be and are working feverishly to figure that out. We'll make those decisions as we go forward. There are a couple of grand jury testimony transcripts from the case, and I've told counsel that it's my practice -- and I don't think there's reason in this case to deviate from that -- to turn those over two weeks in advance. It's not that much stuff. It's the testimony of the case agent and testimony of the cooperating witness, and that's the extent of it. And in reality, there is a number of memoranda of interview related to the cooperator that the defendants already have. **So to the extent that they want the substance of that material, they have it.** So I don't think there's any basis. I would say we're moving with all due speed. I don't think there's any basis to do anything other than what we're doing. **We'll continue to try to, you know, respond to what the defendants are asking for.** We have, I will say -- and we put most of this in our response to the defense motions -- we have preserved the rough notes of the agents who did the interviews of the witnesses consistent with the CES case. We've turned over the agent notes of defendant Carpenter's statements which I think is required under CES. Our reading of CES is such that the notes of the agents regarding the other witnesses are potentially Jencks material but not necessarily so. **The defendants will have, if they don't already have, the actual reports from those.** And to the extent we're going to call any of those witnesses -- let me say this, I think that under CES, should Special Agent Allen or anybody else testify and part of the cross-examination or direct examination is on the subject matter of an interview where they have notes, I think then certainly under CES there would be grounds to have to turn over the agent rough notes. In the event that that doesn't happen, I don't think CES requires it. **However, in an abundance again of trying to avoid needless litigation, I think the government will do an evaluation of its case and figure out are these witnesses we're going to call, and we'll turn over the appropriate notes if they're Jencks material at the appropriate time. I don't think that's right now.** I will also say that as always our obligation is to make sure we are turning over Giglio and Brady material, and to the extent there are notes that are somehow consistent with the reports, we understand our obligation to do that. And frankly that's probably more than anything augers for us turning the notes over in an abundance of caution. I don't think there's anything the government is trying to hide in this case at all." (Transcript of 12/4/2014, pages 85-87, emphasis added).

More than a year after these assertions by the Government, Attorney Guarnieri further advanced the Defendant's rights to discovery materials by sending the government a further *Brady/Jencks* letter, attached hereto as Exhibit 5.

he should have had **Cherneski's** Statement, not the federal agent's statement.  As the Second

Circuit explained in *Scotti*:

> The notes may have been discoverable as a statement by John Egnat, one of the
> government's witnesses. In the circumstances of this case, Scotti would have been
> entitled to discovery of the notes if...the notes were a substantially verbatim recital of
> Egnat's words, even if the interview was not automatically recorded, 18 U.S.C.
> §3500(e)(2); Fed.R.Crim.P. 26(f)(2); *Palermo v. United States,* 360 U.S. 343, 351–53
> (1959) (interpreting 18 U.S.C. §3500(e)(2)). Even if not an exact recording, the notes
> would be considered a substantially verbatim recital of the witness's statement if they
> "could fairly be deemed to reflect fully and without distortion what had been said to the
> government agent" and thus be used to impeach the witness's testimony at trial. *Id.* at
> 352. *Scotti* at 1249-50, *citing Palermo* at 354–55.

The significance of the Cherneski *Jencks* Statement when added to the Synopsis of the

Case and the other statements made by Federal Agents working on a multi-million dollar

undercover investigation, is that no one thought that Mr. Carpenter was criminally involved in

anything happening at 100 Grist Mill Road, much less "running" things as the Court erroneously

concludes in its June 6, 2016 Opinion based on the supposedly "overwhelming" evidence in this

case.  That is also why Mr. Carpenter has been deeply prejudiced by the government's

"inadvertent" withholding of the Cherneski *Jencks* Statement and the Synopsis of the Case.  The

Charter Oak Trust and Mr. Carpenter's company Grist Mill Capital are nowhere mentioned in

this extensive investigation by the government in 2010, and yet the limited existence of the

Charter Oak Trust was from January 2007 to December 2009; well before the approval of the

raid of Mr. Carpenter's building and office in April of 2010 by Magistrate Smith based on totally

erroneous and fictitious information provided by Agent Schrader.  The government claims that

Mr. Carpenter should have been put on notice of the explosive content of the "Synopsis of the

Case" because it filed, under seal, several pages from Agent Schrader's Search Warrant Plan that

makes the same claim that Mr. Bursey and **not** Mr. Carpenter, "controls" all of these companies:

"Nova Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans – with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage. Nova Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that **the head of these companies is Wayne Bursey**." See Exhibit Four, Bottom of Page 1 (emphasis added).

See attached as Exhibit Four the same three pages that the government filed under seal with Doc. 97, and that Mr. Carpenter filed with Doc. 243 of his Motion for Reconsideration of his Motion to Suppress, which was recently denied by the Court. As the Court can clearly see, neither the Search Warrant nor Agent Enstrom's Synopsis of the Case, nor Agent Schrader's Background Investigation in the Search Warrant Plan pages 1, 7, and 8 attached as Exhibit Four mention Mr. Carpenter, much less paint him as the figure "in control" of the Benistar Entities as portrayed by the Court's June 6, 2016 Opinion.

In fact, the Court should note that there was a business operating at the same time as the Charter Oak Trust known as Rex Insurance Services (REXIS), which Agent Schrader mentions on his Search Warrant Plan as being one of the several legitimate businesses being run out of the building:

"The investigation has shown that some businesses being run out of the building ***may* be legitimately** providing insurance and other financial services including: Rex Insurance Services." (Emphasis added and in original). See Exhibit Four, page 8.

The significance of Agent Schrader's statement is threefold. First, REXIS was run by Guy Neumann – the named target of the 2010 Raid – and his good friend Stefan Cherneski, which the government shows sent many emails as Stef@REXIS. There are no Dan Carpenter emails with Dan@REXIS. To the contrary, Mr. Carpenter's "REX is us" email was to provide an introduction for Guy Neumann to meet Mr. Carpenter's friend Chad Gerdes, because Mr. Carpenter was known in the insurance industry while Mr. Neumann was an unknown.

6

Second, whereas the Charter Oak Trust had an indisputable insurable interest in all of the Insureds, and Grist Mill Capital had a Split-Dollar Collateral Assignment interest in all 87 policies, REXIS had created over 500 policies for banks and investors that had no insurable interest and were all based on the same individual "Irrevocable Life Insurance Trusts" as were used in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). While Mr. Carpenter maintains that he did not lie to anyone on any of the Charter Oak Trust applications, Guy Neumann and Stef Cherneski lied on each and every one of the more than 500 REXIS' applications that Agent Schrader says were all legitimate. Now that the Court has concluded in 2017 that STOLI was a crime in 2006-2009 and that Mr. Waesche and Mr. Bursey committed criminal acts by lying on insurance applications, Mr. Carpenter is entitled to go over each of the 500 Rex applications that Mr. Cherneski was involved in to see how many lies he told through the allegedly "legitimate" business, REXIS. Not only did the Court overrule Mr. Carpenter's multiple objections to the obvious Cherneski hearsay during trial, the Court has assumed that Mr. Cherneski was a "co-conspirator" of Mr. Carpenter in order to let that hearsay infect his trial, and that Mr. Carpenter somehow told everyone what to do at 100 Grist Mill Road. Neither of these statements is true, and all of these lies are refuted and contradicted by the Cherneski *Jencks* Statement.

Finally, as is apparent to the Court by now, the reason Mr. Cherneski kept changing his story from April 2010 until February 2016 was that it was not until Mr. Carpenter and Mr. Bursey were indicted in December of 2013 that Mr. Cherneski realized that in the eyes of the government, he had committed a crime just like the Court stated that Mr. Waesche and Mr. Bursey did. See the last page of the Court Transcript from the November 6, 2017 telephone conference (Doc. 312). See, also, more details of the various inconsistencies and the significant differences between what Mr. Cherneski said in 2010 versus 2016 in Mr. Carpenter's original

brief, Doc. 296. Significantly, if for no other reason, Mr. Carpenter is entitled to a *Jencks* Act

Mistrial pursuant to §3500(d) because Mr. Cherneski told Federal Agents on April 20, 2010:

29.    Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA.

30.    Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI). Molly runs the day to day operations of the various businesses.

See Cherneski *Jencks* Statement, Exhibit One, at paragraphs 29 and 30. But then on August 27,

2015, Mr. Cherneski told DOL Agents that Mr. Carpenter and not his wife was at the top of the

Benistar hierarchy ("Daniel Carpenter was the top of the hierarchy at Benistar"), which was then

followed by an even bigger lie at trial:

Q.    Were you aware of any particular person that controlled the companies that called 100 Grist Mill Road company home?

A.    Dan Carpenter was located there. T. Tr., Vol. I., p. 66.

Obviously, these massive contradictions in testimony by Mr. Cherneski beg the question

as to why Mr. Cherneski changed his story, as the differences here are as stark as "night and

day." Could it be that by August of 2015, Mr. Cherneski's attorneys and the government told

him about the *Binday* convictions? Mr. Cherneski certainly knew that Mr. Carpenter was already

in prison in 2015 for unrelated crimes (that he did not commit); and he certainly knew about Mr.

Bursey and Mr. Carpenter's indictments. Perhaps it was also the fact that Mr. Cherneski knew

two things for sure: First, Mr. Carpenter did not lie on any insurance application submitted by the

brokers involved with the Charter Oak Trust and yet was indicted; and second, Cherneski and his

wife Jenny Valedaserra were exposed on the applications which they worked on through REXIS,

which was the **ONLY** company at 100 Grist Mill Road involved in the Life Settlement business,

or, arguably, in the business of misleading insurance carriers to induce them to issue policies to

fake Irrevocable Life Insurance Trusts controlled by Investors just like in *Binday*.

Both of them were heavily involved with every single REXIS STOLI policy. Obviously if Mr. Carpenter wanted to do STOLI policies, he could have easily done it through REXIS, that is, of course, if it is in fact true that he controlled everything at 100 Grist Mill Road.

Unless the Court grants a new trial under *Brady* or a mistrial under §3500(d), we will never know why Mr. Cherneski changed his story and perjured himself at Mr. Carpenter's trial. Moreover, it cannot be disputed that Mr. Cherneski's contradictory testimony, and in some cases outright perjury, tainted Mr. Carpenter's "fair" trial. This is what the Court had to say in its demonstrably erroneous June 6, 2016 Opinion:

> 3.     The Defendant's Control of the Benistar Entities
>
> The superceding indictment alleges that Mr. Carpenter "was in control of the [relevant] Entities both in effect and, in many cases, through direct or indirect ownership interests." Super. Ind. (ECF No. 54) ¶ 2. Mr. Carpenter denies that he was in control. But the evidence at trial establishes that the allegation in the indictment is well-founded. Four witnesses who worked for or with the Benistar Entities credibly testified that Mr. Carpenter was in control. Though one of these witnesses had an incentive to implicate Mr. Carpenter in criminal wrongdoing, the others did not. All four were consistent in testifying that everyone reported to him.
>
> The evidence also shows that corporate entities were created and discarded at Mr. Carpenter's direction when it suited his purposes. For example, in a chain of emails between the defendant, Mr. Waesche and Missy Vallerie, the office manager in Stamford, Ms. Vallerie was directed to "[g]et rid of [Benefit Plan Advisors, LLC] everywhere." Gov't Ex. 1923 at 1. The defendant also reminded Mr. Waesche to "remember you are US Benefits Group, Inc now" and directed him to "[w]ork . . . on new stationary etc etc[.] No more BPA." *Id*. at 2. The last email in the chain is Ms. Vallerie's response to the defendant: "OK. We'll deep six BPA." *Id*. at 1. Mr. Waesche testified that the purpose of creating US Benefits Group and discarding Benefit Plan Advisors was to help create the impression that the Stamford office was not associated with the other Benistar Entities. I credit this testimony.

Just in case the Court is confused by this analysis, let us be perfectly clear. The Four witnesses that the Court put its faith in to find Mr. Carpenter guilty beyond a reasonable doubt were Mr. Cherneski and his wife Jenny Valedaserra, who both left the Benistar family early on and who **each** worked with brokers to fill out applications with misleading information on over

500 so-called STOLI policies between 2006 and 2009, while the evidence adduced at trial shows Mr. Carpenter did not fill out or sign even a single Charter Oak Trust application; Ed Waesche who admitted falsifying at least a dozen insurance applications, but who in fact never worked at 100 Grist Mill Road; and Charlie Induddi-Westcott, who did not admit to lying on any applications, but was responsible for the Christine Lambert policy that witness Ezekiel Lambert admitted he lied about the size of his father's estate so that he could defraud Grist Mill Capital out of $1.4 million in premiums paid for his mother's policy. At all times during the Charter Oak Trust affair, Mr. Induddi-Westcott lived in Millerton, New York, and was never an employee of or a participant in the BASI Employee Stock Ownership Plan that truly owns and controls the Benistar entities. Yet these were the four witnesses that the Court relied upon for its factually erroneous conclusions of June 6, 2016. It is respectfully submitted that the Court should provide Mr. Carpenter with the opportunity to prove to the Court each and every one of the factual errors in the Court's Opinion, and to point out each of Mr. Cherneski's lies at trial.

## II.    THE COURT SHOULD REQUIRE A FULL HEARING ON THIS MATTER

On Page 20 of its brief, the government makes the circular argument that because the Court erroneously in its June 6, 2016 Opinion felt "there was overwhelming evidence" from a "variety of witnesses," that the extensive Synopsis of the Case which does not mention Mr. Carpenter's name, Grist Mill Capital, or the Charter Oak Trust, and was written long after the last Trust policy was applied for, is not material; and Stefan Cherneski's depiction of Mr. Carpenter as an "outside consultant" not involved with the day-to-day running of 100 Grist Mill Road in the Cherneski *Jencks* Statement is likewise immaterial. Because the government is clearly wrong on all of these assumptions, Mr. Carpenter should be granted a new trial in the interests of justice or at the very least allowed to present witnesses at a hearing pursuant to Rule

10

33, so that Mr. Carpenter can prove to the Court just how wrong the government is in basing its circular arguments on the Court's own misinterpretation of the true facts of this case.

First and foremost, Mr. Carpenter's wife runs a company with over 80 employees. Neither Mr. Carpenter, nor his wife, own any stock in the 100% Employee-owned company. Mr. Carpenter does not control **any** of the Benistar entities, contrary to the Court's clearly erroneous June 6, 2016 Opinion. Second, since Valedaserra, Cherneski, and Induddi-Westcott all left the Benistar family at 100 Grist Mill Road before or shortly after the Raid of 2010, and Mr. Waesche was never a part of the 100 Grist Mill Road family, who are the "various witnesses" that established the "overwhelming" evidence of a crime at 100 Grist Mill Road? Mr. Carpenter should be allowed to call the dozen Benistar witnesses who were there for both unconstitutional raids, and **who are still with Benistar**, to prove to the Court that the Court is egregiously wrong in its judgment and that the evidence the Court is relying upon is not so "overwhelming" – or even true – after all. In fact, as the Cherneski *Jencks* Statement shows, much of the testimony at Mr. Carpenter's trial is comprised of false statements told by people that had a reason to lie because **they**, and not Mr. Carpenter, were the people **providing false or misleading information** on insurance applications for REXIS, and in 2010 they thought (like Agent Schrader) that REXIS was a legitimate business, but it was not until Mr. Carpenter was sent to prison for a crime that he did not commit and then was indicted for another crime that he clearly did not do, that Cherneski became worried. Mr. Carpenter should have a new opportunity to cross-examine Mr. Cherneski based on the Cherneski *Jencks* Statement and his connection to REXIS, to prove that he perjured himself at Mr. Carpenter's trial, and the government had to have known Cherneski was lying in violation of *Giglio* and *Napue* to convict Mr. Carpenter.

11

**Respectfully submitted,**
Defendant, Daniel Carpenter

By_____

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel  860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009
rbrown@bpslawyers.com

**ORAL ARGUMENT REQUESTED**

## CERTIFICATION

This is to certify that on December 1, 2017, a copy of the foregoing Motion was served by email to all parties by operation of the Court's electronic filing system or by email on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

A.U.S.A. David Novick
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

A.U.S.A. Neeraj Patel
Office of U.S. Attorney
157 Church Street, 25th Floor
New Haven, CT 06510

Richard Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel  860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009

13