# EXHIBIT
# ONE

## Judge Emmet G. Sullivan
## Wall Street Journal Editorial

DOW JONES, A NEWS CORP COMPANY ▼

DJIA ▲ 23603.36  0.19%          Nasdaq ▲ 6894.46  0.08%          U.S. 10 Yr ▲ 1/32 Yield 2.340%          Crude Oil ▼ 56.20  -1.27%          Euro ▲ 1.1940  0.07%

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/how-new-york-courts-are-keeping-prosecutors-in-line-1510953911

OPINION | COMMENTARY

# How New York Courts Are Keeping Prosecutors in Line

Evidence that supports the accused is supposed to be turned over to the defense. Ted Stevens would know.



New York State Chief Judge Janet DiFiore during a swearing-in ceremony in Albany, 2016.
PHOTO: MIKE GROLL/ASSOCIATED PRESS

*By Emmet G. Sullivan*
Nov. 17, 2017 6:09 p.m. ET

A good prosecutor never forgets the government's constitutional obligations. Every prosecuting attorney has a legal and ethical duty to seek out and turn over to the defense all evidence favorable to the accused that is in the possession of any government official, including the police. The Supreme Court made this clear in a 1963 case, *Brady v. Maryland,* and a line of subsequent rulings over five decades.

The trouble is what to do about prosecutors who deliberately ignore these rulings. Most prosecutors operate under high ethical standards, but a small minority intentionally withhold evidence that might lead to acquittal, which too often results in innocent people serving lengthy prison sentences.

One solution is for judges, at the start of each new case, to issue what's known as a Brady order. The order notifies prosecutors of their legal and ethical obligations, reminding them of their duty to seek out—and then to turn over to the defense in a timely fashion—evidence favoring the accused.

A judge-issued Brady order ensures that busy prosecutors will make finding and turning over such material a priority. It's one thing for prosecutors to know they are supposed to follow the law. But it's far more likely actually to happen when a judge's order tells them exactly what is expected, and what the consequences are for noncompliance.

A Brady order also ensures that prosecutors who commit intentional misconduct can be held accountable. Often it takes years for a wrongly convicted defendant to discover that exculpatory evidence was withheld. By that time, the statute of limitations for bringing disciplinary or criminal charges against the prosecutor may have already expired. If a Brady order is in place, however, the prosecutor can be held in contempt of court or subjected to other judicial sanctions.

As of 2015, roughly 28 of the 94 federal district courts nationwide have promulgated rules clarifying the disclosure obligations of prosecutors who appear before them. But only a fraction of federal and state judges have standing orders focused on the duty to disclose exculpatory evidence.

In New York state courts, at least, that is about to change, thanks to a groundbreaking rule issued last week by Chief Judge Janet DiFiore and Chief Administrative Judge Lawrence Marks. Starting on Jan. 1, 2018, trial judges statewide will be required to issue Brady orders in all criminal proceedings. This is the first rule of its kind in the nation, though I hope my colleagues in the federal and other state courts will follow suit.

My wake-up call to the importance of Brady orders came when I presided over the deeply flawed trial of Ted Stevens, the longtime U.S. senator from Alaska. In October 2008, Stevens was nearing the end of his seventh term, and was almost certain to be re-elected, when he was found guilty of lying on Senate disclosure forms about the cost of renovations to his vacation home. Stevens's name was tainted, and he lost re-election, altering the course of events in the Senate.

Just six months later, it was revealed that federal prosecutors had concealed numerous pieces of evidence that very likely could have resulted in Stevens's acquittal. Among the more egregious examples: Rather than call a witness whose testimony would have supported Stevens, the government flew the witness home to Alaska. The prosecution also concealed that its star witness had an illegal sexual relationship with an underage prostitute, whom he had asked to lie about their relationship.

Henry Schuelke, the special prosecutor I appointed to investigate the misconduct, found that Justice Department lawyers committed deliberate and "systematic" ethical violations by withholding critical evidence pointing to Stevens's innocence. Yet Mr. Schuelke also found that I was powerless to act against the wrongdoers, because I had not issued a direct, written court order requiring them to abide by their ethical and constitutional obligations to disclose favorable evidence.

The experience led me to change my own courtroom practice. I now issue a detailed, standing Brady order in every criminal case before my court. This reminds the prosecutors who appear before me exactly what is required of them, and it ensures that any who intentionally withhold evidence can be held accountable.

Over the past eight years, I have made concerted efforts to persuade my colleagues on the federal bench to do the same. In 2009 I urged the Judicial Conference Advisory Committee on the Rules of Criminal Procedure to propose amendments requiring the disclosure of all exculpatory information to the defense.

But the committee chose not to act, saying that the number of affected cases did not suggest "that the problem is so severe as to warrant a rule change." While the egregious intentional misconduct of the Stevens case thankfully does not happen every day, failure to comply with constitutionally required disclosures does occur. Judges have a responsibility to take action against unethical prosecutors and to exercise their supervisory authority to prevent Brady v iolations before they happen.

By mandating that judges throughout New York issue Brady orders, Chief Judges DiFiore and Marks have taken a bold stance that will no doubt be noticed by their colleagues across the nation. It is my hope that other states, and our federal court system, soon will follow New York's lead.

*Mr. Sullivan is a U.S. district court judge for the District of Columbia.*

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# EXHIBIT TWO

## Constitutionally Defective Search Warrant for Raid of 2010

United States District Court

_____ DISTRICT OF _____ CONNECTICUT _____

| | |
|---|---|
| In the Matter of the Search of<br>(Name, address or Brief description of person,<br>property or premises to be searched) | **SEARCH WARRANT** |
| | **CASE NUMBER:** |

The office of NOVA BENEFIT PLANS LLC, also
known as BENISTAR, located at 100 Grist Mill
Road, Simsbury, Connecticut.

To: **Shaun Schrader, IRS-CID** and any Authorized Officer of the United States

Affidavit(s) having been made before me by **Special Agent Shaun Schrader** who has reason to believe that
on the person of or x on the property or premises known as (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury,
Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists
of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is
accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign
attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden
sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

in the _____ District of _____ **CONNECTICUT** _____ there is now
concealed a certain person or property, namely (describe the person or property to be seized)

*See* Attachment B.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the
person or property so described is now concealed on the person or premises above-described and
establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before **April 25, 2010**

(not to exceed 10 days) the person or place named above for the person or property specified, serving this
warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night
as I find reasonable cause has been established) and if the person or property be found there to seize
same, leaving copy of this warrant and receipt for the person or property taken, and prepare a written
inventory of the person or property seized and promptly return this warrant to THOMAS P. SMITH,
UNITED STATES MAGISTRATE JUDGE as required by law.

April 16, 2010 at 1:05 p.m. _____
Date and Time Issued

at ___ HARTFORD, CONNECTICUT _____
City and State

THOMAS P. SMITH
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

# EXHIBIT THREE

**AUSA Novick Subpoena for Fruits of the Poisonous Tree From the Raid of April 2010**



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

| | |
|---|---|
| *Abraham A. Ribicoff Federal Building* | *(860) 947-1101* |
| *450 Main Street, Room 328* | *Fax (860) 760-7979* |
| *Hartford, Connecticut 06103* | *www.usdoj.gov/usao/ct* |

May 25, 2011

Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739
Attention: Dan E. LaBelle, Esq.

       Re:   Non-Disclosure of Subpoena

Dear Sir or Madam:

      You have been served with a subpoena which requires you to appear before a federal grand jury June 28, 2011 with certain specified documents. Because this subpoena is being issued as part of an ongoing investigation, we request that you do not disclose its existence or its contents to any person who is not involved in your internal document production process. If at some point you decide that it is necessary to disclose the existence and/or the contents of this subpoena, I request that you notify me of your intent to do so prior to the time of the disclosure.

      In addition, to the extent that you do not produce certain responsive materials on the basis that you believe they are protected by the attorney-client or any other privilege, please include with your production a log identifying any documents withheld on the basis of privilege.

      YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY WILL BE EXCUSED if these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

                Very truly yours,

                DAVID B. FEIN
                UNITED STATES ATTORNEY

                DAVID E. NOVICK
                ASSISTANT UNITED STATES ATTORNEY

Enclosure

AO 110  (Rev, 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

H-10-2-9(416)

for the

District of Connecticut

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:
Halloran & Sage, LLP
315 Post Road West
Westport, CT

YOU ARE COMMANDED to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: United States District Court   (Grand Jury Room, 3rd Floor) 450 Main Street Hartford, CT 06103 | Date and Time: June 28, 2011 at 9:30 a.m. |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects (blank if not applicable):

### SEE ATTACHMENT.

PLEASE NOTE:

In lieu of personally appearing before the Grand Jury, these records may be provided to these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

May 25, 2011

Date: _____

*CLERK OF COURT*

*Helena Shotkiwraz*

Digitally signed by Helena Shotkiwraz
DN: cn=Helena Shotkiwraz, o=United States District Court, ou=Clerks Office, email=Helena_Shotkiwraz@ctd.uscourts.gov, c=US
Date: 2011.05.26 10:15:14 -04'00'

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Assistant U.S. Attorney David E. Novick
450 Main Street, Room 328
Hartford, CT 06103
Tel: (860) 947-1101   CONTROL #416

Attachment to Subpoena

TO:   Halloran and Sage, LLP
      315 Post Road West
      Westport, CT 06880-4739

      Attention: Dan E. LaBelle, Esq.


      Provide all documents and other items seized pursuant to a search warrant executed at 100 Grist Mill
Road, Simsbury, Connecticut, by the IRS-CID of Milwaukee, Wisconsin, on April 20, 2010, that are related
to Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, and Avon Capital and associated entities,
including but not limited to IRS evidence box numbers 36, 38, 54, 75, 81, 103, 205, 238, 249, 287, 293, 300,
308, 35, 37, 121,128, 129, 125, 239, 32, 90, 124, 204, 237, 243, 247, 253 and 291.


      In lieu of personally appearing before the Grand Jury, these records may be provided to
Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600
State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before
the grand jury date.

On this date, September 21, 2011, Special Agent Lynn Allen and Senior Investigator, Mary Goraham, pursuant to duly issued Federal Grand Jury Subpoena, removed from the custody of Halloran & Sage LLP 29 numbered boxes of documents held by Halloran & Sage LLP in conjunction with a Grand Jury investigation pending in the eastern district of Wisconsin. The boxes are identified by number on the page attached hereto.

Lynn Allen

Mary Goreham

William J. McGrath, Jr.

| | | |
|---|---|---|
| 32 | 124 | 249 |
| 35 | 125 | 253 |
| 36 | 128 | 287 |
| 37 | 129 | 291 |
| 38 | 204 | 293 |
| 54 | 205 | 300 |
| 75 | 237 | 308 |
| 81 | 238 | 145 |
| 90 | 239 | |
| 103 | ~~243~~ | |
| 121 | 247 | |

# EXHIBIT FOUR

## Synopsis of the Case

Continued ... Enforcement Action Review Form

## Synopsis of the Case

NOVA Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans – with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage.

NOVA Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that the head of these companies is Wayne Bursey.

419 Plans, or Welfare Benefit Plans, are non-qualified plans which businesses can establish to compensate employees in the event of situations such as sickness, disability, and/or disfigurement. Due to the fact that the plans are non-qualified, as opposed to a qualified plan like a 401K, there are no funding limits for the Plan and employers do not have to fund the plan for all employees. Employers can be selective and fund the Plan for as few as one or two employees. Money that is contributed to the plans can be written off by the business as an expense in the year that the contribution is made. NOVA Plans sells its 419 Plans as "10 or more employer plans", meaning that purportedly at least 10 employers contribute to the same plan which is then considered a single plan. If an employer is invested in a 10 or more employer plan, the IRS allows the business to expense an unlimited contribution amount.

The funding of a 419 plan works as follows:
- A business signs up for the 419 Plan and sends a contribution to a trust administered by NOVA.
- The business then claims an expense for the full amount of the contribution.
- The trust, for its part, purchases an annuity or life insurance policy from an insurance company with the covered employee as the beneficiary.

If the plan is administered properly, beneficiaries of the 419 Plans are only able to receive a distribution by filing a valid claim for a sickness, disability, or disfigurement. Per IRS regulations, if a valid claim is approved, the beneficiary receives a distribution from the plan, usually tax free.

Information received from a reliable cooperating witness (CW), indicates that NOVA Benefit Plans is promoting and administering abusive 419 Plans. The CW is an independent broker who sold NOVA 419 Plans to numerous clients in the Milwaukee, WI area. The CW has been selling 419 and 412i Plans through NOVA and their predecessor Benistar since 2002. The CW said that 412i plans were similar to 419 plans; however in 2005, IRS rules changed and 412i plans became less attractive compared to 419 Plans. The CW provided information on 14 clients who he assisted in setting up NOVA and/or Benistar 419 Plans. The 14 Plans had contributions totaling well over $8 million.

Per the CW, NOVA knowingly administers their 419 Plans in a way that allows clients to use the plans as abusive tax shelters. The CW explained that he sold the 419 Plans to his clients as a disability plan with the option to get money out of the plan tax free. NOVA is allowing beneficiaries to abuse the Plans in at least two ways:

- First, per the CW, NOVA approves just about any claim that is filed by a beneficiary no matter how frivolous. For example, one of the CW's clients filed a claim for having a mole removed that left a small scar. NOVA approved the claim and is currently paying out the full contribution amount, less fees, over 60 months. The CW has had conversations with Wayne Bursey where Bursey said that if a beneficiary wants to get money out of the plan, NOVA encourages them to file a claim because they have made it so easy for a claim to be approved.

- Secondly, NOVA allows businesses to terminate their 419 Plans. If a business terminates the plan, NOVA gives the beneficiary the option of purchasing the Plan for 10% of its cash value. Once the beneficiary buys out the plan, they receive a 1099 from the insurance company that held the annuity. The 1099 will reflect the basis of the original purchase amount; however that is not the proper basis for the beneficiary. The beneficiary should have no basis in the annuity since the business, not the beneficiary, made the contribution. Due to the incorrect basis, the taxpayer is told that they owe little or no taxes. The CW said that NOVA knows that 1099's issued to the beneficiary by the insurance company are incorrect.

Of the 14 plans set up by the CW, eight plans, totaling well over $4 million in contributions, have been terminated and cashed out. In addition, multiple claims totaling approximately $1 million have been approved.

Due to the ease of getting money out of the plans virtually tax free, by filing a claim or terminating, the plans are being sold as abusive tax shelters.

Continued ... Enforcement Action Review Form

The fact that NOVA's 419 Plans qualify for the 10 or more employer exemption is also in question. In a 10 or more employer plan, the contributions of all of the employers are supposed to be pooled together and accounted for as one plan. However, NOVA appears to be treating each employer separately. For example, NOVA purchases an annuity for each individual beneficiary. If the beneficiary files a claim or terminates the plan they are only entitled to what they contributed.

This investigation utilized a Three Contact Operation and also a Group II Undercover Operation. The undercover contacts confirmed the CW's allegations regarding NOVA. The end result of the abusive 419 plans is that individuals are able to circumvent IRS regulations and obtain money from businesses that they have an interest in virtually tax free. By using a 419A(f)(6) plan, a business can contribute money, which is deductible as a business expense, to the plan on behalf of a covered employee. Then, with the assistance of NOVA, at a later date the covered employee is able to obtain the money contributed to the plan tax free either through a ginned-up disability (disability payments are generally not includable in income under Section 104 of the Internal Revenue Code) or through a misstated basis when the 419A(f)(6) plan is terminated. In essence, NOVA is providing a blue print, and the means, for business owners and individuals to underpay their taxes.

## A) Significance Evaluation

Per contacts with Neumann, NOVA has thousands of clients and over a billion dollars invested for those clients. The CW provided information that he alone has 14 clients who have invested over $8 million in the 419 Plans. Due to the statements of Neumann and the information provided by the CW, the tax loss associated with NOVA's clients is anticipated to be very significant.

SB/SE has identified some 419 Plans as Abusive Tax Avoidance Transactions. Per their website, promoters are offering plans that purport to provide employee pre-retirement or post-retirement benefits, such as death, medical, dental, life insurance, disability and severance pay. Promoters claim that employer contributions to these plans are tax-deductible when paid, relying on the use of single employer plans under IRC Section 419(e), the 10 or more employer exception in IRC Section 419A(f)(6) or the Bargaining Agreement exception in IRC 419A(f)(5). Arrangements providing welfare benefits may have tax consequences different than what the promoter claims. Depending on the facts and circumstances, a particular arrangement could instead be providing dividends to the owners of a business that are includible in the owners' income and not deductible by the business. The arrangement could also be subject to the split dollar regulations or be a nonqualified deferred compensation plan.

LMSB has an open Promoter Case, or "6700 Investigation", on Wayne Bursey and NOVA. Currently, the case is stalled due to the fact that Bursey has not complied with a summons issued for his testimony. LMSB is currently pursuing summons enforcement activities in order to force Bursey to comply. LMSB believes that the summons enforcement process could take several months.

Pursuant to an ongoing project, LMSB is currently disallowing NOVA 419 Plan contributions for companies that expense the contributions. The contributions may also be includable as income on the personal tax returns of beneficiaries in the year that the contributions are made.

The LMSB case on NOVA is related to an earlier investigation of a company by the name of Benistar. NOVA was created by the operators of Benistar. The CW believes that NOVA may have been created because the IRS was having issues with Benistar's 419 Plans.

## B) Intrusiveness Evaluation

It is unlikely that records, including customer lists, pertinent to the investigation would be obtained through the use of a subpoena. LMSB currently has an open 6700 investigation on NOVA and Wayne Bursey. The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony. Due to the noncompliance with the summons, it is anticipated that a subpoena would garner the same result. Further, based on the investigation to date, it appears that NOVA makes a living out of impeding the IRS. Therefore, NOVA's cooperation with a criminal investigation is highly unlikely.

IRS00008

# EXHIBIT
# FIVE

## Agent Schrader Search Warrant
## Plan of Operation

INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION
SEARCH WARRANT PLAN

## Search Warrant Date and Time

Date:  April 20, 2010
Staging Time: 8:15 AM
Execution Time: ~ 9:00 AM

## Case Name and Number

Guy Neumann
#1000230004

## Case Agent

Shaun Schrader
    Cell:
    Ofc:

## Search Warrant Site

NOVA Benefit Plans AKA Benistar
100 Grist Mill Road
Simsbury, CT 06070

## Primary Objectives

1) To ensure the safety of Agents and other individuals present during the
   execution of the search warrant.
2) To secure evidence of abusive 419 welfare benefit plans.
3) Secure evidence of Title 26 violations and Title 18 Klein Conspiracy
   violations.
4) To interview key employees

## Background of Investigation

NOVA Benefit Plans is a company located in Simsbury, CT. Per its brochure, the
company offers comprehensive welfare benefit plans – with plans offering single
or multiple benefits, ranging from sickness & accident to long term care and life
coverage.

NOVA Benefit Plans was incorporated in 2004 in the state of Delaware.
Numerous companies related to NOVA have also been identified, including
Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of
the companies are run by the same individuals and that the head of these
companies is Wayne Bursey.

1

14176956.1

INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION
SEARCH WARRANT PLAN

NO PHOTO

Name:  Kevin P Slattery
Occupation:  NOVA Salesman
DOB:        1972                    Height:  6' 3"
DL#:                               Weight:  Unknown
SSN:
Residence:  54 Oxford Street Apt C3, Hartford, CT 06105-2917

**Criminal History:**
07/24/1993 – Theft by unauthorized taking
09/27/2003 – Dispensing controlled drug - GHB

## Other Individuals at Site

NOVA Benefit plans/Benistar operates a financial services company. It is
anticipated that up to 70 employees will be on site upon execution of the search
warrant.

The business will be shut down for the duration of the search warrant.

Individuals present will be led to the front entrance where they will provide
identification, contact information, and position with the company to the agents
assigned to occupant control prior to exiting the building.

Employees will not be allowed to re-enter the building once they exit.

Interviews with the following individuals will be attempted before they leave:
- IT STAFF (CIS will handle)
- Stefan Cherneski
- Kevin Slattery
- Richard Belding
- Others willing to provide information to agents

## Use of Multiple Businesses Entitles and Trusts

**Known Businesses and Trusts**
NOVA Benefit Plans, LLC
NOVA Sickness, Accident, Disability & Indemnity Trust (SADI)
NOVA Long Term Care Trust (LTC)
NOVA Life One Plan & Trust
Benistar
Benistar 419 Advantage Plan
Benistar 419 Plan & Trust
Grist Mill Trust

7

14176956.1

INTERNAL REVENUE SERVICE -- CRIMINAL INVESTIGATION
SEARCH WARRANT PLAN

US Benefits Group, Inc
Benefit Plan Advisors

**Unknown Businesses and Trusts**
The above list may not be all inclusive. Be aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans.

The investigation has shown that some businesses being run out of the building *may* be legitimately providing insurance and other financial services including: Rex Insurance Services.

**Inventory Procedures**

Due to the large amount of evidence that is expected to be seized, multiple evidence loggers will be utilized. Three TFIAs will be utilized to log evidence. Once all evidence has been logged, the three TFIAs will merge their data into one complete inventory.

**Evidence Custodian**

SA Stegenga will be the on-site evidence custodian.

At the conclusion of the search, all seized evidence will be loaded into the rental truck which SA Stegenga will have control of. SAs Stegenga and Leming will transport the evidence back to Milwaukee.

**Legal Records and Taint Team**

NOVA and BENISTAR are currently under civil investigation, therefore it is anticipated that there will be attorney/client type documentation at the search warrant site. We are authorized to take legal documents such as legal opinions related to 419 plans. However, if any document appears to have attorney/client type privilege, it should be tagged and given to the taint team for review as to whether we will take the documents. They will make the decision of whether it contains privileged information. If they are unsure, it will be logged into evidence, boxed separately and later reviewed by an independent AUSA in Milwaukee.

**Medical Emergency**

911 Should be the first call

**Nearest Medical Facility**

St. Francis Hospital
114 Woodland Street
Hartford, CT 06105

8

# EXHIBIT SIX

**Cherneski *Jencks* Statement**



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000230004 | **Location:** | NOVA/Benistar |
| **Investigation Name:** | Guy Neumann | | 100 Grist Mill Road |
| **Date:** | April 20, 2010 | | Simsbury, CT  06070 |
| **Time:** | ~9:05 - 11:10 am | | |
| **Participant(s):** | Stephen Cherneski, Witness | | |
| | Jeffrey A. Hencke, Special Agent | | |
| | Crystal Brinson, Special Agent | | |

On the above date and approximate time, Special Agent Crystal Brinson and I met with Stephen Cherneski at the above stated location. We identified ourselves to Cherneski and I explained to him that we were assisting the United States Attorney's Office located in the Eastern District of Wisconsin with a Grand Jury investigation and wanted to ask him some questions. Cherneski agreed to answer our questions, however, at one point during the interview Cherneski asked if he was required to answer the questions. I explained to Cherneski that he was not required to answer the questions and could choose not to answer some questions or stop the interview at any point. In response to our questions, Cherneski provided the following information.

1.  Cherneski currently resides at 6-C Talcott Forrest Road, Farmington, CT. His cell phone number is ▇▇▇▇▇▇. Cherneski received a bachelor's degree in economics with a minor in finance from Central Connecticut State. Cherneski was previously a professional hockey player.

2.  Cherneski described his role for NOVA Benefit Plans/Benistar as providing technical and educational support for employers and advisors. Cherneski currently receives his paycheck from Benistar Admin Services and has been working for Benistar Admin Services since February, 2005. Cherneski believes that all employees located at 100 Grist Mill Road, Simsbury, CT receive their paycheck from Benistar Admin Services even though there are various businesses being operated out of the building. Cherneski is paid $60,000 per year plus bonuses. Cherneski became employed by Benistar Admin Services because of his friendship with Guy Neumann.

3.  Cherneski had no prior knowledge or experience with 419 welfare benefit plans prior to his employment for Benistar Admin Services and his work for NOVA/Benistar. Cherneski learned about 419 welfare benefit plans through on the job training and read various books and tax law to educate himself to do his

job. Cherneski reports to Guy Neumann and Wayne Bursey. No person reports to Cherneski.

4. US Benefits Group is a business that provides information on various employee plans to a network of brokers. US Benefits Group does not administer welfare benefit plans. Cherneski stated that US Benefits Group is run by a collection of people and no one person. Cherneski stated that many individuals work for various companies operating out of the building at 100 Grist Mill Road, Simsbury, CT. Cherneski believes that US Benefits Group was started prior to his employment.

5. Benistar is a 3rd party administer of various retirement plans. Benistar was started prior to Cherneski's employment. Molly Carpenter is the chair person of Benistar. Cherneski stated that he does not deal with Benistar plans and is not familiar with its' plans.

6. Benefit Plan Advisors previously administered 419(e) welfare benefit plans, including the Grist Mill Trust. Cherneski stated that as of January 1, 2010, all 419 plans are administered by NOVA Benefit Plans. (NOVA)

7. NOVA currently administers all 419 welfare benefit plans. Prior to 1/1/2010, NOVA only administered NOVA 419A(f)(6) plans. NOVA was started prior to Cherneski's employment. NOVA is operated through a board containing Cherneski, Guy Neumann, Wayne Bursey, Dan Carpenter, Molly Carpenter, and Kathy Kehoe. NOVA administers its 419A(f)(6) plans through four (4) trusts. These trusts are SADI, LTC, Life 1, and Life 5.

8. A 419A(f)(6) welfare benefit plan is a plan containing 10 or more employers. In a 419A(f)(6) plan, the employer can deduct the amount of the contribution as a business expense, with no limitation.

9. In a NOVA 419A(f)(6) welfare benefit plan, a company/employer contributes money for the benefit of one or more employees (covered employee) of that company. In the plan, a trust (i.e. SADI) is the owner and beneficiary of the policy. The covered employee than designates a beneficiary for the plan. The trust then purchases an annuity or life insurance policy with the proceeds contributed to the trust by the employer. The trust does keep 5% of the amount contributed and the employer is required to pay an additional $1,500 enrollment fee to NOVA. The initial contribution by the company/employer is given to the trust (i.e. SADI). The trust would then deposit the check and write a separate check to the appropriate insurance company in which the trust has purchased the annuity and life insurance from.

10. Beneficiaries in 419A(f)(6) plans administered by NOVA received benefits from the plan through either a qualifying event or death. The death benefit for the 419A(f)(6) plans is discussed in the plan documents, but is usually the value of the annuity or life insurance. A qualifying event is a permanent disability or disfigurement to the covered employee. An employer can also terminate the