UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
_____

UNITED STATES OF AMERICA,

      - v. -                            3:13 Cr. 226 (RNC)

DANIEL CARPENTER,

                      Defendant.
_____


## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT DANIEL CARPENTER


James M. Cole, Esq.
Michael A. Levy, Esq.
Qais Ghafary, Esq.
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com

*Counsel for Daniel Carpenter*


February 27, 2018

<div align="center">

Table of Contents                                          Page

</div>

Introduction ....................................................................................................................1

Applicable Law ...............................................................................................................4

Discussion .......................................................................................................................7

   I.    Section 3553(a)(1)—The History and Characteristics of the Defendant........................8

       A.   Dan's Upbringing and Personal Life ................................................................8

       B.   Dan's Decades of Generosity to Individuals and Communities ......................10

       C.   Dan's Mental Health and His Prior Conviction ..............................................18

   II.   Section 3553(a)(1)—The Nature and Circumstances of the Offense ...........................20

   III.   Section 3553(a)(4)—The Applicable Sentencing Guidelines Range ...........................21

       A.   Loss Amount Enhancement ...........................................................................21

            1.    The Government Incorrectly Bases Intended Loss on Issues
                  Unrelated to STOLI ........................................................................23

            2.    Dan Carpenter Did Not Purposely Intend to Inflict *Any* Harm,
                  Since He Was Unaware of the Economic Harms that Insurers Have
                  Claimed Result from STOLI............................................................32

            3.    On the Facts of This Case, the Insurance Companies Suffered No
                  Actual STOLI-Related Loss .............................................................33

       B.   Money Laundering Enhancement ...................................................................38

            1.    Mail and Wire Fraud Counts...........................................................40

            2.    Money Laundering Counts ..............................................................40

       C.   Sophisticated Means Enhancement..................................................................41

       D.   Loss-to-Financial-Institution Enhancement....................................................43

       E.   Obstruction of Justice and Leadership Enhancements......................................44

   IV.   Section 3553(a)(2)(A) & (B)—The Need for Just Punishment and Adequate
   Deterrence .................................................................................................................46

       A.   Punishment....................................................................................................46

       B.   Deterrence .....................................................................................................49

Conclusion ....................................................................................................................50

<div align="center">

i

</div>

## Introduction

Dan Carpenter's personality is, as described by his wife, "larger than life."  (PSR ¶ 236.) He is overexuberant, has an overwhelming need for control and involvement in every situation, and can test people's patience.  Fortunately, for the *vast* majority of his life, Dan has harnessed his seemingly boundless energy to make himself a force for good.  At every stage of his life, even when he was at his lowest in prison, Dan has spent not just his money but his time and his attention on other people and their problems.  It would be fair to say that, throughout his life, when Dan has spotted either a problem or an opportunity, he has had a compulsion to attack it, regardless of whether it was his own or someone else's.  The record of his charitable deeds and the dozens of letters of support from Dan's supporters attest indisputably to this fundamental aspect of Dan's character.  Dan is exuberant in everything that he does, and—to the significant benefit of every community that he has been a part of—most of what he has chosen to do is help people.

Although, as the Court is aware, Dan disagrees with the Court's verdict, even the Court's findings are not inconsistent with the foregoing.  They do not depict a malicious man.  Indeed, although this is now Dan's second conviction, the theme that runs through both cases—expressly acknowledged by the judge at his prior sentencing—is that Dan has not acted for the purpose of swindling anyone or profiting from someone else's loss.  Instead, in each case, Dan's supposed conduct was that of someone who believed that he had found a way to profit that would be to no one's loss.  To be sure, this Court has found that Dan's conduct involved deceiving insurance companies about an intention to sell policies on the otherwise legal secondary market— something that the Second Circuit has subsequently explained defrauds insurance companies of their right to material economic information in determining whether to issue a policy.  But that is

far different from saying that Dan sought to cause the insurance companies a financial loss.  To the contrary, even crediting the Court's verdict, that verdict is consistent with a man who thought he could make a profit at the same time that insurance companies received legitimate premium payments on policies that, apart from being STOLI, the companies were happy to issue.  Moreover, the proof does not suggest that Dan knew any specific economic reason why insurance companies did not want to issue STOLI policies.  In short, nothing in the evidence or the Court's verdict shows that Dan had in mind some financial loss that he was attempting to inflict for his own gain.

For this reason, the issue of how to calculate the intended or actual loss under the Sentencing Guidelines is not some arcane, theoretical exercise.  Rather, it cuts to the heart of what Dan is to be sentenced for.  The Government asserts that Dan intended to cause more than $190 million in loss, and actually did cause more than $50 million in actual loss.  But the Government relies on a theory in which everything about an insurance policy—including the obligation that the insurance company knowingly undertook to pay a death benefit—is treated as a harm attributable to fraud simply because of one misrepresentation about whether there was a plan to resell the policy.  That view of loss has failed to impress any court as having much grounding in reality.  District courts have repeatedly found the resulting number useless because it overstates the seriousness of the offense, and the Second Circuit has twice lamented that a better alternative has not been proposed.  Importantly, the Fifth Circuit has expressly rejected the theory, explaining that the harm from deceiving an insurance company about STOLI is, logically, the difference between the value to the insurance company of the non-STOLI policy that the company thought it was issuing and the value of the STOLI policy that it actually issued. *See United States v. Bazemore*, 608 F. App'x 207, 216 (5th Cir. 2015).  And this Court

conceptualized the fraud exactly the same way in its verdict, where it described the harm as involving the "discrepancies between the benefits the providers reasonably anticipated from issuing [non-STOLI] policies and the benefits they actually received" from issuing STOLI policies.  (Verdict at 82.)

What makes the Government's overblown position on loss even more puzzling is that it is clear what the Government believes are the *specific* economic differences between STOLI and non-STOLI policies from the insurance company's perspective.  As explained by the Court in its verdict, the differences are that: (i) owners of STOLI policies tend to pay the minimum premium rather than the level-funding premium, which deprives the insurance companies of investment capital and, as a result, deprives them of the investment income they might have earned on that capital; and (ii) STOLI policies are expected to lapse at lower rates than non-STOLI policies, depriving the insurance companies of the gain they would make on lapsed policies.  (Verdict at 12-15.)  The Government has not claimed and the Court has not found that the difference between STOLI and non-STOLI otherwise affects the economics or risks associated with issuing an insurance policy.

The result is enormously consequential both for the application of the Guidelines and, more generally, for the proper conception of the offense.  Dan Carpenter is not some malevolent fraudster who intended to cause nearly $200 million in losses.  The far more modest potential loss from the two economic harms associated with STOLI—the income on a little extra investment capital, and the gain from a few anticipated policy lapses—make that conception of the offense preposterous.  Moreover, although Dan knew that certain insurance companies chose not to issue STOLI policies, there is no proof that Dan knew the specific economic reasons why; *i.e.*, the proof does not show that he intended to cause the companies any specific economic loss

at all.  And as for actual loss, there simply was none.  The policies in this case lapsed at a phenomenal rate, one that provided the insurance companies with gains that far outstripped any lost investment income.  Indeed, the insurance companies are sufficiently happy with the remaining policies that they have not been cancelled despite the fraud.

Ultimately, Dan Carpenter is a 64-year-old man who has spent more than four decades of his adult life helping people.  In that time he has made mistakes, but they have been few and not malevolent.  He has a prior conviction for fraud, but it was a fraud in which even the sentencing court recognized that he did not intend to harm anyone.  (*See* D. Mass. *Carpenter* Sent. Tr. 89, Ex. 1 hereto.)  Similarly, this Court has found that he participated in a scheme to deceive insurance companies about a single fact—the intention to resell insurance policies procured on various insureds—which had the potential to make the policies modestly less valuable to the insurance companies that issued them, and played out in a way that caused no actual harm at all. In a system of sentencing in which an offender's offense must be balanced against his history of altruism and his character for generosity, and the overarching command is that a sentence should be sufficient *but not greater than necessary* to serve the purposes of sentencing, we respectfully submit that Dan Carpenter should be spared a lengthy sentence and the resulting separation from his family and community.

## **Applicable Law**

There is no legal presumption that a sentence within the applicable Sentencing Guidelines range is per se reasonable.  Rather, the Supreme Court has instructed that, after determining the applicable Guidelines range, the sentencing court must "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*,

555 U.S. 350, 351 (2009).  Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate deterrence; the applicable Guidelines range; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

Of particular relevance, the Second Circuit has recently cautioned courts to give greater consideration to downward variances where—as here—the Guidelines offense level is driven primarily by loss amount.  In *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), two defendants were sentenced to terms of imprisonment within Guidelines ranges that the Second Circuit found were correctly calculated and suffered from no legal defect.  *Id*. at 799-800. Nonetheless, the Second Circuit vacated the sentences and remanded the cases "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."  *Id*. at 800.  Specifically, the Second Circuit observed that a monetary loss enhancement had "increased [one defendant's] base offense level from six to eighteen, a three-fold increase," and had "increased [the other defendant's] base offense level from six to sixteen."  *Id*.  Expressly questioning the Sentencing Commission's choice of an "approach[] unknown to other sentencing systems" in which "the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement," the Second Circuit held that the "unusualness" of the Commission's approach "is a circumstance that a sentencing court is entitled to consider" in deciding whether to vary downward from the Guidelines.  *Id*.  Indeed, the Second Circuit felt so strongly that the Guidelines overemphasize loss that it vacated the sentences and "remand[ed] for

further consideration" of the issue even while recognizing that the sentences imposed were not legally erroneous.  *Id.*

"[F]undamentally, the overarching requirement that binds every sentencing court is the parsimony clause, which commands that '[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes' of sentencing."  *United States v. McIntosh*, 33 F. Supp. 3d 448, 454 (S.D.N.Y. 2014) (quoting 18 U.S.C. § 3553(a)); *see also Pepper v. United States*, 562 U.S. 476, 493 (2011) (discussing district courts' "overarching duty to impose a sentence sufficient, but not greater than necessary to serve the purposes of sentencing" (internal quotation marks omitted)).

As the Second Circuit powerfully explained in a recent decision, ensuring fidelity to the parsimony clause is a task that district courts must approach compassionately:

> "Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

6

**Discussion**

This case calls to mind that of *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).  As here, *Adelson* was a business fraud case in which the parties diverged wildly in their proposed applications of the Guidelines, with the Government proposing an offense level that through "the kind of 'piling-on' of points for which the guidelines have frequently been criticized," produced the "barbarity" of a Guidelines range of life imprisonment, one that "[e]ven the Government blinked at."  *Id*. at 510-11.  That result caused the court to remark upon the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."  *Id*. at 512.

The court concluded that the "the calculations under the Sentencing Guidelines [led] to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law."  *Id.* at 506.  In particular, the Court focused on the many letters submitted on Adelson's behalf attesting to his "'generosity of spirit,' his ever-present willingness to go above and beyond the call of duty to help others," and to his "numerous acts of compassion and generosity." *Id*. at 514.  In a passage quoted frequently since, the court explained:

> Adelson's good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Id.* at 513-514.  The court ultimately imposed a sentence of three-and-a-half years, explaining that "where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *Id*. at 515.

To be sure, there are differences between Adelson's case and Dan Carpenter's, and we do not mean to suggest that analysis of the former's sentence can simply be borrowed to determine the latter's.  But we respectfully submit that what resonates equally in this case are the notions of a Guidelines calculation so "run amok" that it bears no reasonable relation to the reality of the offense, and the importance of focusing at this critical moment in Dan's life on the history and characteristics of the defendant and giving him "credit for the good he has done."  Under such circumstances, the parsimonious and compassionate view of sentencing that the law requires does not require a lengthy sentence or the resulting separation of this 64-year-old man from his family and his community.

## I.       Section 3553(a)(1)—The History and Characteristics of the Defendant

### A.       Dan's Upbringing and Personal Life

Dan Carpenter's life has been one of personal accomplishment matched by service to others.  Dan was born in 1954 to working class parents in Manchester, Connecticut.  (PSR ¶ 229.)  His father worked as an engineer for Westinghouse Elevators.  (PSR ¶ 233.)  His mother was a homemaker.  (PSR ¶ 233.)  Both lived into their 90s, and Dan had a loving relationship with each of them, living less than five miles away from them at the end of their lives in order to provide care that would permit them to stay in their home of fifty years.  (PSR ¶ 233.)  Dan also has three younger siblings, with whom he is close, and who have come to depend on him as the

family's rock, "a source of strength through difficult family times," and "a generous soul who only has the best interests in mind for family" and others.  (PSR ¶ 234; Tabs A, B, C.)[1]

Although the Carpenters did not have much financially, Dan made opportunities for himself through intelligence and hard work.  Initially, Dan obtained an academic scholarship to Avon Old Farms, a prestigious college preparatory school in Avon, Connecticut.  (PSR ¶ 229.) Displaying trademark energy, Dan took full advantage of the opportunity, playing numerous sports while excelling academically.  (PSR ¶ 230.)  Dan recalls his Avon years with gratitude, explaining that the scholarship he received gave him the "opportunity to become someone." (PSR at ¶ 230.)  As described below, Dan has made it a point to pass that opportunity forward, giving generously to the school in later years.

Dan did not squander the opportunity he was given.  After Avon, Dan entered Bowdoin College in Maine, again on academic scholarship, graduating in 1976 with a dual degree in Government and History.  (PSR ¶ 231.)  Following that, Dan rounded out his education with a law degree from the University of Connecticut School of Law, earned in 1979.  (PSR ¶ 231.)

Although trained as a lawyer, Dan never practiced law.  Instead, despite passing the bar, he made his way in the insurance industry, becoming a licensed insurance agent in 1980 and founding the companies that would eventually become the Benistar Group.  (PSR ¶¶ 245, 246, 250.)  He also married his wife, Molly, in 1982, beginning what remains 35 years later a devoted and loving marriage.  (PSR ¶ 236.)  Dan has described Molly as his "Rock of Gibraltar," and Molly reports that even through the trials of the past few years, she and Dan are "closer than

---

[1] The letters of support are being supplied to the Court and Government as a bound, tabbed volume.  Citations herein to particular "Tabs" are to that volume.

ever." (PSR ¶¶ 236, 240.) Dan and Molly have a daughter who is, herself, a recent law school graduate. (PSR ¶ 237.)[2]

      B.    <u>Dan's Decades of Generosity to Individuals and Communities</u>

At Benistar, Dan and Molly became a personal and professional unit who used their company not for the simple purpose of benefitting themselves, but to create a workplace family where people would be supported and could flourish. Letter after letter from current and former Benistar employees attests to Jennifer Dougherty's observation that "Dan and Molly care deeply for the employees of Benistar as well as the employees['] family members," and that Dan and Molly's "generosity and caring" are constantly on display through their attention to "[b]irthdays, children's births, sickness of employees and their families, and deaths of employees and their family members." (Tab D.) As noted by Eamonn Murphy, Dan and Molly have, through Benistar, "given jobs to hundreds of local people," and "have treated everyone like family." (Tab E.)

Many of these employees describe the way Dan and Molly came to their aid during difficult moments of their lives. For example, Sharon DeForge, a Benistar billing specialist, describes Dan and Molly's personal involvement and assistance when her husband was fighting an ultimately losing battle with cancer in 2007, explaining that "Dan took the time to talk to me about various types of treatment that he researched and told me not give to up hope." (Tab F.) Moreover, when Sharon's husband passed, "Dan and Molly offered to pay for his funeral expenses" and "told me that I could take as much time off as I needed to cope with this difficult time in my life."

---

[2] The PSR incorrectly reports that Dan and Molly have a grandchild (PSR ¶ 237), which may have stemmed from a misunderstood reference to their two "grand-dogs."

A similar report is provided by Rebecca Gray, a Benistar customer service representative. She recalls that in 2015 when she "lost [her] brother all of a sudden at the age of 33," she "was distraught and didn't know what to do, where to turn and how to cope." (Tab G.) She explains Dan and Molly's reaction, saying: "I've never seen such an outpouring of love and kindness [as] from Dan and Molly. They donated to his funeral. They also checked on my family and mom everyday like we were their family. They sent food, cards, and sent people to our home; they even attended his memorial service. They also afforded me all the time I needed to have off to try to pull myself together." Benistar employee Tasha Gardner tells of the same thing, reporting that: "[S]ince 2009 two of my siblings that were near and dear to my heart passed away and Mr. Carpenter made sure that my family and I had the resources to assist us at the most difficult times in our life. Without him we would not have had the funds to bury my 34 year old sister who passed away [unexpectedly]." (Tab H.)

Other employees describe many times that Dan took a deep and personal interest in their betterment and advancement. Ryan Deasy, for example, describes "Dan's generosity" and "'light up the room' personality," explaining that when he worked at Benistar, Dan "became a mentor to me, just like he had done with so many people in the past." Ryan attributes his subsequent success in obtaining various insurance licenses and "start[ing] several businesses" to Dan's mentorship. (Tab I.)

Mauricio Agudelo tells an even more striking version of the same story. Mauricio explains that as a young man in 2004, he came to Dan to resign from Benistar so that he could "become a paralegal at a large New York City law firm." (Tab J.) Mauricio continues that "rather than to wish me luck and to send me on my way, Dan interjected as a parent might intervene when a child is being impetuous and rash, and sat me down not as a superior, but as a

surrogate."  The two talked "late into that evening," connecting over their "humble" upbringings, "and Dan left that encounter secretly resolved to intervene in my adult education, both through his mentorship and through his sponsorship."  Mauricio attributes his stellar success over the following years to Dan's consistent involvement and mentoring, saying: "I could not have paid off my college loans without his help and generosity; I would not have attended law school and graduated with honors if it had not been for his encouragement; and I would not have received a full scholarship to study at the Yale School of Management[.]"

Two other employees tell nearly identical stories of Dan taking an interest in their schooling and then providing encouragement and material support.  Thyatira Drakeford explains that Dan hired her in 2014 when she was a young single mother of two who had recently been released from a five-year prison sentence.  (Tab K.)  Not content simply to employ her, Dan focused on improving Thyatira's life, "enourag[ing] [her] to go back to school."  She speaks of making simple "small talk" with Dan in the office kitchen about her return to school, and having Dan show intense interest.  After discovering that Thyatira had to stay late at work to use an office computer because she did not own one, Dan "told me he would purchase me my very own laptop computer so that I would never have to struggle to study, research, or write papers ever again. The only clause was that I had to maintain my GPA and strive to make the Dean's List every semester. With my awesome Dell Laptop computer I have kept up my end of the bargain making the Dean's List for Goodwin College every semester."  Thyatira observes that through this and other acts of kindness and support, "Dan and his wife Molly have been nothing short of angels on earth for me."

Shawndrika Gardner has a similar story.  (Tab L.)  As she tells it: "In 2009, I went back to school to get my bachelor degree and I was not able to afford a laptop for school and I spoke

with Mr. Carpenter briefly about school in our company kitchen and told him about some of the supplies that I needed. Mr. Carpenter later buzzed me while I was working and told me that as long as I worked hard and received good grades he would help me with getting the laptop I needed." Shawndrika explained that she has been particularly touched by Dan because she is "an African American female who grew up in the urban area of Hartford, CT and I was given the opportunity to work for an amazing company that never looked at my ethnicity or race but looked at me as a young lady who needed a change in her life."

What comes through from all of these accounts is the personality of someone who, upon the barest mention of a hardship or opportunity, simply cannot resist the urge to seize control and guide the problem to what he perceives to be its best conclusion. As Jonathan Boothroyd, another mentee of Dan's put it, "When he saw someone in need, he made it his personal duty to find a way to get that need taken care of." (Tab M.)

Moreover, Dan's compulsion to take charge and help has never been limited to the problems of his employees. As an initial matter, he has been generous in donating his time and money to community causes over the decades. The Probation Office, itself, recognized "Mr. Carpenter's substantial history of philanthropic work and community service" as a potential ground for a downward departure (PSR ¶ 266), presenting an 18-line chart of some of the various projects Dan has undertaken, dating back to 1991 (PSR ¶ 235).

The Probation Office's somewhat dry chart of some of Dan's good works in the community bears some elaboration. As noted above, Dan has made a point of giving back to Avon Old Farms, in recognition of the opportunity he was provided. As his classmate Dr. Joseph Vecchiarino wrote in a letter of support before passing away very recently: "[Dan] set up a number of charitable trusts for Avon, and his Diogenes Fund has put at least two-dozen young

men through Avon."  (Tab N.)  Dr. Vecchiarino notes that Dan contributed a multi-purpose

soccer field, lacrosse field, and baseball field that bear his father's name and "which everyone

says is the nicest in New England," but observes that "Dan also gave the money for the Kron

Physics Lab, the Chemistry Lab, and the Leavitt-Mendell Day Student Building, plus several

other buildings where Dan gave the money but kept his name out of it, and named the buildings

after his favorite teachers."  Dr. Vecchiarino explains that even after Dan was forced to leave

Avon's board of directors in 2004 because of his indictment in Massachusetts—something that

Dr. Vecchiarino personally "hated Avon" for doing—"Dan still kept giving money . . . , and still

put a number of kids through Avon[.]"

Avon is far from the only school Dan has supported.  Dan established a scholarship for

the Trinity Catholic High School.  (PSR ¶ 235.)  He also started the TOPS program (The

Outreach Program for Soccer for disabled children) and the SCORE program (Stamford

Coalition on Recreation and Education) to help others gain valuable life lessons through soccer.

The SCORE foundation, founded and funded by Dan, helped inner city youngsters play sports

for free, provided the funding for the acquisition of musical instruments for elementary schools,

created scholarships for youngsters to attend dance schools, and donated dozens of computers to

local elementary schools.  And Dan established the "Big Buddy" program, a mentor program

whereby older inner city high school students tutored younger inner city students to help both

groups increase their self-esteem, to help the older students earn money and obtain

extracurricular credits for their college applications, and to help the younger students commit

themselves to education and overcome learning disabilities.

Dan has thrown his support behind other charitable causes as well.  For example, as Matt

Westcott explains, "[W]hen the Sandy Hook Connecticut Massacre took place in December of

2012[,] [o]ne of his companies held a fundraising event for the victims and there was a large turnout from the families of our local community. . . . Dan's companies have been involved with the United States Marine Corps raising money for Toys for Tots during the holiday season[.] Dan's companies have also been involved with a local food pantry in the Hartford[,] Connecticut area providing holiday meals to local families over the years." (Tab O.)

Dan has been committed to local youth sports as well. He coached his daughter's soccer teams, and has regularly coached and sponsored the teams of numerous others in Stamford and Simsbury. In that way, he has personally had a positive influence on generations of young people. Matt Westcott reports: "I bumped into a young wom[an] a couple years ago . . . that knew Dan as her soccer coach around 15-20 years ago. She had nothing but good things to say about Dan. It was almost as [though] the young wom[an] considered Dan to be a father figure to her as she told me that she had grown up in a broken home with just her mother. She told me about all the good times and life lessons that she and the other girls on the soccer team had learned from Dan and Molly. She told me about how selfless the Carpenters[] had been with their time, as well as, the overall sponsorship of the soccer team." (Tab O.)

Overall, as Mary Bursey puts it: "From 'adopting' poor families in his town and giving so many the best holidays of their lives, to coaching the kids' soccer teams, to rescuing shelter animals, to countless charitable works, [Dan] is one of the best men I know. Everyone I know, family, friends and sometimes even people he didn't know well, have Dan as their 'first one to call' when there is trouble." (Tab P.)

Indeed, finding no problem that he can resist deploying his energy to solve, Dan has found unusual ways to jump in and be helpful to members of his community. For example, Ineke Murphy, a Benistar employee, describes how she was also a hostess at a local restaurant

called "Pettibone's," a landmark from the Revolutionary War and a community favorite that employed dozens of people.  She explains that the restaurant "was tanking," but that just "[w]hen it seemed that Pettibone's would have to close its doors forever, Dan jumped in with both feet" in an attempt to save the restaurant and "resuscitat[e] not only the downtrodden staff, but the community as well."  (Tab Q.)  Although Dan was unsuccessful, he "fought, bargained, finagled, [and] 'wheeled and dealed' with vendors to save th[e] restaurant and its staff, even giving some of the staff part-time positions with Benistar when hours had to be cut to support payroll." Eamonn Murphy, a bartender at the restaurant, recalls Dan's efforts as well, explaining that Dan, for a period, "was able to save many jobs (including my job) by putting in his own money into the restaurant, while not having any restaurant ownership experience."  (Tab E.)

Another in the seemingly endless series of individuals whom Dan has turned his attention to helping is Marshall Gardner, the husband of a Benistar employee.  (Tab R.)  As Marshall recalls it, he had a conversation with Dan in passing in which he mentioned that he was unemployed but for some part-time landscaping work that was not paying the bills.  Dan said he would keep Marshall in mind.  Marshall explains what happened next: "[O]ne day my wife came home with great news.  She explained to me that Mr. Carpenter has a friend who has a transportation company and he needs a driver and if I would be interested in the job.  I was so excited and could not believe that he never forgot about our conversation. . . . I am so grateful of the opportunity that I was given to me and it means a lot to me and my wife. Mr. Carpenter helped me when no one else would[.]"

Perhaps the episode that best illustrates Dan Carpenter's uncontrollable urge to be useful is the assistance he provided to fellow prisoners while imprisoned at FPC Canaan on his Massachusetts conviction.  (Tab S.)  Needless to say, that was a dark period in Dan's life.  As the

PSR reports, the impact of that case—even before the imprisonment that resulted from it—put Dan into a depressed state that included suicidal thoughts.  (PSR ¶ 240.)  Moreover, by the time Dan surrendered to serve that sentence, he had been charged in the instant case.  Yet despite every reason to turn inward and wallow in despair, Dan did just the opposite.  Seeing a need for services that he knew he could provide, he spent his time in prison working as a tireless advocate for dozens of fellow inmates in their respective cases.

Dan's bunkmate, Angelo Efthimiatos, explains, for example, that Dan helped him with both "an 8 page letter to the Camp Administrator" on Angelo's behalf, and that Dan "hand wrote a 50 page brief that [Angelo] submitted to the Supreme Court."  (Tab S.)  But Dan did not reserve his help for his bunkmate.  He helped everyone.  With the reduction in the sentencing guidelines for certain drug offenses, Dan volunteered his help to anyone with a Section 3582(c)-reduction claim, preparing "dozens of 3582(c) motions for many indigent Black and Hispanic inmates."  Angelo estimates that "Dan has helped over 30 inmates . . . to get their sentences reduced," including one who, through Dan's help, "received FOUR YEARS off his sentence."  Dan also "wrote 2255 motions for a dozen other inmates."

In this most trying period of Dan's life, Angelo explained that Dan "worked selflessly and tirelessly to help guys he barely knew," while he "religiously refused to accept anything for the services and counsel that he provided people."  When Dan was released, "over 60 inmates . . . came up to hug Dan or sh[ake] his hand and wish[] him well, some with tears in their eyes."  Angelo predicts that "anyone who encountered Dan at Canaan would gladly testify that Dan Carpenter is a certifiable Saint."  (Tab S.)

C.      Dan's Mental Health and His Prior Conviction

In light of the foregoing, it is difficult to square that this is Dan's second criminal conviction.  But it becomes somewhat easier when one considers the diagnosis recently rendered by Dr. Bruce Shapiro, Clinical Professor of Psychiatry at Columbia University.  After examining Dan and receiving pertinent information about him and his family, Dr. Shapiro has reached the conclusion "to a reasonable degree of medical certainty" that Dan "has a Bipolar, type II psychiatric disorder."  (Dr. Shapiro's Pre-Sentencing Psychiatric Evaluation Report at 1 (hereafter "Report").).)[3]  Dr. Shapiro explains that among the symptoms of this mental disorder are various unusually pronounced features of Dan's personality that the Court, the Government, and anyone who has encountered Dan has undoubtedly observed, including: "Inflated self-esteem or grandiosity"; "pressure to keep talking"; "[f]light of ideas" and racing thoughts; "[i]ncrease in goal-directed activity"; and "[e]xcessive involvement in activities that have a high potential for painful consequences."  (Report at 4.)

The presence of a mental illness does not excuse criminal activity.  Dr. Shapiro makes that point expressly in his report.  (Report at 4-5.)  But the symptoms of Dan's illness do start to trace a unifying thread through the many tremendously good and few unfortunately bad acts in his life.  Looking at the good, it takes perhaps a certain amount of narcissism and goal-directed hyperactivity to appoint oneself the repairer of everyone's problems—the person, as Jonathan Boothroyd put it, who upon "s[eeing] someone in need . . . ma[kes] it *his personal duty* to find a way to get that need taken care of."  (Tab M.)  An inflated grandiosity of thinking can be seen, for example, in someone who hears of a folding community restaurant and attempts to save it despite no restaurant experience, or in someone who arrives in prison and immediately takes on

_____

[3] Dr. Shapiro's report is being supplied directly to the Court and the Government.

the role of counsel for dozens of defendants in an area of the law with which he is completely

unfamiliar.  Underlying it all and giving direction is Dan's inherent generosity and altruism, but

it is not hard to see that the engine of this activity has been fueled to some extent by Dan's

bipolar disorder.

The same can be seen in Dan's prior conviction.  As explained in the Presentence Report,

Dan's prior fraud conviction stemmed from the finding that while acting essentially as a bailee of

real estate proceeds that the proceeds' owners were permitted to park for up to six months before

reinvesting, Dan held the money not in safe and secure investments but, instead, used it to

engage in speculative trading, ultimately suffering catastrophic losses.  (PSR ¶ 223.)  Looking at

this offense, two aspects of Dan's personality show through.

First, although the court found that Dan committed fraud, it was also clear to the court

that Dan never meant to hurt anyone—a conclusion that comports with the altruism and

generosity of spirit that have characterized Dan's entire life.  As the court explained at

sentencing, the fraud was "different from perhaps other kinds of fraud" because "[t]his was not a

fraud that took money from someone intending never to return it.  It was actually part of the

business plan that it be returned at some point."  (*See* D. Mass. *Carpenter* Sent. Tr. 89, Ex. 1

hereto.)  As the court explained, "[T]he scheme was intended to produce a flow of money that

Mr. Carpenter thought he could trade with and make money on but it was an objective, of course,

to make money and not to lose it."  (*Id.*)  That is not to say there was anything particularly

altruistic about the plan—Dan was trying to make a profit for his own company—but it would

have been out of character for him to do so deliberately at someone else's expense.  The

sentencing judge recognized that he did not do so.

The other part of Dan's personality that shows through is the grandiose and risk-taking exuberance that characterizes bipolar disorder.  With inflated self-esteem and narcissism will inevitably come a degree of unwarranted reliance on one's own clouded judgment.  A bad idea can be confused for a bright idea, at which point it is manically followed to ruin.  That seems to be a fair description of what led to Dan's prior conviction.  Indeed, the sentencing court indicated as much, explaining that the speculative trading "apparently worked for quite a while which may have over-stoked Mr. Carpenter's confidence that it could keep working."  (*See* D. Mass. *Carpenter* Sent. Tr. 89, Ex. 1 hereto.)  Ultimately, while Dan's prior conviction is a regrettable part of his history, the lack of malevolence and the likely contributing factor of mental illness are notable.

## II.    Section 3553(a)(1)—The Nature and Circumstances of the Offense

The offense here is not dissimilar to Dan's prior offense.  As was true of that offense, this Court's findings concerning the STOLI scheme do not depict an offense committed to swindle any victim out of any sum of money or profit from any victim's loss.  What the Court's findings show is a plan to conceal information from insurance companies to cause them to issue policies that they would have been happy to issue if non-STOLI, but would not have issued had they known they were STOLI.  Although there was no guiding legal precedent on the matter at the time, the Second Circuit has since explained that that defrauds insurance companies of their right to material economic information in determining whether to issue a policy.  But there is no showing that Dan knew of the specific economic harms that the insurance companies have since claimed STOLI policies cause them to suffer.

Indeed, the offense, again, seems consistent with the grandiose, risk-taking behavior associated with Bipolar Type II Disorder.  Specifically, the conduct that the Court attributes to Dan in its verdict is consistent with that of someone who believed as a result of inflated self-

confidence born of hypomania that he had found an ingenuous way to profit that would be to no one's loss, and that it could be accomplished with no harm to anyone even if it required bringing the insurance companies along as unwitting participants.

Moreover, as set forth in the discussion of the Guidelines loss enhancement below, the offense neither had the potential to be, nor was, a particularly destructive one.  To the contrary, it involved a scheme to withhold from insurance companies a single fact—the intention to resell insurance policies procured on various insureds—which had the potential to make the policies only modestly less valuable than anticipated to the insurance companies that issued them, and played out in a way that caused no actual harm to the insurance companies at all.  In fact, even before the initiation of the prosecution in this case, the biggest loser on the policies was Dan.

## III.    Section 3553(a)(4)—The Applicable Sentencing Guidelines Range

Driven primarily by a nearly $200 million intended loss amount that bears no relation to the offense itself, as well as by a litany of smaller enhancements, the Government has asserted that the applicable offense level is 45 and that the applicable Guidelines range is life.  (PSR ¶ 217.)  Were this an accurate application of the Guidelines, it would be a situation, as in *Adelson*, where "the guidelines have so run amok that they are patently absurd on their face." *Adelson*, 441 F. Supp. 2d at 515.  But although the Guidelines have their flaws, the flaw here is in the Government's misapplication of them—particularly the Government's attempt to portray this as a $200-million fraud when, in fact, Dan intended no specific financial loss to anyone, and no actual loss resulted.  As described below, this and numerous other of the Government's proposed enhancements should be rejected.

### A.    Loss Amount Enhancement

Adopting the Government's loss models and calculations, the PSR assumes that the offense caused an intended loss of $194,283,879 and an actual loss of $53,253,560.53, resulting

21

in a 26-level enhancement for intended loss or, alternatively, a 22-level enhancement for actual loss.  (PSR ¶ 210.)  As explained below, these enhancement calculations are incorrect and should be rejected.

The fundamental problem that runs through all of the Government's loss calculations is that the Government conflates the insurance companies' cost of issuing life insurance policies generally (*i.e.*, the cost of their being in the life insurance business) with the far more limited harm that resulted from having been misled into issuing STOLI policies specifically.  When one focuses on the *specific* economic disadvantages potentially caused by the STOLI deception—to use the Court's words, when one focuses on the "discrepancies between the benefits the [insurance companies] reasonably anticipated from issuing the policies and the benefits they actually received" (Verdict at 82)—three things become apparent.

<u>First</u>, as to intended loss, the proper measure of the potential fraud-loss to the insurers does not include every payment the insurer could ever have to make on a policy, and it certainly does not include the death benefit that the insurers willingly and knowingly assumed the risk of paying.  If what was concealed from the insurers was that the policies were STOLI, then the fraud-loss is limited to the specific economic harms that the Court found were associated with STOLI: (i) a decreased amount of investment capital based on lower premium payments; and (ii) losses associated with fewer than expected lapsed policies.[4]  The Government has made no effort to calculate these figures, but they are likely orders of magnitude smaller than the number produced by the Government's flawed model.

---

[4] The defense does not concede that these harms actually exist, and, indeed, the option to pay a minimum premium exists on any policy, STOLI or non-STOLI.  But the defense acknowledges that these reflect the Court's findings.

Second, also as to intended loss, a defendant is not liable for every potential loss the offense might cause the victim, but only for the loss that he *purposely* and subjectively sought to inflict. *See* U.S.S.G. § 2B1.1 cmt. 3(A)(ii). Here, there is nothing in the record to suggest that Dan knew that these two specific economic harms were associated with STOLI policies. Indeed, as discussed, he did not intend any specific financial harm to anyone. As a result, because Dan was not subjectively aware of the specific potential harm associated with STOLI, he could not have purposely sought to inflict that harm, and the intended loss is zero.

Third, as to actual loss, while a loss might have been possible had events unfolded differently, the way these policies played out, no actual loss occurred. The insurance companies saw no losses from reduced lapse rates. To the contrary, roughly *three-quarters* of the policies lapsed, producing significant gains for the companies. Moreover, to the extent the companies saw any losses from the other economic detriment of STOLI—lower investment income from receiving reduced premiums—the gains from the incredible lapse rates more than made up for that. Accordingly, there was no actual loss.

Ultimately, the absence of any loss reflects reality far better than the Government's suggestion that this was a crime involving hundreds of millions in loss. Even if the offense occurred as the Government has claimed, it involved a minor deception about one minor aspect of the policies—whether they were to be resold—and while that might have had the potential to produce some modest economic harm to the insurers under different facts, (a) Dan was unaware of those harms, and (b) they did not ultimately result in any event.

1.    The Government Incorrectly Bases Intended Loss on Issues Unrelated to STOLI

The Government calculates its intended loss figure based on 84 policies. For each of those policies, instead of looking to the particular loss that might have resulted from the fact that

the policies were STOLI when they had been represented as non-STOLI, the Government instead tallies up *everything* that could be expected to happen over the hypothetical life of the policy, regardless of whether it had anything to do with STOLI.  Specifically, the Government says the intended loss is the death benefit that the insurance company would eventually pay, *plus* the first-year brokerage commission that the insurance company would pay, *minus* the premiums that the insurance company would receive over the expected life of the policy,[5] *minus* the investment interest that the insurance company would be expected to earn on those premiums during the expected life of the insured.  (PSR ¶¶ 168-70.)

This intended-loss model is unsupported by law or logic.  As to law, the PSR notes that the Government's model tracks that used by the Government in *Binday*.  (PSR ¶ 168).  But that model was snubbed start to finish in *Binday*.  First, even the Government in *Binday* advocated against using this intended loss calculation for purposes of the final Guidelines calculation, acknowledging that it "overstat[ed] the seriousness of defendants' conduct"—not a ringing endorsement of the model's fidelity to reality.  (*See Binday* Gov't Sent. Mem. at 65, Ex. 2 hereto.)  The district court in *Binday*, in turn, thought so little of its relation to reality that it opted to use actual loss rather than intended loss, even though the Guidelines have a stated preference for intended loss.  (*Binday* Sent. Tr. 38, Ex. 3 hereto; *see also United States v. Kergil*, 2017 WL 3726044, *3 (S.D.N.Y. Aug. 16, 2017) (noting that the court "specifically rejected an 'intended loss' approach" for the *Binday* defendants)).  Finally, in light of the district court's choice not to rely on intended loss, the Second Circuit had no occasion to reject or endorse the intended-loss model.  *See United States v. Binday*, 804 F.3d 558, 595-96 (2d Cir. 2015).

---

[5] The Government assumed that premiums would be paid at the minimum level needed to keep the policy in force.

The Second Circuit *did* have an opportunity several weeks ago to give its full support to the intended-loss model pressed by the Government here, but it declined do so.  Instead, in a summary order in *United States v. Quatrella*, No. 17-1786-CR, 2018 WL 798400, at *3 (2d Cir. Feb. 9, 2018), the Circuit held that "[the defendant] ha[d] never offered an alternative method for estimating intended loss" and that "'the absence of a better alternative weighs in favor of concluding that the method used here is a reasonable one,'" and so found merely "no clear error" in the district court's reliance on the Government's intended-loss model.  *Quatrella*, 2018 WL 798400, at *3 (quoting *Binday*, 804 F.3d at 597).

Thus, there is little precedential support for the Government's model, which the Circuit appears at best to have grudgingly tolerated twice on the facts of each case.  Both times the Circuit has made clear that it would have been open to "a better alternative" to the Government's models had the defendants in those cases presented one.  *See Binday*, 804 F.3d at 597; *Quatrella*, 2018 WL 798400, at *3.

The Circuit's request to be presented with a better alternative is understandable because the Government's intended-loss model, as a matter of logic, makes no sense.  Despite the Second Circuit's general principle that "loss must be the result of the fraud" and "[l]osses from causes other than the fraud . . . [must] be excluded from the loss calculation," *United States v. Ebbers,* 458 F.3d 110, 128 (2d Cir. 2006), the Government's intended-loss model employs a sweeping approach that inappropriately treats every bit of cost and every bit of revenue associated with the entire hypothetical life of an insurance policy as being attributable to fraud.  In other words, the Government calculates the extent to which the policy *as a whole* would be a benefit or a loss to the insurance company, not, as this Court has said, the "discrepancies between the benefits the

25

[insurance companies] reasonably anticipated from issuing the policies and the benefits they actually received." (Verdict at 82.)

By doing this, the Government ignores its *own* proof and its *own* arguments about the economic harm to insurance companies from being deceived into issuing STOLI policies that they believed were non-STOLI.  The evidence on that at trial was very specific.  According to this Court's verdict—and according to a recitation in the PSR to which the Government does not object (PSR ¶¶ 17-19)—there are only *two* relevant ways in which "STOLI policies differ from traditional policies. . . . The first relates to the way the policies are funded, the second involves lapse rates."  (Verdict at 12.)  On funding, the Court found that: (i) insurance companies expect to receive level premiums on non-STOLI policies, meaning premiums that exceed the charges and fees assessed against the insured; (ii) they have found through experience that they receive only minimum premiums on STOLI policies; and (iii) although the difference between level premiums and minimum premiums would eventually be returned to the insured in the death benefits, insurance companies in the interim are deprived of "a source of investment capital" because "STOLI policies do not build up cash value" and, furthermore, "there may be no cash value to offset the death benefit required to be paid."  (PSR ¶¶ 13-14.)  As to lapse rates, the Court found that insurance companies have come to expect "that a certain percentage of insureds will allow their [non-STOLI] policies to lapse for various reasons . . . which usually results in a net gain to the carrier," whereas "STOLI policies have a lower lapse rate than regular [*i.e.,* non-STOLI] policies."  (PSR ¶ 14.)

The Government's intended-loss model ignores these specific economic harms in favor of a sweeping approach that includes *all* losses, irrespective of whether those losses could be attributed to the offense conduct or are simply potential actuarial losses inherent to *all* life

insurance policies, STOLI and non-STOLI alike.  Most significantly in that regard, the Government's model incorrectly treats an insurance company's exposure to the risk of eventually paying a death benefit as fraud-loss, even though that risk is not one of the economic harms that could result from concealing that a policy is STOLI.  Put simply, even if the insurance companies here were misled about whether a policy was procured for the purpose of resale, the risk of paying a death benefit was one that they willingly took on with full appreciation of accurate facts—indeed, it is a risk that the companies are in the business of taking on.  The risk of paying out a death benefit was in no way affected by the fact that the policies were secretly STOLI as opposed to non-STOLI.  *See Kramer v. Lockwood Pension Servs.*, 653 F. Supp. 2d 354, 379 (S.D.N.Y. 2009) (recognizing that "[the insurance company] entered into a calculated business transaction in which it risked paying a large death benefit, but stood to gain from years of large premiums.  The damage [of] potentially having to pay the large death benefits, was not caused by [the defendant's] alleged misrepresentation [about the STOLI nature of the policy], but was always part of the bargain [the insurance company] entered.").

The Government has previously acknowledged this reality.  In *United States v. Neuman*, 11 Cr. 134 (E.D.N.Y.), the defendant engaged in a similar STOLI scheme for three years, during which time he and his co-conspirators "obtained hundreds of millions of dollars in life insurance" through the submission of fraudulent applications that disguised the STOLI nature of the policies.  (*See Neuman* Gov't Sent. Mem. at 2, Ex. 4 hereto.)  But the Government did not take the indiscriminate approach to loss that it takes here, and did not rely on the hundreds of millions of dollars in potential death benefits to claim hundreds of millions of dollars in intended loss.  Instead, the Government focused there on the specific economic detriments of STOLI.  In particular, the Government noted that lapse rates were a key difference between STOLI and non-

STOLI policies and, thus, were a principal driver of the resulting economic harm.  (*Id.* at 2-3.)
Implicitly (and correctly) recognizing that the amount of the potential death benefits was
irrelevant, the Government stipulated with the defendant that "a reasonable estimate of the loss
suffered by the insurance companies was more than $120,000 but less than $200,000" and
ultimately requested that the Court "adopt the loss amount of $120,000."  (*Id.* at 3.)

The Fifth Circuit, in a well-reasoned summary order in *United States v. Bazemore*, has
similarly rejected the Government's theory that everything about an insurance policy becomes
fraud-loss simply because the insurance company was deceived about whether the policy was
STOLI.  In that case, the Government had successfully argued to the district court that the
intended loss of the defendant's STOLI scheme was the total amount of the death benefits
obtainable under the policies—$81 million—because that was "the dollar amount placed at risk"
by the defendant's fraud.  *Bazemore*, 608 F. App'x at 213.  The Fifth Circuit rejected this
approach and ordered resentencing, explaining that, as a general matter, the insurance companies
had voluntarily taken on the various risks and rewards associated with issuing the policies—
including paying a death benefit—and that it was *only* the unknown and unwanted risks that
were associated with the policies secretly being STOLI that could be included in intended loss.
*Id*. at 215-16.  In other words, the Government was "require[d] . . . to establish that the STOLI
policies imposed a financial risk to the insurers *beyond* the risk they believed they were receiving
in issuing life insurance to Bazemore's applicants."  *Id*. at 215 (emphasis added).  The Fifth
Circuit noted that the government in that case (as in this case) "ha[d] not attempted to make this
showing, let alone quantify any purported economic harm."  *Id.* at 216.  Accordingly, the Fifth
Circuit remanded and explained that "[o]n remand, an intended loss enhancement cannot be
applied unless the government proves by a preponderance of the evidence that the STOLI

policies posed a risk of financial loss to the insurers that the same policies issued to qualified

insureds—the applicants the insurers thought they were getting—did not." *Id*. at 216.[6]

Further undermining the Government's intended-loss model in this case is that, even on

its own terms, something is plainly wrong with it because it produces a result that intuitively

makes no sense.   According to the Government, the intended-loss chart attached to the

Presentence Report shows how an insurance company would have fared if the insured had paid

the minimum premium.  That minimum premium is calculated to cover the sum of the

company's expenses and the actuarial probability that the insured will die in a given year (*i.e.*,

the bare cost of insurance).  Overall, although an insurance company might do better if the

insured opted to pay a level premium, one would expect the insurance company to price its

minimum premium so that the company does no worse than roughly break even if the insured

chooses the minimum.  But the Government's intended-loss chart inexplicably predicts massive

losses on each and every policy.  Since insurance companies would not price their policies to

operate at a massive loss, something about the Government's data or its assumptions (or both) is

obviously wrong.  Indeed, in *Bazemore*, the Fifth Circuit rejected the Government's intended-

loss model on exactly this ground, observing that the Government's analysis could not be correct

_____

[6] Testimony from *Binday*, cited by the Second Circuit, makes the same point.  In that case, an insurance company representative explained that death benefits are not a loss to an insurance company, and certainly not a STOLI-related loss.  "'You have the individual who pays one premium and dies six months later.  You lose a lot of money on that policy but we don't consider that a loss. . . .  [T]hat's the benefit of insurance because there's another 900 people who paid a premium who didn't die.'"  *Binday*, 804 F.3d at 597 (quoting insurance company representative's testimony).  The loss from STOLI, the representative explained, is that STOLI policies are somewhat less profitable than non-STOLI policies in specifically identifiable ways yet these policies "weren't priced for STOLI."  *Id*. at 573.  Thus, another way to think of the problem with the Government's model is that, unlike that proposed by the defense in this submission, it makes no effort to answers the question: How *would* the policies have been priced for STOLI?

because, if it were, even "a legitimate policy would show an intended loss because the premiums paid over the course of the insured's expected lifetime would not reach the face value of the policy." *Bazemore*, 608 F. App'x at 215.

The same is true here. There is no reason that an insured's election to pay the minimum premium would create the situation reflected in the Government's intended-loss chart, in which every insurance company's expectation on every policy is apparently to suffer a massive loss. Thus, even on its face, there is obviously something wrong with the Government's chart, and it is neither the defense's burden nor within its capacity (since the Government has not supplied its data) to figure out what.[7]

Thus, for all of the foregoing reasons, the Government's intended-loss model should be rejected. Instead, the "better alternative" that the Second Circuit has twice requested—one that measures the "discrepancies between the benefits the [insurance companies] reasonably anticipated from issuing the policies and the benefits they actually received" (Verdict at 82)—is self-evident. It is one that is based on the two economic disadvantages of STOLI that the Court found at trial. It is those two economic disadvantages of STOLI that represent (if anything does) the "financial risk to the insurers *beyond* the risk they believed they were receiving in issuing life insurance to [the] applicants" in this case. *Bazemore*, 608 F. App'x at 215 (emphasis added).

---

[7] Although the Court should reject the intended- and actual-loss charts proffered by the Government, at a minimum the Government should be required as part of its burden to reveal and explain the underlying data, perhaps at a *Fatico* hearing. The charts present the Government's summary conclusions about inputs—like the total projected premiums that would be paid on a policy at the minimum level over the course of a policy's hypothetical lifespan—but offer nothing that allows the reader to identify the data source or confirm the accuracy of the total. Given that the ultimate results are facially implausible, greater understanding of the underlying data and methodology is required.

Calculation of the potential loss is beyond the capability of the defense, and the defense does not bear the burden of proving loss amount in any event. *Cf. United States v. Hartstein*, 500 F.3d 790, 796-97 (8th Cir. 2007) (finding Government's failure to support its loss calculation with proper evidence resulted in improper burden shifting to the defendant to disprove Government's loss allegation). Moreover, as explained in the next section, it is unnecessary to make the calculation on the facts of this case, because the Guidelines make clear that intended loss is that which a defendant purposely intended to inflict, and there is nothing to suggest that Dan was aware of these two potential harms such that he could have intended to inflict them. But if one *did* calculate the number, it is easy to see that it would be many orders of magnitude lower than the outlandish, nearly-$200-million figure proposed by the Government. For the premium funding issue, the loss for each policy would presumably be some modest rate of return (*e.g.*, 2-4% annually) that the insurance companies might have received on an investment corpus made up of the difference between the level-funding premiums that the companies expected and the minimum premiums that they would receive. For the lapse-rate issue, the Government estimated in *United States v. Neuman*, 11 Cr. 134 (E.D.N.Y.), that the lapse-rate-related loss for hundreds of millions of dollars worth of policies was between $120,000 and $200,000. (*See Neuman* Gov't Sent. Mem. at 3, Ex. 4 hereto.) Thus, while it would be up to the Government to carry its burden of calculating these numbers, it is clear that this alternative model, and not the Government's model, is the appropriate one for estimating loss that might have resulted from the fraud, and it is clear that the resulting figure would be vastly smaller than what the Government has proposed.[8]

---

[8] Indeed, as discussed below, because approximately three-quarters of these policies lapsed to the benefit of the insurance carriers, even this smaller potential loss plainly did not come to pass in actuality.

2. <u>Dan Carpenter Did Not Purposely Intend to Inflict *Any* Harm, Since He Was Unaware of the Economic Harms that Insurers Have Claimed Result from STOLI</u>

Intended loss "means the pecuniary harm that the defendant *purposely sought to inflict*." U.S.S.G. § 2B1.1 cmt. 3(A)(ii) (emphasis added).  This definition went into effect post-*Binday* pursuant to Amendment 792 to the Guidelines.  As relevant here, Amendment 792 clarified that a defendant's *subjective* expectation of loss governs the intended loss inquiry, not the objective risk of loss itself.  *See* U.S.S.G. Supp. to App. C, amend. 792 (2015) (Ex. 5, hereto.)  (noting split among federal courts of appeals and adopting subjective approach).

The Government ignores this distinction, but it is critical here, because there was no proof that Dan had any subjective awareness that STOLI policies caused the specific types of economic harm that the Court found.  Although the record establishes that Dan was aware of what he called the "evils of STOLI" (D. Conn. *Carpenter* Trial Tr. 2818 (hereafter "Trial Tr."))—*i.e.*, that "the providers did not want to issue STOLI policies and . . . had taken [actions] to detect and avoid STOLI business" (Verdict at 81)—there is no proof that Dan was aware of the two specific economic harms that the insurance companies claimed to suffer: lost investment income from lower premium payments and lapse-rate-based loss.  Moreover, it is worth noting that although *Binday* and other more recent analyses have *subsequently* discussed these potential economic harms, the defendant's conduct long predated those discussions.

In the absence of proof that Dan was aware of the specific economic harms of STOLI, there is no intended loss in this case.  The fact that Dan might have unwittingly exposed insurance companies to a potential loss based on the two economic harms of STOLI is not, itself, enough to treat it as intended loss if he did not purposely know and intend it.  Nor is this an unreasonable result.  Indeed, it is the very basis for the recent Guidelines amendment.  For a defendant to be held responsible for a loss that did not *actually* occur, he should at least have

specifically intended it.  *See* U.S.S.G. Supp. to App. C, amend. 792 (2015) (Ex. 5, hereto.) (recognizing that "sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability").  Here, there is simply no evidence that Dan was aware of the claim that STOLI policies cause insurers to lose investment income by being deprived of level-funding premiums or through lower lapse rates.  In the absence of that knowledge, he could not have "purposely sought to inflict" these harms.  U.S.S.G. § 2B1.1 cmt. 3(A)(ii).

3.     On the Facts of This Case, the Insurance Companies Suffered No Actual STOLI-Related Loss

The Government's actual-loss model is more complicated than its intended-loss model, but not to any useful effect, because it is no more tied to the specific harms of STOLI than the Government's intended-loss model.  Once again, instead of calculating the STOLI-related harm to the insurance companies—in other words, calculating the difference between the value of a non-STOLI policy on a particular insured and the value of a STOLI policy on that same insured using the two identified harms of STOLI—the Government simply produces a rough scorecard of how much money the insurance companies are up or down for having issued policies on the insureds at all.  For all the reasons already discussed, such a model does nothing to estimate "the reasonably foreseeable pecuniary harm *that resulted from the offense*."  U.S.S.G. § 2B1.1 cmt. 3(A)(i).  Moreover, as discussed below, it takes little analysis to recognize that the potential harms of STOLI to insurance companies produced no actual loss in this case, because the policies at issue lapsed at an incredible rate, producing significant gains for the insurance companies.

The Government's actual-loss model is complicated and completely untethered from STOLI.  First, the Government differentiates between policies that remain active, and those that

have terminated either through payment of a death benefit or lapse.  For policies that have

terminated, the Government essentially just tallies up whether the policy made or lost money for

the insurance company, adding up the commissions paid out by the insurance company, *plus* any

death benefit paid out by the insurance company, *plus* fees incurred by the insurance company,

*minus* any premiums received by the insurance company.  (PSR ¶¶ 171-72.)  If the policy lapsed

instead of ending in the insured's death, the Government adds the fees that the insurance

company paid to reinsure the policy, but if the policy ended in death, reinsurance fees are not

included.  (*Id*.)  Reinsurance benefit payouts received by the insurance company are also

disregarded.  (*Id.*)  For policies that remain active, the Government calculates loss simply as the

commissions paid by the insurance company.  (*Id.* at ¶ 173.)  In tallying up the winners and

losers among the policies, the Government looks victim-by-victim.  If a company suffered an

overall loss on its various policies, that loss is included in the Government's overall loss total.

(*Id.*)  If a company had an overall gain on its various policies, the Government ignores that

company altogether.  (*Id.*)  The overarching result of the Government's model is that: (i) policies

in which death benefits have been paid produce massive losses attributable largely to payment of

the death benefit itself; (ii) policies that are active produce smaller losses in the amount of the

commissions paid; and (iii) policies that have lapsed produced *gains* for the insurance

companies.

        Given that essentially nothing about the Government's actual-loss model ties back to the

deception over STOLI in any respect, it is hardly surprising that the model has failed to garner

full-throated judicial support.  In *Binday*, the district court calculated the Guidelines range using

this actual-loss model, and then berated it in the next breath, saying that "[t]his, of course, is the

case that proves the idiocy of retaining the federal [sentencing] guidelines structure," and then

proceeded to sentence the defendants "the old-fashioned way," meaning with little regard for the Guidelines range that this nonsensical loss model produced.  (*Binday* Sent. Tr. 40-41, Ex. 3 hereto; *see also Kergil*, 2017 WL 3726044, *3 (indicating that the court "did not sentence [the *Binday* defendants] based on loss amount")).

On appeal, the Second Circuit was equally unenthusiastic about the Government's actual-loss model, given that it was little more than an irrelevant measure of which insureds happed to have died by the time of sentencing.  As the court explained:

> We agree [with the defendants] that the [G]overnment's approach is unlikely to yield an accurate measure of the ultimate performance of the pool of policies.  Presumably, in any collection of policies some insureds will die earlier than expected and some later. Tallying the insurer's gains and losses by referencing only those insureds that died in the first few years of the policies therefore provides a distorted view of the group's ultimate overall performance.

*Binday*, 804 F.3d at 597.  The Circuit highlighted the strengths and weaknesses of the defendants' various objections, but noted that "the defendants ha[d] not offered an alternative calculation for actual loss, nor is one readily apparent."  *Id.*  While recognizing that "it is not defendants' obligation to establish loss amount," the Second Circuit bemoaned "the absence of a better alternative" in that case, found the Government's actual-loss model not clearly erroneous, and expressly "le[ft] open the possibility that on different facts, the method employed here may not provide a reasonable estimate of actual losses." *Id.*

The district court and court of appeals in *Binday* were right to be unimpressed with the actual-loss model pressed by the Government here.  Just as it does with intended loss, the Government ignores the specific harms supposedly associated with the fact that the policies were secretly STOLI, and instead holds the defendant responsible for anything that resulted from the fact that the policies were issued at all—in particular, that some of the insureds died and death benefits were paid.  But as the Fifth Circuit appropriately recognized, the possibility that some of

the applicants would die and that a death benefit would be paid was a risk that the insurance

companies knew they were taking on.  And to show fraud-related loss, the Government needs "to

establish that the STOLI policies imposed a financial risk to the insurers *beyond* the risk they

believed they were receiving in issuing life insurance to [the] applicants." *Bazemore*, 608 F.

App'x at 215 (emphasis added); *see also Kramer,* 653 F. Supp. 2d at 379 ("The damage [of]

potentially having to pay the large death benefits, was not caused by [the defendant's] alleged

misrepresentation [about the STOLI nature of the policy], but was always part of the bargain [the

insurance company] entered.").  Only by showing a loss that the insurance companies were

*unaware* of—*i.e.*, by showing "discrepancies between the benefits the providers reasonably

anticipated from issuing the policies and the benefits they actually received" (Verdict at 82)—

can the Government show loss "that resulted from the offense."  U.S.S.G. § 2B1.1 cmt. 3(A)(i).

As already noted, that would be done by looking to the effect of the specific harms of STOLI—

lower premium payments to be used for investment and reduced lapse rates—not the payment of

death benefits.

Although making up a less significant part of the actual loss calculation, the Government

also mistreats the policies that are still active.  As is apparent from the Government's chart, all or

virtually all of the active policies are currently in the black; *i.e.*, they have brought in more in

premium revenue than has been spent on commissions and other expenses.  Indeed, in that

respect, they are like the many lapsed policies on the chart, which likewise are almost all

calculated to have produced gains for the insurance carriers.  But the Government nonetheless

treats the currently active policies as generating losses—specifically, in the amount of the

commissions paid—presumably on the grounds that the ultimate outcome of these active policies

is unknown and, so, there is a risk that death benefits could be paid.  The fatal flaw in this

reasoning is that the policies need not remain active—under governing state law, they are all cancelable even outside of the ordinary contestability period by virtue of having been procured by fraud.  Thus, the insurance companies could cancel them and lock in a profit; that they have not done so indicates that they foresee further profit—not loss—going forward.

Curiously, the Government in *Quatrella* agreed with, and defended, this position just a few weeks ago before the Second Circuit and prior to that in this District before Judge Thompson.  In *Quatrella*, the defendant had fraudulently induced insurance companies to issue three STOLI policies, two of which had lapsed and the third of which had remained active as of sentencing.  *Quatrella*, 2018 WL 798400 at *1.  Despite $272,000 worth of total commission payments from the insurance companies to the defendant, the Government adopted the following position at sentencing:

> Because the two Lincoln policies lapsed and the West Coast policy remains in effect, no death benefits have been paid on any of these policies.  In fact, the life insurance providers received more money in premiums than they paid out in commissions and other expenses. *As a result, the insurers did not suffer any actual loss.*

(*Quatrella* Gov't Sent. Mem. at 6-7, Ex. 6 hereto (emphasis added)).  The Government stood by this position on appeal, and the Second Circuit ultimately adopted it without controversy.  *See Quatrella*, 2018 WL 798400 at *1 ("There was no actual loss to the providers because no death benefits were paid on any of the three policies before the scheme was discovered."). Accordingly, the position of Dan Carpenter here, the Second Circuit in *Quatrella*, and—as of earlier this month—the Government itself is that active policies such as the 16 on the Government's actual-loss chart ought *not* to count as having produced actual losses.  It is not clear why the Government has chosen to contradict itself here.

Ultimately, an appropriate measure of actual loss—one that takes account of (i) the lost investment income that companies suffer from being denied investment capital when STOLI investors pay the minimum premium instead of a level premium; and (ii) whatever loss companies suffer as a result of the difference in lapse rates between STOLI and non-STOLI policies—would show that there was *no* actual loss here.  As the Government's actual-loss chart shows, nearly *sixty* of the policies at issue—roughly *three-quarters*—have lapsed.[9]  Thus, far from a loss due to lower lapse rates attributable to STOLI policies generally, the insurance companies have seen a massive gain due to the *higher* lapse rates attributable to *these* STOLI policies specifically.  One need not even calculate whatever minor loss might have resulted from the other STOLI harm—lost investment income based on minimum premiums—to be confident that the gains from the incredible lapse rates more than makes up for it.  Accordingly, the actual loss can confidently be said to be zero.  In any event, it is the Government's burden—using an appropriate model tied to the results of the fraud itself—to show otherwise.

B.      Money Laundering Enhancement

The Presentence Report incorrectly concludes that the money laundering guideline adds two levels to the total offense level.  Although a conviction for money laundering often has that effect, the Guideline's grouping rules do not produce any additional levels under the circumstances of this case.

The genesis of the error is the Probation Office's incorrect assumption that "the underlying offense from which the laundered funds were derived," U.S.S.G. § 2S1.1 (a)(1), is the

---

[9] As the testimony at trial showed, the lapse rate for non-STOLI policies is typically only in the neighborhood of 5%.  (*See, e.g.,* Trial Tr. 1888:12-13 (testimony by Phoenix actuarial Buckingham that based on Phoenix's yearly "experience study," in 2015 the company "had a 5 percent lapse rate").)

overarching fraud conspiracy.  In fact, the Indictment very specifically provides that the offense underlying the money laundering counts and from which the laundered funds were derived was the narrower "SI-13 fraud," a defined term that the Indictment expressly defines as the conspirators' alleged efforts to obtain "two Trust-owned insurance policies on SI-13's [Sash Spencer's] life . . . [from] Lincoln based upon applications that contained false and fraudulent representations." (Indict. ¶ 123.)  Each of the three charged objects of the money laundering conspiracy expressly identifies the narrower "SI-13 fraud" as the underlying offense that produced the laundered funds (*see* Indict. ¶¶ 135(a), (b), and (c)), and each of the 23 substantive money laundering counts likewise expressly identify "the SI-13 fraud" as the underlying offense that generated the laundered funds (*see* Indict. ¶¶ 137, 139, 142.)  Consistent with this, the factual allegations in the various money laundering counts describe transactions involving money derived from the proceeds of Sash Spencer's policies; *i.e.*, from the SI-13 fraud.  (*See* Indict. ¶¶ 137, 139, 141-42.)

As recognized by the Probation Office, all of the counts of conviction are grouped together in this case, and the total offense level for the resulting group is the *greater* of the offense level for the money laundering counts or the offense level for the mail and wire fraud counts.  (PSR ¶ 208.)  The Probation Office concludes that the offense level for the money laundering counts is greater; specifically, that it is two levels higher than the offense level for the mail and wire fraud counts.  (PSR ¶¶ 208, 213.)  But because the "offense level for the underlying offense from which the laundered funds were derived," U.S.S.G. § 2S1.1 (a)(1), is based on the "SI-13 fraud," *not* the overarching mail and wire fraud conspiracy, the offense level for the money laundering counts will, in fact, always be *lower* than the offense level for the mail and wire fraud counts.  Indeed, even if the offense level for the money laundering counts *were*

based on the overarching fraud scheme and not just on the SI-13 fraud, the offense level for the money laundering counts would *still* be lower than that for the fraud counts.

### 1. Mail and Wire Fraud Counts

The Probation Office has calculated the offense level for the mail and wire fraud counts as 43 under Section 2B1.1 and various Chapter Three enhancements. That calculation is based on the Probation Office's findings of the following: a base offense level of 7; a 26-level enhancement based on intended loss of more than $150 million; a 2-level enhancement because the fraud scheme involved sophisticated means; a 2-level enhancement because the defendant derived more than $1 million from a financial institution; a 4-level enhancement because the defendant was the leader of at least five culpable participants in the fraud scheme; and a 2-level obstruction-of-justice enhancement because the defendant testified falsely about the fraud scheme in several specifically identified respects. (*See* PSR ¶¶ 209-17.)

### 2. Money Laundering Counts

The offense level for the money laundering counts is significantly lower. Section 2S1.1(a)(1) provides that the base offense level is the "offense level for the underlying offense from which the laundered funds were derived." Thus, the base offense level for the money laundering counts is the offense level from Section 2B1.1 for the SI-13 fraud that is specifically identified in every money laundering count in the Indictment. That offense level is inherently lower than the one for the overarching fraud scheme, because it involves at most a 22-level enhancement for more than $25 million in loss, not a 26-level loss enhancement for nearly $200 million in intended loss. In addition, the SI-13 fraud, standing alone, would not qualify for a 2-level enhancement for sophisticated means.

*Most importantly*, however, Application Note 2(C) to Section 2S1.1 makes clear that the Chapter Three enhancements that the Probation Office has applied to the mail and wire fraud

scheme do not apply to the money laundering counts.  Specifically, Note 2(C) says that when

using Section 2S1.1(a)(1)'s cross-reference to the offense level for the offense from which the

laundered funds were derived (in this case, to Section 2B1.1), "application of any Chapter Three

adjustment shall be determined based on the offense covered by *this* guideline (*i.e.*, the

laundering of criminally derived funds) *and not on the underlying offense from which the*

*laundered funds were derived*."  U.S.S.G. § 2S1.1 comment. (n.2(c)) (emphasis added).

Under the Probation Office's analysis, the offense level for the mail and wire fraud

counts involves a four-level leadership enhancement because the defendant supposedly led five

culpable participants in the fraud, but there is no factual basis for asserting that the defendant led

five culpable participants in the charged money laundering.  Similarly, although the Probation

Office's analysis concludes that the offense level for the mail and wire fraud counts involves a 2-

level enhancement because the defendant supposedly testified falsely about *that offense* in three

specified ways, the Probation Office has identified no such perjury by the defendant concerning

the money laundering offense.  Thus, the offense level applicable to the money laundering counts

will necessarily be lower than the offense level for the fraud counts because the latter (according

to the Probation Office) carries several Chapter Three enhancements that the former does not.

Accordingly, because the money laundering counts' offense level will always be lower

than the mail and wire fraud counts' offense level, the overall offense level must be the offense

level from the latter.  Thus, Section 2S1.1 and the money laundering counts have no impact on

the total offense level and should be disregarded.

C.      Sophisticated Means Enhancement

The Presentence Report's conclusion that a two-level sophisticated-means enhancement

should apply pursuant to U.S.S.G. § 2B1.1(b)(10)(C) is erroneous.  The PSR recommends this

enhancement because it says the "scheme was inherently sophisticated" given its "conceal[ment] from insurers" and reliance on "a complex web of shell companies."  (PSR ¶ 211.)  But a sophisticated means enhancement "requires more than the concealment or complexities inherent in fraud . . . [which alone are] inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C)."  *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

The Fourth Circuit's decision in *Adepoju* is instructive.  There, the defendant's "use of forged checks and a stolen identity to attempt bank fraud" was "beyond dispute."  *Adepoju*, 756 F.3d at 257.  But the Circuit found this insufficient because "virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information.  Therefore, the realm of especial complexities and intricacies [to justify the enhancement] involves more than the forgeries, misrepresentation, and concealment inherent in bank fraud."  *Id.*  (internal citations omitted); *see also United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (finding that because smuggling necessarily involves concealment, sophisticated means requires more than what is necessary to commit the crime); *United States v. Archuletta*, 231 F.3d 682, 685-86 (10th Cir. 2000) (holding that the defendant's use of a false name and checks to obtain funds from a credit union constituted "evidence of nothing more than the minimum conduct required" to establish the crime).

Here, the insurance-trust context and the interrelation between various Benistar Entities is inherently complex, but the *offense* was not especially so.  It ultimately involved nothing more complicated than providing false information to insurance companies during the process of applying for the issuance of policies (often literally checking a box in response to anti-STOLI questions) and then paying premiums on the resulting policies.  (*See Neuman* Gov't Sent. Mem.

at 3, Ex. 4 hereto (revealing the Government's advocacy *against* Probation's recommended

sophisticated means enhancement because, *inter alia*, "[t]he defendant's insurance fraud was

similar to many insurance fraud schemes where the applications for the policies at issue misstate

material facts about the applicant's qualifications").)  The money laundering offense likewise

involved no more than a simple series of transactions: the Sash Spencer death benefit was

received in an account held by COT, about $10 million of it was transferred into an account held

by GMC, and then that money was put to various uses.  While a post-hoc forensic exercise in

reconstructing the money trail may be complicated, the use of the money was straightforward

and uncomplicated in real-time.  Thus, properly construed, a sophisticated-means enhancement is

inappropriate here.

Moreover, even if the scheme was sophisticated, the Probation Office has conflated the

scheme with the simplistic nature of the defendant's own conduct.  This is a common mistake

that a recent substantive change to the Guidelines was designed to correct.  *See* U.S.S.G. Supp. to

App. C, amend. 792 (2015) ("narrow[ing] the focus" of the enhancement to "the defendant's

own intentional conduct" because many courts mistakenly "applied [it only] on the basis of the

sophistication of the overall scheme").  For this additional reason, a sophisticated means

enhancement should not apply.

D.     Loss-to-Financial-Institution Enhancement

This Court should reject the Probation Office's recommendation that a two-level

enhancement applies because the defendant supposedly derived more than $1,000,000 in gross

receipts from one or more financial institutions as a result of the offense.  First, by basing this

enhancement on the assertion that "the loss to Lincoln alone is well in excess of $1,000,000"

(PSR ¶¶ 174, 212), the Probation Office has mistakenly conflated the victim's loss with what

43

"*the defendant* derived."  U.S.S.G. § 2B1.1(16)(A) (emphasis added).  The defendant, personally, has not been shown to have derived $1 million from a financial institution.

Moreover, as with the loss-amount enhancement above, the question is whether any financial institution paid money to the defendant "as a result of the offense."  *Id*.  Here, the offense was the supposed concealment of the fact that the policies were STOLI.  As previously discussed, that offense, at most, resulted in the insurance companies themselves deriving less than they expected as a result of (i) the level of the premium payments that they received, and (ii) the rate at which the policies lapsed.  The offense did not cause the insurance companies to provide any gross receipts to anyone on STOLI policies that they would not have provided on non-STOLI policies; *i.e.*, no gross receipts were derived from the insurance companies "as a result of the offense."  *Id*.

E.  <u>Obstruction of Justice and Leadership Enhancements</u>

The Probation Office has determined that this Court's findings in its verdict inherently include the determination that the defendant was an organizer or leader of criminal activity involving five or more culpable participants, and that the defendant attempted to obstruct justice in his testimony.  To the extent the application of these enhancements is, indeed, a necessary implication of the Court's findings in its verdict, the defense disputes the enhancements for the same reason that it disputes the Court's overall verdict.

More specifically, however, the defense notes that the Government and Probation Office have multiplied the instances of supposed obstruction beyond what the record or the Court's verdict could fairly bear.  For example, the PSR bases the obstruction enhancement in part on the defendant's testimony concerning a December 2006 email between himself and others at the COT, including Jack Robinson, which email the Government contends formed the genesis of the

COT's plan to re-sell policies.  Citing pages 2899-2908 of the trial transcript, the PSR states that

the defendant lied when he testified that "this [email] was both not about the COT" and was "not

[the defendant's] own idea."  (PSR ¶ 177.)

        But a review of the cited pages demonstrates that (i) the defendant did *not* testify that the

email was not about the COT, and (ii) nothing contradicts his assertion that the email reflected

Jack Robinson's idea and not his own.  In particular, when the defendant was asked whether it

was his "testimony that …there was some other $35 million credit facility that was being set up

to fund other policies that were unrelated to this email," he answered "no," it was "Jack

Robinson doing his analysis of what he thinks we should be using the $35 million Ridgewood

line of credit for."  (Trial Tr. 2902:13-20; *see also id.* at 2904:2-5 ("Q: So it's your testimony

that [was] a separate $35 million facility?  A: No, no, no.  This was Jack Robinson giving his

idea on what we should do with the $35 million credit facility."))  When the Government

immediately followed up to ask whether the defendant had "said a second ago that this was not

related to the Charter Oak Trust," the defendant replied, "No.  I said we had other deals that we

were doing.  (*Id.* at 2902:21-23.)  When asked again whether "it's [his] testimony, just [to be] a

hundred percent clear, that this is not the Charter Oak Trust?," the defendant again responded,

"No.  I said this is Jack Robinson's idea of what to do with the $35 million.  This is not my idea

of the Charter Oak Trust, this is Jack Robinson's idea of what to do with the $35 million."  (*Id*. at

2907:17-23; *see also id.* at 2904:6-14 ("Q: So your testimony is that this is just Jack Robinson

talking, that this has nothing to do with you, is that right?  A:  I didn't say that … this is Jack's

opinion of what he's suggesting we should do.  This is not my idea.  This is Jack's idea."))  At no

point in the testimony cited did the defendant state that the email was unrelated to COT; just the

opposite, he clarified each time that that was *not* his testimony.  He did testify that the idea in

that email from Jack Robinson originated with Jack Robinson, but nothing in the email or cited elsewhere by the PSR contradicts that.

## IV.     Section 3553(a)(2)(A) & (B)—The Need for Just Punishment and Adequate Deterrence

Section 3553(a)(2)'s chief considerations—punishment of the defendant, general deterrence, and specific deterrence—do not counsel in favor of a lengthy term of imprisonment in this case. To the contrary, in light of Dan's history of altruism, the absence of significant harm from the offense, and the substantial hardship that Dan has already suffered through 14 consecutive years of bearing the weight of the criminal justice system, a lengthy sentence and the resulting separation of Dan from his family and community is unnecessary to serve the purposes of sentencing.

### A.     Punishment

A lengthy sentence is not needed in this case to serve the purpose of punishment. As an initial matter, Dan's long and continuous history of altruism and generosity are truly exceptional. The letters of support submitted on his behalf do not reflect the usual scraping together of a few stray good deeds to impress a sentencing judge. Rather, the letters testify to the life of a man who over more than four decades of adulthood has felt almost a literal compulsion to throw himself into the problems of others. He has rendered assistance big and small, giving of his time, his money, and his attention. And he has done so seeking no particular accolades or awards. His has been an almost unreasoning, reflexive need to be useful and helpful. Many have unjustifiably attempted to seek refuge in the words of *Adelson*, seeking leniency with little claim to it. By contrast, it truly could have been about Dan that the judge in that case wrote: "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the

46

context of his overall life hitherto, it should be at the moment of his sentencing." *Adelson*, 441 F. Supp. 2d at 513-14.

To be sure, the "principle of weighing the good with the bad," *id.*, requires careful consideration of the offense as well.  But in that regard, although the Government's improperly formed loss amount threatens to distort the matter, this is not a case that involves significant intended or actual harm.  As has been discussed, even under the Court's findings, Dan Carpenter did not set out to swindle anyone or make money off of someone else's financial loss.  The crime the Court has found here was depriving insurance companies of the right to economic information material to controlling their assets.  Without seeking to excuse such conduct, the distinction between that and intending to inflict direct financial harm is meaningful.  Indeed, even those courts that have previously attempted to assign a dollar-value to the harm caused by this type of offense have invariably concluded that the resulting number overstated the seriousness of the offense; recognition that the offense does not work harm in the manner or on the scale of a more traditional fraud.

A variety of Dan's own personal circumstances further mitigate any need for severe punishment.  Dan's mental health issues are not an excuse for illegal conduct, but it is impossible not to conclude that a grandiosity of thinking combined with hypomania contributed to the types of behavior for which he has now twice been convicted.  Those symptoms of Bipolar Type II Disorder should be recognized not as willful, but as the product of an illness.  And while that explanation might hold less sway if the offenses underlying Dan's two convictions were malevolent, neither one has been.

It is also important to observe that Dan has borne for 14 years now the continuous, grinding pressure of the criminal justice system, and there is substantial punishment in that.  His

Massachusetts case involved conduct from 1998 to 2000, yet—due to what the district court found were prosecutorial missteps that twice led to post-trial vacatur of his conviction—he spent *10 years* from indictment in 2004 to sentencing in 2014 in a constant state of turmoil, the epilogue to which was service of a three-year prison sentence from which he only emerged in 2017.

This case, too, has been punishing.  Although the defense has contributed to some of the delay, the fact remains that the conduct at issue here began in 2006 and the Indictment charges that the most recent mailing or wiring was in early 2010, yet charges were not brought until 2013.  Sentencing is now to be held in 2018 for offense conduct that is roughly 10 years old, with all the stress, disruption, and financial upheaval of the criminal process since then. Moreover, beyond those effects, this prosecution has already directly led to Dan serving an extra six to twelve months in prison, because he was denied early release to a halfway house at the end of his Massachusetts sentence solely because of the pendency of these charges.

This grinding punishment of 14 years of prosecution by the federal government has taken its toll on Dan's health.  Physically, as reported in the PSR, Dan is nearly 300 pounds now and suffers from cardiac issues that began while he was incarcerated, hypertension, cellulitis, and diabetes.  (PSR ¶¶ 236, 238.)   Mentally, Dan is under the care of a physician who has prescribed various anti-anxiety medications to deal with the stress of this case.  (PSR ¶ 238.)  Any calculation of the appropriate punishment has to take into account that Dan, at 64 years old and in his present condition, would stand to suffer far more significantly in prison than a younger, healthier person, and the possibilities for a catastrophic health consequence exist.  Put simply, it cannot be ignored that a term of imprisonment that might punish a younger and healthier man

48

with merely a term of years could easily wind up punishing a man of Dan's age and condition with an effective life sentence.

B.   Deterrence

The factors of specific and general deterrence do not justify a severe sentence here either. As to specific deterrence, this is Dan's second conviction, but he is not a recidivist.  The conduct for which this Court will sentence him *predates* his conviction in the Massachusetts case.  He was sentenced on that conviction in 2014, served his time (as a model prisoner), and has kept his nose clean upon release, just as one would hope and expect from a defendant's first brush with the realities of a criminal sentence and prison.  If there was a corner to be turned with respect to what has become by now very old offense conduct, Dan has already turned it.  He does not require further deterrence.

In considering the need for specific deterrence, it also bears noting that although *Binday* has made clear that the conduct described in this Court's verdict is a crime, Dan's conduct predated *Binday*.  The need for specific deterrence might be greater in the case of an individual who engaged in conduct that was self-evidently and blatantly criminal, or who violated a clear and obvious prohibition, since such conduct would bespeak substantial disrespect for the rule of law.  But neither of those is the case here and, thus, Dan's sentence need not reflect that concern.

Finally as to specific deterrence, there is little need to deter because Dan has been effectively incapacitated.  Both of his convictions involve business offenses, but he can no longer participate in his chosen profession, or, really, any profession.  He has lost his insurance license. He has lost his law license.  And at 64 years of age with two felony convictions, he has no realistic prospects of engaging in any meaningful business pursuits.  He is shut out of any meaningful profession and not a threat to reoffend.

With respect to general deterrence, there is no need to make an example of Dan.  On far worse facts, *Binday* announced to the public that this conduct—misrepresenting the STOLI nature of a policy—is a crime.  Subsequent decisions in other jurisdictions have made clear the same.  Although Dan was not a beneficiary of *Binday*'s warning, the insurance industry is now fully on notice.  The harsh sentencing of a defendant whose conduct predated *Binday* would be unfair and can add little.

## Conclusion

Dan Carpenter comes before the Court with flaws laid bare, but with a decades-long record of generosity and compassion for others so exceptional that it cannot help but make clear the true measure of his character.  He has made mistakes, but not for malevolent purposes, and while battling aspects of his personality that are psychiatric rather than willful.  His offense here was neither calculated to, nor did, cause substantial harm.  And after 14 years of the stress of criminal prosecution and prison, he is currently exactly where society would want him—in a place far removed from the very old offense conduct in this case, continuing to serve the needs of people just like the legion of individuals who have spoken up on his behalf.  For all of these reasons, we respectfully submit that Dan Carpenter should be spared a lengthy sentence and the resulting separation from his family and community.

Respectfully submitted,

/s/ James M. Cole
James M. Cole, Esq.
Michael A. Levy, Esq.
Qais Ghafary, Esq.
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
mlevy@sidley.com

## <u>Certificate of Service</u>

I hereby certify that on February 27, 2018, a copy of Defendant Daniel Carpenter's Sentencing Memorandum and attachments thereto were filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

<div style="margin-left: 2in">

/s/ Michael A. Levy
Michael A. Levy (phv09413)
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com

</div>