UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
_____

UNITED STATES OF AMERICA,

             - v. -                    3:13 Cr. 226 (RNC)

DANIEL CARPENTER,

                 Defendant.
_____


## EXHIBITS TO DEFENDANT DANIEL CARPENTER'S SENTENCING MEMORANDUM

James M. Cole, Esq.
Michael A. Levy, Esq.
Qais Ghafary, Esq.
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com

*Counsel for Daniel Carpenter*

February 27, 2018

# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    UNITED STATES OF AMERICA      *
                                    *
 4              vs.                 *      CRIMINAL ACTION
                                    *      No. 04-10029-GAO
 5    DANIEL E. CARPENTER           *
                                    *
 6    * * * * * * * * * * * * * *
```

```
 7          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE
 8                          SENTENCING
```

```
 9    A P P E A R A N C E S
```

```
10            UNITED STATES ATTORNEY'S OFFICE
              1 Courthouse Way, Suite 9200
11            Boston, Massachusetts 02210
              for the United States
12            By:  Jack W. Pirozzolo, AUSA
```

```
13
              MARTIN G. WEINBERG, PC
14            20 Park Plaza, Suite 1000
              Boston, Massachusetts 02116
15            for the defendant
              By:  Martin G. Weinberg, Esq.
16                 Robert M. Goldstein, Esq.
```

```
17

18
                                Courtroom No. 9
19                              John J. Moakley Courthouse
                                1 Courthouse Way
20                              Boston, Massachusetts 02210
                                February 26, 2014
21                              2:00 p.m.

22

23                   CAROL LYNN SCOTT, CSR, RMR
                        Official Court Reporter
24                   One Courthouse Way, Suite 7204
                       Boston, Massachusetts 02210
25                          (617) 330-1377
```

1   people are both good and bad.  They do good things and they

2   do bad things.

3        It is particularly true of a white collar crime

4   which is often committed by people who have a very

5   praiseworthy record of achievement, charity, and other

6   respects so it is, again, not a surprising or unaccounted

7   for factor.  So I don't think that the circumstances warrant

8   a departure within the *Guidelines*.

9        Nonetheless, all of those things, of course, are

10  part of the picture in evaluating the balance between, say,

11  aggravating and mitigating considerations in determining on

12  a precise sentence.  So the statute suggests considering the

13  need for the sentence to address the seriousness of the

14  offenses.  And "seriousness" can be measured in different

15  ways.  One way, of course, is financial loss, which is what

16  the *Guidelines* start with.

17       I think as both the government and the gentlemen

18  who spoke have emphasized that the harm to the victims goes

19  beyond simple economic loss in this case and that is

20  something that has to be accounted for.  In that respect I

21  would note that while the defendant's papers have argued as

22  well that the length of time the matter has been pending is

23  something that should be considered favorably to the

24  defense, I think we heard from the gentlemen who spoke that

25  it counts on the other side of the ledger as well in terms

1    of prolonging the harm felt by the people who were victims

2    of the offense.

3         This is a unique case I think.  One of the points

4    that is different from perhaps other kinds of fraud is the

5    losses were not part of the intended fraud.  The fraud was

6    intended, the scheme was intended to produce a flow of money

7    that Mr. Carpenter thought he could trade with and make

8    money on but it was an objective, of course, to make money

9    and not to lose it.  This was not a fraud that took money

10   from someone intending never to return it.  It was actually

11   part of the business plan that it be returned at some point.

12   And that apparently worked for quite a while which may have

13   over-stoked Mr. Carpenter's confidence that it could keep

14   working.

15        The exhibit that Mr. Pirozzolo referred to is a

16   disturbing one though because it does indicate that in the

17   spring of 2000 that the tide had turned and under those

18   circumstances the decision to keep going comes at least

19   closer to if not becomes evidence of perhaps, if not an

20   intentional loss of money, a degree of recklessness that

21   should have steered Mr. Carpenter in a different direction.

22        So the punishment has to be such that it recognizes

23   the seriousness of the events and the need to promote

24   respect for the law.  In this case that in my view rules out

25   any non-incarcerative sentence.

1          Deterrence of criminal conduct by others is an

2     important factor and it should be taken into account.  I

3     don't think it is a particularly prominent factor in this

4     case.  As long as some period of incarceration is imposed I

5     think there is a deterrent effect on people who are

6     classified generally as white color offenders.

7          The statute suggests considering whether or how the

8     sentence might protect the public from further crimes by the

9     defendant.  Sometimes that means incapacitation.  Sometimes

10    it means a warning I guess that there will be punishment for

11    similar behavior.

12         Respecting this factor, the Connecticut indictment

13    as well as the New York case are concerning.  I do not

14    presume Mr. Carpenter's guilt under the Connecticut

15    indictment but I have to notice that a grand jury found

16    probable cause to hand up that indictment.  And while I

17    can't give that precise value in the weighing of things, it

18    is a factor that has to be attended.

19         Now, so we have the *Guidelines* range.  Let me come

20    back to the question of -- and one of the purposes, of

21    course, of the *Guidelines* as separately stated in the

22    sentencing statute is the need to avoid unwarranted

23    disparities between like cases.  The *Guidelines* attempt to

24    do that by the factors that they employ.  The more common

25    factors case A has with case B, the more appropriate it is

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

     - v. -                                        :

MICHAEL BINDAY,                              :
JAMES KEVIN KERGIL, and                                    12 Cr. 152 (CM)
MARK RESNICK,                                :

             Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Sarah E. McCallum
Eun Young Choi
Assistant United States Attorneys
   -- Of Counsel --

contacted by an Insurer, Kergil was the one who, at Binday's request, reached out to try to get him to lie to the Insurer.

For his part in the conspiracy, Kergil got a cut of the commissions generated as a result of the scheme—both those resulting from his own straw recruitment efforts and those resulting from the efforts of other agents.  And he made millions more in ill-gotten gains by "investing" in the fraud-procured policies on the lives of his own "client," Hanni Lennard, and Resnick's "client," Doris Riviere.

As with Binday, the history and circumstances of the offense and the history and characteristics of the defendant overwhelming favor a very substantial prison sentence for Kergil.

     3.    *Resnick*

Resnick, in his submissions to the Probation Office, has sought to minimize and excuse his role in the fraudulent scheme—going so far as to claim entitlement to a "minor role" adjustment under the Guidelines.  In truth, Resnick's participation in the fraud was extensive, calculatedly self-interested, and very far from "minor."  In his case, too, a very substantial prison sentence is warranted.

Resnick was a field agent, like Krupit.  Two of the straw insureds he recruited (Silas Griffin and Maria Ramos) testified at trial, and their testimony, combined with the documentary evidence introduced, revealed that Resnick's tactics in recruiting and using straw insureds were cynical and deceptive.  Both Griffin and Ramos approached Resnick with a desire to secure modest, affordable life insurance policies commensurate with their actual (modest) means.  Resnick dissuaded them, offering instead "free" multi-million-dollar insurance with the promise of a quick cash payout.  To prevent the straw insureds learning what was actually

involved in securing this "insurance," Resnick forged their signatures on the applications and resisted providing the insureds with copies of paperwork.  Working with Kergil, he urged the straw insureds to lie to Insurers who came calling—about the purposes for which they had sought the insurance, who was funding the premiums, and the insureds' financials.  Resnick, like Kergil and Krupit, procured false accountant certifications to back up the fraudulent applications he was submitting.  And Resnick, like Krupit, tried to wipe his hard drive when he learned of the FBI's investigation.

Resnick netted over two hundred thousand dollars in commissions on the stealth STOLI policies he helped procure.  And he made nearly $800,000 more by "investing" in Doris Riviere's policy on the eve of her death, with full knowledge that this profit was derived from a fraudulently-procured policy.

Although not quite as culpable in the scheme as Binday and Kergil, Resnick's conduct warrants a heavy prison sentence.   The excuses and explanations he has offered to the Probation Office only underscore the need for such a sentence, because they evince a total lack of remorse or recognition of the criminality of his conduct.

### B.        Variance from the Guidelines—Intended Loss Considerations

For the above reasons, imposition of a very substantial prison sentence is necessary in the case of each of the three defendants to serve the goals set forth in 18 U.S.C. § 3553(a).  The Government does not believe, however, that terms of imprisonment as lengthy as those called for by the Guidelines are necessary to serve those goals here.  That is because, in the circumstances of this particular case, the intended loss calculation, which is the principal driver of the offense level, overstates the seriousness of defendants' conduct.

To be clear, the fact that the intended loss has not fully *materialized* neither brings this case outside the Guidelines' heartland nor independently warrants a variance from the Guidelines, for at least three reasons.  First, a number of the Scheme Policies are still in force, and may still result in payments of death benefits in excess of the premiums paid in.  Thus, loss that was intended but not yet materialized may still materialize.[30]  Second, even with respect to those losses not expected to materialize (a circumstance the Guidelines specifically contemplate), the Guidelines are clear that intended loss includes loss "that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1, cmt. 3(A)(ii).  Third, and relatedly, disparities between intended loss and actual loss have been, and no doubt will continue to be, at least in part attributable to circumstances that defendants and the investors on whose behalf they operated would not have predicted.  *See United States* v. *Jimenez*, 513 F.3d 62, 87–88 (3d Cir. 2008) ("It is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control." (internal quotation marks omitted)).  For example, defendants could not have predicted the 2008 financial crisis, which impaired credit flow generally, and certainly had an impact both on the market for STOLI policies and on the ability of investors to keep current with premium payments.  These factors no doubt led to lapses—and accompanying forfeiture of entitlement to death benefits—in many more cases than defendants and investors had predicted.  Moreover, defendants' mortality

---

[30] Defendants have asserted in the past that if Insurers really wanted these policies off their books, they could just seek to rescind them.  This assertion is disingenuous.  Rescission entails institution of legal proceedings (itself a costly undertaking) against current policy owners who in many cases would be expected to assert ignorance of the fraud that caused the policies to be issued in the first place.  Moreover, depending on the jurisdiction, there are legal impediments to undoing a life insurance contract once the two-year contestability period has passed—as it has with respect to all of the in-force Scheme Policies.  (Indeed, as explained above, defendants crafted their scheme to take into account this fact and ensure the contestability period would not interfere with their plans to resell.)

# EXHIBIT 3

E7ugbins

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                          12 CR 152(CM)

 5   MICHAEL BINDAY,
     JAMES KEVIN KERGIL, and
 6   MARK RESNICK,

 7              Defendants.

 8   ------------------------------x
                                            New York, N.Y.
 9                                          July 30, 2014
                                            2:35 p.m.
10
     Before:
11
                      HON. COLLEEN MCMAHON,
12
                                            District Judge
13
                          APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   SARAH MCCALLUM
     EUN YOUNG CHOI
17   PAUL MONTELEONI
     ARIEL PLATT
18        Assistant United States Attorneys

19   LAW OFFICE OF JEREMY SPORN
          Attorneys for Defendant Michael Binday
20   ANDREW FRISCH
     JEREMY SPORN
21
     GALLET, DREYER & BERKEY, LLP
22        Attorneys for Defendant James Kevin Kergil
     ROGER STAVIS
23   ADAM FELSENSTEIN

24   MURRAY LAW, LLC
          Attorney for Defendant Mark Resnick
25   JANEANNE MURRAY
```

E7ugbins

1    false information about named insureds provided by these

2    defendants.

3          They were deprived of the ability to make an informed

4    decision about whether they wanted to deal with shysters,

5    fraudsters, thieves, liars, men of no repute whatsoever, and to

6    pay those individuals massive commissions in the millions of

7    dollars.

8          The government satisfied its burden beyond a

9    reasonable doubt ten times over.  I cannot imagine any basis on

10   which these verdicts could or will be overturned.  Indeed, I do

11   not think that there is a serious argument to be made on that

12   proposition.

13         These are fraudulent inducement cases.  These are

14   policies that would not have issued absent the fraud.  These

15   are not cases about the spread between STOLI and non-STOLI.

16   This is business that would not have been written.

17         In terms of calculating the loss amount for guideline

18   purposes, because I have to calculate the sentencing

19   guidelines, the defendants plainly intended that they and the

20   investors they served would profit at the expense of the

21   insurance companies.  They caused actual losses of $38,153,631,

22   consisting of total commissions paid to them on 74 scheme

23   applications, policies that the evidence showed would not have

24   been issued but for the fraud, total death benefits paid on

25   those policies that have settled less the premiums actually

1    paid on those policies and the premiums on lapsed policies,

2    which, of course, are found money for any insurance company.

3            At that level, the Section 2B1.1 add-on to the base

4    guideline level for fraud, which is seven, is 22 additional

5    points rather than 26 used by probation when calculating

6    guidelines using the government's theory of intended loss.

7            The 22-point enhancement is more than sufficient,

8    especially as I believe it is easy to calculate known not lost

9    to date but difficult to estimate future losses, which shows

10   the time and represents something of a failure of the

11   fraudulent scheme.  For that reason, even though I understand

12   that the guidelines embody a preference for intended loss, I

13   favor calculating actual loss, which betters any reasonable

14   estimate by virtue of being tethered in fact.

15           The resulting 22-point enhancement is severe.

16   Calculating the guideline base figure using gain as a proxy for

17   loss would be slightly more favorable to the defendants, but

18   this Court views it as more appropriate to measure the crimes

19   for guideline purposes using losses to victims rather than

20   gains to the defendant.

21           I am unmoved by the argument made by one of the

22   defendants that the government has presented insufficient

23   evidence to establish that all of the applications it refers to

24   as scheme applications were indeed STOLI applications.

25           The trial testimony established beyond a shadow of a

```
 1   doubt - a standard that the government did not need to meet but
 2   that it did meet - that the R. Binday large case folder was
 3   devoted entirely to stealth STOLI applications, and all of the
 4   insureds in whose names the scheme applications were submitted
 5   to the insurers had files in their name within the large case
 6   folder.  All or practically all were strawman purchasers as
 7   proved at trial or were the subject of one of Mr. Binday's
 8   profit projection charts.
 9         Mr. Binday's assertion that the government's evidence
10   proved too little is, to use the government's own word,
11   ridiculous.  As far as I am concerned, probation correctly
12   calculated all of the other enhancements in each of the three
13   defendants' presentence reports.
14         I reject all arguments propounded by the defendants
15   for why such enhancements, particularly those relating to role
16   in the offense and to obstruction, are inappropriate, and I
17   reject them for substantially the reasons articulated by the
18   government in its briefs.
19         Mr. Binday's total offense level is 35, his Criminal
20   History Category is I, his guidelines range is 168 to 210
21   months.
22         Mr. Kergil's total offense level is 34.  His Criminal
23   History Category is I, his guidelines range is 155 to 188
24   months.
25         Mr. Resnick's total offense level is 29.  His Criminal
```

E7ugbins

History Category is I.  His guidelines range is 87 to 108 months.

Although I did not elect to calculate the guidelines using intended but actual loss, I feel constrained to address the defendants' assertion that they believed that the insurers would win by issuing these policies.  This assertion which underlay the defense that the jury rejected is indeed contradicted by the overwhelming evidence of the lengths to which the defendants went to deceive the insurers.

Had they really believed that the insurers would win from issuing these particular policies in these particular amounts on these particular lives, they would have given the insurers true information and let the insurers write the business, pricing it with full knowledge of exactly what they were insuring.

In the end, the defendants' argument that they did not intend for the insurers to lose money is no different, and if this be possible, less convincing, than the argument that every Ponzi schemer makes:  I never really thought anyone would lose money; I always intended that everyone would be made whole.

I am unconvinced.

Now, we have just spent a long time discussing the calculation of the sentencing guidelines.  This, of course, is the case that proves the idiotcy of retaining the federal structure guidelines structure now that the Supreme Court has

1   belatedly recognized that it is unconstitutional, especially at

2   a time of economic hardships where courts and other government

3   institutions are denying the public basic services in order to

4   save money.

5          It could have saved a lot of time and money — money

6   spent on prosecutors, money spent on agents, money spent by

7   defense lawyers, money spent on me — had we not had to deal

8   with calculating guidelines and arguing about the calculations

9   of the guidelines *ad nauseam* when everyone agrees that the

10  guidelines are unnecessary to the sentencing decision in this

11  case.

12         Any sensible judge with a modicum of experience under

13  his belt would understand immediately that these are serious

14  economic crimes and that the people who perpetrated them should

15  go to jail for a significant period of time without regard to

16  any guideline at all.

17         Having considered the guidelines, it is my belief that

18  the goals of sentencing are best served by sentencing the

19  defendants in the old-fashioned way:  Emphasizing who they are,

20  what they did, and how to punish them, and send a message to

21  the industry that this sort of conduct will not be tolerated.

22  I intend to sentence them for the lying, cheating, scheming,

23  thieving, obstructive fraudsters that the evidence showed them

24  to be.

25         The nature and circumstances of the crimes committed

E7ugbins

 1    by these three men are and should be the drivers of their

 2    sentences.  The government's presentation, written and oral,

 3    aptly summarized why this crime is as serious as any seen by

 4    this Court.

 5            Forget about the amount of the fraud loss, whatever it

 6    was or will turn out to be; in the end, this was a scheme

 7    perpetrated over a span of years, brazen, as the government has

 8    correctly characterized it, and characterized by a number of

 9    truly horrible behaviors on the defendants' part.

10            Starting with callous disregard for the little people

11    who were the straw purchasers of these policies:  Venality,

12    rampant mendacity, the creation of false documents, obstruction

13    of efforts by the victims to ascertain the truth, obstruction

14    of regulators and the government's efforts to learn the truth.

15    It is precisely the sort of criminality that has left large

16    segments of our society convinced that all businessmen are

17    crooks.  And many and honest businessman or woman finds himself

18    or herself unable to overcome the entirely undeserved belief

19    that they are disreputable people and that they ought to be

20    subject to disrepute.

21            I heard Mr. Stavis talk about his experience in the

22    New York State Supreme Court as an assistant district attorney

23    in evaluating crimes.  I, as he knows, was a judge in the New

24    York State Supreme Court where I quickly learned that I had a

25    somewhat different perception of how to value crimes than did

# EXHIBIT 4



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

By ECF                                                  January 17, 2014

The Honorable Sterling Johnson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:     United States v. Moses Neuman
                    Criminal Docket No. 11-134 (SJ)

Dear Judge Johnson:

            The defendant in the above-referenced case, Moses Neuman, is scheduled to be
sentenced on January 28, 2014.  On April 16, 2013, the defendant pleaded guilty to Count One of
a thirteen-count superseding indictment charging him with conspiring to commit bank and wire
fraud, in violation of 18 U.S.C. § 1349.  While the Presentence Investigation Report ("PSR")
indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51
months, the government respectfully argues that, in accordance with the plea agreement entered
into by the parties, the Court should find the applicable Guidelines range to be 18 to 24 months.
Further, the government respectfully submits this letter in opposition to the defendant's letter
dated December 30, 2013 ("Def. Ltr."), asking the Court to issue a non-custodial sentence.  For
the reasons stated below, the defendant should be sentenced within the Guidelines range of 18 to
24 months.

**I.      Background**

            A.      Offense Conduct

            The defendant helped execute a scheme to deceive insurance companies into
entering into contracts for life insurance policies.  PSR ¶¶ 11-15.  Specifically, the insurance
companies would not have sold the life insurance policies at issue if they had known that the
premiums for such policies were paid by investors, as opposed to the insured-customers
themselves or their relatives, and that the policies would later be resold on the secondary market.
Id.  Generally, insurance companies do not knowingly sell a life insurance policy if the purchaser
of the policy intended from the outset to later resell the policy, nor do they knowingly sell a life
insurance policy where a third-party investor, rather than an insured or an owner, would pay the
premium.  The defendant was able to fool the insurance companies into issuing such policies by
recruiting straw applicants and instructing them to make false statements on their insurance

applications and further coaching to them on how to answer questions by third-party verifiers hired by the insurance companies to check the accuracy of the applications. The defendant helped pay the straw buyers for their role in the scheme.

As a result, the defendant caused the submission of applications with materially false statements to insurance companies. These false statements not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply. The false statements that the defendant had the straw applicants submit were that: (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) neither the insureds nor the owners intended to resell the policies on the secondary market for life insurance; (3) the insureds and the owners intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies were "estate planning," "estate liquidity," "estate conservation" or some equivalent description. Id. at ¶ 12. Each of these statements was false. To incentive straw buyers to go along with his scheme, the defendant paid cash and promised other financial incentives to them in exchange for the straw buyers submitting false applications. The defendant engaged in the scheme for three years and, during that time, he and his co-conspirators obtained hundreds of millions of dollars in life insurance through the submission of fraudulent applications.

Further, to falsely convince the insurance companies that the straw buyers were personally paying the premiums on the policies, the defendant paid some of the premiums from the bank accounts of several companies he or his wife controlled. These bank accounts were established in the names of irrevocable life insurance trusts for the straw buyers and were funded by the defendant and his co-conspirators and other third-party investors.

In addition, after the defendant fraudulently induced insurance companies to issue policies (normally with high death benefits to elderly insureds), the defendant would assist in the creation of false records and the submission of false statements which were intended to lower the life expectancies of the elderly insureds in order to fraudulently inflate the resale prices that purchasers would be willing to pay for these policies on the secondary market (since it would make it appear as if the insured would soon die, allowing the investor to quickly collect on the policy). In particular, the defendant instructed one straw buyer to go to the doctor and complain of the symptoms of Transient Ischemic Attacks, a very serious medical condition from which the straw buyer did not suffer. PSR at ¶21.

## II.    Guidelines Calculation

### A.    Loss Amount

Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insureds allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur. Here, because the premiums were actually being paid by third-parties investors (who recruited elderly straw buyers) and who counted on the pay-out of

the policy as a return on their investment, they had no intention of letting the policies lapse. As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.

However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors. As a result, based on the evidence available to the parties at the time, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), the parties agreed that a reasonable estimate of the loss suffered by the insurance companies was more than $120,000 but less than $200,000. While the PSR noted that the defendant agreed to an amount of forfeiture of $300,00, that figure should not affect the loss amount. During a conversation with the Probation Officer who authored the PSR, the government incorrectly told the Officer that the $300,000 represented commissions that the defendant improperly received as a result of his fraud, and the PSR accordingly added this amount to the loss figure, resulting in $420,000 of loss attributed to the defendant. PSR ¶ 26. In reality, the forfeiture amount ($300,000) represents proceeds from the resale of policies on the secondary market. While such sales were improper, they did not cause financial harm to the insurance companies.

As a result, the government respectfully requests that the Court adopt the loss amount of $120,000.

## B. Sophisticated Means

The PSR includes a "sophisticated means" enhancement. PSR ¶ 43. While the scheme the defendant helped execute may not have been simple, and while it certainly was very serious, it is the government's position that the scheme was not "especially complex or especially intricate." See U.S.S.G. § 2B1.1, Application Note (3)(c). The defendant's insurance fraud was similar to many insurance fraud schemes where the applications for the policies at issue misstate material facts about the applicant's qualifications. Further, the government's plea agreement contains no such enhancement and the government, in accordance with that agreement, continues to assert that the Court should compute the Guidelines calculation without this enhancement.

## C. Global Plea

The government's plea agreement provides for an additional one-point reduction in the calculation of the Guidelines range for the defendant's acceptance of a global plea, pursuant to U.S.S.G. § 5K2.0. Because the majority of the defendant's co-conspirators also pleaded guilty alongside him, he is entitled to that reduction, even though it is not reflected in the PSR. See United States v. Figueroa, 2013 WL 4679948 at *5 (E.D.N.Y. Aug. 30, 2013) (Irizarry, J.) (noting that the district court the "subtracted two points for the global plea arrangement, even though that had not been recommended by the Probation Department.").

As a result, the government urges the Court to adopt the following Guidelines calculation:

3

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B1.1(a)(1)) | +7 |
| Loss exceeded $120,000:<br>(U.S.S.G. § 2B1.1(b)(1)(F)) | + 10 |
| More than 10 victims<br>(U.S.S.G. § 2B1.1(b)(2)(A)(i)) | + 2 |
| Global plea<br>(U.S.S.G. § 5K2.0) | - 1 |
| Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a)) | - 3 |
| Adjusted Offense Level: | <u>15</u> |

Because the defendant falls within Criminal History Category I, the resulting Guidelines range should be 18 to 24 months.

**III.    Argument**

For the following reasons, the defendant is deserving of a sentence within the Guidelines range of 18 to 24 months.

A.    The Offense is Serious

It is has been repeatedly held that insurance fraud is a serious offense.  See e.g., United States v. Hawkins, 380 F.Supp2d. 143, 164 (E.D.N.Y. 2005) (Weinstein, J.) (characterizing insurance fraud offense as a "serious crime."); United States v, Hunter, 2008 WL 4291324 at *2 (11th Cir. Sept. 22, 2008) (same).  Here, during the course of three years, the defendant stole from more than 10 separate companies and profited in an amount in excess of one-hundred thousand dollars.  Had the government not learned of the scheme, in light of the sheer number of applications submitted to the victim-companies, the defendant might well have stolen over $1 million.

The evidence also demonstrated that despite his protestations otherwise, the defendant was aware of the serious nature of his actions yet he continued to execute the criminal scheme anyway.  Def. let. at 3-10.  For example, he and his co-conspirators were aware of the steps that insurance companies might take to detect fraud, such as having third-party telephonic verification of the applications.  As a result, he equipped straw buyers with a script to read from should they receive such calls.  In addition, he also submitted phony verifications from purported accountants that claimed to certify the straw buyers' financial statements.  He also shifted a great deal of money through bank accounts he controlled to hide from insurance companies that

4

investors were paying the premiums.  It cannot be believed that the defendant did know that what he was doing was wrong in light of the actions he took to conceal his offense.

Further, his claim that the insurance companies were aware of what he was doing but turned a "blind-eye" is not worthy of belief.  The insurance companies moved to rescind the policies en masse when they learned of the fraudulent scheme, and by so doing, they were required to return, and did return, every single premium payment they had received on the rescinded policies, and also incurred legal fees, which is a very expensive way to turn a "blind eye."  But the most important point is that whether or not the insurance companies were actually deceived by the defendant's lies or, as the defendant argues, turned a blind eye to his lies, is legally irrelevant.  If a defendant intended that his lies would deprive his victims of their money or property then the defendant has committed mail and wire fraud even if the victims were not deceived in the least and did not rely upon the defendant's false statements.  Neder v. United States, 527 U.S. 1, 24  (1999).

### B.  A Non-Custodial Sentence is Not Warranted Based on the Defendant's Family Circumstances

The defendant's request for a non-custodial sentence based on the fact that he has a wife and sister-in-law who suffer from mental illnesses should be rejected.  The pertinent Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant" when fashioning a defendant's sentence.  U.S.S.G. § 5H1.6.  Accordingly, recent cases interpreting the Guidelines explain that family ties and relationships should be taken into account only when they are truly "extraordinary."  See e.g., United States v. Cutler, 520 F.3d 136, 164-65 (2d Cir. 2008) (analyzing the relevance of family ties and responsibilities in determining whether a sentence should be outside the applicable Guidelines range).  Absent extraordinary circumstances, courts are "discouraged" from basing sentences on the defendant's familial circumstances.  United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998); see also United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").

Courts have been reluctant to find such extraordinary circumstances.  In the few cases in which the Second Circuit has found that a defendant's extraordinary familial circumstances warrant a shorter term of incarceration, it has done so where the defendant is the only source of care or financial support for minor or disabled family members.  See e.g., Johnson at 129 (departing from the Guidelines range for a defendant who was solely responsible for raising four young children); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (departure granted to defendant who worked two jobs to support his wife, two children, his grandmother, and his disabled father who depended on the defendant's physical strength "to help him get in and out of his wheelchair").  But see Primo v. United States, 2008 WL 428449 at *3 (E.D.N.Y. Feb. 14, 2008) (refusing to find extraordinary circumstances where the defendant was not "the sole financial provider or caretaker for his family").

Here, the defendant's wife and sister-in-law are not "uniquely dependent" on him to care for their welfare, despite his claims otherwise.  See Sprei at 535.  First, the PSR and its Addendum note that the defendant's wife is under the "intermittent" care of a mental health

professional, undercutting the defendant's arguments concerning the severity of his wife's illness. PSR ¶ 63. It is important to recognize that the Court is not dealing with someone who is mentally crippled, requires round-the-clock care or cannot take care of her own needs. While the defendant's presence may contribute to his wife's mental stability, increasing and regulating her appointments with her psychiatrist and psychologist can also result in such stability. Further, far from not being able to care for her own health, the defendant's wife maintains a job and has raised four children that are generally reported "to be in good health." Id. at ¶¶ 64, 76. Indeed, the defendant's letter notes that he and his wife have a regular housekeeper and that they enjoy the support of an extended community that has supported them financially. Id. ¶ 85. Moreover, the PSR is unclear, and the defendant's letter remains silent, as to whether the defendant's wife's siblings or any of the defendant's eight siblings remain available to assist his family in his absence. It is highly doubtful that none of them are available or so inclined. Thus, the evidence shows both that the defendant's wife is not in dire need of help and that there is a wide network of support to provide the help she does need.

Similarly, the defendant's letter is conspicuously silent as to whether the defendant's sister-in-law's husband still lives with her, as it would naturally fall to him, not the defendant, to care for her. While it may be argued that the defendant's wife or sister-in-law would be better off with the defendant present, that is not the applicable standard. Rather, the standard is whether or not they are uniquely dependent on the defendant's care. See United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (holding non-Guidelines sentence unwarranted, even though the defendant was a single mother, where her three oldest children were available to care for their three younger siblings, one of whom was under 18 and another of whom suffered from a psychiatric disorder); United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005) (finding that extraordinary circumstances do not exist "where other relatives could meet the family's needs"). Here the defense has not proffered sufficient evidence to establish the requisite standard.

Most important, the defendant has shown little respect for his wife's situation by immersing her in his crimes and having used her to further his fraudulent scheme. The defendant used his wife to control the bank account of the Brooklyn Life Group, one of the principal companies that he controlled and through which he funneled investor money to advance his criminal purposes. She paid straw buyers their monthly payments as their compensation for participating in the scheme from that account. She was also the trustee on at least one of the life insurance trusts for the straw buyers, the Martin Lieberman Irrevocable Life Insurance Trust, which, unbeknownst to the insurance companies, listed the defendant as an investor. Indeed, the defendant discussed over the telephone how his wife moved money amongst the different accounts that were part of the scheme. See, e.g., Exs. 1-3 and calls 874 and 1576 over the Neuman cell phone. Further, both the defendant's wife and sister-in-law have had long-standing issues with respect to their mental health and yet the defendant brazenly executed the fraud scheme at issue despite his awareness of this fact. Such behavior demonstrates that he did not take seriously the risks to which he exposed his family, and he should not now be allowed to hide behind the family whose well-being he so blatantly disregarded. As such, "[w]hatever damage to [the defendant's] family [that] will result from his incarceration is a consequence of his actions, not of the court's failure to consider his family

circumstances." Naugle at 267. Accordingly, a non-custodial sentence based on family circumstances is inappropriate in this case.

The defendant's family will also not suffer extraordinary financial hardships as a result of his incarceration. The addendum to the PSR reveals that the defendant's wife's salary is three times his own and that they receive over $2,000 in monthly rental income. See Addendum at 5. While the defendant may be a valued employee of his company, he is not running a sole proprietorship as the business employs eight other individuals, and the business can use the money they would have paid him to hire a professional of equivalent skill should the defendant be incarcerated. In addition, the defendant's wife, who owns the business at issue, told the Probation Officer that "she is learning the business so that she can assume greater responsibility in the event that the defendant is sentenced to a term of incarceration." Id. ¶ 76. See United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003) (refusing to find extraordinary circumstances where the defendant's wife was capable of working to support the family, although she would have to drop out of college to do so).

Ironically, one of the "employees" that wrote to the Court about the defendant's importance to his business, def. let. at 29, had a company of his own, YLE & B Enterprises (Ex. 4), and used that company to pay a portion of a premium payment for one of the straw buyers (Ex. 5). That same individual also owned the mailboxes at which two of the defendant's companies that were central to his scheme, the Brooklyn Life Group and the Blue Rock Group, received their mail, see Exs. 6 and 7, and he discussed the movement of money that was part of the scheme with the defendant over the telephone. See, e.g., calls 874 and 1576. As an unindicted co-conspirator of the scheme in question, he is hardly in a position to advise the Court as to the defendant's sentence.

Lastly, even in cases where defendants have more dire family circumstances than this defendant, courts in this district have repeatedly denied requests for non-Guideline sentences, including cases in which the defendants have committed non-violent offenses. See e.g., United States v. Jacobowitz, 04-CR-558, ECF Docket Entry No. 158 (E.D.N.Y July 31, 2007)(Gleeson, J.) (imposing Guidelines sentence for insurance fraud notwithstanding the fact that defendant and his wife had eight children, several of whom had medical problems, and where the wife suffered from hyperthyroidism); United States v. Johnny Alberto Sosa De Los Santos, 07-CR-111 (ENV), ECF Docket Entry No. 23 (E.D.N.Y. Nov. 11, 2008) (imposing Guidelines sentence for defendant who had seven children and was convicted of importing heroin); see also Sprei at 536 (finding extraordinary circumstances absent where defendant convicted of insurance fraud supported five of his six children, a wife with a medical condition, and an elderly father, even when such factors demonstrated the family had a "heavy dependence" on the defendant).

7

III.     Conclusion

        For the reasons discussed above, the government respectfully requests that the
Court sentence the defendant to a term of incarceration within the applicable Guidelines
sentencing range of 18 to 24 months' imprisonment.

                                        Respectfully submitted,

                                        LORETTA E. LYNCH
                                        United States Attorney

                        By:     ___/s/_____
                                        Todd Kaminsky
                                        Assistant U.S. Attorney
                                        (718) 254-6367

cc:     Clerk of Court (SJ)
        Susan Necheles, Esq.  (by email)

# EXHIBIT 5

# UNITED STATES SENTENCING COMMISSION
# GUIDELINES MANUAL
## Supplement to Appendix C

**PATTI B. SARIS**
Chair

**CHARLES R. BREYER**
Vice Chair

**DABNEY L. FRIEDRICH**
Commissioner

**RACHEL E. BARKOW**
Commissioner

**WILLIAM H. PRYOR, JR.**
Commissioner

**JONATHAN J. WROBLEWSKI**
Commissioner, *Ex-officio*

**J. PATRICIA WILSON SMOOT**
Commissioner, *Ex-officio*

This document contains amendments to the *Guidelines Manual* effective November 1, 2012, November 1, 2013, November 1, 2014, and November 1, 2015.  For amendments effective November 1, 2004; October 24, 2005; November 1, 2005; March 27, 2006; September 12, 2006; November 1, 2006; May 1, 2007; November 1, 2007; February 6, 2008; March 3, 2008; May 1, 2008; November 1, 2008; November 1, 2009; November 1, 2010; and November 1, 2011, *see* Appendix C, Volume III.  For amendments effective November 1, 1998; May 1, 2000; November 1, 2000; December 16, 2000; May 1, 2001; November 1, 2001; November 1, 2002; January 25, 2003; April 30, 2003; October 27, 2003; November 1, 2003; and November 5, 2003, *see* Appendix C, Volume II.  For amendments effective November 1,1997, and earlier, *see* Appendix C, Volume I.

- Loss table in §2B1.1 and tax table in §2T4.1:  adjusting for inflation from 2001 ($1.00 in 2001 = $1.34 in 2014);

- Loss tables in §§2B2.1 and 2B3.1 and fine table for individual defendants at §5E1.2(c)(3):  adjusting for inflation from 1989 ($1.00 in 1989 = $1.91 in 2014);

- Volume of Commerce table in §2R1.1:  adjusting for inflation from 2005 ($1.00 in 2005 = $1.22 in 2014); and

- Fine table for organizational defendants at §8C2.4(d):  adjusting for inflation from 1991 ($1.00 in 1991 = $1.74 in 2014).

Adjusting from the last substantive amendment year appropriately accounts for the Commission's previous work in revising these tables at various times.  Although not specifically focused on inflationary issues, previous Commissions engaged in careful examination (and at times, a wholesale rewriting) of the monetary tables and ultimately included monetary and enhancement levels that it considered appropriate at that time.  The Commission estimates that this amendment would result in the Bureau of Prisons having approximately 224 additional prison beds available at the end of the first year after implementation, and approximately 956 additional prison beds available at the end of its fifth year of implementation.

Finally, the amendment adds a special instruction to both §§5E1.2 and 8C2.4 providing that, for offenses committed prior to November 1, 2015, the court shall use the fine provisions that were in effect on November 1, 2014, rather than the fine provisions as amended for inflation.  This addition responds to concerns expressed in public comment that changes to the fine tables might create ex post facto problems.  It ensures that an offender whose offense level is calculated under the current Guidelines Manual is not subject to the inflated fine provisions if his or her offense was committed prior to November 1, 2015.  Such guidance is similar to that provided in the commentary to §5E1.3 (Special Assessment) relating to the amount of the special assessment to be imposed in a given case.

**Effective Date: The effective date of this amendment is November 1, 2015.**

**792.**   **Amendment:** Section 2B1.1 is amended in subsection (b)(2) by striking the following:

"  (Apply the greatest) If the offense—

    (A)     (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

    (B)     involved 50 or more victims, increase by 4 levels; or

    (C)     involved 250 or more victims, increase by 6 levels.",

and inserting the following:

"  (Apply the greatest) If the offense—

    (A)     (i) involved 10 or more victims; (ii) was committed through mass-

marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;

(B)    resulted in substantial financial hardship to five or more victims, increase by 4 levels; or

(C)    resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.";

in subsection (b)(10)(C) by inserting after "the offense otherwise involved sophisticated means" the following: "and the defendant intentionally engaged in or caused the conduct constituting sophisticated means";

and in subsection (b)(16)(B) by inserting "or" at the end of subdivision (i), and by striking "; or (iii) substantially endangered the solvency or financial security of 100 or more victims".

The Commentary to §2B1.1 captioned "Application Notes" is amended in Note 3(A)(ii) by striking "(I) means the pecuniary harm that was intended to result from the offense; and" and inserting "(I) means the pecuniary harm that the defendant purposely sought to inflict; and";

in Note 3(F)(ix) by striking "there shall be a rebuttable presumption that the actual loss attributable to the change in value of the security or commodity is the amount determined by—" and inserting "the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—";

in Note 4 by striking "50 victims" and inserting "10 victims" at subdivision (C)(ii); and by inserting at the end the following new subdivision (F):

"(F)    _Substantial Financial Hardship._—In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—

(i)    becoming insolvent;

(ii)    filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);

(iii)    suffering substantial loss of a retirement, education, or other savings or investment fund;

(iv)    making substantial changes to his or her employment, such as postponing his or her retirement plans;

(v)    making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

– 111 –

(vi)    suffering substantial harm to his or her ability to obtain credit.";

in Note 9 by striking "Sophisticated Means Enhancement under" in the heading and inserting "Application of"; and by inserting at the end of the heading of subdivision (B) the following:  "under Subsection (b)(10)(C)";

and in Note 20(A)(vi) by striking both "or credit record" and "or a damaged credit record".

**Reason for Amendment:**  This amendment makes several changes to the guideline applicable to economic crimes, §2B1.1 (Theft, Property Destruction, and Fraud), to better account for harm to victims, individual culpability, and the offender's intent.  This amendment is a result of the Commission's multi-year study of §2B1.1 and related guidelines, and follows extensive data collection and analysis relating to economic offenses and offenders.  Using this Commission data, combined with legal analysis and public comment, the Commission identified a number of specific areas where changes were appropriate.

<u>Victims Table</u>

First, the amendment revises the victims table in §2B1.1(b)(2) to specifically incorporate substantial financial hardship to victims as a factor in sentencing economic crime offenders. As amended, the first tier of the victims table provides for a 2-level enhancement where the offense involved 10 or more victims or mass-marketing, or if the offense resulted in substantial financial hardship to one or more victims.  The 4-level enhancement applies if the offense resulted in substantial financial hardship to five or more victims, and the 6-level enhancement applies if the offense resulted in substantial financial hardship to 25 or more victims.  As a conforming change, the special rule in Application Note 4(C)(ii)(I), pertaining to theft of undelivered mail, is also revised to refer to 10 rather than 50 victims.

In addition, the amendment adds a non-exhaustive list of factors for courts to consider in determining whether the offense caused substantial financial hardship.  These factors include:  becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education, or other savings or investment fund; making substantial changes to employment; making substantial changes to living arrangements; or suffering substantial harm to the victim's ability to obtain credit.  Two conforming changes are also included. First, one factor — substantial harm to ability to obtain credit — was previously included in Application Note 20(A)(vi) as a potential departure consideration.  The amendment removes this language from the Application Note.  Second, the amendment deletes subsection (b)(16)(B)(iii), which provided for an enhancement where an offense substantially endangered the solvency or financial security of 100 or more victims.

The Commission continues to believe that the number of victims is a meaningful measure of the harm and scope of an offense and can be indicative of its seriousness.  It is for this reason that the amended victims table maintains the 2-level enhancement for offenses that involve 10 or more victims or mass marketing.  However, the revisions to the victims table also reflect the Commission's conclusion that the guideline should place greater emphasis on the extent of harm that particular victims suffer as a result of the offense.  Consistent with the Commission's overall goal of focusing more on victim harm, the revised victims table ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment, while also lessening the cumulative impact of loss and

the number of victims, particularly in high-loss cases.

### Intended Loss

Second, the amendment revises the commentary at §2B1.1, Application Note 3(A)(ii), which has defined intended loss as "pecuniary harm that was intended to result from the offense." In interpreting this provision, courts have expressed some disagreement as to whether a subjective or an objective inquiry is required. Compare United States v. Manatau, 647 F.3d 1048 (10th Cir. 2011) (holding that a subjective inquiry is required), United States v. Diallo, 710 F.3d 147, 151 (3d Cir. 2013) ("To make this determination, we look to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims."), United States v. Confredo, 528 F.3d 143, 152 (2d Cir. 2008) (remanding for consideration of whether defendant had "proven a subjective intent to cause a loss of less than the aggregate amount" of fraudulent loans), and United States v. Sanders, 343 F.3d 511, 527 (5th Cir. 2003) ("our case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level"), with United States v. Innarelli, 524 F.3d 286, 291 (1st Cir. 2008) ("we focus our loss inquiry for purposes of determining a defendant's offense level on the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud, not on his subjective intentions or hopes") and United States v. Lane, 323 F.3d 568, 590 (7th Cir. 2003) ("The determination of intended loss under the Sentencing Guidelines therefore focuses on the conduct of the defendant and the objective financial risk to victims caused by that conduct").

The amendment adopts the approach taken by the Tenth Circuit by revising the commentary in Application Note 3(A)(ii) to provide that intended loss means the pecuniary harm that "the defendant purposely sought to inflict." The amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability.

### Sophisticated Means

Third, the amendment narrows the focus of the specific offense characteristic at §2B1.1(b)(10)(C) to cases in which the defendant intentionally engaged in or caused conduct constituting sophisticated means. Prior to the amendment, the enhancement applied if "the offense otherwise involved sophisticated means." Based on this language, courts had applied this enhancement on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was "sophisticated." See, e.g., United States v. Green, 648 F.3d 569, 576 (7th Cir. 2011); United States v. Bishop-Oyedepo, 480 Fed. App'x 431, 433-34 (7th Cir. 2012); United States v. Jenkins-Watt, 574 F.3d 950, 965 (8th Cir. 2009). The Commission concluded that basing the enhancement on the defendant's own intentional conduct better reflects the defendant's culpability and will appropriately minimize application of this enhancement to less culpable offenders.

### Fraud on the Market

Finally, the amendment revises the special rule at Application Note 3(F)(ix) relating to the calculation of loss in cases involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity. When this special rule was added to the guidelines,

it established a rebuttable presumption that the specified loss calculation methodology provides a reasonable estimate of the actual loss in such cases.  As amended, the method provided in the special rule is no longer the presumed starting point for calculating loss in these cases.  Instead, the revised special rule states that the provided method is one method that courts may consider, but that courts, in determining loss, are free to use any method that is appropriate and practicable under the circumstances.  This amendment reflects the Commission's view that the most appropriate method to determine a reasonable estimate of loss will often vary in these highly complex and fact-intensive cases.

This amendment, in combination with related revisions to the mitigating role guideline at §3B1.2 (Mitigating Role), reflects the Commission's overall goal of focusing the economic crime guideline more on qualitative harm to victims and individual offender culpability.

**Effective Date: The effective date of this amendment is November 1, 2015.**

793.   **Amendment:**  Section 2D1.1(c) is amended in each of subdivisions (5), (6), (7), (8), and (9) by striking the lines referenced to Schedule III Hydrocodone;

and in each of subdivisions (10), (11), (12), (13), (14), (15), (16), and (17) by striking the lines referenced to Schedule III Hydrocodone, and in the lines referenced to Schedule III substances (except Ketamine or Hydrocodone) by striking "or Hydrocodone".

The annotation to §2D1.1(c) captioned "Notes to Drug Quantity Table" is amended in Note (B) in the last paragraph by striking "The term 'Oxycodone (actual)' refers" and inserting "The terms 'Hydrocodone (actual)' and 'Oxycodone (actual)' refer".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 8(D), under the heading relating to Schedule I or II Opiates, by striking the line referenced to Hydrocodone/Dihydrocodeinone and inserting the following:

"       1 gm of Hydrocodone (actual) =                 6700 gm of marihuana";

in the heading relating to Schedule III Substances (except ketamine and hydrocodone) by striking "and hydrocodone" both places such term appears;

and in the heading relating to Schedule III Hydrocodone by striking the heading and subsequent paragraphs as follows:

"       <u>Schedule III Hydrocodone</u>****

       1 unit of Schedule III hydrocodone =           1 gm of marihuana

       ****Provided, that the combined equivalent weight of all Schedule III substances (except ketamine), Schedule IV substances (except flunitrazepam), and Schedule V substances shall not exceed 2,999.99 kilograms of marihuana.";

and in Note 27(C) by inserting after "methamphetamine," the following:  "hydrocodone,".

**Reason for Amendment:**  This amendment changes the way the primary drug trafficking guideline calculates a defendant's drug quantity in cases involving hydrocodone in response

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:17CR3(AWT) |
| v. | : | |
| | : | |
| DAVID QUATRELLA | : | April 27, 2017 |

## <u>Sentencing Memorandum</u>

For over seven years, the defendant, David Quatrella, abused his position as an attorney to facilitate an insurance fraud scheme. On January 3, 2017, he pleaded guilty to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. He is now seeking a non-incarcerative sentence. But such a sentence is wholly inadequate to reflect the seriousness of the offense, the multiyear nature of Mr. Quatrella's involvement, his flagrant misuse of his position as an attorney to facilitate the crime, and his personal gain ($272,000) from the offense. At the same time, these aggravating factors are offset somewhat by the defendant's personal history and characteristics, and the absence of any actual loss to the victim insurers in this case. Accordingly, the Government respectfully suggests that a sentence of three years of imprisonment is appropriate here.

## I.    Factual Background

The facts underlying Mr. Quatrella's conviction are set out accurately in the presentence report ("PSR"), and adopted by the Government with certain supplementary details and supporting exhibits as follows.

1

misrepresentations as to the policy's purpose, the means by which the premiums would be paid, and the intent to sell the policy to downstream investors after two years. *See* Ex. 5 at 5. Mr. Quatrella again recruited the initial pool of investors to pay the policy premiums from among his law firm's clients, and Mr. Quatrella transmitted premium payments to Lincoln from his IOLTA. Mr. Quatrella and his co-conspirators attempted to find a buyer for J.S.'s policy and, in the process, commissioned an independent life expectancy evaluation for J.S. *See* Ex. 6. However, at least in part because the life expectancy evaluation did not show the decline that Mr. Quatrella and his co-conspirators expected, they were unable to find a buyer for J.S.'s policy, and the policy lapsed for non-payment of premiums. *Id.* On March 6, 2014, the defendant directed a paralegal to call Lincoln for the purpose of having the policy reinstated, and instructed the paralegal via email not to "mention anything about the loan of the premium from my clients." Ex. 7. Twelve days later, Mr. Quatrella facilitated the completion of certain forms that were part of the reinstatement application, which falsely represented to Lincoln that, among other things, the insurance was needed for estate planning (as opposed to investment) purposes and the policy was not being paid for with a premium financing loan. *See* Ex. 8. The defendant and his co-conspirators were unsuccessful in having the policy reinstated.

In the third instance, Mr. Quatrella and his co-conspirators arranged for an 82-year-old insured, A.G., to apply for and obtain a $10 million life insurance policy from West Coast Life Insurance Company ("West Coast"), with an effective date of

April 12, 2010. A.G. was not a client of the defendant's law firm, and the defendant did not help to complete A.G.'s application. However, Mr. Quatrella knew and intended that A.G.'s application contained material misrepresentations as to the policy's purpose, the means by which the premiums would be paid, and the intent to sell the policy after two years to downstream investors. *See* Ex. 9. Mr. Quatrella yet again recruited the initial pool of investors to pay the policy premiums from among his law firm's clients, and he transmitted premium payments to West Coast from his IOLTA. On October 11, 2012, in searching for a buyer for the policy, the defendant and a co-conspirator exchanged emails in which they discussed the fact that West Coast had "flagged the [policy] as probable STOLI" and strategized about how to address various "red flags," including the fact that the policy premiums were paid from Mr. Quatrella's IOLTA and whether the premium payments were financed by investors. Ex. 10.[2] The defendant and his co-conspirators ultimately succeeded in finding a buyer for the A.G. policy—at roughly a 10% loss against the premiums paid by the initial investors through the date of sale. The policy remains in effect.[3]

For their role in causing the issuance of these policies, the defendant and his co-conspirators shared in substantial commissions from Lincoln and West Coast. Mr. Quatrella's share of the commissions, and thus his personal gain from the criminal conduct, was $272,000. Some or all of the investors (who, as noted, were clients of Mr.

---

[2] One of the emails in this thread suggests Mr. Quatrella's involvement in still another illegal STOLI policy: "We did not encounter this issue on [insured's name] because all prior premiums were paid directly from his account." Ex. 10.

[3] West Coast has been notified of the Government's investigation and the proceedings in this case.

Quatrella's law practice) were unaware that Mr. Quatrella was making money on these policies whether or not the policies ultimately were able to be resold.

Because the two Lincoln policies lapsed and the West Coast policy remains in effect, no death benefits have been paid on any of these policies. In fact, the life insurance providers received more money in premiums than they paid out in commissions and other expenses. As a result, the insurers did not suffer any actual loss. There is, however, substantial intended loss of just under $15 million. *See* PSR ¶ 11.

## II. Sentencing Guidelines

The Government agrees with the Sentencing Guidelines calculation in the PSR. The defendant's base offense level under U.S.S.G. § 2B1.1(a)(2) is 6. Twenty levels are added under U.S.S.G. § 2B1.1(b)(1)(K) because the intended loss exceeded $9.5 million.[4] Two levels are added under U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved the defendant's use of sophisticated means, including setting up a trust that technically owned D.S.'s policy, using his IOLTA to disguise the fact that third-party investors were financing the premium payments, contracting for independent life expectancy evaluations on the insureds, and other means of insurance arbitrage. Two levels are added under U.S.S.G. § 3B1.3 based on the defendant's abuse of a position of trust (*i.e.*, Mr. Quatrella's attorney/client

---

[4] The defendant says that "the Government and defendant represented to the court at the time of the guilty plea that there is no calculable or actual loss." Def. Sen. Mem. at 22. That is not correct. The Government's position is that there is no actual loss, but the intended loss absolutely *is* calculable. *See* PSR ¶ 11.