# Exhibit 9

*Universitas Education LLC v. Nova Group, Inc., et al*, 1:11-cv-01590

May 9, 2013 Testimony of Daniel E. Carpenter

D59FUNIH                          Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNIVERSITAS EDUCATION, LLC,
3
                    Plaintiff,
4
            v.                              11 CV 1590 (LTS)
5
    NOVA GROUP, INC. et al,
6
                    Defendants.
7   ------------------------------x
                                            New York, N.Y.
8                                           May 9, 2013
                                            9:30 a.m.
9
    Before:
10                   HON. LAURA TAYLOR SWAIN,

11                                          District Judge

12                          APPEARANCES

13  LOEB & LOEB LLP
        Attorneys for Plaintiff
14  PAULA K. COLBATH, ESQ.

15  BRYAN I. REYHANI, ESQ.
        Attorney for Plaintiff
16
    ANTHONY J. SIANO, ESQ.
17      Attorney for Defendant D. Carpenter and Moonstone Partners
    LLP
18
    HALLORAN & SAGE LLP
19      Attorneys for Defendant M. Carpenter
    DAN E. LaBELLE, ESQ.
20
    BRIEF CARMEN & KLEIMAN, LLP
21      Attorneys for Defendant Nova Group
    IRA KLEIMAN, ESQ.
22
    CAROLE R. BERNSTEIN, ESQ.
23      Attorney for Defendant Grist Mill Capital

24  ABRAMS, GORELICK, FRIEDMAN & JACOBSON, LLP
        Attorneys for Defendant USAA
25  ALEXANDRA E. RIGNEY, ESQ.

```
       D59FUNIH                        Hearing
```

1              (Case called)

2              (In open court)

3              THE COURT:  We are here this morning in connection

4    with the turnover petition in the matter of Universitas v.

5    Nova.  I'm Judge Swain.  Counsel, would you please introduce

6    yourselves?

7              MS. COLBATH:  Paula Colbath from the firm of Loeb &

8    Loeb LLP representing Universitas Education.

9              THE COURT:  Good morning, Ms. Colbath.

10             MS. COLBATH:  Good morning, your Honor.

11             MR. BARNETT:  Hi, your Honor.  Michael Barnett also

12   representing Universitas, also from Lobe & Loeb.

13             THE COURT:  Good morning, Mr. Barnett.

14             MR. REYHANI:  Good morning, your Honor.  Bryan Reyhani

15   from Reyhani, Nemerovsky LLP representing Universitas.

16             THE COURT:  Good morning, Mr. Reyhani.

17             MR. SIANO:  Anthony J. Siano, 333 Westchester Avenue,

18   White Plains, New York for respondent Daniel E. Carpenter and

19   Moonstone Partners LLP.  Good morning, your Honor.

20             THE COURT:  Good morning, Mr. Siano.

21             MR. SIANO:  Your Honor, I look to the seat to my

22   immediate left, Mr. LaBelle is coming up to fill that seat.

23             MR. LaBELLE:  Sorry, your Honor.

24             THE COURT:  So would you introduce yourself?

25             MR. LaBELLE:  Dan LaBelle, Halloran & Sage for Molly

D59FUNIH                    Hearing

1    Carpenter.  Good morning, your Honor.

2            THE COURT:  Good Morning, Mr. LaBelle.

3            MS. RIGNEY:  Alexander Rigney of Abrams, Gorelick,

4    Friedman & Jacobson LLP on behalf of USAA.

5            THE COURT:  Good morning, Ms. Rigney.

6            MR. KLEIMAN:  Good morning, your Honor.  Ira Kleiman

7    of Brief, Carmen & Kleiman, LLP on behalf of Nova Group.

8            THE COURT:  Good morning, Mr. Kleiman.

9            MS. BERNSTEIN:  Good morning, your Honor.  Carole

10   Bernstein on behalf of Grist Mill Capital.

11           THE COURT:  Good morning, Ms. Bernstein.

12           Now, counsel who are sitting in the first row behind

13   the bar, do you intend to participate actively in the

14   proceedings today?

15           MS. BERNSTEIN:  No, your Honor, or hopefully not, I

16   should say.

17           MR. KLEIMAN:  No, your Honor, same.

18           THE COURT:  Thank you.  And good morning to the other

19   people who are here.

20           So, I would like to start off with ten-minute opening

21   statements for each side which will take me through from

22   petitioner's side precisely what relief the petitioner is

23   seeking here, the jurisdictional predicate, what petitioner

24   believes it has to prove to demonstrate its entitlement to what

25   it's seeking and I may have a couple of questions in that

D59FUNIH                      Hearing

1      connection, and for respondents a precis of the principal,

2      legal and factual predicates of the opposition that you would

3      expect to establish or if you're relying on plaintiff's

4      anticipated failure to meet its burden, the way in which you

5      intend to demonstrate that.

6              MS. COLBATH:  Your Honor, would you like me to take

7      the podium or is at the table sufficient?

8              THE COURT:  Whatever is most comfortable for you.

9              MS. COLBATH:  Then I'll stay here.

10             Thank you, your Honor.  Good morning.  This

11     application seeks the turnover of insurance proceeds that are

12     expected to be paid in connection with a vacation property

13     located in Rhode Island; Providence, Rhode Island, South

14     Kingstown, Rhode Island, excuse me.  The property at issue,

15     what our evidence will show, was purchased with funds that

16     originated from the Charter Oak Trust and currently Universitas

17     has a judgment in approximately $31 million against Nova Group

18     Inc., the corporate trustee of the Charter Oak Trust.  To date

19     it has collected not a penny on that judgment.  The judgment

20     arises out of an arbitration where the arbitrator found that

21     Universitas was entitled to certain proceeds under two

22     insurance policies that had been issued on the life of an

23     insured, Sash Spencer, by Lincoln Life Insurance Company.  So

24     after Sash Spencer died Lincoln Life paid the 30 million in May

25     of 2009 to the trust.

D59FUNIH                          Hearing

1          At that point in time, Universitas had made a claim

2     for those insurance proceeds and the trust and its trustee

3     denied the claim and we went through a lengthy internal process

4     which led to a denial and then the arbitration and ultimately

5     this Court confirmed the arbitration award and with interest

6     and attorneys fees, an application that the Court will be

7     receiving soon.  The amount currently due stands at

8     approximately $35 million.

9          In connection with our judgment enforcement action

10    efforts we subpoenaed a number of the banks to find out where

11    did the money go.  We knew that the 30 million had initially

12    been deposited at TD Bank.  From the time of the arbitration

13    we've been frustrated at every step of the way in getting those

14    records.  We sought them in the arbitration, we sought them

15    immediately after.  There were a number of letters threatening

16    the bank and lawyers with criminal prosecution if those records

17    were turned over.  Ultimately after years of efforts we finally

18    got those TD Bank records, and we started to see dozens and

19    dozens of accounts set up right at the time that the money was

20    paid by Lincoln Life and transfers back and forth from various

21    entities that we will show the Court are controlled by

22    Mr. Daniel Carpenter.  The money was transferred in to various

23    accounts, it would come back, it would go to a new entity that

24    as far as we can tell never had a bank account, and ultimately

25    through this effort we traced the money from the Charter Oak

D59FUNIH                          Hearing

1    Trust to purchase of this home.

2              So the relief that we seek here is we would like the

3    insurance proceeds and we were told before we filed this

4    application, we were told by USAA, the casualty insurer

5    involved, that they were imminently ready to pay approximately

6    $450,000 to Moonstone Partners LLC and Mr. Carpenter who owned

7    the property in South Kingstown.  We also seek a turnover of

8    that property, the ownership of that property to our client

9    since our client's funds were used to purchase it.

10             Since the claim, at Mr. Carpenter's deposition he

11   advised us that he had not officially filed a claim for damage

12   yet.  We would also ask that that claim be assigned to

13   Universitas so we could step into his shoes and have direct

14   contact with the carrier in resolving that claim.

15             THE COURT:  Now, the order to show cause that I signed

16   referred to insurance proceeds in connection with, quote, "any

17   structure or property owned at any point in time by Moonstone,

18   Daniel Carpenter and/or Molly Carpenter or any entity owned by

19   the Carpenters including any properties at a Cards Pond Road

20   address in South Kingstown, Rhode Island and it seeks a

21   constructive trust on such insurance proceeds in Universitas'

22   favor.  So this is the first I'm hearing of a request that this

23   Court also order turnover of real property or an assignment of

24   the claim.

25             MS. COLBATH:  Your Honor, I believe the TRO that you

1   entered prohibited any transfer of the property pending

2   resolution, and at this point since we don't have the title

3   report and we don't have a lot of information on the property,

4   at the time we made the application we reserved our rights to

5   turn it over.  I raise it now because I don't want to come back

6   to this Court in two weeks and have you say, well, why didn't

7   you raise it now.  That part of the relief we want to seek to

8   preserve our rights.

9          THE COURT:  And would you explain to me how this

10  request for relief maps on to the provisions of Section 5225 of

11  the CPLR, which I gather you're looking through Rule 69 of the

12  Federal Rules of Civil Procedure.  What do you have to

13  establish under 5225?

14         MS. COLBATH:  The way I envision this happening, your

15  Honor, as you recall from the order to show cause we sought a

16  restraint that any transfer of the LLC that owns the property

17  and I would be seeking to have the LLC membership transferred

18  to Universitas.  I believe under 5225, since the LLC interests

19  and its assets came from the Charter Oak Trust monies that

20  that's appropriate relief under that section.

21         THE COURT:  Okay, again, that relief isn't specified

22  in today's petition.  The request for relief that's been

23  briefed is a request for turnover of insurance proceeds and the

24  only property that's been specified is the South Kingstown

25  property.  The CPLR provision speaks in terms of property of

D59FUNIH                    Hearing

1    the judgment debtor that is in the hands of a third party and

2    it authorizes a turnover order when it is shown that the

3    judgment debtor is entitled to possession of such property or

4    that the judgment creditor's rights to the property are

5    superior to those of the transferee and, so I need to know your

6    legal and factual theory on which these insurance proceeds that

7    you have asked for so far are either property of the judgment

8    debtor Nova and therefore properly addressed under 5225(b) or

9    is property in which Universitas, the judgment creditor, has

10   rights that are superior to those of the --

11            MS. COLBATH:  Right.  So the South Kingstown property

12   are properly properties of the Charter Oak Trust.  The Charter

13   Oak Trust money was used to purchase that property, so that

14   property belongs to the Charter Oak Trust.  They have title in

15   some other name improperly, but that's properly the property of

16   the Charter Oak Trust for which we are entitled to execute on

17   our judgment.

18            If I could just touch on a couple of your other points

19   and we'll get back to -- we will link every transfer for you so

20   that you see that the Charter Oak Trust money was used to

21   purchase that property from which the insurance proceeds arise,

22   as well as the account where the Charter Oak Trust money was

23   deposited the premium payment was even made for the insurance.

24   So the link is that the Charter Oak Trust money was used

25   through a series of entities and transfers.

D59FUNIH                          Hearing

1              On the jurisdictional issue as to why this Court has

2      jurisdiction to decide this issue, the Court's jurisdiction

3      arises under the Federal Rule of Civil Procedure 69 and CPLR

4      provision 5225.  In terms of the burdens --

5              THE COURT:  And the original underlying jurisdiction

6      was diversity, is that correct?

7              MS. COLBATH:  Correct.

8              THE COURT:  And this is a procedure in aid of the

9      judgment granted by this Court in a case in which it had

10     subject matter jurisdiction?

11             MS. COLBATH:  Yes.

12             THE COURT:  And authority to entertain these

13     proceedings is granted by the procedural rules that you just

14     specified?

15             MS. COLBATH:  Yes.  And the technical, procedural and

16     jurisdiction issues we also briefed and gave you the authority

17     in our brief on that.  But that's correct, under supplementary

18     proceedings aid in enforcement of a judgment.

19             On the burden issue, it's Universitas's position that

20     we've met our prima facie case in our moving papers.  The Court

21     had invited an evidentiary hearing, some issues came up

22     certainly at the depositions and there are a lot of complicated

23     transfers so I think the Court could benefit from the testimony

24     and the documents and us simplifying those transfers for you,

25     but we believe at this point we've met our burden and that in

D59FUNIH                              Hearing

1   terms of establishing the validity of a security interest

2   that's not my burden to establish the validity of it.  That

3   would be, that's respondent's defense as to why they took the

4   $30 million.  They have the onus in proving that.

5           THE COURT:  And the Court will ultimately have to make

6   findings on the particular material issues of fact and some of

7   those findings may be inferential and so it is appropriate for

8   the Court to hear testimony on disputed issues because it will

9   have to weigh matters of credibility and the sufficiency of

10  evidence.

11          MS. COLBATH:  Thank you, your Honor.

12          THE COURT:  Thank you very much, Ms. Colbath.

13  Mr. Siano, did you wish to make an opening statement?

14          MR. SIANO:  Yes, your Honor.  It is respondent

15  Mr. Carpenter and respondent Moonstone's position that this is

16  a proceeding and a hearing that is meant to determine if the

17  funds used to acquire the Cards Pond Road property in Rhode

18  Island in the first instance were the property of the judgment

19  debtor or in the second instance were funds as to which --

20  excuse me, whether or not the funds used were property of

21  the -- as to which the judgment creditor's rights are superior

22  to the rights of the property holder the transferee.  We will

23  establish at this hearing, your Honor, factually, that the

24  funds used to acquire the property in the first instance were

25  funds derived from a source other than the funds which were

D59FUNIH                      Hearing

1   properly in the possession of Charter Oak Trust, and which are

2   subject to the judgment, and, secondly, that in any event, that

3   funds in excess of the $1,100,000 -- and that's the specific

4   consideration for the property, Judge, we're going to be

5   focusing on that number -- that funds in excess of that number

6   were funds due and payable to the judgment debtor and that the

7   judgment debtor's interest in funds in excess of the purchase

8   price were properly in the possession of the judgment debtor,

9   used by the judgment debtor and that in any event no funds in

10  excess of that amount were used to acquire the Cards Pond Road

11  property in Rhode Island.

12          THE COURT:  In the arbitration proceeding I recall

13  that there was a finding that there was some obligation of

14  about $4 million and the arbitration award was adjusted for

15  that and there are representations in the papers and perhaps

16  even in the arbitration finding that whatever that $4 million

17  obligation was paid.  Furthermore, the proffer by the

18  petitioner here indicates that funds in excess of $30 million

19  went through not only Charter Oak Trust but also Grist Mill

20  Capital and certain entities in the chain below that, so that

21  to the extent there was a claim for that $4 million by Grist

22  Mill or its affiliates, more money than that has already gone

23  through Grist Mill.  So I frankly don't understand your

24  proposition that we start again from zero and count up to

25  $4 million before this petitioner could collect anything.  So

D59FUNIH                          Hearing

1   would you respond to that?

2           MR. SIANO:  Your Honor, that's a fair question and I

3   suspect that is completely dependent upon facts presented in

4   this case with regard to, for want of a better expression,

5   which money was used to purchase the property which I believe

6   is exactly the phrase that counsel for the judgment creditor

7   used a few minutes ago.  I don't believe that question can be

8   asked in the abstract.  There are large sums of money that move

9   in various ways from the judgment debtor to various other

10  creditors.  Some of which it is asserted by my understanding by

11  Charter Oak Trust have rights superior to this judgment

12  creditor.  That is not what is being heard today.

13          To the extent your Honor asked the question why do I

14  say that the matter of the $4 million is germane to your

15  Honor's consideration, I suggest that if your Honor drills down

16  into the arbitration decision into the holding in the

17  underlying documents, it's that $4 million was contractually

18  the first $4 million.  It wasn't the last $4 million.  It was

19  contractually the first $4 million that was due to be paid, and

20  I'm rounding the number for purposes of responding to your

21  Honor's questions, which are in my answering papers.  That is

22  my response.

23          There's no disputing, Judge, there is $30 million

24  involved here, there is $30 million that was moved in a lot of

25  different directions, but I submit that this application when

1    you look at the declarations which are the only factual

2    assertions made so far in this case, there are two declarations

3    by Mr. Reyhani who is here, those declarations relate to

4    $1,100,000 and that is what we're prepared to present in the

5    hearing.  We're not here to present -- and I don't mean any

6    disrespect when I say this -- a comprehensive resolution of

7    debtor creditor issues, fraudulent transfer issues or issues

8    such as that.

9         Your Honor pointed to 5225 and you aptly note that

10   there are two bases that the evidence needs to address with

11   regard to these turnover proceedings, two standards, and we're

12   prepared to address both of them in the specific context of

13   this piece of property, because the money involved, the money

14   your Honor has restrained, with the consent of the parties I

15   will say, is in fact a casualty claim payment in connection

16   with that one piece of property, and that's what we're prepared

17   to try today.  Thank you.

18        THE COURT:  Well, I will just say that it is my

19   impression from the papers and from Ms. Colbath's statement

20   that the petitioner intends to make its cases to entitlement to

21   this money in the context of a demonstration that the

22   petitioner believes will establish that the entire series of

23   transfers of the $30 million including the amounts that went to

24   Moonstone and were ultimately used to acquire this property

25   were improper and that because -- and I'm speaking in very

1     broad terms here of my understanding of the theory -- because

2     all of it ultimately is equitably and legally the property of

3     Charter Oak Trust holds the money and of which Nova is the

4     trustee, they're entitled to this piece as well.  So I have not

5     made any decision that that theory is too broad.  I have to

6     hear it, I have to evaluate it, and I also have not made any

7     decision that their statement of the issues here is too broad.

8     So this is your opportunity to respond to the case that they're

9     seeking to make here.

10              MR. SIANO:  I would suggest to your Honor that there

11    are several parties who were not served, who were not brought

12    in on this application and who are not being heard.

13              THE COURT:  Such as?

14              MR. SIANO:  Such as several of the Grist Mill

15    entities; Grist Mill Holdings, Grist Mill Trust, Phoenix

16    Capital Management.  These are independent entities.

17              THE COURT:  Independent of what or whom?

18              MR. SIANO:  They have corporate existence, they are

19    incorporated, they have counsel, they have responded to

20    subpoenas, they have been subpoenaed, they have responded to

21    inquiries.  Grist Mill Capital isn't even a party to this

22    particular application.  So the notion that there is being

23    presented to the Court a full resolution of those issues, I

24    would submit there are parties that are essential to this --

25    transferees I believe is the word that 5225 addresses and those

D59FUNIH                         Hearing

1    transferees are not present.

2              THE COURT:  Ms. Colbath?

3              MS. COLBATH:  Your Honor, if I may address that.  On

4    Grist Mill Capital we've been very careful to serve them with

5    all the papers on this application in the event they wish to

6    intervene and they've decided to take no action.  They did send

7    their counsel who is here today.  So from the beginning they

8    have received all of the papers that have been filed and are on

9    notice of this application to the extent they believe it

10   impacts their rights and as the evidence is going to show all

11   the entities that Mr. Siano just referenced, Phoenix Capital

12   Management, Grist Mill Holdings, Grist Mill Capital, those are

13   all controlled by one individual, Mr. Carpenter, who is

14   certainly here and has been on notice of this application from

15   the onset.

16             MS. BERNSTEIN:  Your Honor, may I respond to that

17   briefly as Grist Mill's attorney?

18             THE COURT:  Ms. Bernstein, yes?

19             MS. BERNSTEIN:  Yes.  I was not served with the papers

20   at the time everybody else was served.  It was an afterthought

21   ten days ago that I received in an e-mail all or parts of the

22   application that is before your Honor today.  Seems to me that

23   the burden is on petitioner and if they were seeking to receive

24   property or attempt to receive property from Grist Mill Capital

25   it might have been wise to name them in the instant

1      application.  It's not my burden to intervene I don't think.

2                THE COURT:  Thank you.  All right.  I think I'm ready

3      to start with the testimony, so Ms. Colbath you may call your

4      first witness.

5                MR. LaBELLE:  Your Honor, may I be heard?

6                THE COURT:  I'm sorry.  That's Mr. LaBelle?

7                MR. LaBELLE:  Mr. LaBelle.  At the prior hearing I

8      ruminated a little bit about personal jurisdiction issues.  I

9      don't know if that was on your Honor's mind when you spoke

10     about jurisdiction.  I want to state clearly the named

11     respondents are not raising any personal jurisdiction issues.

12     We've conferred with the clients on that.  Legally there might

13     be an issue but we're consciously waiving it because if they

14     were to win the only thing that would happen there might have

15     to be an action in Connecticut or Rhode Island and we don't

16     want to burden anybody with going and doing that.  So I want to

17     make my statement at the earlier hearing we've consciously

18     waived any personal jurisdiction issues.

19               Secondly, your Honor made a comment in discussing the

20     round figure $4 million that's referenced in the arbitrator's

21     award, and, your Honor, I heard your Honor say there's an

22     indication that that was paid.  What actually happened, the

23     arbitrator made an adjustment in the award to account, to allow

24     for the round figure $4 million to go essentially to Grist Mill

25     Capital which had funded the policies.  It wasn't paid as part

D59FUNIH                    Hearing

1   of the arbitration award.  There was an adjustment in the

2   calculation and I agree with Mr. Siano's statement it's our

3   position that contractually there are papers that make it clear

4   that the first 4 million round figure out of the roughly

5   30 million round figure goes to Grist Mill Capital.  It's the

6   first four.

7            THE COURT:  Thank you.  Let me just ask Ms. Colbath,

8   and I don't want to belabor this because it may be addressed in

9   the testimony, but my recollection is that in your reply brief

10  perhaps you represented that there's evidence that the

11  4 million was actually paid already to Grist Mill?

12           MS. COLBATH:  Yes.  Lincoln Life made the $30 million

13  payment to Charter Oak Trust in May 2009 and by the end of that

14  month 10 million or 11 million, 10.8 million had been

15  transferred out and by October 2009 the remaining 20 million

16  was transferred out, all to Grist Mill Capital.  But well

17  before the arbitrator found that they were entitled to

18  anything.

19           THE COURT:  Thank you.

20           MS. COLBATH:  Your Honor, one other housekeeping

21  matter before we call our first witness.  The parties have

22  entered into a stipulation addressing a number of authenticity

23  and admissibility issues.  We came to final agreement this

24  morning, so there's some handwriting on it and I only have one

25  copy.  But I would like to offer it to the Court on behalf of

D59FUNIH                    Hearing

1   the parties.

2         THE COURT:  Very well.  Do you want to read it into

3   the record?  Or you'll refer to it --

4         MS. COLBATH:  If you'd like me to and it's short

5   enough then I'll do that.

6         THE COURT:  Thank you.  Then we'll mark it as an

7   exhibit again.

8         MS. COLBATH:  It's a stipulation regarding Universitas

9   Education --

10        MR. SIANO:  You don't mind if I stand here, do you?

11        MS. COLBATH:  No, by all means come up.  Stipulation

12   regarding Universitas Education LLC's turnover application.

13   Petitioner/judgment creditor Universitas Education LLC

14   ("Universitas") and respondents Daniel E. Carpenter, Molly

15   Carpenter and Moonstone Partners, LLC, defined as Moonstone

16   respondents (and collectively the Parties) through their

17   respective counsel stipulate to the following in regards to

18   Universitas' turnover application:  1.  The parties stipulate

19   to the admissibility and authenticity of all documents produced

20   pursuant to subpoena by TD Bank identifiable by Bates number

21   TD-Universitas 00001 through TD-Universitas 1397 inclusive."

22         The next numbered paragraph is 3.  "The parties

23   stipulate to the authenticity of Universitas Exhibits 1 through

24   21 inclusive.  Paragraph 4:  The parties stipulate to the

25   authenticity of Moonstone Respondents Exhibits A through O

D59FUNIH                         Hearing

1    inclusive."

2          Paragraph numbered 5.  "The parties stipulate that

3    Wayne H. Bursey" --

4          THE COURT:  I'm sorry.  So you stipulated to the

5    authenticity of the Universitas exhibits.  Is that also a

6    stipulation to their admissibility so basically do we not have

7    to -- can you move them all into evidence now and me accept

8    them as stipulated so that we just work with the documents?

9          MR. SIANO:  I'm prepared to stipulate to the

10   admissibility of all the exhibits and on that basis I'm

11   prepared to respond to your Honor's questions more

12   comprehensively which is as to both sides.

13         THE COURT:  And Ms. Colbath, are you in the same

14   position?

15         MS. COLBATH:  We have three documents, C and E, where

16   we have objections to admissibility on hearsay and other

17   grounds.

18         THE COURT:  You said three documents but you mentioned

19   C and E.

20         MS. COLBATH:  Two documents, C and E.

21         THE COURT:  All right.  So are you willing to

22   stipulate that all of the respondents exhibits other than C and

23   E are admitted in evidence now and respondents are stipulating,

24   I'll assume that Mr. LaBelle is going along with this?

25         MR. LaBELLE:  Entirely, your Honor.

D59FUNIH                          Hearing

1           THE COURT:   That Universitas Exhibits 1 to 21 are also

2      now received in evidence?

3           MS. COLBATH:   Correct.

4           THE COURT:   Okay.   So just for me to sum up,

5      Universitas Exhibits 1 through 21 and Respondents Exhibits A

6      through O except for C and E are hereby admitted in evidence.

7               (Petitioner's Exhibits 1 through 21 received in

8      evidence)

9               (Respondent's Exhibits A, B, D and F through O

10     received in evidence)

11          MR. SIANO:   Thank you for your Honor's question.

12          THE COURT:   Thank you.   And so you'll finish reading

13     the stipulation.

14          MS. COLBATH:   Okay.   I think we're at paragraph 5.

15     "The Parties stipulate that Wayne H. Bursey, whom Universitas

16     has subpoenaed to testify at the May 9 hearing, may appear by

17     letter submitted to the Court through his counsel, Steven V.

18     Manning."

19          Dated May 9, 2013 and signed by Mr. Reyhani on behalf

20     of Universitas, Mr. Siano on behalf of Daniel E. Carpenter and

21     Moonstone Partners and Mr. LaBelle on behalf of Molly Carpenter

22     and Moonstone Partners, LLC.

23          THE COURT:   And I have a question about that last

24     provision when you say that Mr. Bursey may appear by letter.

25     Do you mean that you have a letter embodying what would be his

D59FUNIH                              Hearing

1    testimony that the Court is to accept as his testimony or what

2    does it mean for him to appear?

3              MS. COLBATH:  The letter, your Honor, was sent to the

4    Court yesterday by his counsel and it informs the parties that

5    he would take and assert his Fifth Amendment right if he were

6    here to testify and he lays out the categories as to which he

7    would take the Fifth Amendment which includes all those that we

8    would examine him on today and then he acknowledges that the

9    Court may have the discretion to draw adverse inferences as a

10   result of his assertion of the Fifth Amendment right against

11   self-incrimination.  So rather than him come to Court today to

12   assert his Fifth Amendment right we're prepared to relieve him

13   of that based on the letter which he submitted to the Court.

14             THE COURT:  Very good.  And is that letter designated

15   as an exhibit or should we do that now?

16             MS. COLBATH:  That's fine.  Why don't I mark as

17   Universitas Exhibit --

18             MR. SIANO:  Judge, might I suggest that that might

19   appropriately be the first Court exhibit rather than either

20   party, since the letter was addressed to your Honor.  I don't

21   mean to in any way usurp the Court's function.  Obviously, both

22   sides have received the letter, but I submit it might be

23   appropriate for it to be a Court exhibit rather than an

24   evidentiary exhibit.

25             THE COURT:  Well, if this is information in lieu of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   testimony by a witness that the petitioner would otherwise have

2   called, and this is to represent the witness's response to that

3   I think it's properly a party to it.

4           MR. SIANO:  But it's not, Judge.  It's an invocation

5   of rights and a recitation of subject matter.  I think what

6   Mr. Manning does, perhaps in a gesture of courtesy, is observe

7   that your Honor can draw adverse inferences from Mr. Bursey's

8   failure to appear here, but I don't believe the letter itself

9   has any evidentiary value beyond the invocation of rights.

10          THE COURT:  I hear your position and I will entertain

11  a proffer of it as Petitioner's exhibit.  What number is it?

12          MS. COLBATH:  26, and we'll mark this stipulation as

13  Universitas Exhibit 27.

14          THE COURT:  Thank you.  Would you hand them up to

15  Ms. Ng there.

16          (Petitioner's Exhibits 26 and 27 received in evidence)

17          THE COURT:  So they don't have stickers on them, they

18  have tabs?  You wrote 26.  26 is written on top of the

19  stipulation and nothing is written on the top of the letter.

20  I'm going to ask Ms. Ng to write Exhibit 26, Petitioner's 26 on

21  the top of the letter and the date and Petitioner's 27 at the

22  top of the stipulation.  Thank you.  You may call your first

23  witness, unless there are other housekeeping matters?

24          MS. COLBATH:  No, that's it.

25          Your Honor, Universitas calls Mr. Daniel E. Carpenter.

D59FUNIH                     Hearing

1   We should arrange for him to have -- Mr. Daniel E. Carpenter,

2   and if we could arrange for him to have the notebook with the

3   exhibits for Moonstone.

4           THE COURT:  You can put it on the witness stand.

5   Mr. Carpenter, would you please come forward to the witness

6   stand.

7    DANIEL CARPENTER,

8        called as a witness by the Petitioner,

9        having been duly sworn, testified as follows:

10  Daniel Edgar Carpenter

11          THE COURT:  Thank you, please be seated.

12          THE DEPUTY CLERK:  Can you spell your last name

13  please, sir?

14          THE WITNESS:  CARPENTER.

15  DIRECT EXAMINATION

16  BY MS. COLBATH:

17  Q.  Good morning, Mr. Carpenter.

18          MS. COLBATH:  Your Honor, if --

19  Q.  Mr. Carpenter, could you open up to Exhibit 20 in the

20  notebook, and for the Court's ease, Universitas prepared a

21  flowchart that may assist everyone in following the testimony.

22          THE COURT:  That's fine.  If you provide copies to

23  respondent's counsel and to the Court and an extra one to my

24  law clerk would be most welcome.

25          MS. COLBATH:  We've provided copies, I believe, to

D59FUN1H                    Carpenter - direct

1    your law clerk and to counsel prior to today.

2              THE COURT:  Okay.  And so -- so 20 is the flowchart.

3              MS. COLBATH:  Correct.  I just point that out at the

4    beginning so you'll be able to follow the testimony easily.

5              THE COURT:  Thank you.  I misunderstood.

6    Q.  Mr. Carpenter, who are the members of Moonstone Partners

7    LLC?

8    A.  Molly Carpenter is 99 percent and Caroline Financial Group

9    is 1 percent.

10             THE COURT:  Would you hold on just --

11   Q.  And who is Moonstone Partners' managing --

12             (Pause)

13             THE COURT:  Apologies for the interruption.

14   Q.  Mr. Carpenter, who is Moonstone Partners LLC's managing

15   member?

16   A.  Caroline Financial Group.

17   Q.  And who is its tax matters partner?

18   A.  Caroline Financial Group.

19   Q.  And what is your role with respect to Caroline Financial

20   Group?

21   A.  I'm the chairman of Caroline Financial Group.

22   Q.  And the full name of that entity is Caroline Financial

23   Group Inc.?

24   A.  Yes.

25   Q.  Who are the shareholders of Caroline Financial Group Inc.?

D59FUNIH                    Carpenter - direct

1    A.   I don't know.

2    Q.   Who are the officers and directors of Caroline Financial

3    Group?

4    A.   I believe I'm the chairman and secretary.

5    Q.   Who formed Caroline Financial Group?

6    A.   I did.

7    Q.   What is the business of Caroline Financial Group?

8    A.   Caroline Financial Group acts as the managing member and

9    the tax matters partners of a number of different LLC's.

10   Q.   Is that its only business?

11   A.   No.

12   Q.   Tell me about the other areas that Caroline Financial Group

13   is involved in.

14   A.   Caroline Financial Group also makes loans for the purchases

15   of cars, houses, certain real estate, so it actually acts in a

16   lending capacity for certain loans and things of that sort.

17   Q.   Now, I'm going to refer to Moonstone Partners LLC as simply

18   Moonstone.  Is that agreeable to you?

19   A.   That's fine.

20   Q.   And when was Moonstone formed?

21   A.   I believe it was in February of 2009.

22   Q.   Do you recall testifying at your deposition that it was

23   formed in April of 2009?

24   A.   Do I recall?  No.

25   Q.   If you'll look with me at Exhibit 3 in the binder in front

D59FUNIH                      Carpenter - direct

1   of you, could you tell me what that document is?

2   A.  Exhibit 3?

3   Q.  Correct.

4   A.  It appears to be the operating agreement for Moonstone

5   Partners.

6   Q.  And is that your signature on page three of the agreement?

7   A.  Yes.

8   Q.  And you see on the first page there's the date April 20,

9   2009?

10  A.  Yes.

11  Q.  Would that refresh your recollection that Moonstone

12  Partners was formed around April 20, 2009?

13  A.  No.

14  Q.  Besides you and your wife, have there ever been any other

15  person who is affiliated with Moonstone?

16  A.  I don't know what you mean by affiliated with Moonstone.

17  Q.  Have there ever been any other members of Moonstone at any

18  point in time other than Caroline Financial Group and your

19  wife?

20  A.  No.  I believe it's always been my wife and Caroline

21  Financial Group.

22  Q.  Does Moonstone have any employees?

23  A.  No.

24  Q.  What is the business of Moonstone?

25  A.  Traditionally it's the management of the property that's

D59FUNIH                    Carpenter - direct

1    there.

2    Q.   And what is the property that you're referring to?

3    A.   It's the property at 392 Cards Pond Road.

4    Q.   And can you describe that property for me?

5    A.   Yes.

6    Q.   Please do.

7    A.   It's a famous historical setting known as the Five Sisters

8    that survived the famous Rhode Island hurricane of 1938, so

9    that the properties themselves go back to the late 1890's,

10   early 1900's and they're significant architectural properties

11   that are listed on the federal historical properties landmark.

12   So from an architectural and historical standpoint they're very

13   significant properties.

14   Q.   Do they border any water?

15   A.   Yes.  They're right on Block Island Sound.

16   Q.   And does Moonstone have any other business aside from its

17   ownership and management of the Rhode Island property?

18   A.   No.

19   Q.   And on what date did Moonstone purchase the Rhode Island

20   property?

21   A.   I believe the closing was July 15 of 2009.

22   Q.   Now, what is your relationship to Grist Mill Capital LLC?

23   A.   Which one?  There's more than one Grist Mill Capital.

24   Q.   How many Grist Mill Capitals are there?

25   A.   There's two that I know of.

D59FUNIH                    Carpenter - direct

1   Q.  What are the differences in those two Grist Mill Capitals,

2   what distinguishes them?

3   A.  One Grist Mill Capital, the original Grist Mill Capital is

4   a Delaware LLC and then the more recent established Grist Mill

5   Capital is a Connecticut LLC.

6   Q.  Is there also a Wyoming Grist Mill Capital to your

7   knowledge?

8   A.  No.

9   Q.  Do you control Grist Mill Capital?

10  A.  I don't understand what you mean by do I control it.

11  Q.  Do you hold any position as officer or director of Grist

12  Mill Capital?

13  A.  Yes.  I believe I am the chairman and secretary, the

14  managing member, which is Caroline Financial Group.

15  Q.  Who are the members of Grist Mill Capital Delaware?

16  A.  Carpenter Financial Group Inc. is 99 percent owner of Grist

17  Mill Capital and Caroline Financial Group is also the managing

18  member of the tax matters partner for Grist Mill Capital as

19  well.

20  Q.  And you are a signatory on all of Grist Mill Capital's bank

21  accounts, correct?

22  A.  Once again, Grist Mill Capital Delaware I believe I'm one

23  of the signatories.

24  Q.  Well, under tab 1 in the exhibit binder in front of you,

25  turn to page 342.  There are numbers on the lower right-hand

D59FUNIH                     Carpenter - direct

1   corner.

2   A.   This is Exhibit 1?

3   Q.   Under Exhibit 1 and the pages there are in numerical order.

4   Turn to the page that ends in 342.

5   A.   I've got it.

6   Q.   Is that your signature that appears in the middle of the

7   page?

8   A.   Yes, ma'am.

9   Q.   And can you tell me what this document is?

10  A.   This appears to be a standard banking resolution that you

11  would be signing when you open up a new bank account.

12  Q.   And on whose behalf was this bank account being opened?

13  A.   Grist Mill Capital LLC.

14  Q.   And when was the bank account being opened, approximately

15  the date?

16  A.   Well, the date listed here is May 20 of 2009.

17  Q.   And is that your signature on the second page of the

18  document, that's page 343?

19  A.   Yes, ma'am.

20  Q.   And if you turn with me to tab 5 in the notebook, can you

21  tell me what that document is?

22  A.   Tab 5?

23  Q.   Correct.

24  A.   Appears to be a letter, a letter from Grist Mill Capital to

25  Cynthia Valenti Smith of Washington Trust Company.

D59FUNIH                    Carpenter - direct

1   Q.  And is that your signature on the second page of the letter

2   that has Bates number Nova COL 3032?

3   A.  Yes, ma'am.

4   Q.  And did you prepare this letter?

5   A.  Yes, I believe I did.

6   Q.  And this letter was sent to Washington Trust Company,

7   correct?

8   A.  Yes, ma'am.

9   Q.  In or about June of 2009?

10  A.  I believe so.

11  Q.  And if you look at the last paragraph on the first page, it

12  states Grist Mill Capital is controlled indirectly by

13  Mr. Carpenter through Caroline and Carpenter Financial Group

14  and is involved in the lending of money for the purchase of

15  large life insurance policies on the lives of high net worth

16  individuals for estate planning purposes.  Was that a true

17  statement when you made it in June of 2009?

18  A.  Yes, ma'am.

19  Q.  And as of today do you still control indirectly through

20  Caroline and Carpenter Financial Group Grist Mill Capital?

21  A.  Yes, ma'am.

22  Q.  Now, what is your relationship with Grist Mill Holdings,

23  LLC?

24  A.  Grist Mill Holdings LLC is an entity that I set up a number

25  of years ago to receive commissions, so instead of me receiving

D59FUNIH                    Carpenter - direct

1    the commissions they would go into Grist Mill Holdings LLC.

2    Q.  Do you run Grist Mill Holdings?

3    A.  Yes, ma'am.

4    Q.  And when you say that it receives life insurance

5    commissions, what life insurance commissions are you referring

6    to?

7    A.  In other words, I participate in a number of cases all

8    across the country with various brokers and I get paid a

9    commission, you know, usually 10 or 20 percent on helping those

10   brokers with selling those cases.

11   Q.  Do you recall testifying at your deposition that Grist Mill

12   Holdings is your alter ego?

13   A.  I definitely member saying those words, yes.

14   Q.  And you're a signatory on all the bank accounts for Grist

15   Mill Holdings, correct?

16   A.  Yes, ma'am.

17   Q.  Now, what is your relationship to Hanover Trust Company?

18   A.  I don't know what you mean by "relationship."

19   Q.  Do you have anything to do with Hanover Trust Company?

20   A.  Yes.

21   Q.  What do you have to do with Hanover Trust Company?

22   A.  I was the person that formed it.  It's a Delaware trust

23   company and I formed it and set it up to manage assets, you

24   know, mostly financial estate planning for my own family

25   trusts.

D59FUNIH                    Carpenter - direct

1  Q.  Do you have any position with Hanover Trust Company?

2  A.  Not formally, but I am the only officer, so I would say

3  that I'm the chairman and secretary and chief investment

4  officer of Hanover Trust.

5  Q.  And you're the only signatory on bank accounts of Hanover

6  Trust Company?

7  A.  Yes, ma'am.

8  Q.  Now, were you ever a trustee of Hanover Trust Company?

9  A.  That's not the way a trust company works.  But in other

10  words I was the person who controlled Hanover Trust Company.

11  Q.  If you turn under Exhibit 1 to page 1371.  Do you have

12  that?

13  A.  This is Exhibit 1?

14  Q.  Correct, under Exhibit 1 and then the page that's numbered

15  1371 at the end.

16  A.  Yes, ma'am.

17  Q.  And can you tell me what this is?

18  A.  No, I really can't.  The print is very small, it's very

19  difficult to read, so I'm actually not sure what it is.

20  Q.  Okay, well, down towards the lower third of the page, is

21  that your signature there?

22  A.  Yes, ma'am.

23  Q.  And let's focus on some of the print that's clear.  Do you

24  see up in the upper third of the document, there are the words

25  account titling/address.  Do you see that?

1   A.  Yes, ma'am.

2   Q.  And it states -- and this document is titled TD Banknorth,

3   correct?

4   A.  Yes.

5   Q.  Do you have a recollection of signing this document?

6   A.  No, I don't.

7   Q.  You have no reason to believe that you didn't sign it,

8   though, correct?

9   A.   It definitely looks like my signature and it definitely

10  looks like a new personal account information.

11  Q.  Under the account titling information it states Hanover

12  Trust Company, Daniel E. Carpenter trustee.  Do you see that?

13  A.  Yes, ma'am.

14  Q.  Do you have any understanding as to why you're identified

15  there as a trustee?

16  A.  No, I don't know why they listed it that way.  I mean, this

17  is TD Bank form, so I'm sure that the person set up the account

18  just made the decision to put it down that way.

19  Q.  Who did you speak to at TD Bank concerning setting up this

20  account?

21  A.  I actually don't recall.  There were a couple of different

22  women that I worked with on a regular basis, but I don't recall

23  who was there when we set up this account.

24  Q.  Did you ever notify TD Bank that you were not a trustee of

25  Hanover Trust Company?

D59FUNIH                    Carpenter - direct

1    A.  Honestly, till today, I don't even remember ever seeing

2    this document.

3    Q.  Okay, well, turn to the next page that has Bates number

4    1372 on the bottom.  Do you recognize that document?

5    A.  No.  Just looks like a bank statement for Hanover Trust

6    Company.

7    Q.  Right, and it again indicates that you're the trustee of

8    Hanover Trust Company, correct?

9    A.  It says that in the upper left-hand corner.

10   Q.  Looking at this document, does that refresh your

11   recollection that you told TD Bank that you were a trustee of

12   this entity?

13   A.  Actually, no.

14   Q.  What is your relationship with Grist Mill Trust?

15   A.  I don't have a relationship with Grist Mill Trust.

16   Q.  You don't control Grist Mill Trust?

17   A.  No, not at all.  I'm not a signatory, never been a trustee

18   of it and I'm not a signatory of Grist Mill Trust.

19   Q.  Do you have any decision-making authority for the Grist

20   Mill Trust?

21   A.  None whatsoever.

22   Q.  Have you had decision-making authority for the Grist Mill

23   Trust at any point in time?

24   A.  Never.

25   Q.  Is the Grist Mill Trust an employee welfare benefit plan

D59FUNIH                        Carpenter - direct

1   like the Charter Oak Trust?

2   A.  It's a totally different welfare benefit plan.  Grist Mill

3   Trust has other benefits and it's totally a different structure

4   than the Charter Oak Trust.

5   Q.  It's a different structure, but it is an employee welfare

6   benefit plan, correct?

7   A.  Correct.

8   Q.  Do you have any personal knowledge with regard to the

9   business affairs of the Grist Mill Trust?

10  A.  What do you mean by the business affairs?

11  Q.  Well, do you consult with anyone on behalf of the Grist

12  Mill Trust?

13  A.  Normally if they've got a tax question, if one of the

14  participating employers is being audited I'm usually consulted

15  by the people at the Grist Mill Trust to see if I could help

16  that person through their audit.

17  Q.  Have you ever received any payments from the Grist Mill

18  Trust?

19  A.  Never.

20  Q.  Are you a signatory on any of the bank accounts for the

21  Grist Mill Trust?

22  A.  No, ma'am.

23  Q.  Have you or any of the entities that you control made loans

24  to the Grist Mill Trust?

25  A.  Made loans to the Grist Mill Trust?

D59FUNIH                    Carpenter - direct

1    Q.  Mm-hmm.

2    A.  No.  We've paid back loans but I don't believe we've made

3    any loans.

4    Q.  Have you or any company that you control received a loan

5    from the Grist Mill Trust?

6    A.  I believe several companies that I'm affiliated with have

7    received loans from the Grist Mill Trust.

8    Q.  Which companies that you're affiliated with have received

9    loans from the Grist Mill Trust?

10   A.  I know that Phoenix Capital Management definitely received

11   a loan and I believe that Avon Capital received loans from the

12   Grist Mill Trust.

13   Q.  When did Phoenix Capital Management receive a loan from the

14   Grist Mill Trust?

15   A.  I believe they received several loans going back to

16   2005-2006.

17   Q.  Are those loans evidenced by written promissory notes?

18   A.  I believe they are, yes.

19   Q.  When was the last loan made by the Grist Mill Trust to

20   Phoenix Capital Management?

21   A.  I don't recall.

22   Q.  Who on behalf of the Grist Mill Trust authorized the loan

23   to Phoenix Capital Management?

24   A.  I believe Wayne Bursey and Nova Benefits Plans LLC is the

25   trustee, so Mr. Bursey would have to sign off on any loans that

D59FUNIH                    Carpenter - direct

1   were made.

2   Q.   Did you have any discussion with Mr. Bursey concerning the

3   loan from Grist Mill Trust to Phoenix Capital Management?

4   A.   I believe I talked to two other people in his office about

5   the loan.

6   Q.   And who are those two people?

7   A.   Cathy Keogh, I believe Cathy Keogh and Donna Dawson.

8   Q.   Did you submit a loan application to the Grist Mill Trust?

9   A.   No.

10  Q.   How did it -- just tell me, how did it come to be that

11  Phoenix Capital Management got a loan from Grist Mill Trust

12  that's an employee welfare benefit plan?

13             MR. SIANO:   Judge, I don't mean to intrude, but I

14  believe there was testimony that there was more than one loan.

15  I'm having a little trouble with the use of the word "the," but

16  that's my objection to the form of the question.

17  Q.   The last loan that was made.   Well, let me withdraw that.

18  What was the principal amount of the last loan that was made?

19  A.   The last loan that I remember was for -- there's two loans.

20  There was one for two and a half -- there's three loans that I

21  remember.   So there was one for about 2-1/2 million, there was

22  one for 900-something thousand and there was another one that

23  was done to Phoenix Capital Management for 2.7 million.

24  Q.   And Mr. Bursey approved all three of these loans?

25  A.   He would have to sign off.   Money could not move without

D59FUNIH                    Carpenter - direct

1    Mr. Bursey's signature.

2    Q.  What are the repayment terms for the $2.5 million loan

3    between the Grist Mill Trust and Phoenix Capital Management?

4    A.  On the 2.5 million, we paid back over 2.8 million, so I

5    believe it was about 6 percent interest.

6    Q.  Was that loan repaid prior to May 2009?

7    A.  I don't recall when that was paid.

8    Q.  If you look at, under Exhibit 1, page 467?

9    A.  Yes, ma'am, I have it.

10   Q.  Is that your signature there on the middle of the page?

11   A.  Yes, ma'am.

12   Q.  And can you tell me what this document that we're looking

13   at is?

14   A.  It appears to be another banking resolution form for

15   Phoenix Capital Management LLC.

16   Q.  And was this document a document that you signed and

17   furnished to TD Bank in connection with opening up a bank

18   account at TD Bank for Phoenix Capital Management?

19   A.  Yes, ma'am.

20   Q.  And when did you open up that bank account on behalf of

21   Phoenix Capital Management at TD Bank?

22   A.  I don't exactly recall.  The dates seem to be May 20 and

23   May 21.

24   Q.  Does that comport with your general recollection that you

25   opened up this account in the May 20, 2009 time frame?

D59FUNIH                    Carpenter - direct

1   A.   Yes.

2   Q.   And is that your signature that appears on the second page

3   of the document bearing number 468?

4   A.   Yes, ma'am.

5   Q.   And prior to opening up the bank account at TD Bank for

6   Phoenix Capital Management, did Phoenix Capital Management

7   maintain bank accounts at any other institutions?

8   A.   Yes, ma'am.

9   Q.   Where?

10  A.   I know that there was a large account at Bank of America

11  and I think that there were accounts before at Fleet and

12  perhaps Simsbury Bank and Trust.

13  Q.   If you flip in your notebook to Exhibit 15, and tell me

14  what is document 15?

15  A.   These are accounts, a young man in our office, Eric

16  Schneider, kept all these bank accounts, these are Bank of

17  America bank accounts and usually every day or every other day

18  he would put together a listing of the various bank accounts

19  that we had at Bank of America and he would just routinely do

20  this.

21  Q.   Did he do it under your direction?

22  A.   I actually think he did it under Amanda Rossi's direction.

23  Q.   And Ms. Rossi is your assistant, she works for you?

24  A.   Yes, she does work for me.

25  Q.   Exhibit 15 doesn't list any bank account at Bank of America

D59FUNIH                        Carpenter - direct

1   for Phoenix Capital Management, does it?

2   A.   I don't see it listed on this, I don't see it listed on

3   this sheet.

4   Q.   Okay, and then down in the lower right the document says

5   "last modified 5/15/2009," correct?

6   A.   That's what it says, yes.

7   Q.   And flip to Exhibit 16 and it's a similar sheet, correct?

8   A.   Yes.

9   Q.   And Exhibit 16 bears the date last modified July 7, 2009,

10  right?

11  A.   That's what it says, yes.

12  Q.   And you'll agree with me that there's no Phoenix Capital

13  Management listed as an account at Bank of America?

14  A.   Phoenix Capital is not on this list, but that doesn't mean

15  there wasn't a Bank of America account.

16  Q.   Did you ever receive bank statements from Bank of America

17  for a Phoenix Capital Management account?

18  A.   I don't recall.

19  Q.   Do you still bank with Bank of America?

20  A.   No.  Not at all.

21  Q.   Why not?

22  A.   We had a falling out pretty much around that time frame.

23  One of our companies that had done $20 million in transactions

24  with them, they restricted the wiring and the reason, we're

25  wiring large amounts all the time and they restricted our

D59FUNIH                    Carpenter - direct

1    wiring ability and that was unacceptable to us.

2    Q.  Was it a falling out or -- at your deposition you said you

3    were kicked out.  Is that accurate?

4    A.  Well, you know, it's kind of like a mutual divorce.  There

5    was no question that we felt that somebody -- we were

6    definitely kicked out of TD Bank, but as far as Bank of America

7    goes, I think we went back and forth with some of the top

8    executives there that we didn't think we were being treated

9    fairly and I believed that somebody had sent a nasty letter to

10   the president of Bank of America and I think what they

11   insinuated is that you should get rid of all of the accounts at

12   Bank of America that Dan Carpenter is associated with.  But

13   nobody ever confirmed that at Bank of America.

14   Q.  Now, in your answer I think you may have misspoke at the

15   beginning and you said that you were kicked out of TD Bank.  We

16   could have it read back if you want.  Were you also kicked out

17   of TD Bank?

18   A.  Yes, ma'am.  In June.

19              THE COURT:  I beg your pardon, what year?

20              THE WITNESS:  I'm sorry, June of 2010, your Honor.

21              THE COURT:  Thank you.

22   Q.  Does the Grist Mill Trust operate out of 100 Grist Mill

23   Road in Simsbury, Connecticut?

24   A.  I believe it does.

25   Q.  And you created the Grist Mill Trust, is that correct?

D59FUNIH                    Carpenter - direct

1   A.  No, that's not true.

2   Q.  Why did Phoenix Capital -- I want to go back a couple of

3   questions on the Grist Mill Trust.  I apologize.  Why did

4   Phoenix Capital Management need a loan?

5           MR. SIANO:  Objection as to form.  Which loan?

6           THE COURT:  Do you want to rephrase?

7   Q.  Why did Phoenix Capital Management need any of the three

8   loans that you identified?

9   A.  Phoenix Capital Management is the lending arm or financial

10  arm of Carpenter Financial Group and Phoenix Capital.  I had

11  made substantial loans to Benistar Admin Services Inc. and

12  because of my personal problems legally several people had made

13  the suggestion that we should not have Carpenter Financial

14  Group appearing on the Benistar Admin Services financial

15  statements because Benistar Admin Services had to file

16  financial statements and even though I had nothing to do with

17  BASI our accountants and our attorneys felt it would be a

18  better idea to restructure the loan, create a new entity which

19  would be Phoenix Capital.  So the first deal that Phoenix

20  Capital did was lending money to Benistar Admin Services which

21  was used to pay back Carpenter Financial Group so Carpenter

22  Financial group would no longer appear on BASI's audited

23  financial statements.

24  Q.  Why didn't Grist Mill Trust just make the loan directly to

25  BASI?

D59FUNIH                          Carpenter - direct

1    A.   Nobody ever talked to me about Grist Mill Trust.  I was the

2    only one who approached Grist Mill Trust because in the old

3    days we might be able to get three or four percent interest

4    from JPMorgan, but all during the 2000's the interest rates

5    were all under 1 percent and literally dropped to ten basis

6    points.  So it was my idea to come up with the idea with the

7    excess cash that the Grist Mill Trust had to lend it to groups

8    like Grist Mill Capital and to Phoenix Capital so we could

9    invest in insurance policies and pay back 6 or 8 percent to the

10   Grist Mill Trust.  So it wasn't a question of need, it was a

11   question of opportunity.

12   Q.   Well, sir, if you had nothing to do with the Grist Mill

13   Trust, how would you know that they had excess cash that could

14   be put to work?

15   A.   Because I knew for a fact that hundreds of millions of

16   dollars were coming in to the Grist Mill Trust every year.

17   Q.   Now, all of the entities that we talked about; Carpenter

18   Financial Group, Caroline Financial Group, Grist Mill Holdings,

19   Grist Mill Capital Delaware, Grist Mill Capital Connecticut,

20   Phoenix Capital Management, all of them operate out of 100

21   Grist Mill Road in Simsbury, Connecticut, correct?

22   A.   Yes, ma'am.

23   Q.   Now, you're aware that a judgment was entered in this

24   action against an entity known as Nova Group Inc., correct?

25   A.   Yes, ma'am.

D59FUNIH                    Carpenter - direct

1   Q.  Do you have any relationship with Nova Group Inc.?

2   A.  Which Nova Group Inc. are you referring to?

3   Q.  Okay.  I wasn't aware that there were more than one, but

4   how many Nova Group Inc.'s are there?

5   A.  There's two.  There's a Nova Group Inc. that was formed in

6   Delaware in August of 2002, and then there's a Nova Group Inc.

7   that was formed in Connecticut in January of 2007 and that's a

8   Connecticut corporation.

9   Q.  Were you involved in forming both of those Nova Group

10  entities?

11  A.  I wasn't involved in either one of them.

12  Q.  Did you authorize the forming of either one of those

13  entities?

14  A.  No, I did not.

15  Q.  Have you at any point in time been an officer or director

16  of Nova Group Inc.?

17  A.  When Paul Doucet who established Nova Group Inc. Delaware

18  left, he left in 2004, I took over the doing of tax returns and

19  the filing of various paperwork, but that Nova Group Inc

20  Delaware had nothing whatsoever to do with the Nova Group Inc

21  Connecticut that was formed to be the sponsor of the Charter

22  Oak Trust.

23  Q.  So do I understand your testimony, you -- strike that.

24          Do you have any understanding as to how much is

25  currently due under the judgment against Nova Group Inc?

D59FUNIH                    Carpenter - direct

1   A.   No, ma'am.  I know it's a big number, but I don't know what

2   the actual number is.

3   Q.   Now, you're currently the chairman of Nova Group Inc,

4   aren't you, sir?

5   A.   No, I'm not.

6   Q.   Turn with me to Exhibit 7 and turn to the second page of

7   that exhibit.  Can you identify that document?

8   A.   It appears to be State of Delaware, annual franchise tax

9   report.

10  Q.   Midway down the page it identifies you as the chairman,

11  correct?

12  A.   Yes.

13  Q.   And for what year does this franchise tax report relate?

14  A.   Well, it says the corporation was established August 30th

15  of 2002 and I believe it's for tax years 2008.

16  Q.   And down at the bottom of the page, what is the date as to

17  when this document was filed with the Secretary of State of

18  Delaware?

19  A.   It says February 25, 2010.

20  Q.   And it indicates that you filed this document, correct?

21  A.   I know I didn't file this.  Where do you say -- I

22  definitely didn't file this.

23  Q.   Did you authorize someone to file this with the state of

24  Delaware?

25  A.   We do a number of filings in February and March of various

D59FUNIH                        Carpenter - direct

1    entities and I definitely don't do the filings myself.

2    Q.  My question to you, sir, was, did you authorize someone to

3    file Exhibit 7 or a copy of it with the state of Delaware

4    Secretary of State's office?

5    A.  No, I did not.

6    Q.  Do you know who authorized the filing of Exhibit 7 with the

7    Secretary of State of Delaware?

8    A.  No, I do not.

9    Q.  Now, you've seen this document before today, correct?

10   A.  No, I have not.

11   Q.  You've never seen this document before today?

12   A.  I have never seen this document before today.

13   Q.  Sir, have you read any of the pleadings and papers that

14   were filed in the arbitration?

15   A.  I've read about half of them.

16   Q.  And you were a party in the arbitration, correct?

17   A.  I don't believe I was a party in the arbitration.

18   Q.  Do you recall your lawyer submitted a letter in connection

19   with your opposition?  Strike that.  Have you read the

20   opposition papers that your counsel filed on this turnover

21   application?

22   A.  Yes, ma'am.

23   Q.  And did you review the documents that were attached to his

24   affidavit?

25   A.  Only a couple of the documents.

D59FUNIH                          Carpenter - direct

1   Q.  And do you recall there was a letter dated in March of 2011

2   where we dismissed, where Universitas dismissed you from phase

3   2 of the arbitration.  Do you recall that letter?

4   A.  I do not recall a letter, but I definitely recall that

5   Universitas dismissed Grist Mill Capital LLC and Dan Carpenter

6   from all the proceedings, but I do not remember the specific

7   letter.

8   Q.  Have you ever notified the Secretary of State of Delaware

9   that you're not the chairman of Nova Group Inc?

10  A.  Have I never --

11  Q.  Have you ever notified the Secretary of State of Delaware

12  that you're not the chairman?

13  A.  No.  But this Nova Group has nothing to do with the

14  Universitas.

15  Q.  Who at Nova Group Inc files the franchise tax reports?

16  A.  I don't know how to answer that question.  We don't have

17  anybody at Nova Group.  There's nobody affiliated at Nova

18  Group.

19  Q.  Do you have any understanding as to who filed Exhibit 7?

20  A.  I could make a guess.

21  Q.  What's your -- you work at 100 Grist Mill Road.  What is

22  your best guess?

23  A.  Right.  We have several people that work under Amanda Rossi

24  and Matt Wescott that file hundreds of these forms.  There are

25  several hundred companies that operate out of 100 Grist Mill

1   Road and every year in February and March both Amanda Rossi and

2   Matt Wescott are responsible for filing all of these various

3   returns, because if you don't file them you get hit with 250 or

4   $350 penalties, so if we didn't do it on a regular basis we

5   would be hit with huge fines.

6              So we've set up where several staff people just file

7   these routinely to make sure we don't get hit with the 250 and

8   $350 penalties.

9   Q.  So you have a process set up that these forms will get

10  filed and it's under Amanda Rossi, correct?

11  A.  And Matt Wescott, yes.

12  Q.  Amanda Rossi works for you, correct?

13  A.  My name is not on her paycheck, but one of the entities

14  that I control she works for, yes.

15  Q.  And which entity is that?

16  A.  USB Group.

17  Q.  And if you look at what is marked as Exhibit 8, the second

18  page, have you ever seen this document before?

19  A.  No, ma'am.

20  Q.  Can you tell me what it is?

21  A.  Once again, it looks to be Delaware showing, it's a

22  Delaware filing showing that Nova Group Inc, this Nova Group

23  Inc, was formed on August 30 of 2002 and it says it's for tax

24  year 2010.

25  Q.  And when was the document filed with the Secretary of

D59FUNIH                    Carpenter - direct

1  State?

2  A.  It says at the bottom February 28, 2011.

3  Q.  And this indicates that you are the chairman of Nova Group

4  Inc, correct?

5  A.  Yes, ma'am of this Nova Group Inc., not the Connecticut.

6  Q.  Who are the shareholders of Nova Group Inc?

7  A.  I don't believe there are any.  There are no directors and

8  you don't need to have shareholders.

9  Q.  Now, let's take a look at Exhibit 9.  Do you have that?

10  A.  Yes, ma'am.

11  Q.  And could you tell me, this document appears to be a U.S.

12  corporation income tax return for calendar year 2009, correct?

13  A.  Yes, ma'am.

14  Q.  And two-thirds of the way down under the, under penalties

15  of perjury statement, do you see that?

16  A.  Yes, ma'am.

17  Q.  Is that your signature that appears there?

18  A.  It definitely looks like my signature.

19  Q.  Did you place the date next to your signature of 9-9-10?

20  A.  I don't recall.

21  Q.  And did you place the word "Secretary" on the title line?

22  A.  I don't recall.  That doesn't look like my -- that doesn't

23  look like my handwriting, but the other form said I was

24  chairman and this form said I was secretary, so I honestly

25  don't recall.

D59FUNIH                        Carpenter - direct

1   Q.  Well, when you placed your signature on the document that

2   is under Exhibit 9 was the word "Secretary" to the right of

3   where you placed your signature?

4   A.  No.  I usually sign a lot of these in blank.  You know,

5   normally, when someone from Sumion Maka (ph) comes up they'll

6   have 40 or 50 tax returns at one sitting and we sit down and go

7   through the sitting and I just basically sign as the officer.

8   Q.  You authorize this tax return to be filed with the Internal

9   Revenue Service, correct?

10  A.  Yes, ma'am.

11  Q.  Now, do you recall testifying at your deposition that Nova

12  Group Inc is a shell corporation?

13  A.  Once again, which Nova Group Inc are we talking about?

14  Q.  The Nova Group that you referred to at your deposition,

15  sir.  Let me ask you, is one of the Nova Groups not a shell

16  corporation?

17  A.  No, I'd say just the opposite.  They're both shell

18  corporations.

19  Q.  By that you meant that Nova Group was incorporated but it

20  had no assets or operations, right?

21  A.  There's a Nova Group incorporated in Delaware that was

22  incorporated in 2002 which has nothing to do with the Charter

23  Oak Trust and then there's another Nova Group Inc that was

24  formed by Halloran & Sage in January of 2007 and that was set

25  up to be the sponsor and named fiduciary of the Charter Oak

D59FUNIH                        Carpenter - direct

1    Trust.

2    Q.   Who were the officers and directors currently of the Nova

3    Group Inc. Connecticut?

4    A.   I have no idea.

5    Q.   Now, what is your relationship with the Charter Oak Trust?

6    A.   What do you mean by "relationship"?

7    Q.   Well, do you function in any capacity with regard to the

8    Charter Oak Trust?

9    A.   That was made very clear to me early on that if Dan

10   Carpenter had anything to do with the Charter Oak Trust,

11   several insurance companies actually would not do business with

12   us.

13   Q.   Why was that?

14   A.   Because of legal problems I was going through up in Boston

15   at the time.

16   Q.   You mentioned the personal problems and legal problems a

17   couple of times.  Are you referring to the fact -- well, let me

18   ask you differently.  At one point in time you had a license to

19   practice law, correct?

20   A.   Yes.

21   Q.   And your license has been suspended by the State of

22   Connecticut, correct?

23   A.   I voluntarily gave it up as part of a negotiated deal.

24   Q.   And that negotiated deal came after an adverse finding by

25   the grievance committee, correct?

1  A.  No.  That's really not true.  The deal came after the fact

2  that I was falsely indicted, falsely tried and egregiously

3  prosecuted, not once but twice, up in Boston.

4  Q.  There was a finding by the State of Connecticut statewide

5  grievance committee in early January 2005 adverse to you,

6  correct?

7  A.  That's true.

8  Q.  And two separate juries have found you guilty of multiple

9  wire and fraud counts, correct?

10  A.  That's true.

11  Q.  And you currently are a target of a Grand Jury

12  investigation arising out of the United States Attorney's

13  Office in Connecticut, correct?

14  A.  Yes.

15          MR. SIANO:  Judge, I'm going to object to this.  The

16  fact that someone is a target of an investigation is not a

17  factual finding.  I object to it.  It's not proper examination.

18          MS. COLBATH:  I believe it goes to his credibility and

19  the investigation deals with the Charter Oak Trust.

20          MR. SIANO:  Now Ms. Colbath is testifying.

21          MS. COLBATH:  Let me ask you.

22          MR. SIANO:  I believe even if he was indicted, your

23  Honor is well aware as your Honor gives the instruction myriad

24  number of times in cases that an indictment is just a paper and

25  has no evidentiary value.

1          THE COURT:  Well, the objection to the acceptance of

2    the testimony is overruled.  I hear your argument about the

3    weight.

4    Q.  Now, did you help create the Charter Oak Trust?

5    A.  What do you mean by "help create"?

6    Q.  Did you have anything to do with the formation of the

7    Charter Oak Trust?

8    A.  I came up with the idea that Grist Mill Capital would enter

9    into a split dollar arrangement with each of the policies so

10   that all of the money that came into the Grist Mill Trust came

11   from my company, Grist Mill Capital.

12   Q.  Now, you also have been involved in setting up bank

13   accounts for the Charter Oak Trust, correct?

14   A.  That's not true.

15   Q.  Well, let's turn to Exhibit 12 in the binder.

16          THE COURT:  I'm sorry, I just have to ask you for

17   clarification since this is a short proceeding and I need to

18   understand it.  I thought that you had asked Mr. Carpenter

19   about his involvement with the formation of the Charter Oak

20   Trust and the answer that he gave was I came up with the idea

21   that Grist Mill Capital would enter into a split dollar

22   arrangement with each of the policies so that all the money

23   that came into the Grist Mill Trust came from my company Grist

24   Mill Capital.  And so would you please ask the question to

25   clarify whether he was talking about money that went into

D59FUNIH                    Carpenter - direct

1    Charter Oak Trust or money that went into Grist Mill Trust.

2          MS. COLBATH:  Sure.

3    Q.  Could you clarify for the Court the point as to where the

4    money was coming from?

5          THE COURT:  Whether the money that you're talking

6    about from the split dollar policies went into the Grist Mill

7    Trust or the Charter Oak Trust.

8    A.  If I could have a little leeway, your Honor.  Because of

9    the confusion in the names, the Grist Mill Trust is an employer

10   welfare benefit plan, has nothing to do with Charter Oak Trust.

11   Grist Mill Capital borrowed substantial sums of money from

12   hedge fund and other entities in which they provided the

13   funding for the policies that were purchased through the

14   Charter Oak Trust.  So there were 84 policies that were

15   effectively purchased under the split dollar arrangement and

16   that's the only relationship Grist Mill Capital has with the

17   Charter Oak Trust is in those split dollar arrangements.

18         THE COURT:  Thank you.

19   Q.  We were looking at Exhibit 12, and could you tell me what

20   Exhibit 12 is?

21   A.  Looks to be e-mails going back and forth between myself and

22   some of the top people at U.S. Trust and Bank of America.

23   Q.  And e-mails were going back and forth in the May 2009 time

24   frame, correct?

25   A.  Right.  The first e-mail looks to be May 11 of 2009.

D59FUNIH                    Carpenter - direct

 1  Q.  And that's on the connected page of Exhibit 12, correct?

 2  A.  Yes, ma'am.

 3  Q.  And that's the e-mail where Mr. Roman asks you for the name

 4  of all the companies that run out of 100 Grist Mill Road,

 5  Simsbury?

 6  A.  Yes.

 7  Q.  And they wanted the names of all the companies that you

 8  own, operate, direct, etc.?

 9  A.  Yes, ma'am.

10  Q.  And the ownership and makeup of each company, names of

11  individuals, businesses, LLC and percentages owned?

12  A.  Yes.

13  Q.  This also asked you how any of the companies are related,

14  affiliated, have business transactions between each other,

15  correct?

16  A.  Yes, ma'am.

17  Q.  And then they also asked you for the sources and uses of

18  funds for each company; "important to complete our

19  know-your-customer forms," correct?

20  A.  Yes, ma'am.

21  Q.  Did you furnish U.S. Trust with the information they

22  requested?

23  A.  No.  Because you'll see from the e-mail up above I

24  basically explain that I had nothing to do with Charter Oak

25  Trust and Dan does not own or control the Charter Oak Trust and

D59FUNIH                        Carpenter - direct

1    Wayne Bursey will be the only signatory.

2    Q.  So let's go to the first page of the exhibit, the e-mail

3    that -- the top of the page is an e-mail that you sent on

4    May 14, 2009 at 10:08, correct?

5    A.  I don't know when it was sent but that's when, it says

6    May 14, 2009.

7    Q.  And that's an e-mail that you sent to Jeff Roman at U.S.

8    Trust, correct?

9    A.  I know that I had e-mail discussions with people at Bank of

10   America and U.S. Trust, but I don't remember the particular,

11   the particular -- in other words, this e-mail I don't remember

12   why I was sending the e-mail, but I definitely know I was in

13   discussions with them.

14   Q.  But you have no reason to believe that you didn't send

15   Mr. Roman this e-mail, correct?

16   A.  No, no.  It definitely looks like Dan Carpenter.

17   Q.  And you state in this e-mail, "Just so you know, since we

18   had our meeting with U.S. Trust, we have already opened up new

19   accounts for the Charter Oak Trust with two other major banks."

20   Do you see that?

21   A.  Yes, I say that in the e-mail.

22   Q.  And was that a true statement when you made it to

23   Mr. Roman?

24   A.  Honestly I don't.  I had nothing to do with opening up the

25   accounts so I don't know whether it was true or not, and I

D59FUNIH                        Carpenter - direct

1   think it might have been, I think it might have been on our

2   part that I wanted to stress that we had done $20 million in

3   transactions as Avon Capital and Avon Capital was the entity

4   that I was upset about and Avon Capital had nothing to do with

5   the Charter Oak Trust.  So I think this might have been the

6   sort of thing I was saying to one bank, don't worry, we're

7   setting up accounts with a different bank, you know, because I

8   definitely don't believe we had accounts set up at two

9   different banks.

10              MS. COLBATH:  I'm sorry, could I just have the last

11  part of that answer, the last sentence of that answer read

12  back.

13              (Record read)

14  Q.  So when you state in here that the Charter Oak Trust had

15  opened up accounts with two other major banks, that wasn't

16  true?

17  A.  I honestly don't know whether it was true or not, because

18  obviously I was very upset and I was more worried about Avon

19  Capital being shut down despite the fact we did $20 million

20  that year alone with them and I honestly don't know if Wayne

21  established the accounts, but I said right there that Wayne

22  would have to answer any questions and please get back to Wayne

23  Bursey with any questions on the trust once you people have

24  reviewed it.  So it might have been just I was upset with the

25  bank.

D59FUNIH                        Carpenter - direct

1   Q.  You go on to tell him that you already had starter checks

2   with one of them.  Was that true?

3   A.  I certainly didn't have starter checks.  But once again,

4   the tenor of the relationship here is the fact that Bank of

5   America and U.S. Trust are not telling us why they don't want

6   to do business with us, and I think that that's why I was

7   upset.

8   Q.  Now, who is Wayne Bursey?

9   A.  Wayne Bursey is the president of Nova Benefit Plans LLC and

10  is the trustee of most of the trusts.  He's a signatory for

11  most of the welfare benefit trusts.

12  Q.  Is he related to you in any way?

13  A.  His wife is my wife's sister.

14  Q.  So would you say he's your brother-in-law?

15  A.  I usually object to that, but the fact is, is that he's

16  definitely my wife's brother-in-law, but, you know, I've known

17  Wayne Bursey, but I don't refer to him as my brother-in-law.

18  Q.  What is Mr. Bursey's role with respect to Nova Group Inc.?

19  A.  I don't believe he has any role with Nova Group Inc.

20  anymore.

21  Q.  Did he have a role at any point in time?

22  A.  Yes, ma'am.

23  Q.  What was his role?

24  A.  He was the original trustee, he was the president of Nova

25  Group Inc. and he was the original trustee of the Charter Oak

1   Trust.

2   Q.  And what is Mr. Bursey's role with respect to Grist Mill

3   Capital LLC?

4   A.  I don't believe he's ever had a role with Grist Mill

5   Capital LLC.

6   Q.  Let's take a look at Exhibit 14 in your binder.  Can you

7   tell me what that document is?

8   A.  It appears to be the articles of organization for the

9   Connecticut Grist Mill Capital LLC.

10  Q.  There's a fax legend at the top that has the name Halloran

11  & Sage.  Are you familiar with that entity?

12  A.  Yes, ma'am.

13  Q.  They're your lawyers, correct?

14  A.  There are several attorneys from Halloran & Sage that

15  represent me personally in certain things and Mr. LaBelle is

16  here today representing my wife.

17  Q.  And you've worked with Robert Cox whose name appears midway

18  down the page?

19  A.  That's right.

20  Q.  Am I correct this document indicates that Mr. Bursey is a

21  manager of Grist Mill Capital LLC?

22  A.  I had never seen this before until the various proceedings,

23  but I've already identified that Mr. Cox was mistaken in

24  putting down Jack Robinson or Wayne Bursey for Grist Mill

25  Capital Connecticut.

D59FUNIH                    Carpenter - direct

1  Q.  When did you see this document for the first time?

2  A.  Just when my deposition was going on.  My attorney showed

3  me a group of exhibits.

4  Q.  And so it's your testimony that Mr. Bursey is not a manager

5  of Grist Mill Capital LLC?

6  A.  Yes.  He's never been a manager of Grist Mill Capital LLC,

7  and neither has Jack Robinson.

8          MS. COLBATH:  Your Honor, would it be possible to take

9  a two-minute break?

10         THE COURT:  Yes.  So we will take a break.  People can

11 leave the courtroom to pursue whatever they want to pursue, and

12 then let's just come straight back to our seats and when we've

13 all reconvened we'll start.

14         (Recess)

15 BY MS. COLBATH:

16 Q.  Mr. Carpenter, in connection with Moonstone's purchase of

17 the Rhode Island properties, you sought to obtain a mortgage

18 loan, correct?

19 A.  Yes.

20 Q.  And you sought to obtain that loan from Washington Trust

21 Company, a bank in Rhode Island?

22 A.  Yes, ma'am.

23 Q.  And what happened with that?

24 A.  We were turned down for, once again, undisclosed reasons.

25 They never disclosed the reason but I had the same sort of

1    negative conversations that I had with U.S. Trust and with Bank

2    of America.

3    Q.   Well, did you open up a checking account with Washington

4    Trust Company?

5    A.   No.  They wouldn't let me open up anything, so --

6    Q.   So at that point you needed to go in another direction for

7    your financing for the purchase of the property, correct?

8    A.   No.  We're definitely going to be getting a mortgage from

9    somebody, but it didn't appear that we would be able to get a

10   mortgage from one of the commercial banks.

11   Q.   Well, do you recall when we were together at your

12   deposition a week or two ago you testified, the question was,

13   what's not correct in that, and you said Hanover had plenty of

14   assets, but they're all in cash value of life insurance

15   policies, and after we had a bad experience of applying for a

16   mortgage at Washington Trust and we had given them all these

17   documents and they told us there would be no problem getting a

18   mortgage from them, they just turned us down flat and because I

19   felt that the reason they turned us down flat was because of

20   the terrible problems I was having in Boston and they didn't

21   have the guts to tell me that it was because of the problems

22   that I was personally having in Boston they basically got

23   skittish, wouldn't talk to me, wouldn't return any documents

24   but just said we can't help you.

25          So having been thrown out of Bank of America, having

D59FUNIH                    Carpenter - direct

1   been thrown out of a number of banks and then having this

2   terrible, terrible experience at Washington Trust it was at

3   that point in time that I felt we needed to go in a different

4   direction.  Do you recall giving that testimony?

5           MR. SIANO:  Object.

6           THE COURT:  Your objection is what?

7           MR. SIANO:  Judge, I'd like the witness to see it and

8   it's also as to the form of the question.  I believe that type

9   of cross has to be formulated in this type of Q and A fashion

10  and the witness has to have the opportunity to read the answer.

11  I don't think it's to the substance, but I think we're cutting

12  corners here on something that's important.  Either the

13  questioner has to read the question and the answer or I think

14  the witness should be allowed to see the answer.  One or the

15  other.

16          THE COURT:  A couple of things.  The formatting of the

17  use of the statement in connection with the question is not

18  perfect or appropriate.  Mr. Carpenter, since he is a

19  respondent here is a party, so that his statements are

20  admissible in evidence here, so we don't have to have the

21  formal impeachment procedure as you would with a non-party

22  witness in order to get a statement, an out-of-court statement

23  of his in from the deposition.  I do agree with you that it

24  would be helpful to me and clearer if counsel made it clear

25  whether she's trying to refresh recollection, introduce an

D59FUNIH                    Carpenter - direct

1    inconsistent statement, in which case you should call out the

2    date, the line number, the page of the deposition and let at

3    least Mr. Siano look at it and it may be helpful to let

4    Mr. Carpenter look at it as well and indicate what kind of

5    response you want or whether you simply want to introduce into

6    evidence something that you're reading from his deposition.

7              MS. COLBATH:  Thank you, your Honor.  I was intending

8    to refresh his recollection, I apologize for not incorporating

9    that.  But I'll move on.

10   Q.  Now, Mr. Carpenter, if you could turn to page Exhibit 20

11   and there's a flowchart there.  You examined that Exhibit 20

12   prior to today, correct?

13   A.  I have never seen this Exhibit 20 before.

14   Q.  Well, take a minute to look at it, and my question is going

15   to be do you agree with the flow of money that's outlined

16   there?

17   A.  No.  I don't.

18   Q.  And why not?

19   A.  Because the money did not come from Charter Oak Trust, the

20   money came from Phoenix Capital Management and Phoenix Capital

21   Management is not even listed on the page.  So your chart's

22   wrong because Phoenix Capital Management put the money to Grist

23   Mill Capital and then Grist Mill Capital used Phoenix Capital's

24   money to put the money into Grist Mill Holdings, then the money

25   went to Hanover and then the money went to Moonstone.

D59FUNIH                        Carpenter - direct

1   Q.  And where did, under the transfers you just testified to,

2   where did Phoenix Capital Management get its money?

3   A.  It received, I believe it was 2.7 million from the Grist

4   Mill Trust.

5   Q.  Okay.  So if I could approach the witness with -- he has

6   it?  Okay.

7           MR. REYHANI:  He will have it now.  Your Honor, just

8   to describe what this is, we respectfully request this be

9   admitted as Exhibit 25 under Federal Rule 1006.

10          THE COURT:  So this is the document entitled

11  anticipated respondent's money trail?

12          MR. REYHANI:  Yes.  It's going to be Exhibit 25, your

13  Honor.

14          THE COURT:  Any objection to admitting Exhibit 25?  We

15  did 26 and 27, but I don't think there's been a 25 added to the

16  list yet.  We went from 23 to 26 and 27.

17          MR. REYHANI:  You're absolutely correct, your Honor.

18  Would you like to start with 28 or --

19          THE COURT:  I don't care.

20          MR. REYHANI:  So 25.

21          THE COURT:  If you're happy with 25, I'm happy with

22  25.

23          MR. REYHANI:  So 25, your Honor.

24          THE COURT:  Ms. Ng, would you mark this plaintiff's

25  Exhibit 25?

1              (Petitioner's Exhibit 25 received in evidence)

2              THE COURT:  What do you need, Mr. Siano?

3              MR. SIANO:  I need a copy.  Mr. Reyhani has been very

4   helpful but there was a mark on 25.  I blacked something out.

5              THE COURT:  There was a parenthetical under the

6   heading --

7              MR. SIANO:  I have what I'm missing.  We're set to go.

8              THE COURT:  25 is in evidence.

9              MR. LaBELLE:  As a summary, your Honor.  It's just

10  offered as a summary.

11             THE COURT:  Yes, as a summary.

12  BY MS. COLBATH:

13  Q.  Mr. Carpenter, looking at Exhibit 25, does this depict the

14  transfers as you believe they happened?

15  A.  No.

16  Q.  Tell me what is wrong with Exhibit 25.

17  A.  I believe that -- well, first of all, with all due respect,

18  because obviously somebody spent a lot of time on this, I don't

19  understand what the arrows mean and there's arrows crossing

20  over other arrows so that I'm very clear that Phoenix Capital

21  put the money into Grist Mill Capital, it went to Grist Mill

22  Holding, it went to Hanover, so basically, you know, the other

23  lines, arrows, boxes and things of that sort I really don't

24  understand.

25  Q.  Okay.  But I think your testimony is that Phoenix Capital

D59FUNIH                          Carpenter - direct

1    Management got its money from the Grist Mill Trust, correct?

2    A.   Yes.

3    Q.   Now, is there any reason that you didn't -- strike that.

4    When did you come to learn that the money originated with the

5    Grist Mill Capital?

6    A.   I'm not sure I understand.  I'm not sure I understand the

7    question.

8    Q.   That theory of the payments wasn't set forth in the

9    opposition papers that you filed on this motion, correct?

10   A.   I don't know what was in the opposition papers.

11   Q.   You didn't review the opposition papers before they were

12   filed?

13   A.   I read them, but I know I told my attorney that the papers

14   that Universitas had submitted were totally incorrect and that

15   the exhibits that they had showed right on them that the money

16   had come from Phoenix Capital Management, it had not come from

17   the Charter Oak Trust.  So that's why, I just know that the

18   transfer of money was incorrectly stated at the beginning.

19   Q.   Now, you're the chairman of Grist Mill Capital's managing

20   member, right?

21   A.   Yes.

22   Q.   And that's Caroline Financial Group, correct?

23   A.   Yes, ma'am.

24   Q.   And Grist Mill Capital has no employees, right?

25   A.   That's true.

D59FUNIH                    Carpenter - direct

1    Q.   It's just you at Grist Mill Capital.

2    A.   I believe Amanda Rossi is also a signatory, but it's pretty

3    much just me.

4    Q.   Who is Grist Mill Capital's bookkeeper?

5    A.   By bookkeeper you mean who does the accounting and things

6    of that sort?

7    Q.   Who maintains the general ledger?

8    A.   We use Peachtree.  We don't -- Peachtree is an accounting

9    system, but we just basically use Peachtree for cutting checks

10   and things of that sort.

11   Q.   Who is the person that's responsible for maintaining the

12   general ledger for Grist Mill Capital?

13   A.   By general ledger if you mean Peachtree, that would be

14   Amanda Rossi.

15   Q.   And that's the same Amanda Rossi that works as your

16   personal assistant, correct?

17   A.   Yes, ma'am.

18   Q.   And did Amanda Rossi maintain the general ledger for Grist

19   Mill Capital in the calendar year 2009?

20   A.   I would say yes, but other than Amanda and myself, there's

21   nobody who's been involved with Grist Mill Capital's finances.

22   Q.   Now, did Grist Mill Capital ever transfer money to the

23   Grist Mill Trust?

24   A.   We've paid back several loans.  Grist Mill Capital had

25   several outstanding loans and we paid those loans back.

1   Q.  Do you have any recollection of Grist Mill Capital wiring

2   approximately $3.8 million to the Grist Mill Trust bank account

3   at JPMorgan in 2009?

4   A.  Do I have any personal recollection?

5   Q.  Yes.

6   A.  No.

7   Q.  Let's take a look at tab 1, the page that has number 405 on

8   the bottom of it.  And could you tell me what this page is?

9   A.  I haven't gotten there yet.  It says 0405?

10  Q.  0405, correct.  What is that?

11  A.  I have no idea.

12  Q.  Ever seen a wire transfer before?

13  A.  I've never seen this piece of paper ever.

14  Q.  Well, look with me about a third of the way down the page

15  next to beneficiary, it says "Grist Mill Trust."  Do you see

16  that?

17  A.  Right.

18  Q.  Okay, and if you go two-thirds of the way down it says

19  "originator." Do you see that?

20  A.  Yes.

21  Q.  And next to that it says "Grist Mill Capital LLC."

22  A.  Yes.

23  Q.  Do you see the amount listed of $2,833,568.64?  Do you see

24  that on there?

25  A.  No, mine says 965314.

D59FUNIH                    Carpenter - direct

1  Q.  Look at the top third of the page next to the MIF amount?

2  A.  Okay.

3  Q.  Looking at that, does that refresh your recollection that

4  Grist Mill Capital on or about June 9, 2009 wired $2.83 million

5  to the Grist Mill Trust?

6  A.  I don't doubt that we did, but I had nothing to do with the

7  wire.

8  Q.  Okay.  Well, do you have a recollection of wiring

9  $2.8 million from Grist Mill Capital's account at JPMorgan

10 Chase to the Grist Mill Trust?

11 A.  Yes, because we were paying back a loan of 2,500,000 plus

12 333,000 of interest.

13 Q.  And do you recall on that date were there any additional

14 wires made from Grist Mill Capital's account to the Grist Mill

15 Trust on June 9, 2009?

16 A.  I couldn't say.  It's four years ago.

17 Q.  Let's take a look at page 359 under Exhibit 1.  Could you

18 tell me if you've seen that document before.

19 A.  Yes.

20 Q.  And what is that document?

21 A.  This looks to be the Grist Mill Capital LLC bank statement

22 for the month of June at TD Banknorth.

23 Q.  The account number for this account ends in 4712, correct?

24 A.  It appears to.

25 Q.  And were there any outgoing wires on this account in the

D59FUNIH                    Carpenter - direct

1   month of June?

2   A.   It has two wires listed, the two million 833 and the

3   965314.

4   Q.   Can we agree those two amounts together are approximately

5   about $3.8 million, correct?

6   A.   True, but that's not the significance of the wire.

7   Q.   Where was the wire going to, where was the money sent?

8   A.   It was being sent to the Grist Mill Trust.  Both wires

9   clearly list the Grist Mill Trust.

10  Q.   And when was the Grist Mill Capital account that's shown on

11  page 0359 opened?

12  A.   The Grist Mill Capital account at TD or the one at Bank of

13  America?

14  Q.   The Grist Mill Capital account ending with 4712.

15  A.   I don't recall.

16  Q.   Okay.  Let's turn to page 342 and 343 under tab 1, and does

17  that refresh your recollection when the Grist Mill Capital

18  account ending in 4712 was opened?

19  A.   Yes, it appears this was the same banking resolution

20  statement we had looked at earlier.

21  Q.   Okay.  And you and your assistant Amanda Rossi are the only

22  signatories in the Grist Mill Capital account ending in 4712,

23  correct?

24  A.   Yes, ma'am.

25  Q.   And am I correct that you authorized the two outgoing wires

D59FUNIH                    Carpenter - direct

1    that are shown on page 359 that we just looked at that total

2    3.8 million?

3    A.   Yes, ma'am.

4    Q.   Now, let's turn to page 357 and can you tell me what that

5    document is?

6    A.   Looks like the May 2009 Grist Mill Capital.

7    Q.   This is the first monthly statement that was issued with

8    regard to the Grist Mill Capital account ending in 4712?

9    A.   I would surmise that, because it says beginning balance is

10   zero.

11   Q.   Okay, the beginning balance is zero.  Now, page 357

12   indicates two deposits into the account, correct?

13   A.   Yes.

14   Q.   And the first deposit was on May 21st in the amount of

15   $8,677,276.75, correct?

16   A.   It appears to be, yes.

17   Q.   Where did that money come from?

18   A.   I don't know.  It's not listed here.

19   Q.   You have no idea where that money came from?

20   A.   I don't know whether it came from the Bank of America

21   account that was closed.  I honestly don't know.

22   Q.   Okay.  Well, let's look at page 348 and see if that

23   refreshes your recollection where that $8.7 million came from.

24   Do you have page 348?

25   A.   Yeah, it looks like either the back of checks or checking

D59FUNIH                      Carpenter - direct

1    debit memos.

2    Q.  Right.  So on the left is the document you're referring to

3    as the checking debit memo, correct?

4    A.  That's what it says, yes.

5    Q.  And what is the account title listed?

6    A.  Charter Oak Trust.

7    Q.  And the amount matches up, right, to the penny, with the

8    deposit that we're looking at on page 357?

9    A.  It looks to be.  It looks to be the same amount.

10   Q.  Right.  And the checking deposit ticket that appears on the

11   right side of page 348 indicates a checking deposit of the

12   $8.7 million amount into Grist Mill Capital, correct?

13   A.  The numbers are pretty hard to read, but I'll take your

14   word for it.

15   Q.  Well, don't take my word for it.  Which numbers are you

16   unable to read?

17   A.  I'm having a difficult time reading any of the numbers.

18   Q.  Okay, well, do you see on the right-hand side of the page,

19   the checking deposit ticket indicates a deposit being made into

20   account, on my copy it reads 4242774712.  Do you see that

21   number on yours?

22   A.  Yes.

23   Q.  Okay, and that's the account of Grist Mill Capital,

24   correct?

25   A.  4712, yes.

1   Q.   Okay.  Now, go back to page 357 again and there was a

2   second deposit made into the 4712 Grist Mill Capital account in

3   May, correct?

4   A.   For the 2 million 186?

5   Q.   Correct.  Where did that 2 million 186 come from?

6   A.   I don't recall.

7   Q.   Okay.  Let's take a look at page 349 and does that refresh

8   your recollection that the 2.186 million that was deposited in

9   the Grist Mill Capital account ending in 4712 came from the

10  Charter Oak Trust?

11  A.   Yeah, it looks like the same, looks like the same type of

12  paperwork.

13  Q.   Now, the Grist Mill Capital bank account to which the 3.8

14  was wired, at which bank was that Grist Mill Capital account

15  located?

16  A.   I believe the Grist Mill Capital account has always been at

17  JPMorgan Chase.

18  Q.   So do I understand so far what we've looked at, the Charter

19  Oak Trust transferred approximately $11 million to Grist Mill

20  Capital in May of 2009, correct?

21  A.   It appears so, yes.

22  Q.   And Grist Mill Capital then transferred $3.8 million from

23  that account to Grist Mill Trust at JPMorgan?

24  A.   To pay back the loans that were outstanding, yes.

25  Q.   Okay.  So on June 9 when Grist Mill Capital wired the

D59FUNIH                    Carpenter - direct

1    3.8 million to the Grist Mill Trust account, what monies did

2    Grist Mill Capital have on hand?

3    A.  I don't recall.

4    Q.  Well, let's take a look at page 359 again.  Now, on 359

5    there were no deposits into the 4712 account that stands in the

6    name of Grist Mill Capital in the month of June 2009, right?

7    A.  I don't understand the question.

8    Q.  Were there any deposits of any money into the Grist Mill

9    Capital account ending in 4712 in June 2009?

10   A.  No.  I think we established this was a brand new account

11   that was just opened at TD Banknorth.

12   Q.  So the only money that's in this 4712 account at this point

13   in time is money that initiated with the Charter Oak Trust,

14   correct?

15   A.  Correct.

16   Q.  So when Grist Mill Capital wired the 3.8 million to the

17   Grist Mill Trust account on June 9, 2009, it was wiring money

18   that was originally deposited into the Grist Mill Capital

19   account from the Charter Oak Trust, right?

20   A.  Charter Oak Trust was paying back loans that it had to

21   Grist Mill Capital LLC.

22   Q.  Now, you have Exhibit O.  Do you have that handy?

23   A.  Right here?

24   Q.  Yes.  Have you ever seen Exhibit O before?  Let me take a

25   minute.  Exhibit O is in the respondent's notebook.  It was a

D59FUNIH                    Carpenter - direct

1   document --

2           THE COURT:  It's in the new folder that I just got.  I

3   haven't looked in the notebook yet, but now I have it.

4   A.  I've never seen this particular document, but it appears to

5   be a bank statement for Grist Mill Capital.

6   Q.  Okay.  You've never seen Exhibit O before today?

7   A.  I've never seen.

8   Q.  Look at the third page of Exhibit O and down opposite the

9   July 12 entry -- excuse me, the July 12 date, do you see that,

10  there's an entry to the right?

11  A.  Well, it's a June bank statement, so you mean the June 12th

12  date.

13  Q.  June 12th.  What did I say?

14  A.  You said July 12th.

15  Q.  I apologize.

16  A.  June 12th is the $2.7 million that went from the Grist Mill

17  Trust to Phoenix Capital Management.

18  Q.  So on June 12 do you understand the Grist Mill Trust wires

19  $2.7 million to Phoenix Capital Management?

20  A.  Yes, ma'am.

21  Q.  Why did Grist Mill Trust wire $2.7 million on June 12 to

22  Phoenix Capital Management?

23  A.  Because I asked for the loan to be made from Grist Mill

24  Trust to Phoenix Capital.

25  Q.  Who did you make that request to?

D59FUNIH                      Carpenter - direct

1    A.   I believe Donna Dawson.

2    Q.   Now, what was the beginning balance of the Grist Mill Trust

3    account as reflected on the May 30th, 2009 statement?

4    A.   I don't know, but I know the Grist Mill Trust has hundreds

5    of millions of dollars coming in every year, so usually by the

6    first three months of the year there would be over $100 million

7    deposited in the Grist Mill Trust, but I'm not a signatory of

8    the Grist Mill Trust nor do I do any accounting for the Grist

9    Mill Trust.

10   Q.   If you'll look at the first page of Exhibit O, do you see

11   it lists a beginning balance?

12   A.   Yes.

13   Q.   And that balance is significantly lower than $100 million,

14   right?

15   A.   Well, but the Grist Mill Trust sends out money every month.

16   You can tell the number of wires that they did just on this

17   particular month.  So it gets most of its money in December,

18   January and February and then sends that money to carriers.

19   Q.   And the beginning balance was lower than the $2.7 million

20   wire that the Grist Mill Trust made to Phoenix Capital

21   Management, correct?  Or to say it another way, the

22   $2.7 million wire that was made by the Grist Mill Trust to

23   Phoenix Capital Management exceeds the beginning balance of

24   Grist Mill Trust's account.

25   A.   But you also have 4.4 million coming in in deposits at the

D59FUNIH                    Carpenter - direct

1    same time you have 3 million going out.

2    Q.   Right.  You've already testified, sir, that the

3    3.8 million, you testified as to the 3.8 million that

4    originated with Grist Mill Capital, correct?

5    A.   Right.  Grist Mill Capital was paying back its loans that

6    it owed to the Grist Mill Trust.

7    Q.   The two transfers that we looked at a few minutes ago were

8    in the amount of 2.83, correct, and the 965?

9    A.   Correct.

10   Q.   And again, this Chase Bank statement, you'll agree with me

11   that the beginning balance was 1.4 million, correct?

12   A.   For that month, correct.

13   Q.   Now, to which Phoenix Capital Management account did the

14   Grist Mill Trust make the wire?

15   A.   I'm not sure I understand the question.

16   Q.   Let me withdraw it and try it again.  You've testified

17   Grist Mill Trust made a $2.7 million wire on June 12th to

18   Phoenix Capital Management, correct?

19   A.   Correct.

20   Q.   And to which bank account did the Grist Mill Capital wire

21   that $2.7 million?

22   A.   I believe it was to the TD Banknorth account.

23   Q.   So let's take a look under Exhibit 1 document 441.  Do you

24   have that?

25   A.   Yes, ma'am.

D59FUNIH                    Carpenter - direct

1   Q.  So the $2.7 million wire was made into Phoenix Capital

2   Management's account at TD Bank, correct?

3   A.  Yes.

4   Q.  And the Phoenix Capital Management account ends in the

5   numbers 467, correct?

6   A.  Looks like 4671.

7   Q.  4671, thank you.  And at the time this $2.7 million was

8   wired to Phoenix Capital Management, what was the beginning

9   balance of its account?

10  A.  Zero.  These are all brand new accounts.

11  Q.  Now, is there any mortgage that encumbers the property, the

12  Rhode Island property?

13  A.  Yes, ma'am.

14  Q.  And who is that mortgage in favor of?

15  A.  Hanover Trust Company.

16  Q.  And that's a company that you control, correct?

17  A.  Yes, ma'am.

18  Q.  And did Hanover Trust Company give anything of

19  consideration to Moonstone?

20  A.  It gave it the money.  It gave it the mortgage.

21  Q.  And when was that -- the closing on the property was

22  July 15, 2009?

23  A.  Yes.

24  Q.  And when was that mortgage entered into?

25  A.  I believe it was October of 2010.

D59FUNIH                      Carpenter - direct

1   Q.   Approximately ten months later Moonstone gives Hanover a

2   mortgage?

3   A.   Yes.

4   Q.   And why did you enter -- or why did -- why was that

5   mortgage done ten months later?

6   A.   As I already testified to in my deposition I was doing some

7   general financial planning and estate planning and there was

8   Carpenter Financial Group had made a loan to one of our

9   affiliates and Bob Cox had drafted a mortgage deed for that

10  person for that transaction, and so I thought it would be a

11  good idea to do the same thing and have Bob Cox do the

12  transaction for the mortgage loan between Hanover and

13  Moonstone.

14  Q.   Am I correct the mortgage was entered into 15 months later?

15  I think I had referenced ten months, but can you tell me

16  approximately how long after you closed on the Moonstone

17  property was the mortgage entered into?

18  A.   The closing for Moonstone was in July of 2009 and the

19  Hanover Trust mortgage was done in October of 2010.

20  Q.   And who negotiated the mortgage on behalf of Moonstone?

21  A.   I don't remember any negotiation going on.  I just asked

22  Bob Cox if he would be kind enough to draw up a document just

23  like he had done for the other individual.

24  Q.   Who at Moonstone authorized a mortgage to be placed on the

25  property?

D59FUNIH                    Carpenter - direct

1    A.   Caroline Financial Group is the managing member and is in

2    charge of all of the management decisions regarding Moonstone

3    LLC.

4    Q.   And Caroline Financial Group is you, right?

5    A.   I'm the chairman and secretary of Caroline Financial Group,

6    yes.

7    Q.   And do you recall at your deposition explaining part of

8    your motivation for doing the mortgage was that you had

9    creditors in Boston that you thought might sue you in some

10   regard and you were seeking some protection by this mortgage

11   from them?

12   A.   I never owed the people in Boston a dime.   In fact I had

13   already paid them back $15 million which is double the amount

14   of money that I lost in the great stock market crash in

15   December 2000.   I don't believe I owed those people any money.

16   In fact I'm suing them for $76 million and that case is doing

17   very well.

18   Q.   My question was do you recall at your deposition giving any

19   testimony that you entered into the mortgage --

20   A.   You asked if I had done it for creditors.   I said I had

21   done it for estate planning reasons and that I was worried that

22   people in Boston would be suing any entity that Dan Carpenter

23   was involved with because that's what they had pretty much been

24   doing.

25            MS. COLBATH:   In order to be efficient, your Honor,

1    I'm not going to go through our chart.  We submitted

2    documentation on that and this morning they agreed to accept

3    into evidence all of the underlying data, so at this point I

4    have no further questions, subject to cross.

5            THE COURT:  Does the chart map the transactions to the

6    particular pages or do you expect that I'm going to sit with

7    the chart and -- let me finish asking the question, sir.

8            MR. SIANO:  I'm sorry.

9            THE COURT:   -- and go through these books and do my

10   own accounting.

11           MS. COLBATH:  No, your Honor.  The charts list the

12   pages.  They essentially come out of Exhibit 1 and we've

13   listed, you'll see, there are page references for you.

14           THE COURT:  All right.  I see some page references.

15   I'm looking right now at Exhibit 25 which seems to have page

16   references in some boxes but not in other boxes.  Other boxes

17   just have account numbers.

18           MS. COLBATH:  Each box has an arrow from it.

19           THE COURT:  Yes.

20           MS. COLBATH:  And that box from the arrow will give

21   you the page numbers.

22           THE COURT:  I see the vertical black arrows and boxes

23   at the bottom of the vertical black arrows that have page

24   numbers.  I don't see page numbers in the box that are

25   connected by blue arrows.

D59FUN1H                    Carpenter - direct

1           MS. COLBATH:  Right, because there wouldn't be.  So

2     Grist Mill Capital, when you look at the pages that are

3     referenced by the down arrow, we just listed the entities so

4     you could follow the different entities that the money

5     transferred through so that just identifies the entity for you

6     by name but the document that shows it is the material that's

7     on the bottom of the chart.

8           THE COURT:  Okay.  I think I get it now.  Mr. Siano,

9     what were you going to say?

10          MR. SIANO:  I was going to ask the question if the

11    Court might inquire of my adversary as to whether the response

12    is the same as to a different chart which is a slightly

13    different flow through, to wit, Exhibit 20.

14          THE COURT:  I was just looking at Exhibit 20.  I think

15    that's what I referred to, at least that's what I was meaning

16    to refer to when I asked the question about arrows and numbers.

17    Yes, I've looked at 25 and 20 and the boxes at the bottom of

18    the black vertical arrows of 20 also have page references to

19    them and the ones connected by the blue arrows don't and

20    Ms. Colbath just explained to me that the page reference

21    connections are supplied in the boxes at the bottom of the

22    black arrows.

23          MS. COLBATH:  Correct.

24          THE COURT:  All right.  And so your direct is

25    concluded with Mr. Carpenter?

D59FUNIH                    Carpenter - direct

1          MS. COLBATH:  Yes.

2          THE COURT:  Mr. Siano, did you wish to cross?

3          MR. SIANO:  Yes, your Honor, thank you very much.

4    CROSS-EXAMINATION

5    BY MR. SIANO:

6    Q.  Good afternoon, Mr. Carpenter.  You were asked some

7    questions on direct with regard to the subject matter of the

8    trial in Boston.  And in fact, there were adverse jury verdicts

9    twice in that case, isn't that right?

10   A.  Yes.

11   Q.  In both instances isn't it a fact that the district court

12   judges set aside the judgments?

13   A.  Yes, for egregious prosecutorial misconduct.

14   Q.  Nevertheless, as you stand right now, there are charges

15   pending but you haven't been convicted of anything.

16   A.  There are no charges pending against me right now.

17   Q.  Is it your understanding the matter is on appeal?

18   A.  Yes, the government has appealed and we've done a motion to

19   dismiss the appeal but that's still pending at the First

20   Circuit.

21   Q.  Thank you.  Now, directing your attention to Respondent's

22   Exhibit O.  Did you have occasion yesterday to see a portion if

23   not the entirety of this document?

24   A.  I saw a couple of pages in your office.

25   Q.  Did you see in fact the first and third page of this

1    document?

2    A.   Yes, sir.

3    Q.   So when you answered that you hadn't seen the statement is

4    it a fact you hadn't seen the entirety of the statement?

5    A.   Correct.  And I hadn't seen this particular page because

6    the original page I had seen I had actually made a mark on it

7    for your benefit.

8    Q.   Thank you.  And in fact, did you ask someone in Simsbury to

9    generate the entirety of this document and send it to

10   Mr. LaBelle?

11   A.   Yes.

12   Q.   At any point did anybody tell you that that hadn't

13   happened?

14   A.   No.

15   Q.   Does this document, Exhibit O, reflect on the first page

16   the receipt of the two sums that Ms. Colbath described to you,

17   283,356,664 and 965,314.17?

18   A.   Yes, sir.

19   Q.   And does it reflect on the third page of Exhibit O a wire

20   debit transfer from TD Banknorth to Phoenix Capital Management

21   in the amount of $2,700,000?

22   A.   Yes, sir.

23            MR. SIANO:  I'm going to offer Defendant's O, your

24   Honor.

25            THE COURT:  I think that everything has been admitted

1    except for C and E.

2              MR. SIANO:  Thank you.

3              THE COURT:  I did not admit respondent's C and

4    respondent's E, I admitted everything else.  A through O.

5    Q.  Could I ask you, Mr. Carpenter, to look at Respondent's

6    Exhibit E, please.

7    A.  I don't think I've got the -- I think I've only got the

8    Universitas exhibits.

9    Q.  Mr. LaBelle will come to the rescue.

10             MR. LaBELLE:  May I approach the witness, your Honor?

11             THE COURT:  Yes, please.

12             MR. LaBELLE:  For the record, the witness has a

13   complete set now of respondent's exhibits.

14             THE COURT:  Thank you.

15   Q.  Exhibit E, sir.

16   A.  Yes.

17   Q.  I direct your attention to the four-page document reflected

18   there, and I ask you, sir, do you recognize that document?

19   A.  Yes, sir, I do.

20   Q.  What do you recognize it to be?

21   A.  This was the, this was part of on each one of the split

22   dollar agreements there would be a funding obligation and power

23   of attorney, permanent power of attorney that would be signed

24   on each of the policies in the Charter Oak Trust.

25   Q.  Is this funding obligation the funding obligation document

D59FUNIH                        D. Carpenter - cross

1   that related to the insurance policies for the insured Sash

2   Spencer?

3   A.  Yes, this appears to be one of the policies, Sash Spencer

4   had two policies, but this is definitely the funding agreement.

5   Q.  Was this document prepared at or about the time that it is

6   dated, to wit, April of 2007?

7   A.  Yes.  I believe it would have been done because I believe

8   that was on or about the funding of the second Sash Spencer

9   policy.

10  Q.  And was this document maintained in the ordinary course of

11  business of the entities reflected here, to wit, Charter Oak

12  Trust and Grist Mill Capital?

13  A.  Yes, sir.

14  Q.  And was it kept and maintained in the order and the course

15  of the business?

16  A.  Yes, sir.

17          MR. SIANO:  Offer it into evidence at this time.

18          MS. COLBATH:  No objection.

19          THE COURT:  Respondent's Exhibit E is admitted into

20  evidence.

21          (Respondent's Exhibit E received in evidence)

22  Q.  Now, you were asked several questions about the

23  interception of these various banking relationships with TD

24  Bank.  Sir, were any of the banking relationships with TD Bank

25  commenced for the purpose of trafficking in, and that's my

D59FUNIH                    D. Carpenter - cross

1    word, trafficking in the proceeds of the Sash Spencer insurance

2    proceeds?

3    A.  No.

4    Q.  In each of the instances where you have been questioned

5    about TD Bank accounts, is it fair to say that there was a

6    prior banking relationship with at least one other bank prior

7    to May of 2009?

8    A.  Yes, sir.

9    Q.  And is it fair to say that the problem had to do with what

10   you perceived to be a chink in your access to the ability to

11   wire transfer money?

12   A.  Yes, sir.

13   Q.  And after a series of discussions, did that lead you to

14   cause a search to be made to find a new bank?

15   A.  Yes, sir, because it was inexplicable after doing tens of

16   millions of dollars of transactions with Bank of America we

17   were being treated in the worst way possible and that's why we

18   knew we had to go elsewhere.

19   Q.  And the elsewhere you went was TD Bank?

20   A.  It was at that time American Savings, then it became

21   Banknorth then eventually TD Bank.

22   Q.  And in each of these instances the accounts in front of you

23   reflect the opening of those accounts in or about May of 2009?

24   A.  Yes, sir.

25   Q.  I want to talk about the house in Rhode Island.  When is

D59FUNIH                    D. Carpenter - cross

1   the first time you or anyone acting on your behalf made an

2   offer for that property?  Of any kind.

3   A.   The first time -- I have been tracking the property for

4   about three years, so I want to say about late 2005, early 2006

5   was the first time that we expressed an interest in the

6   property.

7   Q.   At the time you made the offer did you have an

8   understanding as to what the asking price was?

9   A.   Yes.

10  Q.   And what was that understanding?

11  A.   The head trustee wanted $3.9 million.

12  Q.   What offer did you make?

13  A.   At that time I did not make an offer.

14  Q.   Did there come a later point in time where you did make an

15  offer?

16  A.   Yes.

17  Q.   Do you recall a general figure as to the first offer you

18  made?

19  A.   The first offer we made was 1.9 million.

20  Q.   And approximately when did you make that offer?

21  A.   Would have been in early 2008.

22  Q.   Was that offer accepted?

23  A.   No.  They wanted more.  So.

24  Q.   Did you continue to monitor the property?

25  A.   Yes.

D59FUNIH                    D. Carpenter - cross

1   Q.  Did there come a point in time in 2009 where you made a

2   written offer?

3   A.  Yes.

4   Q.  What was that, the amount of that written offer?

5   A.  I believe, the offer started in writing at 1.6 and then we

6   did it to 1.2.

7   Q.  What happened with the offer for 1.2?

8   A.  We basically had some discussions over the future of

9   Coastal Marine Research Commission and then we had some

10  discussions that the engineer who had inspected the property

11  found some bat droppings in the upper level turret, and bats,

12  they're almost like sacred in Rhode Island because they keep

13  the insects down, so we had a very difficult problem being that

14  you could not do anything to harm bats.  But we had to hire

15  somebody to take care of the bat guano droppings and we had to

16  find some sort of a nice way of eliminating the bats from the

17  upper turret.

18  Q.  I direct your attention to Universitas Exhibit number 17.

19. Do you recognize Petitioner's Exhibit 17?

20  A.  Yes.

21  Q.  What do you recognize it to be?

22  A.  It looks like the letter I did on Grist Mill Capital

23  letterhead dated April 8 expressing our interest in purchasing

24  the property.

25  Q.  And this is the $1.2 million offer, in essence?

1    A.  Yes, sir.

2    Q.  And in essence, was this offer accepted and then you

3    negotiated an adjustment for the bat guano?

4    A.  Yes, sir.

5    Q.  And how much of a knockdown did you get?

6    A.  I was able to get down another $100,000.

7    Q.  Is that the sum you closed for?

8    A.  Yes, sir.

9    Q.  And did the closing take place on July 15?

10   A.  Yes, sir.

11   Q.  And it was, you recall that you paid approximately

12   $1,040,000 on July 15th?

13   A.  There was some closing costs.  The reason it was more than

14   a million one, but yes, sir, I do remember the closing.

15          MR. SIANO:  No further questions, your Honor.

16          MS. COLBATH:  Just a couple of questions, your Honor.

17          THE COURT:  I'm sorry.  Mr. LaBelle.

18          MR. LaBELLE:  Yes, your Honor.  I don't have any

19   questions for the witness, but I do want to move Exhibit C.

20   There's been a stipulation as to authenticity of those

21   documents but not yet as to their admissibility.  If the

22   documents are accepted as authentic, that is, they're recorded

23   UCC-1 filings having to do with security interests, they are

24   relevant to the hearing because among them you'll see the Grist

25   Mill Capital had a security interest in all of the assets of

D59FUNIH                    D. Carpenter - cross

1       the Charter Oak Trust and they're authentic.

2               THE COURT:  Ms. Colbath.

3               MS. COLBATH:  They're not certified copies, your

4       Honor, which I'm not going to stand on that.

5               THE COURT:  You stipulated to authenticity.  Isn't

6       that meant to get rid of the certification problem?

7               MS. COLBATH:  I'm sorry?

8               THE COURT:  I thought the purpose of an authenticity

9       stipulation would be to obviate the need for a certified copy.

10              MS. COLBATH:  Yes.  Many of the documents, frankly, I

11      don't understand the relevance here.  I see Avenue Capital and

12      so I would object on the grounds of relevance.  I don't

13      understand how these documents are relevant at all.

14              THE COURT:  Mr. LaBelle?

15              MR. LaBELLE:  The one that is relevant, your Honor,

16      I'll represent to the Court and I've told Ms. Colbath this.

17      These come out of our firm's closing file for the Ridgewood

18      financing credit line which relates to Exhibit A, and I went to

19      the closing file and took out all the UCC filing statements

20      that were made in connection with that transaction and for the

21      purpose of completeness I put them all into our binder.  The

22      one that matters from my standpoint is the first one, which

23      relates to the UCC filing in which the secured party is Grist

24      Mill Capital LLC and the debtor is Charter Oak Trust.  So it

25      would be the first three pages of Exhibit C.  Before we

D59FUNIH                     D. Carpenter - cross

1   completely close the records I'll review with Ms. Colbath

2   whether we need any other.

3          MS. COLBATH:  And I have no objection, your Honor, to

4   the first three pages.

5          THE COURT:  All right.  So the first three pages of

6   Exhibit C are admitted in evidence.

7          (Respondent's Exhibit C received in evidence)

8          MR. LaBELLE:  Your Honor, rather than taking up any

9   more time here, before we close the record I'd just like to

10  review with Ms. Colbath and Mr. Siano to see whether or not

11  there are any others in there which are particularly pertinent

12  and I might be able to explain to Ms. Colbath, she asked some

13  questions about some other questions in the line of questioning

14  to Mr. Carpenter and I believe the UCC filings have to do with

15  those other companies.  Before the record closes I'll just take

16  some time to review with Ms. Colbath, rather than take up time

17  later on.

18         THE COURT:  All right.  Do you want me to give you

19  until tomorrow morning to write me letters as to anything else

20  that's stipulated or were you planning before we break today to

21  argue things that wouldn't be stipulated?

22         MR. LaBELLE:  I just need about ten minutes just to

23  review the offering, so we could do it today.

24         THE COURT:  Okay.  What else do we have in terms of

25  witnesses?  It's 25 after twelve.

D59FUNIH                          D. Carpenter - cross

1            MS. COLBATH:  I had a couple of questions on redirect

2    and we have one other witness who is here, Mr. Goldman.

3            THE COURT:  And how long do we expect to take with

4    Mr. Goldman?

5            MS. COLBATH:  Very short.  My colleague is doing the

6    examination, I would say no more than a half hour.  I would say

7    maybe even 20 minutes.

8            THE COURT:  Let's aim for 15.  I have other matters on

9    for 2 and I have things that have to happen between now and

10   then.  I recognize I asked for opening statements, but I think

11   you understand the need for that.

12           MS. COLBATH:  I understand, your Honor.  Maybe we can

13   have a chat and waive his testimony.

14           THE COURT:  Okay, let's do the redirect and then you

15   can speak with each other.

16           MS. COLBATH:  And this is quick.

17   REDIRECT EXAMINATION

18   BY MS. COLBATH:

19   Q.  Mr. Carpenter, could you put before you Exhibit E and

20   that's the document headed funding obligation agreement of

21   power of attorney.  Do you have that?

22   A.  Yes.

23   Q.  And it says there, the second whereas clause says, "Funder

24   conducts a life insurance premium funding business."  Am I

25   correct that the funder that's referred to there is Grist Mill

1    Capital?

2    A.   The funder is Grist Mill Capital, but we believe that split

3    dollar is a different technique than premium finance, but we're

4    definitely, we're definitely the party that effectively lent

5    all the money to the Charter Oak Trust.

6    Q.   Why does this document say that Grist Mill Capital conducts

7    a life insurance premium funding business?

8    A.   Because we had done 50, $60 million in other transactions

9    separate from Ridgewood where we had borrowed from the trust to

10   fund various policies, so we had done a number of these

11   transactions where we had borrowed from the welfare benefit

12   trust to buy policies on wealthy individuals and we did that as

13   part of the life insurance premium funding.

14   Q.   Grist Mill Capital frequently made premium payments on life

15   insurance applications, correct?

16   A.   Yes.

17   Q.   Now, at paragraph 2, am I correct that that sets forth the

18   amount of money that Grist Mill Capital is entitled to from the

19   trust in respect of the particular policy that's set forth at

20   the top of Exhibit E?

21   A.   Correct.

22   Q.   And paragraph 4, do I understand that to mean that the

23   trust must make the payment to Grist Mill Capital after the

24   trust receives the money within some 90-day period?

25   A.   Yes.

D59FUNIH                         D. Carpenter - redirect

1    Q.   And in this case the trust paid Grist Mill Capital what it

2    was owed within 90 days of receiving the monies from Lincoln

3    Life Insurance Company, correct?

4    A.   Well, Wayne Bursey had to sue Lincoln before the proceeds

5    were paid, but yes, eventually after the lawsuit was brought

6    Lincoln did pay the proceeds in late May of 2009.

7    Q.   So all amounts that were due to Grist Mill Capital from the

8    Charter Oak Trust with regard to the life insurance policies on

9    Sash Spencer's life were paid in full, correct?

10   A.   As to Sash Spencer?

11   Q.   Correct.

12   A.   I think you're correct.  Without doing the math, I think

13   that the 8 million and the 2 million that you had talked about

14   earlier were probably the amounts relating to just the Sash

15   Spencer policy.

16   Q.   Right.  But just to be clear, any amounts that were due to

17   Grist Mill Capital from the Charter Oak Trust as a result of

18   the agreement set forth in Exhibit E were paid by May of 2009,

19   correct?

20   A.   I forget the date that the -- I know that we sued Lincoln

21   or the Charter Oak Trust and Wayne Bursey sued Lincoln at the

22   beginning of May and I believe the proceeds came by the end of

23   May and that you've already identified the two major payments

24   that were made to Grist Mill Capital on behalf of the Sash

25   Spencer policy.

D59FUNIH                    D. Carpenter - redirect

1   Q.  Right, so all amounts that were due to Grist Mill Capital

2   under this agreement, and we looked at paragraph 2, those

3   amounts were paid sometime in the May 2009 time frame, correct?

4   A.  For Sash Spencer, but there are 85 other funding agreements

5   just like this and Grist Mill Capital had a UCC on all of the

6   assets, a UCC filing on all of the assets of the Charter Oak

7   Trust.  So it's not just the Sash Spencer proceeds, it's

8   anything that the Charter Oak Trust had.  We had a secured

9   interest as Grist Mill Capital.

10  Q.  Is it your position on this motion, sir, that Exhibit E

11  creates some lien as to all the trust assets?

12  A.  No.  Exhibit C does.  Exhibit C is a UCC filing and,

13  remember, Mr. LaBelle, as Mr. LaBelle just said to the Court,

14  Ridgewood wanted to make sure they were secure.  They were

15  giving a line of credit of 35 million but there's already been

16  documentation shown that Grist Mill Capital was owed

17  $60 million in addition to that by the Charter Oak Trust.  So

18  Grist Mill Capital was in fact a secured lender to the Charter

19  Oak Trust.

20  Q.  Okay.  The $60 million that you just referred to, is that

21  currently owed by the Charter Oak Trust to Grist Mill Capital?

22  A.  Yes, ma'am, and we've done several iterations of that to

23  show that as of December 31, 2012 there's $60 million that's

24  still owed to Grist Mill Capital by the Charter Oak Trust.

25  Q.  And is there a promissory note evidencing the $60 million?

D59FUNIH                    D. Carpenter - redirect

1    A.  We've, each one of those premium payments made has been

2    well documented by the same sort of documents that are done

3    here.  So each one of those policy payments has a similar

4    28-page funding agreement that Sash Spencer had and all of the

5    participants had in the Charter Oak Trust.

6    Q.  But is there a promissory note obligating the Charter Oak

7    Trust to pay Grist Mill Capital?

8    A.  Absolutely.  Absolutely.  You can see in the level of

9    sophistication that went into this agreement.  The legal fees

10   just for this agreement were over $600,000, and Grist Mill

11   Capital had to pay that 600,000 and there are about five

12   different law firms that had to get involved.

13   Q.  Was there ever a default notice sent to the Charter Oak

14   Trust with regard to this $60 million obligation?

15   A.  I believe there was, but I definitely know Ridgewood sent

16   several because there were two or three specific Ridgewood

17   foreclosures on the Charter Oak Trust.

18   Q.  The Ridgewood that you're referring to, sir, is Ridgewood

19   Finance?

20   A.  Yes, it's part of Plainfield Asset Management.

21   Q.  Is it your testimony that Ridgewood Finance sent several

22   default notices?

23   A.  Yes.  Yes, it is.

24   Q.  Did the Charter Oak Trust ever have direct payment

25   obligation to Ridgewood Finance?

D59FUNIH                    D. Carpenter - redirect

1    A.  No.

2    Q.  Okay.

3    A.  It was only through Grist Mill Capital.

4    Q.  Ridgewood Finance never loaned any money directly to the

5    Charter Oak Trust, right?

6    A.  Correct.  It was all through Grist Mill Capital.

7    Q.  And when was the default notice sent from Grist Mill

8    Capital to the Charter Oak Trust?

9    A.  I'm going to say the first one was in June of 2010 and then

10   they started getting more serious in July and August and I was

11   threatened personally by attorneys representing Ridgewood and

12   Caldwell that they're going to come after me personally.

13          THE COURT:  I'm sorry, I have to stop here.  I believe

14   the question was and when was the default notice sent from

15   Grist Mill Capital to the Charter Oak Trust.  I think your

16   answer was in the context of Ridgewood to somebody.

17          THE WITNESS:  That's what she asked.

18          THE COURT:  No, she asked from Grist Mill Capital to

19   the Charter Oak Trust.  Would you answer the question?

20   A.  I distinctly remember the default notices that came in from

21   Ridgewood.  I do not remember the subsequent notices that we

22   generated from Grist Mill to the Charter Oak Trust.

23   Q.  So you're aware of no default notices sent by Grist Mill

24   Capital to the Charter Oak Trust?

25   A.  And the reason for that is that we were effectively kicked

D59FUNIH                    D. Carpenter - redirect

1    out of TD Bank in the first few days of June of 2010, so I

2    believe that the Charter Oak Trust account and the Nova Group

3    accounts were closed by TD Bank in the first week of June and

4    the first of the Ridgewood foreclosure notices I believe came

5    in the middle of June.  So that the Charter Oak Trust and the

6    Nova Group Inc. Connecticut accounts were closed as of that

7    period of time.

8    Q.  What was the default?  Was it a payment default or some

9    other type of default that you gave notice of?

10   A.  The fact is that the money was owed and that Ridgewood had

11   made it very clear through several conversations that they were

12   having second thoughts how the business was going, and it

13   really wasn't Ridgewood's -- it wasn't Ridgewood's fault as

14   much as it was the economy had failed.  You know, the players

15   were very big in the life settlement business like AIG, Lehman

16   Brothers, Bear Stearns, they had all gone out of business and

17   the people who are in the life settlement, in the business of

18   buying/selling policies, you couldn't even get a bid on any of

19   the policies much less a bid that you could have gotten in the

20   past.

21   Q.  Who was the default notice sent to?

22   A.  I believe it was sent to myself, Don Trudeau, Jack Robinson

23   and Wayne Bursey.

24   Q.  Just so -- the question was not so clear.  Who was the

25   default notice that was issued by Grist Mill Capital to the

D59FUNIH                        D. Carpenter - redirect

1   Charter Oak Trust sent to?  Would your answer be the same with

2   that clarification?

3   A.   No.  I thought you were -- I'm sorry, I thought you were

4   referring to Ridgewood again.  No, it would have definitely

5   just been from Dan Carpenter to Wayne Bursey.

6   Q.   And did you hand deliver this notice to Mr. Bursey?

7   A.   I believe it was done that casually.  I believe I went from

8   my side of the building over to his side of the building and at

9   the same time we were being kicked out of TD Bank we had gotten

10  some threatening phone calls and threatening letters from the

11  attorneys representing Ridgewood and Caldwell and other people

12  at Plainfield asset management.

13  Q.   Did you prepare the default notice that was sent from Grist

14  Mill Capital to Charter Oak Trust?

15  A.   I probably would have done that, yes.

16  Q.   Do you have a specific recollection of doing so?

17  A.   No, I do not.

18  Q.   Do you recall how much you demanded the Charter Oak Trust

19  pay Grist Mill Capital?

20  A.   We had a total amount, we kept what was known as the grid

21  note for Ridgewood.  In addition to that, there were payments

22  that we had been making and that has since been taken over, so

23  there's three different women who worked on those payments and

24  we have to the penny the itemized expense that Charter Oak

25  Trust owes Grist Mill Capital and we've provided it several

D59FUNIH                          D. Carpenter - redirect

1    times in this litigation.

2    Q.  The grid note you referred to, that's an obligation of

3    Grist Mill Capital to Ridgewood Finance, correct?

4    A.  Correct.

5              MS. COLBATH:  No further questions.

6              THE COURT:  Anything further, Mr. Siano?

7              MR. SIANO:  No.

8              THE COURT:  Thank you, Mr. Carpenter, your testimony

9    is concluded.  You can step down.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  Petitioner has one more witness.  Are

13   respondents going to have a witness?

14             MR. SIANO:  Yes, your Honor.

15             THE COURT:  Who is that and how long will that take?

16             MR. SIANO:  I'm going to ask Mr. Reyhani to take me

17   through the bank records.

18             THE COURT:  And how long is that expected to take?

19             MR. SIANO:  I expect it will take probably 45 minutes

20   at the most.

21             THE COURT:  Then we won't be able to complete this

22   hearing today.

23             MR. SIANO:  Judge, I will point out that the letter

24   your Honor received indicated each side will take an hour and a

25   half.  I'm sorry, but I need to call a witness.  Nevertheless,

D59FUNIH                          D. Carpenter - redirect

1    I think since petitioner has taken all the time here this

2    morning, I should be able to call him.

3             THE COURT:  All I said was we can't finish today.

4             MR. SIANO:  No, no, Judge.  I just want to point out I

5    have done everything I can to narrow things down.  I just want

6    to clear up the bank accounts.  I know we can't finish today.

7    Your Honor has made it quite clear through your staff that we

8    were going to break in the middle of the day.

9             THE COURT:  We can go for another half hour, in which

10   I trust the petitioner's second witness can be completed, and

11   we will select a continuation date for respondent's witness

12   that is unfortunately not going to be able to be in the

13   immediate near term because I've got trials and other things

14   set up.  So we'll figure that out.  But first let's do the

15   second witness.

16            MR. REYHANI:  Your Honor, just before I forget, there

17   are several more exhibits that we'd like to move into evidence.

18   Exhibit 22 is the deposition testimony and affidavit of service

19   for Daniel Carpenter.  That should be in your Honor's binder.

20            THE COURT:  All right.  Is there an objection?

21            MR. SIANO:  No, Judge.  I put in responsive cross

22   designations under the Civil Rule 32, I believe it is, and as

23   was provided this morning I read through their designations and

24   I believe that with the other designations I have no objection

25   as long as mine go in as well.

D59FUNIH                    D. Carpenter - redirect

1            THE COURT:  And that's under the rule of completeness.

2            MR. SIANO:  Yes, under rule of completeness,

3    subdivision 706.

4            THE COURT:  And you don't object to that.  So I will

5    take 22 as an exhibit and I will also take the counter

6    designations.

7            MR. SIANO:  I offer as P, your Honor, which is next in

8    sequence.

9            THE COURT:  Okay.

10           MR. SIANO:  Thank you, Judge.

11           (Petitioner's Exhibit 22 received in evidence)

12           (Respondent's Exhibit P received in evidence)

13           MR. REYHANI:  As well, your Honor, we'd like to move

14   into evidence Exhibit 23.  That's also in your Honor's binder.

15   That's deposition excerpts from Molly Carpenter.

16           THE COURT:  Any objection, Mr. Siano?

17           MR. LaBELLE:  No objection.

18           THE COURT:  I'm sorry.  Mr. LaBelle.

19           MR. LaBELLE:  No objection, your Honor.

20           THE COURT:  So Exhibits 22 and 23 are admitted, as is

21   respondent it's Exhibit P.

22           (Petitioner's Exhibit 23 received in evidence)

23           MR. REYHANI:  Two more exhibits, your Honor, if you'll

24   bear with me.  Exhibit 28, I would like to move into evidence

25   the declaration of February 28, 2013 and exhibits thereto.  I

1    apologize, I don't have extra copies with me.  They've been

2    filed in court and we can provide extra copies.

3                THE COURT:  You're going to have to provide me with

4    marked sets of exhibits, both sides.

5                MR. REYHANI:  Absolutely.

6                THE COURT:  Any objection to the Reyhani declaration?

7                MR. SIANO:  No, Judge.

8                THE COURT:  That is admitted.

9                (Petitioner's Exhibit 28 received in evidence)

10               MR. REYHANI:  And finally, your Honor, Exhibit 29, the

11   supplemental April 26, 2013 declaration of Brian Reyhani which

12   we'll submit to the Court in proper form.

13               THE COURT:  Any objection?

14               MR. SIANO:  No, your Honor.

15               THE COURT:  Exhibit 29 is admitted as well.

16               (Petitioner's Exhibit 29 received in evidence)

17               MR. REYHANI:  And, sorry, just for the record we

18   intentionally omitted Exhibit 24.

19               THE COURT:  So noted.

20               MR. REYHANI:  Thank you.

21               THE COURT:  All right, so you may call your next

22   witness.

23               MS. COLBATH:  Your Honor, may I be heard on the

24   Moonstone defendants intention to call petitioner's counsel as

25   a witness?  There's nothing unique that Mr. Reyhani knows and I

D59FUNIH                    D. Carpenter - redirect

1    find it improper for them to call counsel as their witness.

2              THE COURT:  Would you care to elaborate?

3              MS. COLBATH:  I have prepared cases for you on this

4    and the cases are legion.  You can't use as a strategy calling

5    your adversary's counsel as a witness.  The attached submitted

6    documents to the Court from TD Bank.  They've agreed to all the

7    admissibilities of those documents.  He's not going to say

8    anything more than what the document says.

9              THE COURT:  I hear this as a heads up and as I said

10   before, we wouldn't get to him as a witness today anyway.  You

11   hadn't given me the bench memo before and I will have to read

12   it in order to benefit from the information therein.  I will

13   give Mr. Siano an opportunity to respond to that and we can

14   deal with all of that before whatever the next scheduled date.

15             MS. COLBATH:  I appreciate that, your Honor.

16             THE COURT:  Okay.  So, can we have the next witness

17   called, please?

18             MR. REYHANI:  Yes, your Honor.  We call Mr. Peter A.

19   Goldman.

20             THE COURT:  Mr. Goldman, would you please come to the

21   stand?

22             MR. SIANO:  Your Honor, if I might --

23             THE COURT:  First let the witness be sworn.

24    PETER GOLDMAN,

25        called as a witness by the Petitioner,

D59FUNIH                    D. Carpenter - redirect

1          having been duly sworn, testified as follows:

2              THE COURT:  I'll need you to state your name and spell

3     your last name for the record, please.

4              THE WITNESS:  Peter A. Goldman, G-o-l-d-m-a-n.

5              THE COURT:  Thank you.  Mr. Siano?

6              MR. SIANO:  Present at the end of respondent's table

7     is counsel Paula Schwartz Frome of counsel to the firm of Case

8     & Druker.  I believe she can introduce herself.

9              MS. FROME:  Yes, your Honor.  I am the attorney for

10    the witness.

11             THE COURT:  And your name is?

12             MS. FROME:  Paula Schwartz Frome and the firm name is

13    Case & Druker.

14             THE COURT:  Thank you.  Welcome.

15             MR. REYHANI:  Thank you, Mr. Goldman.  Is this on?

16    Hello?

17             THE COURT:  You can tip it up a little bit and then

18    speak as if you are expecting us all to hear you without the

19    benefit of it.

20    DIRECT EXAMINATION

21    BY MR. REYHANI:

22    Q.  Thank you.  Mr. Goldman, are you an attorney?

23    A.  Yes.

24    Q.  How long have you been an attorney?

25    A.  I was admitted in 1973.

D59FUNIH                    Goldman - direct

1  Q.  Okay.  And aside from self employment, what was the last

2  legal organization that employed you?

3  A.  United States Department of Justice, United States

4  Attorney's Office Eastern District of New York.

5  Q.  So you were a federal prosecutor?

6  A.  Yes.

7  Q.  And are you an accountant, Mr. Goldman?

8  A.  Yes, I am.

9  Q.  And you're a certified public accountant or CPA?

10 A.  Yes.

11 Q.  For how long have you been an accountant?

12 A.  I think I was licensed in 1974 or '75.  I don't recall.

13 Q.  Do you have any connection to the company Grist Mill

14 Capital LLC?

15 A.  Yes.

16 Q.  What is your connection, Mr. Goldman?

17 A.  I am an agent for the representative for the company is my

18 understanding.

19 Q.  Just to clarify I think we heard from Mr. Carpenter today

20 there are actually two Grist Mill Capital LLC's, is that your

21 understanding as well?

22 A.  I think there were.  I don't know if there still are, but

23 there were two, yes.

24 Q.  Do you know the interrelationship between the two?

25 A.  There is a Grist Mill Capital Delaware which owns

D59FUNIH                        Goldman - direct

1    100 percent of Grist Mill Capital Connecticut.

2    Q.  And you described yourself as an agent of Grist Mill

3    Capital, is that right?

4    A.  Yes.

5    Q.  And do you understand yourself to be an agent of both of

6    these companies?

7    A.  Yes.

8    Q.  This agency, when did it begin?

9    A.  I don't know the exact date, but more than four weeks ago,

10   but less than twelve weeks ago.

11   Q.  And can you tell us how you came to be brought on as an

12   agent for Grist Mill Capital?

13   A.  An attorney by the name of Anthony Siano, who is currently

14   present in the courtroom, called me and said that he

15   represented a client who probably would need an agent appointed

16   for one of the entities that he had some affiliation with and

17   he introduced me to the attorneys that represented that Grist

18   Mill Capital and I went down and had a meeting with him to

19   discuss the -- I'm sorry, I've got different entities mixed up.

20   The attorney that represented Ms. Carol Bernstein and I met

21   with her or spoke to her on the phone and I don't remember when

22   exactly I was appointed or designated as the agent.

23   Q.  If I understand you correctly you're saying that the

24   attorney for Grist Mill Capital, who is Carol Bernstein, that's

25   someone you met with, is that correct?

D59FUNIH                    Goldman - direct

1    A.   Yes.

2    Q.   And you said before that Mr. Siano approached you about

3    being an agent for a company of one of his clients.   Which

4    client did you understand him to be referring to?

5    A.   No, I think what I said was that one of his clients who had

6    an affiliation with one of the companies.

7    Q.   Okay.

8    A.   At that point I didn't know, I just know he represented an

9    individual and that there might be a need for an agent to be

10   appointed and he explained to me a little bit about what I

11   would be doing and I said okay, let me talk to who I need to

12   talk to.

13   Q.   Do you have an understanding now as to who that person is

14   that Mr. Siano represents?

15   A.   I understand he represents Dan Carpenter.

16   Q.   Do either of the Grist Mill Capitals have any employees?

17   A.   Not to my knowledge.

18   Q.   And we're talking about Grist Mill Capital hiring you as an

19   agent.   What exactly was the scope of your agency?

20   A.   My understanding was that I was going to be prepared for a

21   deposition because the plaintiff in this matter needed or

22   wanted some information about the operation of the company and

23   the finances of the company and they needed someone who could

24   step in and explain as much as they could absorb in a period of

25   time regarding how the Grist Mill Capital operated.

D59FUNIH                    Goldman - direct

1  Q.  So Grist Mill Capital hired you to come in and examine its

2  own records, is that correct?

3  A.  No.  Carol Bernstein hired me.  She retained me.

4  Q.  And do you have an understanding as to why Mr. Carpenter

5  couldn't examine these records?

6  A.  I don't think there was a prohibition about Mr. Carpenter

7  examining the records.

8  Q.  You said before that petitioner's counsel in this case was

9  seeking to depose Grist Mill Capital?

10 A.  I think they wanted a representative from Grist Mill

11 Capital.

12 Q.  Do you have any understanding as to why that representative

13 couldn't be Mr. Carpenter?

14 A.  My understanding was that Mr. Carpenter's counsel had

15 advised him not to testify.

16 Q.  Do you understand the grounds for which he advised him not

17 to testify?

18 A.  My understanding is there was another investigation going

19 on, but other than that, that's the limit of what I'm privy to.

20 Q.  Is that a criminal investigation?

21 A.  As far as I know.

22 Q.  And did you testify at a deposition of Grist Mill Capital?

23 A.  Yes.

24 Q.  And do you recall the date of that deposition?

25 A.  April 30th.

D59FUNIH                    Goldman - direct

1   Q.   And at that deposition did you testify about Grist Mill

2   Capital's transactions?

3   A.   To a degree, yes.

4   Q.   And did you also testify about Grist Mill Capital's

5   finances?

6   A.   To a degree, yes.

7   Q.   And to the best of your knowledge on April 30th were you

8   the only person who testified at this deposition about Grist

9   Mill Capital's company -- let me restate it.  To the best of

10  your knowledge on April 30th were you the only person who

11  testified at Grist Mill Capital's deposition as to the

12  company's finances and transactions?

13  A.   I know there were other people scheduled, but I left before

14  any other deposition started, so as far as I know, I was the

15  only one that testified.  If two other people testified, they

16  might have.  I know two other people were there.

17  Q.   But do you have any understanding as to whether they also

18  testified about Grist Mill Capital's finances and transactions?

19  A.   My understanding is they testified, but I wasn't there,

20  so --

21  Q.   Did you review -- withdrawn.  Prior to your deposition on

22  April 30th, did you review documentation of any transfers

23  between Grist Mill Capital and the Charter Oak Trust?

24  A.   Yes.

25  Q.   And can you recall sitting here today which ones those

D59FUNIH                    Goldman - direct

1   were?

2   A.   Bank statements.

3   Q.   Bank statements from --

4   A.   Charter Oak and Grist Mill.

5   Q.   Do you recall the bank?

6   A.   Grist Mill Capital.  Grist Mill Capital.

7   Q.   Do you recall the statements to which -- withdrawn.  Do you

8   recall the bank to which those statements pertained?

9   A.   TD Bank.

10  Q.   And was that the only bank?

11  A.   Yes.

12  Q.   Do you have in front of you a binder of petitioner's

13  exhibits?  It may be the other one there.

14  A.   There are two binders.  You might point out which one you

15  want me to look at.

16  Q.   The one with numbered exhibits.

17  A.   There's some loose exhibits that look like they were in a

18  book.

19        THE COURT:  Do you want him to look at the binder with

20  the letters or the binders with the numbers?

21        MR. REYHANI:  The numbers, your Honor.

22        THE COURT:  Look for the binder with the numbers.

23  A.   I have it, your Honor.

24  Q.   Do you see the top marked Exhibit 1?

25        THE COURT:  I'll just point out that it's five to one,

D59FUNIH                    Goldman - direct

1    so pace yourself.

2    A.   Yes.

3    Q.   And have you seen this document before?

4    A.   I believe I have.

5    Q.   Okay, and to your understanding what does it show?

6    A.   This -- well, it shows I believe two things, if I recall

7    correctly.

8    Q.   And what are the two things it shows?

9    A.   There's a deposit ticket and a check.

10   Q.   And do you understand this to be a transfer of some sort?

11   A.   I understand this to be a deposit of a check to Charter Oak

12   Trust into the Charter Oak account.

13   Q.   Into the Charter Oak account?

14   A.   I'm sorry.  I believe the check went into the Charter Oak

15   account.

16   Q.   I'm sorry, we're looking at page 348?

17   A.   No.  I'm looking at what looks like it was marked as

18   Exhibit 1, right under Exhibit 1.

19           THE COURT:  I don't know that you directed him or he

20   heard you direct him to the interior page.

21   Q.   I apologize.  Let me be more clear.  On the bottom

22   right-hand corner of each page of Exhibit 1 there's a Bates

23   stamp.

24   A.   Yes, I see it now.

25   Q.   Thank you.  I'd like to you turn to page 348.  They're in

D59FUNIH                    Goldman - direct

1   sequential order.

2   A.   Okay, I'm on 348.

3   Q.   Have you seen this document before?

4   A.   I'm not certain I've seen this one.

5   Q.   Independent of this document, do you have any understanding

6   that in May 2009 the Charter Oak Trust transferred

7   $8,677,276.75 to Grist Mill Capital?

8   A.   Yes, I do.

9   Q.   Do you have any understanding as to why Charter Oak is

10  transferring about $8.7 million to Grist Mill Capital on or

11  about May 21, 2009?

12  A.   No.

13  Q.   Could you turn to page 349, which is the immediate page

14  following?

15  A.   Okay.

16  Q.   Have you seen this document before?

17  A.   I'm not certain I have, but I'm aware of it.

18  Q.   And independent of this document do you have an

19  understanding that $2,186,566 was transferred from the Charter

20  Oak Trust to Grist Mill Capital on or about May 26, 2009?

21  A.   Excuse me.  Yes, I do.

22  Q.   And do you have any idea or understanding as to why the

23  Charter Oak Trust was transferring about $2.2 million to Grist

24  Mill Capital on or about May 26, 2009?

25  A.   No.  Not that I can recall.

D59FUNIH                         Goldman - direct

1    Q.   In the same exhibit, Exhibit 1, can you turn to page 107?

2    A.   Okay.  I'm on 107.

3    Q.   Have you seen this document before?

4    A.   I'm not certain I've seen these.

5    Q.   And independent of this document, do you have an

6    understanding of whether or not Charter Oak Trust transferred

7    $19.8 million to Grist Mill Capital on or about October 27,

8    2009?

9    A.   Yes.

10   Q.   Do you have any idea as to why the Charter Oak Trust was

11   transferring $19.8 million to Grist Mill Capital in

12   October 2009?

13   A.   No.

14   Q.   Now, the three transfers we've been speaking about of

15   8.7 million, $2.2 million and $19.8 million, could you estimate

16   how much they add up to?  8.7, 2.2 and 19.8?

17   A.   If I had a calculator I could tell you exactly how much

18   they add up to so I'd rather not estimate.

19   Q.   Would it be fair to say they add up to about $31 million?

20   A.   I won't dispute your representation.

21   Q.   Thank you.  And you have no understanding as to why any of

22   this money, any of the $31 million is being transferred in a

23   series of three transfers in 2009 from the Charter Oak Trust to

24   Grist Mill Capital?

25   A.   I have no specific knowledge of why they would have

D59FUNIH                    Goldman - direct

1    transferred this money.

2    Q.  Did you ask anyone as to why this money was transferred?

3    A.  No.

4    Q.  Did you see any documentation about why this money was

5    transferred?  Withdrawn.  I'll just clarify.  You've looked at

6    some documents within the possession of Grist Mill Capital,

7    correct?

8    A.  Yes.

9    Q.  And within those documents -- withdrawn.  Did those

10   documents provide you in your mind with any idea or

11   understanding as to why any of this money, any of the

12   $31 million was transferred from the Charter Oak Trust to Grist

13   Mill Capital in 2009?

14   A.  I drew a conclusion that Charter Oak owed Grist Mill

15   Capital money for funding insurance policies based on my

16   understanding of the way Grist Mill Capital operated and

17   Charter Oak operated.

18   Q.  Okay, so did you see any agreements -- withdrawn.  Did you

19   see any documents that led you to believe that this $31 million

20   pertained to some amount of money that the Charter Oak Trust

21   owed to Grist Mill Capital?

22   A.  No.

23               MR. REYHANI:  Your Honor, may I approach the witness?

24               THE COURT:  Yes.

25               MR. REYHANI:  Thank you.

D59FUNIH                    Goldman - direct

1              THE COURT:  We have five minutes left in this session.

2              MR. REYHANI:  That's all I need, your Honor, thank

3       you.

4       Q.  Mr. Goldman, I've placed a multipaged document in front of

5       you, is that correct?

6       A.  Yes.

7       Q.  Have you seen this document before?

8       A.  I believe I've seen page 1.  I'm not certain I've seen the

9       following pages.  I probably have.

10      Q.  You probably have?  When would you have seen this document?

11      A.  When I went up to Simsbury to review the documents.

12             MR. SIANO:  May I have a moment with Mr. Reyhani?

13             THE COURT:  Yes.

14             (Pause)

15      Q.  Do you recall whether someone gave you any part of this

16      document?

17      A.  I believe someone gave me the general ledger trial balance.

18      Q.  And who would that be?

19      A.  Either Matt Wescott or Amanda Rossi.  I'm not certain

20      because those were the two people I saw that day.

21      Q.  Do you see a yellow tab in this document I've just handed

22      you?

23      A.  Yes.

24      Q.  This page it's marked page 7 in the general ledger of Grist

25      Mill Capital from the period January 1, 2009 to December 31,

D59FUNIH                      Goldman - direct

1    2009.

2    A.   Yes.

3    Q.   Have you seen this page before?

4    A.   I don't recall seeing this detailed general ledger.   I

5    might have, but I don't recall seeing it.

6    Q.   And do you see an entry under 27002?  I'm looking at the

7    left-hand side under account ID.

8    A.   Yes.

9    Q.   Do you see an entry under 27002 for the date October 27,

10   2009?

11   A.   Yes.

12   Q.   And how much -- do you see that reflects some kind of

13   credit?

14   A.   Yes.

15   Q.   And what's the credit amount?

16   A.   $8,677,276.75.

17   Q.   I'm sorry, I was directing you to October 27, 2009.

18   A.   Oh, okay, I'm sorry.

19   Q.   And what's the amount there?

20   A.   19,800,000.

21   Q.   And is there a description for this credit?

22   A.   Unknown deposit.

23   Q.   And you've seen this document before, right?

24   A.   If this was the one given to me at the deposition, yes.

25   Q.   Well, did you see this page prior to the deposition?

D59FUNIH                    Goldman - direct

1    A.  No, I think I just testified that I don't recall seeing the

2    detailed general ledger prior to the deposition.  I did see, I

3    really -- excuse me, I did see, I recall, the general ledger

4    trial balance.

5    Q.  Do you have any idea what this October 27, 2009 transaction

6    of a credit of $19.8 million refers to?

7    A.  I'm not certain I understand that question.

8    Q.  There's a 19.8 million credit reflected on this document,

9    correct?

10   A.  Right.

11   Q.  Do you have any understanding whether from this document or

12   any part of it or independent, what this credit refers to?

13   A.  It appears to be the transfer of the funds from the Charter

14   Oak Trust that we just talked about.

15   Q.  Transfer of funds from the Charter Oak Trust to where?

16   A.  To where?  Grist Mill Capital.

17           MR. REYHANI:  Your Honor, I move -- I request that

18   Exhibit 30, which is the document in front of the witness, be

19   moved into evidence.

20           MR. SIANO:  No objection.

21           THE COURT:  Okay.  Petitioner's Exhibit --

22           MR. LaBELLE:  No objection.

23           THE COURT:  Thank you.  Petitioner's Exhibit 30 -- you

24   keep moving down the table and get out of my radar screen.

25           MR. SIANO:  I'm going to have a very hard time with

D59FUNIH                          Goldman - direct

1    Mr. LaBelle.

2              THE COURT:  Petitioner's Exhibit 30 is received in

3    evidence.

4              (Petitioner's Exhibit 30 received in evidence)

5              THE COURT:  It is now 1:09.  I said I'd go to 1:10

6    because I thought that you were going to finish, but clearly

7    there has to be cross, and I didn't mean just the direct

8    finishing.  Oh, no, you're not going to cross the witness?

9              MR. SIANO:  So far I have one question.

10             MR. REYHANI:  And I'm done with my direct.

11             THE COURT:  So maybe Mr. Goldman will get finished

12   today.

13   CROSS-EXAMINATION

14   BY MR. SIANO:

15   Q.  Mr. Goldman, you were also engaged, were you not, by

16   counsel for Charter Oak Trust and Nova Group, is that right?

17   A.  Yes.

18   Q.  And is that engagement still pending?

19   A.  Yes.

20   Q.  And is it correct that your engagement for Grist Mill

21   Capital was to determine what happened to $30 million?

22   A.  That's my understanding.

23             MR. SIANO:  No further questions, Judge.

24             MR. REYHANI:  Nothing further from me, your Honor.

25   Thank you.

D59FUNIH                    Goldman - cross

1           THE COURT:  And, Mr. LaBelle, you said you didn't have

2    any.

3           MR. LaBELLE:  No, your Honor.

4           THE COURT:  Thank you, Mr. Goldman.  Your testimony is

5    concluded.

6           THE WITNESS:  Thank you, your Honor.

7           (Witness excused)

8           THE COURT:  All right, let's do a little scheduling.

9           MS. RIGNEY:  I'm sorry to interrupt.  I'm Alexandra

10   Rigney on behalf of USAA.  I just wanted to make a statement

11   for the record.  USAA takes no position on this turnover

12   proceeding.  We will be directed by whatever order the Court

13   issues as a result of this.  However, I wanted to make one

14   factual statement based on something Ms. Colbath said earlier

15   regarding USAA being imminently on the verge of paying

16   $3,450,000 on the claims made on the property that is the

17   subject of this turnover proceeding.

18           At this point there's been no final determination as

19   to the loss in terms of what the actual value of the loss is.

20   There is a preliminary estimate that is give or take

21   approximately $344,000 not $450,000, but that has not been

22   determined finally, and although USAA will absolutely abide by

23   whatever order this Court directs in terms of the turnover

24   proceeding or where the money should be directed, we just

25   wanted to make clear that there is no final determination as to

D59FUNIH                    Goldman - cross

1    the quantity of loss so there's no exact dollar figure to be

2    moved into a constructive trust or to be paid to petitioner or

3    to anyone else at this point, so I just wanted to make that

4    clear for the record.

5            THE COURT:  Thank you.

6            MS. RIGNEY:  Thank you.

7            MR. SIANO:  Does petitioner rest, your Honor?  I just

8    want to know what stage we're at now as we begin to discuss a

9    schedule so I'll know what's anticipated and I can give

10   informative responses to the Court on timing.

11           THE COURT:  Is petitioner resting its case?

12           MS. COLBATH:  Mr. LaBelle wanted to talk about some

13   additional documents, so pending those discussions I don't want

14   to rest at this point, depending on what negotiations he wants

15   to have.  So, no.

16           THE COURT:  Petitioner is not yet resting.

17           MR. SIANO:  Thank you, Judge.

18           THE COURT:  But I will need by close of business

19   Monday updated exhibit lists and marked copies of the

20   additional exhibits.  The bench, the memo regarding Mr. Reyhani

21   as a witness I will assume that's a motion to preclude or a

22   motion to limit it, whatever, file it on ECF as a motion, give

23   me a courtesy copy and do that by close of business tomorrow,

24   that's Friday, that would be the 10th and any opposition

25   submission by Friday the 17th.

D59FUNIH                    Goldman - cross

1           MR. SIANO:  Thank you, Judge.

2           THE COURT:  And any reply submission -- give me one

3    moment here -- by Tuesday the 21st.  I will put the

4    continuation testimonial session down for June 4 from

5    10:00 a.m. to noon.  And I will tell you now that after the

6    evidentiary presentation has been completed I will be requiring

7    you to file proposed findings of fact and conclusions of law

8    and we'll work out the schedule for that.

9           All right, is there anything else that we need to take

10   up together today?  All right.  Mr. LaBelle?

11          MR. LaBELLE:  Your Honor, I represented I could

12   probably in ten minutes work out the issues with respect to

13   Exhibit C with Ms. Colbath.  Since we're coming back, I'll work

14   that out in the interim so we'll have that straightened out

15   before the next hearing date.

16          THE COURT:  Very well.

17          MR. SIANO:  Nothing further from Mr. Siano.

18          MS. COLBATH:  Nothing, your Honor.

19          THE COURT:  Thank you all.  I will look forward to

20   your initial submissions and to seeing you again.

21          (Adjourned)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

DANIEL CARPENTER

Direct By Ms. Colbath . . . . . . . . . . . . .23

Cross By Mr. Siano . . . . . . . . . . . . . . .83

Redirect By Ms. Colbath . . . . . . . . . . . .93

PETER GOLDMAN

Direct By Mr. Reyhani . . . . . . . . . . . . 106

Cross By Mr. Siano . . . . . . . . . . . . . . 120

PETITIONER EXHIBITS

Exhibit No.                                     Received

1 through 21 . . . . . . . . . . . . . . . . . .20

26 and 27 . . . . . . . . . . . . . . . . . . .22

25 . . . . . . . . . . . . . . . . . . . . . . .65

22 . . . . . . . . . . . . . . . . . . . . . . 103

23 . . . . . . . . . . . . . . . . . . . . . . 103

28 . . . . . . . . . . . . . . . . . . . . . . 104

29 . . . . . . . . . . . . . . . . . . . . . . 104

30 . . . . . . . . . . . . . . . . . . . . . . 120

RESPONDENT EXHIBITS

No.                                             Received

A, B, D and F through O . . . . . . . . . . . .20

E . . . . . . . . . . . . . . . . . . . . . . . .86

C . . . . . . . . . . . . . . . . . . . . . . . .92

P . . . . . . . . . . . . . . . . . . . . . . . 103