UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
_____

UNITED STATES OF AMERICA,

     - v. -                                3:13 Cr. 226 (RNC)

DANIEL CARPENTER,

                   Defendant.
_____


### REPLY SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT DANIEL CARPENTER

James M. Cole, Esq.
Michael A. Levy, Esq.
Qais Ghafary, Esq.
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com

*Counsel for Daniel E. Carpenter*

April 20, 2018

## **Table of Contents**

Introduction .................................................................................................................3

Discussion ...................................................................................................................4

    I.     Section 3553(a)(4)—The Applicable Sentencing Guidelines Range ....................4

          A.    Loss Amount Enhancement ............................................................4

                1.    The Government's "But-For" Loss Models Contravene Prevailing Criminal Law Principles That Require a Proximate Causal Connection Between the Offense and Loss. ...................................6

                2.    The Second Circuit's Proximate Cause Requirement for Fraud-Loss Calculations Applies Generally, Including to STOLI Fraud .................................................................................8

                3.    The Government's Intended and Actual Loss Models Lack Support in STOLI Case Law and Demonstrably Misapply the Sentencing Guidelines ...........................................................13

                4.    Defendant's Loss Models Are Supported by Law, Logic, and the Government's Own Litigating Position In Other STOLI Prosecutions ..................................................................18

          B.    Money Laundering Enhancement ..................................................24

          C.    Sophisticated-Means Enhancement ...............................................28

          D.    Loss-to-Financial-Institution Enhancement ....................................30

          E.    Obstruction of Justice and Leadership Enhancements.............................30

    II.    Section 3553(a)(6) — The Need To Avoid Unwarranted Sentencing Disparities ........................................................................31

    III.    Section 3553(a)(1) & (2) — The Nature and Circumstances of the Offense, and the Need for Just Punishment and Adequate Deterrence ......................................33

    IV.    Section 3553(a)(1)— The History and Characteristics of Defendant...................36

Conclusion ...............................................................................................39

**Introduction**

Nearing the end of what it no doubt considers to have been an unusually arduous five-year prosecution of a contentious defendant, the Government seems to have lost perspective on this case.  To be sure, Dan Carpenter has his faults, and for the second time now he has been found guilty of a crime that requires a sentence to be imposed.  But he has also demonstrated that he has lived a life of exceptional service to others, described in vivid detail in an unusually voluminous set of letters from dozens of people whose lives he has touched.

With these facts in mind, the appropriate sentence for this 64-year-old man—one that is not greater than necessary to achieve the purposes of sentencing—is not anything like what the Government suggests it to be.  Indeed, in an exceptional *74-page* sentencing submission, the Government stakes out a litany of unreasonably aggressive positions that seem less grounded in logic than in fervor around the approach of this particular defendant's apparently much-anticipated judgment day.  Among its other positions:

- The Government vigorously advocates for an interpretation of the Sentencing Guidelines that treats the supposed fraud-loss for each and every policy as having been (or having been intended to be) millions of dollars—supposedly hundreds of millions in total—even though: (i) the economic harms that the Government claimed and the Court accepted at trial involved far more modest aspects of the policies' overall value; (ii) the victim insurance companies—sophisticated and frequent litigators all—themselves view the difference between what they expected and what they got to be so minimal that they have almost uniformly not bothered to undertake the relatively trivial task of having the policies declared void; and (iii) there is nothing

in Second Circuit precedent that requires this Court to adopt a model that blinks reality.

- In its next breath after defending its proposed interpretation of the Guidelines, the Government candidly acknowledges that, if accepted, the Guidelines would produce an absurd sentencing range that offers no useful guidance and must be jettisoned. But the Government apparently lays the blame for that on the Sentencing Commission without pausing to reflect on whether the preposterous result is a signal that the Government's chosen loss theory (which is nowhere expressly commanded by the Guidelines) is simply wrong, especially where Defendant has offered an alternative that actually comports with reality.

- In place of Guidelines that it declares hopelessly broken (after needlessly breaking them), the Government proposes as an "anchor" the solitary, outlier example of the longest sentence ever handed out in this circuit for a STOLI-fraud scheme—12 years for the most harshly treated of the multiple defendants in the *Binday* case—ignoring that *every* other STOLI defendant sentenced in this circuit has received less, and most significantly less, including a defendant in that same case who received half that, another defendant in this district who recently received three years, and four defendants recently sentenced in the Eastern District of New York who each received a year and a day for a scheme where the number of policies and total value at issue exceeded that here.

- Attempting to inspire some passion for severity in a case that involves a relatively bland offense with difficult-to-discern harm, the Government colorfully describes Defendant's conduct in procuring insurance policies on strangers' lives as a

2

"corruption of [the] very soul" of the life insurance industry, but in doing so the Government ignores that an entire—and entirely legal—life settlement industry already exists to permit investors to make and hold exactly that type of ordinary investment in life insurance policies on the lives of strangers.

- Reviving a strategy already pursued and facts already presented in Defendant's 2014 sentencing in Massachusetts, the Government pays an inordinate amount of attention to detailing the events in a messy civil suit in New York that are not part of the criminal charges here, have not inspired these or any other prosecutors to bring criminal charges anywhere (despite their obvious motivation), and yet now, for the second time in four years, are being wielded by the Government more vigorously than anything related to the actual offense of conviction.

- Finally, and perhaps most significantly, the Government takes a lifetime of extraordinary good works by this defendant, detailed in exceptionally voluminous and heartfelt testimonials by friends, family, colleagues, and employees, and—although not denying them—brushes past them to cite a single instance in which Defendant cursed a colleague in an email, declaring on the basis of one obnoxious email that, in the overall balance, "the Court should consider Carpenter's personal history and characteristics, to both his credit and detriment."

The Government's evident frustration with this defendant is palpable. He has been convicted of a crime that involved no physical harm, targeted nobody especially vulnerable, left nobody destitute, and, indeed, caused harm sufficiently ill-defined and minor that the well-heeled corporate victims have almost uniformly not been moved to bother undoing easily voidable policies. Moreover, although it is Defendant's second conviction, he has demonstrated

undeniably that he has lived a life of unflagging, almost compulsive service to others.  None of this is intended to excuse Defendant's offense, but there is little about the offense itself that explains why the Government's decision at every turn of its sentencing submission is to advocate the most aggressive position available.

This Court need not—should not—adopt or be swayed by the Government's partisan perspective.  "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citations omitted).  Dan Carpenter must be sentenced, but the sentence imposed should reflect the reasoned, dispassionate judgment of a court, not the Government's aggravation.  It should reflect the limited harms of STOLI-fraud articulated by the Court in its verdict, not the multi-hundred-million dollar absurdity that the Government claims is required by the Guidelines, and which no court and no prosecutor has ever endorsed as actually comporting with reality.  And finally, it should reflect Dan's lifetime of exceptional service to individuals and communities, reflected in the dozens of letters of support submitted on his behalf.  Viewed in this proper context, we respectfully submit that Dan Carpenter should be spared a lengthy sentence and the resulting separation from his family and community.

<u>Discussion</u>

I.    **Section 3553(a)(4)—The Applicable Sentencing Guidelines Range**

A.    <u>Loss Amount Enhancement</u>

The Second Circuit has twice asked for a "better alternative" to the STOLI fraud-loss models that the Government, with slight modifications, repackages here.  Heeding that invitation, Defendant has offered a sensible methodology that measures the "discrepancies between the

benefits the [insurance companies] reasonably anticipated from issuing the policies and the benefits they actually received." (Verdict at 82.) But rather than engage with the merits of this methodology, the Government instead repeatedly invokes the phrase "fraudulent inducement" as if they were magic words that relieve its present burden—to identify the pecuniary harm that Defendant purposely and subjectively sought to inflict through his offense conduct (intended loss) or which was a reasonably foreseeable result thereof (actual loss)—and instead permit a simple tallying of anything that post-dates the moment a policy issued, irrespective of whether it was proximately caused by the fraud.

In taking this easy way out, the Government commits three fundamental errors: *First*, as the Government openly acknowledges, its intended and actual loss models are based on a theory of "but-for" causation, rather than proximate causation. But the Supreme Court and Second Circuit have made clear that criminal law principles generally, and fraud-loss principles specifically, favor a requirement of proximate causation, which is precisely what animates Defendant's own loss models. *Second*, relying on a small set of loan-fraud cases, the Government draws simplistic and incorrect conclusions that it seeks to extend to any fraudulently induced transaction, when—as the Fifth Circuit has explained—it is the distinct nature of a loan transaction that produced the results in those other cases, not the fact that the transactions were fraudulently induced. The Second Circuit's overall loss-calculation principle—that "losses from causes other than the fraud" must be excluded—applies generally, and applies here, even if the nature of certain loan-fraud scenarios renders that principle superfluous or inert in those particular cases. And, *third*, the Government's intended and actual loss models lack support in STOLI case law and demonstrably misapply the Sentencing Guidelines to produce absurd results that must be discarded as soon as they are computed. By

5

contrast, Defendant's models are supported by law, logic, and the Government's own litigating

position in other STOLI prosecutions, and they produce sensible results under the Guidelines.

1. The Government's "But-For" Loss Models Contravene Prevailing Criminal Law Principles That Require a Proximate Causal Connection Between the Offense and Loss.

Bucking established law that sets a preference for looking to *proximate* cause rather than

*but-for* cause in sentencing, the Government expressly asks this Court to "appl[y] a but-for

causation test" to this case.  (Govt. Sent. Mem. at 32.)  Specifically, the Government asks the

Court to count all gains and losses, including death benefits, that resulted from the issuance of

any STOLI policy on the ground that, as a metaphysical matter, the STOLI policies would not

have issued but for the offense.  In other words, the Government asks the Court to give no

thought to whether any particular loss was proximately or "legally" caused by the offense.  The

Court should decline to do so.

"'A basic tenet of criminal law is that the government must prove that the defendant's

conduct was the legal or proximate cause of the resulting injury.'"  *United States v. Main*, 113

F.3d 1046, 1050 (9th Cir. 1997) (quoting *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir.

1986)); *see Paroline v. United States*, 134 S. Ct. 1710, 1720 (2014) ("[A] requirement of

proximate cause is more restrictive than a requirement of factual cause alone.").  Indeed, in

applying proximate cause in the analogous restitution context, the Supreme Court has observed

that "[p]roximate cause is a standard aspect of causation in criminal law and the law of torts"; so

much so, in fact, that the Supreme Court even "has more than once found a proximate-cause

requirement built into a statute that did not expressly impose one."  *Id.*; *see also Robers v. United

States*, 134 S. Ct. 1854, 1859 (2014) ("[The Mandatory Victim Restitution Act, 18 U.S.C. §

3663A,] has a proximate cause requirement," and "[t]he basic question that a proximate cause

requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue.").

The Government's openly acknowledged "but-for" loss models are not only at odds with this basic principle, they also conflict with the precedent of multiple circuits, which specifically require a proximate casual connection between a fraud offense and loss for Guidelines purposes. *See, e.g., United States v. Ednie*, 707 F. App'x 366, 373 (6th Cir. 2017) ("To attribute an actual loss to a defendant, his or her conduct must be both a 'but for' cause and a proximate cause of the loss.") (citing *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004)); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1236 (C.D. Cal. 2002) ("The Ninth Circuit . . . instructs district courts 'to take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause. . . . The Guidelines . . . contemplate a causation requirement and the government must therefore prove that the defendant's conduct was the proximate cause of the loss.") (citing *United States v. Hicks*, 217 F.3d 1038, 1049 (9th Cir. 2000) (internal citations and quotation marks omitted)).

The Second Circuit has likewise adopted proximate causation as the general rule for fraud-loss calculations under the Guidelines. The Second Circuit laid the foundation in *Ebbers*, where it held that "loss must be the result of the fraud," and "[l]osses from causes other than the fraud must be excluded from the loss calculation." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (applying principle in securities fraud context to exclude non-fraud factors contributing to stock price decline). The following year in *Rutkoske*, the Circuit expressly grafted the civil fraud principle of proximate causation onto Guidelines loss calculations, finding that there is "no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a

fraud is a critical determinant of the length of a defendant's sentence." *United States v. Rutkoske*, 506 F.3d 170, 179-80 (2d Cir. 2007) (remanding for resentencing because of the district court's "basic failure at least to approximate the amount of the loss caused by the fraud without even considering other [non-fraud] factors").

2. The Second Circuit's Proximate Cause Requirement for Fraud-Loss Calculations Applies Generally, Including to STOLI Fraud

Despite all this, the Government argues that the proximate cause requirement for fraud-loss calculations is cabined to "stock fraud cases" or, at the very least, inapplicable to fraudulent inducement cases. (Gov't Sent. Mem. at 21-22.) This argument is unsustainable.

First, while both *Ebbers* and *Rutkoske* involved criminal securities fraud, nowhere in those cases did the Circuit limit its proximate cause principle to that limited category of cases. In fact, the Circuit spoke in broad, general terms, and it anchored the adoption of a proximate causation standard not in the nature of the securities market, but in the nature of a "sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *Rutkoske*, 506 F.3d at 180. The Circuit adopted the sensible position that, because fraud loss can play an outsized role at sentencing, it ought to be at least a proximate result of the person's criminal conduct.

Moreover, even the Government's own fraudulent inducement authorities invoke the *Ebbers-Rutkoske* causation principle and nowhere purport to cabin it to securities cases or exclude it from fraudulent inducement cases. *See, e.g., United States v. Turk*, 626 F.3d 743, 751 (2d Cir. 2010) (discussing the *Ebbers-Rutkoske* causation principle and holding that "[c]ontrary to [the defendant's argument], the Government is *not* trying to limit the application of the causation requirement to securities cases") (emphasis in original).

Contrary to the Government's position that weeding out the non-fraud causes of loss is only required in stock-loss cases, a review of Second Circuit fraud-loss precedents demonstrates that it is the nature of the underlying transaction, *not* the mere presence of fraudulent inducement, that in some cases (notably, the Government's loan-fraud cases) renders the *Ebbers-Rutkoske* causation principle less consequential. *Cf. United States v. Paul,* 634 F.3d 668, 677-78 (2d Cir. 2011) (favorably discussing the causation principle but finding it inapplicable to the type of transaction as issue in that case).

*Leonard*, for example, is a fraudulent inducement case in which the Second Circuit held that the loss from a fraud involving a misrepresentation that overvalued an item was the amount by which the item was overvalued, not, as the Government's position here would require, the total loss resulting from the inducement under a "but-for" theory. *See United States v. Leonard*, 529 F.3d 83, 92 (2d Cir. 2008). The district court in *Leonard* had "computed the [fraud] loss amount as equal to the entire cost of the [non-publicly traded] securities sold by the [defendants], on the ground that the members would not have invested had they realized the [fraudulently concealed] size of the sales commissions." *Id*. at 93. The Circuit "defer[ed] to the district court's determination that the members would not have purchased the investment had they known" about the commission size, but emphasized that the fact of fraudulent inducement "does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without value." *Id.* Because "the district court erred in not deducting from the purchase price the actual value of the instruments," the Circuit remanded for resentencing. *Id.* Here, the difference in value between the non-STOLI policies that the insurers expected to receive and the value of the STOLI policies they actually received is captured by the

lapse rate and funding level metrics, as detailed in the defendant's prior sentencing submission. (*See* Def. Sent. Mem. at 26.)

The Government says "there is no present value of any asset held by the [insurance companies]" (Gov't Sent. Mem. at 30), but that is wrong.  The STOLI policies may be slightly less valuable to the insurers than non-STOLI policies as a function of the lapse rate and investment income differential, but that does not make them valueless.[1]  Indeed, that is why the insurers have not used this Court's finding that the policies were procured by fraud to rescind them.  The Government says it is "disingenuous" for Defendant to claim that the insurers are keeping the policies because they "foresee profits from [the] remaining active policies," asserting instead that the effort to rescind would entail legal costs and possibly legal impediments. (Govt. Sent. Mem. at 34.)  But these insurance companies are large, sophisticated institutions that engage in litigation constantly, including rescission litigation.  It is absurd to suggest, as the Government does, that the mere STOLI nature of these policies makes each one a multi-million dollar expected loser *but* the insurance companies are keeping them anyway because of litigation costs.  These companies have not refrained from attempting to cancel these policies because they are unable; they have refrained because they are uninterested.  Nor is Defendant putting any "onus" on the victims.  (Govt. Sent. Mem. at 34.)  He is simply pointing out that these litigation-savvy entities themselves seem not to see any loss now or in the future—*i.e.*, actual or intended—that merits even a minimal effort to avoid.[2]

---

[1] In fact, in this case, they proved to be very valuable, in that they lapsed at a rate that far exceeded anything that would have been expected for non-STOLI policies.

[2] This is consistent with the Government's position in the Eastern District of New York, where, as will be further detailed later, the Government estimated that the loss on hundreds of millions of dollars' worth of STOLI policies, *see* Ex. 1, hereto (NY Post article), was approximately $70,000 to $120,000 or, at most, $120,000 to $200,000.  (*Compare Lebovits* Gov't Sent. Mem. at 4, Ex. 3, hereto, *with Neuman* Gov't Sent. Mem. at 3, Ex. 4 to Def. Sent. Mem.)

Returning to the Government's argument that the Second Circuit (despite all of the foregoing) is actually unconcerned with the common-sense, oft-applied notion that fraud-loss is the difference between what the victim thought it was getting and what it got, the Government relies on a trio of loan-fraud cases — *Confredo*, *Paul*, and *Turk* — in which the loss was deemed to be the total loan amount.  (*See* Gov't Sent. Mem. at 20-22, 29.)  In *Confredo*, the Circuit applied a Guidelines Note specifically applicable to fraudulent loan applications to overrule the district court's ruling that the defendant was precluded from demonstrating that he subjectively intended a lower loss than the face amount of the loans.  *See United States v. Confredo*, 528 F.3d 143, 151 (2d Cir. 2008).  Thus, in the face of a district court's expansive approach to loss, *Confredo* promoted a narrower, more realistic view.  *Id.*  But the defendant nowhere argued, and the Circuit was not faced with, questions about non-fraud-based losses.  *Id.* at 149.  It is difficult, then, to derive from *Confredo* the hidden causation messages that the Government imputes to the decision.

*Paul* and *Turk* likewise involved loan fraud scenarios.  In both cases, the collateral securing the loans declined in value due to extrinsic forces, but the courts saw no relevance to that because the transaction was about the loan and the promise to repay it, not about the collateral securing it, so the defendants' argument that the collateral had declined in value for non-fraud-related reasons was irrelevant.  *See Paul*, 634 F.3d at 677-78 ("[T]he loss to [the victims] was not caused by the decline in value of [the loan collateral] . . . . [T]he fact that independent market forces may have contributed to the decline in [the loan's collateral] is irrelevant . . . because the [collateral] was merely securing the fraudulently-obtained loans."); *Turk*, 626 F.3d at 748 ("[T]he item of value lost by [the defendant's] victims was the unpaid principal of the loans, not the buildings themselves.").  The Second Circuit did not suggest that

11

the standard *Ebbers-Rutkoske* causation principle was limited to stock cases, but just—as can be

seen from this trio of loan-fraud cases—that the principle did not do much work in loan-fraud

cases where the value of the loan is fixed.  *Turk*, 626 F.3d at 748 ("A loan cannot be compared to

a stock because a stock is owned outright, with the assumption of upside benefit and downside

risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of

upside benefit.")

A fraudulently procured STOLI policy is not like a fraudulently procured loan.  The Fifth

Circuit has explained why.  "There is an obvious difference in the financial risk presented by a

fraudulently-procured loan and the STOLI policies at issue here."  *United States v. Bazemore*,

608 F. App'x 207, 214 (5th Cir. 2015).

> The proceeds of a loan are extended to the borrower upfront, and
> thus the risk of non-payment exposes the lender to a loss of the total
> amount of the loan.  But a life insurance policy lapses in the event
> of nonpayment, in which case the insurer is entitled to retain the
> premiums paid until that point and has no obligation to pay out death
> benefits when the insured dies.  Thus, whereas the risk to a lender is
> non-payment on the loan, the primary risk to an issuer of a
> fraudulently-induced life insurance policy is that an insured will die
> more quickly than anticipated by the actuarial model, forcing the
> insurer to pay death benefits before receiving the expected amount
> of premiums.  Because the insurers would not be responsible for
> paying the death benefits unless compensatory premium payments
> continued to be made until the death of the insured, it is
> inappropriate to use the face value of the [policies] as the intended
> loss.

*Id.*

Thus, the nature of STOLI fraud renders it more similar to securities fraud and requires a

similar causation analysis that filters out losses wholly unrelated to the fraud.  Life insurance

policies, like stocks, offer insurers "the assumption of upside benefit," *i.e.*, the windfall resulting

from policies that lapse or accrue value in excess of death benefit liabilities, as well as

"downside risk," *i.e.*, if an insured dies more quickly than anticipated and death benefits are prematurely paid out. *See Turk*, 626 F.3d at 751. It is necessary in such scenarios to distinguish direct losses caused *by the fraud* from losses caused by extrinsic factors.[3] As earlier described, Defendant's loss models in this case do exactly this, and in so doing, produce sensible results under the Guidelines.

3.  The Government's Intended and Actual Loss Models Lack Support in STOLI Case Law and Demonstrably Misapply the Sentencing Guidelines

Beyond promoting a loss model at odds with general criminal and fraud-loss causation principles, the Government's models lack support in STOLI case law. The Government pretends that its loss models have been well-established and well-received, but it cannot escape the fact that the models have been largely rejected as invalid or sidelined as useless. It is for this reason that the Second Circuit, which has grudgingly tolerated the models, continually seeks a "better alternative." Simply put, if the Circuit really thought the models worked, as the Government contends, it would say so, and not repeatedly fall back on the observation that it has not yet been presented with anything better.

Similarly, the Government cannot dodge the Fifth Circuit's outright rejection in *Bazemore* of the flawed methodology that the Government offers here. The Government argues that the Fifth Circuit's dismantling of its loss model assumptions should be ignored because, there, the "theory of prosecution" was different. (*See* Gov't Sent. Mem. at 23-24.) But the Fifth Circuit's rejection of the Government's loss model, which like here counted "the total amount of

---

[3] Moreover, as the insurance company representative testified in *Binday*, death benefits are not a loss to an insurance company, and certainly not a STOLI-related loss. "'You have the individual who pays one premium and dies six months later. You lose a lot of money on that policy but we don't consider that a loss. . . . [T]hat's the benefit of insurance because there's another 900 people who paid a premium who didn't die.'" *Binday*, 804 F.3d at 597 (quoting insurance company representative's testimony). The loss from STOLI, the representative explained, is that STOLI policies are somewhat less profitable than non-STOLI policies in specifically identifiable ways yet these policies "weren't priced for STOLI." *Id*. at 573.

the death benefits obtainable under the policies . . . because that was 'the dollar amount placed at risk,'" was driven by the model's faulty assumptions about the life insurance industry and the nature of STOLI fraud, not by the theory of prosecution or evidentiary record. *See Bazemore*, 608 F. App'x at 216. As the Fifth Circuit explained:

> To apply the intended loss enhancement . . . the government [must] establish that the STOLI policies imposed a *financial* risk to the insurers beyond the risk they believed they were receiving in issuing life insurance to [the defendant's] applicants.

> \* \* \*

> The government concedes that [the defendant] did not misrepresent the age or health status of his applicants. Therefore, to prove intended loss, it must prove that his misrepresentations as to the applicants' financial status and third-party financing arrangements *posed a risk of financial harm to the insurers that would not have existed if the information provided in the insurance applications were true*.

*Id.* at 215 (first emphasis in original; second emphasis added). The Circuit went on to vacate the defendant's sentence because "[t]he government ha[d] not attempted to make this showing, let alone quantify any purported economic harm," and it instructed that

> [o]n remand, an intended loss enhancement cannot be applied unless the government proves by a preponderance of the evidence that the STOLI policies posed a risk of financial loss to the insurers that the same policies issued to qualified insureds—the applicants the insurers thought they were getting—did not.

*Id.* at 216. Rather than engage with the merits of the Fifth Circuit's analysis, the Government ducks it altogether.

Nor can the Government avoid the fact that its intended and actual loss models were snubbed start to finish in *United States v. Binday*. First, the Government in *Binday* advocated against using intended loss for purposes of the final Guidelines calculation because it "overstat[ed] the seriousness of the defendants' conduct" (*see Binday* Gov't Sent. Mem. at 65,

14

Def. Sent. Mem. Ex. 2), a position that the Government seems to adopt here as well (*see* Gov't

Sent. Mem. at 23 n.5).  The *Binday* district court agreed, "reject[ing] an 'intended loss'

approach," despite the Guidelines' stated preference for intended loss.  *United States v. Kergil*,

2017 WL 3726044, *3 (S.D.N.Y. Aug. 16, 2017).  Instead, the court opted to use actual loss to

calculate the Guidelines, but rebuked that calculation in the next breath, abandoning the

Guidelines range entirely because the result that the actual loss figure generated "prove[d] the

idiocy of retaining the federal [sentencing] guidelines structure."  (*Binday* Sent. Tr. 40-41, Def.

Sent. Mem. Ex. 3; *see also Kergil*, 2017 WL 3726044, *3 (indicating that the court "did not

sentence [the Binday defendants] based on loss amount")).  On appeal, the Second Circuit

highlighted some of the loss models' flaws but, after bemoaning "the absence of a better

alternative" in that case, found the Government's actual-loss model not clearly erroneous.

*United States v. Binday*, 804 F.3d 558, 597 (2d Cir. 2015).  The Circuit took pains to expressly

"le[ave] open the possibility that on different facts, the method employed here may not provide a

reasonable estimate of actual losses."  *Id.*

      The Circuit's dissatisfaction with the *Binday* loss model's underlying assumptions was

not limited to those particular facts or that particular panel of judges.  Faced with the

conceptually identical loss model three years later in *United States v. Quatrella*, this time to

measure intended loss, the Circuit again went out of its way to highlight that the defendant

"ha[d] never offered an alternative method for estimating intended loss," 2018 WL 798400, at *3

(2d Cir. Feb. 9, 2018)—commentary that is unusual and unnecessary for clear-error review in a

summary order.  Repeating its line from *Binday*, the Circuit once more found that "the absence

of a better alternative weighs in favor of concluding that the method used here is a reasonable

one." *Id.* (quoting *Binday*, 804 F.3d at 597 (internal quotation marks omitted)).  This is hardly the ringing endorsement that the Government claims it to be.[4]

The Second Circuit's dissatisfaction with the *Binday-Quatrella* loss model is understandable.  The model dooms any Guidelines calculation right out of the gate because it produces patently absurd loss amounts, here resulting in a Guidelines range of life.  *Cf. S.E.C. v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) ("It is . . . well-established that [a] statute should be interpreted in a way that avoids absurd results.").  The Government recognizes that this is an absurd and useless result, but attributes the fault to the Sentencing Commission and the Guidelines themselves, rather than to the way in which it has chosen to apply the Guidelines.  The Government's approach has all the logic of repeatedly burning pies in a reliable oven, and blaming the oven rather than one's own failure to correct the settings.

And as noted in Defendant's opening sentencing submission, something (although it is not clear what) is wrong with the loss amounts that the Government claims would have resulted from these policies *even* on the Government's own but-for-causation terms.  (*See* Def. Sent. Mem. at 29.)  The intended loss chart, for example, is meant to illustrate how an insurance company would fare if the insured paid the minimum premium, which—since *any* policy-holder (even non-STOLI) could always elect to pay—the company calculates to at least cover the bare cost of insurance.  Presumably companies price these minimum premiums to at least roughly break even if the insured chooses the minimum.  But, here, the chart implausibly predicts

---

[4] Another problem with the Government's claim that the Circuit "gave an unambiguous ratification of the district court's methodology" in *Binday* and *Quatrella* (Gov't Sent. Mem. at 26) is that the *clear-error* standard of review that the Circuit applied in those cases suggests it was just ratifying the factual result in that case, not endorsing the methodology for all future cases.  A district court's *methodology* for calculating loss entails an interpretation of the Sentencing Guidelines, which would have been reviewed *de novo*, as compared to reviewing for clear error the figures plugged into the model and the resulting loss calculations.  *See United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) ("We review legal interpretations of the Sentencing Guidelines construing the term 'loss' de novo.  Factual findings supporting the district court's offense level calculation are reviewed under a clearly erroneous standard." (internal citations omitted)).

massive losses on every policy unless the insured lives dozens of years beyond their life expectancy.

Consider the policy issued by Lincoln on Bobby J. Cargill—a policy for a 72-year-old insured, with a 14-year life expectancy, and a $5.47 million death benefit payout. (*See* Cargill Illustrations, Ex. 2 hereto.)  According to the Government, the insurer has priced the minimum premium schedule so that, over 14 years, it would cover just over a quarter of the death benefit payout, or roughly $1.49 million. (*Id.*)  In other words, according to the Government's projections, if everything went according to the insurance company's expectations, the insurance company would lose nearly $4 million.  Indeed, for the insurance company to *break even*, the insured would have to live 29 years—more than *double* his remaining life expectancy—to age 99. (*Id.*)  This is absurd on its face, and yet for policy after policy, this is how the Government reaches the supposed (but obviously flawed) conclusion that somehow the mere concealment that the policies were STOLI would cause hundreds of millions in loss to insurers.  It is not clear what is wrong with the Government's figures and projections, but it is patently obvious that something is.  Indeed, it was facially nonsensical math just like this that led the *Bazemore* court to reject the nearly identical loss model when it was presented there:

> [I]nsurers issued the policies under the belief that the applicants' representations were truthful—that is the very point of this prosecution. . . . [T]he death benefits and premium costs were calculated based on the qualifications of the applicants the insurers thought they were getting . . . [but] they would still have had to live to be centenarians for the insurers to make a profit under [the Government's] crude financial analysis.  *Accordingly, simply subtracting the intended premium payments from the death benefits would create a false positive: a legitimate policy would show an intended loss because the premiums paid over the course of the insured's expected lifetime would not reach the face value of the policy.*

*Bazemore*, 608 F. App'x at 215 (emphasis added).

Whether scrutinized in isolation or through the lens of the Sentencing Guidelines, it is clear that the Government's loss models are deeply flawed.  It begs the question why the Government would choose to stand by a Guidelines calculation model that it *knows* will produce absurd results that it will have to abandon.  The futility of a Guidelines calculation here need not be a foregone conclusion.  The Guidelines can be applied in a logical way that produces a logical result and, as detailed below, Defendant's model does just that.

4.  Defendant's Loss Models Are Supported by Law, Logic, and the Government's Own Litigating Position In Other STOLI Prosecutions

Defendant will not here repeat the details of his proposed intended and actual loss models, which can be found at pages 30-32 (intended loss) and 36-38 (actual loss) of his opening sentencing submission.  Generally speaking, the models capture the "discrepancies between the benefits the [insurance companies] reasonably anticipated from issuing the policies and the benefits they actually received" (Verdict at 82), and track what this Court, Probation, and the Government itself have found to be the specific economic harms flowing from the issuance of STOLI policies believed to be non-STOLI: losses arising from lower lapse rates and lower funding levels.  (*See* Def. Sent. Mem. at 26 (citing Verdict at 12, 82; PSR ¶¶ 13-14, 17-19)).[5]

Defendant's methodology has several advantages.  *First*, it is animated by the Second Circuit's proximate loss causation principle that "[l]osses from causes other than the fraud [] be excluded from the loss calculation."  *Ebbers*, 458 F.3d at 128; *see also Rutkoske*, 506 F.3d at 180 (adopting proximate causation for fraud Guidelines loss calculations).  Thus, for example, the models do not count death benefit payouts because such losses are not the result of the STOLI

---

[5] The Government argues that the defendant's model was presented to the Second Circuit in *Binday* and tacitly rejected.  (Gov't Sent. Mem. at 26-27, 32.)  But the *Binday* court expressly stated that "the defendants have not offered an alternative calculation" for loss.  *See Binday*, 804 F.3d at 597.

nature of the life insurance policies; that is, because insureds' actual and expected lifespans and any resulting death benefit payouts were wholly unaffected by the STOLI scheme.  *Compare United States v. Jenkins*, 578 F.3d 745, 749–50 (8th Cir. 2009) (counting death benefits towards total loss because defendants *misrepresented the age and health* of applicants such that it was actually "likely that they would die soon after the fraudulently-obtained policies were issued") (emphasis added).

*Second*, Defendant's loss models comport with the Fifth Circuit's guidance in *Bazemore* that loss calculations measure the "financial risk to the insurers beyond the risk they believed they were receiving in issuing life insurance to [the defendant's] applicants," *i.e*., the "risk of financial harm to the insurers that would not have existed if the information provided in the insurance applications were true."  *Bazemore,* 608 F. App'x at 215; *see also Kramer v. Lockwood Pension Servs.*, 653 F. Supp. 2d 354, 379 (S.D.N.Y. 2009) (recognizing that "[the insurance company] entered into a calculated business transaction in which it risked paying a large death benefit, but stood to gain from years of large premiums.  The damage [of] potentially having to pay the large death benefits, was not caused by [the defendant's] alleged misrepresentation [about the STOLI nature of the policy], but was always part of the bargain [the insurance company] entered.").

*Third*, Defendant's methodology is consistent with the Government's own litigating position in a series of STOLI prosecutions in the Eastern District of New York.  *See* 11 Cr. 134 (E.D.N.Y.).  In *United States v. Neuman*, *United States v. Lebovits*, and their companion cases, the Government pressed a loss calculation based (as Defendant here proposes) solely on the economic difference between STOLI and non-STOLI policies, which the Government there identified exclusively as a difference in lapse rates.  (*See Neuman* Gov't Sent. Mem. at 2, Def.

Sent. Mem. Ex. 4; *Lebovits* Gov't Sent. Mem. at 4, Ex. 3, hereto.)  Death benefits were nowhere

mentioned or accounted for, an implicit recognition that they are not losses caused by STOLI.

(*Id.*)  Thus, despite the fact that the defendants there procured 111 STOLI policies worth

"hundreds of millions of dollars[],"—*more* policies and a *larger* total than in the instant case—

the Government stipulated that "a reasonable estimate of the loss suffered by the insurance

companies was more than \$120,000 but less than \$200,000."[6]  (*Id.*; *Neuman, et al.* Gov't Bill of

Particulars, at 3-6, Ex. 4, hereto.)

      The Government's response, buried in a footnote, is that the position of the Government

in the E.D.N.Y. is of little value because those cases "involved a negotiated resolution," "without

a robust development of the facts," which facts "the court had no opportunity to evaluate." (*See*

Gov't Sent. Mem. at 26 n.8).  None of these is a serious argument.  Plea or no plea, federal

prosecutors are not permitted to bargain or stipulate away hundreds of millions of dollars in loss.

Under the Sentencing Guidelines and the U.S. Attorneys' Manual, the Government is not

permitted "to stipulate to misleading or non-existent facts, even when both parties are willing to

assume the existence of such 'facts' for purposes of the litigation."  U.S.S.G. § 6B1.4,

Comment.; U.S.A.M. 9-27.430 ("[T]he Department's policy is only to stipulate to facts that

accurately reflect the defendant's conduct. If a prosecutor wishes to support a departure from the

guidelines, he or she should candidly do so and not stipulate to facts that are untrue. Stipulations

to untrue facts are unethical.").  Nor, as the Government well knows, does a plea agreement

mean "the court had no opportunity to evaluate." (*See* Gov't Sent. Mem. at 26 n.8.)  Guidelines

---

[6] Indeed, this is the *higher* estimate of loss that the Government represented to the Court.  One year later, in April 2015, the Government indicated that the attributable loss is \$70,000 to \$120,000.  (*See Lebovits* Gov't Sent. Mem. at 4, Ex. 2, hereto.)  It is unclear what drove this reduced estimate, but the point remains that on "hundreds of millions of dollars'" worth of insurance policies, the Government's reasonable estimate of loss was comparatively miniscule.

stipulations in plea agreements are not binding on the court, which has an independent obligation to determine the facts relevant to sentencing. *See* U.S.S.G. § 6B1.4, Comment. ("Even though stipulations are expected to be accurate and complete, the court cannot rely exclusively upon stipulations in ascertaining the factors relevant to the determination of sentence.").  Finally, there was nothing so undeveloped about the record in that case that the Government there somehow missed hundreds of millions in loss that the Government here thinks it has spotted—the Government there knew the offense involved 111 policies and several hundred million dollars' worth of insurance.  In short, none of these excuses holds water. The Government and the court in those cases just did not agree with the outlandish, Guidelines-breaking conception of STOLI-fraud loss that the Government presses here.

The same is true of *Quatrella* in this district.  In the instant case, the Government counts active policies as generating losses (in the amount of commissions paid) on the grounds that the ultimate outcome of these active policies is unknown.  But as Defendant's opening submission explained, this squarely contradicts the position taken by the Government in *Quatrella* that insurers suffered *no* actual loss on the active policy at issue in that case, despite $272,000 worth of total commissions.  The Government now chalks up this contradiction to its earlier "misreading of *Binday* in connection with the plea," and says it was forced to stand by that position through sentencing.  (Gov't Sent. Mem. at 34 n.11.)  But the record suggests that the Government went ahead and persuaded the Second Circuit to adopt the position on appeal.  *See Quatrella*, 2018 WL 798400 at *1 ("There was no actual loss to the providers because no death benefits were paid on any of the three policies before the scheme was discovered.").  Thus, yet again, the Government's model in this case breaks from what prior prosecutors (in this district, no less) have done in other STOLI cases.

Indeed, because the Government satisfies itself with the erroneous legal position that loss should calculated based on but-for causation and that proximate causation—the presumptive approach—is irrelevant, the Government never actually engages on the merits with Defendant's proposed loss models.  The Government never explains, for example, why losses arising from lapse rate and funding level differences would be an incomplete or inaccurate measure of STOLI harm.  Misinterpreting a line from Defendant's opening submission, the Government claims that because Defendant remarked that "he cannot do" the calculation, he meant that the calculation cannot be done, and thus the parties and the Court can do no more than  "speculate . . . about lapse rates and funding patterns."  (Gov't Sent. Mem. at 26.)  That is not what Defendant meant. He meant that it is not a reasonable expectation to ask his legal team in the time allotted to perform the necessary calculations on 84 separate policies, nor, as he said at the time, is it his burden to prove loss.  The Government, however, which does have the manpower, could apply the correct methodology with no more effort than it has already put into applying an incorrect methodology.

Specifically, to calculate the lost interest that an insurer suffered from not having received level premium payments to use as an investment corpus, one would take the funding schedule for an insured and—for each year until the insured's expected death—(i) subtract the minimum-funding premium from the level premium to determine the investment corpus that the insurance company was deprived that year, and (ii) use a compounding interest calculator and a hypothetical rate of return on investment (say, 4%) to determine the investment income that would have been earned on that investment corpus from year the particular premium was received until the expected year of death.  For example, using this method on the policy issued on William Dudley, the opportunity for investment income that would have been lost to the

insurer as a result of receiving only minimum-funding premiums rather than level premiums until Dudley's expected death was roughly $54,334.  (*See* Dudley Illustrations, Ex. 5, hereto.)[7]

As for any loss suffered as a result of the difference between STOLI and non-STOLI lapse rates, that is precisely what the Government and court relied upon for loss in the E.D.N.Y. cases.  There, with more policies (111 there to 84 here) and at least the same total amount of insurance issued, the Government, defendants, and court estimated that the loss attributable to the difference in lapse rates was between $120,000 and $200,000.  Thus, that same estimate is appropriate here and, if anything, overstates the loss in this smaller case.

Accordingly, there is nothing to the Government's argument that Defendant's model is impossible to implement.  Defendant's comment in his opening submission was simply to point out (correctly) that he should not be the one to have to do it.

Finally, Defendant reiterates the point from his prior submission that, on the facts of this particular case, there is no need to perform these loss calculations for either intended or actual loss.  As to intended loss, there was no proof that Defendant knew specifically how the insurers were economically harmed by STOLI, and so he could not have intended the loss caused by the two specific economic harms that insurers now claim to suffer.  *See* U.S.S.G. Supp. to App. C, amend. 792 (2015) (Ex. 5 to Def. Sent. Mem.) (noting split among federal courts of appeals and adopting subjective approach to intended loss, as described in *United States v. Manatau*, 647

---

[7] It should also be remembered—as the funding illustrations demonstrate (*see, e.g.,* Cargill and Dudley Illustrations, Exs. 2 & 5, hereto), and as Phoenix actuary Thomas Buckingham testified—that over the fullness of time, minimum premium funding would actually more than make up for any investment income that would have been earned under level premium funding because minimum payment amounts rise year-after-year and eventually exceed what would have been any given year's level payment amount (which the insured has long since forfeited the option to choose).  In short, if an insured were to live long enough, the insurance company would make *more* money from the insured's choice to fund the policy at a minimum premium level.  (*See* Trial Tr. at 1957-61 (Buckingham testifying: "If they did not pay significant premium[s] into the contract and the cash value did not build up, those premiums would escalate dramatically when somebody got over, say, the age of 90. . . . [T]hey might have to pay more than the face amount [of the policy] over the course of time.").)

F.3d 1048 (10th Cir. 2011) (Gorsuch, J.)); *see also Confredo*, 528 F.3d at 152 (remanding for

evaluation of defendant's "subjective intent" concerning fraud loss). Accordingly, there was no

intended harm in this case. Likewise, on the facts of this case, there is no actual loss either. As

the Government's actual-loss chart demonstrates, roughly three-quarters of the policies here have

lapsed, well beyond the typical rate of roughly 5%. (Def. Sent. Mem. at 38.) The gains to the

insurers from this extraordinary lapse rate more than makes up for whatever minor loss might

have resulted from any lost investment income based on minimum premiums. Accordingly,

under the proper model, actual loss is zero.[8]

      B.     <u>Money Laundering Enhancement</u>

Although the Guidelines are indisputably arcane in this area, the upshot of Defendant's

challenge to the application of a money laundering enhancement is that (i) the Government

believes that the underlying fraud from which the laundered funds were derived carries a variety

of Chapter Three enhancements, such as four levels for being a supervisor of a fraud that

involved at least five participants, and two levels for obstruction of justice in testifying about the

fraud, (ii) the same cannot be said of the money laundering conduct and so an offense level based

on the money laundering guideline rather than the fraud guideline will not include these

supposed six levels of enhancements,[9] so (iii) the offense level under the fraud guideline will

always be higher than the offense level under the money laundering guideline and the money

laundering guideline can be disregarded. In response, to try to push the enhancements related to

---

[8] Even the Government recognizes that there is no need to calculate gain. (Govt. Sent. Mem. at 35.) The
Sentencing Guidelines provide that "[t]he court shall use the gain that resulted from the offense as an alternative
measure of loss *only if* there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, cmt. 3(B). Thus, a
gain calculation is inappropriate because (i) as just noted, there was no loss here, and (ii) even if there was loss, the
defendant has offered a method of reasonably determining the amount.

[9] The money laundering guideline expressly says that "application of any Chapter Three adjustment shall
be determined based on the offense covered by this guideline (*i.e.*, the laundering of criminally derived funds) and
not on the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1 comment. (n.2(c)).

the money laundering activity up to the level of those purportedly related to the fraud activity, the Government purports to find a variety of enhancements related to the money laundering activity. But none of these enhancements can be applied.

*First*, raising the issue for the first time in its sentencing memorandum, the Government argues that an additional enhancement applies under § 2S1.1 of the Guidelines for sophisticated laundering. (Govt. Sent. Mem. at 58-59.) The Presentence Report did not include any such enhancement, and the Government never objected to its absence. Having failed to timely object to the absence of a sophisticated laundering enhancement, the Government is barred from seeking such an enhancement unless it establishes good cause. *See* Fed. R. Crim. P. 32(i)(1)(D). "A criminal defendant must have the right to contest the recommendations of a PSR agreed to by the government without fear that, if he or she experiences some success, the government will respond with a new and substantially different position with regard to Guidelines calculations and be able to force courts to entertain the new arguments." *United States v. Johnson*, 221 F.3d 83, 95 (2d Cir. 2000). The Second Circuit has squarely held that "where the government belatedly asserts a new position in the context of an erosion of its initial position, the government has no automatic right to a district court's consideration of that position . . . at least absent a showing of good cause." *Id.* at 96-97 (finding "no good cause for the government's change in position on the grouping of counts"). Here, the Government offers no reason whatsoever, much less good cause, for its failure to timely object to the absence of a sophisticated laundering enhancement. Accordingly, the Government has forfeited this argument.

*Second*, the Government asserts that a four-level leadership enhancement applies to the money laundering conduct. It does not. The Government concedes that Defendant was not a leader of four other culpable participants (for a total of five, counting himself) in connection with

the money laundering activity.  (Govt. Sent. Mem. at 60-61.)  Indeed, the Government

acknowledges that it is not even close, because it identifies only "two knowing participants:

Carpenter and Bursey"; *i.e.,* only one culpable participant besides Defendant.  (*Id*. at 61.)  But,

having fallen well short of the required five participants, the Government nonetheless claims that

a four-level enhancement applies because the money laundering activity was "otherwise

extensive," a standard that the Second Circuit has said is meant to cover a situation that is "the

functional equivalent of one involving five or more *knowing* participants."  *United States v.*

*Carrozzella*, 105 F.3d 796, 803 (2d Cir. 1997) (emphasis added).  In deciding whether there are

so many unknowing participants that the harm is the functional equivalent of that from five

culpable participants, the Circuit has explained that the unknowing participants' services have to

have been "peculiar and necessary to the criminal scheme," *i.e.*, to the money laundering.  *Id*. at

804.

       The Government does not remotely succeed in meeting this standard.  It names only five

supposed *unknowing* participants (Govt. Sent. Mem. at 62 (naming "Trudeau, Cranny, Lutes,

Young, [and] Carpenter's real estate attorney")), who, for the most part, did nothing peculiar or

necessary to money laundering, but just processed wires to pay premiums to insurance

companies.  One was just a real estate attorney who received a check.  As a result, these

individuals do not count at all.  In any event, they bring the total to only seven, five of whom

were unknowing.  A group consisting of only two culpable and only five unknowing participants

is not "the functional equivalent of one involving five or more knowing participants."

*Carrozzella*, 105 F.3d at 803.  In particular, in weighing whether the harms associated with a

group of unknowing participants really measures up to the harm associated with a group of five

full participants in the crime, a particular discount must be given to unknowing participants who

"only minimally further the criminal activity," *Id*. at 804, as is true of most of the individuals the Government relies on.  Accordingly, the Government cannot carry its burden here.  If this were enough to satisfy the "otherwise extensive" prong, that prong would swallow the rule.

*Finally*, relying on Defendant's testimony in a civil case in the Southern District of New York, the Government asserts that a two-level obstruction enhancement applies to the money laundering conduct because Defendant committed perjury there.  But in order to base an obstruction enhancement on perjury (whether in the instant action or, if the appropriate materiality requirements are met, a related civil case), the "sentencing court must explicitly find that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory—*i.e.*, that the defendant committed perjury rather than simply providing false testimony."  *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997) (internal quotation marks omitted).  This Court cannot make that finding.  Even the judge presiding over the civil case did not make that finding.  As the Government reports (Govt. Sent. Mem. at 64-65), she did not credit the testimony, but given every opportunity she did not make a finding that it was perjurious.  There is no reasonable basis for this Court to find that Defendant committed perjury in testimony that this Court has neither seen nor read, and that the judge who *did* see it did not credit but carefully avoided calling perjurious.

Accordingly, because these various enhancements would not apply under the money laundering guideline, the fraud guideline produces the higher offense level and the money laundering guideline can be disregarded.

C.      Sophisticated-Means Enhancement

The Government doubles-down on a simple but fatal flaw that Probation committed in concluding that a two-level sophisticated means enhancement should apply pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  The Government's analysis, like Probation's, rests on an abrogated sophisticated-means standard and obsolete Second Circuit interpretations thereof; the Government thus fails to carry its burden of demonstrating that the sophisticated-means enhancement applies to Defendant under the current standard, which went into effect in 2015.

The Presentence Report recommended a sophisticated-means enhancement because it said the "*scheme* was inherently sophisticated" given its "conceal[ment] from insurers" and reliance on "a complex web of shell companies."  (PSR ¶ 211 (emphasis added)).  The Government, too, builds its entire argument on the notion that "Carpenter's *scheme* was particularly sophisticated," describing the scheme's duration, planned nature, and use of concealment and misrepresentations, and citing exclusively pre-2015 Second Circuit decisions. (Gov't Sent. Mem. at 37-38 (emphasis added).)

But the Government neglects the fact that, after 2015, the sophisticated nature of the scheme is by itself no longer the test.  Amendment 792 to the Guidelines, which "narrow[ed] the focus of the specific offense characteristic" under this enhancement, was designed to correct the exact mistake that the Government and Probation make here.  U.S.S.G. Supp. to App. C, amend. 792 (2015) (Ex. 5 to Def. Sent. Mem.)   The Amendment's Statement of Reasons explains how, under the prior version, "courts had [mistakenly] applied th[e] enhancement on the basis of the *sophistication of the overall scheme* without a determination of whether the *defendant's own conduct* was 'sophisticated.'"  *Id.* (emphases added).  Accordingly, the Amendment inserted a requirement that "the defendant intentionally engaged in or caused the conduct constituting

sophisticated means." *Id*.  Here, by building its argument on a pre-Amendment standard and pre-Amendment Second Circuit interpretations thereof, the Government fails to demonstrate how Defendant's own offense conduct satisfies the current standard.

In any event, Defendant's own conduct in connection with the STOLI fraud scheme does not merit a sophisticated-means enhancement.  Indeed, Defendant's conduct involved no "more than the concealment or complexities inherent in fraud . . . [which alone are] inadequate for demonstrating the complexity required for enhancement under U.S.S.G. § 2B1.1(b)(10)(C)." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014); *see also United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (same); *United States v. Archuletta*, 231 F.3d 682, 685-86 (10th Cir. 2000) (same).

In *Adepoju*, the defendant's "use of forged checks and a stolen identity to attempt bank fraud" was "beyond dispute,"  but the Fourth Circuit found this insufficient because "virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information."  *Adepoju*, 756 F.3d at 257 (internal citations omitted).  In response, the Government makes the correct but irrelevant point that *Adjepoju* also found that the district court had erred in shifting the burden to the defendant to disprove this enhancement.  (Gov't Sent. Mem. at 39.)  But this was *after* the Circuit determined that the offense conduct that the Government had established "involve[d] [no] more than the forgeries, misrepresentation, and concealment inherent in bank fraud."  *Adepoju*, 756 F.3d at 257.

Here, even if the Government has shown that the insurance-trust context and the interrelation between various Benistar Entities was inherently complex, it has not proven by a preponderance of the evidence that Defendant's *offense conduct* was especially so.  All of the Government's examples of Defendant's supposedly sophisticated conduct (*see* Gov't Sent. Mem.

29

at 41) are the sort of concealment and misrepresentations inherent in the fraud.  *See Adepoju*, 756 F.3d at 258-59 ("The government's burden demands more than the mere presence of the tools of fraud and the attempt to use the same," including "more than just thoughtful or potentially successful planning [the fraud].").  Properly construed under the current standard and the relevant facts, a sophisticated-means enhancement is inappropriate here.

      D.      <u>Loss-to-Financial-Institution Enhancement</u>

Defendant reaffirms his opposition to a two-level enhancement for supposedly deriving more than $1 million in gross receipts from one or more financial institutions as a result of his offense.  The Government argues that this standard is satisfied because Lincoln paid the COT more than $1 million in death benefits for the Sash Spencer policies.   (Gov't Sent. Mem. at 41.)  But, again, the question is not whether a financial institution paid money to Defendant as a general matter but whether Defendant derived that amount "as a result of the offense."  *Id*.  As previously discussed, Defendant's concealment of the fact that the policies were STOLI resulted, at most, in the insurance companies potentially losing money as a result of (i) the level of the premium payments that they received, and (ii) the rate at which the policies lapsed.  The offense did not cause the insurance companies to provide any gross receipts to anyone on STOLI policies that they would not have provided on non-STOLI policies; in short, no gross receipts were derived from the insurance companies "as a result of the offense."  U.S.S.G. § 2B1.1(16)(A).

      E.      <u>Obstruction of Justice and Leadership Enhancements</u>

The Government argues in part, and Probation previously determined, that this Court's findings in its verdict inherently include the determination that Defendant was an organizer or leader of criminal activity involving five or more culpable participants, and that Defendant attempted to obstruct justice in his testimony.  (*See* Gov't Sent. Mem. at 44, 47-48.)  Again, to

the extent the application of these enhancements are, indeed, necessary implications of the Court's findings in its verdict, Defendant disputes the enhancements for the same reason that it disputes the Court's overall verdict. Defendant also continues to believe that the Government's examples of supposed obstruction at times strain that which the record or the Court's verdict could fairly support. Defendant dissected in detail one such example in his opening submission (*see* Def. Sent. Mem. at 47), which he will not repeat here, but it bears emphasis that several of the Government's examples are similarly open to non-perjurious interpretations.

## II.    Section 3553(a)(6) — The Need To Avoid Unwarranted Sentencing Disparities

The Government's loss models produce a Guidelines range of life imprisonment, which even the Government acknowledges is a useless benchmark. Indeed, the Government openly admits that it "does not advocate for a sentence *close*" to the result produced by its own models. (Gov't Sent. Mem. at 2 (emphasis added)). Instead, the Government offers "as an anchor" for a non-Guidelines term of imprisonment the example of Michael Binday, who was sentenced to 144 months. (*Id.*) In reality, Mr. Binday's sentence is not an anchor. It is an outlier. And it should be treated as such both as part of the formal legal requirement under Section 3553(a) to avoid unwarranted sentencing disparities between Defendant and the vast majority of STOLI defendants, and, more generally as part of this Court's overall exercise of its sentencing discretion, which should comport with basic fairness and proportionality where various other courts considering various other defendants have reached notions fundamentally different from that in *Binday* of what type of sentence STOLI fraud merits.

For starters, Mr. Binday's 144-month prison term is not only anomalous among STOLI fraud sentences generally, it is by a substantial margin the largest sentence imposed in the same prosecution, including double the length of the sentence received by Mr. Binday's co-defendant Mark Resnick. *See Binday*, 804 F.3d at 597. Moreover, all of the sentences imposed in the

*Binday* matter dwarf those imposed in other STOLI prosecutions in the Second Circuit.  In

*Quatrella*, for example, Judge Thompson in this District sentenced the defendant to 36 months'

imprisonment for his participation in STOLI fraud.  *See Quatrella*, 2018 WL 798400, at *3.

But the best examples of a careful, proportional approach to STOLI fraud sentencing—to

ensure that the sentence imposed is not greater than necessary to achieve the purposes of

sentencing—are found in the Eastern District of New York prosecutions previously referenced.

In *United States v. Neuman, et al.*, 11 Cr. 134 (E.D.N.Y.), six individuals participated in a

STOLI fraud scheme that involved *111* policies with a total face value in the "*hundreds of*

*millions of dollars*"; indeed, the Government's forfeiture allegation sought to recoup $550

million from the scheme.  (*See, e.g., Neuman* Gov't Sent. Mem., Ex. 4 to Def. Sent. Mem.;

*Neuman, et al.* Superseding Indictment, Ex. 6 hereto.)

Despite the massive scope of this scheme, four out of six defendants were sentenced to a

year and a day in prison, while the remaining two defendants were given non-incarceratory

sentences.  (*See Neuman, et al.* Judgments of Conviction, Ex. 7 hereto.)  Notably, these sentences

were not imposed *over* the Government's objection.  Rather, they were imposed with the

Government's full support, except in one instance where the defendant received a year and a day

in prison when the Government had advocated a sentence within the 18 to 24 month Guidelines

range.  (*See Neuman, et al.* Gov't Sent. Mem., Ex. 3 hereto; *Neuman, et al.* Judgments of

Conviction, Ex. 7, hereto.)  For the other five defendants, the Government opposed Probation's

advocacy for a higher Guidelines range and instead supported a sentence consistent with that

which the defendants ultimately received.  (*Id.*)  In fact, in the case of  Chaim Lebovits, the Court

imposed a prison sentence of a year and a day *over* the Government's recommendation of a non-

incarceratory sentence.  (*Compare Lebovits* Judgment of Conviction, Ex. 7 hereto, *with Lebovits*

Gov't Sent. Mem., Ex. 3, hereto.)

The multiple sentences encouraged by E.D.N.Y. prosecutors and imposed by that court

on the many *Neuman* defendants, whose STOLI fraud was of a magnitude larger than that of

Defendant's here, represent an appropriate anchor for the Court's sentencing consideration.  By

contrast, the Government's identification of the single, outlying sentence imposed on Binday

should be disregarded as of a piece with the Government's general tendency in all matters

dealing with Dan Carpenter (in contrast to the other STOLI fraud cases discussed) to advocate

the harshest and most aggressive position available.[10]

## III.   Section 3553(a)(1) & (2)—The Nature and Circumstances of the Offense, and the Need for Just Punishment and Adequate Deterrence

The Government couples its overstated measure of economic harm in this case with an

overblown narrative about the impact of STOLI fraud on the life insurance industry.  The

Government colorfully preaches that a stranger holding a life insurance policy with a financial

interest in the insured dying sooner rather than later "corrupt[s] . . . [the] very soul" of the life

insurance industry.  (Gov't Sent. Mem. at 66.)  That is nonsense.  As the *Binday* court

recognized, there is an entire life settlement industry, whose existence is expressly protected by

"every relevant state's law," in which the same kinds of policies are legally sold to the same

kinds of investors with the same financial interest in the insured's death.  *Binday*, 804 F.3d at

565.  As the Circuit explained, with respect to the possibility that a policy will involve a bet on a

---

[10] In yet another example of this, the Government argues that Defendant is not categorically entitled to have been released early into a halfway house, and so his argument along these lines should be rejected.  (Gov't Sent. Mem. at 73.)  But Defendant was not claiming a constitutional right to a halfway house; he was merely highlighting the fact that 18 U.S.C. § 3624(c)(1) directs that the BOP "shall, to the extent practicable" put a prisoner in a transitional halfway house for up to 12 months of his sentence, and Defendant was denied that solely due to the charges in this case, a situation not especially dissimilar to having been detained pretrial on this case, except he will not get credit.  That is a factor the Court should consider.

stranger's life, "the difference between non-STOLI and STOLI policies is simply one of timing and certainty; whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale from before its issuance." *Id*. Concealing that a policy is STOLI may marginally affect how the policy should be priced, due to minimum payment and lapse rate differentials, but it does no more to corrupt the life insurance industry than do ordinary life settlements, or for that matter no more than the shorting of stocks does to the capital markets. Thus, the Government's attempt to tag Dan Carpenter with corrupting the soul of the insurance industry says more about how the Government feels about Dan Carpenter than it does about the nature of the offense.

A similarly misguided effort to whip up outrage lies in the Government's description of the insureds. Using language calculated to evoke the imagery of an offense somewhere between a predatory telemarketing scam and mass murder, the Government portrays Defendant as having "coopted the lives" of "elderly strangers" (Gov't Sent. Mem. at 1) and "bet on the early deaths of 76 elderly people" (Gov't Sent. Mem. at 68). But according to the Government's own theory, the insureds were beneficiaries not victims of the supposed scheme. According to the Government, the intent was that they would share in the spoils, receiving free insurance for two years and the possibility of a payout if the policy was sold. They were not victimized, and, again, the Government's reach to say otherwise is telling.

To be clear, Defendant does not seek to unduly minimize the offense of conviction. He merely points out that the offense is nowhere near as egregious as the Government breathlessly suggests. In truth, the offense the Court has found involves lies about a minor feature of an insurance policy, causing minor and difficult-to-discern harms to strategically indifferent institutions, most of which are sufficiently untroubled by the future financial prospects of these

34

STOLI policies that they have largely not bothered to rescind them.  The Government in the *Neuman* case, faced with a STOLI scheme larger than this, certainly did not see it (or see the need to portray it) as a multi-hundred-million-dollar swindle that simultaneously constituted the corruption of an industry's soul and elder abuse.

Perhaps in tacit recognition of its failure to make the instant offense appear sufficiently egregious, the Government allocates significantly less space in its "summary of the facts" to describing *this* case than it does to detailing what it claims is relevant conduct in a messy civil suit in the Southern District of New York.  (Govt. Sent. Mem. at 4-11.)  This tactic is not new. At Defendant's Massachusetts sentencing in 2014, the Government did the same thing, diverting from the actual offense conduct in that case to describe what it argued were the "appalling" facts of the civil suit.  (Ex. 9, hereto, at 54.)  And that court, indeed, made clear that the facts of that case were "a factor" to which it "attended" in imposing its 36-month sentence.  (Ex. 9, hereto, at 90.)  The Government in the instant case pursues this strategy again in spades, devoting more than six pages at the front of its sentencing submission to the conduct.

Like the district court in Massachusetts, this Court may consider the S.D.N.Y. suit, but there is even less reason to give it significance now.  *First*, it was already wielded by the Government at Defendant's last sentencing, and it is unfair to *twice* sentence Defendant based on the same *non-offense* conduct.  *Second*, four years have now passed between when the Government first used this uncharged conduct as a supposedly enhancing factor, and when it now seeks to do so again.  Despite all of that time, no prosecutor—including the ones in this case, who claim the conduct is related to what they charged here—has ever charged any part of the conduct underlying or during the S.D.N.Y. civil suit as a crime.  *Finally*, it bears mention that the facts of the S.D.N.Y. case were never explored in depth at trial (nor should they have been)

and it is easy for untested accusations relating to a lengthy and separate proceeding to accidentally become improperly spun up as fact.  Thus, for example, this Court's verdict mistakenly describes the not-for-profit at issue in that case as "a non-profit organization providing scholarships to underprivileged students."  (Verdict at 72.)  That finding is not true (and the Government has never seen fit to correct it, notwithstanding its reliance on the S.D.N.Y. case).  The not-for-profit itself stated in the S.D.N.Y. case that it "has never claimed to be a charity for minority scholarships," and that, instead, the organization's "sole purpose" was to attempt to build near Las Vegas what it called "a center for the spiritual and physical healing of world leaders."  (Ex. 10, hereto, at 6.)  This is not to say that the difference in the nature of the organization is inherently dispositive of anything, but the misimpression was certainly to Defendant's detriment in light of how the Government seeks to use that case here, and it is indicative of the danger inherent in trying to draw anything significant for the criminal sentencing in this case from selected glimpses into a messy, unrelated civil case in another jurisdiction.

## IV.     Section 3553(a)(1)—The History and Characteristics of the Defendant

Dan's prior sentencing submission included approximately 10 pages of accounts from more than 50 letters of support attesting to his exceptional contributions over *decades* to the lives of his family, friends, employees, fellow prisoners, and communities.  Still more letters have been flowing to counsel from supporters, and they will be collected and submitted to the Court. Without repeating the details of those accounts here (*see* Def. Sent. Mem. at 10-17), it is clear beyond cavil that Dan Carpenter has a truly exceptional, decades-long record of generosity and compassion to others that, as Judge Rakoff said of the defendant in *Adelson*, "w[as] not performed to gain status or enhance his image."  *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006).  And as was also said in that case, "[S]urely, if ever a man is to receive

36

credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Id*. at 514.

To its limited credit, the Government acknowledges that the letters supporting Dan "paint a picture of a loyal family member, a generous boss, and a charitable citizen," and that "[t]hose things should certainly be taken into account in pronouncing sentence here."  (Govt. Sent. Mem. at 72.)  And yet, seemingly unable to leave it at that where Dan Carpenter is concerned, the Government's flash of dispassionate evenhandedness passes all too soon when it shifts to a quick and irrelevant piece of character assassination, explaining that Dan can be "overbearing" and "belligerent" and, to make the point, includes the entirety of an email in which Dan curses at several colleagues.  The Government claims that the Court should consider this when evaluating Dan's history of good deeds and "should consider [his] personal history and characteristics, to both his credit and detriment." (Govt. Sent. Mem. at 72-73.)

Suffice it to say, it would be the strange criminal defendant who came to sentencing claiming to be a saint, and Dan does not do so here.  Among other flaws, Dan can be impulsive and that can manifest itself in the occasional angry outburst.  But the Court has more than 50 letters that attest indisputably over the course of a lifetime to the fact that Dan is a generous and intrinsically helpful person, not a nasty one.  Given that, all the Government has shown about Dan by choosing to reprint the entirety of this particular email is that he frustratedly cursed at someone once.  On the other hand, what the Government continues to show about itself by presenting a single, expletive-laden email and offering it as an on-the-one-hand-on-the-other-hand response to Dan's lifetime of good works is that, for whatever reason, it has passed the point of evenhanded reason when it comes to its ability to discuss this defendant and this offense.

The Government's mocking of the defendant's bipolar diagnosis as a "made-for-sentencing" report that "fails to account for his two most defining characteristics—greed and dishonesty" is more of the same.  (Govt. Sent. Mem. at 1.)  One suspects that after five years of observation of Dan's behavior, neither the Government nor the Court would seriously question counsel's instinct to have him psychiatrically examined or the conclusion of an expert that, indeed, there is a diagnosable abnormality there.  Nor, contrary to the Government's sarcastic comment, would one expect a psychiatric report to "account for" characteristics like the ones the Government describes.  Moreover, to be clear, Dan clearly and pointedly did not offer his diagnosis as an excuse, but only as one part of an explanation of "the context of his overall life hitherto," which is critical for the Court to understand "at the moment of his sentencing, when his very future hangs in the balance."  *Id*. at 513-14.  Ultimately, the Government's mockery of an obviously correct diagnosis, lightly relied upon by the defendant, serves mostly to emphasize its own loss of perspective on this defendant and this offense, and to highlight that its uniform tendency towards the most aggressive position possible on every issue connected with this sentencing should be taken by the Court with more than a grain of salt.

## **Conclusion**

For all of the reasons set forth in his opening and reply sentencing submissions, we respectfully submit that Dan Carpenter should be spared a lengthy sentence and the resulting separation from his family and community.

Respectfully submitted,

/s/ James M. Cole
James M. Cole, Esq.
Michael A. Levy, Esq.
Qais Ghafary, Esq.
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com

## Certificate of Service

I hereby certify that on April 20, 2018, a copy of Defendant Daniel Carpenter's Sentencing Reply Memorandum and attachments thereto were filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Michael A. Levy
Michael A. Levy (phv09413)
Sidley Austin LLP
787 7th Avenue
New York, NY 10019
212-839-7341
MLevy@Sidley.com