## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL E. CARPENTER | ) | December 14, 2018 |

## DEFENDANT'S MEMORANDUM OF LAW TO CORRECT HIS SENTENCE PURSUANT TO FED.R.CRIM.P. RULE 35(a)

### PRELIMINARY STATEMENT

Federal Rule of Criminal Procedure 35(a) provides that a District Court Judge must correct a sentence for "clear error" on its own motion or by motion of the defendant if filed within 14 days from the pronouncement of the sentence. Mr. Carpenter's sentence was pronounced on December 3, 2018. Mr. Carpenter respectfully requests that the Court vacate his sentence pursuant to Federal Rule of Criminal Procedure 35(a), because the sentence imposed by the Court ignored the recent Sentencing Guidelines Amendment 792 and 794 and was (1) "substantively unreasonable" under the Sixth Amendment, (2) predicated upon a number of factual inaccuracies and knowingly false information provided by the Government in violation of the Fifth Amendment's Due Process Clause, and (3) constituted clear error in its miscalculation and misconstruing of both the Sentencing Guidelines and the calculation of the proper Offense Level before applying the §3553(a) factors.

Mr. Carpenter's sentence was both procedurally and substantively unreasonable as a matter of law, as there were several errors each of which constitute "plain error" under the Supreme Court's recent decisions in *Rosales-Mireles v. United States*, 138 S.Ct. 1897 (2018) and *Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016), and when combined, these errors

1

would require a corrected and reduced sentence based on the Second Circuit's clear mandate in regard to motions pursuant to Rule 35(a).

For the reasons which follow, the granting of this Rule 35(a) Motion is in order. A new sentencing hearing is in the best interests of justice and fundamental fairness. We have the rare opportunity of a legal crystal ball as provided by the Second Circuit's decisions in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), and *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018), as well as the important decisions on the Mail and Wire Fraud Statutes in *United States v. Takhalov*, 827 F.3d 1307 (*11th* Cir. 2016) and *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) to review and reduce Mr. Carpenter's sentence, now consistent with these cases.  Therefore, this motion is both timely and meritorious and it is respectfully submitted that it should be granted by the Court.

## I. THE SUPREME COURT'S RECENT DECISION IN *ROSALES-MIRELES* REQUIRES A CORRECTION OF MR. CARPENTER'S SENTENCE

In its recent decision vacating the sentence imposed based on a single miscalculation of

the Sentencing Guidelines, the Supreme Court stated the following:

> District courts must determine in each case what constitutes a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the overarching sentencing purposes of "retribution, deterrence, incapacitation, and rehabilitation." *Tapia v. United States,* 564 U.S. 319, 325 (2011); 18 U.S.C. §§3551(a), 3553(a)(2). Those decisions call for the district court to exercise discretion. Yet, to ensure "'certainty and fairness'" in sentencing, district courts must operate within the framework established by Congress. *United States v. Booker,* 543 U.S. 220, 264 (2005) (quoting 28 U.S.C. §991(b)(1)(B)). The Sentencing Guidelines serve an important role in that framework. "'[D]istrict courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" *Peugh v. United States,* 569 U.S. 530, 541 (2013) (quoting *Gall v. United States,* 552 U.S. 38, 50, n.6 (2007)). Courts are not bound by the Guidelines, but even in an advisory capacity the Guidelines serve as "a meaningful benchmark" in the initial determination of a sentence and "through the process of appellate review." *Rosales-Mireles* at 1903-04, *citing Peugh* at 541.

Of course, to consult the applicable Guidelines range, a district court must first determine

what that range is. This can be a "complex" undertaking as discussed in another Supreme Court

decision vacating a sentence calculation off by only one month, *Molina–Martinez v. United

States,* 136 S.Ct. 1338, 1342 (2016). The United States Probation Office, operating as an arm of

the district court, first creates a presentence investigation report, "which includes a calculation of

the advisory Guidelines range it considers to be applicable." *Id.*; see F.R.Crim.P. 32(c)(1)(A),

(d)(1); United States Sentencing Commission, Guidelines Manual §1B1.1(a) (Nov. 2016)

(U.S.S.G.). That calculation derives from an assessment of the "offense characteristics, offender

characteristics, and other matters that might be relevant to the sentence." *Rita v. United States,*

551 U.S. 338, 342 (2007). Specifically, an offense level is calculated by identifying a base level

for the offense of conviction and adjusting that level to account for circumstances specific to the

defendant's case, such as how the crime was committed and whether the defendant accepted

responsibility. See U.S.S.G. §§1B1.1(a)(1)-(5). A numerical value is then attributed to any prior offenses committed by the defendant, which are added together to generate a criminal history score that places the defendant within a particular criminal history category. §§1B1.1(a)(6), 4A1.1. Together, the offense level and the criminal history category identify the applicable Guidelines range. §1B1.1(a)(7). As the Court knows, Mr. Carpenter's criminal history category could drop any day from II to I based on his many motions pending in Boston, any one of which could result in having his Boston conviction vacated. Moreover, in this case, both the Government and the Court failed to examine Mr. Carpenter's sentence in light of the Sentencing Guidelines Amendments 792 and 794.[1] This is clear error. *See, e.g.,* the Second Circuit's recent decision in *Alston,* where the Court chided and admonished the Government that it must take into account Sentencing Guidelines Amendment 794 in all future cases:

> "We have previously vacated a sentence imposed in the United States District Court for the Southern District of New York on precisely this basis…. *See United States v. Soborski,* 708 F. App'x 6, 10–14 (2d Cir. 2017). We expect that, having clarified the impact of Amendment 794 in this opinion *(Alston),* the government will take note in future sentencing proceedings of the updated standard for "minor role" reductions." *United States v. Alston,* 899 F.3d 135, 150 (2d Cir. 2018).

Obviously, the Government did not heed the Second Circuit's straightforward warning in *Alston,* but the district court has the ultimate responsibility to ensure that the Guidelines range it considers is correct, and the "[f]ailure to calculate the correct Guidelines range constitutes procedural error." *Peugh* at 537. Given the complexity of the calculation, however, district courts sometimes make mistakes. It is not surprising, then, that "there will be instances when a district court's sentencing of a defendant within the framework of an incorrect Guidelines range goes unnoticed" by the parties as well, which may result in a defendant raising the error for the first time on appeal as happened in *Molina–Martinez* at 1343.

---

[1] *See* SGA 792 at §2B1.1, and SGA 794 at Note 3(C).

4

In *Molina–Martinez,* the Court recognized that "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—**the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error.**" *Id.* at 1345 (emphasis added). In other words, an error resulting in a higher range than the Guidelines provide usually establishes a reasonable probability that a defendant will serve a prison sentence that is more than "necessary" to fulfill the purposes of incarceration. 18 U.S.C. §3553(a); *Tapia* at 325. "To a prisoner, this prospect of additional time behind bars is not some theoretical or mathematical concept." *Barber v. Thomas,* 560 U.S. 474, 504, (2010) (KENNEDY, J., dissenting). "[A]ny amount of actual jail time is significant for Sixth Amendment purposes," *Glover v. United States,* 531 U.S. 198, 203 (2001), and "ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration," *United States v. Jenkins,* 854 F.3d 181, 192 (2d Cir. 2017). The possibility of additional jail time thus warrants serious consideration in a determination by the Court whether to exercise its discretion under Rule 35(a). It is crucial to maintaining public perception of fairness and integrity in the justice system that courts exhibit regard for fundamental rights and respect for prisoners as "people." *Molina-Martinez* at 1346.

The risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error because of the role the district court plays in calculating the range and the relative ease of correcting the error. Unlike "case[s] where trial strategies, in retrospect, might be criticized for leading to a harsher sentence," Guidelines miscalculations, even if a defendant is sentenced on a non-guideline basis, ultimately result from the Court relying upon erroneous governmental

information. *Glover* at 204; *see also Peugh* at 537. That was especially so in this case where the Court's error in imposing Mr. Carpenter's sentence was based largely on the Government's erroneous use of the non-existent loss amounts in this case found in the presentence investigation report (PSR) by the Probation Office, and based on inaccurate facts provided by the Government to the Probation Officer Mr. Ferraras. This in and of itself is a violation of the Due Process Clause. *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017) *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948) where the Supreme Court stated: "…what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation." *Delacruz* at 175, *citing Townsend* at 741. Moreover, "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Molina–Martinez* at 1348–49. "A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." *United States v. Williams,* 399 F.3d 450, 456 (2d Cir. 2005). The efficacy of reducing Mr. Carpenter's sentence to Time Served now would save scarce judicial resources in the future, because the Government's Calculated Offense Level of 39 is legally untenable and Mr. Carpenter's arguments contained in this Motion for an Offense Level of Three or Four is supported by both the Sentencing Guidelines Amendments themselves as well as recent precedent of the Supreme Court and Second Circuit.

Ensuring the accuracy of Guidelines determinations also serves the purpose of "providing certainty and fairness in sentencing" on a greater scale. 28 U.S.C. §994(f); *see also* §991(b)(1)(B); *Booker* at 264. The Guidelines assist federal courts across the country in

achieving uniformity and proportionality in sentencing. *See Rita* at 349. To realize those goals, it is important that sentencing proceedings actually reflect the nature of the offense and criminal history of the defendant, because the United States Sentencing Commission relies on data developed during sentencing proceedings, including information in the presentence investigation report, to determine whether revisions to the Guidelines are necessary. *Id.* at 350. When sentences based on incorrect Guidelines ranges go uncorrected, the Commission's ability to make appropriate amendments is undermined.

As the Court realizes, the *Lebovits* sentencing memorandum of April 2015, before the Guidelines Amendments were made effective in November 2015, was drafted by Former Attorney General Loretta Lynch, and she asked for Probation only, and the sentences in *Keller-Steinfeld* were only 90 and 60 days respectively. From a "disparity" standpoint, Mr. Carpenter's sentence in this case is sure to be reversed not just because it was substantially more than defendants that admitted to being active in the STOLI business, deceiving the carriers, and dealing in amounts of policies far larger than the Charter Oak Trust, but because the sentence itself was calculated based on clearly erroneous information provided by the Government. Therefore, because Mr. Carpenter's sentence is both procedurally and substantively unreasonable, and was calculated incorrectly based on clear errors by the Court, it is certain to be vacated and remanded based on the Supreme Court's decisions in *Rosales-Mireles* and *Molina-Martinez*. Mr. Carpenter respectfully asks that these obvious errors be corrected now to spare the need for substantial motion practice in the future.

In broad strokes, the public legitimacy of our justice system relies on procedures that are "neutral, accurate, consistent, trustworthy, and fair," and that "provide opportunities for error correction." In considering claims like Mr. Carpenter's in this case, "what reasonable citizen

wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?" *United States v. Sabillon–Umana,* 772 F.3d 1328, 1333–34 (10th Cir. 2014) (Gorsuch, J.). As the Supreme Court has repeatedly explained: "the Guidelines are the starting point for every sentencing calculation in the federal system," *Hughes v. United States,* 138 S.Ct. 1765, 1775 (2018)(quoting *Peugh* at 542). The error in Mr. Carpenter's case is clearly manifest for the reasons stated below and should be corrected now.

## II. THE SUPREME COURT'S DECISION IN *MOLINA-MARTINEZ* REQUIRES AN IMMEDIATE CORRECTION OF MR. CARPENTER'S SENTENCE

In *Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016), the Supreme Court vacated a guilty plea sentence of 77 months where the defendant alleged that a lower sentencing range of 70-87 months was the correct sentencing range. Whereas the Fifth Circuit required Molina-Martinez to show more than just the calculation error, the Supreme Court made it clear that:

> "…**the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights.** Indeed, in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder. **Absent unusual circumstances, he will not be required to show more.**" *Molina-Martinez* at 1347 (emphasis added).

In *Molina-Martinez*, the district court incorrectly believed that 77 months was the lowest possible sentence. The defendant believed the court to be in error and suggested that the correct lowest sentence should be 70 months. While the Fifth Circuit agreed with the defendant that 70-87 months was the correct range, it required the defendant to show more than just the miscalculation error by the Court and how he was prejudiced, when 77 months was clearly between the range of 70-87 months. Because the court in *Molina-Martinez* had made the

statement that, based on the Guidelines, the lowest sentence the court could give was 77 months, which was enough for the Supreme Court to reverse and remand the case for a lower sentence.

In Mr. Carpenter's case, the contrast is much more stark. From a Base Offense Level of 7, the Court added 22 Levels for a fraud loss of between $25-65 million, plus 2 levels for utilizing Sophisticated Means, plus another 2 Levels for deriving more than $1 million from a financial institution, plus 4 Levels for an aggravating role adjustment, plus another 2 Levels for an obstruction of justice enhancement. Obviously, the Court is well aware from the voluminous filings in this case that Mr. Carpenter respectfully disputes the amount of loss in this case, and all of the Government's enhancements. But, for the purposes of this Motion, Mr. Carpenter wishes to respectfully suggest to the Court that, based on SGA 792 and 794, this is clear error that the Court should correct now.

Based on a Guidelines calculation of Seven, the Court should have granted Mr. Carpenter a four-level reduction pursuant to Guidelines Amendment 794 because if there really was a conspiracy of 100 people as the Government maintains, then he should be granted a "minimal" role reduction based on the fact that he did not fill out, sign, or send in any of the allegedly fraudulent insurance applications. If there was any fraud conduct in this case, it was committed not by Mr. Carpenter, but by the agents of the carriers themselves that according to the Government certainly knew who Mr. Carpenter was, and certainly knew about Mr. Carpenter's company Grist Mill Capital being the funder of the policies in the Charter Oak Trust. It is a long held maxim of Insurance Law that the "knowledge of the agent is the knowledge of the carrier." *See Stipcich v. Metropolitan Life*, 277 U.S. 311, 320-21 (1928).

It is submitted that the Government's proof was insufficient, thus there was no deceit, conspiracy, fraud, and certainly no mail and wire fraud conspiracy proven that Mr. Carpenter

9

was a party to. *See, e.g., United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011), where Justice Gorsuch stated: "Proof of criminal intent is required to prevent a 'drag-net of conspiracy' from sweeping up innocent conduct." *Id.* at 1053, *citing United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940). "Without the knowledge, the intent cannot exist….Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal…because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes." *Falcone* at 581. Therefore, Mr. Carpenter was entitled to a Four-level reduction for a minimal role in a nonexistent conspiracy based on Amendment 794, even if the Court determined that Mr. Carpenter's conduct was "essential" to the conspiracy. *See, infra*, the Commentary by the Second Circuit on Amendment 794 in *United States v. Soborski*, 708 Fed.Appx 6 (2d Cir. 2017).

At the outset of the sentencing proceedings, the district court must determine the <u>correct</u> applicable Guidelines range. *Peugh* at 540-41. The Court "must consult those Guidelines and take them into account throughout the sentencing process." *Booker* at 264. The Supreme Court has made clear that the Guidelines are to be the sentencing court's "starting point and ... initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). Federal courts understand that they "'*must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" *Peugh* at 541. The Guidelines are "the framework for sentencing" and "anchor ... the district court's discretion." *Id.* at 531, 541. The sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it. See *United States v. Davila,* 133 S.Ct. 2139, 2149 ("Our essential point is that particular facts and circumstances matter"). Also, the Court was required to look at Mr. Carpenter as he stands now in December of 2018, not the made up picture the Government

10

portrays from 10 and 20 years ago. "[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. United States,* 562 U.S. 476, 492 (2011), *citing United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000).

### III. IT WAS CLEAR ERROR NOT TO EXAMINE, MUCH LESS GRANT MR. CARPENTER A FOUR-LEVEL REDUCTION BASED ON U.S.S.G. AMENDMENT 794

Mr. Carpenter respectfully submits that he is entitled to a Four Level Mitigating Role Reduction due to the recently-adopted Sentencing Guidelines Amendment 794. Even assuming *arguendo* that there was a "conspiracy" surrounding the Charter Oak Trust, which Mr. Carpenter adamantly denies he was a party to or even that such a conspiracy existed, the Court is still obligated to determine what role, if any, that Mr. Carpenter played in the alleged conspiracy, and if that role was a "minimal" one (even if the Court finds Mr. Carpenter's conduct to be "essential" to the conspiracy), he is entitled to a Four-Level Reduction under the Sentencing Guidelines. For example, as the Second Circuit recently described Amendment 794 in *United States v. Soborski,* 708 Fed.Appx 6 (2d Cir. 2017) that:

> "Under §3B1.2 of the Guidelines, a defendant's offense level is reduced by two levels if he was a minor participant in any criminal activity, four levels if a minimal participant, and three levels if falling somewhere between those two categories. U.S.S.G. §3B1.2." *Soborski* at 10.

The Second Circuit went on in *Soborski* to describe Amendment 794's impact on sentencing for "participants" in a "criminal activity" or in a many-participant conspiracy as is alleged here:

> Amendment 794, which became effective in November 2015, less than a year before Soborski's sentencing, modified significantly—especially within this Circuit—the factors that a district court should consider in deciding whether to apply the reduction. It added to the Guidelines commentary the following non-exhaustive list of factors that the district court "should consider" among the "totality of the circumstances":

11

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)     the degree to which the defendant stood to benefit from the criminal activity. U.S.S.G. app. C, amend. 794 (amending U.S.S.G. §3B1.2 cmt. n.3(C)). *Soborski* at *10.

Amendment 794 also clarified that a reduction for a minor role is not necessarily precluded by a defendant's performance of "an essential or indispensable role in the criminal activity," and that a defendant with an essential or indispensable role may still receive a role reduction if he or she was "substantially less culpable than the average participant in the criminal activity." Significantly, in the commentary for Amendment 794, the Sentencing Commission meaningfully changed the phrase "substantially less culpable than the average participant" to "substantially less culpable than the average participant in the criminal activity." *See* U.S.S.G. §3B1.2 cmt. n. 3(C).

The Second Circuit described in *Soborski* why this addition would be crucial to this Court's determination of the appropriate sentence in Mr. Carpenter's case:

> Explaining its reason for adding the words "in the criminal activity," the Commission described a circuit split over the meaning of "the average participant": some circuit courts interpreted it to mean the average among those "participat[ing] in the criminal activity at issue in the defendant's case," *id.*, while other circuits—including ours—looked to the average participant among "the universe of persons participating in similar crimes," *id.* (citing *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)). The Commission stated that it added the words "in the criminal activity" because it favored the former interpretation, under which "the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand." We give the

12

Commission's "interpretation of its own Guideline controlling weight unless it is plainly erroneous or inconsistent with the regulation or violates the Constitution or a federal statute." *United States v. Lacey*, 699 F.3d 710, 716 (2d Cir. 2012). **The Commission's clear directive is for courts to determine a defendant's relative culpability only by reference to co-participants in the case at hand, and we perceive no reason not to give its interpretation controlling weight.** *Soborski* at \*10-13 (emphasis added).

In support of his request that he had, at best, a "minimal" role in the alleged Charter Oak Trust conspiracy, Mr. Carpenter submits the following facts showing that he is entitled to a mitigating role adjustment pursuant to Amendment 794:

1. The Government's letter dated February 25, 2016, showing 37 specifically-named alleged "co-conspirators" and over 200 alleged co-conspirators including all of the employees of Benistar, Ridgewood, Caldwell, Plainfield, and their related companies, plus 84 "Straw-Insureds" and their brokers that were licensed agents of the Carriers. *See* attached as Exhibit One, the Government's list of alleged co-conspirators presented after Mr. Carpenter's trial began;

2. There were 87 policies that were applied for and issued to the Charter Oak Trust, but Mr. Carpenter did not fill out, sign, or submit any of those applications, so he in fact did not "lie" on any of the applications, nor did he cause any mailings or wires in furtherance of the alleged fraud;

3. There was no evidence adduced at trial that showed any commissions payable to Mr. Carpenter;

4. There was no evidence adduced at trial, nor did the Government ever explain how Mr. Carpenter could possibly get possession of the policies from Christiana Bank, the Insurance Trustee, who is **not listed** anywhere as a co-conspirator, and was working for Ridgewood, not Mr. Carpenter;

5. Other than the Government's specious speculation and baseless accusations, there was absolutely no proof adduced at trial that showed Mr. Carpenter taking control of any Charter Oak Trust policy or actually selling a Charter Oak Trust policy;

6. The Government's own submission to the Second Circuit in *Quatrella*, including a Wall Street Journal article from November 2008 shows that the Life Settlement and STOLI business was robust and legal in 2007, and had dried up but was still legal in the Spring of 2008;

7. The alleged lies told by the agents of the carriers and not by Mr. Carpenter were not material to the insurance contract bargain as a matter of law. *See AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018);

8.  Since all of the licensed agents listed by the Government knew the truth of Grist Mill Capital's "third-party funding" of the policies, "the knowledge of the agent is the knowledge of the carrier" (*see Stipcich v. Metropolitan Life*, 277 U.S. 311, 320-21 (1928)), and therefore there are no lies here attributable to Mr. Carpenter as he did not fill out or submit any of the applications in this case;

9.  Even assuming that all of these agents who did not know Mr. Carpenter submitted the allegedly false applications at his behest, Mr. Carpenter is just one of over 100 co-conspirators, so his percentage role cannot possibly be more than 1-10%;

10. Amendment 794 allows Mr. Carpenter to apply for a "minimal role" even if his role was "essential";

11. Mr. Carpenter submits that, in fact, he and his company Grist Mill Capital were the victims here and that he was the one lied to, and he and Grist Mill Capital as the policy "funders" were the real victims here just as the investors were the alleged victims in *Quatrella*;

12. Just as in *Quatrella*, it was the agents that Quatrella conspired with that were in the conspiracy and not the investors, and it was the licensed agents of the carriers including Waesche and Mactas and Westcott that lied to Mr. Carpenter;

13. The Verdict goes into great detail to show that the "Straw-Insureds", "the agents of the carriers", and even officers of the carriers such as Fred Prelle and Charles Induddi-Westcott were all involved in the conspiracy to lie.  See, Verdict pgs. 42-45;

14. There is no evidence anywhere that Mr. Carpenter lied to anyone about anything at any time.  In fact, in the Verdict, the Court said at FN43 on Page 56: "The defendant testified that he never told anyone to lie on the applications. The defendant might not have uttered the word "lie" when instructing others. But there is credible evidence that others lied when completing applications because he told them to do so.";

15. While Mr. Carpenter respectfully disagrees with the Court's analysis of the alleged STOLI questions, even assuming the Court's analysis is correct and Mr. Carpenter understood that these agents that he never met were lying on his behalf, that means Mr. Carpenter was in a conspiracy with at least 20 other people, meaning his percentage of the alleged conspiracy was less than 5%, thereby entitling him to a Four-Level Mitigating Role Reduction;

16. Another example of the Court's misunderstanding of the alleged conspiracy is to say that the "Straw-Insureds" were promised an upfront inducement of "two years of free insurance."  The promise of insurance coverage is not the "cash" inducement the carriers are looking for in detecting alleged STOLI schemes. See Verdict at 45;

17. Even assuming *arguendo* that Mr. Carpenter allegedly "controlled" Wayne Bursey who was the nominal trustee of the Charter Oak Trust, nowhere at trial or elsewhere was evidence adduced showing that Mr. Carpenter had control over Christiana Bank, which was the all-controlling "Insurance Trustee" in the Charter Oak Trust documents. Mr. Carpenter certainly did not have control over Ridgewood, Caldwell, Plainfield, Fred Prelle's Agency, or Bruce Mactas and his people, or any of the insurance agents and brokers in this case, few of which were even known to Mr. Carpenter. For instance, there was no evidence adduced at trial showing any letter, email, text message, or even a phone call between Bruce Mactas and Mr. Carpenter, and there is not even a suggestion by the Government that they ever met.

## IV.   A REVIEW OF THE COURT'S OWN VERDICT PROVES THAT MR. CARPENTER IS ENTITLED TO A FOUR-LEVEL MITIGATING ROLE ADJUSTMENT PURSUANT TO AMENDMENT 794

As previously mentioned, Amendment 794 made it easier for a defendant to qualify for a minor role reduction and encourages courts to apply the reduction more frequently by giving greater discretion. In Mr. Carpenter's case, neither the Government nor Probation, nor even the Court ever mentioned or examined Mr. Carpenter's possibility of a Mitigating Role Reduction pursuant to Amendment 794. As the Second Circuit recently stated in *Alston*, this is clear error certainly on the part of the Government and perhaps even the Court:

> "We have previously vacated a sentence imposed in the United States District Court for the Southern District of New York on precisely this basis.... *See United States v. Soborski*, 708 F. App'x 6, 10–14 (2d Cir. 2017). We expect that, having clarified the impact of Amendment 794 in this opinion (*Alston*), the government will take note in future sentencing proceedings of the updated standard for "minor role" reductions." *United States v. Alston*, 899 F.3d 135, 150 (2d Cir. 2018).

The previous commentary to §3B1.2 had provided that a minor role adjustment is available to any defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant" and Amendment 794 inserted after "substantially less culpable than the average participant" the following phrase: "in the criminal activity." U.S.S.G. §3B1.2, comment n.3(A). The Amendment clarified that a defendant could

be considered for a minor role adjustment in many circumstances, all of which apply to Mr. Carpenter. *See, e.g.,* Amendment 794: "A defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." U.S.S.G. App. C. Amend. 794. The evidence is clear in this case. Mr. Carpenter never owned, sold, or profited from any of the policies including the Spencer policies, and his company Grist Mill Capital **lost** over $70 million, while the alleged carrier "victims" made over $100 million and continue to collect premiums and pay claims to this very day. Furthermore, since the Government's own Loss Spreadsheet shows that every single Charter Oak Trust policy was reinsured by the carrier, that means that even on the Spencer policies, Lincoln made money because it collected a large "permanent insurance" premium while it paid a small "term insurance" premium to some European Reinsurer, so even the Government's calculation of the death benefit loss in this case is wrong. And, as the Second Circuit's decision in *AEI v. Lincoln* makes clear, even if there was a big death benefit to pay out, **"Lincoln was not cheated of premiums."** *See AEI v. Lincoln* at 130.

Amendment 794 also introduced a list of non-exhaustive factors that a sentencing court **should,** not may, consider, in determining whether to apply a minor role adjustment. The factors are: "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G.

§3B1.2, comment. n.3(C). Once again, it is submitted that it was clear error on the part of the Court not to consider any of these factors at Mr. Carpenter's sentencing. Moreover, Mr. Carpenter is the only alleged "STOLI fraudster" to be tried and sentenced after the adoption of SGA 792 and 794.

Therefore, just reviewing this non-exhaustive list of points in view of findings made in the Verdict, the Government's submission to Probation, and Probation's PSR Report, the Court can easily examine the five factors of Amendment 794 and §3B1.2 with the findings in the Verdict itself:

**(1) The degree to which the defendant understood the scope and structure of the criminal activity**:
> Clearly there was no meeting of the minds here as Mr. Carpenter still submits that he did not lie to the carriers, and the carriers, including Lincoln, continue to collect premiums and process death claims on the Charter Oak Trust policies. If the Court's Verdict was correct, the carriers could have rescinded the policies on June 7, 2016 – or even now – and, keep all the premiums paid to date, and not pay any death claims because the policies were "fraudulently" obtained. So, clearly, Mr. Carpenter did not "understand the scope and the structure" of the crime here, and obviously the carriers do not believe they were defrauded and continue to ratify the individual contracts every time they accept a premium payment. "In other words, **Lincoln was not "cheated of premiums.**" *AEI v. Lincoln* at 130.

**(2) The degree to which the defendant participated in planning or organizing the criminal activity**:
> Mr. Carpenter created the Charter Oak Trust so that truly wealthy people could pass money to future generations, income, estate, and gift tax free. The Charter Oak Trust also avoided the Generation Skipping Transfer Tax. The only person who could buy the policy from the Charter Oak Trust was the Insured. Mr. Carpenter could not buy the policy, and if the Insured did not buy the policy, then Ridgewood and not Mr. Carpenter would end up with the policy. At no time did the Government explain how Mr. Carpenter could steal the policies out from under Ridgewood's control of the policies through the Insurance Trustee, Christiana Bank.

**(3) The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority**:
> While the Court erroneously concluded that Mr. Carpenter controlled all of the entities at 100 Grist Mill Road, the alleged "lying" on the applications was done by Agents of the Carriers from all over the Country who Mr. Carpenter not only

did not control, he never met these people or even had so much as a phone call with them. If there was an email between Mr. Carpenter and Bruce Mactas or Mr. Carpenter and Mark Salesman, etc. etc., the Government would have produced them by now. Because Mr. Carpenter had no contact with, much less dominion or control over these Agents of the Carriers all across the Country, he is entitled to a "minimal" role in the alleged conspiracy.

**(4) The nature and extent of the defendant's participation in the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts:**

Similarly, just as Mr. Carpenter did not control the Agents of the Carriers, he did not personally fill out or answer any questions on the allegedly false applications. Nor did anyone file anything on Mr. Carpenter's behalf. More importantly, most of the applications in this case were submitted to the carrier and approved long before they were ever submitted to Mr. Carpenter or Wayne Bursey as Trustee of the Charter Oak Trust for funding. Also, the Charter Oak Trust had a bona fide insurable interest in each and every insured, so the Court's conclusions that these were STOLI policies like in *Binday*, is also clear error.

**(5) The degree to which the defendant stood to benefit from the criminal activity:**

This is probably the most clear-cut of the five factors, because after raiding Mr. Carpenter's offices not once but twice, the Government has failed to produce even one commission check with Mr. Carpenter's name on it, unlike with the defendants in *Binday* and *Quatrella*. Even more significant, if the Government's theory of the scheme to defraud is correct, then Mr. Carpenter is the dumbest criminal in history, because he would know for a fact that if there were **any** lies on the insurance applications, the insurance carrier could deny coverage at any time – even beyond the two-year contestability period – by declaring the policies void due to "STOLI Fraud" which would allow the carriers to keep all of the premiums and not pay out any death benefits. *See, e.g., Chawla v. Transamerica*, 2005 US Dist LEXIS 3473 (E.D.Va. Feb 3, 2005), which was decided in February 2005, a full two years before the first applications for the Charter Oak Trust in March of 2007. In the time period of 2007-2009, Mr. Carpenter's company would have paid over $90 million to the carriers and sustained a loss of $74 million for his company to obtain policies that Mr. Carpenter would have known would be worthless because they were obtained by fraud.

Therefore, not only has the Government failed to prove that Mr. Carpenter was the "leader" of five-or-more "culpable" participants in a scheme to defraud (by a preponderance of the evidence), making him eligible for an enhancement under §3B1.1, the Government has totally failed to address Mr. Carpenter's entitlement to a Four-Level Reduction pursuant to having a minor role if there really were 80-100 people involved in this scheme as the

Government alleges. See List of Government's possible co-conspirators attached as Exhibit One. If there was a scheme to defraud the carriers here, it is submitted that Mr. Carpenter was not part of it because his company Grist Mill Capital, LLC (GMC), as the credible evidence revealed, was not just the biggest loser here at over $70 million in documented losses, but GMC apparently was the **only** loser. Surprisingly, the Government's own voluminous numbers prove that all of the death benefits were reinsured, so not even Lincoln lost money on paying out the $30 million death benefit in the Sash Spencer case. Similarly, in a huge binder filled with TPG's bank records, there was not a single check payable to Mr. Carpenter or signed by Mr. Carpenter. Therefore, based on the Sentencing Guidelines Commission's own Primers, there was no "Intended" or "Actual" Loss in this case, and Mr. Carpenter is entitled to a Four-Level Reduction for having a "mitigating" role rather than a Four-Level Enhancement as the Government argues.

As the Court is certainly well aware by now, Mr. Carpenter respectfully disagrees with virtually every conclusion made in the Court's June 6, 2016 Verdict and Findings of Fact. But, for the purposes of the Five-Person Enhancement, it is not enough that someone knew there was a "conspiracy" going on, they had to play an active role in that conspiracy. *See, e.g., United States v. Studley*, 47 F.3d 569 (2d Cir. 1995) In the June 2016 Verdict, in addition to Mr. Carpenter, the only people listed as possible co-conspirators are Wayne Bursey, Don Trudeau, Charles Induddi-Westcott, Ed Waesche, and Bruce Mactas. See Verdict at 86, FN62. Other than the Government's rank speculation and the Court's erroneous conclusions, there was absolutely no evidence adduced at trial that any of these people were in a conspiracy led by Mr. Carpenter, and, in fact, to the contrary there is much evidence that proves Waesche, Induddi-Westcott, and Mactas lied to Mr. Carpenter and defrauded his Company, so therefore it is absurd to think they were in a conspiracy with him.

Furthermore, perhaps the best evidence that Mr. Carpenter was not in a conspiracy with Robinson, Trudeau, or Mactas, comes from the Government's own Sentencing Memorandum in this case, where the Government cites to Gov't. Ex. 2233 which it used in its Rebuttal in the Final Arguments at Mr. Carpenter's trial three years ago in order to suggest that he terrorized everyone that dared disagree with him:

> "When Jack Robinson tried to send out a Spencer related document that he had worked on with Trudeau, Carpenter responded, "FUCK YOU BOTH THAT DON WANTS TO SEND ANYTHING OUT TODAY ....... I have been working so hard on so many projects that you two have screwed up on and you spring this on me ..... Fuck you both. Nothing goes out without my approval and I did all these numbers already and you are wrong. Assholes!!!!!" Gov't Ex. 2233." See Gov't. Sentencing Memo at 72.

Based on the above indisputable facts, Mr. Carpenter is entitled to a Four-Level Mitigating Role Reduction of his Sentencing Guidelines Offense Level pursuant to SGA 794, and Mr. Carpenter respectfully asks the Court to grant this Motion and to recalculate Mr. Carpenter's Offense Level and reduce his sentence to Time Served.

## V. THE COURT'S CALCULATION OF LOSS IN THIS CASE IS ERRONEOUS

The Government seems to ignore the fact that the Sentencing Guidelines were amended in November of 2015 by Amendments 791, 792, and 794. In her seminal article for the *NYU Journal of Law and Business* (see Issue 12.1, Fall 2015), Judge Patti Saris, the former Chair of the Sentencing Guidelines Commission, makes a number of points on why the Guidelines had to change for Economic Fraud Crimes. She quotes extensively from a number of opinions from the Second Circuit, such as Judge Rakoff's opinion in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), and Judge Underhill's opinion in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013). In discussing the new Amendments affecting the Sentencing Guidelines for Economic Fraud crimes, Judge Saris also frequently commented on the **great disparity of sentences in the Second Circuit alone**, citing such famous cases as *United States v. Collins*, 581

20

Fed.Appx. 59 (2d Cir. 2014), where the attorney at the center of the infamous Billion dollar REFCO fraud received only a year and a day sentence and that was after two trials, and a Billion Dollar check-kiting scandal involving Adam Weitsman, where he also received a sentence of only a year and a day. *See United States v. Weitsman*, 03-cr-00317 (N.D.N.Y. 2004).

In a more recent multi-million dollar check-kiting scandal, Pakistani businessman Saquib Khan was looking at a sentence of 8-9 years, but received a sentence of probation and some community service. *See United States v. Khan*, 13-cr-00268 (E.D.N.Y. 2014). And, of course, the Court is familiar with the Raj Gupta case where he was involved with hundreds of millions of dollars of insider trading violations but received a sentence of only 24 months. *See United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) Finally, Judge Saris in her comments and in the law review article discussed a $77 million fraud against Medicare and the US Government, where one of the officers of the fraudulent company received probation as well, despite looking at a sentence of 14 years or more. Please see *United States v. Khandrius*, 613 Fed.Appx. 4 (2d Cir. 2015), and *United States v. Wahl*, 563 Fed.Appx. 45 (2d Cir. 2014). There are of course other cases that Judge Saris refers to as to why it was necessary to amend the Sentencing Guidelines for White-Collar Economic Fraud Crimes, but suffice it to say, Judge Saris clearly points out the problems of the great disparity in sentencing between similar individuals in similar situations just in the Second Circuit. For example, in the case of Daniel Kornblatt, a former IRS agent and tax attorney, who pled guilty to conspiring with a client to deprive the government of taxes in a $29 million fraudulent tax-evasion scheme; despite defrauding the US Government itself, Mr. Kornblatt received a sentence of only 18 months. *See United States v. Kornblatt*, 14-cr-00581 (E.D.N.Y. 2014) (sentenced to 18 months on May 22, 2017), as opposed to Mr. Carpenter's sentence of 30 months where there was clearly no loss and no victims, intended or

otherwise. In her *NYU Journal of Law and Business* article assessing the use of Intended Loss in

Economic Fraud Crimes, Judge Saris wrote:

> The promulgated amendment revises the initial portion of the definition to read that "intended loss" means the "pecuniary harm that the defendant purposely sought to inflict." This language reflects certain principles discussed in the Tenth Circuit's decision in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). In that case, the defendant was convicted of bank fraud and aggravated identity theft. The district court held that the intended loss should be determined by adding up the credit limits of the stolen convenience checks, because a loss up to those credit limits was, in the government's words, "'both possible and potentially contemplated by the defendant's scheme.'" The Tenth Circuit reversed, holding that "intended loss" contemplates "a loss the defendant purposely sought to inflict," and that the appropriate standard was one of "subjective intent to cause the loss." Such an intent, the court held, may be based on making "reasonable inferences about the defendant's mental state from the available facts." "The amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, **but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability**." NYU Journal of Law and Business, Issue 12.1, Fall 2015, at 27 (emphasis added).

Amendment 792, which became effective on November 1, 2015, essentially settled a

dispute among the Circuits, by adopting the *Manatau* Standard above and the existing law in the

Second Circuit of a *subjective measure of intended loss*. U.S.S.G. Supp. App. C, Amend. No.

792, at 110-14 (2015). Under the revised commentary to U.S.S.G. §2B1.1, Application Note

3(A)(ii), adopts the *Manatau* Standard and is in line with *United States v. Confredo*, 528 F.3d

143 (2d Cir. 2008), intended loss under §2B1.1 means only the pecuniary harm that ***the***

***defendant himself purposefully sought to inflict***.

Therefore, as Judge Saris explained in her commentary on the new Sentencing Guidelines

Amendments, the newly adopted "*Manatau* Standard" in the amended Sentencing Guidelines is

very important to Mr. Carpenter's case for several reasons. First, a defendant's Sentencing

Guidelines should only be based on the amount of loss that the defendant **himself** actually

intended to inflict on the victim(s). As is clear from the evidence of the case, the only "scheme"

22

here was to pay the carriers over $90 million in life insurance premiums, so it is difficult to imagine how there could be any "intentional" infliction of loss on the carriers in this case, or even an "actual loss" to real victims for that matter. Second, and perhaps even more important to Mr. Carpenter's sentencing in this case, is that with the new Sentencing Guidelines adopting the new *Manatau* Standard, the Commission also adopted the "*mens rea*" standard of *Morissette* in *Manatau*, that holds for the defendant's conduct to be criminal, the defendant must have actually known that he was breaking the law and that he was **intentionally** causing "criminal" harm to the victim. As was stated by Justice Gorsuch in *Manatau*:

> But it is equally true that American criminal law often restricts liability to cases where an intentional choice to do a wrong is present. As Justice Jackson explained, "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.... *Morissette v. United States*, 342 U.S. 246, 250 (1952). The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter.... The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051 (emphasis in original).

In fact, under the new Sentencing Guidelines, the definition of "intended loss" makes no mention of "knowledge" or some lesser "*mens rea*" standard and includes only the harm the defendant actually "intended" himself to inflict on the victims. To illustrate this point, Justice Gorsuch gives the example of a "farm boy" who clears the land for an illegal still to earn a day's wages, as opposed to someone involved in the actual operation of the illegal still that clears the land as well. The "Farm Boy" who is working for his wages by clearing the land to help in the running of the illegal still is not involved in the conspiracy of running the illegal still, and is merely getting paid to clear the land, a non-criminal activity. The Farm Boy should not be held criminally liable for the running of the illegal still simply because he cleared the land. In this

case, there was no STOLI "still" and Mr. Carpenter did not recruit any insureds, and did not fill out, sign, or send in any of the alleged fraudulent applications.

These are the points that the Government altogether misses and ignores in its specious analysis of loss in this case.  Contrary to the Government's allegations, there was absolutely no proof adduced at trial that Mr. Carpenter "intended" for the carriers to lose any money, much less suffer any "tangible economic harm" – words that are nowhere mentioned in the Indictment or Trial Transcript, but are required by the Second Circuit to make a case of Mail and Wire Fraud. Moreover, it is clear from the volumes of evidence the Government continues to produce in this case that Mr. Carpenter personally received no commissions directly from the carriers.  For instance, in a binder containing thousands of checks of millions of dollars in payments from TPG Group to brokers, there is not a single check payable to Mr. Carpenter or written by Mr. Carpenter.  The amended Sentencing Guidelines demonstrate the clear error in the Government's thinking.  Even if there was a loss to the carriers in this case, which there wasn't, the loss should not and could not be held against Mr. Carpenter for the purposes of establishing his Sentencing Guidelines.  As the Second Circuit's decision in *Algahaim* makes clear, there is something wrong with a sentence based on 7 levels for the fraud and another 20 levels for the amount of loss.  *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

In this case, it is submitted that the evidence presents beyond dispute that Mr. Carpenter intended no actual "loss" or "concrete harm" to any carrier as the law of the Second Circuit requires.  *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998), *citing United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("...absent the intent to harm, there is no crime.").  The Second Circuit went on to state in *Rossomando* that:

> *Dinome* is an example of a case in which the concrete harm contemplated by the defendant is to deny the victim the right to control its assets by depriving it of

information necessary to make discretionary economic decisions. *See, also, United States v. Rodolitz*, 786 F.2d 77, 80-81 (2d Cir. 1986) (where defendant set up elaborate scheme to conceal fraudulent nature of insurance claims, "the government needed to prove only that [defendant] employed a deceptive scheme intended to prevent the insurer from determining for itself a fair value of recovery"). The government relies on cases such as *Dinome* and *Rodolitz* to argue that by withholding information from the Pension Fund, Rossomando satisfied the intent-to-harm element of mail fraud even if he did not believe he was causing the Pension Fund to lose money, and that this is all the challenged portion of the charge conveyed to the jury. **The government's reliance on these cases is misplaced.** *Rossomando* at 201, FN5. (Emphasis added).

Therefore, no "intended loss" or "tangible economic harm" can be said to have resulted from the scheme of which Mr. Carpenter stands accused of based on the new standard adopted by Amendment 792. It is also difficult to imagine how a scheme to pay almost $100 million in premiums to the various carriers on 87 life insurance policies can be said to have "intended" to cause them any actual harm, much less the "concrete harm" required under *Rossomando* and *Starr*, or the new standard of "tangible economic harm" as required by *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing* the Second Circuit's decision in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994).

## VI.   IT WAS CLEAR ERROR FOR THE COURT NOT TO APPLY THE *STUDLEY* FACTORS

It is submitted that Mr. Carpenter's sentence in this case is also substantively and procedurally unreasonable because the Court failed to allocate the alleged losses among the alleged co-conspirators, utilizing the two-pronged analysis required by the Second Circuit's decision in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), where a court must establish that a defendant "is accountable for the conduct ... of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." As the Court realizes, Mr. Carpenter has consistently argued that there was no conspiracy here, and if there was one, he was not a party to it. But, assuming *arguendo* that

25

there was a conspiracy here, it was clear error for the Court not to allocate the fictitious loss in this case among the 80 alleged co-conspirators.   See Exhibit One, Government List of Co-Conspirators.

It is black letter law in the Second Circuit that "[t]he scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy. **The focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a conspirator"**. *See United States v. Rigo*, 649 Fed.Appx.107, 108 (2d Cir. 2016) *quoting United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991), and U.S.S.G. §1B1.3 (emphasis added).

In this case, it is submitted that the Court erroneously calculated an Offense Level of 39, but the law is clear that the Court should analyze what portion of the total loss is applicable **to each of the alleged conspirators** using the two prongs of *Studley*. *See, also, United States v. Getto*, 729 F.3d 221, 234 (2d Cir.2013) (The Guidelines also require the District Court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant in order to allocate the loss applicable to each defendant) *quoting Studley* at 574.

Assuming, *arguendo*, that there was in fact any loss to the carriers in this case, which clearly there was not; none of that loss can be attributable to Mr. Carpenter. Two good examples for the Court to consider are the "gifting tables" case of *United States v. Platt*, 608 Fed.Appx. 22 (2d Cir. 2015), where the sentences were vacated because the district court relied on a spreadsheet of losses provided by the Government (just like the clearly erroneous spreadsheet provided by the Government in this case) without any particularized finding for each defendant or any of the alleged co-conspirators, and *Getto*, where the Government tried to hold Getto

responsible for "boiler room" type sales that he had nothing to do with. In both cases, the sentences were vacated because the district court did not use the *Studley* prongs to make particularized findings as to the loss apportioned to each co-conspirator based on his role in the conspiracy. As the Second Circuit noted in both *Platt* and *Getto*: "The scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy". See *Platt* at 22, *quoting Getto* at 234. Most importantly, just like the "gifting-table ladies" in *Platt*:

> For the purposes of sentencing, mere "knowledge of another participant's criminal acts or of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." *Platt* at 31, *citing Studley* at 575.

Clearly, the Government did not allege or prove any "pooling of profits and resources" in this case, so it was clear error for the Court not to even mention the *Studley* factors in a case with over 80 co-conspirators and an alleged $100 million in losses caused by the alleged conspiracy in this case. The defendants' sentences in *Platt* were all vacated despite the fact, unlike Mr. Carpenter in this case, they supervised, trained, and otherwise interacted with the gifting table participants because the Second Circuit held that it was insufficient to determine the amount of loss attributable to each of the participants, based on their own conduct for the purposes of calculating the loss amount for the sentencing of each defendant. The reason that is extremely important in this case is because there was no evidence adduced at trial that any conduct of Mr. Carpenter's contributed to the absolute "concrete "loss of any of the carriers. *See Rossomondo*. So, again, even assuming *arguendo* that there were any losses in this case, none would be attributable to Mr. Carpenter based on *Rigo, Platt, Getto,* and *Studley.*

In fact, because there was no evidence adduced at trial that any money came to Mr. Carpenter personally from any carrier, unlike in *Binday*, where Binday's Agency collected all of the commissions, there is no loss from any alleged victim in this case that is directly attributable to Mr. Carpenter's conduct. Because of the new Sentencing Guidelines, it is respectfully submitted that this Court has a duty to show the amount of loss that Mr. Carpenter **personally** actually "criminally" intended to cause under *Manatau* and the new Sentencing Guidelines; it is submitted that amount is clearly ZERO. Mr. Carpenter received no money from any of the "victims" and he certainly did not intend to harm anyone, including the carriers. Mr. Carpenter was not involved with the application process of any applications in this case, was not aware that any of the Insureds and their Agents were allegedly lying on the applications, and even according to Mr. Waesche at trial, would have terminated [any agent] if he ever found out that such "backroom" deals were going on, so Mr. Carpenter is even more removed from the alleged conspiracy than the defendant in *Getto* was, or the "gifting table" ladies were, for the purposes of sentencing and establishing the appropriate Sentencing Guidelines Offense Level.

Moreover, the Second Circuit's recent decision in *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018) negates any possibility of loss attributable to Mr. Carpenter because he was not involved in the recruiting of insureds, the filling out of any application, or signing or sending in any application. Because the Second Circuit in *AEI v. Lincoln* determined there was no actual loss to the carrier, there could be no "intended tangible economic harm" on Mr. Carpenter's part under the new Amendments, even if there was a big death benefit to pay out:

> **"Nevertheless, Lincoln received all the payments it was due under the contract, and it is not alleged that the application was fraudulent with regard to Fischer's health.** Although everyone involved feigned ignorance during his or her testimony—testimony that the district court found untrustworthy, the district court found little reason to doubt that they all knowingly engaged in what was a STOLI scheme. Lincoln concedes that despite the fraud, the policy's premiums were calculated "based on the statistics that

applied to this woman with respect to her age and other conditions," which Lincoln does not allege to be fraudulent, and it received all the "premiums that [its] actuary said should be applicable here." In other words, **Lincoln was not "cheated of premiums."** *AEI* at 130 (emphasis added).

Therefore, based on the Second Circuit's decision in *AEI v. Lincoln*, there were absolutely no actual losses by the carriers, and certainly no "intended" losses caused by Mr. Carpenter according to SGA 792 and the adoption of the *Manatau* standard. Certainly there was no "tangible economic harm" to the carriers intended by Mr. Carpenter's Split-Dollar funding agreement with the Charter Oak Trust. But, even assuming somehow there was some amount of loss attributable to Mr. Carpenter, that has to be reduced by the agents and brokers who were paid commissions, and it must also be reduced by the premiums paid to the carriers. The Court failed to do that calculation as required by the Second Circuit, and must therefore correct and reduce Mr. Carpenter's sentence to a non-custodial sentence.

## VII.   THE GOVERNMENT FAILED TO PROVE THAT ANY OF ITS ENHANCEMENTS WERE WARRANTED IN THIS CASE

The Government's Offense Level of 39 was calculated based on the following: a base level of 7; a 22-level enhancement simply based on a totally specious loss of more than $100 million to the carriers; a 2-level enhancement because the fraud scheme allegedly involved sophisticated means (as if lying on an insurance application is sophisticated); a 2-level enhancement because the defendant allegedly derived more than $1 million from a financial institution (it is indisputable that Mr. Carpenter received no money from the carriers, lost $70 million and the carriers gained more than $100 million); a 4-level enhancement because Mr. Carpenter was the leader of at least five "culpable" participants in the fraud, despite the fact that the names seem to shift between the PSR and the Verdict; and a 2-level obstruction of justice enhancement because the Government claims that Mr. Carpenter allegedly testified falsely about

29

an email sent by Jack Robinson and that he knew nothing about Don Trudeau's endeavors with Life Fund ELITE.

At the outset, and based on these enhancements alone, Mr. Carpenter's Sentencing Guidelines Level of 39 is the same as that of the Boston Bomber, Dzhokhar Tsarnaev, who was sentenced to death for killing and maiming people during the 2013 Boston Marathon. Similarly, a defendant involved in child pornography had an Offense Level of 39, and had his sentence vacated by the Second Circuit. *See United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). With this in mind, several points must be made in Mr. Carpenter's favor to show that he deserves a sentence of Time Served. Even the PSR mentions the fact that Mr. Carpenter believes he is owed at least 16 months of time that he over-served, because he did not receive Halfway House or Home Confinement in the Boston case where he was clearly over-sentenced due to the then-pending indictment in this Court. *See* PSR at ¶201. The Government continues to evoke the sentences in *Binday* rather than the more recent, moderate Government sentence recommendations in *Lebovits* (Probation in April of 2015 by former Attorney General Loretta Lynch) and the 60-90 Day sentences in *Keller-Steinfeld* (July 28, 2017).

Furthermore, of the five people listed in the PSR (see ¶215) as the "culpable" participants that Mr. Carpenter was the alleged leader of, Wayne Bursey is deceased and exonerated; Jack Robinson is deceased and never indicted; and Don Trudeau was never indicted and is still a licensed agent with Lincoln. There was no evidence adduced at trial whatsoever that Don Trudeau was involved in any scheme to defraud Lincoln, because the two agents on the Sash Spencer applications were Bruce Mactas and Don Trudeau, and they are both still with Lincoln three years after Mr. Carpenter's trial, and 10 years after Mr. Spencer's untimely death. As the Court will recall, both Waesche and Induddi-Westcott admitted that they disagreed with Mr.

Carpenter on a regular basis and that they lied, cheated, and stole from Mr. Carpenter's company GMC. Certainly they were not in a conspiracy with Mr. Carpenter. And, neither Waesche nor Induddi-Westcott admitted to being in a conspiracy with Mr. Carpenter to defraud the insurance carriers, and no evidence was adduced at trial showing them being in any conspiracy with Mr. Carpenter on anything.

Moreover, Government Exhibit 2233 (Gov't Ex. 2233, "The Fuck You" email, see Gov't Sentencing Memorandum at 72) is particularly important to Mr. Carpenter's case because it not only destroys the Government's case for a Four-Level Enhancement for being the "Ringleader" of five or more "culpable" participants in the alleged conspiracy, it clearly shows that Mr. Carpenter was not in control of Robinson, Trudeau, or Mactas. But, it also calls into question whether or not there was any conspiracy at all between these alleged "partners" in the first place, because Ex. 2233 clearly shows that Mactas is demanding of Mr. Trudeau that Universitas should be paid the proceeds on the Sash Spencer policies, and Mr. Robinson is trying to offer his own numbers that contradicted Mr. Carpenter's calculations.

Not only does Ex. 2233 undercut the Government's Four-Level Enhancement for being the leader of five "culpable" participants, it substantially undermines the Government's entire theory of the case. If it was always intended by the alleged "conspirators" that Mr. Carpenter was to have control of the Charter Oak Trust policies, then why was Mactas pressuring Trudeau to get Universitas paid out more than a year after Sash Spencer's death? Surely, if there were a true conspiracy here as the Government alleges, Mactas would have known that the Trust was just a clever façade to disguise the true intent of the conspirators to allow Mr. Carpenter to take control of all the policies just as the defendants in *Binday* were accused. Of course, the defendants in *Binday* really did control all of the individual trusts and the policies in that case,

and unlike Mr. Carpenter, recruited the Straw Insureds, and filled out, signed, and sent in all of the applications from the Binday Agency.  But here, in this one email exchange, Trudeau does not say to Mactas "Forget it, Universitas is not going to get a dime," and Robinson is even worse in that he has the unmitigated gall to challenge Mr. Carpenter's calculations rather than telling Trudeau to "Get with the program, we are not paying anything to anyone."  If Mr. Carpenter was supposed to get all of the money, that, of course, never happened.  Instead, Mr. Carpenter expressed his frustration in the email exchange in arguing whether Universitas was to receive $18 million or $19 million, but certainly not the $24 million Mactas was demanding.

Therefore, it is respectfully submitted to the Court that the use by the Government of this Exhibit proves that not only was Mr. Carpenter's Offense Level not correctly calculated in that he should not have been "enhanced" Four Levels, but it is excellent evidence that he should have received a Four-Level Mitigating Role Reduction if there was, in fact, a conspiracy here at all because there was no agreement as to the "object" of the conspiracy or the "essential nature of the conspiracy" as is required by the Second Circuit.  For example, in such notable cases as *United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977), where a Rabbi thought he was in a plan to evade taxes while his "co-conspirator" partner in crime was stealing Postal Orders from the Post Office, the Second Circuit held that while they were both committing crimes, they were not in a "conspiracy" together.  Obviously there was no "meeting of the minds" in that conspiracy, or in Mr. Carpenter's case. The law of conspiracy requires agreement as to the "object" of the conspiracy. This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the "essential nature of the plan" that the conspirators allegedly agreed upon, must be proven by the government, which it clearly did not do in this case:

32

"A conspiracy involves an agreement by at least two parties to achieve a particular illegal end." In order for a defendant to be convicted of a conspiracy, "there must be proof beyond a reasonable doubt that the conspirators agreed on **the essential nature of the plan.** Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." *See Ingram v. United States*, 360 U.S. 672, 678 (1959) *citing Blumenthal v. United States*, 332 U.S. 539, 557 (1947). (Emphasis added).

Significantly, at Mr. Carpenter's trial, neither Mr. Waesche nor Mr. Westcott admitted to being in a conspiracy with Mr. Carpenter. Whereas Mr. Waesche had already pleaded guilty, Mr. Westcott claimed he had done nothing wrong and was an honest man who had not lied to anyone, and he certainly was not in a conspiracy to hurt the carriers as he was an OSJ (Officer of Supervisory Jurisdiction) with Lincoln. Furthermore, while the Government claims (and apparently the Court believed) that Mr. Carpenter ran everything at 100 Grist Mill Road in 2008, Mr. Carpenter had resigned from all things Benistar in 2004 because of his legal problems in Boston. But, even assuming *arguendo* that Mr. Carpenter ran everything in Simsbury during this time period, Don Trudeau operated out of Benistar's Stamford Office, Mr. Waesche operated out of his home in Greenwich, and Mr. Westcott operated out of his home in Millerton, New York. Far from being their leader, there was no evidence adduced at trial of Mr. Carpenter ever having a meeting with Mr. Waesche and Mr. Westcott at 100 Grist Mill Road, and there was certainly no evidence whatsoever of Waesche, Induddi-Westcott, Trudeau, or Mactas agreeing on anything, much less the "essential nature of the conspiracy" that is required by the Second Circuit in *Rosenblatt* and *United States v. Falcone*, 109 F.2d 579 (2d Cir. 1940), and by the Supreme Court in *Blumenthal*, and *Ingram*. Suffice it to say, the 4-Level Enhancement for being the leader of five or more culpable participants is clearly in error because the Government did not prove that by any standard at all, much less by a preponderance of the evidence. Furthermore, Exhibit 2233 entitles Mr. Carpenter to at least a Four-Level Mitigating Role

33

Reduction under SGA 794, if not a new trial pursuant to Rule 33(b). Mr. Carpenter wishes to make it clear to the Court that for the purposes of this Motion, he is not challenging the facts of the case, but rather the 8-Level swing against him in the calculation of this Offense Level, which is not supported at all by the evidence adduced at trial, and is therefore clear error that must be corrected by the Court.

The same can be said of the Sophisticated Means Enhancement. There is nothing sophisticated about lying on an insurance application in order to take advantage of someone's death; a practice which actually predates the founding of this Country, the Constitution, and certainly predates the adoption of the Mail and Wire Fraud statutes. The Loss-to-a-Financial Institution is also preposterous because the Government produced a large binder of thousands of checks paying millions of dollars to the brokers in this case, and there was not a single check payable to Mr. Carpenter by any carrier nor was he a licensed agent on any of the applications. There was no money paid to Mr. Carpenter by any financial institution in this case, much less the $1 million from Lincoln claimed by the Government required for the Enhancement.

Finally, the obstruction of justice enhancement also lacks merit, because the Government could talk to Don Trudeau any time that it wanted, and he would say that Mr. Carpenter had nothing to do with Life Fund ELITE. The proof of that fact is that Jack Robinson brought a $180 million lawsuit against Wells Fargo based on **Don Trudeau's control** of Life Fund ELITE in late January 2016, just two weeks before Mr. Carpenter's trial began in February 2016. *See Avon Capital Holdings (Don Trudeau) v. Wells Fargo*, 16-cv-00101-RNC (D. Conn.). Mr. Carpenter's name is not mentioned even once in any of the filings in that case. Clearly, Mr. Carpenter had no knowledge of this lawsuit or Mr. Trudeau's alleged control of Life Fund ELITE, once again destroying any thought of a conspiracy in this case or that Mr. Carpenter lied

34

about anything at any time. If the Court truly believed that Mr. Carpenter was involved with Mr. Trudeau and Life Fund ELITE, then it is respectfully submitted, the Court should have recused itself from the *Avon Capital* case in the interests of justice, because it involved an alleged co-conspirator of the Defendant in the instant matter. See the filings with this Court in *Avon Capital*. Please note that in the $180 million lawsuit against Wells Fargo dated January 28, 2016, Mr. Carpenter's name is never mentioned. There is no credible evidence that Mr. Carpenter was involved with Life Fund ELITE; there is no foundation that Mr. Carpenter knew anything about Life Fund ELITE and was certainly not involved in any conspiracy with Mr. Robinson or Mr. Trudeau concerning Life Fund ELITE. There is absolutely no credible evidence supporting the Government's two-level enhancement for obstruction of justice in this case.

Moreover, apparently the Government and the Court knew about the Life Fund ELITE lawsuit, but no one informed Mr. Carpenter's counsel about it, so it gave the impression that he was testifying falsely on the witness stand when asked about Life Fund ELITE. Even worse, however, is the fact that unbeknownst to Mr. Carpenter who was still being detained at Wyatt after his trial, Mr. Robinson filed an amended complaint against HSH Nordbank and Strook Strook and Lavan, LLP for $439 million on April 25, 2016 – now a month after Mr. Carpenter's trial, making both of these lawsuits *Brady-Giglio-Bagley-Napue* evidence that should have been provided to Mr. Carpenter and his counsel before and after his trial. Similarly, there was a voluntary dismissal of the defendant HSH Nordbank AG from the Life Fund ELITE affair filed with this Court on September 14, 2016, fully three months after the Court's June 6, 2016 Judgment in this case. Clearly on this basis alone, Mr. Carpenter is entitled to a new trial pursuant to Rule 33(b), as well as having his sentence correctly calculated and reduced as described above, because he did not lie about having no knowledge of Life Fund ELITE, and it is

Mr. Carpenter's position that in fact he did not lie about anything at any time in the conduct of this case.

## CONCLUSION

Therefore, based on the above calculations and even a cursory glance at Sentencing Guidelines Amendments 792 and 794, there is no intended or actual loss in this case, and all four of the Government's sentencing enhancements fail as a matter of law. With that said, based on Probation's calculation of a Base Offense Level of 7 minus a 4-Level Mitigating Role Adjustment Reduction because Mr. Carpenter had no idea he was in any conspiracy with anyone to defraud any life insurance carrier, this Court should grant this motion and based on a new Offense Level of 3, reduce Mr. Carpenter's sentence to a non-custodial sentence of Time Served.

Mr. Carpenter
By His Attorneys

Respectfully submitted,

By _____
Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009

Jonathan J. Einhorn, Esq.
Einhorn Law Offices
129 Whitney Avenue
New Haven, CT 06510
(203) 777-3777
einhornlawoffice@gmail.com

Dated: December 14, 2018

# EXHIBIT ONE

## Government List of Co-Conspirators



**United States Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*      *(203) 821-3700*
*157 Church Street, 25th Floor*      *Fax (203) 773-5376*
*New Haven, Connecticut  06510*      *www.justice.gov/usao/ct*

February 25, 2016

Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

       Re:    <u>United States v. Daniel E. Carpenter</u>
             Criminal No. 3:13CR226(RNC)

Dear Attorney Brown:

       We provide this letter to articulate certain people and entities we believe are co-conspirators for the purpose of offering statements pursuant to Fed. R. Evid. 801(d)(2)(E).  As discussed in Court, the Government reserves the right to supplement this notice as the trial progresses.  This is not a comprehensive list of potential co-conspirators, but only those people we believe are listed as senders of communications on one or more exhibits, and/or those whose statements have been testified about.

- Bill Hutchison
- Bruce Mactas (including through his employees, Felicia Schefer, Ron Palikowski, and Susan Feldman)
- Lee Alper
- Charles Induddi Westcott
- Derek Siewert
- Donald Trudeau
- Eddie Stone
- Guy Neumann
- Jack Robinson
- Joseph Edward Waesche IV
- Ken Landgaard
- Kevin Slattery
- Billy Malcolm Jr. and Sr.
- Molly Carpenter
- Mark Salesman
- Stefan Cherneski

- Philip Kuehne
- Warren and Fred Prelle
- Wayne Bursey
- Robert Pacini (and through employee Andrew Varner)
- Paul Martin
- Brad Kellam
- Anthony Costanzo
- Dennis Nicotra
- Lee Alper
- William Klein
- Tim Shissler
- Ken Grubb
- Benjamin "Buddy" Richman
- Marvin Carrin
- All Benistar-related entities and their employees and agents to the extent that the employees and agents are acting on behalf of the co-conspirator entity
- Caldwell Funding Corporation, Caldwell Life Strategies, Ridgewood Finance, Ridgewood Finance II, Plainfield Asset Management, and all related companies, along with their employees to the extent that they are acting on behalf of the co-conspirator entity

We also believe that some straw insureds may be considered co-conspirators for purposes of the rule, that is, that there is a preponderance of the evidence that they are members of the conspiracy, *see United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969). For example, Marvin Carrin is listed above and should be considered a co-conspirator for evidentiary purposes. However, as there are not many other straw insureds who have statements that are being admitted under the rule, we decline at this point to parse out who else may be a co-conspirator. If you have questions as to a specific insured or statement, we are happy to address our position.

In addition to the above list, the Government notes that many of the proffered statements are admissible under Fed. R. Evid. 801(d)(2)(C) and 801(d)(2)(D), that is, statements offered against an opposing party "made by a person whom the party authorized to make a statement on the subject" and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." This exception would apply to all statements made by employees of one of the Benistar-related entities as well as agents of those entities.

Finally, we reserve our right to claim any other exception that may apply, including that the defendant adopted certain statements made to him by e-mail, *see* Fed. R. Evid. 801(d)(2)(B), or that the statement was offered not to prove its truth, but for some other purpose—including to show the effect on the recipient. If you have a concern about any of the Government's exhibits, please let us know.

*Letter to Richard R. Brown, February 25, 2016*
*Page 3 of 3*

As always, we remind you that we still await your witness and exhibit lists.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/

DAVID E. NOVICK
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY

## CERTIFICATION

I hereby certify that on this 14th day of December, 2018, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Richard R. Brown, Esq.
Brown Paindiris & Scott, LLP
100 Pearl Street, 2nd Floor
Hartford, CT 06103
Tel 860.522.3343
Fax 860.522.2490
Fed Bar No. ct00009