# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
| | ) | |
| v. | ) | |
| | ) | December 20, 2018 |
| DANIEL E. CARPENTER | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A STAY OF THE SURRENDER DATE AND FOR RELEASE PENDING APPEAL

### PRELIMINARY STATEMENT

In asking the Court to stay his surrender date and grant him bail pending his appeal, Mr. Carpenter realizes that the burden is on him to prove to the Court by a preponderance of the evidence that he is not a flight risk or a danger to the community, and that his appeal is not for the purposes of delay but rather raises substantial issues that may result in the reversal of his conviction or a new trial.

Once Mr. Carpenter satisfies that burden to the Court's satisfaction, bail pending appeal is mandatory. *See, e.g., United States v. Silver*, 203 F.Supp.3d 370, 376 (S.D.N.Y. 2016), *citing United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

To help satisfy his burden before the Court, Mr. Carpenter incorporates by reference his recent motion to correct his sentence pursuant to Rule 35(a), the reports of both Dr. Zonana and Dr. Baranoski, and the original determination of his bond and bail status done by the Honorable Magistrate Judge Donna F. Martinez five years ago, when Mr. Carpenter was first arraigned.

These documents provide conclusive evidence, far beyond just a preponderance of the evidence standard, that Mr. Carpenter is not a flight risk or a danger to the community, and as the Court has already experienced, Mr. Carpenter's ongoing defense against these charges raises no

less than a dozen different constitutional issues. The success of any of these issues would result in the reversal of his conviction or the granting of a new trial. Therefore, Mr. Carpenter respectfully asks the Court to grant this motion for bail pending appeal and the stay of his surrender date.

## I.      LEGAL STANDARD

The court "shall order the release" of a defendant if he establishes (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community"; and (2) his "appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … reversal [or] an order for a new trial." 18 U.S.C. §3143(b); *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985). When these two requirements are satisfied, "the sentencing court *shall* order the release of the person pending resolution of the appeal." *United States v. Quinn*, 416 F. Supp. 2d 133, 135 (D.D.C. 2006) (*quoting* §3143(b)(1)(B))(emphasis added). Furthermore, under the wording of §3141, bail pending appeal is mandatory, not discretionary. Once the defendant has made "the required evidentiary showing, the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

**ARGUMENT**

## I.     THE DEFENDANT IS  NOT A FLIGHT RISK

Attached to this Memorandum as Exhibit One is an excerpt from Mr. Carpenter's Presentment and Arraignment, where the Honorable Donna F. Martinez comments that Mr. Carpenter has had a long history of being faithful in meeting his responsibilities in Massachusetts, that he does not have a passport, and that all of his wife's and daughter's assets are tied up in making his original bond. Judge Martinez concluded that she did not believe Mr. Carpenter would flee and leave his wife and only daughter homeless.

Moreover, Mr. Carpenter has been dutifully reporting to Pre-Trial Services or Probation for almost 15 years, since he was first indicted in Boston in February 2004.  In fact, as Mr. Carpenter's Judge in the Boston case, the Honorable George A. O'Toole, often commented: "Mr. Carpenter is more prone to <u>fight</u> than flight." *United States v. Carpenter*, 04-cr-10029 (GAO) (D. Mass).  This Court has also made several observations concerning Mr. Carpenter's propensity for filing motions.  *See, e.g.,* Hearing Transcript of December 6, 2017.

There can be no denying that Mr. Carpenter does not have a passport, a bank account, or any funds anywhere that he could use to support himself.  This Christmas will be his 36th Wedding Anniversary with his wife Molly.  If he were to flee, it would be a violation of not only his bond in Connecticut, but also a violation of his Probation in Massachusetts.   Suffice it to say, Mr. Carpenter was found guilty in June of 2016 and he has been out of prison since January 2017.  He has been directly under this Court's supervision for the past five years, and he has not been accused of any violations on any level of  unlawful conduct since his office was raided by the IRS in April of 2010.

Moreover, as the Court is aware, Mr. Carpenter continues to fight the Government over his Boston case for the past 18 years, denying that he did anything illegal between August and December 2000. At no time during that two decade long fight has anyone accused Mr. Carpenter of being a flight risk, nor has Mr. Carpenter been accused of any other crime other than the Connecticut Indictment before this Court, which Mr. Carpenter is dedicated to fighting on appeal. There is absolutely no evidence to show Mr. Carpenter is a flight risk.

## II.    THE DEFENDANT IS NOT A DANGER TO ANYONE

As the Court is well aware from the more than 70 letters received, Mr. Carpenter has led a lifetime of charitable giving and taking care of others. Far from being a danger to the community, Mr. Carpenter has been enthusiastically giving back to the community, whether it be through the SCORE Foundation in Stamford that sponsored the Big Buddy Program whereby Stamford High School students were paid by the Foundation to tutor the underprivileged primary school students from the poorest families after school. The PSR also documents a number of Mr. Carpenter's charitable deeds, including the gift of 24 computers from Mr. Carpenter to the schools in Stamford.

In Simsbury, Mr. Carpenter was an energetic and enthusiastic soccer coach that coached a dozen different teams to state, regional, and national championships even when he did not have his daughter on the team. In any context, someone who volunteers to coach a children's soccer team who does not have a child on the team is considered to be a "living legend" throughout the soccer community. But, the PSR also documents Mr. Carpenter's proudest achievement, which is the creation of TOPS Soccer, "The Outreach Program for Soccer" where the children from affluent Simsbury families worked with disabled children throughout Connecticut, benefitting the disabled and mentally challenged children, as well as the above-average, perfectly normal

children from Simsbury (whose parents readily noticed the change in their daughters from being "self-centered" to selfless in helping the disabled and mentally challenged that did not have their advantages). The TOPS program that Mr. Carpenter and his wife created has now spread all throughout Connecticut, New England, and even to certain other parts of the Country. But, everyone knows that the TOPS program was created in Simsbury, and the team that provided the first tutors was the Simsbury SHARKS that Mr. Carpenter coached.

Mr. Carpenter sponsored scholarships for more than two dozen students to attend Avon Old Farms over the years, and has personally setup several permanent scholarship funds at Avon Old Farms. Mr. Carpenter donated the money to fund the building for the new physics lab, the science building, and the day-student lounge, which were all named after Mr. Carpenter's favorite teachers. Mr. Carpenter also did the funding for New England's best baseball field, soccer field, and lacrosse field at Avon, which he named after his father. There can be no doubt that Mr. Carpenter has led a life filled with charity for others, and he is always giving back to his community.

It is hard to imagine a person who is less a danger to his community than Mr. Carpenter. He has led a charitable life of helping others from an early age and has always participated in giving back to his community wherever he may be. Significantly, as Dr. Baranoski testified, on all of the tests that she gave to Mr. Carpenter, he had a perfect score for being a "truth-teller" and had a perfect score for having zero anti-social characteristics, which for anyone is a remarkable achievement as most people have at least some anti-social tendencies. Aas Dr. Zonana and Dr. Baranoski's reports bear out, Mr. Carpenter has no anti-social or psychopathic tendencies. Instead, Dr. Zonana points out that Mr. Carpenter wants to live the rest of his life helping the

poor and disenfranchised, and especially the incarcerated through his Prisoner of Hope Foundation.

Similarly, the letter from Angelo Efthimiatos attached as Exhibit Three details how Mr. Carpenter helped over 70 inmates with their legal filings at Canaan under Section 3582(c) and Section 2255, resulting in dozens of people getting out of prison a lot earlier than they expected. Far from being a danger to any community or any person, Mr. Carpenter is usually the first person that someone turns to when they need help, and he is always a benefactor for the community, whether that community be Avon, Stamford, Simsbury, or even USP Canaan. Therefore, based on the Court's willingness to let Mr. Carpenter self-surrender, and Magistrate Martinez's original determination that Mr. Carpenter was not a flight risk and that his past conduct has been exemplary, Mr. Carpenter respectfully asks the Court that he be granted release pending his appeal based on the same bond that Magistrate Martinez believed was acceptable five years ago

## III. BAIL PENDING APPEAL IS NOT INTENDED FOR THE PURPOSES OF DELAY

As in *Quinn*, "there has been no suggestion that [Mr. Carpenter's] appeal is merely a dilatory tactic, and so the only dispute is the extent to which the appeal raises a substantial question of law that is likely to result in…reversal [or] an order for new trial." *Quinn* at 135, *quoting* §3143(b)(1)(B). Mr. Carpenter's pre-trial and post-trial motions, combined with many defense objections preserved in the record, present a number of "close" questions that are more than sufficient to satisfy the requirements of §3143(b). In considering and deciding those questions, this Court has published several lengthy and significant opinions. In granting Mr. Carpenter's motion for bail pending appeal, the Court does not need to admit error, but only

recognize that Mr. Carpenter has preserved an extraordinary number of issues for appeal, any one of which can be considered a "close call" which is the only standard Mr. Carpenter must satisfy for bail pending appeal. *See Randell* at 125.

As an example, in the trial of Anthony Allen and Anthony Conti, the defendants were granted bail pending appeal by Judge Rakoff on the one issue as to the application of the *Kastigar* Hearings (*see Kastigar v. United States*, 406 U.S. 441 (1972)) concerning their prior testimony in a different investigation. Judge Rakoff found that to be the only issue worthy of appeal. As it turns out, they were successful in reversing their convictions on that one issue. But, unlike Allen and Conti, Mr. Carpenter has a dozen constitutional issues that he is raising on appeal. As Judge Rakoff found in the case of Messrs. Allen and Conti, Mr. Carpenter is not doing this appeal for the purposes of delay. *See United States v. Allen*, 864 F.3d 63, 68 (2d Cir. 2017).

## IV. MR. CARPENTER'S APPEAL WILL RAISE A NUMBER OF SUBSTANTIAL QUESTIONS AND A FAVORABLE DECISION ON ANY ONE OF THOSE IS LIKELY TO RESULT IN A REVERSAL OF HIS CONVICTION OR A NEW TRIAL

Mr. Carpenter's appeal will certainly raise over a dozen major issues and substantial questions, all of which are "of more substance than would be necessary to a finding that it was not frivolous" … and/or present "a close question or one that very well could be decided the other way." *Randell* at 125. The Second Circuit has made clear that "likely to result" in reversal or new trial does not mean that a defendant must be likely to succeed on appeal. *Id.* at 124-25. Rather, the substantial question must be sufficiently important that if it "is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial." *Id.* at 125.

That statutory standard is clearly satisfied in Mr. Carpenter's case. He would also respectfully request the Court to incorporate by reference his recently filed motion pursuant to Rule 35(a), because while Mr. Carpenter truly believes he has a dozen Due Process violations and constitutional issues for his appeal to the Second Circuit, he will only present a handful of those substantive issues in this motion, any one of which should satisfy the requirements under §3143(b) for the Court to grant bail pending appeal.

## A. Both of the Search Warrants in this Case were Constitutionally Invalid

In the Court's Ruling and Order of December 24, 2015, the Court clearly erred by saying "The face of the 2010 warrant describes the place to be searched and explained that the search is for the fruits, evidence, and/or instrumentalities concerning violations of Title 18, U.S.C. §371, and Title 27, U.S.C. §7206(2). Attachment 6 to the warrant further describes the items to be seized." See Doc. 155 at 10. Attached as Exhibit Four is the only piece of paper that Mr. Carpenter or anyone else at 100 Grist Mill Road received during the raid of April 20, 2010, that is still the subject of a *Bivens* action and a 41(g) action to have property returned that is currently going on to this very day, and is currently pending before the Second Circuit. Not only did the Court err on what was given to Mr. Carpenter on that day, the record in other cases in front of Judge Underhill and Judge Bolden reveals that Mr. Carpenter did not obtain the Search Warrant Plan or other valuable information until the Summer of 2017 in the deposition of Special Agent Kathy Enstrom.

While the Court acknowledges that the Search Warrant Affidavit <u>must be attached</u>, see Doc. 155 at 9 citing *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010), the Court appears to be unaware of the fact that the Search Warrant was under seal and Mr. Carpenter, along with several other Plaintiffs, had to sue the Government in front of Judge Covello to have the Search

Warrant unsealed. The Court's clear error on finding the Search Warrant of April 20, 2010 constitutionally valid is the sort of substantial question that could result in a reversal of Mr. Carpenter's conviction, an argument which merits this Court granting Mr. Carpenter's Motion for bail pending appeal.

These same constitutional defects are readily apparent in the Search Warrant for the DOL Raid of May 26, 2011, which is attached as Exhibit Five. Similar to the constitutional defects in the IRS Affidavit, the DOL Search Warrant Affidavit was not attached and there is nothing on the face of the Search Warrant that mentions Mr. Carpenter or his company Grist Mill Capital, LLC. Moreover, a recent careful examination of the Search Warrant Affidavit reveals that there is much more in that Affidavit concerning Don Trudeau and his interactions with Life Fund ELITE and people from ISM who were talking to the Government about Life Fund ELITE and their visits with Mr. Trudeau in the Stamford office than there is about Mr. Carpenter. As we know from other filings in this case, there was no evidence adduced at trial that Mr. Carpenter had anything to do with ISM, Life Fund ELITE, or the selling of any life insurance policies. But, because the Search Warrant does not have Mr. Carpenter's name on it and does not have the search of Mr. Carpenter's office on it or what items were supposed to be taken, the DOL Raid of May 26, 2011 suffered from a lack of particularity and a trailer truck full of "overbreadth." Furthermore, it is clear that in both raids the Government knew that Mr. Carpenter was an attorney and neither the IRS nor the DOL Agents sought the approval of the Attorney General's Office, which is required any time an attorney's office is to be raided. None of the Agents in this case sought the approval of the Deputy Attorney General or the Attorney General.

Once again, Mr. Carpenter did not have evidence of this failure on the part of the Government until the Summer of 2017, when Agent Shaun Schrader and Agent Kathy Enstrom

were both deposed. Significantly, the Court's erroneous ruling on the Search Warrants from December 2015, as well as the Court's Verdict of June 6, 2016, came before the Second Circuit's landmark ruling in the definitive case of *In Re 650 Fifth Avenue and Related Properties*, 830 F.3d 66 (2d Cir. 2016), in which the Court's findings as to the Search Warrants in this case are contradicted by the Second Circuit's finding in *In Re 650 Fifth Avenue*. *In Re 650 Fifth Avenue* cites the Supreme Court's ruling in *Groh v. Ramirez*, 540 U.S. 551 (2004), and the Second Circuit's ruling in *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013).

Neither of these cases are mentioned in the Court's order of December 2015, and this constitutes reversible error as *Galpin* and *Groh* were both decided prior to the Court's ruling in December 2015, and they are directly on point and contrary to this Court's rulings.

Moreover, both *In Re 650 Fifth Avenue* and *United States v. Wey*, 256 F.Supp.3d 355 (S.D.N.Y. 2017) came after the Court's Verdict of June 6, 2016, which also foretells that the Second Circuit will likely vacate Mr. Carpenter's conviction both because of the obvious facial constitutional defects of both warrants as described in *Wey, In Re 650 Fifth Avenue, Galpin*, and *Groh*. In fact, Judge Nathan, in her extensive, scholarly opinion in *Wey*, clearly demonstrates seven distinct violations of the Fourth Amendment which are all readily apparent in Mr. Carpenter's case:

1.    Both Search Warrants in this case lacked "Particularity";

2.    Both Search Warrants were clearly "overbroad";

3.    Neither Warrant placed any limit on the Electronically-Stored Information involved;

4.    The Government delay in reviewing the ESI was unreasonable;

5.    The Search Warrants in this case lacked any temporal limitations;

6.    The conduct in both raids was constitutionally unreasonable;

7.     The Government has failed to return the property to this very day.

*See Wey* at 373-380.

The reason this suggests that Mr. Carpenter's conviction will be overturned is because of Justice Brandeis and his eloquent description of Fourth Amendment violations automatically becoming Fifth Amendment Due Process violations in *Olmstead v. United States*, 277 U.S. 438 (1928):

> "The makers of our constitution undertook to secure conditions favorable to the pursuit of happiness. They conferred, as against the Government, the right to be let alone - the most comprehensive of rights, and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment, and the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." *Olmstead* at 485.

Therefore, based on the decisions by the Second Circuit in *Galpin* and *In Re 650 Fifth Avenue*, and the fact that all charges were dismissed against the defendant in *Wey*, Mr. Carpenter respectfully submits to the Court that not only is his appeal raising substantial issues as to the Search Warrants in this case, but it will also result at the very least in a new trial, or having his conviction and indictment vacated altogether for numerous violations of the Fourth and Fifth Amendments.

**B.  Mr. Carpenter's Indictment was Constructively Amended**

Another substantive issue that Mr. Carpenter believes will be successful on appeal is that the Government constructively amended his indictment, or at the very least created a prejudicial variance of the indictment based on Judge Preska's decision in *United States v. Davis*, 2017 WL 3328240 (S.D.N.Y. 2017).

The same defects that Judge Preska found in the World Trade Center case of the contractor Larry Davis and his indictment are all present in this case.  In *Davis*, however, there is

no doubt that the defendant lied and over-billed his client, the Port Authority, over $70 million. At this late date, the Government has failed to prove even a single lie that Mr. Carpenter told anyone at any time about anything. No evidence was adduced at trial to show that Mr. Carpenter lied about anything, and the only mention in the Court's 91-page Verdict of June 6, 2016 discussing Mr. Carpenter and the concept of lying is the following:

> "The defendant testified that he never told anyone to lie on the applications. The defendant might not have uttered the word "lie" when instructing others. But there is credible evidence that others lied when completing applications because he told them to do so." See FN43 on Page 56 of Verdict (Doc. No. 212).

There is no other mention of Mr. Carpenter and the word "lie" anywhere else in the Verdict. This contrasts greatly with the Seventh Circuit's decision in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016), where the defendant lied to both sides of the transaction – the Bank as the seller of the property and the future buyer, costing both sides millions of dollars that ended up in Weimert's pocket. Also see the multi-billion dollar fraud in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), yet the Second Circuit found there was no Mail and Wire Fraud in the debacle in *Countrywide*. Just as in *Davis*, the words "right to control" are nowhere to be found in Mr. Carpenter's Superseding Indictment of May 2014 (Doc. No. 53), but appear frequently in the Court's June 6, 2016 Verdict and Special Findings of Fact. *See, e.g.,* Verdict (Doc. No. 212) at pages 6, 47, and 82, and throughout the Government's Sentencing Memorandum. Significantly, the Court is respectfully directed to Page 82 Footnote 61 of the Verdict, where the Court describes what the defendants in *Binday* argued and what the Second Circuit decided based on the "right to control theory" of mail and wire fraud and then states that "In this respect, this case is very much like *Binday*."

Mr. Carpenter wishes to respectfully suggest to the Court that his case is not at all like *Binday*, but rather is very similar to the prosecution in *Davis*. However, if the Court truly

believes that the Charter Oak Trust in this case is like the individual trusts controlled by the defendants in *Binday*, then there has been a massive constructive amendment of the indictment in this case, because Mr. Carpenter's indictment is a carbon copy of the indictment in *Binday*, and the Government needed to "constructively amend" Mr. Carpenter's indictment to match with the Second Circuit's decision in *Binday* in October 2015.

Even worse for the Government is the fact that the Second Circuit recently cabined the "Right to Control" theory to only those cases where there was a risk of "tangible economic harm," and not the reputational risk that the carriers feared in the unseemly practice of STOLI. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). This, of course was followed in August of 2018 by the death knell for the Government's faulty indictment (and its entire case) in *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018), which demonstrated there was no STOLI fraud in this case because the economics for the carriers are the same between STOLI and non-STOLI policies.

In deciding that the defendant in *Davis* was both the victim of a "constructive amendment" as well as a "prejudicial variance" because nowhere was the "right to control theory" of fraud mentioned or suggested in his indictment, the court in *Davis* rejected the idea that he could be found guilty of mail and wire fraud due to not disclosing the true status of his "minority" enterprise partner. Unlike in Mr. Carpenter's case, there was no doubt that Larry Davis lied and covered up the lie, over-billed and defrauded his contractors and the Port Authority, but his indictment was dismissed with prejudice due to the Constructive Amendment of his indictment.

In this case, more than 10 years after the allegedly false life insurance applications were filled out, the Government has failed to prove that Mr. Carpenter lied to anyone about anything

at any time or intended to cause "tangible economic harm" to anyone, and it is beyond peradventure that he did not fill out, sign, or send in any of the applications in this case. That is why the Government had to constructively amend the indictment to include "nondisclosure" and the failure to provide "valuable economic information," both of which are untrue and do not amount to Mail Fraud or Wire Fraud.

In *Davis*, Judge Preska followed the strict teachings of the Second Circuit in *United States v. Shellef,* 507 F.3d 82, 108 (2d Cir. 2007), *United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987), and *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1182 (2d Cir. 1970) in concluding that deceit is not enough to prove mail and wire fraud. *See Davis* at 35-36. The reason that Judge Preska's decision in *Davis* is so important to Mr. Carpenter's Motion here is that the court in *Davis* granted the defendant's Rule 29 and Rule 33 motions based on both a constructive cmendment theory as well as a Prejudicial Variance theory (and also granted conditional motions for a new trial pursuant to Rule 29(d) and Rule 33(a)) based on the same exact defects of the "Right to Control" theory missing from Mr. Carpenter's indictment.

Judge Preska analyzes why *Davis* is just like the constructive amendments in the Supreme Court, *Stirone v. United States*, 361 U.S. 212 (1960), and the Second Circuit, *United States v. Wozniak*, 126 F.3d 105 (2d Cir. 1997), but Mr. Carpenter wishes to direct the Court's attention to the *Davis* discussion on whether the "right to control theory" was addressed in the indictment in *Davis* or in Mr. Carpenter's case for that matter, or whether it was not:

> Turning to the right to control theory first, either the right to control theory was contained in the core of criminality of the indictment or it was not. If the right to control theory was within the core criminality charged in the indictment, then the indictment is insufficient because *Shellef* teaches that when a right to control theory involving a contract is alleged in an indictment there must also be an allegation that the misrepresentation had "relevance to the object of the contract" or an equivalent allegation, that there was a "discrepancy between benefits reasonably anticipated and actual benefits received," or that the misrepresentation went to "the nature of the bargain." *Shellef* at 108; *see also*

*United States v. Binday*, 908 F. Supp.2d 485, 491 (S.D.N.Y. 2012)("Given the '*Shellef*' language in the present indictment, there is no danger that a jury might improperly convict the defendants based on a misrepresentation[] that had no relevance to the object of the contracts in question."), *aff'd,* 804 F.3d 558 (2d Cir. 2015). This indictment contained none of this language or anything approximating it.

If, however, the right to control theory was not part of the core of criminality contained in the indictment, then offering evidence, argument, and an instruction based on such a theory constitutes an impermissible constructive amendment. Here, the indictment did not contain within its core of criminality the Government's right to control theory of harm. There is no allegation in the indictment that comes close to the right to control theory contained in the jury instruction, (*see supra* p. 90), which reads "it suffices [for a finding of fraudulent intent] that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts to make an informed economic decision on matter that could expose the victim to economic harm," (see Tr. 1136-37.) Also, the indictment never specifies, as would be required for an indictment relying on a right to control theory, that the MWBE aspect of the contract was an essential element of the contract (or similar language). *See Shellef* at 108; *see also Binday* at 491. Without that language, a sufficiently pled right to control theory was not contained in the indictment. <u>Accordingly, the evidence and jury charge pursuant to a right to control theory worked a constructive amendment</u>. *Davis* at *35-36 (*emphasis added*).

Most importantly, Judge Preska goes on to explain exactly the same situation that Mr. Carpenter has experienced at the hands of the Government in this case:

Similar logic applies to the Government's theories of actual harm. The core of criminality alleged by the Government by the end of trial included both the cost overrun theory and the certified payroll theory of actual harm. However, no allegation in the indictment encompasses these factual complexes or would have put the Defendants fairly on notice. Therefore, by the end of trial, the Government alleged a different core of criminality from-that of the indictment with respect to its theories of actual harm. *Davis* at *36.

As the Court is well aware, neither the words "right to control" nor the theory of "deprivation of valuable economic information" or even the required level of "tangible economic harm" as mandated by the Second Circuit in *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) are mentioned anywhere in either of Mr. Carpenter's Indictments. Those words do not appear anywhere in Mr. Carpenter's indictment. Instead, the only harms mentioned in the indictments are the spurious harms that STOLI is somehow more "costly" to the carriers and not

as profitable a block of business, and that commissions are higher on STOLI policies than regular life insurance policies.

All of these assertions made in Mr. Carpenter's Indictment about STOLI by the Government are patently false and have been proven to be untrue in many civil cases since 2014. But, totally fatal to the Government's arguments as to the evils of STOLI in Mr. Carpenter's Indictment is the recent decision by the Second Circuit in *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018), where the Second Circuit concludes there is absolutely no difference in the calculation of a "STOLI" policy and a non-STOLI policy:

> "Nevertheless, Lincoln received all the payments it was due under the contract, and it is not alleged that the application was fraudulent with regard to Fischer's health. Jacob, the broker, received a commission of approximately $100,000 for his efforts with respect to Fischer's policy and, although he was aware that agents are forbidden by law to share their commissions with clients, transferred $50,000 to Irving for acting as a "middleman." Although everyone involved feigned ignorance during his or her testimony—testimony that the district court found untrustworthy, *AEI* at 148—the district court found little reason to doubt that they all knowingly engaged in what was a STOLI scheme." *AEI* at 130. *(Emphasis added)*

> "Lincoln concedes that despite the fraud, the policy's premiums were calculated "based on the statistics that applied to this woman with respect to her age and other conditions," which Lincoln does not allege to be fraudulent, and it received all the "premiums that [its] actuary said should be applicable here." In other words, Lincoln was not "cheated of premiums." *Id.*

Therefore, the Government's Indictment of Mr. Carpenter lacked the necessary "intended actual concrete harm" required by *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998), the "tangible economic harm" required by *Mittelstaedt* and the words "Right to Control valuable economic information" required by *Davis*. These assertions about STOLI made by the Government are not just false, they are demonstrably false and the exact opposite of these claims would be closer to the truth.

The Government originally indicted Mr. Carpenter and others on the basis of making allegedly material misrepresentations, but then realized that no one lied on the applications; certainly not Mr. Carpenter. For example, on page 13 of the Government's Opposition Brief to Mr. Carpenter's Rule 29 Motion (see Gov. Opp. to Motion for Judgment of Acquittal, Doc. No. 262, dated July 28, 2017), the Government makes the statement that "[i]ndeed, the evidence reviewed by the Court supported the Court's finding that misrepresentations contemplated deprivation of economically valuable information." (*Emphasis added*). The problem with this statement is not just that it is untrue, but rather that the words "deprivation of economically valuable information" are nowhere to be found in either of Mr. Carpenter's indictments, and a constructive amendment is a *per se* violation of the Constitution, making Mr. Carpenter's case exactly like *Davis*, only worse.

The Government details the evils of STOLI in both indictments, all of which have been proven to be untrue, but Mr. Carpenter's Fifth Amendment constructive amendment claim is exactly the same as in *Davis*, and in Mr. Carpenter's case, the Government had to rethink and retool its theory of a crime where none existed.

The Government then had to purposefully constructively amend the Indictment in this case because they knew they had charged Mr. Carpenter with a non-crime that he did not commit and they had to somehow fit in and adapt the facts of this case to the Second Circuit's "right to control theory" of fraud in its October 2015 decision in *Binday*. Nowhere are the words "right to control" or "deprived of economically valuable information" found in either of Mr. Carpenter's Indictments or in the trial transcripts, but they were used against Mr. Carpenter for the very first time in the Court's verdict so that the Government could continue the claim that Mr. Carpenter is just like the defendants in *Binday*, which simply could not be further from the truth.

**C. The Due Process Delay Violations in Mr. Carpenter's Case are Extraordinary**

Mr. Carpenter will be raising on appeal several violations of the Speedy Trial Act (18 U.S.C. §3161, *et seq*), as well as the Speedy Trial Clause of the Sixth Amendment. However, for the purposes of this Motion, Mr. Carpenter respectfully asks the Court to focus on the extraordinary Due Process delays in this case pursuant to the *Barker v. Wingo*, 407 U.S. 514 (1972) factors as suggested by Justice Sotomayor in her concurrence in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Not only does Mr. Carpenter have a longer pre-indictment delay than the defendants in *Moore v. Arizona*, 414 U.S. 25 (1973) and *United States v. Marion*, 404 U.S. 307 (1971), he has suffered for a much longer time than the 28 months than Rocky Moore, who was a convicted murderer, and this is what the Supreme Court stated in the unanimous decision in his favor dismissing his indictment on Speedy Trial grounds:

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty. *Moore* at 27, *citing Marion* at 320-21.

Recently, the Second Circuit dismissed the indictment of a marijuana grower who was indicted in October of 2008 but was not tried until May of 2015. The Second Circuit vacated his conviction and dismissed his indictment with prejudice, utilizing the same factors in *Barker*. *See United States v. Tigano*, 880 F.3d 602 (2d Cir. 2018). Since the Court realizes that Mr. Carpenter is charged with illegal conduct going back to 2006 and 2007, and the Court had Mr. Carpenter examined for his state of mind in 2008, Mr. Carpenter is the new record holder for not just Speedy Trial violations, but for Fifth Amendment Due Process delay violations in that he is

accused of criminal conduct from 2006-2008, but was just sentenced in December 2018; fully ten years after the allegedly illegal conduct for which he was accused. The delay in *Tigano* was only seven years, and the Second Circuit termed that as "exceptional" and extraordinary. *See Tigano* at 605-06.

Similarly, the delay in famous cases like *Doggett v. United States,* 505 U.S. 647 (1992) was eight years, *United States v. Loud Hawk*, 474 U.S. 302 (1986) was seven years, and the defendant in *Barker* was only detained for a mere five months, whereas Mr. Carpenter was detained by the Government's actions from December 28, 2015 to January 26, 2017. Therefore, by every Due Process delay standard, Mr. Carpenter is the new record holder, both in the Second Circuit as well as nationally.

When combined with the Sixth Amendment Speedy Trial Clause, and the Speedy Trial Act violations in this case, it is difficult to imagine that Mr. Carpenter will not be successful on appeal when other cases within the Second Circuit have resulted in the dismissal of the defendant's indictment with prejudice; and the violations and delay in those cases are nowhere near the violations in Mr. Carpenter's case. *See, e.g., United States v. Bert*, 814 F.3d 70 (2d Cir. 2016) (delay of only 11 months); *United States v. Montecalvo*, 861 F. Supp. 2d 110, 120 (E.D.N.Y. 2012) (delay of 23 months); *United States v. Giambrone*, 920 F.2d 176 (2d Cir. 1990) (delay of only 90 days).

**D.  None of the Mailings and Wires in this Case were in Furtherance of a Fraud**

Since the alleged fraud in this case is convincing to carriers to issue policies they would not normally issue had they known all the facts, none of the mailings and wires in this case are in furtherance of any fraud.  None of the mailings and wires in this case have anything to do with the original applications sent to the carriers.  Most of these mailings and wires are actually premium payments that have nothing whatsoever to do with the alleged underlying fraud.  This has been the law of the land since the Supreme Court's decision in *Maze*, where it made clear that "[T]he mailing must be 'for the purpose of executing the scheme, as the statute required.'" *United States v. Maze*, 414 U.S. 395, 400 (1974).

Additionally, this case is a perfect example where, as in *Maze*, the relevant wires were used merely "as a result of the fraudulent scheme" rather than "for the *purpose* of executing" it. *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017). In *Maze*, the defendant stole his roommate's credit card to obtain goods and services on his road trip at his roommate's expense.  *Maze* at 396. The government alleged that this act of theft constituted mail fraud because the defendant knew that the credit card bills would be sent to the victim's bank and then the victim himself, but the Supreme Court ruled that this type of mailing did not satisfy the "in furtherance" of the fraud element of mail fraud, because these mailings were innocent and ordinary business mailings "resulting" from the scheme and were not for the purpose of defrauding anyone.  *See Maze* at 405.

An excellent example of this can be seen in the First Circuit's vacating the convictions in a fraud claim in Massachusetts. *See United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016) (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held

that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States,* 323 U.S. 88, 95 (1944)):

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie* at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann* at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). *Maze* at 405." *Tavares* at 59.

If the rejection notices in *Tavares* did not constitute mailings "in furtherance" of the fraud, then certainly the normal business operations and transactions associated with receiving notices of insurance premiums due and wiring or mailing the premium amounts due to the carriers based on contractual obligations in the policies certainly could not be considered mailings or wires "in furtherance" of any fraud.

## CONCLUSION

For the forgoing reasons, the requirements of §3143(b) are overwhelmingly satisfied in this case as Mr. Carpenter is not a flight risk or a danger to the community, and his appeal is not being done for the purposes of delay and will contain a number of substantial issues any one of which could result in the vacating of his conviction and/or a new trial.

Therefore, Mr. Carpenter respectfully requests that the Court grant this motion for release pending appeal of his conviction.

THE DEFENDANT
DANIEL E. CARPENTER
By _/s/*Jonathan J. Einhor*n

Jonathan J. Einhorn, Esq.
Einhorn Law Offices
129 Whitney Avenue
New Haven, CT 06510
(203) 777-3777
einhornlawoffice@gmail.com

## CERTIFICATION

      I hereby certify that on this 20th day of December, 2018, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ *Jonathan J. Einhorn*
Jonathan J. Einhorn, Esq.
Attorney & Counselor at Law
129 Whitney Avenue
New Haven, CT. 06510
tel: 203-777-3777
einhornlawoffice@gmail.com