UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | January 10, 2019 |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING RESTITUTION**

The Government respectfully submits this memorandum regarding restitution in response to the Court's request during Mr. Carpenter's sentencing hearing and as a supplement to its previously filed motion for restitution (ECF No. 361). As explained more fully below, the Government respectfully asks this Court to enter an order requiring Carpenter to pay restitution to certain insurance providers in the total amount of $57,979,924.74.

**BACKGROUND**

On December 3, 2018, the Court sentenced Mr. Carpenter to 30 months of imprisonment to be followed by 36 months of supervised release. The Court did not impose a fine, but ordered Mr. Carpenter to pay a special assessment of $5,700 and restitution in an amount to be determined by the Court within 90 days. *See* Judgment (ECF No. 411). The Court ordered Mr. Carpenter to pay any unpaid restitution during the term of the supervised release at a rate of not less than a $1,000 per month or 10 percent of his gross monthly income, whichever is greater, although the monthly payment schedule may be adjusted based on his ability to pay as determined by the probation office and approved by the Court. Sentencing Tr. (ECF No. 422) at 188.[1]

---

[1] The Judgment appears to contain a clerical error. The supervised release conditions set forth in the Judgment only specify that Mr. Carpenter shall pay unpaid restitution at a rate of not less $1,000 per month. *See* Judgment at 2. It does not include the additional language of "or 10 percent of his gross monthly income, whichever is greater" that the Court imposed during the sentencing hearing.

During the sentencing hearing, the Court adopted the Government's actual loss calculation, finding it was "a reasonable estimate of the loss given the available information." Sentencing Tr. at 175-177. The Government calculated actual loss using the formula approved by the Second Circuit in *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015). The actual loss calculation was based on death benefits, commissions, and fees paid or incurred by the carriers on the policies that were terminated because of death, lapse, or other reason, minus premiums collected by the carriers on those policies. For active policies, the Government counted the commissions paid, but, in accordance with *Binday*, did not attempt to speculate what the ultimate loss or gain would be depending on when the insured died. *See id.* at 175 (noting that the actual loss calculation refrains from speculating about what might happen to active policies in the future). However, as the Court observed during sentencing, while there may be active policies that become profitable, most of the active policies will be unprofitable. *See id.* at 176-177.

Prior to the sentencing hearing, the Government submitted a motion for restitution based on its actual loss calculations. *See* ECF No. 361. The Government provided updated actual loss figures based on (1) additional information obtained from Penn Mutual regarding reinsurance premiums and other fees and expenses incurred on Charter Oak Policies, and (2) legal and other expenses the carriers incurred in the course of cooperating with the Government's investigation and prosecution, which the Government explained should be included in any restitution figure. *See* ECF No. 361 at 1, 3-4 (citing 18 U.S.C. § 3663A(b)(4) and *United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008)).

Based on these calculations, the Government's motion for restitution requested restitution to be ordered as follows:

| | |
|---|---:|
| ANICO | $72,306.77 |
| AXA | $1,295,730.98 |
| Lincoln | $48,429,922.29 |
| MetLife | $299,226.91 |
| Penn Mutual | $1,976,327.27 |
| Transamerica | $4,133,869.14 |
| **Total** | **$ 56,207,383.36** |

ECF No. 361 at 5.

At sentencing, the Court directed the Government to submit a memorandum providing a "best estimate of what the active policies are likely to mean for the [insurance] companies[.]" *Id.* at 190. The Court explained that it wanted to avoid a windfall to the carriers. *Id.* The Court clarified that it was not requiring the Government to provide expert testimony, just an estimate based on a general probability of what is likely to happen to the remaining active policies. *Id.*

## **DISCUSSION**

The Government has reviewed the Charter Oak Trust ("COT") policies and contacted the various insurance companies to obtain additional information in an effort to provide a best estimate of what will likely happen with the remaining active policies. Based on this review, it is highly unlikely that any of the six carriers listed above will receive a windfall.

As the Court may recall, there were a total 84 of policies in the COT. At the time that the Government submitted its actual loss calculation to the Court, there were only 18 active policies. *See* ECF No. 361-1 (revised actual loss chart). The remaining 66 policies terminated because of death (7 policies), lapse (51 policies), or other reason (8 policies). *See id.* Since then, an additional

insured, Gordon (Lincoln policy) has passed away, and Lincoln paid out a death benefit on the policy.

The Government has reviewed the records for the 51 policies that have lapsed. All of the lapses occurred between 2009 and 2013, within the first five years after they were issued. The last lapse occurred in September 2013—nearly 5 ½ years ago. No policy has lapsed since then. This is consistent with the evidence presented at trial: investors are more likely to hold policies they deem profitable until the death of the insured.

As of today, there are 17 active policies from the following five insurance carriers: AXA (2 policies), Lincoln (11 policies), MetLife (1 policy), Penn Mutual (1 policy), and Phoenix (2 policies). Attached as Exhibit 1 is a listing of these active policies, along with the policy's face value, the issuance date, the insured's current age, and the insured's life expectancy.[2] The Government understands that these 17 policies are owned by investors.

For the 17 active policies, the average age of the insured is approximately 88 years old. Five of the insureds are now living beyond their life expectancies, while the other 10 insureds have remaining life expectancies ranging from zero to 4 ½ years.

Given the age of the insureds, the short remaining life expectancies, and the lack of any lapses in the last five years, the probability that any of these active policies will lapse is close to zero. It is not likely that investors, who have paid premiums to keep these policies in force, will let these policies lapse as long as they remain profitable. From an investor's perspective, the death benefit will exceed the premiums paid for several more years for all policies but one MetLife policy. *See* ECF No. 361-1 (revised actual loss chart).

---

[2] The life expectancies are based on the life expectancy reports that were obtained as part of the scheme to defraud at the time of origination.

Thus, it is more probable that the carriers will pay a death benefit on all of these active policies, which will result in an even greater actual loss to the carriers, except for MetLife. As detailed below, and with the exception of MetLife, it is unlikely that the active policies will result in a windfall to the carriers.

**A.    ANICO and Transamerica**

None of the 17 active policies were issued by ANICO or Transamerica. *See* Ex. 1. Accordingly, there is no risk of a windfall to these carriers. The Court should therefore order Mr. Carpenter to pay restitution to ANICO in the amount of $72,306.77 and to Transamerica in the amount of $4,133,869.14, as set forth above.

**B.    AXA**

Two of the active policies were issued by AXA: the Beekman policy for $10 million and the Tucker policy ending in 849 for $8.3 million. *See* Ex. 1. Beekman is currently 87 years old, and is living beyond the life expectancy of 85 years. *Id.* Tucker is 92 years old and is living beyond the life expectancy of 88 years. *Id.* From an investor's perspective, the death benefit is significantly greater than the amount of premiums paid to date, and the investors here could pay premiums for an additional few years before losing money. *See* ECF No. 361-1 (revised actual loss chart). Given that no lapses for COT policies have occurred in over five years, it is very unlikely these policies will lapse given the age and life expectancy of these insureds. It is more likely that AXA will end up paying out a death benefit on both policies fairly soon, resulting in an even greater loss to AXA than set forth above. If AXA pays out a death benefit on both policies within a year, AXA's total actual loss would be approximately $12.2 million.

Over $11.6 million in premiums have been paid to keep these policies in force for the past 11 ½ years. *See* ECF No. 361-1. If the investors paid an additional $5 million in premiums on each

5

policy to keep them in force for several more years, AXA's total actual loss would be approximately $2.2 million once the death benefits were paid, which is still above the current actual loss.

Even if one of the policies were to lapse while the other paid out, there would still be an increased loss to AXA. For example, if the Beekman policy lapses this year while the Tucker policy pays out, AXA's would increase to approximately $2.2 million. The loss would be greater if the Tucker policy lapses while the Beekman policy pays out.

Accordingly, there is almost no risk of a windfall to the carrier, and the Court should order Mr. Carpenter to pay restitution to AXA in the amount of $1,295,730.98, which is the current actual loss.

## C. Lincoln

As noted above, after the Government submitted its actual loss calculation to the Court, another insured (Gordon) passed away resulting in Lincoln paying out a death benefit of $2,511,088.07 (which includes interest) on that policy. That increases Lincoln's current actual loss to $50,273,120.24.[3]

With respect to the 11 active policies issued by Lincoln, two of the insureds are beyond their life expectancies and the remaining nine insureds have life expectancies for up to another four years. In light of the fact that no lapses have occurred in five years, the age of the insureds, and from an investor's perspective, the death benefits greatly exceed the premiums paid to date, it is unlikely that any of these policies will lapse. As a result, the risk of a windfall to Lincoln is

---

[3] As set forth above and in the Government's prior motion for restitution, Lincoln's actual loss before Gordon's death was $48,429,922.29, *see supra* at 3, which included $165,000 in commissions paid on Gordon's policy, *see* ECF No. 361-1. Following his death, Lincoln paid a death benefit of $2,511,088.07. After adding $115,381.98 in fees and reinsurance costs and subtracting $783,272.10 in premiums that Lincoln collected, Lincoln's total actual loss increases to $50,273,120.24.

minimal. It is more likely that Lincoln will pay death benefits on these policies, resulting in an even greater loss.

However, even if the Court assumes a 40% lapse rate—which is very unlikely given that no policies have lapsed in five years—there still would be an increased loss to Lincoln. For example, if the five Lincoln policies with the longest remaining life expectancies (Deckard 8016, Deckard 8008, Neely, Sher, and Wisda) lapse and the remaining policies pay out within the next year, the total loss to Lincoln would exceed $67.5 million.

To date, over $10.2 million in premiums have been paid to keep those five policies in force for the last 10 to 11 years. *See* ECF No. 361-1. Even if another $10 million in premiums is paid ($2 million per policy) to keep those five policies in force for several more years, and then they lapse before the insureds pass away, while another $6 million in premiums is paid to keep the other active policies with shorter remaining life expectancies in force ($1 million per policy) for the duration of the insureds life expectancies and beyond, and the death benefit is collected, the resulting loss to Lincoln would still be over $51.5 million, which is greater than the current actual loss of $50,273,120.24.

Accordingly, the risk of a windfall to Lincoln is minimal, and the Court should order Mr. Carpenter to pay restitution to Lincoln for its current actual loss of $50,273,120.24.

**D.     MetLife**

One of the active policies was issued by MetLife: the Kellam policy for $800,000. *See* Ex. 1. Kellam is currently 96 years old, and is living beyond the life expectancy of 89 years. *Id.* To date, more premiums have been paid into the policy than the face value of the policy. *See* ECF No. 361-1. Yet, the investors who own the policy have continued to pay premiums into the policy for several years beyond the life expectancy. Given that this policy has not lapsed, and given his

current age, this policy is likely to remain in force. However, based on his monthly premium payments, if he were to pass away tomorrow and a death benefit is paid, MetLife's actual loss would be reduced to approximately $228,570.34 because MetLife has collected more in premiums than the death benefit. And with each additional month that the policy stays in force, the loss goes down by another approximately $20,000, meaning MetLife will break even in roughly 12 months. If the policy lapses at any point, MetLife will have a gain.

The Government has no way of predicting how much longer the insured will live, and any guess would be pure speculation. The Government's best reasonable estimate of MetLife's actual losses as of today, based on the methodology approved in *Binday* is approximately $228,570.34. Accordingly, the Government recommends that the Court order restitution in that amount.

**E.     Penn Mutual**

One of the active policies was issued by Penn Mutual: the C. Smith policy for $5,000,000. *See* Ex. 1. Smith is currently 80 years old and has a life expectancy of 84 years. *Id.* From an investor's perspective, the death benefit is significantly greater than the amount of premiums paid to date, *see* ECF No. 361-1, and investors could pay premiums for several more years before losing money. Given that no lapses have occurred in over five years, the probability that this policy will lapse is low given the age and life expectancy of the insured. As such, it is more probable that Penn Mutual will pay out a death benefit on the policy, resulting in an even greater loss to Penn Mutual than set forth above. If Penn Mutual pays out a death benefit on the policy within a year, the Penn Mutual's total actual loss would be approximately $4 million.

Over $725,000 in premiums have been paid over the last 11 years for this policy. *See* ECF No. 1. Even if an additional $2 million in premiums were paid to keep the policies in force for the duration of the insured's life expectancy and beyond, Penn Mutual's total actual loss once it pays

the death benefit would be approximately $2 million, still above the current actual loss. To be clear, however, if the policy were to lapse at any point after today, Penn Mutual, would end up with a gain. As a lapse is unlikely for the reasons discussed above, the Court should order Mr. Carpenter to pay restitution to Penn Mutual in the amount of $1,976,327.27, which is its current actual loss.

**F.     Phoenix**

The remaining two active policies on Exhibit 1 were issued by Phoenix. However, as indicated in the actual loss chart submitted with the restitution motion, Phoenix currently does not have an actual loss. *See* ECF No. 361-1. Accordingly, the Government is not seeking restitution for Phoenix. To be clear, it is likely that these policies will not lapse for the same reasons discussed above (no policies have lapsed in 5 years and the insureds are near their life expectancies). As such, it is more likely that these two policies will result in Phoenix paying a death benefit, in which Phoenix would suffer an actual loss. However, at this time, any loss from these two active policies is speculative, and therefore, is not included as part of the restitution amount.

**CONCLUSION**

For the reasons stated above, the Government respectfully asks the Court to order the defendant to pay restitution in the following amounts to the following victims based on the actual loss methodology adopted by the Court at sentencing:

| | |
|---|---:|
| ANICO | $72,306.77 |
| AXA | $1,295,730.98 |
| Lincoln | $50,273,120.24 |
| MetLife | $228,570.34 |
| Penn Mutual | $1,976,327.27 |
| Transamerica | $4,133,869.14 |
| **Total** | **$ 57,979,924.74** |

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ Neeraj N. Patel
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

CERTIFICATION OF SERVICE

       This is to certify that on January 10, 2019, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

BY:   /s/ Neeraj N. Patel
        NEERAJ N. PATEL
        ASSISTANT UNITED STATES ATTORNEY