**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____
                                          )
UNITED STATES OF AMERICA      )        CRIMINAL NO. 3:13CR226(RNC)
                                          )
v.                                        )
                                          )        February 8, 2019
DANIEL E. CARPENTER          )
_____)

### DEFENDANT'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR RESTITUTION

## I.      PRELIMINARY STATEMENT

By docket entry #361, the government has sought restitution of $56,207,383.36[1].

Mr. Carpenter denies that he is responsible for this restitution amount as the insurance carriers in this case were not victims nor did they experience any actual losses caused by Mr. Carpenter's conduct.  Additional discovery received yesterday pursuant to a *Brady* request supports this argument.

Even if he were responsible for an insurance carrier's cost of doing business (e.g. commissions, administrative costs, and reinsurance premiums), which clearly he is not, once one excludes the "consequential damages" of deaths that he did not cause, the premiums paid on the policies far exceeds the commissions paid, administration costs, and the reinsurance premiums. Once the death benefits are excluded as a matter of law, the carriers all made a profit and only Grist Mill Capital is the loser in this affair.

Mr. Carpenter respectfully submits to the Court that granting any restitution to the carriers would provide a windfall to them in violation of the specific provisions of the Mandatory

---

[1] The total in its Memorandum in Support of Restitution (docket entry #423), is $57,979,924.74.

Victims Restitution Act (MVRA) (18 U.S.C. §3663A) and would be unfair, unjust, and unconstitutional as to Mr. Carpenter.

It would be contrary to law for Mr. Carpenter to pay restitution to the carriers who were clearly not "victims" in this case, as they did not lose any money due to any illegal conduct of Mr. Carpenter.  The law is clear in this regard: the victim's loss must have been caused by Mr. Carpenter's own personal charged unlawful conduct and no one else's.  Since he did not fill out, sign, or send in any of the allegedly false applications in this case, his allegedly unlawful "nondisclosure" of information under the Government's Right to Control Theory of Fraud could not possibly be the proximate cause of any insured's death or loss to the carriers as required by the MVRA, because they received the information on the applications from their duly licensed agents and not from Mr. Carpenter.

Furthermore, virtually every one of the Insureds filled out questionnaires and had Inspection Reports done on them, and many had home or phone interviews to gather information for the carriers.  Mr. Carpenter is not even alleged to have been a party to any of those interviews or Inspection Reports, and virtually none of the Insureds interviewed by the Government even knew who Mr. Carpenter was.

It is not possible that any conduct on the part of Mr. Carpenter personally caused any loss to the so-called victims in this case. Whether all of the Insureds died or all the policies lapsed before death, Mr. Carpenter's personal conduct (illegal or otherwise) would not have been the proximate cause of any loss by any carrier, and the Government does not claim that he caused any insured's death.

The carriers in this case were neither victims nor "losers," and Mr. Carpenter will submit expert reports that show, contrary to the Government's specious claims, the carriers actually

desired STOLI business, profited greatly from their STOLI portfolios, and the Government's own calculations actually prove carriers like Lincoln made money as it appears every policy issued to the Charter Oak Trust was reinsured.  This means Lincoln did not "lose" $30 million on even the Sash Spencer policies because a reinsurance carrier paid most of the Spencer death claim, not Lincoln.

In fact, this is what the Government's newly-provided *Brady* information shows.   Even a cursory glance of Lincoln's Annual Reports from 2007-2017 shows that Lincoln made a profit each year, paid substantial dividends to its shareholders each year, and in the year when Mr. Carpenter allegedly caused them to "lose" money by creating the Charter Oak Trust, Lincoln's Board of Directors authorized a Two Billion Dollar stock buyback and authorized the payment of $140 million over 20 years for the naming rights to the new Eagles stadium.  *See* pages 119 and 177 of Lincoln's 2007 Annual Report attached as Exhibit One.

Of the Government's $58 million in claimed losses, over $50 million allegedly belongs to Lincoln, and yet Lincoln has not sued Mr. Carpenter, filed a claim for restitution, or even terminated the agents associated with any of these alleged "losing" policies. Nor did Lincoln sue to rescind any of the Charter Oak policies.   To the contrary, Lincoln continues to collect premiums, pay death claims, and service the change of ownership forms as the policies are sold from one hedge fund to another. *See, e.g., HUG Funding v. Lincoln*, 11-cv-01590 (LTS) (HBP) (SDNY 2018).  This is all happening even though according to the Government, and even the Court's June 6, 2016 Verdict, the carriers would be well within their rights to claim the policies as void for fraud because if the policies were truly induced by fraud, they could be terminated even beyond the contestability period (a point the Government misses in its analysis of *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018).

It would be unjust to reward the carriers with restitution in this case because any restitution paid to the carriers would create a large windfall, and in Lincoln's case, Mr. Carpenter would actually be paying twice for the policies, which is clearly prohibited by the MVRA as restitution is capped at the actual proven losses of the victim.  If there are no proven losses here, then there is no restitution to be paid under the MVRA.

## II.      LEGAL STANDARD

The law limiting the payment of restitution to only actual victims with real losses and the constitutional reach of the MVRA is very clear in the Second Circuit:

> Federal courts have no inherent power to order restitution, which is traditionally a civil remedy. *See United States v. Reifler*, 446 F.3d 65, 127, 137 (2d Cir. 2006). A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute. *See United States v. Elkin*, 731 F.2d 1005, 1010–11 (2d Cir. 1984). In this case, the relevant statute is the MVRA.  *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012).

The Supreme Court has made it clear in a number of decisions, even in difficult cases with a sympathetic victim, that restitution is only payable to a real victim that had a proven real loss caused by the defendant's illegal conduct, and no one else's.  *See Paroline v. United States*, 572 U.S. 434 (2014) where the Supreme Court states that "the statute allows restitution only for those losses that were the "proximate result" of [defendant]'s offense. *Id.* at 465.  *Paroline* also cites *Burrage v. United States,* 134 S.Ct. 881, 887-88 (1992) for the proposition that:

> [T]he ordinary meaning of the term "results from" requires proof that the defendant's conduct was the "actual cause" of the injury….Congress has authorized restitution only for "the amount of the loss sustained by a victim as a result of the offense." §3664(e). *Id.*

> [The Supreme Court has] interpreted virtually identical language, in the predecessor statute to section 3664, to require "restitution to be tied to the loss caused *by the offense of conviction*.  *Hughey v. United States*, 495 U.S. 411, 418 (1990)(citing 18 U.S.C. §3580(a)(1982 ed.); emphasis added).  That is, restitution may not be imposed for losses caused by any other crime or any other defendant.  *Id.* at 465-66.

The MVRA also gives the alleged victims the opportunity to submit information including an affidavit about the amount of their losses.  According to §3664(d)(5), if the list of victims and their losses is not "ascertainable by the date that is 10 days prior to sentencing," then the court must "set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  Finally, §3664(e) states: "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."

III.   **ARGUMENT**

A.   **The Complexity of the Losses is so Great that Restitution Cannot be Calculated**

It is respectfully suggested that the calculation of losses here are so complex that it has taken three years since Mr. Carpenter's trial (and over five years from his indictment) to determine out how much his alleged "deceit" has supposedly cost the carriers.  Due to the complex nature of the calculation of losses in this case, Congress has mandated that complex calculations should not dominate or interfere with the sentencing process, and in those cases, no restitution should be awarded.

Judge Christopher Droney calculated a Sentencing Guidelines loss of over $400 million in *United States v. Ferguson*, 584 F.Supp.2d 447 (D. Conn. 2008), but held that the calculations of loss were too complex to award any restitution. That logic is appropriate here.

Indeed, if the daily trading price of AIG stock in *Ferguson* was "too complex" to establish restitution, how is it possible for the Government to claim it understands the inner workings of the hugely profitable carriers in order to say they somehow "lost" $58 million on the policies issued to the Charter Oak Trust?

Mr. Carpenter's attorneys claimed in October 2013 that the carriers had actually made a "profit" of $90 million, while Grist Mill Capital lost $70 million.  *See* attached as Exhibit Two, letter from Attorney Richard Brown to AUSA David Novick dated October 25, 2013.

**B.  Restitution Is Not Permitted Here as There is No Proof that the Defendant Caused Any Losses**

In *Paroline*, *supra,* the Supreme Court had to limit the amount of restitution paid to a very sympathetic victim of child pornography because the Government failed to prove any of the victim's losses were caused by the offense.

A relevant case deals with the same limitations placed on restitution involving GE Capital (GE) being a victim of mail and wire fraud. *See Lagos v. United States*, 138 S.Ct. 1684 (2018), where the Supreme Court vacated a restitution award and determined that GE was not entitled to restitution or the costs of its internal investigation and suggested that GE's remedy was to bring a "civil lawsuit against Lagos for the full extent of its losses." *Lagos* at 1690.  GE did in fact happen to bring a lawsuit against Lagos and won a judgment of over $30 million to cover its losses.  There is no doubt that the large financial institutions in this case could and would have done the same thing as GE did if they truly believed that they had lost any money here from an intentional fraud.

No victim has suffered a "pecuniary loss." §§3663A(a), (c)(1)(B).  Thus, if there is no monetary loss in this case, there is no restitution to be paid. "The goal of restitution, in the criminal context, is to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). Since the purpose of restitution is compensatory and the MVRA limits restitution to the amount of each victim's losses, "a

restitution order must be tied to the victim's actual, provable, loss." *Finazzo* at 117, quoting *Zangari* at 91. The "primary and overarching goal" of the MVRA is to make victims of crime whole; that is, "to compensate [victims] for their losses and to restore them to their original state of well-being." *See United States v. Thompson,* 792 F.3d 273, 277 (2d Cir. 2015) (quoting *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011)).

In order "[t]o fulfill this objective without awarding the victim a windfall, *i.e.*, more in restitution than he actually lost, the MVRA caps the restitution award at the actual amount of the victim's loss." *Id.* (quoting *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006)); *see also United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002) ("Unlike loss calculations, a court's power to order restitution is limited to actual loss.").

A "victim" for the purposes of the statute is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." §3663A(a)(2). Mr. Carpenter respectfully asserts that the carriers were not victims of any fraud here.

"In restricting its definition of 'victim' to persons proximately harmed by the defendant's acts, the MVRA aims to limit restitution to those harms that have a sufficiently close connection to the conduct at issue." *Thompson* at 277 (quoting *Robers v. United States*, 134 S.Ct. 1854, 1859 (2014) (recognizing that the MVRA "has a proximate cause requirement")) (internal quotation marks and alterations omitted). This is consistent with the proximate cause requirement for fraud loss generally. *See, e.g., United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (holding that "loss must be the result of the fraud," and "[l]osses from causes other than the fraud must be excluded from the loss calculation."); *United States v. Ednie,* 707 F.App'x 366, 373 (6th Cir. 2017) ("To attribute an actual loss to a defendant, his or her conduct must be both a 'but for' cause and a proximate cause of the loss.").

The Government acknowledges that its restitution figure is based principally on the purported actual loss to carrier "victims", which includes death benefits and the carriers' cost of doing business.  The Government has *conceded* that its actual loss figure of roughly $58 million is based only on a "but-for theory" of loss causation.  (*See* Govt. Sent. Memo. at 32).  Given the MVRA's requirement that restitution be grounded in "proximate" causation, the Government's use of its actual loss figure to calculate restitution is manifestly erroneous, and making Mr. Carpenter responsible for death benefits that he did not cause is clearly erroneous as well.  The restitution calculation likewise suffers from the other flaws that Defendant has already identified in his submissions concerning the Government's actual loss amount:

- The actual loss amount is based on a model that lacks support in STOLI case law.  The model proposed by the Government twice received a cold reception at the Second Circuit.  In both *United States v. Binday*, 804 F.3d 558, 597 (2d Cir. 2015), and *United States v. Quatrella*, 722 F.App'x 64, 69 (2d Cir. 2018) (summary order), the Second Circuit tolerated the model as not clearly erroneous but each time voiced a desire for "a better alternative," even taking pains to expressly "le[ave] open the possibility that on different facts, the method employed here may not provide a reasonable estimate of actual losses," *Binday*, 804 F.3d at 597.

- The Government's actual loss model flouts the Government's *own* arguments and the Court's *own* finding about the economic harm caused to insurance carriers from being deceived into issuing STOLI policies that they believed were non-STOLI.  In the Court's words, the "discrepancies between the benefits the [carriers] reasonably anticipated from issuing the policies and the benefits they actually received" (Verdict at 82) stem from *two* relevant ways in which "STOLI policies differ from traditional policies….The first relates to the way the policies are funded, the second involves lapse rates." (Verdict at 12). That is the only difference between policies according to the Verdict.

The MVRA lists four detailed, specific categories of real recovery for real victims that provide meaningful relief without inviting complex, fact-intensive disputes better suited to civil litigation, such as "child care", "bodily injury", "injury that results in death", and "damage to property."  None of these apply to the big companies involved in this case.  The Government also cannot satisfy multiple conditions in §3663A(b)(4)'s plain text, and it cannot explain the

clear and obvious differences between this statute and other restitution provisions, where (unlike here) Congress *did* provide make-whole relief.  Had Congress wanted to include all losses proximately caused by the offense, it knew how to do so.  It instead "wrote a far more limited provision."  *See, e.g., United States v. Amato*, 540 F.3d 153, 161 (2d Cir. 2008).

The Supreme Court's decision in *Paroline* also strongly suggests that any restitution ordered after a criminal conviction is limited by and within the scope of the Excessive Fines Clause. Although restitution is ultimately paid to the victim, the restitution order results from the government's power to criminally prosecute, and the restitution payable to the victim is first collected by the Government, not the victims. As a check against the abuse of governmental power, the Excessive Fines Clause is meant to limit the government's ability to extract large and unreasonable "payments" from criminal defendants whether they are called "fines" or something else. And, as the *Paroline* Court rightly noted, restitution orders serve "punitive" as well as compensatory purposes. Restitution orders not only deter offense conduct, but also are a component of an offender's punishment and may negatively affect the defendant's future rehabilitation.

C. **The Government's Calculations are Erroneous and not Based on Accepted Actuarial Principles.**

Included as Exhibit Three is an expert opinion by a nationally-renowned actuary, Larry Stern and as reviewed by the equally respected actuary Jeffrey Harper (who has often appeared as a forensic witness for the Government, *see, e.g., United States v. Allen Stewart,* 185 F.3d 112 (3d Cir. 1999)), in which Mr. Stern provides a detailed analysis to show that not only are the Government's calculations flawed, but also how they are in error because according to the Government, as soon as a carrier issues a policy, it is destined to lose money on the transaction.

Tellingly, Mr. Stern provides the following information in contradiction of the Government's claims:

> Based on my analysis of the information I have considered, based on accepted actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, I have formed the following opinions relating to the Government's calculations for restitution:

- The Government's loss calculations do not follow actuarial principles
- The Government's loss calculations do not reflect how insurance companies develop profits or losses
- The Government's loss calculation assumptions are based on false premises, including
  - Companies have suffered losses and should quit the insurance business
  - Affected companies cannot adjust costs after suffering losses
  - Stranger Owned Life Insurance ("STOLI") policies will be kept in force until the death of the insured
- The affected insurance companies do not appear to have suffered losses
  - They continue to collect premiums, pay death benefits, receive reinsurance reimbursement, *etc.*
  - They have not asked for any restitution
- The Government's loss calculations do not show the amount of recovered death proceeds the insurance companies have received from their respective reinsurers. It appears each and every policy in the Trust was reinsured. Therefore, it was clearly erroneous for the Government not to take into account the proceeds received from the reinsurers
- The Government's loss calculations attribute to the Defendant the costs of doing business for the insurance companies. These are expenses included in the determination of the appropriate premium rate paid by the policyholder. It makes no sense to attribute to the Defendant the cost of doing business for a modern life insurance company.
- The Government's loss calculations are based on the false premise once an insurance company issues a policy it cannot be void for fraud or, in the alternative, the company cannot adjust the cost of the policy on a unilateral basis. Both of these theories of the Government are patently erroneous as:
  - I am aware of litigation in which the insurance company has voided an insurance policy for fraud after the two-year incontestability period, and
  - I have been involved in litigation where the insurance company has raised cost of insurance rates on a unilateral basis

As Mr. Stern's analysis makes clear, the Government's calculations are based on the false premise that once a carrier issues a fraudulently-induced policy, it cannot get out the policy, nor can it increase the Cost of Insurance for the policy. Mr. Stern has testified in cases proving both that carriers have the ability to rescind policies after the two-year incontestability period and

carriers having the ability to raise their Cost of Insurance for a policy even beyond the flexible amount they build into a typical universal life policy.  *See* Stern Opinion at 14.  Moreover, as Mr. Stern points out, the Government gives no rationale for why Mr. Carpenter should be responsible for the carriers' cost of doing business.  This cost includes the payment of commissions to their brokers and agents, the administrative costs of running the company, and most importantly, the payment of reinsurance premiums because nowhere does the Government show the reinsurance proceeds to offset the death proceeds that Mr. Carpenter is also charged with.  It is as if Mr. Carpenter defrauded a casino, he would be responsible for paying the jackpots as well as the costs for running the business.  That is why the Government's recently provided *Brady* information is so important to Mr. Carpenter's overall restitution defense; that the carriers were not defrauded, they were not victims, and they did not lose any money.

More importantly, it appears from the Government's restitution calculations that all of the Charter Oak Trust policies were reinsured.  See Stern Opinion at 16.  Therefore, Mr. Carpenter should not be "charged" with the $19 million that the carriers paid in reinsurance premiums to the big reinsurance carriers like Swiss Re and Munich Re, and the Government must reduce the amount of death benefit by what the insurance carriers received from their reinsurance carriers. Obviously, the Government did not do this and therefore, according to Mr. Stern from an actuarial basis, even if all 84 insureds had died, it would have had zero financial impact on any of these carriers and in his professional opinion, none of these carriers experienced an actual "loss" for the purposes of restitution.  See Stern Opinion at 16.  Significantly, Mr. Stern quotes the Court's mandate to not provide the carriers with a "windfall" in any event.  See Stern Opinion at 15.

Based on Mr. Stern's expert actuarial analysis and the Government's incomplete analysis,

Mr. Carpenter wishes to make two separate points. In no way should Mr. Carpenter be responsible for the insurance carriers' cost of doing business. He did not receive any commissions in this case, nor was he paid a management fee or a salary by the carriers. As for the reinsurance premiums charged to Mr. Carpenter's account, that is not just inappropriate and unwarranted, but those reinsurance premiums the carriers pay guarantees they make a profit on each big policy they sell because if there is an early death like Sash Spencer, the reinsurance carrier pays the bulk of the claim above the attachment point.

Furthermore, Mr. Stern quotes insurance executive James Avery in *Binday* that "even if someone dies in the first year (or a policy lapses), that is not a fraud loss, but a cost of doing business. You have the individual who pays one premium and dies six months later. You have a lot of money on that policy but we don't consider that a loss…[T]hat's the benefit of insurance because there's another 900 people who paid a premium who didn't die." See Stern Opinion at 14.

This leaves only the death benefits in this case. The reason that holding Mr. Carpenter responsible for the ultimate death of the insureds is fundamentally unsound is because everyone will die at some point, and it has nothing whatsoever to do with Mr. Carpenter's alleged unlawful conduct as required by the MVRA. People die of cancer and heart attacks, but not because Mr. Carpenter allegedly failed to disclose something to the carriers on the applications he did not fill out. Importantly, it is indisputable that Mr. Carpenter never owned or controlled the policies; Christiana Bank, as the Insurance Trustee for the Charter Oak Trust, did for the benefit of Ridgewood. It is also undisputed that Ridgewood took over all of the policies in June of 2010. Mr. Carpenter was accused of being involved with fraudulent "STOLI policies" in the sealed search warrant of the May 26, 2011 raid. The only Charter Oak Trust insured that died prior to

that date was Sash Spencer, and Lincoln investigated his death for a year before paying the claim.  So, paying death claims is a part of the carriers' cost of doing business and has nothing to do with Mr. Carpenter's charged offense as he was never alleged to have been the proximate cause of any Insured's death as required by the MVRA.  If there is anything attributable to an "Act of God" under the law, it must be someone's death.

Therefore, based on Mr. Stern's actuarial analysis of how the Life Insurance industry works and how carriers make profits on most of their policies, Mr. Carpenter respectfully suggests that a better formula for the Court to adopt is to take away from Mr. Carpenter's account the administrative costs, reinsurance costs, and death benefits in the Government's calculations, and to credit to Mr. Carpenter $96 million paid in premiums rather than the Government's $78 million.  Then, take that number and subtract the $25 million paid out in commissions.

When the real numbers are calculated professionally and on an unbiased basis, the true total for the Charter Oak Trust policies is a profit to the carriers of $71 million; slightly less than the amount of profit that Attorney Brown calculated for the carriers in his letter of October 25, 2013 (see Exhibit Two), over five years ago.

With that said, based on the delay in this case of showing any loss to the carriers since the Government raided Mr. Carpenter's office in May 2011, this Court should not grant any restitution based on the Government's late claims and faulty calculations, as well as any amount of restitution that would provide the carriers with an excessive "windfall" as prohibited by both the MVRA and the Constitution.

### D.  **The Restitution Amount Sought Violates the Excessive Fines Clause**

Restitution is indisputably a component of a criminal defendant's punishment and the product of government action. Therefore, restitution, along with traditional criminal fines and forfeitures, falls within the scope of the Excessive Fines Clause of the Eighth Amendment. When testing for constitutionality, courts should aggregate all economic sanctions and then test for gross disproportionality between the total amount of the aggregated constitutional "fine" and the gravity of the defendant's offense conduct. Although certain guideposts may aid courts in the gross disproportionality inquiry, courts should not abdicate their decision-making duty by simply accepting legislatively prescribed ranges of appropriate punishment. Rather, judges should exercise their sound judgment in the matter.  In this case, it is constitutionally "inconsistent" to say Mr. Carpenter is too poor to pay a fine, yet is then burdened with $58 million in unproven losses because of the MVRA.

In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court provided guidance on how to measure "excessiveness" for criminal penalties under the Excessive Fines Clause. Hosep Bajakajian, pleaded guilty to one count of willfully failing to report that he was transporting more than $10,000 of currency out of the country. Customs inspectors had caught Bajakajian attempting to board an international flight with $357,144 on his person and in his checked baggage. Although the district court found that the currency was not otherwise connected to any unlawful activity, the entire amount was statutorily forfeitable because it was connected to his offense of failing to report. The district court found that forfeiture of the full amount would be grossly disproportionate to the offense conduct and instead ordered Bajakajian to forfeit $15,000 in addition to a fine of $5,000 and a probationary sentence of three years, which the Government appealed.

14

Reviewing its virtually non-existent Excessive Fines jurisprudence, the Supreme Court noted that it had "never actually applied" the Excessive Fines Clause. Citing *Browning-Ferris v. Kelco Disposal*, 492 U.S. 257 (1989) and *Austin v. United States*, 509 U.S. 602 (1993), the Supreme Court stated that the Clause limits the government's power to extract payments as punishment and found that punitive "forfeitures" fell within the Clause's scope. The Court rejected the government's argument that the currency forfeiture was remedial and noted that even if it were, it would still be punitive in part and thus within the Clause's purview.  The Court then addressed how to measure "excessiveness", stating that the principle of proportionality is the "touchstone" of the constitutional inquiry; the Court held that a forfeiture order violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." Applying this test, the Court found that a forfeiture of $357,144 would be grossly disproportional to Bajakajian's offense.

The Supreme Court's interpretation of the Excessive Fines Clause as a limit on "the government's power to extract payments, whether in cash or in kind, as punishment for some offense" *Bajakajian* at 328 (quoting *Austin* at 609–10), has created some disagreement among the lower courts regarding whether "restitution" falls within the scope of the Eighth Amendment. Under this test, the salient questions are whether a restitution order involves payment to the Government as a punishment. Many courts have since reached that conclusion, finding that the Excessive Fines Clause does apply to restitution orders because the prosecution of the offense constitutes sufficient governmental involvement and the purpose of the restitution order is at least partially punitive. Mr. Carpenter respectfully suggests to the Court that the Government's calculation of restitution in this case is solely to further punish Mr. Carpenter, and has nothing to

do with compensating any real victim for any actual loss in this case because none of the carriers lost any money due to Mr. Carpenter's personal conduct, unlawful or otherwise.

In *Bajakajian*, the binary inquiry of whether the money had a sufficiently close relationship to the offense conduct was not part of the constitutional analysis. The concept of "excessiveness" is inherently quantitative; "proportionality" is the key to the analysis. The same treatment should therefore apply to restitution orders. Restitution's causal question—whether the victim's loss resulted solely from the defendant's offense—is statutory, just like forfeiture's binary question—whether the asset had a sufficient nexus to the defendant's offense—is also statutory.  Recently, the Supreme Court decided the question of forfeitures unanimously in Mr. Carpenter's favor. *See Honeycutt v. United States*, 137 S.Ct. 1626 (2017). The relevant constitutional inquiry, however, is always quantitative under the Excessive Fines Clause: whether the amount of the criminal "penalty" or "fine" is excessive. As a check on governmental power, the Eighth Amendment places limits on the legislature's ability to punish excessively. Indeed, the Supreme Court did not resolve *Bajakajian* on the ground of whether the legislature authorized the forfeiture—that is, whether the $357,144 was an instrumentality of the offense of failing to report taking money out of the country. Rather, the Court offered its independent judgment about whether forfeiture of the full amount would be grossly disproportionate to the gravity of the offense. In *Bajakajian*, the Supreme Court recognized this principle and referenced the defendant's maximum sentence under the Guidelines as confirmation that he had "only a minimal level of culpability." *Bajakajian* at 338–39.

The understanding of restitution as at least partially punitive is in keeping with the Supreme Court's repeated statements that restitution serves a punitive function in response to prohibited conduct. The Court has emphasized that restitution constitutes an effort to "mete out

appropriate criminal punishment for [the offending] conduct", and that in doing so it serves the "penal and rehabilitative interests of the State."

In applying the gross disproportionality test, the *Bajakajian* Court focused on the offense seriousness side of the proportionality scale, examining the nature of the offense, the harm created by it, the defendant's culpability, and evidence of Congress' understanding of the offense's seriousness. The Supreme Court also hinted that on the other side of the proportionality scale—punishment severity—the financial effect on the defendant would be relevant. That question remained unresolved, however, as Mr. Bajakajian never raised that issue. Clearly, on an "excessive fine" of $58 million, that issue will be front and center in Mr. Carpenter's appeal. The Supreme Court in *Bajakajian* laid out five key principles that emerge from the "proportionality cases" of the Cruel and Unusual Punishments Clause from which the excessiveness test is borrowed: a desire for equality in sentencing; the need for comparative proportionality of sentencing based on offense seriousness; the importance of harnessing the expressive function of punishment; a concern for the potential criminogenic effect of, and other social harms created by, punishment; and a constraint that punishment not unreasonably undermine basic concepts of human dignity. An examination of those principles supports the conclusion that a defendant's financial condition is relevant to assessing the severity of punishment for use in weighing its proportionality, especially in determining an appropriate amount of restitution.

Moreover, in considering the "protections" offered by the Excessive Fines Clause, the Supreme Court has considered both the defendant's ability to pay, as well as the defendant's culpability. *See, e.g.*, *Enmund v. Florida*, 458 U.S. 782, 800 (1982) (considering the defendant's "culpability" including what his "intentions, expectations, and actions were"). Therefore, the Supreme Court has emphasized this same type of attention to "culpability" of the defendant and

gravity of the offense in the excessive fines context. *See, e.g., Bajakajian* at 334 ("The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."); *id.* at 337 n.12 (describing the crime as a one-time reporting offense and discounting falsehoods the defendant told about his actions).

Finally, in comparing Mr. Carpenter's restitution punishment to the defendants in *Lebovits-Neuman* and *Keller-Steinfeld* (who all pleaded guilty), there is no question that his restitution is far outside the acceptable range under the equality of sentences espoused by *Bajakajian*. The key question remains whether, once defendants are determined to be equally culpable, equality of punishment should be measured formally by dollar amount or substantively according to financial effect.

### E.  Restitution in this Case in Unconstitutional Based on *Southern Union*

There have been a number of scholarly articles written concerning the unconstitutionality of the MVRA after the Supreme Court's decision in *Southern Union v. United States*, 132 S.Ct. 2344 (2012), because its prior decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Jones v. United States*, 526 U.S. 227, 243 (1995) made it clear that the Due Process Clause of the Fifth Amendment combined with the Jury Trial Clause of the Sixth Amendment assured the defendant that an**y** fact that would increase a criminal penalty must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. *See Apprendi* at 490.  In this case, the amount of carrier losses or even the concept of "restitution" was not contained in either of Mr. Carpenter's indictments, presented to a jury (or the Court for that matter), and was certainly not proven beyond a reasonable doubt even at this late date.   Therefore, the Government's exceedingly late call for restitution here not only violates the provisions of the MVRA, it also

violates the Constitution based on the Supreme Court's decision in *Southern Union,* which is based on *Apprendi* and *Jones.*

Significantly, unlike the PSR in this case (which mentions no amount of restitution or list of victims), in *Southern Union* the PSR calculated a maximum fine of $38 million based on a fine of $50,000 per day for 762 days; each day for which Southern Union was in criminal violation of storing environmentally harmful waste pursuant to 42 U.S.C. §6928(d)(2)(A).  The First Circuit affirmed the district court's $600,000 fine and $12 million of "community service", but the reason the Supreme Court took the case was because of the Second Circuit's contrary decision in *United States v. Plaff*, 619 F.3d 172 (2d Cir. 2010), where the Second Circuit used *Apprendi* to vacate a criminal fine, not to justify it.  In reversing the First Circuit's decision in *Southern Union*, the Supreme Court held that *Apprendi* applies to **all** criminal sanctions.  *See Southern Union* at 2352.

The Supreme Court stated unequivocally that "our decisions broadly prohibit judicial fact-finding that increases maximum criminal sentences, penalties, or punishment – terms that each undeniably embrace fines."  *Southern Union* at 2350.  Mr. Carpenter respectfully suggests to the Court that if the $38 million listed in the PSR of *Southern Union* was unconstitutional, then clearly the $58 million that was **not** listed in Mr. Carpenter's Indictment or PSR will be equally unconstitutional.  Before *Southern Union*, the Supreme Court had already decided that "the purpose of awarding restitution [is] to mete out appropriate **criminal punishment** for that conduct."  *See Pasquantino v. United States*, 544 U.S. 349, 365 (2005) (emphasis added).  Since both "restitution" and "fines" are payable to the government, and "restitution" is clearly "criminal punishment," there is virtually no doubt after *Southern Union* that all courts will view "restitution" under the MVRA as an additional punishment and require that it is an amount to be

listed in the indictment and found by a jury beyond a reasonable doubt, and not by a judge by a preponderance of the evidence as part of the post-sentencing procedure.

**F.  The MVRA is Unconstitutional as applied to Mr. Carpenter**

The MVRA violates the Fifth as well as the Sixth and Eighth Amendments as to this defendant.  The Due Process Clause, in fact, guarantees all criminal defendants that the criminal statutes must operate on all defendants alike and not be subject to arbitrary or uneven exercises of power.  *See Caldwell v. Texas*, 137 U.S. 692 (1891).  Therefore, standards for the Court's decision-making must be reasonable and ascertainable.  In this case, Mr. Carpenter was accused of running a "STOLI ring" three years after the defendants in *Lebovits* and *Neuman* were indicted.  Yet while their alleged fraud was reduced from $500 million to $70,000; the Government here has gone from Mr. Carpenter having a "profit" of $24 million at trial (see Gov't. Ex. 11), to the carriers having an MVRA restitution loss of $58 million.  There is not a single exhibit that the Government presented at trial showing losses by any carrier, but after Mr. Carpenter testified that his company lost $74 million, the Government had to scramble to show that even if they could not prove any intended loss or even an actual loss on the part of the carriers, they could still use the fraudster's ill-gotten gains.  This outcome is specifically precluded by the Second Circuit's decision in *Zangari*.

Unfortunately for the Government, that is also directly contrary to the well-established law of the MVRA.  There are no rules of evidence and no rules of discovery. District courts have no choice but to proceed on an ad hoc basis to determine if there is a real victim of the defendant's conduct that had an actual loss. That has led to courts having been reversed for procedural or substantive errors despite their futile efforts to comply with the MVRA.  It was the understatement of the century when the Second Circuit said: "Congress's passage of the

[MVRA] in 1996 has introduced a touch of confusion into our caselaw." *See United States v. Harris*, 302 F.3d 72, 75 n.3 (2d Cir. 2002). The Second Circuit has concluded that Congress's intent was that "sentencing courts not become embroiled in intricate issues of proof," and thereby not protracting the sentencing process with complex calculations of loss so that the "process of determining an appropriate order of restitution be streamlined...Trial courts have employed their varying versions of streamlining." *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006).

Mr. Carpenter has not been treated the same as similarly situated defendants in this case, or in the handful of other STOLI cases across the country. Despite the fact that Ed Waesche and Charles Induddi-Westcott were on many of the applications, none of the victims' losses have been attributed to them as the MVRA requires. "The statute requires restitution to be based exclusively on *the losses that resulted from the defendant's crime*—not on the defendant's relative culpability." *Paroline* at 470 (emphasis in original). Even if the Government tried to suggest that §3663A(h) allows the Court to lump everyone else's loss onto Mr. Carpenter's account, that approach was taken by Justice Sotomayor and was specifically rejected by the rest of the Supreme Court in *Paroline*. *Paroline* at 465-66. In fact, as the Supreme Court stated, "Restitution orders should represent an application of law, not a decisionmaker's caprice, and the approach articulated above involves discretion and estimation." *Paroline* at 462, *citing Philip Morris USA v. Williams*, 549 U.S. 346, 352 (2007).

Therefore, to award any restitution in this case would violate the strict procedures outlined in the MVRA itself, the clear precedent of the Second Circuit and Supreme Court, and at least the Excessive Fines Clause of the Eighth Amendment as applied to Mr. Carpenter personally. As described by the Supreme Court in *Hughey, Bajakajian, Southern Union,*

*Paroline, Lagos,* and most recently by Justice Gorsuch and Justice Sotomayor in their dissent in

*Hester v. United States*, 139 S.Ct. 509 (2019):

> "If you're charged with a crime, the Sixth Amendment guarantees you the right to a jury trial. From this, it follows that the prosecutor must prove to a jury all of the facts legally necessary to support your term of incarceration. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Neither is this rule limited to prison time. If a court orders you to pay a fine to the government, a jury must also find all the facts necessary to justify that punishment too. *Southern Union Co. v. United States*, 567 U.S. 343 (2012). But what if instead the court orders you to pay restitution to victims? Must a jury find all the facts needed to justify a restitution order as well? That's the question presented in this case.

> This Court has held that the Sixth Amendment requires a jury to find any fact that triggers an increase in a defendant's "statutory maximum" sentence. *Apprendi* at 490. Seizing on this language, the government argues that the Sixth Amendment doesn't apply to restitution orders because the amount of restitution is dictated only by the extent of the victim's loss and thus has no "statutory maximum." But the government's argument misunderstands the teaching of our cases. In that sense, the statutory maximum for restitution is usually zero, because a court can't award any restitution without finding additional facts about the victim's loss. And just as a jury must find any facts necessary to authorize a steeper prison sentence or fine, it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order.

> But the Sixth Amendment's jury trial right expressly applies "[i]n all criminal prosecutions," and the government concedes that "restitution is imposed as part of a defendant's criminal conviction." *Ibid*. Federal statutes, too, describe restitution as a "penalty" imposed on the defendant as part of his criminal sentence, as do our cases. 18 U.S.C. §§3663(a)(1)(A), 3663A(a)(1), 3572(d)(1); *see Paroline v. United States*, 572 U.S. 434, 456 (2014); *Pasquantino v. United States*, 544 U.S. 349, 365 (2005). **Besides, if restitution really fell beyond the reach of the Sixth Amendment's protections in criminal prosecutions, we would then have to consider the Seventh Amendment and its independent protection of the right to a jury trial in civil cases.**

> If the government's arguments appear less than convincing, maybe it's because they're difficult to reconcile with the Constitution's original meaning. The Sixth Amendment was understood as preserving the "historical role of the jury at common law." *Southern Union* at 353. And as long ago as the time of Henry VIII, an English statute entitling victims to the restitution of stolen goods allowed courts to order the return only of those goods mentioned in the indictment and found stolen by a jury. In America, too, courts held that in prosecutions for larceny, the jury usually had to find the value of the stolen property before restitution to the victim could be ordered. And it's hard to see why the right to a jury trial should mean less to the people today than it did to those at the time of the Sixth and Seventh Amendments' adoption." *Hester* at 509 (internal citations omitted) (emphasis added).

## IV.    CONCLUSION

For these reasons as described above, Mr. Carpenter respectfully requests that the Court

deny the Government's Motion for Restitution .


THE DEFENDANT
DANIEL E. CARPENTER
By  /s/*Jonathan J. Einhor*n

Jonathan J. Einhorn, Esq.
Einhorn Law Offices
129 Whitney Avenue
New Haven, CT 06510
(203) 777-3777
einhornlawoffice@gmail.com
Fed Bar No 00163


## CERTIFICATION

I hereby certify that on this 8th day of February, 2019, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ *Jonathan J. Einhorn*
Jonathan J. Einhorn, Esq.
Attorney & Counselor at Law
129 Whitney Avenue
New Haven, CT. 06510
tel: 203-777-3777
einhornlawoffice@gmail.com