# EXHIBIT TWO

Letter from Attorney Brown to AUSA Novick
Dated October 25, 2013

## BROWN PAINDIRIS & SCOTT, LLP
Attorneys at Law

RICHARD R. BROWN
NICHOLAS PAINDIRIS
RONALD T. SCOTT
JOHN D. MAXWELL
KATE W. HAAKONSEN
SEAN M. PEOPLES
DAVID S. RINTOUL
J. LAWRENCE PRICE
DAVID K. JAFFE
SIMON J. LEBO
LOUIS W. FLYNN, JR.
BARRY F. ARMATA †
BRIDGET C. GALLAGHER
BRUCE E. NEWMAN•◻
W. ANTHONY STEVENS, JR. †
REGINA VON GOOTKIN
JODIE K. COMER
KRISTINA M. LENDA
CODY N. GUARNIERI

100 PEARL STREET

HARTFORD, CONNECTICUT 06103

(860) 522-3343

FAX (860) 522-2490

www.bpslawyers.com

2252 MAIN STREET
GLASTONBURY, CT 06033
(860) 659-0700
FAX (860) 652-4382

42 EAST HIGH STREET
EAST HAMPTON, CT 06424
(860) 267-2044

747 STAFFORD AVENUE
BRISTOL, CT 06010
(860) 589-4417

†ALSO ADMITTED IN MA
•ALSO ADMITTED IN NY
◻ALSO ADMITTED IN CA

October 25, 2013

A.U.S.A. David Novick
Office of the U.S. Attorney
157 Church Street
New Haven, CT 06510

**Re:** **Carpenter/Charter Oak Trust/
et al. Investigation**

Dear Attorney Novick:

    I am writing on behalf of Dan Carpenter. Thank you for the opportunity to meet and discuss the above captioned matter. I realize that this is not a simple matter; and that it is somewhat complex. I've tried to clarify facts that perhaps were not clear. Mr. Carpenter believed then (in 2007) and believes now that Charter Oak Trust was a legitimate welfare benefit plan, consistent with the rules of the Internal Revenue Code. Unlike other welfare benefit plans, COT offered no tax deductions. As a multiple employer welfare benefit trust, the Charter Oak Trust separated itself from those brokers using individual Irrevocable Life Insurance Trusts (ILIT) to engage in STOLI type life insurance transactions. You will notice that in *Binday* and *Fritsch*, the brokers were using individual ILITs with "hedge-fund" friendly trustees.

    As you will note from a review of the facts, the Charter Oak Trust was written in such a way as to <u>intentionally</u> preclude life polices from being sold to "strangers". In the forms signed by <u>ALL</u> insurance applicants, it was specifically stated that the policies would not/could not be sold to strangers (third party investors). In fact, the only person that could buy the policy was the Insured Participant or his family.

    The Charter Oak Trust owned the policy, paid the premiums and was the beneficiary of the life policies. As was discussed, there was no "third party interest" ever contemplated or created, and we now have the advantage of time, which revealed that

## BROWN PAINDIRIS & SCOTT, LLP

A.U.S.A. David Novick
October 25, 2013
Page 2

none of the 87 policies issued were sold to third parties. Ridgewood, unfortunately, because of severe losses suffered by COT and Grist Mill Capital (GMC), foreclosed on GMC. Additionally, there was no STOLI because the Charter Oak Trust, as a welfare benefit plan, had an automatic and unlimited insurable interest in the policy. There never was any intent to create a "life settlement" in the policy, and the policy could not be sold to anyone except the named insured. In fact, all of the COT documents prohibited life settlements.

Concerning the issue of fraud, we split the period in question into two segments; COT (2007-2008) and COT 2009 (COT 2009). In 2008, when insured Sash Spencer died, Lincoln initially refused to pay on the policy. It did so because the two year contestability period had yet to run and they wanted to thoroughly investigate the claim. It took them a year. GMC met with or had telephone conversations with individuals at the highest levels at Lincoln, including, we believe, Lincoln General Agent and OSJ (Office of Supervisory Jurisdiction) Fred Prelle, Eric Lanning, Corporate Attorney Ken Elder, Compliance Officer of Lincoln and several other attorneys, compliance officers and executive officers of Lincoln. A call occurred on April 23, 2009. Lincoln sought out the various standard documents used by COT with the insured during his application with COT. (See letter dated April 24, 2009 by Valerie Loftin, Chief Claims Officer, Lincoln.)

As a result of that inquiry, Wayne Bursey responded on April 27, 2009, and provided the requested documents. Obviously, Lincoln was looking for fraud, STOLI, or anything to avoid paying out on two policies amounting to $30,000,000. None were found. Eventually Lincoln paid the full amount on both policies. After all of this and notwithstanding Lincoln's policy decision not to write STOLI type of policies, they wrote approximately 15 more COT policies in 2009. Obviously, if Lincoln believed COT or Carpenter or GMC was acting fraudulently or if they thought the scrutinized policies were STOLI, no such policies would have been written. Since Lincoln wrote so many COT 2009 policies for 2009 they found no fraud; there was no STOLI. Moreover, if Lincoln thought that Fred Prelle, the OSJ and General Agent for Houston, or Robert Pacini, Lincoln's Agent of the Year for 2011, or Ken Grubb, another leading agent for Lincoln, were at the bottom of any fraud involving the Charter Oak Trust in 2009, then surely Lincoln would have fired them by now. The proof that there is no fraud in the Charter Oak Trust 2009 period is that Lincoln has not tried to rescind any of the policies and has not fired Mssrs. Prelle, Pacini or Grubb. Dan Carpenter's name is nowhere to be

## BROWN PAINDIRIS & SCOTT, LLP

A.U.S.A. David Novick
October 25, 2013
Page 3

found in any of the Charter Oak Trust applications; nor is his signature found on any of the applications. The government, we believe, searched Robert Pacini's office as well as the office of two attorneys that worked with Lincoln, Andrew Varner and Paul E. Martin, and took their Charter Oak Trust files as well. Since Lincoln has not fired or terminated the contracts of any of these people, it is safe to say that there is no fraud to be found in the Charter Oak Trust from January 1, 2009 to the end of the Charter Oak Trust on December 31, 2009.

For the time period of 2007 – 2008, we agree after a review of documents and events that apparently licensed agent Ken Landgaard and his cohorts across the country submitted fraudulent applications involving several policies we cited in our presentation, attached to this letter. Mr. Carpenter heard about the fraud after both Phoenix and Penn contested certain policies (not all the policies). Phoenix sued COT in 2010 and Penn Mutual sued in 2011. (Note: Later Penn Mutual also settled, realizing that they were wrong and paid COT $600,000; extremely unlikely if there was STOLI or fraud by Carpenter, et al.) As a result of these allegations in March of 2011, Dan Carpenter asked Ed Waesche to explain who Ken Landgaard was, who were his associates and how did they get involved with COT. (See Waesche's email to Carpenter dated 3/16/2011, attached.) Obviously, if Carpenter was involved with these frauds, there would be no need for him to have asked Mr. Waesche about these people. It should also be noted that in responding to Mr. Carpenter's inquiry, Mr. Waesche stated the following:

> "... **we relied on legitimate and substantive financial data to support the need for life insurance protection on their lives and that we did nothing wrong here, because we did not.**"

The vast majority of applicants of COT were people of substance that had their own businesses or were associated with viable businesses.

The application process involves the licensed agent to put together the "package" for the carriers from the applicant seeking insurance. It is their responsibility to truthfully and completely assist the applicant in filling out the forms. Additionally, these agents are required to submit a letter to the carriers vouching for the applicant and essentially confirming the facts. The licensed agents of Lincoln, Phoenix or whoever knew that the

## BROWN PAINDIRIS & SCOTT, LLP

A.U.S.A. David Novick
October 25, 2013
Page 4

carriers <u>and</u> COT and GMC would be relying on their truthfulness in processing the application and deciding whether to issue a policy on their behalf. It was absolutely not in COT's or GMC's interest to provide life insurance and pay the premiums if the insureds at the end of the two-three year period are not in a position to purchase the policy. Mr. Carpenter in the cases of fraud lost a lot of money. If there was any fraud here, Mr. Carpenter, GMC, and COT were the victims of the fraud; not the Insureds and certainly not the Carriers.

Additionally, the process requires the carrier to do its due diligence in checking out the applicants. We know that these carriers sent out warnings to its agents and others to look out for STOLI; look out for those applicants 70 years of age and older seeking $2,000,000 or more of life insurance. Mr. Carpenter, COT, GMC and others (Ridgewood, which gave GMC a Line of Credit of $35,000,000 for 2007 and 2008) expected at a minimum that the carrier (Lincoln, Phoenix, Penn) as part of the insurance carrier underwriting process to run a credit check as well as the required <u>personal history interview</u> with each and every applicant and issue an "Inspection Report". (See enclosed sample type of report.) The report is specifically looking for fraud. Had Lincoln, Phoenix actually done their respective jobs, it is extremely unlikely that the fraud would not have been discovered. Their failure to do their job cost Carpenter, GMC, COT and even Ridgewood millions of dollars.

One of the claims relative to STOLI is that it involves "premium financing" a recognized phrase within the insurance industry. First "premium financing" is not illegal. All the carriers have been involved with premium financing for decades. It requires a financial institution, like A.I. Credit or Credit Suisse, taking, a secured interest in the policy <u>and</u> charging interest. When such institutions are involved in STOLI, they set up a trust, have a "friendly trustee" and have the right to sell the policy to a stranger, usually a hedge fund or a bank.

However, contrasted to premium financing, the Charter Oak Trust, as the owner of the policies, was involved with "Split Dollar Life Insurance", consistent with Treasury Regulation Section 1.61-22. Life insurance companies also deal with this type of financing all the time. With Split-Dollar, one has an arrangement between an owner of the life insurance contract (COT) and a non-owner (GMC) under which either party to the arrangement pays all or part of the premiums and one of the parties (GMC) who pays the

BROWN PAINDIRIS & SCOTT, LLP

A.U.S.A. David Novick
October 25, 2013
Page 5

premium is entitled to recover those premiums and the recovery is secured by the proceeds of the contract. This is exactly what the arrangement was and that is why Mr. Carpenter, COT, et al did not and do not believe there was premium financing. Please remember the real issue with the carrier wasn't the method of payment but rather whether they were dealing with STOLI-in disguise, and the interest of someone without an insurable interest owning the policy. In the instant matter, only people, entities, with an insurable interest owned or could own the policy under the Charter Oak Trust.

Finally, there is the issue of intent. As stated all through this entire process Carpenter and others all believed that they were providing a legitimate product free of STOLI and certainly free of the stain of fraud. COT and GMC wrote the contracts with the insureds to specifically prohibit STOLI. (Please review the standard agreement conditions the insured was required to agree to and they did.) Some might claim, "Oh this is a ruse; Carpenter did this to get STOLI type insurance policies." Of course, the reason one would do this is to sell the policies to investors without an insurable interest, "strangers". This is clearly contradicted by several indisputable facts. First, each COT and GMC agreement with the insured contained clear "anti-STOLI" terms and conditions. Second, the contract signed by the insured made clear that the only person who could buy the policy was the insured, who obviously was not a "stranger" to the insurance policy, and who clearly had an insurable interest. Third, Mr. Carpenter was not the Trustee of the Charter Oak Trust, Wayne Bursey was. But, neither Mr. Bursey nor Mr. Carpenter could do anything without the permission of the Insurance Trustee, which was Christiana Bank. Nor could they fund anything without the approval of the Custodial Trustee, PNC Bank. Both Christiana and PNC Bank took their marching orders from the staff of Ridgewood, which had to approve each of the policies as well. Presumably, you are not planning on indicting Christiana Bank, PNC Bank, or Ridgewood. Indicting Mr. Carpenter for fraud, it is respectfully submitted, is not justified, when clearly under the terms of the documents, they themselves had to answer to the aforementioned higher authorities.

Finally, while there was arguably a STOLI market in 2007 and part of 2008, the STOLI market – if it existed – disappeared in its entirety in 2008 with the collapse of the financial market (e.g. – AIG, Bear Stearns, Lehman Brothers, etc.) Yet, even in the midst of the darkest part of the financial crisis in 2009, when there was no secondary market for life insurance policies, Mr. Carpenter, et al were involved with financing over two dozen

## BROWN PAINDIRIS & SCOTT, LLP

A.U.S.A. David Novick
October 25, 2013
Page 6

policies, virtually all with Lincoln, at great expense to GMC and Mr. Carpenter's other companies. This simple fact totally contradicts any theory to sell "life settlements" to strangers (as opposed to only the insureds). Unfortunately, the only ones to make money out of all of this were the so-called "victims", the carriers. Mr. Carpenter believes from the records (see tables in the attached documents) that the Carriers not only suffered no loss but actually made in excess of 90 million dollars, while Mr. Carpenter and the related businesses lost in excess of 70 million dollars. The insureds, including those that committed fraud, had the valuable benefit of two years or more of millions of dollars of free death benefits.

   Please review the attached documents. If you have any questions, please do not hesitate to call me. Thank you.

                Sincerely,

                Richard R. Brown

RRB:dwr

Enclosures

cc: Daniel Carpenter (w/o enc.)
   A.U.S.A. Eric Glover (w/enc.)
   A.U.S.A. Michael Gustafson (w/enc.)
   Patrick Egan, Esq. (w/enc.)
   Daniel LaBelle (w/enc.)
   William F. Dow, Esq. (w/enc.)
   A. Markowitz, Esq. (w/enc.)