# EXHIBIT THREE

**Larry N. Stern Declaration and Report**

United States of America ("Government") v Daniel Carpenter ("Defendant") Case 3:13 CR 226 (RNC), United States District Court for District of Connecticut

I, Larry N. Stern, FSA, MAAA, declare as follows:

## INTRODUCTION

Counsel for Defendant has retained me to analyze, evaluate, and render my opinions, based on accepted actuarial principles, and on my knowledge of life insurance industry practice and experience as part of (and consulting to) life insurance company managements, issues and actions related to the appropriateness of the Government's calculations for restitution in the above referenced litigation.

My analysis and opinions are based on the information produced to date by Counsel. I reserve the right to supplement and amend my analysis and opinions, as additional information is available.

## BACKGROUND AND QUALIFICATIONS

I am President of Canterbury Consulting, LLC, an actuarial consulting firm and licensed reinsurance intermediary in Charlotte, North Carolina.

I earned a B.S. degree with honors and distinction from Indiana University School of Business in 1971. I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. A copy of my curriculum vitae summarizing my background and experiences is attached to this report as Exhibit A.

I have held numerous actuarial positions over the course of my career. For twenty years, I worked at three separate direct writing insurance companies, last serving for eight years as a Senior Vice President and Chief Actuary. I worked for nine years at a global management and actuarial consulting firm serving as a Principal and Consultant and as the firm's practice leader for product development of life insurance and annuity products. For two years I worked at an international reinsurance company serving as Executive Vice President and Group Head, Financial Solutions. And for the last sixteen years I have served as President of Canterbury Consulting, LLC.

Based on my prior professional experience, I am very familiar with universal life insurance products including the type of products at issue in this litigation. As a practicing actuary,

- I have designed, developed, and priced many universal life policies for life insurance companies at which I was employed and for life insurance companies for which I was a consultant.
- I have drafted or contributed to the drafting of many universal life policy forms.
- I have provided product specification documentation for these policies to IT

1

departments within these companies.
- I have been directly responsible for evaluating, negotiating, and executing reinsurance agreements affecting universal life products.
- I have participated in discussions relating to how universal life policies are underwritten for new business and reinstatement purposes, and how they are administered by customer service departments.

I have been engaged as an expert in several insurance industry-related litigation matters.  These engagements have involved:

- Reviewing cost of insurance (COI) rate increases on blocks of universal life policies which were not in accordance with policy form language;
- Determining the value of an agent's/agency's book of business;
- Reviewing a dispute involving a declined insured's claim to reinstatement policies with a former insurance company;
- Reviewing a dispute involving a life insurance company's incorrect administration of IRC §7702/ §7702A compliance;
- Reviewing a dispute involving the termination of two second-to-die universal life policies at attained age 100 instead of extending the maturity date; and
- Reviewing disputes between direct writing insurance companies, reinsurers, and retrocessionnaires (reinsurers of reinsurers).

## SCOPE OF ENGAGEMENT

I have reviewed the documents produced to date by Counsel, as well as other materials available from other sources.  These documents are listed in Exhibit B attached to this report.

I am not an attorney, and I am not rendering any opinions concerning any legal issues raised.  I understand the Court will decide all issues of law relating to the Government's claims and any defenses asserted by the Defendant.

I have been engaged to analyze, evaluate, and render my opinions, based on accepted actuarial principles, and on my knowledge of life insurance industry practice and experience as part of (and consulting to) life insurance company managements, issues and actions related to the appropriateness of the Government's calculations for restitution in the above referenced litigation.

I reserve the right to modify or supplement the opinions set forth in this declaration based on the receipt of additional information.

## SUMMARY OF OPINIONS

I, Larry N. Stern, President of Canterbury Consulting, LLC., am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

Based on my analysis of the information I have considered, based on accepted

actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, I have formed the following opinions relating to the Government's calculations for restitution:

- The Government's loss calculations do not follow actuarial principles
- The Government's loss calculations do not reflect how insurance companies develop profits or losses
- The Government's loss calculation assumptions are based on false premises, including
  - Companies have suffered losses and should quit the insurance business
  - Affected companies cannot adjust costs after suffering losses
  - Stranger Owned Life Insurance ("STOLI") policies will be kept in force until the death of the insured
- The affected insurance companies do not appear to have suffered losses
  - They continue to collect premiums, pay death benefits, receive reinsurance reimbursement, *etc.*
  - They have not asked for any restitution
- The Government's loss calculations do not show the amount of recovered death proceeds the insurance companies have received from their respective reinsurers. It appears each and every policy in the Trust was reinsured. Therefore, it was clearly erroneous for the Government not to take into account the proceeds received from the reinsurers
- The Government's loss calculations attribute to the Defendant the costs of doing business for the insurance companies. These are expenses included in the determination of the appropriate premium rate paid by the policyholder. It makes no sense to attribute to the Defendant the cost of doing business for a modern life insurance company.
- The Government's loss calculations are based on the false premise once an insurance company issues a policy it cannot be void for fraud or, in the alternative, the company cannot adjust the cost of the policy on a unilateral basis. Both of these theories of the Government are patently erroneous as:
  - I am aware of litigation in which the insurance company has voided an insurance policy for fraud after the two-year incontestability period, and
  - I have been involved in litigation where the insurance company has raised cost of insurance rates on a unilateral basis

## THE BUSINESS OF LIFE INSURANCE

Life insurance companies are in business to make a profit by assuming the risk of premature death, accumulating assets, and deploying capital for societal needs. Insurance companies use actuaries to calculate the estimated actual costs to them of providing someone with insurance coverage by assessing certain risks; one of these risks is mortality. Actuaries can be viewed as the mathematicians for insurance companies. They study the risks assumed by the companies when issuing insurance policies and prepare financial projections based on those risks. The actuaries employed – directly or engaged – by a life insurance company design, develop, and price life insurance policies issued by life insurance companies.

Every life insurance policy is a contract – a long-term contract.  It's essentially an agreement between a policyholder and a company, if the policyholder pays his/her premiums, the insurance company will pay a sum of money (the face amount or the death benefit) to a beneficiary if the insured dies while the policy is in force. Alternatively, if the policyholder wishes to discontinue paying premiums and the policy has accumulated a cash value; the policyholder can receive the cash value by surrendering the policy (at which point the policy coverage terminates).

## LIFE INSURANCE POLICY PRICING

The cost of providing insurance to an individual is not based on the specific person's mortality risk.  It is impossible to predict exactly when any one individual will die. Actuaries make calculations based on the concept of the "law of large numbers". The average life expectancy is based on certain age, gender, and risk classification characteristics.  Actuaries use data in the aggregate to establish premium rates for certain "buckets" of policyholders – in essence, these "buckets" are "pricing cells". When someone buys a policy, they are given a pre-determined premium rate (cost for the insurance) for each year based on the "bucket" into which they fall.

*The Premium Rate.*   The premium rate established by the actuaries in pricing policies must cover two primary contingent costs:

- Claim costs – for life insurance, death benefits when the insured dies and/or cash values when the policies are surrendered with positive cash value
- Issue and administrative maintenance cost – all other costs of doing business

Since life insurance is a long-term contract, it is impossible to predict exactly when any one individual will die, and the pattern of insurance costs does not match the pattern of premium receipts, companies must set aside a portion of each premium received as a reserve to meet future claim obligations.  The amount of reserve is determined by formula and is regulated (uniformly) by each state insurance commissioner.  Each premium can be subdivided into component parts:

- Claim costs
- Reserve increases/decreases
- Commissions
- Other expenses (underwriting, issue, administrative, taxes, company overhead, etc)
- Profit

*Profit Objectives.*   As noted above, "profit" is a component of *each* premium. Policies are priced not with regard to any one individual, but each policy makes its anticipated contribution to the profitability of the company.  Life insurance company management defines desirable levels of acceptable profit.  Actuaries translate profit objectives into pricing metrics.  The complexities of the insurance business, the long-term nature of the business, and the impact of accounting and reserving standards on the emergence of profit have generated a number of pricing metrics.

4

*Pricing Metrics.*   It is widely known companies incur high first year expenses (acquisition costs) when issuing a policy.  In most instances these expenses exceed the amount of premium received.  The excess is "borrowed" from surplus, referred to as "new business strain".   In renewal years the "profit" component of the premium replenishes surplus, thereafter making a positive contribution to the profitability of the company.   Actuaries must take this into consideration when pricing policies to make sure the premiums charged adequately meet company profit objectives – actuaries use pricing metrics as a means to measure various aspects of premium adequacy.  The most common forms of pricing metrics used by actuaries with regard to life insurance policies include the following:

- "Internal Rate of Return (IRR) – defined as the *discount* rate at which the present value of distributable earnings is equal to zero; or the present value of future contribution to *free* surplus equals the initial outlay.  This may be the most widely used metric generally tied to the equity return objectives of the company.     A typical IRR measure in today's economic environment may be expressed in the range 8% - 10% for universal life policies.
- Profit Margin (PM) – defined as the ratio of present value of profits to present value of premiums.  Profits can be pre-tax or after-tax, with the discount rate defined accordingly.   This is another widely used metric providing an economic view of profit, independent of capital and reserve methodology.  For policies with little to no new business strain, PM is a good alternative to IRR.   A typical PM measure in today's economic environment may be expressed in the range 3% - 5% for universal life policies.
- Break-Even Year (BEY) – defined as the first year when the accumulated cash flows exceed the reserve (or cash value) and subsequently remain positive.  This correlates to the year in which the contribution to surplus has adequately replenished the new business strain from surplus.  A year-by-year analysis can provide valuable insight into how quickly the acquisition costs are recovered.  This is a widely used metric for policies where there is a significant risk of early lapses, such as policies with exceptionally high acquisition costs.  BEY is usually considered a supplement to IRR and PM.  A typical BEY measure in today's economic environment may be expressed in the range 5 – 7 years from date of issue for universal life policies."[1]

*Pricing Assumptions.*  Actuaries when pricing the policies make assumptions about anticipated future experience considering the characteristics of the individuals who are expected to buy policies.   The principal "pricing assumptions" include the following:

- Mortality (probabilities of dying)
- Investment income (insurance companies accumulate assets when policyholders pay premiums in excess of the yearly mortality and expense costs; insurance companies earn investment income from these accumulations)
- Persistency (probabilities of how many policyholders and for how long they will continue to pay premiums to keep the policies in force)

- Expenses (commissions, issue/maintenance, overhead, taxes, etc.)
- Contribution to risk-based capital ("assigned" portion of surplus to cover risks associated with doing business, as distinguished from "free" surplus)

*Mortality*.   Different segments of the population exhibit different patterns of mortality as evidenced by health, socio-economics, education, etc. Actuaries study and analyze mortality experience of these different characteristics.  When pricing life insurance policies, "life insurance mortality statistics" are the basis for the mortality pricing assumption.   When a company decides it wants to market a particular policy it determines which group of individuals will be most likely to buy it.  The actuaries must consider this group of potential insureds when determining the appropriate mortality assumption.  For example, a policy designed to provide insurance to older individuals ages 70 and above with face amounts in excess of $1,000,000 to meet ultimate estate tax needs would be expected to exhibit a different pattern of mortality than a policy designed to provide insurance to younger individuals ages 30 – 55 with face amounts less than $500,000 to meet income replacement needs.

*Investment Income*.   Whole life and term policies require policyholders to pay a level premium for the duration of the coverage.  Universal life policies provide the policyholder the opportunity to pay additional premiums in excess of the monthly deductions.  With whole life and universal life (excess premiums) the policyholder accumulates a cash value.  These amounts contribute to the reserves the company must hold.

Insurance companies earn investment income on the funds deposited with them. Actuaries must be aware of the company's investment strategy – most likely in bonds or mortgages, which match up to the long-term nature of the insurance policies – and the current investment yield rates to be earned on these investments.   Policyholders paying premiums in excess of the cost of their insurance protection demonstrate a trust the insurance companies will use the deposited funds to meet the needs of society – such as, capital for corporations to manufacture goods and services, mortgages for homes and businesses, governments to protect the interests of citizens, etc.

*Persistency*.  It is widely known not every life insurance policy bought will be held until a death benefit is paid.  Just as with mortality risks, different segments of the population exhibit different patterns of how long a policyholder will continue to keep the policy in force – some for short periods, some for long periods, some until the death benefit is paid.  The length of time is closely aligned with the need for life insurance coverage, and similar "mortality-like" characteristics (health, socio-economics, education, etc.).  For example, older individuals wanting the insurance proceeds to cover estate taxes at their death may keep the policies in force for a long period of time.   Younger individuals may want the insurance for a finite number – 10 or 20 – of years.  Actuaries must take into consideration the potential group of individuals who will buy the policies and their "buying" characteristics. Just as with mortality, actuaries study and analyze persistency experience of these different groups of individuals.

*Expenses.* The policy premium must cover the expenses incurred by the company to be in business. This involves all expenses and are broken down into four main categories:

- Percent of premium – commissions paid to the agents and other marketing expenses, which can be related to the amount of premium paid by policyholders
- Per $1,000 of face amount – underwriting expenses, which vary with the amount of the death benefit; more medical/financial/personal information is required to be submitted with applications for higher death benefits and by older individuals
- Per policy – issue and maintenance expenses, which are, or are close to, the same for any policy regardless of the death benefit or the amount of premiums paid
- Taxes – as with all United States businesses, insurance companies are subject to paying Federal Income Taxes. As an insurance company they are also subject to paying regulatory fees and taxes.

Actuaries must take into consideration how expenses are to be apportioned to policies to be sure in the aggregate each policy contributes sufficiently to cover its fair share of the expenses incurred by the company.

*Contribution to Risk-Based Capital.* A portion of the company's surplus is to be held as "assigned" for risks of doing business assumed by the company, which are not otherwise priced for in the policies. This "assigned" surplus is required by regulators (and rating agencies) and is used for evaluating the performance and financial stability of the company. The amount of risk-based capital is determined by formula, expressed as a ratio (RBC ratio), with certain benchmarks. If the company's RBC ratio falls below a specified level, it is an indication the company may be in financial difficulty, and may have issues with continuing in business, requiring intervention from regulators. Actuaries must take this into consideration, and allow for policy pricing to maintain "safe" RBC ratios.

*Reinsurance.* The role of reinsurance is important in understanding how much mortality risk of each policy the company is willing to assume. As noted, it is impossible to predict exactly when any one individual will die. It is possible for an individual to buy a life insurance policy and within a few years after issue die unexpectedly. The payment of an earlier-than-anticipated death claim may have significant impact on the financial condition of the insurance company, especially if the death benefit is for a very high face amount. Even if the policy has been in force for a long period of time, the payment of the death benefit may have significant impact on the financial condition of the company if the death benefit is for a very high face amount.

The "true" cost to the insurance company when a death claim occurs is not the face amount (or death benefit) even though the check paid to the beneficiary is the full amount. Remember the insurance company holds a reserve (as required by

7

regulators) for each policy.  This reserve is part of the full payment.  Therefore, the "true" cost is the difference between the face amount and the reserve – commonly referred to as the Net Amount at Risk (NAR).

The insurance company uses current year cash flows and/or free surplus funds to cover the cost of the NAR.  Since there is a limit to the amount of surplus, it stands to reason there is a limit on the amount an insurance company can afford to pay for each death claim.  Actuaries analyze a company's mortality experience, anticipated future mortality experience, and reserves to determine a safe level of how much the company can afford to pay on each death claim.  This establishes the maximum portion of a policy's death benefit risk the company will assume – referred to as the retention limit.

For policies issued with face amounts above the retention limit, the company buys "insurance" from another company referred to as a reinsurer.  The transaction is referred to as reinsurance.  Reinsurers assume excess mortality risk for which they charge a premium, paid by the insurance company (referred to as the ceding company) issuing the policy.  When a death claim occurs, the reinsurer reimburses the ceding company for the portion of the death benefit the reinsurer has assumed.  For example, assume the company's retention limit is $1,000,000:

- For all policies it issues with a face amount equal to or less than $1,000,000, the company assumes all the risk.  When a death occurs, the company pays the entire death benefit.
- For all policies it issues with a face amount in excess of $1,000,000, the company assumes its retention limit of risk, and a reinsurer (or a group of reinsurers) assumes the excess risk.  If, for example, the policy has a face amount of $10,000,000 the ceding company buys $9,000,000 of insurance from the reinsurer(s) and pays premiums each year for this reinsurance.  When a death occurs, the ceding company pays the entire $10,000,000 death benefit to the beneficiary and receives reimbursement for $9,000,000 from the reinsurer(s).

## ACTUARIES PRICE POLICIES IN THE SAME MANNER AS INSURANCE COMPANIES DEVELOP PROFITS AND LOSSES

As noted above, life insurance companies are in business to make a profit by assuming the risk of premature death, the accumulation of assets, and the deployment of capital for societal needs.  The process of accounting for this is as follows for each policy year:

- (+) Receive premiums paid by policyholders
- (+) Earn investment income on accumulated assets and premiums in excess of expenses
- (-) Pay policy expenses

- ▪ (-) Pay cash values (if positive) to policyholders lapsing policies
- ▪ (-) Pay death benefits
  - ○ (-) Pay premium to reinsurer for in force policy death benefits in excess of retention
  - ○ (+) Receive reimbursement for death claims in excess of retention
- ▪ (+ or -) Change in reserves (this may be positive or negative depending on the face amounts of policies in force each year and the change in the total reserves held for in force policies)
- ▪ (=) Net Income (before taxes)
- ▪ (-) Pay Federal Income Taxes on net income
- ▪ (=) Net Income (after taxes)
- ▪ (-) Make contribution to risk-based capital (a portion of Net Income after taxes is apportioned to assigned surplus)
- ▪ (=) Distributable Earnings

Actuaries follow this progression in a pricing simulation of cash flows called a profit projection.  The year-by-year figures for Net Income (before and after taxes) as well as Distributable Earnings provide a picture of the pattern of profits by duration, which may be positive or negative (and is expected to be negative for the first few years).   Usually the pricing simulation is prepared over a 25-year or 30-year "pricing horizon".   The actuaries compare the results to the profit objectives:

- ▪ The first year in which the Net Income or Distributable Earning figures are positive (and remain positive) indicates the Break-Even Year (BEY)
- ▪ Using a discount interest rate, calculating the present value of the Net Income and/or Distributable Earnings compared to the present value of Premiums produces the Profit Margin (PM)
- ▪ The calculated discount rate at which the initial duration "new business strain" (Net Income or Distributable earnings – and generally a negative number), compared to the stream of Net Income or Distributable Earnings in renewal years (a stream that may include a negative number but for the most part is made up of positive numbers) equates to zero produces the Internal Rate of Return (IRR)

To the extent the resulting profit metrics do not compare favorably to the company profit objectives, the actuaries know to change the premium (up or down) and/or adjust some of the assumptions.  The pricing simulation continues in iterations until such time as the actuaries are comfortable the policy pricing is adequate to meet the company objectives.  In addition, the actuaries vary assumptions slightly to measure the impact of variations on future profitability – recall the assumptions are the best estimate of anticipated future experience.   There is no guarantee conditions will remain constant – especially over a 25-year or 30-year period.

Actuaries use this same cash flow projection simulation methodology when tasked with evaluating a block of business.  Cash flow projections generate the present value of future profits based on assumptions actuaries select to represent the characteristics of the individuals insured by the policies in question.

## UNIVERSAL LIFE INSURANCE

The types of insurance policies at issue in this litigation are Universal Life policies. Up until the late 1970's, life insurance companies sold primarily two types of life insurance products – term and whole life.  Term life insurance is issued for a specified period of years, does not build significant cash value, and expires without value at the end of the specified term.  Whole life insurance is permanent insurance issued for the life of the insured and accumulates a cash value.  Premiums for both types of life insurance are fixed during the entire time the policy remains in force.

During the 1970's and 1980's, interest rates and the stock market indices in the United States spiked upward.  The interest rates credited within whole life insurance products became unattractive compared to alternative investment opportunities. As a consequence, many consumers began purchasing less expensive term insurance and invested the premium savings to take advantage of higher returns available through investment products.

Universal life insurance is a hybrid product designed to provide the permanency of death protection (through a stated face amount of coverage) together with a separate savings component (through an accumulation account earning credited interest).  In a sense, universal life became the life insurance industry's answer to "buy term and invest the difference" all contained in one policy.  Premiums paid under a universal life policy are flexible in amount and, when paid, are deposited into the savings component ("accumulation account") from which a cost of insurance ("COI") and expense charge is withdrawn monthly (together the monthly deduction).

Universal life policies state the company may charge COI rates up to a maximum rate for each attained age (based on an industry regulatory mortality table).  The company may charge a COI rate *less* than the guarantee and has the right to adjust this rate based on future expectations for cost factors.  The policies state the company must credit a minimum guaranteed interest rate to the accumulated account.  The company may credit an interest rate *higher* than the minimum and has the right to adjust this rate based on current (and future) economic conditions.

Consistent with these principles, I presume the actuaries for the insurance companies involved in this litigation designed, priced, and developed the policies at issue in this litigation in accordance with sound actuarial principles and actuarial standards of performance, and within regulatory guidelines.

## PRICING NON-STOLI AND STOLI POLICIES

Assumptions made by actuaries when pricing policies resemble the characteristics of the individuals who will buy the policies. When the policies in this litigation were priced, perhaps it was not widely anticipated the policies would become STOLI or life settlement policies. The assumptions made by the actuaries would reflect the general population of individuals who normally buy the insurance companies' policies. Assumptions pertaining to mortality, lapse, and premium payment amount would be reflective of these general populations. If the policies were designed to meet the needs of estate planning purposes (i.e. high face amounts), most likely the policyholder would be a trust, and premiums would be paid until the insureds died; low lapse rates might be assumed.

On the other hand, STOLI policy characteristics would point to older insureds with higher face amounts; policies that could be expected to remain in force for the anticipated life expectancy of the insured; premium payment amounts that would be expected to be the minimum amount required to keep the policy in force but not necessarily to the death of the insured. Hedge funds often become third-party owners of STOLI policies. The hedge fund contemplates paying premiums for the life expectancy of the insured. The policy may lapse at the point the hedge fund realizes the insured has lived or is likely to live past their life expectancy. If a company chose to design and price policies for this market, the actuaries would definitely select the appropriate assumptions reflective of the anticipated experience; higher lapse rates than those for estate planning purposes might be assumed.

## FROM AN ACTUARIAL PERSPECTIVE THE GOVERNMENT'S LOSS CALCULATION METHODOLOGY AND LOGIC IS FLAWED

The Government's actual loss calculations for restitution are based on the formula approved by the Second Circuit in United States v Binday, 804 F.3rd 558, 595 (2nd Cir 2015). The court adopted this loss calculation finding it was "a reasonable estimate of the loss given the available information."[2] ("Binday") I am not aware of what "available information" the Government possessed at the time it made the calculations; however, the method and logic of the calculations is flawed – it does not follow actuarial principles and standards of practice when evaluating blocks of life insurance policies and it does not represent how insurance companies make money.

"The Government has reviewed the Charter Oak Trust ("COT") policies and contacted the various companies to obtain information in an effort to provide a best estimate of what will likely happen with the remaining policies. Based on this review it is highly unlikely that any of the six carriers listed above will receive a windfall."[3] The six companies identified are:

- ANICO (American National)
- AXA
- Lincoln

- MetLife
- Penn Mutual
- Transamerica

In all there were 84 universal life policies issued by the six companies.  Sixty-six policies terminated because of death (7), lapse (51), or other reason (8).  Eighteen policies remain active in force.  The Government's "other" category should be added to the lapse category, because there were four rescinded Penn Mutual policies and Penn Mutual retained $600,000 in premium.  There are four other rescinded Phoenix policies, and Phoenix has not refunded any of the premiums – these policies are still the subject of litigation.  Therefore, a truer tally is 59 policies have lapsed, and there was a policy in the process of lapsing, which means over two-thirds of the 84 policies have lapsed.

I have not had the opportunity to review any pricing or other discovery documents produced by the companies involved in this litigation.  If one accepts the premise life insurance companies are in business to make a profit by assuming the risk of premature death, the accumulation of assets, and the deployment capital for societal needs, I have to believe the actuaries for each of the companies priced the policies in accordance with actuarial principles and standards of practice following the procedure as outlined in the discussion above.

Based on my analysis of the information I have considered; based on accepted actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, the Government's actual loss calculations for restitution do not follow actuarial principles.

### FROM AN ACTUARIAL PERSPECTIVE THE GOVERNMENT'S LOSS CALCULATION METHOLODOGY AND LOGIC DOES NOT REFLECT HOW INSURANCE COMPANIES DEVELOP PROFITS OR LOSSES

In following the Binday formula, the Government indicates "the actual loss calculation was based on death benefits, commissions, and fees paid or incurred by the carriers on the policies that were terminated because of death, lapse, or other reason, minus premiums collected by the carriers on the policies.  For active policies the Government counted the commissions paid, but in accordance with Binday, did not attempt to speculate what the ultimate loss or gain would be depending on when the insured died…while there may be active policies that become profitable, most of the active policies will be unprofitable."

The Government in using the Binday formula takes into consideration only some of the pricing factors.  I am not aware what information the Government requested from the insurance companies – presumably only the factors required by the Binday formula.   I am not aware whom the Government engaged to make the loss calculations.  However, if an actuary had been involved, I have to presume all of the appropriate pricing factors would have been requested; the calculations would be in accordance with actuarial principles and standards of practice.  Furthermore,

if the insurance companies were totally aware of the need/purpose for "information" they should have questioned why only some of the factors were requested and not all.

By examination of "Original Government Calculations in its Sentencing Memorandum of 2018 Exhibit 355-1", I note there are columns for "Fees*" and "Reinsurance**". The footnotes reference:

- *Fees* - "Fees generally include costs to originate and administer the policies, including salaries, premium tax and overhead". There is no specific breakdown of the "Fees" – does it include all costs to originate (marketing and underwriting, etc) and administer (policyholder service, accounting, etc)? Does it include all taxes? These fees represent the costs of doing business as an insurance company for which a premium is charged to adequately cover the expenses.
- *Reinsurance* – "Only counted in cases where there was no death claim and reinsurance credit". As noted above reinsurance mitigates risk and protects company surplus. Death claims in excess of the retention are reimbursed. The Government calculations do not show the amount of death benefits the insurance companies received from their respective reinsurers; it appears each and every policy in the COT was reinsured. Therefore, it was clearly erroneous for the Government not to include the proceeds received from the reinsurer.

The "Commissions" column does not reflect whether charge-back of first year commissions was assessed if the policy lapsed in the first two years. It is a usual practice to require agents to reimburse the company for this expense should they sell a policy which subsequently results in an early lapse.

There are no columns reflecting reserves or the change in reserves from one year to the next. When reserves increase, the financial statement effect from the change in reserves is an expense; when reserves decrease, the financial statement effect from the change in reserves is a negative expense. When a death benefit is paid the NAR is paid from free surplus and the policy's reserve is released. When a policy is surrendered, the cash value (which is equal to or less than the full reserve) is paid and the reserve is released. Therefore, the "true" cost of death benefits is really less than the face amount; there is no additional cost for cash value surrenders as the cash value is part of the reserve. The Binday formula does not take these nuances of how an insurance company makes money into consideration.

Based on my analysis of the information I have considered; based on accepted actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, by not taking into considerations all pricing factors, the Government's actual loss calculations for restitution do not reflect how insurance companies make money.

### FROM AN ACTUARIAL PERSPECTIVE THE GOVERNMENT'S LOSS CALCULATION METHOLODOGY AND LOGIC ARE BASED ON FALSE PREMISES

The use of the Binday formula leads the Government to conclude these insurance companies should immediately cease doing business and not issue any more policies – whether STOLI or otherwise.  The Government suggests these insurance companies lose money when an insured dies early, lives too long, or lapses the policy; the suggestion is even if the policy stays active and the insured does not die, the companies will lose money in every situation.

As noted above, insurance companies are in business to make money; actuaries price policies to meet company profitability objectives.    Actuaries make assumptions about future anticipated experience.  There is no guarantee the actual experience unfolds exactly as the actuaries assume.  Because the nature of the initial cost to issue a policy causes the company new business strain, in renewal years this is repaid - "even if someone dies in the first year (or a policy lapses), that is not a fraud loss, but a cost of doing business.  You have the individual who pays one premium and dies six months later.  You have a lot of money on that policy but we don't consider that a loss...[T]hat's the benefit of insurance because there's another 900 people who paid a premium who didn't die."[4]

By indicating all remaining policies are unprofitable, the Government implies once the insurance company issues a policy, it cannot be void for fraud or, in the alternative, the company cannot adjust the cost of the policy on a unilateral basis. Both of these theories by the Government are patently erroneous as:

- I am aware of litigation in which insurance companies have voided an insurance policy for fraud after the two-year incontestability period, and
- I have been involved in litigation where the insurance company has raised cost of insurance rates on a unilateral basis

As noted above, the nature of universal life policies permits the insurance company to adjust the cost of insurance (subject to a maximum) and credited interest (subject to a minimum) in accordance with policy form language.    These adjustments can be (and are being) made as long as anticipated future experience deviates significantly from what was assumed in pricing.  Companies cannot recoup losses but are permitted to re-price for future profitability to prospectively return (or come close to) what the company expected when the policies were priced. Adjustments have to be applied to all policies on a uniform basis – they cannot be applied just to certain policies.  Cost of insurance and credited interest has been adjusted by many of the companies involved in this litigation.

The Government implies all hedge fund policyholders of STOLI policies will pay the minimum premium to keep the policy in force until the death of the insured.[5]   Third party investors, of which hedge funds are included, purchase polices assuming the insured will live a limited number of years – the anticipated life expectancy. Premiums will be paid to keep the policy in force.  However, if the insured lives longer then the anticipated life expectancy, the third party investor may lapse the

policy.  Of the 84 policies issued by insurance companies, two-thirds of them have lapsed.  Very few death benefits have been paid.  Essentially, the insureds lived too long.

It should be noted from the review of sentencing memorandum in both U S v Moses Neuman (Case 1:11-cr-00134-SJ) Document 196 and U S v Chaim Lebovits, U S Attorney Loretta E. Lynch recommended a significant reduction in the Government's loss calculations for restitution primarily based on the lapse assumption differential.

Based on my analysis of the information I have considered; based on accepted actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, the Government's actual loss calculations for restitution are based on false premises.

## THE AFFECTED INSURANCE COMPANIES DO NOT APPEAR TO HAVE SUFFERED LOSSES

Judge Chatigny's instruction to the Government with regard to restitution requested, "I would like the government to submit a memo that provides me with the government's best estimate of what the active policies are likely to mean for the companies when all is said and done.  I'm not looking for expert testimony…but I want to do what I can to avoid what might be called a windfall…based on some kind of general probability analysis."[6]

In response to Judge Chatigny, the Government states, "Given the age of the insureds, the short remaining life expectancies, and the lack of any lapses in the last five years, the probability that any of these active policies will lapse is close to zero.  It is not likely that investors, who have paid premiums to keep these policies in force, will let these policies lapse as long as they remain profitable [profitable to the investors].  From the investor's perspective, the death benefit will exceed the premiums paid for several more years for all policies but one MetLife policy.  Thus, it is more probable that the carriers will pay a death benefit on all of these active policies, which will result in an even greater actual loss to the carriers, except of MetLife…with the exception of MetLife, it is unlikely that the active policies will result in a windfall to the carriers."[7]

Notice, in both Judge Chatigny's and the Government's statements, they indicate there should not be a windfall to the insurance companies.  Neither acknowledges the possibility of a loss, just not a windfall.  There are several definitions of "windfall", all implying the same meaning; following are two examples:

- Merriam-Webster Dictionary – an unexpected, unrelated, or sudden gain or advantage
- Black's Law Dictionary – an unanticipated benefit, usually in the form of a profit and not caused by the recipient

Neither of these definitions implies there could be a loss.  The affected insurance companies in this litigation do not appear to have suffered losses:

- They continue to collect premiums and will be expected to pay death benefits if the insureds die or pay cash values if the policies are surrendered with positive cash values
- They have not filed any restitution claims in their own right

The Government document reviewed, Case 3:13-cr-0026-RNC Document 335-1 displays the status of all 84 policies – whether they lapsed, resulted in a death, or are active.  This document does not indicate the date of issue or the date of lapse/death.  It cannot be determined from this information for the in-active policies whether they are past the BEY.

However, for the active policies, listed in the Government document reviewed, Case 3:13-cr-0026-RNC Document 423-1, the dates of issue indicate all policies are past the BEY (beyond the normal 5-7 year period as discussed above).  Being beyond the BEY would imply the companies have replenished the new business strain from issuing the policies and are well on the way to earning the anticipated pricing profit.

All the policies are reinsured.  The ceding companies are paying premiums to the reinsurers.  To the extent any of the active policies results in a death claim, the ceding companies will be fully reimbursed for the portion of the death benefit assumed by the reinsurers.  If the policies remain in force, ultimately terminating when a death benefit is paid, the continuing premium payments will provide additional revenues to the insurance companies.

Considering the small block of 84 policies, if every one of the insureds had died, or if all the policies had lapsed without any deaths, it is clear this isolated block of business would have had virtually no financial impact on any of the companies involved in this litigation.  To direct restitution to the insurance companies would constitute a significant gain, in other words a windfall.

The Binday formula is not a probability analysis – no present values are calculated; no mortality or lapse assumptions are used.  Although the Judge's instruction was not to look for expert testimony, it is clear an expert, *an actuary*, should have been involved to determine the appropriateness of the Government's actual loss calculations for restitution.

Based on my analysis of the information I have considered; based on accepted actuarial principles, and based on my knowledge of life insurance industry practice and experience as a part of (and consulting to) life insurance company managements, the affected companies do not appear to have suffered losses.  Therefore, it would be inappropriate to attribute erroneous loss calculations for restitution to the Defendant.

I declare under penalty of perjury the foregoing is true and correct.  Executed this 29th day of January 2019 at Charlotte, North Carolina.

Larry N. Stern, FSA, MAAA

Footnote references:
1. Society of Actuaries, LIFE PRICING STUDY NOTE "LIFE INSURANCE COSTING AND RISK ANALYSIS", June 2008, pp 19-22
2. U.S. v Binday, 804 F.3[rd] 558, 595 (2nd Cir 2015) pp 595-600
3. Government Restitution Memorandum Case 3:13-cr-00226-RNC Document 423, p 3
4. U.S. v Binday, 804 F.3[rd] 558, 595 (2nd Cir 2015) pp 596-597
5. Government's Alleged "Evils" of STOLI in Carpenter Superseding Indictment, pp 1-2
6. Judge Chatigny's Statement at Sentencing, Vol II p 190
7. Government Restitution Memorandum Case 3:13-cr-00226-RNC Document 423, pp 4-5



# LARRY N. STERN, FSA, MAAA
**5719 Old Well House Road**
**Charlotte, NC 28226**
**704 904 8204**
**lstern@canterburyconsultingllc.com**

**Education:**
> Indiana University - Bloomington, Indiana
> B. S. Business with Honors and Distinction, 1971
> Beta Gamma Sigma Business Scholastic Honorary

Insurance Industry Recognition:
> Fellow Society of Actuaries, 1983
> Member American Academy of Actuaries, 1980.

**Employment History:**

October 2002 – Present:
> Canterbury Consulting, LLC (CCL)

> President

> Responsible for securing reinsurance assignments from client companies to solve balance sheet financial needs through reinsurance and capital formation. Provide ad hoc actuarial consulting services and expert witness testimony for client litigation support.

> Here is a list of some recent engagements in which CCL has actively participated:

- Secure for a UK ceding company client a suitable reinsurance partner for the assumption of a large payout annuity block of in-force business (£450 mil reserve value)
  - CCL is assisting another UK ceding company client to secure a similar reinsurance partner for a large payout annuity block of in-force business (£700 mil reserve value)
- Secure for a U S ceding company client reinsurance on new business variable annuity production (base contract and living benefit riders). Initially, this reinsurance cover was for a 5% quota share with one reinsurer; within three years CCL was instrumental in creating a pool of three reinsurers wherein 45% of new business was reinsured

1

- CCL is pursuing a similar reinsurance structure on behalf of several other US ceding company clients for their variable annuity in-force and new business living benefit riders
- Secure for a U S corporate client reinsurance of term insurance redundant reserves (XXX) for two subsidiaries with an offshore reinsurer.
- Assist and direct client activities to form an onshore/offshore captive reinsurance subsidiary for reinsurance of term insurance redundant reserves and secure long-term LOC financing (for two clients)
- Perform the duties of Appointed Actuary for several Bermuda based insurers/reinsurers
- Secure for a U S ceding company client risk-based capital relief involving a $1.2 bil in-force block of deferred annuities.
- Provide consulting actuarial services for a U S life insurance client to develop cash flow testing projections
- Provide actuarial services as a consulting/testifying expert witness in several insurance/reinsurance-related litigations

August 2000 – September 2002:
 Scottish Annuity & Life Holdings

 Executive Vice President and Group Head, Financial Solutions
 Grand Cayman Location (August 2000 – January 2001)
 Charlotte, NC Location (February 2001 – December 2001)

 Direct responsibility for the business and financial results of the financial reinsurance line of business for the Scottish Annuity & Life Holdings group of companies.  From August 2001 to December 2001 Chief Corporate Actuary - oversight of all actuarial functions enterprise-wide.  Serves as a member of top management's team for strategy planning and implementation.

 President, Scottish Solutions (January 2002 – September 2002)

 This was a newly formed reinsurance intermediary subsidiary.  Responsible for securing reinsurance assignments from client companies to solve balance sheet financial needs through reinsurance and capital formation.

March 1991 – July 2000:
 Tillinghast - Towers Perrin

 Principal and Consulting Actuary
 Hartford, CT (March 1991 – December 1995)
 Indianapolis, IN (January 1996 – July 2000)

 Practice leader in product development and specialized in areas of marketing and corporate management strategy; interest-sensitive, variable and traditional life insurance and annuity product development; structured settlements; cash flow and financial projection analysis; and expert witness testimony for client

litigation support.  Served as an approved actuary for several Bermuda and Isle of Mann life insurance and reinsurance companies.

March 1983 - March 1991:
United Presidential Life Insurance Company
Kokomo, IN

Senior Vice President and Chief Actuary

Responsible for all facets of actuarial work for the company, and actively participated in underwriting and reinsurance functions. Served as a member of top management's team for strategy planning and implementation.  As a member of the company's investment committee, contributed in decisions to establish investment choices and setting interest-crediting rates for interest-sensitive products.

March 1981 - March 1983:
Durham Life Insurance Company
Raleigh, NC

Associate Actuary, Individual Product Development

June 1971 - March 1981:
State Life Insurance Company
Indianapolis, IN

Various actuarial positions beginning with Actuarial Student to Assistant Actuary and Manager of the Actuarial Department

Insurance Industry related activities:
- Served as Chairperson of the Society of Actuaries Product Development Section November 2000 – October 2001;
- Served as Chairperson of the Society of Actuaries Entrepreneurial Actuaries Section November 2009 – October 2010;
- Served as Chairperson of the Society of Actuaries Reinsurance Section November 2010 – October 2011;
- Served as Chairperson of Society of Actuaries Nominating Committee November 2013 – 2014;
- Served as Chairperson of the American Academy of Actuaries Reinsurance Subcommittee January 2011 – December 2011.

A frequent speaker at industry meetings and seminars and has authored many articles appearing in the National Underwriter, Best's Review, Loma Resource, and Society of Actuaries periodicals.

3

University related activities:

- Queens University (Charlotte) Entrepreneur Leadership Circle – an invitation only group of 50 local entrepreneurs who assist students in the McColl School of Business; mentoring two graduate students
- University of North Carolina, Charlotte (UNCC) - acting as an informal advisor to risk management/finance/economics students as mentor and guest speaker
- University of California, Santa Barbara – member of the advisory board for the Center for Financial Mathematics and Actuarial Research
- Columbia University – assisting in the planning for a soon to be created graduate program in risk management studies
- Indiana University Alumni Association, Charlotte Chapter – board member and chair of scholarship committee

4

| Exhibit B |
| --- |
| |
| Documents reviewed in preparation of Larry N Stern report dated Jan 28, 2019 |
| 1. Society of Actuaries, LIFE PRICING STUDY NOTE "LIFE INSURANCE COSTING AND RISK ANALYSIS", June 2008 |
| 2. Government Restitution Memorandum, Case 3:13-cr-00226-RNC Document 423 |
| 3. Government Restitution Extension, Case 3:13-cr-00226-RNC Document 420 |
| 4. Judge Chatigny's Statement at Sentencing, There Should be no "Windfall for the Carriers" |
| 5. Government's Alleged "Evils of STOLI" in Carpenter Superseding Indictment |
| 6. Original Government Calculations in its Sentencing Memorandum of 2018, Case 3:13-cr-00226-RNC Document 355-1 |
| 7. Charter Oak Trust Comparison of Government Numbers, Exhibit 5 Revised |
| 8. Charter Oak Trust Audited Version, COT Numbers v LA Numbers |
| 9. Charter Oak Trust Calculations of the 18 Active Policies using the Government's Numbers, Case 3:13-cr-00226-RNC Document 423-1 |
| 10. Lebovits *New York Post* Article stating it was a $500 Million Scheme, February 4, 2011 |
| 11. Neuman Sentencing Memorandum, January 17, 2014, Case 1:11-cr-00134-SJ Document 196 |
| 12. Lebovits Sentencing Memorandum, April 9, 2015, Case 1:11-cr-00134-SJ-SMG Document 300 |
| 13. *United States v Quatrella*, Second Circuit Opinion, United States v Quatrella, 722 Fed. Appx. 64 (2018) |
| 14. Government *Wall Street Journal* Article Submitted in *United States v Quatrella*, United States v Quatrella, 722 Fed. Appx. 64 (2018) |
| 15. U.S. v Binday Cite as 804 F.3rd 558 (2nd Cir. 2015) |