1                    UNITED STATES DISTRICT COURT

2

3               FOR THE DISTRICT OF CONNECTICUT

4

5    – – – – – – – – – – – – – – – x
                                  :
6    UNITED STATES OF AMERICA      :   No.  3:13CR226(RNC)
                                  :
7              vs.                 :
                                  :
8    DANIEL CARPENTER, ET AL,      :
                                  :   HARTFORD, CONNECTICUT
9                  Defendants.     :   February 16, 2016
                                  :
10   – – – – – – – – – – – – – – – x

11

12

13                        BENCH TRIAL
                          VOLUME I

14

15

16        BEFORE:

17              HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22

23

24                            Darlene A. Warner, RDR–CRR
                              Official Court Reporter
25

1
　　APPEARANCES:
2

3　　　　FOR THE GOVERNMENT:

4　　　　　　U.S. ATTORNEY'S OFFICE-NH
　　　　　　157 Church Street
5　　　　　　P.O. Box 1824; 23rd Floor
　　　　　　New Haven, Connecticut 06510.
6　　　　　　BY:  DAVID E. NOVICK, AUSA
　　　　　　　　NEERAJ PATEL, AUSA
7
　　　　FOR DAVID CARPENTER:
8
　　　　　　BROWN, PAINDIRIS & SCOTT
9　　　　　　100 Pearl Street, 2nd Floor
　　　　　　Hartford, Connecticut 06103
10　　　　　BY:  RICHARD R. BROWN, ESQ.
　　　　　　　　CODY N. GUARNIERI, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          TABLE OF CONTENTS

3

4   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

5

6

7   STEFAN JOHN CHERNESKI

8    BY MR. NOVICK:        63

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          9:31 A.M.

2

3              THE COURT:  Good morning.  This is the Carpenter

4    case.  Would you please state your appearances for the

5    record.

6              MR. NOVICK:  For the government, David Novick

7    and Neeraj Patel.  Also at counsel table is Special Agent

8    Lynn Allen, Department of Labor.

9              Good morning, Your Honor.

10             MR. BROWN:  Good morning, Your Honor, Attorney

11   Richard Brown representing Dan Carpenter, who is present

12   in the courtroom; and also Cody Guarnieri, an attorney in

13   my office who is an assistant in this matter.

14             THE COURT:  Good morning.

15             MR. BROWN:  Good morning, Your Honor.

16             THE COURT:  We are here to begin the trial.

17   There are some matters that I think we need to address at

18   the threshold.

19             One is Mr. Carpenter's waiver of his right to a

20   jury trial.

21             MR. BROWN:  Yes, Your Honor.  I've discussed

22   this with counsel for the government.  We both agree, Your

23   Honor, we would want the Court to inquire, Your Honor,

24   though I would state for the record that, prior to today's

25   proceedings, at least on two different occasions I visited

1    my client, discussed the -- what I would consider the

2    serious decision as to whether or not to try this case

3    before a jury of 12 so-called peers and/or to try it to a

4    bench trial, that is to try it to the Court.

5              I'm fully satisfied that he understands what his

6    constitutional right is, and I'm satisfied from our

7    conversation that he believes it is in his best interest

8    to try it to the Court.

9              And I would also note, Your Honor, that as a

10   result of that, I prepared and filed, I believe, with the

11   Court a waiver of the right to a jury trial.  But it's

12   been some time, Your Honor, since that document was filed,

13   and so I would ask the Court to inquire, Your Honor, to

14   include whether or not he still wants to proceed with the

15   Court trial.

16              THE COURT:  All right.

17              Good morning, sir.

18              THE DEFENDANT:  Good morning, Your Honor.

19              THE COURT:  I do think that it is incumbent on

20   me to be sure that your decision to waive your right to a

21   jury trial is a decision that you have made knowingly and

22   voluntarily after full and appropriate consultation with

23   your counsel.  So in that context, let me address first

24   whether the decision is fairly found to be a knowing

25   decision.

1          Do you understand that you do have a

2    constitutional right to a jury trial?

3               THE DEFENDANT:  Yes, sir.

4               THE COURT:  Mr. Carpenter, you are a lawyer, is

5    that right?

6               THE DEFENDANT:  An attorney by background; yes,

7    sir.

8               THE COURT:  Have you ever represented a client

9    at a jury trial?

10              THE DEFENDANT:  No.  I was a tax attorney by

11   background, Your Honor.

12              THE COURT:  All right.  It's my understanding

13   that you have been a defendant in a previous criminal case

14   tried to a jury?

15              THE DEFENDANT:  Absolutely, Your Honor.  I had

16   two absolutely terrible nightmarish experiences in Boston,

17   where I saw that no matter how well the trial was going,

18   the government gets to speak last, and they can basically

19   say anything they want during that rebuttal, and I really

20   felt I was the victim of egregious prosecutorial

21   misconduct.

22              THE COURT:  Okay.  If you want to consult

23   privately, I'll give you that opportunity; if not, I can

24   proceed.

25              It's up to you, Mr. Brown.

1          MR. BROWN:  No, Your Honor, I just wanted to

2      make sure it was either a yes-or-no answer.

3          THE COURT:  Mr. Carpenter, please understand

4      that if you want to consult privately with Mr. Brown, I'll

5      give you that opportunity now and at any point during this

6      case.

7          THE DEFENDANT:  Thank you, Your Honor.

8          THE COURT:  All you need to do is ask, and I'll

9      be happy to accommodate you, okay?

10          THE DEFENDANT:  Thank you, sir.

11          THE COURT:  I inquired about your trial

12      experience because I want to be sure you understand that,

13      as a party, you have a right to participate in the

14      selection of the jury; you understand that?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  And the law would give you an

17      opportunity to challenge members of the jury pool for

18      cause.

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  And you would also have a certain

21      number of so-called peremptory challenges entitling you to

22      strike a person from the jury pool without having to give

23      an answer to the judge as to why you were making that

24      strike.

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  In this way, the process aims to

2     screen out people who could not judge the case fairly and

3     impartially; you understand that?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Indeed, under the law, a person may

6     not be seated as a juror unless the Court is satisfied

7     that he or she can judge the case fairly and impartially

8     based solely on the evidence presented, not on anything

9     else --

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  -- and in accordance with the

12    applicable law.

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Okay.  There are a number of

15    articles reporting on studies of jury decision-making

16    which claim to show that, in fact, the decision of the

17    jury of 12 is likely to be better than the decision of one

18    person.  These studies reflect that 12 minds taking pains

19    to review evidence with due care are apt to touch all of

20    the relevant pieces of evidence, and further that

21    12 people deliberating with regard to the import of the

22    evidence are apt to come to a fully reasoned conclusion in

23    a way that one person sitting alone cannot.

24         I have no reason to disagree with those studies.

25    It's been my experience that jurors do a very good job,

1    and I think that the size of the jury matters.  I think

2    that 12 people are apt to do a better job than one person.

3              Have you given that consideration?

4              THE DEFENDANT:  Yes, Your Honor.  Unfortunately,

5    my experience was much different than the study that you

6    just described.

7              THE COURT:  All right.  It appears to me that

8    you are knowledgeable with regard to your right to a jury

9    trial.  Let me be sure that your decision is voluntary.

10             Has anybody pressured you to get you to waive

11   your right to a jury trial?

12             THE DEFENDANT:  No, Your Honor.  Everybody's

13   been very up front and very knowledgeable, just like Your

14   Honor, in describing the advantages of a jury trial.

15             THE COURT:  Okay.  So you have made a reasoned

16   decision that you think is in your best interest in the

17   circumstances?

18             THE DEFENDANT:  Absolutely, Your Honor.

19             THE COURT:  And you would rather have the case

20   decided by the Court than a jury?

21             THE DEFENDANT:  Absolutely, Your Honor.

22             THE COURT:  You're satisfied that your counsel

23   have given this matter sufficient attention?

24             THE DEFENDANT:  I think he's done an excellent

25   job.

1        THE COURT:  Thank you.  Please be seated.

2        Is that canvass sufficient, as far as the

3    government is concerned?

4        MR. NOVICK:  Yes, Your Honor.

5        THE COURT:  Thank you.

6        Is it sufficient from the defense standpoint,

7    Mr. Brown?

8        MR. BROWN:  Yes, Your Honor.

9        THE COURT:  All right.  Then I will accept

10   Mr. Carpenter's waiver of his right to a jury trial.  I do

11   request that the waiver be done in writing so that the

12   record is clear, and we should have Mr. Carpenter sign and

13   date a written waiver, okay?

14       MR. BROWN:  We'll have that for you on Thursday,

15   Your Honor.

16       THE COURT:  That's fine.

17       Going on to the next item on my list, there is

18   some question about where Mr. Carpenter will be housed

19   during the trial.  It's my understanding that

20   Mr. Carpenter is currently serving a sentence for which he

21   might be eligible for release from confinement in the

22   custody of the BOP on the basis of the amount of time he's

23   served to date.

24       Is that your understanding, Mr. Brown?

25       MR. BROWN:  Well, Your Honor, release from

1    custody's kind of a broad statement.

2            The way I see it, Your Honor, is the fact that,

3    first of all, the Court is correct that my client is, in

4    fact, serving a sentence out of the District of

5    Massachusetts; that his present discharge date, Your

6    Honor, I think both parties agree, is on or about

7    January 26, 2017, which is, of course, less than a year.

8            As a result of that, from the Bureau of Prisons'

9    point of view, that makes him eligible to have confinement

10   other than in a camp or prison itself, as I understand it,

11   Your Honor.

12           And as I see it, Your Honor, there's two

13   different things that the Bureau of Prisons does when it

14   becomes short of the sentence.  One is to integrate them

15   back into the community by putting him in a halfway house

16   such as, I'm not sure we still have it, not the one on

17   Jefferson Street, but in the Hartford area, and there's

18   also one in the Waterbury area, I believe; and the other

19   concept, of course, Your Honor, is home confinement, as

20   two alternatives.

21           What complicates this matter, as I see it, a

22   little bit is the fact that normally this kind of thing is

23   addressed when a person is incarcerated and is doing his

24   sentence and petitions for a modification of the place of

25   confinement.

1        This case is complicated because, up until a few

2   weeks ago, my client was at the federal correctional

3   facility in Canaan, the camp -- there's also a prison in

4   the same town, in Canaan.  But he's been at the camp, I

5   think, since his original sentence started in June

6   of 2014; received a three-year sentence, Your Honor, out

7   of the District of Massachusetts; and commenced his

8   sentence in June of 2014; and I might add, since that

9   period of time, to the best of my knowledge, I believe

10  without incident, no tickets or disciplinary action taken

11  against him.  And he's there on the least secured facility

12  that they have at that particular institution.

13        But what complicates the matters a little bit,

14  Your Honor, is that -- as I understand it, is that the

15  Marshal's Office -- on the direction of the government, as

16  they're required to do at some point -- transported him

17  from Canaan, Pennsylvania, to in this case Wyatt, down in

18  Central Falls, Rhode Island.  Wyatt is a contracted -- has

19  a contractual relationship with the Bureau of Prisons.

20        And as I went through the various federal

21  statutes, and also the FCR, Your Honor, I determined that

22  it appears to me that there's a distinction between those

23  cases in which the defendant, the petitioner in that case

24  is petitioning from a federal correctional facility and,

25  believe it or not, petitioning from something else such as

1    being in the custody of the U.S. Marshals.  They're at

2    this point, as I see it, responsible for him.

3            I took it upon myself to talk to the acting U.S.

4    Marshal down in New Haven, I think it was, last week or

5    maybe the week before, and I asked him about it from the

6    U.S. Marshals' perspective.

7            And what he told me was that he believed it was

8    his job at the end of this trial to return my client to

9    Canaan, that is to the facility from which they took him

10   that date that they are responsible for him.

11           The U.S. Marshals Office believe that it was

12   appropriate to put him in a physical contracted facility,

13   specifically Wyatt, they do house a good number of federal

14   inmates.

15           On occasion, Your Honor, the U.S. Marshals

16   Office sometimes -- because of concerns, one particular

17   inmate near another inmate -- use and contract with the

18   various facilities here in Connecticut, including of

19   course the one in Hartford, but also, Your Honor, other

20   facilities in the Suffield-Enfield area and this general

21   area.

22           In my reading of the U.S. Code and the CFR, I

23   pointed out to the Court, Your Honor, that I believe that

24   the code and the statutes distinguish between an inmate

25   who is presently in custody of the Bureau of Prisons and

1    somebody who is under the custody of the U.S. Marshals.

2    So that's why it's a little bit different, and that's why

3    the sections that I cited are different than if he was

4    doing his time, for example, in Danbury, and they were

5    just going down there every day and picking him up.

6            So as best as I can understand it, Your Honor,

7    that this Court -- I mean I guess judges have the power to

8    do whatever they want but -- seems that way sometimes, but

9    at any rate, Your Honor, it seems my interpretation is

10   that the marshals are permitted to furlough someone for up

11   to 30 days if, among the various purposes, one is to

12   attend trial, appear for the trial and attend a trial.

13   And I think I pointed that out in my brief, that section.

14           But while it's up to the Marshals to do that or

15   not do that, it appears from the regulations that they

16   cannot do it unless there is a request by the appropriate

17   authority, in this case the Court, to recommend to the

18   U.S. Marshals that they release him or otherwise change

19   the facility, for example, to a halfway house.

20           The reason, Your Honor -- and I have to be

21   honest, I don't normally make this type of request and, as

22   counsel I'm sure will point out, that there are other

23   people that have had trials before this very Court that,

24   on a daily basis, are transported from Wyatt, and I would

25   just put on the record, Your Honor, Wyatt correctional

1    facility, I mean the facility located in Central Falls

2    Rhode Island -- having gone down there myself on many

3    occasions, that the average time is an hour and

4    45 minutes, maybe a little less if it's a nice day -- that

5    it's roughly 90-something miles from this facility.  My

6    client this morning, as it happened a week ago when he was

7    inadvertently brought up here, that they get him up

8    4:00 in the morning.  They at some point provide him with

9    food.  He's housed with other inmates in a separate area.

10   He's separated from where he would normally rest.  And

11   then sometime after 6 a.m., they have some sort of

12   breakfast.  They had conflicts this morning.

13            They then shackle him and transport him, in this

14   case, right up to Hartford.  Sometimes they might go to

15   New Haven first.  In this case they came to Hartford.  I

16   don't know what the general policy is, for which one they

17   go to first, but it's possible he can go to another

18   facility depending on the demands of the Marshal's Office

19   and the inmates of that particular day.

20            And then ultimately he gets up here and is

21   locked in the Marshals office here.  And at the conclusion

22   of the day, I'm sure the Court is aware, at some point

23   he's re-shackled, and then put into a van, and then driven

24   another 90 miles back to the facility at Wyatt.  From

25   apparently what the government has checked out, he's given

1    a sandwich or something that -- something to eat when he

2    gets back to that facility.

3            Assuming those things are accurate, obviously it

4    doesn't permit my client to have much opportunity to

5    discuss the day's affairs with his attorney or to help

6    prepare for the next day.

7            What I'm concerned about, Your Honor, is if this

8    was a three- or four- or five-day trial, suck it up, why

9    should you be treated any differently; not that they're

10   necessarily treated great, but that's the way it is.

11           In this case it's different because counsel for

12   the government has alerted the Court, in response to an

13   inquiry by this Court, that its estimate is approximately

14   20 trial days.  Now, maybe it won't turn out to be that

15   many, he's not locked into that date, but I'm sure he gave

16   a good-faith belief at the time he answered the question

17   as to how long this trial is.

18           So that's approximately four weeks, Your Honor.

19   And if every day you're dragged in shackles 90-miles two

20   ways, supposed to get some sleep, get up at 4:00 in the

21   morning, I submit, Your Honor, that his ability, as is his

22   constitutional right to assist counsel, is in my mind

23   greatly diminished over the long term.

24           Now, in this particular case, what also

25   separates it from many other cases is, there's another

1     complicating factor, I guess, although I believe helpful

2     factor.  And that is prior to -- my client was indicted

3     December of 2013.  And as a result of that, Your Honor, he

4     was presented to the Court, and he was released on bond.

5     And that bond was secured by property of his wife, who is

6     present, his daughter who is present, their houses.

7          And what that means, Your Honor, is if he were

8     to take off or commit a crime while out on bond, that

9     these people -- who love him and trust him and know him a

10    lot better than you and I do -- would be subject to

11    forfeiture of their property.  Nevertheless they put it

12    up, Your Honor.

13         And from the time of his indictment and

14    subsequent superseding indictment, up until June of 2014,

15    whenever he was required to come to court, he came to

16    court, was required to report to the probation.  As far as

17    I'm concerned, he complied with each and every term of his

18    pretrial release.  There's no evidence, by the way, that

19    he suffers from a drug addiction.  There's no evidence

20    that he's ever engaged in a violent act.  And even the

21    prosecutor, I believe, in his reply brief as to why this

22    Court should not grant it, noted, I believe -- counsel,

23    for the record, if I mischaracterize his response -- that

24    they don't perceive that he constitutes a risk to society

25    in terms of, if he were out on bond during the course of

1    this trial.

2            Nor do they argue, I believe, that if he were

3    out on bond that he would flee the jurisdiction.

4    Obviously the Court's concern, that's a significant

5    concern.  He's facing additional time in prison.  But

6    truthfully, he's known that since the day he was indicted.

7            But there's absolutely no evidence.  His whole

8    family is here in Connecticut, his life is in Connecticut,

9    essentially a lifelong resident of Connecticut, and he

10   loves this area and has no interest in going anywhere

11   else.  So I think even the government concedes that.

12           It appears to be more of an argument of perhaps

13   the Court's authority to do so, but I'll let counsel speak

14   to their side.

15           I believe, Your Honor, that if the laws of this

16   country did not want Mr. Carpenter to be out on furlough,

17   and I think he's earned it to his good behavior, then they

18   easily could have made that -- either the Bureau of

19   Prisons could have made that regulation or rule or what

20   have you.

21           But it appears to the contrary, Your Honor.  In

22   the brief cited by the -- I'm sorry.  In the statute cited

23   by the government, Your Honor, in a footnote on page 3 of

24   the brief, they cite 18 3142 Subsection I, which I did not

25   cite.

1          What's interesting about that section, Your

2    Honor, I don't think it's necessarily applicable in this

3    particular case, but what it says is that the Congress, in

4    their infinite wisdom, has considered the concept of

5    people being out while they're facing trial.  No matter

6    what happens to him in this trial, Your Honor, it's going

7    to be a life-altering situation, Your Honor, one way or

8    the other, good or bad.

9          And what the statute says, Your Honor, is that

10   here's a situation in which the Court may, if it deems it

11   appropriate, provide for a furlough.  And the sections

12   that I cite in my brief, it says the same thing, we just

13   get down to basics, and that is:  Not under all

14   circumstances but under some circumstances it is

15   appropriate for this Court to allow a person to be out,

16   Plan B is at some kind of halfway facility.

17         I can only state, Your Honor, that Mr. Carpenter

18   has been deeply involved in every aspect of this case.  He

19   calls us on a regular basis.  He's very active when I go

20   down to meet with him.  He's done a lot of homework and

21   whatnot, Your Honor.

22         When I went down this morning, the first

23   question he asked me was:  They're not postponing this

24   case, are they?

25         His fear is that they don't move ahead with this

1    trial.  So he's keenly interested in seeing this.  And to

2    shackle the guy, which is what's going on, drag him for

3    90 miles one way back and every day, in some cases,

4    totally understandable because we need to worry about what

5    he would do if he's out on the street.

6          Because while he was ordered to have punishment,

7    and he's serving his sentence down there, it's difficult

8    for me to come up with reasons as to why things for this

9    trial -- which is a very complicated trial which is, quite

10   frankly, one of counsel's reasons for having the Court

11   trial -- is if you look over here, you can see the volumes

12   of documents that the government intends to introduce.

13         It would be extremely helpful in his defense to

14   be able to have the Court have him come back to the office

15   or meet early in the morning, whatever we do, if we get

16   tired after eight hours.

17         But that's what I normally do with my clients,

18   Your Honor.  And from a practical point of view, it's

19   difficult when a man has to get up early and gets dragged

20   back to that prison down there.

21         Now, some have said:  Well, why not lock him up

22   at Hartford Correctional Center.

23         I think the Court, in a comment to counsel,

24   raised that.  I asked my client about that.  I went down

25   to see him Friday return, and I asked him about that.  And

1    here's his concern:  His concern is, he has some access;

2    having been at Wyatt for a few weeks now, he has some

3    sense of the facility itself.  They had a lockdown

4    24 hours yesterday, and it apparently lifted around 3:00.

5    And about 3:01, I got a phone call from Mr. Carpenter to

6    discuss the case.

7            And one of his concerns is, he has some papers

8    down there.  And I do bring him some documents

9    periodically.  I haven't brought him all the documents

10   because -- I don't know, I hadn't, but I brought those

11   that I believed to be important, to see him.  And maybe

12   the Court can inquire, because he does want to speak to

13   the Court if he may, Your Honor.

14           But I just feel, Your Honor, that there really

15   isn't a reason to keep him locked up during this period of

16   time.  It's not a question of escaping 20 or 30 days off

17   his punishment.  If he gets convicted, you'll let him out,

18   throw another 30 days on top of it, make up for it.  I

19   don't care.

20           This is a very important case to him.  It's life

21   altering, as I mentioned.  And I see no reason other than

22   logistical as to why he can't be released.

23           So I'm simply asking the Court to make the

24   strongest recommendation the Court can make, and hopefully

25   the U.S. Marshal's office respects the Court enough that

1    if the Court feels it's appropriate for him to be released

2    during this period of time that they will honor that.

3              THE COURT:  Specifically, are you asking for

4    release to a halfway house or to home confinement?

5              MR. BROWN:  Your Honor, let me just start off

6    with, the answer to that is yes, even though you put in

7    the alternative.  By that what I mean, Your Honor, is I

8    intentionally had his wife show up today.  If it would be

9    home confinement, that he would be required to wear

10   electronic bracelet around his ankle, you know, subject to

11   monitoring 24/7; that he would be restricted to either

12   being at home -- and his wife has indicated that if the

13   Court were to see fit to let him out, that she would be

14   put under oath and would represent to the Court subject to

15   contempt of court, whatever, that should my client not

16   return to the facility or not stay in the facility, except

17   if they were going to church because he is a religious

18   person, or to his health or to counsel, that he is

19   required 24/7 to be in except for Court, that that would

20   satisfy any concerns.  But I brought her here in case

21   there were any questions the Court wanted to ask, or if

22   you were willing to do that.

23              The other thing I want to be clear about on the

24   record, Your Honor, is that the terms and conditions of

25   his release in this particular matter have not changed,

1    meaning that I suppose I could have sought, because he was

2    locked up, to remove the liens on the properties or

3    whatever.  We didn't do that and, as counsel for the

4    government has pointed out, those things appear to be

5    still in operation.

6          The reason I say that, Your Honor, is that I

7    suppose the fallback position is a halfway house.  And to

8    be honest with you, I'll take the halfway house over

9    Wyatt, as long as he has access to a phone and some

10   ability to have in his possession evidence and documents

11   that he can review that would be practical.  And I

12   certainly -- any other conditions you want to put on, he

13   would obviously honor those conditions.

14         It's just that -- and I'd ask him to speak about

15   it himself, but while it may appear that that makes sense,

16   and I know the government is willing to, according to what

17   they put in their document, according to the conversations

18   that I've had, going to do what they can to put him in the

19   Hartford correctional facility if that's what

20   Mr. Carpenter wants.  And while I appreciate that,

21   Mr. Carpenter can speak to, and I'd ask that he speak now,

22   as to why that would not be in his best interest.

23         THE COURT:  All right, thank you.

24         THE DEFENDANT:  First, I'd like to thank Your

25   Honor for giving me the opportunity to be heard on what I

1    feel is a very important issue.  I appreciate my counsel

2    talking about the fact that I'm shackled and go back and

3    forth in the commute.  Honestly, that's not my real

4    concern, and the people at Wyatt are great professional

5    people.  I was never handcuffed at Canaan, never.  I was

6    allowed to report to Canaan, self-report to Canaan.  And

7    it is a camp, it's very open.

8           If I was assigned to Watkinson House on Collins

9    Street, I could literally walk to the courthouse, I could

10   walk to my attorney's office every day.  I used to do

11   three miles every day walking around the Canaan compound.

12   So even though it's a bit of a walk from Collins Street to

13   the courthouse, I could easily do that.

14          But the reason that I'm asking for home

15   confinement is because, in my situation, my actual home

16   confinement date is October 10.  The government refers to

17   it as September.  As of October 10, I would have been sent

18   directly home.

19          What everybody in the camp does is, they talk to

20   their case manager, and they ask to get extra

21   halfway-house time.  Under the Second Chance Act of 2007,

22   every inmate, good, bad or indifferent, is entitled to

23   12 months of halfway house.

24          So if I only got 8 months return from

25   October 10, that would have been February 10.  Had it not

1    been for the indictment in the Connecticut case, I would

2    be just like every other inmate, talking to my case

3    manager every day to see if he could process the paperwork

4    to get me to the halfway house.

5           The thing that bothers me about this whole

6    situation is that the government knows about 5980; the

7    government knows about 573; and even in their brief they

8    brought up 3142, which I didn't know anything about, so

9    that even some of these poor home who were being detained

10   at Wyatt prior to their hearings, they can petition the

11   Court and say:  It's just not fair, I should be allowed to

12   be released, I should be on bond.

13          I was -- as my attorney says, I was already on

14   bond in this case.  So my real feeling here, and I'm going

15   to apologize to the Court up front because, as my attorney

16   said, we were locked down all day, right after my wife

17   visited on Valentine's day.  We normally get locked down

18   at 11:00 to 12:00, and then there's a 3:00 count, which

19   means you're in your cell.  You can't do anything.  You

20   can't be on your phones or anything.

21          So at 10 after 4:00, I was literally running

22   down the stairs, as the attorney said, so I could be the

23   first one to call my attorney, call my wife.  As I was

24   bolting down the stairs, in came seven or eight COs,

25   saying:  Back to your cells, back to your cells, you're

1    locked in, you're locked in.

2           And literally we were locked in for 24 hours

3    from 4:10, when they locked us down to, 4:10 the next day.

4    And the first phone call I made was to my attorneys,

5    because I knew my wife would be worried they hadn't heard

6    from me, and my attorneys hadn't heard from me, even

7    though I told them I was going to be going over all these

8    notes.

9           Now, Your Honor knows that February 5, there was

10   a snowstorm; and then February 8, there was a snowstorm;

11   and I was woken up at 4:00, and tried to explain to

12   everybody, you know, from the CO that woke me up at

13   4:00 in the morning to the marshals downstairs that:  No,

14   no, the judge has postponed the trial, the judge has

15   postponed the trial.

16          No, you're on the schedule today, today is jury

17   selection.

18          You couldn't explain to anybody.  And I want to

19   express my gratitude to Your Honor, because when I got

20   here the marshals said:  No, we can't call your wife,

21   can't call your attorney, but you have the ability to talk

22   to the judge.

23          They said:  Sure, we can call the judge's

24   chambers.

25          Well, will you please have him call my attorney,

1    Dick Brown.

2              And they said:  Fine.

3              And I understand Your Honor did do that, and I'm

4    extremely grateful.

5              What bothers me is that, you know, this whole

6    journey began, no one gave me the chance.  Once Your Honor

7    denied all of the motions we did, unbeknownst to me, the

8    government filed a writ detainer, which means that after

9    count, December 29, they came and got me out of my bunk

10   and said:  You're being shipped out tonight.

11             They told me to put a duffle bag together, get

12   all my things together.  And literally they took that

13   duffle bag from me when I went up to the penitentiary, I

14   was stripped down, stripped naked, put into a flimsy paper

15   pajama bottom and a T-shirt.  And even though it was below

16   freezing outside, I was you know, shackled -- you know,

17   it's your arm shackles, shackles around your waist, leg

18   irons -- and I was let out.  And that was the first time

19   in this entire experience that I'd ever been shackled.

20             I was put on a bus to Brooklyn.  Nobody even

21   told me it was a bus to Brooklyn.  So about 4:00 in the

22   morning I arrived at Brooklyn MDC.  And that began this

23   nightmarish experience.  But Brooklyn MDC, you at least

24   have access to internet, BOP.  It took a few days to get

25   my phone set up to get internet access, but Brooklyn is

1    part of the BOP system, and so I was able to communicate

2    with the outside world.

3             I did not get any medical treatment, did not --

4    every pill line that went up, I said:  I need to get my

5    meds.

6             They didn't allow me to take my meds from

7    Canaan, and they said:  You have to put in a request, you

8    have to put in a request.

9             I must have put in 14 requests.  I tried to get

10   my wife and my attorneys, I even tried to say:  Could I

11   have access to the law library.

12            And they said:  No.  Because you're in transit,

13   you don't have access to the library.

14            Same thing happens eight days later, and

15   certainly all of my legal stuff was attained.  And, Your

16   Honor, if I seem to be waxing poetic about Canaan, I was

17   taken from the comfort of my cubicle, the staff there, the

18   warden there.  I was the only person allowed to have a

19   bunch of Redwells on my desk.  No one else was allowed to

20   have as many books and Redwells.

21            The case manager and the case counselor there

22   allowed me to have three full boxes under my desk of all

23   my legal work.  And Attorney Brown and his staff would

24   keep sending me documents in so I would be updated.

25            Now that I've begun this odyssey to Brooklyn,

1    and then to Wyatt, I haven't even gotten Your Honor's

2    opinions on the 18 different motions we've had, didn't get

3    any of those.

4            So it's a constant lockdown situation, and the

5    only thing we have access to at Wyatt is the phones.

6            Now, the interesting thing is, there's one

7    antiquated law computer that we have access to.  Somebody

8    spilled a soda on it.  And since I was at Wyatt until last

9    week, the infamous inmate, Martin Frankel, would occupy

10   that computer from 9:00 in the morning until 9:00 at

11   night, except when we were locked down.

12           So nobody had access to looking up cases or

13   doing things.  But unlike Canaan, where you could print

14   out cases and things that you looked up on the law

15   computer, you'd have to talk to the CO, the correctional

16   officer, to have them print out a case for you.  So there

17   is no access to any internet or email.

18           Now, you know, to be honest with you, Attorney

19   Brown threatened me that if I ever sent him one more quote

20   from Justice Brandeis, he'd stop reading my emails.  But

21   he and his staff have been excellent in responding to my,

22   you know, dozens of emails every day from Canaan.  And you

23   know, my wife was able to get emails from me.

24           Now, unfortunately, I just have a phone, and

25   filing my reply brief on my 2255 up in Boston, I literally

```
1    had to spend about a thousand dollars because I dictated

2    my entire 2255 reply brief.  Because there is no internet

3    access at Wyatt, so you are allowed unlimited phone time.

4            But now let me tell you the story of what was

5    really upsetting to me.  Because after we had the

6    experience of being dragged up here, shackled, and

7    spending the entire day in the detention center -- and

8    there are signs all over the place saying, "Sexual assault

9    is not part of your sentence" -- well, I got to be honest

10   with you, being shackled, sent to Brooklyn and sent to

11   Wyatt, and being there for five, six weeks, that wasn't

12   part of my sentence either, out of the Boston case.

13           And as Attorney Brown said, and as the

14   government acknowledges in his brief, I would have been

15   eligible for home confinement in September-October of this

16   year.  If you just subtract 8 months from that, not even

17   getting the full 12 months, and if Your Honor would call

18   the warden or talk to Mr. Gibson, the camp administrator,

19   they would tell you that I've been an ideal inmate; and

20   that if I'm not the most popular and respected inmate

21   there, I'm definitely in the top three or four.

22           And the fact is, if anybody was going to get

23   eight, nine or ten months of halfway-house time, it would

24   have been Dan Carpenter.

25           As I explained to my attorney, the reason why --
```

1    and I know in the government's brief they acknowledge that

2    they've got the power to send me to Hartford or Enfield.

3    That would just be starting the nightmare all over.

4    Because now at Wyatt, I do have friends, I do have

5    commissary, I do have -- it took me five days to get

6    Attorney Brown and my wife on the phone list.

7              So when I got to Wyatt, I was locked down for

8    72 hours, which means you're not allowed out of your cell.

9    And then because there was a fight in the pod that I was

10   being sent to, literally we got there in the middle of the

11   night, and we hadn't showered or anything else, and we

12   said:  You know, could we take a shower, could you please

13   get my wife and attorney on the phone list.

14             And the guy said:  No, I can't do anything for

15   you.

16             So we were actually locked down for another

17   48 hours because of a fight that happened in the pod.

18             So there's these lockdowns all the time.  And

19   after the experience I had of being dragged up to Hartford

20   shackled, the very next day someone broke the phones.  So

21   not only were the phones not working, I had no contact.

22   And because somebody had broken the phones, we were locked

23   down again.

24             So this past week. in putting together this

25   information for Your Honor, I've literally been locked

1    down five days out of seven, and have not been able to

2    have any contact with anybody.  If I was to go to Hartford

3    or Enfield, granted the commute would be easier than

4    Wyatt, but that's not the point.  I wouldn't have access

5    to a computer there, I wouldn't have access to the

6    2,000 exhibits that the government plans, I wouldn't have

7    access to my attorneys, I would not be able to prepare my

8    defense or assist my attorneys in aiding in my defense.

9         So not only do I think I'm going to have another

10   bad trial experience, I won't have a fair trial, I won't

11   be able to assist my own counsel assisting me in my

12   defense because I won't have access to them.

13        So at least if I was at Watkinson House on

14   Collins Street, you know, my wife could pick me up; I

15   could walk; I could basically have access to a phone; and

16   then I would certainly be able to have access to a

17   computer so I could look at the volumes of the evidence.

18        So the thing that I'm frightened about is that

19   if I stay at Wyatt rather than home confinement, I'm going

20   to be in a situation where I will be behind the eightball

21   again, not be able to assist my attorneys.  So as much as

22   I hate the commute, as much as I hate getting up at

23   4:00 in the morning and getting back at 8:00 at night, at

24   least I have friends at Wyatt that save a dinner for me,

25   save commissary for me and take care of me, even in the

1    lockdown situation.

2              So it's the fact that there's no email access or

3    internet access at Wyatt that makes it untenable for me to

4    be there during a 20- or 30-day trial.

5              THE COURT:  Thank you.

6              Let me hear from the government, please.

7              MR. NOVICK:  Your Honor, I think off the bat --

8    and I'm not going to speak as long as counsel and

9    Mr. Carpenter did, because I think we've responded to all

10   of these points in our briefing.

11             What I would add is that, ultimately, I don't

12   think that the question here is, as Mr. Brown seems to

13   want to put it, what's the reason not to do this.  There

14   needs to be an affirmative reason to do this in light of

15   the fact that the defendant is in prison.  He's in prison

16   because of a crime he committed that was prosecuted in

17   Massachusetts.  He was sentenced to prison by a judge up

18   there.  He had victims in that case, millions of dollars

19   involved.  Whatever the defendant's view of that case,

20   he's serving a sentence like other defendants that have

21   come before this Court before in trials while they were

22   serving other sentences.

23             So we start from that, that there are other

24   interests involved which the government has no involvement

25   in.  This U.S. Attorney's Office, we don't represent the

1    victims in that case.  So I have problems, as I indicated

2    in the briefing, simply saying to the Court:  We're fine

3    with this, we're fine with the defendant essentially

4    getting, on a 36-month sentence, a month or two off of

5    that in order to be here.

6            The second point is, Your Honor, that the

7    statute 3624, 18 USC 3624, is the Second Chance Act.

8    That's the provision of the code.  That's the codified

9    version of the Second Chance Act that says that the

10   defendant would be eligible for the halfway house at a

11   year, not meaning he's going to go into it, but eligible;

12   and after 10 percent of his sentence left in this case, or

13   the lesser of 10 percent or six months, he could go on

14   home confinement.  So we're not talking about home

15   confinement as an option under the BOP regulations.

16           The BOP has their own procedures.  I'd have to

17   find an appropriate halfway house with the defendant

18   needs, society needs, has to apply, has to be a bed

19   available.  Ultimately it's a BOP process, BOP decision.

20   And not everybody gets to go into a halfway house.  It has

21   to be their decision, based on everything they know, and

22   BOP isn't represented here today.

23           The defendant can make whatever application and

24   statements he wants to make about his standing or statute

25   or the likelihood of being granted that BOP halfway-house

1    application, but the BOP isn't represented here.

2              Which brings me to my next point.  Which is that

3    this is ultimately I think, Your Honor, an academic

4    discussion.  I did not reach out to the BOP upon -- or I

5    did not reach out to Canaan, I should say, upon receiving

6    the defendant's motion.

7              I did, like Mr. Brown, have a conversation with

8    somebody from the marshals, the chief deputy, who

9    indicated that he did not believe -- because he is not the

10   primary custodian of this defendant, he is holding this

11   defendant for the Court as a convenience so that the

12   defendant doesn't have to drive up 84 to Canaan every day

13   back and forth for trial.  This is the way it works.

14             And so he's being primarily detained by the BOP,

15   and he's being held at Wyatt by the marshals as a

16   convenience for the Court.

17             I also, after filing our response, got a phone

18   call from the executive officer to the warden at Canaan,

19   who indicated that the positions helped by the government

20   here, as expressed in the motion, in the motion response,

21   were consistent with the opinion of Canaan, that they had

22   their own procedures, and if -- but that they did not have

23   any intention, Your Honor, of agreeing to release the

24   defendant on a furlough or whatever at this time for a

25   myriad of reasons, one of which is the fact that he stands

1      indicted for a separate crime now.

2              And at any rate, Your Honor, they had no

3      intention -- they were originally going to reply, Your

4      Honor, but they indicated to me that the individual -- the

5      individual I spoke with thought that the government

6      articulated the position that they would have had well.

7      For the record, I did not notify Canaan of this motion.

8      My understanding is that Attorney Brown sent a copy of his

9      motion to Canaan, which is what triggered the phone call

10     to me.

11             Your Honor, counsel mentioned our reference to

12     18 United States Code, Section 3142I.  The reason we put

13     that reference in our motion was not to tell the Court

14     what the Court likely already, knew which there was this

15     provision that permitted release for a pretrial detainee.

16     It was because there are all these -- all the cases on

17     this general subject area don't fall within the second

18     chance -- or I should say, don't fall within the furlough

19     provision related to BOP, they fall in the context of

20     pretrial detention.

21             And the reason we raised that is because all of

22     the cases on the subject of the pretrial detention

23     involved denials of release, and courts are saying in

24     cases equally as complicated, if not more complicated than

25     this one, that release was not necessary for a fair trial,

1    Your Honor, and I think that's the case here as well.

2              I certainly understand what the defendant is

3    saying.  I certainly understand why the application is

4    being made.  Shackles are not, Your Honor -- I don't think

5    that the judge, when he sentenced Mr. Carpenter in

6    Massachusetts, did so with a "no shackle provision."

7              It's prison.  It's not intended to be, you know,

8    an easy experience.  Nevertheless, Your Honor, the

9    defendant was sentenced to prison.

10             Ultimately, Your Honor, I don't think that the

11   defendant has articulated anything out of the ordinary,

12   anything to warrant his release here, given the fact that

13   he is serving a sentence that a judge in another district

14   imposed upon him, and he's dealing with the same types of

15   issues that I suspect, if we gave voice to any number of

16   other prisoners who had to stand trial before the Court,

17   probably would say very similar things, if not more

18   difficult things because they wouldn't have had what

19   appears to be a much easier experience at the camp until

20   Canaan.

21             And the last thing I'll say, Your Honor, we

22   touched upon in the brief is, we are now exactly two years

23   down, a little over two years down the road from the

24   initial indictment in this case.  The defendant has had a

25   predominant amount of discovery for a long time.  And if

1    the defendant felt like he needed more time -- that is not

2    what I understand him to be saying, I understand him to be

3    saying he wants to go forward now, but there are other

4    remedies if the defendant doesn't feel he has enough time

5    with the pertinent documents.

6            We're not sitting on Fridays in this case, Your

7    Honor.  That's an opportunity -- except for this Friday,

8    that's an opportunity for the defendant to work with his

9    counsel.

10           I did speak to the head deputy marshal here in

11   Hartford, who is -- although it's much of a -- it's a

12   strain on his office to have to bring the prisoner,

13   Mr. Carpenter, as well as other people back and forth,

14   different local facilities as opposed to receiving the

15   van, he was willing to do whatever the Court felt was

16   best, and would have done it if the government had asked.

17           So I appreciate that.  But I think that's the

18   remedy here, Your Honor, the defendant has to decide.  He

19   has to weigh the different options as to what he

20   ultimately wants.  And Your Honor would ultimately -- I

21   don't think there's enough here to warrant a release.

22           THE COURT:  All right.  Thank you.

23           MR. BROWN:  Can I just make a couple comments?

24           THE COURT:  Briefly, please.

25           MR. BROWN:  I just want to make clear on the

1    record, Your Honor, while it's true we received a lot of

2    documents a ways back, it's equally true that there's been

3    a steady stream as required of documents as they come in

4    the control and possession of the government to us, and

5    that flow has not stopped as recently as this past week.

6    We constantly get different things.

7          And then the final point simply is that if the

8    intent of the Congress was not to permit these types of

9    situations to give the Court the authority, then the

10   sections that I cite have no meaning, and so I believe

11   that it is in the discretion of this Court.

12         Thank you.

13         THE COURT:  Okay, thank you.

14         I don't claim to be as well informed as to the

15   applicable law and regulations as I would wish to be, but

16   let me respond to your respective positions.

17         I think that the defendant's request is

18   reasonable, given the anticipated length of the trial and

19   the volume of discovery and the volume of evidence.

20         The parties have indicated to me that both sides

21   view this as a relatively complicated matter.  This was a

22   factor in the parties' analysis of the question whether it

23   should be a bench trial.

24         I'm prepared to accept the characterization.

25   Given that it's submitted jointly.  So in addition to the

1    length of the trial and the scope of the discovery in

2    evidence, it's a complex matter.

3              These factors distinguish it from the cases that

4    I typically see involving people who are temporarily

5    detained at Wyatt.  Those cases tend to be significantly

6    shorter with a much narrower scope of evidence, and they

7    tend to be relatively uncomplicated.  Add to that the

8    defendant's representation, confirmed by his counsel, that

9    he is an active participant in the defense, a

10   representation I credit, I think that the case is further

11   distinguishable on that basis.

12             I don't mean to suggest that other defendants

13   don't participate, but I think you understand what I mean.

14   We have a white-collar prosecution involving what is said

15   to be a complex fraud.  And for that additional reason, I

16   think the case needs to be viewed differently from the

17   ordinary case that we see when it comes to the defendant's

18   housing during trial.

19             Beyond that, I think based on my own experience

20   that having Mr. Carpenter at Wyatt ultimately would tend

21   to impair his ability to participate effectively in his

22   defense, maybe not this week, but I do think that at some

23   point during what is expected to be a very lengthy trial.

24             I think even an early riser would begin to show

25   signs of wear if he had to get up at 4:00 in the morning

1    and make that 90-minute journey to sit through a long

2    trial, and then make the 90-minute journey back, arriving

3    at 8:00 in the evening.

4           So I think the defendant's request is

5    reasonable.  I think that it would help the trial process

6    if he were housed locally.

7           Please understand that the Court, as a court,

8    has been trying for a long time to try to come up with an

9    alternative to Wyatt, precisely because it is so far from

10   here, and I consider Mr. Carpenter's request in that

11   context.

12          For me then the question becomes:  What

13   authority do I have in the matter?

14          And again, it's not clear to me, but it appears

15   that my authority is limited to making a request

16   presumably of the warden at Canaan, which the warden is

17   free to reject.

18          In the ordinary course, judges make

19   recommendations to the BOP with regard to such things as

20   where a person should be designated to serve his or her

21   term of incarceration.  And the BOP tends to give

22   respectful consideration to the judge's recommendations,

23   but by no means are they binding on the BOP.  And it has

24   happened more than once in my experience that I've gotten

25   letters telling me that my recommendation was not going to

1    be followed.

2              Assuming that I have the authority to make a

3    recommendation, the question becomes:  Why not make a

4    recommendation if having Mr. Carpenter in a halfway house

5    would make for a better, a fairer trial, and avoid a claim

6    that his right to participate effectively in his defense

7    had been impaired?

8              I would not be inclined to make that

9    recommendation if it meant that I would be asking the

10   warden to, in effect, commute Mr. Carpenter's sentence.

11   It's not my place to do that.

12             On the other hand, if under 18 U.S. Code,

13   Section 3624, Mr. Carpenter would be eligible for a

14   halfway-house placement in any event, and I would

15   therefore be recommending favorable consideration on a

16   matter that the warden would be able to take up in the

17   ordinary course, that's different.  If in that instance

18   I'm not, in effect, asking that his sentence be commuted,

19   then I'm open to making the recommendation.

20             On that point, Mr. Novick, let me be sure I

21   understand your position.

22             Did you say that if I were to make that

23   recommendation, I would be, in effect, asking that his

24   sentence be shortened by some period of time?

25             MR. NOVICK:  My point, Your Honor, was if the

1    Court was -- I think there are two issues here.  I think

2    there's a question of what the defense, I thought, was

3    requesting was a furlough.  A furlough would mean not a

4    halfway house, a release to whomever, would not be in any

5    incarceratory framework, halfway house or otherwise, would

6    go home for some period of time; and yet during that

7    period of time that he was at home during the pendency of

8    the trial, he would still receive credit for the time that

9    he's out on furlough.  In other words, that would count

10   against his 36-month sentence.

11        As far as a halfway house, I suppose the Court

12   could recommend a halfway house, but I don't know of a

13   provision that would allow this Court to release the

14   defendant to a halfway house.

15        I think what would have to happen is, Mr. Brown

16   can correct me if I'm wrong, that he would have to make an

17   application to the warden through the normal course, for

18   Mr. Carpenter to be released to a halfway house, and then

19   perhaps the Court here could weigh in on whether that

20   application ought to be granted.

21        But I understood -- and I may be wrong, but I

22   understood that what the defense was requesting was a

23   furlough under the act.

24        THE COURT:  Focusing on the effect that a

25   halfway-house placement would have on Mr. Carpenter's

1   sentence, is it your understanding that, under the

2   statute, the BOP has authority to place Mr. Carpenter in a

3   halfway house now?

4             MR. NOVICK:  Yes, Your Honor.  With 12 months

5   left to go, he is eligible for a halfway house.  He would

6   have to be -- he would have to go through whatever

7   procedures, there would have to be space availability for

8   the defendant, and I don't understand -- I don't know that

9   to be a one-day kind of process.

10            THE COURT:  Okay.  Well, let's leave it this

11  way:  On the assumption that Mr. Carpenter's sentence

12  makes him eligible for release to a halfway house now, I

13  would be inclined to recommend that the BOP exercise its

14  discretion to designate him to the a halfway house in

15  order to facilitate this trial.

16            I know that the government has to be concerned

17  about the victims in the District of Massachusetts case,

18  and I respect the government's concern, but if under the

19  law a person in Mr. Carpenter's position is eligible for

20  release to a halfway house, then so be it; and if indeed

21  he has earned consideration for halfway-house placement

22  based on his good behavior, and the BOP is inclined to

23  make that placement, then I think that's fine.

24            I think that, at that point, Mr. Carpenter is no

25  better off because of the pendency of this case, but no

1    worse off because of the prior conviction; and as he

2    points out, he is entitled to the presumption of

3    innocence; he appears to pose no risk to the community nor

4    any risk of flight; and if it weren't for his current

5    sentence, he would be at home.

6           So in that context, I think that people need to

7    do whatever can be done promptly to expedite this process.

8    And if you will keep me informed, I'll make a timely

9    recommendation, okay?

10          MR. BROWN:  Your Honor, if I may, just the only

11   claim I'd like you to hear, or at least have the Court

12   acknowledge on the record, is the concept about furloughs

13   is applicable to anyone with a year or less, except

14   typically if there's a detainer or other pending criminal

15   charge, then they're not eligible.

16          So I take it that the Court understands that

17   and, notwithstanding that, still would recommend the

18   furlough, at least to the extent of the conclusion of this

19   trial -- or rather transfer to the halfway house.

20          And I would note just for the record, Your

21   Honor -- it's on page 4 of my brief of my request -- that

22   I do suggest in the alternative a halfway house.  So while

23   the emphasis was on a furlough at home, our fallback

24   position was the halfway house, Your Honor.

25          THE COURT:  I don't want to misspeak, I don't

1    want to get hung up on what might be terms of art.  My

2    point is, as I just said, if Mr. Carpenter can be placed

3    in the halfway house, that will be helpful to him and to

4    the government and to me in this trial process; and if he

5    were to be released, he would be no better off and no

6    worse off.  And that, to me, is where we are ought to be.

7    So whatever the technical terminology might be, that's the

8    gist of my position.

9             MR. BROWN:  I understand.

10            MR. NOVICK:  I understand, Your Honor.  And the

11   point I made was, we're not now talking furlough.  So I

12   know -- I want to make sure I'm doing what the government

13   is obliged to do here.  That counsel will make an

14   application for a halfway-house placement through BOP and

15   direct -- once we find out how the application process

16   works, allow the Court an opportunity to make a

17   recommendation.

18            THE COURT:  Right, correct.

19            And, Mr. Brown, you're authorized to state in

20   your application that, at the hearing today, I stated that

21   the Court would support the request, and that a letter to

22   that fact will be forthcoming.

23            And, Mr. Novick, if there's anything you can do

24   to facilitate this within the Department of Justice, that

25   would be helpful to me.

1            And I would ask the Marshals Office, perhaps

2    with the help of the probation office, to determine

3    whether there is, in fact, a space available at Watkinson

4    house.

5            THE MARSHAL:  Yes, Your Honor.

6            THE COURT:  Why don't we take a recess.

7            Is there anything else we need to take up

8    preliminarily?

9            MR. BROWN:  Yes, Your Honor, very quickly, I

10   have filed a motion for sequestration with respect to

11   witnesses, and ask the Court to rule on that.

12           THE COURT:  That would be granted.

13           MR. NOVICK:  Your Honor, I would just ask for

14   the exemption allowed as for the case agent to sit with

15   us.

16           THE COURT:  Yes.

17           MR. NOVICK:  Thank you, Your Honor.

18           We can deal with this after the break, there's

19   one other issue to take up preliminarily.  The first

20   witness we're going to call is Stefan Cherneski, and he

21   was previously represented by Mr. Brown.  Not on a

22   directly related matter, but related enough that he ought

23   to be canvassed.  We can give the Court more information

24   about that after the break.

25           THE COURT:  Okay.  We'll take a recess.

1             We'll be in recess for 20 minutes.

2                   (Whereupon, a recess followed)

3             THE COURT:  Mr. Novick?

4             MR. NOVICK:  Your Honor, preliminarily, we

5     wanted -- a couple of issues.  One we wanted to raise for

6     the Court:  A few years ago, as the Court is well aware

7     now, the IRS searched the 100 Grist Mill Road offices as

8     part of its separate investigation.

9             In connection with that -- Mr. Brown can

10    probably speak more intelligently than I can --

11    Mr. Cherneski -- who was an employee, an entity there --

12    obtained representation or was looking for representation

13    and spoke to Mr. Brown.  I don't know whether he, in fact,

14    was retained or what the sort of circumstances were, but I

15    know that they at least had a conversation.  My

16    understanding is they had a conversation about that.

17            After talking to Mr. Brown, looking at whatever

18    documents we had in our possession, speaking to the

19    witness, I don't believe that there is an actual conflict

20    here.

21            Out of an abundance of caution, it's my

22    understanding Mr. Brown is going to have his co-counsel do

23    the cross-examination of Mr. Cherneski to avoid even the

24    appearance of impropriety.  And it's my understanding, and

25    although Mr. Brown can speak to this, that the defendant

1    does not have a problem with us proceeding,

2    notwithstanding this potential conflict.

3            So I'll start with that.

4            THE COURT:  Okay.

5            For future reference, it would be helpful to the

6    reporter and to me if counsel would be careful to speak up

7    and speak into the microphones.  You both tend to be

8    soft-spoken, and I have difficulty hearing, and I think

9    the reporter does too.  So please be careful to make

10   yourself heard.

11           On this point, Mr. Brown, is there anything

12   further that I need to do?

13           MR. BROWN:  Yes, Your Honor.  I would just like

14   the opportunity to put on the record, to be clear about

15   this, from my perspective, Your Honor, and that is several

16   years ago, the next witness, Your Honor, Mr. Cherneski,

17   retained my services in connection with an IRS

18   investigation.

19           I met with him on a few occasions.  We talked.

20   I'm sure I took some notes.  I made no effort to obtain

21   those notes.  I have no personal recollection of what he

22   said.  I've had many, many clients fortunately since that

23   time.  Nothing happened in terms of his being brought into

24   court or anything along those lines.  At the time my

25   associate, Attorney Guarnieri, did not work for us.

1           Since it came to my attention when the

2    government let me know that he was a possible witness,

3    number one, I alerted the government to the fact that I

4    had represented him in the past.  I intentionally, from

5    that day forward, did not discuss with co-counsel or my

6    client any conversations I may have had.  I don't think

7    those conversations had anything or have anything to do

8    with this trial or the subject matter.  But out of an

9    excess of caution, Your Honor, I put up the old Chinese

10   wall up there and refused to discuss the file, which I've

11   also intentionally not attempted to recover from our -- we

12   have a warehouse where I keep all my files.  I've made no

13   efforts to retrieve it.

14          I have no personal recollection of any

15   conversation.  I've not discussed this with co-counsel,

16   except to tell him that I wouldn't discuss it with him.

17          I've discussed this matter with my client, and

18   while I would ask the Court to inquire, I can represent to

19   the Court that my client has no objection to us

20   representing him and waives any and all claims he might

21   otherwise have, Your Honor, in the interest of keeping us

22   as his attorneys.

23          I don't feel that we're under any tactical

24   advantage or have any knowledge or would exploit anything

25   that the witness may have said to me in the past and that

1    would not be part of this trial.

2              THE COURT:  Thank you.

3              What is the anticipated subject matter of this

4    witness's testimony?

5              MR. NOVICK:  It will principally concern, Your

6    Honor, the experiences he had as an employee of the

7    relevant entities at Grist Mill Road.  He's involved at

8    Charter Oak Trust and some similar businesses going around

9    at the same time.  I don't anticipate it to touch on the

10   sickness, accident, disability trust or the other trusts

11   that were the principal subject of the investigation out

12   of Wisconsin.

13             THE COURT:  Unless you see no real conflict?

14             MR. NOVICK:  I do not see any real conflict,

15   Your Honor.

16             THE COURT:  All right, thank you.

17             Mr. Carpenter, did you hear what Mr. Brown said

18   just now?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Do you agree with him?

21             THE DEFENDANT:  Absolutely, Your Honor.

22             THE COURT:  So you have no objection to being

23   represented by Mr. Brown and his law firm, notwithstanding

24   Mr. Brown's prior representation of Mr. Cherneski, is that

25   right?

1           THE DEFENDANT:  Cherneski, but none whatsoever.

2    Thank you, Your Honor.

3           THE COURT:  Okay, thank you.

4           All right then, you may proceed.

5           MR. NOVICK:  Thank you, Your Honor.

6           THE COURT:  I should note that a motion to

7    dismiss based on speedy trial concerns has been filed.

8    I've read the briefs, and I'm satisfied that there is no

9    violation.  I think that should be on the record before we

10   proceed to swear in the first witness.

11          Is there anything else we need to address?

12          MR. NOVICK:  Your Honor, there were several

13   motions in limine which I think we could probably take up

14   as we go.  I think they were mostly legal issues to bring

15   to the Court's attention, and that I don't anticipate, at

16   least with the first witness, any of those principal

17   issues being raised.

18          THE COURT:  All right, very good.

19          MR. BROWN:  Your Honor, can I assume the Court

20   will issue a written ruling on that motion for speedy

21   trial?

22          THE COURT:  We can do that.

23          MR. BROWN:  I would ask for that; yes, Your

24   Honor.

25          THE COURT:  Okay.

1          MR. NOVICK:  As a practical matter, Your Honor,

2     I do acknowledge -- although I will say up front that the

3     government does not agree with the defense in terms of the

4     characterization of the complexity of the case --

5     nonetheless I do acknowledge the fact that there are a lot

6     of documents in this case.

7          Just by way of organization and how I think it

8     makes sense to proceed in the most efficient manner, what

9     I -- first, Your Honor, counsel and I have agreed on four

10    stipulations, which ordinarily I would read but in light

11    of the fact that this is a bench trial, I can just hand

12    them up and provide them to the Court.

13         THE COURT:  Okay.

14         MR. NOVICK:  May I approach, Your Honor?

15         THE COURT:  Yes, please.

16         Are we all set to proceed?

17         MR. NOVICK:  Your Honor, just to finish what I

18    was saying, those stipulations are designed to deal with

19    the issue of authenticity of the various exhibits.  My

20    understanding is that Mr. Brown wanted to reserve the

21    rights, as do the government, to contest relevance to the

22    admissibility as we went.

23         I've given the exhibit list over a week ago to

24    counsel and have not heard whether the defense is going to

25    have an objection in the ordinary course to any of the

1    documents.  I suppose we can deal with each exhibit as we

2    go.  Obviously it would be easier to -- what the

3    government would prefer to do is offer all of the exhibits

4    pursuant to that agreement into evidence so that we don't

5    have to deal with it on a case-by-case basis.

6          My understanding of the principal objection is

7    as to whether the government is entitled to admit exhibits

8    that deal principally with insureds other than Straw

9    Insureds 1 through 15.

10          It is the government's position -- and I can

11    explain just very briefly about the exhibits.

12    Exhibits 100 through 1599 are the exhibits related to

13    Straw Insured 1 through Straw Insured 15.  They don't take

14    up every exhibit in that series.  In other words, 101 to

15    199 is Straw Insured 1, 201 to 299 is Straw Insured 2.

16    Although the reality is, there are about 20, 25 documents

17    in each of those series.

18          We put precipitously less -- fewer documents

19    related to the other straw insureds, and those are

20    Exhibits 1601, '2, '3, '4 and '5, and those are binders

21    that include the basic documents as to each of those

22    individuals, each of those straw insureds.

23          It's my expectation that some of the

24    correspondence -- such as Exhibits 2001 through 2306, so

25    about 300 emails, Your Honor -- will deal with both the

1   principal Straw Insureds 1 through 15, as well as the

2   remaining straw insureds talked about in the context of

3   the entire operation of this trust, and that the relevance

4   will become clear as we go through the trial.

5          But in the first instance, Your Honor, the

6   superseding indictment charges a conspiracy, charges a

7   conspiracy involving the entirety of the Charter Oak

8   Trust.  We believe that all those documents are relevant.

9   It's on the government ultimately, Your Honor, if we put

10  in more than we should.  I don't think we're doing that.

11  And I understand that at some point -- again, Your Honor,

12  the government is not intending to do this to over-prove

13  the case.  We are essentially trying to meet our burden

14  here, both with regard to the conspiracy count as well as

15  the substantive counts.

16         So that's the point, Your Honor.  I suspect that

17  some of the objections will have to deal with that.

18  Beyond that, Your Honor, I'm prepared to call the first

19  witness.

20         MR. BROWN:  If I may, Your Honor?  Thank you.

21  I'll try to deal with these as a group to move it along.

22         But if the Court will note that there is a

23  stipulation that we've agreed to, simply because those

24  things are not in dispute and, as opposed to take up the

25  Court's time unnecessarily, we've agreed to them.  But I

1    want to be clear, Your Honor, what we've agreed to and

2    what we haven't agreed to.

3         There's a number of documents that the evidence

4    will show over a period of time that the government, in

5    the course of its investigation, seized documents, may

6    have been from my client's business, may have been from

7    insurance companies, may have been from third parties.

8    And counsel and I, before today, got together and talked

9    about what we could possibly agree to to move this trial

10   along, because of the significant number of documents.

11        What we agreed to, and what my client agreed to,

12   Your Honor, was that we would not contest the authenticity

13   of the documents; meaning by that, Your Honor, that if the

14   government during the course of the trial on a certain

15   day, they went to my client's business and seized a

16   particular document, they don't need to bring in the

17   evidence agent who seized that document to come in and say

18   just that.

19        As to that authenticity, I've taken the word of

20   the government they have not altered in any way or changed

21   the document that they're presenting to this Court.

22        However, what we did not agree to is the issue

23   of materiality or relevance in terms of any other

24   objection we might have to the admissibility of any

25   particular document.

1          So we're not inclined to agree that en masse

2     these documents can be presented.  I don't mind Bruton, as

3     it relates to a particular subject, but we're not allowing

4     them to take the pile and put it on the Court's desk and

5     say that these should all be admitted.  They need to

6     establish that these documents have some relevancy to the

7     issues at hand.

8          Second point is, I would ask the Court to

9     instruct the government not to use the word "straw."  I

10    don't know what that means; and I don't think there's any

11    evidence presented at this point as to what it means; and

12    further, that assumes certain things that are not in

13    evidence.

14         So they can talk about insureds, they can talk

15    about people filing applications, but I object to the use

16    of the word "straw" as something that hasn't been

17    established as to what that means or any evidence to

18    support whatever it is they claim it means.  So I would

19    ask the Court to instruct the government not to, at this

20    point, use that term, making the summation here.

21         The next thing which is very important is, way

22    back, Your Honor, when the Court first got this case, the

23    Court inquired of the government the necessity of

24    presenting a certain number of these insured application

25    with several different carriers, insurance companies.

1           And after a certain dialogue, the government had

2    represented that they were going to limit the number of

3    individuals that they were going to go after, relative to

4    certain counts and the original indictment and the

5    superseding indictment.

6           And the original indictment, Your Honor, there

7    were 12 of these insurance applications that were under

8    scrutiny.  The superseding indictment, while they added on

9    a number of charges, I believe they really added on three

10   individuals who had taken on insurance policies with the

11   Charter Oak Trust, which played a major role in this case.

12   And we're prepared for that.

13          But now what the government would like to do is

14   come in through the back door and present to this Court

15   transactions involving others than these now 15

16   individuals.  And I think the Court -- and I don't want to

17   misquote the Court, but my recollection is, the Court

18   seemed to suggest that either the government can prove its

19   case with 12 at the time of the insureds, or it can't, and

20   we obviously agree with that.

21          Adding on all these other applications, it's our

22   position that that goes beyond the scope of the

23   superseding indictment; that it's really seeking to

24   broaden the indictment to include a lot of transactions

25   that were not mentioned in the indictment for which we

1    have not prepared.  We prepared for those and the

2    documents given to us, those twelve, plus the subsequent

3    three insurance applications that were charged as against

4    my client.

5            And we object to and will continue to object or

6    have a standing objection to any reference to any of these

7    other applications.  If they felt strong about the need to

8    present these as part of their case, they could have.

9            I understand about the concept of conspiracy,

10   and I think again, trying to come in through the back door

11   as opposed to laying it out on the indictment itself or

12   the superseding indictment, as they could have and as they

13   did do, as relates to three of the policies, the

14   conspiracy as alleged certainly covers these 15 people,

15   but it's our position that that is the extent of the

16   conspiracy for the purposes of whether or not my client

17   did or didn't violate the various counts of wire fraud,

18   mail fraud, money laundering, et cetera; and that it would

19   not be appropriate and be extremely prejudicial and

20   contrary to the rules of us being -- prior to being

21   notified in what we needed to defend against it.  We

22   counted on the indictment.  We actually asked the Court, I

23   think, to expand upon or cause the government to expand

24   upon the Court in a bill of particulars.

25            I think the Court essentially stated that

1    there's a sufficient amount of warning, in terms of the

2    nature of the wrongdoing, found and contained within the

3    superseding indictment as to meet the requirement the

4    government needed to have for effective notice to my

5    client to prepare his defense.

6          To now throw in all of these other counts and

7    all of these other individuals, I think, runs contrary to

8    law and doesn't prepare us with adequate notice.  So we

9    will object as they come along, and we will not agree as

10   to any evidence concerning any alleged wrongdoing beyond

11   the scope of these fifteen.

12         THE COURT:  All right, fine.

13         MR. NOVICK:  To be clear, your Honor, "straw

14   insureds," that's how it's referred to in the indictment,

15   as I'm referring to Straw Insureds 1 through 15.  This is

16   to the Court, which I understand the Court is both the

17   fact finder and judge of the law here, and I think the

18   Court is immensely capable of not drawing any prejudicial

19   inference from the use of the word "straw insured," other

20   than to say that this is how these counts are referred to

21   in the indictment.

22         And if we didn't do that, it would be very

23   difficult to refer Your Honor to which insureds cover

24   which counts in the indictment.  So I think, as a

25   practical matter, it would be virtually impossible here

1    to -- and unnecessary to grant that application from the

2    defendant.

3              As far as the remainder, Your Honor, I take

4    issue -- take exception to the idea that we're trying to

5    get anything in through the back door.  The indictment

6    charges, in explicit terms, 84 policies, 76 insureds.

7    It's in black and white on the superseding indictment that

8    the defendants had notice of for years now.  There is

9    nothing, no subterfuge here.  They had knowledge to

10   precisely what the government was charging.

11             With regard to the 1 through 15 straw insureds,

12   we're not putting in evidence of particular transactions

13   to prove the substantive counts.  We're putting them in,

14   in large part, Your Honor, because the emails, the

15   correspondence that the defendants engaged in, and other

16   co-conspirators engaged in, concerns oftentimes more than

17   one of these straw insureds.  Sometimes they're 1 through

18   15, sometimes they're not.  But in all events, they show

19   the involvement in the scheme in general.

20             And in terms of proving the conspiracy that has

21   been articulated to and including all of these, as Your

22   Honor will see as we go through, I think those are equally

23   admissible as to any of the principal insureds.

24             THE COURT:  Okay.  Dealing with the request for

25   an order preventing the government from using the phrase

1    "straw insured," I appreciate the concern that this is

2    loaded language and it assumes facts not in evidence, but

3    I'm not going to preclude the government from using this

4    phrase.  I don't think it's going to result in any undue

5    prejudice, and I think it makes it easier for me to

6    understand who the government is referring to.  So that

7    takes care of that.

8              As to the rest, we'll just have to see how it

9    goes.  I understand the defendant's position.

10             Thank you for your input.  Let's call our first

11   witness, please.

12             MR. NOVICK:  Your Honor, the government calls

13   Stefan Cherneski.

14             THE COURT:  Good morning, sir.  The witness

15   stand is here at the end of the bench.  If you would

16   please stand there, our clerk will swear you in.

17             THE CLERK:  I'm going to ask you to raise your

18   right hand.

19

20

21

22

23

24

25

 1

 2                      STEFAN JOHN CHERNESKI,

 3           called as a witness, having been first duly

 4           sworn or affirmed, was examined and testified as

 5           follows:

 6

 7                 THE CLERK:  Please be seated.

 8                 Please state your name and spell your last name

 9   for the record.

10                 THE WITNESS:  Stefan John Cherneski,

11   C-H-E-R-N-E-S-K-I.

12                 THE CLERK:  Your business address, please?

13                 THE WITNESS:  Six Talcott Forest Road, Suite C,

14   in Farmington, Connecticut 06032.

15                 THE CLERK:  Thank you.  Please be seated.

16

17                      DIRECT EXAMINATION

18   BY MR. NOVICK:

19   Q.   Mr. Cherneski, where are you from originally?

20   A.   Canada originally.

21   Q.   How long have you lived in Connecticut?

22   A.   Approximately going on 18 years.

23   Q.   Can you briefly tell the judge what brought you to

24   Connecticut?

25   A.   I used to play professional hockey, and it made me

1    end up in the Hartford area.

2    Q.   And are you married?

3    A.   I am.

4    Q.   To whom?

5    A.   To Jenny Valedaserra Cherneski.

6    Q.   Can you tell us briefly about your educational

7    background?

8    A.   I graduated high school, and then I came down here to

9    play hockey.  And then after I was done with hockey, I

10   went to Central Connecticut State and got a degree in

11   economics with a minor in business.

12   Q.   Did you study in college anything related to

13   insurance?

14   A.   Not specifically, no.

15   Q.   Following college, where did you work?

16   A.   I worked at Benistar.

17   Q.   And until when did you work at Benistar?

18   A.   I worked there until approximately August or

19   September of 2010.

20   Q.   Where was that located?

21   A.   100 Grist Mill Road, Simsbury, Connecticut.

22   Q.   Approximately when were you hired by Benistar?

23   A.   I started work there approximately February of 2005.

24   Q.   Can you briefly describe the circumstances under

25   which you were hired?

1    A.   One of my friends, Guy Neumann, worked at Benistar,

2    approached me when he knew I was graduating and asked me

3    if I would be interested in joining him at Benistar.

4    Q.   And did you interview; how did that process work?

5    A.   I did.   Prior to me graduating, I met with Dan

6    Carpenter and Guy Neumann at the Pettibone Tavern in

7    Simsbury, Connecticut.   And upon meeting, we discussed a

8    little about what it would be like for me to work at

9    100 Grist Mill Road.   And he said, when I was done with

10   school, if I wanted to join them, he was open to that.

11   Q.   Did you, in fact, join them?

12   A.   I did.

13   Q.   Was that your first interaction with Mr. Carpenter?

14   A.   It was.

15   Q.   Do you see Daniel Carpenter in the courtroom today?

16   A.   I do.

17   Q.   Could you please point to him and indicate an article

18   of clothing he's wearing?

19   A.   Oh, he's wearing the dark suit with the white shirt

20   and the red tie.

21           MR. NOVICK:   Could the record indicate the

22   defendant, Your Honor?

23           THE COURT:   Yes.

24   BY MR. NOVICK:

25   Q.   Can you tell us very briefly, in your experience,

1    what kind of company Benistar was?

2    A.    There was multiple operations to Benistar.  Typically

3    they described themselves as a third-party administrator

4    of employee benefit plans.

5    Q.    And you said that there were multiple entities?

6    A.    Correct.

7    Q.    So Benistar, you're using sort of as an umbrella

8    term?

9    A.    I am.

10   Q.    Do you know how many entities were at the location?

11   A.    I do not know.

12   Q.    Were you aware of any particular person that

13   controlled the companies that called 100 Grist Mill Road

14   company home?

15   A.    Dan Carpenter was located there.

16   Q.    You said that the principal occupation of these

17   various businesses was third-party administrator --

18   A.    Correct.

19   Q.    -- of particular types of plans or entities?

20   A.    Yes.  So there was one side of the house that did

21   health plans and prescription plans, and then the other

22   side of the house that did kind of different types of

23   employee welfare benefit plans.

24   Q.    Okay.  And did you deal with that particular part of

25   the business, one side or the other?

1    A.    I was on the side of the employee welfare benefit

2    plans.

3    Q.    Did those employee welfare benefit plans that you

4    dealt with have a particular numerical designation

5    associated with them?

6    A.    They were call 419s.

7    Q.    To your knowledge, where does that come from?

8    A.    Internal Revenue code.

9    Q.    Section 419?

10   A.    Correct.

11   Q.    Did you have background in Section 419 of the

12   Internal Revenue code before you got to the Benistar

13   entities?

14   A.    I did not.

15   Q.    How did you learn about them?

16   A.    Upon joining at 100 Grist Mill Road, being employed

17   there, I was taught by Dan Carpenter and Guy Neumann how

18   the plans work.

19   Q.    Can you tell the judge your understanding, very

20   briefly, what is -- in general terms, what is a 419 plan?

21   A.    It's an employee welfare benefit plan where a

22   participating employer can adopt it for the benefit of his

23   company and his employees, and provide certain types of

24   welfare benefits.

25   Q.    And the vehicles through which they provide these

1  benefits, is there a typical mechanism?

2  A.   What do you mean by "vehicles"?

3  Q.   In other words, investment vehicle; how are the

4  benefits typically provided, through what?

5  A.   Well, for an investment of the plan was typically

6  invested in insurance contracts, either life insurance or

7  annuities.

8  Q.   And the time that you worked at Benistar, were there

9  different types of 419 plans, different sections of the

10  code?

11  A.   There were.

12  Q.   Can you tell the judge what the different types were?

13  A.   419a(f)(6) and 419(e) plans.

14  Q.   Can you explain the distinction between the two of

15  them, to your knowledge?

16  A.   Sure.  419a(f)(6) plan was a multiple-employer plan

17  with 10 or more employers.  The plan exhibited certain

18  characteristics.  An employer was able to take an

19  unlimited deduction for the type of plan.

20  Q.   What was the other type of plan?

21  A.   419(e) plan.  The main difference between the two was

22  the amount of the deduction that an employer could take

23  for their contribution to the plan.

24  Q.   And was there a distinction in time between the AF6

25  and the E plans; in other words, when ones were offered as

1    opposed to the other, did something happen with the AF6

2    plans?

3    A.    Yeah.   The AF6 plans were under scrutiny from the IRS

4    for a number of years due to the increased scrutiny.

5    Those plans fell out of favor with people who were

6    promoting them, and then the 419(e) plans became a more

7    viable alternative at the time.

8    Q.    Why were they more viable?

9    A.    Because the deduction that an employer could

10   potentially take was not unlimited.   It was limited to

11   what was referred to as the qualified cost for the

12   benefits provided for the plan.

13   Q.    And what you've just described to us, are these the

14   things that you learned while working at Benistar?

15   A.    It was.

16   Q.    Now, you're talking about employee welfare benefit

17   plans providing some benefits to the employer -- the plan

18   to provide benefits to the employee, is that correct?

19   A.    That is correct.

20   Q.    And what kinds of benefits can be provided in an

21   employer welfare benefit plan?

22   A.    Multiple benefits.   The ones that we provided or were

23   provided in our plan were death benefits, accident,

24   sickness, health, disability, long-term care, and various

25   health benefits, and even educational benefits.

1    Q.   Would you have different trusts that provided

2    different types of benefits?

3    A.   Yes.  Different trusts provided different types of

4    benefits.

5    Q.   Now, prior to -- you said you learned about 419 from

6    Mr. Carpenter and Mr. Neumann.

7         Prior to joining Benistar, did you have any

8    experience whatsoever with 419 plans?

9    A.   I did not.

10   Q.   When you got hired at Benistar, what was your job,

11   what were you supposed to be doing?

12   A.   Primarily, I was educating brokers, financial

13   advisers, on the various types of plans we offered and how

14   the plans worked.  We were offering educational conference

15   calls, seminars, also running illustrations and associated

16   support for the different sales for the plans.

17   Q.   Okay.  You used the word there -- we'll talk about it

18   in a couple minutes, but you mentioned illustrations.

19        What do you mean by "illustrations"?

20   A.   Illustrations from the insurance companies, that was

21   a projection of how the policies would perform under

22   certain assumptions.

23   Q.   The assumptions include the amount of insurance and

24   what else?

25   A.   It would include the amount of insurance, the

1    projected premium outlay, and the projection of cash

2    values and how they performed.

3    Q.   And during your time at Benistar, did you deal with

4    419(e) plans, AF6 plans, or both?

5    A.   I dealt with both.

6    Q.   Can you tell the judge, to your recollection, which

7    of the plans did you deal with while you were at Benistar?

8    A.   So there was Life 1, Life 5, SADI, LTC Trust,

9    Survivorship Trust, there was Grist Mill Trust, Grist Mill

10   Living Benefits Trust, Jefferson Trust, Charter Oak Trust.

11   Q.   And the Life 1, Life 5, SADI, LTC Trust, did that

12   fall under a particular type of plan or header?

13   A.   419a(f)(6).

14   Q.   The Grist Mill Trust, what kind of trust was that?

15   A.   That was the one that was described under 419(e).

16   Q.   And what kind of benefit was provided in the Grist

17   Mill Trust?

18   A.   The straight Grist Mill Trust, it was a life

19   insurance benefit or a death benefit provided.

20   Q.   Would that be provided as a death benefit welfare

21   only benefit plan?

22   A.   Yes.

23   Q.   In the Grist Mill Trust, that 419(e) death benefit

24   only that you referenced, where did the money come from to

25   pay the insurance premiums within the Grist Mill Trust?

1    A.    They came from the employers that adopted the plan.

2    Q.    Mechanically, the employers would pay the money into

3    the trust, and the trust would pay for the insurance?

4    A.    Correct.

5    Q.    Can you explain your understanding, based again on

6    your time working at 100 Grist Mill Road, what the

7    advantages were to an employer adopting a 419(e) plan?

8    A.    So, I mean, in addition to the tax deduction that may

9    be available to the employer for the contribution made to

10   the plan, they could also provide these benefits to their

11   covered employees in the plan, life insurance or death

12   benefit.  And also, there was no gift tax implications.

13   There's creditor protection, assets were outside of the

14   employer's and the business owner's estate.

15   Q.    Were these plans, in particular the Grist Mill Trust

16   and the 419(e) plans marketed to, or aimed at, a

17   particular type of company and employee?

18   A.    Yeah.  They were typically aimed at small to medium

19   size, closely held businesses.

20   Q.    Within the small to medium size, closely held

21   businesses, who were typically the participants?

22   A.    Typically it was the owner-employee himself.

23   Q.    In an employee welfare benefit plan, did it have to

24   cover all the employees of an entity?

25   A.    The way our plans were designed, they did not have to

1    provide it to all covered employees or to all

2    eligibility -- to all employees.

3    Q.   Are you familiar -- you mentioned this a second

4    ago -- with the Charter Oak Trust?

5    A.   I am.

6    Q.   Did you have any involvement with the Charter Oak

7    Trust?

8    A.   I did.

9    Q.   What was your involvement?

10   A.   My involvement with the Charter Oak Trust would be

11   similar to with the other plans, but not to that extent.

12   I was more of a support with regards to, you know, helping

13   with illustrations; putting packages together, emails

14   together of information for review; and if there was any

15   discussions regarding the plan or any concerns were raised

16   in the course of business, I was usually a participant in

17   those as well too.

18   Q.   I missed the last part of that.

19   A.   Sorry.  I was usually a participant in those

20   discussions as well.

21   Q.   On its surface, what was the Charter Oak Trust set up

22   as?

23   A.   It was set up as a 419(e) plan like the Grist Mill

24   Trust.

25   Q.   And in truth, did the Charter Oak Trust operate as a

1    419(e) welfare benefit plan?

2    A.   It did not.

3    Q.   What was its true purpose, in your observation and

4    experience?

5              MR. GUARNIERI:  I'm going to object, Your Honor,

6    to improper foundation.  So far we've heard this person

7    was involved in certain aspects of the trust, but we

8    haven't heard sufficient information to justify how this

9    person has information about the day-to-day operation or

10   purpose of that trust, Your Honor.

11             THE COURT:  Mr. Novick?

12             MR. NOVICK:  Your Honor, I stand by the

13   question.  I think he's said he had experience with the

14   Charter Oak Trust.  He worked there.

15             THE COURT:  You may proceed.

16   BY MR. NOVICK:

17   Q.   Do you want me to repeat the question?

18   A.   Please.

19   Q.   You had testified a second ago that the Charter Oak

20   Trust did not operate as a true 419(e) welfare benefit

21   plan.

22        And then I'd asked you:  Can you tell us, based on

23   your experience, what was the true purpose of the Charter

24   Oak Trust?

25   A.   The true purpose, from my observations, were to

1    originate policies on older insureds for the eventual sale

2    in the secondary market.

3    Q.   Why was it necessary -- or why was a structure or the

4    framework of a 419(e) welfare benefit plan used?

5    A.   Because there was certain of the insurance carriers

6    that participated, had blessed the 419(e) concept; and so,

7    therefore, was used as a disguise for the true intentions

8    of the plan.

9    Q.   How did you come to learn about the Charter Oak

10   Trust?

11   A.   Through my interactions in the office there,

12   primarily through Guy Neumann and Dan Carpenter.

13   Q.   In your experience or knowledge, based on being there

14   and learning about the trust, who did you come to learn,

15   created or designed the trust?

16   A.   That was designed by Dan.

17   Q.   When you say "Dan," you're referring to

18   Mr. Carpenter?

19   A.   I am.

20   Q.   In the Charter Oak Trust, would employers be paying

21   premiums into the trusts for the purpose of maintaining

22   these welfare benefits?

23   A.   To the best of my knowledge, no.

24   Q.   Who was actually funding the premiums into the

25   Charter Oak Trust?

1    A.   There was third parties that were putting the money

2    inside the trust to fund these policies.

3    Q.   On day one, when the Charter Oak fund was begun, was

4    there any money in the fund, or did it have to come from

5    outside sources?

6    A.   The money came from outside sources.

7    Q.   Do you know what those outside sources were?

8    A.   There's two.  There was one that was Ridgewood

9    Capital, or Ridgewood; and then there's also Grist Mill

10   Capital.

11   Q.   Whose entity was Grist Mill Capital?

12   A.   That was controlled by Dan Carpenter.

13   Q.   And Ridgewood was an outside entity?

14   A.   I believe that was a hedge fund.

15   Q.   Let's discuss some of the aspects of the Charter Oak

16   Trust, as you discussed them.

17        You mentioned a little bit about this before, but

18   first:  Who was the target insured for the Charter Oak

19   Trust?

20   A.   Typically was older insureds, age 70 and above, that

21   were higher net worth.

22   Q.   Why was it important to have older folks involved as

23   well as higher net-worth individuals?

24   A.   Higher net-worth individuals would be larger face

25   amounts, larger death benefits, that were contemplated

1    being purchased, and also for older individuals because

2    they had a less of a period that they were expected to

3    live.

4    Q.   And what impact would that have in terms of the

5    purpose of the Charter Oak Trust in general?

6    A.   So people had a less of a time horizon for life

7    expectancy.  It was easier to calculate how much premium

8    would have to go into that policy in relation to when the

9    person passed away.

10   Q.   And in terms of the value, did it have a fact on the

11   value of the expected policies on the secondary marked?

12   A.   For how long the people were expected to live?

13   Q.   Yes.

14        MR. GUARNIERI:  I'm going to object again, Your

15   Honor, foundation.  And I'll just briefly state that we're

16   now moving into life expectancy markets.  We haven't heard

17   any testimony that this witness has a knowledge to testify

18   with regard to those secondary markets.

19        MR. NOVICK:  I stand by the question, Your

20   Honor.  I think it's relevant.

21        THE COURT:  You may proceed.

22   BY MR. NOVICK:

23   Q.   The question was again:  What relevance or import did

24   the age of the individual, as well as the size of the

25   death benefits, have on the salability of the value of the

1    policy in a secondary market?

2    A.   I don't understand the question.  Would you repeat

3    it?

4    Q.   Were the age of the individual and the value of the

5    policy -- I'm sorry.  Let's start with the age of the

6    individual:  Did those play into the ability to sell the

7    policy on the secondary market; in other words,

8    originating policies with those factors?

9    A.   Yeah.  The -- once again, the older individuals had a

10   shorter life expectancy, so it was easier to determine the

11   value of the policy for the secondary market.

12   Q.   Was there another way, in addition to eventually

13   selling the policies on the secondary market, that money

14   would be made through the sale of these insurance

15   policies?

16   A.   Once again, can you repeat the question?

17   Q.   Sure.  Let me ask you this:  On any insurance policy,

18   are you familiar with the concept of commissions?

19   A.   I am.

20   Q.   How are commissions typically -- can you tell us very

21   briefly how commissions work on the types of insurance

22   policies that were in the Charter Oak Trust?

23   A.   The types of policies were typically universal life

24   policies, and the commission was driven or was -- was

25   driven by the age and the face amount of the life

1    insurance policy, and then the health rating associated

2    with that.  The older the individual, the higher the face

3    amount -- depending on the health rating, the higher it

4    was referred to -- and the target premium would be for

5    that case.

6    Q.    Did the target premium relate to the commission

7    amount?

8    A.    Yes, it did.

9    Q.    How?

10   A.    That was the calculation that the insurance company

11   would use, the target premium, to pay out commissions for

12   premiums paid into the life insurance contract.

13   Q.    And typically what percentage of the target premium

14   would be paid as a commission?

15   A.    It varied from carrier to carrier; but, you know, for

16   instance, on average you'd probably look at an insurance

17   carrier that, if a hundred thousand dollars' insurance

18   premium was paid, the insurance company would pay out

19   around $120,000 in commission in the first year.

20   Q.    Would that include things like overrides as well?

21   A.    It would.

22   Q.    So in other words, the age, death benefit, and those

23   kind of factors figure into the premium which dictates the

24   commission, is that correct?

25   A.    Right, correct.

1    Q.   In the Charter Oak Trust, did the Charter Oak Trust

2    take a portion of the commission paid on the policy?

3    A.   They did.

4    Q.   Do you know how much they took?

5    A.   It ranged, but I believe it was typically around

6    40 percent that an in-house agent went down on the

7    application for.

8    Q.   And that 40 percent, was that the same or different

9    from, say, the Grist Mill trust?

10   A.   It was different.

11   Q.   And what was the percentage of that, 100 Grist Mill

12   Road took on the Grist Mill Trust?

13   A.   Twenty percent.

14   Q.   So it was double the amount or the percentage in the

15   Charter Oak Trust?

16   A.   Correct.

17   Q.   In those large commissions on the Charter Oak Trust

18   policies, when they came into the 100 Grist Mill Road

19   entities, was there an entity they went into?

20   A.   Yeah.  TPG Group.

21   Q.   What was TPG Group?

22   A.   I was not sure the purpose of it otherwise, to

23   receive commissions.

24   Q.   But that was another of the entities that was housed

25   at 100 Grist Mill Road?

1    A.    Correct.

2    Q.    You mentioned a few minutes ago that there were two

3    funding sources, Grist Mill Capital and Ridgewood.

4          Do you recall how the funding, the Ridgewood funding,

5    was initially located?

6          Were you involved in those discussions?

7    A.    I was not.

8    Q.    Were you generally aware of the fact that they were

9    occurring?

10   A.    I was.

11   Q.    Do you recall who from the Benistar entities was

12   involved in those discussions, to your observation?

13   A.    The people that I recall that were involved directly

14   in the discussions were Guy Neumann, Dan Trudeau, and Jack

15   Robinson.

16   Q.    You said Dan Trudeau or --

17   A.    Don Trudeau.   Sorry.

18   Q.    Was Mr. Carpenter involved in those discussions as

19   well?

20   A.    Not that I can recall.

21   Q.    So it was Don Trudeau, Jack Robinson, and Guy Neumann

22   involved in discussing the funder?

23   A.    Correct.

24   Q.    Involved in meetings, particularly?

25   A.    Yes.

1    Q.   So when you say who was involved, your observation is

2    there was meetings and those were the folks involved?

3    A.   Yeah.   There was a specific meeting that I recall.

4    Q.   Were you actually in the meeting?

5    A.   I was not.

6    Q.   How did you learn about it?

7    A.   So it was a meeting that took place at 100 Grist Mill

8    Road in the conference room.   My office was located close

9    to the conference room.   The three gentlemen that were in

10   the meeting worked with Ridgewood.

11        After the meeting they were celebrating and giving

12   high-fives that they had secured the funding source.   So

13   after that meeting, you know, we were made aware that the

14   plan had received blessing or funding from Ridgewood in

15   that instance.

16   Q.   Was the Charter Oak Trust widely marketed?

17   A.   It was not.

18   Q.   How was it marketed or sold?

19   A.   I guess we refer to it as friends and family of

20   100 Grist Mill Road, advisers that were close to the

21   company.

22   Q.   Who were some of these advisers or brokers that you

23   were aware of transacting business with the Charter Oak

24   Trust?

25   A.   Charlie Induddi-Westcott, Ed Waesche, a guy named

1    Pacini.  There was a Fred Prelle's Agency down in Houston,

2    Texas.

3    Q.   So you said Charlie Induddi-Westcott; Ed Waesche;

4    Pacini, down in Texas, and he was part of --

5    A.   Fred Prelle.

6    Q.   Fred Prelle?

7    A.   He's an associate of Charlie Induddi's, and he owned

8    an agency down in Texas.

9    Q.   Who was Charlie Induddi-Westcott?

10   A.   They were advisers that were affiliated with

11   100 Grist Mill Road, internal agents.

12   Q.   They worked out of either 100 Grist Mill Road or

13   another location?

14   A.   Yeah.  They worked out of either 100 Grist Mill Road

15   or there's also a Benistar location in Stamford.  That's

16   where Ed primarily worked out of, and Charlie primarily

17   worked out of his home.

18   Q.   And you mentioned this other location, 300 Stamford

19   Place?

20   A.   I wasn't sure of the address.

21   Q.   But it was a location in Stamford?

22   A.   Correct.

23   Q.   And who was Don Trudeau?

24        You mentioned his name earlier.

25   A.   I believe he was the president of Benistar.

1    Q.    Where did he work out of?

2    A.    Stamford.

3    Q.    You said you believe -- did you have a lot of

4    interaction with Mr. Trudeau?

5    A.    I did not.

6    Q.    What was the internal broker's role in the -- you

7    mentioned internal brokers, Charlie Westcott and

8    Ed Waesche.

9          What was their role in Charter Oak Trust?

10   A.    Their role was to go down for the house's percentage

11   on the application.  And also they were involved in

12   educating other brokers about the plan, recruiting them,

13   to see if they had clients who could potentially fit

14   inside the Charter Oak Trust.

15   Q.    When you say -- that would cover Charlie Westcott and

16   Ed Waesche being the internal brokers?

17   A.    Correct.

18   Q.    What was the role of the external broker, like

19   Mr. Pacini or folks like that?

20   A.    Typically their role would be to locate the potential

21   insured for the plan, and kind of educate them of the ins

22   and outs of how the plan worked.

23   Q.    What was the gist of the plan as you -- the essence

24   of the plan, as you understood, it would be marketed to

25   individual brokers and to individual insureds?

1    A.   So that it was an opportunity for them to participate

2    in the plan and get free insurance for the first two

3    years.  After two years, if and when the policy was sold

4    into the secondary market, they could potentially receive

5    a portion of the proceeds.

6    Q.   And how did you learn that that was the general gist

7    of the Charter Oak Trust?

8    A.   From general discussions in 100 Grist Mill Road,

9    amongst Dan and guy and the people involved.

10   Q.   Dan; again, Dan Carpenter?

11   A.   Dan Carpenter.

12   Q.   And Guy Neumann?

13   A.   Correct.

14   Q.   Now, were you familiar -- you said that you

15   participated in some internal operations related to the

16   Charter Oak Trust, is that right?

17   A.   That is correct.

18   Q.   And in your ordinary business -- well, I should say,

19   in other business that you had, were you familiar with

20   life insurance applications in that context as well?

21   A.   I was.

22   Q.   And were you familiar with, generally speaking, with

23   some of the questions that were asked on applications for

24   insurance that was taken within the Charter Oak Trust?

25   A.   I was.

1    Q.    How did you become familiar with those?

2    A.    From generally handling applications as they came in,

3    and also internal discussions when questions on the

4    applications would come up.

5    Q.    To your knowledge, on those applications were there

6    questions regarding the intent to sell a policy, as well

7    as the third-party funding of premiums?

8    A.    Yes, there was.

9    Q.    Were there conversations at the Benistar locations

10   or, in particular, 100 Grist Mill Road over how to answer

11   those questions?

12   A.    Yes, there were.

13   Q.    Can you tell us -- well, first of all, was that a

14   point of intention, or was that something that was

15   frequently brought up?

16   A.    Yeah.  That was brought up quite frequently, in

17   regards to both the internal advisers' agents and the

18   external ones, on how to properly answer the questions on

19   the applications, specifically life settlement and premium

20   finance.

21   Q.    And what was the gist or the essence of those

22   directives given regarding to those questions, how to

23   answer those questions?

24   A.    The directions were to answer "no" to those on the

25   applications.

1    Q.   In other words, that there was no premium financing

2    and there was no intent to sell or life settlement these

3    policies?

4    A.   Correct.

5    Q.   Did you have conversations specifically with

6    Mr. Carpenter to that effect?

7    A.   I didn't myself specifically with Dan, but there was

8    numerous meetings that we would have, that were driven by

9    Dan, where we'd have discussions on how to properly answer

10   those questions.

11   Q.   And do you recall, on the context of those meetings,

12   Mr. Carpenter saying anything with regard to how to answer

13   those questions?

14   A.   So -- well, he would instruct that the answers should

15   be "no" for those questions.

16   Q.   And do you recall him giving any justifications for

17   that?

18   A.   Two of the reasons that were brought up, were

19   floated, were that the plan was actually premium funding,

20   not premium financing; and also that it could be construed

21   as some sort of executive split-dollar agreement.

22   Q.   Could be construed as that?

23   A.   Sure, yes.

24   Q.   Did you understand what the difference was between

25   premium financing and premium funding, practically

1    speaking?

2    A.    In my opinion it was just a play on words.

3    Q.    And did you understand this to be a split-dollar

4    arrangement based on what you understood split-dollar to

5    be?

6    A.    No.

7    Q.    Did you understand the insurance companies to know,

8    based on what was provided to them, that the policies were

9    being either funded or financed by a third party?

10   A.    They were unaware.

11   Q.    How were -- consistent with what we discussed, how

12   were the insurance application questions about funding or

13   financing answered?

14   A.    They were answered that that was not taking place or

15   answered no.

16   Q.    And why were they answered no?

17   A.    It was under direction from Dan Carpenter.

18   Q.    What was the reason or the import for having to

19   answer those questions no?

20   A.    If they were answered yes, the insurance company

21   could potentially ask more questions regarding the yes

22   questions that were answered, and then potentially cause

23   the policies not to be issued inside the plan.

24   Q.    Were there documents for enrolling in the Charter Oak

25   Trust?

1    A.    There were.

2    Q.    And did those documents reflect information about the

3    funding arrangement?

4    A.    There was the A, B and C documents.  And the C

5    documents indicated the funding arrangement.

6    Q.    Just make sure I understand what you're saying:

7    There's three sets of documents for the enrollment in the

8    Charter Oak Trust, right?

9    A.    Correct.

10   Q.    And the A documents, B documents, and C documents?

11   A.    Correct.

12   Q.    And the C documents, is this document that discusses

13   the funding arrangement?

14   A.    That is correct.

15   Q.    Was that ever sent to the insurance company, to your

16   knowledge?

17   A.    No.

18   Q.    Are you familiar with what's commonly referred to as

19   a life expectancy report or life expectancy evaluation?

20   A.    I am.

21   Q.    What is it?

22   A.    It's a report that's obtained from a third party that

23   will determine, in their opinion, the person's life

24   expectancy based on their medical records.

25              MR. GUARNIERI:  Sorry, Your Honor.  I'm going to

1    object to that one on the basis of foundation as well.

2              MR. NOVICK:  I stand by the question, Your

3    Honor.  It's relevant.

4              THE COURT:  The question is whether the witness

5    is familiar with --

6              MR. NOVICK:  -- the life expectancy report or

7    evaluation.  He said he was, and I asked him what it was.

8              THE COURT:  You may proceed.

9    BY MR. NOVICK:

10   Q.   I think you had answered the question.

11        And you said this is done by third parties like

12   outside companies?

13   A.   Correct.

14   Q.   Do you remember some of the names of the companies?

15   A.   ABS, Fasano, and 21st.

16   Q.   And they did that, based on medical records that

17   would be provided to them?

18   A.   Correct.

19   Q.   Were life expectancy reports run on the insureds in

20   the Charter Oak Trust?

21   A.   They were.

22   Q.   What was the purpose of running a life expectancy

23   report for an insured in the Charter Oak Trust?

24   A.   It was used to determine the potential value of the

25   policy.

1          MR. GUARNIERI:  Object as well, Your Honor, to

2     foundation for that.

3          THE COURT:  Overruled.

4     BY MR. NOVICK:

5     Q.   And in fact, were the -- was the running of a life

6     expectancy report required in the course of funding or

7     valuating a policy for the Charter Oak Trust?

8     A.   To the best of my knowledge, yes.

9     Q.   And were there cases where the life expectancy report

10    or the outcome of this report would cause the funder to

11    decline to fund a particular policy?

12    A.   Yes, there were.

13    Q.   Why?

14    A.   They viewed that the policy didn't have value in the

15    secondary market.

16    Q.   And what might happen in that case; if a policy was

17    determined not to be something that the funder wanted to

18    fund, what could happen in that event?

19         MR. GUARNIERI:  Objection, Your Honor.  Calls

20    for speculation.

21          THE COURT:  Overruled.

22          THE WITNESS:  In that instance, depending on the

23    relationship with the external adviser that brought the

24    case, the size of the case, and the amount of commission

25    would potentially to be paid, it could be brought to Dan's

1    attention, and then he could decide whether or not to use

2    funds at his disposal to fund that contract.

3    BY MR. NOVICK:

4    Q.   You mentioned earlier this entity, Grist Mill

5    Capital.

6         Would that be the entity, or at least one of the

7    entities that might engage in that?

8    A.   It could be, yes.

9    Q.   Were there other entities that Mr. Carpenter had at

10   100 Grist Mill Road?

11   A.   Numerous entities.

12   Q.   Are you familiar with an individual named Wayne

13   Bursey?

14   A.   Yes, I am.

15   Q.   What was Mr. Bursey's role?

16   A.   He was the trustee of all of the plans, the trusts

17   that we had at 100 Grist Mill Road.

18   Q.   And did he have a relationship with the defendant?

19   A.   He was his brother-in-law through marriage.

20   Q.   So their sisters are wives?

21   A.   Correct.  Sisters --

22   Q.   Their wives are sisters?

23   A.   Correct.

24   Q.   Apologies.

25        Did -- you said Mr. Bursey was a trustee.

1       Did he have independent ability to make major

2   decisions by himself?

3   A.   He did not.

4   Q.   Who did he answer to or report to?

5   A.   To Dan Carpenter.

6   Q.   You mentioned earlier, Charlie Westcott, one of these

7   outside -- or, sorry, inside internal advisers or brokers.

8       Did you ever witness conversations between

9   Mr. Westcott and Mr. Carpenter regarding concerns about

10  the Charter Oak Trust?

11  A.   I did.

12  Q.   What can you tell us, what you observed?

13  A.   Charlie really had issues with the way that he was

14  being instructed to fill out the application.  There's no

15  premium financing help, no talk of life settlements.

16  There was a bone of contention numerous times between him

17  and Dan on how to properly fill these applications out.

18           MR. GUARNIERI:  Objection, Your Honor.  Hearsay.

19           MR. NOVICK:  Number one, defendant's statement;

20  number two, co-conspirator's statements.

21           THE COURT:  Okay.

22           I take it you were present at the discussions

23  that you refer to?

24           THE WITNESS:  Correct.

25           THE COURT:  You may proceed.

1           MR. NOVICK:  Thank you, Your Honor.

2    BY MR. NOVICK:

3    Q.   That was my next question.

4         Are you -- how was it that you were privy to these

5    conversations, or observed or overheard these

6    conversations?

7    A.   So whenever there was concerns like this brought up

8    by Charlie or any external brokers, a meeting would be

9    held -- take place at 100 Grist Mill Road; and these

10   discussions would take place, either internally or

11   sometimes we'd have conference calls with outside parties,

12   in regards to some of the concerns regarding the plan.

13           MR. GUARNIERI:  Your Honor, I'm sorry, if I may

14   renew the objection to hearsay and state, Your Honor,

15   we've never been provided a list of co-conspirators in

16   this case.  At this point it's kind of an amorphous

17   concept to indicate who is a co-conspirator.

18           I believe we're hearing conversations that the

19   witness has testified Mr. Carpenter was present at, but

20   not necessarily words that he spoke or conversations from

21   his side of it.

22           So I would renew my objection, Your Honor.

23           THE COURT:  Okay.

24           Mr. Novick, perhaps it would be best if you

25   could clarify with the witness who said what.

1             MR. NOVICK:  Understood.  I thought I was clear,

2      but let me clarify.

3      BY MR. NOVICK:

4      Q.   These were conversations that you observed -- we'd

5      asked about -- specifically here about concerns being

6      raised by Mr. Westcott, and answers being given by

7      Mr. Carpenter, is that correct?

8      A.   Correct.

9      Q.   And that's what we're talking about here?

10     A.   That is correct.

11     Q.   And these were conversations in the context of

12     meetings that you observed?

13     A.   That is correct.

14            THE COURT:  What did you hear Mr. Carpenter say

15     to Mr. Westcott?

16            THE WITNESS:  He was instructing him just to

17     make sure the applications are signed no, in regards to

18     the financing and life settlement motions.

19            THE COURT:  All right.

20     BY MR. NOVICK:

21     Q.   Did you hear him -- we talked about some of the

22     explanations that were given earlier:  The funding versus

23     financing; it's like split-dollar.

24          Did you ever hear him give those explanations as

25     well?

1    A.   Yes, he did.

2    Q.   Were there particular companies in these

3    conversations that Mr. Westcott, based on your

4    observations, was concerned about?

5    A.   Charlie was primarily concerned with Lincoln

6    National.

7    Q.   And did, in fact, something eventually happen with

8    regard to Mr. Westcott's relationship to Lincoln National?

9    A.   Yes.  He was eventually terminated.

10   Q.   Were other folks terminated?

11   A.   Everyone associated with 100 Grist Mill Road was

12   terminated.

13   Q.   Are you familiar with the term "stranger-originated

14   life insurance," or STOLI --

15   A.   I am.

16   Q.   -- or "investor-originated life insurance," or IOLI?

17   A.   I am.

18   Q.   What did you -- just generally speaking, based on

19   your knowledge that you gained working at Benistar, what

20   did you understand that concept to be?

21   A.   It's when a third party, who had no financial

22   interest in the life of an insured, was participating in

23   purchasing the policy on an individual.

24          MR. BROWN:  I'm sorry, I couldn't hear.  Could I

25   ask that be read back or repeated.  He has to keep his

1    voice up.

2              THE WITNESS:  So stranger-owned life insurance

3    is when a third party is involved in a life insurance

4    policy, and where they have no financial interest in the

5    life of that insured.

6    BY MR. NOVICK:

7    Q.   And no other interest in the life of that insured as

8    well?

9    A.   No insurable interest.

10   Q.   Did you understand that, generally, to involve a

11   particular end result or purpose?

12   A.   Typically either to resell that policy in the

13   secondary market or collect on the death proceeds of the

14   death of that individual.

15   Q.   Were there discussions of STOLI or IOLI at the

16   Benistar offices?

17   A.   Yes, there were discussions.

18   Q.   Did you have an understanding -- again, based on your

19   experience working at Benistar and with the various

20   insurance carriers, did you have an understanding of the

21   insurance industry's position on STOLI, as of 2007?

22   A.   They did not want to participate in STOLI

23   transactions.

24   Q.   And was that a concern, based on your observations at

25   100 Grist Mill Road?

1    A.    Yes, it was a concern.

2    Q.    Why?

3    A.    The viability of the trust.  If the carriers were to

4    understand what was truly taking place, the transaction

5    origination of the policies couldn't take place; and,

6    therefore, there would be no revenue generated from the

7    origination of these policies.

8    Q.    And in particular, you talked to me about one of the

9    particular trusts here, that we're referencing?

10   A.    The Charter Oak Trust.

11   Q.    I'm going to show you some documents at this point.

12   You have a binder of documents in front of you, and I'm

13   going to pull them up.

14         MR. NOVICK:  Your Honor, since there's no jury,

15   I can pull the document up on the screen to make it easier

16   for the Court, rather than going through the

17   authentication process.

18         THE COURT:  That's fine.

19         MR. NOVICK:  Any objection from counsel?

20         MR. GUARNIERI:  No objection.

21   BY MR. NOVICK:

22   Q.    I'm going to first direct you to Exhibit 2001.

23         MR. NOVICK:  Your Honor, I am going to work

24   principally off of -- solely off of the correspondence

25   binders for the duration of his testimony.

1          And it will be on the screen, and also it will

2    be the first document in your binder, Mr. Cherneski.

3    BY MR. NOVICK:

4    Q.   Mr. Cherneski, what is this?

5    A.   Email from Ron Lanza; dated Wednesday, December 7,

6    2005; to Dan Carpenter, Charlie Induddi, Rich Belding,

7    Ed Waesche, Guy Neumann, myself, and someone named J. Cox;

8    subject is:  "Jefferson Pilot's View"; and attachment,

9    "JPS Position on STOLI/IOLI Business."

10   Q.   Who is Ron Lanza?

11   A.   Also an individual that worked internally at Grist

12   Mill Road such as myself.

13   Q.   Similar role to you?

14   A.   Similar.

15          MR. NOVICK:  Your Honor, I'd offer Exhibit 2001.

16          MR. GUARNIERI:  No objection.

17          THE COURT:  Thank you.

18   BY MR. NOVICK:

19   Q.   What is Jefferson Pilot?

20   A.   A life insurance company.

21   Q.   And did it merge or become part of another life

22   insurance company after this?

23   A.   It did.  It joined up with Lincoln National.

24   Q.   You said that there was an attachment to this

25   document, correct?

1    A.    Correct.

2    Q.    Let's take a look at the attachment.

3          Can you read the title of the attachment for us, and

4    then just the first two paragraphs on the page?

5    A.    Sure.

6          "Stranger-owned life insurance, SOLI; or

7    investor-owned initiated life insurance, IOLI.  Jefferson

8    Pilot Financial, JPF, has been increasingly concerned that

9    individuals are being recruited to consent to the purchase

10   of life insurance and annuities on their lives.  In some

11   instances the individual is told that a charity will

12   receive part of the death benefit at no cost to the

13   charity.  In other instances, the individual is told that

14   they can receive free insurance coverage for a year or

15   two, with the option to retain the policy by repaying the

16   loan.  Some concepts also contemplate a life settlement of

17   the policy.  Because the 'strangers' or 'investors'

18   financing these programs are not interested in long-term

19   investments, these programs typically target an older

20   individual with high net worth that can qualify for large

21   amounts of insurance.

22         "We all have a stake in protecting our franchise, a

23   reputation in our industry, including the tax-favored

24   status of our products.  For all these reasons, and until

25   a change occurs which would merit reconsideration of our

1    position, JPF will no longer accept applications for life

2    or annuity policies sold for SOLI or IOLI programs.  If

3    you know or should know that a SOLI or IOLI program is

4    involved, you are asked and instructed not to submit

5    applications to a JPF insurer.  Submission of an

6    application and violation of this policy will result in

7    disciplinary action up to and including termination for

8    cause.

9         "There are numerous variations of SOLI and IOLI, and

10   Jefferson Pilot Financial is not interested in selling

11   life insurance if this is part of it."

12   Q.   If you could go down to paragraph 4, on the same

13   page.

14   A.   "Underwriting and issuing life insurance where the

15   primarily recipient of the life insurance proceeds does

16   not suffer an economic loss at the insured's death strikes

17   at the heart of our needs-based selling and our

18   underwriting process.  Our reinsurers do not want this

19   business, citing lack of financial need, concerns over

20   insurable interest, and targeting older consumers."

21   Q.   Is what was we read here in this document generally

22   consistent with your understanding of the positions of the

23   various life insurance carriers that you all dealt with at

24   100 Grist Mill Road, at the time in 2006, 2007, 2008?

25   A.   It is my understanding, yes, all insurance carriers

1    held a similar position.

2    Q.    Did that position remain consistent through the time

3    of the operation of the Charter Oak Trust, based on your

4    observation?

5    A.    Yes, it did.

6    Q.    In fact, did there become increased restrictions and

7    underwriting questions over time?

8    A.    I would say, over time the scrutiny that was upon

9    these types of arrangements by the insurance companies

10   greatly increased over time.

11   Q.    I'm going to look now -- well, let me ask you this:

12   Did you see other positions similar to this circulated

13   through the 100 Grist Mill Road office via email or other

14   means?

15   A.    Yes.

16   Q.    Take a look at the next document I'm going to show

17   you, is Government's Exhibit 2125.

18   A.    That's tab 2?

19   Q.    That should be the next one in your book --

20   A.    Right.

21   Q.    -- and I'll pull it up on the screen.

22         We're looking at Exhibit 2125.

23         Do you have that in front of you?

24   A.    I do.

25              MR. NOVICK:  Give me one moment, please, Your

1      Honor?

2              THE COURT:  Sure.

3              MR. NOVICK:  Your Honor, can I ask a brief

4      question?

5              Would it be -- I'm trying not to create too many

6      versions of the exhibits that everybody has, and I

7      understand and suspect that people will make notes on

8      theirs, but at the same time I want this to go as

9      efficiently as possible.  I made a binder of copies of

10     documents for the witness to use to make him -- so that he

11     knows what he's looking at.

12             Would it be easier for the Court to make copies

13     of that binder for it to have in front of it, or would the

14     Court rather work off the copies that the Court is going

15     to have for all the witnesses?

16             THE COURT:  I'm sorry, but I don't follow your

17     question.

18             MR. NOVICK:  I'm not articulating it right.

19             Would it be easier for the Court if, for each

20     witness, I gave the Court a separate document that I

21     anticipate that witness talking about, or would the Court

22     prefer to work off the set of copies that you have?

23             THE COURT:  I think I'm fine with the set that I

24     have.  If that changes, I'll let you know.

25             MR. NOVICK:  That's fine.  Thank you, Your

1    Honor.

2    BY MR. NOVICK:

3    Q.   All right.  So we're looking now at Exhibit 2125.

4         What is that?

5    A.   It's an email from Ed Waesche; dated Wednesday,

6    May 21, 2008; to Dan Carpenter, Don Trudeau; cc'ing Guy

7    Neumann and myself; and the subject is, "Important

8    Announcement From Phoenix."

9              MR. NOVICK:  Your Honor, I would offer

10   Exhibit 2125?

11             MR. GUARNIERI:  No objection, Your Honor.

12             THE COURT:  Thank you.

13   BY MR. NOVICK:

14   Q.   You indicated that it says, "See below."

15        Did this forward another email?

16   A.   It did.

17   Q.   And who is the other email from?

18   A.   It's from Elizabeth Brochu, appears to be from

19   Phoenix, to Ed Waesche.

20   Q.   What was Phoenix?

21   A.   Phoenix was one of the insurance companies that we

22   dealt with.

23   Q.   Turn to page 2 of this email.  Actually, let's turn

24   to page 3.  Here we go, page 2 of this email.

25        Can you read the title of the attachment here?

1    A.    Yes.  It says:  "Phoenix Position on

2    Stranger-Originated Life Insurance."

3    Q.    Can you read that first paragraph there?

4    A.    "The objective of this communication is to share

5    Phoenix's position on stranger-originated life insurance

6    and to notify you of the consequences a producer faces in

7    submitting this kind of business."

8    Q.    And you can go on to the next sentence?

9    A.    "You'll find the following included in this

10   communication."

11   Q.    And was there a -- where it's underlined

12   "communication," what does that appear to be?

13   A.    Appears to be a hyperlink.

14   Q.    Let's take a look at Exhibit 2126, the next exhibit.

15         What does that appear to be?

16   A.    This appears to be the article that was indicated on

17   the hyperlink.

18   Q.    So if you clicked on the hyperlink, you'd get to this

19   document?

20   A.    Appears so.

21   Q.    On the bottom there, it says:  "508 for producer use

22   only," is that right?

23   A.    Yes.

24   Q.    Again I'll have you read just the paragraph, title,

25   and paragraphs 1 through 3 this document?

1    A.    Sure.

2         "Phoenix Position on Stranger-Originated Life

3    Insurance.  The objective of this communication is to

4    share Phoenix's position on stranger-originated life

5    insurance and to notify you of the consequences a producer

6    faces in submitting this kind of business.

7         "Stranger-originated life insurance, STOLI, also

8    known as investor-originated life insurance, IOLI, is a

9    practice where a policy is initiated with the sole intent

10   of being sold to speculators or investors.  Unfortunately,

11   STOLI promoters often target retirees who may be unaware

12   of tax liability and transaction costs, as well as the

13   impact on their ability to obtain in the insurance in the

14   future.  This and other inferior business practices have

15   led to industry abuses.

16        "Phoenix will not engage in this business and is

17   opposed to any transactions that manufacture life

18   insurance specifically to position for early sale.  We

19   have rigorous screening measures in place today to detect

20   this business, and we continue to refine this process."

21   Q.    Is that an accurate reflection of what you understood

22   the position of insurance carriers to be in 2008?

23   A.    Yes.

24   Q.    And looking at paragraph 6 of that section, beginning

25   with, "It is our expectation," can you read that for us?

1    A.    Yes.

2          "It is our expectation that the producers who do

3    business with us share in this commitment.  If a producer

4    or firm attempts to place business with Phoenix that is

5    clearly intended for resale in the secondary market, or

6    where fraudulent information is provided to support the

7    insurance need, Phoenix will terminate the producer and/or

8    firm, and employ all other remedies available to protect

9    the Phoenix company."

10   Q.    You mentioned earlier that the Charter Oak Trust was

11   kept to a smaller set of brokers than some of the other

12   trusts the company was engaged in?

13   A.    That is correct.

14   Q.    You referred to friends and family, I think?

15   A.    Correct.

16   Q.    Take a look at Government's Exhibit 2038.

17   A.    Got it.

18   Q.    What is that?

19   A.    An email from Dan Carpenter; Monday, March 26, 2007;

20   to Derek Siewert, Bill Hutchinson, Ed Waesche, Guy

21   Neumann, myself, Don Trudeau; and Dan cc'd himself.  It's

22   forwarding "Life Insurers and Life Investors."

23          MR. NOVICK:  First, Your Honor, I'd move

24   Exhibit 2038.

25          MR. GUARNIERI:  No objection, Your Honor.

1          THE COURT:  Thank you.

2     BY MR. NOVICK:

3     Q.   Do you know who Jack Robinson is?

4     A.   Yes.

5     Q.   Who is that?

6     A.   He was the general counsel for Benistar.

7     Q.   Did you interact with him much?

8     A.   I did not.

9     Q.   Did you have an understanding of what his role was

10    with regard to the Charter Oak Trust?

11    A.   I did not.

12    Q.   And do you know who Derek Siewert is?

13    A.   I do not.

14    Q.   Is this email here forwarding another email?

15    A.   It is.

16    Q.   What's the title of the -- or subject line of the

17    earlier email?

18    A.   "Life Insurers and Life Investors."

19    Q.   And who is that from and to?

20    A.   From Don Trudeau to Dan Carpenter.

21    Q.   And Settlement Association, it reads:  "Life Insurers

22    Hypocritical on Investor Initiated Life Insurance"?

23    A.   Correct.  That appears to be the title.

24    Q.   It seems to be a Newswire article or Marketwire

25    article?

1    A.    Yes.

2    Q.    Who is this article actually from, if I look at the

3    third page, where it says:  "For more about LISA,

4    contact"?

5    A.    So that's from the Life Insurance Settlement

6    Association.

7    Q.    What is that?

8    A.    It's an organization for life settlements.

9    Q.    An industry organization?

10   A.    Yes.

11   Q.    If you go back to page 2 of this document, I'll have

12   you look at a couple of paragraphs beginning with, "The

13   ACLI has repeatedly said," and read those couple

14   paragraphs for us?

15   A.    "The ACLI has repeatedly said these proposed bills

16   are necessary to protect the industry's tax status.  In

17   asking the NAIC to pass model legislation to ban many

18   legitimate life settlement and premium finance

19   arrangements, ACLI president, Frank Keating, testified

20   powerfully, underscoring that life insurance sold must

21   take into account the concept of insurable interest.  At

22   the same time, Keating spoke out against

23   investor-initiated life insurance transactions in which

24   speculative investors are allowed to profit from the

25   insured's death.

1        "Referring again to the OSU scenario, Head asks:

2    'Where is the protection to the family for the loss of a

3    breadwinner, and where is the insurable interest?

4    Nowhere.

5        "'Where is the investor-initiated life insurance?

6    Where is the speculative investor?  And where is the abuse

7    of the social purpose of life insurance?  It is found

8    throughout this wagering scheme.'"

9    Q.   Now, let's go back to page 1 of this email, and can

10   you read for us Mr. Carpenter's comments.

11   A.   "This is why we fly under radar . . . we don't talk

12   to anyone . . . we don't give presentations to anyone. . .

13   even our friends will say terrible things about us."

14   Q.   What did you understand, as someone who's working at

15   Benistar and a recipient of this email, Mr. Carpenter to

16   be saying?

17             MR. GUARNIERI:  Objection, Your Honor.  Calls

18   for speculation.

19             THE COURT:  Overruled.

20             THE WITNESS:  From this email, I'm inferring

21   that he's saying that we don't talk about this to anybody;

22   otherwise, if it comes to light, people will be

23   criticizing the plan and put it in jeopardy.

24   BY MR. NOVICK:

25   Q.   Was that consistent with the general position at

1    Benistar, in keeping this plan to close friends and

2    families, so to speak?

3    A.    Yes, it was.

4    Q.    Take a look at the next document in your binder,

5    Exhibit 2043.

6          What is that?

7    A.    It's an email from Dan Carpenter; on Friday, May 4,

8    2007; to Guy Neumann, myself, Ed Waesche, Bill Hutchison,

9    and Derek Siewert.  The subject is, "Coventry Sued," and

10   it's a forwarded email.

11   Q.    And you said it's a forwarded email, who is the

12   earlier email from that's here?

13   A.    It's from Don Trudeau to Dan Carpenter and Jack

14   Robinson.

15   Q.    And what's the title of the -- is this another news

16   article being forwarded?

17   A.    It is.

18   Q.    And what's the title of the article?

19   A.    "Ritchie Capital Management Sues Coventry First Under

20   Federal RICO Act."

21   Q.    Can you read that first paragraph there?

22   A.    "Ritchie Capital Management today filed a complaint

23   against Coventry First, a leader in the life settlements

24   industry, under the federal RICO act for fraud, breach of

25   fiduciary duty, and breach of contract.  This complaint,

1      filed in the United States District Court, Southern

2      District of New York, was brought to recover damages to

3      Ritchie Capital caused by Coventry First's pervasive fraud

4      in the secondary market for life insurance, wherein an

5      investor purchases a life insurance policy from the owner,

6      pays the premiums as they come due, and collects the

7      benefits upon the expiration of the insured."

8      Q.   And then can you read the comment from Mr. Carpenter

9      above?

10     A.   "We will always fly safe, straight, under the radar,

11     and in our clients' best interests."

12     Q.   In this context, again based on your working at

13     100 Grist Mill Road, what did you understand "clients" to

14     mean?

15     A.   The advisers --

16              MR. GUARNIERI:  Objection.  Speculation again,

17     Your Honor.

18              THE COURT:  The question asks for the witness's

19     understanding?

20              MR. NOVICK:  Yes.

21              THE COURT:  You may proceed.

22              THE WITNESS:  That the clients would refer to

23     the advisers that we work with.

24     BY MR. NOVICK:

25     Q.   Take a look at the next document in your binder, and

 1   that would be Exhibit No. 2123.

 2              MR. NOVICK:  One moment, please.

 3              THE COURT:  Mr. Novick, would this be a

 4   convenient time to break for lunch?

 5              MR. NOVICK:  Certainly, Your Honor.

 6              THE COURT:  And I think it would be better for

 7   me, if I didn't have to --

 8              MR. NOVICK:  That's fine, I can have a copy of

 9   that for you after --

10              THE COURT:  Thank you.

11              We'll be in recess for lunch.

12              MR. NOVICK:  Your Honor, I forgot and neglected

13   to offer Exhibits 2126 and 2043, which are the previous

14   two that I had shown the witness.

15              MR. GUARNIERI:  No objection, Your Honor.

16              THE COURT:  They will be admitted.

17              How much time would you like for lunch?

18              MR. NOVICK:  As little as the Court will allow.

19              THE COURT:  I'm happy to --

20              MR. BROWN:  One-thirty, Your Honor.

21              THE COURT:  Do you think 45 minutes would

22   typically be the right time?

23              MR. BROWN:  I don't want to incur the wrath of

24   staff, Your Honor.  I know the court reporter -- having

25   been married to one.

1          THE COURT:  I'll speak with the court reporter

2     privately.

3               We'll be in recess.

4                    (Whereupon, a recess followed)

5          THE COURT:  All set?

6     BY MR. NOVICK:

7     Q.   Okay.  Mr. Cherneski, when we had last -- when we

8     broke, we had just looked at Exhibit 2043, and now I am

9     directing you to Exhibit 2123.  That's tab 6 in your

10    binder.

11         Do you see that in front of you?

12    A.   Yes, I do.

13    Q.   What is this, first of all?

14    A.   An email from myself to Charlie Induddi, dated

15    Wednesday, May 14, 2008.

16    Q.   Is it responding to some earlier emails as well?

17    A.   Yes, it is.

18               MR. NOVICK:  Your Honor, at this time I would

19    offer Exhibit 2123.

20               MR. BROWN:  Can I have a moment, Your Honor?

21               THE COURT:  Yes.

22                    (Pause)

23               MR. GUARNIERI:  No objection, Your Honor.

24               THE COURT:  Thank you.  It will be admitted.

25

1    BY MR. NOVICK:

2    Q.   Let's look at the bottom of the email, the original

3    email, where it says -- first, at the bottom of page 1,

4    can you tell us who it is from and to?

5    A.   From Pacific Life to myself.

6    Q.   And it says, "Stefan rexis"; what does that mean?

7    A.   That's one of the email domains that I have over at

8    100 Grist Mill Road.

9    Q.   What does rexis stand for?

10   A.   That's for Rex Insurance.  It's a general agency

11   that's located at 100 Grist Mill Road.

12   Q.   One of the companies you referenced earlier?

13   A.   Yes.

14   Q.   And did you have several domains at 100 Grist Mill

15   Road?

16   A.   I did.

17   Q.   What's the subject of this email?

18   A.   "ADU Reporter, Forward:  Shed Light on the Definition

19   of Insurable Interest and Wager Contract."

20   Q.   Is it forwarding, again, some sort of synopsis or

21   article related to a court case?

22   A.   It is.

23   Q.   Can you read on the second page of the document where

24   it says, "Summary"?

25   A.   Yes.

1        "A U.S. District Court in Ohio held, in William T.

2    Wuliger v. Manufacturer's Life Insurance Company, that

3    even insurance policies taken out on the lives of the

4    policy owners themselves will lack an insurable interest

5    if the owners intended to assign their policies at issue.

6    In Wuliger, several individuals took out life policies on

7    their own lives with the intention of transferring their

8    policies to a company in exchange for a fee.  The company

9    then marketed those contracts to investors who thought

10   they were investing money in life settlements.  The court

11   held that the policies were equivalent to wagering

12   contracts and, therefore, void and subject to recession."

13   Q.   Let's go back to page 1.

14        Did you forward that email?

15   A.   I did.

16   Q.   To whom?

17   A.   I forwarded it to Guy Neumann, Dan Carpenter, Don

18   Trudeau, Wayne Bursey, Kevin Slattery, Ron Lanza,

19   Ed Waesche, Charlie Induddi, Jack Robinson, and Rich

20   Belding.

21   Q.   I don't think you've mentioned the name Kevin

22   Slattery.

23        Who is that?

24   A.   Kevin was another individual who worked at 100 Grist

25   Mill Road, in a similar capacity to me.

1    Q.   It says, "Kevin U.S.," what is that?

2    A.   That stands for U.S. Benefits, which is another email

3    domain we used.

4    Q.   Was it another company there as well?

5    A.   Yes, it was.

6    Q.   And next to -- Ron, who is Ron?

7    A.   That's Ron Lanza.

8    Q.   The individual you mentioned earlier?

9    A.   Yes.

10   Q.   And it says BPA, what's that?

11   A.   Benefit Plan Advisers.

12   Q.   And is that another one of the companies you

13   referenced earlier?

14   A.   Yes.

15   Q.   Did Charlie Induddi respond to your forward?

16   A.   He did.

17   Q.   What did he say?

18   A.   He responded:  "Does that mean ACE work or COT?"

19   Q.   Do you remember what ACE was?

20   A.   American Charitable Endowment Trust.

21   Q.   Do you know what that was?

22   A.   It was a similar trust to Charter Oak that was made

23   for charities.

24   Q.   But the intent was the same?

25   A.   Correct.

1    Q.    How did you respond here?

2    A.    I responded:  "The decision is not binding in other

3    courts, but it is an interesting decision."

4    Q.    Is that your own answer; where did you get that

5    answer, the decision was not binding in other courts?

6    A.    It doesn't look like my answer.

7    Q.    Why do you say that?

8    A.    Because that's not the way I would respond to an

9    email.

10   Q.    Where do you believe that email came from?

11             MR. GUARNIERI:  Objection, Your Honor.

12   Speculation.

13             THE COURT:  You can ask if he has a

14   recollection.

15   BY MR. NOVICK:

16   Q.    Do you have a recollection of where that came from?

17   A.    I don't specifically know.

18   Q.    Let me talk in general terms.

19        Typically, when you would get an email like this, who

20   would you speak to about it?

21   A.    If it was a legal question or something to do with

22   court rulings, I would talk to Dan.

23   Q.    Your understanding, based on your experience working

24   at 100 Grist Mill Road, would you have gone to anybody

25   else who would have told you whether this decision was

1    binding on other courts?

2    A.   I would not have.

3    Q.   Is that something that would commonly happen, with

4    regard to you asking or showing these kinds of emails to

5    Mr. Carpenter?

6    A.   Yes.

7    Q.   And were these kinds of emails -- in other words, one

8    talking about STOLI, cases, articles -- something that was

9    frequently circulated at the office at 100 Grist Mill

10   Road?

11   A.   It was.

12   Q.   Even beyond the few exhibits we've looked at here?

13   A.   Correct.

14   Q.   Take a look at tab 7 in your binder.  That would be

15   Exhibit 2276.

16        What is this?

17   A.   It's an email from Dan to Mauricio Agudelo; Kevin

18   Slattery; Erik Schneider; myself; Jack Robinson; Guy

19   Neumann; Don Trudeau; Joe Castagno; and Dan, cc to

20   himself.

21   Q.   What's the subject line?

22   A.   It says:  "Forward to Phoenix Life."

23            MR. NOVICK:  Your Honor, I'd offer 2276.

24            MR. GUARNIERI:  One moment, Your Honor.

25                (Pause)

1          MR. GUARNIERI:  No objection, Your Honor.

2          THE COURT:  Thank you.  It will be admitted.

3    BY MR. NOVICK:

4    Q.   Can you first read Mr. Carpenter's comment above?

5    A.   Sure.

6         "Jack and Joe, please get this case, Dan."

7    Q.   The original email was forwarded from whom?

8    A.   It was forwarded from Ed Waesche, to Dan Carpenter.

9    Q.   And then Mr. Carpenter forwarded that article?

10   A.   He did.

11   Q.   And can you just, for us, read the first -- let's

12   read the title of the article and the first line.

13   A.   Sure.

14        "Minnesota Judge Rules in Favor of Phoenix in Fraud

15   Case.

16        "A federal judge ruled in favor of Phoenix Variable

17   Insurance Co. last week in an alleged fraud and

18   stranger-originated life insurance case allowing the

19   carrier to retain $518,562 in premiums paid for a

20   rescinded 10 million life insurance policy.  The decision

21   by Chief Judge Michael Davis, of the U.S. District Court

22   of Minneapolis, went against Lucille E. Morelo

23   2007 irrevocable trust."

24   Q.   And again, we talked about this earlier, you said

25   that these were -- types of articles were frequently

1    forwarded around the office?

2    A.   Correct.

3    Q.   Why was that?

4    A.   Just to stay abreast of what was taking place in the

5    life settlement market, to make sure that we were aware of

6    the court cases and instances where things went south for

7    the life settlement people.

8    Q.   You mentioned earlier that you did some

9    administrative work and assistance with the Charter Oak

10   Trust, is that right?

11   A.   Correct.

12   Q.   Ran illustrations, put together packages, I believe

13   you said?

14   A.   Correct.

15   Q.   I want to take a look now at the next document in

16   your binder, and that's tab 8, and it is Exhibit 2069.

17        What is this?

18   A.   An email from Dan to myself and Guy Neumann; Monday,

19   August 20, 2007.

20   Q.   What's the subject matter?

21   A.   Forward Doug Sanders and Angela Lyles.

22   Q.   Who were Doug Sanders and Angela Lyles?

23   A.   Two potential candidates for the Charter Oak Trust.

24   Q.   Insureds?

25   A.   Correct.

1          MR. NOVICK:  Your Honor, I'd offer Exhibit 2069.

2          MR. GUARNIERI:  Your Honor, if I may just

3    inquire from the government:

4          Are you only offering the single front page,

5    because my tab has significant materials behind it.

6          MR. NOVICK:  I'm offering the entirety of the

7    exhibit, which would include the emails as well as all the

8    attachments.

9          MR. BROWN:  Could we have a moment, Your Honor?

10          THE COURT:  Yes.

11          (Pause)

12          MR. GUARNIERI:  Your Honor, may I inquire

13    briefly from the witness regarding this exhibit?

14          THE COURT:  Any objection?

15          MR. NOVICK:  Yes, Your Honor.  I'm not sure how

16    inquiring of the witness will be appropriate at this

17    stage.

18          THE COURT:  What's the concern, please?

19          MR. GUARNIERI:  Your Honor, the concern is

20    whether or not this individual actually has read and

21    viewed all the materials that are referenced and attached

22    to the email, and then just concerns that were raised

23    about the dates and times, whether this is -- you know,

24    there's a foundation to be laid that this is a legitimate

25    email.

1          MR. NOVICK:  Your Honor, the point of entering

2     into the stipulation regarding authenticity of these

3     documents was not to bring the computer forensics up here.

4     The providence of the email and the attachments is well

5     laid out in the database that was provided to counsel,

6     including all of the attachments.

7          I don't have the meta data here with me.  If I

8     was preparing for that, I would have put a forensics agent

9     on first.  If we're going to have this kind of dialogue, I

10    don't think it makes sense to have it in front of the

11    Court here.

12         The second point, Your Honor, is this is a

13    witness who is perfectly capable of talking about the

14    documents once the documents are in evidence, such that --

15    and a proper foundation has been laid, and that's what I

16    intend to do.  He's a party to this email, and that's why

17    I'm asking him about this email.  I don't think there's

18    anything improper about that.

19         MR. GUARNIERI:  Your Honor, I want to point out

20    that we're not raising an argument as to the authenticity

21    in terms of whether or not we received this from the

22    government.  The government responded, they received it

23    from either the warrants they served or the warrants they

24    served are stipulated to.  Our main issue is whether or

25    not this is, in fact, what it purports to be.  I don't

1      think a foundation has been laid to that effect yet.

2              In addition to that, the issue that we're

3      raising is whether or not there's been a valid foundation

4      laid that this witness has received this email, and the

5      email and attachments are what they purport to be.  And

6      this is a full email, in terms of what he received, and he

7      reviewed it and can testify to what it is.

8              THE COURT:  Okay.  Well, realistically, this is

9      an email dated 2007.  I would think it unlikely that any

10     witness could be able to testify under oath that a routine

11     email is as it was when he received it in 2007.

12             More fundamentally, what is the intention of the

13     stipulation to authenticity if we're going to have

14     questions about authenticity?

15             MR. GUARNIERI:  Your Honor, if we're going into

16     the area of stipulation, perhaps Attorney Brown can

17     address it, but my understanding is that the stipulation

18     regarding authenticity was to allow ultimately so that the

19     government doesn't have to produce witnesses who, in turn,

20     serve subpoenas and execute warrants to show that these

21     were, in fact, the documents they received, and to provide

22     the chain of custody from the time that those searches and

23     seizures were being done or those subpoenas were being

24     served to court today.

25             What I believe was not stipulated to was that

1    the documents themselves are what they purport to be, in

2    the sense that the witnesses -- you know, that the

3    documents were in any way altered or modified or changed

4    before they came into the custody or care of the

5    government through their procedures.  And perhaps that's

6    not the anticipated workings of the stipulation, but --

7              MR. BROWN:  Your Honor, if I may, just try to

8    move this along, contrary to what counsel was stating is

9    that we're not contesting the fact that the government

10   received this document, as it's represented, during

11   apparently a search of the defendant's computers.  I think

12   that's how they received these documents.  We're not

13   disputing that.

14             We're having problems because, quite frankly,

15   one of the addresses addressed to Mr. Carpenter is not an

16   address that he typically uses and -- or may have used at

17   all.  And the question is whether or not this particular

18   witness is capable of discussing this particular document,

19   not whether or not the document itself was different from

20   that which was seized at the time.  That is our primary

21   concern, Your Honor.

22             THE COURT:  That's a matter to be taken up with

23   the witness.

24             Does he recognize the document, does he recall

25   the document?

1          MR. NOVICK:  Here's the thing, Your Honor.  As

2     Your Honor rightly pointed out, if we're going to get into

3     an issue of -- I can certainly ask the witness on the

4     stand what the document is, and he can read it just like

5     the rest of it.  In many ways the point is, have him read

6     it, have him tell us what is referred to by certain things

7     in there.  That's not, I understand, what counsel is

8     referring to here.

9          What I --

10          MR. BROWN:  Actually it is.

11          MR. NOVICK:  Then I stand --

12          THE COURT:  Let's take the good news and accept

13     it and go forward, okay?  Let's not dwell on what might be

14     a problem.

15          MR. NOVICK:  Certainly.  What I want to do right

16     now is just offer the exhibit into evidence.

17          THE COURT:  I'm going to admit it, subject to

18     whatever examination counsel wants to conduct on

19     cross-examination.

20          MR. GUARNIERI:  Thank you, Your Honor.

21     BY MR. NOVICK:

22     Q.   Looking at Exhibit 2069, is this a forward of some

23     prior emails?

24     A.   It is.

25     Q.   What was the original -- look at the bottom of the

1    chain here, original message, bottom of the page, who was

2    that to?

3    A.    It was from Mark Salesman, to Guy Neumann and Charlie

4    Induddi.

5    Q.    Who is Mark Salesman?

6    A.    A person who worked at Fred Prelle's office.

7    Q.    And it has the same subject line we just mentioned

8    earlier?

9    A.    Correct.

10   Q.    Can you read that email for us?

11   A.    "Here are two more for the spreadsheet.  Let us know

12   ASAP as American National has placed deadlines on these

13   offers."

14   Q.    Was that email then forwarded?

15   A.    It was.

16   Q.    And then from who to whom?

17   A.    From Guy Neumann to Dan Carpenter.

18   Q.    And then it was -- can you read the top email from

19   Mr. Carpenter to you?

20   A.    "Stef, show Guy how to set up packages."

21   Q.    Did that email come with certain attachments?

22   A.    It did.

23   Q.    And it listed under the attachment line, what's the

24   first one there?

25   A.    A Charter Oak spreadsheet.

1    Q.    Dot-XLS?

2    A.    Correct.

3    Q.    If you could turn to not the next page but the

4    following page, what is that?

5    A.    It's a spreadsheet.

6    Q.    And what is it a spreadsheet of?

7    A.    It has the client's name, date of birth, face amount,

8    health rating, carrier, first-year premium, second-year

9    premium, AVS LE, and 21st LE.

10   Q.    Did you create this spreadsheet?

11   A.    I did not.

12   Q.    Would this be something that was commonly done for

13   the Charter Oak Trust?

14   A.    I'm unsure.

15   Q.    Can you tell us what the different columns mean

16   across the top?

17   A.    Client name obviously refers to their name.  Date of

18   birth is the date of birth.  Face is the death benefit on

19   the life insurance contract.  Rating refers to the health

20   rating from the insurance carrier.  Carrier indicates the

21   life insurance carrier company.

22        First-year premium indicates first-year premium that

23   would be required for the life insurance contract, and

24   second-year premium is the second-year outlay.  AVS LE is

25   the life expectancy from the company AVS, and 21st LE is

1    the life expectancy from the 21st.

2    Q.   If I'm looking down from the left-hand side, it looks

3    to be for some insureds -- for example, Mr. Sanders, if

4    you go across, it has two entries.

5         What's the principal difference between the two

6    entries here?

7    A.   In terms of the premium?

8    Q.   Well, in terms of the two lines in general.

9    A.   The differences are, yeah, in the premium amounts,

10   first-year premium and second-year premium.

11   Q.   So the first-year premium on the top line was

12   $201,700, and the second-year premium was $190,700, is

13   that right?

14   A.   Correct.

15   Q.   And then the one below that, the first-year premium

16   was 274,220, and the second-year premium was zero?

17   A.   That is correct.

18   Q.   And under AVS LV, and 21st LV, what are the numbers

19   represented there?

20   A.   One says 140, for AVS; and 128, for 21st.

21             MR. GUARNIERI:  Your Honor, I'm going to object

22   to this line of questioning.  It's irrelevant to Charter

23   Oak Trust, the issues that we're here for.

24             MR. NOVICK:  Testified these are Charter Oak

25   Trust insureds, Your Honor.

1           THE COURT:  Please speak up, gentlemen.

2           MR. NOVICK:  I'm sorry, Your Honor.

3           I don't see why this wouldn't be relevant.  He

4   testified these were Charter Oak Trust insureds.  I don't

5   understand the objection.

6           THE COURT:  I'll assume that you're doing this

7   for a reason.

8           MR. NOVICK:  Yes, Your Honor.

9           THE COURT:  Okay.  The question is about the

10  life expectancy numbers, is that right?

11          MR. NOVICK:  That's right, Your Honor.

12  BY MR. NOVICK:

13  Q.   And those would have been from what; where would you

14  have gotten those life expectancy numbers?

15  A.   Those would be from the third parties, AVS and

16  the 21st.

17  Q.   Why would you have gathered different illustrations

18  for the same person or the same company?

19  A.   Typically, you'd want to see illustrations showing

20  target premium the first year, and then minimum premium

21  thereafter; and then other options would be just showing

22  the level premium all years, so you know what the outlay

23  will be.

24          MR. GUARNIERI:  Objection, Your Honor, on

25  speculation.

 1          THE COURT:  You want to lay a foundation for

 2   that?

 3          MR. NOVICK:  Certainly.

 4   BY MR. NOVICK:

 5   Q.  You said --

 6          MR. NOVICK:  I believe I had, Your Honor, in the

 7   sense that --

 8   BY MR. NOVICK:

 9   Q.  You had testified earlier that part of your

10   responsibility with the Charter Oak Trust policies was to

11   run illustrations from time to time?

12   A.  Correct.

13   Q.  And that included, I should say, illustrations on

14   various insureds within the Charter Oak Trust plan,

15   correct?

16   A.  Correct.

17   Q.  And you're familiar with life expectancies being run

18   within the Charter Oak Trust?

19   A.  Correct.

20   Q.  In fact, we're about to look at one related to this

21   email, correct?

22   A.  Correct.

23   Q.  Or there are life expectancies attached to this email

24   as well, right?

25   A.  Yes.

1           THE COURT:  In other words, what I'm looking at

2    is similar to the kind of thing that you did?

3           THE WITNESS:  I wouldn't run a spreadsheet like

4    this, but I would run illustrations that would show the

5    premiums required for individual insureds, and then in

6    conjunction with those life expectancy reports would

7    accompany those illustrations or evaluation.

8           THE COURT:  So you're familiar with how Charter

9    Oak Trust went about gathering the information and

10   presenting the information?

11          THE WITNESS:  Correct.

12          THE COURT:  If I may, what is the significance

13   of a life expectancy figure of 140?

14          THE WITNESS:  That shows how many months the

15   person is expected to live, on average.

16          THE COURT:  Is there a different between

17   American National GUL and American National CURR?

18          THE WITNESS:  Two different products.

19          THE COURT:  Is it products sold by the same

20   company?

21          THE WITNESS:  Correct.

22          MR. GUARNIERI:  Your Honor, I'm going to renew

23   my objections on speculation.  This witness, I don't

24   believe, established he actually made this report.  So to

25   ask him questions about why these are done in this report

1    is speculative.

2            And secondly, I don't believe -- I think that

3    one individual who's been identified as somebody that was

4    involved in the Charter Oak Trust, is a named straw

5    insured, is listed here; otherwise, I don't believe

6    there's testimony that the rest of these individuals are

7    related to the Charter Oak Trust or if this is, in fact, a

8    Charter Oak Trust document.

9            THE COURT:  Mr. Novick, maybe you should tell me

10   why you're proceeding in this way.  What is the point that

11   you're trying to make?

12           MR. NOVICK:  I'm going to get there, Your Honor,

13   after we're going to look at the spreadsheet and look at

14   some of the LE's, and explain why different illustrations

15   were run on the same person -- we've already talked about

16   why life expectancies were done -- and look at life

17   expectancies for Charter Oak people.

18           THE COURT:  So this is an illustration for

19   background?

20           MR. NOVICK:  This is a little bit of an

21   illustration for background, to describe what kind of

22   information was gathered for each of the insureds, and

23   it's merely corroborative to what the witness has

24   testified to.

25           THE COURT:  I think it makes sense for me to

1    hear this.  I see no undue prejudice to the defense.  It's

2    illustration for purposes of --

3              THE DEFENDANT:  It's --

4              THE COURT:  I'm sorry?

5              MR. GUARNIERI:  Your Honor, this is not

6    illustrations for the Charter Oak Trust or documents

7    related thereto.  I understand Your Honor's point.

8              THE COURT:  You're welcome to bring out these

9    points on cross-examination.

10             MR. GUARNIERI:  Thank you, Your Honor.

11             THE COURT:  So do we have a pending question?

12             MR. NOVICK:  I don't know, Your Honor.  I don't

13   think so.  Why don't I ask another question.

14             THE COURT:  Please.

15   BY MR. NOVICK:

16   Q.   Let's go back to the email itself.

17        And you said that there were some other attachments

18   there as well?

19   A.   Correct.

20   Q.   Can you just tell us, generally speaking -- well, can

21   you read what attachments were here, attached to this

22   email?

23   A.   Sure, after the Charter Oak spreadsheet dot-XLS?

24   Q.   That's right.

25   A.   Lyles, Angela, AVS LE, with medical summary dot-PDF;

1    Lyles, Angela, 21st Services LE dot-PDF; Lyles, Angela,

2    ANICO passport target to min level dot-PDF; Lyles, Angela,

3    ANICO LTG min dot-PDF.

4    Q.   So it is fair to say life expectancies and

5    illustrations?

6    A.   Correct.

7    Q.   And were these different kinds of illustrations?

8         Let me withdraw that question for a minute, and let's

9    look at the comment or the email here from Mr. Carpenter.

10        What did he write here?

11   A.   "Stef, show Guy how to set up packages."

12   Q.   What did you understand a package to be; what kind of

13   information would you be gathering?

14   A.   Life expectancies and illustrations.

15   Q.   And what was the purpose of gathering those?

16   A.   Purpose would be to evaluate them for value in the

17   secondary market.

18   Q.   And would they be provided to anyone in the course of

19   evaluating them?

20   A.   They would be provided to the funder to determine if

21   the people were eligible to participate.

22   Q.   And that funder being what you mentioned earlier?

23   A.   Yes, correct.

24             MR. NOVICK:  Your Honor, we can move on from

25   this exhibit to Exhibit 2152.  That's tab 9.

1    BY MR. NOVICK:

2    Q.    What is this document?

3    A.    An email from Guy Neumann; dated Wednesday,

4    October 22, 2008; to Charles Collier, Christine Weimar;

5    cc's Don Trudeau and myself; blind copying Dan Carpenter;

6    and the subject is, "Forward New Case on Christine

7    Lambert."

8              MR. NOVICK:  Your Honor, I offer this exhibit.

9              MR. GUARNIERI:  Moment, Your Honor, please?

10                  (Pause)

11             MR. GUARNIERI:  No objection, Your Honor.

12             THE COURT:  It will be admitted.

13   BY MR. NOVICK:

14   Q.    First, who are Charles Collier and Christine Wiemar,

15   to the best of your recollection; who do you recall them

16   to be?

17   A.    Do I recall them?

18   Q.    Who do you recall them to be?  Who do they work for?

19   A.    I can see who their emails are from.

20   Q.    What is their email from?

21   A.    Ridgewood Finance.

22   Q.    You said you testified earlier that these packages

23   would be sent to Ridgewood or the funder?

24   A.    Correct.

25   Q.    Does this appear to be one of the packages that we

1     referenced earlier?

2     A.   It appears to be.

3     Q.   And again, are there attachments to this?

4     A.   There are.

5     Q.   What are the attachments here?

6     A.   Read them off?

7     Q.   Yes, please.

8     A.   Lambert, Christine, 21st Services dot-PDF; Lambert,

9     Christine, AVS LE with medical summary dot-PDF; Lambert,

10    Christine, life guarantee COI dot-PDF; Lambert, Christine,

11    life guarantee plus COI dot-PDF.

12    Q.   Let me ask you a couple of questions about that.

13         First, what does COI stand for?

14    A.   Cost of insurance.

15    Q.   What does it mean to have a cost of insurance -- what

16    does "cost of insurance" mean in that context?

17    A.   Means an illustration showing paying the minimum

18    premium into the contract each year, after the first year

19    target has been paid.

20    Q.   Why would a -- or why did you and others send to the

21    funder cost-of-insurance illustrations?

22    A.   That would show minimum --

23         MR. GUARNIERI:  Objection, Your Honor.

24    Speculation.

25         MR. NOVICK:  Your Honor, just because I'm using

1        the word "would," does not make this speculation.  He's

2        talking about practices and procedures.

3                    THE COURT:  Ask, "why did you."

4        BY MR. NOVICK:

5        Q.   Why did you understand that the process was to send

6        these cost-of-insurance illustrations to your funder?

7                    MR. GUARNIERI:  I'm going to make the same

8        objection, Your Honor, and just indicate that unless this

9        witness has a foundation for why he knows why others did

10       things that they did, as opposed to just what he himself

11       did and why he did it.

12       BY MR. NOVICK:

13       Q.   Did you have an understanding of the process involved

14       in the Charter Oak Trust and how things were sent to the

15       funder or what was sent to the funder, based on your

16       experience?

17       A.   I did.

18       Q.   And what would be sent to the funder -- let me go

19       back to the question I asked before.

20            Why would a cost-of-insurance illustration

21       specifically be sent to the funder?

22       A.   Because the COI is showing the minimum premium each

23       year going to the contract, so the minimum amount would be

24       payable as the premium by the Charter Oak Trust.

25       Q.   Why was that the illustration being sent to the

1    funder as opposed to some other type of illustration?

2    A.   Because this could show the funder based on the

3    person's life expectancy, the smallest amount possible

4    that would go into the policy in return of the death

5    benefit that would eventually be paid out.

6    Q.   And why would -- would the cost-of-insurance

7    illustration, in your experience with the Charter Oak

8    Trust, be sent to the insurance company?

9    A.   It would not.

10   Q.   What typically would be sent to the insurance

11   company?

12   A.   Typically it would be an illustration showing target

13   premium first year and level premiums thereafter.

14   Q.   You mentioned before what the target premium is;

15   that's the commissionable premium?

16   A.   What the commission is based off is the target

17   premium.

18   Q.   And why would you not send the cost-of-insurance

19   illustration to the insurance company?

20   A.   You wouldn't send that, because that could be an

21   indication that there's a life settlement business taking

22   place.

23   Q.   Let's take a look at these illustrations here.

24        THE COURT:   Mr. Novick, dealing with the

25   objection that has been advanced repeatedly, I would ask

1    you to pause and explain through this witness how he knows

2    that.

3              MR. NOVICK:  Certainly, Your Honor.  That was

4    what I was trying to do with the prior email, when the

5    email said show -- testify how -- show Guy how to set up

6    packages.

7              THE COURT:  Right.  The thrust of the objection,

8    as I take it, is that this witness doesn't know what he's

9    talking about; and if he says that, for instance, the

10   cost-of-insurance figures didn't go to the providers

11   because it would raise a red flag about STOLI, the

12   objection is that that's just him speculating.

13             So while we're on the subject, I think I need to

14   know what basis, if any, the witness has for his

15   testimony.

16   BY MR. NOVICK:

17   Q.   Can you explain to us, first of all, how you knew

18   that -- well, you're familiar -- let me withdraw that.

19        In the time that you were working at 100 Grist Mill

20   Road, did you become familiar with the processes and

21   procedures associated with Charter Oak Trust?

22   A.   I did.

23   Q.   How?

24   A.   From general experience from processing and assisting

25   with items like this.

1    Q.    Were you instructed by others on how to do these

2    kinds of things?

3    A.    I was.

4    Q.    By whom?

5    A.    For the illustrations for Guy Neumann and how to run

6    them, and put together packages and illustrations and life

7    expectancy reports.

8    Q.    Would that be by Dan?

9    A.    Correct.

10   Q.    Referring to Mr. Carpenter?

11   A.    Correct.

12   Q.    And you testified that, in your setting up the

13   packages that went to the funder, or assisting others in

14   setting up these packages that went to the funder, you

15   understood that you would not send the cost-of-insurance

16   illustration to the insurance company, correct?

17   A.    Correct.

18   Q.    And you testified that that was because that could be

19   a red flag for STOLI?

20   A.    That is correct.

21   Q.    How do you know that to be the case?

22   A.    From interactions at 100 Grist Mill Road, various

23   conversations regarding what a second-year premium should

24   look like for an illustration, and what was actually paid,

25   and what the life insurance company would receive.

1           THE COURT:  Conversations with whom?

2           THE DEFENDANT:  With the same people I mentioned

3    earlier:  Dan Carpenter, Charlie Induddi, Ed Waesche, Guy

4    Neumann.

5           MR. GUARNIERI:  I think that testimony does

6    indicate that he does not have a basis for a foundation to

7    know what the insurance company is doing and why it's

8    doing it, having not had any communications or

9    conversations with the insurance company.

10          THE COURT:  The question went to what was going

11   on at Charter Oak Trust.

12          As I understand the testimony, the witness is

13   saying that, based on conversations with, among others,

14   Mr. Carpenter, he understood that the cost-of-insurance

15   data was not supposed to go to the insurance providers

16   because it would be a red flag for STOLI.

17          Is that your testimony, sir?

18          THE WITNESS:  That is correct.

19          THE COURT:  That came from Mr. Carpenter?

20          THE WITNESS:  During the conversations that we

21   had, yes.

22          THE COURT:  Okay.

23   BY MR. NOVICK:

24   Q.   Now, where I was going, I'd like to take you to the

25   first of the illustrations in this package.  It's page 6

1   of the exhibit.

2       So go past the life expectancies just for a moment

3   and take a look at the first of the illustrations, and I

4   just want you to walk us through looking at this

5   illustration.

6       First, at the top, can you tell us who this

7   illustration was for, what the insured's name was?

8   A.   The illustration is for Christine Lambert.

9   Q.   And does it indicate on this page who it was prepared

10  by?

11  A.   It says:  "Valued Agent, 4400 Post Oak Parkway,

12  Suite 2550, Houston, Texas 77027."

13  Q.   Are you familiar with what was located at 4400 Post

14  Oak Parkway in Houston; was that associated with one of

15  the -- with anybody you're familiar with?

16  A.   It appears to be Fred Prelle of the GA's office.

17  Q.   So you did not prepare this illustration?

18  A.   I did not.

19  Q.   And then I want to direct you to page 7 of the

20  illustration, so it would be 7 of 11 --

21              MR. NOVICK:  Sorry, Your Honor, one moment.

22                  (Pause)

23  BY MR. NOVICK:

24  Q.   -- entitled at the top, "Section D, Illustrated

25  Values."

1    Do you see that?

2    A.   I do.

3    Q.   And can you tell us on this document where we can

4    find the planned premium for the particular insurance

5    policy?

6    A.   It would be the third column from the left where it

7    says:  "Annual Premium Outlay."

8    Q.   So the first year being $479,500?

9    A.   Correct.

10   Q.   And then tell us, why does this -- why does the

11   second-year number go down, and then it increased from

12   year to year?

13   A.   So this appears to be an illustration that has paying

14   the target premium the first year, and then the minimum

15   premium each year thereafter to maintain the policy in

16   force.

17   Q.   You said this, based on what we had read earlier,

18   would be the cost of insurance for this particular policy

19   from year to year?

20   A.   That would be a minimum COI illustration, yes.

21   Q.   Now, let's take a look at the first two exhibits,

22   going backwards, of the life expectancy valuations, page 2

23   of the exhibit.

24        What's the -- first, what company is this from?

25   A.   This is from 21st Services.

1    Q.   And what insured is it related to?

2    A.   Christine Lambert.

3    Q.   And it says:  "Attention, Warren Prelle."

4         Who is that?

5    A.   It's Fred Prelle's son, who worked for his office in

6    Advisers Financial Group in Houston.

7    Q.   Looking at the following page, is that the -- is that

8    the life expectancy certificate?

9    A.   It is.

10   Q.   Does it indicate the life expectancy or the median

11   life expectancy of this particular individual?

12   A.   It does.

13   Q.   Where do we find that?

14   A.   It says:  "Median life expectancy value," asterisk,

15   "164 months, or 13.7 years."

16   Q.   Then if you flip forward a couple of the pages,

17   you'll see another life expectancy valuation.

18        Do you see that?

19   A.   Correct.

20   Q.   What company is that from?

21   A.   That's from AVS.

22   Q.   Again, is this for the same insured, Ms. Lambert?

23   A.   Yes.

24   Q.   Does it indicate a life expectancy on this page?

25   A.   It does.

1    Q.   What is that?

2    A.   It says 141 months.

3    Q.   Does it indicate on this page again who ran this

4    illustration -- excuse me -- who requested this life

5    expectancy report?

6    A.   It does.

7    Q.   What does it list there?

8    A.   Warren Prelle again.

9    Q.   And the requesting company?

10   A.   Is Capitas Houston.

11   Q.   Do you know what Capitas is?

12   A.   Capitas is a GA, general agency.

13   Q.   What's a general agency; can you explain that?

14   A.   A general agency is a company that sells or

15   wholesales life insurance products via financial advisers

16   that are affiliated with that agency.

17   Q.   So how would they relate to, say, a retail broker

18   that an individual might buy insurance from?

19   A.   A retail broker would have to have his contracts

20   through GA that are affiliated with the life insurance

21   company.  So a retail broker has to select a GA such as

22   Capitas to get the contract to sell life insurance to

23   various companies.

24   Q.   So essentially a middleman?

25   A.   Wholesaler.

1    Q.   Turn to tab 10, Exhibit 2151.

2         What is this?

3    A.   Email from Guy Neumann; dated Wednesday, October 22,

4    2008; to Charles Collier, Christine Weimar; cc's Don

5    Trudeau, myself; and blind copying Dan.

6    Q.   And again, does this have various attachments to it?

7    A.   It does.

8    Q.   And what are the attachments?

9    A.   It says:  Von Noorden, Betty, Life Guarantee Plus COI

10   til 100 dot-PDF; Von Noorden, Betty, preliminary AVS LE

11   dot-PDF; Von Noorden, Betty, Fasano LE dot-PDF.

12   Q.   And can you read the -- excuse me.

13              MR. NOVICK:  First I offer 2151.

14              MR. GUARNIERI:  No objection, Your Honor.

15              THE COURT:  Thank you.  It will be admitted.

16   BY MR. NOVICK:

17   Q.   Can you read the message from Guy Neumann?

18   A.   Sure.

19        "Here is a new case for inclusion to the Charter Oak

20   program.  There's a huge divergence between the AVS and

21   Fasano.  Previously this case would have been a slam-dunk.

22   Let me know how it goes."

23   Q.   What are AVS and Fasano?

24   A.   Those are two life expectancy companies.

25   Q.   What do you understand Mr. Neumann to mean by,

1    there's a huge divergence between AVS and Fasano?

2    A.   There's a difference between the two numbers for life

3    expectancies.

4    Q.   Was it common -- or I should say:  Was it always the

5    practice that the funder would ask for more than one life

6    insurance expectancy?

7    A.   It was my understanding they always needed two.

8    Q.   Why was that?

9    A.   They basically wanted to have two calculations so

10   they can throw that into the formula to determine whether

11   the policy was a viable contract to move forward with.

12   Q.   Let's take a look at the attachments here.

13        And first, the next page of this document, is this an

14   illustration here?

15   A.   It is.

16   Q.   Who is this illustration for?

17   A.   It is for Betty Von Noorden.

18   Q.   Similar to the illustration we looked at earlier?

19   A.   Correct.

20   Q.   And again, who was this run by?

21   A.   It was run by the same agency.

22   Q.   In Houston, Texas?

23   A.   Correct.

24   Q.   And again, looking at page 7 of this email -- excuse

25   me -- of this illustration, do you see a section entitled,

1    "Illustrated Values"?

2    A.    I do.

3    Q.    And does that also indicate the planned premium

4    similar to the other illustration we looked at?

5    A.    It is similar to it, yes.

6    Q.    And again, can you tell from looking at this whether

7    this is a level illustration or a cost-of-insurance

8    illustration?

9    A.    This is a minimum cost-of-insurance illustration.

10   Q.    And looking at this document, can you tell us how you

11   know that it's a cost-of-insurance illustration?

12   A.    If you're looking at it, you can see at the current

13   basis the surrender value, so that's -- because that

14   number is so low, it indicates that the premium outlay

15   that's going into it is just enough to sustain that policy

16   for each given year.

17   Q.    So that would be the column my cursor is on now,

18   "Current Basis Surrender Value"?

19   A.    That is correct.

20   Q.    And if this were an overfunded or level-premium

21   illustration, would you see higher numbers in this period?

22   A.    Typically you would.

23   Q.    Now, take a look at the life expectancy valuations in

24   this particular case, page 13 of the exhibit.

25         First, the AVS illustration on page 13 of the

1    exhibit, who is this requested by and prepared for?

2    A.    It is requested by Capitas Houston again, W. Prelle

3    Advisers Financial Group.com, and it was for Betty Von

4    Noorden.

5    Q.    What is the life expectancy listed for her?

6    A.    Ninety-three months.

7    Q.    If we go to the next page, is there a second life

8    expectancy evaluation?

9    A.    There is.

10   Q.    From which company?

11   A.    Fasano Associates.

12   Q.    What is the life expectancy listed here?

13   A.    126 months.

14   Q.    That's at the bottom of the page there?

15   A.    That's correct, where it says, "estimated life

16   expectancy."

17   Q.    Was it common for -- at 100 Grist Mill Road for these

18   type of packages to be sent around the office and to the

19   funder?

20   A.    What do you mean by the whole office?

21   Q.    Let me withdraw that question.

22         Were these types of packages commonly sent to

23   Ridgewood?

24   A.    They were.

25   Q.    And were they, in your experience, also included --

1    was Mr. Carpenter, included in those communications?

2    A.   In my experience he was included in the

3    correspondence.

4    Q.   Take a look at tab 11.  That's Exhibit 2074.

5         What is this?

6    A.   An email from myself, on Thursday, August 30, 2007,

7    to Don Trudeau, Dan Carpenter, and Guy Neumann; subject

8    is, "With regards Terry case for COT."

9              MR. NOVICK:  Your Honor, I'd offer Exhibit 2074.

10             MR. GUARNIERI:  Moment, Your Honor, please.

11                  (Pause)

12             MR. GUARNIERI:  Your Honor, we're going to

13   object.  I believe this document is referencing a document

14   that's not one of the insurance policies referenced to the

15   superseding indictment as addressed earlier by Attorney

16   Brown and Attorney Novick, in some depth of argument.

17             MR. NOVICK:  Your Honor, I understand the

18   defense objection.  As I articulated earlier, this is a

19   conspiracy case that involves 76 insureds, 84 policies.

20   It is not my intention to go into details as to each of

21   the policies themselves.  But when we're talking about

22   emails about Charter Oak Trust, I think all of this is

23   relevant to the conspiracy and the scheme, regardless of

24   whether this is a one of the designated insureds for the

25   substantive counts.

1          THE COURT:  Okay.  Forgive me for harping on it,

2    but I need to ask you to please speak up.  If there's a

3    way for you to do it automatically, that would be good.

4          I'm overruling the objection.  I understand that

5    the objection goes to the claim that there was a

6    conspiracy, so it goes to the way things were being done

7    generally, not the particulars of a given insured who's

8    not among the 15, okay?

9          MR. GUARNIERI:  Thank you, Your Honor.

10   BY MR. NOVICK:

11   Q.   Mr. Cherneski, was this email responding to other

12   emails in the same chain?

13   A.   It was.

14   Q.   I ask you just briefly to turn back to page -- or

15   turn forward in the email, back in time, to page 6 of the

16   exhibit.

17          THE COURT:  I'm sorry, where are we now?

18          MR. NOVICK:  I'm sorry, Your Honor,

19   Exhibit 2074, that's tab 11 --

20          THE COURT:  Right.

21          MR. NOVICK:  -- and to go to page 6 of the

22   email.

23          THE COURT:  Thank you.

24   BY MR. NOVICK:

25   Q.   Do you see an email at the bottom of the page there?

1    A.    I do.

2    Q.    Who is that from and to?

3    A.    The original message is from me, on Tuesday,

4    August 28, 2007, to Guy Neumann and Dan Carpenter.

5    Q.    And the subject is what?

6    A.    Says:  "Subject, Emailing Terry 5 million DB

7    Lincoln."

8    Q.    And what does the message say?

9    A.    It says:  "These are the Mark Salesman cases that are

10   being considered for COT."

11   Q.    Let's now flip forward.  I'm not going to have you

12   read through the entirety of the email chain, but if you

13   could read the top message on page 1, from you to

14   Mr. Trudeau and Mr. Carpenter?

15   A.    Yes.  Starting with, "The attached"?

16   Q.    Yes, please.

17   A.    "The attached spreadsheets are Avon, our recent COT.

18   The ones in green were previously approved, red declined,

19   white pending, and gray have gone elsewhere.  The COT 1's

20   are of interest and are in green."

21   Q.    I'm going to have you take a look at the attachments

22   here.  Let's skip past the one that's entitled, "Avon

23   XLS," and go to the last two pages of the exhibit, the one

24   entitled, "Copy of Charter Oak Spreadsheet Guy Rev XLS."

25         You see that?

1   A.    Is that the colored --

2   Q.    The last page of the document.

3         Is this similar to the spreadsheet that we looked at

4   earlier?

5   A.    It appears to be, yes.

6   Q.    And again, does it capture some of the same

7   information or principally similar information to the one

8   that we looked at earlier?

9   A.    It does.

10  Q.    Do you recall whether you had been the one to create

11  this spreadsheet with the coloring?

12  A.    I do not recall.

13  Q.    Based on the -- but you're the one in this case who

14  is forwarding this to -- or sending this to Mr. Trudeau

15  and Mr. Carpenter, is that right?

16  A.    That is correct.

17  Q.    You mentioned earlier that the applications we talked

18  about this morning, the applications did not reveal the

19  funding arrangements for the Charter Oak Trust to the

20  insurance companies, correct?

21  A.    That is correct.

22  Q.    Were you generally aware of some of the application

23  questions regarding funding, financing, and intent to

24  sell?

25  A.    Yes, I was.

1    Q.   I'm going to first have you very briefly turn back to

2    tab 8.  We looked at this earlier, and I'm going to direct

3    your attention to a different page here, and specifically

4    I'm going to direct your attention to page 20 of the

5    exhibits, and it would be the Bates number ending 983.

6    A.   All right.

7    Q.   And can you read -- first, what insurance company is

8    this related to?

9    A.   American National.

10   Q.   And what's the name of the form?

11   A.   Premiums Funding Intent Form.

12   Q.   Can you read the top sentence or two sentences there,

13   under the line?

14   A.   Sure.

15        "Required for all formal applications where the

16   proposed insured is age 70 and above, and the proposed

17   face amount is $500,000 and above.  The form may also be

18   required in other situations at the underwriter's

19   discretion."

20   Q.   Let's take a look at questions -- first, does it ask

21   for the name of the proposed insured owner and beneficiary

22   there?

23   A.   It does.

24   Q.   Take a look at Questions 1 through 4 on this

25   particular form.

1        Can you read those for us?

2              MR. GUARNIERI:  Can I make an objection, Your

3    Honor?  I suppose it would be lack of foundation.

4              I don't believe that it's been offered, that

5    this is Charter Oak Trust policy, or that there's American

6    National insurance companies involved with the Charter Oak

7    Trust.  And so I'm left not sure if this goes to the

8    nature of the indictment, so perhaps relevance as well,

9    Your Honor.

10              THE COURT:  Okay.

11              What is the relevance?

12              MR. NOVICK:  First of all, Your Honor, there was

13    at least one policy in the Charter Oak Trust that was an

14    American National policy.

15              The second reason why it's relevant is, there

16    were applications with the American National.

17              And the third reason, frankly, Your Honor, is

18    this is an email that Mr. Carpenter is on, and there's a

19    question that I thought it worthwhile, in the exhibit, to

20    draw the Court's attention to.

21              If the defense wants to argue weight, then

22    that's fine.  I really think that this is relevant to the

23    proceedings for obvious reasons.

24              THE COURT:  Overruled.

25

1    BY MR. NOVICK:

2    Q.   Can you read Questions 1 through 4, please?

3    A.   "Question 1:  Do you intend to transfer ownership of

4    this life insurance policy to a third party; example, life

5    settlement company, charity, or investor group?"

6         "Two, have you ever been offered any direct or

7    indirect inducement to encourage you to apply for this

8    life insurance policy such as a cache payment, gifts or

9    loan proceeds in excess of funds necessary to fund the

10   policy?

11        "Three, is it intended that the policy be directly or

12   indirectly owned by a charity or by an entity for the

13   purpose of investment?

14        "Four, will the source of funds for premium payments

15   involve premium financing?"

16        Go through --

17   Q.   No, that's okay.  I'll just have you read -- can you

18   just read the bottom instruction where it says, "Agent

19   Instructions"?

20   A.   "Agent Instructions:  Any yes answer for Questions 1

21   through 4 will result in automatic disqualification.  If

22   Questions 1 through 4 are all answered no, or if the

23   program has previously been approved, please proceed to

24   Questions 5 through 8."

25   Q.   I'll ask you just to turn to the next page and just

1    read Questions 5 and 6.

2    A.    "Question 5:  Will a collateral assignment be placed

3    on is this policy?

4         "Question 6:  Are any funds other than your own being

5    used to pay the premiums for the applied-for life

6    insurance?"

7    Q.    Let me ask you first as to -- I should have asked you

8    a second ago, but as to Questions 1, 2, 3, and 4 -- or at

9    least Questions 1, 2 and 4, what did you understand the

10   answers to those questions for the Charter Oak Trust

11   should have been?

12   A.    When you say "should have been" --

13   Q.    How should they have been answered if you're being

14   truthful -- what are the truthful answers to these

15   questions?

16            MR. GUARNIERI:  Objection, Your Honor.  I don't

17   believe there's a proper foundation for what is being

18   asked of the witness.

19            MR. NOVICK:  I think we've established the

20   witness's understanding of the operation, that he's told

21   the Court how he believes the trust worked; and now I'm

22   asking him, based on all of that, the foundation that's

23   been laid, what he believes the correct answers should

24   have been, notwithstanding what they were instructed to

25   do.  I think that's the whole thrust of the case.

1            THE COURT:  My understanding of what the witness

2    has told us so far is that, under the Charter Oak Trust,

3    everything was done the same way with regard to each and

4    every transaction.  In that context, I think I should

5    allow him to answer the question.

6            Is there something further?

7            MR. GUARNIERI:  Your Honor, I would like to note

8    for the record that the concern for -- the nature of the

9    objection we're raising is related to the fact that we

10   don't believe that this is a document that relates to the

11   Charter Oak Trust, and moreover speaking in generalities

12   as opposed to having this witness indicate specific

13   documents were answered in specific ways with reference to

14   specific individuals that the government alleges were

15   wrongly answered would be the more appropriate way to

16   address these and would actually, I suppose --

17           THE COURT:  My understanding is that Mr. Novick

18   is introducing me to the case through this witness.

19           And I trust that, in due course, what you just

20   talked about will be part of the trial, particularly with

21   regard to the 15 people who are of particular interest to

22   us.

23           So I believe this is by way of background, is

24   that right?

25           MR. NOVICK:  By way of background and by way of

1    showing Your Honor the defendant's familiarities, because

2    he is -- this won't be the only one, Your Honor.  We're

3    at, like, the very beginning of this, and there's going to

4    be a lot more.  But I think ultimately these are building

5    blocks, and this is the bottom floor, and so I'm trying to

6    get there.

7              MR. GUARNIERI:  Your Honor --

8              THE COURT:  I assume -- well, I don't need to

9    say anything more.  The objection is overruled, and if you

10   people are unhappy with my ruling, I'm sorry.  I'm doing

11   my best, but this is preliminary, in my opinion, and the

12   particulars that you have in mind presumably will be

13   forthcoming.

14       I guess one of the advantages of being a juror is you

15   don't have to rule on objections.

16   BY MR. NOVICK:

17   Q.   I believe the question I had asked, Mr. Cherneski,

18   was:  Did you understand what the correct answers -- by

19   "correct," I mean accurate, truthful answers -- should

20   have been for these questions?

21   A.   Yes.

22   Q.   They should have been what?

23   A.   They should have answered yes for the questions.

24   Q.   And you've been talking about what you were directed

25   to -- how you were directed to answer these types of

1    questions, And how was that?

2    A.    Just answer no.

3    Q.    And were those the -- and even if it's not directly

4    this form here, were those the types of questions that you

5    became familiar with for the Charter Oak Trust over time?

6    A.    Correct.

7    Q.    I will again take us back to the following page.  And

8    to close the loop on this, there's a notice at the bottom

9    of this page that had you read Questions 5 and 7.

10        Can you just read this agent notice?

11   A.    The full thing again?

12   Q.    Yes.

13   A.    "If the proposed insured or policy owner answered no

14   to Questions 1 through 4, or the program voiding the

15   financing has been previously approved by American

16   National Insurance Company, the application process may

17   proceed.  Depending on answers to Questions 5 to 8,

18   additional information may be required prior to approval

19   of the application.

20        "If the proposed insured or policy owner answered no

21   to Questions 1 through 4, but indicated in Question 6 that

22   the source of funds was being provided by a third party,

23   and American National Insurance Company has not previously

24   approved the program providing the financing, do not

25   submit this application."

1    Q.   Did you know the Charter Oak Trust or Ridgewood

2    financing to be an approved financing program for any of

3    the life insurance providers that we're discussing --

4    A.   No.

5    Q.   -- in Charter Oak --

6    A.   No.

7    Q.   -- in this plan?

8    A.   No.

9    Q.   So let's move forward to tab 12.  That's

10   Exhibit 2082.

11        What is this document?

12   A.   It's an email from Ineke to Dan Carpenter, Don

13   Trudeau, Guy Neumann, and myself.

14   Q.   What's the subject matter?

15   A.   Says, "Subject:  Deckert Issue Pages."

16   Q.   And are there attachments to this?

17   A.   There are.

18   Q.   Before I have you read anything further, I will offer

19   Exhibit 2082.

20              MR. BROWN:  Can I have a moment, Your Honor?

21              THE COURT:  Okay.

22                  (Pause)

23              MR. GUARNIERI:  No objection, Your Honor.

24              THE COURT:  Thank you.  It will be admitted.

25

1    BY MR. NOVICK:

2    Q.    Who is Ineke?

3    A.    Ineke is another person who worked at 100 Grist Mill

4    Road.

5    Q.    Do you recall her last name?

6    A.    It says it in the email:  Ineke Murphy.

7    Q.    I'm sorry.

8          And what is -- can you just read the email for us?

9    A.    "Please find attached the issue pages for the two

10   Deckard LFG policies.  Call me if you need anything else."

11   Q.    What does LFG stand for?

12   A.    Lincoln Financial Group.

13   Q.    Take a look at the first of the two attachments.

14         What is this document?

15   A.    This appears to be a screen shot or a web page

16   regarding the policy on Charles Deckard.

17   Q.    And are there comments under the requirements

18   section?

19   A.    Yes, there are.

20   Q.    What is that section of this page?

21   A.    What do the comments say?

22   Q.    What -- generally speaking, what is the requirements

23   section; what's the significance of that part of this

24   application?

25   A.    So that's the -- for the requirements list, things

1    that are required to place the case in force.  And it

2    looks like it's an amendment to the application.

3    Q.   Under the comments section, can you just read the

4    part beginning at the bottom, where my cursor is, saying,

5    "The premiums"?

6    A.   Sure.

7         "The premiums illustrated to be paid in the first two

8    years are not being advanced, loaned or financed by a

9    third party."

10   Q.   And, in fact, was that true of the Charter Oak Trust

11   in reality?

12   A.   That was not true.

13   Q.   Why not?

14   A.   Because the funds were being financed by a third

15   party.

16   Q.   And was this answer based on what you testified to

17   earlier, required in order to be signed off on, in order

18   to put the policy in force with the insurance company?

19   A.   Yes.  This was an amendment.  The adviser and the

20   owner, potentially even the insured, would have had to

21   sign off on the amendment for the policy to be placed in

22   force.

23   Q.   Take a look at tab 13.  And this is Exhibit 207.

24        What is this?

25   A.   What did you say, the exhibit number?

1    Q.   I'm sorry.  It's tab 13, Exhibit 2097.

2    A.   I'm there.

3    Q.   What is this?

4    A.   Email from Jenny Valedasserra to me; Tuesday,

5    February 5, 2008.

6    Q.   Is there an attachment to this?

7    A.   There is.

8    Q.   What's that?

9    A.   IOLI Form Number LF06658.PDF.

10           MR. NOVICK:  Your Honor, I'd offer 2097.

11           MR. GUARNIERI:  Moment please, Your Honor.

12                (Pause)

13           MR. BROWN:  We're looking for the document.

14                (Pause)

15           MR. GUARNIERI:  No objection, Your Honor.

16           THE COURT:  Thank you.

17   BY MR. NOVICK:

18   Q.   Who is Jenny Valedasserra, other than your wife?

19   A.   She worked on the admin side of the Charter Oak

20   Trust.

21   Q.   Can you read the email for us?

22   A.   "Stef, the answer to all these Qs are no, right?"

23   Q.   And is there an attachment to this document?

24   A.   There is.

25   Q.   Let's take a look at this form.  And first I'm going

1    to have you look at the third page of the form, read the

2    title of the document for us?

3    A.    "Lincoln Policy Regarding Investor-Owned Life

4    Insurance."

5    Q.    Is there a policy statement listed here from Lincoln?

6    A.    There is.

7    Q.    I'm just going to have you first read a little bit of

8    this, read the first two paragraphs of the policy here?

9    A.    The first two?

10   Q.    Yes, please.

11   A.    "The success of Lincoln financial group of companies

12   depends on the public's confidence in our honesty,

13   integrity and professionalism.  As one of our producers or

14   representatives, your business practices and professional

15   conduct reflect directly upon how the public perceives

16   Lincoln Financial Group.  Therefore, we expect that our

17   producers and representatives will understand and actively

18   support our efforts to not issue any new life insurance

19   policies where any of the parties are considering or

20   actually intend the eventual transfer of the life

21   insurance policy to a life settlement company or other

22   investors.  Our life insurance products are intended to

23   provide benefits to the insured and his or her

24   beneficiaries, all of whom have a bona fide need for the

25   insurance protection.  Our life insurance products are not

1    intended to enrich investors who simply hope for a

2    financial profit from the death of the insured.

3        "Investor-owned life insurance programs, IOLI, come

4    in many different forms.  Some of the approaches simply

5    offer financial inducements to an individual to apply for

6    a life insurance policy that will solely benefit the

7    investors that will pay the premiums.  Other more

8    sophisticated structures are disguised to appear like

9    traditional premium financing.  IOLI arrangements are

10   constantly changing their structures and practices in an

11   effort to avoid detection and identification.  We expect

12   our producers and representatives to assist us in

13   implementing our policy against IOLI and refrain from

14   submitting inappropriate cases to underwriting.  There

15   are, however, certain common red flags that we believe are

16   present in many of the more common IOLI arrangements.

17   Cases with any of the following red flags are particularly

18   suspect, and the details of any cases with these

19   characteristics must be fully disclosed to underwriting."

20   Q.   And if you could just take a look at the bullet

21   points, just the first four bullet points?

22   A.   You want me to read them?

23   Q.   Yes, please.

24   A.   Bullet 1:  "The insured or owner/applicant are

25   offered some financial inducement for applying for the

1    life insurance policy.  It could be a direct cash payment

2    to someone, e.g., the insured, family member, business

3    partner, charity; or an indirect payment such as the right

4    to designate a beneficiary for a portion of the life

5    insurance death benefit."

6         Bullet 2:  "The insured or owner/applicant is

7    borrowing all of the premiums and is not making any

8    personal investment in the life insurance program.

9    Arrangements where all interest on the premium financing

10   is added to the loan balance are particularly suspect,

11   regardless of the time period involved.  Capitalization of

12   loan interest is never justified when the likely source of

13   the loan payoff is the policy death benefit."

14        Bullet 3:  "The interest rate, loan terms, and fees

15   on the premium financing must be reasonable; and the loan

16   terms, taken as a whole, cannot create an incentive for

17   the insured or owner/applicant to transfer ownership of

18   the policy to the lender or other third parties.

19   Generally, any loan interest rate in excess of LIBOR plus

20   300 basis points is unreasonable.  Origination and

21   prepayment fees should be reasonable."

22        Bullet 4:  "There must not be any understanding,

23   whether written or oral, that the lender will accept

24   ownership of the policy in full satisfaction of any

25   outstanding premium financing."

1    Q.   And then you can skip the fifth one, and just the

2    last part of this, just the above "list of red flags"?

3    A.   "The above list of red flags is not intended to be

4    all inclusive.  If you have an arrangement that does not

5    have any of these red flags but otherwise violates the

6    spirit of our policy, you should not submit it to

7    underwriting."

8    Q.   I want to take you back to the first page of the

9    attachments.

10        And what's the title of this document?

11   A.   It says:  "Required Producer and Representative

12   Certification Regarding Investor-Owned Life insurance."

13   Q.   And this was the form that was forwarded to you by

14   Ms. Valedaserra?

15   A.   That is correct.

16   Q.   And can you read for us the -- just the section in

17   italics at the top of the page?

18   A.   Sure.

19        "Please complete this certification after reviewing

20   the accompanying February 21, 2007, policy statement

21   regarding investor-owned life insurance, IOLI.  This

22   certification must be submitted with all applications for

23   single life, universal life insurance where the insured is

24   age 70 or older and the face amount of all currently

25   pending life insurance applications is $2 million or more,

1    including applications with other insurers."

2    Q.   Now I'm going to have you take a look at some of the

3    questions on this form.

4         Take a look first at Question No. 2.

5    A.   You want me to read it?

6    Q.   Yes, please.

7    A.   "Is any premium financing contemplated to pay the

8    initial or future premiums for this policy; yes or no."

9    Q.   And again, consistent or similar to what I asked you

10   earlier, in truth, in your understanding of how the

11   Charter Oak Trust worked, what should the correct answer

12   to that question have been?

13   A.   It should have been yes.

14   Q.   And your understanding about how you were supposed to

15   answer these questions, how was it in fact answered?

16   A.   It was answered no.

17   Q.   And if you had answered yes here, were there other

18   forms that would have had to have been filled out relating

19   to premium financing?

20        Let me direct you to Sub-question B.

21   A.   Okay, so I read that.

22        So, yeah, if you answered yes, Part B indicates that

23   additional forms would have to be filled out.

24   Q.   And now looking at the next page of this

25   questionnaire, this document, can you read Question No. 3?

1    A.   "If the policy will be owned by a trust, limited

2    liability company, or other entity created or to be

3    created for the insured's behalf, are you aware of any

4    business or financial relationship between the trustee or

5    entity managers and any premium financing, life

6    settlement, viatical, or other secondary market provider?"

7    Q.   How was this question -- what would be a truthful

8    answer relating to Charter Oak Trust be to this question?

9    A.   It would yes.

10   Q.   And how were you, generally speaking, instructed to

11   answer these kinds of questions?

12   A.   Would be no.

13   Q.   Now let's take a look at tab 14.

14        Is this a response to the email we just looked at?

15   A.   It is.

16   Q.   Who is it from and to?

17   A.   It was from me, responding to Jenny.

18        MR. NOVICK:  Your Honor, I'd offer -- this is

19   tab 14, Exhibit 2098, I would offer into evidence.

20        MR. BROWN:  Could we have a moment, Your Honor?

21        (Pause)

22        MR. GUARNIERI:  No objection, Your Honor.

23        THE COURT:  Thank you.  It will be admitted.

24   BY MR. NOVICK:

25   Q.   Can you read for us what your response to

1    Ms. Valedaserra was, initially?

2    A.    Yep.

3          It says:  "The answers are no.  You'll have to send

4    to all producers so they can sign the documents.  S."

5    Q.    And what was Ms. Valedasserra's response?

6    A.    She responded:  "Only when I get the Lincoln app

7    though, right?"

8    Q.    And what was your response?

9    A.    I said yes for COT.

10          THE COURT:  We need to take our afternoon break

11    now.  We'll be in recess for 20 minutes.

12          I do think that going forward, if it's feasible,

13    it would be helpful if the government could provide the

14    defense with the notebook containing the exhibits that the

15    government anticipates using in its examination of the

16    upcoming witnesses.  I would ask counsel for the defense

17    to review the documents with an eye toward identifying any

18    possible objections so that we can move along a bit more

19    efficiently.

20          That would be much appreciated.  Thank you.

21          (Whereupon, a recess followed)

22          MR. NOVICK:  Your Honor, just to briefly address

23    the point you made before the break:

24          I've spoken to counsel.  It was the government's

25    hope and intention, by providing the government's witness

1    and exhibit list to defense, coupled with the stipulation,

2    we would be able to offer en masse all the exhibits, and

3    any issues with relevance or admissibility would be hashed

4    out prior to coming in today.

5             I've had conversation with counsel -- who, I

6    think, understands what I think ought to happen here and

7    make this most efficient -- and I understand they're going

8    to try to go back and look at particularly the

9    correspondence files between now and the next time we

10   meet, and then perhaps we will be able to offer a critical

11   mass of those so we don't have to have this back-and-forth

12   with every document.

13            But I understand the Court's concern, and which

14   is why we provided the exhibits, as the rules require.

15            THE COURT:  Thank you.

16   BY MR. NOVICK:

17   Q.   Before we left, Mr. Cherneski, we were looking at

18   your response to Ms. Valedasserra regarding the Lincoln

19   IOLI form, and you indicated that you had informed her

20   that the answers should be no for the Charter Oak Trust.

21        How did you know, again, that the answers would have

22   to be no; how did you know to inform Ms. Valedaserra that

23   was the truth?

24   A.   The general procedures for the Charter Oak Trust for

25   the other carriers, they all indicated the answers should

1    be no in regards to those questions, so I passed that

2    along for that form that she inquired about.

3    Q.   And did you know this, again, from these

4    conversations that you referred to earlier with people,

5    including Mr. Carpenter, including Mr. Neumann, inside

6    100 Grist Mill Road?

7    A.   Yes, correct.

8    Q.   I'd like to move on.

9         Along those lines, was there conversation with

10   Mr. Carpenter and others at 100 Grist Mill Road about the

11   true intent for the Charter Oak Trust, as you testified

12   earlier, with regard to the eventual sale of the policies?

13   A.   I'm sure that there were ongoing discussions with

14   what to do with the policies after the two-year

15   contestability period had expired, in regards to how to

16   dispose of the policies at that point.

17   Q.   We're going to talk about what happened after two

18   years in a minute, but you did raise -- one term I'd like

19   you to just define for us to your understanding:

20   "Contestability," what is that?

21   A.   When a life insurance contract is issued, there's a

22   two-year contestability period where, if there's any

23   misrepresentations made on the application, that the life

24   insurer can rescind the contract.

25   Q.   And the contestability, is the policy being inside or

1    beyond the contestability period, in your knowledge and

2    your experience, impact its ability to be sold in the

3    secondary market?

4    A.    Yes, it does.  Within the two-year contestability,

5    it's almost impossible to sell a policy.  In the secondary

6    market the fear is that the policy can be rescinded by the

7    insurer once it gets transferred to the new owner.  So

8    that's why policies out of the two=year period are much

9    more attractive on the secondary market.

10   Q.    I'm going to have you take a look at tab 15.  That's

11   Exhibit 2051.

12        Actually, my colleague pointed out, and before I move

13   on:  Before the break you had referred or seen reference

14   in emails to something called COT.

15        What does COT stand for?

16   A.    Charter Oak Trust.

17   Q.    Taking a look at Exhibit 2051, what is this?

18   A.    An email from Dan Carpenter, on Monday, May 21, 2007.

19   To Benjamin Richman; then cc'ing himself, as well as

20   Debbie Maximer, and Stefan, and myself.

21   Q.    What's the subject?

22   A.    Avon Trust Davis Angershman.

23             MR. NOVICK:  Your Honor, we offer 2051.

24             MR. BROWN:  No objection, Your Honor.

25             THE COURT:  It will be admitted.

1    BY MR. NOVICK:

2    Q.   Is this email here responding to a longer email

3    chain?

4    A.   It is.

5    Q.   Regarding what, in general?

6         Take a minute and get the document.

7    A.   Sure.

8         It appears to be a conversation going back and forth

9    between myself, Richman, and Dan for the Avon Trust, for

10   potential insured, commentary on documents on properly

11   filling them out.

12   Q.   What is the Avon Insurance Trust?

13   A.   It was the trust similar to the Charter Oak Trust;

14   but instead of there being business entities that adopted

15   the Charter Oak Trust, the Avon Trust was made for estate

16   planning for people who didn't have a company.

17   Q.   And was it similar to the Charter Oak Trust in how it

18   operated?

19   A.   It was.

20   Q.   Did it have the same funding source, Ridgewood

21   Capital, do you know?

22   A.   I was not aware.

23   Q.   Did it have the same intent as Charter Oak Trust with

24   regard to sale on the secondary market?

25   A.   It did.

1    Q.   Were there a lot of policies in Avon Insurance Trust,

2    to the best of your recollection?

3    A.   To the best of my recollection there was one policy

4    in the Avon Trust.

5    Q.   Let's take a look.  It's a long email chain.  I want

6    to direct you to page 5.

7    A.   Five at the bottom?

8    Q.   Yes, five at the bottom of the email chain.

9         Do you see an email down there from Daniel Carpenter,

10   at the bottom, May 17, 2007?

11   A.   I do.

12   Q.   And who is that to?

13   A.   That's to Benjamin or Buddy Richman.

14   Q.   Who is Benjamin or Buddy Richman?

15   A.   A financial adviser, insurance adviser from New York.

16   Q.   And I'm going to have you read some of that email.

17   It begins at the bottom of page 5, and then take a look at

18   the top of page 6.

19        Can you read beginning with, "Let Rex do

20   underwriting"?

21   A.   Sure.

22        "Let Rex do underwriting if they cannot.  Better to

23   let us do everything.  Just get our documents filled out

24   and leave the rest to us.  We will deal directly with

25   carriers.  The trust has its own funds.  Not premium

1    financing."

2    Q.   Stop there.

3         When it says, "Let Rex do underwriting," what is Rex?

4    A.   Rex is the insurance general agency that we had in

5    house at 100 Grist Mill Road.

6    Q.   And what did you take this -- these sentences to

7    mean; what did you understand these to mean?

8    A.   They said -- Dan was advising Buddy just not to worry

9    about anything, let us deal with the carriers; in regards

10   to the question regarding premium financing, to answer no.

11   Q.   When it says the trust has its own funds, is that

12   what you understood that to mean?

13   A.   Correct.

14   Q.   And so "not premium financing" refers to how to

15   address any questions on the application?

16   A.   Correct.

17   Q.   Did the trust have funds absent money coming into it

18   from a third party?

19   A.   No.

20   Q.   Can you continue reading -- well, let me ask you this

21   question:  In the Charter Oak Trust, as well as the Avon

22   Trust, would the money from the funder come in en masse,

23   or did it come in on a case-by-case basis as policies were

24   approved?

25   A.   From what I understood, the trust would be funded as

1    the case was approved for issue.

2    Q.   You can keep reading, "Do not show our documents" --

3    keep reading with, "Do not show our documents"?

4    A.   "Do not show our documents to any brokers.  Brokers

5    should not say anything to carriers, just get our

6    documents signed and returned to us."

7         Continue?

8    Q.   Yes, please continue.

9    A.   "We can deal with carriers.  If you say 'premium

10   finance,' case is dead in water, simple as that."

11   Q.   Okay.  What did you understand Mr. Carpenter to mean

12   here?

13   A.   That he didn't want Buddy to show the documents with

14   regards to the trust to anybody, including his brokers;

15   doesn't want brokers talking to the insurance carriers,

16   just get the stuff signed and back to us.

17   Q.   And when it says, "if you say 'premium finance,' case

18   is dead in the water, simple as that," was that your

19   understanding as well?

20   A.   That is correct.

21   Q.   I'm going to have you now go to the bottom of page 1.

22   Take a look at the email that begins at the bottom of

23   page 1.

24        Who is that from and to?

25   A.   It's an email from Dan to Buddy Richman, and he's

1    cc'ing me.

2    Q.   Okay.  And taking a look at page 2, can you read for

3    us beginning, "We are happy to talk"?

4    A.   Sure.  How far do you want me to read to?

5    Q.   Why don't you read just that first couple of lines.

6    A.   "We are happy to talk with anyone's legal counsel,

7    but we are taking all of the risk, doing most of the work,

8    and getting 40 percent of the payout."

9    Q.   You can stop there.

10        When you -- what did you understand Mr. Carpenter to

11   mean by "taking all the risk, doing most of the work, and

12   getting 40 percent of the payout"?

13   A.   Taking on all the risk, taking all the financial

14   risk --

15        MR. GUARNIERI:  Objection, Your Honor.

16   Speculation.

17        THE COURT:  You may proceed.

18        THE WITNESS:  In regard to taking all the risk,

19   that we are taking all the financial risk of the

20   transaction.  Sometimes a policy not sellable or the

21   insured is not insurable, we're going to be holding the

22   hat at the end of the day, doing most of the work.  It

23   speaks for itself.

24        And "40 percent of the payout" would indicate

25   what we went down on the life insurance application for.

1    BY MR. NOVICK:

2    Q.   So Charter Oak or Grist Mill entities would get

3    40 percent of the -- that's the actual commission?

4    A.   Correct.

5    Q.   Can you read the line beginning, "Let Stef and I

6    know"?

7    A.   Let Stef and I know how we can help, but we

8    definitely don't want your brokers talking to any carrier

9    about our trust.  Understood?"

10   Q.   You can keep going.

11   A.   "The trust has its own money and is paying all

12   premiums, no premium financing here.  No talk of LS or

13   LE's, et cetera, et cetera, et cetera.  No problem in

14   signing the forms."

15   Q.   When it says, "Let Stef and I help, we don't want the

16   brokers talking to the carrier." what did you understand

17   him to mean by that?

18   A.   If the advisers or brokers spoke directly to a

19   carrier and said something wrong to them regarding how the

20   trust operated, it could cause red flags to go up and

21   cause the carrier to stop accepting business from us.

22   Q.   And then with regard to the trust having its own

23   money, did the trust have any money other than what came

24   into it from the various -- either funding it that we

25   talked about?

1    A.    To the best of my knowledge, no.

2    Q.    Again, with the reference to "no premium financing

3    here," did you understand there, in fact, to be premium

4    financing?

5    A.    Yes.

6    Q.    And, "No talk of LS or LE's," what does that

7    reference?

8    A.    Life settlements or life expectancies.

9    Q.    And again, what did you understand Mr. Carpenter to

10   mean when he put this in the email?

11   A.    He's indicating on how to properly fill out the

12   applications.

13   Q.    And were in fact -- was there, in fact, discussion

14   about life settlements in the Charter Oak Trust and the

15   Avon Insurance Trust?

16   A.    Yes.

17   Q.    And same with regard to life expectancies, were life

18   expectancies run on the Charter Oak Trust and Avon

19   Insurance Trust insureds?

20   A.    Yes.

21   Q.    In fact, were they in every case of -- in both of

22   those trusts run as a matter of requirement?

23   A.    To the best of my knowledge, yes.

24   Q.    And again with the last line there, "No problem in

25   signing forms," what is that a reference to?

1    A.   Reference to the applications, that there should be

2    no concern in signing the forms.

3    Q.   Were there discussions at 100 Grist Mill Road about

4    how much to pay in premiums on the Charter Oak Trust

5    policies once they were in effect?

6    A.   Yes, there were.

7    Q.   And were you a party to or involved in those

8    discussions from time to time?

9    A.   Yes, I was.

10   Q.   And can you tell us who else was involved in those

11   particular discussions?

12   A.   It would be Dan Carpenter, Guy Neumann, Charlie

13   Induddi, Ed Waesche.

14   Q.   You've talked about this earlier with regard to the

15   illustrations; but, generally speaking, what was the

16   approach in terms of how much money was going to be paid

17   into the insurance policies in the Charter Oak Trust?

18   A.   So typically the target premium, so full commission,

19   would be paid in the first year, would be paid into the

20   policy; and then after that, a minimum amount into the

21   policy just to sustain it through year two, until you pass

22   the two-year contestability period.

23   Q.   And were the insureds ever involved in how much to

24   pay in premium on their policies in the Charter Oak Trust?

25   A.   Not to my knowledge.

 1    Q.    Why not?

 2    A.    Because it wasn't their money they were putting in,

 3    to begin with.

 4    Q.    Take a look at tab No. 16.

 5          What is this document?

 6    A.    It's an email from Dan to Jack Robinson, Guy, Don

 7    Trudeau, Ed Waesche, myself, Charlie Westcott, Jenny

 8    Valedaserra, and Ineke Murphy.

 9    Q.    And is it responding to another email?

10    A.    It is.

11    Q.    And what's the subject line of this?

12    A.    It's regards forward Deckard.

13    Q.    And who was Deckard?

14    A.    I can't recall.

15          MR. NOVICK:  Your Honor, at this time I'd move

16    Exhibit 2103.

17          MR. GUARNIERI:  No objection, Your Honor.

18          THE COURT:  Thank you.

19    BY MR. NOVICK:

20    Q.    Let's look at the bottom email first.

21          Who is that from and to?

22    A.    It's from Jack Robinson to Dan, Guy Neumann, and John

23    Trudeau.

24    Q.    Can you read that for us, please?

25    A.    "On the new cases, please make sure that the total

1    three-year funding commitment on each case exceeds

2    $250,000, even if you have to over fund the last premium.

3    That will make my life a lot easier."

4    Q.   And can you read -- first of all, do you know why the

5    commitment needed to be $250,000 over 3 years?

6    A.   I do not.

7    Q.   Can you read Mr. Carpenter's response?

8    A.   "We need to make sure there are no more second-year

9    zero-funding illustrations.  The policy will lapse, hurts

10   our funding, and is a dead giveaway that it is life

11   settlement business."

12   Q.   Does it say "LS biz" there?

13   A.   LS biz.

14   Q.   What does that stand for?

15   A.   Life settlement.

16   Q.   When the insurance company got the applications for

17   policies in the Charter Oak trusts, would they get an

18   illustration with the application?

19   A.   They would.

20   Q.   Would it look like the cost of insurance or

21   minimum-funding illustration that we've been talking

22   about?

23   A.   It would not.

24   Q.   What would it look like?

25   A.   Typically it would be:  The target premium would be

1    paid the first year; and then minimum premium thereafter,

2    minimum level premium to carry to age 100.

3    Q.   Level premium across the board as opposed to cost of

4    insurance premium or illustration, right?

5    A.   Correct.

6    Q.   You talked about, in the minimum-funding illustration

7    is the one that would go to the funder, correct?

8    A.   Correct.

9    Q.   Which of those illustrations -- the one that had the

10   cost of insurance, minimum funding, or the level

11   illustration, which of those illustrations would drive how

12   much premium would actually be paid into the policy once

13   in effect?

14   A.   Typically it was the minimum COI illustration,

15   minimum cost-of-insurance illustration.

16   Q.   The one that had gone to the funder?

17   A.   Correct.

18   Q.   So not, in fact, the one that the insurance company

19   had, correct?

20   A.   Correct.

21   Q.   And when we see in here a reference to, "no more

22   second-year zero-funding illustrations," what is a

23   second-year zero-funding illustration?

24   A.   That would be an illustration where there's actually

25   no money going into the policy, and the policy appears to

1   be able to survive for those first two years without any

2   money in the second year.

3   Q.   So in some cases that cost-of-insurance illustration

4   might call for zero dollars in the second year?

5   A.   It potentially could, yes.

6   Q.   So what would happen if the funder approved and then

7   paid on a zero second-year illustration?

8        What would be the issue; what's the issue that's

9   being presented here?

10  A.   If the funder did pay, or there was no money going in

11  there?

12  Q.   If there was no money in the second year

13  contemplated.

14  A.   It's my understanding that would be a red flag.

15  Q.   So the insurance carrier was expecting a full level

16  premium and they got zero?

17  A.   Correct.

18  Q.   That would be if you paid on that zero-funding

19  second-year illustration?

20  A.   Correct.

21  Q.   And just by way of comparison, why would you not do a

22  zero first-year illustration or payment?

23  A.   Well, the first year is when the target premiums paid

24  the commission, so typically you want to get a premium

25  there to at least pay a full commission the first year,

1    and then subsequently deal with the minimum premium

2    funding thereafter.

3    Q.   So are the commissions in after year one?

4    A.   There are.

5    Q.   Are they as big as the first commission?

6    A.   They are not.

7    Q.   Are they in fact much, much, much less?

8    A.   They are.

9    Q.   So it's important to have -- if you want to make the

10   full commission, to be able to pay the target commission

11   in the first year?

12   A.   That is correct.

13   Q.   Let's take a look at tab 17, and that's going to be

14   Exhibit 2117.

15        What is this document?

16   A.   It's an email from Dan, dated Monday, March 24, 2008,

17   to Jenny, Don Trudeau, Jack Robinson, Ineke, Wayne Bursey,

18   Guy Neumann, and myself.  And it says regards -- in

19   regards to Phillip Beekman, second-year funding.

20   Q.   Is this responding to another email?

21   A.   It is.

22             MR. NOVICK:  Your Honor, I'd offer Exhibit 2117.

23             MR. GUARNIERI:  No objection, Your Honor.

24             THE COURT:  It will be admitted.

25

1    BY MR. NOVICK:

2    Q.   And what's the title -- or excuse me -- the subject

3    line of the bottom email from Jenny NOVA, to Daniel

4    Carpenter and John Trudeau?

5    A.   It says, "Subject:  Phillip Beekman Second-Year

6    Funding."

7    Q.   And can you read that email?

8    A.   Sure.

9         "Let's try this again.  Attached is a second-year

10   premium notice for Phillip Beekman.  According to the

11   funding package, the bank agreed to $175,000 for the

12   second year.  Please prepare funding docs for the second

13   year.  Thanks, Jen."

14   Q.   What's the reference to -- what did you understand

15   the reference to the bank here to be?

16   A.   That would be the funder.

17   Q.   Do you recall any other names that used to be known

18   as, within 100 Grist Mill Road?

19   A.   The funder, big brother.

20   Q.   And then can you read Mr. Carpenter's response?

21   A.   "Let's put in 175K and see how policy does."

22   Q.   What did you understand that to me?

23   A.   He was looking to say:  Put $175,000, and see if that

24   sustains the policy through year two.

25   Q.   So in other words, it's not clear that it will, but

 1   to see if it does?

 2   A.   Correct.

 3   Q.   Was Mr. Carpenter, frequently in your experience and

 4   observation, involved in the decisions on how much would

 5   go into the particular insurance contracts in the Charter

 6   Oak Trust?

 7   A.   Yes.

 8   Q.   And in conjunction -- on the policies that were

 9   funded by the funder, in conjunction with the funder?

10   A.   Correct.

11   Q.   And you also mentioned earlier that there were some

12   policies that were funded by Grist Mill Capital solely?

13   A.   Correct.

14   Q.   Would Mr. Carpenter play a role in deciding how much

15   was going to be paid in those policies?

16   A.   Yes.

17   Q.   In the first and the second year?

18   A.   Correct, yes.

19   Q.   Take a look Government's Exhibit 2212.

20        What is that?

21   A.   Email from Dan, dated Tuesday, April 21, 2009, to Don

22   Trudeau, myself, Kathy Kehoe, Charlie Induddi, Luann

23   Pinko, and cc Dan himself.

24   Q.   And what's the subject of the email?

25   A.   Subject is regards forward Deckard.

1           MR. NOVICK:  Your Honor, I'd move this exhibit.

2           MR. GUARNIERI:  No objection, Your Honor.

3           THE COURT:  It will be admitted.

4    BY MR. NOVICK:

5    Q.   You said this is responding to a series of other

6    emails?

7    A.   It is.

8    Q.   Let's go to page 5 of this email chain.

9         Can you read or tell us what the email is, the

10   bottommost email?

11   A.   It says:  "Charlie, I know you were rerunning an

12   illustration, and I'm following up.  Did you ever find out

13   how much needed to go into the policy for this quarter or

14   month?  It's in grace period.  Thanks."

15   Q.   What's "grace period"?

16   A.   That's when a policy is pending lapse.

17   Q.   And what is Jenny asking in this email?

18   A.   She's asking Charlie how much money needs to go into

19   the policy to get it out of grace.

20   Q.   When a policy is in grace, there's an opportunity to

21   get it out of grace?

22   A.   There's a grace notice where you get 30 days to bring

23   the policy up to date, otherwise it will lapse.

24   Q.   And let's take a look at the next email, it begins on

25   the prior page, from Charlie Induddi.

1          Do you see that at the bottom?

2     A.   Yes.

3     Q.   And then to Jenny.

4          Can you read the response?

5     A.   From Charlie?

6     Q.   Yes, please.

7     A.   "I reran Deckard.  The second-year quarterly premium

8     is 14,000 per quarter.  But we are behind two, going on

9     three, on June 2, 2009.  I have attached an illustration.

10    Probably if we put a little more in to make up the time

11    issue, maybe 15K per quarter.  The minimums in the future

12    may be a bit lower, but these numbers work.  These numbers

13    can be extrapolated for the 10-million policy as well.  I

14    think we will be okay with the 10 million until its

15    anniversary.  In your file you should have an illustration

16    with the minimums annually for both.  Let me know if you

17    do, Charlie."

18    Q.   Okay.  Was that then forwarded to you?

19    A.   It was.

20    Q.   Now, let's go to page 3.

21         Did you forward that on?

22    A.   I did.

23    Q.   And let's go back to page 11, and I want to look

24    at -- well, first I want to look at your email.  It says

25    "Stefan wrote," and then on to page 2.

1      Could you just read that one line there?

2   A.   Start where it says from, "Reading"?

3   Q.   Correct.

4   A.   "From reading Charlie's email, it appears that we

5   should pay 30K now, and then 15K each in June and

6   September, to bring the policy up to date."

7   Q.   Okay.  And now, finally, can you read Mr. Carpenter's

8   email at the top?

9   A.   "I think that is dangerous unless we plan to hold

10   onto the money.  We should commit to specific policies and

11   get our partners to commit the amount.  I think Charlie is

12   wrong, and it will be a disaster if the carrier lapses

13   policy.  Have our people find out what is needed now."

14   Q.   So again, Mr. Carpenter, was he involved in making

15   decisions on how and how much to fund the policies in the

16   Charter Oak Trust?

17   A.   Yes.

18   Q.   And why would it be a disaster if the carrier lapsed

19   the policy?

20   A.   If the policy were to lapse, then there would be no

21   opportunity to sell it in the secondary market after a

22   two-year contestability period; and if the policy was to

23   be reinstated, the reinsured would have to go through

24   another medical to get the policy reinstated after it

25   lapsed.

1    Q.   There's no guarantee they would reinstate the policy

2    after it lapses, is that right?

3    A.   That is correct.

4    Q.   Let's take a look at tab 19.  That's Exhibit 2213.

5         What is this?

6    A.   It's an email from Charlie to Don Trudeau, myself,

7    Kathy Kehoe, and Dan.  It's a continuation of the previous

8    email.

9    Q.   So this is another response to one of those earlier

10   emails we just looked at?

11   A.   Correct.

12             MR. NOVICK:  Your Honor, I'd move Exhibit 2213.

13             MR. GUARNIERI:  No objection, Your Honor.

14             THE COURT:  Thank you.

15   BY MR. NOVICK:

16   Q.   Can you read Mr. Westcott's or Mr. Induddi's response

17   to this email chain?

18   A.   Sure.

19        "The plan for all policies was to pay minimum,

20   usually annually starting in year two.  This method yields

21   the highest IRR for the policy.  Please let me know if

22   there are others that you need checked out that are in

23   year two.

24        "So instead of overpaying Deckard, we should use the

25   money to pay George Doug Sanders' last quarterly premium

1     in its first-year first commission Policy No. JJ77041576,

2     at $61,925, due 5/2/2009, Charlie."

3     Q.   First of all, is what you just read, particularly the

4     first few sentences, the first couple of lines, consistent

5     with your understanding of how the funding of these

6     Charter Oak Trust policies were supposed to proceed?

7     A.   Yes.

8     Q.   And what does IRR stand for?

9     A.   Stands for "internal rate of return."

10    Q.   And why is that significant?

11    A.   The highest --

12    Q.   First of all, what is the IRR on the insurance

13    policy?

14    A.   The internal rate of return on an insurance policy is

15    the rate of return that you would get in regards to

16    premiums going into the policy versus the death benefit

17    that's paid out.

18    Q.   And why would that method yield the highest IRR for

19    the policy?

20    A.   Because you're putting in the minimum amount into the

21    policy to sustain the death benefit to eventually get paid

22    back on the death benefit.

23    Q.   Is IRR something that has significance with regard to

24    the funder and the life settlement market?

25    A.   Showing the return of the policy will give you based

1  on the premiums going into it, so it would be used to

2  determine the value of the policy.

3  Q.    How typically are policies priced on the secondary

4  market, how does one -- is there a particular way to talk

5  about how policies are priced in the secondary market?

6  A.    The typical way is, it would be a percentage of the

7  face amount or the death benefit as a sale price.

8  Q.    Take a look at tab 20, Exhibit 2055.

9        What is this?

10 A.    It's an email from Guy Neumann, on Tuesday, July 10,

11 2007, to myself and Charlie Induddi, in regards to

12 settlement prices as a percentage of face based on ages.

13               MR. NOVICK:  Your Honor, I'd move Exhibit 2055.

14               MR. GUARNIERI:  Your Honor, objection on the

15 grounds of relevance, since Mr. Carpenter is not on this

16 email.

17               MR. NOVICK:  These are co-conspirator

18 statements, Your Honor.

19               THE COURT:  Okay.  Overruled.

20 BY MR. NOVICK:

21 Q.    Are you in this email, or is Mr. Neumann responding

22 to another email?

23 A.    Yes.

24 Q.    And is that from you?

25 A.    It is.

1    Q.   Can you just read your -- the subject and the one

2    line that you wrote?

3    A.   "Charlie wanted to know if you had any information on

4    this."

5    Q.   By "this," what's the subject line of this email?

6    A.   "Settlement Price as a Percent of Face Based on

7    Ages."

8    Q.   Okay.  And can you read Mr. Neumann's response?

9    A.   Sure.

10        "There is no such guideline.  There are too many

11   moving parts to create such a chart.  For conservative

12   purposes, you can sort of count on a person over the age

13   of 75, with a standard or better U.L. policy getting at

14   least 20 percent of face.  Using 25 percent is not overly

15   aggressive, but anything north of that can create problems

16   in the future."

17   Q.   Why was this information relevant to Mr. Westcott at

18   the time?

19        Why were you answering this question or seeking an

20   answer for him on this question?

21   A.   It's a little bit relevant to Charlie in this

22   respect, because when a policy is sold in the secondary

23   market after the two-year contestability period of the

24   Charter Oak Trust, there was a certain percentage analysis

25   that would have to be paid back to the trust, and then the

1    insured can potentially receive some funds above and

2    beyond the funding repayments when the policy is sold.

3    Q.   So why was it important for Charlie to know that

4    information; who was he interacting with?

5    A.   This is important for Charlie to pass along to his

6    brokers, and so they could pass it along to the clients

7    who were participating in the transaction.

8    Q.   And in your experience at the time, was 20 percent of

9    face, or 25 percent of face, typical of what you might

10   have expected; in other words, is that consistent with

11   your understanding as of July 2007?

12   A.   I never really participated in that end of the

13   transaction, so I wouldn't know.

14   Q.   Okay.  You mentioned earlier that insurance carriers

15   were not aware that the Charter Oak Trust policies were

16   financed or funded with the intent to sell them, correct?

17   A.   Correct.

18   Q.   Were you involved in discussions with carriers and

19   about carriers regarding potential issues with the Charter

20   Oak Trust?

21   A.   Yes, I was.

22   Q.   And do you recall in the discussions that you had, at

23   least within 100 Grist Mill Road, who else was involved in

24   those conversations?

25   A.   So that would be Dan, Guy, Charlie, Ed Waesche,

1    myself.

2    Q.   What role did Mr. Carpenter play in those discussions

3    about issues with carriers?

4    A.   He was the one who would seek guidance on how we were

5    to respond to any concerns or issues that popped up from

6    the carriers.

7    Q.   Take a look at tab 21.  It's Exhibit 2111.

8         What is this?

9    A.   It's an email from Guy to Charlie, Amanda Rossi,

10   myself, me, and Dan.

11   Q.   What's the subject line?

12   A.   "Lincoln Conference Call."

13            MR. NOVICK:  Your Honor, I'd offer Exhibit 2111.

14            MR. GUARNIERI:  No objection, Your Honor.

15            THE COURT:  Thank you.

16   BY MR. NOVICK:

17   Q.   Is this responding to an earlier email?

18   A.   It is.

19   Q.   And who is that from?

20   A.   Email from Charlie to Amanda, Guy, myself, and Dan.

21   Q.   Can you read briefly those four lines there?

22   A.   "Lincoln conference call will be Thursday at

23   1:30 p.m.  I will be in the office.  Very important we all

24   know what they want.  Let me know everyone can make it."

25   Q.   And how did Guy Neumann respond?

1  A.   "Stefan, I will be on.  Dan will probably be in the

2  room . . . regards, Guy."

3  Q.   What did you understand, "Dan will probably be in the

4  room . . ." to mean?

5  A.   I think it's a foregone conclusion that Dan was going

6  to be in the room.

7  Q.   And was it always true that Mr. Carpenter was the one

8  doing the speaking on a phone call with the insurance

9  carrier?

10  A.   He wouldn't necessarily always be the one speaking;

11  but for conversations of this nature, he would definitely

12  be in the conference room.

13  Q.   Okay.  Let's take a look at Exhibit 22 -- excuse

14  me -- tab 22, Exhibit 2115.

15       What is that?

16  A.   So it's an email from Guy Neumann to Dan Carpenter,

17  Charlie Induddi, and myself.

18            MR. BROWN:  Your Honor, can we have a moment

19  with the prosecutor?

20            THE COURT:  Yes.

21            MR. BROWN:  I gave counsel a number of them

22  before, and I understand that we've gone beyond what I

23  gave them.

24            (Pause)

25            THE COURT:  Mr. Novick, we're close to our

1    adjournment time.

2              MR. NOVICK:  It's not critical that I either get

3    through this or not.  I have several more to go through.

4              THE COURT:  Okay.  So we'll continue on

5    Thursday.

6              MR. NOVICK:  Yes, Your Honor.

7              THE COURT:  Nine o'clock?

8              MR. NOVICK:  Nine o'clock.

9              THE COURT:  And government will provide the

10   defense with the documents that it expects to cover with

11   the witnesses on that day?

12             MR. NOVICK:  Yes, Your Honor.  Like I said, I

13   anticipate that we're going to try to work out any issues

14   with admissibility, see that we don't have to go document

15   by document.

16             THE COURT:  Thank you very much.

17             We'll see you on Thursday.

18                  (Proceedings adjourned at 4:28 p.m.)

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3                   In Re: U.S. vs. CARPENTER

4

5

6            I, Darlene A. Warner, RDR-CRR, Official Court

7      Reporter for the United States District Court for the

8      District of Connecticut, do hereby certify that the

9      foregoing pages are a true and accurate transcription of

10     my shorthand notes taken in the aforementioned matter to

11     the best of my skill and ability.

12

13

14

15

16               /s/_____

17               DARLENE A. WARNER, RDR-CRR
                   Official Court Reporter
                 450 Main Street, Room #223
18               Hartford, Connecticut 06103
                     (860) 547-0580

19

20

21

22

23

24

25