1                    UNITED STATES DISTRICT COURT

2

3                  FOR THE DISTRICT OF CONNECTICUT

4

5     – – – – – – – – – – – – – – – x
                                    :
6     UNITED STATES OF AMERICA      :   No.  3:13CR226(RNC)
                                    :
7            vs.                    :
                                    :
8     DANIEL CARPENTER, ET AL,      :
                                    :   HARTFORD, CONNECTICUT
9                    Defendants.    :   February 18, 2016
                                    :
10    – – – – – – – – – – – – – – – x

11

12

13                         BENCH TRIAL
                            VOLUME II

14

15

16        BEFORE:

17              HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22

23

24                              Darlene A. Warner, RDR-CRR
                                Official Court Reporter
25

1

APPEARANCES:

2

3       FOR THE GOVERNMENT:

4           U.S. ATTORNEY'S OFFICE-NH
            157 Church Street
5           P.O. Box 1824; 23rd Floor
            New Haven, Connecticut 06510.
6           BY:  DAVID E. NOVICK, AUSA
                 NEERAJ PATEL, AUSA

7

        FOR DAVID CARPENTER:

8
            BROWN, PAINDIRIS & SCOTT
9           100 Pearl Street, 2nd Floor
            Hartford, Connecticut 06103
10          BY:  RICHARD R. BROWN, ESQ.
                 CODY N. GUARNIERI, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEFAN JOHN CHERNESKI | | | | |
| BY MR. NOVICK: | 208 | | 348 | |
| BY MR. GUARNIERI: | | 269 | | |
| PATRICK GLYNN | | | | |
| BY MR. NOVICK: | 354 | | | |

1                          9:09 A.M.

2

3              THE COURT:  Are you all set to proceed?

4              MR. NOVICK:  We are, Your Honor.

5              Just for hopefully purposes of efficiency this

6       morning, I spoke to counsel, and I have given them the

7       list of the remaining exhibits of this witness.  And I

8       believe we are agreed on their admissibility with the

9       caveat, and counsel can correct me if I'm wrong, they

10      would like to preserve an objection to any exhibit that

11      does not specifically reference one of the 15 straw

12      insureds, 1 through 15, through the superseding

13      indictment, and also any email that does not specifically

14      reference or have as a sender or recipient, the defendant.

15             Obviously, as I've made my position clear on

16      both fronts, I think with regard to the emails not

17      referencing the defendant, not having the defendant as a

18      "to" or "from," those are co-conspirator or statements,

19      and also part of the conspiracy itself.  And with regard

20      to the emails not referencing Straw Insureds 1 through 15,

21      I believe I've made my position on that clear.

22             So with those caveats, I believe with the

23      remaining exhibits there's no objection to them.  And if

24      the Court prefer, I can read them off to Terri now, so we

25      don't have to discuss them one at a time.

1          THE COURT:  They will be admitted subject to

2     those objections.  Unless counsel has something new to

3     offer by way of authority, I think that the government has

4     the better of the argument.

5          MR. GUARNIERI:  Sure, Your Honor.  And I would

6     just, for the record, just wanted to indicate that that

7     was the understanding of the conversation that we had this

8     morning, and that we will be preserving those objections

9     which are really basis and hearsay relevance.

10          And we made substantial argument about that the

11     other day.  But the nature of our argument is that we've

12     never been produced a list of co-conspirators besides

13     Mr. Bursey and Mr. Waesche.  At least, it's kind of an

14     amorphous concept as a co-conspirator to swallow the rule

15     in this case.

16          And so for those reasons, we want to preserve

17     our objections on those grounds, Your Honor.

18          THE COURT:  Okay.  Well, fine.

19          Would you please ask the witness to resume the

20     stand.

21          MR. NOVICK:  Yes, Your Honor.

22          THE COURT:  Good morning.

23          THE WITNESS:  Good morning.

24          THE COURT:  I'm going to ask the clerk to swear

25     you in this morning.

1          THE CLERK:  Please raise your right hand.

2

3                    STEFAN JOHN CHERNESKI,

4          called as a witness, having been first duly

5          sworn or affirmed, was examined and testified as

6          follows:

7

8          THE CLERK:  Please be seated.

9          Please state your name and spell your last name

10    for the record.

11         THE WITNESS:  Stefan John Cherneski,

12    C-H-E-R-N-E-S-K-I.

13         THE CLERK:  Your business address, please?

14         THE WITNESS:  Six Talcott Forest Road, Suite C,

15    Farmington, Connecticut 06032.

16         THE CLERK:  Thank you.  Please be seated.

17

18              DIRECT EXAMINATION (Continued)

19    BY MR. NOVICK:

20    Q.   Good morning, Mr. Cherneski.

21    A.   Good morning.

22    Q.   Yesterday we had left off talking about Government's

23    Exhibit 2111.

24    A.   You mean Tuesday.

25    Q.   I'm sorry, Tuesday.  Thank you.

1    And you had been talking about dealing with issues

2    related to particular carriers and the Charter Oak Trust.

3    Do you recall that?

4    A.    I do.

5    Q.    And we looked at this email in 2111, referencing a

6    conference call with Lincoln; and you had talked about how

7    Mr. Carpenter was typically in the room for these calls

8    and, in fact, often either spoke or told people what to

9    say.

10    Do you recall that?

11    A.    I do.

12    Q.    So I want to move forward to the next document in the

13    binder, which is tab 22, in Exhibit 2115.

14    You see that?

15    A.    I do.

16    Q.    And what is it?

17    A.    It's an email from Guy Neumann; Thursday, March 1,

18    2008; to Dan Carpenter, Charlie Induddi, myself.

19    Q.    And what's the subject line of the email?

20    A.    "Regarding New Potential COT Case."

21    Q.    Okay.  And is it responding to a series of other

22    emails?

23    A.    Yes.

24    Q.    What I'd like to do --

25            MR. NOVICK:  Your Honor, I'd offer 2115.

1        MR. GUARNIERI:  No objection, Your Honor.

2        THE COURT:  It will be admitted.

3   BY MR. NOVICK:

4   Q.    What I'd like to do is direct you to page 2 of the

5   document in the earliest email in this chain, do you see

6   that, from Charlie Induddi to Dan Carpenter, Thursday,

7   March 13, 2008?

8   A.    I do.

9   Q.    Can you read that for us?

10  A.    "I just got off the phone with Fred Prelle, and we

11  were discussing underwriting, and he mentioned that John

12  Hancock and MetLife are making great underwriting offers.

13  Fred said "no" is not in their vocabulary.  In fact,

14  Hancock in particular offered STD on a declined case from

15  another carrier.  The problem is both Hancock and MetLife

16  will not do 419 plans.  Is it possible to have an ILIT or

17  something as the vehicle instead of a 419 for a COT

18  lookalike?  Hancock wants to see the trust in its entirety

19  so there can be no language regarding beneficial interest

20  or transfers.  MetLife only wanted to see first and last

21  page of trust.  Fred has 1M of premium approved with

22  Hancock and is asking for some ideas.  Help, Charlie."

23  Q.    Can you tell us -- just a couple of abbreviations

24  there, what is STD mean in the third line, the first word

25  there?

1    A.    That is referred to as a standard.

2    Q.    And what does that mean in the context of an

3    insurance policy?

4    A.    So that was the rating that the insurance company

5    offered on a particular insured.

6    Q.    Okay.  And that determines what the cost of the

7    insurance policy is going to be?

8    A.    That is correct.

9    Q.    And what's an ILIT?

10   A.    That's an irrevocable life insurance trust.

11   Q.    What is that?

12   A.    It's a trust that somebody would set up for the sole

13   purpose of holding a life insurance contract.

14   Q.    When it says here that there can be no language

15   regarding beneficial interest or transfers, what did you

16   take that to mean?

17   A.    No language to indicate that it could be

18   stranger-originated life insurance.

19   Q.    So, in other words, that can't be in whatever

20   document would be produced to the carrier, is that what

21   you interpret that to mean?

22   A.    Yeah, I would.

23   Q.    Generally speaking, were you sending trust documents

24   to the carriers?

25   A.    In --

1    Q.    -- first and last pages of trust documents?

2    A.    It depends on which carrier.

3    Q.    Okay.  And why might they not -- just talking about

4    whether or not they were doing a 419 plan here, why would

5    they not do a 419 plan in these particular carriers?

6    A.    Some carriers, these two that are mentioned here,

7    would not participate in the 419 marketplace because of

8    some of the perceived abuses that had occurred earlier.

9    Q.    Okay.  And those were -- just so we're clear, those

10   are tax-related abuses?

11   A.    Correct.

12   Q.    Not anything to do with STOLI or things like that?

13   A.    That is correct.

14   Q.    So let's look at the next email up.

15         You can go ahead and read, beginning on the bottom of

16   page 1, the response from Mr. Carpenter?

17   A.    "We have the Avon Trust, which is an estate-planning

18   trust, and ACE, which is a charitable trust.  Neither are

19   WBT.  Also, we can set up a Delaware ILIT trust for a

20   client for certain cases."

21   Q.    Okay.  And then over onto the next page?

22   A.    "How is Guam?  We're not going to change commission

23   structure, but I have some ideas we can discuss when you

24   wish.  Remember, we are on the hook for all the debt.  No

25   one else has a problem when we declare bankruptcy.  Best

1  thing to do right now is sell Met and JH on Avon Trust."

2  Q.   And just remind us, Avon Trust, you had testified

3  about yesterday, what was that?

4  A.   Tuesday.

5  Q.   Sorry.  Tuesday.

6  A.   Avon Trust is a similar trust to the Charter Oak

7  Trust, except that it wasn't a 419 plan.  It was set up

8  for people that did not have a business entity.

9  Q.   But the purpose was still the same?

10  A.   Correct.

11  Q.   And it was still funded in the same way?

12  A.   Correct.

13  Q.   And when it says, "We are on the hook for all the

14  debt, what did you understand that to mean?

15  A.   That we, the trust, was on the hook to repay the

16  financing to the lender, were something bad to happen.

17  Q.   And now looking at the top email, the response from

18  Mr. Neumann.

19  A.   Read that?

20  Q.   Yes, please.

21  A.   Thinking about it, I think that Avon has a great shot

22  with MetLife, a few cases right now.  I'm sure that if

23  they see 25 Avon insurance trusts, they will start asking

24  questions, but until that time comes, we can place good

25  business.  I don't think JH will approve the Avon Trust,

1    but we can try."

2    Q.   Okay.  You can stop there.

3         When we're looking at, "I am sure that if they see

4    25 Avon insurance trusts, they will start asking

5    questions," what did you understand Mr. Neumann to be

6    saying?

7    A.   So that, I was understanding him to be saying that

8    maybe if we get a couple through before they started

9    asking questions, any red flags went up regards to the

10   business being submitted to the carrier.

11   Q.   In that context, why would red flags go up with

12   regard to something like the Avon Insurance Trust, as

13   opposed to the Charter Oak Trust with multiple people?

14   A.   So if you had a number of applications being

15   submitted to a carrier, individuals over age 70 and

16   they're all with the same owner, then the insurance

17   company can start to question what's going on there.

18   Q.   Okay.  As opposed to in the Charter Oak Trust where

19   you have a welfare benefit plan?

20   A.   I don't know if there was necessarily a difference.

21   I think they still would question.  It's the same.

22         MR. NOVICK:  Let's take a look now at tab 23,

23   Government's Exhibit 2129, which I would offer into

24   evidence per our earlier discussion?

25         MR. GUARNIERI:  Per our discussions, no

1    objection, Your Honor.

2                THE COURT:  It will be admitted.

3    BY MR. NOVICK:

4    Q.   What is this?

5    A.   It's an email from myself, dated Friday, May 30,

6    2008, to TMG Corp.net.

7    Q.   Who is this addressed to?

8    A.   It appears to be buddy Richman.

9    Q.   We spoke about Mr. Richman on Tuesday?

10   A.   Yes.

11   Q.   Can you read the top email for us?

12   A.   Sure.

13        "Buddy, hope all is well.  On the Avon side, nothing

14   has changed since we last tried to get a case through.

15   For the Charter Oak Trust, we have been submitting

16   business to Lincoln, Phoenix, Penn Mutual, Transamerica,

17   and ANICO.  The difference with the COT is that the

18   insured has to have a business which can be established at

19   the same time of adopting the trust.  We can speak further

20   if you would like some more information."

21   Q.   With regard to this email, you had testified

22   yesterday that there were maybe one case in the Avon

23   Trust -- on Tuesday, you testified that there had been

24   maybe one case in the Avon Trust, is that right?

25   A.   Correct.

1   Q.  With regard to the reference of Charter Oak Trust, is

2   that consistent with your recollection to the carriers

3   that the business had been submitted to?

4   A.  The first three, Lincoln, Phoenix, and Penn Mutual.

5   I'm unsure of Transamerica or ANICO.

6   Q.  No recollection there?

7   A.  Pardon?

8   Q.  You don't have a recollection now?

9   A.  No.

10   Q.  And we looked at an ANICO application illustration on

11   Tuesday, did we not?

12   A.  We did.

13   Q.  And did you understand, in fact, that -- I believe

14   you testified to this yesterday, that in fact, businesses

15   were being set up for the purpose of participating in the

16   Charter Oak Trust?

17   A.  Sometimes if individuals did not have a business,

18   they would, in certain cases, establish one so that they

19   could adopt the Charter Oak Trust.

20   Q.  Were you personally involved in that?

21   A.  I was not.

22        MR. NOVICK:  Let's take a look at tab 24,

23   Exhibit 2208, which I would offer into evidence.

24        MR. GUARNIERI:  Subject to our conversation, no

25   objection, Your Honor.

1          THE COURT:  Thank you.  It will be admitted.

2     BY MR. NOVICK:

3     Q.    What is this document?

4     A.    It's an email from Guy Neumann to Charlie Induddi,

5     Dan Carpenter, and myself.

6     Q.    And is this responding to a number of -- or a series

7     of other emails?

8     A.    It is.

9     Q.    Let's take a look on page 3 at the earliest email

10    where it says, "Original message."

11         Can you tell us who that is from?

12    A.    It's from Tommy Eusebio, to Fred Prelle, and Ken

13    Elder, and Eric Lanning.

14    Q.    Do you know who Eusebio, Elder, and Lanning are,

15    specifically?

16    A.    They are individuals who work for Lincoln National.

17    Q.    And what is the message there; can you read that for

18    us?

19    A.    "Fred, regarding the meeting with Ken and Eric, let's

20    plan for 4:00 Eastern next Thursday.  Would you coordinate

21    this with Charlie?  The two main issues that need to be

22    addressed are:  How these plans are not STOLI, and how

23    they do not abuse section 419 on of the Internal Revenue

24    Code through the creation of LLC's to avoid estate and

25    gift taxes."

1    Q.    And let's now go to the prior email, one page up, or

2    actually two pages up, to the bottom of page 1.

3          You see a forward of this email from Charlie Induddi

4    to a series of other people?

5    A.    I do.

6    Q.    And who is that, who is the email they were sent to?

7    A.    It's from Charlie to Dan Carpenter, Guy Neumann, and

8    myself.

9    Q.    And can you read the comment?

10   A.    Below is the email from Lincoln to Fred Prelle

11   regarding their concerns with the COT.  Both issues seem

12   easy to overcome or explain.  We will have a conference

13   call next Thursday at 4:00 p.m.  I think Lincoln wants to

14   coordinate the call in, but I will figure that out.  I

15   will be in CT for this call.  Please mark date on your

16   calendar."

17   Q.    And now let's take a look at the top email, the

18   response from Guy Neumann.

19         Can you read that, please?

20   A.    "Charlie, what information does Lincoln have about

21   the COT?  To the best of my knowledge we have never even

22   provided them with the full plan document.  Can you

23   confirm this?  Why do they think that individuals are

24   forming LLC's?  Who have they been speaking to?  Obviously

25   every American has a right to form an LLC for many

1    different purposes."

2    Q.   And you had testified a minute ago that, in fact,

3    people were forming LLC's when needed in the Charter Oak

4    Trust?

5    A.   That is correct.

6              MR. NOVICK:  Let's take a look at tab 25, which

7    is Exhibit 2209, which I would offer?

8              MR. GUARNIERI:  Subject to our conversation, no

9    objection, Your Honor.

10             THE COURT:  Thank you.

11   BY MR. NOVICK:

12   Q.   Is this email a further response to some of the other

13   email chain that we just looked at?

14   A.   Yes, it appears to be.

15   Q.   And there seems to be a message in the middle of

16   page 1 there, from Guy Neumann.

17        What does he say?

18   A.   He writes:  "I think Don Trudeau should be on this

19   call."

20   Q.   And what is Mr. Carpenter's response?

21   A.   "We'll get all of the Oaks on the call."

22   Q.   Do you recall, in general terms, this particular

23   phone call?

24   A.   I do.

25   Q.   And do you recall who was participants -- well, first

1    of all, was this a phone call, or was this an in-person

2    meeting?

3    A.    This was a phone call.

4    Q.    And were you present for the phone call itself?

5    A.    I was.

6    Q.    And where did the phone call from the Benistar

7    entity-side take place?

8    A.    It took place in the conference room in the back.

9    Q.    At 100 Grist Mill Road?

10   A.    Correct.

11   Q.    And you said you were present.

12         Do you recall who else was present?

13   A.    I recall that Dan was present, Guy was present, and

14   Charlie was present, as well as myself.

15   Q.    Do you recall, generally speaking, what the subject

16   matter of the discussion was?

17   A.    It was regards to the STOLI issue and why people were

18   setting up the LLC's for the -- to participate in the

19   trust.

20   Q.    Do you recall -- again, it's several years ago, do

21   you recall specifically what was said during the phone

22   call?

23   A.    I do not.

24   Q.    To the best of your recollection, was the funding

25   arrangement we've been talking about revealed during this

1    phone call?

2    A.    To the best of my recollection, no, it was not.

3    Q.    Was the concept of selling the policies after

4    two years revealed to the insurance company in the phone

5    call?

6    A.    No, it was not.

7              MR. NOVICK:  Let's take a look now at tab 26,

8    and that's Exhibit 2217, which I would offer.

9              THE COURT:  It will be admitted on the same

10   understanding.

11             MR. NOVICK:  Thank you, Your Honor.

12   BY MR. NOVICK:

13   Q.    What is this document?

14   A.    It's an email from Charlie Induddi to Dan Carpenter,

15   Trudeau, myself, Guy Neumann, and Mark Salesman.

16   Q.    And what does the email say?

17   A.    It says:  "See attached, why [sic] are back."

18   Q.    Does it appear to say, "we are back"?

19   A.    Appears it should have stated "we."

20   Q.    Is it forwarding an earlier email from Ken Elder?

21   A.    It is.

22   Q.    And Ken Elder, you testified a minute ago, worked for

23   Lincoln?

24   A.    Correct.

25   Q.    Do you recall if he was one of the people on that

1  phone call?

2  A.   I do.  He was.

3  Q.   Just going to have you -- well, what was -- let me

4  ask you this:  Can you read paragraph 2 for us, please?

5  A.   Starting at, "Based"?

6  Q.   Yes.  One minute, please.

7       Yeah, "Based on the information provided"?

8  A.   "Based on the information provided, I will inform our

9  underwriting department that I have completed my view and

10  they can continue to underwrite these cases subject to

11  receipt of the employer acknowledgment form and other

12  requirements that Lincoln has for 419 business.  In the

13  meantime, any additional information you can provide to

14  help me better understand how these plans work would be

15  greatly appreciated.  For example, any legal opinions you

16  have obtained regarding the structure of these trusts and

17  compliance with applicable federal and state laws would be

18  helpful to review."

19       Continue?

20  Q.   Yes, please.

21  A.   "As you know from our April 23 phone call, the

22  pattern that led to my questioning of the Charter Oak

23  Trust was that all insureds were above age 70, and the

24  employers were LLC's that appeared to be created for the

25  purpose of participating in these plans.  My knowledge of

1    419 plans is very basic, so I don't understand every

2    detail about them.  The one concept I am still trying to

3    understand is how the benefits from an employer welfare

4    benefit plan can inure to a benefit of an individual

5    employee, as it is my understanding that welfare benefit

6    plans must benefit all employees equally.  I appreciate

7    any additional explanation or information you can provide

8    in that regard."

9    Q.   Okay.  You can stop there for a minute.

10        With regard to the first part of that third

11   paragraph, the over 70, what did you understand him to be

12   referring to there?

13   A.   So they had concerns that everyone was above age 70

14   inside of the Charter Oak Trust.

15   Q.   Was that in reference to the earlier email we looked

16   at regarding how these plans are not STOLI?

17   A.   Correct.

18   Q.   And then there seem to also be secondary or second

19   level of concerns here relating to tax issues on 419, is

20   that correct?

21   A.   Correct.

22                    (Pause)

23   BY MR. NOVICK:

24   Q.   In the latter part of this paragraph it says:  "The

25   one concept I'm still trying to understand is how the

1    benefits from an employer welfare benefit plan can inure

2    to the benefit of an individual employee."

3          Is there a misunderstanding there about the type of

4    419 plan that you all were purporting to offer?

5    A.    Yes.  He didn't understand how our plans were set up.

6    Q.    And can you explain that?

7    A.    So our plans did not provide for any postretirement

8    benefits; therefore, since they did not provide for any

9    postretirement benefits, we could be discriminatory in who

10   participated in them.  So, therefore, the owner-employee

11   could participate without providing the benefit to the

12   rest of his employees.

13   Q.    And in fact, did Lincoln continue to issue policies

14   in the Charter Oak Trust for some time afterwards?

15   A.    They did.

16   Q.    Did that end the questions, or were there further

17   conversations and questions about the Charter Oak Trust

18   from Lincoln?

19   A.    I'm unsure if there were continuous questions from

20   there.

21   Q.    What's that?

22   A.    I am unsure if there were questions there.

23   Q.    Let's take a look at a few more documents.

24         Take a look at tab 27 --

25              MR. NOVICK:  That's Exhibit 2243, which I would

1    offer.

2              THE COURT:  It will be admitted on the same

3    basis.

4    BY MR. NOVICK:

5    Q.    What is this document?

6    A.    This is an email from myself, dated Tuesday,

7    August 4, 2009, to Eric Lanning, Dean Chatlane, Susan

8    Hutchinson, William Boudreau, Joe Ciaccia, Fred Prelle,

9    Charlie Induddi, and Wayne Bursey.

10   Q.    What's the subject line?

11   A.    "COT Letter to LFG."

12   Q.    Can you read the email for us?

13   A.    "Eric, per your discussions with Charlie

14   Induddi-Westcott and Fred Prelle, please find attached

15   letter that addresses the concerns that were raised.  If

16   you have any question, please do not hesitate to contact

17   Charlie directly.  Regards, Stefan Cherneski."

18   Q.    Is there an attachment to this document?

19   A.    There is.

20   Q.    Let's take a look at the attachment.

21         Is this a letter?

22   A.    It is.

23   Q.    And who is the letter addressed to?

24   A.    It is addressed to Mr. Eric Lanning, at Lincoln

25   Financial Group.

1    Q.   Can you read for us the first two paragraphs of the

2    letter?

3    A.   Starting at, "Please"?

4    Q.   Yes, please.

5    A.   "Please accept this letter in response to concerns

6    that were recently raised with Fred Prelle of Advisers

7    Financial Group.  The two concerns that were raised were

8    in regards to the availability of a legal opinion and

9    whether or not the Charter Oak Trust can be construed as a

10   listed transaction.  I will address both of these concerns

11   in order.

12        "Please be advised that there is no tax deduction

13   that is being suggested, offered, or taken in conjunction

14   with an employer's contribution to the Charter Oak Trust.

15   Since there's no contemplation of an employer taking a tax

16   deduction for any contribution to the trust, there is no

17   legal opinion necessary to support such a tax deduction."

18   Q.   Was, in fact, there a tax deduction suggested for the

19   Charter Oak Trust?

20   A.   There was not.

21   Q.   In fact, were there any employers actually putting

22   money into the Charter Oak Trust to deduct?

23   A.   To the best of my knowledge, no.

24   Q.   Take a look at page 2 of the letter at the top.

25        I'm sorry, actually, can you read the bottom

1    paragraph, and then the first few bullets there, beginning

2    with "instead of focusing"?

3    A.    Read to the bottom of the page?

4    Q.    Yes.

5    A.    "Instead of focusing on the tax deductibility of

6    welfare benefit plan contributions, the Charter Oak

7    focuses on the inherent benefits of life insurance in a

8    trust for estate planning purposes.  Furthermore, there

9    are numerous reasons that an employer would want to adopt

10   the Charter Oak Trust for the benefit of his or her

11   employees that go above and beyond taking a tax deduction

12   which is not offered in the Charter Oak Trust.  These

13   benefits include:

14        "Company dollars rather than personal dollars are

15   used to purchase life insurance;

16        "There is no limit on the size of the contribution

17   that an employer may make to a welfare benefit trust."

18   Q.    You can stop there.

19        And again, were in fact company dollars the dollars

20   that were being used to fund the trust for the premiums of

21   these insurance policies?

22   A.    They were not.

23   Q.    And where was the money coming from to purchase the

24   life insurance in the trust?

25   A.    They were coming from a third party.

1    Q.    So is that statement about how the Charter Oak Trust

2    worked accurate?

3    A.    It is not.

4    Q.    Let's talk about -- let me move you to the third page

5    of the document -- or the letter, I should say.

6          Who signs the letter?

7    A.    It's Wayne Bursey.

8    Q.    And we looked at the email initially, where you sent

9    it out.

10          Do you know who actually authored the letter?

11    A.    Yes.  Dan authored this letter.

12    Q.    Mr. Carpenter?

13    A.    Correct.

14    Q.    How do you know that?

15    A.    Because I helped him set it up.

16    Q.    And just in general with regard to this letter, were

17    the type of issues that had been raised by Lincoln in the

18    context of this, that you're answering with Mr. Carpenter,

19    STOLI related or tax related?

20    A.    This addresses tax-related issues.

21    Q.    And those are tax issues that related to welfare

22    benefit plans, 419 plans?

23    A.    In general, yes.

24    Q.    Take a look at tab 28, Exhibit 2246 --

25          MR. NOVICK:  -- which I would offer?

1        THE COURT:  Same ruling.

2    BY MR. NOVICK:

3    Q.    What is this document?

4    A.    This is an email from Wayne Bursey; on Monday,

5    August 10, 2009; to Dan Carpenter, myself, Guy Neumann;

6    subject is, "Forward COT Letter to LFG."

7    Q.    And is this a response to the letter -- or forward of

8    the letter, I should say, that we just looked at a minute

9    ago?

10   A.    Yes.

11   Q.    And can you just read the message from Mr. Bursey?

12   A.    Sure.

13        "Dan, Charlie left me a message stating that LFG will

14   require this letter to come from outside counsel.  Please

15   advise.  Thanks."

16   Q.    And signed by Mr. Bursey?

17   A.    Correct.

18   Q.    What is LFG?

19   A.    Lincoln Financial Group.

20   Q.    Now, let's take a look at Exhibit -- or, I'm sorry,

21   tab 29, Exhibit 2247 --

22        MR. NOVICK:  -- which I'll offer?

23        THE COURT:  Same ruling.

24   BY MR. NOVICK:

25   Q.    Is this a response to the letter -- excuse me -- the

1    email we just looked at in the prior document?

2    A.    It appears to be.

3    Q.    From whom?

4    A.    From Dan to Wayne, myself, Guy Neumann, Charlie

5    Induddi.

6    Q.    Can you read the email?

7    A.    "No problem.  Get the letter approved first, and I

8    will get it from outside counsel.  Don't want to keep

9    guessing what they want."

10   Q.    Now, to close the loop on this series, let's take a

11   look at tab 30, Exhibit 2258 --

12            MR. NOVICK:  -- which I'll offer in the same

13   conditions.

14            THE COURT:  It will be admitted.

15   BY MR. NOVICK:

16   Q.    What is this document?

17   A.    It's an email from Guy Neumann to Charlie Induddi,

18   myself, and Wayne Bursey; and it's, "Forward NOVA Group

19   Letter."

20   Q.    Is it, in fact, forwarding an earlier email?

21   A.    It is.

22   Q.    And who is the earlier email from?

23   A.    Dan Carpenter to Wayne Bursey, Charlie, myself, Guy

24   Neumann, John Trudeau, cc'ing them.

25   Q.    What is the message on the below email from

1    Mr. Carpenter?

2    A.    It says:  "Please review and get to Charlie."

3    Q.    And can you read Guy Neumann's response or his

4    comment on the forward above?

5    A.    Sure.

6          "Charlie, here's the COT opinion you have been

7    waiting for.  I just reviewed it, and it is very strong.

8    I hope you find it well.  Best regards, Guy."

9    Q.    Is there, in fact, an attachment to this email?

10   A.    Yes.

11   Q.    Let's take a look at the attachments.

12         What is the attachment?

13   A.    It appears to be a legal opinion from Wormser Kiely

14   Galef & Jacobs.

15   Q.    Who is it addressed to?

16   A.    NOVA Group, Incorporated.

17   Q.    Does it say, "Dear Mr. Bursey"?

18   A.    It does.

19   Q.    Can you read the first two paragraphs on page 1?

20   A.    Starting with, "You have requested"?

21   Q.    Yes, please.

22   A.    Sure.

23         "You have requested our opinion with respect to the

24   inapplicability of listed transaction status, and

25   particularly the inapplicability of the Internal Revenue

1    Service (IRS).  Pronouncements, Rev. Rule 2007-65, and

2    Notice 2007-83, to the Charter Oak Trust (the trust).  The

3    trust is a multiple-employer welfare benefit fund as

4    described in Section 419(e) Internal Revenue Code (the

5    code) that provides fully insured death benefits to

6    covered employees (covered employees or employees) of a

7    participating employer (employer or participating

8    employer) pursuant to the terms of the declaration of

9    trust creating the trust effective October 1, 2006.  NOVA

10   Group, Inc., serves as The Trust's administrator and

11   sponsor (The Sponsor).  The Sponsor is not the

12   participating employer and is independent of and

13   unaffiliated with any employer. The sponsor has made the

14   following representations to us in connection with our

15   preparation of this opinion."

16   Q.   So in this opinion letter, the trust is being

17   described as a 419(e) welfare benefit plan, correct?

18   A.   It is.

19   Q.   And let's take a look at the following page.  Can you

20   read -- there are several listed bullets here.

21        Can you read Number 5 for us?

22   A.   "An employer is required to contribute to the trust

23   an amount sufficient to meet the costs for benefits

24   selected in the adoption agreement executed by the

25   employer, but no employer is responsible for the

1  contributions to the plan required of other employers."

2  Q.   And again, I asked you this earlier, but did any

3  employer actually contribute any money to the Charter Oak

4  Trust?

5  A.   To the best of my knowledge, no.

6  Q.   You mentioned earlier, we had discussed earlier, the

7  fact that the Charter Oak Trust was not widely marketed,

8  correct?

9  A.   That is correct.

10 Q.   I believe you'd used the term, "friends and family"?

11 A.   Correct.

12 Q.   And you had talked yesterday about the importance of

13 keeping it to that close knit group.  I'll have you take a

14 look at tab 31.

15      MR. NOVICK:  And that's Exhibit 2061, which I

16 would offer subject to the same conditions.

17      THE COURT:  All right.

18 BY MR. NOVICK:

19 Q.   What is this document?

20 A.   It's an email from myself; dated Wednesday, July 25,

21 2007; to Fred Prelle, cc'ing Fred Prelle again, and

22 Charlie Induddi.

23 Q.   What's the subject of the document?

24 A.   "Charter Oak Trust NDA."

25 Q.   Can you read the email for us?

1    A.    "Fred, please print and sign on company letterhead

2    and return to my attention.  Regards, Stefan."

3    Q.    And then can you take a look at the actual

4    attachments on the following page?

5          And what is that?

6    A.    It's a blank letter template from -- that was sent

7    to -- appears to be sent to Fred Prelle, for him to sign.

8    Q.    Is it addressed to Jack Robinson?

9    A.    It is.

10   Q.    And can you just read the two paragraphs there?

11   A.    "This is to confirm that I will not release and/or

12   copy the Charter Oak Trust plan documents in any way,

13   shape or form.  The Charter Oak Trust plan documents will

14   always remain in my possession, and those documents will

15   not be made available to anyone else.  When I have no

16   further use for the Charter Oak Trust plan documents, I

17   will send the Charter Oak Trust plan documents back to

18   your attention at the address above."

19   Q.    Do you have a specific recollection of this

20   particular email?

21   A.    I do not.

22   Q.    I'd like to take a look now -- well, let me switch

23   gears for a minute.

24         Was there a certain amount of time that was supposed

25   to pass before a policy could be or would be sold in the

1    Charter Oak Trust?

2    A.    Two years was the period.

3    Q.    And you talked about this yesterday:  Why was that?

4    A.    So the first two years is a contestability period

5    where it's not as attractive to sell a policy.  So

6    typically after two years, it's easier to sell a policy

7    after two years.

8    Q.    After two years it's more difficult to contest

9    policies based on its representations, is that right?

10   A.    Correct.

11   Q.    Let's look at tab number 32, and that's Exhibit 2274.

12        MR. NOVICK:  First, I'll offer 2274, subject to

13   the same conditions.

14        THE COURT:  That's fine.

15   BY MR. NOVICK:

16   Q.    What is this?

17   A.    It's an email from Guy Neumann, on Wednesday,

18   March 3, 2010, to Charlie Induddi-Westcott and myself.

19   Q.    What's the subject?

20   A.    It says:  "Regards COT Procedure."

21   Q.    Can you read the email for us?

22   A.    "Charlie, here's the procedure in place for COT

23   policies.  We start ordering LE's three months before the

24   24-month anniversary date, then we start shopping the

25   cases.  We will be happy to provide Fred and his office

1    with copies of LE's for their own pricing.  We will mail

2    letters to clients one month before anniversary, asking

3    them if they want to buy their policies from us.  Hope

4    this helps."

5    Q.   Was that consistent with the general process for

6    Charter Oak policies, as you understood them?

7    A.   They were.

8    Q.   Can you describe to the judge what, generally, the

9    process was -- you talk about ordering LE's here, can you

10   describe to the judge what the process was?

11   A.   So to be able to determine whether or not the

12   policies had any value in the secondary market, we would

13   have to obtain copies of the life expectancy reports.  To

14   get the life expectancy report, you have to have the

15   client's up-to-date medical records so the life expectancy

16   company can evaluate those records and then produce that

17   report, then estimate how many months the person had left

18   to live.

19        With those reports, we could then go to the secondary

20   market and determine if the policy had any value to be

21   able to sell it.

22   Q.   Thank you.

23        And does it take some time to get those life

24   expectancy reports; is that why there's the three-month

25   window there?

1    A.   Well, it takes -- it's not the reports necessarily

2    themselves, it's the difficulty of obtaining people's

3    medical records from their doctors.  That's what takes a

4    lot of time in some cases.

5    Q.   And it refers, in that last line there, to mailing

6    letters to clients one month before the anniversary.

7         What is that in reference to?

8    A.   So upon the expiration of the two-year period, when

9    we were potentially looking to sell the policies, we

10   wanted the clients to be aware what was transpiring at

11   that point in time.

12   Q.   And then would they be given the option to purchase

13   the policy?

14   A.   I believe there were letters that were sent out to

15   them, stating what their options were at that point in

16   time.

17   Q.   Did anybody actually buy their policies in the

18   Charter Oak Trust, any of the insureds to your knowledge?

19   A.   To my knowledge, no.

20   Q.   Were there -- you mention, these letters that went

21   out to individual insureds, were there any issues

22   regarding those letters, points of controversy within

23   100 Grist Mill Road?

24   A.   There was a point of contention about the letters

25   going out to the insureds, exactly if they went directly

1    to them or if the brokers were involved, and what they

2    said was to not cause any commotion.

3    Q.   Can you describe what you mean by what -- what were

4    the possible concerns that were raised?

5         And we'll look at some emails in a second.

6    A.   Sure.  Some concerns were if the insured were to

7    receive the letter directly, without being aware it was

8    coming, they could contact someone who was not involved in

9    the transaction, such as maybe their attorney, or contact

10   the insurance carrier directly and kind of make them aware

11   of what has transpired.

12   Q.   Okay.  And folks in 100 Grist Mill Road did not want

13   that to happen?

14   A.   That is correct.

15   Q.   Take a look at tab 33.

16         MR. NOVICK:  That's Exhibit 2235, which I'll

17   offer subject to the same conditions.

18   BY MR. NOVICK:

19   Q.   What is that document?

20   A.   It's a letter from Dan Carpenter; dated Friday,

21   July 24, 2009; to Guy Neumann, Don Trudeau, Wayne Bursey,

22   Ed Waesche, Charlie Induddi, and myself, as well as Dan

23   Slattery, Erik Schneider, and cc'ing Dan; and it's,

24   "Forward Charter Oak Trust Letter."

25   Q.   Is it forwarding -- well, first of all, what does the

1   email itself say?

2   A.   "Please let me have your comments over the weekend or

3   by 10:00 Monday at latest.  Dan."

4   Q.   And is it forwarding an attachment here?

5   A.   Yes.

6   Q.   Let's take a look at the attachment.

7        What is the attachment?

8   A.   It appears to be a sample letter for a Charter Oak

9   participant.

10  Q.   And is this a sample or draft of the letter that you

11  were just talking about that potentially would go out to

12  insureds?

13  A.   It appears to be, yes.

14  Q.   And was this the letter, the first of the potential

15  letters that was going to go out that you saw?

16  A.   Yes.

17  Q.   Have you take a look at the letter for a minute, and

18  first start with the top paragraph on the page.

19       Can you go ahead and read beginning with, "As you

20  know."

21  A.   "As you know, your company has been participating in

22  the Charter Oak Trust to provide substantial benefits for

23  your covered employees in the trust.  Pursuant to the

24  adoption agreement and the disclosure and acknowledgment

25  agreements that you signed, it was always anticipated that

1    at some time, one, you would want you or your employees to

2    take over this valuable coverage for themselves or for

3    whatever estate planning or financial planning reason they

4    had wanted to have coverage in the first place.  We would

5    be happy to allow the covered employee, a member of the

6    family, or a grantor or trust controlled by the

7    participant's family to purchase the policies on the lives

8    of insured participants."

9    Q.    Based on your experience with the Charter Oak Trust

10   and knowledge of how it worked, was that the expectation

11   that people had for how the Charter Oak Trust was going to

12   go?

13   A.    No, it was not.

14   Q.    What was, in fact, your understanding of what was

15   supposed to happen after two years?

16   A.    So, after two years, if and when the policy was sold,

17   the proceeds from that sale would be used to pay back any

18   of the fees, origination fees that were associated with

19   establishing the policy and the person's participation in

20   the trust, and then anything above and beyond the payback

21   to the trust would then potentially be shared by the

22   participating insured.

23   Q.    Did you have an understanding as to why the proposed

24   letter now, after two years, was being written this way?

25   A.    Yeah.  It was to cover ourselves in case the letter

1    was worded, in case it ended up in the wrong hands, to

2    cover us.

3    Q.    And was one of the concerns -- you had mentioned

4    concern if this letter just went to a participant sight

5    unseen.

6        Why would that be a concern, why would you be worried

7    about the reaction of the insured here?

8    A.    So, if the insured reacted the wrong way, they could

9    bring to the attention the true intentions of the

10   participation of the trust.

11   Q.    Might an insured reading this letter have a reaction

12   that this didn't reflect that they believed?

13   A.    It could.

14   Q.    Let's keep reading in the letter, the next set of

15   numbers in the middle, can you keep reading, "If you or

16   your family decides"?

17   A.    "If you or your family decides to purchase the policy

18   on your life with or without the trust, the following

19   would be the purchase price.  Insured participants sample

20   client:  Face amount of policy, $5 million; carrier,

21   Phoenix; premiums paid to date, $600,000; origination fee,

22   20 percent of premiums, $120,000; placement fee, 6 percent

23   of death benefit, $300,000; admin fee, $1,500; total

24   purchase price, $1,020,500.

25   Q.    Where did these numbers come from?

1    A.   They came from the amount of premiums that were paid

2    into the contract; and also in regards to the origination

3    fees, a percentage of those premiums and a percentage of

4    the death benefit.

5    Q.   Were those found in any of the funding documents that

6    we had talked about earlier, do you recall?

7    A.   I do not recall.

8    Q.   Okay.  So in essence, on the -- under this sample,

9    albeit the sample on the 600,000-dollar premiums paid to

10   date for an insured to buy this policy, you would have to

11   pay back the $600,000, plus an additional over $420,000;

12   is that right?

13   A.   It appears so.

14   Q.   You said there were discussions about this proposed

15   letter, correct?

16   A.   That is correct.

17   Q.   Let's take a look at tab -- let me ask you one other

18   question about this letter first.

19        That $420,000 payback on the $600,000 outlay, with

20   regard to that, did you have familiarity with traditional

21   carrier-approved premium financing plans?

22   A.   I did.

23   Q.   How would the effective interest rates here compare

24   with those premium financing programs, that you were

25   familiar with, approved by carriers?

1   A.   This program was a lot more expensive than a

2   traditional premium financing program.

3   Q.   So now let's go talk about some of the comments about

4   the letter.  Let's take a look first at tab 34.

5           MR. NOVICK:  And that's Exhibit 2236, which I

6   would offer.

7           THE COURT:  Same ruling.

8   BY MR. NOVICK:

9   Q.   What is this document?

10  A.   An email from Charlie Induddi to Dan Carpenter, Guy

11  Neumann, Don Trudeau, Wayne Bursey, Ed Waesche, myself,

12  Kevin Slattery, Erik Schneider, in regards to Charter Oak

13  Trust letter.

14  Q.   Is this responding to the email from Mr. Carpenter

15  that we looked at a minute ago?

16  A.   It is.

17  Q.   Can you read the email from Mr. Induddi?

18  A.   "The letter is fine, but we did not want to put this

19  in the hand of the broker to personally deliver.  If we

20  mail it to the employer or insured, we run the risk that

21  they will call the carrier.  If we coach the broker and he

22  goes out and meets the client and gets a signature of

23  intent or interest, then we control where the letter goes

24  or better yet doesn't go.  Charlie."

25  Q.   Is this consistent with what Mr. Westcott was

1    expressing here, with what you recall being one of the

2    concerns voiced about this letter?

3    A.    Yes, it is.

4    Q.    Take a look at tab 35.

5              MR. NOVICK:  And that's Exhibit 2237, which I

6    would offer subject to the same conditions.

7              THE COURT:  Okay.

8    BY MR. NOVICK:

9    Q.    What is this document?

10   A.    It's a letter from Ed Waesche to myself, Charlie

11   Induddi, Guy Neumann, Dan Carpenter, Don Trudeau, Wayne

12   Bursey; and then cc'ing himself, as well as Kevin

13   Slattery, Erik Schneider, and Dan as well again.

14   Q.    Is this responding to a series of other emails again

15   about this letter, termination letter?

16   A.    It is.

17   Q.    I'm going to direct you to the third page of the

18   document, and specifically let's read the emails moving

19   forward in time, beginning with Guy Neumann's response to

20   the initial letter.

21         Do you see that, in the middle of page 3?

22   A.    I do.

23         "I think the letter is fine, but we need to be

24   mindful of the ABC docs that were signed.  Some

25   participants signed a 3 percent letter and others a

1    6 percent.  Otherwise, I think the letter is fine.  I am

2    still very much in support of getting the brokers involved

3    as much as possible.  Guy."

4    Q.   What's the reference here, to the 3 percent versus

5    the 6 percent, do you recall?

6    A.   Appears to be a reference to the origination fee they

7    were being charged.

8    Q.   Now, looking up one email, a response from

9    Mr. Carpenter, what does that say?

10   A.   "Erik" -- I'm sorry -- "Each letter will be

11   personalized based on the docs they signed.  Erik already

12   has copies of what each person signed."

13   Q.   Now let's move to page 2, forward in time to the

14   bottom of page 2, to Mr. Westcott's response.

15   A.   "The other question we have to deal with us how to

16   explain that there is no value or whatever, and going

17   forward what will happen.  Charlie."

18   Q.   Why would the -- what was your understanding as to

19   why it would have to be explained to insureds that there

20   was no value?

21   A.   Well, depending on what was promised to the insureds

22   when they first signed up for the trust, they were

23   expecting to get some money from the transaction, and we'd

24   have to tell them that there was no value.  We'd have to

25   figure out how to deal with that, what type of

1    conversation would take place.

2    Q.   Let's take a look at the next response up from

3    Mr. Neumann.

4    A.   "Unless the clients have been sleeping under a

5    bridge, the state of our economy should speak for itself;

6    a lot has changed in the past two years, Guy."

7    Q.   What is this a reference to, that we're talking about

8    now, in mid-2009, when these policies were mostly started

9    in 2007?

10   A.   So in 2008, when the economy kind of took a nosedive,

11   a lot of things changed in the life settlement market.

12   Q.   Much harder to sell policies than it was before?

13   A.   Yes.

14   Q.   And looking one up, Mr. Westcott's response?

15   A.   He responded:  "I didn't say they wouldn't

16   understand, I only said we have to deal with it and who

17   will own the policy now, et cetera."

18   Q.   What did you understand that to mean?

19   A.   What did I understand that to mean?

20   Q.   Yes.

21   A.   Kind of exactly what Charlie was saying, not saying

22   the clients would be angered, we just need to make sure we

23   deal with it properly, and who is going to own the policy

24   moving forward.

25   Q.   And then the next email up from you, can you read

1    those few lines for us?

2    A.    Sure.

3        "My three issues that I feel need to be addressed, of

4    which the letter is the starting point:  One, protect the

5    financials of the trust; two, prevent lawsuits; three,

6    protect brokers from any fallout."

7    Q.    Can you explain what you meant here?

8    A.    The financials are a reference to the funding that

9    took place inside of the trust.  To prevent lawsuits,

10   didn't want anybody getting sued in regards to their

11   participation, us or the brokers.

12       And then the last one, to protect brokers from any

13   fallout, these are the people that brought us business,

14   and we didn't want them to be impacted in any way, as

15   well, too.

16   Q.    Take a look at the top email in this chain on page 1,

17   from Mr. Waesche.  I won't have you read the entirety of

18   this, but I'll direct you to the third paragraph, "I agree

19   with Charlie."

20   A.    "I agree with Charlie with respect to broker

21   involvement to identify what the client's initial

22   goal/expectation was, so as to manage expectations versus

23   reality."

24   Q.    Let me have you take a look now at tab 36,

25   Exhibit 2241 --

1    MR. NOVICK: -- which I'll offer into evidence
2    subject to the same condition.
3    THE COURT: That's fine. We'll have a standing
4    rule, so to speak.
5    MR. NOVICK: I won't need to keep saying,
6    "subject to" -- understood, Your Honor, thank you.
7    BY MR. NOVICK:
8    Q.   What is this document?
9    A.   It's an email from Dan to myself, Wayne Bursey,
10   Charlie, Guy Neumann, Ed Waesche, Don Trudeau; regards COT
11   letter.
12   Q.   Okay. Is this responding to earlier emails?
13   A.   It is.
14   Q.   Take a look at page 2, the bottom of this email
15   chain, from Mr. Westcott to Mr. Bursey.
16        Can you read that for us, please?
17   A.   "Hi, Wayne. I had a thought in reference to the COT
18   letters. Could we draft a letter that required a
19   signature by the client and broker as witness that said, I
20   understand the above (our current letter) and am or am not
21   interested in pursuing a buyout. Broker has two weeks or
22   else letter goes directly to client. This way it forces
23   the broker to meet client and go over this and alleviate
24   the possibility of catching anyone by surprise and get
25   them pissed off and who knows what they will do."

1    Q.   Now, is there a response to that from Mr. Bursey?

2    A.   Yes.  He responds:  "Charlie, that's a good idea.  I

3    am sending around for comment."

4    Q.   Go to page 1.  There's an email from you in the

5    middle of the page.

6         Can you read that for us?

7    A.   Sure.

8         "I also had a thought.  Since we know that the

9    valuation process can drag on for months, collecting

10   medical records, LE's, et cetera, we should state that the

11   figure for the buyout may change if any more premiums are

12   paid into the policy."

13   Q.   What's the valuation process referred to here?

14   A.   That's referring to the collection of the medical

15   records, life expectancy reports, and then going out to

16   the market for the people that participated in the

17   purchase of the life insurance policies to see what type

18   of offers we could get for the life insurance contracts.

19   Q.   So when we say "valuation," the value we're referring

20   to is the value of the policy itself?

21   A.   The value of the policy if it was to be sold.

22   Q.   And now let's go to the top of this page, and can you

23   read Mr. Carpenter's response?

24   A.   "We do and will in the subsequent followup letters.

25   Don't want to mention LE's or the process."

1    Q.    What did you understand him to mean by LE's and the

2    process?

3    A.    The life expectancies or the process of valuing the

4    policies.

5    Q.    And why not mention the LE's or the process?

6    A.    Don't want what we're doing to be exposed to the

7    general public, specifically the insurance carriers that

8    we were working with.

9    Q.    In other words, if the letter -- if it was put down

10   on paper in a letter that went out to somebody?

11   A.    Correct.

12   Q.    Were there discussions, in fact, regarding efforts to

13   sell the policies within 100 Grist Mill Road?

14   A.    There were general discussions.

15   Q.    Do you recall the defendant being a participant in

16   those discussions?

17   A.    I do.

18   Q.    In fact, did those efforts start even before these

19   letters that we've been looking at started to be

20   discussed?

21   A.    I don't recall.

22   Q.    Let's take a look at tab 37 then, Exhibit 2210 --

23          MR. NOVICK:   -- which I would offer.

24   BY MR. NOVICK:

25   Q.    What is this document?

1    A.    This is an email from Dan to myself, and it says,

2    "Subject:  Forward AT."

3    Q.    Do you know what AT stands for?

4    A.    From looking at the email, yes.

5    Q.    Appears to be Allen Tucker?

6    A.    It does.

7    Q.    Is this forwarding another email?

8    A.    It is.

9    Q.    From who?

10   A.    From Don Trudeau to Wayne Bursey, cc'ing Jenny

11   Valedaserra and Dan Carpenter.

12   Q.    Before we were going to look at the attachment in a

13   second, what is the bottom email say?

14   A.    It says:  "Need attached executed by trustee to get

15   quote from ILS."

16   Q.    So let's take a look at the attachment.

17         Can you read the title, first, of the attachment?

18   A.    The first attachment?

19   Q.    Yes, please.

20   A.    Sure.

21         "Tucker Allen AXA Settlement Preliminary App.PDF."

22   Q.    I'm sorry, you're reading from the email.

23         Can you turn to the next page and the actual

24   attachment?

25   A.    I'm sorry.

1    Q.   My apology.

2         Looking at page 1 of the first attachment, what's the

3    title of the document?

4    A.   States "Life Settlement Application."

5    Q.   And what's the name of the insurance carrier?

6    A.   AXA Equitable.

7    Q.   How many policy numbers are listed there?

8    A.   Three.

9    Q.   I'm going to have you then read Question 13 for us.

10   A.   Sure.

11        "Has this policy or any of its proceeds ever been

12   used as security for a loan made to the original policy

13   owner or any affiliate of the original policy owner for

14   the purpose of paying all or part of the ongoing policy

15   premium payments?"

16   Q.   Who was the original policy owner on the Charter Oak

17   Trust?

18   A.   It was the trust itself.

19   Q.   And I know that you testified yesterday that you

20   didn't have a full understanding of how the credit or the

21   funding worked.

22        Are you aware of how the loan was secured?

23   A.   I was not.

24   Q.   Let's take a look at Question 14A, B, and C.

25        Can you read those for us?

1    A.    "If seller purchased this policy with financial

2    assistance from a lender or investor, financier, do any of

3    the following apply to the financing:

4        "A, the original policy owner or the life insured

5    received a financial inducement to finance the premiums.

6    Yes or no.

7        "B, the financier has a potential interest in the

8    death benefit or possible proceeds from the sale of this

9    policy, yes or no.

10       "C, the financing arrangement included a

11   prearrangement to sell this policy, yes or no."

12   Q.    And then on the next page, Question 18?

13   A.    Question 18?

14   Q.    Yes, please.

15   A.    "Was a life expectancy report or valuation obtained

16   for the insured at the time of issuance, or was the

17   possibility of a life settlement discussed with the

18   insurance agent of record before issuance of the policy,

19   yes or no."

20   Q.    Is that actually answered on this application?

21   A.    It is not.

22   Q.    Why would -- to your understanding and experience

23   working at 100 Grist Mill Road, why was a life settlement

24   company asking these questions?

25   A.    So they're asking the questions to determine if

1    financing had occurred and when the policy was originated.

2    Some buyers in the market did not want to purchase

3    policies if they were financed or if the financing was

4    potentially not disclosed to the insurance1 company.

5    Q.   Take a look at Section 2B.  It's on page 4 of the

6    attachment.

7         Who is listed as the seller of this policy?

8    A.   Would that be in Section 1?

9    Q.   Yes, please.

10   A.   It says:  "Type of entity and full legal name,

11   Charter Oak Trust, dated 10/1/06."

12   Q.   Okay.  Now, if I could take you back for just a

13   minute to the email itself and have you read just

14   Mr. Carpenter's comment on this.

15   A.   Read the comment?

16   Q.   Yes, please.

17   A.   "Duplicate this for us at USB.  White paper."

18   Q.   What did you understand that to mean?

19   A.   To basically take the life settlement application and

20   recreate it so we could use it for our own purposes.

21   Q.   Okay.  Switch gears for a minute.

22        Do you recall anything about an insured by the name

23   of Sash Spencer?

24   A.   I do.

25   Q.   What do you recall, if anything, about his entry into

1    the Charter Oak Trust?

2    A.    I don't necessarily recall anything about the

3    specific entry into the trust.

4    Q.    Do you remember the size of the policies that were

5    involved with Mr. Spencer's participation in the Charter

6    Oak Trust?

7    A.    Yes.

8    Q.    What do you remember?

9    A.    That he had a 30 million-dollar death benefit in the

10   Charter Oak Trust.

11   Q.    Was that split into multiple policies?

12   A.    I believe it was split into two.

13   Q.    And did you participate at all in the origination of

14   the policies?

15   A.    I did not.

16   Q.    Do you recall, based on your time at 100 Grist Mill

17   Road, anything that happened to Mr. Spencer within the

18   first two years of his participation in the Charter Oak

19   Trust?

20   A.    He passed away while he was a participant in the

21   trust.

22   Q.    Do you recall when he died specifically?

23   A.    I do not.

24   Q.    What do you remember about what happened when he

25   died?

1    A.    I recall that since it was in the two-year

2    contestability period, that Lincoln National contested the

3    death benefit originally; and then after a period of time

4    that they eventually did pay the death benefit to the

5    Charter Oak Trust.

6    Q.    Based on your understanding of how the trust worked,

7    what did you understand was supposed to happen if someone

8    died like that within the first two years?

9    A.    What I understood was to happen was, the death

10   proceeds would be received by the trust per the documents

11   the person signed, the premiums paid, and any origination

12   fees and placement fees that were due to be paid back to

13   the trust; and the remaining death proceeds would be paid

14   to the beneficiary as the designated adoption of fees.

15   Q.    Did that, in fact, happen here?

16   A.    To the best of my knowledge, no.

17   Q.    You indicated that Lincoln had taken some time to

18   investigate the claim?

19   A.    That is correct.

20   Q.    Is that typical with a -- within contestability

21   death?

22   A.    I --

23   Q.    Are you aware of that?

24   A.    That was the first time I've experienced that, so --

25   I assume so, but --

1    Q.   And in the process of that investigation, did you --

2    or to your knowledge, any of the funding documents get

3    provided to Lincoln in the context of the investigation?

4              MR. GUARNIERI:  Objection, Your Honor.  Lack of

5    foundation.

6              THE COURT:  Do you want to break the question

7    into two?

8              MR. NOVICK:  Sure.

9    BY MR. NOVICK:

10   Q.   Were you present during the time -- present at

11   100 Grist Mill Road during the time that the Lincoln

12   investigation of the Spencer death benefit was going on?

13   A.   Yes.

14   Q.   And are you familiar, generally speaking, with

15   aspects of that investigation and what documents were

16   being requested?

17   A.   Not specifically, no.

18   Q.   Okay.  And so all I'm asking for is your knowledge.

19        To your knowledge, were any of the funding documents

20   provided to Lincoln during the course of the

21   investigation?

22             MR. GUARNIERI:  Objection, Your Honor.  Lack of

23   foundation.

24             THE COURT:  He's asking for his knowledge.

25             THE WITNESS:  The answer to that is no.

1    BY MR. NOVICK:

2    Q.   Now, once the death benefit -- you said, eventually

3    the death benefit was paid?

4    A.   Correct.

5    Q.   And do you recall, you said, I believe, that -- what

6    happened when the death benefit was paid?  Did any money

7    go to the insured for Mr. Spencer's participation?

8               MR. GUARNIERI:  Objection, Your Honor.  Lack of

9    foundation.

10              THE COURT:  When the question asks for the

11   witness's knowledge, I don't understand the objection.

12              MR. GUARNIERI:  Your Honor, my understanding of

13   the question was, did monies get paid.  It wasn't to his

14   knowledge necessarily.

15              THE COURT:  I think the question asked for the

16   witness's knowledge.

17              THE WITNESS:  To the best of my knowledge, no,

18   it did not get paid.

19              THE COURT:  Let's take our morning break.  We'll

20   be in recess for 20 minutes.

21                  (Whereupon, a recess followed)

22              THE COURT:  Mr. Novick.

23              MR. NOVICK:  Thank you, Your Honor.

24   BY MR. NOVICK:

25   Q.   Mr. Cherneski, when we broke I had asked you -- I

1    believe you had testified, to your knowledge, the money

2    from the Spencer death benefit did not get paid to the

3    death -- the beneficiaries of Spencer's participation in

4    the Charter Oak Trust.

5        Do you recall that?

6    A.   I do.

7    Q.   Do you recall, based on your knowledge, why nothing

8    was paid to the beneficiaries?

9    A.   From what I -- to my knowledge, the reason that it

10   was originally not paid out was because there was an issue

11   with the beneficiaries.

12   Q.   Do you recall specifically what that was?

13   A.   I do not.

14   Q.   What actually was done with the money that came into

15   the trust from the Spencer death benefit?

16       MR. GUARNIERI:  Objection, Your Honor.  Lack of

17   foundation.

18       MR. NOVICK:  To your knowledge.

19       THE COURT:  Can you lay a foundation for the

20   knowledge he has?

21       MR. NOVICK:  Sure.

22   BY MR. NOVICK:

23   Q.   You were present in the office at the time the

24   Spencer death benefit came in, correct?

25   A.   Yes.

1    Q.   And did you become aware -- through your

2    participation or your employment at 100 Grist Mill Road,

3    and frequent contact with people at 100 Grist Mill Road,

4    did you become aware generally of where some of the death

5    benefit money was used?

6    A.   Yes.

7    Q.   Can you testify to your knowledge, and just your

8    knowledge and generally speaking, of the types of places

9    or where the money went?

10   A.   Well, I became aware that Dan used or misappropriated

11   the funds to the various entities that he controlled.  And

12   I know one specific thing that they were used for was to

13   purchase a home in Rhode Island.

14   Q.   Okay.

15            THE COURT:  What is the basis for your

16   knowledge, please?

17            THE WITNESS:  From my interaction with the other

18   people at the office at 100 Grist Mill Road.

19            THE COURT:  Can you be more specific?

20            THE WITNESS:  Talking to Erik Schneider, Guy

21   Neumann, individuals who worked at 100 Grist Mill Road.

22            THE COURT:  Is the basis for your testimony your

23   recollection of statements they made to you?

24            THE WITNESS:  That would be correct.

25            THE COURT:  Did they purport to be repeating

1    something that they heard from Mr. Carpenter?

2         THE WITNESS:  Erik Schneider dealt directly with

3    wires that Dan had him perform, so he had direct knowledge

4    of that.

5         THE COURT:  Will he be a witness?

6         MR. NOVICK:  No, Your Honor.  But the wires will

7    be evidence later on.  That's why I'm asking purely

8    generality here, to introduce the Court.  But the physical

9    documents we'll introduce at some point, most likely

10   through Special Agent Allen, near the end of the trial.  I

11   just wanted to lay the general overview here.

12        MR. GUARNIERI:  Your Honor, if I could renew my

13   objection and indicate, we believe this is multiple layers

14   of hearsay involving more people that have not been

15   identified prior as co-conspirators, that are apparently

16   not intending on testifying in this matter, and that an

17   insufficient foundation is the result of layers of hearsay

18   for this testimony.

19        MR. NOVICK:  Your Honor, I believe that it's

20   appropriate testimony based on what the witness has told

21   under the circumstances.  He was -- first of all, Guy

22   Neumann has already been identified here as a

23   co-conspirator.  He's been on a number of emails from

24   which the Court can now likely but certainly by the end of

25   the trial can make a Geaney finding that he was a member

1    of this conspiracy.

2              With regard to Mr. Schneider, I believe that the

3    indication that the witnesses said that Mr. Schneider.

4    Whether or not he was acting as a co-conspirator, was

5    certainly acting an agent for Mr. Parker, executing wires,

6    and so that was the basis of the witness's testimony.

7              So I think he can offer the testimony he's

8    given.  I don't purport or intend to go deeper than I've

9    gone to this point.

10             THE COURT:  All right.

11             Well, I think that if we're going to have

12   documents that establish the transfers, then we don't need

13   to belabor the point at the moment.

14             MR. NOVICK:  Understood, Your Honor.

15   BY MR. NOVICK:

16   Q.   Do you recall, in addition to what we've talked about

17   up until now, anything that happened with regard to the

18   Charter Oak Trust document following Mr. Spencer's death?

19   A.   Yeah, the Charter Oak Trust document was modified in

20   regards to the percentage of the death benefit.

21             MR. GUARNIERI:  Objection, Your Honor.  Lack of

22   foundation.

23             MR. NOVICK:  Again, Your Honor, I'm asking the

24   witness to testify as to his knowledge about whether

25   anything happened to the Charter Oak Trust document

1    after --

2        THE COURT:  I think, as the trier of fact, it's

3    reasonable for me to infer at this point on the present

4    state of the record that this witness was intimately

5    involved in these matters, and so I think the government

6    is probably proceeding in a fair and reasonable manner by

7    seeking to elicit his understanding.

8        On that basis, I wouldn't want to spend a great

9    deal of time addressing the foundation for each and every

10   question; but if you want me to do that, I will.

11       MR. GUARNIERI:  Your Honor, I just want to

12   make --

13       THE COURT:  If that's what you want me to do, I

14   will insist that the government have the witness explain,

15   in response to each question, how he knows what it is he

16   is telling us.  That's fine with me.

17       MR. GUARNIERI:  Yes, Your Honor.  I think that

18   would be appropriate, especially under the line of

19   questioning that we're in now.

20       THE COURT:  That's fine.  It may be that it

21   would be easier in the long run for everybody.

22       So, Mr. Novick, why don't we proceed that way.

23       MR. NOVICK:  Certainly, Your Honor.

24       THE COURT:  Please proceed on the assumption

25   that, as to every question for this witness, you need to

1    lay a foundation before you elicit the testimony that

2    you're looking for.

3            MR. NOVICK:  Certainly, Your Honor.

4    BY MR. NOVICK:

5    Q.   Mr. Cherneski, let me ask you a question.

6         Just generally speaking, you worked -- in your time

7    at 100 Grist Mill Road, did you work near any of the

8    people that we've been talking about, like physically sit

9    near any people we've been talking about so far?

10   A.   I did.

11   Q.   Can you give us a sort of lay of the land, so to

12   speak, as to where different people sat relative to one

13   another, talking specifically about Mr. Neumann,

14   Mr. Carpenter, yourself, Mr. Bursey.

15   A.   Sure.  So we were in the back side of the office.  It

16   was called the bullpen.  I sat -- and there was four areas

17   for people to sit.  I sat in one section there.  Guy

18   Neumann sat directly across from me there, as well as

19   Kevin Slattery and Ron Lanza.  On the other side of the

20   division there sat -- Erik Schneider sat over there,

21   Amanda Rossi sat over there, and another individual,

22   Jason.  I can't remember his last name.

23        Directly across from them there was a conference room

24   where a lot of these phone calls and conversations took

25   place.  Attached to the conference room there was one big

1    office and a smaller office.  Those were locations where

2    Dan sat.

3         And then completely diagonally through doors on the

4    other side of the office was where Wayne Bursey sat.

5    Q.   And when the -- well, let me ask you this:  Did

6    Mr. Carpenter frequently come out and walk among those

7    areas that you've just described; the bullpen, so to

8    speak?

9    A.   Absolutely, absolutely.

10   Q.   When he was having conversations with, say, Erik

11   Schneider, would it happen that you would be able to hear

12   what was said?

13   A.   Yes.

14   Q.   And similarly with Mr. Neumann?

15   A.   Correct.

16   Q.   And vice versa, if he's coming over and talking to

17   you, would they be able to hear from where they were?

18   A.   Yes.

19   Q.   So we were talking a second ago about the change in

20   the trust document.

21        Did you become aware -- and I'm going to ask you a

22   follow-up question regarding how you became aware -- did

23   you become aware in a change of the trust documents

24   following the death of Mr. Spencer?

25   A.   I did.

1    Q.    How did you become aware of that?

2    A.    Because I took a look at the plan document --

3    Q.    Okay.

4    A.    -- and I saw it both before and after his death.

5    Q.    I'm going to ask you, can you explain to us what the

6    difference, what the change in the plan document from

7    before and after was?

8    A.    So after he passed away, there was language that was

9    put into the trust document that stated 20 percent of the

10   death benefit proceeds were to be payable to the trust,

11   and that 80 percent to the participating employees'

12   beneficiaries --

13   Q.    Go ahead.

14   A.    -- and that was not present in the previous

15   documents.

16   Q.    So it's your testimony that that was added after

17   Mr. Spencer died?

18   A.    Yes.

19   Q.    So prior to that, what was your understanding of what

20   money would go over to the beneficiary?

21   A.    It was a hundred percent that would be paid out to

22   the person's beneficiaries, minus any premiums advanced

23   and the funding of the origination fees, placement fees,

24   et cetera.

25   Q.    Again, at least as to the Spencer case, did any money

1    end up going to the beneficiaries at any rate?

2    A.   To the best of my knowledge, no.

3    Q.   I'm going to have you look at tab 38, Exhibit 2232.

4              MR. NOVICK:  First, I'd offer this, Your Honor.

5              THE COURT:  It will be admitted.

6    BY MR. NOVICK:

7    Q.   What is this?

8    A.   It's an email from myself to Joe Castagno; subject,

9    COT 2009.

10   Q.   Can you read the email for us?

11   A.   "Please work with Dan on this, Stef."

12   Q.   "Please only work with Dan on this"?

13   A.   It was addressed to Joe.

14   Q.   It says:  "Please only work" -- I want to make sure

15   we're clear on the wording.

16   A.   I'm sorry.  "Please only work with Dan on this."

17   Q.   And what's -- the subject is COT 2009.

18        Do you know what that was, as opposed to the

19   original COT?

20   A.   Just a newer version of the Charter Oak Trust.

21   Q.   Do you recall or are you aware of, in detail, what

22   the differences between the two entities were?

23   A.   I do not.

24   Q.   I'm going to direct you to a section of this

25   document, Section 6.01, which is on page -- it's a Bates

1    number ending 908.  And looking at that section, if you

2    could just read the sentence beginning, "If a participant

3    dies"?

4    A.    "If a participant dies while participating in the

5    plan, a death benefit equal to 80 percent of the original

6    face amount of any policies held by the plan on the

7    participant's life, minus the cost of any premiums or

8    placement or origination fees listed in the plan

9    documents, and minus any benefits paid under the plan

10   shall be paid to the participant's designated beneficiary.

11   Q.    Okay.  Have you stop there.

12         Is that some of the language that you recall being

13   added afterwards?

14   A.    That is.

15   Q.    Did you ultimately leave employment at 100 Grist Mill

16   Road?

17   A.    I did.

18   Q.    Approximately when?

19   A.    August/September 2010.

20   Q.    Can you describe generally the circumstances of your

21   departure?

22   A.    Well, a couple of things transpired.  There was an

23   incident where the IRS raided the facilities based upon

24   some of the 419 plans that we were offering.  I was in the

25   process of obtaining a new mortgage on my condo, so I was

1  waiting until that was complete.  There was a -- subject

2  to an outstanding bonus that I felt that was due to me

3  that was not paid.

4       So kind of a convolution of all those things

5  together, plus being offered another job elsewhere, I left

6  around August or September of 2010.

7  Q.   Where did you go to work afterwards?

8  A.   I worked for a company called M3 Financial.

9  Q.   Is that where you work now?

10 A.   It is not.

11 Q.   What do you do now?

12 A.   I'm currently self-employed.

13 Q.   Doing what?

14 A.   I do point-of-sale work for life insurance wholesale

15 cases.

16          MR. NOVICK:  One moment, please, Your Honor.

17              (Pause)

18          MR. NOVICK:  No further questions, Your Honor.

19          THE COURT:  Thank you.

20

21                    CROSS-EXAMINATION

22 BY MR. GUARNIERI:

23 Q.   Good morning, Mr. Cherneski.

24 A.   Good morning.

25 Q.   Can you tell me how you prepared for your testimony

1    today.

2    A.   I met with the government on numerous times in

3    regards to the testimony today, plus they gave me binders

4    of material to take a look at.

5    Q.   When was the most recent that you met with the

6    government?

7    A.   Thursday of last week.

8    Q.   What kinds of documents did the government ask you to

9    review?

10    A.   Mostly the ones that we're going over today.

11    Q.   Were there other documents that you were asked to

12    review that you didn't go over today?

13    A.   There were.

14    Q.   Were they of the same nature, emails, memos?

15    A.   Yes, they were.

16    Q.   Have you discussed your testimony with anyone from

17    Tuesday?

18    A.   My specific testimony or the fact --

19    Q.   I'll withdraw that question.

20    After you left Tuesday, after testifying for some

21    period of time --

22    A.   Yes.

23    Q.   -- did you speak with anybody about your testimony?

24    A.   So I guess the best way to explain is:  Did I tell

25    people I was here testifying, yes; did I talk about what

1    was spoken about, no.

2    Q.    So you didn't speak with anybody about the content of

3    your testimony on Tuesday?

4    A.    Correct.

5    Q.    Do you recall, when was the first time you met with

6    the government in relation to this matter?

7    A.    Several years ago.

8    Q.    Do you have an idea of how many times you met with

9    them in total?

10   A.    Probably five times.

11   Q.    Do you think the first time you met with them was

12   around March 2013?

13   A.    Could have been.  I'm not sure.

14   Q.    When you meet with the government to discuss this

15   case, were the same people always there?

16   A.    They were, yes.

17   Q.    Who was present at your meetings?

18   A.    The three people sitting right directly behind you;

19   and Rich, sitting over there in the first row.

20   Q.    Do you have a sense of how long your first meeting

21   with the government was?

22   A.    They probably all average anywhere from two to three

23   hours, the meetings.

24   Q.    Do you have any idea what was discussed the very

25   first time you met with the government?

1    A.   To the best of my recollection, they were trying to

2    get a general overview of things that transpired at

3    100 Grist Mill Road.

4    Q.   Do you have any specific recollection of things that

5    were discussed, or was it all kind of general things that

6    were discussed?

7    A.   It was just kind of in general.

8    Q.   Now, as far as you can recall, you think the second

9    time you met with the government was in August of 2015?

10   A.   That sounds correct.

11   Q.   And then you met with them again in September and

12   October, and then more recently, as you discussed?

13   A.   Correct.

14   Q.   Did you discuss making any kind of deal with the

15   government with regards to your testimony?

16   A.   No, I did not.

17   Q.   Did they offer you anything?

18   A.   They did not.

19   Q.   Did you enter into any kind of agreement with the

20   government?

21   A.   I did sign a proffer letter upon meeting them the

22   first or second time, I believe.

23   Q.   When you say "proffer letter," what do you mean, what

24   did you sign?

25   A.   It was a proffer letter.

1   Q.   What's your understanding of what that letter does?

2   A.   So my understanding is, as long as I'm truthful and

3   tell the truth of what transpired, that cannot be used

4   against me in any criminal proceedings.

5   Q.   And you're not sure if you signed that the first time

6   you met with the government or after?

7   A.   I'm pretty sure I signed it before the first time I

8   met with them, before they asked me questions.

9   Q.   Were there any other deals you made with the

10  government besides the proffer agreement you just

11  mentioned?

12  A.   There were not.

13  Q.   I'm going to first ask you some questions about your

14  background, just to make sure I understood your testimony

15  correctly, okay?

16  A.   Sure.

17  Q.   Your studies in college were not related to the

18  insurance industry, is that fair?

19  A.   That would be correct.

20  Q.   Am I correct, right out of college you were employed

21  by Benistar?

22  A.   That is correct.

23  Q.   You didn't have any work insurance regarding life

24  insurance or the industry before you started work with

25  Benistar?

1    A.   That would be correct.

2    Q.   And that was in, did you say, February of 2005, was

3    it?

4    A.   Yes, correct.

5    Q.   What was your job title at Benistar?

6    A.   I didn't have a job title.

7    Q.   Did you ever consider yourself an administrator of

8    certain plans, or is that not necessarily how you would

9    define your tasks?

10   A.   It could have been construed as that.  It wasn't

11   really a necessarily defined role there.

12   Q.   Would it be fair to say that your recollection of

13   what occurred and the subject of your testimony today was

14   better in 2013, when you first met with the government,

15   than it is today?

16   A.   It's been three years, so I would say -- sure.

17   Q.   And to the best of your recollection, did you

18   identify your job function in 2013 to the government as a

19   plan administrator at Benistar?

20   A.   I -- so to think back of what originally my job title

21   would have been on some documents, it would have said

22   "plan administrator" with regards to -- in that respect.

23   Q.   So is that to say that your job title was plan

24   administrator, or is that just something you're saying you

25   put on paper?

1    A.    I believe, for purposes of visa, that's what was put

2    on a paper.

3    Q.    So for purposes of a visa, you indicated you were

4    plan administrator, but your testimony today is that was

5    not necessarily your title officially at Benistar?

6    A.    Correct.

7    Q.    So what was your primary job functions at Benistar?

8    A.    My primary job functions were to educate brokers

9    about the benefits of the various 419 plans that we

10   offered there.

11   Q.    How much of your time -- you worked full-time,

12   40 hours a week?

13   A.    I did.

14   Q.    You work more than 40 hours a week?

15   A.    If it was necessary.

16   Q.    How much of your time do you think was spent

17   contacting brokers and agents and talking about the plans?

18   A.    Probably be -- contacting brokers directly?

19   Q.    Contacting brokers and agents like you described, to

20   describe the plans that were offered.

21   A.    Probably 50 percent of my time.

22   Q.    Okay.  And you were also contacting financial

23   advisers, is that fair?

24   A.    Well, these would be the agents, financial advisers,

25   and group them together.

1    Q.   Was it ever part of your responsibilities to fill out

2    applications for life insurance while you were working at

3    Benistar?

4    A.   No, it was not.

5    Q.   Did you ever receive applications at Benistar and

6    were asked to confirm the accuracy of information that was

7    contained in the applications?

8    A.   Occasionally, yes.

9    Q.   What kind of information would you be asked to

10   confirm?

11   A.   So in regards to when the application's received, if

12   they were to come across my desk, I'd confirm that they

13   had the proper owners on them, and that the agents were

14   down for the proper percentages on the applications.

15   Q.   Is it fair to say that you never conducted any

16   investigation, in terms of your time at Benistar, about

17   the validity of any medical, financial, or any other kind

18   of information in the applications, is that fair?

19   A.   That would be fair.

20   Q.   Were you ever responsible while you were at the

21   Benistar entity for doing any kind of money transactions

22   on behalf of the company?

23   A.   I was not.

24   Q.   Were you ever responsible for talking directly with

25   an insurance provider for any purpose?

1    A.    I was not.

2    Q.    Did you ever have contact directly with Ridgewood

3    Finance?

4          That was an entity that you discussed earlier.

5    A.    You mean besides from me being on the emails?

6    Q.    Correct.

7    A.    I did not.

8    Q.    So is it fair to say that your contact with Ridgewood

9    was limited to, "Here's stuff for you to review" in an

10   email?

11   A.    That would be fair.

12   Q.    Now, when you say that an important part of your job

13   function was informing brokers and advisers about how the

14   plans functioned, who specifically were you involved with

15   speaking with about the plans?

16   A.    So I would contact the advisers that promoted and

17   marketed the 419 plans, ones that currently did business

18   with us, perspective ones to do business with us.  And

19   we'd also participate with conference calls with the

20   clients to explain the benefits of the plans too, as well.

21   Q.    Did you explain the plan to Fred Prelle's group in

22   Texas?

23   A.    Which plan are you referring to?

24   Q.    Any plan.

25   A.    I worked with them on the Grist Mill Trust.

1    Q.   Specifically with Charter Oak Trust, did you explain

2    that plan to the Fred Prelle group?

3    A.   I did not.

4    Q.   Did you explain it to Robert Paccini in Texas?

5    A.   I did not.

6    Q.   Were you responsible for specifically explaining the

7    plans -- the Charter Oak Trust plan to any agents of

8    Lincoln or Phoenix?

9    A.   I was not.

10   Q.   So insofar as your job function was to explain these

11   plans, it was largely the other 419 plans that were housed

12   in Simsbury, is that fair?

13   A.   That would be fair, yes.

14   Q.   Is there plans that you spent -- what was the plans

15   that you spent most of your time marketing to other

16   brokers and agents?

17   A.   So that would be the NOVA benefit plans and the Grist

18   Mill Trust family of plans, is where I spent a majority of

19   my time.

20   Q.   You don't have any legal background or training, is

21   that right?

22   A.   That is correct.

23   Q.   Have you ever reviewed the IRS Code, as far as

24   419 plans are concerned?

25   A.   I've read through it numerous times.

1    Q.   And is your understanding of the 419 plans that

2    you've testified to today, your independent understanding

3    based on your review of the IRS Codes?

4    A.   It would be from the education that I received at the

5    Benistar entities.

6    Q.   You have never taken any courses or continuing

7    education or anything like that with regards to 419 plans?

8    A.   I have not.

9    Q.   So the information that you knew about 419 plans and

10   conveyed to agents and brokers for your job function was

11   the information that you acquired at Benistar?

12   A.   It was.

13   Q.   Did you spend a significant amount of time at

14   Benistar with Guy Neumann?

15   A.   I did.

16   Q.   Did you spend a significant amount of time outside of

17   Benistar with Guy Neumann?

18   A.   I did.

19   Q.   Were you close friends with Guy Neumann?

20   A.   I was.

21   Q.   In fact, you and Guy Neumann would refer to each

22   other as brothers, is that true?

23   A.   That would be true.

24   Q.   You were in some kind of independent business

25   relationship with Guy Neumann as well?

1    A.    Yes, I was.

2    Q.    Was it a shoe company or something to that effect?

3    A.    Yes.

4    Q.    You lived together with Guy Neumann?

5    A.    I did.

6    Q.    And I can't help but notice that during your direct

7    testimony, when you said you learned things at Benistar

8    about 419 plans, you always mention Guy Neumann's name in

9    addition to Mr. Carpenter.

10         Now, did you spend significant amounts of time

11   outside of work with Mr. Carpenter?

12   A.    I wouldn't say "significant."

13   Q.    Significant in comparison to how much time you spent

14   with Guy Neumann?

15   A.    I would say, I spent more time with Guy than I did

16   with Dan outside of work.

17   Q.    Would it be fair to --

18             MR. GUARNIERI:  Withdraw that question, Your

19   Honor.

20   BY MR. GUARNIERI:

21   Q.    Now, did you and Mr. Neumann talk about work often?

22   A.    We did.

23   Q.    Did you have what I would say as lengthy

24   conversations about how 419 plans operate?

25   A.    I wouldn't say that we had lengthy conversations

1   about 419 plans.

2   Q.   Would you say that a considerable amount of your

3   understanding of 419 plans, when you came on at Benistar,

4   was given to you by Guy Neumann?

5   A.   I wouldn't say that.

6   Q.   Wouldn't say that?

7   A.   Would not say that.

8   Q.   Is it in fact true that Guy Neumann introduced you to

9   Mr. Carpenter?

10  A.   That is true.

11  Q.   Now, are you aware that Mr. Neumann, during this

12  relevant time period, held himself out as the founder and

13  president of Benefit Plan Advisers?

14  A.   I'm aware of that.

15  Q.   And your email address that we've seen a number of

16  times is from Benefit Plan Advisers, is that right?

17  A.   That is correct.

18  Q.   And are you aware if Benefit Plan Advisers is the

19  creator and sponsor of the Grist Mill Trust?

20  A.   I am.

21  Q.   Are you aware that Mr. Neumann also holds himself out

22  as a founder of Rex Insurance Services?

23  A.   I am.

24  Q.   What does Rex Insurance Services do?

25  A.   They were a life insurance general agency.

1    Q.   So what do they do as a life insurance general

2    agency?

3    A.   So, they were -- I'm trying to think of the best way

4    to explain this.  They were kind of a wholesale entity

5    that had producers that they worked with.  Rex represented

6    a number of different insurance carriers, so the insurance

7    producers would come to Rex with pending applications with

8    different insurance companies, and Rex would be the ones

9    that held the contracts and helped the insurance producers

10   place the business with various life insurance carriers.

11   Q.   Did you spend a significant amount of time working

12   with Rex?

13   A.   I did not.

14   Q.   Did Mr. Neumann spend the majority of his time

15   working with Rex, to your knowledge?

16   A.   I wouldn't necessarily say the majority of his time.

17   Q.   Was the majority of the business that was being done

18   for Rex, related to Guy Neumann, if you know.

19   A.   Can you rephrase that question.  I'm not sure I

20   understand that question.

21   Q.   Sure.

22        So the vast majority of business that was conducted

23   by Rex, did it involve Guy Neumann?

24             MR. NOVICK:  Your Honor, I'm going to object at

25   this point on two grounds.

1          One is relevance.  I have been sitting waiting

2    to hear it connected up at some point, and I haven't heard

3    that yet.

4          And number two is foundation.  Since I'm being

5    called upon to lay a detailed foundation for each of these

6    questions, I'd just note here that I don't see a

7    foundation laid for these questions that we're hearing

8    now.

9          So on both of those grounds I object.

10          THE COURT:  What is the relevance of this,

11    please?

12          MR. GUARNIERI:  Your Honor, I think that this

13    tests the knowledge of the relationship between the

14    witness and Mr. Neumann and.  We've heard repeatedly on

15    direct about how Mr. Neumann was involved.  And we've

16    heard his name come up a number of times also, about Rex

17    Insurance and the job functions that this witness did

18    compared to these different entities.

19          So I think that this goes directly to that, Your

20    Honor.

21          THE COURT:  It goes to the relationship between

22    this witness and Mr. Neumann?

23          MR. GUARNIERI:  And, in fact, how this witness

24    came to the knowledge he had about 419 plans that we heard

25    testified to a great extent on direct.

1    MR. NOVICK:  I didn't object to that question,

2  Your Honor.  I'm objecting to these questions because

3  we've moved past the question which I heard a little while

4  ago, about, "Where did you get your knowledge of 419s."  I

5  didn't object to that.  That's relevant.  I get that.

6    We've moved on to what Guy did beyond that,

7  without connection to anything else that I'm hearing.  So

8  that's why I'm standing up now.

9    THE COURT:  Do you want to spend more time on

10  this?

11    MR. GUARNIERI:  No, I'm going to move on right

12  now, Your Honor.

13    THE COURT:  Okay.

14    MR. GUARNIERI:  Thank you.

15  BY MR. GUARNIERI:

16  Q.  So, Mr. Cherneski, is it fair that the information

17  that you were conveying about 419 plans to individuals,

18  brokers, agents, which you've testified that you've

19  learned through your experiences at Benistar, came largely

20  from Guy Neumann; is that not true?

21  A.  That's not true.

22  Q.  Now, are you aware of whether or not it's common for

23  a trust to own a life insurance policy?

24  A.  I'm kind of confused by, is it common that a trust

25  would own a life insurance contract; is that your

1  question?

2  Q.   Correct.

3  A.   Depends on the circumstance.

4  Q.   Is it unusual for a trust to own a life insurance

5  policy?

6  A.   It is not.

7  Q.   In your experience, don't people create trusts for

8  numerous reasons, including to be able to hold it for the

9  benefit of the beneficiaries?

10  A.   People do that.

11  Q.   Is it uncommon for a 419 plan to involve a trust?

12  A.   In my experience, no.

13  Q.   In fact, is a 419 plan, in essence, a welfare benefit

14  trust and require a trust?

15  A.   It does.

16  Q.   Mr. Cherneski, I believe that on direct you spoke at

17  some length about your knowledge of insurance providers.

18       Have you worked for an insurance provider?

19  A.   I have not.

20  Q.   So the familiarity you have with the insurance

21  provider system comes from these meetings that you've had

22  in Simsbury, is that fair?

23  A.   It comes from that and my current employment.

24  Q.   Well, the information that you have about insurance

25  providers, when you worked before 2010, is it fair that

1    all came from your experience at Benistar?

2    A.    Yes, that would be fair.

3    Q.    Do you know what kind of licensure is required to be

4    an agent at an insurance company?

5    A.    I do.

6    Q.    What's that?

7    A.    It's a live license issued in the state that the

8    person's living.

9    Q.    What's required to get that license, do you know?

10   A.    You have to take an exam with the state.

11   Specifically in Connecticut, there's an 80-hour

12   pre-license for life, accident, and health.  Complete

13   that, and you can take an exam.  And then if you pass that

14   exam, you would get a license.

15   Q.    Once you have a license, does that mean every

16   insurance company is willing to allow you to sell their

17   products?

18   A.    Not specifically, no.

19   Q.    Do you have an understanding of how that connection

20   works between a licensed agent and an insurance company?

21   A.    Can you kind of rephrase the question so I can --

22   Q.    Sure.

23         How does an insurance company then allow an agent to

24   sell their product?

25   A.    So I guess maybe the question is, how do they get

1    appointed to sell insurance with them?

2    Q.    Sure, "How do you get appointed to sell life

3    insurance," that would be good.

4    A.    Once you're licensed appropriately in the state that

5    you live in, typically you'd also have to have E and O

6    insurance to cover you for any liability.  You then maybe

7    fill out appointment paperwork to get appointed typically

8    through a general agency.  The insurance company would

9    review your paperwork and determine whether or not to

10   grant you the ability to represent them and sell their

11   products.

12   Q.    And does the insurance company, to your knowledge, do

13   any kind of investigation of people that make these

14   applications for them?

15   A.    They do.

16   Q.    Do you have a sense of what's involved in that

17   process?

18   A.    I do.

19   Q.    And what is that?

20   A.    So they ask a number of background questions on the

21   appointment paperwork to determine if there's been any

22   activities that they would deem kind of not in the

23   position for them to grant you the appointment with that

24   company.  They do kind of a background history, criminal

25   check, those types of things.

1    Q.   Why do you think they -- why do they do that kind of

2    investigation?

3                    MR. NOVICK:  Objection, Your Honor.  Foundation

4    and relevance.

5                    THE COURT:  All right.

6                    Can you lay a foundation?

7                    MR. GUARNIERI:  Yes, Your Honor.

8    BY MR. GUARNIERI:

9    Q.   So, Mr. Cherneski, do you have an understanding of

10   why it is that the insurance companies go through that

11   process to license an individual?

12   A.   Because they don't want the people --

13                   MR. NOVICK:  Your Honor, that was just the same

14   question asked in a slightly different way.  So I have the

15   same objection.

16                   MR. GUARNIERI:  If I could try again, Your

17   Honor?

18                   THE COURT:  All right.

19   BY MR. GUARNIERI:

20   Q.   Mr. Cherneski, do you have an understanding, yes or

21   no, as to why an insurance company goes through this

22   process to investigate somebody before they allow them to

23   sell their products?

24   A.   Yes, I do.

25   Q.   And what is your understanding of how that process --

1          THE COURT:  I guess the question would be:  What

2     is the basis of your understanding?  Without telling me

3     what the understanding is, can you tell me what the basis

4     of your understanding --

5          THE WITNESS:  My current understanding of why

6     they ask these questions?

7          THE COURT:  Yes.

8          THE WITNESS:  They don't want people

9     representing their --

10         THE COURT:  I was unclear.  The objection is

11    lack of foundation, which calls into question the source

12    of your knowledge, the basis for your understanding.  So

13    without telling me what your understanding is --

14         THE WITNESS:  What's my basis?

15         THE COURT:  Yes.

16         THE WITNESS:  I'm currently a licensed life

17    insurance agent with numerous companies.

18         MR. NOVICK:  My objection, Your Honor, is:  The

19    question is asking for why the insurance companies do

20    something, and he's not an employee of an insurance

21    company.

22         The questions on direct had to do with -- the

23    relevance of them were the impression of people or

24    co-conspirators working, why they took particular actions.

25    I don't see the relevance of this line of questioning in

1    light of the particular questions that are being asked of

2    the witness here.

3              THE COURT:  What is the relevance, please?

4              MR. GUARNIERI:  Your Honor, I think this

5    witness, who has testified just now that he is a licensed

6    agent and has an understanding of why it is that they go

7    through this process to license him, is relevant because

8    it goes to how the agents of the insurance companies were

9    acting relative to the charged conspiracy.  And I think

10   that it will become clear as I go on.

11             And based on direct testimony, we heard a number

12   of inside agents and brokers and agents and their relative

13   conduct, that we'll be able to test the depths of what it

14   means to be an insurance agent and what that requires, and

15   what that would be asking of the individuals of what we've

16   already heard about the conduct earlier.

17             THE COURT:  Mr. Novick?

18             MR. NOVICK:  Your Honor, it seems like a leap

19   from where we are right now.  And I would still add the

20   original -- he's trying to use this witness as, I guess, a

21   quasi-expert or representative of insurance companies at

22   large, to try to talk about, you know, Ed Waesche and

23   Charlie Westcott, when presumably he could either call the

24   witness on his case to make those points, or inquire of

25   the particular agents that he wants to, you know, test

1    these issues with.

2              MR. GUARNIERI:  Your Honor, if I may, I feel

3    we've heard significant conversation on direct examination

4    as to this witness's understanding of why insurance

5    companies do certain things and why they don't do certain

6    things, and his understanding of red flags with insurance

7    companies and how processes work within insurance

8    companies.  And I'm inquiring about his understanding of

9    another aspect of how insurance companies operate.

10             THE COURT:  What is the point that you want to

11   make?

12             MR. GUARNIERI:  Your Honor, the ultimate point

13   that we're getting to on this is that the insurance

14   company agents had certain responsibilities to the

15   insurance companies.

16             THE COURT:  I think that's undisputed.

17             MR. NOVICK:  Correct, Your Honor.  I don't know

18   why this witness needs to be the one to testify to that.

19   That's my issue here.

20             THE COURT:  I take it for granted that the

21   agents had fiduciary obligations to their employers.

22   Perhaps I'm mistaken about that, but I believe that is a

23   matter of law.

24             MR. GUARNIERI:  Well, I think, Your Honor, that

25   this testimony will go to not only the nature of the

1    relationship but also the nature of how the insurance --

2    or this witness's understanding of what the insurance

3    providers need to know about these individuals affects

4    their own reliance on the actions of these individuals.

5           So I think, Your Honor, this goes directly to

6    the element of materiality in the larger scope of this

7    case.

8           THE COURT:  How so?

9           MR. GUARNIERI:  Your Honor, I would indicate --

10   I believe it goes to materiality because I believe it goes

11   to how insurance companies perceived the conduct of these

12   individuals and their perception of these individuals.

13          And I think the testimony will go to this when

14   further witnesses are advanced, that their understanding

15   of the Charter Oak Trust and interactions with the Charter

16   Oak Trust through their own agents is, in effect, colored

17   by their understanding of what their agents are supposed

18   to be doing and the obligations of their agents.

19          THE COURT:  I'm not following you.

20          The claim is that Mr. Carpenter knowingly made

21   material misrepresentations to the providers in order to

22   induce them to issue policies.  The government claims

23   Mr. Carpenter thereby deprived them of their right to make

24   up their own minds based on accurate information with

25   regard to whether a policy should be issued, and the

1    government says that the misrepresentations are material

2    under an objective standard because they have the capacity

3    to influence a reasonable person.

4           Now, if you want to elicit testimony that is

5    directed to that claim of materiality, then fine.  But to

6    talk generally about the obligations of agents to

7    insurance carriers, I think, is a bit far wide of the

8    mark.

9           MR. GUARNIERI:  Thank you, Your Honor.

10   BY MR. GUARNIERI:

11   Q.   Now, Mr. Cherneski, can you tell me, what companies

12   was Mr. Westcott licensed by, if you know?

13          THE COURT:  Excuse me, while we're on the

14   subject, it may be helpful to be clear on a point that

15   came out in the briefing on the motions in limine.

16          Dealing with the defendant's suggestion that the

17   providers cannot fairly be viewed as victims of fraud, the

18   government states in its papers that it would be incumbent

19   on the defendant to demonstrate that a person speaking on

20   behalf of a provider with apparent authority from the

21   provider authorized the misrepresentations to be made, and

22   short of that, the government says, the defense that the

23   providers were involved here in some way would be

24   unavailing.

25          The government cites the D'Amato case, and I've

1    read that case repeatedly, and the case does seem to

2    support the government's position.

3              The case seems to say that it's no defense to

4    mail or wire fraud for a defendant to say, "Well, this

5    employee told me it was okay to lie."  The fact that an

6    employee may have been himself or herself complicit in a

7    fraud does not defeat a charge.

8              Again, under D'Amato, it seems the Second

9    Circuit would require the defendant to show that a person

10   with apparent authority to speak on behalf of the company

11   authorized the misrepresentation; and, as D'Amato

12   recognized, that would be a pretty rare event.

13             If you suspect embezzlement on the part of an

14   employee and you don't want the world to know about that

15   pending the completion of an internal investigation, then

16   you might falsely state that you don't know about any

17   embezzlement, for example.

18             In that situation, a reasonable person could

19   well understand that the misrepresented matter was

20   something of legitimate concern to the principal and the

21   falsehood served the legitimate interest of the principal

22   and was otherwise lawful.

23             So given the D'Amato case, it seems to me, to

24   the extent the defense in this case seeks to show that the

25   providers, one or more of them, authorized the

1       misrepresentations, that's fine, provided the defendant

2       can go on to show that this was in the interest of the

3       providers, and he reasonably understood that, and it was

4       lawful.

5               But under D'Amato, it seems that unless you can

6       touch each of those bases, your defense that the providers

7       were involved here in some way falls short.

8               So while we're on the point of the providers and

9       their role in this, it is helpful to step back and look

10      and see what D'Amato says.

11              MR. GUARNIERI:  If I may, Your Honor, just on

12      that point, and I -- without reviewing, I believe that one

13      of the main defense concerns is that the case law -- and I

14      believe it's up through Binday -- would require that the

15      surer was actually deceived; that if the government was

16      unable to prove that they actually were deceived, there

17      was not mail or wire fraud.  And I believe it goes back to

18      Shell and Schwartz cases and the dichotomy there.

19              Essentially, the defense argument builds on that

20      basis and what the providers knew and didn't know.  But I

21      do, of course, take Your Honor's points.

22              MR. NOVICK:  I don't know that we need to

23      address it now.  I understand Your Honor's reason for

24      addressing this particular point right now.  But obviously

25      the government doesn't quite agree -- doesn't agree with

1    the need to prove actual deceit.  We've played out the

2    reason for that in the motions in limine.  I won't belabor

3    it now, unless the Court wants to have a full discussion

4    now.

5              THE COURT:  I don't think it's necessary.

6              For me, it's helpful to bear in mind that, in a

7    fraud case, it's incumbent on the government to prove

8    wrongdoing.  Conduct that's morally reprehensible, that's

9    what fraud is all about; and if, in a hypothetical case, a

10   person got into bed with a bad actor, and together with

11   that bad actor, in effect, pursued wrongdoing, it's

12   unlikely to be a defense that the bad actor was an agent

13   of the victim; and that's what the D'Amato case seems to

14   say.

15             MR. GUARNIERI:  Thank you, Your Honor.

16             May I continue?

17             THE COURT:  And there's one other point I might

18   mention now -- and again, this is just by way of orienting

19   us to the case and framing whatever lies ahead -- I don't

20   know what the government would claim to prove here with

21   regard to loss.  I have no idea.  I don't know, for

22   example, whether --

23             MR. BROWN:  Excuse me, Your Honor, if I may?

24   Can this witness be excused?  Because what the Court is

25   saying could influence his testimony.

1          THE COURT:  I'm done.  But I allow for the

2     possibility that, as to any claimed loss with regard to

3     any provider, there might be some basis for the defendant

4     to contest the claim on the ground of some unclean hands

5     or something of the sort on the part of that provider.

6          I don't know, and I underscore the words, "I

7     don't know," I'm just saying, it may be that the kinds of

8     considerations that the defendant seems to have in mind

9     may be of significance there, but I don't comment on that.

10    I don't know.

11          MR. NOVICK:  Your Honor, just to close the loop

12    on that point, the point the government was trying to make

13    in its motions in limine -- I do note that we may come

14    upon an insurance company witness shortly -- was that

15    while I do agree that actual loss will become relevant if

16    and when we were to have a sentencing, that the government

17    isn't going to endeavor to prove at any great length --

18    certainly going to prove the contemplated harm, which is

19    what the law requires us to do; but in terms of trying to

20    assess the actual loss, I don't know -- although the Court

21    will certainly hear evidence about what that course of

22    business, I don't know that we're going to endeavor to

23    prove what actual loss is here, because that is a whole

24    other subject, in my view, far afield from what the core

25    of the elements are that we need to prove.  And that,

1    again, was the subject of one of the motions in limine.

2                    THE COURT:  All right.  Thank you.

3                    You may proceed.

4                    MR. GUARNIERI:  Thank you, Your Honor.

5    BY MR. GUARNIERI:

6    Q.    Mr. Cherneski, do you know what companies Mr. Charles

7    Westcott was an agent for?

8    A.    Only one specifically is Lincoln National, what I

9    recall.

10   Q.    And to your knowledge, what was Mr. Westcott's main

11   functions in Simsbury?

12   A.    His role as an internal in-house broker, his role was

13   to solicit business for the various trusts that we

14   operated at the 100 Grist Mill Road through his contacts

15   and network of other agencies and advisers that he had

16   relationships with.

17   Q.    So as far as to your knowledge, did Mr. Westcott

18   relay his understanding of how trusts, including the

19   Charter Oak Trust, worked to other agents and brokers?

20         Is that correct?

21   A.    That would be correct.

22   Q.    I believe it was your testimony on direct that

23   Mr. Westcott, at some point in time, lost his license with

24   Lincoln.

25         Was that your testimony?

1    A.    That was.

2    Q.    Now, who is Fred Prelle?

3    A.    Fred Prelle is a -- he owns an agency out of Texas.

4    Q.    When you say, "he owns an agency," does that mean he

5    has other agents that work for him; is he also an agent?

6    A.    I don't believe -- I don't know if he was an agent or

7    not.  But yes to the first part, he has other agents that

8    worked for him.

9    Q.    Was Robert Paccini an agent that worked for him?

10   A.    I believe so.

11   Q.    Was Mr. Salesman an agent that worked for him?

12   A.    Yes.

13   Q.    And do you know what companies, to your knowledge,

14   they were licensed by?

15   A.    I know they were affiliated with Lincoln.  I don't

16   know any other companies.

17   Q.    Now, are you aware if Mr. Prelle, Mr. Paccini, or

18   Mr. Salesmen lost their licenses at any given time?

19   A.    I am not aware.

20   Q.    What was the role of Mr. Waesche, who I know his name

21   came up in direct, with the entities in Simsbury that

22   you've talked about?

23   A.    So it would have been similar to that role of

24   Mr. Induddi-Westcott.

25   Q.    Do you know what companies he was licensed by?

1    A.    The two I recall, he was licensed by was Penn Mutual

2    and Phoenix.

3    Q.    Are you aware of whether or not he lost his license

4    with either of those companies as a result of this?

5    A.    I am not aware.

6    Q.    Now, in terms of your understanding of how the

7    Charter Oak Trust worked, who filled out the applications

8    for the Charter Oak Trust?

9         "Applications," by that term I mean the applications

10   that were eventually submitted to providers.

11   A.    So kind of the flow of how I understood they were

12   filled out, the agent, the external agent would have

13   filled that out with the insured; it would have been

14   submitted to 100 Grist Mill Road, Benistar entities; and

15   then there, the trust information would have been filled

16   out, and then the trustee would have been signed off as

17   owner-applicant on the application package.

18   Q.    So as far as your understanding of how that process

19   worked for the Charter Oak Trust, all the information for

20   the insureds was filled out before the applications made

21   their way to the offices in Simsbury, is that right?

22   A.    That would be correct.

23   Q.    You never saw any of the people that were insured

24   through the Charter Oak Trust at the office in Simsbury,

25   is that true?

1    A.    I did not.

2    Q.    You never had any conversations with individuals who

3    had insurance policies with the Charter Oak Trust?

4    A.    I did not.

5    Q.    Did you ever -- and being that you never had

6    conversations with the insureds, you never spoke with any

7    person who had insurance in the Charter Oak Trust about

8    what their intentions were in receiving that insurance or

9    what they were planning to do with the insurance?

10   A.    That is correct.

11   Q.    And as far as your understanding of this process, it

12   was external or outside agents that were having

13   conversations with people who then sought to get insurance

14   and be placed in the Charter Oak Trust, is that right?

15   A.    It would be my understanding that in some cases the

16   internal agents -- Ed Waesche, Charlie Induddi -- would

17   have conversations with external agents, with the insureds

18   when, they were contemplating entering into the

19   transaction.

20   Q.    As far as you know, the entire process of the insured

21   meeting with an agent and filling out an application all

22   happened outside of the Simsbury entities or Charter Oak

23   Trust, is that right?

24   A.    That would be correct.

25          MR. GUARNIERI:  If I may just have a moment,

1    Your Honor?

2               (Pause)

3          MR. GUARNIERI:  Thank you, Your Honor.

4    BY MR. GUARNIERI:

5    Q.   Mr. Cherneski, I'm going to direct you to some of the

6    documents that we've looked at or that have been entered

7    during your direct testimony.  I don't know what their tab

8    numbers are, so if you would refer to the screen, I will

9    do my best to try to get them on there.

10         Referring to Government's Exhibit 2001, you testified

11   on direct examination that this was -- and correct me if

12   I'm wrong -- an email that you were cc'd on that came from

13   Mr. Carpenter, is that right?

14   A.   This one came from Ron Lanza.

15   Q.   I'm sorry, from Ron Lanza.

16   A.   Yes.

17   Q.   And the attachment that was included with this email

18   which you now see before you, as far as you can recall,

19   that was with the -- that was attached to the original

20   email as well, right?

21   A.   Yes.

22          MR. GUARNIERI:  Excuse me, the screen -- I might

23   have hit the cord here again.  The screen is flickering on

24   and off.

25               (Pause)

1    BY MR. GUARNIERI:

2    Q.   So do you have the second page of that Exhibit 234 in

3    front of you --

4    A.   I do.

5    Q.   -- titled:  "Stranger-Owned Life Insurance STOLI or

6    Investor-Owned Initiated Life Insurance, IOLI"?

7    A.   Yes.

8         Does it matter if I look in the book to find this,

9    instead of going off the screen?

10              THE COURT:  That's fine.

11   BY MR. GUARNIERI:

12   Q.   I have a sense that this is Exhibit No. 1 --

13              MR. NOVICK:  Just to be clear so that -- for

14   record purposes, it's Exhibit 2001, tab 1, of his binder.

15              MR. GUARNIERI:  Thank you.

16   BY MR. GUARNIERI:

17   Q.   Would it be fair to state, Mr. Cherneski, that

18   stranger-originated life insurance is a concern for

19   everybody in the life insurance industry?

20   A.   That would be fair, yes.

21   Q.   And this email with this attachment, am I correct

22   that this came in 2005?

23   A.   You are correct.

24   Q.   2005, to your understanding, is some years before

25   Charter Oak Trust was initiated, is that right?

1    A.    I'm uncertain of when the Charter Oak Trust started.

2    Q.    This was a -- this email was received from within a

3    year from when you started at Benistar-related entities,

4    right?

5    A.    Correct.

6    Q.    And do you have an understanding as to who it is that

7    receives these emails and these memos from the insurance

8    companies?

9    A.    So who would they be sent out to by the insurance

10   company?

11   Q.    Correct.

12   A.    Typically if you sign up for a mailing list and/or

13   agents of that insurance company.

14   Q.    So is it fair to say that your understanding is that,

15   in part, this stranger-originated life insurance

16   circulation was intended for insurance agents for that

17   company?

18   A.    I would agree with that statement, yes.

19   Q.    Mr. Cherneski, now referring you to Government's

20   Exhibit 2125, which I believe is tab 2 in your binder --

21   A.    It is.

22   Q.    -- looking at page 2, this is another circulation

23   regarding Phoenix's position on stranger-originated life

24   insurance, is that right?

25   A.    That is correct.

1    Q.   Would it be your understanding that, at least in some

2    part, the insurance agencies wanted to make their agents

3    aware of their policies in that regard?

4    A.   I would agree with that.

5    Q.   Mr. Cherneski, you testified on direct examination,

6    to some extent, about how insurers perceive certain

7    applications, I think you referenced red flags that come

8    up on applications, is that right?

9    A.   That is correct.

10   Q.   And is it fair to state again that your understanding

11   of how insurance providers perceive applications is based

12   entirely on your -- the information you acquire while

13   working at Benistar, is that right?

14   A.   I'm not sure if I understand the question.

15   Q.   Well, sir, you never had any conversations with any

16   insurance companies during your time at Benistar, right?

17   A.   So I guess what you're saying is, did I have

18   conversations with them?

19        I've kind of testified to that before.  I was part of

20   conference calls with the insurance companies, so I

21   guess -- I'm not understanding directly what you're

22   specifically asking me.

23   Q.   Well, did you have any specific conversations with a

24   person from an insurance company regarding how they

25   process applications?

1    A.    I did not.

2    Q.    Did you ever have a conversation with an insurance

3    provider about how they underwrite applications?

4    A.    I did not.

5    Q.    Did you have conversations with insurance providers

6    about how they perceive STOLI applications or what things

7    they look for in terms of trying to identify STOLI

8    applications?

9    A.    I did not.

10    Q.    Is it fair to say that your understanding of an

11    insurance provider tries to screen out or identify STOLI

12    policies does not come from any insurance providers, is

13    that fair?

14    A.    That would be fair.

15    Q.    I notice that you also testified on direct regarding

16    the consequence of an insurance company believing that a

17    policy was a STOLI policy.  And correct me if I'm wrong, I

18    believe that you said there was a concern regarding

19    policies after two years.

20         Can you describe for me again what the two-year

21    period means?

22    A.    So there's a two-year contestability period for life

23    insurance where an insurer, if they discovery any

24    misrepresentations made on the application, they rescind

25    that policy.

1    Q.   So is it your understanding that if an insurance

2    company believed the policy was a STOLI policy, they would

3    not be able to challenge it after two years?

4    A.   You're asking my understanding?

5    Q.   Yes, your understanding, sir.

6    A.   My understanding is that if there was

7    misrepresentation within the two years, then they do

8    rescind the policy; after two years, if there was any

9    fraud that took place, that they could still challenge the

10   validity of that policy.  That's my understanding.

11   Q.   Am I correct that it was your testimony earlier that

12   there was some arrangement between the Charter Oak Trust

13   and an entity called Ridgewood, is that correct?

14   A.   That is correct.

15   Q.   And what was your understanding of that relationship?

16   A.   My understanding was that Ridgewood was providing the

17   funds to pay the premiums for the policies that were

18   originated in the Charter Oak Trust.

19   Q.   Did you have an understanding in terms of who they

20   were paying that funds to, or how they --

21   A.   I did not.

22   Q.   Do you have an understanding as to whether or not

23   Ridgewood was providing funding for any application that

24   Charter Oak Trust submitted to it?

25   A.   Can you repeat that?

1    Q.   Sure.

2         As far as your understanding, was Ridgewood selective

3    in which policies they were going to fund that sought to

4    be part of the Charter Oak Trust, or did they allow every

5    policy?

6    A.   They were selective, is my understanding.

7    Q.   Is it your understanding that Ridgewood had some kind

8    of underwriting process of their own in determining what

9    policies they intended to fund?

10   A.   It is my understanding, yes.

11   Q.   But is it fair to say that you have never spoken with

12   anyone at Ridgewood, beyond the emails we've seen, in

13   regards to what they -- their criteria for funding

14   policies?

15   A.   That would be correct.

16              MR. GUARNIERI:  If I may have just a moment,

17   Your Honor?

18              THE COURT:  Yes.

19                   (Pause)

20   BY MR. GUARNIERI:

21   Q.   Mr. Cherneski, you discussed at some length earlier

22   life expectancies, and am I correct that your description

23   of a life expectancy being a report that -- well, explain

24   to me what a life expectancy is, please.

25   A.   It's a report generated by a third party upon the

1    review of the medical records of a prospect client,

2    whatever you want to call it, that gives a calculation,

3    based on the reports that they read, of how long they

4    expect that a person is expected to live.

5    Q.   And is it your understanding that life expectancies

6    were forwarded to Ridgewood?

7    A.   It is.

8    Q.   So is it your understanding that the life expectancy

9    played some role in the funding decision?

10   A.   Yes, correct.

11   Q.   I'm going to refer you to Government's Exhibit 2152.

12   I'm sorry, I do not know what number that is in your

13   binder.

14   A.   I can see it.

15        MR. NOVICK:  It's tab 9.

16   BY MR. GUARNIERI:

17   Q.   Tab 9 in your binder, sir.

18        Now, you testified on direct that this was an email

19   from Guy Neumann, on which you are cc'd, is that correct?

20   A.   That is correct.

21   Q.   And did Guy Neumann cc you on this because he liked

22   to keep you informed about what he was doing?

23   A.   I guess that would be a fair statement.

24   Q.   And one of the attachments for this document, I

25   believe, is in fact a life expectancy chart, is that

1    correct?

2    A.   Yes.  Appears there are two.

3    Q.   Now, as far as you know, did Dan Carpenter order

4    these life expectancy reports be done?

5    A.   As far as I know, no, he did not.

6    Q.   And in terms of what you've testified to already, is

7    it your understanding that Ridgewood Finance needed to

8    have life expectancy reports so that they could make an

9    independent determination as to whether there was value in

10   the policy?

11   A.   That is my understanding, yes.

12   Q.   And is it your understanding that, to justify funding

13   or financing, a company would want to know if there was

14   intrinsic value in the policy that they're asked to

15   finance?

16   A.   Maybe I don't understand that.

17        Could you repeat that again, please, or rephrase it?

18   Q.   I'll withdraw that question.

19        Do you know --

20             MR. NOVICK:

21             MR. GUARNIERI:  Withdraw that as well, Your

22   Honor.

23   BY MR. GUARNIERI:

24   Q.   Now, you testified on direct, as well, regarding

25   certain funding illustrations, is that right?

1    A.    That is correct.

2    Q.    Now, am I correct that funding illustrations are

3    something that you can create on programs or software that

4    was provided to you by the insurance company, is that

5    right?

6    A.    That is correct.

7    Q.    And am I correct that the purpose of being able to

8    run these illustrations are to be able to show a potential

9    insured the types of coverage and the costs associated

10   with it that they could get theoretically?

11   A.    Theoretically, yes.

12   Q.    And do you think it would be fair to state that some

13   insureds would want to know what they could pay into the

14   policy and what they would not necessarily have to pay

15   into a policy to be able to keep it alive, is that true?

16   A.    Rephrase that.  I'm not sure I --

17   Q.    Sure.

18        In your experience, would somebody who is applying

19   for life insurance and given the ability to run these

20   illustrations benefit from knowing how much they need to

21   be put into their life insurance policy at a minimum to

22   keep it alive?

23   A.    In my experience it's typically never really -- you

24   never see those proposals being presented to an insured.

25   Q.    Is it fair to say that a savvy insured could ask you

1    to run an illustration to let them know how much they

2    would need to put in to keep it in force but not more, is

3    that fair?

4             MR. NOVICK:  Objection, Your Honor.  It's both

5    speculative and irrelevant given the answer the witness

6    just gave.

7             MR. GUARNIERI:  Your Honor, I think it's a

8    different question than was previously asked, and I'm

9    asking for his experience.

10            THE COURT:  What is the point you're trying to

11   make?

12            MR. GUARNIERI:  The point I'm trying to make,

13   Your Honor, is that there's more than one reason that --

14   as the government presented, reasoning why minimum funded

15   life insurance illustrations were run, but there are

16   alternative reasons why minimum-funding illustrations are

17   run.

18            THE COURT:  Do you want to ask him that?

19            MR. GUARNIERI:  Yes, Your Honor.

20   BY MR. GUARNIERI:

21   Q.   Mr. Cherneski, are there alternative reasons, besides

22   valuing policies, why minimum-funding life illustrations

23   would be run by an agent?

24   A.   Sure, yes.

25   Q.   And would among those reasons be that it was

1    requested by an applicant?

2    A.    That could occur, yes.

3    Q.    Now, insofar as your understanding of the arrangement

4    with Ridgewood Finance, did you understand Ridgewood

5    Finance to be charging interest on their financing?

6    A.    I was not aware.

7    Q.    So you have no knowledge in terms of whatever

8    interest they would have or would not have charged, is

9    that right?

10   A.    That is correct.

11   Q.    Now, there's been significant testimony given by

12   yourself regarding the Charter Oak Trust.

13        So is it fair to say that you were not involved in

14   any way in the formation of the Charter Oak Trust?

15   A.    That would be fair to say, yes.

16   Q.    Is it fair to say that you were not involved in any

17   discussions predating the Charter Oak Trust about the

18   purpose of the Charter Oak Trust?

19   A.    That would be fair to say, yes.

20   Q.    And relatedly, would it be fair to say that you did

21   not know who was involved in the process and who was not

22   involved in the process of developing the Charter Oak

23   Trust?

24   A.    That would be fair to say.

25   Q.    Am I correct that it was your testimony that it's

1    your belief that the purpose of the Charter Oak Trust was

2    to avoid insurance company rules regarding life settlement

3    transactions, is that right?

4    A.   Sorry.  Can you repeat that?

5    Q.   Am I correct that it was your testimony that the

6    purpose of the Charter Oak Trust was to avoid insurance

7    company rules regarding life settlement transactions?

8    A.   Yes, that sounds like what I said.

9    Q.   Now, what specific functions did you play with

10   regards to the Charter Oak Trust?

11   A.   Specific functions, I served as kind of general

12   support.  As you see, I was cc'd on a number of emails for

13   that regarding life expectancies and illustrations.  In

14   some instances I was asked to run illustrations.  I was

15   party to a number of discussions regarding concerns that

16   arose regarding Charter Oak Trust.

17   Q.   Now, is it your understanding as well that

18   Mr. Carpenter -- insofar as your understanding of what the

19   Charter Oak -- what he desired for the Charter Oak

20   Trust -- was looking for high wealth individuals?

21   A.   Repeat that.  Sorry.

22   Q.   Is it your understanding that Mr. Carpenter was

23   looking for high net-worth individuals to be involved in

24   the Charter Oak Trust?

25   A.   It's my understanding, correct, yes.

1    Q.   So it's fair to say that, your understanding,

2    Mr. Carpenter was not involved in poor people being

3    involved in the Charter Oak Trust, is that right?

4    A.   I'm not really sure I'm getting what you're trying to

5    ask me.

6    Q.   Insofar as your understanding, did Mr. Carpenter ever

7    indicate to you that he was looking for poor people living

8    in shanties in California to be involved in the Charter

9    Oak Trust?

10   A.   That would be no.

11   Q.   Did he ever indicate to you that he was looking for

12   people living in mobile trailer parks in Arizona to be

13   involved in the Charter Oak Trust?

14   A.   No, he did not.

15   Q.   You're familiar, from your testimony on direct as

16   well, with the A, B and C documents, is that right?

17   A.   I'm aware of those documents, yes.

18   Q.   And it's your understanding of those documents, and

19   correct me if I'm wrong, that those are the documents that

20   needed to be put in place if an individual sought to be

21   placed in the Charter Oak Trust, is that right?

22   A.   That's my understanding, correct.

23   Q.   Have you reviewed those documents during your time at

24   Benistar?

25   A.   Not in depth, no.

1    Q.   Are you aware that nowhere in those documents is

2    there any reference to whether Daniel Carpenter can sell

3    policies in the Charter Oak Trust?

4    A.   I stated I didn't review them in depth, so I'm not --

5    I can't answer yes or no to your question.

6    Q.   Do you have an understanding of what an insured's

7    options were regarding their policy in the Charter Oak

8    Trust?

9    A.   I do.

10                MR. GUARNIERI:  Moment, please, Your Honor?

11                (Pause)

12   BY MR. GUARNIERI:

13   Q.   Mr. Cherneski, is it your understanding that an

14   individual had the opportunity at some point, whether it

15   be two years down the line, to purchase their policy out

16   of the Charter Oak Trust?

17   A.   It is my understanding, yes, they did have that

18   option.

19   Q.   Is it your understanding that the individual would

20   have had the opportunity to continue paying the premiums

21   to keep alive a policy or to keep in force a policy that

22   was in the Charter Oak Trust?

23   A.   While it was in the trust or outside of the trust?

24   Q.   Is it your understand --

25                MR. GUARNIERI:  I'll withdraw that question,

1    Your Honor.

2    BY MR. GUARNIERI

3    Q.   -- that an individual could have kept their policy

4    that was in the Charter Oak Trust in force by taking over

5    the payment of the premiums?

6    A.   Yes.

7    Q.   Now, is it your understanding that an individual's

8    employer could continue to pay premiums and keep a policy

9    that was in the Charter Oak Trust in force?

10   A.   Yes.

11   Q.   Is it your understanding that the Charter Oak Trust

12   was, in fact, the owner of the policies that were within

13   the Charter Oak Trust?

14   A.   It is my understanding, yes.

15   Q.   Is it correct, Mr. Cherneski, that the decision

16   whether to buy a policy or continue paying premiums to

17   keep a policy in force that an insured could make, could

18   be made one or more years into the policy being in force?

19   A.   Could you rephrase that?

20   Q.   Sure.

21        Is it your understanding that an individual, if

22   they're going to buy their policy, pay premiums to keep it

23   in force, could make that decision one or more years after

24   the issuance of the policy?

25   A.   I believe they could, yep.

1    Q.    And as far as you were aware, there's no provisions

2    in the documents, the enrollment documents with the

3    Charter Oak Trust, that requires an insured to sell their

4    policy, is there?

5    A.    Not that I'm aware of.

6    Q.    Have you ever seen a document, in the course of your

7    time at Benistar or in Simsbury, that requires an insured

8    in the Charter Oak Trust to sell their policy at any point

9    in time?

10   A.    I have not.

11   Q.    Now, I note from your direct examination that you

12   spoke about commissions.  You referenced an entity called

13   TPG Group.

14        What is that?

15   A.    It was an entity that received commissions that were

16   paid from the sale of life insurance contracts.

17   Q.    Do you know who owns TPG Group?

18   A.    I do not.

19   Q.    Do you have any idea of where the funds that come

20   into TPG Group go to?

21   A.    I do not.

22   Q.    And as far as your understanding of commissions, do

23   insurance companies allow agents to split commissions on

24   policies?

25   A.    They do.

1    Q.    And regarding the Charter Oak Trust again, there was

2    some discussion on direct examination regarding premium

3    payments.

4         Am I correct that your testimony is that there was a

5    group of individuals that were involved in decision-making

6    for what premiums would get paid on policies in the

7    Charter Oak Trust?

8    A.    Can you rephrase that?

9    Q.    Sure.

10        Is it your understanding that -- well, policies that

11   were within the Charter Oak Trust required premium

12   payments to the providers to be kept in force, correct?

13   A.    Correct.

14   Q.    And was it not your testimony on direct that there

15   was a group of people involved in the decision for how

16   much to pay on premiums in the Charter Oak Trust to the

17   providers?

18   A.    So there were people involved in discussions, yes.

19   Q.    Were you one of the people that was involved in the

20   discussions about how much premiums to pay to providers on

21   Charter Oak Trust policies?

22   A.    Was I involved in the discussions?

23   Q.    Correct.

24   A.    Like in the email chains?

25   Q.    Were you involved in any discussions with any

1   individuals in Simsbury about how much premiums to be paid

2   to insurance companies for Charter Oak Trust policies?

3   A.   So was I cc'd on emails, or did I have a direct

4   discussion on how much we should pay?

5   Q.   Did you have any direct discussions in that regard.

6   A.   I did not.

7   Q.   Emails you were cc'd on, did you have any active

8   input on how much premium payments were to be?

9   A.   I believe there was one email, chain of emails I

10  looked at, where I did offer my suggestion on how much

11  should be paid.

12  Q.   Were you involved in any sense in the wiring of funds

13  for the payments of premiums?

14  A.   I was not.

15  Q.   And your understanding of the Charter Oak Trust, if

16  an insured in the trust decided to purchase their policy,

17  they would have had to pay, in addition to fees, the costs

18  of the premiums that were paid into the policy, is that

19  right?

20  A.   That is correct.

21  Q.   So is it fair to say, as well, that the more premium

22  that's paid into a policy, the higher the cost is going to

23  be to an insured if they wish to buy out of their policy,

24  is that correct?

25  A.   That would be correct.

1   Q.   Now, considering the significant testimony about how

2   the Charter Oak Trust works, is it fair to say that your

3   understanding of the Charter Oak Trust and how it works

4   comes from the many discussions you were involved in at

5   100 Grist Mill Road?

6   A.   That would be fair, yes.

7   Q.   How much discussions do you think you were involved

8   in regarding the operation of the Charter Oak Trust and

9   how it worked?

10  A.   I don't even know if I could put a number on that.

11  Q.   Do you remember when any of these conversations

12  occurred?

13  A.   When you say "when," specific dates?

14  Q.   Dates.

15  A.   I do not.

16  Q.   Do you recall where; were they always in the

17  conference room?

18  A.   They took place all over the office.

19  Q.   Do you remember any specific details from any of the

20  discussions you had about how the Charter Oak Trust works?

21  A.   Not specific, no.

22  Q.   Now, we mentioned at the very beginning that you,

23  back in 2013, had a conversation with the government about

24  your knowledge about the entities at 100 Grist Mill Road,

25  right?

1    A.    That is correct.

2    Q.    And the U.S. Attorney's Office was represented there,

3    and the Department of Labor, I believe, is that right?

4    A.    That's correct.

5    Q.    And in 2013, you mentioned that you would have a

6    better recollection in terms of your being at 100 Grist

7    Mill Road than you would today, is that fair?

8    A.    I probably remembered more than I do today, yes.

9    Q.    Do you recall having indicated at that time that you

10   had no single meeting with anyone to discuss how the

11   Charter Oak Trust worked?

12   A.    I don't recall that.

13            MR. NOVICK:  Your Honor, I'm just going to

14   object to, if this is how we're going to do impeachment,

15   when the witness testifies he doesn't remember, I don't

16   think it's proper to try to impeach him with a document.

17   You can ask him if a document will refresh his

18   recollection.  I don't think he can ask a question as if

19   to try to prove up a prior inconsistent statement.

20            MR. GUARNIERI:  I don't believe the witness

21   indicated he didn't know.  I believe he said -- we had

22   several questions that went into detail about the

23   conversations he had, and how all of his knowledge come

24   from conversations he had at Charter Oak Trust, and I

25   think it's appropriate under the circumstances to note

1    what his statement said some years ago.

2            THE COURT:  You may proceed.

3            MR. GUARNIERI:  Thank you, Your Honor.

4    BY MR. GUARNIERI:

5    Q.   Now, Mr. Cherneski, do you have an understanding of

6    the process of how an insurance company underwrites an

7    application when it's received by them?

8    A.   I do.

9    Q.   And based on your understanding of that process, do

10   they seek to verify the information contained in the

11   application?

12   A.   They do.

13   Q.   As far as you know, is the ordinary course for an

14   insurance company investigating an application to do a

15   credit report on the individual applicant?

16   A.   I am unsure of that.

17   Q.   Do you know what the Medical Information Bureau is?

18   A.   I do.

19   Q.   What is that?

20   A.   It's a database that the life insurers subscribe to

21   where, different cases that they take a look at, they will

22   post different bits of information to that Medical

23   Information Bureau that's going to be available to all

24   participating insurers.

25   Q.   Have you ever seen a Medical Information Bureau

1    report?

2    A.    I have not.

3    Q.    Is it your understanding that an insurer that

4    receives an application would, in fact, in the normal

5    course receive a Medical Information Bureau report on the

6    applicant?

7    A.    It's my understanding, yes.

8    Q.    And is it your understanding --

9              MR. GUARNIERI:  I'm going to withdraw that, Your

10   Honor.

11             THE COURT:  Would this be a convenient time to

12   break for lunch?

13             MR. GUARNIERI:  Yes, Your Honor.

14             THE COURT:  Okay.

15                 (Whereupon, a recess followed)

16             MR. GUARNIERI:  May I proceed, Your Honor?

17             THE COURT:  Yes.

18             MR. GUARNIERI:  Thank you.

19   BY MR. GUARNIERI:

20   Q.   Mr. Cherneski, I believe that, before the lunch

21   break, one of the topics we were discussing were the

22   different entities that were in Simsbury.

23        And am I correct that it's your understanding that

24   the Benefit Plan Advisers, or BPA, the president of that

25   company was Guy Neumann?

1    A.   That is my understanding, yes.

2    Q.   Is it your understanding as well that Guy Neumann was

3    the president of Rex's?

4    A.   That is correct.

5    Q.   Now, is it your understanding, or did you have an

6    understanding that TPG Group was owned by BASI?

7    A.   I was not aware of that.

8    Q.   And I'm not sure if it has come up before, but do you

9    have an understanding of what BASI is, or the meaning of

10   that is?

11   A.   Benistar Admin Services, Incorporated.

12   Q.   And do you have an understanding of how BASI is

13   owned?

14   A.   Best of my recollection, an employee stock-ownership

15   plan.

16   Q.   Is the acronym for that ESOP?

17   A.   That is correct.

18   Q.   And were, in fact, checks that you received in the

19   course of your employment from BASI?

20   A.   They were.

21   Q.   Moreover, when you separated from employment in 2010,

22   am I correct that you received a check from BASI?

23   A.   That is correct.

24   Q.   Am I correct as well that your check from BASI, as

25   well as all the checks you received from the course of

1  your employment, were not signed by Daniel Carpenter?

2  A.   I don't recall.

3  Q.   Do you recall who your checks were signed by each

4  week?

5  A.   I do not.

6  Q.   You did receive a check every week?

7  A.   Yeah, I did.

8  Q.   I'm going to refer you to a couple more documents

9  that we've been discussing over the last -- earlier, if I

10  may.

11       With regard to Government's Exhibit 2097 -- I'm

12  sorry, I don't know what number tab it is in your binder.

13  A.   Tab 13.

14  Q.   Did Jenny Valedaserra work at 100 Grist Mill Road

15  before you?

16  A.   Before me?

17  Q.   Before you.

18  A.   Before me?

19  Q.   Before you in time.

20  A.   Yes.

21  Q.   Was she still working there after you separated

22  in 2010?

23  A.   She was not.

24  Q.   Do you know how long -- or when she was hired?

25  A.   I do not.

1   Q.   Do you know if Jenny Valedaserra had the email

2   address for Daniel Carpenter?

3   A.   I assume she did.

4   Q.   Do you know if, in the course of her employment, she

5   had to have contact with Daniel Carpenter, whether it be

6   via email or whether she spoke with him?

7   A.   Can you rephrase that again, please?

8        I'm not sure I understand what you're asking me.

9   Q.   Do you know if Jenny Valedaserra had contact --

10  email, spoke to -- Daniel Carpenter while she was employed

11  at Grist Mill Road?

12  A.   Yes.

13  Q.   Am I correct that this email, Government's

14  Exhibit 2092, from February of 2008, Jenny has questions

15  with regards to how to answer certain questions on life

16  insurance applications, is that accurate?

17  A.   That is correct.

18  Q.   Is it also accurate that she is not emailing Daniel

19  Carpenter to ask him those questions?

20  A.   That is correct.

21  Q.   She's relying on you to answer those questions for

22  her?

23  A.   That's what it looks like.

24  Q.   And then with regards to Exhibit 2098, which I

25  believe is your tab 14, the same day, minutes later, you

1    did answer her question, is that right?

2    A.    That is correct.

3    Q.    And you informed her how she was supposed to answer

4    those questions on the application, right?

5    A.    Correct.

6    Q.    And you're not indicating that you spoke with Daniel

7    Carpenter, and this is what he's telling you to do.

8          That's not what this email says, is it?

9    A.    That is correct.

10   Q.    Referring to Government's Exhibit 2051, am I correct

11   that this series of emails that you spoke about regarding

12   Benjamin Richman is not, in fact, regarding Charter Oak

13   Trust?

14   A.    That is correct.

15   Q.    This is in relation to a different trust called Avon

16   Insurance Trust, is that right?

17   A.    It is.

18   Q.    Do you have any knowledge as to whether or not Buddy

19   Richman was involved in referring any cases to the Charter

20   Oak Trust?

21   A.    I do not.

22   Q.    I'm going to refer you to Government's Exhibit 2117.

23         Am I correct that your testimony with regard to this

24   exhibit was that Mr. Carpenter was indicating that -- or

25   suggesting that $175,000 be put into a certain -- that

1    would be paid towards a certain insurance policy, is that

2    right?

3    A.    That is correct.

4    Q.    And then this exhibit was in connection, as well, to

5    Government's Exhibit 2213.

6          Is that your understanding?

7               MR. NOVICK:  I'm sorry, Your Honor, I don't know

8    if I want to object, but I'm not sure which two emails --

9    we are saying which one was in connection to which one?

10              MR. GUARNIERI:  If I could just have a moment,

11   Your Honor, to clarify?

12                  (Pause)

13   BY MR. GUARNIERI:

14   Q.    I withdraw that question.

15         And in reference to Government's Exhibit 2212, which

16   I believe you'll see on the screen in front of you --

17   A.    I've got it.

18   Q.    -- I believe your testimony in this regard was that

19   these emails relate to a discussion about the premiums to

20   be paid on a certain Charter Oak Trust policy, is that

21   accurate?

22   A.    That's what it appears to be, yes.

23   Q.    And this email relates as well to Government's

24   Exhibit 2213, is that accurate?

25   A.    It does, yeah.

1    Q.   Am I correct, Mr. Cherneski, that part of the issue

2    that Mr. Westcott is rasing is his belief that

3    Mr. Carpenter wants to pay more than the minimum required

4    to keep the certain policy, the Deckard policy in force,

5    is that accurate?

6    A.   You're asking me what Charlie meant in this email?

7    Q.   Is that your understanding of this email?

8    A.   Can you repeat that?

9    Q.   Is it your understanding that one of the points that

10   Mr. Westcott is making is that Dan Carpenter's

11   recommendation for how much to pay into the policy premium

12   is more than the minimum required to keep the policy in

13   force?

14   A.   I'm trying to -- I apologize, I'm trying to follow

15   you on these emails for which I should be looking to see

16   where Charlie's kind of correcting Dan what he's supposed

17   to be paying.

18   Q.   Let me withdraw the question and rephrase it this

19   way --

20   A.   Sure.

21   Q.   Is the concern that Mr. Westcott is raising in this

22   email is that more than the minimum is potentially to be

23   paid on the Deckard policy?

24   A.   I apologize, you lost me.

25   Q.   Well, let me direct you to the portion that says, "So

1   instead."

2   A.   All right.

3   Q.   With regards to that portion of this email, is your

4   understanding of this email, at least in some part, that

5   Mr. Westcott's concerned that there's more being paid into

6   this policy than the minimum necessary to fund it?

7   A.   From reading that email, that's the way I understand

8   that, correct.

9   Q.   I'm going to direct you now to Government's

10  Exhibit 2055.

11       Am I correct that it was your testimony that, with

12  regards to this exhibit, that you sent an email to Guy

13  Neumann based on a question posed to you by Charlie

14  Westcott?

15  A.   That's correct.

16  Q.   And the question specifically has to do with life

17  settlement valuations, is that right?

18  A.   That is right.

19  Q.   Do you have any understanding as to why --

20            MR. GUARNIERI:   Well, withdraw that, Your Honor.

21  BY MR. GUARNIERI:

22  Q.   Now, is it fair to say that Mr. Westcott, having not

23  sent the email directly, was not telling you to email Dan

24  Carpenter to ask questions about life settlements?

25  A.   I don't recall the conversation with Charlie.

1    Q.   Well, it's fair to state that, based on your

2    conversation with Charlie and the fact that a life

3    settlement issue was raised, the person you thought best

4    suited to answer it for you was Guy Neumann, is that

5    accurate?

6    A.   Once again, I don't recall the conversation with

7    Charlie.

8    Q.   Directing you to Government's Exhibit 2129, which is

9    tab 23 for you, sir, this is, correct me if I'm wrong,

10   another email at the top that you are sending to Buddy

11   Richman, is that correct?

12   A.   Yep, correct.

13   Q.   And part of the point of this email is to

14   theoretically induce Buddy Richman to place policies in

15   the Charter Oak Trust, is that right?

16   A.   It appears I'm sending him an email regarding an

17   update on where the business is.

18   Q.   And you're indicating that an insured has to have a

19   business to participate in the Charter Oak Trust, right?

20   A.   That is correct.

21   Q.   And you're not indicating in this email that it is --

22   that they can have a non-existing business or a fake

23   business, right, you're not telling him that?

24   A.   That is correct.

25   Q.   You're telling him that every person that

1    participates in the Charter Oak Trust has to have a

2    business?

3    A.    That is correct.

4    Q.    And in reference to Government's Exhibit 2208, you

5    indicated that, in this email, Guy Neumann is indicating

6    to Charlie that every American has a right to form an LLC

7    for many different purposes, right?

8    A.    So what's the question?

9    Q.    That's what this email is saying, right?

10   A.    That's what the email says, yes.

11   Q.    Do you disagree with that?

12   A.    Do I disagree with that?  I do not disagree with that

13   statement.

14   Q.    Do you have -- I believe this was -- well, this was

15   addressed on direct examination, but do you know when Sash

16   Spencer passed away?

17   A.    I do not.

18   Q.    And am I correct that it was your direct testimony

19   that you don't know what occurred during the investigative

20   process, and what documents were sent to who, and whether

21   at that time Lincoln received Charter Oak Trust documents?

22   A.    That is correct.

23   Q.    Now, in relation to -- well, you also testified that

24   you were involved in a phone call between some individual

25   at Lincoln Financial Group and individuals at 100 Grist

1   Mill Road, correct?

2   A.   That is correct.

3   Q.   Is it also fair to say, based on your previous

4   testimony, that you don't recall any specific information

5   that occurred during that phone call?

6   A.   Don't specifically remember what was exactly said

7   during that conversation, no.

8   Q.   By extension, you would have no idea who said what

9   during that phone call either, is that accurate?

10   A.   That would be accurate.

11   Q.   Now, with regard to Government's Exhibit 2217, given

12   that you don't recall what transpired during the phone

13   call with Lincoln, is it your understanding that this

14   message is indicating that Lincoln conducted whatever

15   examination or investigation it was conducting at that

16   time, and agreed to continue engaging in business with the

17   Charter Oak Trust?

18   A.   Can you repeat that?  Sorry.

19   Q.   Given what -- you testified a moment ago that you

20   don't recall any of the specific information regarding the

21   phone call with Lincoln group, right?

22   A.   Correct.

23   Q.   You testified you don't remember who was there and

24   who was not there, to some extent.

25   A.   I remembered who was there.  I don't remember

1    specifically what was said.

2    Q.   So taking that into account, is it your understanding

3    of this email that Lincoln Financial Group conducted some

4    investigation and then, based on this phone call, decided

5    to continue engaging in business with the Charter Oak

6    Trust?

7    A.   From reading this email, that appears to be the case,

8    yes.

9    Q.   Was it part of your job function to type letters for

10   Daniel Carpenter?

11   A.   Occasionally.

12   Q.   How often would you say that that was your job

13   function?

14   A.   How often?  It depended on who was around when Dan

15   needed assistance.  So how often did I do that in the

16   course of a day, a week, a month?  How would you like me

17   to quantify it?

18   Q.   Let me ask you this:  How many assistants did Dan

19   Carpenter have, administrative assistants particularly for

20   Dan Carpenter?

21   A.   Specific assistants relating to him, he probably had

22   one.

23   Q.   Who was that?

24   A.   Amanda Rossi.

25   Q.   Do you know Joe Castagno?

1    A.    I do.

2    Q.    What was his job function at Benistar?

3    A.    I guess you could say he was also an assistant to Dan

4    as well, too.

5    Q.    Would you say that it largely fell on Mr. Carpenter's

6    assistants to write letters --

7    A.    Typically, yes.

8    Q.    -- that he hand wrote?

9          Now, referring you to Government's Exhibit 2243,

10   which is tab 27 in your binder, do you have that in front

11   of you, sir?

12   A.    I do.

13   Q.    The attachment related to this email, you discussed

14   on direct examination, includes certain statements as to

15   why a 419 plan is a benefit to an employer, is that right?

16   A.    That is correct.

17   Q.    That was on page -- excuse me -- page 4 of this

18   exhibit, I believe, starting at the bottom.

19   A.    Yes.

20   Q.    You see those, sir?

21   A.    Yes, I do.

22   Q.    The third bullet point down says:  "No taxation to

23   the employee."

24         Was that correct with regard to your understanding of

25   welfare benefit plans under 419?

1    A.    That is correct.

2    Q.    How about the fourth bullet point that is completely

3    selective, the benefits under a 419 plan, is that correct

4    in your opinion?

5    A.    For the way our plans were designed, that was correct

6    according to my understanding.

7    Q.    Funds inside the insurance policy accumulated on a

8    tax advantage status, is that correct?

9    A.    That is correct.

10   Q.    Funds can be paid out for living benefits, do you

11   disagree with that?

12   A.    I do not.

13   Q.    Do you disagree that all funds are secured from the

14   hands of creditors?

15   A.    I do not disagree.

16   Q.    That there's no estate tax on death proceeds payable?

17   A.    I do not disagree on that.

18   Q.    No gift tax on contributions, do you disagree with

19   that?

20   A.    I do not.

21   Q.    Is there any limit, as far as you know, on the size

22   of contributions that an employer can make to a welfare

23   benefit trust?

24   A.    Not that I'm aware of.

25   Q.    And company dollars are typically used in a welfare

1    benefit trust?

2    A.    I do not disagree with that typically.

3    Q.    Is there any statement that's made in here regarding

4    whether an employer can borrow money to facilitate funding

5    a welfare benefit plan; is that mentioned in this document

6    at all, sir?

7    A.    I do not see that.

8    Q.    Is it correct that based on -- well, after the

9    drafting of that document, I'm referring you to

10   Government's Exhibit 2246, that there was a need for a

11   letter from outside counsel regarding a tax issue for the

12   Charter Oak Trust, is that correct?

13   A.    That is correct.

14   Q.    And in fact, sir, is it your understanding that an

15   outside counsel was obtained and did offer an opinion

16   insofar as the tax issues for the Charter Oak Trust?

17   A.    It is my understanding that it did occur, yes.

18   Q.    And in fact, you saw that opinion letter earlier, is

19   that right, under Government's Exhibit 2258, tab 30?

20   A.    Correct, yes.

21   Q.    And is it fair to say, from your understanding or

22   having reviewed this letter, that there's nothing saying

23   that Charter Oak Trust wasn't a valid trust in this

24   letter?

25        It doesn't say that anywhere, does it, sir?

1    A.   I do not see that, no.

2    Q.   Doesn't say that it fails to comply with the IRS Code

3    regarding 419 plan, is that correct, sir?

4    A.   That is correct.

5    Q.   Is it your understanding that that letter alleviated

6    Lincoln's concerns in that regard for the Charter Oak

7    Trust?

8    A.   It alleviated their tax concerns regarding the

9    Charter Oak Trust.

10   Q.   Is it your understanding, at that time they weren't

11   raising other concerns of the Charter Oak Trust after the

12   phone call, they wanted this letter, Is that accurate?

13   A.   To the best of my recollection, yes, that is

14   accurate.

15   Q.   Are there a lot of companies to your knowledge, in

16   2006 to 2009, doing 419 employee benefit welfare plans in

17   the country?

18   A.   There were none.

19   Q.   So 419 plans in the insured's field are a relatively

20   rare policy type, is that accurate?

21   A.   For the insurance company to participate, is that it?

22   Q.   I'll withdraw that question and say:

23        From what you were saying, there are no other

24   providers that are offering welfare benefit trusts at this

25   point, as far as you know?

1    A.   What do you mean, "no other providers"?

2    Q.   No other trust companies set up to have -- to be a

3    419 plan that you're aware of during this timeframe, was

4    that not your testimony a minute ago?

5    A.   I don't believe so.  Maybe you're confusing me a

6    little bit.

7    Q.   Let me ask you:  How many providers are you aware of

8    during this relevant period that also had a welfare

9    benefit program under IRS 419?

10   A.   There was -- I believe there was one or two, but I

11   can't recall their names.

12   Q.   So is it fair to say that there were not a lot of

13   programs available for welfare benefit trusts, in your

14   knowledge, during this timeframe?

15   A.   That would be fair to say, yes.

16   Q.   Who is Jack Robinson?

17   A.   Jack Robinson is the general counsel for Benistar.

18   Q.   To your understanding, would part of Jack Robinson's

19   job be to protect the interests of the trusts run out of

20   Benistar?

21   A.   I had no idea what Jack did.

22   Q.   To your knowledge, was there ever a concern about

23   other 419 plans being developed to compete with the

24   entities at Benistar?

25   A.   I don't recall that.

1    Q.   I'm going to direct you, sir, to Government's

2    Exhibit 2274.

3    A.   Do you know what tab that is?

4         Oh, I found it.

5    Q.   That's tab 32 for you, sir.

6    A.   Yep.

7    Q.   I note in this email, this email was sent March 3,

8    2010, at the top, is that correct?

9    A.   That is correct.

10   Q.   Now, Mr. Carpenter is not in this email, right?

11   A.   That is correct.

12   Q.   Mr. Carpenter did not receive this email.

13        You don't have any information that he would have

14   received this email, right?

15   A.   I do not.

16   Q.   Do you know or have any information as to whether the

17   Charter Oak Trust was still conducting any business

18   after 2009?

19   A.   I am not aware.

20   Q.   Is it your understanding that, as this email

21   indicates, every insured was sent a letter asking them if

22   they wanted --

23   A.   I'm aware?

24   Q.   Sorry -- asking them if they wanted to buy policies?

25   A.   So maybe repeat that, please, or rephrase it.

1    Q.    Is it your understanding that every insured was sent

2    a letter asking them if they wanted to buy their policies?

3    A.    I'm not aware of whether or not every insured

4    received a letter.

5    Q.    But as you testified earlier, you understood that

6    every insured had that option.

7    A.    I understood that, correct, yes.

8    Q.    Next, sir, I'm going to ask you to take a look at

9    Government's Exhibit 2210, under tab 37.

10        To your knowledge, was Allen Tucker a Charter Oak

11   Trust insured?

12   A.    From going through these documents, yes, it appears

13   that he was.

14   Q.    And you're premising your belief on that based on

15   having seen these documents?

16   A.    That is correct.

17   Q.    Do you have any information as to whether a life

18   settlement transaction actually was conducted on Allen

19   Tucker's policy?

20   A.    I have no knowledge one way or the other.

21   Q.    Do you have any knowledge as to who filled out this

22   life settlement application?

23   A.    I do not.

24   Q.    It do you have any knowledge as to whether Wayne

25   Bursey ever signed this application?

1    A.    I do not.

2    Q.    I note on the first page, "Duplicate for USB."

3          What is USB?

4    A.    That would be U.S. Benefits.

5    Q.    What is that?

6    A.    Another entity located at 100 Grist Mill Road.

7    Q.    Is U.S. Benefits completely separate from the Charter

8    Oak Trust, different entity?

9    A.    It is a different entity, yes.

10   Q.    Just a final -- discuss the final exhibit that the

11   government put in, I would refer to you tab 38,

12   Government's Exhibit 2232.

13         With regards to this document, you said on direct

14   that you had had an opportunity to review this during your

15   time at Grist Mill Road, is that correct?

16   A.    That is correct.

17   Q.    How recently before the passing of Mr. Spencer did

18   you review this document?

19   A.    Once again, I'm unsure of when he passed away.

20   Q.    Is there any reason in your ordinary course of

21   business at Benistar that you would have needed to review

22   old documents related to previous -- people who had active

23   policies in the Charter Oak Trust?

24   A.    There would not have been, no.

25              MR. GUARNIERI:  Just a moment, please, Your

1    Honor.

2              (Pause)

3    BY MR. GUARNIERI:

4    Q.   Now, Mr. Cherneski, having reviewed this document, is

5    it your understanding that an insurance trustee was

6    required to -- needed to approve any transfers of the

7    trusts -- of the -- excuse me -- of the insurance policy?

8    A.   I'm not an attorney, so I do not understand

9    necessarily that language inside of the trust.

10   Q.   But did you read the trust document at some point?

11   A.   I've looked through this trust document, yes.

12   Q.   And during the course of having looked through it,

13   you've seen references to the consent of the insurance

14   trustee necessary to make changes to the documents or to

15   change the ownerships of policies, is that right?

16   A.   Without relooking through it right now, I don't think

17   I can answer that question.

18        I don't recall that section, if that's what you're

19   asking.

20   Q.   Do you know who the insurance trustee was for Charter

21   Oak Trust?

22   A.   I do not recall.

23   Q.   Is it correct that you testified on direct

24   examination that you have -- you were not involved in the

25   application process for Sash Spencer, is that true?

1  A.    That is correct.

2  Q.    You were not involved in any kind of negotiation of

3  the documents or discussion of the Charter Oak Trust

4  documents with Sash Spencer, is that accurate?

5  A.    That is accurate.

6  Q.    You have no knowledge whether Sash Spencer negotiated

7  changes in his documents versus other insureds in the

8  Charter Oak Trust, is that right?

9  A.    That is correct.

10  Q.    Mr. Cherneski, on direct examination you mentioned

11  that Mr. Carpenter had indicated to you and to others that

12  the financing arrangement with the Charter Oak Trust is

13  not premium financed, is that correct?

14  A.    That is correct.

15  Q.    Do you recall what reasoning he gave you for that?

16  A.    He would come up with two suggestions.

17       Number one, he would say that it was premium funding

18  or some type of a split-dollar arrangement.

19  Q.    Did he ever explain to you what he meant by "premium

20  funding"?

21  A.    He did not.

22  Q.    Is it fair to say that Mr. Carpenter has been in the

23  insurance industry for a lot longer than you have, either

24  now or when you were working at Benistar?

25  A.    That would be fair.

1    Q.   You understand that Mr. Carpenter's background is in

2    the law, in tax law, is that right?

3    A.   That is correct.

4    Q.   Was Mr. Carpenter consistent in regards to telling

5    you this was premium funding and a split-dollar

6    arrangement?

7    A.   Yes, he was.

8    Q.   Did he say that to you repeatedly, and others that

9    were in these group discussions?

10   A.   I would say yes.

11   Q.   Mr. Cherneski, isn't it a fact that he never said to

12   you, "We have to make this thing up called 'premium

13   funding'"?

14   A.   To me, no, that is correct.

15   Q.   And you had some conversations with him, just between

16   the two of you, between premium funding and split-dollar

17   arrangements?

18   A.   Directly between the two, I can't recall, but in

19   group discussions.

20   Q.   Group discussions that only involved people at the

21   100 Grist Mill Road location?

22   A.   Correct.

23   Q.   And during those conversations, he never said to you

24   and to others that:  This is the lie we're going to tell

25   regarding how the premiums were going to be financed.

1    He never said that, right?

2    A.    He did not specifically say that, no.

3    Q.    Did he ever explain to you what split-dollar

4    arrangement he meant?

5    A.    He did.

6    Q.    What did he mean by a split-dollar arrangement?

7    A.    What he was trying to explain it off as, is a

8    cautionary agreement between an employer and an employee

9    in regards to the ownership of a life insurance policy.

10    Q.    And was he always consistent in that explanation of

11    how this was not a premium finance operation?

12    A.    He used the fact that it could be construed as a

13    split-dollar agreement for -- as a reason to answer no on

14    the applications.

15    Q.    And he was always consistent, is what I'm asking you,

16    with regards to the fact that it was not premium financed

17    because it was a split-dollar arrangement, isn't that

18    true?

19    A.    He was consistent in that, yes.

20    Q.    And in fact, in your experience at 100 Grist Mill

21    Road, am I correct that you never saw Dan Carpenter fill

22    out an application for an insurance policy?

23    A.    That would be correct.

24    Q.    Am I correct that you never saw him review an

25    application for an insurance policy that was sought to be

1   issued?

2   A.   I did not see him review one, no.

3   Q.   You never saw him meet with an insured or somebody

4   who was seeking insurance?

5   A.   I did not see him do that, no.

6   Q.   To your knowledge, you never saw Dan Carpenter run a

7   life expectancy report?

8   A.   I did not.

9          MR. GUARNIERI:  Moment, please, Your Honor.

10         THE COURT:  Sure.

11              (Pause)

12  BY MR. GUARNIERI:

13  Q.   Mr. Cherneski, is it, in fact, true that you have no

14  personal knowledge of any insurance policy in the Charter

15  Oak Trust having been sold at any time?

16  A.   That is true.

17         MR. GUARNIERI:  Nothing further, Your Honor.

18         THE COURT:  Thank you.

19

20                  REDIRECT EXAMINATION

21  BY MR. NOVICK:

22  Q.   Mr. Cherneski, just a couple of things.

23       You talked recently about this phone call with

24  Lincoln.  You had testified on direct about who was in the

25  room, and I won't have you rehash that.

1    But I believe you said on cross-examination, or there

2    was maybe a disconnect, that you didn't remember

3    specifically the words that were said, correct?

4    A.    That is correct.

5    Q.    Do you remember the general subject matter of the

6    phone call, the discussion?

7    A.    It was in regard to why the trust wasn't

8    stranger-owned life insurance, and the tax issue.

9    Q.    Consistent with the email that we looked at earlier?

10   A.    That is correct.

11   Q.    And you had testified on direct that during that call

12   you did not -- you don't have any recollection of the

13   funding arrangement or any intent to sell these policies

14   after two years being revealed to the insurance company?

15   A.    That is correct.

16   Q.    You had testified on direct and cross-examination

17   about this letter, these series of letters.  I'll have you

18   look at Government's Exhibit 2243, tab 27.  I just want to

19   clarify something you said.

20       Counsel walked you through a few of these bullet

21   points in the letter, asking you if you agreed or didn't

22   agree, you know, with regard to company dollars rather

23   than personal dollars used to purchase life insurance, and

24   that's on the second page of the attachment.

25       Is your testimony that you agree with that with

1    regard to the typical 419(e) plan?

2    A.    That is correct.

3    Q.    Were, in fact, company dollars rather than personal

4    dollars being used to purchase life insurance in the

5    Charter Oak Trust?

6    A.    They were not.

7    Q.    And counsel also asked you if there's anything in

8    there about borrowing funds, and you said there's nothing

9    in there about the employer borrowing funds, correct?

10   A.    In this article, correct.

11   Q.    And is it fair to say that, in that phone call with

12   Lincoln, or in this letter, there was no discussion of

13   borrowing funds for the employers to pay the premiums?

14   A.    That is correct.

15   Q.    And there was some discussion on cross-examination

16   about the split-dollar explanation for why this wasn't

17   premium financing, and the premium funding explanation.

18        Do you recall that?

19   A.    I do.

20   Q.    Those are different explanations that Mr. Carpenter

21   had given you?

22   A.    That is correct.

23   Q.    And you understood -- based on your experience in the

24   insurance world, as well as your time at Benistar --

25   split-dollar to be an arrangement between an employer and

1    an employee?

2    A.    Correct.

3    Q.    Did it involve, in a typical or traditional

4    split-dollar arrangement, an actual contribution by both

5    the employer and the employee splitting both the cost and

6    the benefits?

7    A.    Typically, yes.

8    Q.    And in the Charter Oak Trust, was there any

9    contribution by the employer or the employee?

10   A.    There was not.

11   Q.    You testified -- and I just again want to clarify

12   something that you said on cross-examination -- you had

13   talked about, again, this letter that we're looking here,

14   at tab 27, Government 2243, as being something that you

15   typed out with Mr. Carpenter, correct?

16   A.    Correct.

17   Q.    And you said on cross-examination that he had other

18   assistants as well, is that right?

19   A.    That is correct.

20   Q.    And you had been asked a question, but we never

21   really got an answer, as to how often it would be that you

22   would be called upon to pen a letter with Mr. Carpenter,

23   at his direction.

24       Do you have an estimate of how often that would

25   happen?

1  A.   Maybe once every couple of months.

2  Q.   So it wasn't like this was the only letter that you

3  ever wrote with Mr. Carpenter's direction?

4  A.   Correct.

5           MR. NOVICK:  Nothing further, Your Honor.

6           THE COURT:  Thank you.

7           Does that complete the testimony of this

8  witness?

9           MR. GUARNIERI:  Yes, Your Honor.

10           THE COURT:  Thank you, sir.

11           MR. BROWN:  Excuse me, Your Honor.  This witness

12  does know a potential witness.  I'm going to ask the Court

13  to remind him of the witness's instruction and order --

14  ask him not to discuss his testimony.

15           MR. NOVICK:  Your Honor, I've discussed that

16  with the witness.  I have every expectation he's going to

17  speak to his wife.  And he's assured us that he's not

18  going to speak to his wife about his testimony.

19           THE COURT:  I had taken it for granted the

20  government gave that instruction to the witnesses.

21           MR. BROWN:  I haven't seen that on the record,

22  Your Honor.  As I always do -- although I don't think any

23  have quite so much contact with other, so we did have that

24  specific conversation.

25           THE COURT:  Neither side expects this gentleman

1    to be recalled, or am I mistaken in that?

2              MR. NOVICK:  I do not expect this witness to be

3    recalled.

4              MR. GUARNIERI:  Neither does the defense, Your

5    Honor.

6              THE COURT:  Okay.  So while you won't be with us

7    again, it looks like your wife will be here, and it's

8    important that you not discuss the substance of your

9    testimony with her before she testifies, okay?

10             THE WITNESS:  Okay.

11             THE COURT:  Thank you.

12             MR. NOVICK:  Next witness is Patrick Glynn, Your

13   Honor.

14             THE COURT:  Glynn?

15             MR. NOVICK:  Yes.

16             THE COURT:  Good afternoon.

17             THE WITNESS:  Your Honor.

18             THE COURT:  If you would please stand at the

19   chair, our clerk will swear you in.

20             THE CLERK:  I'm going to ask you to raise your

21   right hand.

22

23

24

25

1

2                    PATRICK GLYNN,

3          called as a witness, having been first duly

4          sworn or affirmed, was examined and testified as

5          follows:

6

7               THE CLERK:  Please be seated.

8               Please state your name and spell your last name

9    for the record.

10              THE WITNESS:  Patrick Glynn, G-L-Y-N-N.

11              THE CLERK:  Your business address, please?

12              THE WITNESS:  One Farm Glen Boulevard,

13   Farmington, Connecticut.

14              THE CLERK:  Thank you.  Please be seated.

15

16                   DIRECT EXAMINATION

17   BY MR. NOVICK:

18   Q.   Good afternoon, Mr. Glynn.

19   A.   Hi.

20   Q.   Can you please -- well, first let me ask you this:

21        Where are you originally from, Connecticut?

22   A.   Hartford, Connecticut, I was born.

23   Q.   Are you married?

24   A.   Yes, I am.

25   Q.   Family and children in the area?

1    A.   Yes.

2    Q.   Can you briefly tell the judge about your educational

3    background?

4    A.   Secondary and high school in Hartford, Connecticut;

5    attended Central Connecticut State and graduated from

6    there in 1984, with a business degree, major in marketing.

7    Q.   And have you spent your career in one particular

8    industry?

9    A.   Yes, I have.

10   Q.   What is that?

11   A.   Life insurance industry.

12   Q.   Can you briefly trace your path in the life insurance

13   industry?

14   A.   Yes.

15        Started in 1984 at Cigna, as a life insurance

16   underwriter.  From there, I worked for Merrill Lynch,

17   Phoenix Life, and most recently Highland Capital

18   Brokerage, in a variety of positions including, as I said,

19   underwriting, advance sales, and most recently brokerage

20   sales for the past 17 years.

21   Q.   So let's just break that down a little bit.

22        You mentioned that, at one point early on, you were

23   an underwriter?

24   A.   Yes, my first job.

25   Q.   Is that with Cigna?

1    A.   Yes.

2    Q.   Was that your only, of the jobs that you talked

3    about, the only time you were an underwriter?

4    A.   I was an underwriter at Security Connecticut, as

5    well, for about three years.

6    Q.   When was that?

7    A.   Oh, God, 1990; 1991, 1990?

8    Q.   Just generally speaking, what does an underwriter do,

9    what does that mean?

10   A.   Risk selection for life insurance and disability

11   insurance, evaluating medical information, financial

12   information, to select risk for -- on behalf of an

13   insurance company.

14   Q.   When you say "select risk," can you give us, in

15   practical terms, what that means?

16   A.   Determining whether the candidate is a good risk for

17   insurance.

18   Q.   The particular insured's life --

19   A.   Correct, life insurance.

20   Q.   After you were an underwriter, you said, you were

21   involved in some areas of life insurance industry.  I

22   think you mentioned advanced sales and wholesaling.

23        Can you tell us what that means?

24   A.   Advanced sales is where I would work with helping

25   advisers design product solutions, as well as helping them

1    understand advanced sales concepts to apply in terms of

2    solutions with their clients.

3    Q.   When you say "advisers," are you talking about

4    financial advisers?

5    A.   Correct.

6    Q.   And their clients being individual insurance buyers

7    potentially?

8    A.   Yes.

9    Q.   What's the difference between advanced sales, if

10   there's any difference, between advanced sales and

11   wholesaling?

12   A.   Advance sales, I was in a home-office position

13   working for, at one time, Merrill Lynch and Cigna.  This

14   was a home-office capacity supporting agents who worked

15   for our company versus wholesaling, I was out in the field

16   trying to meet and develop relationships and encourage

17   them to do business with us.

18   Q.   Similar to a sales rep?

19   A.   Yes.

20   Q.   When did you start at Phoenix Life Insurance Company?

21   A.   September 1, 1999.

22   Q.   When did you leave Phoenix?

23   A.   January 1, 2010.

24   Q.   What position were you hired into at Phoenix?

25   A.   Regional sales director.

1    Q.   What essentially was your responsibility or role with

2    Phoenix?

3    A.   Life insurance wholesaler, business development.

4    Q.   Did you maintain that position your entire time while

5    at Phoenix?

6    A.   For the most part.  I did work as a manager, sales

7    manager, was a quasi sales manager, wholesaling role for

8    two years, 2001, 2002, if I remember right.

9    Q.   Can you describe your job in practical terms?

10        I think you told us what a wholesaler basically did,

11   was that what you were doing for Phoenix?

12   A.   Yes.

13   Q.   Working for brokers, advisers, to come up with

14   products for their clients?

15   A.   Correct.

16   Q.   You say "come up with," or design the appropriate

17   product, what do you mean?

18   A.   Helping them, first of all, understand the products

19   that we had, helping them understand where they fit,

20   helping them understand how they satisfied sales

21   solutions.

22   Q.   And can you describe for us how that role for the

23   insurance company differed from when you were an

24   underwriter in that role?

25   A.   When I was an underwriter, I was evaluating risk for

1    insureds applying for insurance, and I would evaluate the

2    medical information and financial information to determine

3    if they were a good risk or a bad risk, did we want to

4    participate or not.

5         In my wholesaling capacity, I would go out and try to

6    build relationships with the purpose of them doing

7    business with me and the Phoenix, in that example.

8    Q.   As an underwriter, you're actually making decisions

9    or participating in the decision-making process about

10   which policies should be taken?

11   A.   Correct.

12   Q.   And as a -- in the wholesaling, you are trying to

13   bring in new business, is that right?

14   A.   Yes.

15   Q.   And as a -- in the wholesaling business, would you

16   have any authority to make a decision on whether a policy

17   gets accepted or not?

18   A.   No.

19   Q.   Or on what terms that would be done?

20   A.   No.

21   Q.   As a wholesaler, did you have any role to any extent

22   in the application process?

23   A.   We would provide the applications when a case was

24   about to be started or someone was going to buy our

25   policies or submit to the application process.  We would

1    provide the necessary forms, illustrations.  We would

2    provide them the necessary documentation that they needed

3    to complete, relative to what state they were in.

4    Q.   Okay.

5         Would you assist if there were questions during the

6    application process?

7    A.   Yes.

8    Q.   Where would questions typically come from, if there

9    were questions?

10   A.   Questions would come from the adviser or the

11   adviser's staff.

12   Q.   And did you also help try to answer questions if the

13   underwriter had a question?

14   A.   Yes.

15   Q.   And did you ever participate or assist in running

16   illustrations?

17   A.   Yes.

18   Q.   Did the applications typically come to you in the

19   first instance, or would they go somewhere else?

20   A.    Initially when I started Phoenix, they came for a

21   short period of time, but then we centralized and

22   everything was sent directly to the home office.

23   Q.   And as a Phoenix wholesaler, did you work for a -- in

24   a particular region; were you responsible for a particular

25   region?

1    A.    Yes.

2    Q.    And what was that?

3    A.    The Northeast, primarily in Connecticut and Upper

4    State New York, Vermont.

5    Q.    Western Massachusetts?

6    A.    Yes, yes.

7    Q.    And in Connecticut, in particular, for your time as a

8    wholesaler, were you the sole wholesaler for Phoenix in

9    this area?

10   A.    Yes, yes, yes.

11   Q.    Now, let me switch gears for a second.

12         In your time at Phoenix, did you becomes familiar

13   with the concept known as stranger or investor-originated

14   life insurance or STOLI?

15   A.    Yes.

16   Q.    Can you describe what you understood STOLI to be, in

17   very general terms?

18   A.    General terms, it was the concept where an individual

19   was incented to apply for insurance with the intent of

20   that policy, if approved, to be sold to an investor or

21   someone else, transferred to someone else.

22   Q.    Was there typically a period of time before the

23   policy might be sold?

24   A.    There was a couple of ways that we saw.

25         Initially it was done immediately, but usually we saw

1   it in 30 months.

2   Q.   Thirty months --

3   A.   Thirty months after the policy was issued.

4   Q.   And what's the significance of that?

5        Is there something that happens at some point in the

6   process in terms of --

7   A.   Yeah.  There was a contestability period that needed

8   to be satisfied within the -- most insurance policies

9   today.

10  Q.   Could that -- in terms of talking about STOLI, could

11  it also involve the sale of an interest in the policy as

12  opposed to the policy itself?

13  A.   Yes.

14  Q.   And typically with STOLI transactions, were you made

15  aware of a particular age, demographic or age bracket

16  where these became the most common?

17  A.   Yes.

18  Q.   What was that?

19  A.   Sixty-five, seventy, is where we saw most or heard

20  that most of this was going on.

21  Q.   In your experience, again as a wholesaler and not as

22  an underwriter, did you learn Phoenix -- or did Phoenix

23  develop a policy related to STOLI?

24  A.   Yes.

25  Q.   And what was that position?

1    A.    It was not permitted.

2    Q.    And did you have a role as a wholesaler in the field

3    of Phoenix in either developing or enforcing that policy?

4    A.    Enforcing the policy.

5    Q.    What were you supposed to do; what was your

6    responsibility?

7    A.    We were to, you know, make our producers aware of the

8    company policy and let them know what was prohibited and

9    not prohibited.

10   Q.    When you say -- just by way of definition, when you

11   use the word or term "producer," what are you referring

12   to?

13   A.    Agent, life insurance agent or adviser.

14   Q.    If you remember, do you recall when -- roughly when

15   Phoenix first developed its anti-STOLI position or policy?

16   A.    2005, 2006 was when I, you know, started to become

17   aware -- we became aware of it.

18   Q.    Was that anti-STOLI policy in effect as of 2007?

19   A.    Yes.

20   Q.    Can you tell us, generally speaking, what kinds of

21   steps Phoenix took to identify and prevent STOLI policies

22   being issued with Phoenix insurance?

23   A.    Well, the first was to establish policy; communicate

24   it to the field, both the agents and to us, producers in

25   the field, wholesalers in the field; and then develop

1    procedures, guidelines, forms that needed to be completed,

2    in order -- with every application's -- that's a certain

3    criteria.

4    Q.   You mentioned forms, what kind of forms were created

5    to assist in this process?

6    A.   There was a form called the SOCI form -- that stood

7    for Statement of Client Intent -- that needed to be

8    completed with applications of face amounts over

9    $2 million, and ages 65 and over.

10   Q.   Why was the form developed for just -- for that age

11   and the amount bracket?

12   A.   That's where we were seeing most of the STOLI cases.

13           THE COURT:  Mr. Glynn, did you say Phoenix

14   became aware of STOLI in 2005, 2006?

15           THE WITNESS:  Best of my recollection.  It may

16   have been earlier, but it's when we started becoming aware

17   of it, best of my recollection.

18   BY MR. NOVICK:

19   Q.   And you said that was roughly the time that you

20   started to develop these policies to try to prevent it?

21   A.   Yes.

22   Q.   And over time, did those -- the forms that we're

23   talking about, did they change and get more -- and the

24   policies get more strict?

25   A.   Yes.

1    Q.   And the questions change over time?

2    A.   Yes.

3              MR. BROWN:  Excuse me, Your Honor.

4              Who's testifying?

5              THE COURT:  Okay, yes.

6              MR. BROWN:  Leading, Your Honor.

7              THE COURT:  Right.

8    BY MR. NOVICK:

9    Q.   Let me just -- so that we're clear, were you an

10   expert in STOLI?

11   A.   No.

12   Q.   What was your role in this anti-STOLI policy?

13   A.   Enforcing the company's guidelines and rules on it.

14   Q.   I want to direct you to some documents.

15        First, you have a binder in front of you.  If we

16   could turn to tab 1.

17             MR. NOVICK:  And it's Government's Exhibit 2009,

18   which I would offer.

19             MR. BROWN:  Can I have a moment, Your Honor?

20             THE COURT:  Yes.

21             MR. BROWN:  Tab Number 1?

22             MR. NOVICK:  Yes.

23             MR. BROWN:  May I inquire of the witness, Your

24   Honor?

25             THE COURT:  Any objection?

1           MR. NOVICK:  Yes, Your Honor.

2           MR. BROWN:  Your Honor, I'll state the reason

3    why:  Because what I don't know, Your Honor, is the

4    statement implying intent?

5           MR. NOVICK:  It is.

6           MR. BROWN:  Your Honor, I don't know if this

7    particular document was, in fact, used as -- this specific

8    document -- I mean not this particular one, but this

9    specific form was used in the -- in any of the policies

10   issued that are subject matter of this indictment, Your

11   Honor.  That's all I wanted to know.

12          THE COURT:  I'll rely on Mr. Novick to address

13   that.

14          MR. NOVICK:  Your Honor, so, number one, this

15   would be -- I'm offering it pursuant to the stipulation

16   we've entered into earlier.

17              In terms of its relevance, hopefully it will

18   become clear both -- not just with this witness, Your

19   Honor, but in terms of the specific policies.

20              I don't anticipate having this witness testify

21   as to specific applications.  They will come in during the

22   course of the trial today, if we get to it, although I

23   doubt we'll get to it.

24              And so, I mean, if counsel wants to --

25          THE COURT:  You may proceed.

1          MR. NOVICK:  -- put in subject to connection --

2          THE COURT:  Let's proceed.

3          MR. NOVICK:  Okay.

4    BY MR. NOVICK:

5    Q.   Take a look at this document.

6         Are you familiar with this?

7    A.   Yes, I am.

8    Q.   And what is it?

9    A.   Statement of client intent form that was established

10   by Phoenix.

11   Q.   On the bottom right-hand corner there's a couple of

12   numbers there.

13        What is that?

14   A.   Which ones?

15   Q.   1106?

16   A.   That's the date that it was established.

17   Q.   So November 2006?

18   A.   Yes.

19   Q.   And do you recall whether there were earlier and

20   subsequent iterations of these types of forms, if you

21   recall?

22   A.   I can't recall if it was earlier, but there were

23   subsequent after this.

24   Q.   And did these questions ultimately get incorporated

25   somewhere else as well?

1    A.    Yes.  They were included in the application, life

2    insurance application, many of them.

3    Q.    Was this form part of the standard application

4    process for certain types of policies?

5    A.    Yes.

6    Q.    And was it a required form --

7    A.    Yes, it was.

8    Q.    -- for certain categories of policies?

9    A.    Yes.

10   Q.    Was it mandatory for all policies?

11   A.    No.

12   Q.    Can you tell us -- well, first, let me have you read

13   the first paragraph where it says, "Notice."

14   A.    "As a matter of public policy and to protect the

15   interest of our existing policyholders, our shareholders,

16   and our industry, Phoenix will not knowingly participate

17   in sales programs and strategies including premium finance

18   arrangements designed primarily to facilitate the eventual

19   sale or transfer the policy to investors.  The purpose of

20   this form is to provide Phoenix with the information to be

21   used to implement that policy.  Any misstatement or

22   concealment will be treated as a material

23   misrepresentation for which Phoenix may seek any and all

24   sanctions available to it."

25   Q.    Does that paragraph accurately restate what you

1    understood Phoenix's policy to be as a wholesaler?

2    A.    Yes.

3    Q.    And you mentioned that this was for a particular

4    category policy.

5          Can you just read the next two lines?

6    A.    "This form must be completed, signed and submitted

7    with each application for life insurance policy with

8    Phoenix Life Insurance Company and its subsidiaries for

9    insureds age 65 and over in amounts of $2 million and up.

10         "The undersigned blank proposed insured and proposed

11   owner in connection with an application for life insurance

12   being submitted to Phoenix Life Insurance Company or

13   subsidiary hereby certifies as follows . . ."

14   Q.    Okay.  So this form was directed at not just the

15   insured but also the owner of the policy?

16   A.    Correct.

17   Q.    I want to talk about the questions on the form that

18   were asked.

19         Let's go -- I'm going to direct you to a few of them.

20         First question, borrowing, can you read that for us?

21   A.    "Will any of the first-year or subsequent premiums

22   for the policy" --

23              THE COURT:  Mr. Glynn, do you know why age 65

24   was chosen as opposed to 60 or 70?

25              THE WITNESS:  Well, initially it started at 70,

1    but then we started seeing the program being used for ages

2    underneath 70.

3    BY MR. NOVICK:

4    Q.    Could you -- I'm sorry, let's try that again.

5          Can you read that borrowing question?

6    A.    "Will any of the first-year or subsequent premiums

7    for the policy be borrowed by the proposed owner or

8    proposed insured, or by any other individual trust,

9    partnership, corporation, or similar or related entity,

10   yes or no?"

11   Q.   What was your understanding as to why this question

12   was being asked?

13   A.   Many times monies were borrowed initially from an

14   investor.

15   Q.    In STOLI arrangements?

16   A.    In STOLI arrangements, right.

17   Q.    If there was, in fact, borrowing indicated here, what

18   would have happened, in your experience or knowledge?

19   A.    We would have needed to know, what was the financing

20   program, we would need to review it.

21   Q.    And I'll talk about this again in a minute, but did

22   Phoenix have approved premium financing programs that they

23   had vetted?

24   A.    Yes, yes.

25   Q.    Let's take a look at Question 3, formal or informal

1    programs.

2    A.    "Is the policy being purchased in connection with any

3    formal or informal program under which the proposed owner

4    or proposed insured has been advised of the opportunity to

5    transfer the policy to a third party within five years of

6    its issuance, yes or no?"

7    Q.    In your experience and understanding, why was that

8    question being asked in the context of STOLI?

9    A.    We wanted to know or -- yeah, we wanted to know

10   whether there was a prearranged agreement in place to sell

11   the policy.

12   Q.    Would that have indicated STOLI to you?

13   A.    Yes.

14   Q.    And then similarly, Question Number 4.

15   A.    "Do the proposed insured or proposed owner have any

16   understanding or agreement providing for a party, other

17   than the owner, to obtain any legal or equitable right,

18   title or interest in the policy or entity owning the

19   policy, yes or no?"

20   Q.    And again, what was the purpose of this question?

21   A.    To determine if there was a prearranged intent to

22   transfer the policy.

23   Q.    And looking at that question, if there was an entity

24   that had a collateral assignment in the policy, would

25   that -- would you have viewed that as included in the

1    "obtain any legal or equitable right, title or interest in

2    the policy"?

3    A.   Yes.

4    Q.   Take a look at Question Number 5, bona fide

5    insurance -- excuse me -- Question Number 5, yes, life

6    expectancy valuation.

7         Could you please read that?

8    A.   "Has any entity, including for example any life

9    expectancy valuation company or premium financing company,

10    conducted or made plans to conduct in the future a life

11    expectancy evaluation of the insured within the past

12    two years, yes or no?"

13    Q.   What was the purpose of asking this question?

14    A.   Many times a life expectancy valuation was done to

15    determine how long a person's life expectancy was.  And

16    that was routinely seen in premium finance or these types

17    of STOLI/IOLI agreements.

18    Q.   So these were all -- questions that we're talking

19    about now were questions being asked to try to identify

20    STOLI policies, is that right?

21    A.   Red flags, yes.

22    Q.   Can you then turn the page, and let's look at

23    Question Number 7.

24    A.   "Bona fide insurance needs.  State in detail what

25    bona fide need the proposed owner or proposed insured has

1   for this insurance."

2   Q.   And what was intended with that; in other words, what

3   did you understand the purpose of that question to be?

4   A.   We wanted to know what was the purpose of insurance.

5   Q.   Why was that relevant in the context of STOLI?

6   A.   We wanted to know if the person was going to own this

7   long term.

8   Q.   Then the last question, Question Number 8, entitled,

9   "Inducements"?

10  A.   "Have the proposed insured or proposed owner, or any

11  individual, trust, partnership, corporation, or similar or

12  related entity received cash or other financial

13  inducements in connection with this application or the

14  purchase of the life insurance" -- "of this insurance; yes

15  or no."

16  Q.   And then same questions here:  What was the reason or

17  purpose for this question?

18  A.   To determine if some monetary incentive was provided

19  to engage in this life insurance.

20  Q.   Could that include a share of a sale of the policy

21  ultimately?

22  A.   Yes.

23  Q.   And again, the bottom of the page, who has to sign

24  this statement of client intent?

25  A.   Proposed insured, proposed owner and the producer.

1    Q.   You mentioned, over time some of these questions got

2    put in the application itself, correct?

3    A.   Yes.

4    Q.   Now, you talked a second ago about existence of

5    premium financing as something that was potentially a red

6    flag in the evaluation of whether something was STOLI or

7    not.

8         Do you recall that?

9    A.   Yes.

10   Q.   Did Phoenix permit some premium financing for its

11   policies?

12   A.   Yes.

13   Q.   Can you tell us, under what circumstances they would

14   permit it?

15   A.   Yes.  We were looking for programs, finance programs

16   that had reasonable market interest rates that offered

17   some -- we wanted to see the insured or owner have some

18   stake in the game where they're paying part of the premium

19   or paying at least interest.  We're looking for a program

20   that you just couldn't walk away from the loan, you had to

21   pay back the loan, you know?

22   Q.   So there had to be some collateral other than the

23   life insurance policy itself?

24   A.   Yes, yes.

25   Q.   And did Phoenix, in fact, have a list of approved

1    premium financing vendors that it maintained along the

2    lines of the standards you just told us?

3    A.   Yes.

4    Q.   And again asking those questions and getting at what

5    the parameters of the premium financing would have been,

6    was that all part of the STOLI inquiry?

7    A.   Yes.

8    Q.   If, in your experience, an unapproved premium

9    financing program had been -- or were suggested by an

10   application, on an application, what would happen?

11   A.   We would stop the application process, and the

12   finance program would have to be reviewed by the team in

13   place at the home office.

14   Q.   Would that evaluation proceed along the same lines

15   with the same factors that you just talked about in terms

16   of evaluating the premium financing?

17   A.   Yes, yes.

18   Q.   Would you also look at the entity that was doing the

19   lending, what type of entity it was?

20   A.   Yes.

21   Q.   Why?

22   A.   Well, we'd want to know who they are, the reputation.

23   These are all factors that the team in place at the home

24   office looked at.

25   Q.   Now, we've talked about sale of policies being an

1    objective in a STOLI arrangement, correct --

2    A.   Yes.

3    Q.   -- or sale of an interest in a policy?

4    A.   Yes.

5    Q.   Is there a distinction between, to your knowledge and

6    experience, a distinction between a legitimate life

7    settlement and a stranger-originated life insurance

8    arrangement?

9    A.   Yes, there is.

10   Q.   Did Phoenix permit legitimate life settlements with

11   its policies?

12   A.   Yes.

13   Q.   In fact, could Phoenix have stopped someone who had

14   taken an insurance policy for bona fide reasons from, some

15   day later on, selling their policy?

16   A.   No.

17   Q.   Take a look at Exhibit 2126.  It's tab 2.  It's

18   already in evidence.

19        We've read some of this document so far.  I'm not

20   going to have you reread what the Court's already heard,

21   but could you take just a minute and read over the first

22   few paragraphs under Phoenix position on

23   stranger-originated life insurance?

24   A.   Uh-huh.  Do you want me to read it out loud?

25   Q.   Just read it to yourself, and I'm going to ask you a

1    couple of questions about it.

2        I will have you read one paragraph, but before I do

3    that I'm going to ask you:  Does this section -- in other

4    words, the first few paragraphs under Phoenix position on

5    stranger-originated life insurance -- again accurately

6    state what you understood Phoenix's policy related to

7    STOLI to be?

8    A.    Yes.

9    Q.    And I will have you read, which we didn't read

10   before, the paragraph beginning, "It is also important."

11             MR. BROWN:  Excuse me, Your Honor.  I know

12   counsel has been using this methodology since the start of

13   the trial, but the document clearly speaks for itself.  If

14   he has any questions he wants to ask about the document --

15   we're not trying in front of a jury where perhaps it might

16   accelerate things by having a person read it.  The Court's

17   quite capable of reading.  If he has a question, ask the

18   question versus us sitting here and reading stuff that's

19   in evidence, Your Honor.

20             THE COURT:  Mr. Novick?

21             MR. NOVICK:  Your Honor, it is a document in

22   evidence, and the Court is certainly entitled and I expect

23   will read many of these documents.  The government is

24   certainly also entitled to draw the Court's attention and

25   the witness's attention to particular passages.  I'm not

1    having him read the entire document.  He's reading small

2    parts and commenting on it.  I think it's completely

3    legitimate.  I understand there's a difference between the

4    Court and a jury being here, but I am trying to proceed

5    judiciously.

6              THE COURT:  Just so I understand your interest

7    in the matter, why wouldn't it be sufficient to simply

8    call the attention of the witness to a particular

9    paragraph, as you have just done, and proceed on the

10   assumption that I'm reading it myself, as indeed I am?

11             MR. NOVICK:  I can do that, Your Honor.

12             There are, I suspect -- I can do that, Your

13   Honor.  What I would like to do, I suppose judiciously

14   again is, I don't want any witness to read, except for

15   probably a couple of times through this course of the

16   trial, every word of every email, but it will, I think --

17   if the witness is going to read it anyways to himself, in

18   many cases, I don't think there's any downside to having

19   him read it out loud.

20             THE COURT:  I'm sympathetic to the import of

21   Mr. Brown's comment.  It does seem to take more time than

22   necessary to have the witness read.  I'm oftentimes

23   finished reading when the witness is still in the early

24   stages, so --

25             MR. NOVICK:  Understood, Your Honor.

1        THE COURT:  But if you're trying to make a

2   record, if it's important to you to have a transcript that

3   contains the excerpt in the transcript, I don't mean to

4   step on your toes.  I'll let you do that.

5        MR. NOVICK:  I appreciate the Court raising it

6   and counsel raising it.

7        Why don't I, as we go, see what I think is

8   important.

9        THE COURT:  And feel free to ask me if I'm done

10  reading.

11       MR. BROWN:  Your Honor, to be clear, I have no

12  problem directing the witness to draw his attention to a

13  particular paragraph, and then read the first few words

14  and make sure the witness is reading the correct

15  paragraph, but --

16  BY MR. NOVICK:

17  Q.   Mr. Glynn, I'm looking now -- it is also important to

18  note that there is a difference between STOLI/IOLI and

19  life settlements.  And it indicates in that paragraph

20  that:  "Our Phoenix life solutions subsidiaries will offer

21  life settlements based with a focus on customer value and

22  transparency."

23       With regard to that paragraph, was that also

24  consistent with your understanding of Phoenix's position

25  on the distinction between STOLI and legitimate life

1    settlements?

2    A.    Yes.

3    Q.    In fact, did Phoenix have a life settlement company

4    for some short period of time?

5    A.    Yes.

6    Q.    In your recollection, when the policy -- when Phoenix

7    was identifying or recognizing STOLI patterns within its

8    policies, was there a particular reason why Phoenix became

9    attractive to STOLI promoters or purveyors; in other

10   words, related to a particular type of product?

11            MR. BROWN:  Excuse me, Your Honor.  If I may, I

12   object on the grounds of speculation, Your Honor.  He's

13   asking this particular witness to go in the minds of

14   people who we don't know and to try to explain in some

15   fashion why they acted a certain way.  Pure speculation.

16            THE COURT:  Mr. Novick?

17            MR. NOVICK:  Your Honor, what I'm asking the

18   witness, and I can try to rephrase the question --

19   BY MR. NOVICK:

20   Q.    -- were you aware of a particular product that

21   Phoenix had, that had characteristics that were attractive

22   to someone who would be involved in a STOLI arrangement?

23   A.    Yes.

24   Q.    Can you tell the Court what that was?

25   A.    Yeah.  That was a product that we had had for quite

1    some time, a universal life product that was a low-cost

2    product.  It was very, very competitive at the time that

3    worked very well in a STOLI type of arrangement because of

4    the ability to pay low loads in the first couple years.

5    Q.   Why would paying low loads, low cost of insurance, in

6    the first couple of years be attractive to a STOLI

7    arrangement, as you understood it?

8    A.   It allowed you to pay the minimum amount required.

9    Q.   Switching gears a little bit, are you familiar with

10   Internal Revenue Code Section 419 plans?

11   A.   Yes, I am.

12   Q.   Are you an expert in 419 plans?

13   A.   No, I'm not.

14   Q.   What did you understand 419 plans to be, as someone

15   who was working for Phoenix?

16   A.   It was a concept for employers in which they could

17   provide a benefit using life insurance for estate

18   planning, business protection planning.  And the real

19   sizzle to it was, it provided a tax deduction when paying

20   the premium.

21   Q.   So you said it was something employers could provide

22   for employees?

23   A.   Yes.

24   Q.   And were you familiar with -- well, in specific, was

25   one of the benefits that could be provided was a death

1    benefit on these policies --

2    A.    Yes.

3    Q.    -- these plans?

4          And you mentioned estate planning, was that one of

5    the purposes you understood for 419 plans in general?

6    A.    Yes.

7    Q.    Were there any others you recall?

8    A.    Business planning, income protection.

9    Q.    Can you describe for the Court, when you say the use

10   of these plans for estate planning while transfer of

11   business succession, what do you mean?

12   A.    Estate planning could be whether it's providing a

13   legacy for a family, providing the funding to pay for

14   eventual transfer taxes or estate taxes.

15   Q.    Upon the death of a particular insured?

16   A.    Upon their death, yes.

17   Q.    Were these typical purposes for insurance in general?

18   A.    Yes.

19   Q.    In particular for the 70-plus bracket or in general?

20   A.    High net worth.

21   Q.    Back in the period of 2006 to 2008, did Phoenix allow

22   their policies to be used in 419 plans?

23   A.    Yes.

24   Q.    Was it an across-the-board allowance, or was it a

25   case-by-case?

1    A.    It was with select distributors, select vendors.

2    Q.    In that period of time, do you remember principally

3    what the concerns over the use of 419 plans were?

4    A.    Yeah.  From my recollection, the service had been

5    scrutinizing, you know, looking at it, and we were

6    conservative, an old-mind company.

7          There were some abuses seen where there would be the

8    use of it for tax deduction purposes and tax deferral, and

9    then tax re-income, and that's where we were uncomfortable

10   with -- well, we heard of and saw those abuses.

11         So that's why we were restricted in terms of who we

12   selected to participate.

13   Q.    So principally it would concern the 419 -- use of 419

14   was tax concerns, is that right?

15   A.    Abuses with the code.

16   Q.    And you mentioned the service.

17         Just to clarify, you're referring to the IRS?

18   A.    Correct.

19   Q.    Mechanically, how did you understand insurance

20   premiums to be paid in a 419 plan?

21   A.    The employer would make contributions to the plan on

22   behalf of the employees.

23   Q.    And then what would happen?

24   A.    The plan would purchase the life insurance on the

25   select individuals.

1    Q.   At some point did you become familiar with a series

2    of entities located in Simsbury, Connecticut, associated

3    with Benistar?

4    A.   Yes.

5    Q.   Do you recall roughly when you first became familiar

6    with them?

7    A.   2000, 2001, around there, shortly after I joined.

8    Q.   Do you recall how you first became familiar with

9    them?

10   A.   I was introduced to them through the Phoenix --

11   through, I think, some people within the Phoenix who had

12   been working with them.

13   Q.   And when you first became familiar with them, did you

14   have discussions or meeting with them about 419 plans?

15   A.   Yes.

16   Q.   And do you recall who was present for the meeting?

17   A.   We had the meeting in Hartford, and at that meeting

18   was representatives from Benistar, I believe, at the time,

19   and representatives from Phoenix.

20   Q.   Do you recall whether Daniel Carpenter was at that

21   meeting?

22   A.   I believe so.

23   Q.   In that first meeting, did Phoenix agree to

24   participate in that iteration of 419 plans?

25   A.   No, no.  We were just gathering all the facts and

1    listening to the presentation.

2    Q.    Did there come a time a few years later -- direct you

3    to a few years later -- that you began -- that that

4    changed, where you did, in fact, start to work with the

5    419 plans from Benistar?

6    A.    Yes.

7    Q.    Can you tell the judge what the circumstances were

8    that you did start to use or work with or allow Phoenix

9    policy in the 419 plan associated with Benistar?

10   A.    They were approved with certain modifications to the

11   plan:  Had to be death benefit only; cannot be used for

12   retirement purposes.  And also we were -- the team that

13   approved it when Phoenix was comfortable with the fact

14   that -- or liked the fact that they did not have or did

15   not recognize an entire deduction.  It was a partial

16   deduction of about 65 percent of premiums, roughly around

17   that.  So we liked that.

18   Q.    Do you recall, that iteration of the plan, who you

19   had been meeting with or talking to on behalf of Benistar?

20   A.    Yes.

21   Q.    Who was that?

22   A.    Dan Carpenter; I think it was Rich Belding; and there

23   was one other gentleman, Wayne, Wayne Bursey.

24   Q.    Did you meet with or become familiar with a gentleman

25   by the name of Ed Waesche?

1    A.    Yes.

2    Q.    Who was he?

3    A.    Ed was a representative of Benistar.

4    Q.    Did you have meetings with him about the Benistar

5    plan?

6    A.    Yes.

7    Q.    What was the name of the trust, as to your best

8    recollection, that eventually got approved for use with

9    the -- with Phoenix policies?

10   A.    Grist Mill Trust.

11   Q.    You said your recollection of that was, it was only a

12   partial tax deduction?

13   A.    Correct.

14   Q.    Do you recall as well an entity known as the Charter

15   Oak Trust?

16   A.    Yes.

17   Q.    And do you recall any difference between the Charter

18   Oak Trust and the Grist Mill Trust, as far as you knew?

19   A.    I didn't.  They were sister trusts.  I didn't -- I

20   don't -- I'm not familiar with any differences.  There may

21   have been but --

22   Q.    What did you understand them to be, in general terms?

23   A.    Benefit plans which provided employers the ability to

24   provide benefits to their employer -- employers providing

25   benefits to their employees on a select basis, providing

1  death benefit protection to help them with estate

2  planning.

3  Q.   Who did you understand the premiums would be paid by

4  in those trusts for those plans?

5  A.   The employer.

6  Q.   Were you aware of, in either of those plans, any

7  third party paying the premiums?

8       Were you ever told anything about that?

9  A.   No.

10  Q.   Were you ever told about any financing or funding

11  arrangement in the Charter Oak Trust or Grist Mill Trust?

12  A.   No.

13       MR. BROWN:  Excuse me, Your Honor.  I'm going to

14  object to this line of questioning insofar as it relates

15  to the Grist Mill Trust.  And I'm saying it now because

16  the next document the government is going to introduce,

17  just to move things along, only concerns the Grist Mill

18  Trust.  And in 60-plus pages of the superseding

19  indictment, Your Honor, I fail to see any reference to the

20  Grist Mill Trust, which is a separate legal entity that

21  concerned itself with the use of the tax code and things

22  like that, that have nothing to do with the Charter Oak

23  Trust, which have nothing to do with the IRS.  There was

24  no claims of deductions or whatever.

25       And the 60 pages, we've got a long way to go,

1    Your Honor, in trying to prove all of this stuff, and I'm

2    objecting to anything that goes beyond the scope of the

3    superseding indictment.

4         I have no problem with him asking questions

5    about the Charter Oak Trust, and its qualities and what

6    they're looking for, in that line of questioning, but to

7    start bringing in some other legal entity for which my

8    client is not under indictment is inappropriate and

9    irrelevant.

10        Thank you.

11        THE COURT:  Mr. Novick?

12        MR. NOVICK:  Your Honor, well, I will offer that

13   document shortly.  The relevance should be clear to the

14   Court, in the sense that -- unless my colleague is

15   prepared to concede materiality here, the impression of

16   the witness as to the fact that he believed these two

17   things to be the same, because he has not described any

18   difference.

19        So then the fact that they were marketing

20   materials or descriptions of the Grist Mill Trust, it was

21   very relevant:  What did the sales rep for these folks

22   understand the Charter Oak Trust to be; what material was

23   he provided, related material Phoenix was provided.

24        I think it's very much relevant.  I don't

25   anticipate or intend to put in specific policies from the

1    Grist Mill Trust.  There may be discussion from time to

2    time because it was there, contemporaneous to the Charter

3    Oak Trust, although it started beforehand.

4          So I think number one is relevant.  Number two,

5    I think relevance will become clear as we go along.  And

6    it's very little relevance to the defendant, given it's a

7    bench trial.

8          THE COURT:  I'm going to allow you to proceed.

9    But before we do that, Mr. Glynn has testified that there

10   came a time when Phoenix did business with Benistar in

11   connection with the Grist Mill Trust?

12         MR. NOVICK:  That's right, Your Honor.

13         THE COURT:  I don't think I've heard testimony

14   about the Charter Oak Trust.

15         MR. NOVICK:  I can clarify that, Your Honor.

16         MR. BROWN:  I take it the Court's overruling my

17   objection.

18         THE COURT:  Yes.

19   BY MR. NOVICK:

20   Q.   Let me clarify, Mr. Glynn.

21        Did Phoenix also ultimately issue policies within the

22   Charter Oak Trust as well, to your knowledge?

23   A.   I can't recall.

24   Q.   We're going to look at some documents for a few

25   minutes.

1          Have you looked at some documents that seemed to

2      indicate there were Phoenix policies within the Charter

3      Oak Trust?

4              MR. BROWN:  Excuse me, Your Honor.  He's already

5      answered that he doesn't recall.  This calls for

6      speculation.

7              THE COURT:  All right.

8              MR. NOVICK:  I'm asking whether he looked at

9      documents, and we can check and show him documents.  He's

10     about to look at documents that may refresh your

11     recollection on those points.

12             THE COURT:  Well, I don't insist that you do it

13     this minute.  If you're happier proceeding as you planned

14     to do, it's okay with me.

15             All right.  We'll be in recess for 20 minutes.

16                 (Whereupon, a recess followed)

17             MR. NOVICK:  Thank you, Your Honor.

18     BY MR. NOVICK:

19     Q.   Mr. Glynn, before we broke, we were talking about the

20     approval of the Grist Mill Trust in the -- to be used with

21     Phoenix policies.

22          Do you recall that?

23     A.   Yes.

24     Q.   Was there a process involved for the approval of the

25     Grist Mill Trust?

1   A.   Yes.

2   Q.   And were there meetings involved?

3   A.   Yes.

4   Q.   Submission of documents?

5   A.   Yes.

6   Q.   And you testified earlier -- were you aware of an

7   entity called the Charter Oak Trust?

8   A.   Yes.

9   Q.   And you testified earlier that you did not

10  necessarily recall a distinction between the two, is that

11  right?

12  A.   I didn't.

13  Q.   I'm going to have you take a look at the next

14  document behind tab 3.  That's Government's Exhibit 1917.

15       Can you tell us just --

16            MR. BROWN:  Excuse me for a second, if I may,

17  before you start talking about the document?

18            MR. NOVICK:  Depends on what it is before I

19  offer it.

20            MR. BROWN:  I'm sorry.

21  BY MR. NOVICK:

22  Q.   Can you tell us what it is?

23  A.   It looks like a memo to me from Ed Waesche.

24  Q.   At the top, does it have a logo on it?

25  A.   Yes, it does.

1    Q.    What's that?

2    A.    It looks like a Grist Mill Trust.

3              MR. NOVICK:  Your Honor, I would offer

4    Exhibit 1917.

5              MR. BROWN:  Your Honor, if I may, on

6    paragraph 22 of the superseding indictment, it

7    indicates -- the first date that I can come up with in

8    this superseding indictment of 60-something pages is

9    October of 2006.  That's our notice.

10             This document, Your Honor, is dated April 21,

11   2006.  I can tell this Court that the Charter Oak Trust

12   wasn't created until October of 2006, which is why it's in

13   paragraph 22 of the indictment.

14             So aside from my objection, Grist Mill Trust,

15   which none of the 84 policies are under the Grist Mill

16   Trust -- correct me if I'm wrong, all under the Charter

17   Oak Trust.  It's irrelevant for that reason, and it's

18   irrelevant, Your Honor, because it precedes the

19   allegations in the superseding indictment, and it's

20   irrelevant.

21             THE COURT:  Why is it relevant, Mr. Novick?

22             MR. NOVICK:  Your Honor, it's going to become

23   very clear from the next two documents, but the point of

24   offering this is sort of twofold.

25             One is to explain that, as I had indicated

1    earlier, that the witness didn't know a distinction in --

2    was never explained a distinction between the Charter Oak

3    Trust and the Grist Mill Trust, believed the Charter Oak

4    Trust was just a regular 419 plan.

5            And so what was understood and what was provided

6    regarding marketing materials for any of this is what

7    we're about to look at.

8            THE COURT:  So this is pertinent background?

9            MR. NOVICK:  It's both -- so first, it's

10   pertinent background to understand what's coming.  And

11   you're going to see some emails again conflating the

12   Charter Oak and the Grist Mill Trust.

13           Part of that won't get tied together until we

14   put in -- part of why we have the scheme evidence to show

15   Your Honor, I can make it clear as we go along, why that

16   conflation is evidenced by other things within the case.

17           THE COURT:  So that covers relevance.

18           What about undue prejudice because of lack of

19   notice?

20           MR. NOVICK:  Your Honor, these documents the

21   defendant has had since -- this document in particular was

22   one of the first documents, I believe, in the first

23   production that was turned over to the defendant, you

24   know, a couple of years ago.  I don't think there's any

25   undue prejudice at all.  It certainly was on the exhibit

1  list that I gave to counsel, and it certainly ought to be

2  no surprise.  The report of interview for Mr. Glynn was

3  certainly provided, I think, with the first production

4  in 2014.

5          So his belief as to what these things were has

6  been consistent.  This is a document that came from Grist

7  Mill Road, from an agent of Grist Mill Road.

8          MR. BROWN:  If I may, Your Honor, so that the

9  Court is not misled:  It's true, I assume.  I'll take him

10  at his worth.  I'm not exaggerating, we got roughly about

11  a million documents, and I would note, thank God, for the

12  most part, none of them are in because they're not

13  necessarily relevant.

14         So the fact that we got a document that was

15  literally buried in a million documents, I think I have a

16  right to rely upon on behalf of my client the framework of

17  the four walls of the superseding indictment.

18         And there's no reference to Grist Mill Capital.

19  There's no reference to conduct before October of 2006.

20  It's not relevant.  And like many, many other documents,

21  Your Honor, there's no reason that I would have to believe

22  that they would be relevant.

23         It is true that he has provided us before today

24  with previous statements made by this witness, and I

25  appreciate that, but having read those statements, it

1    doesn't tie in or refer to this particular document.

2              THE COURT:  Okay.  Well, I think, based on the

3    submissions of counsel, that it's relevant.  And I'm not

4    satisfied that the relevance is substantially outweighed

5    by a risk of prejudice to Mr. Carpenter, so I'll let you

6    proceed.

7              MR. NOVICK:  Thank you, Your Honor.

8    BY MR. NOVICK:

9    Q.   Okay, Mr. Glynn, I'm going to first -- and consistent

10   with our discussion earlier about not having you read out

11   loud, I'm going to direct you first to read to yourself

12   the second paragraph beginning, "As you recall, the Grist

13   Mill Trust is."

14        Have you finished reading that paragraph?

15   A.   Yes.

16   Q.   Does that accurately capture generally what you

17   understood the Grist Mill Trust to be?

18   A.   Yes.

19              MR. BROWN:  Objection, Your Honor.  He testified

20   about, before, that he doesn't have a recollection

21   relevant to this trust.

22              MR. NOVICK:  I said Grist Mill Trust.  He did

23   testify to Grist Mill Trust several times.

24              MR. BROWN:  I know he testified, but he

25   indicated he couldn't tell a distinction between the two.

1        THE COURT:  The question goes to the Grist Mill

2   Trust period?

3        MR. NOVICK:  Yes.

4        THE COURT:  Overruled.

5   BY MR. NOVICK:

6   Q.  And by extension, apropos of what counsel's objection

7   was, similarly, did you understand there to be any

8   distinction between that Grist Mill Trust, that

9   description, and the Charter Oak Trust?

10        MR. BROWN:  Excuse me, Your Honor.  Again, I

11  don't mean to delay these things, but I feel I have no

12  choice, Your Honor, because it's clear from previous

13  testimony, he doesn't know.  He testified he doesn't know,

14  and now counsel is asking him to distinguish between stuff

15  he doesn't recall.

16        THE COURT:  He's asking if he was aware of any

17  distinction between the two, which I think is a fair

18  question.

19        You may answer.

20        THE WITNESS:  I was not.

21  BY MR. NOVICK:

22  Q.  I want to make sure we're clear here:  It's not that

23  you didn't know what the Charter Oak Trust was, it's that

24  you didn't know there to be a distinction between the

25  Charter Oak Trust and the Grist Mill Trust, is that --

1    A.    That's correct.

2    Q.    With this letter are several enclosures, and I just

3    want to direct you to a few of them, not all of them.

4          First, page 3 of the exhibit, there's a --

5              MR. BROWN:  Counsel, perhaps you could refer to

6    the Bates number.

7              MR. NOVICK:  Certainly, I'm going to do that as

8    well.  I just wanted to get onto the right page of the

9    screen.

10   BY MR. NOVICK:

11   Q.    It's Bates number ending 348.

12         You see that?

13   A.    Yes.

14   Q.    What's the title of that document?

15   A.    "Grist Mill Trust Welfare Benefits Plan, November

16   Billing."

17   Q.    Does it appear to be a notice of contribution form

18   for a generic employer?

19   A.    Yes, it does.

20   Q.    And is that consistent with your understanding that

21   plans were to be funded by employers?

22   A.    Yes.

23   Q.    Let's take a look now at the document, Bates

24   ending 352.

25         What's the title of this page?

1    A.    "Grist Mill Trust, Advantages of the Grist Mill

2    Trust."

3    Q.    And just looking at the first few lines, take a look

4    at those.  I've highlighted them on the screen, the first

5    couple of bullets.

6          And again, was that consistent with your

7    understanding that premiums were being contributed by

8    employers in these plans?

9    A.    Yes.

10   Q.    Anywhere in this document reference the possibility

11   of an advantage being the provision of cash from life

12   settlements?

13         And I can --

14   A.    No.

15   Q.    -- open the document here.

16         Anywhere in this document, in the advantages of the

17   Grist Mill Trust, talk about third-party funding of

18   policies?

19   A.    No.

20   Q.    Now, let's turn a couple of pages in, to Bates

21   ending 355.

22         What is this document entitled?

23   A.    "Grist Mill Trust Welfare Benefit Plan Adoption

24   Agreement."

25   Q.    Why did you understand Mr. Waesche to be providing

1    you with these documents?

2    A.    To provide us with information relative to their

3    plan, and how the plan is established, and the process of

4    the plan.

5    Q.    Just take a look at the first paragraph.  It's all

6    I'm going to have you look at on this page.

7         Does it seem to indicate that an employer would be

8    agreeing to provide funds -- to contribute funds for the

9    benefit of employees?

10   A.    Yes.

11   Q.    And again, was that your understanding of how the

12   419 plan worked, as we discussed before?

13   A.    Yes.

14   Q.    And was that your understanding without a distinction

15   of both the Charter Oak Trust and the Grist Mill Trust?

16   A.    Yes.

17   Q.    Take a look at page 371, moving forward a little bit.

18        Does that appear to be a brochure?

19   A.    Yes.

20   Q.    Of marketing material?

21   A.    Yes.

22   Q.    And I'm just going to direct you forward within that

23   document to page 376.

24        Does that indicate certain steps that one would have

25   to take in order to join and participate in the Grist Mill

1  Trust?

2  A.    Yes.

3  Q.    Just take a minute and look through those steps.

4       Is that consistent with your recollection of how the

5  Grist Mill and Charter Oak trusts worked?

6  A.    Yes.

7       MR. BROWN:  Objection, Your Honor.  This is a

8  document that purports to be the Grist Mill Trust which,

9  as I've stated, Your Honor, is not relevant to any of the

10 84 policies.

11      I can tell the Court the preview of coming

12 attractions that the government intends to introduce the

13 adoption agreements of each of the insureds that

14 constitute the first 12 to 15 that concern themselves with

15 the Charter Oak Trust.

16      And to continue to ask about questions about a

17 trust that has no role in this particular criminal case,

18 Your Honor, aside from wasting the Court's time, is

19 clearly irrelevant; that he's going to have -- he, being

20 the prosecutor, is going to have ample opportunity to

21 demonstrate to this Court whatever he wants to, concerning

22 adoption agreements that concern themselves with the

23 Charter Oak Trust, that concerns themselves with Counts 1

24 through 57.

25      So why we're spending a half an hour talking

1    about some trust agreement that is irrelevant, Your Honor,

2    I submit it's inappropriate that this testimony be

3    considered by the Court.

4            THE COURT:  Okay.  I have ruled that it is

5    relevant based on the representations of government

6    counsel; that this witness, Mr. Glynn, understood that

7    there was no difference between the Grist Mill Trust and

8    the Charter Oak Trust.

9            MR. BROWN:  I'll save it for cross, Your Honor.

10           THE COURT:  Okay.

11   BY MR. NOVICK:

12   Q.   All right.  I don't remember if I got an answer to

13   that last question.

14        Was this consistent, these steps we just looked at,

15   consistent with your recollection or understanding of how

16   both trusts operated?

17   A.   Yes.

18   Q.   Again, without a distinction in your recollection as

19   to what the two of them were?

20   A.   Yes.

21   Q.   Anywhere along these steps or anything that you were

22   aware of -- in either of the Grist Mill Trust or, in

23   particular, the Charter Oak Trust -- reference sale of the

24   policy or third-party financing or funding?

25   A.   No.

1    Q.   And then just one last page in this particular

2    document, I'll have you go to.  There's a question in the

3    frequently asked question section.  It ends on page 385.

4         And the question is -- at least with regards to the

5    Grist Mill Trust, it says:  "Does the employee have access

6    to the cash value of the life insurance inside?"

7         I'll have you read that paragraph, and then I'll

8    reference that paragraph again in the next document we're

9    going to look at.

10   A.   "Does the Grist Mill" --

11   Q.   You don't need to read it out loud, just to yourself.

12                  (Pause)

13   Q.   What is this referring to, this frequently asked

14   question here?

15   A.   It's referring to provision through a concept called

16   "split-dollar," in which one could access cash value in a

17   life insurance policy.

18   Q.   For a life insurance policy that's already in effect,

19   and then you could use the split-dollar?

20   A.   Correct, the policy in force, and then fund it with

21   cash.

22   Q.   So again, as I said, I'll reference that again in a

23   minute.  I'll have you turn to tab 4.

24        What is this document?

25   A.   It's a memo from Ed Waesche to me, on June 14, 2006.

1          MR. NOVICK:  First of all, Your Honor, I'd offer

2     Exhibit 1918, tab 4.

3          MR. BROWN:  Your Honor, I'll spare the Court

4     hearing me twice, I'll simply adopt my previous arguments,

5     Your Honor.  I'd only note the difference is the date on

6     this particular document.  It's dated June 14, 2006,

7     roughly three or four months before the entity known as

8     Charter Oak Trust was created.

9          But otherwise, may I just adopt by reference,

10    Your Honor, the objections?

11         THE COURT:  Yes, thank you.

12         It will be admitted.

13         MR. NOVICK:  Thank you.

14    BY MR. NOVICK:

15    Q.   Take a minute and just read the letter.

16              (Pause)

17    Q.   Looking particularly at the third paragraph

18    beginning, "As requested, the plan brochure and Q and A

19    have been," is that in reference to that last frequently

20    asked question we looked at a minute ago?

21    A.   Yes, it was.

22    Q.   And do you recall what that means or what the concern

23    was with that?

24    A.   The concern was the ability to access cash from the

25    plan to be used for income, and Phoenix was uncomfortable

1    with that.

2    Q.    Was that a tax concern?

3    A.    Yeah.  That was -- we felt uncomfortable in terms of

4    how it -- whether it was within the code of the 419 plans.

5    We had concerns about that.

6    Q.    Did, in fact, Grist Mill Trust get approved to be

7    used with some Phoenix policies?

8    A.    Yes.

9    Q.    And again, you indicated you didn't recall the

10   difference between Grist Mill Trust and Charter Oak Trust,

11   is that right?

12   A.    No, I did not.

13   Q.    Take a look at tab 5, and it's Exhibit 2227.

14         What is that document?

15   A.    It's a memo from Ed Waesche to me, on June 2009.

16   Q.    Does it appear to be an email?

17   A.    Yes, an email.  Sorry.

18   Q.    And is it to you and several other folks at Phoenix?

19   A.    Yes, it is.

20              MR. NOVICK:  Your Honor, I'd offer 2227.

21              MR. BROWN:  I have no objection, Your Honor.

22              THE COURT:  Thank you.  It will be admitted.

23   BY MR. NOVICK:

24   Q.    Could you read -- or I'll read it.

25         Does it appear to say:  "I have been hosting

1    webinars.  Could look something like this"?

2         You see that?

3    A.   Yes.

4    Q.   And below that, does this appear to be a description

5    of the Grist Mill Trust program?

6    A.   Yes.

7    Q.   And just looking underneath where it says, "Plan

8    highlights include," does that include again, as we looked

9    at before, discussion of company dollars being used to

10   purchase life insurance?

11   A.   Yes.

12   Q.   And this particular email, you testified a second

13   ago, was in June of 2009, correct?

14   A.   Yes.

15   Q.   What was this -- well, let me just ask you:  What was

16   this email, what was the intent of this email, if you

17   recall?

18   A.   To see if we'd be interested in participating --

19   getting our advisers to participate in webinars to learn

20   more about the Grist Mill Trust.

21   Q.   Let's turn to tab 6, and that's Exhibit 2042.

22        What is this document?

23   A.   It's an email from Michele Macy, underwriter at

24   Phoenix, to me.

25   Q.   What's it regarding, what's the subject line?

1  A.   "TPG Grist Mill Trust Cases of Ed Waesche."

2  Q.   Is it responding to an earlier email?

3  A.   Yes.

4  Q.   And who that earlier email is from, there at the

5  bottom, looking at where it says Patrick Glynn to Michele

6  Macy, at the bottom?

7  A.   Yes.

8         MR. NOVICK:  I'd offer 2042.

9         MR. BROWN:  If I may, Your Honor, just simply

10  I'd note, as a subject matter the Grist Mill Trust, if I

11  may just simply adopt my previous arguments.  They didn't

12  really concern COT, but subject to that, Your Honor.

13         THE COURT:  Thank you.  It will be admitted.

14  BY MR. NOVICK:

15  Q.   Taking a look at that bottom email, and it goes on to

16  the top of page 2.  Looking now at the third paragraph on

17  the top of page 2, it says:  "The purpose of this coverage

18  is for estate liquidity."

19  A.   Yes.

20  Q.   What does that mean, "estate liquidity," is that

21  similar to the estate planning you mentioned earlier?

22  A.   Yes.  Many times it can be planning for to cover the

23  cost of estate taxes at the transfer -- at the death of an

24  individual.

25  Q.   Is this particular email in relation to particular

1    policies or insureds?

2    A.   Yes.

3    Q.   Robert Farnum, Robert Solem, Carl Burhanan, and Earl

4    Whitehurst, do you see that?

5    A.   Yes.

6    Q.   Do you recall any of these cases specifically?

7    A.   I don't.

8    Q.   Do you know whether, in fact, these people were

9    Charter Oak insureds or Grist Mill Trust insureds?

10    A.   I don't.

11    Q.   But the subject line of the email was Grist Mill

12    Trust?

13    A.   Yes, it was.

14    Q.   But you can't tell us here whether these were, in

15    fact, Charter Oak people?

16    A.   No, I cannot.

17    Q.   Let's turn to --

18          MR. NOVICK:  One moment, please, Your Honor.

19    BY MR. NOVICK:

20    Q.   You mentioned that, from time to time, you would get

21    involved with the application process where there were

22    questions that the underwriter may have for the producer,

23    is that right?

24    A.   Yes.

25    Q.   Similar to that last document we just looked at

1    involving Michele Macy?

2    A.   Yes.

3    Q.   What other types of things would you be asked by an

4    underwriter, information to gather?

5    A.   Information relative to who their doctor was, or

6    could they clarify information relative to a medical

7    history.

8         Many times it was, if someone was traveling to

9    foreign lands, that there could be potential risk, harm;

10   clarifying financial information such as income, net

11   worth, things of that nature.

12   Q.   Let's take a look at the next document, tab number 7,

13   Exhibit 2130.

14        What is that document?

15   A.   It's an email from me to Ed Waesche.

16   Q.   And what's the date of it?

17   A.   June 12, 2008.

18             MR. NOVICK:  Your Honor, I'd offer 2130.

19             MR. BROWN:  Your Honor, subject to him tying it

20   in to one of the 57 counts, other than that, meaning

21   relevancy, no other objection.

22             THE COURT:  It will be admitted.

23   BY MR. NOVICK:

24   Q.   What's the subject line here?

25   A.   "Knobloch."

1    Q.   First, on this email -- copied to somebody by the

2    name of Jenny, with a NOVA designation; and also Scott

3    Hinchey, on Phoenix WM -- do you know who those people

4    were?

5    A.   I believe Jenny was someone who worked at Benistar,

6    perhaps a new businessperson, and Scott Hinchey worked in

7    my office, and he was a new business manager.

8    Q.   First, I'll have you first take a look at that

9    initial email.

10        It reads:  "Thanks, Ed, I want to send this to" -- is

11   that "senior underwriting officer" there?

12   A.   Yes, it is.

13   Q.   -- "I have discussed this case with.  He's out until

14   Monday.  So bear with me a few days, Pat."

15        Did I read that accurately?

16   A.   Yes, you did.

17   Q.   Is this in response to an earlier email from

18   Mr. Waesche?

19   A.   Yes.

20   Q.   Let's look at the email immediately prior.

21        Is that June 1, 2008, from Mr. Waesche to you, and

22   copying Scott Hinchey and Jenny Valedaserra?

23   A.   Yes.

24   Q.   Take a look at the first paragraph there.  It says,

25   "Pat," the first line.  You can go ahead and just read

1   that.

2       Here, Mr. Waesche is asking you if you can approve

3   his client for issuance.

4       Did you have the power, as a wholesaler, to approve a

5   policy per se?

6   A.   No, I did not.

7   Q.   Who would actually -- what could you do; what could

8   you facilitate?

9   A.   I could help provide information to an underwriter to

10  enable them to make a decision.

11  Q.   And then if you could look at the middle paragraphs

12  beginning, "You told me you now require," those two

13  paragraphs.  And I'll highlight them on the screen as

14  well.

15      Is that the type of information of -- an example of

16  the type of information that you would help the

17  underwriter gather to answer questions about?

18  A.   Yes.

19  Q.   And then if you could look at the last two full

20  paragraphs beginning, "Mr. and Mrs. Knobloch have

21  acquired," go ahead and read those two paragraphs to

22  yourself.

23      The sentence that reads, "The interest income and

24  capital gains will be used to pay the premiums without

25  substantially retarding the growth of their estate."  Was

1    that your understanding of where funds were coming in, in

2    either of the -- in both the Grist Mill Trust and the

3    Charter Oak Trust?

4    A.   Yes.

5    Q.   In other words, coming from either the insured or the

6    company?

7    A.   Yes.

8    Q.   And the second paragraph, again, the purpose of the

9    cover is estate tax liquidity; again, is that consistent

10   with your understanding of the purpose or one of the

11   principal purposes of these trusts?

12   A.   Yes.

13   Q.   Do you recall again whether the Knobloch case was an

14   application in the Grist Mill Trust or the Charter Oak

15   Trust?

16   A.   Yes.

17   Q.   Do you recall which one?

18   A.   Grist Mill, I believe.

19   Q.   Are you sure about that?

20   A.   I'm not.

21   Q.   Okay.  And let's turn to tab 8, Government's

22   Exhibit 2154.

23        What is that document?

24   A.   An email from Guy Neumann from Rex Insurance to me,

25   on October 28, 2008.

1  Q.  What's the subject line here?

2  A.  "Phoenix Request for Requirements on Stephen Rose."

3  Q.  Does it give a policy number there?

4  A.  Yes.

5  Q.  Again, do you recall whether Stephen Rose was Grist

6  Mill or Charter Oak?

7  A.  I do not.

8         MR. NOVICK:  Your Honor, I'd offer 2154.

9         MR. BROWN:  No objection.

10        THE COURT:  Thank you.  It will be admitted.

11 BY MR. NOVICK:

12 Q.  I'm going to have you read certain parts of this; but

13 first, is this responding to a series of earlier emails or

14 forwarding a series of earlier emails?

15    Do you see that?

16        MR. BROWN:  I'll stipulate to that, Your Honor.

17        THE WITNESS:  Yes.

18 BY MR. NOVICK:

19 Q.  I just want to orient you here, and I'd like to

20 direct you to page 4 of the document, just have you read

21 that.

22 A.  Okay.

23 Q.  It's an email from Heather Prado to D. Frooney,

24 regarding again Stephen Rose, is that right?

25 A.  Yes.

1  Q.   It says:  "Please advise if this file is going to be

2  financed.  The SOCI form indicates no, but the agent cover

3  letter indicates 'other.'  Please note.  Due to the

4  client's age of 81, we cannot proceed with financing."

5      What's the SOCI form, is that the form you referred

6  to earlier?

7  A.   Yes.

8  Q.   And what's an agent cover letter?

9  A.   A dover letter provided by agents that describes the

10  case and talks about who the client is, what the purpose

11  of coverage is, and any relevant facts pertaining to

12  the -- how the face amount was arrived at.

13  Q.   So there's a discrepancy being asked about here, in

14  terms of the SOCI, and the cover letter indicating

15  "other," with regard to the funding or financing?

16  A.   Yes.

17  Q.   Let's turn now to the next email up, which would be

18  back on page 3, from Heather Prado to Peter Cammarota,

19  Phoenix WM.

20      Do you know who Peter Cammarota is?

21  A.   Yes.

22  Q.   Go ahead and read this email.

23      It indicates that "This policy is not a premium

24  financing case.  The premiums are being paid by his

25  business.  We noted that as corp funding on the cover

1   letter."

2       Did I read that accurately?

3   A.   Yes.

4   Q.   Now I want to direct you to the next email up in the

5   chain, beginning on page 2 and going on to page 3, from

6   Heather Prado to Guy BPA.

7       Let me ask you this:  Do you know who Guy BPA is, or

8   who that email was?

9   A.   I know who Guy was.

10   Q.   Who is Guy?

11   A.   Guy Neumann.

12   Q.   What's your familiarity with Guy Neumann?

13   A.   He worked for Rex Insurance and part of the Grist

14   Mill Trust organization, or he worked with the Grist Mill

15   Trust as part of Rex Insurance.

16   Q.   In the Simsbury location of the Benistar entities?

17   A.   Yes.

18   Q.   Take a look at the email, it says, "The underwriter

19   indicated" -- and it looks like at the top of the next

20   page beginning, "This particular case is a bit confusing

21   for me," can you go ahead and read that?

22           (Pause)

23   Q.   Are you done?

24       Thank you.

25       So is this indicating, where it says, "I just told

1    Pete that, yes, the client was too old for the premium

2    financing, so that the premium was coming out of his LLC

3    instead," again, is that your understanding of the source

4    of the funds in the welfare benefits plan base?

5    A.    Yes.

6    Q.    In particular, with regard to the Grist Mill Trust

7    and the Charter Oak Trust?

8    A.    Yes.

9    Q.    Now I'm going to bring you ultimately finally up to

10   the top email, from Mr. Neumann to you, and look at a few

11   of the paragraphs or a couple of paragraphs here,

12   beginning, "The client's name is Stephen Rose."

13        Go ahead and read that.

14        And then I'll have you read, "For the past few

15   weeks," there's a paragraph in the middle of the page

16   beginning with, "For the past few weeks."  There's a

17   paragraph which I'll highlight and ask you to read.

18        Again, was this consistent -- this appears to

19   indicate that the rose Policy was related to the Charter

20   Oak Trust, is that right?

21   A.    Yes.

22   Q.    You didn't have an active recollection of that

23   distinction prior to looking at this email, is that

24   correct?

25   A.    No.

1    Q.   And looking at the bottom paragraph, I'll have you

2    read that briefly.

3                    (Pause)

4         Based on this, did you understand that the insured

5    would be generating the money himself to pay the premiums

6    with his own assets?

7    A.   Yes.

8    Q.   Is there any indication here at all that there was go

9    going to be some third party funding the premiums?

10   A.   No.

11   Q.   In fact, was this in response to concerns and further

12   explanation over what the Charter Oak Trust or what the

13   trust in general, the 419 trust, was?

14   A.   Uh-huh, yes.

15   Q.   Have you turn to tab, Exhibit 2188.

16        What is that?

17   A.   Email from Ed Waesche to Scott Hinchey, on Monday

18   January 26, 2008 -- '9.

19             MR. NOVICK:  Your Honor, I'd offer Exhibit 2188.

20             MR. BROWN:  No objection.

21             THE COURT:  It will be admitted.

22   BY MR. NOVICK:

23   Q.   This is a relatively short email.

24        Could you read it for us?

25   A.   "Did you get a chance to look into the status of the

1    Zahner and Paulsrud?  I know they have only a quarter or

2    so of premium in them each, and that they need another

3    payment immediately.  I just need some ammo to go to the

4    client for payment.  Thanks, Ed."

5    Q.   Do you recall whether Zahner and Paulsrud are Charter

6    Oak or Grist Mill Trust?

7    A.   I don't.

8    Q.   Based on this, when it says, "I just need ammo to go

9    to the client for payment," who did you understand

10   "client" to mean?

11   A.   Wanted to know the status of the policy in terms of

12   where it was from, a funding standpoint, and wasn't in

13   jeopardy of lapsing; and is there an imminent need to pay

14   the premiums, how long before the policy would lapse.

15   Q.   Specifically where it says, "I just need some ammo to

16   go to the client," who did you understand "client" to

17   refer to here?

18   A.   The insureds.

19   Q.   Tab 10, Exhibit 706, what is this?

20   A.   Appears to be an email from Ed Waesche to Scott

21   Hinchey.

22   Q.   Let me lead you a little bit.

23        Is this an email at the top from Scott Hinchey to

24   someone by the name of John Grippo?

25   A.   Yes.

1    Q.   Is it forwarding an email from Waesche to Hinchey,

2    and copying you?

3    A.   Yes.

4    Q.   Regarding Henry Cooper?

5    A.   Yes.

6    Q.   And just the first line there:  "Attached is a copy

7    of the cover letter I put together when I sent the case in

8    originally.  It should help."

9         Did I read that accurately?

10   A.   Yes.

11   Q.   And in fact, let's take a look at the attachments,

12   the fourth page of this exhibit.

13        Is that a memo?

14   A.   Yes, it is.

15   Q.   From who to who?

16   A.   To Ineke Henderson from Ed Waesche.

17   Q.   I'm going to direct you -- and is it regarding again

18   Henry Cooper?

19   A.   Yes.

20   Q.   And just in the first paragraph, does it appear to be

21   related to Mr. Cooper's Charter Oak Trust application?

22   A.   Yes.

23   Q.   And now looking at paragraph 3, where it says --

24   begins, "This client currently has no life insurance,"

25   could you just read that paragraph to yourself?

1      Is this consistent with your understanding of the

2   purpose of the policies in the Charter Oak Trust to be

3   estate planning-type purposes?

4   A.   Yes.

5   Q.   Any reference in this document to the potential for a

6   sale -- proceeds from a sale of a policy?

7   A.   No.

8   Q.   Again, you testified to this in general terms

9   earlier, but why did getting a document like this, why did

10   this information matter to Phoenix?

11   A.   It just gave us more information regarding the

12   proposed insured, the purpose of the sale, how the sale

13   was arrived at; just gave us a better understanding of,

14   you know, why we're doing this.

15   Q.   Was this kind of memorandum something that would be

16   commonly sent by Mr. Waesche to Phoenix?

17   A.   Yes.

18   Q.   In fact, was this kind of memorandum sent by other

19   agents, as well, to Phoenix?

20   A.   Yes.

21   Q.   And was the -- was this part of the application

22   package that would be reviewed by the underwriter?

23   A.   Yes.

24   Q.   And would be evaluated as part of that

25   decision-making process we've been discussing?

1    A.    Yes.  It would be factored in.

2    Q.    At some point in 2000, I believe you said 2010, you

3    left Phoenix insurance company?

4    A.    Yes.

5    Q.    What were the circumstances of your departure?

6    A.    Pursue new opportunity.

7    Q.    Where did you go to work?

8    A.    Brokerage general agency in Farmington, Connecticut.

9    Q.    Do you recall at any point, are you familiar with any

10   litigation around any of the Charter Oak Trust policies,

11   any civil litigation?

12   A.    No, I'm not.

13   Q.    You were not made aware of that, to your

14   recollection?

15   A.    I was not.

16          MR. NOVICK:  One moment, please, Your Honor.

17                (Pause)

18          MR. NOVICK:  The only thing that I neglected to

19   do, Your Honor, was offer Exhibit 706.

20          MR. BROWN:  No objection.

21          MR. NOVICK:  I have no further questions, Your

22   Honor, for this witness.

23          THE COURT:  Would this be an appropriate time to

24   adjourn?

25          MR. BROWN:  Yes, Your Honor.

1          THE COURT:  All right.  We'll reconvene tomorrow

2    at 9:00.

3          MR. NOVICK:  Your Honor.  If I could just have a

4    moment to consult with counsel for the defense and counsel

5    for the witness, just because I understand that the

6    witness has some obligations tomorrow, and I want to make

7    sure that we're satisfying everybody.

8          THE COURT:  All right.

9              (Pause)

10          MR. BROWN:  Yes, Your Honor.

11          MR. WADE:  Good afternoon, Your Honor.

12          THE COURT:  Attorney Wade, nice to see you.

13          MR. NOVICK:  Your Honor, I'm trying to be

14    sensitive.  Obviously our pace has not proceeded as I may

15    have intended, and I take full responsibility for that.

16          I understand the witness has a medical

17    appointment tomorrow at 12:30, in Farmington.  In

18    discussing with Mr. Brown, he thinks he will go -- without

19    obviously holding him to this -- no longer than a couple

20    of hours, such that he, Mr. Glynn would be out of here by

21    11:00, to allow him enough time to get to his doctor's

22    appointment.

23          We all, I think, agree that if we get to that

24    critical cutoff point and there's significant more stuff

25    that Mr. Brown wants to go to, then we can then call

1  Mr. Glynn out of order on another day, if it's no problem

2  with the Court.  I understand Mr. Glynn has some other

3  appointments too, but I'm trying to balance --

4          THE COURT:  It's all right with me.

5          MR. WADE:  The medical appointment is a

6  longstanding one and involves a test that can't be

7  postponed.

8          THE COURT:  That's fine.

9          We'll see you at 9:00 tomorrow.  Have a good

10  night.

11              (Proceedings adjourned at 4:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3           In Re: U.S. vs. CARPENTER

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                       DARLENE A. WARNER, RDR-CRR
17                        Official Court Reporter
                        450 Main Street, Room #223
18                      Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25