1                    UNITED STATES DISTRICT COURT

2

3                 FOR THE DISTRICT OF CONNECTICUT

4

5      – – – – – – – – – – – – – – – x
                                    :
6      UNITED STATES OF AMERICA      :   No.  3:13CR226(RNC)
                                    :
7               vs.                  :
                                    :
8      DANIEL CARPENTER, ET AL,      :
                                    :   HARTFORD, CONNECTICUT
9                     Defendants.   :   March 9, 2016
                                    :
10     – – – – – – – – – – – – – – – x

11

12

13                        BENCH TRIAL
                          VOLUME XIV

14

15

16        BEFORE:

17              HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22

23

24                              Darlene A. Warner, RDR–CRR
                                Official Court Reporter
25

```
 1

      APPEARANCES:
 2

 3          FOR THE GOVERNMENT:

 4              U.S. ATTORNEY'S OFFICE-NH
                157 Church Street
 5              P.O. Box 1824; 23rd Floor
                New Haven, Connecticut 06510.
 6              BY:  DAVID E. NOVICK, AUSA
                     NEERAJ PATEL, AUSA
 7

            FOR DAVID CARPENTER:
 8

                BROWN, PAINDIRIS & SCOTT
 9              100 Pearl Street, 2nd Floor
                Hartford, Connecticut 06103
10              BY:  RICHARD R. BROWN, ESQ.
                     CODY N. GUARNIERI, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                             TABLE OF CONTENTS

3

4      WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

5

6

7      LYNN ALLEN

8       BY MR. NOVICK:    2427                    2582

9       BY MR. BROWN:              2571

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                            10:08 A.M.

 2

 3              THE COURT:  Good morning.  All set to proceed?

 4              MR. NOVICK:  I am, Your Honor, thank you.

 5              THE COURT:  Mr. Brown, I'll rely on you to let

 6    me know when you want to take a break.

 7              MR. BROWN:  If I may report to the Court, Your

 8    Honor?  Thank you.

 9              I had a conversation with Attorney Durham, John

10    Durham, this morning to explain that I'll try to make this

11    as fast as possible, the judge is expecting a call at

12    10:30, so I'm thinking just a couple of minutes before.

13              What I worked out with Attorney Durham today is

14    we would be in agreement with, simply the Court wants to

15    know why I filed a motion for enlargement of time.  It's

16    totally understandable, but it's my third request, and

17    both the government and myself are in agreement it should

18    be granted.  So I expect this to take no more than five or

19    ten minutes.

20              And I would suggest that as opposed to the

21    morning break, just a little time out, I could do it in

22    the hallway out there.  And so I would say about 10, 20

23    minutes or so.

24              THE COURT:  We'll plan on that.  You're just

25    going to use your cell phone?
</pre>

1          MR. BROWN:  Yes, thank you.

2          THE COURT:  Thank you.

3          MR. BROWN:  I don't know if the Court wants to

4    inquire as to how my client is doing today, Your Honor?

5          THE COURT:  Yes.

6          THE DEFENDANT:  Actually, Your Honor, I had a

7    really rough name last night, but the nurse at Wyatt did a

8    great job rewrapping everything at 5:00 in the morning.

9    So I didn't have a chance to talk to my attorneys today,

10   but the doctor wants to put me on a diuretic called lasix,

11   L-A-S-I-X, and I'm going to inform my attorney about that

12   at lunchtime and I've got all the details to give him.

13         Thank you.

14         THE COURT:  Thank you.

15         Mr. Novick?

16         MR. NOVICK:  Thank you, Your Honor.

17

18

19

20

21

22

23

24

25

```
 1
 2                        LYNN ALLEN,
 3           called as a witness, having been previously duly
 4           sworn or affirmed, was examined and testified as
 5           follows:
 6
 7
 8                 DIRECT EXAMINATION (continued)
 9     BY MR. NOVICK:
10     Q.   Good morning, Agent Allen.
11     A.   Good morning.
12     Q.   When we left off yesterday, we were still in a binder
13     for Straw Insureds 1 through 6.  The Court had just
14     admitted Exhibit 313.
15                 MR. NOVICK:  Your Honor, as a housekeeping
16     matter, I believe I talked about, I did not offer
17     Exhibits 1703 and 2281, which I would do so at this time.
18                 MR. BROWN:  Your Honor, may I have a moment?
19                 THE COURT:  Yes.
20                 Do you happen to have the tabs for those?
21                 MR. NOVICK:  1703 would be in the 1700's binder.
22     It was the ISM related documents.  And then I will get
23     Your Honor the tab for --
24                 THE WITNESS:  It's 98.
25                 MR. NOVICK:  Thank you.
```

1          MR. BROWN:  We need just a moment, Your Honor.

2               (Pause)

3          MR. NOVICK:  I'm sorry, Your Honor, the one that

4     has been not admitted is 2081, so I apologize.

5          MR. BROWN:  May I have just a moment, Your

6     Honor?

7          THE COURT:  Yes.

8               (Pause)

9          MR. BROWN:  No objection, Your Honor.

10         THE COURT:  Thank you.  They will be admitted.

11         MR. NOVICK:  Returning to the binders for Straw

12    Insureds 1 through 6, yesterday we had been talking about

13    the Knobloch case, and we had offered -- last offered 313,

14    which the Court had admitted.

15         At this time I would also offer tabs 316 --

16    Exhibit 316 and Exhibit 317, which are the two -- call

17    them termination letters.

18         MR. BROWN:  Your Honor, no objection.

19         THE COURT:  Thank you.

20    BY MR. NOVICK

21    Q.   And then just for purposes of clarity, Special Agent

22    Allen, following along in our summary chart, Government's

23    Exhibit 4, that would be Count Six, is that right?

24    A.   Yes.

25    Q.   And that would be related to Exhibits 314, is that

1    right?

2    A.    Correct.

3    Q.    And again, I'm not going to go through that in

4    detail.  It's already in evidence.

5         I'm sorry, that's Count Five -- Count Six,

6    Exhibit 314, correct?

7    A.    Correct.

8    Q.    The next series of documents relates to Teresa

9    Martinez.

10             MR. NOVICK:  Your Honor, I would offer

11   Exhibit 401; Exhibit 403; Exhibit 408; Exhibit 410;

12   Exhibit 412, 413, and 416, all being exhibits that had not

13   been previously offered relating to Ms. Martinez.

14             MR. BROWN:  If I may have just a moment, Your

15   Honor?

16             THE COURT:  Yes.

17                (Pause)

18             MR. BROWN:  No objection, Your Honor.

19             THE COURT:  They will be admitted.

20   BY MR. NOVICK:

21   Q.    Special Agent Allen, just for purposes of clarity,

22   for example, looking at Exhibit 416, there are two exhibit

23   stickers there.  The bottom is an exhibit sticker labeled

24   TM14.

25        Do you know, on each of those exhibits, why there are

1    two exhibit stickers?

2    A.   Yes.   These documents were presented as exhibits

3    during a deposition conducted of Teresa Martinez.

4    Q.   Okay.  So they were exhibits there, and then being

5    offered as exhibits here?

6    A.   Correct.

7    Q.   Now take a look at, collectively, 417 and 418.

8         Are those the documents related to Count Seven, the

9    October 10, 2008, wire transfer listed on the summary

10   chart?

11   A.   Yes.

12              MR. NOVICK:  I would offer 417 and 418.

13              MR. BROWN:  No objection, Your Honor.

14              THE COURT:  They will be admitted.

15   BY MR. NOVICK:

16   Q.   And then 419, what is that?

17   A.   A bank statement for the time period of October 2008,

18   from Bank of America, Avon Capital account ending in 6620.

19   And it confirms the wire transfer represented in 417

20   and 418.

21              MR. NOVICK:  I'd offer 419.

22              MR. BROWN:  No objection, Your Honor.

23              THE COURT:  It will be admitted.

24   BY MR. NOVICK:

25   Q.   Next exhibit, which I believe came in through

1    Ms. Lutes, 420, is that the supporting document for

2    Count Eight?

3    A.   Yes.

4    Q.   And next, looking at Exhibit 421 and 422, what are

5    those?

6    A.   So 421 is a Bank of America funds transfer request

7    and authorization for March 25, 2009, to transfer the

8    amount of $55,650 from the account of Avon Capital, ending

9    in 6620, and going to the PNC Bank account for Charter Oak

10   Trust, ending in 3247.  It is signed by Daniel Carpenter.

11       And then 422 is a wire confirm, confirming that that

12   transfer occurred.

13   Q.   Are those the documents as detailed in the summary

14   chart as to Count Nine of the indictment?

15   A.   Yes.

16   Q.   And then Exhibit 423, just to move this along, is

17   that the bank statement that confirms that wire transfer

18   we just referenced?

19   A.   Yes.

20           MR. NOVICK:  Your Honor, I'd offer 421, 422 and

21   423.

22           MR. BROWN:  No objection, Your Honor.

23           THE COURT:  They will be admitted.

24   BY MR. NOVICK:

25   Q.   Exhibit 424, what is that?

1   A.   This is the email from Don Trudeau to Deborah Lutes,

2   asking for the transfer of money from PNC Bank to Penn

3   Mutual, and it relates to Count Ten in the indictment.

4   Q.   I believe that's already been offered through

5   Ms. Lutes.

6        Special Agent Allen, just to perhaps give a little

7   further explanation, I note that even using the summary

8   chart, Count Nine shows a wire transfer from Bank of

9   America to PNC, and Count Ten is an evidence of a transfer

10  from Charter Oak Trust to the insurance carrier, is that

11  right?

12  A.   Correct.

13  Q.   So those counts essentially work in tandem with one

14  another?

15  A.   Yes.

16  Q.   To go from Avon to Charter Oak, and then Charter Oak

17  to the insurance carrier?

18  A.   Yes.

19  Q.   Let's move on to the next section of the binder

20  related to Ms. Paulsrud.

21           MR. NOVICK:   I believe Exhibit 501 has already

22  been admitted into evidence during Mr. Waesche's

23  testimony, but I will offer 502, 504, 505, 506, and 509,

24  all being documents that I have not yet been offered.

25

1    BY MR. NOVICK:

2    Q.   Although again I would note that a lot of these also

3    have stickers from the deposition, is that right?

4    A.   Correct.

5            MR. BROWN:  No objection, Your Honor.

6            THE COURT:  They will be admitted.

7    BY MR. NOVICK:

8    Q.   Okay, now flipping forward to 515, and 516, and 517,

9    what are those?

10   A.   So these again are a funds transfer request and

11   authorization form; the wire confirm, confirming that

12   transfer; and the bank statement to show that the transfer

13   did occur.  And they relate to Counts -- Count 11 in the

14   indictment.

15   Q.   As demonstrated on the summary chart?

16   A.   Yes.

17   Q.   And these are from -- these documents are from Bank

18   of America, is that right?

19   A.   Yes.

20           MR. NOVICK:  I would offer 515, 516 and 517.

21           MR. BROWN:  No objection, Your Honor.

22           THE COURT:  They will be admitted.

23   BY MR. NOVICK:

24   Q.   And then I believe 518 is already in evidence, and

25   that relates -- which count does that relate to as on the

1    summary chart?

2    A.    Count 12.

3    Q.    And again, that comes after the wire that we looked

4    at in 515 and 516?

5    A.    Correct.

6    Q.    Then looking at 519, 520 and 521, what are those?

7    A.    These are documents related to a transfer from

8    TD Bank North.  It's the Grist Mill Capital account in

9    Bank North, ending in 4712, wired to PNC Bank.

10         So we have the transfer request form to confirm, and

11   then the bank statement confirming that the transfer

12   occurred.

13   Q.    And this is related to Ms. Paulsrud's case again?

14   A.    Yes.

15   Q.    And you said those are related to which count in the

16   indictment?

17   A.    I'm sorry.  Count 13.

18              MR. NOVICK:  I'd offer 519, 520 and 521.

19              MR. BROWN:  No objection, Your Honor.

20              THE COURT:  They will be admitted.

21   BY MR. NOVICK:

22   Q.    Now, 522 is in evidence.

23         Is that related to a particular count in the

24   indictment?

25   A.    Count 14.

1    Q.   And that's again an email from Mr. Trudeau to

2    Christiana, with a wire form related to the prior count?

3    A.   Yes.

4    Q.   And then 523 and 524, what are those?

5    A.   They are life expectancy reports for life

6    expectancies conducted on Luella Paulsrud.  One is from

7    AVS Underwriting, dated June 20, 2008, requested by

8    Ridgewood Finance; and the second one is 21st Services,

9    dated May 20, 2008, requested by Ridgewood Finance.

10   Q.   You said the first one and the second one, that's 523

11   and 524?

12   A.   Yes.

13            MR. NOVICK:  I'd offer those two exhibits.

14            MR. BROWN:  No objection, Your Honor.

15            THE COURT:  They will be admitted.

16            Mr. Brown, I think we should take our brief

17   recess now.

18            MR. BROWN:  Thank you, Your Honor.

19               (Whereupon, a recess followed)

20            MR. BROWN:  Your Honor, I want to make it clear

21   on the record so it doesn't come across I was deceitful in

22   any way.  I just talked to Mr. Durham between the time I

23   left the Court and now, and apparently there was an email

24   sent out by the clerk of the Court of the judge,

25   indicating that he was too busy.  And I waited a while,

1    and then I called Mr. Durham.  Hopefully it will be later

2    this week, Your Honor.  Thank you.

3    BY MR. NOVICK:

4    Q.   Okay, Special Agent Allen, let's move on to the --

5    one moment, please -- let's move on to the Judith

6    Amsterdam case.

7         Just by way of orientation here, did we look earlier

8    at emails related to the Amsterdam case?

9    A.   Yes.

10   Q.   And I'll just put a couple of those up on the screen.

11        Exhibit 2124, we talked about yesterday, related to

12   the intent with this particular policy?

13   A.   Correct.

14   Q.   Talking about the recognition of a policy like this

15   in the secondary market, the volume like this in the

16   secondary market?

17   A.   Correct.

18   Q.   And we also looked yesterday at 2119.  Without again

19   repeating anything we did yesterday, this was a forward of

20   a life insurance source of premium eligibility

21   questionnaire, is that right?

22   A.   Yes.

23   Q.   I'd asked you a question yesterday because this form

24   was not completely filled out or signed, has that become a

25   later part of the final application?

1    A.    Yes.

2    Q.    So let's just go through the documents here, none of

3    which I think are admitted, and we'll do it efficiently.

4          Exhibit 601, what is that?

5    A.    It is a Sun Life life insurance application for

6    Judith Amsterdam.

7    Q.    I don't believe we've looked at the Sun Life policy

8    application quite yet.

9          Is it signed by Mr. Bursey?

10   A.    Yes.

11   Q.    And I note on page 3 of the application, there's a

12   question that's not answered asking:  Will the premium for

13   this policy be financed through single or multiple loans

14   from a private or public lender now or in the future.

15         Do you see that?

16   A.    Yes.

17              MR. NOVICK:  Your Honor, I'd offer 601.

18              MR. BROWN:  No objection, Your Honor.

19              THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.    And then turn to 602.

22         What is that?

23   A.    It is a Sun Life life insurance source of premium

24   eligibility questionnaire for Judith Amsterdam.

25   Q.    Is this one the filled-out and signed version of the

1    one that was forwarded in the email we looked at a minute

2    ago?

3    A.   Yes.

4    Q.   And just looking at page 3 of that document, the

5    questions are now answered there?

6    A.   Yes.

7    Q.   How are they answered?

8    A.   "No."

9    Q.   Who is it signed by?

10   A.   Wayne Bursey and Bruce Mactas.

11              MR. NOVICK:  Offer 602.

12              THE COURT:  It will be admitted.

13   BY MR. NOVICK:

14   Q.   603, what is that?

15   A.   A life insurance illustration for Sun Life on the

16   policy insuring the life of Judith Amsterdam.

17   Q.   Was this the -- first let me ask you:  On page 5 of

18   the illustration, is it signed by anybody?

19   A.   By Wayne Bursey.

20   Q.   And this was the illustration that went to Sun Life?

21   A.   Yes.

22   Q.   How do you know that?

23   A.   The Bates stamp at the bottom indicates it was a

24   document we received from Sun Life.

25   Q.   And the next --

1        MR. NOVICK:  I'll offer 603.

2        MR. BROWN:  No objection, Your Honor.

3        THE COURT:  It will be admitted.

4   BY MR. NOVICK:

5   Q.   The next document is 604.

6        What is that?

7   A.   Sun Life request for alteration of application for

8   the policy insuring the life of Judith Amsterdam.

9   Q.   Is it signed by Mr. Bursey again?

10  A.   Yes.

11  Q.   On 604, among the questions what are asked here, is

12  one of them the questions that was not answered on the

13  form we just looked at?

14  A.   Yes.

15  Q.   And that's 1C, about halfway down?

16  A.   Yes.

17  Q.   And how is it answered there?

18  A.   "No."

19       THE COURT:  That's on 604?

20       MR. NOVICK:  That's on 604, Your Honor.

21       So I'll put it up on the screen.

22  BY MR. NOVICK:

23  Q.   This is 604 on the screen now; is that right, Special

24  Agent Allen?

25  A.   Yes.

1    Q.   Just highlighting the middle section entitled,

2    "Section D, Premium Plan and Fund Information" --

3    A.   Yes.

4    Q.   -- and 1C, is that the question that we looked at a

5    minute ago, that had been left blank on the application?

6    A.   Yes.

7             MR. NOVICK:  I'll offer 604.  Sorry.

8             MR. BROWN:  No objection, Your Honor.

9             THE COURT:  It will be admitted.

10   BY MR. NOVICK:

11   Q.   605, what is that?

12   A.   An email from Bruce Mactas to Brian Van Winkle,

13   Bernie Connell, and Felicia Schefer; March 28, 2008;

14   subject, "Re:  J. Amsterdam XXX156442."

15   Q.   And where did this email, just generally speaking,

16   come from?

17   A.   Sun Life.

18   Q.   From the policy file for Judith Amsterdam?

19   A.   Yes.

20            MR. NOVICK:  I'll offer Exhibit 605.

21            MR. BROWN:  No objection, Your Honor.

22            THE COURT:  It will be admitted.

23   BY MR. NOVICK:

24   Q.   I would highlight the longer two paragraphs.

25        The first one, is that a description of the Charter

1    Oak Trust?

2    A.    Yes.

3    Q.    The second paragraph, just highlighting the sentence:

4    "It is clear to me that the funding will be coming from

5    assets as well as income.  The insurance is being put in

6    place for estate planning purposes, and the advisers are

7    fine with the insurance as a vehicle based on the internal

8    rate of return at death analysis on the relationship of

9    premiums to death benefit."

10        You see that?

11   A.    Yes.

12   Q.    Now take a look at 606.

13        What is that?

14   A.    This is a document entitled, "Advantages of the

15   Charter Oak Trust," and it came from Sun Life.

16   Q.    And among other --

17            MR. NOVICK:  I'll offer 606.

18            MR. BROWN:  No objection, Your Honor.

19            THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.    And this came from the Judith Amsterdam policy file?

22   A.    Yes.

23   Q.    And among other things, is there a bullet point there

24   that says company dollars rather than personal dollars are

25   used to purchase life insurance?

1    A.    Yes.

2    Q.    Now take a look at 607, 608 and 609.

3          What are those collectively?

4    A.    Collectively these are the Charter Oak Trust

5    documents related to Judith Amsterdam.

6    Q.    607 being the informal inquiry questionnaire?

7    A.    Yes.

8    Q.    608 being the adoption agreement and related forms?

9    A.    Yes.

10   Q.    And 609 being the disclosure, acknowledgment and

11   certification for Judith Amsterdam?

12   A.    Yes.

13             MR. NOVICK:   Your Honor, I'd offer 607, 608 and

14   609.

15             MR. BROWN:   Your Honor, there's no objection.

16             THE COURT:   They will be admitted.

17   BY MR. NOVICK:

18   Q.    Just so there's no lack of clarity here, where did

19   these documents come from?

20   A.    These documents were received via subpoena.   They

21   were records being held by Halloran & Sage.

22   Q.    And that was -- without getting into the details,

23   those are documents that were held by Halloran & Sage,

24   having been returned to Halloran & Sage from the

25   IRS search warrant?

1    A.    Yes.

2    Q.    So in other words, these were not in the policy file

3    for Judith Amsterdam, is that right?

4    A.    Correct.

5    Q.    Just 609, who signs for Grist Mill Capital in that

6    document?

7    A.    Wayne Bursey.

8    Q.    Now let's take a look at 610.

9          What is that?

10   A.    This is a Bank of America fund transfer request and

11   authorization form requesting the transfer of $32,000 from

12   the Avon Capital account at Bank of America to the PNC

13   Charter Oak Trust account for the policy of Judith

14   Amsterdam.  It is dated April 22, 2009 and signed by

15   Daniel Carpenter.

16   Q.    What is 611?

17   A.    A wire confirm confirming that that transfer

18   occurred.

19   Q.    And then 612?

20   A.    The bank statement for Avon Capital for April 2009,

21   showing that the transfer occurred.

22           MR. NOVICK:  Your Honor -- let me ask one other

23   question.

24   BY MR. NOVICK:

25   Q.    Is that related to a particular count in the

 1    indictment that's shown on the summary chart?

 2    A.    Count 15.

 3              MR. NOVICK:  Your Honor, I'd offer 610, 611

 4    and 612.

 5              MR. BROWN:  No objection.

 6              THE COURT:  They will be admitted.

 7    BY MR. NOVICK:

 8    Q.    And now 613, already in evidence, without again

 9    getting into detail, was that one of the counts on the

10    indictment?

11    A.    It relates to Count 16.

12    Q.    Now look at, please, 614 and 615 and 616.

13          What are those collectively?

14    A.    These are records regarding a wire transfer out of

15    TD Bank North on August 21, 2009, from Avon Capital to

16    PNC, for the Judith Amsterdam policy.  They relate to

17    Count 17 of the indictment.

18    Q.    And this 614 is signed by Mr. Carpenter?

19    A.    Yes.

20              MR. NOVICK:  I would offer 614, 615 and 616.

21              MR. BROWN:  No objection, Your Honor.

22              THE COURT:  They will be admitted.

23    BY MR. NOVICK:

24    Q.    617, is that one of the counts in the indictment as

25    well?

1    A.   Count 18.

2    Q.   And then 618 and 619, are those the termination

3    letters for the Amsterdam case?

4    A.   Yes.

5         MR. NOVICK:  I'd offer 618 and 619.

6         MR. BROWN:  No objection, Your Honor.

7         THE COURT:  They will be admitted.

8    BY MR. NOVICK:

9    Q.   Special Agent Allen, you can put that binder to the

10   side, and we'll go to the binder which involves Straw

11   Insureds 7 through 11.

12        These are documents relating to Mr. Cooper, is that

13   right?

14   A.   Yes.

15   Q.   And a number of these documents have already come in,

16   and I won't reiterate those that have.

17        Just looking at ones that not been admitted yet,

18   first 702, what is that?

19   A.   It is a Phoenix certification acknowledgment of trust

20   agreement for Henry Cooper.

21        MR. NOVICK:  Offer 702.

22        MR. BROWN:  No objection.

23        THE COURT:  It will be admitted.

24   BY MR. NOVICK:

25   Q.   And flipping forward to 711, what is that?

1    A.   This is a collateral assignment agreement for the

2    policy insuring the life of Henry Cooper, and it is signed

3    by Daniel Carpenter.

4    Q.   And 712?

5    A.   A Charter Oak Trust funding obligation agreement and

6    power of attorney dated August 20, 2007, regarding Henry

7    Lee Cooper, signed by Daniel Carpenter.

8    Q.   And by Wayne Bursey?

9    A.   And Wayne Bursey.

10             MR. NOVICK:  I'd offer 711 and 712.

11             MR. BROWN:  No objection, Your Honor.

12             THE COURT:  They will be admitted.

13             MR. NOVICK:  713 is already in evidence, I

14   believe.

15   BY MR. NOVICK:

16   Q.   That's the commitment letter, am I correct?

17   A.   Correct.

18   Q.   So if we look forward to 714, what is that?

19   A.   Grist Mill Capital funding memorandum and funding

20   request dated August 20, 2007, requesting the amount of

21   $227,407.27 for the life insurance policy on Henry Cooper.

22   It is signed by Daniel Carpenter.

23   Q.   And then 715, what's that?

24   A.   It is again a Grist Mill Capital funding memorandum

25   and disbursement request second-year premium, dated

1    June 13, 2008, requesting $25,000 for Henry Cooper, signed

2    by Daniel Carpenter.

3    Q.   And 716, what is that?

4    A.   This is a May 10, 2010 letter and associated

5    documents from NOVA group to Deborah Lutes at Christiana

6    Bank, regarding the funding package for Henry Cooper.

7    Q.   Does it have with it a FedEx label?

8    A.   Yes.

9    Q.   And in 717, what is that?

10   A.   It's a record from Federal Express confirming that

11   this document, the funding package, was sent via Federal

12   Express.

13           MR. NOVICK:  I would offer 714, 715, 716

14   and 717.

15           MR. BROWN:  No objection, Your Honor.

16           THE COURT:  They will be admitted.

17   BY MR. NOVICK:

18   Q.   And again orienting us back to our summary chart, are

19   the last two exhibits we looked at, 716 and 717, related

20   to a count in the indictment?

21   A.   Yes.  Count 19.

22   Q.   I believe the remainder of the documents in that

23   series have already been offered and admitted.  Let's move

24   to Exhibit 801.  I believe it's already in evidence, but

25   just to -- actually withdrawn.

1      Who is this series beginning with 801 relating to?

2   A.    Insured Ronald Goelzer.

3   Q.    And are you aware of what happened to Mr. Goelzer?

4   A.    Yes.  He passed away last year.

5   Q.    And with regard to the policy or intent with his

6   policy, did we look at a couple of emails yesterday that

7   related to that?

8   A.    Yes.

9   Q.    I'll just direct you very briefly again, without

10  going into great detail, to 2174.  Again, without

11  rereading the entire email, did this involve discussion of

12  the return of premium rider used with cases?

13  A.    Yes.

14  Q.    And I believe it says, "In two years we will have the

15  best portfolio imaginable"?

16  A.    Yes.

17  Q.    And then just to close the loop on that, we looked

18  at 2176.

19      Would that involve the Goelzer case?

20  A.    Yes.

21  Q.    And does it read, among other things, "Another great

22  case thanks to the ROP rider"?

23  A.    Yes.

24  Q.    Looking at first 801, which is in evidence -- it came

25  in first through Mr. Westcott -- is this document, this

1    fax, a count in the indictment that we can see on the

2    summary chart?

3    A.   Yes.

4    Q.   That's the December 29 fax of the application?

5    A.   Yes.

6    Q.   Let's look at the next series of documents that have

7    not been entered, beginning with 802.

8         What is that?

9    A.   This is a Lincoln life insurance illustration for

10   Ronald Goelzer.

11   Q.   And this is an illustration that went to Lincoln?

12   A.   Yes.

13             MR. NOVICK:  I'd offer 802.

14             MR. BROWN:  No objection, Your Honor.

15             THE COURT:  It will be admitted.

16   BY MR. NOVICK:

17   Q.   803, 804, 805, what are those?

18   A.   Collectively they are the Charter Oak Trust documents

19   for Ronald Goelzer.

20   Q.   And can you just tell us as to which exhibit -- which

21   set of documents goes with which exhibit?

22   A.   803 is the informal inquiry questionnaire; 804 is the

23   adoption agreement and associated enrollment documents;

24   and 805 is the disclosure, acknowledgment and

25   certification agreement.

1    Q.    And that last document is signed by Mr. Carpenter?

2    A.    Yes.

3    Q.    And again, just to be clear, where did these

4    documents come from?

5    A.    These all came from Christiana Bank's files.

6              MR. NOVICK:  I would offer 803, 804 and 805.

7              MR. BROWN:  No objection, Your Honor.

8              THE COURT:  They will be admitted.

9    BY MR. NOVICK:

10   Q.    Exhibit 806 and 807, what are those?

11   A.    806 is a collateral assignment agreement insuring the

12   life of Ronald Goelzer, signed by Daniel Carpenter; 807 is

13   a December 30, 2008, Charter Oak Trust funding obligation

14   agreement and power of attorney regarding the policy on

15   Ronald Goelzer, and it is signed by Wayne Bursey and

16   Daniel Carpenter.

17             MR. NOVICK:  I'd offer 806 and 807.

18             MR. BROWN:  No objection, Your Honor.

19             THE COURT:  They will be admitted.

20   BY MR. NOVICK:

21   Q.    And 808, what is that?

22   A.    It is a Ridgewood Finance commitment letter dated

23   December 24, 2008, committing the amount of $345,788.49

24   for the policy insuring the life of Ronald Goelzer, and it

25   is signed by Daniel Carpenter.

1    Q.   Thank you.

2              MR. NOVICK:  I'd offer 808.

3              MR. BROWN:  No objection.

4              THE COURT:  It will be admitted.

5    BY MR. NOVICK:

6    Q.   Exhibit 809?

7    A.   Is a Grist Mill Capital funding memorandum and

8    disbursement request dated December 30, 2008, requesting

9    the amount of $229,288.49, regarding the policy insuring

10   the life of Ronald Goelzer, and it is signed by Daniel

11   Carpenter.

12   Q.   Thank you.

13             MR. NOVICK:  I'd offer 809.

14             MR. BROWN:  No objection.

15             THE COURT:  It will be admitted.

16   BY MR. NOVICK:

17   Q.   810, I believe, and 811 are already in evidence.

18        Are they reflected in one of the counts of the

19   indictments?

20   A.   Count 21.

21   Q.   And that's the December 30, 2008 FedEx of the funding

22   memorandum disbursement request?

23   A.   Yes.

24   Q.   812?

25   A.   Is a PNC transfer out form requesting the transfer of

1    $79,000.

2    Q.   Was it part of a package in that exhibit?

3    A.   I'm sorry, yes, it is.  It is a Grist Mill Capital

4    funding memorandum and disbursement request package for

5    the second-year premium, requesting the amount of $79,000.

6    Q.   Again, was that from Christiana Bank?

7    A.   Yes.

8    Q.   The next document --

9              MR. NOVICK:  First I'd offer 812.

10             MR. BROWN:  No objection.

11             THE COURT:  It will be admitted.

12   BY MR. NOVICK:

13   Q.   813?

14   A.   It is a November 10, 2010 funding memorandum and

15   disbursement request, requesting $37,500, regarding the

16   policy insuring the life of Ronald Goelzer, and it's

17   signed by Daniel Carpenter.

18             MR. NOVICK:  I'd offer 813.

19             MR. BROWN:  No objection.

20             THE COURT:  It will be admitted.

21   BY MR. NOVICK:

22   Q.   And then 814 and 815, what are those?

23   A.   These are Lincoln life ownership change forms and

24   beneficiary change forms for the policy insuring the life

25   of Ronald Goelzer.

1    Q.    Transfer to what entity?

2    A.    Avalon One trust.

3    Q.    And are these signed by Wayne Bursey -- is 814 signed

4    by Wayne Bursey?

5    A.    Yes.

6              MR. NOVICK:  I'd offer 814 and 815.

7              THE COURT:  They will be admitted.

8              MR. NOVICK:  One moment, please, Your Honor.

9              THE COURT:  Yes.

10                  (Pause)

11             MR. NOVICK:  Now moving to the documents

12   beginning with 901, to 923.

13   BY MR. NOVICK:

14   Q.    These relate to Judith Musiker, is that right?

15   A.    Yes.

16   Q.    Straw Insured 9?

17   A.    Yes.

18             MR. NOVICK:  Your Honor, just for your

19   information, I believe we have reached a stipulation as to

20   what Ms. Musiker would have said.  I think we can do this

21   after, but we'll go through these documents now.

22   BY MR. NOVICK:

23   Q.    If you could just read the exhibit number and tell us

24   what the document is?

25   A.    Certainly.  Exhibit 901 is a Lincoln life insurance

1    application regarding insured Judith Musiker; 902 is a

2    Lincoln required producer and representative certification

3    regarding investor-owned life insurance for Judith

4    Musiker's policy; Exhibit 903 is an email from the Lincoln

5    policy file for Judith Musiker.

6         904 is an -- I believe a Lincoln amendment for the

7    policy insuring the life of Judith Musiker; 905 is a

8    Lincoln life insurance illustration for Judith Musiker.

9    Q.   901 through 905, are those all from the Lincoln

10   policy file for Ms. Musiker's Charter Oak Trust policy?

11   A.   Yes.

12              MR. NOVICK:  I'll offer 901 through 905.

13              MR. BROWN:  No objection, Your Honor.

14              THE COURT:  They will be admitted.

15   BY MR. NOVICK:

16   Q.   Start again with 906.

17   A.   906 is the Charter Oak Trust informal questionnaire

18   for Judith Musiker; 907 is the Charter Oak Trust

19   enrollment package for Judith Musiker; and 908 is an

20   acknowledgment and certification package for Judith

21   Musiker.

22              MR. NOVICK:  Offer 906, 907 and 908.

23              MR. BROWN:  No objection.

24              THE COURT:  They will be admitted.

25

1    BY MR. NOVICK:

2    Q.   Those are all from the Christiana fund?

3    A.   Yes.

4    Q.   909, 910 and 911, what are those?

5    A.   909 is a lateral assignment agreement for the policy

6    insuring the life of Judith Musiker, signed by Daniel

7    Carpenter; 910 is an April 4, 2007 Charter Oak Trust

8    funding obligation agreement and power of attorney for

9    Judith Musiker's policy, signed by Wayne Bursey and Daniel

10   Carpenter; and 911 is an April 4, 2007 commitment letter

11   committing for the funding of $284,234.92 on the life

12   of -- the policy insuring the life of Judith Musiker, and

13   it is signed by Don Trudeau.

14              MR. NOVICK:  I would offer those exhibits, Your

15   Honor.

16              MR. BROWN:  No objection.

17              THE COURT:  They will be admitted.

18   BY MR. NOVICK:

19   Q.   And then 912, 9 -- excuse me -- yeah -- what is

20   Exhibit 912?

21   A.   Grist Mill Capital disbursement capital and funding

22   request, requesting the amount of $267,134.92, regarding

23   the policy insuring the life of Judith Musiker, signed by

24   Daniel Carpenter.

25              MR. NOVICK:  I'd offer 912.

1            MR. BROWN:  No objection.

2            THE COURT:  It will be admitted.

3     BY MR. NOVICK:

4     Q.   913 and 914 are already in evidence, but do those

5     relate to a particular count in the indictment from the

6     summary chart?

7     A.   Yes.  Count 22.

8     Q.   And then 915 and 916, what are those?

9     A.   Those are funding packages for Judith Musiker; 915 is

10    dated August 25, 2009; 916 is dated February 1, 2010.

11           MR. NOVICK:  Offer 915 and 916.

12           MR. BROWN:  No objection.

13           THE COURT:  They will be admitted.

14    BY MR. NOVICK:

15    Q.   And then 917 and 918, are those termination letters

16    for Ms. Musiker?

17    A.   Yes.

18           MR. NOVICK:  And I would offer 917 and 918.

19           MR. BROWN:  No objection.

20           THE COURT:  They will be admitted.

21    BY MR. NOVICK:

22    Q.   Then 919, 920, 921, 922 and 923, what are those?

23    A.   Those are documents we received from Judith Musiker,

24    regarding correspondence she received, I think, starting

25    in 2011, regarding the policy insuring her life.

1    Q.   And reading them all in detail right now, are they

2    generally relating to try to get her to sign forms?

3    A.   Yes.

4    Q.   And is the -- looking at 922 and 923, are those

5    related to requests from the Life Insurance Fund Elite --

6    A.   Yes.

7    Q.   -- or on behalf of the Life Insurance Fund Elite?

8    A.   Yes.

9         MR. NOVICK:  I'd offer 919, 920, 921, 922

10   and 923.

11        MR. BROWN:  No objection, Your Honor.

12        THE COURT:  They will be admitted.

13   BY MR. NOVICK:

14   Q.   And looking just at 923, again without reading the

15   entire document, does that appear to be offering her

16   $25,000 to sign the reinstatement application?

17   A.   Yes.

18   Q.   Now looking at exhibits beginning with 1001, who do

19   those relate to?

20   A.   Joan Pennington.

21   Q.   And that Joanne or Joan?

22   A.   She says it Joan.  I know it reads Joanne.

23   Q.   And 1001, which is already in evidence, is that

24   related to a particular count in the indictment?

25   A.   Count 23.

1    Q.    Is that on the summary chart as well?

2    A.    Yes.

3    Q.    And then going through some of the documents, first

4    1002, was that a fax record indicating the receipt of the

5    fax in Exhibit 1001, for Lincoln?

6    A.    Yes.

7    Q.    And 1004 -- I believe 1003 is already in evidence.

8          1004, what is that?

9    A.    It's a Lincoln life insurance illustration for Joan

10   Pennington.

11   Q.    From the Lincoln file?

12   A.    Yes.

13              MR. NOVICK:  Offer 1002 and 1004.

14              MR. BROWN:  No objection.

15              THE COURT:  They will be admitted.

16   BY MR. NOVICK:

17   Q.    Looking collectively at 1005, 1006 and 1007, what are

18   those?

19   A.    Charter Oak Trust documents received from Christiana

20   regarding Joan Pennington.

21   Q.    Which one is which?

22   A.    1005 is the informal inquiry questionnaire; 1006 is

23   the enrollment package; 1007 is the disclosure,

24   acknowledgment and certification package.

25   Q.    And those are from the Christiana file?

1    A.   Yes.

2              MR. NOVICK:  I would offer 1005, 1006, 1007.

3              MR. BROWN:  No objection.

4              THE COURT:  They will be admitted.

5    BY MR. NOVICK:

6    Q.   Then can you walk us through what 1008, 1009 and 1010

7    are?

8    A.   1008 is the collateral assignment agreement for the

9    policy Joan Pennington, signed by Daniel Carpenter; 1009

10   is a September 22, 2008 Charter Oak Trust funding

11   obligation agreement and power of attorney for the policy

12   on Joan Pennington, signed by Wayne Bursey and Daniel

13   Carpenter; and 1010 is a Ridgewood financial commitment

14   letter dated December 8, 2008, committing $868,077.91,

15   regarding the policy insuring the life of Joan Pennington,

16   and signed by Daniel Carpenter.

17             MR. NOVICK:  Offer 1008, 1009 and 1010.

18             MR. BROWN:  No objection, Your Honor.

19             THE COURT:  They will be admitted.

20   BY MR. NOVICK:

21   Q.   They're already in evidence, but 1011, 1012 are they

22   related to a count in the indictment?

23   A.   Yes.  Count 24.

24   Q.   And then 1013 and 1014, what are those?

25   A.   1013 is a second-year funding package for the policy

1    insuring the life of Joan Pennington, dated August 26,

2    2009, and it contains a FedEx label.  And then 1014 was a

3    confirmation from Federal Express that that was sent.

4    Q.   Does that relate to a count in the indictment?

5    A.   Yes.  Count 25.

6    Q.   And is 1015 another funding package for Joan

7    Pennington policy?

8    A.   Yes.

9    Q.   And that's August 5, 2010?

10   A.   Yes.

11              MR. NOVICK:  I'd offer 1013, 1014 and 1015.

12              MR. BROWN:  No objection, Your Honor.

13              THE COURT:  They will be admitted.

14   BY MR. NOVICK:

15   Q.   Exhibits 1016, 1017, 1018, are those letters to Joan

16   Pennington from NOVA Group relating to the termination

17   from Charter Oak Trust?

18   A.   Yes.

19              MR. NOVICK:  We'd offer 1016, '17 and '18.

20              MR. BROWN:  No objection, Your Honor.

21              THE COURT:  They will be admitted.

22   BY MR. NOVICK:

23   Q.   And finally as to this insured, 1019 and 1020, are

24   those change of ownership and then change of beneficiary

25   forms for the Joan Pennington case --

1   A.   Yes.

2   Q.   -- to Avalon One trust, and signed by Mr. Bursey

3   in 1019?

4   A.   Yes.

5          MR. NOVICK:  I'd offer those two exhibits, Your

6   Honor.

7          MR. BROWN:  No objection.

8          THE COURT:  They will be admitted.

9   BY MR. NOVICK:

10  Q.   Moving on to the Von Noorden case, beginning with

11  1101, 1101 is already in evidence.

12       Is that related to a count in the indictment and on

13  the supplementary chart?

14  A.   Yes.  Count 26.

15  Q.   That's a fax of an application?

16  A.   Correct.

17  Q.   And a series of documents that have not been admitted

18  yet, what is 1102?

19  A.   It is a Lincoln life insurance illustration for Betty

20  Von Noorden, and this was provided to Lincoln.

21          MR. NOVICK:  I'd offer 1102.

22          MR. BROWN:  No objection.

23          THE COURT:  It will be admitted.

24  BY MR. NOVICK:

25  Q.   If you could tell us what 1103, 1104, 1105, '6 '7

1    and '8 are?

2    A.   1103 is the Charter Oak Trust informal inquiry

3    questionnaire; 1104 is the Charter Oak Trust enrollment

4    package; 1105 is the Charter Oak Trust disclosure,

5    acknowledgment and certification agreement.  All of those

6    are for Betty Von Noorden.

7         1106 is a collateral assignment agreement regarding

8    the policy for Betty Von Noorden and signed by Daniel

9    Carpenter; 1107 is a December 31, 2008 Charter Oak Trust

10   funding obligation agreement and power of attorney for the

11   policy insuring the life of Betty Von Noorden, signed by

12   Wayne Bursey and Daniel Carpenter; and 1108 is a

13   December 24, 2008 Ridgewood Finance commitment letter

14   committing the amount of $473,862.45, regarding the life

15   of Betty Von Noorden -- or the policy insuring the life of

16   Betty Von Noorden, signed by Daniel Carpenter.

17             MR. NOVICK:  I'd offer 1103 through 1109.

18             MR. BROWN:  No objection, Your Honor.

19             THE COURT:  They will be admitted.

20   BY MR. NOVICK:

21   Q.   I believe 1109 is already in evidence; and is that

22   one of the counts in the indictment?

23   A.   Yes.   Count 27.

24   Q.   And then is 1111, already in evidence, is that again

25   a count in the indictment?

1    A.    Yes.   Count 28.

2    Q.    And then 1113 and 1114, again, are those ownership

3    change and beneficiary changes for respectively for the

4    Betty Von Noorden case?

5    A.    Yes.

6    Q.    From Charter Oak Trust to Avalon One trust, with 1113

7    signed by Mr. Bursey?

8    A.    Yes.

9                MR. NOVICK:  I'd offer 1113 and 1114.

10               MR. BROWN:  No objection, Your Honor.

11               THE COURT:  They will be admitted.

12   BY MR. NOVICK:

13   Q.    And then 1115, 1116, 1117, 1118, 1119, what are

14   those?

15   A.    These are various documents regarding the creation of

16   Betty L. Von Noorden Investments LLC.

17   Q.    Were these also exhibits during the deposition for

18   Ms. Von Noorden?

19   A.    Yes.

20               MR. NOVICK:  Your Honor, I'd offer, without

21   going through them one by one, I would offer 1115

22   through 1119.

23               MR. BROWN:  Your Honor, no objection.

24               THE COURT:  They will be admitted.

25

1    BY MR. NOVICK:

2    Q.   That ends our tour of that particular binder.  And

3    we'll take a look at the binder, right now we're just

4    going to look at Straw Insured 12, Exhibit 1201, relating

5    to Mr. Zahner.

6         And again, I think a lot of these documents are in

7    evidence, so I'll just highlight Certification and

8    Acknowledgment of Trust Agreement for Beat Zahner.

9         And 1204, what's that?

10   A.   It's an acknowledgment and indemnification form from

11   the Phoenix Zahner policy file.

12            MR. NOVICK:  I offer 1202 and 1204.

13            MR. BROWN:  No objection.

14            THE COURT:  They will be admitted.

15   BY MR. NOVICK:

16   Q.   And if we flip forward to 1212, 1213, and 1214, can

17   you tell us what those relate to?

18   A.   A Bank of America regarding the transfer of $57,000,

19   dated October 3, 2008, from Avon Capital LLC to PNC Bank.

20   The first, 1212, is the transfer request form signed by

21   Daniel Carpenter; 1213 is the wire confirm confirming the

22   transfer; and 1214 is the bank statement, again confirming

23   that the transfer occurred.

24   Q.   Do those relate to a particular count in the

25   indictment?

1    A.    Count 29.

2              MR. NOVICK:  I'd offer those three exhibits.

3              MR. BROWN:  No objection, Your Honor.

4              THE COURT:  They will be admitted.

5    BY MR. NOVICK:

6    Q.    And I believe 1215 came in through Ms. Lutes, but is

7    that related to a particular count in the indictment?

8    A.    Yes.  Count 30.

9              MR. NOVICK:  I apologize, it did not come in

10   through Ms. Lutes.

11   BY MR. NOVICK:

12   Q.    Could you just tell us what it is?

13   A.    Sure.

14        1215 is an email from Donald Trudeau to Deborah

15   Lutes, dated October 6, 2008, with an attachment of two

16   PNC transfer-out wire forms, one regarding Beat Zahner.

17   Q.    And is that related to an account in the indictment?

18   A.    Yes.  Thirty.

19             MR. NOVICK:  I would offer 1215.

20             MR. BROWN:  No objection.

21             THE COURT:  It will be admitted.

22   BY MR. NOVICK:

23   Q.    And now 1216, 1217 and 1218, what are those?

24   A.    These are documents related to a May 5, 2009,

25   transfer of $57,600, from the Bank of America account of

1      Avon Capitol to PNC Bank, for Beat Zahner.

2           The first, 1216, is the request signed by Daniel

3      Carpenter; 1217 is the wire confirming the transfer; and

4      1218 is the bank statement, again confirming that the

5      transfer occurred.

6      Q.   And those relate to a particular count in the

7      indictment?

8      A.   Yes.  Thirty-one.

9               MR. NOVICK:  I'd offer them, Your Honor.

10              THE COURT:  They will be admitted.

11     BY MR. NOVICK:

12     Q.   What is 1219, what is that?

13     A.   An email from Don Trudeau to Deborah Lutes and

14     Veronica Cranny; May 6, 2009; subject, "COT Zahner"; with

15     an attachment of a PNC transfer-out form.

16     Q.   Is that related to a particular count in the

17     indictment?

18     A.   Count 32.

19              MR. NOVICK:  I'd offer 1219.

20              MR. BROWN:  No objection, Your Honor.

21              THE COURT:  It will be admitted.

22     BY MR. NOVICK:

23     Q.   And then 1220, what is that?

24     A.   It is an email from Ed Waesche to Sheila O'Grady;

25     September 17, 2008; subject, "Re:  Zahner"; with

1    attachments of life expectancy reports.

2    Q.   For Mr. Zahner?

3    A.   For Mr. Zahner.

4    Q.   That were requested by whom?

5    A.   Sheila O'Grady.

6    Q.   Sheila O'Grady requested the email, but who on the

7    life expectancy certificates requested the analysis?

8    A.   I apologize.  Ridgewood Finance.

9    Q.   And when were these life expectancy certificates

10   done?

11   A.   May and June of 2008.

12            MR. NOVICK:  I'd offer Exhibit 1220.

13            MR. BROWN:  No objection, Your Honor.

14            THE COURT:  It will be admitted.

15   BY MR. NOVICK:

16   Q.   Put Exhibit 4, the summary chart, to the side, and

17   now we're going to talk to you about Sash Spencer, his

18   case, and some emails relating to him.  And I apologize in

19   advance, it's going to require us to look in the

20   1300 series as well as the email binder, but I'll tell you

21   where we are.

22        So generally speaking, you know, we've spoken about

23   Mr. Spencer previously in the trial, are there additional

24   emails relating to the origin of his Charter Oak Trust

25   policies that you were able to find?

1    A.    Yes.

2    Q.    The first one I will direct you to is in the email

3    binder, which is tab 99, Exhibit 2031 -- and we're going

4    to bounce back and forth between this and the 1300 series

5    that we were just looking at -- the email binder being the

6    one that I gave up to everybody yesterday.

7              THE COURT:  Government's Exhibit 2031?

8              MR. NOVICK:  Yes, Your Honor.

9              So this should be -- yesterday I handed up a

10   binder that had -- a fairly large binder that had emails

11   in it.

12             THE COURT:  Are you referring to correspondence

13   binder 14?  I'm looking at Government's Exhibit 2031,

14   under tab 2031.

15             MR. NOVICK:  That will have all of the emails,

16   but I handed up a large binder that will go in the order

17   that we're talking about them today.

18             THE COURT:  How large a binder is it?

19             MR. NOVICK:  It was extremely large.

20             THE COURT:  Do you propose to through this

21   binder?

22             MR. NOVICK:  We've already gone through

23   3 quarters of it.  We did yesterday.  That was the emails

24   we were grouping, and then reading some of them, and then

25   admitting them.

1           THE COURT:  Okay.

2           MR. NOVICK:  What I'm doing now is, we're going

3    to keep -- we've got about -- in this binder about this

4    much that we haven't talked about.  I'm not going to read

5    all of them, but what I'm going to be doing now is talking

6    about Mr. Spencer's case.  Some of the documents are going

7    to come from the email correspondence binder, and some are

8    going to come from the Sash Spencer section of the insured

9    binder, so I'll just let the Court know where I am.

10          So there's no lack of clarity, all of the

11   documents that are in the binder we put together for the

12   special agent's testimony are in the correspondence 1

13   through 4.  We just put these separately together so that

14   the Court didn't have to keep -- and the parties -- didn't

15   have to keep moving through those four binders to find

16   exhibits, and they should be in the order I'm going to

17   talk about them.

18          I just, I think for obvious reasons, did not

19   want to have like three binders for the agent's testimony,

20   so I didn't put stuff from the straw insured binder into

21   the compilation, if that makes sense.

22          THE COURT:  Okay.

23          MR. NOVICK:  So where we are right now is, we're

24   going to start it with an email in the correspondence

25   binder, and then we're going to probably move very quickly

```
 1    to a series of documents from the 1300 series.

 2    BY MR. NOVICK:

 3    Q.   So let me direct you first in the large email binder,

 4    tab 99, Exhibit 2031.

 5         What is that?

 6    A.   This is an email from Eddie Stone to Veronica Cranny;

 7    dated March 1, 2007, subject, "Forward writeup on large

 8    cases.  Start."

 9    Q.   And is it forwarding an earlier set of emails?

10    A.   Yes.

11    Q.   And if you go to the second page, is there an email

12    there from Donald Trudeau to Eddie Stone, dated

13    September 13, 2006?

14    A.   Yes.

15    Q.   Among the subject of the discussion on that page, do

16    you see a discussion about Bruce Mactas and Sash Spencer?

17    A.   Yes.

18              MR. NOVICK:  I'd offer 2031.

19              MR. BROWN:  No objection.

20              THE COURT:  Admit.

21    BY MR. NOVICK:

22    Q.   Special Agent Allen, I just want to direct you to a

23    couple of passages in that email from Mr. Trudeau to

24    Mr. Stone.

25         Do you see a sentence that says:  "MAS has
```

1    significant experience in both life finance and life

2    settlement and are competent in managing the full

3    underwriting process"?

4    A.   Yes.

5    Q.   And, "Their experience in identifying candidates that

6    work for all parties in these types of transactions," you

7    see that?

8    A.   Yes.

9    Q.   And below that, do you see a description of Sash

10   Spencer?

11   A.   Yes.

12   Q.   I'll just leave that up on the screen and allow you

13   to read it to yourself.

14                    (Pause)

15   Q.   The next documents I'm going to direct you to are

16   unfortunately in the 1300 series.  There's a series of

17   emails, three emails, that were added to the back of that

18   section?

19        MR. NOVICK:  Your Honor, it's Exhibits 1332,

20   1333 and 1334.

21   BY MR. NOVICK:

22   Q.   And I'll just direct you first to 1332.

23        What is that?

24   A.   It is an email from Don Trudeau to Daniel Carpenter;

25   January 3, 2007 -- sorry -- copying Jack Robinson;

1   subject, "Re:  Happy '07."

2              MR. NOVICK:  I would offer Exhibit 1332.

3              MR. BROWN:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5              MR. BROWN:  No objection, Your Honor.

6              THE COURT:  It will be admitted.

7   BY MR. NOVICK

8   Q.   This says:  "Spencer ready to fund 10,000,000 face,

9   about 700,000 premium.  Two more Spencer policies coming."

10       Do you see that?

11  A.   Yes.

12  Q.   And this was an email to Dan Carpenter, correct?

13  A.   Correct.

14  Q.   And looking at 1333, what is that?

15  A.   An email from Guy Neumann to Dan Carpenter; dated

16  January 12, 2007; subject, "Forward:  Sash Spencer."

17             MR. NOVICK:  Offer 1333.

18             MR. BROWN:  No objection.

19             THE COURT:  It will be admitted.

20  BY MR. NOVICK:

21  Q.   The text is, "We are on the app for Spencer," is that

22  right?

23  A.   Correct.

24  Q.   And then 1334, what is that?

25  A.   It is an email from Don Trudeau to Guy Neumann,

1    Daniel Carpenter, and Jack Robinson; January 16, 2007;

2    subject, "SS Lincoln Policy"; with an attachment.

3    Q.   And is the attachment, in fact, a copy of documents

4    relating to the Sash Spencer policy?

5    A.   Yes.

6         MR. NOVICK:  I'd offer 1334.

7         MR. BROWN:  No objection.

8         THE COURT:  It will be admitted.

9    BY MR. NOVICK:

10   Q.   Just to be clear, that copy of policy documents, does

11   that include copies of application documents?

12   A.   Yes.

13   Q.   Now, I know that when Mr. Elder was testifying, we

14   introduced a series of the -- or some of Spencer-related

15   policy file, but at this time I'm going to walk you

16   through the documents that we had not yet put in.

17        First, 1302, what is that?

18   A.   It is a Lincoln policy amendment for the Sash Spencer

19   policy ending 5475.

20   Q.   And we already offered 1303, but is this the same

21   as 1303, just signed by the insured as opposed to the

22   trustee?

23   A.   Yes.  1302 is signed by the insured, 1303 by the

24   trustee.

25        MR. NOVICK:  I'd offer 1302.

1          MR. BROWN:  No objection.

2          THE COURT:  It will be admitted.

3    BY MR. NOVICK:

4    Q.   And 1304, what is that?

5    A.   Lincoln life insurance illustration for Sash Spencer,

6    and this was provided to Lincoln.

7          MR. NOVICK:  Offer 1304.

8          MR. BROWN:  No objection.

9          THE COURT:  It will be admitted.

10   BY MR. NOVICK:

11   Q.   1305, what is that?

12   A.   This is the benefit funding application for Sash

13   Spencer.

14   Q.   Are these documents similar to the enrollment

15   documents that we've seen for other Charter Oak

16   participants?

17   A.   Yes.

18   Q.   And are these similar to -- excuse me.

19        Is this the -- are there any other cases that have

20   documents that are like this, do you recall?

21   A.   I'm not sure.  One other policy may have.

22   Q.   But, generally speaking, this was the earlier version

23   or earlier iteration of the Charter Oak documents?

24   A.   Correct.

25   Q.   Does it have still a disclosure, acknowledgment and

1   certification agreement?

2   A.   Yes.

3   Q.   Look at page 1061 in this agreement; is that that

4   document?

5   A.   Yes.

6           MR. NOVICK:  I would offer 1305.

7           MR. BROWN:  No objection.

8           THE COURT:  It will be admitted.

9   BY MR. NOVICK:

10  Q.   Do you know, where did this policy that we're looking

11  at now fit within the chronology of the Charter Oak

12  policies that you've reviewed?

13  A.   This was a first policy.

14  Q.   The next document, 1306, what is that?

15  A.   A collateral assignment agreement regarding the

16  policy on Sash Spencer, signed by Daniel Carpenter.

17  Q.   And 1307, what is that?

18  A.   An April 4, 2007 Charter Oak Trust funding obligation

19  agreement and power of attorney regarding the Sash Spencer

20  policy ending 5475, signed by Wayne Bursey and Daniel

21  Carpenter.

22  Q.   And then 1308?

23  A.   A Ridgewood Finance January 11, 2007 commitment

24  letter regarding the funding of the Sash Spencer policy.

25  Q.   And this came from -- the first two documents,

1    1307 -- 1306 and 1307, came from the Christiana files?

2    A.   Correct.

3    Q.   And 1308 from 100 Grist Mill Road?

4    A.   Correct.

5             MR. NOVICK:  I would offer those three exhibits.

6             MR. BROWN:  No objection.

7             THE COURT:  They will be admitted.

8    BY MR. NOVICK:

9    Q.   And then what is 1309?

10   A.   It is a Grist Mill Capital funding memorandum and

11   disbursement request dated January 12, 2007, requesting

12   the amount of $696.35, regarding the policy insuring the

13   life of Sash Spencer.  It is signed by Don Trudeau.

14   Q.   And then we looked at -- or well --

15            MR. NOVICK:  First let me offer 1309.

16            MR. BROWN:  No objection.

17            THE COURT:  It will be admitted.

18   BY MR. NOVICK:

19   Q.   And again, we looked at through Mr. Elder, 1310,

20   1311.

21        Were those related to the second policy application?

22   A.   Yes.

23   Q.   And in addition, can you tell us what 1312 is?

24   A.   1312 is a Lincoln life insurance illustration for

25   Sash Spencer.  This was provided to Lincoln.

1          MR. NOVICK:  And then I'd offer 1312.

2          MR. BROWN:  No objection, Your Honor.

3          THE COURT:  It will be admitted.

4    BY MR. NOVICK:

5    Q.   And then 1313, 1314 and 1315, what are those

6    documents?

7    A.   1313 is a Charter Oak Trust informal inquiry

8    questionnaire for Sash Spencer; 1314 is the enrollment

9    package for Sash Spencer; and 1315 is the disclosure,

10   acknowledgment and certification agreement for Sash

11   Spencer's policy.

12   Q.   These are for the second policy?

13   A.   Yes.

14         MR. NOVICK:  I'd offer 1313, 1314 and 1315.

15         MR. BROWN:  No objection, Your Honor.

16         THE COURT:  They will be admitted.

17   BY MR. NOVICK:

18   Q.   And then 1316, 1317, and 1318, what are those?

19   A.   1316 is a collateral assignment agreement for the

20   policy insuring the life of Sash Spencer, signed by Daniel

21   Carpenter; 1317 is a March 19, 2007 Charter Oak Trust

22   funding obligation agreement and power of attorney

23   regarding the policy insuring the life of Sash Spencer,

24   signed by Wayne Bursey and Daniel Carpenter; 1318 is a

25   Ridgewood Finance commitment letter committing the amount

1    of $1,915,448.94 for the policy insuring the life of Sash

2    Spencer.

3    Q.   Again, we're referring to the second policy now?

4    A.   Yes.

5    Q.   And then is 1319 the first funding memorandum and

6    disbursement request for that second policy?

7    A.   Yes.

8            MR. NOVICK:  I'd move 1316, 1317, 1318,

9    and 1319.

10           MR. BROWN:  No objection, Your Honor.

11           THE COURT:  They will be admitted.

12   BY MR. NOVICK:

13   Q.   Just for a minute, I'll have you take a look at the

14   next document in the email binder, which is now tab 100.

15       What is that, Exhibit 2054?

16   A.   An email from Bruce Mactas to Donald Trudeau, Bill

17   Hutchison, and Susan Feldman; July 9, 2007; with an

18   attachment, "Spencer Milliman Immediate Trans" PDF.

19           MR. NOVICK:  I would offer 2054.

20           MR. BROWN:  No objection, Your Honor.

21           THE COURT:  It will be admitted.

22           MR. NOVICK:  And I'll let you read that to

23   yourself.

24   BY MR. NOVICK:

25   Q.   Looking at this, it seems to discuss the possibility

1    of an immediate transaction relating to the Spencer

2    policy, is that right?

3    A.   Correct.

4    Q.   Did you find any evidence on the server or in the

5    search warrant of an actual agreement on a transaction

6    referenced here?

7    A.   No.

8    Q.   Did, in fact, the policy continue to get funded?

9    A.   Yes.

10   Q.   If you look at the next four tabs -- we're going to

11   go back to the 1300 book for a minute, there's a series of

12   tabs there -- 1320, 1321, 1322, and 1323, are those

13   documents related to the second-year funding for the Sash

14   Spencer policy?

15   A.   Yes.

16   Q.   Can you just walk through, just generally briefly,

17   what they are?

18   A.   1320 is a December 26, 2007 letter and FedEx copy,

19   and it included the amended funding memo and disbursement

20   request for Sash Spencer's two policies; 1321 is a

21   confirmation from Federal Express that that package was

22   sent; 1322 is the Grist Mill Capital amended funding

23   memorandum and disbursement request, second-year premium

24   dated December 21, 2007, signed by Daniel Carpenter; 1323

25   is a Grist Mill Capital amended funding memorandum and

1    disbursement request second-year premium, signed by Daniel

2    Carpenter; 1323 is regarding the policy ending in 0809 for

3    Sash Spencer; and 1322 is a policy ending in 5475.

4              MR. NOVICK:  I'll offer 1320 through 1323.

5              MR. BROWN:  No objection.

6              THE COURT:  They will be admitted.

7    BY MR. NOVICK:

8    Q.   We've heard evidence in the trial that Mr. Spencer

9    died, do you recall that?

10   A.   Yes.

11   Q.   And next I want to have you -- we looked, I believe,

12   during the course of Mr. Elder's testimony, at a death

13   claim form filed with Lincoln?

14   A.   Yes.

15   Q.   And did you locate emails where that death claim form

16   was being transmitted among people at 100 Grist Mill Road?

17   A.   Yes.

18   Q.   Take a look at, back in the correspondence binder,

19   tab 101, and that's Exhibit 2131.

20        What is that?

21   A.   An email from Don Trudeau to Wayne Bursey, Dan

22   Carpenter, and Jack Robinson; dated June 14, 2008;

23   subject, "Confidential COT Death Claim"; with an

24   attachment.

25   Q.   And what is the attachment?

1    A.   It is the death claim paperwork to be sent to Lincoln

2    for Sash Spencer's policies.

3    Q.   Is it substantially or is it the same form that we

4    looked at when Mr. Elder testified?

5    A.   Yes.

6            MR. NOVICK:  And then I'd offer Exhibit 2131.

7            MR. BROWN:  No objection.

8            THE COURT:  It will be admitted.

9    BY MR. NOVICK:

10    Q.   And then 2132, which is exhibit -- excuse me --

11    tab 102, what is that?

12    A.   An email from Daniel Carpenter to Don Trudeau, Wayne

13    Bursey, and Jack Robinson; June 14, 2008; subject, "Re:

14    Confidential COT Death Claim."

15    Q.   Is it responding to the email we just looked at in

16    Exhibit 2131?

17    A.   Yes.

18    Q.   And it reads:  "Do you need today or is Monday okay",

19    is that right?

20    A.   Correct.

21            MR. NOVICK:  I'd offer 2132.

22            MR. BROWN:  No objection.

23            THE COURT:  It will be admitted.

24    BY MR. NOVICK:

25    Q.   Next did you review any documents related to the

1      period of time between Mr. Spencer's death and the payment

2      by Lincoln?

3      A.    Yes.

4      Q.    And I'm not going to have you rehash any of the

5      documents that Mr. Elder testified about.  I am going to

6      have you look at 1325.

7            What is that?

8      A.    This is a letter dated October 22, 2008, from NOVA

9      Group, Inc. to Lincoln Financial Group, "Re:  Sash Spencer

10     Death Claim 587487."

11     Q.    And does it attach a series of documents?

12     A.    Yes.

13     Q.    Including the death certificate for Mr. Spencer?

14     A.    Yes.

15             MR. NOVICK:  I'd offer 1325.

16             MR. BROWN:  No objection, Your Honor.

17             THE COURT:  It will be admitted.

18     BY MR. NOVICK:

19     Q.    I recall -- I don't want to have you review documents

20     that came in through Mr. Elder.

21           1327, do you recall that letter on April 27, 2009,

22     including certain documents sent by Mr. Bursey to Lincoln

23     as part of the investigation?

24     A.    Yes.

25     Q.    Let me just ask you this question:  Did you subpoena

1    the entire file for the Spencer death benefit

2    investigation during the course of your investigation?

3    A.   Yes, through Lincoln.

4    Q.   And based on your review of that material, did you

5    find any evidence that Lincoln received any of the funding

6    documents that we've looked at, such as the disclosure,

7    acknowledgment and certification agreement; funding

8    obligation agreement; collateral assignment; or commitment

9    or funding letters?

10   A.   No.  There was no evidence of that.

11   Q.   And, in fact, did you find -- well, let me withdraw

12   that.

13        Did the death benefit get paid to the Charter Oak

14   Trust eventually?

15   A.   Yes.

16   Q.   And let's look just at a few documents that aren't

17   yet in evidence relating to that subject, which again are

18   in the 1300 series.

19        First, 1328, what is that?

20   A.   This is a complaint filed in U.S. District Court,

21   District of Connecticut:  Plaintiff, Wayne Bursey, Charter

22   Oak Trust; Defendant, Lincoln National Life Insurance

23   Company; May 5, 2009.

24   Q.   And again, without going into the -- reading the

25   entirety of this, is this related to a demand to get paid

1    the death benefit?

2    A.   Yes.

3    Q.   And where did you find this -- in other words this --

4    did you pull this off of PACER, or did you locate this

5    somewhere in the files?

6    A.   It was in the files of 100 Grist Mill Road.

7    Q.   During the course of the search warrant?

8    A.   Yes.

9              MR. NOVICK:  I'd offer 1328.

10             MR. BROWN:  No objection.

11             THE COURT:  It will be admitted.

12   BY MR. NOVICK:

13   Q.   And then 1329, what is that?

14   A.   It is a letter from Lincoln; dated May 15, 2009; to

15   the Charter Oak Trust; "Re:  Sash A. Spencer, Claim

16   Number 587487."

17             MR. NOVICK:  I'd offer 1329.

18             MR. BROWN:  No objection.

19             THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.   Then 1330; what is that?

22   A.   This is copies of the two checks from Lincoln to the

23   Charter Oak Trust as payment of the death benefit and

24   interest on the Sash Spencer death claim.

25             MR. NOVICK:  I'd offer 1330.

1          MR. BROWN:  No objection.

2          THE COURT:  It will be admitted.

3    BY MR. NOVICK:

4    Q.   And this came from the Lincoln file, is that right?

5    A.   Yes.

6    Q.   We can move to the email binder.  I think there will

7    be one more email from the 1300 series in a minute, but

8    back to the email binder and Exhibit 2221, tab 103.

9          What is that?

10   A.   This is an email from Wayne Bursey to Daniel

11   Carpenter; May 18, 2009; subject, "Bursey v. Lincoln

12   National Life."

13         MR. BROWN:  Your Honor, if I may, Your Honor,

14   are we talking about 1331?

15         MR. NOVICK:  We were on -- now we've moved, as I

16   said, back to the email binder, and we're going to go to

17   tab 103.

18         MR. BROWN:  It's just that I don't have anything

19   for 1331 except a blank space.

20         MR. NOVICK:  Okay.  We haven't gotten there yet.

21   When we get there, I'll make sure you have that document.

22         MR. BROWN:  So where are we?

23         MR. NOVICK:  In the email binder, tab 103.

24         MR. BROWN:  Thank you.

25

```
 1    BY MR. NOVICK:

 2    Q.   So looking at Exhibit 2221 from the email binder,

 3    that's tab 103, could you tell us what that was?

 4    A.   Yes.  Again, it is an email from Wayne Bursey to

 5    Daniel Carpenter; dated May 18, 2009; subject, "Re:

 6    Bursey v. Lincoln National Life."

 7              MR. NOVICK:  I'd offer 2221.

 8              MR. BROWN:  No objection.

 9              THE COURT:  It will be admitted.

10    BY MR. NOVICK:

11    Q.   And just looking at the bottom of the document, email

12    from Daniel Scarpalletti to Mr. Carpenter, among others,

13    stating, "See below, let me know you've received the

14    30 million-dollar death benefit with interest," you see

15    that?

16    A.   Yes.

17    Q.   And there are a series of responses?

18    A.   Yes.

19    Q.   "Big day for all of us.  Speak to me and only to me.

20    May you be in heaven before the devil knows you're dead."

21         Did I read that correctly?

22    A.   Yes.

23    Q.   And then tab 104, Exhibit 2222, what is that?

24    A.   This is an email from Don Trudeau to Dan Carpenter

25    and Wayne Bursey; May 18, 2009; subject, "Spencer Claim
```

1    Letter"; with an attachment.

2    Q.   Is the attachment that same letter that we looked at

3    a minute ago, in the 1300 series?

4    A.   Yes.

5              MR. NOVICK:  Offer 2222.

6              MR. BROWN:  No objection, Your Honor.

7              THE COURT:  It will be admitted.

8    BY MR. NOVICK:

9    Q.   Just to orient us, now we've looked at documents

10   indicating the payment of the death benefit in May 2009 to

11   the Charter Oak Trust, correct?

12   A.   Correct.

13   Q.   And we're going to talk about, going forward, a

14   series of documents related to where that money went,

15   okay?

16        Have you reviewed the bank records for the relevant

17   Grist Mill Capital and Charter Oak Trust accounts, as well

18   as several other accounts?

19   A.   Yes.

20   Q.   Did, to your knowledge, the Charter Oak Trust pay

21   anything to Universitas, which was the beneficiary of

22   Mr. Spencer's Charter Oak Trust participation?

23   A.   No, they did not.

24   Q.   Are there some emails in the binder relating to that

25   issue?

1    A.    Yes.

2    Q.    Let's take a look first at Exhibit 2225, tab 105.

3          What is that?

4    A.    It is an email from Daniel Carpenter to Wayne Bursey

5    and Jack Robinson; May 26, 2009; subject, "Sash Spencer";

6    with an attachment.

7    Q.    It says:  "Please check my math"?

8    A.    Yes.

9              MR. NOVICK:  I'd offer 2225.

10             MR. BROWN:  No objection, Your Honor.

11             THE COURT:  It will be admitted.

12   BY MR. NOVICK:

13   Q.    Looking at the attachment there, I don't want you to

14   interpret it, but I'm going to ask you some questions

15   about it.

16         Does it appear to be an accounting of money related

17   to the Sash Spencer death claim?

18   A.    Yes.

19   Q.    And on the top of the second-to-top line, do you see

20   where it says, "Death benefit 80 percent of proceeds,

21   section 6.1"?

22   A.    Yes.

23   Q.    And is that again -- does that appear to be taking

24   out 20 percent or holding back 20 percent of the death

25   proceeds for the trust?

1    A.    Yes.

2    Q.    Did you look in the server for emails related to that

3    80 percent holdback provision or where that came from?

4    A.    Yes.

5    Q.    In your search of the server and other documents, did

6    you find any versions of the trust documents, Charter Oak

7    Trust document, that in fact had a provision that withheld

8    20 percent of the death benefit prior to Mr. Spencer's

9    death?

10   A.    No.

11   Q.    And are there some emails now in the binder related

12   to different versions of the Charter Oak Trust document

13   that you found?

14   A.    Yes.

15   Q.    So I want to walk through those documents for a

16   minute and just call your attention to the relevant

17   provision.

18        First, Exhibit 2020, what is that?

19   A.    It is an email from Jack Robinson to Guy Neumann,

20   Amanda Rossi, Daniel Carpenter, Wayne Bursey, and Don

21   Trudeau; December 20, 2006; subject, "Charter Oak Trust

22   Final"; with an attachment, "Charter Oak Trust."

23              MR. NOVICK:  I offer 2020.

24              MR. BROWN:  No objection, Your Honor.

25              THE COURT:  It will be admitted.

1    BY MR. NOVICK:

2    Q.    So this is a December 2006 email with a copy of the

3    Charter Oak Trust document, and I'm just going to direct

4    you to that section of the trust document that was

5    referenced on the accounting we just looked at, and it's

6    on page 7 of the attachment Bates number ending 9815.

7          Do you see that?

8    A.    Yes.

9    Q.    And just directing you to Section 6.01 of that page,

10   again the 6.01 that was referenced earlier on the

11   accounting, in that December 2006 version of the trust

12   document, was there a provision that withheld 20 percent

13   of the -- or only paid 80 percent of the death benefit to

14   the participant?

15   A.    No.

16   Q.    So then let's take a look at another version of the

17   Charter Oak trust document, or another communication of

18   it, the next tab 107.

19         What is that?

20   A.    This is an email from Jack Robinson to Daniel

21   Carpenter, Guy Neumann, Wayne Bursey, Joe Castagno, Don

22   Trudeau, and Ed Waesche; dated February 14, 2007; subject,

23   "Charter Oak Trust and Avon Insurance Trust"; with two

24   attachments.

25   Q.    Okay.  It says:  "Here are the final versions of the

1    Charter Oak Trust and Avon insurance trusts.  Please

2    replace older versions with these"?

3    A.    Yes.

4                MR. NOVICK:  Offer 2027.

5                MR. BROWN:  No objection.

6                THE COURT:  Thank you.

7    BY MR. NOVICK:

8    Q.    And again I'm going to direct you -- there are two

9    trust documents here.  I'm going to direct you to the

10   Charter Oak Trust document which is the second one.  And

11   again to Section 6.01.  For your convenience, it's the

12   Bates number ending 4692.

13        You see that?

14   A.    Yes.

15   Q.    And again looking at Section 6.01, is there any

16   reference there to the withholding of 20 percent or only

17   paying 80 percent of the death benefit to the employee?

18   A.    No.

19   Q.    Now take a look at -- and just remind us -- this is

20   February 2007.

21        When was Mr. Spencer's first policy?

22   A.    Approximately January 2007.

23   Q.    Taking a look at Exhibit 108, what is that?

24   A.    It's an email from Amanda Rossi to Joe Castagno;

25   dated July 7, 2008; subject, "Forward:  Charter Oak Trust

1    and Avon Insurance Trust"; with two attachments.

2              MR. NOVICK:  I'd offer Exhibit 2135.

3              MR. BROWN:  No objection.

4              THE COURT:  It will be admitted.

5    BY MR. NOVICK:

6    Q.   Just so that we're oriented here, does this appear to

7    be a forward, in 2008, of the same email that we looked at

8    from February 14, 2007, in Exhibit 2027?

9    A.   Yes.

10   Q.   And attached to this again was that same copy of the

11   Avon and the Charter Oak Trust?

12   A.   Yes.

13   Q.   And again, if you look at Section 6.01, was there the

14   withholding of the 20 percent of the death benefit?

15   A.   No.

16   Q.   Now take a look at the next exhibit, which is 2136,

17   tab 109.

18        Do you see that?

19   A.   Yes.

20   Q.   Who's that from?

21   A.   This is from Joe Castagno to Daniel Carpenter and

22   Amanda Rossi.

23   Q.   Okay.  And subject matter?

24   A.   Charter Oak.

25   Q.   And so how long after Exhibit 2135 was this one?

1    A.    Approximately an hour and 20 minutes.

2    Q.    Okay.  So now -- and this is July of 2008, correct?

3    A.    Correct.

4    Q.    And when did Mr. Spencer die?

5    A.    June of 2008.

6              MR. NOVICK:  Let me offer 2136.

7              MR. BROWN:  No objection.

8              THE COURT:  It will be admitted.

9    BY MR. NOVICK:

10   Q.    Take a look at the section 6.01 of this document.

11   It's on page 4021.

12         Is there a deference between this and the documents

13   we have been looking at previously?

14   A.    Yes.

15   Q.    What is that?

16   A.    It now includes a 20 percent holdback.

17   Q.    So it says:  If a participant dies while

18   participating in the plan, a death benefit equal to

19   80 percent of the original face amount of any policies

20   held by the plan on the participant's life, minus the cost

21   of any premiums or placement or origination fees listed in

22   the plan documents, or minus any funds paid under the plan

23   shall be paid to the participant's designated beneficiary?

24   A.    Yes.

25   Q.    And that wasn't in the document we had been looking

1    at previously?

2    A.   Correct.

3    Q.   And in the Spencer case, 20 percent holdback of

4    $10 million would be how much money?

5    A.   $2 million.

6    Q.   And 4,000,000 in the case of the 20 million-dollar

7    death benefit?

8    A.   Correct.

9    Q.   Now, take a look at Exhibit 110.

10        What is that?

11   A.   This is an email from Daniel Carpenter to Don Trudeau

12   and Jack Robinson and Wayne Bursey; dated July 24, 2008;

13   subject, "Re:  Spencer."

14   Q.   And it asks --

15             MR. NOVICK:  First let me offer 2139.

16             MR. BROWN:  No objection.

17             THE COURT:  It will be admitted.

18   BY MR. NOVICK:

19   Q.   And now, this is a couple of weeks after the emails

20   we just looked at involving the 80 percent provision?

21   A.   Correct.

22   Q.   "I need to ask you which version of the COT trust was

23   provided to Lincoln for the claim, the most current

24   version or the version at the time of participation?  I'm

25   going to ask if a fulfillment kit with trust was ever sent

1     to Spencer."

2          And what's Mr. Carpenter's answer?

3     A.   "Current" and "no."

4     Q.   And I'm not going to go back and look at it again;

5     but, in fact, was the 80 percent document the one that was

6     sent to Lincoln in the documents we looked at through

7     Mr. Elder?

8     A.   Yes.

9     Q.   Looking at the next document, what is that?

10          It's Exhibit 2298, tab 111.

11    A.   It is an email from Daniel Carpenter to Richard

12    Order, Jack Robinson, Wayne Bursey, and Don Trudeau; dated

13    November 18, 2010; subject, "Forward Universitas

14    Discovery"; with an attachment.

15    Q.   Again, I don't want you to testify as to any hearsay

16    about any litigation going on.

17          Does this appear to be written in connection with

18    litigation with Universitas, just generally speaking?

19    A.   Yes.

20               MR. NOVICK:  I'll offer 2298.

21               MR. BROWN:  No objection.

22               THE COURT:  It will be admitted.

23    BY MR. NOVICK:

24    Q.   It's written to Richard Order -- is that right?

25    A.   Yes.

1    Q.   -- who is a lawyer in the context of that litigation?

2    A.   Yes.

3    Q.   And among the documents that are attached to this

4    email, is there another email?

5         If you go to page 1227, one of the attachments to

6    this email, do you see that?

7    A.   Yes.

8    Q.   Does it appear to be a scan of an email from Joe

9    Castagno to Daniel Carpenter, dated November 16, 2010?

10   A.   Yes.

11   Q.   Does that appear to be forwarding earlier emails?

12   A.   Yes.

13   Q.   And what's the bottom email there?

14   A.   It is an email from Jack Robinson to Daniel

15   Carpenter, Wayne Bursey, and Amanda Rossi; dated

16   January 12, 2007; subject, "Charter Oak Trust Final

17   Final."

18   Q.   With that document provided by Mr. Carpenter to his

19   own lawyer, did he also provide a document -- a Charter

20   Oak Trust document that purports to be attached to that

21   email?

22   A.   Yes.

23   Q.   And then look at 6.01, and that is page 1240.

24        Do you see that?

25   A.   Yes.

1    Q.   And does that have the 80 percent provision?

2    A.   It does.

3    Q.   So let me ask you this:  Were you able to go on the

4    server and find the actual email -- so again I'm going

5    to -- the email from January 12, 2007, that Mr. Carpenter

6    had sent to his lawyer that had this Charter Oak Trust

7    document?

8    A.   Yes.  The original email from Jack Robinson.

9    Q.   Okay.  Let's take a look at Exhibit 1931.  It's

10   tab 112.

11        What is that?

12   A.   The original email -- the email from Jack Robinson to

13   Daniel Carpenter, Molly Carpenter, Wayne Bursey, Amanda

14   Rossi, Guy Neumann, and Don Trudeau -- dated January 12,

15   2007; subject, "Charter Oak Trust Final Final"; with an

16   attachment of the Charter Oak Trust.

17             MR. NOVICK:  Offer 1931.

18             MR. BROWN:  No objection.

19             THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.   And again, if you go to 6.01, page 8 of the document,

22   page 5144 Bates number, is there an 80 percent provision

23   in there?

24   A.   There is not.

25   Q.   So just to close out that particular section, that's

1   the email that it appears Mr. Carpenter was sending to his

2   lawyer, but the actual attachment was not the same, is

3   that right?

4   A.   Correct.

5   Q.   And the actual attachment from 2007 did not have the

6   holdback provision, is that right?

7   A.   Correct.

8   Q.   Which amounts to a total of about $6 million?

9   A.   Correct.

10              THE COURT:  We'll take our lunch break now.

11                   (Whereupon, a recess followed)

12              THE COURT:  Mr. Novick.

13              MR. NOVICK:  Thank you, Your Honor.

14   BY MR. NOVICK:

15   Q.   Special Agent Allen, before we broke we were going

16   through some documents and emails related to the Sash

17   Spencer case and the death benefit, and what happened

18   after the -- during the period of time after the death

19   benefit was paid and, for that matter, the period of time

20   beforehand.  And the last thing we had gone through was a

21   series of emails related to the trust document.

22        Do you recall that?

23   A.   Yes.

24   Q.   And the last thing I talked about -- and I don't know

25   that it was completely clear, and I want to make sure that

1    it is, where we had compared two exhibits.  I have them

2    both next to each other on the screen now.

3        Do you see that?

4        It's 2298 and 1931, do you see that?

5    A.   Yes.

6    Q.   And 2298 was an email from Mr. Carpenter to Attorney

7    Richard Order, in the context of the Universitas

8    litigation, is that right?

9    A.   Yes.

10   Q.   And it had several attachments, and I'm going to put

11   up on the screen page 8 of the exhibit, one of the

12   attachments there.

13       And that was, as I think you said earlier, an email

14   forwarding some earlier emails?

15   A.   Yes.

16   Q.   And at the bottom of that -- again, I'm putting them

17   up on the screen next to each other -- at the bottom of

18   that attachment that Mr. Carpenter had put with the

19   documents to Mr. Order, Attorney Order, you see that email

20   from Mr. Robinson, January 12, 2007?

21   A.   Yes.

22   Q.   Does that appear to be the same email as the one that

23   you found on the server from January 12, 2007?

24   A.   Yes.

25   Q.   So I think what we had done before the break is, we

1    had looked at the -- each of these emails came with a

2    trust version of the document, is that correct?

3    A.    Correct.

4    Q.    And the trust document that was in the one that was

5    forwarded in the Universitas litigation on the left-hand

6    side of the screen, I'll just look at that.

7         That, if I scroll through it to 6.01, you had

8    testified that one had the 80 percent provision in it?

9    A.    Correct.

10   Q.    And then you said you went back, and you looked and

11   you found, in Exhibit 1931, the actual email from the

12   server from January 12, 2007, correct?

13   A.    Correct.

14   Q.    And if we look at the attachment that was actually on

15   that January 12, 2007 email, and go to 6.01 and highlight

16   that, you had testified that that did not have the

17   80 percent provision in it, correct?

18   A.    Correct.

19   Q.    And in fact, that was consistent with the other early

20   2007 versions of the Charter Oak Trust that we looked at

21   earlier?

22   A.    Yes.

23   Q.    Now, we've gone through at great length and looked at

24   the different versions of the trust document, but

25   notwithstanding this back-and-forth related to whether

1    there was a holdback or not a holdback, did any money

2    actually get paid to Universitas?

3    A.    No.

4    Q.    And I'm going to now -- now in the email binder

5    again, and have you look at tab 113, and that's

6    Exhibit 2226.

7         What is that document?

8    A.    An email from Daniel Carpenter to Don Trudeau, Molly

9    Carpenter, Wayne Bursey, Jack Robinson; May 28, 2009;

10   subject, "Forward:  Charter Oak Trust Sash A. Spencer."

11             MR. NOVICK:  I offer 2226.

12             MR. BROWN:  No objection.

13             THE COURT:  It will be admitted.

14   BY MR. NOVICK:

15   Q.    And it is responding to an earlier email from an

16   attorney, Ivan Schinderman, is that right?

17   A.    Yes.

18   Q.    And that's on page 2 of the email?

19   A.    Yes.

20   Q.    Talking about the receipt of payment on the Sash

21   Spencer policy, is that right?

22   A.    The death benefit, yes.

23   Q.    If you look at page one, does that appear to get

24   forwarded to Mr. Carpenter?

25   A.    Yes.

1    Q.   It says:  "See, they even expect interest.  Told you

2    the broker was bad news.  I will assist Jack in ESAD

3    letter.  No one tells them anything but what we write,

4    Dan."

5         Do you know what ESAD stands for?

6    A.   Yes.

7    Q.   What is that?

8    A.   "Eat shit and die."

9    Q.   How did you figure that out?

10   A.   I did a Google search online.

11   Q.   And let's take a look at another document on tab 114,

12   Exhibit 2233.

13        What is that?

14   A.   This is an email from Daniel Carpenter to Jack

15   Robinson, Wayne Bursey, and Don Trudeau; July 2, 2009;

16   subject, "Re:  Spencer Benefit Notice."

17             MR. NOVICK:  I'll offer 2233.

18             MR. BROWN:  No objection.

19             THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.   And is it responding to an earlier email?

22   A.   Yes.

23   Q.   From Mr. Robinson?

24   A.   Yes.

25   Q.   Referencing "a draft of the Sash Spencer formal

1    benefit notice that Don and I have been working on"?

2    A.   Yes.

3    Q.   I'll just let you read the response to yourself.

4         And then the next document, I'm going to keep that

5    one in mind and look at chronologically the next document,

6    tab 115, Exhibit 2257.

7         What is that?

8    A.   It is an email from Daniel Carpenter to Guy Neumann,

9    Charlie Westcott, Don Trudeau, Wayne Bursey, and Stefan

10   Cherneski; September 21, 2009; subject, "Re:  Lincoln

11   Finalized."

12   Q.   And without getting into --

13              MR. NOVICK:  Well, first let me offer 2257.

14              MR. BROWN:  No objection.

15              THE COURT:  It will be admitted.

16   BY MR. NOVICK:

17   Q.   Without getting into all of the email, is this

18   generally referencing interest to be paid on the Spencer

19   death benefit?

20   A.   Yes.

21   Q.   Now, you said a second ago that no money was ever

22   paid to Universitas, correct?

23   A.   Correct.

24   Q.   And we heard reference earlier to some litigation, is

25   that right?

1    A.   Yes.

2    Q.   Now I'm going to take a look at Exhibit 1331.  So

3    this is back in the 1300 series binder.

4                (Pause)

5                MR. BROWN:  Your Honor, it's a five-page

6    document.  I think it's about five pages.  I'm wondering

7    if counsel could perhaps have someone make copies while

8    he's asking about other areas and get back to this one, or

9    I could sit here and read the five pages, Your Honor.

10               MR. NOVICK:  I'm fine with not having a copy,

11   Your Honor.  If counsel wants to take a minute --

12               MR. BROWN:  I'm just trying to move it along.

13   I'm happy to sit here and read it.

14               THE COURT:  Okay.

15   BY MR. NOVICK:

16   Q.   Before I offer it, can you tell us what it is?

17   A.   An October 2, 2009 letter from NOVA Group, Inc., to

18   Loeb & Loeb, and Universitas Education, signed by Wayne

19   Bursey, regarding Charter Oak Trust/Universitas.

20   Q.   And Universitas was the beneficiary of the Charter

21   Oak participation for Mr. Spencer?

22   A.   Yes.

23   Q.   And you mentioned earlier that the Universitas claim

24   or beneficiary status was denied, is that right?

25   A.   Yes.

1    Q.   And is that the letter that you located that

2    memorialized that?

3    A.   Yes.

4              MR. BROWN:  Excuse me, Counsel.

5              Your Honor, just to state for the record that I

6    have read it.  I don't have any objection.  I just will

7    ask counsel to provide us with copies at their earliest

8    convenience.

9              THE COURT:  All right, thank you.

10             It will be admitted.

11             MR. NOVICK:  Copies are being made, Your Honor.

12   It was certainly on the exhibit list that we did provide

13   to counsel prior to trial, but I credit that the copy was

14   not in the binder, so we'll get a copy.

15   BY MR. NOVICK:

16   Q.   Among other things, does it appear to be several bold

17   underlined points made here as the basis for the denial of

18   the claim -- I'm not going to have you go through all of

19   these.

20        Among them was a conflicting claim of Grist Mill

21   Capital; do you see that?

22   A.   Yes.

23   Q.   And we heard -- we saw reference earlier in an email

24   to a discussion about an early sale of the policy.

25        Do you recall that?

1    A.    Yes.

2    Q.    And I believe I asked you at the time a similar

3    question, but did you locate any actual agreement to sell

4    the policy on the server at 100 Grist Mill Road?

5    A.    No.

6    Q.    Anywhere in the 100 Grist Mill Road material from the

7    search warrant?

8    A.    No.

9    Q.    And in the course of any of this that you reviewed,

10   this litigation material, did you see anybody come forward

11   with the text of an actual agreement?

12   A.    No.

13   Q.    And just so that we're clear here, on this particular

14   section, the suggestion here on the last page of the

15   document on page 5, there's a settlement offer for

16   $1.8 million in total?

17   A.    Yes.

18   Q.    So there was an offer to pay the beneficiary

19   $1.8 million, and for Grist Mill Capital and Charter Oak

20   Trust to keep the remaining portion of the

21   30 million-dollar death benefit?

22   A.    Yes.

23   Q.    Now looking at the email binder again, that's the end

24   of the 1300 section, Exhibit 116 -- excuse me -- tab 116,

25   Exhibit 2264, what is this document?

1    A.   It is an email from Daniel Carpenter to Jack Robinson

2    and Erik Schneider; November 13, 2009; subject,

3    "COT/Universitas"; with an attachment, COT.PDF.

4              MR. NOVICK:  Offer 2264.

5              MR. BROWN:  No objection.

6              THE COURT:  It will be admitted.

7    BY MR. NOVICK:

8    Q.   Is there an attachment to this document?

9    A.   Yes.

10   Q.   And who is it addressed to?

11   A.   It's addressed to Paula Colbath, of Loeb & Loeb.

12   Q.   Relating to the Universitas matter?

13   A.   Yes.

14   Q.   And signed by who?

15   A.   Jack Robinson.

16   Q.   Along with the letter are there a series of

17   handwritten notes?

18   A.   Yes.

19   Q.   And again without -- the document speaks for itself,

20   and without getting into detail, is this generally the

21   subject matter of the claim of Universitas for the death

22   benefit?

23   A.   Yes.

24   Q.   Just to close out this particular part of the

25   examination here, I believe you had talked earlier about

1    Exhibit 1325, is that right?

2          And I put it up next to this letter on the screen.

3    A.   Yes.

4                    (Pause)

5    Q.   So on the letter of 2264, in the middle, the initial

6    letter that had been edited, it references, "concern with

7    your demand for written assurances that the disputed

8    benefits are being held in a separate interest-bearing

9    account and will not be co-mingled with any other funds."

10         Do you see that?

11   A.   Yes.

12   Q.   That's November 17, 2009.

13         We're about to look at a series of other documents

14   relating to the transmission or movement of funds in

15   the -- related to the Spencer death benefit, correct?

16   A.   Correct.

17   Q.   At this point, had many of those funds already been

18   transferred out of the Charter Oak Trust?

19   A.   Yes.

20   Q.   And I think I had pointed out on the screen an

21   earlier email from October of 2008, that you had

22   referenced earlier, pleading with Lincoln to pay the death

23   benefit for Universitas' benefit, correct?

24   A.   Correct.

25   Q.   And that's 1325?

1    A.    Yes.

2    Q.    Those are the documents up on the screen now, is that

3    right?

4    A.    Yes.

5    Q.    Now, I'm going to move slightly in subject matter to

6    talk about the money laundering counts in the indictment.

7    And in order to do that, I just ask you a few preliminary

8    questions.

9          Did you attempt to trace the money from the Spencer

10   death benefit after it was paid by Lincoln into Charter

11   Oak Trust in May of 2009?

12   A.    Yes.

13   Q.    And generally speaking, can you tell the Judge what

14   some of the places were that this money went?

15   A.    Sure.

16         The money went to repay Ridgewood certain fees and

17   the premiums and loan money from the forwarding for the

18   Spencer policies.

19         It paid premiums on other Charter Oak policies, and

20   it also went to purchase a house in Rhode Island.

21   Q.    Okay.  And you said that one of the destinations was

22   to pay for other Charter Oak policies?

23   A.    Yes.

24   Q.    And I know we've heard testimony related to Christine

25   Lambert and Doug Sanders through the course of the trial?

1    A.    Yes.

2    Q.    Were those two of the policies on which Spencer death

3    benefit money was spent?

4    A.    Yes.

5    Q.    Any other Charter Oak policies that are the subject

6    of the indictment that the Spencer death benefit was used

7    to pay?

8    A.    The Luella Paulsrud policy.

9    Q.    And we've already looked at documents relating to

10   her.

11               MR. NOVICK:  So at this point we've seen or

12   admitted a number of the documents related to Lambert and

13   Sanders.  Before we go through tracing the money relating

14   to Spencer death benefit, I just wanted to offer the

15   remainder of the Lambert and the Sanders documents.

16               That material, Your Honor, is in the same binder

17   as the Spencer material, the 1300 series, the next series

18   after that beginning with 1401.

19   BY MR. NOVICK:

20   Q.    And we've admitted most of these documents before.

21   And I'm just going to direct you to the ones that we

22   haven't, the first one being 1406.

23               What is that?

24   A.    This is a Lincoln life insurance illustration

25   prepared for Christine Lambert, in this case from Lincoln.

1   Q.   And 1410?

2   A.   1410 is an email from Veronica Cranny to Don Trudeau,

3   Deborah Lutes, and Christine Wiemar; June 2, 2009;

4   subject, "Re:  Rose and Lambert."

5   Q.   What did this attach?

6   A.   A PNC transfer-out form dated June 1, 2009, for the

7   Christine Lambert policy ending 7369.

8   Q.   Thank you.

9           MR. NOVICK:  Your Honor, I'd offer 1406

10   and 1410.

11          MR. BROWN:  No objection, Your Honor.

12          THE COURT:  They will be admitted.

13   BY MR. NOVICK:

14   Q.   And now the remainder of the documents in that

15   section have already been offered and admitted.

16       Take a look at, now, the series beginning 1501.

17       Who is that related to?

18   A.   George Sanders.

19   Q.   And 1501 is already in evidence.

20       That was a fax of an application for Mr. Sanders'

21   policy?

22   A.   For one of his policies, yes.

23   Q.   And 1502 was another of his policies, was a reissue?

24   A.   Correct.  They changed the face amount.

25   Q.   So let's turn to 1503, which is not yet in evidence.

1      What is 1503?

2   A.   So it is a fax from Jenny Valedaserra to Premier

3   Partner Underwriting, attaching or including a life

4   insurance illustration for George Sanders.

5   Q.   And this was the one that went to Lincoln, you said?

6   A.   Yes.

7           MR. NOVICK:  I'd offer 1503.

8           MR. BROWN:  No objection.

9           THE COURT:  It will be admitted.

10  BY MR. NOVICK:

11  Q.   Then can you tell us what 1504, 1505 and 1506 are?

12  A.   1504 is the Charter Oak Trust informal inquiry

13  questionnaire for George Sanders; 1505 is the Charter Oak

14  Trust enrollment package for George Sanders; 1506 is the

15  Charter Oak Trust disclosure, acknowledgment and

16  certification agreement for George Sanders.

17          MR. NOVICK:  I would offer 1504, 1505 and 1506.

18          MR. BROWN:  No objection, Your Honor.

19          THE COURT:  They will be admitted.

20  BY MR. NOVICK:

21  Q.   And 1507, 1508, and 1509, what are those?

22  A.   1507 is a collateral assignment agreement relating to

23  the policy insuring the life of George Sanders, ending

24  in 9114.  It is signed by Daniel Carpenter.

25      1508 is a July 10, 2008 Charter Oak Trust funding

1    obligation agreement and power of attorney for George

2    Sanders, policy ending 9114, signed by Wayne Bursey and

3    Daniel Carpenter.

4        1509 is a Ridgewood Finance commitment letter dated

5    July 10, 2008, committing the amount of $414,961.29, for

6    George Sanders and signed by Daniel Carpenter.

7    Q.   And these are related to one of his policies?

8    A.   Yes.

9    Q.   We'll talk about this in a minute.

10       Were both of his policies Ridgewood funded?

11   A.   No.

12   Q.   This one that we just looked at was?

13   A.   Yes.

14   Q.   And what is --

15       MR. NOVICK:  Well, first let me offer 1507, 1508

16   and 1509.

17       MR. BROWN:  No objection, Your Honor.

18       THE COURT:  They will be admitted.

19   BY MR. NOVICK:

20   Q.   And just for purposes of efficiency here, 1510, 1511,

21   1512 and 1513, are those funding memoranda and

22   disbursement requests for the Sanders/Ridgewood funded

23   policy?

24   A.   Yes.

25       MR. NOVICK:  I'd offer 1510, '11, '12, '13.

1          MR. BROWN:  No objection, Your Honor.

2          THE COURT:  They will be admitted.

3    BY MR. NOVICK:

4    Q.   Then 1514 is already in evidence.

5          This is the application related to the second Sanders

6    policy?

7    A.   Yes.

8    Q.   And was this one Ridgewood funded?

9    A.   No.

10   Q.   And looking at 1515 and 1516, which are not yet in

11   evidence, what are those?

12   A.   1515 is a Lincoln acknowledgment for single employer,

13   419(e) welfare benefit plan; signed by Wayne Bursey and

14   George Sanders; 1516 is a Lincoln life insurance

15   illustration for George Sanders from Lincoln's file.

16          MR. NOVICK:  I'd offer those as exhibits.

17          MR. BROWN:  No objection, Your Honor.

18          THE COURT:  They will be admitted.

19   BY MR. NOVICK:

20   Q.   1517, what is that?

21   A.   An email from Don Trudeau to Veronica Cranny and

22   Deborah Lutes, subject:  "COT GS"; with an attachment of a

23   PNC transfer-out form dated June 17, 2009, requesting the

24   transfer of $61,925.

25   Q.   Was that related to the second policy which was not

1    Ridgewood funded, do you know?

2    A.   Yes.

3            MR. NOVICK:  I'd offer 1517.

4            MR. BROWN:  No objection, Your Honor.

5            THE COURT:  It will be admitted.

6    BY MR. NOVICK:

7    Q.   And 1518 and 1519, are those the termination letters

8    for Mr. Sanders' case?

9    A.   Yes.

10           MR. NOVICK:  I'd offer 1518 and 1519.

11           MR. BROWN:  No objection.

12           THE COURT:  Thank you.  They will be admitted.

13   BY MR. NOVICK:

14   Q.   And then 1520 and 1521, again for purposes of time,

15   are these life ownership change form and life beneficiary

16   name-change form for the Doug Sanders case ending 9114?

17   A.   Yes.

18   Q.   Going to Avalon One trust?

19   A.   Yes.

20   Q.   And this is the Ridgewood funded case?

21   A.   Yes.

22   Q.   And then 1522, 1523, 1524, and 1525, what are those?

23   A.   These are all documents related to the formation of

24   George D. Sanders Interests, LLC.

25   Q.   When was that formed?

1    A.   Approximately May 2008.

2              MR. NOVICK:  I'd offer 1522, 1523, 1524,

3    and 1525.

4              MR. BROWN:  No objection, Your Honor.

5              THE COURT:  They will be admitted.

6    BY MR. NOVICK:

7    Q.   So that concludes that binder, the 1200 to 1500

8    series.

9         The documents that we're going to need now are going

10   to be in the 1801 and 1851 series.  We looked at and used

11   it earlier yesterday relating to ISM.  That was in the

12   1700 series.  Now we're going to start with 1801.

13        I'm going to be referring now to the series of

14   summary charts relating to the bank accounts and money

15   laundering counts.  Those are going to be Government's

16   Exhibits 5 through 10, should be the last five in the

17   packet provided to counsel and the Court.

18             MR. BROWN:  Excuse me, Your Honor, could I see

19   counsel for a moment?

20             THE COURT:  Yes.

21                  (Pause)

22   BY MR. NOVICK:

23   Q.   We're going to talk now, generally speaking, about

24   the tracing of some of the money that came as a result of

25   the Spencer death benefit.  And in order to do that, I'm

1    going to start with Government's Exhibit 10, which is a

2    summary chart of certain bank accounts.

3        Can you tell us what Exhibit 10 is?

4    A.   Sure.

5        As you said, it's a summary chart of certain bank

6    accounts.  It lists the different banks the accounts are

7    held at in the first column.  It provides the last four

8    digits of the account number for the pertinent account,

9    the entity in which the account's name is, the authorized

10   signers on the accounts, and then it has an exhibit column

11   which goes to the exhibit that supports this information

12   on this chart.

13   Q.   Okay.  And I note there's one that didn't have a

14   signature card available?

15   A.   Correct.

16   Q.   So how do you know that there is an account 3335?

17   A.   We have the account statements and debits and credits

18   for that account.

19   Q.   The bank just didn't have the signature card?

20   A.   Correct.

21   Q.   And so just to be clear, these are the exhibits, 1801

22   through 1815, otherwise that you obtained this information

23   from?

24   A.   Yes.

25   Q.   And be mindful of our colloquy earlier, before I

1    offer this, let's just take a look at 1801 through 1815.

2         Can you just look through those documents?

3              (Pause)

4    Q.   Okay?

5    A.   Yes.

6    Q.   Are those all records from banks that are listed on

7    the summary chart with the signature cards?

8    A.   Yes.  All these records came from the banks.

9              MR. NOVICK:  Your Honor, I'd offer 1801

10   through 1815.

11             MR. BROWN:  Your Honor, I just want to make

12   clear that the witness is verifying that she's personally

13   gone through each of these -- sort of like a voir dire, I

14   just want the Court or counsel to inquire as to that she's

15   personally looked at each of these exhibits that form the

16   basis for this particular chart and is attesting to the

17   fact that, to the best of her knowledge, she believes

18   they're 100 percent accurate.

19             THE COURT:  Mr. Novick?

20             MR. NOVICK:  Just to parse this out a little

21   bit, Your Honor, right now I'm just offering the exhibits

22   themselves, 1801 to 1815.  That was to be my next line of

23   inquiry.  I think the records would come in through the

24   business record stipulation as to authenticity.

25             MR. BROWN:  I thought you were offering the

1    charts at this point.

2              No objection.

3              THE COURT:  They will be admitted.

4    BY MR. NOVICK:

5    Q.   Consistent with what counsel is asking, this summary

6    chart is then a representation or a summary of the

7    information that you gleaned from the documents in 1801

8    through 1815?

9    A.   Yes.

10             MR. NOVICK:  Your Honor, I'd offer Exhibit 10.

11             MR. BROWN:  On that basis, no objection.

12             THE COURT:  It will be admitted.

13   BY MR. NOVICK:

14   Q.   There's a small indictment key at the bottom.  Is

15   that just a description for the convenience of the parties

16   and the Court as to some of the anonymized entities

17   relating to the money laundering counts in the indictment?

18   A.   Yes.

19   Q.   And just to be clear, are these accounts in

20   Exhibit 10 every bank account that touched the Spencer

21   death benefit money?

22   A.   No.

23   Q.   Are these all of the accounts involved in the

24   transactions that are charged in the superseding

25   indictment related to the money laundering charges?

1    A.    They are, though I will add that there's listed TPG

2    groups on here which do not relate to the money laundering

3    but affect another aspect of the investigation.

4    Q.    So that was related to another part of the indictment

5    but still on the indictment?

6    A.    Yes, yes.

7    Q.    And the remainder of those accounts relate to the

8    Spencer death benefit money?

9    A.    Correct.

10   Q.    With that in mind -- let's take a step back for a

11   second.

12        The indictment charges are grouped by statute,

13   correct?

14   A.    Correct.

15   Q.    And are these summary charts we're about to look at

16   grouped exactly the same way as the indictment itself?

17   A.    No.

18   Q.    Can you explain roughly why?

19   A.    Yes.  Because in tracing the money, I compare it to a

20   tree in which the money starts in one location and then,

21   as you follow it, it branches out.  So each of these

22   charts follows one branch --

23   Q.    Okay.

24   A.    -- though overall, you know, it starts in one place

25   and moves along.

1    Q.   Okay.  So let's look at each chart, and we'll start

2    with -- well, first, let me direct you to the exhibits

3    beginning 1851 and going through 1891.

4         We'll look at these -- some of these individually in

5    a minute, but generally speaking, are these the bank

6    records that you used to create the charts in Exhibits 5

7    through 9?

8    A.   Yes.

9         MR. NOVICK:  Your Honor, pursuant to the

10   authenticity stipulation, I would offer Exhibits 1851

11   through 1891.  I'm not offering the chart yet.

12        MR. BROWN:  May I have a moment, Your Honor?

13        THE COURT:  Yes.

14             (Pause)

15        MR. BROWN:  Your Honor, subject to counsel tying

16   these up later on to a reported criminal act, Your Honor,

17   there's no objection in the sense that the question really

18   is relevancy, and we don't dispute, per our agreement, the

19   fact that the documents are what they purport to be.  It's

20   just a question we're not conceding, Your Honor, that

21   they're relevant to this prosecution.

22        THE COURT:  All right.  They will be admitted.

23   BY MR. NOVICK:

24   Q.   Special Agent Allen, let's start with the first

25   chart, being Government's Exhibit 5, related to Counts 49

1    through 52, charging 18 USC 1956, promotion of specified

2    unlawful activity.

3        Do you see Exhibit 5?

4    A.   Yes.

5    Q.   Did you create that?

6    A.   Yes.

7    Q.   Can you explain how you created it, what it

8    represents?

9    A.   Certainly.

10       So if we follow the header columns, the first column

11   represents the counts of the indictment.  So that refers

12   back to each individual account.

13       The second column is the date column, and that lists

14   the date of the activity.

15       The third column is the amount, and that is the

16   amount of the transfer involved in each count.

17       The fourth column is the source, and that is the

18   source of the funds that were in the previous column.

19       The recipient is the account that received the money.

20   And just to explain that a little further, in the first

21   row, COT, TDBN4548 refers to Charter Oak Trust TD Bank

22   North account ending 4548.

23       The next column says, "Document," and that just

24   identifies the documents that were used to confirm the

25   activity.

1          The next column says, "Signature, If Any."  Some of

2     the documents we reviewed have a signature on them, and

3     that identifies who signed the document.

4          The next column says, "Purpose, 1956," and that

5     relates to the purpose for the transfer as it relates to

6     the count of the indictment.

7          And then the last column represents the exhibit

8     number detailing the activity contained in this chart.

9     Q.   And I want to have you walk through this for us, how

10    you traced the money?

11              MR. NOVICK:  But based on what the witness has

12    testified to, I would offer Exhibit 5.

13              MR. BROWN:  No objection, Your Honor.

14              THE COURT:  It will be admitted.

15    BY MR. NOVICK:

16    Q.   So can you walk through, trace the money here on the

17    summary chart, and explain how you arrived at what you

18    did?

19    A.    Certainly.

20         So it starts on May 18, 2009.  $30,677,276.85 was

21    sent from Lincoln to Charter Oak Trust TD Bank North

22    account 4548.

23         The documents we have are the checks from Lincoln, as

24    we saw before, and a deposit slip from Charter Oak Trust.

25         And then on -- so then we move down to the next

1    column, Count 35.  On May 21, 2009, from that previous

2    deposit, $8,677,276.75 was then transferred from the

3    Charter Oak Trust TD Bank North account into a Grist Mill

4    Capital TD Bank North account ending in 4712.

5    Q.   Let me stop you for a minute.  I'm sorry.

6         Just to be clear, Counts 35, 36 and 37 are in

7    brackets, correct?

8    A.   Correct.

9    Q.   This chart is talking about money laundering, whereas

10   those counts are related to illegal monetary transactions,

11   is that correct?

12   A.   Correct.

13   Q.   Are they going to be on other charts we're going to

14   see in a minute?

15   A.   Correct.

16   Q.   You mentioned a tree analogy before, so we're going

17   to see some of the same transactions?

18   A.   Correct.  I think Count 35 is on many of the charts.

19   Q.   Go ahead.

20   A.   So that $8 million was deposited into Grist Mill

21   Capital TD Bank North 4712.

22        From there, May 22, 2009, $3,356,700 was transferred

23   out of GMC TD Bank North account and deposited in the

24   Grist Mill Capital Bank of America account ending 4932.

25        Then again going back to the Charter Oak Trust

1    account where the original $30 million was deposited, on

2    5/26/09, $2,186,566 was transferred out of the Charter Oak

3    Trust account at TD Bank North and deposited into the

4    Grist Mill Capital account at TD Bank North ending 4712.

5         So then for Counts 49 and 50, which are counts for

6    the money laundering charges, on May 26, 2009,

7    $2,094,654.78 was transferred out of the Grist Mill

8    Capital Bank of America account ending 4932 and sent to

9    Ridgewood Finance.

10        On that same day, Count 50, $1,063,045.54 was also

11   transferred out of the Grist Mill Capital account at Bank

12   of America and sent to Ridgewood Finance.

13   Q.   Let me just have you pause there for a second.

14        The "purpose" column, where did you get that

15   information from?

16   A.   That information is from -- through the

17   investigation, it was confirmed that these amounts repaid

18   the Ridgewood loan for Spencer's premiums.

19   Q.   If you look at 1856, a Bank of America document that

20   supports these counts, does it in fact say to pay off

21   facility RWF Sash Spencer Lincoln policy?

22   A.   Yes.

23   Q.   For each of those two amounts?

24   A.   Correct.

25   Q.   So in other words, backing off the documents --

1    backing up your summary that that's what this was for,

2    there is actually a document that says that, correct?

3    A.    Yes.

4    Q.    Sorry to interrupt you.

5          Go ahead.

6    A.    So then on May 28, $700,000 was sent out of the Grist

7    Mill Capital TD Bank North account 4712 and deposited in

8    the Grist Mill Capital Bank of America account 4932.

9          Then on June 2, 2009, $671,566.16 was transferred out

10   of the Grist Mill Capital Bank of America account and sent

11   to Ridgewood.

12         On that same date, June 2, 2009, $119,875 was sent

13   out of the Grist Mill Capital Bank of America account 4932

14   and sent to the Charter Oak Trust account at PNC Bank

15   ending in 3247.  That relates to Count 51.

16         Then on June 3, relating to Count 52, $119,875 was

17   transferred out of the Charter Oak Trust PNC account and

18   sent to Lincoln.

19         And Counts 51 and 52 relate to the payment of the

20   premium on the Christine Lambert Charter Oak Trust policy.

21   Q.    So again, your assessment of what the purpose is, for

22   example, on Count 51, we can find in Exhibit 1860

23   and 1861, is that right?

24   A.    Yes.  1861 specifies the Christine Lambert policy.

25   Q.    That's the wire request form?

1    A.    Correct.

2    Q.    And just a couple follow-up questions, if you can.

3          I note that accounts that receive the death

4    benefit -- let's put it this way:  Where the checks are

5    cashed and deposited, the Charter Oak trust account is TD

6    Bank North 4548, correct?

7    A.    Correct.

8    Q.    You testified based on your summary chart, that comes

9    from Exhibit 1802, is that right?

10   A.    Yes.

11   Q.    So I've pulled up Exhibit 1802, the signature card

12   for the TD Bank North Charter Oak Trust account.

13         When was that account set up?

14   A.    Approximately May 1, 2009.

15   Q.    So about six days before the checks were deposited

16   into the account?

17   A.    Correct.

18   Q.    And what was the balance in the account prior to the

19   receipt of the Spencer death benefit money?

20   A.    Twenty dollars.

21   Q.    In your investigation, your assessment reading these

22   bank records, did the Spencer death benefit money ever

23   pass through Christiana Bank?

24   A.    No.

25   Q.    Let's take a look at Exhibit 6.

1          What is that?

2     A.    This is another summary chart tracing money movement

3     for Counts 48, 53, 54, 55, 56 and 57.

4     Q.    Was this based upon, again, the bank records in

5     Exhibits 1851 through 1891?

6     A.    Yes.

7     Q.    And it's your testimony today that this is accurate

8     to the best of your ability in tracing this money?

9     A.    Yes.

10               MR. NOVICK:  I'd offer Exhibit 6.

11               MR. BROWN:  Your Honor, with that understanding,

12    coupled with the ability of the government to tie it in to

13    the counts in the superseding indictment, Your Honor,

14    there's no objection.

15               THE COURT:  Thank you.

16               It will be admitted, Exhibit 6.

17    BY MR. NOVICK:

18    Q.    On Exhibit 6, can you explain how you traced this

19    money?

20          So you testified earlier that there was something of

21    a tree, correct?

22    A.    Correct.

23    Q.    So looking at the second -- I see the first two lines

24    are the same as the last chart we just looked at?

25    A.    Correct.

1    Q.   And then rather than in Exhibit 5, where it focuses

2    on a -- traces a payment to the GMC Bank of America

3    account on May 22, it appears this one traces a payment to

4    the Grist Mill Holdings account on May 22, is that right?

5    A.   Correct.

6    Q.   So can you follow that for us from there, in terms of

7    what you were able to trace using the bank records?

8    A.   Certainly.

9         So for 48, as you said, on May 22, 2009, 2,100,000

10   was transferred from the Grist Mill Capital TD Bank North

11   account ending in 4712, and was deposited into a Grist

12   Mill Holdings account at TD Bank North ending in 7136.

13        Then related to Count 53, on June 9, 2009, $1,946,000

14   was transferred out of that Grist Mill Holdings TD Bank

15   North account and was transferred to a Grist Mill Holdings

16   account at Bank of America ending in 0017.

17        Then on June 17, 2009, relating to Counts 54 and 55,

18   first $61,925 was transferred out of that Grist Mill

19   Holdings Bank of America account and sent to the Charter

20   Oak Trust account at PNC Bank.  And on the same day,

21   $139,633.33 was transferred again from the Grist Mill

22   Holdings Bank of America account to the Charter Oak Trust

23   PNC account.

24        Then related to Counts 56 and 57, on June 18, 2009,

25   that $61,925 was transferred out of the Charter Oak Trust

1    PNC account and sent to Lincoln as a payment on a premium

2    for a policy on George Sanders.

3        And then on July 1, '09, the $139,633.33 was

4    transferred out of the Charter Oak Trust PNC account and

5    sent to Phoenix to pay a premium on the policy insuring

6    the life of Luella Paulsrud.

7    Q.    Thank you.

8        And just so that it's completely clear, you traced

9    the money from Lincoln to the Charter Oak Trust 4548

10    account, to a GMC account ending 4712, to a Grist Mill

11    Holdings account ending 7136, to a Grist Mill Holdings

12    account of Bank of America ending 0017, and that was the

13    $1.9 million roughly?

14    A.    Yes.

15    Q.    And then those are Counts 48 and 53, correct?

16    A.    Correct.

17    Q.    And so just to be clear, those you represent in the

18    chart went to pay insurance policy premiums, including for

19    Sanders and Paulsrud policies, is that right?

20    A.    Correct.

21    Q.    So if we look down, when you refer to the Sanders and

22    Paulsrud policies, those are Counts 54, 55, 56 and 57?

23    A.    Yes.

24    Q.    So that money went and did other things as well,

25    right?

1    A.    Yes.

2    Q.    It's just not on this chart?

3    A.    Correct.

4    Q.    The 61,000 transfer went from Bank of America to PNC,

5    and then from PNC to Lincoln, is that right?

6    A.    Yes.

7    Q.    So those are a pair, 54 and 56, and 55 and 57 related

8    to the Paulsrud policy?

9    A.    Correct.

10   Q.    We're going to look at Number 7 next.

11         And what is this?

12   A.    This is a chart tracking the transfer of money

13   regarding Counts 35 through 37.  The headings on the chart

14   are slightly different.

15   Q.    And this is related to 18 USC 1957 monetary

16   transaction charges, is that right?

17   A.    Yes.

18   Q.    So there's no purpose column here, is that right?

19   A.    Correct.

20   Q.    But there is a prior balance column?

21   A.    Correct.

22   Q.    Let's talk about -- let me ask you just generally:

23   Is this again based upon the exhibits that are listed on

24   the column, the far-right column in the chart?

25   A.    Yes.

1    Q.   And they're in evidence now?

2    A.   Yes.

3    Q.   And is it related specifically to Counts 35, 36

4    and 37 in the indictment?

5    A.   Yes.

6              MR. NOVICK:  Your Honor, I'd offer -- well,

7    first --

8    BY MR. NOVICK:

9    Q.   Is this your, to the best of your ability, accurate

10   restatement and summary of what's in those exhibits?

11   A.   Yes.

12             MR. NOVICK:  I'd offer Exhibit 7.

13             MR. BROWN:  Your Honor, subject to the same

14   understanding as previously stated, Your Honor, no

15   objection.

16             THE COURT:  Thank you.

17             It will be admitted.

18   BY MR. NOVICK:

19   Q.   So you'd indicated that this is slightly different.

20        Can you tell us how you created this chart?

21   A.   Yes.

22        Again, most of the columns are the same.  However, at

23   the end, instead of the purpose, there is a column for

24   prior balance.  And that was used by looking at the bank

25   statement in determining the balance on the account prior

1    to the deposit of the funds listed here.

2    Q.    Okay.  Just so that we have a complete understanding

3    of how that works, can you trace us through this,

4    explaining how the prior balance figures in?

5    A.    Certainly.

6         Well, if we look at -- we discussed this privately,

7    but if we look at the first row with no account attached,

8    again on May 18, 2009, that $30 million was sent from

9    Lincoln and deposited into the Charter Oak Trust TD Bank

10   account.  That prior balance of $20 relates to the

11   recipient.  So that was the balance in the account prior

12   to the $30 million being deposited.

13   Q.    And then out of the account three days later was the

14   $8.6 million that you've testified about earlier?

15   A.    Correct.

16   Q.    And the TD Bank North GMC account had nothing in it

17   prior to that transfer?

18   A.    Correct.

19   Q.    And how did you -- can you just trace the rest of

20   that?

21   A.    Certainly.

22        So Count 36, on May 22, 2009, $3,356,700 was

23   transferred out of the Grist Mill Capital TD Bank North

24   account and deposited into the Grist Mill Capital Bank of

25   America account ending in 4932.  Prior to that

1    $3.3 million going in, the GMC Bank of America account had

2    $27,152.48 in it.

3        Count 37, 5/26/2009, $2,186,566 was transferred out

4    of the TD Bank North account 4548, and transferred into

5    the Grist Mill Capital TD Bank North account.  And we have

6    no prior amount in that account.  It was not relevant.

7    Q.   This chart doesn't trace further where that money

8    went?

9    A.   Correct.

10   Q.   And just so it's clear on this chart, this is looking

11   at -- 35 and 37 are two different disbursements from the

12   4548 account, correct?

13   A.   Correct.

14   Q.   And there was no other money that went in, in the

15   intervening time, is that correct?

16   A.   Correct.

17   Q.   Okay.  I'm going to go slightly out of order and have

18   you look at Exhibit 9.

19       What is that?

20   A.   So this is another chart tracing the transfer of

21   funds and relating to Counts 40 through 47 on the

22   indictment.

23   Q.   And again the same questions we've been talking

24   about:  Are these based on the exhibits that are listed on

25   the right-hand column?

1    A.   Yes.

2    Q.   It's your best effort at an accurate truthful summary

3    of what the exhibits say?

4    A.   Yes.

5    Q.   And as it relates to counts in the superseding

6    indictments as listed on the left-hand side?

7    A.   Correct.

8            MR. NOVICK:  I would offer Exhibit 9.

9            MR. BROWN:  Subject to the same objections, no

10   additional objections, Your Honor.

11           THE COURT:  Thank you.

12           It will be admitted.

13   BY MR. NOVICK:

14   Q.   Okay.  And just generally, before we actually look at

15   the count or the chart itself, I'm going to ask you:  Is

16   this particular chart tracing money related to a

17   particular purchase?

18   A.   Yes.

19   Q.   What purchase was that?

20   A.   It was a purchase of the beach home in Rhode Island.

21   Q.   And I'm going to look at -- I hate to do it, but just

22   look at four emails that come out of the correspondence

23   binders for a minute, the next four that were in the

24   correspondence binder which we're almost done with.  And

25   it starts with tab 118.  It's Exhibit 2205.

1       What is that?

2    A.   This is an email from Daniel Carpenter to John

3    Hodnett; April 2009; subject, "Purchase Offer"; with an

4    attachment.

5               MR. NOVICK:  I'd offer 2205.

6               MR. BROWN:  No objection, Your Honor.

7               THE COURT:  It will be admitted.

8    BY MR. NOVICK:

9    Q.   And the attachment, what is that?

10   A.   It is -- looks like a memo on Grist Mill Capital

11   letterhead; dated April 8, 2009; to, again, John Hodnett

12   of Lila Delman Real Estate; from Daniel Carpenter on

13   behalf of Moonstone Partners; regarding purchase of

14   property, 392B Cards Pond Road.

15   Q.   Okay.  And it indicates an offer for a house,

16   $1.2 million, is that right?

17   A.   Yes.

18   Q.   Take a look at Exhibit -- tab 119, Exhibit 2206.

19        What is that?

20   A.   An email from Daniel Carpenter to, again, John

21   Hodnett; April 9, 2009; subject, "Deposit Check"; with an

22   attachment of a check.

23               MR. NOVICK:  Offer 2206.

24               MR. BROWN:  No objection, Your Honor.

25               THE COURT:  It will be admitted.

1    BY MR. NOVICK:

2    Q.   And the check on the second page is to Lila Delman

3    Real Estate for a thousand dollars?

4    A.   Yes.

5    Q.   Deposit, 392B Cards Pond Road?

6    A.   Yes.

7    Q.   Next is tab 120, and it's Exhibit 2223.

8         What is that?

9    A.   An email from Daniel Carpenter to John Hodnett; May

10   21, 2009; subject, "New Original Amended P and S

11   Agreement, 392 Cards Pond Road"; with an attachment.

12   Q.   And the attachment, what is that?

13   A.   It is a letter dated May 21, 2009, and a single

14   family purchase and sales agreement.

15   Q.   Related to the same Cards Pond Road address?

16   A.   Yes.

17        MR. NOVICK:  I'd offer Exhibit 2223.

18        MR. BROWN:  No objection.

19        THE COURT:  It will be admitted.

20   BY MR. NOVICK:

21   Q.   And if you just look at the first page of the

22   purchase and sale agreement, there's a total purchase

23   price of $1.1 million?

24   A.   Yes.

25   Q.   And then Exhibit 121, what is that?

1    A.    Exhibit 2230, from Daniel Carpenter to Cynthia M.

2    Smith; dated June 19, 2009; subject, "Forward:  Moonstone

3    and Carpenter Financials"; with attachment, Moonstone PDF.

4              MR. NOVICK:  I'd offer 2230.

5              MR. BROWN:  No objection, Your Honor.

6              THE COURT:  It will be admitted.

7    BY MR. NOVICK:

8    Q.    Does it have an attachment with it?

9    A.    Yes.

10   Q.    What is the attachment?

11   A.    The attachment starts with a letter dated June 19,

12   2009, to Cynthia Smith at Washington Trust Company, from

13   Daniel Carpenter, and also includes a number of bank

14   statements.

15   Q.    Okay.  I have put it up on the screen.  Just at the

16   bottom of that first page, it reads:  "Grist Mill

17   Capital's controlled indirectly by Mr. Carpenter through

18   Caroline and Carpenter Financial Group and is involved in

19   the lending of money for the purchase of large life

20   insurance policies on the lives of high net worth

21   individuals for estate planning purposes."

22         You see that?

23   A.    Yes.

24   Q.    And you said there are some attachments as well?

25   A.    Correct.

1    Q.    Among the attachments, do you see a Grist Mill

2    Capital account statement from TD Bank North?

3    A.    Yes.

4    Q.    And it lists deposits on 5/21 and 5/26.

5          Do you see that?

6    A.    Yes.

7    Q.    Are those familiar to you?

8    A.    Yes.

9    Q.    Where are those coming from, based on the charts we

10   looked at?

11   A.    We just reviewed them in Counts 35 and 37.

12   Q.    And then also attached to this letter to Washington

13   Trust, do you see a TD Bank North account for Charter Oak

14   Trust?

15   A.    Yes.

16   Q.    And in that account -- and that's account 4548, as

17   far as you can tell?

18   A.    Yes.

19   Q.    I notice that the numbers are blocked out.

20         And what's the amount of money there that's listed as

21   having been deposited in the account?

22   A.    $30,677,296.85.

23   Q.    And again based on what we've looked at earlier,

24   where did that money come from?

25   A.    Lincoln.

1    Q.    From the Spencer death benefit?

2    A.    Correct.

3    Q.    So let's return to the summary chart, Exhibit 9 --

4              MR. NOVICK:  Moment, please, Your Honor?

5                      (Pause)

6              MR. NOVICK:  Sorry.  Just wanted to highlight

7    one other portion of this Exhibit 2230.

8    BY MR. NOVICK:

9    Q.    And the second page of the document, letter -- second

10   page of the letter to Mr. Carpenter, do you see where it

11   says:  "Through our various trusts we control over

12   $2 billion in life insurance policies"?

13   A.    Yes.

14   Q.    All right.  Now let's turn to Exhibit 9, already in

15   evidence.

16         Can you walk us through this chart and explain how

17   you got from the death benefit money to the house?

18   A.    Certainly.

19         So again, I won't go through them in detail, the

20   first three rows we've discussed, but it's the deposit of

21   the $30 million from Lincoln to Charter Oak, and then a

22   transfer of 8.6 to Charter Oak to Grist Mill Capital, and

23   another transfer of 2.1, approximately, from Charter Oak

24   Trust to Grist Mill Capital at TD Bank 4712.

25         And then Count 40, on June 9, 2009, $2,833,568.64 was

1    transferred from the Grist Mill Capital TD Bank account

2    and sent to a Grist Mill Trust account at JP Morgan Chase

3    ending in 3305.

4         On that same day, June 9, '09, the same amount,

5    2,833,568.64, was transferred from the Grist Mill Trust

6    account ending in 3305 at JPMorgan Chase, and sent to

7    another Grist Mill Trust account, ending in 8488, at

8    JPMorgan Chase.  That's Count 41.

9         Count 42, on June 12, 2009, $2,700,000 was

10   transferred from the Grist Mill Trust account ending

11   in 8488, and sent to a Phoenix Capital Management account

12   at TD Bank North ending in 4671.

13        Count 43, on July 13, 2009, $2.5 million was sent

14   from that Phoenix account ending in 4671, to the Grist

15   Mill Capital TD Bank account ending in 4712.

16        Then Count 44, on the same date, July 13, 2009,

17   $2.2 million was sent from the Grist Mill Capital account

18   ending 4712, and sent to a Grist Mill Holdings account at

19   TD Bank North ending in 7136.

20        For Count 45, on July 15, 2009, $1.2 million was sent

21   from that Grist Mill Holdings account at TD Bank North and

22   sent to a Hanover Trust account at TD Bank North, ending

23   in 2940.

24        Then on the same day, July 15, $1.1 million was sent

25   from the Hanover account at TD Bank North and deposited

1    into a Moonstone Partners account at TD Bank North ending

2    in 5455.  That relates to Count 46.

3         Then finally Count 47, on the same date, July 15,

4    2009, $1,040,000 was sent by official check out of the

5    Moonstone account and provided to John McCloskey.

6    Q.   I note on the chart that the money goes through the

7    Grist Mill Trust account, two different Grist Mill Trust

8    accounts, is that right?

9    A.   Correct.

10   Q.   And there were some significant balance in some of

11   those accounts prior?

12   A.   Yes.

13   Q.   But you looked at the significance -- excuse me --

14   the fact that the money was virtually the same in each

15   case?

16   A.   It was the same in each case, and it related to the

17   2.7 that went out from the 8488 account.  There were no

18   other similar deposits of that same amount as well.

19   Q.   And the prior balance in the Grist Mill Capital

20   TD Bank North 4712 account, I note, in the third line is

21   $3.2 million.

22        Is that also traceable to Spencer death benefit

23   money?

24   A.   Yes.  That balance is primarily or maybe completely

25   due to the prior line.  That was remaining from the 8.6

1    before the 2.1 was deposited.

2    Q.   And there were other withdrawals between 5/21 and

3    5/26 that we saw on the other chart?

4    A.   Correct.

5    Q.   And finally --

6         THE COURT:  Will you be wrapping up soon,

7    Mr. Novick?

8         MR. NOVICK:  Your Honor, I have one more chart

9    to go, and then -- one more money laundering chart, and

10   then just some sort of -- like three more emails and the

11   overall summary charts of all the policies and questions.

12   So --

13        THE COURT:  So we'll take a break.

14             (Whereupon, a recess followed)

15        THE COURT:  Mr. Novick?

16        MR. NOVICK:  Thank you, Your Honor.

17   BY MR. NOVICK:

18   Q.   Special Agent Allen, we had left off, I was going to

19   start asking you questions about Exhibit 8.

20        What is that?

21   A.   That is a summary chart regarding illegal monetary

22   transactions related to the counts in the indictment of

23   Counts 38 and 39.

24   Q.   And again, is this based on your representation of

25   what's in the exhibits listed in the right-hand column,

1    and related to Counts 38 and 39, to the best of your

2    ability?

3    A.   Yes.

4              MR. NOVICK:  Offer Exhibit 8.

5              MR. BROWN:  No objection, Your Honor.

6              THE COURT:  It will be admitted.

7              MR. BROWN:  When I say that, Your Honor, I say

8    under the same terms and conditions as to previous

9    objections.

10             THE COURT:  Understood.

11   BY MR. NOVICK:

12   Q.   Can you tell us briefly what this shows?

13   A.   So this is tracking a large transfer out of the

14   Charter Oak Trust TD Bank account 4548, and where it went.

15        Do you want me to go through the details?

16   Q.   Sure, just briefly.

17   A.   As we discussed, on May 18, 2009, 30 million and

18   change went from Lincoln to the TD Bank account 4548.  And

19   for Count 38, on October 27, 2009, $19,800,000 was

20   transferred out of the Charter Oak Trust TD Bank account

21   and transferred into the Grist Mill TD Bank account

22   ending 4712.

23        And then related to Count 39, on October 28, 2009,

24   $19 million was transferred out of the Grist Mill Capital

25   TD Bank account and deposited into the Grist Mill Holdings

1    TD Bank account ending 7136.

2    Q.   And that transfer in October of 2009, is that

3    following the denial of the claim by the Charter Oak Trust

4    to pay Universitas?

5    A.   Yes.

6    Q.   And that's the remainder of the death benefit money

7    that was still remaining in the Charter Oak Trust TD Bank

8    North account?

9    A.   Yes.

10   Q.   We can put that to the side, and now I want to direct

11   you to government's exhibits -- we're going to look at

12   Government's Exhibits 1 and 2, which are also summary

13   charts.

14        Do you have those with you?

15   A.   Yes.

16   Q.   Let's start with number 1.

17        What is that?

18   A.   Number 1 is a summary chart basically summarizing

19   certain details regarding the 76 insureds and the

20   84 policies that were issued in the Charter Oak Trust.

21   Q.   Okay.  And just in terms of the columns and the

22   information that it provides, can you give us the -- what

23   each of these columns represent?

24        Some of them are self-explanatory.

25   A.   Certainly.

1        The first column is 1 through 76, for each insured

2   within the Charter Oak Trust.

3        The second column listed "SI," relates to the straw

4   insureds from the indictment that were specifically

5   identified.

6        The third column is the insurance name, fourth column

7   is the state of the insured.  The fifth column, "Issue

8   Age," is the issue for the insured related to the issuance

9   of the life insurance policy.

10       The issue date is the date of issue of the life

11  insurance policy in the Charter Oak Trust.  The face value

12  is the amount of the death benefit.

13       The insurance carrier is the carrier who issued the

14  policy.  The policy number is the policy number for that

15  policy.  The agent/producer lists the agents who sold this

16  policy.

17       The next column asks, "Ridgewood Funded?"  So if it

18  says yes in that column, that policy was a policy funded

19  through the line of credit through Ridgewood.

20       And then the last column listing exhibits provides

21  some exhibit numbers that would help back up the

22  information on this chart.

23  Q.   And just for further explanation I note that, for

24  some of these folks, there's a 25A, 25B, 25C and 25D.

25       Why would that have been the case?

1   A.   Yes.  For two individuals there are A, B, C, D

2   because they had multiple policies issued in the Charter

3   Oak Trust.  So we didn't want to just count them

4   numerically because we wanted to maintain the 76 insureds.

5   Q.   Okay.  And I thought that some of the exhibit numbers

6   related to these are in the 1601 and 1602, 1603, 1604 and

7   1605, which we have not offered yet, which I'll do now.

8   And each of them is a binder, and I'll have you just

9   explain what each binder is.

10       I'm not intending to have you actually go through the

11   binders, but just tell us what each binder is.

12       Do you have it in front of you, by the way?

13   A.   I do.

14   Q.   If it's okay with the Court, you can just stand next

15   to the binders and tell us what each one of them is.

16   A.   So 1601 is a list of application.

17   Q.   When you say a list, it's a compilation?

18   A.   It's a --

19           MR. BROWN:  Excuse me, Your Honor, I don't mean

20   to interrupt, but we're trying to find the documents.  If

21   he can just hold off for a minute?

22               (Pause)

23           MR. BROWN:  Thank you, Your Honor.  For the

24   record, I now have them in front of me.

25           THE WITNESS:  So 1601 involves insureds 16

1    through 76, and it is copies of the applications and

2    associated documents and forms that we received from the

3    insurance companies for each insured.

4    BY MR. NOVICK:

5    Q.   So you didn't repeat 1 through 15, that we already

6    have in the other binders?

7    A.   Correct.

8    Q.   It starts with 16 and goes through 76?

9    A.   Correct.

10   Q.   In the cases, for example, with Mr. Deckard and

11   Mr. Tucker, who have multiple policies, how did you handle

12   that in terms of organization of the binder?

13   A.   Again, I believe just like the summary charts, they

14   are 25A, B, C, D, and I think it's 56 or -- yeah, 56A, B,

15   C.

16   Q.   And the tabs in there, in other words, if I were to

17   look for tab 16 in there, it would have Mr. Ainsworth's

18   policy?

19   A.   Ms. Ainsworth, yes.

20   Q.   And similarly all the way down, the tabs in there

21   correspond to the summary chart as if this were a table of

22   contents to that?

23   A.   Correct.

24   Q.   And I note, just in terms of how you organized the

25   summary chart, what was the order that you put the

1    insureds in here and in the binder?

2    A.    Yeah.  So they are for the 1600 series, the first

3    number of insureds are those who were financed through

4    Ridgewood, through the line of credit with Ridgewood with

5    one exception, Mr. Deckard.  His fourth policy was not

6    Ridgewood financed.  But we didn't want to separate him.

7    So --

8    Q.    And then within those subsets they're alphabetical?

9    A.    Yes.  I'm sorry.  They are alphabetical.

10   Q.    So to be clear, all right, so 1601 is the

11   application, and other application documents for insureds

12   numbered 16 through 76, correct?

13   A.    Correct.

14   Q.    Now, before I offer them, can you tell us what

15   1602 is?

16   A.    Certainly.

17         1602, again, it's for insureds 16 through 76, and it

18   is the disclosure, acknowledgment and certification

19   agreement for each insured, the Charter Oak Trust

20   disclosure, acknowledgment and certification agreement.

21   Q.    Again following the same order that's in the summary

22   chart?

23   A.    Yes.

24   Q.    Now, 1603, what is that?

25   A.    1603 is for Straw Insureds 16 through 59.  And it

1    only involves -- so those are the ones that were financed

2    through the line of credit from Ridgewood.  And it is a

3    collateral assignment agreement for each straw insured.

4    Q.   Just for the Ridgewood funded?

5    A.   Correct, just for the Ridgewood funded.  So for

6    example, for number 25, there's a tab A, B, C, and no D,

7    because that policy was not Ridgewood funded.

8    Q.   And binder 1604?

9    A.   Again, it is for insureds 16 through 59, only the

10   Ridgewood funded, and this is a commitment letter for each

11   of the insureds.

12   Q.   And then 1605.

13   A.   And this again for only the Ridgewood insureds 16

14   through 59, and it is the Charter Oak Trust funding

15   obligation agreement and power of attorney for each of

16   those insureds.

17   Q.   And the information that's contained in the summary

18   chart is your best summary of the information that you

19   glean from reviewing 1601 through 1605, as well as the

20   policy files for each of these insureds?

21   A.   Correct.

22   Q.   It's a fair and accurate summary of these materials?

23   A.   Yes.

24          MR. NOVICK:  Your Honor, I'd offer 1601 through

25   1605, as well as Government's Exhibit 1.

1          MR. BROWN:  Your Honor, I'm going to object to

2     admissibility of all of the offered documents, Your Honor.

3     I think my argument would be applicable to all of them

4     aside from the chart, which I'm sure is an accurate

5     representation of that which it purports to be.

6          I'm objecting, Your Honor -- I'm reminded of the

7     words of this Court.  It seems like a hundred years ago,

8     early on, Your Honor, I don't know if it was the

9     arraignment or shortly thereafter, or if it was

10    anticipation of a pretrial conference in terms of the

11    scope of this case.

12         And hopefully I'm not misquoting the Court, but

13    essentially what I believe the Court asked the government

14    was:  Can you come up with a finite number; do we really

15    need to go through 84 different policies?

16         And the government then represented:  Well,

17    we're going to deal with 15 or 16 -- I think it was

18    actually 12 back then, but when the superseding indictment

19    grew a little bit, Your Honor, and I didn't comment on it

20    at that time because it seemed to be more of the same.

21    But we were prepared to defend against that which is in

22    the superseding indictment, and that's what we're trying

23    to do.

24         But now what I believe the government's trying

25    to do, with all due respect, is sneak in that which the --

1    I thought we had an understanding and agreement that we

2    would work with the superseding indictment and concern

3    ourselves, Your Honor, with these particular individuals.

4         Now what's happening is to the proverbial back

5    door, the government is attempting to put into evidence a

6    significant number of policies and documents that seem to

7    be, aside from repetitious, seem to now bring in a whole

8    new group of individuals far beyond the scope of what we

9    would receive reasonable notice or what one could

10   interpret as reasonable notice under case law and the four

11   corners of the superseding indictment.

12        So I'm objecting, Your Honor, to any of these

13   documents coming in.  I think it goes well beyond the

14   spirit and the intent of what the understanding that the

15   Court had with the government.

16        And furthermore, irrespective of that, I might

17   add, it certainly goes way beyond the notice that we were

18   afforded under the superseding indictment, and we would

19   find the admission of these documents to be extremely

20   prejudicial, given that we prepared for and participated

21   in that which was in the superseding indictment, nothing

22   more, Your Honor.

23        So for those reasons we strongly object.

24        THE COURT:  Mr. Novick?

25        MR. NOVICK:  Certainly, Your Honor.

1           Your Honor, I think this is a similar argument

2    we had earlier in the trial, and my response is

3    principally the same.

4           First, Mr. Brown and I disagree, I think, on the

5    import of our initial colloquy, which was at least a

6    couple of years ago, and I suspect before -- definitely

7    before any of the litigating that has gone on relating to

8    the case.  And I think it was in connection with Your

9    Honor asking the government to just give an overview of

10   what the case is about.

11          I think -- and I try not to take offense too

12   much, Your Honor, but the government has made no effort to

13   sneak anything in.  The indictment charges a conspiracy

14   that explicitly says 76 insureds, 84 policies.

15          So in terms of notice, it was given.  Defense

16   had an understanding from the beginning as to what this

17   case was about, and the additions of additional straw

18   insureds, those were still within that ambit, the

19   1 through -- the 76 insureds and 84 policies but were

20   added in relation to the money laundering counts.

21          We've taken great pains, I think, Your Honor --

22   notwithstanding the fact that the trial has gone on for a

23   long time, and I am conscious of that -- not to -- and I'm

24   not asking the witness to go through each of these

25   applications; however, I think they're important and

1   relevant in a couple of respects.

2          One is, they are, as I've said before, insureds

3   that were -- policies that were taken out in the course of

4   this scheme.  So they are relevant.  They are evidence of

5   the crime.

6          Two, I think it's important in terms of the

7   summary charts to get a sense of the entirety or the

8   import of this case.  The Court's asked questions

9   particularly of the insurance company representatives,

10  which I'm sensitive to, as to where does this fit; what's

11  the scale of this in relation to how many policies, face

12  value, of all of the policies that have been taken in the

13  Charter Oak Trust.

14         So I think it's relevant, Your Honor, to have

15  information from which the Court can glean that, in this

16  policy we have -- or in this plan we have $459 million of

17  total death benefit, that these respective insurance

18  companies are exposed to that risk, that they wouldn't

19  have taken otherwise.

20         And I think in terms of assessing our burden,

21  whether we've met our burden, we have the right to put on

22  that evidence to show the scope of this.  This just wasn't

23  15 policies.  This is a much larger case than that.

24         And beyond that, Your Honor, there have been a

25  myriad of emails relating to intense -- relating to a

1    number of the different categories we went over with

2    Special Agent Allen, in addition to things that we went

3    over with the other witnesses, including Mr. Waesche and

4    Mr. Westcott, and Mr. Cherneski, that touched on a number

5    of these other insureds.

6            So I think it's important to provide context for

7    the Court, and there be actual evidence available to the

8    Court as the fact finder from which to conclude that when,

9    for example, there's an email talking about whether this

10   is hiding the fact that this is LS biz from the insurance

11   companies, from Mr. Carpenter, and it references Deckard,

12   I think it's important to have the Deckard policy in

13   evidence.

14           And so yet again, I think that's another reason

15   why these are important to have in evidence.

16           I also think, Your Honor -- finally, my last

17   point, I'm about to talk about Government's Exhibit 2,

18   which is a summary of the questions on the applications

19   related to STOLI.  And in terms of proving our case, I

20   think it is relevant, Your Honor, to have the applications

21   across the entirety of the Charter Oak Trust to be able to

22   make the point that there was no inconsistency here.  It's

23   not like in one case they were answering the questions in

24   one way, and in another case they were answering it

25   another way.  It was uniform across the board.

1            I think, again, getting a sense of what the

2    insurance companies understood the Charter Oak Trust to be

3    and not to be is highly relevant and important to the

4    government trying to meet its burden of proof, Your Honor.

5            THE COURT:  Anything further, Mr. Brown?

6            MR. BROWN:  No, Your Honor, other than I'm

7    reminded, I think, of the words of the Court:  Either you

8    can prove your case with 15 straw insureds -- at the

9    time 12 -- or you can't.

10            His arguments, I think, should fall on deaf ears

11    because of the fact, Your Honor, aside from bringing on

12    all of these extraneous matters that are highly

13    prejudicial, there's been extensive testimony over the

14    last month -- of course it's up to the Court to decide

15    whether to accept it or not, or a portion thereof, but

16    whatever the Court's going to do, I would submit, Your

17    Honor, the testimony we've had over 15 policies is --

18    approximately 15 -- would appear to me to be more than

19    enough, Your Honor, and consequently while it's highly

20    prejudicial, I don't think it weighs much in the way of

21    probative area in proving the government's case, Your

22    Honor.

23            THE COURT:  All right.  Briefly, I think the

24    government has the better of the argument.  I think the

25    government is entitled to have admitted into evidence the

1     documents contained in these binders essentially for the

2     reasons stated by Mr. Novick.

3             I don't intend to look at those documents except

4     insofar as they've been referred to in the course of

5     testimony.  As Mr. Novick mentioned, some of these people

6     have been mentioned in the course of the testimony already

7     and, if necessary, I would go into the binders to

8     doublecheck documents pertinent to them.

9             As for the rest -- and those are just a handful.

10    I mean, according to my recollection, which isn't perfect,

11    Deckard was mentioned, Tucker, Luciani, and perhaps

12    others.

13            But to me, what carries the day for the

14    government is the argument Mr. Novick makes about the

15    government's right to offer evidence showing the scope of

16    the Charter Oak Trust and the consistency with which these

17    policies were obtained and handled.

18            I can appreciate the defense's point of view.

19    It's difficult enough to prepare to defend against

20    15 straw insureds, much less 76, but I think when we focus

21    on those two points, the government's desire to establish

22    the scope of the trust and the consistency with which

23    things were done, I don't think that it's unduly

24    prejudicial.

25            So we're not going to undertake a review of each

1    of these insureds.  The defense is under no obligation to

2    try to rebut anything other than the government's

3    contention that these policies are kind of all part of the

4    overall picture.  There's nothing new or different in any

5    of the others.  Indeed, that's precisely the

6    government's point.  It's just more of the same.

7              So rather than exclude these from evidence, I'll

8    allow these binders to come in.

9              MR. NOVICK:  Thank you, Your Honor.  And also --

10             MR. BROWN:  Your Honor, as it relates to the

11    chart that was prepared, given the testimony of this

12    witness, as I understand it, that the effort put into this

13    chart was consistent with what was put on to other summary

14    charts that are already in evidence that I'll stand by my

15    other objections.  But beyond that, I have no other

16    objections.

17             THE COURT:  All right, thank you.

18             Then the chart can come in too.

19             MR. NOVICK:  Thank you, Your Honor.

20    BY MR. NOVICK:

21    Q.   And then taking a look at Exhibit 2, what is that?

22    A.   Exhibit 2 is a 12-page summary chart detailing the

23    STOLI-related questions on the life insurance applications

24    and associated forms for the insurance companies in which

25    policies were issued for the Charter Oak Trust.  So it

1    details, if I go across the columns, the provider, which

2    is the life insurance company; and then the form is the

3    name of the form that we're discussing here.

4         Then the next column, "Questions," lists the

5    STOLI-related questions that are asked on the form.  Then

6    the next column is "Insured," and that is the name of all

7    the insureds for which that question and the subsequent

8    answer relate.

9         So the next column is the answer.  So that's how the

10   question was answered for each of those specific insureds.

11        Then the last column again is "Exhibit."  And that

12   points you to the exhibits that confirm this chart.

13   Q.   And it's your testimony that you got this

14   information -- this is a fair and accurate summary of the

15   information gleaned from the exhibits that are listed on

16   the far-right column?

17   A.   Correct.

18             MR. NOVICK:  I'd offer Exhibit 2.

19             MR. BROWN:  Your Honor.  Under the same terms

20   and understandings, there's no other objection.

21             THE COURT:  All right.

22             Exhibit 2 will be admitted.

23   BY MR. NOVICK:

24   Q.   I'm going to talk now for a minute about commissions.

25   We'll go back to the email binder for hopefully almost the

1    last time.  About five or six more emails just to run

2    through, and this is leading up to just a discussion of

3    commissions and a summary chart relating to commissions.

4         When we were talking -- yesterday we had been going

5    through different categories of emails that were on the

6    exhibit list.  And I'm looking at Exhibit 122, 12 --

7    excuse me -- tab 122, 123 and 124.

8         Are these all related to commissions?

9    A.   Yes.

10   Q.   And first on tab 122, what is that?

11   A.   It is an email from Ineke Murphy to Dan Carpenter,

12   Wayne Bursey.  And Kathy Kehoe; August 20, 2007; subject,

13   "Funding Lists COT"; with an attachment, Funds Lists, COT.

14   Q.   Okay.

15              MR. NOVICK:  And first I'd offer Exhibit 2068?

16              MR. BROWN:  No objection, Your Honor.

17              THE COURT:  It will be admitted.

18   BY MR. NOVICK:

19   Q.   And there's an attachment to that, is that right?

20   A.   Yes.

21   Q.   And on the attachment, does it list with regard to

22   those certain Charter Oak policies the amounts of money

23   paid to -- in commissions to various sources?

24   A.   Yes.

25   Q.   Total commissions paid, paid to brokers and paid to

1    house?

2    A.   Correct.

3    Q.   And this is as of August of 2007, or according to the

4    email, being August of 2007?

5    A.   Yes.

6    Q.   Now, looking at 123, Exhibit 2109, what's that?

7    A.   It is an email from Daniel Carpenter to Guy Neumann,

8    Don Trudeau, and Jack Robinson; February 25, 2008;

9    subject, "Re:  Re:  Information requested."

10              MR. NOVICK:  I'd offer 2109.

11              MR. BROWN:  No objection.

12              THE COURT:  It will be admitted.

13   BY MR. NOVICK:

14   Q.   And it's responding to an earlier email from Guy

15   Neumann, is that right?

16   A.   Correct.

17   Q.   It says among other things:  "If we fund this week,

18   we can get paid next week"?

19   A.   Correct.

20   Q.   And 124, Exhibit 2231, what is this?

21   A.   It's an email from Daniel Carpenter to Charlie

22   Westcott and Don Trudeau; June 29, 2009; subject,

23   "Re:  Law Lore."

24              MR. NOVICK:  I offer that exhibit.

25              MR. BROWN:  No objection, Your Honor.

1          THE COURT:  It will be admitted.

2     BY MR. NOVICK:

3     Q.   Now, did you put together a summary chart related to

4     commissions in this case?

5     A.   Yes.

6     Q.   Is that Exhibit 3?

7     A.   Yes.

8     Q.   So we're going to move from the -- you can keep the

9     email binder out for a minute, but we're going to just

10    look at the last summary chart, which is Government's

11    Exhibit 3.

12         How did you go about doing this?

13    A.   So it was a bit of a process, but I can certainly

14    explain it, in that for each policy listed here, the

15    insurance companies sent us information regarding

16    commissions paid on those policies.

17         I used that information, and then also used the bank

18    records from TPG Group.  There were three bank accounts I

19    think I reviewed at TD Bank North, Bank of America, and at

20    People's Bank, and I reviewed the TPG accounts there to

21    confirm the deposit of the commissions from the insurance

22    company into the TPG Group accounts.

23         Additionally, I found that there were overrides paid

24    to TPG Group from general brokers, such as Associated Life

25    Brokerage or Prelle Financial, that were also deposited

1    into the TPG Group accounts.

2         So I tracked those, and that is the column that says,

3    "Total First-Year Commissions Paid to TPG."  That lists

4    those deposits, what was deposited into those accounts

5    either by the insurance company or by the general agency.

6         And then I tracked what was paid out.  The column

7    says, "Paid Out to Brokers."  There were checks paid out

8    of the TPG Group account to Edward Waesche, Joseph

9    Waesche, Charlie Westcott, Bill Hutchison, Ken Landgaard,

10   and Derek Siewert or a company operated by Derek Siewert.

11   So I checked those checks out, and that correlates to the

12   amount paid out to brokers.

13        There were some additional steps I can discuss if you

14   want more detail.

15   Q.   Let me ask you this:  In some of these rows, without

16   getting into detail yet, for example, on the Amsterdam

17   entry it only shows $41,000 being paid to that -- to TPG.

18        Why is that?

19   A.   Because -- so Amsterdam, Bruce Mactas was the broker

20   on that, so I believe Sun Life, the insurance company,

21   paid Mactas or his firm directly a portion of that

22   commission.  And this, the $41,000, represents only what

23   TPG got of the commission.

24   Q.   Okay.  So the total for the first-year commissions is

25   what went to TPG Group; there may have also been

1    additional sums that went to other brokers who were on the

2    applications?

3    A.    Correct.

4    Q.    And what documents did you use to do this?

5    A.    So again, as I said, the insurance companies provided

6    us commission information.  So that was one source of the

7    details about payments out.

8         Additionally, I used the banks records for TPG Group

9    to confirm the deposits in or the payments out.  And then

10   there were times where either -- actually, it was in both

11   cases -- the insurance company or the general agency would

12   send a check that included a number of commissions for a

13   number of insureds.

14        So what I did in those cases, I researched the

15   documents we received either via the subpoena or the

16   search warrant.  And when I was able to, I found documents

17   detailing the breakout of how much of that check went to

18   each different policy for the commission, so that helped

19   me tie back the number specifically.

20        And then there was also a chart that I found from the

21   documents from 100 Grist Mill Road that laid out -- I

22   think it's called a Charter Oak insurance policy summary,

23   and it actually was a spreadsheet that listed -- very

24   similar to the one we looked at a couple of emails ago,

25   that listed the amount of total commissions, what the

1    primary broker got, the secondary, the internal broker.

2    And then the last column said, "Paid Out," I believe, and

3    it listed an amount and a check number.  And I was

4    typically able to tie that back to the TPG account and a

5    check going from TPG out to one of those five individuals.

6    Q.    Is this chart your product of hours of work and your

7    best effort at a fair and accurate summary of the

8    information that's detailed in here?

9    A.    Correct.

10              MR. NOVICK:  Your Honor, I'd offer Exhibit 3.  I

11   have not offered into evidence all of the backup

12   documents.  It's available.  It's a binder yea big.

13   Rule 1006 doesn't require it, and I don't know that it's

14   of any particular use, unless the Court briefs it, it

15   would be of particular use, or unless the defense insists

16   on us offering it into evidence.  The chart and the

17   witness's testimony speaks for itself.

18              THE COURT:  Mr. Brown?

19              MR. BROWN:  Your Honor, on the representations

20   made by the witness, I don't object except for the

21   objections I made before, that is the ability to tie in

22   these particular figures or other information with the

23   conduct of the defendant, Your Honor.  Aside from that, no

24   objection, Your Honor.

25              THE COURT:  Okay.

1           Then Exhibit 3 will be admitted.

2           MR. NOVICK:  Thank you, Your Honor.

3    BY MR. NOVICK:

4    Q.   Just looking on the second page of Exhibit 3, it

5    again lists the total face value; and then the total

6    commissions paid to TPG; and then from that, the total

7    paid out to the brokers, is that right?

8    A.   Correct.

9    Q.   And you have a few notes on the bottom.

10          Can you just explain those?

11   A.   Certainly.

12          So the first note says, "Commission on Policy 8229381

13   Paid to Waesche."  In that regard, the first insured,

14   actually Straw Insured 1, Marvin Carrin, none of the

15   commission from that policy went into TPG, so that column

16   is blank there.

17   Q.   That's on the Penn Mutual Carrin policy?

18   A.   Correct.

19          And then there were four Lincoln policies.  They're

20   all late on the second page.  I believe one is the policy

21   for Lowrie.  I think it's Lowrie -- sorry -- Rose --

22   Rosenthal, and Wisda.  I was not able to find any checks

23   from the insurance company going to TPG for those

24   commissions, however, for all but Wisda.  I did see checks

25   going from the general agency to TPG for those policies,

1    for those commissions.

2         For Barbara Wisda, actually the last insured on the

3    list, I didn't find either an override check or a

4    commission check going in.  So there is nothing in that

5    column.

6    Q.   Okay.

7    A.   And then again as I discussed, I found that document

8    on the Charter Oak Trust insurance policy summary, and

9    that is just referenced at the bottom there.  That's the

10   Bates number for that chart.

11   Q.   Thank you.

12        And then finally, just a few additional emails that I

13   didn't get to earlier that I'll offer now.

14        First, Exhibit 2025, tab 125, what is that?

15   A.   This is an email from Daniel Carpenter to Barbara

16   Corel, Kathy Kehoe, Wayne Bursey, and Amanda Rossi;

17   January 26, 2007; subject, "Re:  SCU134031 Carol Siewert."

18   Q.   And that's Derek Siewert's mother, is that right?

19   A.   Yes.

20   Q.   And was that an applicant in the Charter Oak Trust?

21   A.   Yes.

22   Q.   And the email says:  "Never send anything to anyone

23   without me"?

24   A.   Correct.

25                   MR. NOVICK:  I'd offer 2025.

1           MR. BROWN:  No objection, Your Honor.

2           THE COURT:  It will be admitted.

3    BY MR. NOVICK:

4    Q.   And then the last one in the binder of 126,

5    Government's Exhibit 2270, what is that?

6    A.   An email from Daniel Carpenter to Donald Trudeau and

7    Jack Robinson; February 4, 2010; subject, "Financials."

8           MR. NOVICK:  I would offer 2270.

9           MR. BROWN:  No objection.

10   BY MR. NOVICK:

11   Q.   And then finally, I was informed that I neglected --

12   I skipped over a document as we were talking earlier.  It

13   was tab 117 that I forgot to ask you about, and it is

14   Exhibit 2297.

15        What is that?

16   A.   It is an email from Daniel Carpenter to Jack Robinson

17   and Richard Order; November 17, 2010; subject, "Re:  Sash

18   Spencer Docs."

19          MR. NOVICK:  I'd offer 2297 --

20          MR. BROWN:  No objection.

21          THE COURT:  It will be admitted.

22          MR. NOVICK:  -- tab 117.

23   BY MR. NOVICK:

24   Q.   And this was related when we were talking earlier

25   about Sash Spencer?

1    A.    Correct.

2    Q.    And in connection with the litigation with

3    Universitas?

4    A.    Correct.

5    Q.    And it says:  "Read the docs I sent you.  They signed

6    agreement with GMC on financing," correct?

7    A.    Correct.

8              MR. NOVICK:  Just a moment, please, Your Honor.

9                   (Pause)

10             MR. NOVICK:  Your Honor, there seems to be lack

11   of clarity as to whether these were admitted, so I'm going

12   to offer them now:  523 and 524, 1520 and 1521 --

13             THE COURT:  Can you tell me what they are?

14             MR. NOVICK:  Yes, Your Honor.

15             523 and 524 are life expectancy reports for

16   Ms. Paulsrud, one from 2008 -- both from 2008.

17             MR. BROWN:  Your Honor, I thought those had

18   already been admitted.  I have no objection to them.

19             MR. NOVICK:  I thought as well.

20             1520 and 1521, which are the change of ownership

21   forms for Doug Sanders, which I also think were admitted

22   but I'll offer them any way.

23             MR. BROWN:  Same thing, Your Honor, we thought

24   they were admitted.

25             MR. NOVICK:  And then I think there was a lack

 1    of clarity, I believe I did this before the break last

 2    time, but 2281, which is tab 21, from the -- excuse me --

 3    from the email binder.  I'm reasonably certain that I

 4    offered it.

 5              THE CLERK:  I don't have it either.

 6              MR. BROWN:  Same thing, Your Honor.

 7              MR. NOVICK:  I'll do it again.

 8              And then tab 108, which is 2135.

 9              MR. BROWN:  Same thing, Your Honor, I thought it

10    was admitted.

11              THE CLERK:  That I have in.

12              MR. NOVICK:  So good.

13    BY MR. NOVICK:

14    Q.   And just a couple of follow-up questions:  Did you

15    find in your review of some of these policy files credit

16    reports?

17    A.   Yes.

18    Q.   And did the credit reports show the assets or

19    liabilities of the individuals listed in them?

20    A.   No.

21    Q.   Did they show annual income?

22    A.   No.

23    Q.   Is that typical in your experience as an investigator

24    in reviewing credit reports?

25    A.   Correct.

1    Q.   And then just as a general matter, for any of the

2    Charter Oak Trust policies and the policy files, did any

3    employer ever pay money into the Charter Oak Trust to pay

4    premium?

5    A.   No.

6              MR. NOVICK:  Nothing further, Your Honor.

7              THE COURT:  Is Exhibit 4 in evidence?

8              THE CLERK:  Yes, Your Honor.

9              THE COURT:  Okay, thank you.

10             MR. BROWN:  Your Honor, I don't expect to be

11   very long.

12             THE COURT:  All right.

13

14                     CROSS-EXAMINATION

15   BY MR. BROWN:

16   Q.   Good afternoon, Agent Allen.

17   A.   Good afternoon.

18   Q.   As you may know, my name is Attorney Richard Brown,

19   and I represent Mr. Carpenter, who I will not ask you to

20   identify.

21        I direct your attention, while I still have the image

22   screen up and working, to Exhibit 1327, which is a

23   government's exhibit concerning correspondence between

24   Lincoln and NOVA.

25        Do you have that in front of you, ma'am?

1    A.   Yes.

2    Q.   And that, I think, you testified that from your

3    research -- and I believe this particular document

4    originated with Lincoln, is that correct?

5    A.   Correct.

6    Q.   And you know that because the date stamp at the

7    bottom right-hand corner is, in fact, Lincoln, is that

8    correct?

9    A.   Correct.

10   Q.   And I believe this was brought up in the context of

11   Sash Spencer, is that correct?

12   A.   Correct.

13   Q.   And you testified, as I understood it, on direct that

14   this document was consistent with the ultimate proceeds in

15   terms of the $30 million, is that correct?

16   A.   That this document was received as part of the --

17   Q.   No, no, no.  Is consistent; in other words, the

18   $30 million that was discussed, that these documents

19   relate to that $30 million.

20   A.   Yes.

21   Q.   And that as I understand it, this particular

22   document, that this appears to be the election and

23   participation beneficiary designation form; is that

24   correct, ma'am?

25   A.   Correct.

1    Q.    And that as I understand it, from your research and

2    whatnot, this appears to be the fact that Sash Spencer is

3    verifying that, number one, that he is an agent of his

4    employer, Holding Capital Group Inc.

5         Is that what you would interpret from this document?

6    A.    I see that he signed the form.

7    Q.    Sure.  And he did so in the capacity as an individual

8    signature employee, is that correct?

9    A.    That's what the form says.

10   Q.    And I note further that you had testified that,

11   through your efforts and efforts of people that work with

12   you at the Department of Labor, you determined that

13   ultimately this money, this $30 million, was ultimately

14   paid to Grist Mill Capital, is that correct?

15   A.    Among other entities, yes.

16   Q.    Right.  But is it fair to state that, initially, the

17   money went from -- went into Charter Oak Trust, or did it

18   go directly --

19   A.    In an account of Charter Oak Trust, yes.

20   Q.    Sure.  And then ultimately it indicates, does it not,

21   that Grist Mill Capital, LLC was, in fact, the primary

22   beneficiary of any sums.

23        Do you see that, ma'am?

24   A.    I see that.

25   Q.    And so that any sums that went in to Grist Mill

1    Capital would have been consistent with the wishes, or the

2    understanding perhaps is a better term, of Sash Spencer?

3    A.   I can't comment on that.

4    Q.   Well, it's clear -- you don't have any information to

5    the contrary to you that he authorized those proceeds to

6    go to Grist Mill Capital, do you?

7    A.   I really -- I can't.  I mean, I see his signature on

8    the page, but I can't say what he was agreeing to when he

9    signed the document.

10   Q.   But you have no reason to doubt that's his signature,

11   do you?

12   A.   Not as I sit here, no.

13   Q.   Now, as I understand it, ma'am, you essentially

14   started this investigation, did you say it was in 2010 or

15   2011?

16   A.   June of 2010.

17   Q.   Okay.  And what was it that caused you to start this

18   investigation?

19   A.   I received information from a bank that had concerns

20   about the banking activity of 100 Grist Mill Road

21   entities.

22   Q.   I'm just wondering how that would be related to the

23   Department of Labor.

24   A.   Because the Grist Mill Trusts and the Charter Oak

25   Trusts and other entities are acting as 419 plans.

1    Q.   And certainly from your experience there's nothing

2    unusual, is there, about trusts being set up for the

3    purposes of handling proceeds from life insurance?

4    A.   No.

5    Q.   Now, as I understand it, I think you testified on

6    direct examination -- I don't think I need to go over it

7    with you -- but you did what you perceived to be a

8    thorough investigation of all possible emails that may

9    have been generated by Dan Carpenter, is that correct,

10   relative to, of course, your investigation of the Charter

11   Oak Trust 419 plan?

12   A.   An investigation of -- I mean, I did a thorough

13   investigation of activity regarding the Charter Oak Trust.

14   Q.   Sure.  And from what I could glean, there's been an

15   awful lot of emails concerning Daniel Carpenter; and I

16   take it that all of these came through your investigation,

17   whether it be the search warrant executed in 2011 or other

18   sources, correct?

19   A.   Correct.

20   Q.   And those sources included an investigation that had

21   been conducted by the IRS in 2010, at the same premises at

22   Mr. Carpenter's place of employment?

23   A.   One hundred Grist Mill Road in Simsbury; yes.

24   Q.   Now, let me ask you this question:  Did you find any

25   email from Daniel Carpenter directed to Mr. Carrin -- who

1    you've testified about, and others have testified about --

2    instructing him to falsify his financial statements on any

3    application?

4    A.   No, not that I recall.

5    Q.   And your investigation concerning Mr. Carrin, as I

6    understand it, the primary agents appear to be Ed Waesche,

7    who testified, correct?

8    A.   Correct.

9    Q.   Did you find any emails directed to Mr. Waesche, to

10   instruct him to have Mr. Carrin falsify his financial

11   statements?

12   A.   You mean from Mr. Carpenter?

13   Q.   Yes.

14   A.   No.

15   Q.   Concerning, I think it's Vito Esparo, are you

16   familiar with that file?

17   A.   Yes, yes.

18   Q.   He's otherwise known as straw number 2.

19        In your investigation, did you find that -- any

20   emails from Mr. Carpenter to Mr. Esparo, suggesting or

21   instructing him to file false financial information?

22   A.   No.

23   Q.   And I believe with Mr. Esparo that -- it was our

24   friend Mr. Waesche again -- did you find any emails or

25   other communication -- I don't want to limit it to

1    emails -- that he had instructed Mr. Waesche to have

2    Mr. Esparo file false financial statements?

3    A.    That Mr. Carpenter instructed him?

4    Q.    Yes.

5    A.    No.

6    Q.    Now, without belaboring this point, but let me just

7    ask a general question, if I might:  Concerning the other

8    named straw insureds -- Knobloch, Martinez, Paulsrud,

9    Amsterdam, Cooper, Goelzer, Musiker, Pennington, Von

10   Nordeen, Zahner, Spencer, Lambert, or Sanders -- did you

11   find in your scrutiny of the emails of Mr. Carpenter that

12   any time he sent any email or any other form of

13   communication to any of those insureds indicating that

14   they should falsify their financial information to the

15   appropriate carrier?

16   A.    As I sit here I do not recall any.

17   Q.    Okay.  And equally so, we know there's others beside

18   Mr. Waesche.  We have Mr. Westcott, we have others.

19        Same question, ma'am, and that is whether or not, in

20   your investigation, you found that Mr. Carpenter at any

21   time contacted any of the producers or agents and

22   instructed them to falsify financial information on the

23   applicant for the application for insurance.

24   A.    I'm sorry, can you -- you said, "falsify financial

25   information"?

1    Q.   Yes.

2    A.   No, as I sit here I do not recall any.

3    Q.   Now, you're aware of certain testimony really since

4    you've been in this courtroom for the entire trial,

5    correct?

6    A.   Other than for one day, yes.

7    Q.   And were you here during testimony concerning

8    Mr. Waesche and his dealings with Mr. Carrin?

9    A.   Yes.

10   Q.   Now, you -- were you here when, I believe -- and

11   hopefully I'm not mischaracterizing the testimony -- that

12   Mr. Waesche admitted to splitting a commission with

13   Mr. Carrin?

14   A.   I believe he discussed providing him a referral fee.

15   Q.   A referral fee.  Another name, thanks.

16        Did you find, ma'am, any communication that

17   Mr. Carpenter condoned this secret transaction between --

18   as I recall the way Mr. Waesche characterizes -- between

19   him and Mr. Carrin as a finding fee for someone who

20   wasn't -- owe?

21   A.   I don't believe I saw any communications regarding

22   Mr. Carpenter and Mr. Waesche and a fee to Mr. Carrin.

23   Q.   So that if Mr. Waesche had testified that he did so

24   secretly and didn't disclose the same to Mr. Carpenter,

25   that would not be inconsistent with your investigation of

1    communication between Mr. Carpenter and Mr. Waesche?

2    A.   In that we didn't find any document regarding that?

3    Q.   Right.

4    A.   Correct.  We did not find any document.

5    Q.   Now, in talking about the source of the $30 million

6    and change, I guess we could look at it that you testified

7    about Sash Spencer, is it more factually correct that

8    these were proceeds from a lawsuit as opposed to proceeds

9    from a death benefit of a life policy?

10   A.   I don't believe so.

11   Q.   Are you aware of the fact that there was a lawsuit?

12        I think there was evidence of that fact in this case.

13   A.   I am aware that there was a lawsuit filed, I believe,

14   requesting the death benefit be provided.

15   Q.   Correct.

16        And that were you aware of the fact from your

17   investigation as to whether or not as a result of that

18   lawsuit -- and I thought there was testimony by more than

19   one person on that, that there had been a settlement and a

20   payment by the carrier to settle the lawsuit?

21   A.   It's my understanding that the lawsuit was settled in

22   late 2009, and the death benefit was paid in May 2009.

23   Q.   Now, speaking of May 2009, I note there was some

24   testimony in some exhibits concerning a property in Rhode

25   Island, I think referred to as Moonstone, is that correct?

1    A.    Correct.

2    Q.    And that's located in Rhode Island?

3    A.    Correct.

4    Q.    And that as I understand it from reviewing the

5    document, is it accurate to state that that email where

6    there was, I believe, a deposit placed for that property,

7    from your investigation from those emails, am I fair in

8    characterizing it that that deposit and those

9    communications initiated prior to any funds being

10   transferred from Lincoln to Charter Oak Trust?

11   A.    I believe the deposit may have been April of 2009.

12   Q.    Excellent memory.

13        And that so that is it fair to state that I'm not

14   mischaracterizing that your testimony in stating that the

15   Moonstone property acquisition efforts commenced prior to

16   any proceeds being received from Lincoln relative to the

17   Sash Spencer matter?

18   A.    Correct.

19   Q.    Now, in your investigation of Mr. Carpenter and your

20   review, is there any evidence that you have that

21   Mr. Carpenter had a fiduciary relationship with any of the

22   carriers, including Lincoln, Phoenix, Penn Mutual?

23   A.    In that he was a producer and agent?

24   Q.    Yes.

25   A.    No.

1    Q.   Were there any emails or other communications that

2    you discovered wherein Mr. Carpenter represented to any of

3    the insureds that he was acting on behalf of any of the

4    carriers for which we've heard testimony?

5    A.   I do not believe so.

6    Q.   But is it fair to state that your investigation did

7    show that both Mr. Westcott and Mr. Waesche, along with

8    others named earlier, did in fact have a formal

9    relationship with the respective carriers, is that

10   correct?

11   A.   Correct.

12   Q.   Meaning that they had a -- they were licensed by

13   these individuals to represent them in the procuring of

14   insurance for the public.

15   A.   They were licensed agents for life insurance,

16   correct.

17   Q.   And with that, your investigation revealed that they

18   did, unlike Mr. Carpenter, have a fiduciary relationship

19   with the various carriers, respective carriers, I should

20   say.

21   A.   I'm not sure of the details of an insurance agent and

22   the use of the word "fiduciary."  I apologize.

23           THE COURT:  Mr. Brown?

24           MR. BROWN:  I'm just about done, Your Honor.

25           THE COURT:  Okay.

1        MR. BROWN:  May I just consult with my client?

2        THE COURT:  Yes.

3              (Pause)

4        MR. BROWN:  No further questions, Your Honor.

5        Thank you, ma'am.

6        MR. NOVICK:  I just have like literally two

7   questions, Your Honor.

8        THE COURT:  All right.

9

10                   REDIRECT EXAMINATION

11   BY MR. NOVICK:

12   Q.   Special Agent Allen, just so that the record is

13   clear, counsel asked you lots of questions about whether

14   you found any evidence of Mr. Carpenter directing anybody

15   to make -- to file false financials with the -- or

16   financial information with the companies.

17        When you answered no, that was related to things like

18   assets, income, et cetera, is that right?

19   A.   Correct.

20   Q.   Not related to questions regarding premium financing

21   and that intent to sell, and that kind of thing, correct?

22   A.   Correct.

23   Q.   And then the second question, counsel asked you

24   questions about the timing of the deposit.

25        You said it was April 2009 on the Moonstone property,

1    is that right?

2    A.   Yes.

3    Q.   So April 2009 was still -- when did Spencer die?

4    A.   June of 2008.

5    Q.   And when did the trust document get changed to

6    withhold roughly $6 million from the death benefit for

7    Grist Mill Capital?

8    A.   July of 2008.

9    Q.   So this is April of 2009, when the deposit's being

10   put down on Moonstone, correct?

11   A.   Correct.

12   Q.   And money doesn't actually get transferred, other

13   than the thousand dollars' deposit, until after the death

14   benefit is actually paid, is that right?

15   A.   Correct.

16           MR. NOVICK:  That's all I have, Your Honor.

17           Thank you.

18           THE COURT:  Thank you.

19           Are we all set?

20           MR. BROWN:  Yes, Your Honor.

21           THE COURT:  Okay.  You may step down.

22           THE WITNESS:  Thank you.

23           THE COURT:  All right.

24           Mr. Novick.

25           MR. NOVICK:  Yes, Your Honor, I am handing up

1    four stipulations, Your Honor.  I'll just tell you what

2    they are generally and they speak for themselves.

3              The first stipulation dated today signed by all

4    parties relates to bank records and certain interstate

5    nature of certain wire transfers and the fact that several

6    banks are FDIC insured.

7              Another stipulation, Your Honor, is regarding

8    facts related to Betty and Gunther Von Noorden.  Straw

9    Insured 11.

10             Another stipulation relates to again the facts

11   related to Teresa Martinez.

12             And then the fourth stipulation relates to facts

13   associated with Judith Musiker in lieu of her appearing to

14   testify.

15             And the other two are essentially agreed upon

16   summaries of the deposition transcripts relating to Von

17   Noorden and Martinez.

18             So I'll hand those up to the Court.

19             MR. BROWN:  Your Honor, if I may, I just want to

20   put on the record, Your Honor, that prior to this being

21   signed, I discussed the same with my client, and my client

22   made it clear to me, Your Honor, quite frankly that he

23   wanted to try to save time with the Court as opposed to

24   bringing these people in from around the country, one of

25   which I believe was quite ill, and also to avoid having

1    agents come up and waste their time testifying to

2    something that we would agree to.

3             So I just wanted to agree on the record that

4    that's why we stipulated.

5             THE COURT:  Thank you.

6             MR. NOVICK:  What remains, Your Honor, is one

7    additional stipulation relating to Ms. Paulsrud.  Defense

8    has a draft of that and I expect them to give us comments

9    on the draft.

10            Beyond that, Your Honor, I don't expect to have

11   additional evidence.  We'll rest as soon as that's put in.

12            We can proceed one of two ways:  I could rest

13   now with the understanding that the defense isn't going to

14   object to us opening briefly the case to add that

15   stipulation or we could just rest Monday morning.

16            MR. BROWN:  If I may be heard, Your Honor?

17            If the government rests now, Your Honor, it

18   would be with the understanding they're resting but we

19   haven't agreed upon an agreement; and, quite frankly, we

20   haven't been able to work out any stipulations in terms of

21   submitting by Monday morning the stipulation concerning

22   Ms. Paulsrud.  We've worked those things out with the

23   other ones, Your Honor.

24            So with that understanding, no problem with the

25   government resting.  And assuming they're going to do

1    that, I would ask for the following, Your Honor:  That we

2    have -- Monday morning, I am going to do a Rule 29 motion

3    to the Court.  Hopefully that will take up the rest of the

4    day.  If for some reason it doesn't, Your Honor, we would

5    be prepared to proceed on that day, Your Honor.

6              THE COURT:  Very good.  Then the government will

7    be deemed to have rested subject to the Paulsrud

8    stipulation, and I'll look forward to hearing from counsel

9    on Monday with regard to the motion, and the defense will

10   have witnesses available in the event that motion is not

11   granted.

12             MR. BROWN:  Yes, Your Honor.  And I've discussed

13   that with counsel and I've discussed it even more.  There

14   will be no surprises.

15             MR. NOVICK:  Your Honor, just a couple of

16   things.

17             One is I know counsel is on the fence as to

18   certain things, and obviously just like they've asked us

19   for the courtesy, it would be helpful to know,

20   particularly with the expert -- I would be prepared to

21   examine the defendant in the ordinary course -- but the

22   expert requires us to do some work.

23             To be completely candid with the Court, Your

24   Honor, after we got the late notice regarding the expert

25   from the defense, I don't know that we would need it, but

1    we did reach out to an expert who would be available to

2    the government if necessary.  I don't think it will be.

3    I've given notice of that to counsel.  It was somebody who

4    had testified in another case that this particular expert

5    had testified at in New York.  But it obviously would be

6    helpful to obviate the need to pursue that avenue any

7    further to know whether or not they plan on calling the

8    expert.

9              The second thing, Your Honor, again just for our

10   planning purposes, Rule I believe 23 is what governs bench

11   trials, and in terms of how to proceed, I've raised this

12   with counsel for the defendant, the government I think

13   would be fine -- I leave it to the Court what you think

14   the best way to proceed was -- would be, whether you'd

15   want to hear closing arguments from us, whether you want

16   us to write or whether you want both.

17             The government would be fine with summing up and

18   letting the Court give a guilty/not guilty verdict.  I

19   know that the parties have the right to request the Court

20   to write on it.  I don't anticipate the government

21   invoking that.

22             I don't know from the defense whether they

23   would, but I guess it also would be helpful for the

24   government if the Court had a sense of what you would

25   prefer, particularly so that if we are going to do closing

1      arguments in court next week, that would be something I

2      would presumably prepare for and my co-counsel would

3      prepare for and the defense could prepare for.

4              So I raise that, and again, I don't know what

5      the defendant would prefer, and I've asked him.  I don't

6      know exactly where we are.

7              MR. BROWN:  Your Honor, if I may be heard on

8      that point, Your Honor?

9              Generally, it's my preference to have oral

10     arguments and rather than summation.  I would like to

11     visit that with my client at the plush surroundings of the

12     facility in Rhode Island this weekend.  But I would

13     suggest to the Court that by Monday I will have had an

14     opportunity to do that.

15             I just want to alert the Court that, generally

16     speaking, my preference is that we have oral arguments,

17     but it is also my preference that we have a written

18     decision whenever -- there's an awful lot of stuff for

19     this Court to consider.

20             Neither side, having put a lot of work into this

21     case, desires the Court to rush to any decisions.  And in

22     the unlikely event I don't prevail on my Rule 29, I would

23     like the Court to have whatever time necessary to review

24     the evidence and to issue a written decision when you felt

25     the time was appropriate, Your Honor.

```
 1              THE COURT:  All right.  I had assumed that you
 2     would want me to put something in writing, and so if
 3     that's your preference, that's okay with me.
 4              As far as closing argument's concerned, I would
 5     be very interested to hear closing argument.
 6              MR. BROWN:  The reason I ask that, Your Honor,
 7     is I find that with some courts there's always questions,
 8     and since this is a Court trial, I guess it gives a little
 9     more Socratic bend to it.
10              THE COURT:  Why don't we plan on having closing
11     argument next week and we'll see where we are at the
12     completion of those arguments.
13              MR. NOVICK:  Okay.
14              THE COURT:  And I suppose we should have some
15     sense of how much time you would like.
16              I'm happy to give you as much time as you want.
17     So let me ask you to confer and let me know in due course
18     how much time you'd like for the closings.
19              MR. BROWN:  Thank you, Your Honor.
20              MR. NOVICK:  Your Honor, assuming that there
21     will be a written decision, would Your Honor anticipate
22     wanting us to write as well as give the arguments?  I'm
23     fine doing that.
24              The only other bench trial that I was able to
25     find someone had done in my office was Gordon Hall with
```

1    Judge Droney several years ago, and he had sent me

2    documents they had filed relating to the proposed findings

3    of fact and conclusions of law.

4           I don't know whether the Court would find that

5    necessary, useful; but again I leave it to the Court in

6    terms of what you want.

7           We can wait and see next week after arguments

8    are done.

9           THE COURT:  Okay, thank you.

10          MR. BROWN:  Your Honor, one final thing, Your

11   Honor, if I may?

12          Most important to my client at this point, which

13   is that in light of the fact that there is no court

14   tomorrow or Friday, that the marshals certainly be alerted

15   to that so we don't have the same event happen that

16   happened a month ago.

17          THE COURT:  Yes.

18          MR. BROWN:  Thank you, Your Honor.

19          THE COURT:  I'm not sure that there's anything I

20   need to do; but, marshal?

21          THE MARSHAL:  Your Honor, there's no court for

22   him Thursday and Friday you said?

23          THE COURT:  Yes.

24          What time on Monday would you like to resume.

25          MR. BROWN:  I would say around 9:30.

1               THE COURT:  That's fine.

2               Thank you all.

3                    (Proceedings adjourned at 4:44 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3                 In Re: U.S. vs. CARPENTER

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

                        /s/_____
16

17                      DARLENE A. WARNER, RDR-CRR
                          Official Court Reporter
                         450 Main Street, Room #223
18                       Hartford, Connecticut 06103
                              (860) 547-0580
19

20

21

22

23

24

25