No. 13-CR-226-(RNC)


# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

---


**DANIEL E. CARPENTER,**
**Petitioner,**

v.

**UNITED STATES OF AMERICA**
**Respondent.**

---

# EMERGENCY MOTION FOR REDUCTION IN SENTENCE TO TIME SERVED AND FOR IMMEDIATE RELEASE TO HOME CONFINEMENT PURSUANT TO §3582(c)(1)A

---

Daniel E. Carpenter
Incarcerated Inmate
Petitioner, *pro se*
Reg. # 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DANIEL E. CARPENTER | ) | |
| Petitioner, | ) | |
| v. | ) | CRIMINAL NO. 13-CR-226-(RNC) |
| | ) | |
| UNITED STATES OF AMERICA | ) | January 14, 2020 |
| Respondent. | ) | |
| | ) | |

## EMERGENCY MOTION FOR REDUCTION IN SENTENCE TO TIME SERVED AND FOR IMMEDIATE RELEASE TO HOME CONFINEMENT PURSUANT TO §3582(c)(1)A

NOW COMES THE PETITIONER, Daniel E. Carpenter (hereinafter the "Petitioner" or "Mr. Carpenter"), *pro se* as an incarcerated inmate, to move this Honorable Court to reduce his sentence pursuant to 18 U.S.C. §3582(c)(1)(A), §3582(c)(1)(B) and §3624(c) as amended by the First Step Act, and to order his immediate release to Home Confinement as well as any other relief that this Court deems to be necessary and appropriate in the interests of justice. Petitioner believes that he has served his full sentence based on the new Family Reunification and Elderly Offender Program under the FSA. A court may now modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that "extraordinary and compelling reasons warrant such a reduction." §3582(c)(1)(A). *See, e.g., United States v. Cantu,* 2019 WL 2498923 at *1 (S.D. Tex. June 17, 2019). This is a large part of the reason for the passage of the First Step Act (FSA): to have elderly offenders with medical problems be under Home Confinement rather than in a Camp or a Halfway House, where the BOP (and the American Taxpayer) would be responsible for the inmate's medical bills.

Petitioner was at the Camp at FMC Devens until he was unexpectedly transferred to MDC Brooklyn, where he is literally in a cell in one of the most notorious maximum security facilities

in America rather than the Camp at Otisville or the Camp at Devens that this Court recommended in Petitioner's Judgment and Commitment Order. No reason has been given or found for Petitioner's sudden and unexpected transfer to MDC Brooklyn, and there is no BP-409 Form in his file explaining the reason for his transfer as required by law and the BOP's own regulations. Petitioner has started the inquiry process, including a FOIA request to find out why he was transferred to Brooklyn rather than Watkinson House in Hartford which is a BOP Halfway House facility closer to his home under the FSA, and is literally within walking distance to St. Francis Hospital where his doctors are, and if there were an emergency he could receive life-saving treatment immediately. Instead, he now finds himself in a maximum security cell in locked quarters and his cell has been locked several times due to periodic lockdowns caused by violence here at MDC Brooklyn and the emergency buzzers do not work in his cell. Therefore, Petitioner seeks his immediate release to Home Confinement for the reasons described below, all of which are provided to the Court by Petitioner under the penalty of perjury pursuant to Section 1746.

## I.    PRELIMINARY STATEMENT

Abraham Lincoln once said, "I have always found that mercy bears richer fruits than strict justice."

With the First Step Act of 2018 (FSA), Congress has amended the rules for compassionate release pursuant to §3582(c)(1)(A) so that the Courts have the power to review "extraordinary and compelling" circumstances other than an inmate's terminal illness, and an inmate can seek recourse to the courts after thirty days if the Warden of the prison has not responded to the inmate's letter. Petitioner's letters to the Warden were dated April 9, 2019 and May 22, 2019, and there has been no response. Therefore, this Court clearly has jurisdiction to adjudicate Petitioner's motion and grant the relief Petitioner seeks.

On the Monday before Thanksgiving, November 25, 2019, Mr. Carpenter was called to the office at the Camp at FMC Devens and told to pack his belongings as if he was not coming back. When Mr. Carpenter asked what it was about the CO said he did not know but "they want you up there at 8:30 that morning."  Mr. Carpenter hurriedly packed his things and was kept in the SHU for the next two days before enduring a nine hour bus ride to MDC Brooklyn.  At no time was he told that he was going to Brooklyn or if that was his final destination. Nor was Mr. Carpenter allowed to contact his wife or his attorneys to let them know what was going on.  It was not until Thanksgiving Day itself that Mr. Carpenter was able to phone his wife.

While in the SHU at FMC Devens, the medical PA that knew Mr. Carpenter from the Camp was kind enough to take his Blood Pressure reading three times, because he had monitored it the week before Mr. Carpenter was sent to the SHU. Those readings in the SHU were consistent with the readings the week before. They were all 190/100, which is extremely dangerous.  In fact, the Wall Street Journal has been running ads from the AHA that encourage everyone to get their blood

pressure checked by showing a woman who had scars from her heart surgery because she had suffered a heart attack but only had 182/100 blood pressure, lower than Mr. Carpenter's. As the Court knows, Mr. Carpenter has been under the care of physicians affiliated with St. Francis Hospital for his blood pressure and other issues, and has been under several medications continually at FMC Devens and here at MDC Brooklyn.  In fact, that was the reason for Mr. Carpenter to request a transfer to Watkinson House under the FSA, because a Halfway House and Home Confinement is the same security level as a Camp.

Under the FSA, Mr. Carpenter's 30 month sentence has become 20 months of incarceration at a Camp and 10 months of Home Confinement under the BOP's Custody. In fact, according to the First Circuit in *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), which is cited by the Second Circuit in *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), there is no custody level difference between Mr. Carpenter being at the Camp at Devens, Watkinson House close to St. Francis Hospital, or being on Home Confinement.  The BOP has made a major constitutional error by shipping Mr. Carpenter to a maximum security prison that is farther away from his family after Mr. Carpenter requested a transfer closer to home to Watkinson House under the FSA. But, from the 20 months of incarceration, Mr. Carpenter is also entitled to 135 days of Good Conduct Time (GCT) Credits. Even if the BOP uses the calculation under H.R. 4018 for calculating the two-thirds date, because Mr. Carpenter reported to FMC Devens on March 22, 2019, his new two-thirds date for mandatory release to Home Confinement is August 20, 2020 instead of November 2020.

This is significant because under the old law of the Second Chance Act of 2007 as codified in 18 U.S.C. §3624(c) and as amended by the FSA, everyone is entitled to 12 months of Halfway House and 10% of their sentence on Home Confinement to get them back into the community. Home Confinement is now guaranteed under the FSA as it states "shall" and is no longer up to the

BOP's discretion. The FSA makes the 10% mandatory for Home Confinement, so that means another 3 months off, which means Mr. Carpenter's release date is May 20, 2020.  But, if Mr. Carpenter receives only 3 months of Halfway House, that means his release date to Home Confinement should be February 20, 2020. If he receives 4 months (much less than the 20% given out to other people at MDC Brooklyn) then his release date should be January 20th, because as of January 20th he will have served 10 months with 2 months in a maximum security prison.  Mr. Carpenter has not seen the Sun since his bus ride to Brooklyn on November 27th.  For that reason alone, this Court should reduce his sentence and order his immediate release to Home Confinement.

Having Petitioner on Home Confinement would clearly save the American taxpayers money, which is what the FSA is all about. There is no justifiable reason to keep Petitioner in prison, as he was over-sentenced for the crime alleged, and the only other "defendants" or "co-conspirators" received no prison time whatsoever for even more egregious conduct than what Mr. Carpenter was charged with. This huge disparity supports compassionate release in and of itself. *See, e.g., United States v. Diaco*, 448 F.Supp. 978 (D.N.J. Feb. 8, 1978) (where the defendant in that case had his 60 month sentence reduced to time served because his co-conspirators received sentences of only 3-6 months.). Petitioner has had a spotless record while incarcerated, and has shown that he is not a danger to society nor is he likely to recidivate, and this Court clearly has the power under §3582(c)(1)(A) to send Petitioner home. Moreover, because of the changes to various statutes amended by the FSA, and the amendments to the Sentencing Guidelines, Mr. Carpenter is also entitled to relief pursuant to §3582(c)(1)(B) and §3582(c)(2) by this Honorable Court.

Simply put, Petitioner's 30 month incarceration is now meant to be 15.5 months of incarceration and 10 months of Home Confinement. From the 20 months of incarceration, the FSA

also provides 54 days each year with the final year prorated, so that Petitioner is entitled to 135 days of Good Conduct Time (GCT) credits or 4.5 months, meaning that Petitioner's incarceration is now 15.5 months.  But, also under the FSA, every inmate is guaranteed up to 10% of their sentence in Home Confinement.  This means that Petitioner is effectively guaranteed at least 3 months of Home Confinement pursuant to the FSA, so his time of incarceration is now 12.5 months.  But, under the new §3624(c) as amended by the FSA, every inmate is entitled to up to 12 months of Halfway House and Home Confinement, whether they have a sentence of 18 months or 18 years. See attached as Exhibit One, the April 4, 2019 memo from the Director of the BOP highlighting the new language under §3624(c).

Since Petitioner entered FMC Devens on March 22, 2019, as of January 20, 2020 he will have served 10 months (and have earned 5 months of Earned Time Credits under the FSA's Earned Time Credit program that began with the date of enactment of the FSA) and therefore definitely qualifies for direct transfer to Home Confinement for the remainder of his sentence, or a transfer to Watkinson House, the Halfway House (or RRC/CCC) on Collins Street in Hartford, Connecticut; literally just down the road from St. Francis Hospital which is the hospital that Petitioner's doctors are affiliated with.  As will be discussed below and in letters already sent to the Warden, the medical personnel here at FMC Devens are not just inept but also unprofessional and uncaring.  They are a danger to the health and wellbeing of all the inmates here; not just Petitioner.  It makes no sense to keep Petitioner at a Camp, much less in Maximum Security at MDC Brooklyn, when this Court can just as easily put Petitioner in Home Confinement for the remainder of his sentence and/or reduce his sentence to time served based on the extraordinary and compelling circumstances described below.

In addition to being qualified for compassionate release under §3582(c)(1)(A), Home Confinement under the new §3624(c), and the Elderly Offender Program under the FSA, Petitioner is also entitled to at least 12 months of time served credits pursuant to §3585(b) for the time he spent at Brooklyn MDC and Wyatt prior to and during his trial. Petitioner should have been credited for his entire time at Wyatt, as he has now spent more time in detention in both Brooklyn and Wyatt than Benatta did, and Benatta had his indictment dismissed for the Due Process violations in his case that were not as great as the overall Due Process violations in this case. Not only has Petitioner sent letters to the Acting Director of the BOP and the Warden, both of which were ignored, his attorneys also sent letters to Paul Irby, the General Counsel of the BOP's Designation and Sentence Calculation Center (DSCC) in Grand Prairie, Texas.

Petitioner's first letter was sent to the Warden on April 9, 2019 explaining the ramifications of the BOP's Memo of April 4, 2019 combined with my credits of up to 12 months pursuant to §3585(b). See Exhibit Two. If this Court gives Petitioner any credit for the 12 months of 2016 spent at trial and post-verdict, then he should be sent to Home Confinement. While he feels entitled to at least 13 months of §3585(b) credits Petitioner realizes that there is an overlap in sentences from December 28, 2015 to January 27, 2016. But, there is nothing that stops Petitioner from receiving credit for the time from January 28, 2016 to January 27, 2017 when Petitioner was released without receiving any Halfway House or Home Confinement from his original sentence in the Boston case. Also, if Petitioner's conviction is vacated in Boston due to his ongoing appeals there, he will receive sentencing credits of 36 months which will negate his entire 30 month sentence in the Connecticut case. That, in and of itself, should qualify for extraordinary and compelling circumstances, as Petitioner is the only person ever to have convictions under attack in both the First and Second Circuit at the same time. Because the Warden has not replied to any

of Petitioner's letters, this Court has jurisdiction to grant Petitioner the relief that he requests, which is to have his sentence reduced to time served and order his immediate release from prison.

Moreover, attached as Exhibit Three is yet another letter sent to the Warden explaining Petitioner's health issues and his qualification under the Elderly Offender Program. Petitioner sent several other letters to the Warden one of which the Warden picked up personally when Petitioner was in the Segregated Housing Unit (SHU) at FMC Devens for allegedly being insolent to one of the medical personnel that thought it was appropriate for Petitioner, at age 65, to have an upper bunk. And, despite almost killing himself trying to get down in the middle of the night to use the bathroom, this person thought there was no problem with assigning Petitioner to the midnight shift at the Power House while being very cognizant of Petitioner's Bi-Polar Depression and other medical issues. Suffice it to say, the Warden has not responded to *any* of Petitioner's letters, and Petitioner need only send *one* letter to invoke the jurisdiction of this Court after 30 days has lapsed.

Therefore, Petitioner respectfully requests that this Court reduce his sentence to time served for the extraordinary and compelling reasons detailed below, or in the alternative, assign him to Home Confinement under the Elderly Offender Program pursuant to the FSA.

## II.   LEGAL STANDARD

The First Step Act of 2018, which focuses on promoting rehabilitation and combating recidivism, amended 18 U.S.C. §3582(c)(1)(A). Pub. L. No. 226-391, §603, 132 Stat. 5194, 5238-40 (2018). In a section titled "Increasing the Use and Transparency of Compassionate Release," the First Step Act amended §3582(c)(1)(A) to allow courts to modify sentences not only upon motion of the Director of the BOP but also upon "motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." §603(b), 132 Stat. at 5239 (codified at 18 U.S.C. §3582(c)(1)(A) ). A court may now modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that "extraordinary and compelling reasons warrant such a reduction." §3582(c)(1)(A). *United States v. Cantu,* 2019 WL 2498923 at *1 (S.D. Tex. June 17, 2019).

### III.   THIS COURT HAS AUTHORITY TO RESENTENCE PETITIONER TO TIME SERVED UNDER SECTION 3582(c)(1)(A) FOR THE EXTRAORDINARY AND COMPELLING REASONS PRESENTED HERE

With the changes made to the compassionate release statute by the FSA, courts need not await a motion from the Director of BOP to resentence prisoners to time served under §3582(c)(1)(A) for "extraordinary and compelling reasons," and the reasons that can justify resentencing need not involve only medical or family circumstances.

### A.   When Congress originally enacted §3582(c)(1)(A) in 1984, it intended for district courts to reduce sentences for prisoners on the basis of extraordinary and compelling reasons not limited to medical or family circumstances

Congress first enacted the modern form of the compassionate release statute contained in §3582(c)(1)(A) as part of the Comprehensive Crime Control Act of 1984. Section 3582(c)(1)(A) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence if and whenever "extraordinary and compelling reasons warrant such a reduction." §3582(c)(1)(A). In 1984, Congress conditioned the reduction of sentences on the BOP Director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.*

While Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under §3582(c)(1)(A), the legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish the federal parole system and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances,

the Senate Committee stressed how some individual cases may still warrant **a second look** at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which **other extraordinary and compelling circumstances justify a reduction of an unusually long sentence**, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment. *Id.* at 55-56 (emphasis added).

Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that §3582(c)(1)(A) could and would enable courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56. Congress intended for the situations listed in §3582(c)(1)(A) to act as "safety valves for modification of sentences," *id.* at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations*." *Id.* (emphasis added). Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences, and there is no indication that Congress limited the safety valve of §3582(c)(1)(A) to medical release; if extraordinary and compelling circumstances were present, they could be used to "justify a reduction of an unusually long sentence." S. Rep No. 98-225, at 55–56.

The Sentencing Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. §1B1.13, app. n. 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.* Consistent with the text and legislative history of §3582(c)(1)(A), the Sentencing Commission concluded that reasons beyond medical, age, and family circumstances could qualify as "extraordinary or compelling reasons" for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant.

**B. Through the First Step Act, Congress changed the process for compassionate release based on criticism of BOP's inadequate use of its authority, returning to the federal judiciary the authority to act on its own to reduce sentences for "extraordinary and compelling reasons."**

Prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A) was as follows: the U.S. Sentencing Commission set the criteria for resentencing relief under §3582(c)(1)(A), and the only way a sentencing court could reduce a sentence was if the BOP Director initiated and filed a motion in the sentencing court. See PL 98-473 (HJRes 648), PL 98-473, 98 Stat 1837 (Oct. 12, 1984). If such a motion was filed, the sentencing court could then decide where "the reduction was justified by extraordinary and compelling reasons." *Id.* So even if a federal prisoner qualified under the Sentencing Commission's definition of extraordinary and compelling reasons, without the BOP Director's filing a motion, the sentencing court had no authority to reduce the sentence, and the prisoner was unable to secure a sentence reduction. This process meant that, practically, the BOP Director both initiated the process and set the criteria for whatever federal prisoner's circumstances the Director decided to move upon.

Leaving the BOP Director with this authority created several problems. The Office of the Inspector General found that the BOP failed: to provide adequate guidance to staff on the criteria for compassionate release, to set time lines for reviewing compassionate release requests, to create formal procedures for informing prisoners about compassionate release, and to generate a system for tracking compassionate release requests. See *FBOP Compassionate Release Program*, at i–iv. As a result of these problems, the OIG concluded that "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." *Id.*; see generally Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. §3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009). Congress heard those complaints. In late 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under §3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at §603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which §3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and then move for release, a court can now resentence "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies, "or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." §3582(c)(1)(A).

Congress made these changes in an effort to expand the use of compassionate release sentence reductions under §3582(c)(1)(A). Congress labeled these changes, "*Increasing* the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Senator Cardin noted in the record that the First Step Act made several reforms to the federal prison system, including that "[t]he bill *expands compassionate release* under the Second

14

Chance Act and expedites compassionate release applications." 164 Cong. R. 199, at S7774 (Dec. 18, 2018) (emphasis added). The effect of these new changes is to allow federal judges the ability to move on a prisoner's compassionate release application even in the face of BOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner. In the House, Representative Nadler noted that First Step included "a number of very positive changes, such as . . . *improving application of compassionate release*, and providing other measures to improve the welfare of Federal inmates."164 Cong. Rec. H10346-04, 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018) (emphasis added).

Federal judges now have the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that BOP once held under the pre-First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the applicable statute.

With the First Step Act, Congress decided that federal judges are no longer constrained or controlled by how the BOP Director decides what constitutes extraordinary and compelling reasons for a sentence reduction. Consequently, those sections of the application notes requiring a BOP determination or motion are not binding on courts. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute..."). Put differently, now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a court finds there exists an extraordinary and compelling reason for a sentence reduction without

the BOP Director's initial determination, then the sentence reduction is not inconsistent. §3582(c)(1)(A).

## IV. PETITIONER HAS EXTRAORDINARY AND COMPELLING REASONS WHY HIS SENTENCE SHOULD BE REDUCED TO TIME SERVED

Very little guidance exists on what constitutes extraordinary and compelling reasons warranting a sentence reduction under U.S.S.G §1B1.13 cmt. n.1(D). Only the BOP was previously empowered to seek such relief, and it rarely did so. *United States v. Gutierrez*, 2019 WL 1472320, at *1 (D.N.M. Apr. 3, 2019). The statute "does [not] define—or place any limits on—what 'extraordinary and compelling reasons' might warrant such a reduction." *Crowe v. United States*, 430 F. App'x 484, 485 (6th Cir. 2011). Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," Extraordinary, (10th ed. 2014), and extrapolating from its definition of "compelling need," a compelling reason is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]," *see* Compelling Need, (10th ed. 2014). Petitioner has properly exhausted his claim for a reduction of sentence under the compassionate release provision, and he presents this Court with extraordinary and compelling reasons for reducing his sentence to time served.

### A. Petitioner properly exhausted his request for a reduction of sentence under the compassionate release statute

Under the newly amended §3582(c)(1)(A), Petitioner has standing to bring this motion because more than 30 days elapsed between his reduction-in-sentence request to the warden and a response. The Court may thus:

> "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-(i) extraordinary and compelling reasons warrant such a reduction .... 18 U.S.C. §3582(c)(1)(A)." *Cantu* at *3.

Although Congress empowered the Commission to issue policy statements regarding the appropriate use of the sentence-modification provisions under §3582(c)(1)(A), §994(a)(2)(C), Congress may override the Commission's policy statements by statute. *See United States v. Colon*, 707 F.3d 1255, 1261 (11th Cir. 2013) ("Congress can override any guideline or policy statement by statute."); *United States v. Berberena*, 694 F.3d 514, 524-25 (3d Cir. 2012) ("Congress can ... pass a law overruling the Commission's [policy] determination at any time." *United States v. Horn*, 679 F.3d 397, 405-06 (6th Cir. 2012) (*quoting Mistretta v. United States*, 488 U.S. 361, 394 (1989)); *United States v. Anderson*, 686 F.3d 585, 591 (8th Cir. 2012) ("Congress ... can modify or override the Commission's policy statements."); *United States v. Fox*, 631 F.3d 1128, 1131 (9th Cir. 2011). ("Congress of course can override both Guidelines and policy statements by statute."). *See Cantu* at *3.

Petitioner filed a reduction of sentence "compassionate release" request with the Warden on April 9, 2019 and May 22, 2019, and has not received a response now over 30 days later. Therefore, Petitioner may request that this Court reduce his sentence pursuant to §3582(c)(1)(A) (courts can reduce a sentence "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies). Congress has specifically used §3582 as a congressional act of lenity. *See, e.g., Dillon v. United States*, 560 U.S. 817, 828 (2010) ("§3582(c)(2) represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines."). Petitioner also seeks with this Motion a reduction in sentence pursuant to §3582(c)(2) because of the Sentencing Guidelines Amendment 794 in regard to a Mitigating Role Adjustment and the changes in statute of §3624(c) pursuant to §3582(c)(1)(B).

**B. Petitioner is deserving of having his sentence reduced to time served**

This Court must endeavor in the interests of justice not to punish Petitioner because of mistakes he made from 2006 to 2008 concerning certain policies involving the Charter Oak Trust. That in itself is "extraordinary and compelling". Hopwood, Shon R., *Second Looks & Second Chances* (June 16, 2019). Cardozo Law Review. Available at SSRN: https://ssrn.com/abstract=3404899, describing *United States v. Diaco*, 457 F. Supp. 371 (D.N.J. 1978), where the sentencing judge lowered a sentence from 60 months to time served because other conspirators all received sentences of 3-6 months. *Second Looks & Second Chances* at 115-16, *citing Diaco* at 375. Instead of receiving justice and being sentenced on the basis of the man he was in 2018, Petitioner had a number of false allegations made at his sentencing that were clearly beyond the pale and unconstitutional. This is reversible Plain Error.

The Supreme Court has made two things absolutely clear when it comes to sentencing a defendant. First, "…what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation." *See Townsend v. Burke,* 334 U.S. 736, 740-41 (1948). *See, also, United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017). Second, each and every defendant is to be sentenced as he stands now before the court on the day of sentencing. Whatever or whoever the defendant was 10 years ago or even 2 years ago should not be discussed by the court, much less be the basis for sentencing. *See Pepper v. United States*, 562 U.S. 476, 492 (2011), *quoting United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000) ("a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing."). "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a

sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

## V.   A REVIEW OF THE COURT'S OWN VERDICT PROVES THAT MR. CARPENTER WAS ENTITLED TO A FOUR-LEVEL MITIGATING ROLE ADJUSTMENT PURSUANT TO AMENDMENT 794

Amendment 794 made it easier for a defendant to qualify for a minor role reduction and encourages courts to apply the reduction more frequently by giving greater discretion.  In Mr. Carpenter's case, neither the Government nor Probation, nor even the Court ever mentioned or examined Mr. Carpenter's possibility of a Mitigating Role Reduction pursuant to Amendment 794 despite the Government alleging over 80 co-conspirators in its letter of February 25, 2016. See Exhibit Four.  As the Second Circuit recently stated in *Alston*, this is clear error on the part of the Government and perhaps even the Court:

> "We have previously vacated a sentence imposed in the United States District Court for the Southern District of New York on precisely this basis….*See United States v. Soborski*, 708 F. App'x 6, 10-14 (2d Cir. 2017). We expect that, having clarified the impact of Amendment 794 in this opinion (*Alston*), the government will take note in future sentencing proceedings of the updated standard for "minor role" reductions." *United States v. Alston*, 899 F.3d 135, 150 (2d Cir. 2018).

The previous commentary to §3B1.2 had provided that a minor role adjustment is **<u>available to any defendant</u>** "who plays a part in committing the offense that makes him substantially less culpable than the average participant" and Amendment 794 inserted after "substantially less culpable than the average participant" the following phrase: "in the criminal activity." U.S.S.G. §3B1.2, comment n.3(A). The Amendment clarified that a defendant could be considered for a minor role adjustment in many circumstances, all of which apply to Mr. Carpenter.  "A defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." U.S.S.G. App. C. Amend. 794.

The evidence is clear in this case.  Mr. Carpenter never owned, sold, or profited from any of the policies including the Spencer policies, and his company Grist Mill Capital **lost** over $70 million, while the alleged carrier "victims" made over $100 million and continue to collect premiums and pay claims to this very day. Furthermore, since the Government's own Loss Spreadsheet shows that every single Charter Oak Trust policy was reinsured by the carrier, that means that even on the Spencer policies, Lincoln made money because it collected a large "permanent insurance" premium while it paid a small "term insurance" premium to some European Reinsurer, so even the Government's calculation of the death benefit loss in this case is wrong. And, as the Second Circuit's decision in *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018) makes clear, even if there was a big death benefit to pay out, **"Lincoln was not cheated of premiums."** *See AEI* at 130.

Amendment 794 also introduced a list of non-exhaustive factors that a sentencing court **should**, not may, consider, in determining whether to apply a minor role adjustment.  The factors are: "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. §3B1.2, comment. n.3(C). Once again, it is submitted that it was clear error on the part of the Court not to consider any of these factors at Mr. Carpenter's sentencing.

Moreover, Mr. Carpenter is the only alleged "STOLI fraudster" to be tried and sentenced after the adoption of SGA 792 and 794. Therefore, just reviewing this non-exhaustive list of points in view of findings made in the Verdict, the Government's submission to Probation, and Probation's PSR Report, the Court can easily examine the five factors of Amendment 794 and §3B1.2 with the findings in the Verdict itself:

(1) **The degree to which the defendant understood the scope and structure of the criminal activity**:

> Clearly there was no meeting of the minds here as Mr. Carpenter still submits that he did not lie to the carriers, and the carriers, including Lincoln, continue to collect premiums and process death claims on the Charter Oak Trust policies. If the Court's Verdict was correct, the carriers could have rescinded the policies on June 7, 2016 – or even now – and, keep all the premiums paid to date, and not pay any death claims because the policies were "fraudulently" obtained. So, clearly, Mr. Carpenter did not "understand the scope and the structure" of the crime here, and obviously the carriers do not believe they were defrauded and continue to ratify the individual contracts every time they accept a premium payment. "In other words, **Lincoln was not "cheated of premiums."** *AEI* at 130.

(2) **The degree to which the defendant participated in planning or organizing the criminal activity**:

> Mr. Carpenter created the Charter Oak Trust so that truly wealthy people could pass money to future generations, income, estate, and gift tax free. The Charter Oak Trust also avoided the Generation Skipping Transfer Tax. The only person who could buy the policy from the Charter Oak Trust was the Insured. Mr. Carpenter could not buy the policy, and if the Insured did not buy the policy, then Ridgewood and not Mr. Carpenter would end up with the policy. At no time did the Government explain how Mr. Carpenter could steal the policies out from under Ridgewood's control of the policies through the Insurance Trustee, Christiana Bank.

(3) **The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority**:

> While the Court erroneously concluded that Mr. Carpenter controlled all of the entities at 100 Grist Mill Road, the alleged "lying" on the applications was done by Agents of the Carriers from all over the Country who Mr. Carpenter not only did not control, he never met these people or even had so much as a phone call with them. If there was an email between Mr. Carpenter and Bruce Mactas or Mr. Carpenter and Mark Salesman, etc., the Government would have produced them by now. Because Mr. Carpenter had no contact with, much less dominion or control over these Agents of the Carriers all across the Country, he is entitled to a "minimal" role in the alleged conspiracy.

**(4) The nature and extent of the defendant's participation in the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts:**

> Similarly, just as Mr. Carpenter did not control the Agents of the Carriers, he did not personally fill out or answer any questions on the allegedly false applications. Nor did anyone file anything on Mr. Carpenter's behalf. More importantly, most of the applications in this case were submitted to the carrier and approved long before they were ever submitted to Mr. Carpenter or Wayne Bursey as Trustee of the Charter Oak Trust for funding. Also, the Charter Oak Trust had a bona fide insurable interest in each and every insured, so the Court's conclusions that these were STOLI policies like in *Binday*, is also clear error.

**(5) The degree to which the defendant stood to benefit from the criminal activity:**

> This is probably the most clear-cut of the five factors, because after raiding Mr. Carpenter's offices not once but twice, the Government has failed to produce even one commission check with Mr. Carpenter's name on it, unlike with the defendants in *Binday* and *Quatrella*. Even more significant, if the Government's theory of the scheme to defraud is correct, then Mr. Carpenter is the dumbest criminal in history, because he would know for a fact that if there were **any** lies on the insurance applications, the insurance carrier could deny coverage at any time – even beyond the two-year contestability period – by declaring the policies void due to "STOLI Fraud" which would allow the carriers to keep all of the premiums and not pay out any death benefits. *See, e.g., Chawla v. Transamerica*, 2005 WL 405405 (E.D.Va. Feb. 3, 2005), which was decided a full two years before the first applications for the Charter Oak Trust in March of 2007. In the time period of 2007-2009, Mr. Carpenter's company would have paid over $90 million to the carriers and sustained a loss of $74 million to obtain policies that Mr. Carpenter would have known would be worthless because they were obtained by fraud.

Not only has the Government failed to prove that Mr. Carpenter was the "leader" of five-or-more "culpable" participants in a scheme to defraud (by a preponderance of the evidence), making him eligible for an enhancement under §3B1.1, the Government has totally failed to address Mr. Carpenter's entitlement to a Four-Level Reduction pursuant to having a minor role if there really were 80-100 people involved in this scheme as the Government alleges. As the Court knows well by now, if there was a scheme to defraud the carriers here, Mr. Carpenter was not part of it because his company Grist Mill Capital, LLC (GMC), as the credible evidence revealed, was not just the biggest loser here at over $70 million in documented losses, but GMC apparently was the **only** loser. Surprisingly, the Government's own voluminous numbers prove that all of the death

benefits were reinsured, so not even Lincoln lost money on paying out the $30 million death benefit in the Sash Spencer case.  Similarly, in a huge binder filled with TPG's bank records, there was not a single check payable to Mr. Carpenter or signed by Mr. Carpenter. Therefore, based on the Sentencing Guidelines Commission's own Primers, there was no "Intended" or "Actual" Loss in this case, and Mr. Carpenter is entitled to a Four-Level Reduction for having a "mitigating" role rather than a Four-Level Enhancement as the Government argues.

As the Court is certainly well aware, Mr. Carpenter respectfully disagrees with virtually every conclusion made in the Court's June 6, 2016 Verdict and Findings of Fact. But, for the purposes of the Five-Person Enhancement, it is not enough that someone knew there was a "conspiracy" going on, they had to play an active role in that conspiracy. *See, e.g., United States v. Studley*, 47 F.3d 569 (2d Cir. 1995).  In the June 2016 Verdict, in addition to Mr. Carpenter, the only people listed as possible co-conspirators are Wayne Bursey, Don Trudeau, Charles Induddi-Westcott, Ed Waesche, and Bruce Mactas.  See Verdict at 86, FN62.  Other than the Government's rank speculation and the Court's conclusions, there was absolutely no evidence adduced at trial that any of these people were in a conspiracy led by Mr. Carpenter and, in fact, to the contrary there is much evidence that proves Waesche, Induddi-Westcott, and Mactas lied to Mr. Carpenter and defrauded his Company, so therefore it is absurd to think they were in a conspiracy with him.

Furthermore, perhaps the best evidence that Mr. Carpenter was not in a conspiracy with Robinson, Trudeau, or Mactas, comes from the Government's own Sentencing Memorandum in this case, where the Government cites to Gov't. Ex. 2233 which it used in its Rebuttal in the Final Arguments at Mr. Carpenter's trial three years ago in order to suggest that he terrorized everyone that dared disagree with him:

> "When Jack Robinson tried to send out a Spencer related document that he had worked on
> with Trudeau, Carpenter responded, "FUCK YOU BOTH THAT DON WANTS TO

SEND ANYTHING OUT TODAY....... I have been working so hard on so many projects that you two have screwed up on and you spring this on me.....Fuck you both. Nothing goes out without my approval and I did all these numbers already and you are wrong. Assholes!!!!!" Gov't Ex. 2233." See Gov't. Sentencing Memo at 72.

Based on the above indisputable facts, Mr. Carpenter was entitled to a Four-Level Mitigating Role Reduction of his Sentencing Guidelines Offense Level pursuant to SGA 794, and Mr. Carpenter respectfully asks the Court to grant this Motion and to recalculate Mr. Carpenter's Offense Level without the Leadership Enhancement; with the Mitigating Role adjustment, and reduce his sent to time served.

## VI.   THE REMEDY FOR THE DUE PROCESS VIOLATIONS IN THIS CASE IS TO REDUCE MR. CARPENTER'S SENTENCE TO TIME SERVED

The Due Process delays in this case were extraordinary, and the prejudice to Mr. Carpenter was palpable. "[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings." *United States v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009), *citing Doggett v. United States,* 505 U.S. 647, 666 (1992). In *Ray*, in trying to craft a remedy for the Due Process violation for the delay in Ms. Ray's case, the Second Circuit eliminated the need for her to serve any of her custodial sentence or serve her time in a Halfway House and stated the following:

> "The appropriate remedy for a proven due process violation often depends on the stage at which the violation is found and the relief sought. After a due process violation has occurred, courts endeavor to fashion relief that counteracts the prejudice caused by the violation. The Sixth Circuit has stated that suspension of the remainder of the sentence is the appropriate remedy for a due process violation.... The violation of Ray's due process right has prejudiced her insofar as a delayed custodial sentence threatens to undermine her successful rehabilitation. To remedy that harm, the appropriate relief is to release her from any requirement that she submit to a custodial sentence. Accordingly, we conclude that the appropriate remedy in this case is the vacatur of Ray's sentence insofar as it imposes a six-month term of residence in a halfway house." *Ray* at 202-03.

Dismissal of an indictment for the Government's violation of §3161(j) is rare, and in fact it has happened in only one case in the Second Circuit, *United States v. Benatta*, 2003 WL

24

22202371 (W.D.N.Y. 2003), despite the holdings in cases such as *United States v. Lainez-Leiva*, 129 F.3d 89 (2d Cir. 1997) where the Court recognized a Due Process violation, but it was not sufficient enough to dismiss the indictment.  The reason that the dismissal of the indictment in *Benatta* is so important to Mr. Carpenter's case is that the defendant was suspected by the FBI of being one of the 9-11 terrorists caught at the Canadian Border, and was held at MDC Brooklyn from the time of his indictment (December 12, 2001) to his release to the Immigration Court at the Batavia Federal Detention Facility on April 30, 2002, a delay of only four and a half months. While Mr. Carpenter, of course, respectfully suggests that the Court would be well within its discretion to dismiss the indictment in this case as the Court did in *Benatta* pursuant to Rule 48(b) of the Fed.R.Crim.P., he is only asking for a credit of 12 months rather than a dismissal of the Indictment, but Rule 48(b) does provide that:

> The court may dismiss an indictment, information, or complaint if unnecessary delay occurs in:
> > (1) presenting a charge to a grand jury;
> > (2) filing an information against a defendant; or
> > (3) bringing a defendant to trial

Rule 48(b) not only allows a court to dismiss an indictment on constitutional grounds, but also where the delay may not be of the constitutional magnitude of this case – a court can still dismiss an indictment pursuant to Rule 48(b) for any Due Process delay violation.  *See Pollard v. United States*, 352 U.S. 354, 361 n. 7 (1957) ((noting that Rule 48(b) provides for enforcement of the Sixth Amendment's speedy-trial right), but it also restates the court's inherent power to dismiss an indictment for lack of prosecution where the delay is not of a constitutional magnitude, *see* Fed.R.Crim.P. 48(b) advisory committee note pointing out that the rule restates the "inherent power of the court to dismiss a case for want of prosecution." *Pollard* at 361.

Similarly, this is the rare case where both sections 18 U.S.C. §3161(j) and §3164 come into play.  Section 3164 was violated because the Government required Mr. Carpenter to be imprisoned at the Wyatt Detention Center throughout his trial rather than receive a furlough under CFR 570.33, or be at a local Halfway House in Hartford.   The Government also knowingly postponed Mr. Carpenter's trial from the original date of October 2015 to a new date in February 2016, just so the Government could travel across the country and interview witnesses that had never even heard of Mr. Carpenter, much less participated with him in a scheme to defraud the insurance carriers. This was clearly a violation of §3164 of the Speedy Trial Act, but §3164's only remedy is the release of the defendant, therefore Mr. Carpenter asks only for the Court to recognize the several Due Process violations in this case and reduce his sentence accordingly.   However, the Due Process Delay bullet that the Government cannot possibly dodge is 18 U.S.C. §3161(j)(1), (2), and (3), which provide as follows:

> (j)(1) If the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly
>
> (B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.
>
> 2. If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the government who caused the detainer to be filed.
>
> 3. Upon receipt of such notice, the attorney for the government shall promptly seek to obtain the presence of the prisoner for trial. *See Benatta* at *12-13.

In Mr. Carpenter's case, however, the Government knew that he was sentenced by the Judge in Boston in February of 2014, and his post-trial motions were denied in May of 2014 when the Government hit him with a Superseding Indictment with a whole new series of Money

Laundering charges, one month before the Government knew that Mr. Carpenter would be reporting to prison.  So, while the Government knew they were re-indicting Mr. Carpenter in May 2014 just before he reported to USP Canaan in June 2014, they did absolutely nothing as required under §3161(j).  Then, without notifying Mr. Carpenter or his attorneys, they had Mr. Carpenter yanked out of his bunk after lights-out on December 28, 2015 and he was transferred to the same MDC Brooklyn that resulted in the defendant in *Benatta* having his indictment dismissed for only a violation of four months, where Mr. Carpenter's §3161(j) violation was over 18 months, and Mr. Carpenter was held in Maximum Security at both MDC Brooklyn and at Wyatt for 180 days, whereas the total for Benatta, the suspected 9/11 terrorist, was only 134 days.

Therefore, Mr. Carpenter respectfully requests this Court reduce Mr. Carpenter's sentence to Time Served as was done in *Ray*.  Once again, the defendant in *Ray* pleaded guilty to mail fraud, the Government forgot about her, and the district court sentenced her to six months of Halfway House which the Second Circuit reduced to zero to make up for the Due Process Delay.  In this case, the §3161(j) violation is four times greater than *Benatta*, and Mr. Carpenter is owed a 12-month time served credit.  So, even assuming that Mr. Carpenter was guilty, he deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*, and they were not owed any credits for time served as Probation's PSR clearly provides for Mr. Carpenter.

## VII.  THE COURT SHOULD EXERCISE ITS DISCRETION AND RESENTENCE PETITIONER TO TIME SERVED

Compassionate release is appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." *Cantu* at *3. That statute provides:

> **(g) Factors to be considered.** - The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning-
>
> **(1)** the nature and circumstances of the offense charged;
> **(2)** the weight of the evidence against the person;
> **(3)** the history and characteristics of the person. *Cantu* at *6.

Petitioner's offense was not a violent one. In prison, now twice, he has had a spotless, incident free, and exemplary record. He has served his time without any violent or aggressive incidents on his BOP file. Petitioner is qualified to serve out the rest of his sentence at a Halfway House or on Home Confinement. Weighing the applicable §3553(a) factors likewise supports Petitioner's request for compassionate release.  Section 3553(a) provides:

> **(a) Factors to be considered in imposing a sentence.** - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed—
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

Thus, pursuant to §3142(g) and §3553(a), the Court should find that the Due Process errors and violations in this case alone present extraordinary and compelling reasons in support of reducing Petitioner's sentence to time served. Clearly under §3142(g), Mr. Carpenter is not a danger to anyone or the community, and he was clearly over-sentenced as the carriers did not

experience any losses, and Lincoln alone reported a gain on the death benefits of the Charter Oak

Trust policies of over $37 million from the reinsurance in force, which is in addition to the profits

from the premiums paid and investment income after commissions and other expenses. Mr.

Carpenter should not have been hit with any of the enhancements because there was no evidence

to support them, much less the required "clear and convincing evidence" standard. *See, e.g.*, the

Ninth Circuit's decision in *United States v. Ridgill*, 781 Fed.Appx. 641 (9th Cir. 2019). It was

clearly Plain Error to hit Mr. Carpenter with a Leadership Role Enhancement, just as it was Plain

Error under *Rosales-Mireles v. United States*, 138 S.Ct. 1897 (2018) not to even analyze a

Mitigating Role Adjustment pursuant to SGA 794.

> District courts must determine in each case what constitutes a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. §3553(a), to achieve the overarching sentencing purposes of "retribution, deterrence, incapacitation, and rehabilitation." *Tapia v. United States,* 564 U.S. 319, 325 (2011); §§3551(a), 3553(a)(2). Those decisions call for the district court to exercise discretion. Yet, to ensure "certainty and fairness" in sentencing, district courts must operate within the framework established by Congress. *United States v. Booker,* 543 U.S. 220, 264 (2005) (quoting 28 U.S.C. §991(b)(1)(B)). The Sentencing Guidelines serve an important role in that framework. "[D]istrict courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Peugh v. United States,* 569 U.S. 530, 541 (2013) (quoting *Gall v. United States,* 552 U.S. 38, 50, n.6 (2007)). Courts are not bound by the Guidelines, but even in an advisory capacity the Guidelines serve as "a meaningful benchmark" in the initial determination of a sentence and "through the process of appellate review." *Rosales-Mireles* at 1903-04, *citing Peugh* at 541.

Of course, to consult the applicable Guidelines range, a district court must first determine

what that range is. This can be a "complex" undertaking as discussed in another Supreme Court

decision vacating a sentence calculation off by only one month, *Molina–Martinez v. United States,*

136 S.Ct. 1338, 1342 (2016). In other words, an error resulting in a higher range than the

Guidelines provide usually establishes a reasonable probability that a defendant will serve a prison

sentence that is more than "necessary" to fulfill the purposes of incarceration. §3553(a).

## CONCLUSION

For the reasons discussed above, Petitioner prays that this Court would find him worthy of its mercy and grace by granting this Motion for Compassionate Release, or to release him to Home Confinement for the remainder of his sentence.

Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Incarcerated Inmate
Petitioner, *pro se*
Reg. # 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232