UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:13CR226 (RNC) |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARPENTER | : | April 9, 2020 |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER MOTION FOR COMPASSIONATE RELEASE

The government respectfully submits this memorandum in opposition to the defendant's motion to reconsider the Court's denial of his prior motion for compassionate release (Doc. 518).[1]

### I. Background

Carpenter previously filed two *pro se* motions for release, one on January 27, 2020 and one on March 13, 2020. *See* Docs. 506, 507. Those motions did not raise the current COVID-19 pandemic as a basis for release, *see id.*, and the government opposed both requests.[2] *See* Doc. 510. On March 26, 2020, Carpenter, through counsel, supplemented his pending applications by arguing that the COVID-19 pandemic constitutes "extraordinary and compelling circumstances" warranting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *See* Doc. 511. The government opposed that motion arguing, among other things, that (1) Carpenter had not exhausted his administrative remedies with the Bureau of Prisons ("BOP"), (2) there was no evidence to support Carpenter's claim of diabetes, so the only risk factor he presented was high blood pressure,

---

[1] To the extent that the Court reconsiders all of the arguments Carpenter raised in his prior motion, the Government respectfully incorporates by reference its memorandum in opposition to that motion. *See* Doc. 510.

[2] While those *pro se* motions were pending with this Court, the defendant, through his counsel, filed a motion for bail pending appeal with the Second Circuit Court of Appeals and argued that his health issues placed him at high risk should he be exposed to COVID-19 in prison. *See United States v. Carpenter*, No. 19-70 (2d Cir. Mar. 25, 2020), ECF No. 136 (order denying bail pending appeal). The Second Circuit rejected this argument and noted that "Carpenter's medical situation is not significantly different from that of most inmates." *Id.* A copy of the Second Circuit's order was attached to the government's prior memorandum at Doc. 515-1.

which did not distinguish him from a large portion of the BOP population, and (3) the BOP has taken aggressive measures to prevent the transmission of COVID-19 in its facilities. *See* Doc. 515.

On April 2, 2020, the Court held a telephonic hearing on Carpenter's motion for release. *See* Doc. 517 (minute entry). After hearing from counsel for both parties, the Court denied the request for compassionate release, and indicated it was doing so primarily for the reasons described in the government's memorandum. The Court further noted that Carpenter has been requesting release from incarceration essentially since the day he self-surrendered. The Court denied the motion for compassionate release without prejudice, but indicated that any future application for release based on COVID-19 must include an "individualized assessment" describing how Carpenter specifically is at a higher risk from COVID-19 due to his particular health issues and describing how COVID-19 would specifically impact him should he catch the virus.

On April 7, 2020, Carpenter, through counsel, filed the instant motion to reconsider the Court's decision. Carpenter attached medical records that purportedly indicate he has diabetes, as well as charts showing the spread of COVID-19 nationally at BOP facilities. Significantly, he failed to submit an individualized assessment as the Court had requested. In addition, the medical records do not definitely indicate that Carpenter has been diagnosed with diabetes, instead suggesting some suspicion of diabetes, which the records clearly show that Carpenter himself denied having. In fact, Carpenter subsequently refused to take the tests that would have confirmed if he has diabetes. Finally, Carpenter ignores the fact that only two inmates have tested positive for COVID-19 at the facility where Carpenter is housed, demonstrating the effectiveness of BOP's preventive measures at that location. Accordingly, having failed to submit the individualized assessment that this Court requested, Carpenter's argument should be denied.

## II. Argument

### A. Carpenter has failed to exhaust his administrative rights.

As a preliminary issue, Carpenter has failed to exhaust his administrative rights with the BOP. As the government noted in its earlier memorandum, a prerequisite to any request for compassionate release under § 3582(c)(1)(A) requires the defendant's exhaustion of administrative rights with the BOP. *See United States v. Gagne*, No. 18 Cr. 242 (VLB), 2020 WL 1640152, at *2 (D. Conn. Apr. 2, 2020) ("Because of [the First Step Act,] a defendant may move for compassionate release 'after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.'") (quoting 18 U.S.C. § 3582(c)); *United States v. Gileno*, No. 19 Cr. 161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence.").

In recent weeks, numerous defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused. The only Court of Appeals to have addressed the question has rejected the argument and required exhaustion. *See United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that "the mere existence of COVID-19 in society and the possibility that it might spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and

professional efforts to curtail the virus's spread. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 2.

As the Third Circuit recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, such as disciplinary records, recidivism score, and medical history, that the BOP is uniquely suited to obtain and which will benefit both the BOP and later the court evaluating such claims. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions—particularly at a time like this when many inmates are making petitions advancing similar claims—and adjudicate those positions in a consistent manner. A court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment. *See United States v. Russo*, No. 16 Cr. 441 (LJL) (S.D.N.Y. Apr. 3, 2020) (Dkt. No. 54) (The statutory text "recognizes that the BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan. That recognition is consistent with one of the bedrock principles underlying administrative exhaustion—to permit the agency, with its expertise and with its responsibility over the movant, to make a decision in the first instance.").

Here, as the government previously argued, Carpenter failed to formally request compassionate release with the BOP using the required application forms. *See* Doc. 510 at 8 n.6. Even if his prior letters to the warden do constitute a proper request to the BOP for compassionate release, those letters did not raise COVID-19 concerns as a basis for release. In fact, there is nothing in the record demonstrating that Carpenter has asked BOP to grant him compassionate

4

release due to his medical conditions and COVID-19 concerns. As noted, the BOP, which has full access to his medical records and can conduct additional tests, is in the best position to make an initial determination as to whether compassionate release is appropriate in light of COVID-19. Carpenter has failed to take that step here. Accordingly, in seeking release based on COVID-19, Carpenter has not exhausted his administrative rights, and his request must be denied.

### B. Carpenter has failed to show extraordinary and compelling reasons for release.

Even assuming Carpenter has met the exhaustion requirement, he fails to carry his burden to show "extraordinary and compelling reasons" to obtain relief. To consider a sentence reduction for compassionate release, a defendant must show that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). By statute, such reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission. *Id.* Then, before compassionate release can be granted, the Court must consider relevant the 18 U.S.C. § 3553 sentencing factors. *Id.* "The defendant bears the burden of showing that she is entitled to a sentence reduction." *Gagne*, 2020 WL 1640152, at *3.

Carpenter has not met his burden here. Most importantly, he has failed to present an "individualized assessment"—as this Court stated it would need before reconsidering any request for compassionate release on the basis of COVID-19—showing that Carpenter is at an increased risk in light of any medical conditions. On that basis alone, his motion for reconsideration should be denied.

Although Carpenter has now supplemented his prior memoranda with some records suggesting he may have diabetes, these records along with other records, leave tremendous doubt as to whether he has been diagnosed with diabetes. BOP medical records indicate that Carpenter has repeatedly and consistently denied having diabetes. For instance, in three separate BOP health

screenings over the past year, Carpenter denied having diabetes. *See* Ex. 7 at 1 (Mar. 22, 2019 health screening), Ex. 8 at 1 (Apr. 2, 2019 health screening), Ex. 9 at 1 (Nov. 29, 2019 health screening).[3] Those screenings also indicate that Carpenter was not taking any medications for diabetes. *See* Ex. 7 at 7-8, Ex. 8 at 11, Ex. 6 at 8. The medical record that Carpenter attached to his motion, from a December 31, 2019 visit with BOP health services, also indicates in the "Subjective" section[4] that Carpenter denies having "DM," which the Government believes is a reference to diabetes mellitus. *See* Doc. 518-1 at 1 ("inmate reports he does not have DM").

Although that same medical record indicates an assessment of "Type 2 diabetes mellitus," *id.* at 2, this looks to be the first time that diabetes appears as an assessment in Carpenter's medical records. It is unclear, however, what, if any, tests were performed to arrive at this assessment. No positive test results are referenced in the medical records.

More importantly, an assessment is not a diagnosis. An assessment is the first step in the diagnostic process. *See* The Diagnostic Process: Rediscovering the Basic Steps, *available at* https://blog.thesullivangroup.com/rsqsolutions/diagnostic-process-rediscovering-basic-steps (noting that step one is the initial assessment which involves taking patient history, physical exam, evaluation of the patient's chief complaint and symptoms, forming a differential diagnosis, and ordering of diagnostic tests). Step two is when tests are performed to confirm a condition or rule out more serious conditions.

---

[3] Exhibits 1 through 6 are being filed publicly with this memorandum. Exhibits 7 through 12 are Carpenter's medical records, which are being filed under seal in a separate docket entry.

[4] The government understands that the "Subjective" section contains information self-reported by a patient. *See* Understanding SOAP format for Clinical Rounds, *available at* https://www.globalpremeds.com/blog/2015/01/02/understanding-soap-format-for-clinical-rounds/ (noting that the "subjective" section "refers to subjective observations that are verbally expressed by the patient[.]"); Gossman, William; Lew, Valerie; Ghassemzadeh, Sassan (2019), "SOAP Notes", StatPearls Publishing LLC, *available at* https://www.ncbi.nlm.nih.gov/books/NBK482263/ (noting that information under the "subjective" heading "comes from the 'subjective' experiences, personal views or feelings of a patient or someone close to them.").

In order to properly diagnose diabetes, blood tests must be conducted to determine blood glucose levels. The "A1C" test is the commonly used blood test used to diagnose type 1 and type 2 diabetes. *See, e.g.,* Ex. 1 (printout from Mayo Clinic website), Ex. 2 (printout from American Diabetes Association website), Ex. 3 (printout from National Institute of Diabetes and Digestive and Kidney Diseases website). In Carpenter's case, this test does not appear to have been conducted. The same December 31, 2019 medical record that Carpenter attaches to his motion indicates there have been "no recent A1c" tests. *See* Doc. 518-1 at 1.  The same medical record indicates that the BOP requested new laboratory tests for Carpenter, including the A1C test and several other lab tests, presumably to diagnose whether Carpenter has diabetes. *See id.* at 2-3 (listing "New Laboratory Requests" to include the A1C test and other blood tests).

Significantly, Carpenter refused to take this test. Carpenter failed to mention his refusal in his motion for reconsideration. BOP medical records show that on February 6, 2020—well after COVID-19 was declared a public health emergency[5]—Carpenter refused to take the following laboratory tests: Comprehensive Metabolic Profile, Lipid Profile, Microalbumin & Creatinine, Urine Random, TSH, CBC w/ Differential, Hemoglobin A1C. *See* Ex. 10. These are the same test the BOP requested during Carpenter's December 31, 2019 visit to BOP Health Services. *See* Doc. 518-1 at 2-3. These tests would have confirmed whether or not Carpenter had diabetes. *See, e.g.,* Exs. 1 to 3 (describing A1C test); Ex. 4 (describing Comprehensive Metabolic Profile test).[6]

---

[5] *See* press release titled "Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus," United States Department of Health and Human Services, January 31, 2019, *available at* https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

[6] The second medical report that Carpenter attached was dated January 31, 2020, before Carpenter refused to take the tests, and reflects the initial assessment, not a definitive diagnosis. *See* Doc. 518-2.

In refusing to take the tests, Carpenter signed a medical treatment refusal form in which he acknowledged that the Federal Bureau of Prisons Medical staff members carefully explained the possible consequences and/or complications from refusing treatment including delay in diagnosis or treatment "that may result in death." Ex. 11. Just above Carpenter's signature, he further acknowledged that he understood the consequences, was still refusing treatment, and "assume[d] all responsibility for my physical and/or mental condition, and release the Bureau of Prisons and its employees from any and all liability for respecting and following my expresses wishes and directions." *Id.* [7]

The medical record that Carpenter attached is nothing more than an initial assessment based on an evaluation of his own self-reporting, in other words, a suspicion of diabetes. No tests appear to have been performed to validate this suspicion because Carpenter refused to take the tests and get treatment. Carpenter cannot have it both ways. He should not be able to refuse testing and treatment by BOP medical professionals—treatment that the BOP was ready, willing, and able to provide to him to properly manage his health—and then come to this Court and complain that BOP is unable to tend to his medical needs.

Further lending doubt to Carpenter's purported diagnosis is the fact that he does not appear to be taking any prescribed medications for diabetes. Attached as Exhibit 12 is a listing of all of Carpenter's active prescriptions from January 1, 2020 to March 20, 2020. None of the medications appear to be for the treatment of diabetes. This presents two possibilities: he either does not have confirmed diabetes—perhaps because he refused to take the tests—or if he does have diabetes, his condition is not so severe as to require medication or is being well-managed without medication.

---

[7] It is worth noting that Carpenter also has refused other treatment while in BOP custody, including a vaccination for pneumonia, which would have lowered his risk for pneumonia. *See* Ex. 12; *see also* Pneumococcal Vaccination, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/pneumococcal/vaccination.html (recommending vaccine for individuals age 65 or older).

The answer to this question is important because the risk from COVID-19 to persons with diabetes is not the same for everyone. Contrary to Carpenter's motion, which suggests that everyone with diabetes is at high risk from COVID-19, the American Diabetes Association states that the "risk of getting very sick from COVID-19 is likely to be lower if your diabetes is well-managed." It also states that "People who already have diabetes-related health problems are likely to have worse outcomes if they contract COVID-19 than people with diabetes who are otherwise healthy" Ex. 5 (printout from American Diabetes Association website); *see also* Ex. 6 (printout of American Journal of Managed Care article: "If individuals with diabetes effectively manage their condition, the risk of getting severely sick from COVID-19 is about the same as the general population."). This highlights the need for Carpenter to present more information and an individualized assessment, as the Court previously requested.

In short, Carpenter's motion for reconsideration does not present any definitive evidence of diabetes or any other particular vulnerability to COVID-19. While Carpenter presents some limited COVID-19 risk factors, such as hypertension, they do not distinguish him from a large swath of BOP's population. On this record alone, as the Second Circuit noted when it recently denied Carpenter's request for release based on COVID-19, "Carpenter's medical situation is not significantly different from that of most inmates." Doc. 515-1.

In his motion, Carpenter cites two cases he cited in his previous memoranda where courts have granted release to defendants with diabetes. First, he cites *United States v. Fellela*, No. 3:19-cr-79 (JAM), 2020 WL 1457877 (D. Conn. Mar. 20, 2020). As the government previously noted, however, *Fellala* involved bail pending trial, not a post-conviction reduction in sentence, and thus the district court's discretion was far broader. *Compare* 18 U.S.C. § 3142 *and* 18 U.S.C. § 3582(c)(1)(A). In addition, the defendant in *Fellala* suffered not only from diabetes, but from

"several other ailments." *Id.* at 1.  Here, not only is there no confirmed diagnosis of diabetes, there is also no indication of any other severe ailments that make him a risk. Finally, in granting release, the court noted, among other things, that there was no risk of flight and no risk that the defendant would commit additional crimes. 2020 WL 1457877 at *1. Here, by contrast, this Court has already expressed its concern that Carpenter will re-offend. *See* Sen. Tr. 184 ("I'm worried that the probation office is not going to be able to protect the public from a determined Dan Carpenter who doesn't take his meds and who continues to conduct himself as he has over these years.").

Second, Carpenter cites *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, (D. Conn. Apr. 2, 2020). In that case, there was evidence not only that the defendant had diabetes, but that she was seeing medical professionals at a local hospital who have treated her for her diabetes. *See id.* at 1. Here, aside from a vague reference to a diabetes assessment, there is no evidence Carpenter took any tests to confirm he had diabetes or that he is taking any medication to treat diabetes.  It also bears noting that the defendant in *Colvin* had only 11 days left to serve on her sentence, *see id.*, whereas here, Carpenter has only served 12 months of a 30 month sentence. Finally, the court in *Colvin* considered the 3553(a) factors before releasing the defendant and determined that, unlike Carpenter in this case, Colvin was not a danger to anyone in the community. *Id.* at 4.

In Carpenter's motion, he also attaches various charts showing the increase in COVID-19 cases at BOP facilities nationwide. It should be noted that these positive cases are in 34 facilities out of total of 142 BOP managed facilities. *See* https://www.bop.gov/coronavirus/ (listing 34 current facilities with COVID-19 cases); https://www.bop.gov/locations/list.jsp (listing 142 BOP managed facilities). While the spread in these 34 facilities is unsettling, and some facilities have a large number of positive cases, it should also be noted that to date, the Metropolitan Detention

Center ("MDC")—where Carpenter is housed, and which has a total population of approximately 1,692 inmates—has only two reported case of COVID-19. The first diagnosis was before March 23, 2019, over two weeks ago, and the government has spoken with staff at MDC, who confirmed that Carpenter is not, and was never, in the same housing unit as that inmate who tested positive. The second diagnosis was not until this week. Both inmates have since been isolated from others. These numbers demonstrate that notwithstanding the spread in some facilities, the BOP's efforts at minimizing the spread of the virus at MDC has been effective.

Finally, even if the Court determines that Carpenter has met his burden of showing extraordinary and compelling circumstances warranting release based on COVID-19 concerns, the Court must still consider the relevant 3553(a) factors before granting release. *See* 18 U.S.C. § 3582(c)(1)(A); *Gagne*, 2020 WL 1640152, at *3. Here, the Court considered the various 3553(a) factors at sentencing. Recognizing the seriousness of the offense and considering the other factors, the Court sentenced Carpenter to 30 months of imprisonment. Although Carpenter argues that he is not a danger to the community, the Court felt otherwise. In addressing the 3553(a) factors of deterrence and the need to protect the public, the Court indicated "I'm worried that the probation office is not going to be able to protect the public from a determined Dan Carpenter who doesn't take his meds and who continues to conduct himself as he has over these years." *See* Sen. Tr. 184. Here, Carpenter has been incarcerated for just over twelve months, serving only forty percent of his sentence. Accordingly, the government submits that a reduction in his sentence to home confinement will not reflect the seriousness of the offense or promote respect for the law.

## III.  Conclusion

Carpenter has failed to carry his burden to show that he has exhausted his administrative rights or to demonstrate extraordinary and compelling circumstances warranting release based on COVID-19 concerns. Importantly, he has not presented the Court with the individualized assessment that it requested when it denied his original motion for release. In any event, Carpenter's risk factors are not particularly unique, he has presented only suspicions of diabetes, not a confirmed diagnosis for which he is being treated, and he has failed to show that BOP's comprehensive preventative measures have not been effective at MDC.  Finally, he fails to show why release is warranted under the 3553(a) factors. Accordingly, Carpenter's request for compassionate release based on COVID-19 concerns should be denied.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ Neeraj N. Patel
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

/s/ David E. Novick
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: David.Novick@usdoj.gov

CERTIFICATION OF SERVICE

      This is to certify that on April 9, 2020 a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

    /s/ Neeraj N. Patel
    NEERAJ N. PATEL
    ASSISTANT UNITED STATES ATTORNEY