### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
| | ) | |
| v. | ) | |
| | ) | February 2, 2021 |
| DANIEL E. CARPENTER | ) | |

**MEMORANDUM IN SUPPORT OF PETITION FOR RELEASE OF GRAND JURY MINUTES FOR BOTH THE ORIGINAL INDICTMENT OF DECEMBER 12, 2013 AND THE SUPERSEDING INDICTMENT OF MAY 14, 2014 PURSUANT TO FED. R. CRIM. P. RULE 6(e)(3)(E)(ii)**

Petitioner is respectfully requesting a copy of the Grand Jury transcripts that led to both Indictments, because he believes it will expose substantial constitutional violations by the Government in the prosecution of this case. Because Petitioner has already been tried, sentenced, and has served the majority of his sentence, none of the traditional reasons for protecting the secrecy of the Grand Jury transcripts exist, and the exception to the normal secrecy of the Grand Jury transcripts is now secondary to the needs of Petitioner pursuant to Rule 6(e)(3)(E)(ii).

**NO ORAL ARGUMENT REQUESTED**

1

## PRELIMINARY STATEMENT

Petitioner needs to learn the identity of the person who created the lie that the Government continues to repeat. Someone lied to the Grand Juries that the Rhode Island Beach House was purchased with the proceeds of the Sash Spencer insurance policies, which is a complete falsehood. It is indisputable that the funds came from a different source, and the Government had the records of the transaction showing this fact. The Government had all of the bank records after twice seizing them, so they knew whatever the witness said to the Grand Juries regarding the use of the funds was completely false and perjurious testimony. This is not just misinformation, it is a categorical and outright lie that was presented to the Grand Juries, and the identity of this person is pertinent as to why the lie was promulgated. Moreover, Petitioner cannot be certain about who lied without this Court's assistance in providing the minutes from both Grand Jury proceedings.

Significantly, if it was one of the witnesses from Petitioner's trial, then there was also a serious *Jencks* violation in this case as well that would require dismissal of the Indictment as well as a Due Process violation for lying to the Grand Juries. If for no other reason than this, the Court should release the Grand Jury transcripts to Petitioner immediately so that he may prepare his new Motion to Dismiss Both Indictments due to egregious prosecutorial misconduct. As the Government should now realize that Petitioner is proceeding *pro se*, it should not have any objections to releasing the Grand Jury transcripts at this time if it truly has nothing to hide.

## I.    LEGAL STANDARD

A defendant demonstrates a particularized need under Rule 6(e)(3)(E)(i) when he shows that "the material [he] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [his] request is structured to cover only material so needed." *See United States v. Teman*, 465 F.Supp.3d 277, 301-02 (S.D.N.Y. 2020), *citing Douglas Oil*, 441 U.S. 211, 222 (1979). Rule 6(e)(3)(E)(ii) permits limited disclosure of information in this category. It allows for disclosure "at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." F.R.C.P. 6(3)(E)(ii).

In order to invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *See United States v. Lauria*, 2020 WL 5743523, at *16 (S.D.N.Y. Sept. 25, 2020), *citing United States v. Dunn*, 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005). While "grand jury proceedings are subject to strict secrecy requirements" *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991), that secrecy is not absolute."

Therefore, "the standard for dismissing an indictment is relevant to the standard for disclosure of grand jury materials." Courts may "dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46 (1992).

The Government has an obligation to disclose exculpatory material, or material favorable to an accused as to either guilt or punishment, even when no affirmative request has been made. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Material "favorable to an accused" includes not only evidence that affirmatively tends to exculpate the defendant, but also information that impeaches the credibility of Government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). The test for materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Evidence may be material for *Brady* purposes even if it is not admissible, as long as it could lead to the discovery of admissible evidence. *See United States v. Gerace*, 2020 WL 4227990, at *8 (W.D.N.Y. June 26, 2020), *citing United States v. Gill*, 297 F.3d 93, 104 (2d Cir. 2002).

Notwithstanding this material, a defendant is not entitled to inspect grand jury minutes and evidence without producing "concrete allegations of government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994). *See, also, United States v. Ulbricht*, 858 F.3d 71, 106-07 (2d Cir. 2017)(to be entitled to disclosure of grand jury proceedings, a defendant must show a particularized need that outweighs the strong government and public policy interests in the secrecy of grand jury proceedings); *United States v. Ayeki*, 289 F. Supp. 2d 183, 186 (D. Conn. 2003) ("grand jury proceedings carry a presumption of regularity, and a review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct.").

A prosecutor may not mislead a grand jury by knowingly presenting false evidence. *See United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983); *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979). Thus, "in cases where over-zealous prosecutors have manipulated a grand jury by willfully misleading it or knowingly presenting false evidence, courts have not

hesitated to exercise their power to dismiss indictments." *United States v. Rankin*, 422 F. Supp. 3d 564, 587-88 (D. Conn. 2019), *citing United States v. Udziela*, 671 F.2d 995, 998 (7th Cir. 1982) (collecting cases). Clearly, Petitioner has satisfied his burden that the Government is guilty of egregious prosecutorial misconduct that will obviously be of a constitutional magnitude.

Since the standard for dismissing an indictment is relevant to the standard for disclosure of Grand Jury materials, it should be a matter of fairness and full disclosure to grant this Petition and order the Clerk to send a copy of both Grand Jury transcripts to Petitioner by mail. At this point in the investigation, the only reason for the Government to object is because they have something to hide, as Petitioner has already discovered enough evidence on his own to warrant this Court to dismiss the Indictment for outrageous prosecutorial misconduct.

## II.    THE GRAND JURY TRANSCRIPTS ARE NECESSARY TO SHOW PROSECUTORIAL MISCONDUCT

Petitioner does not know who testified about the Rhode Island Beach House to the Grand Jury, but the Transcripts are necessary to find out where this demonstrably false information originated, especially if the Government suggested to the Grand Jury that Petitioner stole the funds to buy the Beach House. After all, it is indisputable that the Government lied because they twice seized the bank records, which clearly showed the money did not come from the Sash Spencer proceeds because that claim was not included in the Original Indictment of December 12, 2013, and instead was only included in the Superseding Indictment of May 14, 2014 in paragraph 133. See Superseding Indictment of May 14, 2014 attached as Exhibit One. Whoever testified to that clearly erroneous information presented false evidence to the Grand Jury to support the claim that the death proceeds were used to purchase the home in Rhode Island, even though the bank records and transfers in the Government's possession at the time prove just the opposite.

The Government clearly could not find a crime cognizable under the Federal Fraud statutes after reviewing the unlawfully seized documents, and therefore took its cues from Universitas in order to manufacture an alleged offense that could poison a Grand Jury against Petitioner. See, e.g., USDOJ Press Release for the Original Indictment attached as Exhibit Two with no mention of the Rhode Island Beach House. In fact, and contrary to the truth, the Press Release for the Superseding Indictment distinctly mentions the purchase of the Beach House as if it were the heart of the crime. See USDOJ Press Release for the Superseding Indictment attached as Exhibit Three. Someone must have lied to the Grand Jury about the source of funds to purchase the Beach House, and the Government knew the truth from the bank records and personal documents that it had unlawfully seized. Because the Government knowingly presented false evidence to the Grand Jury, the Indictment must be dismissed as a matter of law and this Court should grant Petitioner's Motion to receive a copy of the Grand Jury Transcripts.

It should be noted that the Beach House in Rhode Island was mentioned again in the Press Release describing the Verdict. See attached as Exhibit Four, the USDOJ Press Release of June 9, 2016 describing the Court's Verdict. Similarly, two and a half years later, the Government once again mentions the Beach House in describing Petitioner's sentencing. See attached as Exhibit Five, a copy of the USDOJ Press Release of December 3, 2018. Similarly, the Government mentioned the Rhode Island Beach House again in its request for a light sentence for cooperating witness Ed Waesche. See Govt. Motion for Downward Departure filed July 1, 2019, Dkt. #44 (Case No. 13-cr-00224) at page 9, attached as Exhibit Six. Clearly, there was no reason to mention the purchase of the Rhode Island Beach House unless it was part of the Government's conspiracy with Universitas with the spurious claim that Petitioner "stole" the Sash Spencer proceeds to buy the Rhode Island Beach House.

Significantly, Universitas sued TD Bank in 2015 in the Southern District of New York a year after the Superseding Indictment on behalf of the Charter Oak Trust despite the fact that Wayne Bursey had died and Petitioner was in prison. There is absolutely no mention of the Beach House in Rhode Island in Judge Scheindlin's December 2015 dismissal of the Universitas claims against TD Bank. See Judge Scheindlin's Order attached as Exhibit Seven. Judge Scheindlin based her decision largely on the timing of events in Sharon Seibert's Affidavit of March 24, 2011, where there is also no mention of Petitioner or the Rhode Island Beach House. See Seibert Affidavit of 2011 attached as Exhibit Eight.

The purchase of the Beach House, however, is not the only example of the lies told at Petitioner's trial and apparently to the Grand Jury as well. The Court also quoted Mr. Cherneski in the Verdict as having seen the Charter Oak Trust plan document after it was amended. Mr. Cherneski, however, never testified to the date of the amendment. Now, it turns out that we have proof that the Charter Oak Trust Plan Document was amended in January of 2007 from the Affidavit submitted by Sharon Siebert in September 2019 in the Universitas claim against Jack Robinson's estate. See Exhibit Nine, paragraph 13. Once again, this also calls into question who told the Grand Jury about the alleged amendment to the Trust after Sash Spencer's death, or the use of those proceeds to purchase the Rhode Island Beach House. If it was Stefan Cherneski, Jenny Valedaserra, Agent Lynn Allen, or Ed Waesche, then there was clearly a major *Jencks* violation in this case that would automatically result in the dismissal of the Superseding Indictment either by this Court, or eventually by the Second Circuit.

If it was Mr. Cherneski, then this Court must also review the *Brady-Jencks-Giglio* statement given by Mr. Cherneski to federal agents during the raid of April 20, 2010, which was never provided to Petitioner or his defense team by the Government, and which Petitioner did not

receive until August of 2017 in the civil litigation involving the search warrants of this case that is still ongoing. See the Cherneski *Jencks* Statement attached as Exhibit Ten. Even a cursory glance at the Cherneski *Jencks* Statement will show this Court that it not only disputes Mr. Cherneski's own testimony at Petitioner's trial, but it also calls into question much of this Court's Verdict, especially when the Court quotes Mr. Cherneski. So, if one piece of evidence crumbles, then it necessarily brings down Petitioner's entire Verdict like a house of cards. Once again, Petitioner does not know if Mr. Cherneski testified before the Grand Jury; but if he did, then the chances are overwhelming that he knowingly presented perjurious testimony to protect himself and his wife, Jenny Valedaserra, from prosecution. We do not know who told the Grand Jury about the "home in Rhode Island," but whoever it was lied, and the Government knew it.

Moreover, if the lying witness was any of the witnesses that testified at Petitioner's trial, then there is a major *Jencks* violation that warrants the dismissal of the Superseding Indictment. Perhaps the greatest perjurer at the trial was Ed Waesche, who even admitted that he committed perjury during a lawsuit with Penn Mutual (who was suing Mr. Waesche in 2011). But, that case was also in front of this Court in 2011 and was assigned to Magistrate Judge Holly Fitzsimmons to mediate. In that mediation, it was Petitioner who proved and convinced Penn Mutual that there was no fraud in the Charter Oak Trust, which led to Magistrate Judge Fitzsimmons mediating that Penn Mutual pay a large sum of money to the Charter Oak Trust to rescind the policy at issue in that case in 2011.

Furthermore, another reason the Government should have known that the Beach House being purchased with allegedly "ill-gotten" gains was a lie was because during Petitioner's trial in 2016, Universitas was suing Christiana Bank in front of the Honorable Vanessa Bryant. See attached as Exhibit Eleven Judge Bryant's March 3, 2017 denial of WSFS/Christiana Bank's

motion for reconsideration where there is no discussion about Petitioner buying the Beach House with the Sash Spencer death proceeds. Moreover, if Petitioner truly was a thief, then why would WSFS and Christiana Bank be responsible for paying any money at all to Universitas, much less the $12 million that negates the debt allegedly owed by Carpenter Financial Group, Inc. in the Charging Order case? See emails submitted in Case No. 14-mc-00125.

### III.    THE GOVERNMENT COMMITTED CLEAR ERROR

More importantly, the Grand Jury minutes are also crucial to determine what **elements** of what crime the Government actually accused Petitioner of **knowingly** committing. The Government committed clear error because it could not know the future rulings of the Second Circuit as to Mail and Wire Fraud as determined in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) and *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017). Certainly, the Government could not state the rules pertaining to the "right to control" theory of fraud as updated in *Kelly v. United States*, 140 S.Ct. 1565 (2020).

The fraud the Government accused Petitioner of (and that the Court repeated in the Verdict), was that he did not disclose any of the Collateral Split-Dollar Documents to Lincoln. This is another lie, because Petitioner gave all of the documents to every Lincoln agent and broker involved, including Bruce Mactas, Charlie Induddi-Westcott, and especially Ed Waesche who admitted to lying on the documents he filled out for the Charter Oak Trust and Grist Mill Capital. Therefore, as was made clear in the Supreme Court's decision in *Stipcich v. Metropolitan Life*, 277 U.S. 311, 320-21 (1928) ("knowledge of the agent is the knowledge of the carrier"). Therefore, despite what the Court said in the Verdict, *the agents of Lincoln all knew about the Grist Mill Capital documents that they had to have their clients fill out, as did Lincoln*. Moreover, those documents prove that Petitioner's company, Grist Mill Capital, was a fully-secured creditor of all

the policies including the Sash Spencer policies, meaning that the public UCC filings on all of the insurance policies belie the Verdict's claim that Petitioner did not disclose the source of the funding of the policies. Additionally, after the Supreme Court's unanimous decision in *Skilling v. United States*, 561 U.S. 358 (2010), "[N]ondisclosure is outside the bounds of the fraud statutes." *Id.* at 410. So, if that is what the Government claimed was the crime to the Grand Jury, then they failed to describe a federal crime in May of 2014 and the Indictment must be dismissed. Since Petitioner clearly satisfies his burden to dismiss the Indictment, it is axiomatic that he has satisfied his burden of having access to the Grand Jury transcripts as provided by Rule 6(e)(3)(E)(ii).

In addition, knowing who told the lie to the Grand Jury is critical because not only did the Government or a Government witness lie to the Grand Jury, they also lied to the Court, which was the trier of fact in this case. The Grand Jury transcripts will show just how badly the Government lied during the trial as well as the Grand Jury proceedings, and then the Court can determine for itself the appropriate remedy for all of these lies. But, if the transcripts show that Agent Allen, Mr. Cherneski, or Mr. Waesche testified, then the Government is also guilty of an egregious *Jencks* 18 U.S.C. §3500 violation, which will effectively require that Petitioner's Superseding Indictment be dismissed by this Court as well.

IV.    **THE DESCRIPTION OF THE SASH SPENCER POLICIES IN THE VERDICT CONFLICTS WITH THE AFFIDAVITS SUBMITTED BY SHARON SIEBERT OF UNIVERSITAS**

This is what the Court had to say about the Sash Spencer policies in its Verdict against

Petitioner:

The Sash Spencer Policies

"Two policies on the life of COT insured Sash Spencer require separate discussion because they provide the basis for the charges of money laundering and illegal monetary transactions in the Superseding Indictment. Mr. Spencer founded a successful investment company called Holding Capital Group. See Gov't Ex. 2031 at 2. His case was one of the first pitched to Ridgewood, and his two Lincoln policies were the first to be placed in COT. See Gov't Ex. 1 at 1. The two policies, which were issued on the same day, had face values of $10 million and $20 million, providing a total death benefit of $30 million. The applications for both policies contained the types of material misrepresentations described above. **And because both policies were funded by Ridgewood, they went through the usual funding process.**

Mr. Spencer died in June 2008, within the two-year contestability period. Six days later, Lincoln received two death claims from COT signed by Mr. Bursey. As was its practice when dealing with claims within the contestability period, Lincoln began an investigation. One of the investigators was Ken Elder. Mr. Elder hired an investigation firm, ICS Merrill, to assist in gathering documents and conducting interviews. ICS Merill interviewed Mr. Spencer's widow, Mary Spencer. **The interview proved to be unhelpful to Lincoln because she was not well informed regarding her husband's life insurance policies.**

Lincoln also requested documents from COT concerning its relationship with Mr. Spencer. Though COT provided a number of documents, none was provided that might have raised concerns about the source of the premiums. **For example, COT failed to provide the Collateral Assignment Agreement, GMC's agreement with Ridgewood, or any of the documentary evidence related to the manner in which the policies were funded. In the absence of those documents, Lincoln could mistakenly conclude that the premiums had been paid by Mr. Spencer's employer.** [*Once again, this is clearly untrue, because Ken Elder testified at trial about a 90-minute phone call with Petitioner in April of 2009 where they learned everything about the Charter Oak Trust and were allowed to ask many questions. They then approved the documentation for the new Charter Oak Trust 2009. Lincoln also had these documents from their officers like Charlie Induddi-Westcott and their brokers like Bruce Mactas.*]

Despite a lengthy investigation, Lincoln was unable to determine that the two policies were procured for sale on the secondary market. In the meantime, Mr. Bursey had admonished Lincoln that the trust had a "fiduciary duty to pay death benefits to the Participant's designated beneficiary." Ultimately, Lincoln issued two checks to COT totaling

11

$30,677,276.75, representing the proceeds of the two policies plus interest. The designated beneficiary of Mr. Spencer's two policies **was Universitas Education, LLC, a non-profit organization providing scholarships to underprivileged students**. [*Once again, this is clearly another lie that has been disproven by Sharon Siebert's September 2019 Affidavit.*]

Not long after learning that Lincoln had issued the checks, the defendant made some initial calculations regarding the amount of the total death benefit to which Universitas was entitled. Though his handwritten calculations are not entirely clear, it appears he was thinking about paying Universitas approximately $19 million. **As explained below, however, Universitas received nothing.... Litigation ensued and Universitas lost.** As a result, no payment was made to Universitas notwithstanding Mr. Bursey's admonition to Lincoln that COT had a fiduciary duty to pay the death benefits to Mr. Spencer's designated beneficiary." *United States v. Carpenter*, 190 F. Supp. 3d 260, 292-95 (D. Conn. 2016).

Therefore, the Court in its Verdict basically described all of the litigation that was going on at the time, and the Court clearly says that "**Litigation ensued and Universitas lost.**" This is significant not only because the claim had been denied, but also because Universitas had lost in trying to collect the claim in 2009, and then in an act of desperation sued TD Bank "*for the benefit of the Charter Oak Trust*" without anyone at Nova Benefits or the Charter Oak Trust approving the lawsuit. This lawsuit was brought in the Southern District of New York without the knowledge of anyone at the Charter Oak Trust, and certainly without Petitioner's knowledge or approval. The Honorable Judge Shira Scheindlin summarily dismissed all of the Universitas claims as untimely.

As the Court knows, Petitioner was in prison in 2015 and at the time of his trial in 2016 and Mr. Bursey had died in March of 2015, and now without having Petitioner or Mr. Bursey's permission, Universitas brought an action in the Southern District of New York against TD Bank allegedly on behalf of the Charter Oak Trust, which Judge Scheindlin dismissed as untimely due to the three-year Statute of Limitations. This is another critical reason why Petitioner needs to secure a copy of the Grand Jury transcript minutes, because this lawsuit allegedly on behalf of the Charter Oak Trust was filed more than a year after the Grand Jury of May 2014, and yet does not speak of Petitioner stealing the money to buy the Beach House. Therefore, it is essential to find

out who the individual was that mentioned this patently false accusation that the Grand Jury could easily have mistaken to be the true "crime" in this case rather than the complicated and incorrect nondisclosure theory of fraud.

Even more significant is the fact that in September 2019 in suing the estate of Jack Robinson, Ms. Seibert says she knew that the Charter Oak Trust Agreement Section 6.01 was modified in January 2007 to withhold 20% of the insurance proceeds for the Trust's benefit, which means the Court might have to review the fact that if the Charter Oak Trust document was really modified as Petitioner testified to in January of 2007, those are probably also grounds to vacate Petitioner's conviction in and of itself when Petitioner eventually files his future 2255 Petition. More importantly, for the purposes of this Petition, the Court stated in the Verdict that Stefan Cherneski said he knew the documents had been modified but did not specify a date. However, when Sash Spencer died in June of 2008, Petitioner was on trial in Boston. But, this is what the Court says about the negotiations with Universitas in 2009: "It looked like Petitioner was willing to pay them $19,800,000." See the copy of the May 26, 2009 email from Petitioner submitted to the Court to dissolve the Charging Order.

As Judge Scheindlin realized from the filings that were submitted in October 2015 that in October of 2009 Mr. Bursey paid $19.8 million to Petitioner's company Grist Mill Capital, and therefore it certainly was not going to be paid to Universitas, because as the Court recognized in the Verdict, Petitioner's company Grist Mill Capital was not only a secured creditor of the Trust, it was always the original beneficiary of the Sash Spencer Policies. See Sash Spencer Beneficiary Designation Form attached as Exhibit Twelve. The $19.8 million that was calculated by Petitioner in the May 26, 2009 email was now paid to Grist Mill Capital as a secured creditor, and because the Universitas claim had been denied and Grist Mill Capital was owed more than $60 million at

the time because, as this Court states in its Verdict, Grist Mill Capital was the entity that borrowed money from Ridgewood to fund the policies in the Charter Oak Trust. Once again, this was a well-documented creditor relationship, and not a theft of funds to buy a Beach House as has been repeatedly and erroneously claimed by the Government in various filings. Since the evidence clearly shows that the original and **only** beneficiary of the Sash Spencer proceeds was Grist Mill Capital, the Government's entire theory of the case as reported in its various press releases is just a pack of lies formulated by the Government when it discovered that it did not have a traditional Mail and Wire Fraud case after the Supreme Court's decision in *Skilling* that "[N]ondisclosure is outside the bounds of the fraud statutes." *Id.* at 410.

Furthermore, the Government needed to create a convincing lie to justify the huge expense of the SIG-TARP investigation in this case and the two commando raids on 100 Grist Mill Road in April of 2010 and May of 2011. After reviewing the evidence in this case for four years, it was necessary to make up an entirely new and false narrative to secure an indictment against an innocent man. If for no other reason than that, turning over the Grand Jury transcripts is warranted in this case. Petitioner also needs the Grand Jury transcripts to see if the clearly exculpatory evidence in this case was presented to the Grand Jury as is required by law.

Therefore, Petitioner respectfully requests that this Court have the Clerk immediately send Petitioner a copy of both Grand Jury transcripts that led to the Original and Superseding Indictments by mail so that he may prepare his motion to dismiss the Superseding Indictment for egregious prosecutorial misconduct.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

**NO ORAL ARGUMENT REQUESTED**