# EXHIBIT ONE

**Superseding Indictment of May 14, 2014 with  Paragraph 133 Mentioning Sash Spencer Insurance Proceeds and Purchase of Home in Rhode Island**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
H-13-1

UNITED STATES OF AMERICA

v.

DANIEL CARPENTER and
WAYNE BURSEY

CRIMINAL NO. 3:13CR226 (RNC)

VIOLATION:

18 U.S.C. § 1349 (Conspiracy to Commit
Mail and Wire Fraud)
18 U.S.C. § 1343 (Wire Fraud)
18 U.S.C. § 1341 (Mail Fraud)
18 U.S.C. § 1956(h) (Conspiracy to
Commit Money Laundering)
18 U.S.C. § 1957 (Illegal Monetary
Transactions)
18 U.S.C. § 1956 (a)(1)(A)(i) (Money
Laundering)
18 U.S.C. § 2 (Aiding and Abetting)

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

### The Defendant and Relevant Entities

At all times relevant, unless otherwise specified:

1.      The Subject Entities were a group of related businesses operating principally from

Simsbury, Connecticut (the "Simsbury Office"), and/or Stamford, Connecticut (the "Stamford

Office"), that were primarily engaged in the business of, among other things, designing,

installing, marketing, selling, and administering employee welfare benefit plans.

2.      Defendant DANIEL CARPENTER ("CARPENTER") was in control of the

Subject Entities both in effect and, in many cases, through direct or indirect ownership interests.

CARPENTER maintained his principal place of business at the Simsbury Office.

3.      Defendant WAYNE BURSEY ("BURSEY") worked for and on behalf of the

insurance premiums on Trust-owned policies; rather, it was set up specifically to receive the death benefit funds.

132.    As the beneficiary of SI-13's participation in the Trust, the SI-13 charity requested payment of the death benefit funds from the Trust (the "SI-13 charity death claim"). However, on October 2, 2009, the Subject Entities denied the SI-13 charity death claim.

133.    Beginning on May 21, 2009, the defendants and others working with the defendants transferred the death benefit funds to several different places, but in no instance did they provide any of the death benefit funds to SI-13's beneficiary, the SI-13 charity. Instead, the defendants used the death benefit funds to pay for, among other things, various Trust-related insurance premiums, other insurance premiums, and a home in Rhode Island. The death benefit funds were passed through various bank accounts controlled by CARPENTER and/or BURSEY, and others working for or with the defendants. Some of those bank accounts are described below.

Background on Bank Accounts

134.    The defendants and their co-conspirators utilized several different bank accounts to receive and disburse the death benefit funds. These bank accounts were in the names of the Trust, the Funding Entities, another welfare benefit trust operated by the Subject Entities ("Trust-2"), and other business organizations owned and/or controlled by CARPENTER and other co-conspirators, including entities referred to herein as Business Organization 1 ("BO-1") through Business Organization 4 ("BO-4"). Authorized signers on these bank accounts include the defendants, CARPENTER's assistant ("CA-1"), a relative of CARPENTER ("CR-1"), and another employee of the Subject Entities ("SEE-1"). These bank accounts were held at financial institutions that are engaged in, and the activities of which affect, interstate and foreign

# EXHIBIT TWO

**USDOJ Press Release of January 3, 2014 Describing Original Indictment with no Mention of Sash Spencer Proceeds or Beach House**

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE                                                    Friday, January 3, 2014

# Two Indicted In Stranger- Originated Life Insurance Scheme

Follow @USAO_CT

Deirdre M. Daly, United States Attorney for the District of Connecticut, Cheryl Garcia, Acting Special Agent-in-Charge, U.S. Department of Labor – Office of Inspector General, Susan A. Hensley, Regional Director, U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and Christy Romero, Special Inspector General for the Troubled Asset Relief Program (SIGTARP), todayannounced that a federal grand jury in Hartford has returned a 33-count indictment charging **DANIEL CARPENTER**, 59, of Simsbury, and **WAYNE BURSEY**, 63, of Bloomfield, with wire fraud, mail fraud and conspiracy offenses stemming from a scheme to defraud insurance companies into issuing insurance policies on the lives of elderly people for the benefit of the defendants and other investors, also known as a stranger-originated life insurance scheme.  The indictment was returned on December 12, 2013, and unsealed on December 30.

According to the indictment, CARPENTER and BURSEY ran a series of companies, based in Simsbury and Stamford, that developed an employee welfare benefit plan and trust (the "Trust") whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by the defendants and others as investments, or resold on the life settlement market, which is a third-party market for life insurance policies.  Typically, insurance agents working with, for, or on behalf of the defendants approached individuals who were over the age of 70 (the "Straw Insureds").  The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market.  In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds.  In other cases, the Straw Insureds were offered a cash inducement up front to participate.

The indictment alleges that CARPENTER and BURSEY, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs.  All applications were signed by BURSEY, who acted as trustee of the Trust, which was to be the "owner" of all policies in the Trust.  Moreover, the applications purported that the Trust was a bona fide welfare benefit trust under Internal Revenue Code Section 419(e), wherein employers would be making

contributions to the Trust in order to fund the life insurance policies for the benefit of certain select employees.

The indictment further alleges that, in truth, no "employer" or Straw Insured ever paid a premium into the Trust, and the premiums were funded by loans, which typically came to the Trust from another company headquartered in Simsbury and controlled by CARPENTER.  In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford.  The loan arrangements were withheld from the insurance providers, who would likely not have issued policies had they known the true nature of the Trust, and had the insurance applications been filled out truthfully.

CARPENTER and BURSEY are scheduled to be arraigned on January 17 before U.S. Magistrate Judge Donna F. Martinez in Hartford.

If convicted, CARPENTER and BURSEYface a maximum term of imprisonment of 20 years on each count of wire fraud and mail fraud.

This case is assigned to U.S. District Judge Robert N. Chatigny in Hartford.

This matter is being investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program.  The case is being prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

**PUBLIC AFFAIRS CONTACT:**

**U.S. ATTORNEY'S OFFICE**
Tom Carson
(203) 821-3722
thomas.carson@usdoj.gov

---

**Component(s):**
USAO - Connecticut

Updated March 18, 2015

# EXHIBIT THREE

**USDOJ Press Release of May 27, 2014 Stating that the Sash Spencer Proceeds were used to Purchase a Beach House**

 United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE                                    Tuesday, May 27, 2014

## Two Connecticut Men Face Additional Charges Related To Stranger-originated Life Insurance Scheme

Follow @USAO_CT

Deirdre M. Daly, United States Attorney for the District of Connecticut, Cheryl Garcia, Acting Special Agent-in-Charge, U.S. Department of Labor – Office of Inspector General, Susan A. Hensley, Regional Director, U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and Christy Romero, Special Inspector General for the Troubled Asset Relief Program (SIGTARP), todayannounced that **DANIEL CARPENTER**, 60, of Simsbury, and **WAYNE BURSEY**, 63, of Bloomfield, have been charged in a 57-count superseding indictment with various conspiracy, fraud and illegal monetary offenses stemming from a scheme to defraud insurance companies into issuing insurance policies on the lives of elderly people for the benefit of the defendants and other investors, also known as a stranger-originated life insurance scheme.

In December 2013, CARPENTER and BURSEY were charged in a 33-count indictment with conspiracy to commit mail and wire fraud, and multiple wire fraud and mail fraud offenses. The superseding indictment, which was returned by a grand jury in Hartford on May 14, 2014, adds one count of conspiracy to commit money laundering, 10 counts of money laundering, and 13 counts of making illegal monetary transactions.

CARPENTER appeared today before U.S. Magistrate Judge Donna F. Martinez in Hartford and entered a plea of not guilty to the charges. BURSEY's arraignment is not yet scheduled.

According to the superseding indictment, CARPENTER and BURSEY ran a series of companies, based in Simsbury and Stamford, that developed an employee welfare benefit plan and trust (the "Trust") whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by the defendants and others as investments, or resold on the life settlement market, which is a third-party market for life insurance policies. Typically, insurance agents working with, for, or on behalf of the defendants approached individuals who were over the age of 70 (the "Straw Insureds"). The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market. In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds. In other cases, the Straw Insureds were offered a cash inducement up front to participate.

The indictment alleges that CARPENTER and BURSEY, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs.  All applications were signed by BURSEY, who acted as trustee of the Trust, which was to be the "owner" of all policies in the Trust.  Moreover, the applications purported that the Trust was a bona fide welfare benefit trust under Internal Revenue Code Section 419(e), wherein employers would be making contributions to the Trust in order to fund the life insurance policies for the benefit of certain select employees.

The indictment further alleges that, in truth, no "employer" or Straw Insured ever paid a premium into the Trust, and the premiums were funded by loans, which typically came to the Trust from another company headquartered in Simsbury and controlled by CARPENTER.  In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford.  The loan arrangements were withheld from the insurance providers, who would likely not have issued policies had they known the true nature of the Trust, and had the insurance applications been filled out truthfully.

The indictment further alleges that one Straw Insured died within the first two years of the issuance of the two insurance policies on his life.  Those policies had been issued in late 2006 and early 2007 based on misrepresentations similar to those described above, specifically that his policies were not being funded by a third party and were not intended for resale.  The two insurance policies had a combined death benefit of $30 million, which the insurer paid to the Trust in May 2009, in part based upon further misrepresentations made by CARPENTER, BURSEY and others.  According to the indictment, the Trust, directed by CARPENTER and BURSEY and others, failed to pay the $30 million to the Straw Insured's beneficiary, and instead used the funds to pay for various expenses, including other insurance premiums that were related to the underlying fraud, as well as to purchase a home in Rhode Island.

If convicted, CARPENTER and BURSEYface a maximum term of imprisonment of 20 years on each count of wire fraud and mail fraud, a maximum term of imprisonment of 20 years of each count of money laundering and conspiracy to commit money laundering, and a maximum term of imprisonment of 10 years on each count of making illegal monetary transactions.

This case is assigned to U.S. District Judge Robert N. Chatigny in Hartford.

This matter is being investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program.  The case is being prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

**PUBLIC AFFAIRS CONTACT:**

**U.S. ATTORNEY'S OFFICE**
Tom Carson
(203) 821-3722
thomas.carson@usdoj.gov

---

**Component(s):**
USAO - Connecticut

Updated March 18, 2015

# EXHIBIT
# FOUR

**USDOJ Press Release of
June 9, 2016 Announcing
Verdict of June 6, 2016**

 United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE                                    Thursday, June 9, 2016

## Connecticut Man Found Guilty in Multimillion Dollar Stranger-Originated Life Insurance Scheme

Deirdre M. Daly, United States Attorney for the District of Connecticut, Jonathan Mellone, Acting Special Agent-in-Charge, U.S. Department of Labor – Office of Inspector General, Susan A. Hensley, Regional Director, U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and Christy Romero, Special Inspector General for the Troubled Asset Relief Program (SIGTARP), today announced that U.S. District Judge Robert N. Chatigny has found **DANIEL CARPENTER**, 62, formerly of Simsbury, guilty of 57 counts of conspiracy, mail and wire fraud, money laundering and illegal monetary transaction offenses stemming from a scheme to defraud insurance companies into issuing insurance policies on the lives of elderly people for the benefit of the defendant and other investors, also known as a stranger-originated life insurance scheme.

The verdict follows a five-week long bench trial before Judge Chatigny in Hartford that began on February 16, 2016 and concluded on March 21, 2016.  CARPENTER had waived his right to a trial by jury.

According to the evidence at trial, CARPENTER controlled a series of companies, based in Simsbury and Stamford, that developed the Charter Oak Trust (the "Trust"), an employee welfare benefit plan and trust whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by CARPENTER's companies as investments, or resold on the life settlement market, which is a third-party market for life insurance policies.  Typically, insurance agents working with, for, or on behalf of CARPENTER and his companies approached elderly individuals (the "Straw Insureds").  The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market.  In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds.

The evidence at trial established that CARPENTER, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs.  All applications were signed by CARPENTER's brother-in-law, who acted as trustee of the Charter Oak Trust, which was to be the "owner" of all policies in the trust.  Moreover, the applications purported that the Charter Oak Trust was a bona fide welfare benefit trust under Internal Revenue Code

Section 419(e), wherein employers would be making contributions to the Charter Oak Trust in order to fund the life insurance policies for the benefit of certain select employees.

The evidence further established that, in truth, no "employer" or Straw Insured ever paid a premium into the Charter Oak Trust.  Rather, the premiums were funded by loans primarily from another company headquartered in Simsbury and controlled by CARPENTER.  In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford.  The loan arrangements were withheld from the insurance providers, who would not have issued policies had they known the true nature of the Charter Oak Trust, and had the insurance applications been filled out truthfully.

Based on the false applications that were submitted to the insurance providers, the Charter Oak Trust procured 84 insurance policies that had a total aggregate death benefit of more than $459 million on the lives of 76 different Straw Insureds.  In addition, another company controlled by CARPENTER received more than $12 million in commissions from the insurance providers, who would not have paid the commissions had they known about the false representations on the insurance applications and the true nature of the Charter Oak Trust.

Finally, the trial evidence showed that one Straw Insured died within the first two years of the issuance of the two insurance policies on his life.  Those policies had been issued in late 2006 and early 2007 based on misrepresentations similar to those described above, specifically that his policies were not being funded by a third party and were not intended for resale.  The two insurance policies had a combined death benefit of $30 million, which the insurer paid to the Charter Oak Trust in May 2009.  At CARPENTER's direction, the Charter Oak Trust failed to pay the $30 million to the Straw Insured's beneficiary, and instead used the funds to pay for various expenses, including other insurance premiums that were related to the underlying fraud, as well as to purchase a home in Rhode Island.

Judge Chatigny has scheduled sentencing for August 26, 2016, at which time CARPENTER faces a maximum term of imprisonment of 20 years on each count of mail and wire fraud and conspiracy to commit mail and wire fraud, a maximum term of imprisonment of 20 years on each count of money laundering and conspiracy to commit money laundering, and a maximum term of imprisonment of 10 years on each count of making illegal monetary transactions.

CARPENTER is currently serving a 36-month term of imprisonment for a previous mail and wire fraud conviction in the District of Massachusetts.

This matter is being investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program.  The case is being prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

---

**Component(s):**
<u>USAO - Connecticut</u>

Updated June 9, 2016

# EXHIBIT
# FIVE

**USDOJ Press Release of December 3, 2018 after Sentencing and Mentioning the Beach House**

 United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

DISTRICT *of* CONNECTICUT

U.S. Attorneys » District of Connecticut » News And Press Releases

**Department of Justice**

U.S. Attorney's Office

District of Connecticut

FOR IMMEDIATE RELEASE                                      Monday, December 3, 2018

## Simsbury Man Sentenced to Prison for Multimillion Dollar Stranger-Originated Life Insurance Scheme

John H. Durham, United States Attorney for the District of Connecticut, announced that DANIEL CARPENTER, 64, of Simsbury, was sentenced today by U.S. District Judge Robert N. Chatigny in Hartford to 30 months of imprisonment, followed by three years of supervised release, for defrauding insurance companies into issuing insurance policies on the lives of elderly people for the financial benefit of Carpenter and other investors in the scheme.

On June 9, 2016, Judge Chatigny found Carpenter guilty of 57 counts of conspiracy, mail and wire fraud, money laundering and illegal monetary transaction offenses stemming from the scheme, also known as a stranger-originated life insurance scheme. The verdict followed a bench trial that began on February 16, 2016 and concluded on March 21, 2016. Carpenter had waived his right to a trial by jury.

According to the evidence at trial, Carpenter controlled a series of companies, based in Simsbury and Stamford, that developed the Charter Oak Trust (the "Trust"), an employee welfare benefit plan and trust whose primary objective was to secure insurance policies on the lives of elderly individuals that could be held by Carpenter's companies as investments, or resold on the life settlement market, which is a third-party market for life insurance policies. Typically, insurance agents working with, for, or on behalf of Carpenter and his companies approached elderly individuals (the "Straw Insureds"). The agents promised to provide the Straw Insureds with free life insurance for two years, and, at the end of the two years, would attempt to sell the policies on the life settlement market. In most cases, the agents promised the Straw Insureds that they would receive a portion of any sale proceeds.

The evidence at trial established that Carpenter, working with insurance agents, caused to be submitted to several insurance providers numerous insurance applications that contained several material misrepresentations, including falsely denying that third-parties were paying the premiums for the insurance, falsely denying discussions about the resale of the policies, falsely inflating the net worth and/or income of the insured, and falsely claiming that the insurance was being purchased for legitimate estate planning-related needs. All applications were signed by Carpenter's brother-in-law, who acted as trustee of the Charter Oak Trust, which was to be the "owner" of all policies in the trust. Moreover, the applications purported that the Charter Oak Trust was a bona fide welfare benefit trust under Internal Revenue Code Section 419(e), wherein employers would be making contributions to the Charter Oak Trust in order to fund the life insurance policies for the benefit of certain select employees.

The evidence further established that, in truth, no "employer" or Straw Insured ever paid a premium into the Charter Oak Trust. Rather, the premiums were funded by loans primarily from another company headquartered in Simsbury and controlled by Carpenter. In many cases, those loans were, in turn, financed by another third-party financing company based in Stamford. The loan arrangements were withheld from the insurance providers, who would not have issued policies had they known the true nature of the Charter Oak Trust, and had the insurance applications been filled out truthfully.

Based on the false applications that were submitted to the insurance providers, the Charter Oak Trust procured 84 insurance policies that had a total aggregate death benefit of more than $459 million on the lives of 76 different Straw Insureds. In addition, another company controlled by Carpenter received more than $12 million in commissions from the insurance providers, who would not have paid the commissions had they known about the false representations on the insurance applications and the true nature of the Charter Oak Trust.

Finally, the trial evidence showed that one Straw Insured died within the first two years of the issuance of the two insurance policies on his life. Those policies had been issued in late 2006 and early 2007 based on misrepresentations similar to those described above, specifically that his policies were not being funded by a third party and were not intended for resale. The two insurance policies had a combined death benefit of $30 million, which the insurer paid to the Charter Oak Trust in May 2009. At Carpenter's direction, the Charter Oak Trust failed to pay the $30 million to the Straw Insured's beneficiary, and instead used the funds to pay for various expenses, including other insurance premiums that were related to the underlying fraud, as well as to purchase a home in Rhode Island.

Judge Chatigny will issue a restitution order at a later date.

Carpenter, who is released on bond, was ordered to report to prison on March 4, 2019.

Carpenter was previously convicted in the District of Massachusetts of mail fraud and wire fraud offenses stemming from an unrelated business scheme. On February 26, 2014, he was sentenced to 36 months of imprisonment for those offenses.

This matter was investigated by the U.S. Department of Labor – Office of the Inspector General, the U.S. Department of Labor – Employee Benefits Security Administration's Boston Office, and the Special Inspector General for the Troubled Asset Relief Program. The case was prosecuted by Assistant U.S. Attorneys David E. Novick and Neeraj N. Patel.

---

**Topic(s):**
Financial Fraud

**Component(s):**
USAO - Connecticut

Updated December 3, 2018

# EXHIBIT

# SIX

**Government Motion for Downward Departure filed July 1, 2019 in *United States v. Waesche*, No. 13-cr-00224**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Redacted Version** |
| | : | |
| v. | : | Criminal No.  3:13-cr-224 (RNC) |
| | : | |
| JOSEPH EDWARD WAESCHE, IV | : | July 1, 2019 |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR DOWNWARD DEPARTURE**

The United States of America (the "Government") has filed a "substantial assistance"
motion in this case pursuant to Section 5K1.1 of the United States Sentencing Guidelines
("U.S.S.G."). The Government requests that the Court impose a fair and appropriate sentence
below the defendant's applicable guideline range because the defendant has provided substantial
assistance to the Government in the investigation or prosecution of other persons who have
committed criminal offenses.  The nature, extent, and significance of the defendant's cooperation
are detailed in this memorandum.  The Government also asks the Court to order the defendant to
pay restitution in the amount of $569,327.27.

I.      **INTRODUCTION**

A.      **Offense Conduct**

The Government agrees with the offense conduct and relevant conduct set forth in the Pre-
Sentence Report ("PSR"), which is drawn principally from the Court's Verdict and Special
Findings (hereinafter, the "Verdict") in *United States v. Daniel Carpenter*, 3:13-cr-226(RNC)
(Docket Entry # 212), the evidence adduced at Carpenter's trial, and other information obtained
during the course of the investigation.

In summary, from approximately 2006 to 2013, the defendant, Joseph Edward Waesche
IV, conspired with Daniel Carpenter, Wayne Bursey, and others to defraud life insurance

incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs.").

If, however, "more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

Here, the total actual loss (including attorney's fees and other related expenses incurred by the victims in assisting in the Government's investigation) for restitution purposes is $52,420,891.50. *See* PSR § 100. However, the Government believes that it would be inequitable to compel Mr. Waesche to make restitution in that amount to the same extent as Mr. Carpenter, who conceived of and led all aspects of the scheme.  Mr. Waesche was only involved in the issuance of nine (9) policies through Penn Mutual, eighteen (18) policies through Phoenix, and two (2) policies through Lincoln. *Id.* Phoenix and Lincoln did not suffer losses on the 20 policies on which Mr. Waesche was involved.  *Id.*  Penn Mutual suffered an actual loss (excluding fees) of approximately $490,866.27 on the policies. *Id.* In addition, Penn Mutual incurred an additional $78,461.00 in assisting the Government in its investigation, for a total actual loss for restitution purposes of $569,327.27.  *Id.*

Unlike Carpenter, who was economically invested in the entire scheme, Mr. Waesche only stood to make money, in the form of commissions, on the policies in which he was directly involved.  *Id.*  Indeed, Carpenter (and not Mr. Waesche) stole two death benefits in the total amount of approximately $30 million, and used that money to further invest in his scheme and for personal purposes, including the purchase of a Rhode Island beach house. *Id.* Mr. Waesche did not economically benefit from the scheme in that way.  *Id.*

9

Accordingly, pursuant to 18 U.S.C. § 3664(h), the Government respectfully asks the Court to order Mr. Waesche to pay restitution for losses on only those policies that he was directly involved in procuring that caused an actual loss to the insurance carriers. As such, the Government asks the Court to enter a restitution order of $569,327.27 in favor of Penn Mutual, to be paid jointly and severally with Carpenter.

## III.   CONCLUSION

The Government believes that Mr. Waesche's assistance to the Government warrants the filing of a substantial assistance motion requesting that the Court depart downward from the applicable Guideline range. Mr. Waesche cooperated by meeting with the Government on a dozen occasions, providing information about Carpenter, Bursey, and the fraudulent scheme, ██████ ███████████████, and testifying for three days at the trial against Carpenter, who the Court found was the mastermind who devised and orchestrated the fraud. Mr. Waesche's cooperation substantially assisted in convicting Carpenter, resulting in his current incarceration. Accordingly, the Government respectfully requests the Court impose a fair and appropriate below-Guidelines sentence that includes an order of restitution.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: 203-821-3700
Email: Neeraj.Patel@usdoj.gov

# EXHIBIT
# SEVEN

**Judge Scheindlin Order in**
*Universitas Education, LLC, individually and on behalf of the Charter*
*Oak Trust v. TD Bank, N.A.,* **2015 WL 9304551 (S.D.N.Y. Dec. 21, 2015)**

2015 WL 9304551
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNIVERSITAS EDUCATION, LLC, Plaintiff,

v.

T.D. BANK, N.A., Defendant.

15-cv-5643 (SAS)
|
Signed 12/21/2015

**Attorneys and Law Firms**

Annie E. Causey, Esq., Napoli Shkolnik PLLC, 1301 Avenue of The Americas, New York, NY 10019, (212) 397-1000, Marie E. Napoli, Esq., Napoli Law, PLLC, 1301 Avenue of The Americas, New York, NY 10019, (212) 397-1000, Paul J. Napoli, Esq., Napoli Bern Ripka & Associates, 350 Fifth Avenue, New York, NY 10118, (212) 267-3700, for Plaintiff.

Jeffrey J. Chapman, Esq., Aaron F. Jaroff, Esq., McGuire Woods LLP, 1345 Avenue of the Americas, 7th Floor, New York, NY 10105, (212) 548-7060, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHIRA A. SCHEINDLIN U.S.D.J.

**\*1** Plaintiff Universitas Education, LLC ("Universitas") brings this diversity action against defendant T.D. Bank alleging the aiding and abetting of conversion and related claims stemming from the alleged misappropriation of certain assets by a non-party actor, using T.D. Bank as its financial institution. Defendant moves to dismiss, arguing that plaintiff's claims are time-barred. For the following reasons, defendant's motion is GRANTED.

## I. BACKGROUND[1]

On May 15, 2009, the Lincoln National Life Insurance Company issued two checks to the Charter Oak Trust totaling $30,677,276.85, representing the life insurance proceeds for two life insurance policies issued on the life of Mr. Sash Spencer.[2] Mr. Spencer, now deceased, named Universitas as the sole beneficiary of the Charter Oak Trust.[3] Nova Group, Inc. served as the trustee.[4]

Contemporaneous with the Charter Oak Trust's receipt of the life insurance proceeds, Nova Group sought to open a new bank account for the Trust.[5] It applied for this account with at least three major banking institutions, and was declined by at least Bank of America due to Nova Group's failure to satisfy certain due diligence protocols.[6] T.D. Bank accepted Nova Group's application, and opened an account for Charter Oak Trust on May 12, 2009.[7]

On May 20 and May 21, 2009, T.D. Bank accepted applications for and opened business checking accounts for Nova Group and several related entities.[8] From May 21, 2009 to October 27, 2009, Nova Group transferred Charter Oak Trust proceeds to and

between its business checking accounts, and directly withdrew $19.8 million from the Charter Oak Trust account.[9] Universitas was aware that Nova Group did not intend to remit the Charter Oak Trust's proceeds to it by October 2009.[10]

Plaintiff filed a demand for arbitration against the Nova Group on June 17, 2010.[11] The arbitrator awarded plaintiff damages in the amount of $26,558,308.26 plus interest on January 24, 2011.[12] The award was confirmed on June 5, 2012.[13] In the meantime, T.D. Bank closed all accounts associated with Nova Group, which has yet to pay any of the arbitration award to plaintiff.[14] On July 17, 2015, plaintiff brought this action against T.D. Bank accusing it of aiding and abetting in this conversion, and bringing several related claims.

## II. LEGAL STANDARD

**\*2**  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[ ] all factual allegations in the complaint as true and draw[ ] all reasonable inferences in the plaintiff's favor."[15] The court evaluates the sufficiency of the complaint under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*.[16] Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[17] For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[18] Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[19] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20] Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[21]

When deciding a 12(b)(6) motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[22] " '[I]t is 'axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss.' "[23]

## III. DISCUSSION

When sitting in diversity, a federal court applies New York's statutes of limitations to state law claims.[24] Under New York law, causes of action accrue at the time and in the place of the injury.[25] Applying these principles to the instant case, each of plaintiff's causes of action is time-barred, and must be dismissed.

### A. Aiding and Abetting Conversion Claim

Allegations for conversion, and aiding and abetting of conversion, are subject to a three-year statute of limitations.[26] A conversion occurs when one exercises unauthorized dominion over the property of another to the exclusion of the rights of the lawful owner.[27] Here, the alleged conversion took place no later than October 2009, when Nova Group formally refused to remit the proceeds of the Charter Oak Trust to plaintiff.[28] Thus, plaintiff's conversion claim was time-barred as of October 2012.

### B. Fraud Claims

Claims for fraud and the aiding and abetting of fraud are normally governed by New York's six-year statute of limitations.[29] However, a "[c]ourt will not apply the six-year statute of limitations if the claim of fraud is merely incidental to another claim with a shorter limitations period."[30] To determine whether a fraud claim is "merely incidental" to other claims in an action, courts examine the "gravamen," or basic essence, of a plaintiff's claims.[31] In order to not be "merely incidental," a fraud claim

must be distinct from a plaintiff's other claims — it must be a claim in its own right, and not merely recast the same facts as other claims in order to obtain the benefit of the longer limitations period.[32]

*3  The gravamen of plaintiff's fraud claims are that Nova Group converted Charter Oak Trust funds meant for Universitas, and that defendant — by opening accounts and approving transfers between them — aided and abetted in that conversion. The facts underlying the fraud and conversion claims are the same. The injuries are the same. The relief sought is identical. Both the fraud and the aiding and abetting fraud claims are identical, for all intents and purposes, to the aiding and abetting conversion claim, and are merely incidental thereto. "Time barred claims cannot be revitalized by tricks of pleading";[33] the six-year statute of limitations does not apply to plaintiff's claim of aiding and abetting fraud. Plaintiff's claims for fraud and aiding and abetting fraud are subject to the three-year statute of limitations governing plaintiff's conversion claim, and are time-barred.

### C. Fiduciary Duty Claims

New York does not prescribe a statute of limitations for claims based on the breach of a fiduciary duty, and instead determines the applicable limitations period based on the substantive remedy sought.[34] Where a plaintiff seeks only money damages — as is the case here — a three-year statute of limitations applies.[35] For the same reasons described above, plaintiff's claims accrued in October 2009, and were time-barred as of October 2012.

### D. Unjust Enrichment Claim

Claims for unjust enrichment are generally governed by a six-year statute of limitations.[36] However, as with claims for fraud and breach of a fiduciary duty, if an unjust enrichment claim is merely incidental to a claim governed by a shorter statute of limitations, "the Court will not allow a plaintiff to avail himself of a longer limitations period."[37] Here, plaintiff's unjust enrichment claim recites the same facts and circumstances as its conversion claim, and is just as incidental to the conversion claim as the fraud claims. The three-year statute of limitations therefore applies, and plaintiff's claim was time-barred as of October 2012.

### E. Negligence Claims

New York applies a three-year statute of limitations to all negligence claims, including claims for negligent hiring and negligent supervision.[38] As with conversion claims, the limitations period begins to run at the time and place of injury, "even though the injured party may be ignorant of the existence of the wrong or injury."[39] The injury alleged in support of the negligence claims is the same injury as alleged for the conversion claim and claims incidental to the conversion. Plaintiff's negligence claims were therefore time-barred as of October 2012.

### F. Racketeer Influenced and Corrupt Organizations Act ("RICO") Claim

Civil RICO claims are subject to a four-year statute of limitations.[40] The four-year limitations period begins to run "upon the discovery of the injury alone."[41] As with all of plaintiff's claims, the only injury alleged in plaintiff's civil RICO claim is the conversion of the Charter Oak Trust funds, of which plaintiff had actual notice in October 2009 when Nova Group formally denied plaintiff's claim to the trust funds. Plaintiff's civil RICO claim was therefore time-barred as of October 2013.

### IV. CONCLUSION

*4  For the foregoing reasons, defendant's motion is GRANTED. The Clerk of the Court is directed to close this motion (Dkt. No. 12) and this case.

SO ORDERED.

# EXHIBIT

# EIGHT

**Sharon Siebert Affidavit of March 24, 2011**
**With No Mention of Daniel Carpenter**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

               Petitioner,          :

           -against-           :    **CASE NO: 11 CV 01590-LTS-HBP**

NOVA GROUP, INC., AS TRUSTEE, NAMED  :    **AFFIDAVIT OF**
FIDUCIARY, PLAN SPONSOR AND                **SHARON SIEBERT**
ADMINISTRATOR OF THE CHARTER OAK  :
TRUST WELFARE BENEFIT PLAN,

               Respondent.
---------------------------------------------------------------X

STATE OF FLORIDA    )
                   )   SS.
COUNTY OF PALM BEACH )

     I, Sharon Siebert, being duly sworn, state:

     1.     I am a member of Universitas Education, LLC ("Universitas"), a limited

liability company organized to provide research and support for a related non-profit

charity organization, Destination Universitas Foundation (the "Foundation"). The

Foundation is a charitable foundation dedicated to providing a center for the spiritual and

physical healing of world leaders. I have personal knowledge of all of the following

facts.

     2.     Universitas is a Delaware limited liability company with its principal place

of business in New York, NY. Universitas has two members, myself and Donna Vassar,

and both of us reside and are domiciled in New York, NY.

3.      Universitas does not maintain any offices in Connecticut, nor does it transact any business in Connecticut. In addition, Universitas has no employees in Connecticut or elsewhere.

4.      Universitas does not own nor rent any property in Connecticut, nor does it maintain a bank account in Connecticut.

5.      Universitas derives no revenue from business dealings within Connecticut, nor does it advertise in Connecticut.

6.      In fact, the only contact Universitas has ever had with Connecticut was as a direct result of Nova Group, Inc.'s ("Nova Group") wrongful withholding of certain trust benefits owed to Universitas as the sole, irrevocable beneficiary of Sash Spencer.

7.      Mr. Spencer was a long time supporter of the Foundation's work and accordingly named Universitas as the sole, irrevocable beneficiary of the Charter Oak Trust Welfare Benefit Plan (the "Plan"), so that upon his death, Universitas would receive approximately $30 million (the result of two insurance policies on Mr. Spencer's life placed in the Plan), less certain expenses to which Mr. Spencer and the Plan representatives agreed.

8.      Mr. Spencer died in June 2008, and in May 2009, the Plan received approximately $30 million in life insurance proceeds. However, the Plan failed and refused to pay over the monies owed to Universitas as the sole, irrevocable beneficiary. Instead, the Plan claimed that it was entitled to keep Universitas' monies for its own purposes.

9.      When the Plan failed to pay over the Plan benefits to Universitas, Universitas necessarily had a representative reach out to the Plan to find out why it was not paying over the monies as Mr. Spencer had directed it to do.

10.     First, this representative was Universitas' New York-based lawyer Ivan Schinderman, Esq.  Because Mr. Schinderman unfortunately passed away before the parties could resolve the dispute and Universitas had not yet obtained new counsel, an informal business advisor of Universitas, Alex Sgoutas, met twice in Connecticut during the summer of 2009 with Plan representative Donald Trudeau to discuss payment to Universitas.  Nothing ever came of these settlement meetings.  Nova Group and its affiliates have still not paid any of the monies to Universitas, despite an arbitration award in Universitas' favor.

11.     Mr. Sgoutas, a personal acquaintance of Universitas member Donna Vassar for more than 20 years, made these communications to the Plan as a favor and without any payment by Universitas.

12.     At the Plan's request, in July 2009, I submitted a form for benefits on behalf of Universitas to the Plan, which the Plan stated I must do or Universitas would forfeit the entire $30 million.

13.     Universitas received notice on January 25, 2011 from the American Arbitration Association that it had won an arbitration award against Nova Group in the amount of $26,525,535.98.  On February 8, 2011, Universitas first learned  that Nova Group had filed an action in Connecticut Superior Court to vacate the arbitration award.

14.     Connecticut is not a convenient forum for Universitas, owing in part to Nova Group's refusal for almost two (2) years to pay the required death benefits to Universitas.  At the arbitration's outset, Universitas applied for and received from the American Arbitration Association (AAA) a deferral of its share of the arbitration fees.  In order to obtain this deferral, Universitas needed to document and establish its limited financial means to the AAA, which it did.

15.     Universitas is not in a financial position to pay for a protracted legal battle in Connecticut (which requires the additional costs of local counsel), especially while continuing to incur legal fees in the ongoing Phase Two arbitration in New York.

_____
SHARON SIEBERT

Sworn to before me this
24th day of March, 2011
_____
Notary Public
Signature only

JULISSA HERNANDEZ
Notary Public - State of Florida
My Commission Expires Apr 10, 2011
Commission # DD 658469
Bonded Through National Notary Assn.

NY\2\2\10878.1

# EXHIBIT

# NINE

**Sharon Siebert September 6, 2019 Affidavit
Mentioning that Charter Oak Trust Section
6.01 was Amended in January 2007, and also
that Universitas was not a real Charity**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC <br><br> Plaintiff, <br><br> v. <br><br> JACK E. ROBINSON, III a/k/a JACK E. ROBINSON, <br><br> Defendant. | Civil Action No. <br> 1:15-CV-11848 (DPW) |

### AFFIDAVIT OF SHARON E. SIEBERT

SHARON E. SIEBERT, under penalty of perjury, declares and says as follows:

1.     My name is Sharon E. Siebert, and I am a founder and member of Universitas Education, LLC ("Universitas"). I have personal knowledge of the facts set forth herein.

2.     Universitas is a Delaware limited liability company, with its headquarters at 404 East 55th Street, Apartment 13A, New York, New York 10022.

3.     Universitas was previously the research and development arm of the now-defunct Destination Foundation Universitas ("Destination Universitas").

4.     Destination Universitas was a charitable foundation based in New York. Destination Universitas had its charitable designation administratively revoked because Universitas was unable to continue to fund it. Universitas's hardships were a direct result of the costly litigation efforts to enforce Universitas' judgment against the Charter Oak Trust and Nova Group.

5.     Universitas aims to develop and provide programs for leaders and educators around the world to support global philanthropic and humanitarian efforts.

6.    Universitas is operated by myself and my colleague, Donna Vassar.

7.    Ms. Vassar and I are Universitas' only members.

8.    In 2007, Universitas had negotiated for, and had prepared a letter of intent for the purchase of land for the development of a sanctuary on 69.59 acres in Lake Las Vegas, Nevada, for global leaders to gather and recharge during multi-day retreats.

9.    Universitas had discussed the purchase of the Lake Las Vegas property, solicited and selected a design proposal, completed a strategic development plan, and was in the process of finalizing proposals.

10.    One contributor to the project was Mr. Sash Spencer. Mr. Spencer chaired a private investment firm and was a financial partner to Universitas and Destination Universitas. Mr. Spencer died unexpectedly in June 2008. Prior to his death, he named Universitas the sole irrevocable beneficiary of two life insurance policies worth $30,000,000.

11.    Universitas has still not obtained the life insurance proceeds that Mr. Spencer endowed it.

12.    I received and reviewed the correspondence from Jack E. Robinson, Wayne Bursey, and others sent on behalf of the Charter Oak Trust ("COT") and its affiliates. I discussed these communications with Universitas' various representatives, including its attorney when appropriate.

13.    I initially believed that COT's accurately conveyed the provisions of the COT Declaration of Trust and would abide by the provisions thereof. I believed that the COT Declaration of Trust as amended in January 2007 included a provision within Section 6.01 that allowed COT to retain twenty percent of the death benefits of a participant who dies while participating in COT. However, I did not believe that the provision applied to Universitas'

2

circumstances because Mr. Spencer enrolled in COT prior to this alleged amendment, and COT never notified myself or anybody else about this alleged change in the Trust document.

14.     Universitas also undertook the arbitration against COT and its affiliates in good faith. Universitas relied upon Mr. Bursey's affidavit and Mr. Robinson's declaration asserting that COT had the assets to satisfy a judgement against it. Had I known that the proceeds from Mr. Spencer's life insurance proceeds had already been disbursed and spent on things such as a vacation home for Daniel Carpenter, Universitas would have altered its litigation strategy and would likely have sought civil remedies against Carpenter and his affiliates sooner. Universitas likewise would have adopted a much different litigation strategy had I known that the money in dispute had been improperly conveyed and used for criminal purposes. Instead, the misrepresentations and continuing bad faith by Robinson (before his death), Carpenter, and the rest of their affiliates have forced us to engage in protracted litigation that eventually contributed to the dissolution of Destination Universitas.

15.     The arbitration awarded Universitas a judgment against COT and its trustee, Nova Group, Inc. for $26,525,535.98.[1] Universitas' received this award on January 24, 2011, and the award remains largely unsatisfied.

16.     Universitas' effort to enforce its judgement has caused Universitas to become involved in numerous cases across the country. Attached as **Exhibit A** is a list of cases wherein Universitas has made filings concerning its award.

17.     The cost of this litigation has been high. To date, Universitas been billed for legal fees in excess of $10,000,000.

---

[1] This award was broadened during the subsequent litigation to confirm and enforce the award. The court provided Universitas with a money judgment on August 7, 2014. The money judgment is for $30,181,880.30, to account for interest on the unpaid judgment. The judgment is also enforceable against Daniel Carpenter and some of his companies, in addition to the original judgment debtors.

3

18. The judgment debtors and their affiliates have been recalcitrant and obstructive. To date, Universitas has recovered only $4,703,621.64 of its $30,181,880.30 judgment.

19. The judgment debtors' refusal to satisfy Universitas' judgment has caused Universitas hardship. Universitas has had difficulty paying the excessive legal fees accrued in trying to recover the proceeds from the Spencer policies, and this has led to disputes with former counsel regarding fees.

Dated: New York, New York West Palm Beach, Fla.
September 6, 2019

Sharon E. Siebert

Sworn to me on this 6 day
of September, 2019

Notary Public

DARLENE A. BROWN
MY COMMISSION # GG 213385
EXPIRES: May 11, 2022
Bonded Thru Notary Public Underwriters

4

# EXHIBIT

# TEN

**Cherneski *Jencks* Statement
of April 20, 2010**



### DEPARTMENT OF THE TREASURY
### Internal Revenue Service
### Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| Investigation #: | 1000230004 | Location: | NOVA/Benistar |
| Investigation Name: | Guy Neumann | | 100 Grist Mill Road |
| Date: | April 20, 2010 | | Simsbury, CT  06070 |
| Time: | ~9:05 - 11:10 am | | |
| Participant(s): | Stephen Cherneski, Witness | | |
| | Jeffrey A. Hencke, Special Agent | | |
| | Crystal Brinson, Special Agent | | |

On the above date and approximate time, Special Agent Crystal Brinson and I met with Stephen Cherneski at the above stated location. We identified ourselves to Cherneski and I explained to him that we were assisting the United States Attorney's Office located in the Eastern District of Wisconsin with a Grand Jury investigation and wanted to ask him some questions. Cherneski agreed to answer our questions, however, at one point during the interview Cherneski asked if he was required to answer the questions. I explained to Cherneski that he was not required to answer the questions and could choose not to answer some questions or stop the interview at any point. In response to our questions, Cherneski provided the following information.

1. Cherneski currently resides at 6-C Talcott Forrest Road, Farmington, CT. His cell phone number is ▮▮▮▮▮▮▮. Cherneski received a bachelor's degree in economics with a minor in finance from Central Connecticut State. Cherneski was previously a professional hockey player.

2. Cherneski described his role for NOVA Benefit Plans/Benistar as providing technical and educational support for employers and advisors. Cherneski currently receives his paycheck from Benistar Admin Services and has been working for Benistar Admin Services since February, 2005. Cherneski believes that all employees located at 100 Grist Mill Road, Simsbury, CT receive their paycheck from Benistar Admin Services even though there are various businesses being operated out of the building. Cherneski is paid $60,000 per year plus bonuses. Cherneski became employed by Benistar Admin Services because of his friendship with Guy Neumann.

3. Cherneski had no prior knowledge or experience with 419 welfare benefit plans prior to his employment for Benistar Admin Services and his work for NOVA/Benistar. Cherneski learned about 419 welfare benefit plans through on the job training and read various books and tax law to educate him<u>self</u> to do his

job. Cherneski reports to Guy Neumann and Wayne Bursey. No person reports to Cherneski.

4. US Benefits Group is a business that provides information on various employee plans to a network of brokers. US Benefits Group does not administer welfare benefit plans. Cherneski stated that US Benefits Group is run by a collection of people and no one person. Cherneski stated that many individuals work for various companies operating out of the building at 100 Grist Mill Road, Simsbury, CT. Cherneski believes that US Benefits Group was started prior to his employment.

5. Benistar is a 3rd party administer of various retirement plans. Benistar was started prior to Cherneski's employment. Molly Carpenter is the chair person of Benistar. Cherneski stated that he does not deal with Benistar plans and is not familiar with its' plans.

6. Benefit Plan Advisors previously administered 419(e) welfare benefit plans, including the Grist Mill Trust. Cherneski stated that as of January 1, 2010, all 419 plans are administered by NOVA Benefit Plans. (NOVA)

7. NOVA currently administers all 419 welfare benefit plans. Prior to 1/1/2010, NOVA only administered NOVA 419A(f)(6) plans. NOVA was started prior to Cherneski's employment. NOVA is operated through a board containing Cherneski, Guy Neumann, Wayne Bursey, Dan Carpenter, Molly Carpenter, and Kathy Kehoe. NOVA administers its 419A(f)(6) plans through four (4) trusts. These trusts are SADI, LTC, Life 1, and Life 5.

8. A 419A(f)(6) welfare benefit plan is a plan containing 10 or more employers. In a 419A(f)(6) plan, the employer can deduct the amount of the contribution as a business expense, with no limitation.

9. In a NOVA 419A(f)(6) welfare benefit plan, a company/employer contributes money for the benefit of one or more employees (covered employee) of that company. In the plan, a trust (i.e. SADI) is the owner and beneficiary of the policy. The covered employee than designates a beneficiary for the plan. The trust then purchases an annuity or life insurance policy with the proceeds contributed to the trust by the employer. The trust does keep 5% of the amount contributed and the employer is required to pay an additional $1,500 enrollment fee to NOVA. The initial contribution by the company/employer is given to the trust (i.e. SADI). The trust would then deposit the check and write a separate check to the appropriate insurance company in which the trust has purchased the annuity and life insurance from.

10. Beneficiaries in 419A(f)(6) plans administered by NOVA received benefits from the plan through either a qualifying event or death. The death benefit for the 419A(f)(6) plans is discussed in the plan documents, but is usually the value of the annuity or life insurance. A qualifying event is a permanent disability or disfigurement to the covered employee. An employer can also terminate the

plan. If the employer terminates the plan, the policy becomes an asset of the trust and the employer never receives any contributed money back. The covered employee can continue in the plan by purchasing the plan from the trust for the fair market value (FMV) of the annuity or life insurance policy purchased with the amount originally contributed by the employer. Revenue Procedure 2002-25 defines how the FMV of a life insurance policy is valued. The trust will also make a loan arrangement with the covered employee to assist the covered employee in purchasing the plan. In this loan arrangement, the covered employee is required to pay three years of interest up front. If NOVA loans money for the covered employee to purchase the plan, NOVA puts a collateral assignment on the policy. Collateral assignments are placed on both annuities and life insurance policies. Cherneski stated that he does not know much about the loan documents.

11. If the employer terminates the plan and the covered employee does not choose to continue in the plan, the money contributed by the employer is forfeited. Cherneski believes that money has been forfeited in the past but can not cite specific examples.

12. If an annuity is purchased with the employer contribution and there is a qualifying event, the covered employee receives money based upon a created formula. This money is paid out over 60 months after a one year waiting period. The formula is based upon the amount of the contribution and the amount of time in the plan. Cherneski stated that the covered employee can receive more money than what was initially contributed. Cherneski stated that the list of what qualifies as a disability of disfigurement is written in the plan documents, but does not know what the plans rely on for their definition of disability or disfigurement.

13. If a covered employee wishes to make a disability or disfigurement claim, the covered employee submits a claim form along with documents from the employer and a doctor. Wayne Bursey, the trustee, makes the decision to either accept or not accept the claim. Cherneski does not know if there have been any claims denied.

14. Cherneski stated the money contributed by employers into NOVA plans are comingled into trust accounts. (i.e. SADI) Cherneski stated that he does not deal with the accounting side of the client funds.

15. Cherneski is not familiar with the covered employee being able to pay 10% of the FMV of an annuity policy and obtain the proceeds of the annuity. (10% buy-out) Cherneski believes that 10% buyouts were allowed in prior to his employment, but a 100% buy-out has been required since Cherneski began his employment. Cherneski stated when he talks to clients, he advises them to never buy-out of the plans, however the plan documents do state the covered employee can pay 100% of the FMV to purchase the plan. Cherneski does not know of any employee of NOVA/Benistar that is allowing a 10% buy-out.

IRS00223

16. I explained to Cherneski that I believed that 10% buy-outs were still happening in the last few years. Cherneski stated that he is close to 100% sure that there are no 10% buy-outs. Cherneski again stated that he did not promote 10% buy-outs and has not heard of 10% buy-outs in the last 3 or 4 years. Cherneski stated that clients may ask about a 10% buy-out, however Cherneski would tell the client that there is only 100% buy-outs.

17. I explained to Cherneski that lying to a federal agent is a crime. Cherneski stated that he understood.

18. Cherneski stated that he does not believe that the NOVA 419 plans can be abused because the covered employee is required to pay 100% of the fair market value of the policy. Cherneski stated that he does not know of any way plans can be used as abusive tax shelters.

19. I showed Cherneski a document titled, "Sickness Accident Disability Indemnity Plan & Trust." (Attachments 1 - 24)  Cherneski stated that the document describes the SADI plan, however the document shown to him is an old version. The new version would show a revision date on the cover page.

20. I showed Cherneski a copy of a letter dated April 18, 2005 to NOVA Benefit Plans, LLC from John Reid of Edwards & Angell LLP.  (Attachments 25 - 38) Cherneski stated he is familiar with the letter, but does not give the letter to clients unless the client requests it. Cherneski has never met John Reid.

21. Cherneski is not aware of the insurance companies from whom they purchase annuities or life insurance contract having had concerns with the collateral assignments and any Forms 1099 to be issued by them.

22. Cherneski is aware that Benistar 419 Plan and Trust is in a dispute with the IRS and the dispute is being resolved through the courts.  The Benistar 419 Plan & Trust is a pre-2003 plan.

23. Cherneski stated that the SADI plan is not a listed transaction. Cherneski stated there is a document that explains why NOVA plans are not listed transactions.  I then showed Cherneski a document title "NOVA Benefit Plans LLC and "Why we not a Tax Shelter…" (Attachments 39 - 55) Cherneski stated this document explains why NOVA plans are not listed transactions. Cherneski does not know who prepared the document, however the document I showed to him is an old version.  The new document does not contain the statement in the third paragraph about being audited if one files a Form 8886.

24. The difference between Grist Mill trust and the NOVA plans is in the timing of the deduction.  In the Grist Mill Trust, the employer is able to only deduct qualifying costs.  Also, in the Grist Mill Trust, the trust files Forms 8886 for clients even though it may not be required.  The Forms 8886 are filed as a precaution.

25. Other individuals that do the same type of work as Cherneski, include Guy Neumann, Rich Belding and Ron Lanza.

26. Neumann and Belding provide technical and education support for employers and advisors.  Neumann also runs a life insurance business call Rex Insurance. Cherneski is not involved in Rex Insurance

27. Wayne Bursey is the trustee for all of the 419 plans.  Bursey works full time at the offices locate at 100 Grist Mill Road, Simsbury, CT.

28. Kevin Slattery does not know much about 419 plans.  Slattery handles much of the administrative stuff involving benefits.

29. Dan Carpenter is a consultant and outside counseloil for all of the businesses. Carpenter also operates a business named ARIA.

30. Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI)  Molly runs the day to day operations of the various businesses.

31. Cherneski stated that some of its clients are or have been audited by the IRS. Attorney Ira Stechel is representing Benistar Plan clients with the IRS.

32. STEP plans are older plans and are not currently sold.

33. Physical files for the clients are kept on site.  Kathy Kehoe handles theat administrative side of the business.  Cherneski is notw aware of files being stored off-site.  Cherneski stated that a lot of the plan and client information is stored on the computers.

At approximately 11:10 am, Supervisory Special Agent Kathy Enstrom entered the room and stated that an attorney outside of the building wished to speak with Cherneski.  The interview was then concluded.

I prepared this memorandum on April 23, 2010, after refreshing my memory from notes made during and immediately after the interview with Stephen Cherneski.

Memorandum Author  *Jeffrey A. Hencke*

Jeffrey A. Hencke
Special Agent

Crystal Brinson
Special Agent

IRS00226

# EXHIBIT
# ELEVEN

**Judge Vanessa Bryant March 3, 2017
Denial of Reconsideration**

Wilmington Savings Fund Society, FSB v. Universitas Education, LLC et al                    Doc. 118

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILMINGTON SAVINGS FUND SOCIETY,    :
FSB, as successor-in-interest to    :
Christiana Bank & Trust Company,    :
                                    :
        Plaintiff,                  :        CIVIL CASE NUMBER:
                                    :
        v.                          :        3:15-cv-911 (VLB)
                                    :
UNIVERSITAS EDUCATION, LLC, and     :        March 3, 2017
RIDGEWOOD FINANCE II, LLC, as       :
successor-in-interest to Ridgewood  :
Finance, Inc.                       :
                                    :
        Defendants.                 :

MEMORANDUM OF DECISION

The Court granted Universitas Education, LLC's ("Universitas") Motion to
Compel Arbitration between Universitas and Wilmington in a Memorandum of
Decision dated February 17, 2016. [Dkt. No. 105.] Wilmington Savings Fund
Society ("Wilmington") timely moved for reconsideration. [Dkt. No. 107; Local R.
Civ. P. 7(c).] For the reasons set forth below, the Motion for Reconsideration is
DENIED.

I.   Facts

The Court assumes the parties are familiar with the facts underlying this
case. For the purpose of this Decision, the Court briefly states the facts relevant
to the disputed arbitration agreement. Universitas' arbitration demand asserts
that Holding Capital Group, Inc., a participating employer in a Multiple Employer
Welfare Arrangement ("MEWA") named Charter Oak Trust ("COT"), purchased

1

Dockets.Justia.com

two life insurance policies totaling $30 million for its chief executive officer, Sash A. Spencer. [Dkt. No. 1-1 at ¶ 48.] Universitas also asserts Spencer selected Universitas, the research and development arm of a charitable foundation, as his insurance beneficiary. *Id.* at ¶¶ 9, 48. Spencer died in 2008, and the insurance company tendered his death benefits to COT in 2009. *Id.* at ¶ 50. Universitas's demand for those benefits was unsuccessful. *Id.* at ¶ 51.

Wilmington agreed to serve as insurance trustee for what Wilmington refers to as the Grist Mill COT.[1] [Dkt. No. 31-5 (Appointment Agreement).] By the terms of the Appointment Agreement, Wilmington agreed to arbitrate any and all disputes relating to its performance of its duties as trustee of the purported Grist Mill COT. [Dkt. No. 31-5 (Grist Mill COT).] As insurance trustee for the purported Grist Mill COT, Wilmington opened a corporate trust account with the identification number CH125161-0. [Dkt. Nos. 31-8 (Letter); 31-9 (New Account Form).] One of the Spencer policies was placed in the trust account numbered CH125161-0, opened by Wilmington incident to its appointment as insurance trustee. [Dkt. Nos. 31-11 (Trust Vault Receipt); 31-12 (Account Statement).] Both policies were monitored by Wilmington. *Id.*

In its Memorandum of Decision, the Court concluded from the aforementioned evidence that Wilmington acted as insurance trustee for the Spencer policies. [Dkt. No. 107-1 at 30-32.] The Court also concluded Wilmington

---

[1] Wilmington asserts two separate trusts existed – the "Grist Mill COT" and the "Nova COT" – and that Nova COT held the Spencer policies. The Court did not determine in its Memorandum of Decision whether one or two trusts existed, nor does it do so now, because there is no evidence demonstrating that a trust named COT and sponsored by Nova held the Spencer policies.

agreed to arbitrate any and all disputes relating to its performance of its duties as insurance trustee, as evidenced by the Appointment Agreement. *Id.* Wilmington disputes this finding in its Motion for Reconsideration.

II.   <u>Statement of Law</u>

In the Second Circuit, the standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). There are three grounds for granting a motion for reconsideration: intervening change in controlling law, the availability of newly discovered evidence or a need to correct a clear error or avoid manifest injustice. *Virgin Atl. Airways Ltd. v. National Mediation Board*, 956 F2d. 1245, 1255 (2d Cit. 1992). Evidence is "newly discovered" for the purpose of a motion for reconsideration if the movant "could not have discovered the new evidence earlier had he exercised due diligence." *Patterson v. Bannish*, 3:10-cv-1481, 2011 WL 2518749, at *1 (D. Conn. June 23, 2011); *Robinson v. Holland*, 3:02-cv-1943, 2008 WL 1924971, at *1 (D. Conn. Apr. 30, 2008) (same). If the Court "overlooked controlling decisions or factual matters that were put before it on the underlying motion," reconsideration is appropriate. *Wiseman v. Greene*, 204 F3d 393, 395 (2d Cir. 2000) (per curium).

III.   <u>Analysis</u>

Wilmington raises three arguments for reconsideration. Each fails to meet any of the three grounds for granting a motion for reconsideration.

3

First, Wilmington disingenuously asserts the Court "ignore[d]" evidence that Universitas admitted in a 2010 arbitration that Universitas has no arbitration agreement with Grist Mill Capital.  [Dkt. No. 107-1 at 8.]  Wilmington supports this argument with a letter from Universitas to an arbitrator in the matter *Universitas Education, LLC v. Nova Group, Inc., Wayne Bursey, Benistar Admin. Services, Inc., Donald Trudeau, Grist Mill Capital, LLC and Daniel E. Carpenter*, dated August 19, 2010.  [Dkt. No. 107-2.]  In the letter, Universitas states "no arbitration agreement exists between Universitas and Grist Mill Capital."  *Id.*  The letter was publicly filed on November 20, 2013 in a case pending in the Southern District of New York.  *Id.*  However, Wilmington asserts it did not discover the letter until January 2016.  [Dkt. No. 107-1 at 4.]  The letter was not filed with the Court in this case and thus the Court could not have "ignore[d]" evidence that Universitas admitted in the 2013.

The letter Wilmington offers to assert Universitas has no arbitration agreement with Grist Mill is not "newly discovered" evidence for the purpose of a motion for reconsideration, as Wilmington has not established why it "could not have discovered the new evidence earlier had he exercised due diligence." *Patterson*, 2011 WL 2518749 at *1.  Wilmington discovered the letter in 2016 on a public docket, where it had been available since November 2013.  Wilmington does not indicate why it could not have discovered the letter sooner with due diligence.   Wilmington also asserts no intervening change in law or controlling legal decisions which made the letter relevant after the Court rendered its decision.  Wilmington's first argument for reconsideration fails.

Wilmington next argues the Court failed to resolve material factual disputes in its Decision, including whether Wilmington agreed to act as insurance trustee for the owner of the Spencer policies and whether any such agreement includes a binding arbitration clause. [Dkt. No. 107-1 at 11.] In its Order compelling arbitration, the Court addressed both of these issues.

First, the Court found that Wilmington "agreed to serve as insurance trustee for the purported Grist Mill COT" based on (1) Wilmington's Appointment Agreement, (2) a New Account Form indicating Wilmington opened a corporate trust account as "Grist Mill's" trustee, and (3) trust vault receipts and account statements showing Wilmington monitored the Spencer policies placed in that trust account. [Dkt. No. 105 at 31 (citing Dkt. Nos. 31-5 (Appointment Agreement), 31-9 (New Account Form), 31-11 (Trust Vault Receipt, 31-12 (Account Statement)).] The Court also found Wilmington "agreed to arbitrate any and all disputes relating to the purported Grist Mill COT by virtue of its appointment as insurance trustee," as evidenced by the Appointment Agreement. [Dkt. No. 105 at 31 (citing Dkt. No. 31-5).] Based on those findings, the Court concluded that "Wilmington acted as insurance trustee for the Spencer policies pursuant to the appointment agreement in which it admittedly agreed to arbitrate any and all disputes relating to its performance of its insurance trustee duties." [Dkt. Nos. 105 at 32; 107-1 at 12.]

Wilmington raises no newly discovered evidence or overlooked evidence presented in the initial briefing which would require the Court to reconsider its findings. Wilmington asserts "the Grist Mill COT limited [Wilmington's] authority

as the Insurance Trustee to only those policies that were controlled by Grist Mill Capital." [Dkt. No. 107-1 at 12.] However, Wilmington offers no evidence – new or overlooked – establishing the Spencer policy placed in the Grist Mill COT was not "controlled by" Grist Mill, rendering Wilmington its trustee.

Rather, Wilmington raises a new legal argument that its possession of the Spencer policies constituted a "constructive bailment . . . since [the Spencer] policies were not owned by the Grist Mill COT and such possession was by mistake or accident." [Dkt. No. 107-1 at 13.] Wilmington cites one Connecticut Superior Court case from 2008 for the premise that "constructive bailment arises when possession of personal property passes from one person to another by mistake or accident," but offers no intervening change in controlling law necessitating reconsideration of the Court's Order. *Id.* (citing *H.J. Kelly & Assocs. v. Meriden*, No. CV030285781, 2008 WL 496688, at *7 (Conn. Super. Ct. Jan. 17, 2008). To the extent that Wilmington obtained the Spencer Policies accidently, it dealt with the policies under the mistaken understanding that it had authority to do so incident to the Appointment Agreement, thus making its conduct subject to arbitration under the Appointment Agreement.

Wilmington's constructive bailment is not a proper argument to raise in a motion for reconsideration. Wilmington did not raise a constructive bailment argument at all in its initial briefing, the ruling on which it now seek reconsideration. Wilmington raises no "intervening change in controlling law" or "controlling decisions . . . hat were put before [the Court] on the underlying motion." *Virgin Atl. Airways Ltd.*, 956 F2d. at 1255; *Patterson*, 2011 WL 2518749

6

at *1.  Nor does Wilmington argue that some intervening law of bailment, not relevant at the time its original motion, has emerged to warrant consideration of this omitted theory on a motion for _re_consideration.  As a motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple,'" Wilmington's second argument for reconsideration fails.  *Analytical Surveys*, *Inc. v. Tonga Partners*, *L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).  To rule otherwise is inconsistent with the principles of fairness, finality, and judicial efficiency.  Were this not the law, every loosing party could scour every obscure legal source to scrounge for arcane theories indefinitely and file motions for reconsideration in perpetuity in hopes of either finding a winning argument or either exhausting or bankrupting its opponent into capitulation.

Finally, Wilmington asserts "the best evidence as to which Charter Oak declaration of trust (if any) owned the Spencer policies are the Spencer policies themselves and their respective applications for insurance.  [Dkt. No. 107-1 at 13.] Wilmington asserts the policies state the owner of the policies was "Wayne Bursey, Trustee of the Charter Oak Trust."  *Id.* at 14.  From this evidence, Wilmington concludes neither Grist Mill nor Nova owned the Spencer policies, but rather a third, distinct trust called Charter Oak Trust owned the policies.  *Id.* Wilmington asserts it did not consent to act as trustee for the "Charter Oak Trust."  *Id.* at 14-15.  Wilmington asserts "there is no evidence before the Court as to the identity of the owner of the Spencer policies."  [Dkt. No. 107-1 at 13.]  These Arguments are not only improper to raise on a motion for reconsideration, they

7

ignore the uncontested facts which the Court does know. They ignore the fact that Wilmington acted as though it was the trustee of the trust which was entitled to the Spencer Policies.  They also ignore the fact that Wilmington failed in its original briefing to identify any capacity, other than as trustee of the Grist Mill COT, under which Wilmington would have acted in respect to the Spencer Policies. While this Court will be the first to say the underlying facts are murky, that in and of itself does not entitle Wilmington a second bite the apple it has already devoured.  Further, for the reason stated above, any attempt would be unavailing.

Wilmington tacitly admits that it is attempting to re-litigate the matter by admitting "none of the[] documents" on which Wilmington bases this argument were presented to the Court with the Motion to Compel Arbitration.  *Id.* at 13.  This is patently impermissible.

IV.   Conclusion

For the foregoing reasons, the Court DENIES Wilmington's motion for reconsideration of the Court's Order Compelling Arbitration.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut, March 9, 2017.

8

# EXHIBIT
# TWELVE

**Sash Spencer Beneficiary Designation Form showing Grist Mill Capital as Primary Beneficiary**

Apr 26 06 01:55p                        212-319-6823                    p.2



LINCOLN # 7320809
$20,000,000



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION &
## BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: HOLDINGS CAPITAL GROUP, INC.

NAME OF COVERED EMPLOYEE: SASH A. SPENCER         SSN: 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

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____    I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____    Phone: _____

Address: _____
I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. ✓           I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: UNIVERSITAS EDUCATION, LLC

Contact Person: SHARON SIEBERT          Phone: 212-826-0056
Address: 404 E. 55TH STREET, SUITE 13A, NY NY
I hereby elect that the foregoing designation of my beneficiary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amendable, and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen option B, your signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC.

X _____                          X _____
Signature of Employer's Authorized Person      Signature of Covered Employee

SASH A. SPENCER, CEO                        SASH A. SPENCER
Name and Title of Authorized Person (Print or Type)   Name of Employee (Print or Type)

May 9th, 2008                              The foregoing instrument was acknowledged
Date of this Designation                   before me this 9th day of May, 2008

                                           _____
                                           Notary Public
                                                          Commission Expires: 10/31/2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

                                           BARBARA A. KNIFFEN
                                           Notary Public, State of New York
                                           No. 31-4826843
                                           Qualified in New York County
                                           Commission Expires 2-04-09
                                           10/31 -