**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:13CR226(RNC) |
|  | ) |  |
| v. | ) |  |
|  | ) | February 22, 2021 |
| DANIEL E. CARPENTER | ) |  |
|  | ) |  |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE**
**SUPERSEDING INDICTMENT FOR LACK OF JURISDICTION AND**
**PURSUANT TO THE OLD RULE 12(b)(3)(B)**

Petitioner respectfully requests that this Court examine the May 14, 2014 Indictment in light of the Supreme Court's decisions in *Marinello v. United States*, 138 S.Ct. 1101 (2018) and *Kelly v. United States*, 140 S.Ct. 1565 (2020), as well as the Second Circuit's decisions in *AEI v. Lincoln*, 892 F.3d 126 (2d Cir. 2018), *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012), and *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000). Petitioner realizes that none of these issues were brought up by his attorneys on appeal, so he respectfully submits the enclosed Motion and Memorandum of Law subject to the Plain Error standard established by the Supreme Court in *Rosales-Mireles v. United States,* 138 S.Ct. 1897 (2018) *citing Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016), and as stated by the Second Circuit in *United States v. Balde*, 943 F.3d 73 (2d Cir. 2019).

**NO ORAL ARGUMENT REQUESTED**

## PRELIMINARY STATEMENT

Petitioner respectfully submits that both the Government and this Honorable Court are well aware that since the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019) in June of 2019, there have been a number guilty pleas involving "aliens, felons, guns, and drugs" that were vacated because of a failure to plead all of the "essential" elements of the alleged crime in the indictment. *See, e.g., United States v. Guzman-Merced*, 2020 WL 7585176 (1st Cir. 2020), and *United States v. Balde*, 943 F.3d 73 (2d Cir. 2019), where the Second Circuit overturned a conviction based on a deficient indictment of an "illegal alien" that pled guilty to holding up a bodega in the Bronx with a gun. *Balde* cites *United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) for the proposition that "the error is plain if it is so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." *See Bastian* at 219.

*Balde* is directly on point for Petitioner's Motion to Dismiss the Indictment because it succinctly states the Plain Error standard that Petitioner submits this Motion under, since none of these issues could possibly have been raised by Petitioner's attorneys on appeal:

> "Under the plain error standard, an appellant must demonstrate that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Within the context of plea proceedings, "a defendant must establish that the violation affected substantial rights and that there is a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009)." *Id.* at 96.

It is noteworthy that *Balde* cites *Garcia*, which is another guilty plea case that was overturned due to an indictment made defective by a change in the law. A number of the cases cited by Petitioner throughout this brief involve people that actually did the conduct they were accused of in the indictment, and unlike Petitioner, they pleaded guilty to that conduct. As the Court is well aware, Petitioner respectfully asserts that he did not do any of the conduct alleged in

his Indictment, but even if that alleged conduct were true, it still did not amount to a federal crime and therefore this Court lacked subject matter jurisdiction. Moreover, unlike many of the cases cited here, Petitioner did not plead guilty.

In Petitioner's case, there are four major Supreme Court decisions that warrant dismissing Petitioner's Indictment as the Second Circuit did in *Balde* on both jurisdictional grounds as well as a failure to currently describe a federal crime. *See Kelly v. United States*, 140 S.Ct. 1565 (2020), *Marinello v. United States*, 138 S.Ct. 1101 (2018), *Class v. United States*, 138 S.Ct. 798 (2018), and *Skilling v. United States*, 561 U.S. 358 (2010). Petitioner respectfully suggests that the judgment in this case was void because the Court lacked subject matter jurisdiction, and the Indictment must be dismissed because it did not properly alleged each and every one of the five elements to secure a mail and wire fraud conviction. And, after the Supreme Court decisions in *Kelly* and *Marinello,* there was no proof at trial whatsoever that Petitioner had the criminal *mens rea* to "**obtain**" any "**property**" of the Carriers (which according to *Kelly* must be the object of the fraud to obtain that specific property). Simply put, for this Court to have had jurisdiction, the Government needed to allege specifically and in detail five elements and yet instead, the Government only poorly alleged three – and even with those three they failed to state a federal crime that would invoke the jurisdiction of this Court. Furthermore, convicting someone "on a record lacking any relevant evidence as to a crucial element" also "violates due process." *See Vachon v. New Hampshire*, 414 U.S. 478, 480 (1974). Because Petitioner was sent to prison for conduct that was not criminal under the law according to *Kelly* and *Skilling*, his Indictment should be dismissed and a swift reversal is warranted.

Finally, even if the Court was to incorrectly assume that Petitioner's Indictment was not legally deficient and the Indictment gave him "Fair Warning" in accordance with *Marinello*, this

5

Court should still dismiss the Indictment because the Second Circuit has found that "It is a universally-accepted truth in the law that each of the elements of the crime must be proved at trial for there to be a valid conviction." *See United States v. Crispo*, 306 F.3d 71, 74 (2d Cir. 2002).

There was no valid conviction here because just as in *Balde*, the Indictment was constitutionally defective at the time because of *Skilling*, and certainly after *Marinello, Class*, and *Kelly*, the Court lacked jurisdiction, and none of the five required elements required to secure a conviction for mail and wire fraud were proven by the Government beyond a reasonable doubt. Because the mail and wire fraud counts fail, so too must the money laundering counts fail as the proceeds subject to money laundering must be illicit proceeds from a federal crime. If there was no mail and wire fraud in this case, there can be no money laundering of any of the proceeds as a matter of law, and the entire Indictment must be dismissed.

## I.     LEGAL STANDARD

As the Supreme Court has made clear, "Subject matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141-42 (2012):

> "When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety. "[M]any months of work on the part of the attorneys and the court may be wasted." *Gonzalez* at 142, *citing Henderson v. Shinseki*, 562 U.S. 428 (2011).

Petitioner moves to dismiss the Superseding Indictment pursuant to the old rules under Fed.R.Crim.P. 12(b)(3)(B) which allow Petitioner to bring a challenge to the Court's subject matter jurisdiction or the sufficiency of the Indictment at any time, even after conviction, because the Indictment is legally deficient and fails to allege all of the facts necessary to constitute a **federal** offense, and because the Indictment fails to charge mail and wire fraud with the particularity needed to invoke this Court's jurisdiction. Rule 12(b)(3)(B) provides, in pertinent part, that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." In December 2014, the Federal Rules were amended to require that Rule 12(b)(3)(B) claims be made before the trial begins, but because Petitioner was indicted in December 2013 and May 2014, he clearly qualifies under the old rules.

As this Court knows, the Government postponed the appeal concerning Restitution in this case, so the case is still active in the Second Circuit and the old rules of Rule 12(b)(3)(B) still apply, which means that Petitioner's motion to dismiss the indictment is both timely and meritorious. If the Court examines the Indictment of 2014 and finds that it is deficient in alleging the facts to support the five necessary elements of mail and wire fraud, then the Court must dismiss the Indictment as a matter of law. *See United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012):

7

"a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute. *See United States v. Pirro,* 212 F.3d 86, 91-92 (2d Cir. 2000). The sufficiency of an indictment and the interpretation of a federal statute are both matters of law that we review de *novo. See Fiero v. Fin. Indus. Regulatory Auth., Inc.,* 660 F.3d 569, 573 (2d Cir. 2011)." *Id.* at 75-76.

If this Court lacks jurisdiction due to the Government's failure to allege all of the specific facts necessary to make Petitioner's conduct a federal crime, then this Court must dismiss the Indictment pursuant to Rule 12(b)(3)(B) as the Second Circuit did in *Aleynikov* based on the Second Circuit's decision in *Pirro.* Accordingly, the allegations in the Indictment failed to satisfy the legal requirement necessary to make out a violation of the federal mail and wire fraud statutes. Because the Government has failed to specifically allege the facts necessary for each and every one of the five elements that must be alleged for federal mail and wire fraud, the Indictment is defective as a matter of law, and such defect therefore deprives this Court of jurisdiction over the case, even at this late date. As the Second Circuit made clear in *United States v. Balde,* 943 F.3d 73 (2d Cir. 2019):

"Under the plain error standard, an appellant must demonstrate that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Within the context of plea proceedings, "a defendant must establish that the violation affected substantial rights and that there is a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Garcia,* 587 F.3d 509, 515 (2d Cir. 2009)." *Id.* at 96.

As the Second Circuit determined in *Balde,* the test would be whether the government or Court in examining the law as it currently stands, would bring the case again based on the Supreme Court decisions. The Supreme Court has explained that "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison,* 449 U.S. 361, 364 (1981). While dismissal of an indictment

might be a remedy of last resort, it is appropriate to "restore the defendant to the circumstances that would have existed had there been no constitutional error." *See United States v. Stein,* 541 F.3d 130, 144 (2d Cir. 2008), *quoting United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir. 2000).

In *Aleynikov,* the Second Circuit examined the deficiencies of the indictment even after the defendant was tried, found guilty, and sentenced. Because the indictment failed to specifically allege sufficient facts necessary to establish all of the elements of a federal crime in order to sustain an indictment under federal law, the indictment was found to be insufficient and was dismissed and Aleynikov's conviction was set aside. The Second Circuit relied extensively on its earlier decision dismissing the indictment in *Pirro,* which set the standard for reviewing the sufficiency of an indictment in the Second Circuit. Therefore, based on recent decisions in both the Second Circuit and Supreme Court, the Indictment in this case was woefully inadequate and should be dismissed as happened with the indictments in *Aleynikov* and *Pirro.*

## II.     THIS COURT LACKED JURISDICTION

Subject matter jurisdiction of the court can be challenged at any time, even after judgment has been rendered. *See, e.g., Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). Thus, "a court's subject matter jurisdiction may be raised at any point." *Peretz v. United States*, 501 U.S. 923, 953 (1991). Similarly, "a claim that an indictment does not charge an offense may be raised at any time." *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000). *See, also*, the old Fed.R.Crim.P. 12(b)(3)(B) which states that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Finally, there is no jurisdiction unless "the indictment alleges all of the statutory elements of a federal offense." *United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2013).

The "inquiry into whether an indictment charges a federal offense for the purposes of establishing subject matter jurisdiction" asks "whether the face of the indictment discloses that the count or counts…failed to charge a federal offense." *Yousef* at 259, *quoting Hayle v. United States*, 815 F.2d 879, 882 (2d Cir. 1987). Petitioner's Indictment obviously fails this test because it was legally necessary to allege five elements in detail, and instead it poorly alleges only three. This failure to actually allege an "offense against the laws of the United States" means there was no jurisdiction for Petitioner's prosecution. *Yousef* at 259. Moreover, Petitioner had "no notice of the true nature of the charge." *See Bousley v. United States*, 523 U.S. 614, 618 (1998).

Federal courts are courts of limited jurisdiction, and not all frauds rise to the level of conduct falling within the federal mail and wire fraud statutes or involve the United States of America in such a way that would invoke federal jurisdiction. The federal courts have consistently held to the principle that once jurisdiction is challenged, the District Court has **no authority to do anything** but to take action on the motion to determine whether or not it has jurisdiction to proceed.

10

"Jurisdiction **cannot be assumed** by a district court nor conferred by agreement of parties, but it is incumbent upon [the US Attorney] to allege in clear terms, the necessary facts showing jurisdiction which must be proved by convincing evidence." *McNutt v. General Motors Acceptance*, 298 U.S. 178 (1936). If a court lacked jurisdiction, any judgment that it made is null and void as a matter of law. *See, e.g., United States v. Peter,* 310 F.3d 709 (11th Cir. 2002), *citing United States v. Morgan*, 346 U.S. 502 (1954):

> "When a court without jurisdiction convicts and sentences a defendant the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Peter* at 715.

For example, in *United States v. Maze,* 414 U.S. 395 (1974), the Supreme Court reversed the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any way on the mailings at issue, focusing on "the more difficult question [of] whether [the] mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the statute." *Maze* at 402. Here, as in *Maze*, the success of the alleged scheme clearly did not depend in any way on the use of mails or wires by Petitioner, as the mailings and wires listed in the Indictment all occurred **after** the alleged fraud was **complete**. Moreover, all of the Counts of the Indictment concerning Petitioner list mailings and wires that had nothing to do with the alleged nondisclosure in this case of Grist Mill Capital funding the premiums for the Charter Oak Trust's policies. Certainly, there is no way that innocent premium payments were part of the scheme to defraud. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this…"). *Maze* at 405; *see also United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), where it was determined the mails and wires were not "in furtherance" of the fraud. Accordingly, the federal mail and wire fraud statutes have not

11

been properly invoked, so this Court lacked jurisdiction to proceed any further and the Indictment must be dismissed in this case.

Because the Government has not alleged any scheme to defraud, much less the particularity required (the "who", "what", "where", and "when" of fraud), this Indictment is woefully inadequate even as a basis for **civil** fraud much less criminal fraud. As the Seventh Circuit held in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), "[b]oth the 'scheme or artifice to defraud' clause and the 'obtaining money or property' clause…contemplate a transfer of some kind." *Id.* at 1227. In Petitioner's case there was no "deceitful scheme" or any fraudulent **material** misrepresentations with the intent to **obtain** the victim's property as the word "obtain" is defined in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017) and *Sekhar v. United States*, 133 S.Ct. 270 (2013), but more importantly, there are no specific material misrepresentations alleged in the Indictment. *See, also, United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). And, as the Seventh Circuit points out, just because there were losses in a "deceitful scheme," that does not satisfy the statutory requirements of mail and wire fraud.

Moreover, the mailings relied upon by the Government, none of which originated with Petitioner or were caused by him, occurred after the alleged "scheme" was complete and did nothing to further the scheme. None of the premium payments in this case were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed.

Petitioner respectfully suggests that this Court did not have jurisdiction over him because the federal mail and wire fraud statutes do not purport to reach **all frauds**, but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944)

(emphasis added). *See also Maze*. In this case, the Government's indictment not only fails to address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment involves an email, letter, or wire involving Petitioner that came **after** the allegedly fraudulent applications had been submitted between 2006 and 2008. All of the Counts in the Indictment relate to acts occurring after the alleged fraud had come to its full fruition with the submission of the insurance applications to the Carriers. And, if the alleged fraud was now a crime of omission or nondisclosure based on Grist Mill Capital funding the policies, then it was outside of the fraud statutes according to *Skilling*. Therefore, none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

### III.    THE INDICTMENT FAILED TO ALLEGE ALL FIVE ELEMENTS

In a landmark decision issued in April 2012, the Second Circuit dismissed the indictment of Goldman Sachs computer programmer Sergey Aleynikov pursuant to Rule 12(b)(3)(B) even after he had been tried and found guilty, just as in Petitioner's case, because the indictment against him failed to state all the elements of a federal crime and therefore failed to establish the jurisdiction of the federal court. *See United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012). Even though *Aleynikov* dealt with highly sophisticated computer programming crimes, the similarities between it and Petitioner's case could not be clearer. At this late date, the Government has repeatedly failed to show even a single false statement made by Petitioner or an intent to cause "**tangible economic harm**" as required by *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994); much less a scheme to defraud that would rise to the level necessary for a mail and wire fraud indictment, especially after the Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) as well as the Supreme Court's decisions in *Marinello* and most recently in *Kelly v. United States*, 140 S.Ct. 1565 (2020). The Indictment fails to adequately allege each of the five elements required to invoke the federal jurisdiction of this Court. Because the Indictment was constitutionally insufficient, this Court lacked jurisdiction as a matter of law. Moreover, the Indictment clearly failed to state a federal crime as described in *Aleynikov* and *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000).

The Indictment in this case fails even to allege any specific intent on the part of Petitioner to cause tangible economic harm to anyone. Moreover at this late date, the Government has failed to allege, much less prove at trial, each and every and every one of the necessary elements to secure a mail and wire fraud conviction. The five necessary elements can be found in Charles Doyle's highly regarded report from the Congressional Research Service to Congress on mail and wire

14

fraud dated July 21, 2011, where he states the elements of mail and wire fraud that must be alleged

in an indictment and proven beyond a reasonable doubt are that the defendant:

(1)      Used either mail or wire communications **in the foreseeable furtherance**,
(2)      of a scheme to defraud,
(3)      involving a material deception,
(4)      with the intent to deprive another of,
(5)      either property or honest services.

*See* report to Congress on the elements of mail and wire fraud by the Congressional Research

Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal*

*Law*, by Charles Doyle, July 21, 2011 attached as Exhibit One. Failure to properly allege each and

every one of these elements with sufficient facts renders an indictment facially invalid. "Where

guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held

that an indictment must do more than simply repeat the language of the criminal statute." *United*

*States v. Russell*, 369 U.S. 749, 764 (1962). Petitioner's Indictment is devoid of any **specific** intent

to defraud. In fact, the words "mens rea," "scienter," and even the "specific intent to defraud" are

nowhere to be found in the Indictment, even though those words are required by the US Attorney's

Manual. *USAM Chapter 9-43.000, Criminal Resource Manual at 948.* This fact alone renders the

Indictment defective. Just reciting the basic elements of mail and wire fraud are not enough.

The Government must allege specific facts in an indictment that comprise a federal crime.

Generally, Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to

provide "a plain, concise and definite written statement of **the essential facts** constituting the

offense charged." The indictment may incorporate the words of the statute to set forth the offense,

but the statutory language must be accompanied with such a statement of the facts and

circumstances as will inform the accused of the specific offense, coming under the general

description, with which he is charged. *Hamling v. United States*, 418 U.S. 87, 117-18 (1974)

15

*quoting United States v. Hess*, 124 U.S. 483, 487 (1888)). Where guilt depends so crucially upon...a specific identification of fact...cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Hamling* at 118.

Not all frauds are federal frauds – as the Supreme Court unanimously confirmed in *Kelly* – and as Second Circuit has made clear in *Aleynikov* and *Pirro*. Specifically, in this case, the Government has failed to allege all five elements necessary to invoke this Court's jurisdiction to prosecute a mail and wire fraud case. There is not a single sentence in the entire Indictment that even mentions the "specific intent to defraud" necessary to indict someone for mail and wire fraud as required in *Countrywide*. Similarly, the words "right to control" and "tangible economic harm" are nowhere to be found in the Indictment as required by *Finazzo* and *Mittelstaedt*. Also, since this case involves insurance contracts, there can be no mail and wire fraud here unless the parties never intended to pay the insurance premiums or live up to their part of the insurance bargain. It is time for this Court to remedy these procedural defects and to dismiss the Indictment in its entirety and set aside Petitioner's conviction as was done in *Aleynikov* based on *Pirro*, where the Second Circuit stated:

> The Sixth Amendment guaranty of the defendant's right "to be informed of the nature and cause of the accusation" against him is also offended by an indictment that does not state the essential elements of the crime. *Russell* at 761. Because the requirement of a sufficient indictment serves these important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn. *See Sanabria v. United States,* 437 U.S. 54, 65-66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored...."). The Supreme Court, has recognized a limitation on this practice, so that "where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must descend to particulars." *United States v. Cruikshank,* 92 U.S. 542 (1875).... "Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Hess,* 124 U.S. 483, 487 (1888). *Russell* at 765." *Pirro* at 91-92.

The Indictment as it relates to Petitioner is also constitutionally deficient because it contains no description beyond the conclusory allegations referencing the statute allegedly violated. As such, the Indictment in its current state deprives Petitioner of constitutionally fair notice of the charges and for that reason alone should be dismissed. *See Fleisher v. United States*, 302 U.S. 218 (1937) for the proposition that "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie, the defendant's commission of that crime." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992). *See also United States v. Polychron*, 841 F.2d 833 (8th Cir. 1988). A bill of particulars cannot cure a legal deficiency in the Indictment; rather, the proper result is dismissal of the indictment. *See, e.g., Russell* at 770 ("But it is a settled rule that a bill of particulars cannot save an invalid indictment"). S*ee, also, United States v. Norris*, 281 U.S. 619, 622 (1930). The Supreme Court has cautioned:

> Undoubtedly the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged. *Hamling* at 117.

*See also United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (holding that, absent intent to harm or actual harm, deception alone does not constitute fraud); *Starr* at 98-99 (holding that because the scheme was **designed to satisfy** [the carriers], rather than harm the [carriers], the deception did not constitute fraud); *Regent Office* at 1181 (rejecting Government's theory that merely inducing the customers "to part with their money because of the false representations…amounted to fraud").

In *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002), the Government argued that "an indictment or information charges an offense, for purposes of the old Rule [12(b)(3)(B)], as long as it recites in general terms the essential elements of the offense, even if the specific facts

17

alleged in the charging instrument fail to satisfy those elements." The court in *Panarella* held, however, that **"for purposes of [the old Rule 12(b)(3)(B)], a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute**, as a matter of statutory interpretation." *Id.* (emphasis added).

The court's common sense rejection of the Government's argument in *Panarella* - that an indictment that merely tracks the language of a criminal statute states an offense even where the facts it alleges do not fall within the meaning of that statute - is consistent with the law of this and every other circuit with respect to the sufficiency of an indictment. Therefore, an indictment is thoroughly defective under the law of this and every other circuit when it alleges conduct, however broadly and generously interpreted, that simply does not violate the charged statutes. Merely parroting the statute will not do. There must be specific allegations of facts and the necessary elements of the stated offense to survive a motion to dismiss the Indictment.

This Indictment is woefully inadequate as a matter of law, and does not state the elements of mail and wire fraud to make the breach of contract into a "federal" crime, nor does it allege the facts necessary to constitute a criminal offense. The Indictment is devoid of any facts related to Petitioner, which is not enough for a criminal indictment. There is also no allegation in the Indictment that Petitioner owed any "honest services" or a "fiduciary duty" to the Carriers; he did not. In sum, as the Indictment relates to Petitioner, it fails to state a viable claim of mail or wire fraud.

## IV.   THE   INDICTMENT   IN   THIS   CASE   WAS   CONSTITUTIONALLY DEFICIENT

In *Aleynikov*, the Second Circuit reviewed the indictment even though the defendant had been tried, convicted, and sentenced to 96 months in prison. Aleynikov challenged the sufficiency of his indictment to state a federal crime, and the Second Circuit examined the two federal statutes at issue which involved the theft of computer software, concluding that the indictment did not satisfy the requirements of providing facts sufficient to invoke the jurisdiction of the federal court or state a federal crime. Therefore, the indictment was dismissed and Aleynikov's conviction was set aside. Significantly, the basis for the decision in *Aleynikov* was based on the dismissal of the indictment in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), where the Second Circuit laid out the requirements under the Fifth and Sixth Amendment for an indictment to be sufficient:

> "A criminal defendant is entitled to an indictment that states the essential elements of the charge against him. *See Jones v. United States,* 526 U.S. 227, 232 (1999). An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments. *See Russell v. United States,* 369 U.S. 749, 760-61 (1962). The Fifth Amendment guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, *see Russell* at 770; *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir. 1999), or that the grand jury acted properly in indicting him. *See Russell* at 768-69.
>
> If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, *see Russell* at 770; or that the grand jury acted properly in indicting him. *Russell* at 768-69 (An important corollary purpose of requirement that indictment state elements of offense is to allow court to evaluate whether facts alleged could support conviction.) *See generally* 2 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* §19.2 at 436, 448-49 (1984) ("[T]he requirement that the offense be stated ... specifying in detail each element of the crime, was seen as providing assurance both that the grand jury understood what was necessary to establish an offense and that the courts did not engage in unanticipated extensions of the substance of the offense."). "The Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury."

The Sixth Amendment guaranty of the defendant's right "to be informed of the nature and cause of the accusation" against him is also offended by an indictment that does not state the essential elements of the crime. *Russell* at 761. Because the requirement of a sufficient indictment serves these important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn. *See Sanabria v. United States,* 437 U.S. 54, 65-66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored...."). The Supreme Court, has recognized a limitation on this practice, so that "where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must descend to particulars." *United States v. Cruikshank,* 92 U.S. 542 (1875).... "Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Hess,* 124 U.S. 483, 487 (1888). *Russell* at 765." *Pirro* at 91-92.

Moreover, the Second Circuit reached a similar conclusion in *United States v. Pacione,* 738 F.2d 567 (2d Cir. 1984), where the defendant moved to dismiss those counts of an indictment that charged him with violating the extortionate credit statute, 18 U.S.C. §891 *et seq.*, by threatening to record a mortgage and a deed. Although the indictment tracked the language of the statute, the defense argued, and Judge Knapp agreed, that the threat of non-violent conduct it alleged as a factual basis for that statutory violation "was not what congress meant to prohibit in the extortionate credit statute." *Id.* at 569. Rejecting the Government's appeal, the Second Circuit affirmed that dismissal because its analysis of the statute revealed that, as Judge Knapp had concluded, the defendant's activities as alleged in the indictment were beyond the limits of that statute. *Id.* at 572.

One of the other cases cited in *Aleynikov* is the First Circuit's decision in *United States v. Rosa-Ortiz,* 348 F.3d 33 (1st Cir. 2003), which affirmed the dismissal of an indictment charging the defendant with conspiracy to violate the Federal Escape Act, 18 U.S.C. §751(a) because **that statute does not prohibit the conduct that was described and charged in the indictment in that case**. In *Rosa-Ortiz,* the indictment charged the defendant with conspiring to violate §751(a)

by assisting in the escape of his co-defendant, who was in federal custody on a federal material witness warrant. Unlike Petitioner, the defendant in *Rosa-Ortiz* pleaded guilty to that charge and appealed, arguing that his conduct was not within the crime charged. The First Circuit agreed, finding that §751(a), which by its terms proscribes escapes of those in federal custody "by virtue of an arrest on a charge of felony, or conviction of any offense," does not apply to the escape of one taken into federal custody on a material witness warrant. The court explained, "[t]he plain text of [Section 751(a)] does not support the indictment in this case, and due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* at 42 (*quoting United States v. Lanier*, 520 U.S. 259, 266 (1997)).

Similarly, the First Circuit's decision in *Rosa-Ortiz* was largely based on the Eleventh Circuit's decision in *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002), Petitioner respectfully asks the Court to examine the lack of subject matter jurisdiction under the old Rule 12(b)(3)(B) because, unlike the defendants in *Rosa-Ortiz* and *Peter*, Petitioner did not do the acts he was accused of and never pleaded guilty to those actions at any point. Therefore, this Court should set aside Petitioner's conviction under the old rules of Rule 12(b)(3)(B) that are still applicable to his case. In granting a Writ of Coram Nobis in *Peter*, the Eleventh Circuit's decision is very instructive on the necessity to clearly allege each element of a crime because the Eleventh Circuit dismissed the indictment in *Peter* as the defendant pleaded guilty to conduct that was later found to not be criminal in the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000):

> The problem is not that the Government's case left unanswered a question as to whether its evidence would encompass a particular fact or element. Rather, it is that the Government affirmatively alleged a specific course of conduct that is outside the reach of the mail fraud statute. Peter's innocence of the charged offense appears from the very allegations made in the superseding information, not from the omission of an allegation requisite to liability. *Peter* at 715.

21

In fact, the Eleventh Circuit ruled that because of *Cleveland,* the defendant in *Peter* did not commit a federal crime and therefore the District Court lacked jurisdiction and that the judgment of the court was void, and set aside Peter's conviction because "When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Peter* at 715.

Just as the defendant in *Peter* had his conviction vacated and indictment dismissed because of *Cleveland,* so too does the Supreme Court's recent decisions in *Marinello* and *Kelly* warrant the dismissal of Petitioner's Indictment for failure to state a federal crime with the "Fair Warning" as required by the Constitution. Significantly, the Supreme Court's decision in *Skilling v. United States*, 561 U.S. 358 (2010) also warrants dismissing Petitioner's Indictment for failure to state a federal crime. Petitioner asks this Court to look at the holdings above to make it clear that there was no scheme to defraud in this case based on the Supreme Court's statement in *Skilling* that "Nondisclosure is outside the bounds of the fraud statutes," and in any type of fraud, "the fraudster's gain should be the mirror image of the victim's loss." *Skilling* at 410. Obviously, the unanimous holding in *Skilling* renders Petitioner's Indictment constitutionally defective. Therefore, just as the Supreme Court's decision in *Cleveland* wiped out the conviction in *Peter*, so too should this Court set aside Petitioner's conviction based on the Supreme Court's decisions in *Skilling, Marinello,* and *Kelly.*

Once again, unlike the defendant in *United States v. Balde*, 943 F.3d 73 (2d Cir. 2019), Petitioner did not do the acts he was accused of, and he never pleaded guilty to those actions at any point. In *Balde*, the defendant challenged both the jurisdiction of the court and his ability to plead guilty to a non-crime based on the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191, 2200 (2019). Significantly, the Second Circuit reversed his conviction – not because

the court lacked jurisdiction – but because the indictment failed to state a federal crime that he could plead guilty to. Therefore, this Court should also set aside Petitioner's conviction under the old rules of Rule 12(b)(3)(B) that are still applicable to him. Significantly, in *Balde*, the Second Circuit ruled that the district court did have subject matter jurisdiction to accept the guilty plea, but that the court's instructions constituted Plain Error because it did not explain the knowledge factor as required by *Rehaif*. As the Second Circuit stated:

> While "[w]e typically do not find plain error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court, we do ask whether an error is "so egregious and obvious that a trial judge and prosecutor would be derelict *in permitting it in a trial held today*. *Rehaif* settles this question: there is now binding Supreme Court precedent that "the Government...must show that [Balde] knew he possessed a firearm and also that he knew he had the relevant status when he possessed it. *Rehaif* at 2194." *Balde* at 97.

Therefore, Petitioner respectfully asks this Court to review the alleged conduct in the Indictment between 2006 and 2008 through the lens of *Skilling* in 2010, *Marinello* in 2018, *Kelly* in 2020, *Countrywide* in 2016, and *Finazzo* in 2017. Petitioner's Motion pursuant to Rule 12(b)(3)(B) is timely, and unlike the defendant in *Balde*, Petitioner is able to challenge both the jurisdiction of this Court and the sufficiency of the Indictment. Similarly, unlike the defendants in in *Rosa-Ortiz*, *Peter*, and *Balde*, Petitioner did not commit the acts that would be necessary for the indictment to be brought, and he did not plead guilty at any point in time. Therefore, Petitioner respectfully challenges the jurisdiction of the Court as well as the sufficiency of the Indictment as was done in *Aleynikov* and *Pirro*. Petitioner also realizes that none of these issues were brought up on appeal and therefore submits them under the same Plain Error standard that was successful in having the conviction set aside in *Balde*.

The Government must also show that the defendant intended to cause actual "**tangible economic harm**" to the other contracting party. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir.

2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). But, once again, in this case, the Government made no such concrete allegations in the Indictment. Critically, the Indictment makes no allegation that Petitioner failed to perform any work called for under any contract that he signed, and there were no **material** misrepresentations in any of the Grist Mill Capital or Charter Oak Trust documents that Petitioner signed or was involved in. The Court knows that Petitioner did not fill out, sign, or send in any of the alleged false applications. Each and every application involving the Charter Oak Trust was filled out by a licensed agent of the carrier, so if the crime here was "nondisclosure" to the Carriers, then that crime was committed by the brokers and agents of the Carriers. Obviously, Petitioner had no duty to disclose anything to the Carriers, so his nondisclosure cannot possibly be criminal as a matter of law.

The Government's allegations that Petitioner somehow committed fraud by failing to disclose a breach is nothing more than a semantic trick designed to evade the holdings of all of the cases cited in this Motion. If the failure to disclose a breach of contract constituted fraud, then nearly every breach of contract would constitute fraud. That is precisely the result that the cases foreclose. To prosecute mail and wire fraud cases arising out of contractual relationships, "much more" than a mere undisclosed breach is required. *See Countrywide citing Corley* at 1007. At a minimum, fraud "requires a showing of deception **at the time the promise is made.**" *Id.* (emphasis added). In this case, the Government has made no such allegation. Moreover, at this late date, the Government has not provided even one example of Petitioner making an oral or written fraudulent misrepresentation, much less a fraudulent **material** misrepresentation as required by *Neder v. United States*, 527 U.S. 1 (1999).

The Government must also show that the defendant actually intended to cause economic harm to the other contracting party. *See United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir.

1998) (conviction for Mail Fraud reversed because Government must show that the defendant actually intended and contemplated actual "concrete harm" to his victims); *United States v. Sun-Diamond Growers*, 138 F.3d 961, 973 (D.C. Cir. 1998). There is no allegation contained in the Indictment here at all of Petitioner's "specific intent" to harm, deceive, cheat, or steal anything from anyone, much less "tangible economic harm" as required by *Mittelstaedt* and *Finazzo*. Indeed, what is apparent is that this entire dispute has worked to the economic benefit of the Carriers, as they have used Petitioner's alleged fraud to keep the premiums paid in addition to the restitution payments for their nonexistent losses.

The Indictment makes absolutely no allegation of actual or intended economic harm to the Carriers. There is no mention at all of Petitioner's "specific intent" to harm, deceive, cheat, or steal anything from anyone. Indeed, what is apparent is that this entire dispute has worked to the economic benefit of the Carriers, as they still collect premiums and pay death benefits to this very day. This Court should similarly reject the Government's novel and expansive theory of mail and wire fraud based on *Binday*, while rejecting *Aleynikov, Pirro*, and *Mittelstaedt*. The mail and wire fraud charges in this case rest, at their core, on an allegation of an undisclosed intent to sell the policies, which is clearly false, and the nondisclosure of Petitioner's company, Grist Mill Capital, as the funder of the policies, which is also clearly false. Even as a general matter, such a theory would be dubious and would certainly not rise to the level necessary to be a "federal" fraud or a "criminal" offense.

The conclusions reached by the Second Circuit in *Finazzo, Countrywide*, and *Aleynikov* based on decisions in other circuits, as well as the First Circuit in *Rosa-Ortiz* and Second Circuit in *Pirro*, are commensurate with the positions by numerous district courts throughout the country. As these cases make clear, an indictment that merely tracks the language of a charged statute and

alleges vague criminality **but alleges no facts that actually violate the statute it charges cannot be sustained**. The fatal flaw in such indictments is that the facts they allege make clear that the charge cannot be maintained and no actual federal crime has been committed, as is the case here.

That is precisely the problem with Petitioner's Indictment. Each Count of the Indictment that charges Petitioner with an alleged federal crime merely parrots the language of the mail and wire fraud statute without any details establishing the necessary elements of the crime. But none of the counts allege facts that would bring Petitioner's conduct within the meaning of the charged statutes under any circumstances. For example, none of the mailings or wires were done by Petitioner or even contemplated by Petitioner. None of the mailings and wires were done in **furtherance** of a scheme to defraud, because there is no description of what the scheme to defraud was at the time. The Carriers received all of the premium they were entitled to, and all the Government claimed at trial was that Petitioner failed to disclose the Grist Mill Capital financing documents behind the Charter Oak Trust.

This accusation by the Government is both untrue and unfounded, but even if it was true, it would not describe a federal crime under *Skilling* because "[N]ondisclosure is outside the bounds of the mail and wire statutes." Nor would it describe a crime under *Kelly*, because the scheme to defraud must involve taking actual money or property from the Carriers. As Petitioner has pointed out, both *Kelly* and *Skilling* were unanimous Supreme Court decisions, and just like the indictment in *Aleynikov, Pirro,* and *Peter*, it appears that Petitioner's Indictment does not describe a federal crime and so this Court's judgment is void as a matter of law as the defective Indictment failed to invoke this Court's jurisdiction. Therefore, Petitioner's Indictment should be dismissed and his conviction set aside.

## V.   THIS COURT'S COMMENTS IN *SHAPIRO* PREDATED THE SUPREME COURT'S DECISION IN *MARINELLO*

In *Marinello v. United States*, 138 S.Ct. 1101 (2018), the Supreme Court cited to several famous cases requiring a defendant to not only know what conduct he is doing that crosses the line into a crime or conduct proscribed by law, he must also know what punishment he will face for breaking the law should he willfully pass that line:

> "Willfulness…requires the Government to prove that the law imposed a duty on the defendant, **that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.**" *Cheek* v. *United States*, 498 U.S. 192, 201 (1991). A taxpayer may know with a fair degree of certainty that her babysitter will not declare a cash payment as income-and, if so, a jury could readily find that the taxpayer acted to obtain an unlawful benefit for another. For the same reason, we find unconvincing the dissent's argument that the distinction between "willfully" and "corruptly"-at least as defined by the Government-reflects any meaningful difference in culpability.
>
> Regardless, to rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor. Doing so risks allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Smith* v. *Goguen*, 415 U.S. 566, 575 (1974), which could result in the non-uniform execution of that power across time and geographic location. And insofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system. That is one reason why we have said that we "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell* v. *United States*, 136 S.Ct. 2355 (2016) (quoting *United States* v. *Stevens*, 559 U.S. 460, 480 (2010)). And it is why "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute.
>
> We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that *a fair warning should be given to the world in language that the common world will understand, of **what the law intends to do if a certain line is passed**. McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106-09 (emphasis added).

If Marinello did not have "Fair Warning" that he would be punished for his conduct, certainly Petitioner could not have had "Fair Warning" that his conduct involving Grist Mill Capital lending money to the Charter Oak Trust could possibly be criminal and that he could be punished for that conduct. But more than that, *Marinello* says that in addition to the "knowledge"

that you were breaking the law, you must also know that the law intends to punish you once you cross that "brightly marked" line. Interestingly, in *Marinello,* the Supreme Court determined that Marinello did not only have adequate "Fair Warning" that he had committed a crime, but he had no conception that he could go to prison for his conduct. Perhaps the best analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter in cash. Neither the parents nor the babysitter report that transaction to the IRS as taxable income. Clearly, that could be considered a violation of the tax laws, but no one would seriously believe the babysitter would be sentenced to 30 months for accepting cash "under the table" for doing her job.

In fact, prior to *Marinello*, this Court granted a new trial in *United States v. Gramins* based largely on the same concept as expressed in the Second Circuit's decision in *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"). Petitioner wishes to focus on page 20 of this Court's decision in *Gramins*, which mentions the acquittal of the defendant David Demos in *United States v. Demos*, No. 16-cr-220:

> "In *United States v. Demos*, another case involving misrepresentations by a broker-dealer in the RMBS market, Judge Thompson barred counsel and expert witnesses from using the terms "broker" and "commission" because "[j]urors may be familiar with brokers and the concept of commission in their own affairs and associate those terms with an agency relationship." The jury acquitted Demos on all counts. *See id.*" *See* page 20, n.8:

Mr. Demos was acquitted in large part **because the jury instructions in his case were drawn from this Court's decision in *Shapiro***. For example, this Court stated in *Shapiro:*

> **"I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment**....The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the Government has a burden to prove that the defendant knew his conduct was unlawful. **Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.**" *Demos citing Shapiro* at Vol. XIII, 2617.

But, this Court is also quoted in *Demos* as saying:

> To establish that a defendant 'willfully violat[ed]' the anti-structuring law, **the Government must prove that the defendant acted with knowledge that his conduct was unlawful**." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).... As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "**the Government must prove that the defendant acted with knowledge that his conduct was unlawful**." *Bryan v. United States*, 524 U.S. 184, 191 (1998).

Then, the final quotations of this Court from *Shapiro* that led to the acquittal in *Demos* and a new trial order in *Gramins* is particularly relevant to this Motion:

> "*As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances*." *See Regent Office* at 1179 (**lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud**). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment. *I would rather risk error on the side of lenity than the other way*."

Clearly, if the defendants in *Marinello, Demos, Shapiro*, and *Gramins* did not know that they were "crossing the line" and "breaking the law," and that they did not know they could be prosecuted **and punished** for their conduct, Petitioner respectfully suggests that there are far fewer "STOLI fraud" cases in America than even the few cases involving brokers lying to clients on Wall Street.

The Indictment must also be dismissed because it fails to allege any "**knowledge**" on the part of the Petitioner that he was **willfully** participating in a scheme to defraud. One of the elements which has been considered **indispensable** to an indictment for any type of crime is **knowledge**;

e.g., knowledge that a law was broken. In *Pettibone v. United States*, 148 U.S. 197, 206-07 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their convictions, stated:

> It seems clear that an indictment against a person… must charge a knowledge or notice, on the part of the accused….Unless that fact exists, the statutory offense cannot be committed…and without such knowledge or notice, the evil intent is lacking.

In *Direct Sales v. United States*, 319 U.S. 703 (1943), the Supreme Court further affirmed the position it had taken in *Pettibone* fifty years prior, and stated:

> Without the knowledge, the intent cannot exist….Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal….This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes. *Id.* at 711.

The Supreme Court has also made it very clear that unless and until there is the "concurrence" of an evil meaning mind with an evil act, there is no crime. *See Morissette v. United States*, 342 U.S. 246, 251-52 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked."). That has been called the cornerstone of American jurisprudence. *See Elonis v. United States,* 135 S.Ct. 2001 (2015) *citing Liparota v. United States,* 471 U.S. 419, 427 (1985) ("It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."). There is no mention in the Indictment of Petitioner's "specific intent" to defraud anyone, nor is there any mention in the Verdict of the "concurrence of an evil-meaning mind with an evil-doing hand." As the Verdict makes clear, Petitioner did not fill out, sign, or send in any of the applications. And, quoting from the Verdict, the worst thing Petitioner may have done was to tell people to lie for him, which after the Supreme Court's decision in *Marinello* and certainly the "Bridgegate" case

30

of *Kelly*, the fact that someone lied or even worse told someone to lie, cannot possibly constitute mail or wire fraud.

Therefore, since the Indictment is devoid of any "evil acts" actually done by Petitioner and any "evil mind" is pure conjecture on the part of the Government and is not found anywhere in the Indictment or the Verdict, Petitioner's Indictment should be dismissed in its entirety. Because of the lack of any specific intent to defraud in the Indictment, or proof that Petitioner knew he was committing a crime and could be punished for his conduct, Petitioner respectfully asks this Court dismiss his Indictment as was done by the Second Circuit in *Aleynikov* pursuant to Rule 12(b)(3)(B) and as was done by the Supreme Court in *Marinello*.

## VI.   THE SUPREME COURT'S UNANIMOUS DECISION IN *KELLY* REQUIRES THE DISMISSAL OF PETITIONER'S INDICTMENT

Just as the Supreme Court's decision in *Cleveland* led to the grant of a Writ of Coram Nobis by the Eleventh Circuit in *Peter*, so too should this Court grant the dismissal of Petitioner's Indictment pursuant to Rule 12(b)(3)(B) based on the fact that the Supreme Court thoroughly dismantled the "Right to Control" theory of fraud advanced by the Government in that case as well as in Petitioner's case, based on the erroneous decision in *United States v. Binday,* 804 F.3d 558 (2d Cir. 2015). In supporting other Supreme Court precedent that reversed convictions based on intangible rights, the Supreme Court stated that:

> "But that property must play more than some bit part in a scheme: It must be an "object of the fraud. Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme... If U.S. Attorneys could prosecute as property fraud every lie [someone] tells in making such a decision, the result would be-as *Cleveland* recognized-"a sweeping expansion of federal criminal jurisdiction." *Id.* at 24. And if those prosecutors could end-run *Cleveland* just by pointing to the [] incidental costs, the same ballooning of federal power would follow. In effect, the Federal Government could use the criminal law to enforce (its view of) integrity in broad swaths of [activities]. The property fraud statutes do not countenance that outcome. **They do not "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial Government**." *Kelly v. United States*, 140 S.Ct. 1565, 1573-74 (2020), *quoting McNally* at 355.

In fact, in *Kelly*, the Supreme Court cites *United States* v. *Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993) for the proposition that under the prosecution's theory of fraud, even a practical joker could be prosecuted for mail and wire fraud. In dismissing the indictment in that case, Judge Easterbrook stated:

> "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. *Id.* "But there is no party; the address is a vacant lot; B is the butt of a joke." *Id.* Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it. *Id.* at 1226." *Kelly* at 1573, n.2.

The Supreme Court decision in *Kelly* discussed how the defendants committed a despicable act that should be condemned politically and actually did lead to Governor Christie falling in the polls, but also went on to say it was not a property crime nor did it cost citizens money or property, and therefore could not be prosecuted as mail or wire fraud. The First Circuit came to same decision in the case of *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019), where it vacated the conviction of the defendants for the Government's failure to prove one of the essential elements of the crime under 18 U.S.C. §666 because:

> "the Government was required to establish that...the Commonwealth of Puerto Rico, received at least $10,000 in federal "benefits" within the meaning of that statute. The Government did not meet this burden. Accordingly, we must reverse defendants' convictions for federal program bribery...For the reasons explained above, we conclude that the Government failed to establish an essential element of the crime it charged defendants with. We need not go further and hereby reverse Bravo's and Martínez's §666 convictions. We direct the district court to enter a judgment of acquittal on both charges. *Bravo-Fernandez* at 244, 250-51

In this case, not only were all of the insurance company premiums paid, there was never any attempt to "obtain" any money or property from the Carriers. In fact, the goal was just the opposite, which was to pay the Carriers the premiums that they had bargained for in the numerous insurance contracts. Even more significant to Petitioner's claim that his Indictment should be dismissed for failure to state a federal crime than the unanimous Supreme Court decision in *Kelly* that dispensed with the "Right to Control" theory of fraud is the Second Circuit's decision in *AEI v. Lincoln*, 892 F.3d 126 (2018), which specifically supports that fact that the Carriers were not cheated in this case because they received the actuarially-calculated premium amounts that they charged:

> "Nevertheless, Lincoln received all the payments it was due under the contract, and it is not alleged that the application was fraudulent with regard to Fischer's health. Jacob, the broker, received a commission of approximately $100,000 for his efforts with respect to Fischer's policy and, although he was aware that agents are forbidden by law to share their commissions with clients, transferred $50,000 to Irving for acting as a "middleman."

33

Although everyone involved feigned ignorance during his or her testimony that the district court found untrustworthy, **the district court found little reason to doubt that they all knowingly engaged in what was a STOLI scheme.**" *AEI* at 130.

"Lincoln concedes that despite the fraud, the policy's premiums were calculated "based on the statistics that applied to this woman with respect to her age and other conditions," which Lincoln does not allege to be fraudulent, and it received all the "premiums that [its] actuary said should be applicable here." **In other words, Lincoln was not "cheated of premiums.**" *Id.* (emphasis added).

It is beyond dispute that Petitioner did not fill out, sign, or send in any of the alleged fraudulent applications in this case. Surprisingly, Lincoln, who was the alleged victim of $50 million of the total $58 million in "actual" loss never appeared in this Court to claim restitution since executives testified at Petitioner's trial. In fact, just as the insurance executives testified in *Binday*, the life insurance carriers consider death benefits to be a "cost of doing business" and not a fraud loss because they "received the full economic benefit of its bargain." *Binday* at 570. Thus, not only was there no intended loss or intent to defraud to seize real money or property from the Carriers as required by *Kelly*, the worst that the Government can say about Petitioner is that he did not disclose the financial documentation of Grist Mill Capital being a secured lender to the Charter Oak Trust. But, once again, not only is this demonstrably false, if the Government's case is based on nondisclosure, then *Skilling* is directly on point because "Nondisclosure is outside the bounds of the fraud statutes." *Skilling* at 410.

Therefore, just as a number of cases that have been recently dismissed based on *Kelly* (*see, e.g., Olan v. United States*, No. 20-306, Judgment Vacated January 11, 2021), and the defendant in *Peter* that head pleaded guilty to crime and his conviction was vacated sentence was granted a Writ of Coram Nobis based on *Cleveland*, Petitioner respectfully submits to this Court that his Indictment should be dismissed pursuant to Rule 12(b)(3)(B) based on the Supreme Court's unanimous decisions in both *Skilling* and most recently in *Kelly*.

The Indictment also must be dismissed because (1) it fails to allege that the victims were deprived of "property" within the meaning of the mail and wire fraud statutes; (2) it fails to allege that Petitioner intended to defraud the carriers of any property; and (3) it alleges no mailing or wiring that was in furtherance of the scheme to defraud or that was a necessary part of the fraud, as required by the Supreme Court in *Parr v. United States*, 363 U.S. 370 (1960), *Maze,* and *Kann.* For these reasons, as written, the Indictment is insufficient on its face. The Court usually accepts as true the facts alleged in the indictment and determines only whether the indictment is "valid on its face." Petitioner argues that the Indictment must be dismissed because it fails to allege that the victims were **deprived of "property" within the meaning of the mail and wire fraud statutes**, and because it **fails to allege that Petitioner intended to defraud** the carriers of any property. *See, e.g., United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. April 21, 2008).

As a consequence, **the deceit practiced** must be related to the **contemplated harm**, and **that harm must be found to reside in the bargain sought to be struck**. *See United States v. Regent Office*, 421 F.2d 1174, 1180-82 (2d Cir.1970). **In order for the Indictment to allege a valid charge of mail or wire fraud under these circumstances, it must allege that the Carriers were deprived of some property right**.With regard to the Carriers as alleged victims, the Indictment is also insufficient. There is no allegation in the Indictment that Petitioner **ever actually possessed**, or had any "right, ownership or interest," in such "property." Moreover, even if it were assumed that the carriers were deprived of "property," the Indictment would still be insufficient because it does not allege **any type of misrepresentation or fraudulent conduct directed toward the carriers** regarding the "property."

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes-and schemes that depend for their completion on a misrepresentation of an essential element of the bargain-which do violate the mail and wire fraud statutes.

We concluded that no conviction under the mail fraud statute could stand where the misrepresentation was "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." The defendants nonetheless charged their customers as if the mailings were high-rate, and produced and mailed false invoices to show that the high-rate price had in fact been paid. *Id.* We decided that "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." *United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987). **Because "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution,"** we concluded that such a charge cannot apply to situations where the alleged victims "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* at 98-99.

And as in *Regent Office*, [the Carpenter Indictment] fails to allege that [Petitioner] misrepresented "the nature of the bargain." Instead, the indictment states only that [Petitioner's] misrepresentation induced [the carriers] to enter into a transaction it would otherwise have avoided. Because it does not assert that [Petitioner's] misrepresentation had "relevance to the object of the contract," we do not think it is legally sufficient. *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007).

The heart of the mail and wire fraud statutes is to condemn – and to punish – the willful and knowing participating in a scheme to defraud – both the successful and unsuccessful. "[T]he wire fraud statute punishes the scheme, not its success." *Pasquantino v. United States*, 544 U.S. 349, 371 (2005). If there is no "scheme to defraud" then there is no mail and wire fraud. As Justice Scalia famously scolded the Supreme Court: "[I]t is mail fraud, not mail and fraud..." *Schmuck v. United States*, 489 U.S. 705, 723 (1989). In the context of mail fraud and wire fraud, "the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally* at 358, *quoting Hammerschmidt* at 188.

Although the Indictment need not show that the intended victim of the fraud was actually harmed, it must show that the defendant **contemplated doing actual harm** to the insurance carriers. He must have intended to do something more than merely deceiving the victim. *See Regent Office,* at 1180-81. As a consequence, the deceit practiced must be related to the

36

contemplated harm, and that harm must be found to reside in the bargain sought to be struck. *Id.* at 1182. Furthermore, it is well established that a mere breach of contract does not constitute fraud nor does every mailing or wire that is part of an actual fraud rise to the level of federal mail and wire fraud. Not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud. Nor does a breach of contract in itself constitute a scheme to defraud.

The words "scheme to defraud" have long been held to mean: "to wronging one of his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally* at 358. Nowhere in Petitioner's Indictment is anyone "deprived" of anything by "trick, deceit, chicane, or overreaching." Nor is there any allegation in the Indictment of any attempt by Petitioner to use the mails or the wires in the **furtherance** of any scheme to defraud. All the mailings and wires are done by other people, not Petitioner. None of the talk in the Indictment mentions any "deception," "trickery" or "harm" meant to "deprive" anyone of anything. It has long been held that mail and wire fraud statutes speak of schemes to defraud or to obtain money or property by deceit or trickery.

Just as in *Kurtz*, the Indictment here is constitutionally infirm and is defective on its face because it fails to sufficiently allege **the specific intent to defraud** the carriers out of their property or money, through the use of mailings and wires in furtherance of the scheme to defraud. If the carriers would not have done the "deal" with Binday and his associates because of alleged STOLI purposes, then this is the *Shellef* "doctrine" in spades.

> As in *Starr*, the indictment here does not allege…that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received. And as in *Regent Office*, it fails to allege that [the defendant] misrepresented "the nature of the bargain." **Instead, the indictment states only that [the defendant's] misrepresentation induced [the**

**Carriers] to enter into a transaction it would otherwise have avoided. Because it does not assert that [the defendant's] misrepresentation had "relevance to the object of the contract," we do not think it is legally sufficient.** *Shellef* at 109 (emphasis added).

As discussed above, the Government's "scheme to defraud" theory is legally invalid.

Similar to *Kelly,* the Supreme Court in *United States v. Cleveland*, 531 U.S. 12 (2000) required that there must be real property or money that is the object of the fraud, and not intangibles like "licenses." To deprive victims of **real property or money** by fraud, trickery, or chicanery is the only way to invoke federal court jurisdiction through the mail and wire fraud statutes. In the instant matter, there is no proof that any of the Carriers actually lost any money. To the contrary, the Carriers have made millions, and have suffered no actual loss. The Carriers, in sum, were not deprived of any property as required by *Kelly*. Nor was it the intent of Petitioner to deprive the Carriers of money or property as required by *Cleveland*. The Indictment is filled with speculation and theories about loss, but there is no specific claim of actual loss of money or property, or allegations that Petitioner **intended** any of the Carriers to suffer any loss, which is the *sine qua non* of mail and wire fraud. Finally, the Indictment did not allege a federal crime because under *Skilling,* "Nondisclosure is outside the bounds of the fraud statutes." *Id.* at 410. The Indictment, therefore, should be dismissed as it was defective and failed to state a crime.

## VII.   THE SECOND CIRCUIT'S DECISION IN *COUNTRYWIDE* REQUIRES DISMISSAL OF THE INDICTMENT

The Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) totally eviscerates not only the Government's theory of culpability in Petitioner's case, but also the legal reasoning behind the Indictment in the first place. The bedrock of these elements is the "scheme to defraud," which requires proof that the defendant know that he was breaking the law and the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation of a material fact. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion." *Countrywide* at 657.

In *Countrywide*, everyone knows that the mortgage brokers lied from the top executives on down, but no one was criminally indicted unlike in Petitioner's case. But, if a mortgage applicant lies about his wealth on a mortgage application or the value of his property and then receives $400,000 in a cash mortgage that he defaults on after making only a few payments (as happened in thousands of cases in *Countrywide*), then the mortgage applicant really has "stolen" or defrauded the bank out of $400,000. There is truly real money or property "obtained" from the bank by "trickery or deceit." Suffice it to say, if there was no criminal mail or wire fraud at Countrywide in 2008, there was no mail or wire fraud involving the Charter Oak Trust from 2006 to 2008.

Furthermore, the Second Circuit evaluated "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?" *Countrywide* at 658. The Second Circuit concluded that a "scheme to defraud" requires proof of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is not an intent

39

not to perform one's obligations under the contract at the time of execution, a subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the mail or wire fraud statutes. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide* at 656.

The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous First Circuit cases in its analysis of the history of mail and wire fraud. Analyzing the history of the mail and wire fraud statutes and citing *Durland v. United States*, 161 U.S. 306, 313 (1896), the court buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that he or she is lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on it or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.*

The Second Circuit further emphasized **that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that intention not to perform on the promise when it was made.** *Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of

contract do not constitute a "scheme to defraud" under the mail and wire fraud statutes, absent a fraudulent intent at the time the contract is made. *Id.* at 661-62. As the Court is well aware, there was never any intention to not pay the insurance premiums, which is the only part of the bargain that is relevant to this case. This Court knows that there is no problem with the owner of an insurance policy selling the policy, even a day after it is issued. Respectfully, one cannot watch TV these days without seeing a commercial from Coventry Direct offering to buy one's insurance policies.

The Second Circuit, after reviewing the Supreme Court precedents, along with the history of the Common Law and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*...where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide* at 658 (emphasis in original). The Second Circuit also relied on and cited on more than one occasion cases from other circuits, including the First Circuit in *McEvoy Travel v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir. 1990), for the proposition that "the common law requires proof-other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660. The Second Circuit also quotes the First Circuit in *Sanchez v. Triple-S*, 492 F.3d 1, 11 (1st Cir. 2007) in saying:

> A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. *See, e.g., Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065, (11th Cir. 2007); *United States v. Gray*, 405 F.3d 227, 235-36 (4th Cir. 2005); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who-a jury might find-secretly harbored in his heart the hope that the buyer would never ask."

41

Therefore, evidence of a subsequent breach or breaches of contract alone cannot support a fraud claim. Fraud requires proof of deception, which is absent from a breach of contract. *Id.* at 660. The court parsed the distinction between intentional subsequent breach and fraud this way: if a purchaser forms the intent not to pay for goods after title passes to him, he is liable for an intentional breach of contract, not fraud. Fraud cannot be proven merely by showing a broken promise to pay. To find otherwise, the court explained, would contravene the fundamental common law requirement of contemporaneity between the representation and fraudulent intent. *Id.* at 660-61. Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* (emphasis added).

This Court should follow the ruling in *Triple-S*, as the cases parallel completely:

> The[] [Government] do[es] not say whether Petitioner ha[s] a duty to disclose "the actual manner in which the [policies] were [sold]" or, if so, what the source of that duty is; they do not say whether the defendant[] "fail[ed] to disclose" or "conceal[ed]" this information with the intent to deceive the plaintiffs. Instead, they proceed on the assumption that nondisclosure alone can support mail and wire fraud claims. As we have discussed, **that is not the law**, in this circuit or elsewhere. *Id.* at 11 (emphasis added).

## VIII.   RECENT   DECISIONS   IN   OTHER   CIRCUITS   WARRANT   GRANTING PETITIONER A JUDGMENT OF ACQUITTAL

The Supreme Court has made it clear that subject matter jurisdiction can be challenged any time, even after a judgment had been rendered. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). As the First Circuit determined in *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019), which has not been going on as long as this case, the Government failed to allege and prove at trial an essential jurisdictional element of the crime so the conviction had to be set aside and the indictment had to be dismissed. Petitioner submits to this Court that, based on the First Circuit's decisions in *Bravo-Fernandez*, *Tavares*, *Berroa* and especially the Supreme Court's decision in *Skilling,* this Court lacked subject matter jurisdiction because Petitioner's indictment lacked all five essential elements of the Mail and Wire Fraud statutes, and therefore the Petitioner's conviction should be set aside based on *United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003) which was based on *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002), which in turn was based on the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000).

In a recent decision vacating a wire fraud conviction, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the wire fraud statute and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" is as opposed to a "scheme to deceive" so as to satisfy that requirement under the Federal mail and wire fraud statutes. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then Petitioner's indictment, which is just a copy-and-paste of the indictment in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), failed to state a federal offense, and therefore this Court lacked jurisdiction and the Court should enter a judgment of acquittal as to Petitioner on all counts.

### A. *Takhalov*

To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor." The court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

The reason Petitioner's indictment fails to articulate any particular "scheme to defraud" is because the very facts of the case belie the existence of any "scheme to defraud" by anyone. Even deceitfully breaching a contract is not a crime per se; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited above in *Takhalov* by the Eleventh Circuit describing the law of mail and wire fraud in the Second Circuit. If the alleged deceit merely and solely causes the victim to enter into a contract that they would not normally enter, that is merely a "scheme to deceive" and not an illegal scheme to defraud. *Takhalov* at 1314, *citing Shellef* at 108 and *Starr* at 98.

44

Petitioner's indictment is filled with speculation about how STOLI policies might affect insurance carriers, speculation by the Government that is not just specious, but has been proven false in numerous civil lawsuits, and theories about possible fraud, but there is no specific claim of actual fraud, or allegations that Petitioner intended any of the Carriers to suffer any "actual concrete" harm, which is the sine qua non of mail and wire fraud, and Petitioner certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See, also, the dispositive quote from *Takhalov* about harm:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*. *Takhalov* at 1313.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation of the law in that: "a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive", but not one *to defraud*. *Takhalov* at 1313-14 (emphasis in original).

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit distinguishes between a high-end rare premium bourbon whisky and a cheap bar brand. The fact that the bar-girl works for the bar does not matter because

the businessman got what he bargained for which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if they substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that may be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the deceitful neighbor gave her a real dollar for the four quarters was merely a scheme to deceive, but in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used the phone to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit.

To be a "scheme to defraud" the schemer must make a misrepresentation that is material nature to the very nature of the bargain. This is important to Petitioner's case because unlike the *Binday* scheme, there was no proof at trial that Petitioner lied or deceived anyone, and Petitioner still believes the questions at issue to prevent STOLI policies were answered truthfully and accurately on the applications filled out by other people for the Charter Oak Trust. In *Binday*, the defendants had every intention to use investor funds to pay premiums to the day the insured died, and at no time did the *Binday* defendants lie about gender, age, or health, nor is that alleged in the indictment as required by *Neder v. United States*, 527 U.S. 1 (1999). The only misrepresentations that the *Binday* defendants made were about the reason for purchasing the insurance or the wealth of the insured, just like the Deceitful Neighbor lied about his child being ill, but the *Binday* defendants did not lie about the essential elements of the life insurance bargain which are gender, age, and health. In Petitioner's case, there was no evidence produced at all at trial to show that Petitioner lied about anything to anyone, and the lies by the brokers harmed Petitioner and Grist Mill Capital, not the Carriers.

46

But, just as in *Binday*, there were no allegations in Petitioner's indictment or evidence produced at trial that any broker lied about the essential elements of the insurance bargain, which are age, gender, and health. Even J. Edward Waesche, Bruce Mactas, Robert Pacini, Charles Induddi-Westcott, and Ezekiel Lambert only lied about wealth and not the age, health, or gender of their insurance clients. In describing and adopting the law of the Second Circuit, the difference between a "scheme to deceive" and a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, the Eleventh Circuit stated the following:

> The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid-which do not violate the mail or wire fraud statutes-and schemes that depend for their completion on a misrepresentation of an essential element of the bargain-which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef*, 507 F.3d at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at 1314-15, *citing Shellef* at 108.

This statement by the Eleventh Circuit conforms to other case law emanating from the Circuit that without the "intent to harm" there can be no scheme to defraud. *See United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because

Government failed to prove that the defendant actually intended and contemplated "concrete harm" to the pension fund). Therefore, based on the Eleventh Circuit's description of the law of mail and wire fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that the scheme in *Binday* was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder* and *Skilling v. United States*, 561 U.S. 358 (2010). Since the indictment in Petitioner's case is a virtual carbon copy of the indictment in *Binday*, and because the Government has failed to demonstrate, much less prove beyond a reasonable doubt any "scheme to defraud" knowingly joined by Petitioner with the intent to deceive with "material" misrepresentations to harm some carrier, this Court should grant a judgment of acquittal on all counts based on the Government's failure to properly allege federal fraud and to prove it beyond a reasonable doubt at trial based on Second Circuit precedents that have now been adopted and memorialized by the Eleventh Circuit in *Takhalov*.

### B. *Weimert*

Similar to the Second Circuit's decision in *Countrywide*, and the Eleventh Circuit's decision in *Takhalov*, the Seventh Circuit's decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) has been cited in hundreds of articles across the country for its analysis of the mail and wire fraud statutes. *See, e.g., When Do Business Negotiations Cross the Line and Become Fraud?*, New York Law Journal, Abramowitz, E. and Sack, J., May 5, 2016.

In *Weimert*, the Seventh Circuit reversed a banker's conviction for mail and wire fraud because they felt the materiality element of the federal fraud statutes was being stretched too far "to criminal deception about a party's negotiating positions." *Weimert*, 819 F.3d at 357. While it is clear that Weimert did lie to parties on both sides of a transaction to purchase a property from Anchor Bank, those lies actually caused Anchor Bank to pay him a large bonus so that he could

purchase his equity stake in the property that he was in charge of selling for Anchor Bank, and also caused the purchaser to pay more than they would have, had Mr. Weimert not been involved. Once again, unlike Petitioner, it is undisputed that Mr. Weimert lied to both his employer – the Seller – and to his future "partner" – the Purchaser – in this transaction, and clearly his lies caused his "partner" to pay more than they needed to, but also "harmed" his employer by the amount of the bonus that went into Weimert's pocket and the diversion of proceeds from the increased cost. For his negotiation deceptions, and for inserting himself in the transaction, Mr. Weimert was indicted on six counts of wire fraud and found guilty of five counts by the jury in the district court.

In reversing Weimert's conviction the Seventh Circuit declared that the mail and wire fraud statutes had been stretched "far beyond where they should go." *Id.* at 355. The court then itemized four ways that the mail and wire fraud statutes had been stretched too far:

> First, information about a party's negotiating position is surely material in the sense that it is capable of influencing another party's decisions. Second, actionable deception can include false statements of fact, misleading half-truths, deceptive omissions, and false promises of future action. All of these descriptions may fit deceptions about negotiating positions, at least if a negotiator's present state of mind is treated as a fact. Third, the false statement may be made to someone other than the owner or holder of the money or property targeted by the scheme. And fourth, it is no defense that the intended victim either trusted the defendant too much or was too savvy to be fooled. (*Id.* at 357.)

The court then states that: negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id.* at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statements." *Id.* The mail and wire fraud statutes do not cover all behavior which strays from the ideal." *Id.* at 357. Once again, Petitioner is not accused in the original indictment or the superseding indictment of lying to anyone, but rather being in an alleged conspiracy with other people who are claimed to have made misrepresentations on various insurance applications. But,

49

as the Court said itself during the trial, if Petitioner had known that agents and brokers like Mr. Waesche were lying to him, then Petitioner would have terminated them. See T. Tr. Vol. VI, p. 1193 at *17-21.

Unlike in *Weimert*, Petitioner was not accused of lying in the insurance transaction. In fact, it was the agents and brokers, like Mr. Waesche, that were acting as the go-between. It was Mr. Waesche that lied to Penn Mutual (the Seller) and Petitioner's company Grist Mill Capital (the Purchaser through the Charter Oak Trust) for his own gain. Thus, it is Mr. Waesche who is the "Weimert" of this case, not Petitioner. Based on the Seventh Circuit's decision in *Weimert*, Petitioner should not have been indicted in the first place. Mr. Waesche's lies and misrepresentations did not harm the Carriers; they only harmed Grist Mill Capital. Petitioner did not lie or misrepresent anything to anyone, much less make a "material" misrepresentation as required by *Neder* and *Weimert*.

In *Weimert*, Mr. Weimert's lies caused the Purchaser to pay more and the Seller to get less then had he not inserted himself (especially with the big bonus he required from the Bank), but the Seventh Circuit's opinion – just like the Eleventh Circuit's opinion in *Takhalov* – demonstrates that proving Fraud requires evidence of more than just sharp, or even distasteful, business practices, and that a "scheme to defraud" requires intent to deceive, about a material and essential element of the deal, and contemplated harm to the victim. Without such deceit, fraud does not exist in the common law, or under the mail and wire fraud statutes. In Petitioner's case, he did not fill out any applications nor did he lie to anyone, and unlike the defendants in *Binday*, he has not admitted to lying to anyone about anything, and no one has accused him of lying about an essential element of the insurance contract, i.e. age, gender, or health.

50

### C. *Sadler*

Just as the Second Circuit reviewed the history of the mail and wire fraud statutes in *Countrywide*, so, too, did the Sixth Circuit examine that same history to conclude that property for the purposes of the mail and wire fraud statutes does not include "a right to accurate information", or what might be referred to in the Second Circuit as being deprived of information that affects economic decision making. *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014). In *Sadler*, Nancy Sadler's conviction for wire fraud was reversed despite the fact that she lied to pharmaceutical companies about the reasons why she was buying large quantities of drugs. She and her husband were convicted of running a pill mill, but her conviction for wire fraud was vacated because she paid full price for the drugs and her lies as to why she wanted the drugs were not just "immaterial" to the bargain, the deceit and lies did not constitute depriving the victims of money or property or creating pecuniary losses as required by the mail and wire fraud statutes because she paid full price for the pills.

> But paying the going rate for a product does not square with the conventional understanding of "deprive." *United States v. Cleveland*, 531 U.S. 12, 19 (2000). Stealing the pills would be one thing; paying full price for them is another. Case law reinforces that the conventional meaning of "deprive applies in the fraud context. To be guilty of fraud, an offender's "purpose must be to injure," *Horman v. United States,* 116 F.3d 350, 352 (6th Cir. 1902), a common-law root of the federal fraud statutes, *see Neder v. United States,* 527 U.S. 1, 21-25 (1999); Nancy may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them. As to the wire-fraud count, she ordered pills and paid the distributors' asking price, nothing more.

> As an alternative, the Government offers another potential deprivation: Nancy's lies convinced the distributors to sell controlled substances that they would not have sold had they known the truth. Nancy in other words deprived the companies of what might be called a right to accurate information before selling the pills.To support this theory, the Government points to the testimony of one distributor's representative, who said she would have been "concern[ed]" had she known more about Nancy's operation. But the statute is "limited in scope to the protection of *property rights,"* and the ethereal right to accurate information doesn't fit that description. *McNally* at 360 (emphasis added). Nor can it plausibly be said that the right to accurate information amounts to an interest that "has long

been recognized as property." *Cleveland* at 23. *United States v. Murphy* illustrates the point. 836 F.2d 248, 253-54 (6th Cir. 1988). The Government charged the defendant with mail fraud because he lied on his application for a state bingo permit. The state argued it had a "right to control" the permits and a "right to accurate information" regarding their issuance. True or not, these were not the kind of "property" rights safeguarded by the fraud statutes, we held. *Id.* at 254. Just the same here: Until the Government proves that Nancy intended to deprive the distributors of "money" or "property," it must look elsewhere for a conviction.

The Supreme Court stopped this expanding universe of intangible- right protections, limiting the fraud statutes' scope to rights that sounded in property. *See Carpenter* at 25; *McNally* at 360. Congress responded to *Carpenter* and *McNally* in 1988, but its response was limited. Instead of reinstating the universe of previously protected intangible rights, it embraced just one of them: "the intangible right of honest services," which protects citizens from public official corruption. 18 U.S.C. §1346. Congress's reverberating silence about other intangible interests tells us all we need to know. Nancy's fabrications, objectionable though they may be and punishable under other laws though they may be, fall outside this statute.

This congressional silence counts against the Government's theory for other reasons as well. Lightly equating deceptions with property deprivation, even when the full sales price is paid, would occupy a field of criminal jurisdiction long covered by the States, a consideration that has prompted the Court to resist like-minded readings of "scheme to defraud" before…."[U]nless Congress conveys its purpose clearly," we cannot—indeed the Court tells us we should not—upset the "federal—state balance in the prosecution of crimes" to hold Nancy accountable for these misdeeds. *Jones v. United States,* 529 U.S. 848, 858 (2000).

That silence also requires us to pick the more lenient reading of the wire fraud law. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally* at 359-60. "Money, property and the intangible right of honest services" clearly and definitely fall within the fraud statutes' scope, 18 U.S.C. §§1343, 1346, but other interests—such as the right to accurate information—do not. Without more, we must conclude that the distributors' truth-in-purchasing concerns do not support a federal criminal conviction. *Sadler* at 590-92.

Therefore, based on the Appellate decisions establishing a clarification of and an intervening change in the law of Mail and Wire Fraud in *Countrywide, Takhalov, Weimert,* and *Sadler,* this Court should dismiss Petitioner's Indictment with prejudice.

## CONCLUSION

For the reasons stated above, Petitioner respectfully requests that this Court grant Petitioner's Motion and dismiss his Indictment with prejudice, or in the alternative, to set aside his conviction pursuant to Rule 12(b)(3)(B), and any other relief this Court deems proper.

Respectfully submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, pro se
18 Pond Side Lane
West Simsbury, CT 06092