**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

AUG 8 2023 PM3:49
FILED-USDC-CT-HARTFORD

|  |  |
|---|---|
| DANIEL E. CARPENTER<br>        Petitioner | ) <br> ) <br> ) <br> ) |
| v. | )        CRIMINAL NO. 13-CR-0226 |
| UNITED STATES OF AMERICA<br>        Respondent | ) <br> ) <br> ) <br> ) |

## MOTION TO RECONSIDER THE COURT'S VERDICT OF JUNE 6, 2016 PURSUANT TO RULE 60(b)(6) AND TO VACATE PETITIONER'S CONVICTION

## PRELIMINARY STATEMENT

Petitioner Daniel Carpenter is an innocent man, wrongfully accused, wrongfully indicted, and wrongfully prosecuted for a nonexistent crime that he did not commit, which he had nothing to do with, and which was based on an alleged "conspiracy" that he was not a part of, never participated in, and certainly never joined. He is also the victim of prosecutorial abuse and egregious government misconduct that, at the very least, should also merit dismissing the Superseding Indictment in this case and vacating his conviction. In addition to the numerous constitutional infirmities addressed at length in Petitioner's Motion for a Judgment of Acquittal pursuant to Rule 29(c), Doc. No. 229, which is hereby incorporated by reference, Petitioner did not received a fair trial or Due Process for a number of additional reasons addressed herein, and this Court is asked to exercise its broad discretion to immediately vacate the Judgment in this case and dismiss the broadened and untimely Superseding Indictment of 2014 based on its failure to state any conduct of the Petitioner that constitutes a criminal offense. Additionally, the Supreme Court vacating the convictions in *Binday* based on the rejection of the Second Circuit's "Right to Control Theory of Fraud" in *Ciminelli*, requires this Honorable Court to reconsider that the facially defective Superseding Indictment of May 2014 was actually "constructively" amended during the 2014 trial of February 2016 and did not properly invoke the jurisdiction of this Court, which means its judgment and sentence of December 2018 was void as a matter of law. Since Petitioner continues to suffer under Supervised Release from this Court's void judgment, Petitioner respectfully requests Expedited Relief from this Court pursuant to 28 U.S.C. 2243 to vacate his unlawful conviction *sua sponte* without wasting any more time waiting for a response from the Government.

1

## I.      LEGAL STANDARD

As the Second Circuit has stated, Rule 60(b)(6) provides, in relevant part, that a "court may relieve a party or its legal representative from a final judgment, order, or proceeding for…: (6) any…reason that justifies relief." Rule 60(b)(6). Furthermore, Rule 60(b)(6) "constitutes a grand reservoir of equitable power to do justice in a particular case; *Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986) *citing United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977))," and "is designed to balance the sanctity of final judgments and the command that justice be done in light of all the facts." *Paddington v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994). It has often been noted that Rule 60(b)(6) confers broad discretion upon the trial court to grant relief when appropriate to accomplish justice. A District Court's discretion is "especially broad under subdivision (6)." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977). The Second Circuit has long recognized that a Rule 60(b)(6) Motion is appropriate in both criminal and civil cases. *See, e.g., United States v. Becker*, 502 F.3d 122 (2d Cir. 2007).

In the Second Circuit, a District Court has the authority to vacate its own judgment *sua sponte* under Rule 60(b)(6). *See, e.g., Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 111 (2d Cir. 2001); *Matter of Perras*, 2010 WL 11627295, at *6 (E.D.N.Y. Nov. 3, 2010); *Economist's Advocate, LLC v. Cognitive Arts Corp.*, 2004 WL 728874, at *11 (S.D.N.Y. Apr. 6, 2004). The rule, which permits a court to "relieve a party ... from a final judgment" for "any ... reason that justifies relief," Rule 60(b)(6), "confers broad discretion ... to grant relief when appropriate to accomplish justice." *Matter of Perras*, 2010 WL 11627295, at *6 (quoting *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009)). Relief is appropriate "where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Id.* (*quoting United Airlines* at

176. Courts have relied on Rule 60(b)(6) to *sua sponte* vacate a denial of habeas and reopen the proceeding. *See, e.g., Cobb v. United States*, 2019 WL 2607002, at *2 (E.D.N.Y. Jan. 11, 2019). *See, also, Walker v. Conway*, 2007 WL 2027911, at *1 (N.D.N.Y. July 11, 2007); *Cole v. United States*, 2003 WL 21909758, at *1 (E.D.N.Y. July 30, 2003).

A motion for reconsideration pursuant to Rule 60(b)(6) also serves a valuable function where the court "*has patently misunderstood a party*," or…" has made an error not of reasoning but of apprehension." *Caisse Nationale v. CBI*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). A court may also "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Becker* at 127, *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). All three of these factors are amply present in this case. "[W]hen reconsideration of an earlier ruling is requested; the District Court should place great emphasis on the interests of justice." *United States v. Siciliano*, 578 F.3d 61, 72 (1st Cir. 2009) ("When faced with a motion for reconsideration, District Courts should apply an interests-of-justice test"). "This is so...because such requests for reconsideration rely, in the last analysis, on the trial court's inherent power to afford relief from interlocutory decisions as justice requires." Alternatively, the Court can also amend a judgment pursuant to Rule 60(b)(6) – the catch-all provision of Rule 60(b) – which "allows courts to vacate judgments whenever necessary to accomplish justice…." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg* at 863).

Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the court must include a judge's power to change his mind and/or correct his own decisions when, as

in this case, they are clearly based on the government's many misrepresentations of the law and/or the facts of any given situation. The intervening change in controlling law and the "extraordinary circumstances" that the Supreme Court listed in *Buck* are all present in this case, and warrant reconsideration by this Court of its Verdict of June 6, 2016. *See Pichardo v. Ashcroft*, 374 F.3d 46, 52 (2d Cir. 2004) (reversing District's Court's denial of post-judgment motion for reconsideration and reversing deportation order based on an intervening change in the law). Petitioner respectfully asks this Court to reconsider, review, and vacate its Verdict of June 6, 2016 and its judgment and sentence of December 3, 2018 based upon intervening changes in the controlling law and manifest errors of fact contained in the Verdict and the Judgment as will be discussed below based on the Supreme Court's decisions in *Ciminelli* and *Binday* and the demise of the "Right to Control Theory of Fraud". *See* recent article on the *"Repudiation of the Right to Control Theory of Fraud"* attached as Exhibit One.

## II.     DUE PROCESS REQUIRES VACATING THIS COURT'S JUDGMENT

From the earliest days of the Constitution, and until the middle of the twentieth century, habeas relief was limited to claims that the court lacked "jurisdiction". *See, e.g., McCleskey v. Zant*, 499 U.S. 467, 468 (1991). The understanding of a court lacking "jurisdiction" at the time of the Founding Fathers encompassed claims that an individual was detained for conduct that was not actually criminal under the applicable law. Based on the Supreme Court's decision in *Ciminelli* and the abrogation of the "Right to Control Theory of Fraud", this Court lacked jurisdiction because no crime was actually charged in the Defective Indictments. Instead, Petitioner was subjected to one massive "Constructive Amendment" of the facially defective Indictments and was clearly tried for acts the law does not make criminal.

Thus, the Framers understood that courts lacked jurisdiction to convict an individual for conduct that (in retrospect, of course, upon review) was not, by statute, a crime. *See Ex parte Yarbrough*, 110 U.S. 651, 654 (1884). ("If the law which defines the offence and prescribes its punishment is void, the court was without jurisdiction, and the prisoners must be discharged."); *Ex parte Siebold*, 100 U.S. 371, 375 (1879) (holding a "party imprisoned under a sentence of a United States court, upon conviction of a crime created by and indictable under an unconstitutional act of Congress, may be discharged from imprisonment by this court on habeas corpus" because there was no authority to indict and try the defendant for a crime is "illegal and void, and cannot be a legal cause of imprisonment"); *cf. Ex parte Page*, 49 Mo. 291, 294 (1872) (granting habeas to a person sentenced to ten years under statute that allowed maximum sentence of seven years because the "judgment of the court in passing sentence was illegal" and "absolutely void" and thus exceed[ed] the jurisdiction of the court and [was not] the exercise of an authority prescribed by law").

5

*Bousley v. United States*, 523 U.S. 614 (1998), totally supports Petitioner's constitutional entitlement to reconsideration and review by this Court. There, Bousley pleaded guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1), on the ground that guns in his "bedroom were in close proximity to drugs and were readily accessible". 523 U.S. at 617. Five years later, the Supreme Court interpreted Section 924(c)(1)'s "use" prong more restrictively, requiring a showing of "active employment of the firearm", not merely "storing a weapon near drugs". *Id.* Bousley sought collateral relief under 28 U.S.C. § 2255, alleging that his plea was unintelligent because he was misinformed about the elements of a Section 924(c)(1) offense. The Supreme Court agreed. And while it held that Bousley had procedurally defaulted that claim by failing to raise it on direct review, that default did not bar relief insofar as petitioner could "establish actual innocence." 523 U.S. at 623. As the Supreme Court famously explained:

> [D]ecisions of this Court holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe, necessarily carry a significant risk that a Defendant stands convicted of an act that the law does not make criminal … Accordingly, it would be inconsistent with the doctrinal underpinnings of habeas review to preclude petitioner from relying on [an intervening decision] in support of his claim that his guilty plea was constitutionally invalid.
>
> *Id.* At 620-21 (internal citations and quotation marks omitted).

In short, the Supreme Court relied on constitutional concerns to allow the defendant in *Bousley* to advance his claim where the Supreme Court's recent interpretation of a criminal statute created "a significant risk that a defendant stands convicted of an act that the law does not make criminal". *Id.* At 620 (internal quotation marks omitted). Similar constitutional concerns favor this Court reconsidering and vacating the Petitioner's conviction because nothing he did was "criminal" or in violation of any law in the past and certainly now with the Supreme Court's recent decisions.

6

The Due Process Clause also prohibits continued imprisonment for conduct that "a criminal statute, as properly interpreted, does not prohibit". *Fiore v. White*, 531 U.S. 255, 228 (2001) (per curiam). Like Petitioner here, the defendant in *Fiore* was convicted of violating a statute that was later interpreted to clarify that an element of the crime has a narrower meaning than the meaning understood at the time the defendant was convicted. The Supreme Court deemed it "clear" that Due Process forbade Fiore's "conviction and continued incarceration" for conduct that a criminal statute, "as properly interpreted, does not prohibit". *Id.; see also Bunkley v. Florida*, 538 U.S. 835, 840 (2003) ("It has long been established by this Court that the 'Due Process Clause . . . forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt.'" (quoting *Fiore*, 531 U.S. at 228-29)). As the Supreme Court previously explained, [t]here can be no room for doubt" that sustaining "conviction and punishment . . . for an act that the law does not make criminal "inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346-47 (1974).

For similar reasons, punishing Petitioner for conduct that Congress did not make criminal also violates the Separation of Powers Doctrine under the Constitution. "[U]nder our federal system it is only Congress, and not the courts, which can make conduct criminal". *Bousley*, 523 U.S. at 620-21; *see also United States v. Lanier*, 520 U.S. 259, 267-68, n.6 (1997); *United States v. Hudson*, 11 U.S. 32 (7 *Cranch*) (1812). Therefore, where the Supreme Court construes a federal criminal statute, detaining individuals under contrary readings of the statute exceeds the District Court's constitutionally granted authority. Such is the case under the facts this Court must assume here. Petitioner is currently being punished not because *Congress* authorized his punishment, but because *a federal court* erroneously construed the statute to criminalize conduct Congress did not in fact make a crime and which now everyone knows is not, in fact, criminal conduct.

The Supreme Court's direction that substantive interpretations narrowing criminal statutes apply retroactively on collateral review further supports the notion that the Constitution precludes punishing individuals under statutes that do not in fact criminalize their conduct – regardless of when it is actually determined what is and is not criminal conduct. In *Mackey v. United States*, 401 U.S. 667, 675 (1971), Justice Harlan articulated a view of retroactivity for cases on collateral review, later adopted in *Teague v. Lane*, 489 U.S. 288 (1989), that finality interests should yield when a conviction is attacked on the grounds, as is it here, that the "conduct [is] beyond the power of the criminal law-making authority to proscribe". *Id.* at 310; *see Mackey*, 401 U.S. at 692-93 (Harlan, J., opinion concurring in judgments in part). Because **"[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void . . . a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced.**" *Montgomery v. Louisiana*, 577 U.S. 190, 203 (2016).

Accordingly, both the Due Process Clause and the Separation of Powers supports the common-sense proposition that the Constitution does not permit the continued punishment of an individual whose conduct was not actually a crime.

Moreover, punishing someone for conduct that is not actually a crime would also violate the Eighth Amendment. Punishment is "cruel and unusual" U.S. Const. amend. VIII, when it is "grossly disproportionate and excessive punishment for the crime". *Solem v. Helm*, 463 U.S. 277, 288 (1983). That being so, it must also violate the Eighth Amendment to inflict punishment for no crime at all, as was done in this case by this Court. **Serving "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime of' something that the law does not punish**. *See Robinson v. California*, 370 U.S. 660, 667 (1962).

### III.   THE DEFECTIVE INDICTMENT OF 2014 WAS ACTUALLY CONSTRUCTIVELY AMENDED AT TRIAL

This Court will recall that the Petitioner brought several motions under Rule 12(b)(3)(B) for lack of jurisdiction and under Rule 33 and Rule 29 that the original Indictment was Constructively Amended—and the words "Right to Control Theory of Fraud" are nowhere to be found in either of Petitioner's Indictments. Please see Judge Preska's scholarly analysis of this problem in the World Trade Center Case: *U.S. v. Davis* No. 13-CR-923 (LAP), 2017 WL 3328240, at *13–14 (S.D.N.Y. Aug. 3, 2017) as to why this Court should also vacate Petitioner's conviction as it is a *per se* violation of the Fifth Amendment:

> The theory of "constructive amendment" is based on the fundamental principle that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 332, 337 (2d Cir. 1998); see also *United States v. LaSpina*, 299 F.3d 165, 181 (2d Cir. 2002). A constructive amendment is a per se violation of the Fifth Amendment, *LaSpina* at 181, and constructive amendments have been found when the government alleges one theory of the case in the indictment but argues another at trial. *Stirone* at 217 (proof of interference with interstate shipment of steel from Pennsylvania to Michigan and Kentucky was constructive amendment of indictment that alleged interference with shipment of sand into Pennsylvania).

> In considering the issue of constructive amendment, the Court is mindful that it is a fairly narrow doctrine in this Circuit. Indeed, the Court is aware of only six cases since 1988 in which the Court of Appeals has found constructive amendments. See *United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988); *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988); *United States v. Milstein*, 401 F.3d 53, 65 (2005); *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997); *United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001); *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008). A constructive amendment occurs where the actions of the court 'broaden the possible bases for conviction from that which appeared in the indictment.'" Id. (quoting *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2011)). The Court of Appeals elaborated upon the standard as follows:   Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where "only one particular

kind of [criminal conduct] is charged ... a conviction must rest on that charge and not another." *Zingaro* at 99 (emphasis added).

Turning to the right to control theory first, either the right to control theory was contained in the core of criminality of the indictment or it was not. If the right to control theory was within the core criminality charged in the indictment, then the indictment is insufficient because *Shellef* teaches that when a right to control theory involving a contract is alleged in an indictment there must also be an allegation that the misrepresentation had "relevance to the object of the contract" or an equivalent allegation, that there was a "discrepancy between benefits reasonably anticipated and actual benefits received," or that the misrepresentation went to "the nature of the bargain." *Shellef*, 507 F.3d at 108 (internal quotations omitted); see also *United States v. Binday*, 908 F. Supp.2d 485, 491 (S.D.N.Y. 2012)("Given the '*Shellef*' language in the present indictment, there is no danger that a jury might improperly convict the defendants based on a misrepresentation[ ] that had no relevance to the object of the contracts in question."), aff'd,  804 F.3d 558 (2d Cir. 2015). **This indictment contained none of this language or anything approximating it**.

If, however, the right to control theory was not part of the core of criminality contained in the indictment, then offering evidence, argument, and an instruction based on such a theory constitutes an impermissible constructive amendment**. Here, the indictment did not contain within its core of criminality the Government's right to control theory of harm**. There is no allegation in the indictment that comes close to the right to control theory contained in the jury instruction, which reads "it suffices [for a finding of fraudulent intent] that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts to make an informed economic decision on matter that could expose the victim to economic harm," Also, the indictment never specifies, as would be required for an indictment relying on a right to control theory, that the MWBE aspect of the contract was an essential element of the contract (or similar language). See *Shellef*, 507 F.3d at 108; see also *Binday*, 908 F. Supp.2d at 491. **Without that language, a sufficiently pled right to control theory was not contained in the indictment. Accordingly, the evidence and jury charge pursuant to a right to control theory worked a constructive amendment**. Similar logic applies to the Government's theories of actual harm. The core of criminality alleged by the Government by the end of trial included both the cost overrun theory and the certified payroll theory of actual harm. However, no allegation in the indictment encompasses these factual complexes or would have put the Defendants fairly on notice. **Therefore, by the end of trial, the Government alleged a different core of criminality from that of the indictment with respect to its theories of actual harm**. *United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240, at \*32–33 (S.D.N.Y. Aug. 3, 2017)

## IV.    THE DISTRICT COURT LACKED JURISDICTION

Subject matter jurisdiction of the court can be challenged at any time, even after judgment has been rendered. *See, e.g., Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). Thus, "a court's subject matter jurisdiction may be raised at any point." *Peretz v. United States,* 501 U.S. 923, 953 (1991). Similarly, "a claim that an indictment does not charge an offense may be raised at any time." *United States v. Crowley,* 236 F.3d 104, 108 n.6 (2d Cir. 2000). *See, also,* the old Fed.R.Crim.P. 12(b)(3)(B) which states that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Finally, there is no jurisdiction unless "the indictment alleges all of the statutory elements of a federal offense." *United States v. Yousef,* 750 F.3d 254, 259 (2d Cir. 2013).

The "inquiry into whether an indictment charges a federal offense for the purposes of establishing subject matter jurisdiction" asks "whether the face of the indictment discloses that the count or counts... failed to charge a federal offense." *Yousef* at 259, *quoting Hayle v. United States,* 815 F.2d 879, 882 (2d Cir. 1987). Petitioner's Indictment obviously fails this test because it was legally necessary to allege five elements in detail, and instead it poorly alleges only three. This failure to actually allege an "offense against the laws of the United Stales" means there was no jurisdiction for Petitioner's prosecution. *Yousef* at 259. Moreover, Petitioner had "no notice of the true nature of the charge." *See Bousley v. United States,* 523 U.S. 614,618 (1998).

Federal courts are courts of limited jurisdiction, and not all frauds rise to the level of conduct falling within the federal mail and wire fraud statutes or involve the United States of America in such a way that would invoke federal jurisdiction. The federal courts have consistently held to the principle that once jurisdiction is challenged, the District Court has

11

**no authority to do anything** but to take action on the motion to determine whether or not it

has jurisdiction to proceed. "Jurisdiction **cannot be assumed** by a district court nor conferred

by agreement of parties, but it is incumbent upon [the US Attorney] to allege in clear terms,

the necessary facts showing jurisdiction which must be proved by convincing evidence."

*McNutt v. General Motors Acceptance,* 298 U.S. 178 (1936). If a court lacked jurisdiction, any

judgment that it made is null and void as a matter of law. *See, e.g., United States v. Peter,* 310

F.3d 709 (11th Cir. 2002), *citing United States v. Morgan,* 346 U.S. 502 (1954):

> "When a court without jurisdiction convicts and sentences a defendant the
> conviction and sentence are void from their inception and remain void long after
> a defendant has fully suffered their direct force." *Peter* at 715.

For example, in *United States v. Maze,* 414 U.S. 395 (1974), the Supreme Court reversed

the mail fraud conviction, concluding that the success of Maze's scheme did not depend in any

way on the mailings at issue, focusing on "the more difficult question [of] whether [the]

mailings were sufficiently closely related to [Maze's] scheme to bring his conduct within the

statute." *Maze* at 402. Here, as in *Maze,* the success of the alleged scheme clearly did not depend

in any way on the use of mails or wires by Petitioner, as the mailings and wires listed in the

Indictment all occurred **after** the alleged fraud was **complete.** Moreover, all of the Counts of

the Indictment concerning Petitioner list mailings and wires that had nothing to do with the

alleged nondisclosure in this case of Grist Mill Capital funding the premiums for the Charter

Oak Trust's policies. Certainly, there is no way that innocent premium payments were part of

the scheme to defraud. ("Congress could have drafted the mail fraud statute so as to require

only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this...

"). *Maze* at 405; *see also United States v. Tavares,* 844 F.3d 46 (1st Cir. 2016), where it was

determined the mails and wires were not "in furtherance" of the fraud. Accordingly, the federal

mail and wire fraud statutes have not been properly invoked, so this Court lacked jurisdiction to proceed any further and the Indictment must be dismissed in this case.

Because the Government has not alleged any scheme to defraud, much less the particularity required (the "who", "what", "where", and "when" of fraud), this Indictment is woefully inadequate even as a basis for **civil** fraud much less criminal fraud. As the Seventh Circuit held in *United States v. Walters,* 997 F.2d 1219 (7th Cir. 1993), "[b]oth the 'scheme or artifice to defraud' clause and the 'obtaining money or property' clause ... contemplate a transfer of some kind." *Id.* at 1227. In Petitioner's case there was no "deceitful scheme" or any fraudulent **material** misrepresentations with the intent to **obtain** the victim's property as the word "obtain" is defined in *Honeycutt v. United States,* 137 S.Ct. 1626 (2017) and *Sekhar v. United States,* 133 S.Ct. 270 (2013), but more importantly, there are no specific material misrepresentations alleged in the Indictment. *See, also, United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016). And, as the Seventh Circuit points out, just because there were losses in a "deceitful scheme," that does not satisfy the statutory requirements of mail and wire fraud. (See *United States v. Walters*, 997 F. 2d 1219 (1993) cited in *Kelly*). In this case, millions of dollars were paid to the Carriers in premiums for insurance contracts that resulted in millions of dollars in profits to the Carriers.

Moreover, the mailings relied upon by the Government, none of which originated with Petitioner or were caused by him, occurred after the alleged "scheme" was complete and did nothing to further the scheme. None of the premium payments in this case were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed. Not only was there no "scheme" to obtain money or property from the Carriers, they were paid millions of dollars under a contract and no money was unlawfully obtained from them.

13

Petitioner respectfully suggests that this Court did not have jurisdiction over him because the federal mail and wire fraud statutes do not purport to reach **all frauds,** but only those "limited instances in which the use of the mails is a part of the execution of the fraud, leaving **all other** cases to be dealt with by appropriate state law." *Kann v. United States,* 323 U.S. 88, 95 (1944) (emphasis added). *See also Maze.* In this case, the Government's indictment not only fails to address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment involves an email, letter, or wire involving Petitioner that came **after** the allegedly fraudulent applications had been submitted between 2006 and 2008. All of the Counts in the Indictment relate to acts occurring after the alleged fraud had come to its full fruition with the submission of the insurance applications to the Carriers. And, if the alleged fraud was now a crime of omission or nondisclosure based on Grist Mill Capital funding the policies, then it was outside of the fraud statutes according to *Skilling.* Therefore, none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

As the Supreme Court has made clear, "Subject matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler,* 565 U.S. 134, 141-42 (2012):

> "When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented. The objections may be resurrected at any point in the litigation, and a valid objection may lead a court midway through briefing to dismiss a complaint in its entirety. "[M]any months of work on the part of the attorneys and the court may be wasted." *Gonzalez* at 142, *citing Henderson v. Shinseki,* 562 U.S. 428 (2011).

Because both Petitioner's Indictments were before the new rules for Rule 12(b) adopted in December 2014, Petitioner moves to dismiss the Superseding Indictment pursuant to the old rules under Fed.R.Crim.P. 12(b)(3)(B) which allow Petitioner to bring a challenge to the Court's subject matter jurisdiction or the sufficiency of the Indictment at

14

any time, even after conviction, because the Indictment is legally deficient and fails to allege all of the facts and elements necessary to constitute a **federal** offense, and because the Indictment fails to charge mail and wire fraud with the particularity needed to invoke this Court's jurisdiction. Rule 12(b)(3)(B) provides, in pertinent part, that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." In December 2014, the Federal Rules were amended to require that Rule 12(b)(3)(B) claims be made before the trial begins, but because Petitioner was indicted in December 2013 and May 2014, he clearly qualifies under the old rules.

As this Court knows, the Government postponed the appeal concerning Restitution in this case, so the case is still active in the Second Circuit and the old rules of Rule 12(b)(3)(B) still apply, which means that Petitioner's motion to dismiss the Indictment is both timely and meritorious. If the Court examines the Indictment of May 2014 as Judge Preska did so well in *Davis*, and finds that it is deficient in alleging all of the facts necessary to support each and every one of the five necessary elements of Mail and Wire Fraud (*see Charles Doyle's Report to Congress* attached as Exhibit Two), then the Court must dismiss the Indictment as a matter of law. *See e.g., United States v. Aleynikov,* 676 F.3d 71 (2d Cir. 2012):

> "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute. *See United States v. Pirro,* 212 F.3d 86, 91-92 (2d Cir. 2000). The sufficiency of an indictment and the interpretation of a federal statute are both matters of law that we review de *novo. See Fiero v. Fin. Indus. Regulatory Auth., Inc.,* 660 F.3d 569, 573 (2d Cir. 2011)." *Id.* at 75-76.

If this Court lacked jurisdiction due to the Government's failure to allege all of the specific facts necessary to establish all five of the necessary elements to make Petitioner's conduct a federal crime, then this Court must vacate Petitioner's conviction and dismiss the Indictment pursuant to Rule 12(b)(3)(B) as the Second Circuit did in *Aleynikov* based on the Second Circuit's decision in *Pirro.* Accordingly, the allegations in the Indictment failed to satisfy the legal requirement necessary to make out a violation of the federal mail and wire fraud statutes. Because the Government has failed to specifically allege the facts necessary for each and every one of the five essential elements that must be alleged for federal mail and wire fraud, the Indictment was defective as a matter of law, and such defect therefore deprived this Court of jurisdiction over the case, even at this late date. As the Second Circuit made clear in *United States v. Balde,* 943 F.3d 73 (2d Cir. 2019):

> "Under the plain error standard, an appellant must demonstrate that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Within the context of plea proceedings, "a defendant must establish that the violation affected substantial rights and that there is a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Garcia,* 587 F.3d 509,515 (2d Cir. 2009)." *Id.* at 96.

As the Second Circuit determined in *Balde,* the test would be whether the government or Court in examining the law as it currently stands, would bring the case again based on the recent Supreme Court decisions. While dismissal of an indictment might be a remedy of last resort, it is appropriate to "restore the defendant to the circumstances that would have existed had there been no constitutional error." *See United*

States v. Stein, 541 F.3d 130, 144 (2d Cir. 2008), *quoting United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir. 2000).

In *Aleynikov,* the Second Circuit examined the deficiencies of the indictment even after the defendant was tried, found guilty, and sentenced. Because the indictment failed to specifically allege sufficient facts necessary to establish all of the elements of a federal crime in order to sustain an indictment under federal law, the indictment was found to be insufficient and was dismissed and Aleynikov's conviction was set aside. The Second Circuit relied extensively on its earlier decision dismissing the indictment in *Pirro,* which set the standard for reviewing the sufficiency of an indictment in the Second Circuit. Therefore, based on recent decisions in both the Second Circuit and Supreme Court, the Indictment in this case was woefully inadequate and should be dismissed as happened with the indictments in *Aleynikov* and *Pirro.* Suffice it to say, if the Court were to look at Petitioner's June 6, 2016, Judgment on Westlaw, it is now filled with red flags stating the law of the Case, especially *Binday*, has been abrogated.

Petitioner respectfully submits that both the Government and this Honorable Court are well aware that since the Supreme Court's decision in *Rehaif v. United States,* 139 S.Ct. 2191 (2019) in June of 2019, there have been a number guilty pleas involving "aliens, felons, guns, and drugs" that were vacated because of a failure to plead all of the "essential" elements of the alleged crime in those indictments. *See, e.g., United States v. Guzman-Merced,* 2020 WL 7585176 (1st Cir. 2020), and *United States v. Balde,* 943 F.3d 73 (2d Cir. 2019), where the Second Circuit overturned a conviction based on a deficient indictment of an "illegal alien" that pled guilty to holding up a bodega in the Bronx with a gun. *Balde* cites *United States v. Bastian,* 770 F.3d 212 (2d Cir. 2014) for the proposition that "the error is plain if it is so egregious and

17

obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." *See Bastian* at 219. Clearly that is any case based on the now discredited "Right to Control Theory of Fraud" and *Binday* in particular.

*Balde* is directly on point for Petitioner's Motion to Dismiss the Indictment because it succinctly states the Plain Error standard that Petitioner submits this Motion under, since none of these *Ciminelli-Binday* issues could possibly have been raised by Petitioner's attorneys on appeal:

> "Under the plain error standard, an appellant must demonstrate that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Within the context of plea proceedings, "a defendant must establish that the violation affected substantial rights and that there is a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Garcia,* 587 F.3d 509, 515 (2d Cir. 2009)." *Id.* at 96.

It is noteworthy that *Balde* cites *Garcia,* which is another guilty plea case that was overturned due to an indictment made defective by a change in the law. A number of the cases cited by Petitioner throughout this brief involve people that actually did the conduct they were accused of in the indictment, and unlike Petitioner, they pleaded guilty to that conduct. As the Court is well aware, Petitioner respectfully asserts that he did not do any of the conduct alleged in his Indictment, but even if that alleged conduct were true, it still did not amount to a federal crime and therefore this Court lacked subject matter jurisdiction. Moreover, unlike many of the cases cited here, Petitioner did not plead guilty.

In Petitioner's case, there are now nine major Supreme Court decisions that warrant dismissing Petitioner's Indictment as the Second Circuit did in *Balde* on both jurisdictional grounds as well as a failure to currently describe a federal crime. *See United States v. Binday*, 143 S. Ct. 1121 (2023), *Ciminelli v. United States*, 215 L. Ed. 2d 294 (2023), *Ruan v United*

18

*States*, 142 S. Ct. 3370 (2022), *Kelly v. United States,* 140 S.Ct. 1565 (2020), *Marinello v. United States,* 138 S.Ct. 1101 (2018), *Class v. United States,* 138 S.Ct. 798 (2018), *McDonnell v. United States*, 136 S.Ct. 2355, 2373 (2016), *Elonis v. United States,* 575 U.S. 723 (2015), and *Skilling v. United States,* 561 U.S. 358 (2010). Petitioner respectfully suggests that the judgment in this case was void because the Court lacked subject matter jurisdiction, and the Indictment must be dismissed because it did not properly allege each and every one of the five necessary elements to secure a Mail and Wire Fraud conviction. And, after the Supreme Court decisions in *Ciminelli, Ruan, Kelly* and *Marinello,* there was nothing in the Indictment and absolutely no proof at trial whatsoever that Petitioner had the criminal *mens rea* to **"obtain"** any **"property"** of the Carriers through deceit (which according to *Ciminelli* and *Kelly* must be the object of the fraud to obtain that specific property). Simply put, for this Court to have had jurisdiction, the Government needed to allege specifically and in detail all five elements in the defective Indictment and yet instead, the Government only poorly alleged three - and even with those three they failed to state a federal crime that would invoke the jurisdiction of this Court. Furthermore, convicting someone "on a record lacking any relevant evidence as to a crucial element" also "violates due process." *See Vachon v. New Hampshire,* 414 U.S. 478, 480 (1974). Because Petitioner was sent to prison for conduct that was not criminal under the law according to *Ciminelli, Ruan, Kelly* and *Skilling,* his Indictment should be dismissed and an immediate order vacating his conviction by this Court is warranted.

The Government never alleged that Petitioner lied to or deceived anyone, and after *Ciminelli* "Nondisclosure" and the "Right to Control Theory of Fraud" are no longer sufficient. Petitioner's company paid the Carriers over $100,000,000. In fact, the Government's whole case is based on the millions of premiums paid to the Carriers, and Petitioner did not "obtain" any

"money" or "property" form the Carriers by lies or deceit. *Ciminelli* (2023), *Percoco* (2023), *Binday* (2023), *McDonnell v. United States* 136 S. Ct. 2355 (2018), *Elonis v. United States* 135 S. Ct. 2001 (2015).

Finally, even if the Court was to incorrectly assume that Petitioner's Indictment was not legally deficient and the Indictment gave him "Fair Warning" in accordance with *Marinello,* this Court should still dismiss the Indictment because the Second Circuit has found that "It is a universally-accepted truth in the law that each of the elements of the crime must be proved at trial for there to be a valid conviction." *See United States v. Crispo,* 306 F.3d 71, 74 (2d Cir. 2002). This the Government did not do at Petitioner's trial because without the "Right to Control Theory of Fraud", Petitioner had no duty to disclose anything to the Carriers and there was no "obtaining" of the Carriers' property. None whatsoever.

There was no valid conviction here because just as in *Balde,* the Indictment was constitutionally defective at the time because of *Skilling,* and certainly after *Marinello, Class, Kelly,* and now *Ciminelli.* The Court lacked jurisdiction, and **none** of the five required elements required to secure a conviction for Mail and Wire Fraud were proven by the Government beyond a reasonable doubt. Because the Mail and Wire Fraud counts fail, so too must the money laundering counts fail, as the proceeds subject to money laundering must be illicit proceeds from a federal crime. If there was no Mail and Wire Fraud in this case, there can be no money laundering of any of the proceeds as a matter of law, and the entire defective Indictment must be dismissed and Petitioner's conviction vacated as a matter of law.

Before the landmark Supreme Court decisions in *Marinello, Kelly, Ruan*, and now *Ciminelli*, this Court stated the following in *Gramins* and *Shapiro*:

> I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment….The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the Government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.

> As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances." See Regent Office at 1179 (lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. *Gramins* currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment. I would rather risk error on the side of lenity than the other way.

## V.    RELIEF REQUESTED

### RELIEF SOUGHT

Petitioner respectfully requests that the Court grant the instant Petition and issue an order: (i) vacating and setting aside the Court's Judgment of June 6, 2016, the Order of Restitution and Petitioner's December 2018 conviction for mail and wire fraud in its entirely; (ii) expunging and sealing all records of the foregoing indictment and conviction, (iii) ordering the Government to return all funds paid to the Government on behalf of Petitioner in this case; and (iv) granting such other and further relief as this Court deems just, equitable, and proper.

### EXPEDITED RELIEF

Petitioner's conviction continues to prevent him from practicing law as an attorney, or acting as an insurance agent or working on any ERISA Employee Benefit Plan. This has caused and continues to cause significant financial instability to his family. In addition, it would be better for Society to restore Petitioner's law license so that he may help other individuals who are still in prison and not able to afford legal counsel to help them prepare the necessary legal documents to secure their release. Petitioner helped to secure the early release of over 120 inmates pursuant to the First Step Act and the CARES Act during his period of incarceration. Accordingly, to the extent possible and practicable, Petitioner most respectfully requests that his Petition be treated on an expedited basis as the Due Process delays and Speedy Trial Act and Statute of Limitations violations in this case have been extraordinary to date, and far exceed any other case in the history of the Second Circuit.

## EXPUNGEMENT

After a conviction is invalidated "district courts possess ancillary jurisdiction to expunge criminal records. That jurisdiction flows out of the congressional grant of jurisdiction to hear cases involving offenses against the United States pursuant to 18 U.S.C. § 3231." *See, e.g., United States v. Sumner,* 226 F.3d 1005, 1014 (9th Cir. 2000). Here, in the event the Court grants this Petition and invalidates Petitioner's conviction, Petitioner respectfully requests that this Court order the record of the conviction to be expunged and sealed. As discussed, *supra*, Petitioner's conviction is invalid as a matter of law and was premised on erroneous applications of the law that were never valid. Accordingly, Petitioner has demonstrated appropriate, extraordinary, and unusual circumstances to warrant the relief of expungement and the return of all funds paid to the Government over the past seven years.

## VI.    CONCLUSION

Therefore, based on the Supreme Court vacating the convictions in *Binday* based on the demise of the "Right to Control Theory of Fraud" as explained in *Ciminelli* and *Percoco*, which is intervening law that establishes that Petitioner's conduct was at no time criminal, Petitioner respectfully moves this Court to reconsider its June 6, 2016 Judgment to vacate Petitioner's conviction as to all counts pursuant to Rule 60(b)(6) *sua sponte*, along with any other relief that this Court deems just and proper, including the dismissal of the Indictment with prejudice and ordering Petitioner's immediate release from Supervised Release.

Respectfully Submitted:

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT ONE

*Repudiation of the Right to Control Theory of Fraud*

**Debevoise & Plimpton**

The **Debrief**

## Supreme Court Repudiates "Right-to-Control" Theory Under the Federal Wire Fraud Statute

May 15, 2023

On May 11, 2023, the United States Supreme Court issued its latest opinion in a series of decisions narrowing the scope of the federal fraud statutes. In that case, *Ciminelli v. United States*, the Court foreclosed prosecutors' ability to pursue fraud charges for misrepresentations that did not intend to result in financial harm, but instead deprived victims of information that may have been useful in deciding how to use assets. In repudiating this theory, known as "right-to-control," a unanimous Court held that the federal fraud statutes touch only schemes aimed at traditional property interests, like money, and not "mere information." To have held otherwise would have meant that "almost any deceptive act could be a crime."

Going forward, the Department of Justice will not be able to prosecute a defendant for engaging in mere deceptive or unethical conduct but must additionally prove that the defendant's objective was to deprive the victim of money or property.

**Ciminelli's Prosecution and the Supreme Court's Decision.** Ciminelli's conviction centered on New York's "Buffalo Billion" initiative, designed to invest $1 billion in upstate development projects. To help his construction company win state-funded jobs, Ciminelli engaged a lobbyist. In 2013, Ciminelli, along with the lobbyist and a board member of the nonprofit administering the initiative, schemed to get Ciminelli's construction company selected as a preferred developer for "Buffalo Billion" projects. This preferred developer status allowed Ciminelli's construction company to secure a major $750 million project. By engaging in this bid-rigging scheme, Ciminelli kept information from the nonprofit that may have impacted how it allocated funds and awarded projects. Put another way, Ciminelli deprived the nonprofit of its right to control its economic decisions.

Relying on a right-to-control theory, prosecutors pursued Ciminelli's bid-rigging scheme and secured his conviction on charges of wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349.

In a unanimous opinion, the Supreme Court rejected the "right-to-control" theory for three main reasons. First, the theory runs afoul of the statute's limited reach to schemes depriving a victim of "money or property." It is also at odds with a 1987 Supreme Court decision, *McNally v. United States*, in which the Court rejected use of the federal fraud statutes to pursue schemes purportedly depriving victims of "intangible interests."

**Debevoise**
**& Plimpton**

Second, criminalizing misrepresentations where no financial harm occurred clashes with the structure and history of the federal fraud statutes. As honest services fraud is the *only* intangible interest on which Congress chose to legislate post-*McNally*, the wire fraud statute cannot be interpreted as covering any other intangible interest.

Finally, the Court characterized the right-to-control theory as "vastly expand[ing] federal jurisdiction without statutory authorization." By treating "mere information" as property, almost any deceptive act could be criminalized at the federal level, including those typically left to state contract and tort law.

**The Decision's Impact and the Narrowed Scope of Federal Criminal Fraud Statutes.**
Going forward, the key question is how the loss of the right-to-control theory will impact the types of cases pursued by federal prosecutors. In the United States' brief to the Court, the Government argued that there is a "core" of right-to-control cases that are, at bottom, fraudulent inducement prosecutions where the Government could have satisfied the elements of traditional property fraud.[1] Indeed, the Government argued that Ciminelli's conviction should be affirmed on this basis, but the Court declined to reach that question. In the future, the Government will face more challenging prospects for success given the burden of proving that a defendant intended to deprive a victim of actual money or property, as opposed to deceiving or harming the victim in a more general sense. For example, in one successful wire fraud prosecution, the Government proved that the head of a bank's trading desk deceived a client about how the bank would carry out a foreign exchange transaction and thereby profit. This deception impacted the client's decision to undertake a certain type of transaction, though the client still received the full economic benefit of its bargain.[2] Having received that benefit, it is questionable, if not outright unlikely, that prosecutors could have shown an intent to financially harm the client.

Where the Government cannot show this intent to cause financial harm, a fraud-based prosecution will therefore be foreclosed. A number of prior wire fraud prosecutions would appear to fall into this group, with the foreign exchange transaction prosecution being one example.[3]

---

[1]   Brief for the United States at 12, *Ciminelli v. United States*, 598 U.S. __ (2023), No. 21-1179. For an example of a case that could potentially be brought under a traditional property fraud, see *United States v. O'Garro*, 700 Fed. Appx. 52, 54 (affirming defendant's wire fraud conviction on a right-to-control theory where the fraud victim had sent the defendant's company $250,000).

[2]   *United States v. Johnson*, 945 F.3d 606, 613-614 (2d Cir. 2019).

[3]   *See id.; see also United States v. Gatto*, 986 F.3d 104, 109-12 (2d Cir. 2021) (affirming defendants' convictions for disguising improper payments to student-athletes' families, where covering up the payments enabled the student-athletes to attest to compliance with NCAA rules, thereby depriving the universities of information useful to their financial aid decisions, as the payments rendered the student-athletes ineligible).

**Debevoise & Plimpton**

May 15, 2023                3

The *Ciminelli* opinion also represents the latest in a recent line of Supreme Court decisions restricting prosecutors' ability to pursue white collar crimes in other ways under the federal fraud statutes. Since 2010, the Supreme Court has narrowed the honest services fraud statute to coverage of only bribery and kickback schemes,[4] reined in the definition of what constitutes an "official act" required for a federal bribery conviction,[5] and determined that "political retribution" does not constitute "money or property" supporting a fraud prosecution.[6] On the same day as *Ciminelli*, the Court also issued a decision in a companion case, *Percoco v. United States*, which excludes private citizens not otherwise acting as agents of a government entity from the scope of the honest services fraud statute.[7]


**Helen V. Cantwell**
Partner, New York
+1 212 909 6312
hcantwell@debevoise.com


**Andrew J. Ceresney**
Partner, New York
+1 212 909 6947
aceresney@debevoise.com


**Courtney M. Dankworth**
Partner, New York
+1 212 909 6758
cmdankworth@debevoise.com


**John Gleeson**
Partner, New York
+1 212 909 7281
jgleeson@debevoise.com


**David A. O'Neil**
Partner, Washington, D.C.
+1 202 383 8040
daoneil@debevoise.com


**Winston M. Paes**
Partner, New York
+1 212 909 6896
wmpaes@debevoise.com


**Bruce E. Yannett**
Partner, New York
+1 212 909 6495
beyannett@debevoise.com


**Douglas S. Zolkind**
Counsel, New York
+1 212 909 6804
dzolkind@debevoise.com


**Scott M. Caravello**
Associate, New York
+1 212 909 6467
smcaravello@debevoise.com

---

4   *Skilling v. United States*, 561 U.S. 358, 413, 415 (2010).
5   *McDonell v. United States*, 579 U.S. 550, 577, 580 (2016).
6   *Kelly v. United States*, 140 S. Ct. 1565, 1568-69 (2020).
7   2023 WL 3356527, at *2, *6-*8 (U.S. May 11, 2023).

# EXHIBIT TWO

*Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law,* Charles Doyle's Report to Congress 2011



*Congressional
Research
Service*

# Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law

**Charles Doyle**
Senior Specialist in American Public Law

July 21, 2011

Congressional Research Service

7-5700
www.crs.gov
R41931

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Introduction

The federal mail and wire fraud statutes outlaw schemes to defraud that involve the use of mail or wire communications. Both condemn fraudulent conduct that may also come within the reach of other federal criminal statutes. Both may serve as racketeering and money laundering predicate offenses. Both are punishable by imprisonment for not more than 20 years; for not more than 30 years, if the victim is a financial institution or the offense is committed in the context of major disaster or emergency. Both entitle their victims to restitution. Both may result in the forfeiture of property.

# Elements

The mail and wire fraud statutes are essentially the same, except for the medium associated with the offense – the mail in the case of mail fraud and wire communication in the case of wire fraud. As a consequence, the interpretation of one is ordinarily considered to apply to the other. In construction of the terms within the two, the courts will frequently abbreviate or adjust their statement of the elements of a violation to focus on the questions at issue before them. As treatment of the individual elements makes clear, however, there seems little dispute that conviction requires the government to prove:

1. the use of either mail or wire communications in the foreseeable furtherance
2. of a scheme to defraud
3. involving a material deception
4. with the intent to deprive another of
5. either property or honest services.

**Use of Mail or Wire Communications**: The wire fraud statute applies to anyone who transmits or causes to be transmitted by wire, radio, or television communication in interstate or foreign commerce any writings for the purpose executing a scheme or artifice. The mail fraud statute is similarly worded and applies to anyone who for the purpose of executing a scheme or artifice causes use of the mails.

The statutes require that a mailing or wire communication be in furtherance of a scheme to defraud. It need not be an essential element of the scheme, as long as it is incident to an essential element of the scheme. A qualifying mailing or communication, standing alone, may be routine, innocent or even self-defeating, because the relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive. The element may also be satisfied by mailings or communications designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect.

A defendant need not personally have mailed or wired a communication; it is enough that he caused a mailing or transmission of a wire communication in the sense that the mailing or transmission was the reasonable foreseeable consequence of his intended scheme.

**Scheme to Defraud**: The mail and wire fraud statutes both prohibit, in pertinent part, any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, or deprive another of the right to honest services by such means. From the beginning, Congress intended to reach a wide range of schemes to defraud, and has expanded the concept whenever doubts arose. It added the second prong – obtaining money or property by false pretenses, representations, or promises – after defendants had suggested that the term "scheme to defraud" covered false pretenses concerning present conditions but not representations or promises of future conditions. More recently, it added Section 1346 to make it clear the term "scheme to defraud" encompassed schemes to defraud another of the right to honest services. Even before that adornment, the words were understood to refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.

The statutes condemn schemes to defraud—both the successful and the unsuccessful. Nevertheless, there may be some question whether the statutes reach those schemes designed to deceive the gullible though they could not ensnare the reasonably prudent. It is not uncommon for the courts to declare that to demonstrate a scheme to defraud the government needs to show that the defendant's communications were reasonably calculated to deceive persons of ordinary prudence and comprehension. One court considered these statements no more than an identification of a point at which the government has satisfied its burden in a particular case, without addressing whether a lesser quantum of evidence might suffice in other cases. In any event, the question may be more clearly present in the context of the defendant's intent and the materiality of deception, matters discussed below.

**Materiality**: Neither the mail nor the wire fraud statute include a reference to materiality. Yet materiality is an element of each offense, because at the time of the statutes' enactment, the word "defraud" was understood to require a misrepresentation or concealment of a material fact. A statement is material for mail or wire fraud purposes only if it has the natural tendency to influence or be capable of influencing the person to whom it was addressed.

**Intent**: Under both statutes, intent to defraud requires a willful act by the defendant with the intent to deceive or cheat, usually, but not necessarily, for the purpose of getting financial gain for one's self or causing financial loss to another. A defendant has a complete defense if he believes the deceptive statements or promises to be true or otherwise acts in good faith. A defendant has no such defense, however, if he blinds himself to the truth. Nor is it a defense if he intends to deceive but feels his victim will ultimately profit or be unharmed.

**Money, Property, or Honest Services**: The mail and wire fraud statutes speak of schemes to defraud or to obtain money or property. They clearly protect against deprivations of tangible property. Their protection of intangibles has not always been as clear. They do protect intangible *property* rights, although they do not apply to certain intangible rights in property that have no value in the hands of the victim of a scheme.

Some time ago, the Supreme Court held in *McNally v. United States* that the protection does not extend to "the intangible right of the citizenry to good government." Soon after *McNally*, Congress enlarged the mail and wire fraud statute coverage to include the intangible right to honest services, by defining the term "scheme or artifice to defraud" to include[s] a scheme or artifice to deprive another of the intangible right to honest services. Lest the expanded definition be found unconstitutionally vague, the Court in *Skilling v. United States* limited its application to cases of bribery or kickbacks.