SEP 13 2023 AM 11:57
FILED-USDC-CT-HARTFORD

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :     Criminal No. 3:13CR226 (RNC)

                 v.                    :

DANIEL CARPENTER                :     September 8, 2023

## PETITIONER'S REPLY IN SUPPORT OF HIS MOTION TO VACATE HIS CONVICTION PURSUANT TO RULE 60(b)(6)

Respectfully, this Court now can see that AUSA Patel has for the better part of 10 years been working to send an innocent man to prison and to keep him there. After the Supreme Court vacated the convictions in *Binday* based on the unanimous ruling vacating the convictions in *Ciminelli* and abrogating the Second Circuit's discredited "Right to Control Theory of Fraud" there can be no doubt that Petitioner was an innocent man prosecuted by "overzealous" prosecutors for a non-crime that he did not even commit. Petitioner's conviction should be vacated and the defective Superseding Indictment must be dismissed as a matter of law because it was Constructively Amended as well as failing to state a federal offense.

For his part, Petitioner during the past 10 years has helped over 180 inmates to get out of prison. He was able to get 120 of them out early under the First Step Act and the CARES Act, and the last of his "clients" was finally released on July 28th of 2023. Petitioner says "clients" in quotes because neither Petitioner nor the people helping him ever charged a dime – a "Mack" – or even a package of tuna for helping them. Because of that – Petitioner happens to know all of the Supreme Court attorneys involved with the *Binday* and *Ciminelli* cases and is currently working with Justice Sotomayor on another Rule 60(b)(6) case.

Obviously, if the Supreme Court had the benefit of AUSA Patel's cogent analysis of cases from 15-20 years ago, they would not have needed to spend time reviewing all six sections of Rule 60(b) in last year's *Kemp* decision. The opening paragraph by Justice Thomas in *Kemp* suggests that AUSA Patel's Opposition should be sanctioned or at the very least struck as being frivolous and vexatious because *Kemp* was clearly a criminal case:

> Federal Rule of Civil Procedure 60(b)(1) allows a party to seek relief from a final judgment based on, among other things, a "mistake." The question presented is whether the term "mistake" includes a judge's error of law. We conclude, based on the text, structure, and history of Rule 60(b), that a judge's errors of law are indeed "mistake[s]" under Rule 60(b)(1). In 2011, a federal jury convicted Dexter Kemp of various drug and gun crimes, and he was sentenced to 420 months in prison. Kemp, along with seven codefendants, appealed. The Eleventh Circuit consolidated their appeals and, in November 2013, affirmed their convictions and sentences. Both the Government's and Kemp's interpretations of Rule 60(b) depart from aspects of our reading. Their reasons for doing so are unavailing. The Government contends that the term "mistake" encompasses only so-called "obvious" legal errors. Several Courts of Appeals agree that Rule 60(b)(1) may be used to correct only "obvious errors" of law, such as overlooking controlling statutes or case law." The Government argues that this limitation "has historical roots" because courts of equity traditionally "could grant relief from legal errors, but only 'in the most unquestionable and flagrant cases.'" *Kemp v. United States*, 142 S. Ct. 1856, 1860, 1862–63, (2022).

But if that was not bad enough, this is what Justice Sotomayor (Justice for the Second Circuit) had to say:

> Justice SOTOMAYOR, concurring. I join the Court's opinion holding that the term "mistake" in Federal Rule of Civil Procedure 60(b)(1) encompasses a judge's mistake of law. I write separately to make two points. First, I join the Court's opinion with the understanding that nothing in it casts doubt on the availability of Rule 60(b)(6) to reopen a judgment in extraordinary circumstances, including a change in controlling law. See, *e.g.*, *Buck v. Davis*, 137 S.Ct. 759, (2017) **(concluding that the petitioner was "entitle[d] to relief under Rule 60(b)(6)" because of a change in law and intervening developments of fact); *Gonzalez v. Crosby*, 125 S.Ct. 2641, (2005) ("[A] motion might contend that a subsequent change in substantive law is a 'reason justifying relief,' Fed. Rule Civ. Proc. 60(b)(6), from the previous denial of a claim");** (leaving open that a "clear and authoritative change" in the law governing judgment in a case may present extraordinary circumstances). Today's decision does not purport to disturb these settled precedents. Second, I do not understand the Court's opinion to break any new ground as to Rule 60(c)(1), which requires that all Rule 60(b) motions be "made within a reasonable time." ("What constitutes reasonable time necessarily depends on the facts in each individual case"). *Kemp v. United States*, 142 S. Ct. 1856, 1865, 213 L. Ed. 2d 90 (2022).

Please notice that Justice Sotomayor bases her Concurrence on another criminal case where Duane Buck shot and killed his ex-girlfriend and shot and wounded his own sister. He received relief in a Supreme Court decision authored by Chief Justice John Roberts. Too bad AUSA Patel was not there to properly advise the Chief Justice as to the extent and limits of Rule 60(b)(6).

Suffice it to say AUSA Patel is doubly wrong in that convicted criminal killers and drug dealers can argue to vacate their convictions pursuant to Rule 60(b)(6), and since *Ciminelli* proves there was no crime here, AUSA Patel can treat this as a "civil" matter and this Court can treat *Ciminelli* as the "intervening change of law" that both the Chief Justice and the Justice for the Second Circuit state qualifies as the "extraordinary circumstances" that Petitioner needs to show this Court to earn his own relief pursuant to Rule 60(b)(6).

AUSA Patel is also wrong in saying that *Becker* and *Tenzer* were not criminal cases. Rather than deluge this Honorable Court with two dozen cites to *Becker-Tenzer* quotes, Petitioner will just cite the well-respected jurist, the Honorable Stefan Underhill, in yet another criminal case – this time a kidnapper-robber-killer from just last month:

> Reconsideration is only permitted if the court is "confronted with 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" See *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). *TERRELL HUNTER, Petitioner, v. UNITED STATES OF AMERICA, Respondent.*, No. 3:21-CV-1322 (SRU), 2023 WL 5646026, at \*5 (D. Conn. Aug. 31, 2023).

For Judge Underhill to quote Petitioner's favorite "criminal" cite is also important because Judge Underhill has ordered the return of Petitioner's unlawfully seized property from the illegal raids of April 2010 and May 2011 three times starting in June 2015. The latest appeal by the Government is still *sub judice* before the Second Circuit. Significantly, AUSA Patel has been representing the government in all of those appeals. It is bad enough that AUSA Patel lied to Judge

Meyer about Petitioner being off Supervised Release (Petitioner is still on Supervised Release and has sadly not received a single day of benefits from the First Step Act or the CARES Act and Your Honor wrote the seminal decision in *United States v. Anthony Page* that this Court has the power under the First Step Act to resentence a defendant:

> "Returning to the First Step Act, I conclude that it authorizes a reduction in a term of supervised release. The First Step Act constitutes an authorization to "impose a reduced sentence." A sentence is comprised of at least two parts: the term of imprisonment and the term of supervised release." *United States v. Anthony Page*, No. 3:08-CR-168 (RNC), 2020 WL 1698671, at *6 (D. Conn. Apr. 8, 2020).

But in 2019 AUSA Patel even told the Second Circuit that he only used a little bit of evidence illegally seized from Petitioner's office. The gist of all three AUSA Patel Government appeals of Judge Underhill's Orders to return the property is that Petitioner might win on his 2255 Petition and the Government needs to keep the unlawfully seized property for the new trial (ignoring the Double Jeopardy Clause of the Constitution). See attached as Exhibit A the Rule 28(j) Letter submitted to the Second Circuit by Attorney Jon Einhorn with AUSA Patel's admission that he used evidence unlawfully seized from Petitioner's office – but only a little bit. Interestingly, all three judges listening to AUSA Patel's arguments believe that Petitioner will be successful on his 2255 Petition. Your Honor can listen to the *Carpenter v. Allen* audio stream from June 28, 2023 in the footnote below.[1]

Finally, and perhaps for a different motion to vacate on a different day, AUSA Patel's partner in crime, AUSA David Novick, issued a "Secret *Silverthorne* Subpoena" to Petitioner's law firm of Halloran & Sage, which is attached as Exhibit B. The "*Silverthorne* Subpoena" has

---

[1] https://www.ca2.uscourts.gov/decisions/isysquery/23a04348-36b0-4c3a-869b-ba654463d615/11-20/list/

been illegal in this Country for over a century, and Petitioner believes that Your Honor has seen

the immortal words of Justice Brandeis in *Olmstead* once or twice before from Petitioner:

> Time and again this Court, in giving effect to the principle underlying the Fourth Amendment, has refused to place an unduly literal construction upon it. This was notably illustrated in the *Boyd* Case itself. Taking language in its ordinary meaning, there is no 'search' or 'seizure' when a defendant is required to produce a document in the orderly process of a court's procedure. **'The right of the people of be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' would not be violated, under any ordinary construction of language, by compelling obedience to a subpoena. But this Court holds the evidence inadmissible simply because the information leading to the issue of the subpoena has been unlawfully secured.** *Silverthorne Lumber Co. v. United States.* **Literally, there is no 'search' or 'seizure' when a friendly visitor abstracts papers from an office; yet we held in** *Gouled v. United States,* **that evidence so obtained could not be used.**

> Decisions of this Court applying the principles of the *Boyd* case have settled these things. Unjustified search and seizure violate the **Fourth Amendment**, whatever the character of the paper; whether the paper when taken by the federal officers was in the home, **in an office**, or elsewhere; whether the taking was affected by force, by fraud, or in the orderly process of a court's procedure. **From these decisions, it follows necessarily that the Amendment is violated by the officer's reading the paper without a physical seizure, without his even touching it, and that use, in any criminal proceeding, of the contents of the paper so examined -- as where they are testified to by a federal officer who thus saw the document, or where, through knowledge so obtained, a copy has been procured elsewhere -- any such use constitutes a violation of the Fifth Amendment**.

> The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings, and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone -- the most comprehensive of rights, and the right most valued by civilized men. **To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.**

> *Olmstead v. United States*, 277 U.S. 438, 476-485 (1928) (Brandeis, J., dissenting).

Therefore, Petitioner respectfully asks this Court to immediately vacate Petitioner's conviction on any basis the Court prefers, and to reduce Petitioner's Supervised Release to time served as the Petitioner is owed over 37 months of First Step Act and other credits and has only seven months left on Supervised Release. Petitioner would be honored to have this Court issue an immediate release pursuant to 28 U.S.C. § 2243 in two days as was done for John Merryman during the Civil War. See *Ex parte Merryman:*

> However, these interests can only be satisfied within the limits of our constitutional scheme, which requires that all governmental action resulting in the deprivation of a person's liberty be authorized by law. See Ex parte Merryman, 17 Fed.Cas. 144, 147, No. 9487 (C.C.Maryland 1861) (Taney, C.J.); *U. S. ex rel. Martinez-Angosto v. Mason*, 344 F.2d 673, 685 (2d Cir. 1965).

Finally, attached as Exhibit C is the submission by the *Ciminelli* attorneys to the Second Circuit for the ease of this Court's perusal, and those excellent arguments made by famous attorneys are hereby incorporated by reference supporting Petitioner's claim that indeed the law of Mail & Wire Fraud in the Second Circuit has certainly changed and Petitioner's conviction should be vacated immediately. Petitioner also notes that the Government agreed to vacate Percoco's conviction for Wire Fraud and should do so in this case as well as was done in other recent cases based on *Ciminelli*.

Respectfully Submitted:

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

# EXHIBIT A

# Rule 28(j) Letters filed in Carpenter v Allen,
# Docket Nos. 22-1057, 22-1061(XAP)

June 20, 2023

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:   *Carpenter v. Allen*,
              Docket Nos. 22-1057, 22-1061(XAP)

Dear Ms. Wolfe:

Pursuant to Rule 28(j), this letter is to advise the Court of two recent decisions from the Supreme Court that will have a major impact on the future of the litigation between the parties in *Carpenter v. Allen*. The first case, *Binday v. United States*, is included as Exhibit One and resulted in the Defendants in *Binday* having their convictions vacated based on the Supreme Court's unanimous decision in *Ciminelli v. United States* (Exhibit Two), which effectively abrogated and reversed a number of convictions involving the Second Circuit's "Right to Control" Theory of Fraud. The Government has already begun to advise people to stop collecting restitution on cases involving the "Right to Control" Theory. See e.g., Notice to Trevon Gross attached as Exhibit Three.

The gist of the Government-Appellants' appeal of Judge Underhill's three Orders over the past eight years is that Mr. Carpenter might succeed in his efforts to vacate his conviction and the Government will need the property unlawfully seized in two raids in 2010 and 2011 for what the Government believes will be a second trial for Mr. Carpenter.

But the Double Jeopardy Clause of the Constitution precludes any such second trial because: "In essence, the Double Jeopardy Clause protects criminal defendants against three things: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *United States v. Olmeda*, 461 F.3d 271, 279 (2d Cir. 2006).

The Government's claim that it must withhold the unlawfully seized property from the innocent Grist Mill Capital LLC is also dubious because the Government claimed in 2019 that it had all of the evidence that it needed and there was no evidence illegally seized from Mr. Carpenter's office that it needed for any future trial. See Government's Rule 28(j) Letter attached as Exhibit Four. So, there is no further evidence that the Government needs to retain for a hypothetical second trial.

By: */s/ Jonathan J. Einhorn*
JONATHAN J. EINHORN
129 WHITNEY AVENUE
NEW HAVEN, CT 06510
FEDERAL BAR NO. ct00163
EINHORNLAWOFFICE@GMAIL.COM

# EXHIBIT ONE

## Binday v. United States

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

May 22, 2023

Clerk
United States Court of Appeals for the Second
Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

> Re:  Michael L. Binday
> v. United States
> No. 21-1241
> (Your No. 21-1206)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is granted.  The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Ciminelli* v. *United States*, 598 U. S. ___ (2023).

The judgment or mandate of this Court will not issue for at least thirty-two days pursuant to Rule 45.  Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

*Scott S. Harris*

**Scott S. Harris**, Clerk

# EXHIBIT TWO

Ciminielli v. United States

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC 20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

May 11, 2023

Clerk
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:  Louis Ciminelli
          v. United States, et al.
          No. 21-1170
          (Your No. 18-3710, 18-3712, 18-3715, 18-3850)

Dear Clerk:

The opinion of this Court was announced today in the above stated case. A copy of the opinion is available on the Court's website at www.supremecourt.gov.

The judgment or mandate of this Court will not issue for at least twenty-five days pursuant to Rule 45. Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

*Scott S. Harris*

**Scott S. Harris**, Clerk

by

Laurie Wood
Deputy Clerk
(202) 479-3031

(Slip Opinion)          OCTOBER TERM, 2022          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CIMINELLI *v.* UNITED STATES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 21–1170.  Argued November 28, 2022—Decided May 11, 2023

Petitioner Louis Ciminelli was convicted of federal wire fraud for his involvement in a scheme to rig the bid process for obtaining state-funded development projects associated with then-New York Governor Andrew Cuomo's Buffalo Billion initiative.  The Buffalo Billion initiative was administered by the nonprofit Fort Schuyler Management Corporation.  Investigations uncovered that Fort Schuyler board member Alain Kaloyeros paid lobbyist Todd Howe $25,000 in state funds each month to ensure that the Cuomo administration gave Kaloyeros a prominent role in administering projects for Buffalo Billion.  Ciminelli's construction company, LPCiminelli, paid Howe $100,000 to $180,000 each year to help it obtain state-funded jobs.  In 2013, Howe and Kaloyeros devised a scheme whereby Kaloyeros would tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts by designating LPCiminelli as a "preferred developer" with priority status to negotiate for specific projects. Kaloyeros, Howe, and Ciminelli jointly developed a set of requests for proposal (RFPs) that effectively guaranteed LPCiminelli's selection as a preferred developer by treating unique aspects of LPCiminelli as qualifications for preferred-developer status.  With that status in hand, LPCiminelli secured the marquee $750 million "Riverbend project" in Buffalo.  After the scheme was uncovered, Ciminelli, Kaloyeros, Howe, and others were indicted for, as relevant here, wire fraud in violation of 18 U. S. C. §1343 and conspiracy to commit the same under §1349.

In the operative indictment and at trial, the Government relied solely on the Second Circuit's right-to-control theory of wire fraud, under which the Government can establish wire fraud by showing that

Syllabus

the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions. Consistent with that theory, the District Court instructed the jury that the term "property" in §1343 "includes intangible interests such as the right to control the use of one's assets," which could be harmed by depriving Fort Schuyler of "potentially valuable economic information." The jury convicted Ciminelli of wire fraud and conspiracy to commit wire fraud. On appeal, Ciminelli argued that the right to control one's assets is not "property" for purposes of §1343. The Second Circuit affirmed the convictions on the basis of its longstanding right-to-control precedents.

*Held*: Because the right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest, the Second Circuit's right-to-control theory cannot form the basis for a conviction under the federal fraud statutes. Pp. 4–10.

(a) The federal wire fraud statute criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. When the federal wire fraud statute was enacted, the "common understanding" of the words "to defraud" referred "to wronging one in his property rights." *Cleveland* v. *United States*, 531 U. S. 12, 19. This Court has therefore consistently understood the statute's "money or property" requirement as limiting the "scheme or artifice to defraud" element. *Ibid.* Even so, lower federal courts for decades interpreted the mail and wire fraud statutes to protect intangible interests unconnected to traditional property rights. See *Skilling* v. *United States*, 561 U. S. 358, 400. This Court halted that trend in *McNally* v. *United States*, 483 U. S. 350, which confined the statutes to the "protect[ion of] individual property rights." *Id.*, at 359, n. 8.

The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights." *Id.*, at 360. The so-called right to control is not an interest that had "long been recognized as property" when the wire fraud statute was enacted. *Carpenter* v. *United States*, 484 U. S. 19, 26. From the theory's inception, the Second Circuit has not grounded the right to control in traditional property notions. The theory is also inconsistent with the structure and history of the federal fraud statutes. Congress responded to this Court's decision in *McNally* by enacting §1346, which revived only the intangible right of honest services, one of many intangible rights protected by courts under the fraud statutes pre-*McNally*. Congress' silence regarding other such intangible interests forecloses the judicial expansion of the wire fraud statute to cover the intangible right to control. Finally, by treating

Cite as:  598 U. S. \_\_\_\_ (2023)                    3

Syllabus

mere information as the protected interest, the right-to-control theory
vastly expands federal jurisdiction to an almost limitless variety of de-
ceptive actions traditionally left to State law.  Pp. 4–9.

    (b) Despite relying exclusively on the right-to-control theory before
the grand jury, District Court, and Second Circuit, the Government
now concedes that the theory as articulated below is erroneous.  Yet,
the Government insists that the Court can affirm Ciminelli's convic-
tions by applying facts presented to the jury below to the elements of
a different wire fraud theory.  The Court declines the Government's
request, which would require the Court to assume not only the func-
tion of a court of first view, but also of a jury.  See *McCormick* v. *United
States,* 500 U. S. 257, 270–271, n. 8.  Pp. 9–10.

13 F. 4th 158, reversed and remanded.

    THOMAS, J., delivered the opinion for a unanimous Court.  ALITO, J.,
filed a concurring opinion.

Cite as: 598 U. S. ____ (2023)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports.  Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 21–1170

## LOUIS CIMINELLI, PETITIONER v.
## UNITED STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 11, 2023]

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we must decide whether the Second Circuit's longstanding "right to control" theory of fraud describes a valid basis for liability under the federal wire fraud statute, which criminalizes the use of interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U. S. C. §1343. Under the right-to-control theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of "potentially valuable economic information" "necessary to make discretionary economic decisions." *United States* v. *Percoco*, 13 F. 4th 158, 170 (CA2 2021) (internal quotation marks omitted). Petitioner Louis Ciminelli was charged with, tried for, and convicted of wire fraud under this theory. And the Second Circuit affirmed his convictions on that same basis.

We have held, however, that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. *Cleveland* v. *United States*, 531 U. S. 12, 24 (2000). Because "potentially valuable economic in-

formation" "necessary to make discretionary economic decisions" is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability under §1343. Accordingly, we reverse the Second Circuit's judgment.

I

This case begins with then-New York Governor Andrew Cuomo's "Buffalo Billion" initiative. On its face, the initiative was administered through Fort Schuyler Management Corporation, a nonprofit affiliated with the State University of New York (SUNY) and the SUNY Research Foundation. It aimed to invest $1 billion in development projects in upstate New York. Later investigations, however, uncovered a wide-ranging scheme that involved several of former Governor Cuomo's associates, most notably Alain Kaloyeros and Todd Howe. Kaloyeros was a member of Fort Schuyler's board of directors and was in charge of developing project proposals for Buffalo Billion; Howe was a lobbyist who had deep ties to the Cuomo administration. Each month, Kaloyeros paid Howe $25,000 in state funds to ensure that the Cuomo administration gave Kaloyeros a prominent position in Buffalo Billion.

Ciminelli had a similar arrangement. His construction company, LPCiminelli, paid Howe $100,000 to $180,000 each year to help it obtain state-funded jobs. In 2013, Howe and Kaloyeros devised a scheme whereby Kaloyeros would tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts. First, on Kaloyeros' suggestion, Fort Schuyler established a process for selecting "preferred developers" that would be given the first opportunity to negotiate with Fort Schuyler for specific projects. Then, Kaloyeros, Howe, and Ciminelli jointly developed a set of requests for proposal (RFPs) that treated unique aspects of LPCiminelli as qualifications for

Cite as: 598 U. S. ____ (2023)          3

Opinion of the Court

preferred-developer status. Those RFPs effectively guaranteed that LPCiminelli would be (and was) selected as a preferred developer for the Buffalo projects. With that status in hand, LPCiminelli secured the marquee $750 million "Riverbend project" in Buffalo.

After an investigation revealed their scheme, Ciminelli, Howe, Kaloyeros, and several others were indicted by a federal grand jury on 18 counts including, as relevant here, wire fraud in violation of 18 U. S. C. §1343 and conspiracy to commit wire fraud in violation of §1349.

Throughout the grand jury proceedings, trial, and appeal, the Government relied on the Second Circuit's "right to control" theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions. The Government's indictment and trial strategy rested solely on that theory.[1] And, it successfully defeated Ciminelli and his codefendants' motion to dismiss by relying on that theory. In addition, it successfully moved the District Court to exclude certain defense evidence as irrelevant to that theory. The Government also relied on that theory in its summation to the jury.

Consistent with the right-to-control theory, the District Court instructed the jury that the term "property" in §1343 "includes intangible interests such as the right to control the use of one's assets." App. 41. The jury could thus find that the defendants harmed Fort Schuyler's right to control

_____

[1] An earlier indictment alleged that the Buffalo Billion contracts were the property at issue. But, to defend against the defendants' motion to dismiss, the Government relied solely on the theory that the scheme "defraud[ed] Fort Schuyler of its right to control its assets." App. 31–32. The District Court then relied expressly on the right-to-control theory in denying the motion to dismiss. *United States* v. *Percoco*, 2017 WL 6314146, *8 (SDNY, Dec. 11, 2017).

4                    CIMINELLI v. UNITED STATES

                      Opinion of the Court

its assets if Fort Schuyler was "deprived of potentially val-
uable economic information that it would consider valuable
in deciding how to use its assets." *Ibid.* The District Court
further defined "economically valuable information" as "in-
formation that affects the victim's assessment of the bene-
fits or burdens of a transaction, or relates to the quality of
goods or services received or the economic risks of the trans-
action." *Ibid.* The jury found Ciminelli guilty of wire fraud
and conspiracy to commit wire fraud and the District Court
sentenced him to 28 months' imprisonment followed by 2
years' supervised release.

   On appeal, Ciminelli challenged the right-to-control the-
ory, arguing that the right to control one's assets is not
"property" for purposes of the wire fraud statute. Defend-
ing the wire fraud convictions, the Government relied solely
on the right-to-control theory. The Second Circuit affirmed
the convictions based on its longstanding right-to-control
precedents, holding that, by "rigging the RFPs to favor their
companies, defendants deprived Fort Schuyler of poten-
tially valuable economic information." 13 F. 4th, at 171 (in-
ternal quotation marks omitted).

   We granted certiorari to determine whether the Second
Circuit's right-to-control theory of wire fraud is a valid basis
for liability under 18 U. S. C. §1343.  597 U. S. ___ (2022).
And, we now hold that it is not.

                            II
                            A

   The wire fraud statute criminalizes "scheme[s] or arti-
fice[s] to defraud, or for obtaining money or property by
means of false or fraudulent pretenses, representations, or
promises." §1343. Although the statute is phrased in the
disjunctive, we have consistently understood the "money or
property" requirement to limit the "scheme or artifice to de-
fraud" element because the "common understanding" of the
words "to defraud" when the statute was enacted referred

Opinion of the Court

"to wronging one in his property rights." *Cleveland*, 531
U. S., at 19 (internal quotation marks omitted).[2] This un-
derstanding reflects not only the original meaning of the
text, but also that the fraud statutes do not vest a general
power in "the Federal Government . . . to enforce (its view
of) integrity in broad swaths of state and local policymak-
ing." *Kelly* v. *United States*, 590 U. S. ___, ___ (2020) (slip
op., at 12). Instead, these statutes "protec[t] property rights
only." *Cleveland*, 531 U. S., at 19. Accordingly, the Gov-
ernment must prove not only that wire fraud defendants
"engaged in deception," but also that money or property was
"an object of their fraud." *Kelly*, 590 U. S., at ___ (slip op.,
at 7) (alterations omitted).

Despite these limitations, lower federal courts for dec-
ades interpreted the mail and wire fraud statutes to protect
intangible interests unconnected to traditional property
rights. See *Skilling* v. *United States*, 561 U. S. 358, 400
(2010) (recounting how "the Courts of Appeals, one after an-
other, interpreted the term 'scheme or artifice to defraud' to
include deprivations not only of money or property, but also
of intangible rights"). For example, federal courts held the
fraud statutes reached such intangible interests as the
right to "honest services," *ibid.* (internal quotation marks
omitted); the right of the citizenry to an honest election, see
*United States* v. *Girdner*, 754 F. 2d 877, 880 (CA10 1985);
and the right to privacy, *United States* v. *Louderman*, 576
F. 2d 1383, 1387 (CA9 1978). In *McNally* v. *United States*,
483 U. S. 350 (1987), this Court halted that trend by con-
fining the federal fraud statutes to their original station,
the "protect[ion of] individual property rights." *Id.*, at 359,
n. 8. Congress then amended the fraud statutes "specifi-
cally to cover one of the 'intangible rights' that lower courts

_____

[2] Although *Cleveland* involved the mail fraud statute, 18 U. S. C.
§1341, "we have construed identical language in the wire and mail fraud
statutes *in pari materia*." *Pasquantino* v. *United States*, 544 U. S. 349,
355, n. 2 (2005).

had protected under [the statutes] prior to *McNally*: 'the intangible right of honest services.'" *Cleveland*, 531 U. S., at 19–20 (quoting 18 U. S. C. §1346).

The right-to-control theory applied below first arose after *McNally* prevented the Government from basing federal fraud convictions on harms to intangible interests unconnected to property. See *United States* v. *Wallach*, 935 F. 2d 445, 461–464 (CA2 1991). As developed by the Second Circuit, the theory holds that, "[s]ince a defining feature of most property is the right to control the asset in question," "the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States* v. *Lebedev*, 932 F. 3d 40, 48 (2019) (alterations omitted). Thus, a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States* v. *Binday*, 804 F. 3d 558, 570 (CA2 2015) (alterations omitted).[3]

The right-to-control theory cannot be squared with the text of the federal fraud statutes, which are "limited in scope to the protection of property rights." *McNally*, 483 U. S., at 360. The so-called "right to control" is not an interest that had "long been recognized as property" when the wire fraud statute was enacted. *Carpenter* v. *United States*, 484 U. S. 19, 26 (1987). Significantly, when the Second Circuit first recognized the right-to-control theory in 1991—decades after the wire fraud statute was enacted and over a century after the mail fraud statute was enacted—it could

_____

[3] At least two Circuits have expressly repudiated the right-to-control theory of wire fraud. *United States* v. *Sadler*, 750 F. 3d 585, 590–592 (CA6 2014); *United States* v. *Bruchhausen*, 977 F. 2d 464, 467–469 (CA9 1992). Several other Circuits have embraced the theory to varying degrees. See, *e.g.*, *United States* v. *Gray*, 405 F. 3d 227, 234 (CA4 2005) (collecting cases).

Opinion of the Court

cite no authority that established "potentially valuable eco-
nomic information" as a traditionally recognized property
interest. See *Wallach*, 935 F. 2d, at 462–463.[4] And, the
Second Circuit has not since attempted to ground the right-
to-control theory in traditional property notions. We have
consistently rejected such federal fraud theories that "stray
from traditional concepts of property." *Cleveland*, 531
U. S., at 24. For its part, the Government—despite relying
upon the right-to-control theory for decades, including in
this very case—now concedes that if "the right to make in-
formed decisions about the disposition of one's assets, with-
out more, were treated as the sort of 'property' giving rise
to wire fraud, it would risk expanding the federal fraud
statutes beyond property fraud as defined at common law
and as Congress would have understood it." Brief for
United States 25–26. Thus, even the Government now
agrees that the Second Circuit's right-to-control theory is
unmoored from the federal fraud statutes' text.

---

[4] The only judicial authority the Second Circuit cited for this key prop-
osition was a 1989 Fifth Circuit opinion that conclusorily asserted that
"[t]he economic value of . . . knowledge" was "sufficient 'property' to im-
plicate" the mail fraud statute, and that appears to have misunderstood
18 U. S. C. §1346 as "eliminating the requirement of property loss" in all
cases. *United States* v. *Little*, 889 F. 2d 1367, 1368–1369. The Second
Circuit then proceeded to rely on the "bundle of sticks" metaphor of prop-
erty rights. See *United States* v. *Wallach*, 935 F. 2d 445, 463 (1991)
("[G]iven the important role that information plays in the valuation of a
corporation, the right to complete and accurate information is one of the
most essential sticks in the bundle of rights that comprise a stockholder's
property interest"). But that metaphor—whatever its merits in other
contexts—cannot compensate for the absence of an interest that itself
"has long been recognized as property," *Carpenter* v. *United States*, 484
U. S. 19, 26 (1987), particularly in light of our rejection of attempts to
construe the federal fraud statutes "in a manner that leaves [their] outer
boundaries ambiguous." *McNally* v. *United States*, 483 U. S. 350, 360
(1987). As noted above, the right to information necessary to make in-
formed economic decisions, while perhaps useful for protecting and mak-
ing use of one's property, has not itself traditionally been recognized as
a property interest.

8                    CIMINELLI *v.* UNITED STATES

Opinion of the Court

The right-to-control theory is also inconsistent with the structure and history of the federal fraud statutes. As recounted above, after *McNally* put an end to federal courts' use of mail and wire fraud to protect an ever-growing swath of intangible interests unconnected to property, Congress responded by enacting §1346, which—despite the wide array of intangible rights courts protected under the fraud statutes pre-*McNally*—revived "*only* the intangible right of honest services." *Cleveland*, 531 U. S., at 19–20 (emphasis added). "Congress' reverberating silence about other [such] intangible interests" forecloses the expansion of the wire fraud statute to cover the intangible right to control. *United States* v. *Sadler*, 750 F. 3d 585, 591 (CA6 2014).

Finally, the right-to-control theory vastly expands federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal. See, *e.g., United States* v. *Viloski*, 557 Fed. Appx. 28 (CA2 2014) (affirming right-to-control conviction based on an employee's undisclosed conflict of interest). The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, "[a]bsent [a] clear statement by Congress," courts should "not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland*, 531 U. S., at 27. And, as it did below, the Second Circuit has employed the theory to affirm federal convictions regulating the ethics (or lack thereof) of state employees and contractors—despite our admonition that "[f]ederal prosecutors may not use property fraud statutes to set standards of disclosure and good government for state and local officials." *Kelly*, 590 U. S., at ___ (slip op., at 12) (alterations omitted). The right-to-control theory thus criminalizes traditionally civil matters and federalizes traditionally state matters.

Cite as: 598 U. S. ____ (2023)          9

Opinion of the Court

In sum, the wire fraud statute reaches only traditional property interests. The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest. Accordingly, the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes.

B

Despite indicting, obtaining convictions, and prevailing on appeal based solely on the right-to-control theory, the Government now concedes that the theory as articulated below is erroneous. Brief for United States 24–26. The Government frankly admits that, "to the extent that language in the [Second Circuit's] opinions might suggest that depriving a victim of economically valuable information, without more, necessarily qualifies as 'obtaining money or property' within the meaning of the fraud statutes, that is incorrect." *Id.*, at 24. That should be the end of the case.

Yet, the Government insists that its concession does not require reversal because we can affirm Ciminelli's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory. *Id.*, at 31–32. With profuse citations to the records below, the Government asks us to cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a *different* wire fraud theory in the first instance. In other words, the Government asks us to assume not only the function of a court of first view, but also of a jury. That is not our role. See, *e.g.*, *McCormick* v. *United States*, 500 U. S. 257, 270–271, n. 8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury"); *Chiarella* v. *United States*, 445 U. S. 222, 236 (1980). Accordingly, we decline the Government's request to affirm Ciminelli's convictions on alternative grounds.

10                CIMINELLI *v.* UNITED STATES

Opinion of the Court

### III

The right-to-control theory is invalid under the federal fraud statutes. We, therefore, reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 598 U. S. \_\_\_\_ (2023)                    1

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 21–1170

## LOUIS CIMINELLI, PETITIONER *v.*
## UNITED STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 11, 2023]

JUSTICE ALITO, concurring.

The opinion of the Court correctly answers the sole question posed to us: whether the right-to-control theory supports liability under the federal wire fraud statute. The jury instructions embody that theory, and therefore this error, unless harmless, requires the reversal of the judgment below. I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including: (1) petitioner's ability to challenge the indictment at this stage of proceedings, see Fed. Rule Crim. Proc. 12(b)(3)(B); (2) the indictment's sufficiency, see *United States* v. *Miller*, 471 U. S. 130, 134–135 (1985) (variance from indictment did not make indictment insufficient); (3) the applicability of harmless error to particular invocations of the right-to-control theory during trial, see *Neder* v. *United States*, 527 U. S. 1, 15 (1999) (omission of element in jury instructions subject to harmless error); and (4) the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts. On this understanding, I join the Court's opinion.

# EXHIBIT THREE

## Restitution Cases

From: "Robinson, LaKisha (USANYS)" <LaKisha.Robinson@usdoj.gov>
Date: May 31, 2023 at 5:42:07 PM EDT
To: bfloyd@hopecathedral.com
Subject: RE: [EXTERNAL] Trevon Gross payment

Hello Ms. Floyd,

Please do not send June or any payments going forward at this time for Trevon Gross.
We received payment for May
I will send you a letter as well.
Thank You,
Lakisha

FYI

Subject: PLEASE READ!!! Supreme Court vacated judgment of several defendants - 12 Cr 152 and 15 CR
769

The U.S. Supreme Court has vacated the judgments entered in the cases below. The Court further
instructed that the cases be returned to the district court for further proceedings. At this point, we have
no idea whether the Office will pursue different charges against these defendants. In any case, because
the judgments (imposing restitution) have been vacated, please suspend any collection for the
foreseeable future. That means we should remove these defendants from TOP and stop any ongoing
wage garnishments. Thanks, and please contact me if there are any questions.

John E. Gura, Jr.
Assistant United States Attorney
Southern District of New York
Tel. (212) 637-2712
Email: john.gura@usdoj.gov

# EXHIBIT FOUR

## Government Rule 28(j) Letter



**United States Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*          *(203) 821-3700*
*157 Church Street, 25th Floor*          *Fax (203) 773-5376*
*New Haven, Connecticut  06510*          *www.justice.gov/usao/ct*

August 19, 2019

Catherine O'Hagan Wolfe
Clerk of the Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

       Re:    *United States v. Carpenter*
              Docket No. 19-70

Dear Ms. Wolfe:

      Pursuant to Fed. R. App. P. 28(j), this letter is to advise the Court of the following decision: *United States v. DiTomasso*, No. 17-1699, 2019 WL 3417264 (2d Cir. July 30, 2019). This case has bearing on the government's argument, at pages 48-50 and 77-79 of its brief, that Mr. Carpenter lacked a reasonable expectation of privacy (*i.e.*, standing) to seek suppression of trial evidence obtained from the execution of two searches—one in 2010 and one in 2011—at the offices of the Charter Oak Trust, and that any error was harmless in light of the other evidence properly admitted.

      In *DiTomasso*, this Court rejected the defendant's suppression challenge as to some of the seized material in part because that material was "not offered or admitted at trial." *DiTomasso*, 2019 WL 3417264 at *6. Similarly, in this case, almost none of the material from Carpenter's own office—the only material in which he *may* have had a reasonable expectation of privacy—was introduced as evidence at trial. Only one document from the 2010 search that was admitted at trial came from Carpenter's office. *See* Gov't Br. at 49-50, 78. At most 14 trial exhibits (and 4 parts of composite exhibits) from the 2011 search potentially *could* have come from Carpenter's office (the record was undeveloped on this point). *See id.* at 78-79. The rest of the material coming from Carpenter's office was not admitted at trial and thus, under *DiTomasso*, should not factor in the Court's decision.  Moreover, since none of the evidence from Carpenter's office would have affected "in some material

respect" the district court's judgment, *id.* at 77-78, its admission—even if error—was harmless.

I respectfully request that a copy of this letter be circulated to each of the panel members assigned to this case.

Very truly yours,

JOHN H. DURHAM
UNITED STATES ATTORNEY

NEERAJ N. PATEL
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEYS

cc:    Michael A. Levy, Esq. (via ECF)
       Qais Ghafary, Esq. (via ECF)

# EXHIBIT B

# AUSA Novick  "Silverthorne Subpoena"



U.S. Department of Justice

*United States Attorney*
*District of Connecticut*

*Abraham A. Ribicoff Federal Building*      (860) 947-1101
*450 Main Street, Room 328*      Fax (860) 760-7979
*Hartford, Connecticut 06103*      www.usdoj.gov/usao/ct

May 25, 2011

Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739
Attention: Dan E. LaBelle, Esq.

      Re:   Non-Disclosure of Subpoena

Dear Sir or Madam:

      You have been served with a subpoena which requires you to appear before a federal grand jury June 28, 2011 with certain specified documents. Because this subpoena is being issued as part of an ongoing investigation, we request that you do not disclose its existence or its contents to any person who is not involved in your internal document production process. If at some point you decide that it is necessary to disclose the existence and/or the contents of this subpoena, I request that you notify me of your intent to do so prior to the time of the disclosure.

      In addition, to the extent that you do not produce certain responsive materials on the basis that you believe they are protected by the attorney-client or any other privilege, please include with your production a log identifying any documents withheld on the basis of privilege.

      YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY WILL BE EXCUSED if **these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date**

              Very truly yours,

              DAVID B. FEIN
              UNITED STATES ATTORNEY

              DAVID E. NOVICK
              ASSISTANT UNITED STATES ATTORNEY

Enclosure

AO 110  (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

H-10-2-9(416)

for the

District of Connecticut

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:

Halloran & Sage, LLP
315 Post Road West
Westport, CT

YOU ARE COMMANDED to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | United States District Court   (Grand Jury Room, 3rd Floor) 450 Main Street Hartford, CT 06103 | Date and Time: June 28, 2011 at 9:30 a.m. |
|---|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

### SEE ATTACHMENT.

**PLEASE NOTE:**

In lieu of personally appearing before the Grand Jury, these records may be provided to these records are provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date

Date:  **May 25, 2011**

CLERK OF COURT

*Yelena Gutierrez*

Digitally signed by Yelena Gutierrez
DN: cn=Yelena Gutierrez, o=United States District
Court, ou=Clerks Office, email=yelena_gutierrez@ctd.
uscourts.gov, c=US
Date: 2011.04.04 10:51:51 -04'00'

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Assistant U.S. Attorney David E. Novick
450 Main Street, Room 328
Hartford, CT 06103
Tele: (860) 947-1101     CONTROL #416

Attachment to Subpoena

**TO:**   Halloran and Sage, LLP
315 Post Road West
Westport, CT 06880-4739

Attention: Dan E. LaBelle, Esq.


Provide all documents and other items seized pursuant to a search warrant executed at 100 Grist Mill Road, Simsbury, Connecticut, by the IRS-CID of Milwaukee, Wisconsin, on April 20, 2010, that are related to Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, and Avon Capital and associated entities, including but not limited to IRS evidence box numbers 36, 38, 54, 75, 81, 103, 205, 238, 249, 287, 293, 300, 308, 35, 37, 121,128, 129, 125, 239, 32, 90, 124, 204, 237, 243, 247, 253 and 291.


**In lieu of personally appearing before the Grand Jury, these records may be provided to Special Agent Lynn Allen, U.S. Department of Labor, Office of Inspector General, c/o Squad 4, 600 State Street, New Haven, CT 06511, telephone (203) 630-9526, facsimile (203) 630-9530 on or before the grand jury date.**

# EXHIBIT C
## Ciminelli Filing in Second Circuit

# 18-2990(L)

## 18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON), 19-1272(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants,*

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT BRIEF ON REMAND OF DEFENDANTS-APPELLANTS STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI AND ALAIN KALOYEROS

---

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
FABIEN M. THAYAMBALLI
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants
Steven Aiello and Joseph Gerardi*

TIMOTHY W. HOOVER
SPENCER L. DURLAND
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600

HERBERT L. GREENMAN
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 300
Buffalo, New York 14202
(716) 849-1333

*Attorneys for Defendant-Appellant
Louis Ciminelli*

(*Counsel continued on inside cover*)

MICHAEL C. MILLER
REID H. WEINGARTEN
MICHAEL G. SCAVELLI
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

BRUCE C. BISHOP
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-6747

*Attorneys for Defendant-Appellant
   Alain Kaloyeros*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

SUPPLEMENTAL STATEMENT OF THE CASE .................................................. 2

    A.    The Supreme Court Rejected The Right-To-Control Theory
           Underlying Defendants' Wire Fraud And Conspiracy Convictions .......... 2

    B.    The Supreme Court Rejected The Government's Attempt To
           Rely On A Traditional Fraud Theory ........................................................... 3

    C.    The Supreme Court Rejected The Theory Underlying Aiello's
           Conviction For Honest Services Fraud, Which The Government
           Agrees Should Be Vacated So That It Can Dismiss That Charge ............. 8

ARGUMENT ........................................................................................................ 8

I.    DEFENDANTS ARE ENTITLED TO JUDGMENTS OF ACQUITTAL ....... 8

    A.    Acquittal Is Required Because The Government Did Not Present
           Any Legally Valid Theory At Trial ............................................................. 9

           1.    Sufficiency Review Cannot Look Beyond The Theory
                 Charged In The Indictment And Presented At Trial ........................ 9

           2.    Defendants Are Entitled To Acquittal ............................................. 15

    B.    The Evidence Is Insufficient Even If Measured Under A
           Traditional Property Fraud Theory ............................................................. 18

           1.    Wire Fraud Requires Proof That The Defendant Intended
                 To Inflict Economic Harm ............................................................... 19

           2.    There Was No Evidence That Defendants Intended Harm
                 To Fort Schuyler's Property Interests ............................................. 25

3.   The Theoretical Possibility That Fort Schuyler Could
      Have Gotten A Better Deal Is Insufficient To Establish
      A Wire Fraud Scheme ...................................................................29

II.   GERARDI'S FALSE STATEMENT CONVICTION SHOULD BE
      REVERSED ......................................................................................32

      A.   Background..............................................................................33

      B.   *Ciminelli* Renders Gerardi's Statements Immaterial.................35

      C.   At A Minimum, Spillover Prejudice From The Wire Fraud
           And Conspiracy Counts Requires Vacating The § 1001 Conviction.......37

CONCLUSION .........................................................................................43

## TABLE OF AUTHORITIES

**Cases**                                     **Page(s)**

*Abraham Zion Corp. v. Lebow*,
761 F.2d 93 (2d Cir. 1985) ..................................................................................28

*Aiello v. United States*,
143 S. Ct. 2491 (2023) ..................................................................................7, 8

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001) ..................................................................................28

*Bullington v. Missouri*,
451 U.S. 430 (1981) ..................................................................................17

*Burks v. United States*,
437 U.S. 1 (1978) .......................................................................... 10, 16, 17, 43

*Chiarella v. United States*,
445 U.S. 222 (1980) ..................................................................................... 4, 12

*Ciminelli v. United States*,
598 U.S. 306 (2023) ..................................................................................... passim

*Dunn v. United States*,
442 U.S. 100 (1979) ..................................................................................13

*Eaton v. City of Tulsa*,
415 U.S. 697 (1974) ..................................................................................13

*Genovese Drug Stores, Inc. v. Conn. Packing Co.*,
732 F.2d 286 (2d Cir. 1984) ..................................................................................28

*Hammerschmidt v. United States*,
265 U.S. 182 (1924) ..................................................................................24

*Jackson v. Virginia*,
443 U.S. 307 (1979) ..................................................................................... 9, 10

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ..................................................................................17

*Kaloyeros v. United States*,
   143 S. Ct. 2490 (2023) ........................................................................7

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) .............................................. 9, 15, 18, 23, 31

*Kungys v. United States*,
   485 U.S. 759 (1988) ..........................................................................36

*Lockhart v. Nelson*,
   488 U.S. 33 (1988) ............................................................................10

*McCormick v. United States*,
   500 U.S. 257 (1991) ............................................................................4

*Musacchio v. United States*,
   577 U.S. 237 (2016) ..........................................................................14

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ..........................................................................23

*Percoco v. United States*,
   598 U.S. 319 (2023) ............................................................................8

*Russell v. United States*,
   369 U.S. 749 (1962) ..........................................................................12

*Skilling v. United States*,
   561 U.S. 358 (2010) ..........................................................................23

*Stirone v. United States*,
   361 U.S. 212 (1960). ..........................................................................12

*United States v. Abdelaziz*,
   68 F.4th 1 (1st Cir. 2023) ...................................................................41

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) .................................................................13

*United States v. Aleynikov*,
   No. 10-cr-96 (DLC), ECF No. 164 (S.D.N.Y. June 5, 2012) .............14

*United States v. Bonds,*
   784 F.3d 582 (9th Cir. 2015) ................................................................37

*United States v. Bouchard,*
   828 F.3d 116 (2d Cir. 2016) ...............................................................12

*United States v. Bruno,*
   383 F.3d 65 (2d Cir. 2004) ........................................... 37, 38, 40, 41

*United States v. Concepcion,*
   983 F.2d 369 (2d Cir. 1992) ...............................................................13

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) .................................................................32

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994) ..............................................................31

*United States v. Facchini,*
   874 F.2d 638 (9th Cir. 1989) .............................................................36

*United States v. Finazzo,*
   850 F.3d 94 (2d Cir. 2017) .................................................................30

*United States v. Frampton,*
   382 F.3d 213 (2d Cir. 2004) .................................................... 10, 11

*United States v. Gaudin,*
   515 U.S. 506 (1995) ...........................................................................35

*United States v. Gonzales,*
   841 F.3d 339 (5th Cir. 2016) .............................................................11

*United States v. Guadagna,*
   183 F.3d 122 (2d Cir. 1999) ...................................................... 18, 31

*United States v. Guertin,*
   67 F.4th 445 (D.C. Cir. 2023) ...........................................................24

*United States v. Hamdi,*
   432 F.3d 115 (2d Cir. 2005) ...............................................................28

*United States v. Ismail*,
    97 F.3d 50 (4th Cir. 1996) ................................................................36

*United States v. Johnson*,
    19 F.4th 248 (3d Cir. 2021) ............................................................35

*United States v. Kwong*,
    14 F.3d 189 (2d Cir. 1994) ..............................................................31

*United States v. Labat*,
    905 F.2d 18 (2d Cir. 1990) ..............................................................12

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015) ....................................................... 35, 36

*United States v. Mancuso*,
    485 F.2d 275 (2d Cir. 1973) ............................................................37

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) .........................................................24

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994) ............................................................22

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006) ...................................... 22, 23, 32

*United States v. Olano*,
    507 U.S. 725 (1993) ........................................................................17

*United States v. Parse*,
    789 F.3d 83 (2d Cir. 2015) ..............................................................18

*United States v. Pauling*,
    924 F.3d 649 (2d Cir. 2019) ............................................................32

*United States v. Percoco*,
    13 F.4th 158 (2d Cir. 2021) .................................................... passim

*United States v. Qaisi*,
    779 F.2d 346 (6th Cir. 1985) ..........................................................36

*United States v. Regan,*
    937 F.2d 823 (2d Cir. 1991) ................................................................. 31

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970) ..................................................... passim

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) ................................................................ 11

*United States v. Rooney,*
    37 F.3d 847 (2d Cir. 1994) ............................................... 37, 39, 40, 41

*United States v. Sadler,*
    750 F.3d 585 (6th Cir. 2014) .............................................................. 24

*United States v. Schwartz,*
    924 F.2d 410 (2d Cir. 1991) ............................................................... 16

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007) ................................................... 23, 24, 30

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987) ........................................................ passim

*United States v. Takhalov,*
    827 F.3d 1307 (11th Cir. 2016) .......................................................... 24

*United States v. Tellier,*
    83 F.3d 578 (2d Cir. 1996) ................................................................ 40

*United States v. Wright,*
    665 F.3d 560 (3d Cir. 2012) ............................................................... 41

*Van Buren v. United States,*
    141 S. Ct. 1648 (2021) ....................................................................... 14

*Voisine v. United States,*
    579 U.S. 686 (2016) ........................................................................... 31

**Statutes**

18 U.S.C. § 1001 ............................................................................... passim

18 U.S.C. § 1341 ................................................................................... 20

18 U.S.C. § 1343 ..................................................................................... 7

## INTRODUCTION

This case was charged and tried on a single theory—that the Defendants schemed to defraud Fort Schuyler of its "right to control" its assets by depriving it of "potentially valuable economic information." The government *chose* not to pursue any other theory. It abandoned earlier indictments alleging a traditional theory of property fraud and replaced them with a second superseding indictment exclusively charging a "right to control" theory. Consequently, "right to control" was the sole theory on which the jury was instructed, and the sole theory on which its verdict could have rested.

But it was not a legally valid theory of wire fraud or wire fraud conspiracy. The Supreme Court unanimously held in *Ciminelli v. United States*, 598 U.S. 306 (2023), that the wire fraud statute reaches only "traditional property interests," and that the right to control one's assets is not one of them. The Court therefore reversed this Court's decision affirming Defendants' convictions. The Court held that, given the history of this prosecution and the government's exclusive reliance on the right-to-control theory, the convictions could not be affirmed under *any* theory.

"That should be the end of the case." *Id.* at 316. Under the controlling law, the required remedy on remand to this Court is a judgment of acquittal on the fraud counts.

Defendant Joseph Gerardi's false statement conviction should also be reversed. After *Ciminelli* his statements were immaterial, and extensive spillover prejudice from the proof relating to the fraud charges deprived him of a fair trial.

## SUPPLEMENTAL STATEMENT OF THE CASE

### A.    The Supreme Court Rejected The Right-To-Control Theory Underlying Defendants' Wire Fraud And Conspiracy Convictions

The facts of this case are set forth in Defendants' prior briefs.  In its earlier decision, this Court affirmed Defendants' convictions for wire fraud and wire fraud conspiracy. *United States v. Percoco*, 13 F.4th 158, 164 (2d Cir. 2021) ("*Percoco I*"). Central to the decision was the "right-to-control theory of wire fraud," long applied in this Circuit, which "allow[ed] for conviction on a showing that the defendant … deprived some person or entity of potentially valuable economic information." *Id.* at 170.[1]  This Court held, among other things, that (1) the "evidence was []sufficient to support [Defendants'] convictions under a right-to-control theory," (2) the jury instructions correctly "explained the right-to-control theory," (3) the district court did not err in excluding defense evidence that was "not material" to "right-to-control wire fraud," and (4) the district court did not err

---

[1] Unless otherwise noted, citations omit internal citations, quotation marks, footnotes, and previous alterations, and emphasis is in the original source.  "SAR" refers to Defendants' Supplemental Appendix on Remand; "A" and "SPA" refer to Defendants' original Appendix and Special Appendix, respectively; and "SA" refers to the government's Supplemental Appendix.  "Dkt." refers to docket entries in *United States v. Percoco*, No. 18-2990(L).

2

in admitting government evidence that was "relevant under the right-to-control theory." *Id.* at 170, 175, 178.

Defendants petitioned for certiorari, seeking review of the legal validity of the right-to-control theory under the federal wire fraud statute. The Supreme Court granted Defendant Louis Ciminelli's petition.

In a 9-0 decision, the Supreme Court held that "the right-to-control theory is not a valid basis for liability." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023). The Supreme Court explained that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes," is "inconsistent with the[ir] structure and history," and "vastly expands federal jurisdiction without statutory authorization." *Id.* at 314-16. "[T]he wire fraud statute reaches only traditional property interests," and because "[t]he right to [potentially] valuable economic information … is not a traditional property interest," the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316.

## B.   The Supreme Court Rejected The Government's Attempt To Rely On A Traditional Fraud Theory

The government itself abandoned the right-to-control doctrine during Supreme Court proceedings. "[D]espite relying upon the right-to-control theory for decades, including in this very case," the government switched course after the Supreme Court granted certiorari, and conceded that the right-to-control theory "is erroneous." *Ciminelli*, 598 U.S. at 315-16. "The Government frankly admit[ted]

3

that, 'to the extent that language in the [Second Circuit's] opinions might suggest

that depriving a victim of economically valuable information, without more,

necessarily qualifies as "obtaining money or property" within the meaning of the

fraud statutes, that is incorrect.'" *Id.* at 316 (quoting Brief for the United States

("*Ciminelli* U.S. Br.") at 24). Nevertheless, the government urged the Supreme

Court to "affirm [the] convictions on the alternative ground that the evidence was

sufficient to establish wire fraud under a traditional property-fraud theory"—

namely, that Defendants allegedly schemed to obtain hundreds of millions of

dollars in contract revenue. *Id.*; *see also Ciminelli* U.S. Br., at 11, 13-15, 31-33.

The Supreme Court rejected that request because that was not the theory on

which Defendants were indicted, tried, or convicted. "'Appellate courts are not

permitted to affirm convictions on any theory they please simply because the facts

necessary to support the theory were presented to the jury.'" *Ciminelli*, 598 U.S. at

317 (quoting *McCormick v. United States*, 500 U.S. 257, 270-71 n. 8 (1991), and

citing *Chiarella v. United States*, 445 U.S. 222, 236 (1980)). The theory actually

advanced by the government at trial and considered by the jury is what matters—

not hypothetical theories the government could have charged and tried but did not.

Here, the Supreme Court was unequivocal that the government "indict[ed],

obtain[ed] convictions, and prevail[ed] on appeal based *solely* on the right-to-

control theory." *Id.* at 316 (emphasis added).

4

In fact, as the Supreme Court explained, the government deliberately

abandoned any traditional theory of wire fraud.  As the Supreme Court observed,

"[a]n earlier indictment alleged that the Buffalo Billion contracts were the property

at issue.  But, to defend against the defendants' motion to dismiss, the Government

relied *solely* on the theory that the scheme 'defraud[ed] Fort Schuyler of its right to

control its assets.'"  *Id.* at 310 n.1 (emphasis added) (quoting final indictment).

Specifically, the government obtained a second superseding indictment that

jettisoned the earlier allegations and replaced them with the right-to-control theory.

(*See* SAR-23-24, SAR-27 (redline comparison of S1 and S2 Indictments filed by

the government)).  As the government admitted, this provided an "easier route to

prove to a jury" that Defendants should be convicted.  (*Ciminelli* Oral Arg. Tr. 60).

"The District Court then relied expressly on the right-to-control theory in denying

the motion to dismiss."  *Ciminelli*, 598 U.S. at 310 n.1; *see* SPA-14-15.

The Supreme Court also concluded that "[t]he Government's … trial

strategy rested *solely* on [the right-to-control] theory." *Ciminelli*, 598 U.S. at 310

(emphasis added).  Opposing a defense motion in limine challenging the

government's theory of property, the government insisted that "[i]t is clear from

the S2 Indictment and the Court's order [denying the motions to dismiss] that the

property interest at issue was Fort Schuyler's right to control its own assets."

(A845).  When the trial court asked the government to clarify its theory, the

5

government submitted another letter reiterating its exclusive reliance on the right-to-control theory.  (A849-52).

This strategy won the government several courtroom advantages.  The prosecution argued repeatedly that because it was not pursuing a traditional fraud theory, it did not need to prove actual or intended financial or economic harm, only an intent to deprive Fort Schuyler of potentially valuable economic information. (*E.g.*, A850-52; *see also* A998/127 ("[E]ven if there is no ultimate harm intended[,] dollar value, it is still a crime if they intend to deprive the victim of potentially economic valuable information.")).  The district court agreed and so instructed the jury.  (A1554-55/2884-88).

Likewise, the government "successfully moved the District Court to exclude certain defense evidence as irrelevant to [the right-to-control] theory."  *Ciminelli*, 598 U.S. at 311.  The defense sought to admit evidence that the developers fully performed their contracts, delivering high-quality buildings on time, on budget, and at a reasonable cost.  The government responded that the developers' performance was "not relevant" in a right-to-control case, and emphasized, "I can be clear this is a case based on a right to control, *not a garden variety*" fraud case. (A1130/808 (emphasis added)).  The district court agreed with the government and excluded Defendants' evidence.  (A1002/143-46, A1130-31/809-11).

6

The government similarly "relied on [the right-to-control] theory in its
summation to the jury." *Ciminelli*, 598 U.S. at 311.  And, "[c]onsistent with the
right-to-control theory, the District Court instructed the jury that the term
'property' in § 1343 'includes intangible interests such as the right to control the
use of one's assets.'" *Id.*  "Defending the wire fraud convictions [on appeal], the
Government relied solely on the right-to-control theory," and this Court "affirmed
the convictions based on its longstanding right-to-control precedents." *Id.*

Given the government's sole reliance on the right-to-control theory
throughout these proceedings, the Supreme Court declined to "apply [the evidence]
to the elements of a *different* wire fraud theory in the first instance" and "affirm
[the] convictions on alternative grounds." *Id.* at 316-17.  "The right-to-control
theory is invalid under the federal fraud statutes," and "[t]hat should be the end of
the case." *Id.*  Accordingly, the Supreme Court reversed and remanded "for further
proceedings consistent with [its] opinion." *Id.* at 317.

The Supreme Court likewise granted the separate petitions for certiorari filed
by Defendants Alain Kaloyeros, Steven Aiello, and Joseph Gerardi, vacated their
judgments, and remanded for "further consideration in light of *Ciminelli*."
*Kaloyeros v. United States*, 143 S. Ct. 2490 (2023); *see also Aiello v. United
States*, 143 S. Ct. 2491 (2023).

7

### C. The Supreme Court Rejected The Theory Underlying Aiello's Conviction For Honest Services Fraud, Which The Government Agrees Should Be Vacated So That It Can Dismiss That Charge

In a separate decision, the Supreme Court unanimously reversed this Court's ruling affirming Aiello's conviction, following a separate trial, on Count Ten, for conspiracy to commit honest services fraud. *See Percoco v. United States*, 598 U.S. 319 (2023) ("*Percoco II*"); *see also Aiello*, 143 S. Ct. 2491 (granting Aiello's petition for certiorari, vacating the judgment, and remanding for further consideration in light of *Percoco II*). All of Aiello's convictions are embodied in a single judgment of conviction. Accordingly, the government and Aiello have jointly requested that this Court vacate Aiello's conviction on Count Ten and remand to the district court for further proceedings on Count Ten, so that the government can move to dismiss it. (*See* Dkt. 525).[2]

## ARGUMENT

## I. DEFENDANTS ARE ENTITLED TO JUDGMENTS OF ACQUITTAL

Based on the right-to-control theory of wire fraud, the district court denied Defendants' motion for a judgment of acquittal, and this Court rejected

---

[2] Gerardi was convicted under 18 U.S.C. § 1001 for statements relating to the Syracuse RFP on which his wire fraud and conspiracy convictions were based. This Court previously declined to consider whether the § 1001 conviction would fail if the wire fraud convictions were reversed, *see Percoco I*, 13 F.4th at 178 n.13, but that issue is now ripe for review given the Supreme Court's decision in *Ciminelli*. The facts relevant to the § 1001 count are described below in Argument Point II.

Defendants' challenge to the sufficiency of the evidence.  Now that the Supreme Court has held the right-to-control theory legally invalid, Defendants are entitled to judgments of acquittal for two independent reasons.  *First*, because the sole theory charged in the indictment and presented to the jury was legally invalid, the government did not prove a crime at trial.  *Second*, even if the government could pivot to a traditional theory of wire fraud despite its deliberate decision to abandon any such theory before trial, the evidence would be insufficient to sustain the convictions.

### A.     Acquittal Is Required Because The Government Did Not Present Any Legally Valid Theory At Trial

The government "indict[ed], obtain[ed] convictions, and prevail[ed] on appeal based *solely* on the right-to-control theory."  *Ciminelli*, 598 U.S. at 316 (emphasis added).  As a result, the government did not prove wire fraud or wire fraud conspiracy, and Defendants are entitled to judgments of acquittal.[3]

#### 1. *Sufficiency Review Cannot Look Beyond The Theory Charged In The Indictment And Presented At Trial*

When reviewing the sufficiency of the evidence, the Court asks whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This analysis is

---

[3] The conspiracy convictions "stand or fall with the substantive offenses.  If there was property fraud here, there was also conspiracy to commit it.  But if not, not." *Kelly v. United States*, 140 S. Ct. 1565, 1571 n.1 (2020).

not, however, divorced from the decision the jury actually rendered.  The question

is always whether to "uphold the jury's decision," *Burks v. United States*, 437 U.S.

1, 17 (1978)—that is, whether a rational jury could have reached the verdict that

this jury reached, given the facts and theories presented to it.

For instance, if the facts presented to the jury are legally insufficient, the

government cannot avoid acquittal by showing that facts *not* presented to the

jury—whether due to oversight, an adverse evidentiary ruling, or something else—

would have tipped the balance.  Sufficiency review is based "upon the record

evidence adduced at the trial." *Jackson*, 443 U.S. at 324; *see Lockhart v. Nelson*,

488 U.S. 33, 41-42 (1988) (reviewing court considers same "quantum of evidence"

as trial court).  A rational jury could not have convicted on evidence it never saw,

which is why sufficiency review is confined to the evidence presented at trial.

The same is true of legal theories.  In reviewing the sufficiency of the

evidence, the Court measures the evidence against the theory, or theories, that

could have formed the basis for the jury's verdict.  Theories the jury did not rely on

are irrelevant.  In *United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004), for

example, one of the defendants (Johnson) was tried on alternate theories: principal

liability and aiding-and-abetting liability.  *Id.* at 224.  The jury convicted him as a

principal, as shown on the verdict form, and on appeal this Court refused "to

determine whether Johnson's conviction could be supported on an aiding and

10

abetting theory," since "the jury found [him] guilty only on the theory that he acted as a principal." *Id.* Because the evidence was legally insufficient to convict Johnson as a principal, the Court held that he was entitled to a judgment of acquittal. *Id.* at 224-25; *accord United States v. Gonzales*, 841 F.3d 339, 349-50 (5th Cir. 2016) ("sufficiency review" is "limited" to "the jury's chosen theory").

Theories the jury *did not consider* are irrelevant as well. As the Supreme Court emphasized in this case, courts do not "cherry-pick facts presented to a jury charged on [one] theory and apply them to the elements of a *different* … theory." *Ciminelli*, 598 U.S. at 316-17. Thus, a court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella*, 445 U.S. at 236. Likewise, a court cannot withhold a judgment of acquittal where the verdict was based solely on a legally invalid theory, merely because the government later proffers a different theory, never submitted to the jury, and points to record evidence it claims would satisfy the new theory. In case after case, this Court has refused to expand its sufficiency review to encompass theories the government never presented to the jury:

- In *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), after the defendants were convicted of bank fraud, they challenged the sufficiency of the evidence that their misrepresentations were material to the banks' decisions. The Court declined the government's invitation to consider "arguments regarding materiality that were not presented to the jury." *Id.* at 231 n.29; *see also id.* at 235 n.38. Rejecting the new "theory" that "[t]he government did not proffer at trial," the Court found the evidence insufficient as to one count and reversed and remanded for "entry of an acquittal." *Id.* at 236, 239.

11

- In *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), the Court reversed mail and wire fraud convictions for insufficient evidence because the defendants' customers had "received exactly what they paid for." *Id.* at 99. The Court refused to consider the sufficiency of the evidence to support an alternative "agency theory" that had not been "included in the indictment" or "jury charge" or "argued by the government to the jury." *Id.* at 100.

- In *United States v. Labat*, 905 F.2d 18 (2d Cir. 1990), the Court reversed a drug conviction for insufficient evidence. *Id.* at 22-23. The Court refused to consider the government's new "*Pinkerton* theory," holding that the "theory [wa]s not available on this appeal" because "the jury was not instructed that it could find [the defendant] guilty … on this basis." *Id.* at 23.

- In *United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016), the Court "reject[ed] the Government's argument" that it should consider a new "theory of [the defendant]'s knowledge" that was "never presented … to the jury." *Id.* at 127. Finding the evidence insufficient to support the theory advanced at trial, the Court reversed the conviction. *Id.* at 127-29. The Court remanded only for resentencing on a different, surviving count—*not* a new trial on the government's new theory. *Id.* at 129.

This rule has a corollary: Sufficiency review is necessarily confined to the theory or theories charged in the indictment. "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Likewise, a court cannot sustain a conviction against an insufficiency challenge based on a theory not charged in the indictment. To do so would violate both the defendant's Fifth Amendment grand-jury-indictment right and his Sixth Amendment right to be informed of the nature and cause of the accusation. *See, e.g., Russell v. United States*, 369 U.S. 749, 760-61, 768-71 (1962). Thus, in reviewing the sufficiency of the evidence supporting a conviction, courts ignore uncharged theories:

12

- In *Eaton v. City of Tulsa*, 415 U.S. 697 (1974) (per curiam), the defendant was convicted for contempt under an information that charged him with "insolent behavior during open court," "to wit: by using the language 'chicken-shit'" to describe someone who assaulted him. *Id.* at 697-98. The state appellate court affirmed his conviction based on his "'discourteous responses' to the trial judge" in addition to his "use of th[is] expletive." *Id.* at 698. The Supreme Court reversed, holding that (i) the conviction could not be affirmed "upon a charge not made" and (ii) focusing on the charge in the information, the "single isolated usage" of the expletive was insufficient to "support the conviction of criminal contempt." *Id.* at 698-700; *see also id.* at 701 (Rehnquist, J., dissenting) (summarizing holding).

- In *Dunn v. United States*, 442 U.S. 100 (1979), the defendant was indicted for making false declarations under oath, based on the inconsistency between his grand jury testimony in June and his later recantation in a sworn statement given at an attorney's office in September. *Id.* at 102-04. The Tenth Circuit affirmed his conviction on the ground, not charged in the indictment, that his testimony at an evidentiary hearing in October was inconsistent with his grand jury testimony. *Id.* at 104-06. The Supreme Court reversed, holding that (i) the conviction could not be affirmed based on the uncharged October testimony and (ii) the charged September statement did not meet the requirements of the statute. *Id.* at 106-13.

- In *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992), the defendant was charged with violating a provision of the VICAR statute that offers two possible theories of liability, but "the indictment alleged only" one of the two theories. *Id.* at 384. Citing *Dunn*, the Court noted that although the evidence appeared sufficient to support the uncharged theory, the Court was "constrained by th[e] allegations" in the indictment. *Id.* It affirmed the conviction only after determining the evidence was sufficient to support the charged theory. *Id.*

In sum, a conviction cannot survive sufficiency review, and the defendant must be acquitted, unless the evidence supports a valid theory of liability that was charged in the indictment and presented to the jury at trial. *See also United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (reversing convictions where

13

theories charged in indictment were "legally insufficient" under the applicable statutes); *United States v. Aleynikov*, No. 10-cr-96 (DLC), ECF No. 164 (S.D.N.Y. June 5, 2012) (Judgment of Acquittal entered on remand).

Relying on *Musacchio v. United States*, 577 U.S. 237 (2016), the government urged the Supreme Court to review the evidence in this case under a "traditional" theory of property fraud, "absent the right-to-control lens." *Ciminelli* U.S. Br., at 12, 31-32. But the Supreme Court rejected the government's invitation, *see Ciminelli*, 598 U.S. at 316-17, and this Court should too.

As the Supreme Court observed in another context, "*Musacchio* did not address—much less resolve in the Government's favor—the 'point now at issue.'" *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021). *Musacchio* does not allow the government to shift to an entirely different legal theory on appeal. It merely holds that "when a jury instruction … incorrectly adds one more element [than required], a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Musacchio*, 577 U.S. at 243. That holding is irrelevant, because Defendants are not arguing that the government failed to prove an element not actually required by the wire fraud statute. The required elements will do—but in evaluating whether the government's proof satisfied those elements, Supreme

14

Court and Circuit precedent require the Court to consider only the theory charged in the indictment and presented to the jury at trial.

### 2. Defendants Are Entitled To Acquittal

Measuring the theory the government submitted to the jury against the correct elements of the offense, the conclusion is inescapable: The government failed to prove wire fraud.

To establish wire fraud, "the Government must prove not only that [the] defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'" *Ciminelli*, 598 U.S. at 312 (quoting *Kelly*, 140 S. Ct. at 1571). Here, the sole theory of "property" charged in the indictment and presented to the jury was the "right-to-control theory." *Id.* at 310-11 & n.1, 316-17. Under that theory, "potentially valuable economic information" is the protected "property interest." *Id.* at 309, 313. Thus, at trial, the government undertook to prove that "defendants deprived Fort Schuyler of 'potentially valuable economic information.'" *Percoco I*, 13 F.4th at 171. But as the Supreme Court later held, "potentially valuable economic information" is "not a ... property interest" for purposes of the wire fraud statute. *Ciminelli*, 598 U.S. at 309, 316. In other words, the government might have proved something, but what it proved was not wire fraud. Defendants are therefore entitled to a judgment of acquittal, regardless of any new theories of liability the government may try to advance at this stage.

15

This Court's decision in *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), is particularly instructive. There, the trial court denied the defendants' motion for acquittal, ruling that "the government had an intangible ... interest in the export licenses it issued," but this Court concluded that "[wa]s not a property interest within the meaning of the wire fraud statute." *Id.* at 417-18. On appeal, the government offered an "alternative ... property theory" to try to salvage the convictions, but this Court "refuse[d] to consider th[at] argument because the district court did not instruct the jury on this theory," and "[t]he jury therefore could not have based its verdict on the alternative ... property theory." *Id.* at 418. Accordingly, the Court reversed those wire fraud convictions for insufficient evidence, and remanded only for resentencing on the surviving counts. *Id.* at 417-19, 426.

Like the reversed counts in *Schwartz*, the wire fraud charges in this case are at an end. "[O]nce the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." *Burks*, 437 U.S. at 18. "[T]he prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Id.* at 16. The government knew, from the time of Defendants' motions to dismiss, that Defendants challenged the validity of the government's theory of property. When it superseded to switch to the right-to-control theory

while those motions were pending, it could have charged traditional fraud in the

alternative.  And it could have presented both theories at trial.  For its own strategic

reasons, it chose not to, and specifically disavowed any reliance on a "garden

variety" fraud theory (A1130/809):  The government excised the charge that

Defendants schemed to defraud Fort Schuyler "in its award of significant taxpayer-

funded development contracts" from the operative indictment (SAR-23; *see also*

SAR-24, SAR-27), and instead "relied solely on the theory that the scheme

'defrauded Fort Schuyler of its right to control its assets,'" *Ciminelli*, 598 U.S. at

310 n.1 (quoting A952).[4]  It may not seek a do-over now.  "The Double Jeopardy

Clause forbids a second trial for the purpose of affording the prosecution another

opportunity to supply evidence which it failed to muster in the first proceeding."

*Burks*, 437 U.S. at 11.  "Having received 'one fair opportunity to offer whatever

proof it could assemble,' the [government] is not entitled to another."  *Bullington*

*v. Missouri*, 451 U.S. 430, 446 (1981) (quoting *Burks*, 437 U.S. at 16).

---

[4] This is not a situation where the government merely failed to raise a particular
legal theory.  Rather, this is a waiver—a situation where the government
"intentional[ly] relinquish[ed]" and "abandon[ed]" that theory.  *United States v.
Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464
(1938)).

### B.     The Evidence Is Insufficient Even If Measured Under A Traditional Property Fraud Theory

Even if the Court were to assess sufficiency against a traditional property fraud theory, a judgment of acquittal would be required because the government failed to prove an essential element—that Defendants sought to "rip off" Fort Schuyler.

To establish liability for mail or wire fraud, the government must prove "'that the defendant contemplated or intended some harm to the property rights of the victim.'" *United States v. Parse*, 789 F.3d 83, 121 (2d Cir. 2015) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). In other words, the alleged schemers must intend to cause "loss to the victim." *Kelly*, 140 S. Ct. at 1573. Here, however, there was no evidence any Defendant intended to overcharge for his company's services or provide less than what Fort Schuyler paid for. Indeed, the government did not even try to prove that Defendants' object was to cheat Fort Schuyler out of money. Instead, it insisted that under the right-to-control theory such proof was unnecessary and sought and obtained a jury instruction that proof of intent to cause Fort Schuyler "to enter into a transaction without potentially valuable economic information" would suffice. (A982).

In the Supreme Court, the government suggested an alternate basis for affirmance. It argued, for the first time, that if a defendant lies to induce a victim to transact and pay money, that establishes a property fraud scheme *even if* "he

18

provides consideration in return" for the money. *Ciminelli* U.S. Br., at 11. Thus, according to the government, "the fraud statute does not require proof that the defendant caused *or intended to cause* [financial] harm." *Id.* (emphasis added); *accord*, *e.g.*, *id.* at 20-23.

The problem with that argument—apart from the government's having expressly jettisoned any traditional fraud theory—is that it is squarely foreclosed by long-settled law in this Circuit.

### 1. *Wire Fraud Requires Proof That The Defendant Intended To Inflict Economic Harm*

For at least the past half-century, the law in this Circuit has been clear: Deceit intended only to induce a commercial transaction, without more, is insufficient to establish a property fraud scheme. To establish fraudulent intent under a traditional property fraud theory, the government must "prove that defendants *contemplated* some actual harm or injury to their victims." *Starr*, 816 F.2d at 98. Thus, if the defendant intends an exchange of fair value in a completed transaction, such that the victim receives what it paid for, that is not property fraud.

These fundamental principles trace their roots to two seminal decisions, *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), and *Starr*. In *Regent Office Supply*, the defendants sold stationery supplies. Their salesmen induced potential customers to purchase the goods using various lies (*e.g.*, claiming they had been referred by the customer's friend, or that the stationery had

19

to be disposed of because of a friend's death). The principal issue was whether "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitutes a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. § 1341." 421 F.2d at 1179. The Court held "it does not" and reversed the convictions. *Id.*

Key was the lack of evidence that the salesmen "made any false representations regarding the quality or price of their … merchandise," or any false "suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered." *Id.* at 1180. Although the government is not required to prove "that purchasers were in fact defrauded," the Court explained, "this does not mean that the government can escape the burden of showing that some actual harm or injury was contemplated by the schemer." *Id.* While the scheme need not succeed, "the purpose of the scheme must be to injure." *Id.* at 1181.

Thus, the fact that "the customers were induced to part with their money because of the false representations" is insufficient to prove a fraud scheme: "[A]n intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the 'fraudulent intent' required by the statute." *Id.*

20

Without "proof that the defendants expected to get 'something for nothing,' or that they intended to get more for their merchandise than it was worth to the average customer," there is insufficient evidence of "any intent to injure or to defraud." *Id.*

The Court reinforced this critical distinction between mere fraudulent inducement and the intent to harm required by the property fraud statutes in *Starr*. There, the operators of a mailing service engaged in a scheme to bury higher postage rate mail inside bulk mail sacks, which enabled them to pay less to the Postal Service than they should have. The defendants misrepresented to their customers that the legally correct postage had been paid, but the customers received all the services for which they had paid the defendants. Thus, the Court held, "there was insufficient evidence that the object of the [defendants'] scheme was to defraud their … customers." *Starr*, 816 F.2d at 98.[5]

Following *Regent Office Supply*, the *Starr* Court reasoned that the government "must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *Id.* The Court explained that in *Regent Office Supply*, the lies "were only collateral to the sale and did not concern the quality or nature of the goods being sold" and, "therefore, did not go to the basis of the customers' bargain with the salesmen." *Id.* Because the "customers received

---

[5] The scheme did defraud the Postal Service, but the government had charged only a scheme to defraud the customers.

21

exactly what they paid for and no customer testified that he had been cheated,"
there was no violation of the statute. *Id.*

Regent Office Supply thus "identifies an important distinction"—mere deceit
is "insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit
must be coupled with a contemplated harm to the victim" which "affect[s] the very
nature of the bargain itself." *Id.* And this requires a showing that the defendants
"*intended* … to cause direct pecuniary harm to their alleged victims." *Id.* at 100.
Because there was no evidence of "tangible injury" from which the jury could infer
an intent to defraud, the evidence was insufficient. *Id.* at 101.

In short, even though the government does not have to show that a fraud
scheme is successful—since the statute targets the inchoate scheme—it does have
to prove that *if* the scheme were to succeed, it would result in some economic harm
to the purported victim.

This Court has reaffirmed that holding of *Regent Office Supply* and *Starr* in
numerous subsequent decisions. For instance, in *United States v. Mittelstaedt*, the
Court "disagree[d]" with the government's contention that "it does not matter
whether the [victim] would have suffered some economic loss if the scheme had
been successful." 31 F.3d 1208, 1217 (2d Cir. 1994); *see also id.* (fraud requires
proof that deceit "can or does result in some tangible harm"). Likewise, in *United
States v. Novak*, the Court found insufficient evidence of intent to defraud because,

22

"as in *Starr*, the [alleged victims] received all they bargained for, and [the

defendant's] conduct did not affect an essential element of those bargains." 443

F.3d 150, 159 (2d Cir. 2006). And in *United States v. Shellef*, the Court again held

that it is not enough to "induce[] [the alleged victim] to enter into a transaction it

would otherwise have avoided." 507 F.3d 82, 109 (2d Cir. 2007). "As in *Starr*,"

the indictment did not allege "that there was a 'discrepancy between benefits

reasonably anticipated' and actual benefits received." *Id.* "And as in *Regent*

*Office [Supply]*," the indictment "fail[ed] to allege" that the defendant

"misrepresented 'the nature of the bargain.'" *Id.* Accordingly, the indictment was

insufficient to state a wire fraud offense. *Id.*

These precedents are fully consistent with the Supreme Court's decisions

interpreting the property fraud statutes. In *Kelly*, for example, the Court held that

"*loss* to the victim" must be "an 'object of the fraud.'" 140 S. Ct. at 1573

(emphasis added). As the Court explained, a scheme intended to cause "economic

loss to a city" would be "sufficient to meet the federal fraud statutes' property

requirement," but if such loss was merely "an incidental byproduct" of the

schemers' plans, "a property fraud conviction cannot stand." *Id. See also*, *e.g.*,

*Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (scheme constituted mail

fraud in part because it "inflict[ed] an economic injury" on victim); *Skilling v.*

*United States*, 561 U.S. 358, 400 (2010) (property fraud involves schemes where

23

"the victim's *loss* of money or property supplie[s] the defendant's gain") (emphasis

added); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (mail fraud

requires the "wrongful purpose of injuring one in his property rights").

Nor is this Court alone in holding that when the putative "victim" receives

the benefit of the bargain in a completed transaction, there is no property fraud.

Other Circuits, both before and after *Ciminelli*, have reached the same

conclusion—often relying on this Court's precedents. *See, e.g., United States v.

Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) ("If an employee's untruths do not

deprive the employer of the benefit of the bargain, the employer is not

meaningfully defrauded of 'money or property' when it pays the employee his or

her salary.") (citing *Shellef*); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th

Cir. 2020) (property fraud requires scheme to "deceive *and* cheat") (citing *Regent

Office Supply* and *Starr*); *United States v. Takhalov*, 827 F.3d 1307, 1313-14 (11th

Cir. 2016) (where "defendant lies about something" other than price or

characteristics of goods, "he has not lied about the nature of the bargain, has not

'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that

lie") (citing *Regent Office Supply*, *Starr*, and *Shellef*); *United States v. Sadler*, 750

F.3d 585, 590-92 (6th Cir. 2014) (reversing wire fraud conviction where

defendant's lies induced sale but did not deprive victims of property because

defendant "paid the … asking price").

24

### 2. There Was No Evidence That Defendants Intended Harm To Fort Schuyler's Property Interests

Applying the principles set forth above, the government's case plainly fell short. The alleged deceit occurred when Fort Schuyler was attempting to identify "preferred developers" in Buffalo, Syracuse, and other regions who would be qualified to build potential projects. The government alleged that Defendants deceived Fort Schuyler about whether the "preferred developer" process was competitive. This deception, according to the government, induced Fort Schuyler to identify Defendants' companies as "preferred developers" and later enter contracts with them to build facilities in Buffalo and Syracuse. But, as explained below, there was no evidence of any intent to deceive regarding "the quality, adequacy or price of [services] to be sold." *Regent Office Supply*, 421 F.2d at 1179. Nor was there any evidence suggesting Fort Schuyler did not "receive[] exactly what [it] paid for." *Starr*, 816 F.2d at 99. Accordingly, the government failed to prove anything more than mere inducement by deceit, which is insufficient.

In its earlier decision, this Court concluded that Fort Schuyler did not "receive[] the benefit of its bargain" because "[t]he bargain at issue was not the terms of the contracts ultimately negotiated, but instead Fort Schuyler's ability to contract in the first instance, armed with the potentially valuable economic information that would have resulted from a legitimate and competitive RFP

25

process." *Percoco I*, 13 F.4th at 172.  The Supreme Court held, however, that this "bargain" did not involve any property interest protected by the wire fraud statute. *Ciminelli*, 598 U.S. at 316-17.

Thus, the only "bargain" that involved any cognizable property interest was the one written into the "terms of the contracts ultimately negotiated" by Fort Schuyler.  *Percoco I*, 13 F.4th at 172.  Indeed, in its brief to the Supreme Court, the government claimed the property interest at issue was the "contract funds." *Ciminelli* U.S. Br., at 11.  Accordingly, unless Fort Schuyler was denied the benefit of its bargain under the construction contracts, the evidence is necessarily insufficient to prove a wire fraud scheme.

And it is undeniable that Fort Schuyler *did* receive the benefit of that bargain.  The government did not even try to prove that Defendants defrauded Fort Schuyler during the contract negotiations, or that, in performing the contracts, they overcharged or failed to deliver.  (A997/123-25, A1000/137, A1002/145, A1130/807-08).  Instead, the government made "clear" to the district court that "this is a case based on [the] right to control, not a garden variety [fraud case]." (A1130/808).  The government made this concession because the bargain struck in the contracts was an exchange of construction services for money.  Its terms did not include the existence of a "competitive RFP process," or whatever else Fort Schuyler supposedly lost due to Defendants' conduct.

26

Indeed, the developers and Fort Schuyler expressly agreed that the *final* development contracts set forth their entire bargain.  (SAR-54 § 7 ("The parties acknowledge that the Agreement integrates all prior understandings and representations of the parties, and sets forth the entire agreement and understanding of the Parties …."), SAR-76 § 11.1 (listing "the Contract Documents" that "form the entire Contract by and between" the parties), SAR-80 § 23.1) ("The Contract … represents and embodies all the agreements and negotiations between the Parties hereto on the subject matter hereof ….")).  And those final contracts are clear that the bargain struck is money for construction services.[6]  The contracts do not even mention the process through which the developers were selected, much less include any material term related to that process.  (SAR-46-81).

It is thus beside the point that the preliminary Memoranda of Understanding (MOUs) and Notices to Proceed (NTPs) signed by the parties briefly allude to the developers' selection through a "competitive" process.  *Percoco I*, 13 F.4th at 172

_____

[6] *E.g.*, SAR-46 § 1 ("COR shall exercise COR's best skill and judgment in furthering the interests of FSMC; to furnish efficient design and construction, construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the work for the Project in an expeditions and economical manner consistent with FSMC's interests."), SAR-61 § 1.1 (LPCiminelli "agrees to furnish or cause to be furnished project design and construction services, and project management, administration and superintendence and to furnish at all times an adequate supply of workmen and materials and to perform the Work as set forth in this Agreement.").

27

n.9. The MOUs and NTPs were not incorporated into the construction contracts.

And even in the MOUs and NTPs, the references to a "competitive" selection

process appeared only in factual recitals and "whereas" clauses that described the

historical background of the parties' relationship (A1809; SA-766, SA-780, SA-

788)—not the "terms and conditions" or "mutual promises" that bound the parties

and defined their obligations (A1810, SA-766-67, SA-780, SA-789). Prefatory

material of this sort "cannot create any right beyond those arising from the

operative terms of the [contract]." *United States v. Hamdi*, 432 F.3d 115, 123 (2d

Cir. 2005); *accord Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir.

2001); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103-04 (2d Cir. 1985);

*Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 291 (2d Cir.

1984). Indeed, the references to a competitive process were interspersed among

other recitals praising the work and vision of Governor Cuomo, Fort Schuyler, and

their state university partners, which plainly could not and did not create any

property rights.[7] The operative terms of the final contracts, by contrast, envisioned

---

[7] *E.g.*, A1808 ("New York State … under the leadership of Governor Andrew
Cuomo has led the U.S. in multi-billion dollar strategic investments in high
technology programs …."), A1809 (SUNY's "C[ollege of] N[anoscale] S[cience
and] E[ngineering] is a critical enabling component in maintaining and bolstering
NYS' position as a leader in nanotechnology. CNSE has leveraged the experience
it has obtained from its success in nano-electronics …."); SA-779-80 (same), SA-
766 ("CNSE, with FSMC … is establishing … a first of its kind accredited Film
Nano-School ….").

an exchange of construction services for payment, which the parties faithfully executed.

In sum, Fort Schuyler's "defeated expectation[s]" about the selection process did "not affect the nature or quality of the services" rendered under the construction contracts, and Fort Schuyler could not "legally claim" any injury under those contracts. *Starr*, 816 F.2d at 99-100. As in *Starr*, there was no evidence Defendants intended to deprive Fort Schuyler of any property interest, and an essential element of wire fraud was lacking. Defendants are entitled to a judgment of acquittal.

### 3. The Theoretical Possibility That Fort Schuyler Could Have Gotten A Better Deal Is Insufficient To Establish A Wire Fraud Scheme

The government cannot avoid acquittal by arguing that Defendants intended to deprive Fort Schuyler of a better deal. In its initial decision, this Court acknowledged that "the government offered little evidence that other companies would have successfully bid for the projects and then either charged less or produced a more valuable product absent the fraud." *Percoco I*, 13 F.4th at 172. The Court indicated the most that could be said was that Fort Schuyler "*might* have selected a preferred developer who could offer more favorable economic terms for development contracts." *Id.* at 172 n.8 (emphasis added).

Even if this hypothetical risk of harm would be sufficient under the right-to-control doctrine, it does not establish contemplated harm to a traditional property

29

interest.  Under the right-to-control theory, the fraud entails depriving a counterparty of potentially valuable economic information, so a mere risk of economic harm could show that the withheld information was *potentially* economically valuable.  *See United States v. Finazzo*, 850 F.3d 94, 111-12 (2d Cir. 2017).  Following *Ciminelli*, however, hypothesizing theoretical risks is insufficient.  Instead, the government must actually prove that Defendants intended to rip off Fort Schuyler.

This is consistent with this Court's decisions defining traditional property fraud.  Whenever a party is deceived into entering a transaction, but gets exactly what it paid for, there is a risk that, but for the deception, it might have gotten a better deal somewhere else.  Indeed, that was true in cases such as *Regent Office Supply*, *Starr*, and *Shellef*, yet this Court asked only whether the purported victim got what it bargained for, not whether it got the most optimal deal imaginable. And, as explained, this Court has repeatedly held that the government must prove that if the fraud were completed, it would have caused the alleged victim some pecuniary harm.  *See* Point I.B.1 *supra*.  Here, of course, the "scheme" was completed because the parties engaged in transactions, and Defendants' companies got paid to perform services, but there was no proof whatsoever that Fort Schuyler suffered any loss.  Indeed, the government did not even try to prove any such harm.

30

Similarly, because proof of "fraudulent intent" is required, "[i]t is not

sufficient that [the] defendant realizes that the scheme ... has the capacity to cause

harm." *Guadagna*, 183 F.3d at 129.  Rather, "the defendant must intend to harm

the fraud's victims." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.

1994); *accord Starr*, 816 F.2d at 98 ("Only a showing of intended harm will satisfy

the element of fraudulent intent."); *Regent Office Supply*, 421 F.2d at 1181 ("[T]he

purpose of the scheme must be to injure ...."); *see also Kelly*, 140 S. Ct. at 1573

("loss to the victim" must be "an 'object of the fraud'").

Even if the evidence suggested Defendants theoretically "might" have

deprived Fort Schuyler of a better deal, *Percoco I*, 13 F.4th at 172 n.8, that would

fall far short of showing that Defendants intended to cause harm.  A theoretical

possibility of harm would not even prove Defendants acted "recklessly," because

"recklessness" entails the "deliberate decision to endanger another" with

"awareness of the[] *substantial* risk of causing injury." *Voisine v. United States*,

579 U.S. 686, 694 (2016) (emphasis added).  A theoretical possibility is not a

"substantial risk."  And "recklessness," of course, is a lower standard.  It does "not

suffice" to prove the "specific intent," *United States v. Kwong*, 14 F.3d 189, 195

(2d Cir. 1994), required for the "specific intent crimes" of mail and wire fraud.

*United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991).

31

In sum, any harm to Fort Schuyler was *entirely* theoretical and speculative, and therefore cannot support the convictions under a traditional property fraud theory. *See, e.g.*, *Novak*, 443 F.3d at 159 ("hypothetical contention" that alleged victims would have paid less had they known the truth was "inadequate"); *Starr*, 816 F.2d at 99-100 ("metaphysical" harm insufficient). As this Court has emphasized, even "reasonable speculation … is an insufficient basis on which to rest a guilty verdict." *United States v. Pauling*, 924 F.3d 649, 660 (2d Cir. 2019); *see also, e.g.*, *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012) ("A conviction based on speculation and surmise alone cannot stand."). Consequently, Defendants are entitled to acquittal even if Fort Schuyler "might" have obtained a better deal.

*     *     *

There was no evidence from which a reasonable jury could have found beyond a reasonable doubt that Defendants intended to cause Fort Schuyler any pecuniary harm. The wire fraud and conspiracy convictions must therefore be reversed with instructions to enter a judgment of acquittal.

## II.   GERARDI'S FALSE STATEMENT CONVICTION SHOULD BE REVERSED

The Court should also reverse Joseph Gerardi's parallel conviction under 18 U.S.C. § 1001 for alleged false statements about tailoring the Syracuse RFP. For starters, Gerardi's suggested edits to the draft RFP would have *broadened* the RFP

32

so other developers would also qualify, just as Gerardi told the prosecutors. But in any case, the statements were immaterial to the government's investigation as a matter of law in light of *Ciminelli*.

At a minimum, the § 1001 conviction should be vacated due to the prejudicial spillover from the flawed wire fraud and conspiracy counts, which dominated the trial as the government presented extensive inflammatory evidence about the Buffalo RFP—which had nothing to do with Gerardi. The government lumped Defendants together as purported "fraudsters" and "liars" for the alleged conspiracy and urged the jury to treat the § 1001 count as part of the larger "fraud." Under these circumstances, no jury could have fairly evaluated the false statement charge independent of the alleged wire fraud. Gerardi was thus deprived of a fair trial on the false statement charge.

### A.    Background

In June 2016, after receiving a grand jury subpoena, Gerardi voluntarily agreed to be interviewed by the U.S. Attorney's Office. (SA-900-01). By that point the government's investigation was nearly over; prosecutors and FBI agents had conducted many interviews and obtained a wealth of documentary evidence, including Gerardi's emails. (*See, e.g.*, SA-899-900; A1328-29/1695-99). The criminal complaint issued just three months later. (A19).

33

Much of the proffer session centered on handwritten notes Gerardi made on a draft Syracuse RFP on which COR's consultant had asked him to comment. (A1650-64/GX606). COR was able to satisfy most, if not all, the requirements in the draft: It had the requisite years of development experience and the right kind of experience, utilized the required software applications, could obtain a performance bond, and could supply audited financial statements. (A1098-99/536-37, A1328/1695, A1420-21/2210-11). Nonetheless, Gerardi suggested *broadening* the requirements so other developers—not just COR—would qualify. For instance, his handwritten comments proposed reducing the number of years' experience required, expanding the types of experience considered relevant, removing any requirement of specific software programs, forgoing the performance bond requirement, and deleting the requirement of "audited" financial statements, which typically only public and not-for-profit companies would maintain. (A1655-60; *see also* Aiello Br. (Dkt. 211), at 57). In his proffer, Gerardi said he was concerned the draft RFP "would preclude other companies from being able to apply." (A1329/1696; *see* A1328/1694-95).

Nonetheless, Count Sixteen charged Gerardi with falsely "denying involvement in tailoring the Syracuse RFP for the benefit of [COR]." (A312; *see* A1557/2894 (jury charge)). During the four-week trial, the government presented myriad evidence related to the wire fraud counts yet called only a single witness,

34

an FBI agent, to briefly testify about Gerardi's proffer session, in testimony lasting under an hour. (Tr.1681-1701). The government presented no evidence that Gerardi's proffer hindered the FBI's investigation; indeed, he was arrested just three months later. (A1330/1700). In its summation the government portrayed the proffer session as just another step in the alleged fraud, urging the jury to convict under § 1001 because "Gerardi tried to convince the F.B.I. he had done nothing wrong" and "lie[d] … to the government to get away with fraud." (A1459/2464, A1473/2527).

## B. *Ciminelli* Renders Gerardi's Statements Immaterial

Section 1001 prohibits "knowingly and willfully … mak[ing] any *materially* false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a)(2) (emphasis added). A false statement is "material" only if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *accord United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015). Consequently, "not every misrepresentation presented to a governmental decisionmaker is inherently 'material.' A statement might be false, but still incapable of affecting anything." *United States v. Johnson*, 19 F.4th 248, 258-59 (3d Cir. 2021).

Critically, if the government could not have acted on a true statement, then a false statement—even if in some sense "relevant" to the agency—is not "reasonably capable of influencing a decision" and thus not material. *Litvak*, 808 F.3d at 174; *see Kungys v. United States*, 485 U.S. 759, 774 (1988) (false date and place of birth given in naturalization petition not material to INS because unrelated to qualifications for citizenship); *United States v. Facchini*, 874 F.2d 638, 644 (9th Cir. 1989) (en banc) (false statements not material given "limited" federal role in an Oregon state benefits program); *United States v. Qaisi*, 779 F.2d 346, 348 (6th Cir. 1985) (statement not material where misstated fact cannot be basis of agency's decision). The government fails to prove materiality when it fails to establish "an actual decision of the [agency] that was reasonably capable of being influenced by [defendant]'s misstatements." *Litvak*, 808 F.3d at 172; *see United States v. Ismail*, 97 F.3d 50, 60-61 (4th Cir. 1996) (reversing for insufficient evidence where there was no evidence false bank signature card could influence any FDIC decision).

There is no such decision here. Even if Gerardi had admitted tailoring the RFP in his proffer session, his statements were not "reasonably capable of influencing" any prosecutorial decision: As a matter of law, that conduct was not chargeable fraud because *Ciminelli* invalidated the right-to-control theory of wire fraud, and the government couldn't prove traditional property fraud. *See* Point I *supra*. Thus, the alleged misrepresentation about RFP tailoring was immaterial.

36

*See United States v. Bonds*, 784 F.3d 582, 585 (9th Cir. 2015) (reversing

conviction of former MLB player Barry Bonds because, whether or not his

statement before the grand jury was false, it "communicate[d] nothing of value or

detriment to the investigation" and therefore was immaterial).

Nor did the government attempt to prove that Gerardi's statements could or

did impact the government's investigation in any way. Because "[n]either the

answer he in fact gave nor the truth he allegedly concealed could have impeded or

furthered the investigation," *United States v. Mancuso*, 485 F.2d 275, 281 (2d Cir.

1973), Gerardi's proffer statements were not material, and he is entitled to acquittal

on Count Sixteen.

### C.   At A Minimum, Spillover Prejudice From The Wire Fraud And Conspiracy Counts Requires Vacating The § 1001 Conviction

In granting Gerardi bail pending appeal, Judge Caproni found there was "a

substantial question whether his conviction for false statements would require a

new trial, due to the risk of prejudicial spillover from the fraud counts." (A2652).

She was right. Spillover prejudice requires a new trial.

Whenever an appellate court reverses convictions as to some counts, it must

vacate any remaining conviction unless it can "conclude that [the] conviction …

did not result from a spillover from" the reversed counts. *United States v. Rooney*,

37 F.3d 847, 857 (2d Cir. 1994) (vacating § 1001 conviction due to prejudicial

spillover); *see United States v. Bruno*, 383 F.3d 65, 91 (2d Cir. 2004) (same). In

making that assessment, the Court considers "the totality of the circumstances" with particular focus on three factors: "1) whether the evidence on the reversed counts was inflammatory and tended to incite or arouse the jury to convict the defendant[] on the remaining counts; 2) whether the evidence on the reversed counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the Government's case on the remaining counts." *Bruno*, 383 F.3d at 91. Here, those factors—individually and in combination—require vacatur.[8]

1. The wire fraud and conspiracy counts dominated the government's evidence and its arguments to the jury. Of the 15 witnesses the government presented over the four-week trial, only a single one—an FBI agent—offered evidence relating to the § 1001 count, in a mere 21 pages of the nearly 3,000-page trial transcript.

The government used the wire fraud and conspiracy counts to lump all Defendants together—even though Gerardi was not involved in the Buffalo RFP—and to disparage them as fraudsters and liars who took advantage of a non-profit organization. It hammered this theme over and over in its jury arguments:

- "This is a case about lying and cheating" (A1012/37);
- Defendants "lied, cheated, and tricked the non-profit" (A1013/39);

---

[8] *See also* Gerardi Br. (Dkt. 209), at 49-60; Gerardi Reply (Dkt. 267), at 30-36.

- "[T]he reason for all the secrecy, for all the lies … is because the defendants defrauded the SUNY nonprofit and duped it into picking the defendants' companies" (A1015/49);

- "These defendants lied repeatedly and they lied to everyone" (A1459/2464);

- Defendants "lied to Fort Schuyler to get what they wanted.  And that's at the heart of the crimes that these defendants are charged with" (A1461/2473);

- "These men did not want to play by the rules.  They were not willing to play fair or honest" (A1474/2531).

The government then wove Gerardi's proffer session into this larger narrative of fraud and deceit, telling the jury he "lie[d] … to the government to get away with fraud."  (A1459/2464).

In *Rooney*, this Court concluded that an isolated line in the government's summation was sufficient to "incite or arouse the jury into convicting" on separate § 1001 counts, because the comment had a "decidedly pejorative connotation."  37 F.3d at 856-57.  Here the government's incendiary comments were far more pervasive, smearing not only Gerardi but also those with whom he supposedly associated as deceptive, manipulative, and untruthful.  Once the jury decided to convict on wire fraud and conspiracy counts, it was all but certain they would convict Gerardi on the tag-along § 1001 count as well.

2.  This Court recognizes that "spillover prejudice is likely to occur" when "evidence is introduced on the invalidated count[s] that would otherwise be inadmissible on the remaining count[], *and* this evidence is presented in such a

39

manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining count[]." *Id.* at 856.

That is exactly what happened here. Every count at trial concerned alleged RFP tailoring. There was no way for the jury to associate certain evidence with certain counts, and other evidence with others. And the vast majority (including the most inflammatory proof) would have been inadmissible in a trial focused solely on the false statement count. For instance, there were numerous exhibits and many days of testimony devoted to purported efforts to tailor the Buffalo RFP—which Gerardi had nothing to do with—and far less evidence concerning the Syracuse RFP. (*See* A1394/2085 (district court acknowledging that the evidence regarding the Syracuse RFP was "thinner" than Buffalo)). This evidence included, among other things, testimony and exhibits about other (non-Syracuse) Defendants' deleted emails and use of personal email accounts and other services supposedly to avoid detection, and highly inflammatory evidence about certain Defendants' ties to Governor Cuomo. (*See* Gerardi Br. (Dkt. 209), at 55-56).

The government's lengthy presentation of alleged "criminal activities in which [Gerardi] did not participate" makes it "highly likely" that that evidence prejudiced him in the eyes of the jury. *United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996). In *Bruno*, for example, this Court vacated a § 1001 conviction because of the "enormous amount of prejudicial spillover evidence admitted" for

subsequently reversed RICO counts, "all but a tiny sliver" of which was irrelevant to the false statement count. 383 F.3d at 91; *see also*, *e.g.*, *United States v. Abdelaziz*, 68 F.4th 1, 55-58 (1st Cir. 2023) (in "Varsity Blues" case, finding prejudicial spillover from government's failure to prove a nationwide conspiracy that enabled the jury to impute other parents' misconduct to defendants).[9]

Moreover, as discussed, "the prosecution encouraged the jury to consider the evidence on [the wire fraud and conspiracy counts] as bearing on [Gerardi's] culpability on" the § 1001 count. *Rooney*, 37 F.3d at 856. The government exhorted the jury: "[T]hink about all of these lies, all of the concealment, the destruction of evidence. These defendants lied repeatedly and they lied to everyone." (A1459/2464).

3. The third factor also weighs heavily in favor of vacatur. Not only did the government fail to prove materiality, but also, its proof that Gerardi falsely "den[ied] involvement in tailoring the Syracuse RFP for the benefit of [COR]" was slim at best.

---

[9] The government's claim that all of this evidence would have nonetheless been admitted as context for Gerardi's proffer session (Gov't Br. (Dkt. 238), at 191-92) is nonsensical. No rational judge would have admitted the vast majority of this evidence, particularly the evidence related to the Buffalo RFP and the alleged acts of concealment having nothing to do with the Syracuse RFP. *See United States v. Wright*, 665 F.3d 560, 576 (3d Cir. 2012) (rejecting similar government arguments because "a trial court likely would exclude some of [the evidence] under [FRE] 403 or 404"); *see also* Gerardi Reply (Dkt. 267), at 34-35.

There was no evidence Gerardi "denied involvement in tailoring" the RFP; the closest the government came was the FBI agent's claim that Gerardi said "he did not *ask* for the RFP to be tailored." (A1330/1700 (emphasis added)). But that was literally true. Indeed, the district court and the government acknowledged that any tailoring was not done at Gerardi's request. (A2639 (district court stating that "this scheme originated with and was nudged along by Howe"), A2647/16 (government arguing "it was really Kaloyeros's plan to rig these RFPs")).

The agent also recounted statements in which Gerardi indicated that his handwritten comments on the draft RFP were intended to open it up to more bidder-developers, not to favor COR. (*E.g.*, SA-904 ("He also stated that he was trying to make the RFP as broad as possible so that companies would be able to respond"); A1328/1694-95 (Gerardi wrote "too telegraphed" to mean "too telescoped" and stated "he was concerned that it wouldn't be broad enough for other develop[ment] companies to be able to apply")). But this was indisputably true. COR easily could have met the requirements in the draft RFP that Gerardi received. But Gerardi proposed loosening the RFP's requirements—*e.g.*, softening the experience requirements and removing software, performance bond, and audited financial statement requirements (A1655-60)—which on its face would have made the RFP more competitive, less restrictive, and less tailored to COR.

And other statements the government emphasized—that Gerardi gave Howe comments on the draft RFP as an attorney and a friend, that he did not know why Howe emailed him about adding a "financial institution reference letter" option (A1458-59/2461-64)—were hardly damning evidence that Gerardi falsely "denied involvement in tailoring" the Syracuse RFP.  In short, the evidence pertaining to the false statement charge was far from overwhelming and the jury could easily have convicted him on that count due to the evidence of supposed lies, fraud, and corruption relating to the other counts.  Accordingly, Gerardi was deprived of a fair trial on the false statement charge.

## CONCLUSION

The government chose to try these Defendants on a right-to-control theory, which the government subsequently conceded was invalid.  When the government decides to charge someone with a crime, it does so knowing the law affords it "one fair opportunity to offer whatever proof it c[an] assemble." *Burks*, 437 U.S. at 16. The government had its opportunity, and it failed to prove guilt under a valid theory of the charged crimes.  Defendants are entitled to acquittal on the wire fraud and conspiracy counts.

The Court should also reverse and remand Aiello's honest services fraud conspiracy conviction so that the government can move to dismiss that count.  And

it should reverse Gerardi's false statements conviction and remand with

instructions to grant a judgment of acquittal, or at least a new trial on that count.

Dated:    September 8, 2023

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Fabien M. Thayamballi
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants
Steven Aiello and Joseph Gerardi*

/s/ Spencer L. Durland
Timothy W. Hoover                  Herbert L. Greenman
Spencer L. Durland                 LIPSITZ GREEN SCIME CAMBRIA LLP
HOOVER & DURLAND LLP               42 Delaware Avenue, Suite 300
561 Franklin Street                Buffalo, New York 14202
Buffalo, New York 14202            (716) 849-1333
(716) 800-2600

*Attorneys for Defendant-Appellant Louis Ciminelli*

/s/ Michael C. Miller
Michael C. Miller                  Bruce C. Bishop
Reid H. Weingarten                 STEPTOE & JOHNSON LLP
Michael G. Scavelli                1330 Connecticut Avenue N.W.
STEPTOE & JOHNSON LLP              Washington, D.C. 20036
1114 Avenue of the Americas        (202) 429-6747
New York, New York 10036
(212) 506-3900

*Attorneys for Defendant-Appellant Alain Kaloyeros*

44

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION, TYPEFACE REQUIREMENT, AND <u>TYPE STYLE REQUIREMENT</u>

1.  The undersigned counsel of record for Defendants-Appellants Steven Aiello and Joseph Gerardi certifies that the foregoing brief contains 44 pages and thus complies with the page limit set forth in this Court's Order dated July 10, 2023 (Dkt. 517).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point font of Times New Roman.

Dated:   September 8, 2023

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

45